**Exhibit 4%**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL PARISH, CURTIS L. OATS,      )
LEILA KHOURY, SEAN DRISCOLL, CARLA   )
LOFTON, ROY CLEAVES, LISA BROWN, DAN )
TAYLOR, DEAN MILLER, KEVIN SANDERS,  )
STACEY CLARK, and CARLOTTE WATSON,   )
                                     )
              Plaintiffs,            ) No. 07CV4369
                                     )
        vs.                          )
                                     )
SHERIFF OF COOK COUNTY and COOK      )
COUNTY,                              )
                                     )
              Defendants.            )

        The videotaped deposition of LEILA SAMI

KHOURY, called by the Defendants for examination, taken

pursuant to notice and pursuant to the Federal Rules of

Civil Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

Teresa Resendez, Certified Shorthand Reporter and

Notary Public, at 500 Daley Center, 50 West Washington

Street, Suite 500, Chicago, Illinois, commencing at

1:20 p.m. on the 14th day of September, A.D., 2009.

PERSCRIBO REPORTING, INC. (312) 236-9211

Plaintiffs' Exhibit 41

```
 1   APPEARANCES:

 2        THOMAS G. MORRISSEY, LTD.
          MR. THOMAS G. MORRISSEY
 3        10249 South Western Avenue
          Chicago, Illinois 60643
 4        Phone:  (773)  233-7900

 5            On behalf of the Plaintiffs;

 6        ASSISTANT STATE'S ATTORNEY
          CIVIL ACTIONS BUREAU
 7        MR. FRANCIS J. CATANIA
          500 Daley Center
 8        50 West Washington Street
          Suite 500
 9        Chicago, Illinois  60602
          Phone:  (312) 603-6572
10
              On behalf of the Defendants.
11

12   ALSO PRESENT:  Mr. Brian C. Falk
                    Legal-Ease Video Services
13                  (773) 262-4472

14

15                *   *   *   *   *   *

16

17

18

19

20

21

22

23

24
```

0387a3ce-8e15-4353-8d24-24fca89fb6fd

1                    I N D E X

2    WITNESS                                    PAGE

3    LEILA SAMI KHOURY

4         Direct Examination by Mr. Catania .....   5

5         Cross-Examination by Mr. Morrissey ....  147

6         Redirect Examination by Mr. Catania ...  160

7

8                  E X H I B I T S

9    KHOURY DEPOSITION EXHIBIT

10        No. 1 ................................   89

11        No. 2 ................................  120

12        No. 3 ................................  133

13        No. 4 ................................  135

14        No. 5 ................................  168

15

16

17

18

19

20

21

22

23

24

Plaintiffs' Exhibit 41

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 4

1          THE VIDEOGRAPHER:  We're going on video record at

2     1:20 p.m.  My name is Brian Falk.  I'm the videographer

3     from Legal-Ease Video Services in association with

4     Perscribo Reporting.  My address is 3550 North Lake

5     Shore Drive, Chicago, Illinois.

6               The court reporter is Teresa Resendez of

7     Perscribo Reporting.  This will be the -- pardon me --

8     the videotaped deposition of Leila Khoury taking place

9     today, Monday, September 14th at 50 West Washington,

10    Chicago, Illinois.

11              This deposition is being taken in the matter

12    of Michael Parish, Curtis L. Oats, Leila Khoury, Sean

13    Driscoll, Carla Lofton, Roy Cleaves, Lisa Brown, Dan

14    Taylor, Dean Miller, Kevin Sanders, Stacey Clark, and

15    Carlotte Watson vs. The Sheriff of Cook County and Cook

16    County, in the U.S. District Court for the Northern

17    District of Illinois, Eastern Division,

18    Case No. 07 CV 4369.

19              This deposition is being taken on behalf of

20    the defendant.  The party at whose instance this

21    deposition is being recorded on an audiovisual

22    recording device is the defendant.

23              Will counselors now please announce their

24    appearances for the record.

1      MR. CATANIA:  Francis Catania for the defendants.

2      MR. MORRISSEY:  Thomas Morrissey on behalf of the

3  plaintiff.

4      THE VIDEOGRAPHER:  Will our court reporter now

5  swear the witness, please.

6                (Witness sworn.)

7      THE VIDEOGRAPHER:  Please proceed.

8      MR. CATANIA:  Thank you.

9  WHEREUPON:

10               LEILA SAMI KHOURY,

11  called as a witness herein, having been first duly

12  sworn, was examined and testified as follows:

13               DIRECT EXAMINATION

14  BY MR. CATANIA:

15      Q.   Ma'am, will you please state your full name

16  and spell both your first and last name for the court

17  reporter.

18      A.   Leila Sami Khoury, L E I L A, K H O U R Y.

19      Q.   And did you say you have a middle name?

20      A.   Sami, S A M I.

21      Q.   Ma'am, this is a federal deposition which

22  means basically that I'm going to be asking you a bunch

23  of questions that you're going to answer under oath.

24  The court reporter here is taking down everything that

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 6

1    you say and I say.  And she's going to produce at some

2    point a transcript, a record, which is a printed copy

3    of what's said here today.  You'll be able to read that

4    at some point.  You can review it to determine if it's

5    accurate, and then you will be given an opportunity to

6    sign it or make corrections.  Do you understand that?

7         A.   Yes, I do.

8         Q.   Do you understand that there's also a

9    videographer here who is taking down a videotape of

10   everything that's said by in this deposition?

11        A.   Yes, I do.

12        Q.   All right.  You have the right as the

13   deponent to ask for clarifications, to ask for the

14   definition or the meaning of words.  You have the right

15   to ask questions about documents.  But you need to ask

16   me for all those clarifications.  Okay?

17        A.   I understand.

18        Q.   What that means is, if you don't understand

19   something, it's incumbent upon you to tell me you don't

20   understand.  And then I will try to explain further.

21   But you have to ask me those questions.  All right?

22        A.   Of course.

23        Q.   If you do answer, we're going to assume that

24   you understood the question and then we'll take your

1    answer as the answer to that question.  Okay?

2         A.   Yes.

3         Q.   And if you need to take a bathroom break or

4    any other break at any other time, please just let me

5    know ahead of time.  Or when you need to take the

6    break, there's only one thing that might interrupt you

7    taking an immediate break, and that's if there's a

8    question that I've asked that's pending.  You have to

9    answer that question before we can take a break.  All

10   right?

11        A.   I understand.

12        Q.   Have you ever been deposed before?

13        A.   What do you mean "deposed"?

14        Q.   Sat here and -- with a court reporter --

15        A.   No.

16        Q.   -- taking down your testimony.

17        A.   No.

18        Q.   Have you ever testified in a courtroom

19   before?

20        A.   Yeah.

21        Q.   Okay.  So --

22        A.   Well, I mean, not testified.  But, you know,

23   as a prisoner or somebody that's been arrested.

24        Q.   All right.  You've been arrested before?

Page 8

1        A.   Yeah.  All the testimony is because of my

2    cases.

3        Q.   Okay.  You've gone to court before, right?

4        A.   Many times.

5        Q.   Okay.  And among those many court

6    appearances, have you ever been placed under oath and

7    sworn to tell the truth?

8        A.   Yes, I have.

9        Q.   Okay.  Well, that's kind of what this is

10   here --

11       A.   Okay.

12       Q.   -- today.  It's just like that where your

13   testimony is under oath and you're sworn to tell the

14   truth.  Okay?

15       A.   Okay.

16       Q.   All right.  Could you tell me, what is your

17   date of birth?

18       A.   █████████

19       Q.   Where were you born?

20       A.   Damascus, Syria.  D E M A S C U S; Syria,

21   S Y R I A.

22       Q.   Are you a United States --

23       A.   Yes, I am.

24       Q.   -- citizen?

1           When did you become a citizen?

2      A.   I came in '69.  So it would be five years

3  later.  So that would be '74, I believe.

4      Q.   Okay.  And have you lived in the United

5  States --

6      A.   Yes.

7      Q.   -- since then?

8      A.   Yes.

9      Q.   All right.  Do you have a Social Security

10  number?

11      A.   ▓▓▓▓▓▓▓

12      Q.   ▓▓▓▓▓

13      A.   7▓

14      Q.   ▓▓▓.

15           Okay.  Have you ever been known by any other

16  name?

17      A.   No.  Well, my married name was Barr, but, you

18  know, it's hyphenated on my citizenship.

19      Q.   Okay.

20      A.   So I like Khoury better than Barr.  So I use

21  Leila Khoury instead of Leila Barr.

22      Q.   Are you currently married?

23      A.   No.  I've been divorced since '93, separated

24  in '91.

1        Q.   And what was the name of your exhusband?

2        A.   Ronald Andrew Barr.

3        Q.   Were you divorced in the Circuit Court of

4    Cook County?

5        A.   Yes, here at the Daley Center.

6        Q.   Okay.  And have you ever remarried?

7        A.   No.

8        Q.   Do you have any children?

9        A.   Three.  Jessica, 26; Jeffrey, 22; Gregory,

10   20.

11       Q.   And does Jessica still have the same last

12   name as you?

13       A.   They're all Barr.

14       Q.   They're all Barr.

15            Any of them married?

16       A.   No.

17       Q.   And I'm sorry.  How old is Gregory?

18       A.   Twenty.

19       Q.   Do any of them live with you?

20       A.   None of them.

21       Q.   And where do you currently reside?

22       A.   Hickory Hills.

23       Q.   Do you have an address?

24       A.   ████████████████████████████████████ .

1    Q.   Is that a house or an apartment?

2    A.   House.

3    Q.   And is the house in your name?

4    A.   No.  I live with my parents, Sami and Agnes

5    Khoury.

6    Q.   How long have you lived at that location with

7    your parents?

8    A.   Well, we moved in in '74.  I moved in after

9    the divorce in early '90s, tried it on my own.  I

10   always end up going back.  After treatment, after jail,

11   you know, and God willing, I'll stay there -- I'll

12   never go back to jail.

13   Q.   Within the last ten years, have you had any

14   other addresses?

15   A.   Yeah.  A few for a -- a few months, nothing

16   really, you know, significant.

17   Q.   How long ago did you last have a different

18   address than the one you gave us?

19   A.   Well, my sense of timing is not as good as

20   someone without what I've gone through so I --

21   MR. MORRISSEY:  Just to the best of your

22   recollection.

23   BY THE WITNESS:

24   A.   Maybe August of -- a year -- a year and a

Page 12

1    half ago.  I want to say it will be two years this

2    August.  Wait.  I had my surgery in 2006.  So, yeah,

3    August of 2006, I want to say.

4         Q.   Okay.  In August of 2006, you were living --

5         A.   Yeah.

6         Q.   -- at a different address?

7         A.   Yeah.  At �utty        South Harlem in Worth.  I

8    want to say it's 60428, but I'm not sure.

9         Q.   Was that a house or an apartment.

10        A.   It was an apartment, studio.

11        Q.   Did you live alone there?

12        A.   My son Jeffrey was with me on and off.  You

13   know, his father's in Wisconsin.  So he would visit his

14   father.

15        Q.   All right.  You said you had a surgery in

16   2006?

17        A.   Yes.

18        Q.   What time of the year did you have that

19   surgery?

20        A.   November 16th or 17th.

21        Q.   And what was the surgery for?

22        A.   Breast cancer.

23        Q.   Could you tell me, what is your highest level

24   of education?

Page 13

1       A.   High school.  And I got my cosmetology

2   license the exact following year.  So I've been a

3   hairdresser, make-up artist, licensed since 1979, 1980.

4       Q.   And what high school did you go to?

5       A.   Amos Alonzo Stagg, Palos Hills.

6       Q.   And where did you get your cosmetology --

7   cosmetology --

8       A.   Capri Beauty School -- or Beauty College.

9       Q.   And where was that located?

10      A.   63rd and Narragansett, Chicago.

11      Q.   And you've maintained your license since

12  then?

13      A.   Yes, I have.

14      Q.   What do you have to do to renew your license?

15      A.   Well, not until quite a few years ago, it was

16  just to pay $50 every -- you know, whenever it expires.

17  I think it's every year.  And maybe 15 years ago they

18  started continuous education, or after that, before

19  that.  Like I said, my sense of timing is -- is

20  very ...

21      Q.   So you -- Did you do any continuing education

22  to maintain your certificate?

23      A.   Oh, yes.  Now I don't have to because I've

24  been doing it for a -- you know, a long time.  So just

Page 14

1    pay the fees.

2         Q.   And you say your license is current; is that

3    right?

4         A.   Yes.

5         Q.   And are you working?

6         A.   No.

7         Q.   Where is the last place that you worked?

8         A.   I sold windows prior to the arrest in 2005.

9         Q.   Who did you sell windows for?

10        A.   Energy Savers.

11        Q.   When's the last time you worked for a beauty

12   salon?

13        A.   I want to say in the mid '90s, maybe for like

14   about six months, eight months.

15        Q.   And what salon was that?

16        A.   Great Clips, 30th and Wolf Road.  I don't

17   know.  Is that Westchester or Winchester, something

18   like that?  Not for long.

19        Q.   All right.  You said that your last

20   employment was with the Energy Savers and that was

21   before your surgery, right?

22        A.   That was right before the arrest in 2005.

23        Q.   Right before the arrest?

24        A.   Yes.

Page 15

1    And then I picked up a case at -- You know --
2  Well, I disappeared from work, so they -- I lost my job
3  and I picked up a case.
4    Q.   Okay.  What's the name of the company again?
5    A.   Energy Savers.
6    Q.   And where are they located?
7    A.   They moved, I think, to Frankfort, New
8  Lennox.  I have no idea.  It's been since 2005.
9    Q.   When you worked there, where were they
10  located?
11    A.   Chicago Heights.
12    Q.   And what was the name of your supervisor?
13    A.   William Shaheen, S H A H E E N, Shaheen.
14    Q.   And you say you think they might be in
15  Frankfort or --
16    A.   Frankfort.  I don't know.  183rd, past Wolf
17  Road somewhere.  I think it's 183rd.
18    Q.   Now, you said that you were arrested in 2005?
19    A.   Mm-hmm.
20    Q.   Is that right?
21    A.   Yes.
22    Q.   Is that the case that we're here to discuss
23  today?
24    A.   Yes, it is.

Plaintiffs' Exhibit 41                                    Page 15

Page 16

1        Q.   Okay.  I have in front of me a complaint that

2   was filed naming you.  It's the Document 21 under our

3   Case No. 07 4369.  And paragraphs 23 through 31 are the

4   ones that are under your name.  I'm going to show it to

5   the attorney just so he knows what we're talking about.

6        MR. MORRISSEY:  Do you have an extra copy for me?

7        MR. CATANIA:  No.  Mr. Flaxman, I believe, wrote

8   it.

9   BY MR. CATANIA:

10       Q.   I'm going to show you that document as soon

11   as your lawyer is done looking at it.

12            But when is the first time you became aware

13   that you were involved in this lawsuit, this civil

14   rights lawsuit?

15       A.   I'm the one that initiated it, I believe.

16       Q.   Okay.  And when you initiated it, was that in

17   2005 or --

18       A.   I --

19       Q.   -- 2006?

20       A.   2006, I think.  I don't know.

21       Q.   Do you have a driver's license?

22       A.   I got a ticket, actually.

23       Q.   Do you have a state ID?

24       A.   Yes, I do.  It's expired.  But I do have my

Page 17

1    passport.

2         Q.    Could I see your ticket and your ID, please.

3    You could show it to your lawyer first.

4         A.    I don't know if I have that.  That's probably

5    why I grabbed my passport.  I'm not sure if I have my

6    ticket.  Oh, yeah, I do, inside my passport.

7              It was a car accident.  If you want to look

8    at that.

9         MR. CATANIA:  Did you want to look at them first,

10   Tom?

11        MR. MORRISSEY:  I don't know how it's relevant to

12   this lawsuit.

13        MR. CATANIA:  I've been handed a couple of

14   complaints written on the Uniform Traffic Citation

15   form.  Both are written in the name of Leila Khoury,

16   giving the address of 8930 West 93rd Place, Hickory

17   Hills, with a license number of _____, listing

18   a date of birth of April 2, 1961.  And both were

19   written, looks like, on September 2nd of '09 at around

20   2:00 p.m.  The complaint numbers are YP 373189 with a

21   charge of 3707, and YP 37188 with a charge of 11, dash,

22   601A.

23   BY MR. CATANIA:

24        Q.    Is that the same information that's on your

Page 18

1    Illinois state ID card?

2         A.   Yes.

3         Q.   And your driver's license?

4         A.   Yes.

5         Q.   In fact, is that the information that came

6    off of your Illinois driver's license?

7         A.   This, yes.  The ticket, yes.

8         Q.   All right.  Now, you said that you picked up

9    a case in 2005.  What do you mean you "picked up a

10   case"?

11        A.   I was arrested for possession of cocaine.

12             I can't answer you and read at the same time.

13   I'm sorry.

14        Q.   I understand.  I wasn't asking you to read

15   that yet.  I just wanted you to know --

16        MR. MORRISSEY:  I would like to give the deponent

17   a chance to read the allegations that were made in the

18   complaint.

19   BY THE WITNESS:

20        A.   And I'm a slow reader.  And my

21   comprehension's not well, so I may have to reread

22   sentences so ...

23        Q.   Well, why don't you take a moment and read it

24   for Tom's sake.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 19

1      MR. MORRISSEY:  I believe the deponent said that

2  she -- you showed her a document.  You asked her to

3  look at it.  And now we're taking time so the deponent

4  can look at the document that you asked her to read.

5           So proceed, Ms. Khoury.

6  BY THE WITNESS:

7      A.   Ignored this order?

8      MR. MORRISSEY:  Ms. Khoury, there is no question

9  pending.

10      THE WITNESS:  I'm sorry.  Okay.

11  BY THE WITNESS:

12      A.   I guess that's --

13      MR. MORRISSEY:  There is no question pending.

14  BY THE WITNESS:

15      A.   Okay.  I read that to the best of my ability.

16      Q.   All right.  You had a chance to read the

17  paragraphs that were listed under your name starting at

18  23 and going to 31; is that right?

19      A.   Yes, it is.

20      Q.   Okay.

21      A.   I may need to refer back to that, you know,

22  if you ask me questions that I don't --

23      MR. MORRISSEY:  There is no question pending,

24  Ms. Khoury.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 20

```
 1        THE WITNESS:  Okay.

 2        MR. MORRISSEY:  Just answer what he asks.

 3        THE WITNESS:  Okay.

 4   BY MR. CATANIA:

 5        Q.  All right.  Paragraph 23 says "Plaintiff

 6   Leila Khoury was admitted to the jail on or about

 7   November 5, 2005, and remained incarcerated there until

 8   January 3, 2006, when she was enlarged on bond."  Do

 9   you remember that paragraph?

10        A.  Yeah.  I was bonded out.

11        Q.  Is that true?

12        A.  Yes.

13        Q.  Okay.  It says that you were admitted to the

14   jail on November 5 of 2005.  Did you have a bond

15   hearing --

16        A.  Yeah.

17        Q.  -- on that day?

18            Where did you have that bond hearing?

19        A.  Bridgeview courthouse.

20        Q.  Okay.  And were you actually at the

21   Bridgeview courthouse?

22        A.  Yes.

23        Q.  Were you actually transferred in on that day

24   from the courthouse to the jail?
```

1       A.   No.  I was in jail, I believe, prior to that.

2   I can't remember.

3       Q.   Okay.

4       A.   I remember the board -- you know, the judge

5   and --

6       Q.   Right.

7       A.   -- going to jail.

8       Q.   Do you remember the amount of the bond?

9       A.   50,000.

10      Q.   And you were not able to post that, right?

11      A.   No.

12      Q.   All right.  Before you were given the bond

13   amount, were you in a hospital or anywhere before that?

14      A.   Yes.

15      Q.   What hospital?

16      A.   Christ Hospital in Oak Lawn.

17      Q.   What were you there for?

18      A.   Panic attack and anxiety attack that occurred

19   at the police station.

20      Q.   All right.  Before you went to Christ

21   Hospital -- And that's in Oak Lawn, right?

22      A.   Yes.

23      Q.   Before you went to Christ Hospital, you were

24   at a police station?

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 22

1      A.   Yes.

2      Q.   What station?

3      A.   Justice, Illinois, on Archer.

4      Q.   At that time did you have an address in

5  Justice, Illinois?

6      A.   Yes.

7      Q.   What was the address?

8      A.   I was staying with my daughter.  What is it?

9  It's on 83rd Place, and it was west of -- I was there

10 only -- I was there a year and a half.  But 6405, I

11 want to say.  No.  See, numbers and stuff -- Let me

12 think.  Because I've had so many address, I can't keep

13 up with the numbers.

14     Q.   Okay.  That's fine.

15     A.   7945, something like that, because it's west

16 of Roberts Road by one block.

17     Q.   All right.

18     A.   I think it was like 8345 or something.  I

19 don't know.

20     Q.   And where was it that you were arrested?

21     A.   In the apartment.

22     Q.   Okay.  You were arrested at your daughter's

23 home?

24     A.   Uh-huh.  Well, actually, she moved out, got a

Page 23

1    new apartment because of my relapse.  So I was going to

2    try to take over the apartment, but I was incarcerated.

3          Q.   Okay.  Justice police arrested you?

4          A.   Yes, they did.

5          Q.   And they brought you to their police station?

6          A.   Yes.

7          Q.   All right.  When you arrived at the Justice

8    police station, was that on or about November of '05?

9          A.   It was whatever the day they said.

10         Q.   Okay.

11         A.   Yeah.

12         Q.   All right.  Were you taken to a processing

13   area at the police station?

14         A.   Yes, I was.

15         Q.   Were you asked questions during processing?

16         A.   Of course.

17         Q.   Were you fingerprinted?

18         A.   Yes.

19         Q.   Photographed?

20         A.   Yes.

21         Q.   And were they -- Did they tell you what the

22   charge was?

23         A.   Of course.

24         Q.   And that was possession of a controlled

Page 24

1   substance --

2        A.   Yes.

3        Q.   -- cocaine?

4             Okay.  In the questioning prior to being

5   placed in their lockup, were you asked questions about

6   your medical conditions?

7        A.   Of course.

8        Q.   What medical conditions did you tell them you

9   were suffering from at that time?

10       A.   I told them that I take psychotropic

11  medications since 1991 and that I needed somebody from

12  home to bring them down because -- so I can take my

13  medication in the evening.

14       Q.   When you were arrested by the Justice Police

15  Department, you were at home, right?

16       A.   Yes.

17       Q.   You didn't bring any of the medicines with

18  you at that time?

19       A.   They don't give you a chance.

20       Q.   Okay.  But you didn't bring any medicines

21  with you?

22       A.   No.

23       Q.   So when you were at the police station, you

24  informed them that you had medications?

1    A.   Yes.

2    Q.   What medications?

3    A.   Well, at that time -- It's been changed since

4    then.  But I believe it was Trileptal, Buspar,

5    Klonopin, Prevacid, Temazepam.  I can get you the

6    records for --

7         MR. MORRISSEY:  There is no question pending.

8    BY THE WITNESS:

9    A.   I don't know.  It's been changed so many

10   times.

11   Q.   All right.  The Trileptal, who prescribed

12   that medicine?

13   A.   I was seeing Dr. Cusick at that time.

14   Q.   Dr. Cusick?

15   A.   Yes.

16   Q.   Could you spell the name for me?

17   A.   C U S I C K.

18   Q.   And where is Dr. Cusick located?

19   A.   Right now he moved -- He was in North

20   Riverside -- or Riverside.  I believe he's on Ogden off

21   of 294.

22   Q.   Do you still see Dr. Cusick?

23   A.   No, I don't.

24   Q.   When is the last time you saw him?

Page 26

1      A.   I believe right after surgery, maybe, early

2   2006.

3      Q.   When did he prescribe the Trileptal?

4      A.   Three years, four -- I -- Years, years

5   before.  I've changed doctors because you like one, you

6   don't like one.  So I ...

7      Q.   Okay.  The Buspar, I believe is what you

8   said --

9      A.   The Buspar.

10      Q.   What is that?

11      A.   That's -- Well, the Trileptal is a mood

12   stabilizer.  The Buspar is for anxiety.

13      Q.   Do you know how to spell that?

14      A.   B U S P A R.

15      Q.   Thank you.

16           Who prescribed that?

17      A.   Dr. Cusick.

18      Q.   Also at Riverside?

19      A.   Yeah.  At that time I believe that's the

20   medication that he prescribed.

21      Q.   Okay.  And you mentioned --

22      A.   To my best of ability, you know, knowledge.

23      Q.   You mentioned Klonopin?

24      A.   Klonopin, yes.

1       Q.   Okay.  When was that prescribed and by whom?

2       A.   Dr. Cusick, I believe.  I think I was even

3    taking it prior to that.  And that's for, you know, the

4    anxiety and the panic attacks.

5            The Buspar is also -- is -- it works with the

6    manic depressive medication somehow.  You know, I'm not

7    a doctor, so ...

8       Q.   Is Dr. Cusick the one that said -- first

9    diagnosed you?

10      A.   No.  Dr. Busch or -- B U S C H.  I believe

11   that was at Christ Hospital when they used to have a

12   30-day program back in '91, '92.

13      Q.   So in '91 or '92, you were first diagnosed

14   by --

15      A.   Yes.

16      Q.   -- Dr. Busch?

17      A.   Yes.

18      Q.   What was the diagnosis?

19      A.   Dual diagnosis.

20      Q.   What were they?

21      A.   Bipolar and addiction.  They used to call it

22   manic depression back then.

23      Q.   Is Dr. Busch an emergency room physician?

24      A.   No.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 28

1      Q.   What is his specialty?

2      A.   He's a psychiatrist.

3      Q.   Do you still see Dr. Busch?

4      A.   No, I don't.

5      Q.   When is the last time you saw him?

6      A.   When he stopped taking Medicaid.

7      Q.   When was that?

8      A.   I'm trying to associate it between jobs.

9   Well, it was before Dr. Cusick.  So that had to have

10  been early '90s, mid '90s.

11     Q.   To your knowledge, is he still practicing as

12  a psychiatrist?

13     A.   Yeah.  I believe his office is still on --

14  off of Harlem, I think, Cal Sag Road east,

15  123 something.

16     Q.   Does Dr. Cusick have admitting privileges at

17  Christ Hospital?

18     A.   On -- I'm not sure.  But I -- Dr. Cusick was

19  from MacNeal, and Dr. Busch was from Christ.

20     Q.   Have you been treated at MacNeal?

21     A.   Yes, I have.

22     Q.   When was the last time you were treated at

23  MacNeal?

24     A.   Well, last time was right after I was -- the

Page 29

1    same day I was released from Cook County.  That was the

2    last time.

3         Q.   Would that be January 3rd?

4         A.   January 3rd, yes.  That was the last time,

5    and that was for many things.

6         Q.   Okay.

7         A.   Prior to that, years, I've been in and out of

8    psych units and hospitals.  I can't remember how many.

9         Q.   Okay.  It was a dual diagnosis made by

10   Dr. Busch; is that right?

11        A.   Yes.

12        Q.   What was the treatment plan that Dr. Busch

13   imposed in 1991/'92?

14        A.   I started taking Lithium, a few other things.

15   But I was breaking out with boils, so he had to change

16   it.  And I think he put me on Depakote.  You know,

17   it's -- It's a hit and miss with psych meds.  You know,

18   you take them and then --

19        Q.   When Dr. --

20        A.   -- you finally get the right one.

21        Q.   Sorry.

22             When Dr. Busch prescribed the things that you

23   described, Lithium and Depakote and other -- other

24   things --

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 30

1        A.    Well, first it started with Lithium.   Then we

2    tried Prozac, and then we tried Depakote.   Prozac

3    didn't help at all.   Lithium, I was allergic to, gave

4    me a skin condition.   Depakote didn't do anything.

5    Like I said, I need a printout from Walgreens.

6        Q.    All right.   Is Walgreens where you had filled

7    your prescriptions during that whole period of time?

8        A.    Yes.

9        Q.    Okay.   Have you ever obtained a list of the

10   prescriptions that you've been taking?

11       A.    Yes, I have.

12       Q.    And do you have that with you?

13       A.    No, I don't.   Cook County does.

14       Q.    Did you review that list of prescriptions

15   before testifying today?

16       A.    I was in jail.

17             No, I don't have it.   Christ -- Cook County

18   Jail has it.

19       Q.    Tell me how that happened.   How does --

20       A.    My mom --

21       Q.    -- Cook County Jail have your list of

22   prescriptions?

23       A.    My mom gave it to them or mailed it, one of

24   the two.   They got it.   Mailed it, obviously.   I don't

Page 31

1     think she would drive down there.

2          Q.    What is your basis of information that the

3     Cook County has your Walgreens prescription history?

4          A.    What -- Say that again.

5          Q.    Your basis of knowledge.  How do you know

6     that?

7          A.    My mom mailed it.

8          Q.    Did she tell you that?

9          A.    Yeah.  She mailed millions of things.

10         Q.    So it's based on her telling you that you say

11    you know this, right?

12         A.    Yeah.  I -- 95 percent sure.  I'll have to

13    ask her again whether she mailed it or she brought it

14    to court.  All I know is that, you know, we did

15    something with it.

16         Q.    And when was that?

17         A.    2005.  January -- I mean, November,

18    December -- November.

19         Q.    Has she updated that list at all during the

20    period of time of '05 to the present?

21         A.    I never had another one printed out.  But,

22    yeah, it's definitely different because the medication

23    has been changed.

24         Q.    Okay.  So your medications have changed since

1    then?

2          A.    Since after jail, yes.

3          Q.    All right.

4          A.    And they're still changing them.

5          Q.    You're 95 percent sure that your mom either

6    mailed it or brought it to court; is that right?

7          MR. MORRISSEY:  I'm going to object.

8    BY THE WITNESS:

9          A.    I don't know --

10         MR. MORRISSEY:  You're arguing with the witness.

11   She already testified to the best of her knowledge her

12   mother --

13         THE WITNESS:  Right.

14         MR. MORRISSEY:  -- conveyed the information.

15   Let's move on.

16   BY MR. CATANIA:

17         Q.    This is all part of the case.  Are you saying

18   that your mother brought the prescription list from

19   Walgreens to court where you were being heard in court

20   or someplace else?

21         A.    I don't know.

22         Q.    Okay.

23         A.    Maybe she didn't bring it at all.  I will

24   have to ask her if you would like.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 33

```
 1        Q.   Okay.  I just want to know what it is that
 2   you know today about this situation.
 3        A.   I know that we got one.
 4        Q.   Okay.  All right.  I know that you said
 5   you've testified in court, been under oath in court.
 6   Have you ever filed any lawsuits before this one?
 7        A.   No.
 8        Q.   So you've never challenged your treatment by
 9   a physician; is that right?
10        A.   No.
11        Q.   Okay.  Have you ever been in the military?
12        A.   No.
13        Q.   Do you have any prior felony convictions?
14        A.   Yes.
15        Q.   For what?
16        A.   Possession.
17        Q.   And by that, you mean possession of a
18   controlled substance?
19        A.   Yes.
20        Q.   How many convictions?
21        A.   And one theft to get drugs.
22             Six, seven, eight.
23        Q.   Okay.
24        A.   I don't know.  Many.
```

Page 34

1      Q.   And the theft, was that the first arrest and

2    conviction you had?

3      A.   Actually, I was just in the vehicle.  So --

4    Yeah, that was the first.  And -- Well, it was a

5    Class F or it was a burglary.  And then they dropped it

6    to a misdemeanor because the witness testified that I

7    wasn't carrying anything.  So it eventually went to a

8    misdemeanor.  But they haven't changed it, so it still

9    shows as a Class F, I think.

10     Q.   It's a conviction, though, right?

11     A.   Yeah.  I got probation.

12     Q.   Probation.

13          And as far as you know, that first one was

14   for theft, right?

15     A.   Or whichever was the greater.  The Class F is

16   what they first initiated, guilty.  I took the guilty

17   plea.  Then I rebuked it within 30 days of the letter.

18   And then when I went back in front of the judge, we

19   went to trial.  And it was proven that I wasn't

20   stealing, that I was just in the vehicle.  And it was

21   dropped from a felony to a misdemeanor.

22     Q.   Okay.  All right.  And since then you've had

23   several convictions for felonies, namely, possession of

24   a controlled --

1     A.    Yep.

2     Q.    -- substance?

3           All right.  Can you tell me all of the

4  diagnoses that you had before you were transferred from

5  Christ Hospital to the County jail in November of '05?

6     A.    You want me to tell you what now?

7     Q.    Your diagnoses.

8     A.    Well, I was having a panic attack, anxiety

9  attack.  I don't know what my diagnosis is because they

10 never really told me or I asked.

11    Q.    Did you have the panic attack as a result of

12 being arrested?

13    A.    Yes.

14    Q.    And that was, again, Justice police, right?

15    A.    Yes.

16    Q.    Okay.

17    A.    Every time I've gotten arrested, I ended up

18 in a hospital.

19    Q.    All right.  Had you ever filed suit against

20 the Justice Police Department?

21    A.    There was no reason to.

22    Q.    I'm sorry?  No reason to?

23    A.    Why -- Why -- No.

24    Q.    All right.  Because of the panic attack, is

Page 36

1    what I meant.

2         A.   They took me to the hospital.

3         Q.   All right.  When you were taken to the

4    hospital, did they do any examination?

5         A.   They handcuffed me, gave me a catheter,

6    obviously took blood work, just a -- original

7    procedure.  And I told them I was on my medication,

8    gave them a list.  They asked about surgeries and so

9    forth.

10        Q.   Okay.

11        A.   They know my history, so ...

12        Q.   Christ does?

13        A.   Yeah.

14        Q.   Okay.  Christ Hospital knows?

15        A.   Mm-hmm.

16        Q.   Okay.  And you were transferred from Christ

17   Hospital to Cook County Jail?

18        A.   Yes.  Directly.

19        Q.   All right.  In order for that to happen, was

20   there a physician who released you from Christ

21   Hospital?

22        A.   If that's their procedure, then, obviously,

23   yes.

24        Q.   Do you know who that doctor was?

```
 1        A.    No, I don't.

 2        Q.    Okay.  Were you admitted into Christ

 3   Hospital?

 4        A.    I was there a few days, yeah.

 5        Q.    A few days?

 6        A.    Two, three days.

 7        Q.    During which time they ran tests?

 8        A.    Every -- Yeah.

 9        Q.    Okay.

10        A.    They all do.

11        Q.    Did you receive any medication when you were

12   at Christ Hospital?

13        A.    Yes.

14        Q.    What medication?

15        A.    My psych medication.  I mean, I don't see why

16   they would deny me.  I mean, actually --

17        MR. MORRISSEY:  Just answer the question.

18        THE WITNESS:  Right.

19   BY MR. CATANIA:

20        Q.    All right.  You received medication that you

21   say was psych medication, right?

22        A.    My normal medication, yes.

23        Q.    What at that time were those medications?

24        A.    I don't remember.  Let me think.  Okay.
```

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 38

1    Yeah.  I was taking the Trileptal.  I was taking pretty

2    much whatever Dr. Cusick has given me.  There might

3    have been one or two more.  But it's pretty much the

4    mania, the depression, the sleeping, the anxiety,

5    whatever is needed for those conditions.

6         Q.   Okay.  At that time, in that time frame

7    before your arrest in November of '05, were you also

8    using illegal drugs?

9         A.   On occasion, yes.

10        Q.   What illegal drugs were you using?

11        A.   Cocaine, maybe a little marijuana.  That's

12   about it.

13        Q.   Okay.  Aside from cocaine and marijuana, have

14   you used any other illegal drugs?

15        A.   Yeah.  But not at that time.  I have tried

16   heroine since, you know, my incarceration was -- When I

17   left prison, I've tried that.

18        Q.   Was that many years ago when you left prison

19   and tried heroine?

20        A.   I got of jail in 2006.

21        Q.   Okay.

22        A.   July 27th.  And after surgery -- No.

23   July 2006.  And after surgery in November when I had

24   relapsed, I played around with heroine and crack again

Page 39

1    for a little bit.

2          Q.   Between release in July of '06 and November

3    of '06, is that when you were using --

4          A.   No.  It was after November '06 after I had

5    the surgery.

6          Q.   Until that point, you had used cocaine and

7    marijuana?

8          A.   Yes.  I was introduced to cocaine in '90 --

9    in '87, '88.

10         Q.   1988?

11         A.   '89.

12         Q.   All right.  And at the time you were being

13   treated by --

14         A.   Dr. Busch in --

15         Q.   Dr. Busch?

16         A.   Yes.

17         Q.   Were you using cocaine at that time?

18         A.   Prior to -- Yeah.  Before I went into the

19   30-day program, yes.

20         Q.   How about after that?

21         A.   I relapsed after that.  I don't know when.

22   But I was in denial about the psych meds, so I stopped

23   taking them.  And shortly after that, I had relapsed.

24         Q.   Okay.  You stopped taking the meds that were

Page 40

1    prescribed by --

2         A.   I didn't think I needed them.

3         Q.   Okay.  And then as a result of stopping

4    those, you started using street drugs?

5         A.   I relapsed and then I was arrested again.

6         Q.   All right.

7         A.   And that happened like three, four times.

8         Q.   All right.

9         A.   Three times.

10        Q.   All right.  As I understand, the Trileptal

11   was prescribed to you before you entered into the jail?

12        A.   Yes.

13        Q.   Any other drugs that you recall before you --

14        A.   All the drugs that I mentioned earlier, if

15   not more because --

16        Q.   Were those medications that you were

17   prescribed before entering the jail -- were they

18   effective?

19        A.   Yes.

20        Q.   What were they effective to do?

21        A.   Well, I didn't make hasty decisions.  I mean,

22   I was still the lively, bubbly person I was.  They made

23   me a little bit tired at first, you know, until they

24   leveled off in my system.  And people -- I -- You know,

Page 41

1    I felt better, you know, but my actions -- People said

2    that my behavior changed -- changed -- Because people

3    see me better than I see myself.  I mean, that's just a

4    general comment.  And everybody said I was a totally

5    different person.

6         Q.   At the time when you were taking the

7    medications before entering into the Cook County Jail,

8    did you undertake any other treatments outside of

9    prescriptions?

10        A.   What do you mean "treatments outside of

11   prescriptions"?

12        Q.   Did you undergo any kind of regimen to

13   improve your health?

14        A.   Oh, I see a psychiatrist every month.

15        Q.   Did you do any diet or exercise during that

16   period of time?

17        A.   Yeah.  I mean, I bike ride.  I would swim.

18   My parents have a pool.  I used to work, waitress.  So,

19   yeah, I was active.

20        Q.   Okay.  I know you've mentioned that you had a

21   bout with cancer.  Did you have any other physical

22   disease or defect before the incarceration in '05?

23        A.   In '82, I had my ovary removed because of a

24   cyst, and my appendix.  Broke my ribs once, my nose.  I

Page 42

1    had carpal tunnel surgery.

2         Q.   When did you have the carpal tunnel surgery?

3         A.   Maybe like -- It was -- That was like two

4    years ago.

5              And I had sleep apnea surgery in 2000.  I

6    sleep with a machine.

7         Q.   When was it that you had sleep apnea?

8         A.   Well, I had the surgery in 2000.  But I was

9    told that I would stop breathing and snore many years

10   prior to that, you know.

11        Q.   Do you know what the cause of the apnea was?

12        A.   Well, what it is is the muscles sleep in your

13   throat and it closes the breathing canal.  And the CPAP

14   machine is a continuous airflow pressure that keeps

15   your throat open.  And I had the surgery, had my

16   tonsils out.  And they opened up my throat area, fixed

17   my broken nose.  And I sleep with a machine.  And I'm

18   okay now.

19        Q.   Okay.  Do you currently sleep with a --

20        A.   Yes, I do.

21        Q.   -- sleep apnea machine?

22        A.   I -- I won't sleep without it.

23        Q.   Is it an alarm?

24        A.   No.  What it is is a continuous air pressure

Page 43

1   that is in a mask that is -- has different pressures

2   depending on what the test results were.  And I sleep

3   with that every day so I don't wake up in the REM stage

4   because not a good night's sleep is not healthy for

5   people who are bipolar.

6        Q.   Okay.  When did you start using that

7   particular machine?

8        A.   Well, I started in 2000.  It was very hard

9   getting used to -- so I would go back and forth with

10  it -- because it was a full mask.  And then we tried

11  the nasal mask, then, you know, like the oxygen thing.

12            And then they came up with just a nasal mask,

13  and that's what I'm using because that's most

14  comfortable.  And that's the one I don't rip off my

15  face in the middle of the night like I used to with the

16  rest of them.  So after six -- nine years, we finally

17  got the right mask that fits.

18       Q.   I take it that when you were in the custody

19  of the Justice Police Department, you did not have your

20  sleep apnea machine --

21       A.   No, neither did I in Cook County.  And I told

22  them that too.

23       Q.   Okay.  And the result of not having the sleep

24  apnea machine in Cook County was that you had times

Page 44

1   when you didn't sleep well; is that right?

2        A.   Oh, yeah.  And a lot of girls got really

3   angry because they couldn't sleep well either because I

4   was snoring so loud, and almost got in a few fights

5   over it and so ...

6        Q.   But you didn't get in any fights over it,

7   right?

8        A.   A lot of arguments, a lot of food -- It

9   wasn't comfortable and it didn't help.

10       Q.   You didn't certainly expect it to be

11  comfortable in the jail, did you?

12       A.   Of course not.  But I've been there three,

13  four -- three times before.  And I knew what to expect.

14  And this was definitely a different experience than the

15  prior times.

16       Q.   In the three to four times you were there

17  before, did you have the sleep apnea machine?

18       A.   I didn't -- wasn't using it.  I've only been

19  using it faithfully for the past maybe four years, five

20  years, you know, since -- Prior to my surgery -- Right

21  after my surgery, I went for the test, I believe.

22       Q.   Okay.

23       A.   But no.  The prior times in jail, '92, '94,

24  '96, or whatever, I wasn't using -- I mean, using --

Page 45

1    wasn't even tested for sleep apnea.

2        Q.   Okay.  But you could have had it at the time,

3    just not have been aware of it?

4        A.   Oh, right, yeah, I've been told you can --

5    like a freight train.

6        Q.   Any other physical injuries that you had

7    before you entered in November of '05, entered into the

8    jail?

9        A.   Well, I was in a car accident.  I needed many

10   stitches on my knee but --

11       Q.   And how long ago --

12       A.   That was in '92 when I broke my ribs and my

13   nose in a car accident.

14       Q.   Ribs, nose, and your leg --

15       A.   And I cut my knee.  Yeah.

16       Q.   Okay.

17       A.   No seat belt.

18       Q.   I think that we identified when it was that

19   you were first diagnosed with the mental illness.  Is

20   anybody in your family suffering from any mental

21   illness besides you?

22       A.   My mom says she's all depressed all the time.

23   But, you know, she handles it.  She's okay.

24       Q.   How about your children, any of them?

Page 46

1         A.   I believe Jeffrey, my 22-year-old, behaves --
2    shows symptoms that I experienced when I was his age.
3    And now that I have knowledge of the illness, I would
4    say 99.9 percent that my son suffers from bipolar
5    because he's a recovering addict also.
6         Q.   Okay.  Based on your experience and your
7    knowledge of your own disease, you believe that it's
8    possible that Jeffrey also has bipolar?
9         A.   Yes.
10        Q.   Has he ever been diagnosed --
11        A.   And he's fought with one doctor.  Yes.  And
12   they told him he has to get off the stuff before they
13   can really diagnose him properly.  But, like I said, he
14   behaves just like I did when I was his age.  And the
15   doctor did put him on Clonidine.  But he did not take
16   it faithfully.  And he doesn't believe he's bipolar
17   like I didn't believe I was bipolar for ten years.
18        Q.   Okay.
19        A.   And that's why I went back and forth to jail.
20        Q.   And at the time when you were diagnosed with
21   this bipolar disorder, you were also diagnosed with an
22   addictive personality --
23        A.   Yes, I was.
24        Q.   -- disorder; is that right?

```
 1              And that was because of the same thing,

 2    cocaine, marijuana?

 3        A.   Yes, addiction -- Right.  I was -- I became

 4    addicted to crack cocaine --

 5        Q.   Okay.

 6        A.   -- in the late '80s.

 7              Prior to that, I played around a little bit

 8    here and there.  But not until I unfortunately met the

 9    drug of choice that's -- that I, you know -- that made

10    me feel good.  You know, release the serotonins,

11    endorphins.  You know what it does.

12        MR. MORRISSEY:  You've --

13        THE WITNESS:  Okay.

14    BY MR. CATANIA:

15        Q.   All right.  So that's the basis for which you

16    think that Jeffrey shows symptoms of the same problems;

17    is that right?

18        A.   Well, the behavior, the angry, the blurting

19    out things and, you know ...

20        Q.   Is Jeffrey also using cocaine?

21        A.   No, he's not.

22        MR. MORRISSEY:  Mr. Catania, the issue is not her

23    son.  Can you move on.

24        MR. CATANIA:  This is a deposition.  And, in fact,
```

1   it's a federal deposition, sir.

2       MR. MORRISSEY:  That's true.  But the issue in

3   this case is not her son's condition.  It's her claim

4   that she did not receive medication at the Cook County

5   Jail.  Can you proceed.

6       MR. CATANIA:  I will proceed.

7   BY MR. CATANIA:

8       Q.  Can you tell me, has Jeffrey been diagnosed

9   in any other way by a physician with a mental illness?

10      MR. MORRISSEY:  I'm going to object.  I don't see

11  how the physical or mental condition of her son has any

12  bearing in regards to Ms. Khoury's claim in this case.

13  And I asked you to move on.  Will you please move on?

14      MR. CATANIA:  And I apologize for you not

15  understanding that this is a federal deposition and it

16  is relevant and it may lead to discoverable evidence,

17  which is the point of it.

18      MR. MORRISSEY:  Well --

19  BY THE WITNESS:

20      A.  Well, my father's controlling.  Does that

21  mean that he has to have a doctor tell him that he's

22  got a controlling issue?  What does that have to do

23  with me?

24      Q.  The question --

Page 49

1       MR. MORRISSEY:  Mr. Catania, I don't see how this

2   is really discoverable.

3   BY THE WITNESS:

4       A.   You know --

5       MR. MORRISSEY:  I'll let you proceed briefly.  And

6   then I'd ask you to move on because this clearly is --

7   BY THE WITNESS:

8       A.   This was when he was a teenager.

9       MR. MORRISSEY:  Ms. Khoury.

10          This is clearly peripheral to this lawsuit.

11  I don't think it's very discoverable.  You can briefly

12  touch on it and move on.

13  BY MR. CATANIA:

14      Q.   Has a doctor diagnosed his mental illness?

15      A.   The one doctor he saw says he needs to stop

16  smoking pot before he can truly diagnose it, whether --

17  whether -- is it -- whether it's adolescence,

18  behavioral, stubbornness.

19      Q.   And so the answer --

20      A.   Could have been one of anything for the --

21      Q.   And so the answer is no; is that right?

22      A.   He spoke to a psychiatrist.  And there was

23  not a definite diagnosis because my son was still

24  smoking marijuana.  And we never --

Page 50

```
 1        MR. MORRISSEY:  There is no further question.

 2   BY MR. CATANIA:

 3        Q.   And who was the doctor?

 4        A.   I don't know.

 5        Q.   Okay.

 6        A.   Oh, that was Dr. Cusick.

 7        Q.   Okay.

 8        A.   Yeah.  But $130 later.

 9        Q.   Okay.  And that's the same doctor that was

10   treating you; is that right?

11        A.   Yes.

12        Q.   Aside from Jeffrey, anybody else in the

13   family that has been diagnosed, to your knowledge --

14        A.   No.

15        Q.   -- with a mental illness?

16             All right.

17        A.   Jeffrey was never diagnosed.  You just asked

18   me other than Jeffrey was anyone diagnosed.  Jeffrey

19   was not diagnosed.

20        Q.   Thank you for clarifying that.

21        A.   Yeah.  It was just a feeling --

22        Q.   Have you spoken to family members about your

23   mental illness before November 5 of '05?

24        A.   They all knew about it.  Yes.
```

Page 51

1      Q.   Okay.  But "all," do you mean that your

2   parents knew about your illness?

3      A.   My parents, everybody that's related to me by

4   blood or even friends.

5      Q.   Okay.

6      A.   And meetings.  My sponsor.

7      Q.   Do you go to NA or AA?

8      A.   Yes, I do.

9      Q.   All right.  How long have you been going to

10  NA?

11     A.   On and off since 1992, '91.

12          And church.

13     Q.   And what church?

14     A.   St. Mark's in Worth.  There's a few that I go

15  to depending, you know, the mood I'm in, contemporary

16  or traditional.

17     Q.   What types of symptoms did you experience

18  prior to, before, I should say, November 5 of '05?

19     A.   Well, when I'm on my medication or when I'm

20  getting high?

21     Q.   When you're on your medication, do you

22  experience symptoms?

23     A.   No.  I didn't at that time, no.

24     Q.   Before taking the medication, did you

Page 52

1    experience symptoms?

2        A.    I didn't know I was experiencing symptoms

3    until I went into treatment and I saw a psychiatrist

4    because I didn't see myself as others saw me with the

5    behavior that I was showing, with the compulsion, and

6    impulsion that I didn't realize was actually happening

7    until after I started taking my medication and I looked

8    back and I say, Oh, my God, what was I thinking?

9        Q.    Okay.  In November of 2005 when you were

10   brought by Justice police to Christ Hospital, what

11   symptoms were you experiencing during the transport?

12       A.    The reason I believe I relapsed, because I

13   was working very hard selling windows, I would fail to

14   remember to take my afternoon dose.  And after six

15   months of doing that is when the self-medication

16   started.  And my daughter's the one that called the

17   police, you know, because -- when I relapsed.  And

18   that's because I was not taking my meds according to

19   prescribed.

20       Q.    All right.  And I understand that you were

21   self-medicating.  Was that with cocaine at the time?

22       A.    Yes, it was.

23       Q.    All right.  What symptoms were you

24   experiencing between -- well, at the time you were at

Page 53

1    Justice police station until when you were transported

2    to the hospital?

3          A.   Hyperventilation; anxiety; dry mouth;

4    dizziness; hot flashes, cold flashes; speckles, you

5    know; getting warm, clammy; crying; begging, Go get my

6    meds.

7          Q.   And Justice brought you to Christ and you

8    were then --

9          A.   Admitted.

10         Q.   -- admitted?

11              And then from there, you were actually

12   transferred --

13         A.   To Cook.

14         Q.   -- with medical records to Cook County?

15         A.   Of course.  I don't see why not.

16         Q.   Okay.

17         A.   I don't know.

18         Q.   You don't know if you came with medical

19   records?

20         A.   I was carrying my box, following the police

21   officer, sat in the car, and went to County.  They had

22   a bag, and they took everything when I got there.

23         Q.   Okay.

24         A.   So whatever was in that bag was in that bag.

1     Q.   Okay.  Do you know what was in the bag?

2     A.   I was handcuffed.  I couldn't look through

3 it.

4     Q.   So the answer is you don't know what was in

5 that bag; is that right?

6     A.   No.

7     Q.   Okay.

8     A.   I mean, toiletries and so forth.

9     Q.   When you got to the Cook County Jail, had you

10 already been in front of a judge for bond court?

11     A.   No.  I went directly from Justice to the

12 police station, the police station to Cook County.

13     Q.   Okay.

14     A.   So it had to have been afterwards.

15     Q.   Okay.  After you went to County, then you

16 went to a judge?

17     A.   Yes.

18     Q.   Was your bond set before you went to Cook

19 County?

20     A.   No.  I was at the hospital.

21     Q.   Are you sure the bond was not set while you

22 were at the hospital?

23     A.   I won't know until I saw the judge that day.

24 That's the first I heard of it.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 55

1      Q.   Do you remember what day it was that you saw

2   the judge for bond setting?

3      A.   I think it was a Monday because I think I got

4   arrested -- No.  I was arrested, I think, on a

5   Saturday.  I don't know.  Three, four -- four days a

6   week, maybe.

7      Q.   All right.

8      A.   Within a week.

9      Q.   Where were you admitted to when you got to

10  Cook County Jail?

11     A.   Well --

12     MR. MORRISSEY:  I'm going to object.  I don't

13  understand the question.

14  BY MR. CATANIA:

15     Q.   Do you understand the question --

16     MR. MORRISSEY:  Can you rephrase the question?

17  BY MR. CATANIA:

18     Q.   -- ma'am?

19     A.   The --

20     MR. MORRISSEY:  Can you rephrase the question?

21  BY MR. CATANIA:

22     Q.   Do you understand the question, ma'am?

23     A.   What was it again?

24     Q.   Where were you admitted to when you went to

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 56

1    Cook County Jail?

2         A.   Down the stairs where you stand against the

3    wall and they have your name and then they go around

4    and put you in the bullpen.

5         Q.   You're talking about processing at this

6    point?

7         A.   Well, isn't that how I enter Cook County

8    Jail?

9         Q.   That's why I'm asking the questions.

10        A.   Yes.

11        Q.   Okay.  Are you saying you went through the

12   female intake processing?

13        A.   I remember most of it, not all of it.

14        Q.   Okay.  Was this on the day that you were

15   transported from Justice Police Department that you

16   went through this intake processing?

17        A.   No.  I went to the hospital first.

18        Q.   Okay.

19        A.   For two, three days.

20             Handcuffed, catheter, medication.

21        Q.   When you were handcuffed at Christ Hospital,

22   what officers or what agency was present attending to

23   you?

24        A.   Justice police.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 57

1      Q.   Was there ever a time when that -- Justice
2   police were taken over, in other words --
3      A.   By a guard?
4      Q.   -- transferred by a correctional officer?
5      A.   I have no idea.
6      Q.   Okay.  You don't know?
7      A.   I doubt it because I don't think a
8   correctional officer --
9      MR. MORRISSEY:  All right.
10  BY THE WITNESS:
11     A.   I don't know.
12     Q.   Okay.
13     A.   A uniform is a uniform.
14     Q.   All right.  Were you taken from the hospital
15  to Cermak Health Services hospital?
16     A.   No.  I went through the bullpen from what I
17  recall.
18     Q.   Okay.
19     A.   See, I was medicating --
20     MR. MORRISSEY:  All right.
21  BY MR. CATANIA:
22     Q.   Yeah, I understand that, which is why I'm
23  asking what you remember.
24          Were you brought to an area with other female

Page 58

1   detainees in ordinary street clothes?

2        A.   Yes.  At the bullpen.

3        Q.   What day was that?

4        A.   I don't know.

5        Q.   All right.

6        A.   I don't know what day they released me.  Four

7   days, six is -- the days.

8        Q.   We have established that you've been to Cook

9   County Jail several times before this?

10       A.   2002, I believe, couple times prior to that.

11  And, yes, I was receiving medication at that time.

12       Q.   All right.  When you came in in November

13  of '05, the question is, were you taken through the

14  ordinary process of sitting with a medical technician

15  and answering questions?

16       A.   I remember walking down a long tunnel with

17  double silver doors.  You walk in.  There's a guard

18  right in front of you.  There's some glass doors, I

19  mean, rooms, chairs like a school desk.  I sat in one.

20  She sat in one, asked me questions.  And that's pretty

21  much about it.  Medical history, you know, gave her all

22  my medication.

23       MR. MORRISSEY:  All right.  There is no question

24  pending.

Page 59

1    BY MR. CATANIA:

2        Q.   All right.  I want to know where it was that

3    you were asked questions about your medication history.

4        A.   It would be in Cermak.  A long tunnel with a

5    guard there and -- yes, and there was doctors.  And

6    there was people, you know, being -- in rooms and -- On

7    the right side is where the --

8        MR. MORRISSEY:  All right.

9    BY MR. CATANIA:

10       Q.   You didn't actually enter the same way as you

11   had in the previous experiences, right?

12       A.   Yes.

13       Q.   You entered the same way?

14       A.   From -- You know, walking into Cook County, I

15   was in a fog because they just gave me a shot prior to

16   leaving Christ Hospital, which I honestly don't even

17   remember the drive to Cook County.

18       Q.   Do you remember what the shot was?

19       A.   They gave me all kinds of shots.

20       Q.   Okay.

21       A.   I was withdrawing from cocaine, not heroine.

22   I was having a panic attack, not anxiety.  So I don't

23   know what they gave me.  I left.  I had -- remember

24   things, forget things, remember things, forget things.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

1    I don't know what Christ did.  And I have spurts of

2    what happened in County in processing.  All I know is

3    that I needed medication, didn't get them, and here we

4    are.  Okay.

5        Q.   It seems very simple to you, but I have to

6    ask --

7        MR. MORRISSEY:  Do you need to take a break?

8        THE WITNESS:  Yeah, I do.

9        MR. CATANIA:  Do you need to take a break?

10       THE WITNESS:  Yes, please.

11       THE VIDEOGRAPHER:  Remove your microphone.

12       THE WITNESS:  Oh, sorry.

13       THE VIDEOGRAPHER:  That will be all for

14   Tape No. 1.  We're going off the video record at

15   2:14 p.m.

16                      (Discussion off the record.)

17       THE VIDEOGRAPHER:  This is the beginning of

18   Tape No. 2.  We're back on video record at 2:19 p.m.

19       MR. CATANIA:  Thank you.

20   BY MR. CATANIA:

21       Q.   Ma'am, we had a break, right?

22       A.   Yes.

23       Q.   Don't wait for your lawyer to suggest it.  If

24   you feel like you need to have a break, just ask and

Page 61

1   you certainly have a break.

2        A.   Thank you.

3        Q.   All right.  What I was trying to find out is

4   what it was that you were given at Christ Hospital

5   before you were transported to the jail, what --

6        A.   Medication?

7        Q.   Yes.

8        A.   I don't know.

9        Q.   Okay.

10       A.   They gave me an IV, probably Valium.  That's

11   what they normally give addicts.  And they don't care

12   either.

13       Q.   Okay.  Have you ever attended any drug or

14   alcohol rehabilitation program?

15       A.   Many.

16       Q.   Okay.  What's the most recent one that you

17   have attended?

18       A.   Right before my surgery when I got out of

19   prison.

20            Are you saying "treatment"?

21       Q.   Yes.

22       A.   Yeah.  Right out of jail and then, after

23   that, shortly before surgery.

24       Q.   Where did you --

1      A.   So it was twice that I was treated for -- in

2   a psych unit since jail and since surgery, which is

3   from July to August.

4      Q.   Okay.  When you say "psych unit," are you

5   talking about --

6      A.   Inpatient.

7      Q.   Are you talking about drug rehab?

8      A.   No.  I'm talking about psych medication.

9      Q.   Have you had any drug rehab?

10     A.   Yes, I have.  That's when I was diagnosed

11   with bipolar in the first place.

12     Q.   When is the most recent time you had a drug

13   abuse rehab program?

14     A.   Sometime -- Quite a time prior to my arrest,

15   obviously.  But exact year, oh, I don't know.

16     Q.   All right.  When you entered into the Cook

17   County Jail, is it your testimony that you told

18   somebody in intake about your hospitalization and your

19   medical conditions?

20     A.   Yes.  After the long corridor with the

21   officer sitting at the desk and, to the left, a lady

22   sitting in a desk that was a school desk with a table

23   and me on a side chair in front of a glass window.

24     Q.   Can you -- Can you describe the person that

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 63

1   you told that you were on medication?

2         A.   I can't even tell you what color she was.

3         Q.   Aside from that person --

4         A.   Let's say, medium skin.  I would say medium

5   skin.

6         Q.   Medium skin, African-American?

7         A.   Yeah.  I want to lean towards that.  Or maybe

8   Spanish, dark Spanish lady.  I was looking to see what

9   she was writing down and reading, papers she was giving

10  me and ...

11        Q.   Were you photographed at intake?

12        A.   I don't remember that.

13        Q.   Were you fingerprinted at intake?

14        A.   Yeah.  I remember that part.

15        Q.   Do you remember where that happened?

16        A.   No.  Is it --

17        MR. MORRISSEY:  Don't guess.  If you don't

18  remember, you don't remember.

19  BY THE WITNESS:

20        A.   Yeah.

21        Q.   All right.  Were you brought to a place where

22  they had photographic equipment set up in a large room?

23        A.   Yes.

24        Q.   And that was a photograph taken at the time

Page 64

1    of your intake of November 5 of '05?

2        MR. MORRISSEY:  I'm going to object.  You've asked

3    this question.  She said she didn't remember.  Now

4    you're asking it again.  Isn't that true?  That's the

5    same question you asked about 30 seconds ago.

6        MR. CATANIA:  Mr. Morrissey, this is an evidence

7    and discovery deposition.  And it is improper for you

8    to object the way you're objecting.

9        MR. MORRISSEY:  When you ask the same question

10   twice and she -- The first time she says she doesn't

11   recall being photographed.  You then asked her, Were

12   you brought before a photographer?

13   BY THE WITNESS:

14       A.   Well, I had an ID when I went to the -- to

15   the unit.  So, yeah, they did take a picture because

16   they had my card.

17       MR. MORRISSEY:  The question is --

18   BY THE WITNESS:

19       A.   Do I remember it?  No.

20       Q.   The question now is -- hoping to stir your

21   memory of it -- did you go into the receiving room for

22   that photograph?

23       MR. MORRISSEY:  If you recall.

24   BY THE WITNESS:

Page 65

1      A.   I don't know what -- I don't know what -- All

2   the rooms are big and corridor and this and that.  It's

3   like an eight-hour process and ...

4      Q.   Have you had a chance to review any records

5   before coming here to testify today?

6      A.   All the records that I gave Mr. Morrissey.

7      Q.   Okay.  Any records that were shown to you

8   that you did not give to Mr. Morrissey?

9      A.   No.  Just paperwork to sign for our

10   agreement.

11      Q.   Okay.  Were you shown anything evidencing

12   your intake of November 5 of '05 to your knowledge?

13      A.   No.

14      Q.   Okay.  So you've seen no documents about

15   that?

16      A.   I've been trying to get my records from Cook

17   County for the past two years.  My doctor has been

18   asking for them.  And for some reason I can't seem to

19   get them.

20      Q.   When you entered into Cook County November 5

21   of '05, were you suffering from any other medical

22   condition aside from having the anxiety that you

23   described earlier?

24      A.   Not at that time.  But a few days later, I

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 66

1    did.

2         Q.   What was that?

3         A.   A urinary tract infection because of the

4    catheter, chances are, in general, usually because of

5    the catheter.

6         Q.   And that catheter is one that was placed by

7    Christ Hospital?

8         A.   Yes.

9         Q.   Have you done anything regarding Christ

10   Hospital and the causing of that infection?

11        A.   Huh?

12        Q.   Did you do --

13        A.   Have I --

14        Q.   -- anything like sue them or send them notice

15   of suit or complain about it?

16        A.   I'm not a hundred percent sure that it was

17   from Christ because -- I'm assuming it's from the

18   catheter, but people --

19        MR. MORRISSEY:  Answer the question.  Did you sue?

20   BY THE WITNESS:

21        A.   I don't know.

22        MR. MORRISSEY:  All right.  Just yes or no.

23   BY THE WITNESS:

24        A.   No.  I'm not sure.

Plaintiffs' Exhibit 41                                    Page 66

Page 67

```
 1        THE WITNESS:  Are we?

 2   BY THE WITNESS:

 3        A.    Maybe.

 4        Q.    All right.  Where was it that you were housed

 5   immediately upon entering in the jail on November 5 of

 6   '05?

 7        A.    I think it was Q2.

 8        Q.    And what is Q2?

 9        A.    General population.  General population.

10        Q.    I understand the term "general" --

11        A.    Oh, it's a tier.

12        Q.    -- "population."

13              Where is that tier located?

14        A.    What division?

15        Q.    Yes.

16        A.    I would not know.

17              They changed divisions from the time I was

18   there before, maybe of '04.  I'm not sure because in

19   the past I was in 8, but 8 became a man's division.

20   So ...

21        Q.    Okay.  When you were in Division -- with Q2

22   as the name of it --

23        A.    I believe that's what it was.

24        Q.    Okay.  And how was it that you remember Q2?
```

Page 68

1      A.   Sticks out in my mind.

2      Q.   Were you shown any documents recently about

3   your housing?

4      A.   No.

5      Q.   All right.

6      A.   I see the -- by the door, Q2.

7      Q.   All right.

8      A.   I've been there quite a few times, so ...

9      Q.   And when you arrived to Q2, did you see any

10   nursing staff?

11      A.   No.

12      Q.   Did you see any paramedics?

13      A.   No.

14      Q.   Correctional medical technicians?

15      A.   Just the guards.

16      Q.   Only correctional officers?

17      A.   Yes.  Everybody was sleeping.

18      Q.   Okay.  So what time of day was it that you

19   arrived, if you know?

20      A.   After midnight, probably, by the time I got

21   up there.  Like I said, it's a six- to eight-hour

22   process.

23      Q.   When is the first time after that that you

24   saw any medical staff?

0387a3ce-8e15-4353-8d24-24fca89fb6fd

1        A.   Oh, after I got all my senses back, three,

2    four days later.  About three days later when I came

3    out of the -- the state of mind I was in, I guess.

4        Q.   And who did you see?

5        A.   A caseworker.

6        Q.   Do you remember the name of the caseworker?

7        A.   No, I don't.

8        Q.   Do you remember where you had that meeting?

9        A.   In Cermak, I believe.  But it was -- I had to

10   go a little bit further, and it was a room off to the

11   side.  And I believe there was like three stalls to the

12   left, shelves on the top with files.  I want to say

13   they were blue files.  I'm not sure.  And I spoke with

14   her, told her my history.  And nothing was done.

15       Q.   Okay.  This caseworker you're talking about,

16   could you tell me what job title she gave you about

17   what she did for a living?

18       A.   She didn't.  She just -- She was just asking

19   me questions.

20       Q.   All right.

21       A.   I'm assuming, a social worker.

22       Q.   All right.  She ask any questions about your

23   medical condition?

24       A.   That was the reason I was there.

Page 70

1       Q.   Okay.  You were there for her to ask

2    questions about it?

3       A.   I was there to tell them that I need my

4    medication.

5       Q.   All right.  Did you go there yourself, or

6    were you referred there?

7       A.   I was escorted by a guard.

8       Q.   Do you know why you were escorted by a guard?

9       A.   Because I put in a request to see them and I

10   was losing it.  And they -- All the guards could do is

11   send me to a psych eval.

12      Q.   Okay.  Are you saying that you had some

13   behavioral issue that sent you for a psych eval?

14      A.   Yes.

15      Q.   What was that issue?

16      A.   Frantic, anxiety, crying, couldn't take a

17   shower by myself, couldn't eat, shaking and rocking,

18   hysterical, tears, shaking.

19      Q.   Okay.  And as a result of seeing the social

20   worker or caseworker, was anything done?

21      A.   No.

22      Q.   You were sent back to your living unit?

23      A.   Yes, I was.

24      Q.   Okay.

Page 71

1        A.   And I had to compose my- --

2        MR. MORRISSEY:  There's no question pending.

3        THE WITNESS:  I'm sorry.

4   BY MR. CATANIA:

5        Q.   All right.  Was the person you spoke to a

6   male or female?

7        A.   Female.

8        Q.   Did you see anybody else after that female

9   that you saw?

10       A.   No.

11       Q.   You said you made a request.  Was that a

12   mental health or health service request that you made?

13       A.   It was a psych eval which is step one prior

14   to seeing a psychiatrist.  And that was the only option

15   I had.

16       Q.   Do you remember when it was that you made

17   that request?

18       A.   I made three or four, and I was seen three

19   seen three or four times.

20       Q.   Okay.  Was one of the requests you made about

21   the pain you were experiencing in urinating?

22       A.   That was for the nurse's request, yes.

23       Q.   Okay.

24       A.   I was treated for that.

Page 72

1      Q.   All right.  You were treated for that?

2      A.   Yes.  But I was supposed to have a follow-up,

3  and I never received that.  And when I was admitted to

4  MacNeal Hospital, the poison had spread throughout my

5  whole body.  That's why I was there for two weeks

6  after --

7      Q.   What poison are you talking about?

8      A.   The urinary tract infection had spread

9  throughout my body because it was not followed up by

10  the doctor when I continued to complain of pain

11  urinating and cramping by my bladder.

12     Q.   Did you receive any other medicine besides

13  treatment for the infection?

14     A.   No.  At the hospital, I did, but only one

15  time.  And the second time, I told them I'm still in

16  pain.  So that was in -- I still had the infection

17  untreated for at least six weeks prior to going to

18  MacNeal Hospital and I --

19     Q.   Do you know what medication you were given to

20  treat the infection?

21     A.   An antibiotic.

22     Q.   Do you know what antibiotic it was?

23     A.   For that, no.  I know that there's different

24  ones for skin, for this, for that.  All I know is an

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 73

1    antibiotic.

2        Q.   All right.  After being treated for the

3    infection, did you receive any other treatment at

4    Cermak?

5        A.   No.

6        MR. MORRISSEY:  She already testified that she had

7    three or four psych evaluations.

8        THE WITNESS:  At least.

9        MR. MORRISSEY:  Are you directing her to those

10   questions --

11       MR. CATANIA:  I may be --

12       MR. MORRISSEY:  -- or to the medical?

13       MR. CATANIA:  I want to know what else.

14       MR. MORRISSEY:  Well, you -- you're -- She already

15   responded --

16       THE WITNESS:  We're talking medical, right.

17       MR. MORRISSEY:  -- that she had three or four

18   psych evaluations.  Other than that, is that what your

19   question is?

20   BY MR. CATANIA:

21       Q.   Do you understand my question?

22       A.   No.  Repeat it, please.

23       Q.   After being treated for a medical condition

24   of an infection, did you receive any other medical

Plaintiffs' Exhibit 41

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 74

1   treatment?

2        A.   Like the last three days before my mom bonded

3   me out, yes, I was finally able to see a doctor.

4        Q.   So sometime before your release on

5   January 3rd of '06, you saw a doctor?

6        A.   Yes.

7        Q.   Okay.  Who was the doctor?

8        A.   I don't know.  Gary, I think, was the

9   psychologist that my mom finally got a hold of after

10  eight weeks of calling.  Gary, I believe, is the

11  psychologist.  And the psychiatrist, I believe her name

12  was Mary.  Or was that my second reincarnation [sic]

13  that I picked up three weeks after my original release?

14       Q.   Okay.  When you saw this particular Dr. Gary

15  or whatever his name is, what symptoms were you

16  suffering at the time?

17       A.   All the ones I mentioned before:  hysteria,

18  anxiety, anger, sweating, hot flashes.  You psycho- --

19  You psychomanic.  You psychomanic, and depressed.  It's

20  just an overwhelming feeling that you have no control

21  over, that just causes sometimes to snap.

22       Q.   And when you had that -- When you had that

23  first experience, you went and talked to a social

24  worker or some other caseworker?

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 75

1      A.   All I know is that when I met Gary, he said,

2   You better thank God for your mom because she finally

3   got a hold of me and let's go.

4      Q.   All right.  At that time you were feeling the

5   anxiety and the other symptoms that you talked about?

6      A.   And it was progressing.

7      Q.   Did you have any problems with other

8   detainees during that period of time?

9      A.   You mean, other inmates?

10     Q.   Yes.

11     A.   The first week or so, yes, until they started

12  understanding my situation and they were trying to

13  help.

14     Q.   Okay.  And the first week or so of your

15  incarceration in November of '05 is what you're talking

16  about, right?

17     A.   Yeah.  The first two -- The first three days.

18  Because of my state of mind from Christ -- which I'm

19  not sure if they gave me my psych meds because they

20  knocked me out the first day I walked in.  There was a

21  girl that told me a few days I was there that I was

22  threatening and I was nuts, crazy, or -- just starting

23  trouble over stupid stuff.  And she was by my side.

24  And after I started get -- coming to, the girls

Plaintiffs' Exhibit 41                              Page 75

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 76

1    understood.  And that's when I started asking for my

2    medication.

3        Q.   Okay.  Until that point, though, you were

4    unaware that you were having the behavioral issues with

5    other detainees, right?

6        A.   No.  Because I wasn't -- No.  I don't ...

7        Q.   Okay.  And then at that point when some other

8    detainees started to understand your situation, did you

9    then have a period of time when you were more calm?

10       A.   Oh, yeah.  They were very helpful.

11       Q.   All right.  So other detainees --

12       A.   Most of them, anyway.

13       Q.   All right.  Did you receive any medication

14   during that period of time?

15       A.   No, I did not.

16       Q.   All right.  When you saw the doctor, do you

17   remember, was it within a month of your intake or after

18   that?

19       A.   It was a few days before I was bonded out.

20       Q.   Okay.

21       A.   Maybe a week.

22            And then they gave me the wrong medication.

23       Q.   All right.  As a result -- What medication

24   did they give you?

1      A.   Prozac.  And I told them that causes more

2   mania.  And I had a histamine problem.  And I told them

3   I can't take Benadryl because it has a reverse effect

4   on me; it causes me to break out some more.

5      Q.   Okay.  They --

6      A.   And I was having my skin condition.  And I

7   figured something was better than nothing.

8      Q.   Did they prescribe Prozac to you, or did they

9   just deliver it to you?

10     A.   They prescribed it and delivered it.  And I

11  was in such a state that I figured something was better

12  than nothing.

13     Q.   Okay.  Did you take it?

14     A.   Yes, I did.

15     Q.   And did it help in any way?

16     A.   No.

17     Q.   Did you take anything else aside from Prozac?

18     A.   Benadryl.

19     Q.   Okay.  Did that help in any way?

20     A.   No.  It made me break out more, but -- It

21  helped a little bit, but I still broke out in welts.

22  It wasn't as severe.

23     Q.   Okay.

24     A.   It helped, but it was so far along.

Page 78

1     Q.   Okay.  After trying the Prozac and the
2   Benadryl, did you have a conversation with any provider
3   about those effects of those medications?
4     A.   I told them.  And they said, That's all we
5   have for you; we cannot order outside medication.  And
6   I told them, When I was here in the past, you guys
7   ordered exactly what I was taking; please look up the
8   records.
9     Q.   Okay.  Who was --
10    A.   And they --
11    Q.   -- it that you told that to?
12    A.   Somebody that worked there.  I don't know.
13    Q.   Any description at all, any --
14    A.   There was men and women.  I talked to
15  everybody I could see.
16    Q.   And you told them to look up your records?
17    A.   Oh, my God, many.  Since -- Since the first
18  week.  My parents called the warden.  They sent
19  letters.  They even brought the medication.  They -- I
20  had a court order.  I got my doctor, my medication.
21  And they didn't do nothing.
22    Q.   Ma'am --
23    A.   I'm sorry.
24    Q.   It's all right.

Page 79

1        A.    I mean, this is ridiculous.

2        Q.    Do you want to take a break now?

3        A.    No.  I want to get this over with.

4        Q.    Okay.  And we do also.

5        A.    I'm sorry.  But, you know, last time I was

6   here I had to relive it in front of what's his name for

7   three hours.  And he had like this much paperwork.  I

8   got that much.  I'm sorry.  But please let's just get

9   this over with.  I'll be okay.  Just keep going.

10       Q.    All right.

11       A.    There.  I'm sorry.

12       Q.    That's all right.  It's not a problem.  I

13  just -- I need know the details.

14       A.    I know, I know.  You just don't know how it

15  is.

16       Q.    All right.

17       A.    And the sad part is I wasn't the only one --

18       MR. MORRISSEY:  There is no question.

19       THE WITNESS:  Okay.

20       MR. MORRISSEY:  Ask a question.  Let's move on.

21  BY MR. CATANIA:

22       Q.    Do you have any idea of how records are kept

23  in the jail?

24       A.    All I know is that when the nurse came every

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 80

1    time, she had everybody's names and she's signing away

2    medication they get and don't get.

3         Q.   And did you receive medication that way?

4         A.   When I was moved to Division 3 in the psych

5    unit.

6         Q.   Okay.  So you were moved, then, from the

7    general population --

8         A.   The last few days before I was bonded out.

9         Q.   Who moved you; do you know?

10        A.   Somebody that worked there.

11        Q.   You don't know?

12        A.   They usually keep you in the psych unit -- I

13   think I was there for like three days.  They start off

14   your medication.  Then they send you to the psych -- to

15   the Division 3, I believe, where the pregnant women are

16   and people taking medication.  And then in the morning

17   and at night, the nurse comes, gives you the

18   medication, and during -- And that's it.

19        Q.   Okay.  And how many times including this one

20   in November, December, and January of '05 and '06 --

21   how many times have you had that experience of being in

22   a location where you were given a dose-by-dose

23   medication?

24        A.   Three times, four times.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 81

1      Q.   Okay.

2      A.   Every time I was incarcerated.  I believe the

3    first one was in 2001, waiting bond, or 24 hours --

4    I've been there more than once.  And I've been

5    medicated every time I've been there except this last

6    time.

7      Q.   Okay.  And in this last time, can you tell

8    me, aside from what you've described already as

9    symptoms, on the day that you were sent to Division 3,

10   what were your symptoms?

11     A.   Well, after three days of medication, not

12   much of -- not a change at all.

13     Q.   No change?

14     A.   Very anxious, very, you know -- It wasn't

15   doing anything.  Plus it takes sometimes weeks for it

16   to start working.

17     Q.   Okay.  Did you have any physical altercations

18   with anyone else during that period of time?

19     A.   Arguments.

20     Q.   Okay.  But no physical altercation?

21     A.   Well, actually, yes, but ...

22     MR. MORRISSEY:  We're talking in January of 2006

23   prior to her release?  Is that your time period,

24   Mr. Catania?

Page 82

 1      MR. CATANIA:  Yes.

 2      MR. MORRISSEY:  Okay.  Thank you.

 3  BY THE WITNESS:

 4      A.   Okay.  Say that again.  January -- Prior to

 5  January 3rd?

 6      Q.   Yes.  Any physical altercations between --

 7  Let's do it this way.  Between November 5 of '05 and

 8  January 3 of '06 --

 9      A.   Yeah.  Pushing and shoving and taking your

10  food and, you know, slap across the face --

11      Q.   Okay.  But --

12      A.   -- you know, but nothing --

13      Q.   Were you pushed and shoved?

14      A.   Yes.

15      Q.   Okay.  Did you push and shove anybody?

16      A.    If I had to, yes, I did, that one time or

17  twice, yes, because they just wouldn't stop coming.

18      Q.   Okay.  Was it in response to them taking your

19  food that you pushed and shoved?

20      A.   I don't know.  I know it was over

21  disagreements.

22      Q.   All right.

23      A.   And not everybody is -- You know, there's a

24  lot of nice girls.  But there's a few that want to be,

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 83

1    you know, the bully.

2        Q.   Sure.

3             Okay.  Did you have any behavioral changes

4    besides the anxiety you've told us about, any

5    behavioral changes from November of '05 to January 3 of

6    '06?

7        A.   Oh, yeah.  Weight loss, dark circles under my

8    eyes, no sleeping, vomiting, panic attacks, passing

9    out, hyperventilating, isolating, not wanting to take

10   showers, just kind of ...

11       Q.   Were any of those things observed by staff

12   members?

13       A.   Yes.  And all they could do was send me on a

14   psych eval.

15       Q.   Okay.  And you did do that, right?

16       A.   Mm-hmm.

17       Q.   You went to a psych eval?

18       A.   Three, four times.

19       Q.   Three to four psych evals?

20       A.   Three.  Well, I know three for sure.  Because

21   when I went there the second time, the lady said, This

22   is your first time here.  And I go, No, this is my

23   second time here.  So obviously, the first time, they

24   lost the paperwork for that or something.

Page 84

1     Q.   Were you upset that they lost the paperwork?

2     A.   Yes.

3     Q.   Okay.

4     A.   I don't know if they lost it.  All I know is

5  the lady said this is the first time here.  And I told

6  her no.

7     Q.   All right.

8     A.   All I know is that I went there needing help

9  and I didn't get it.

10     Q.   When you left on January 3rd of '06, you

11  bonded out; is that right?

12     A.   My mother bonded me out.

13     Q.   Okay.  And you left in her care?

14     A.   She would never -- She -- She -- It was very

15  hard to get her down here.

16     Q.   Okay.

17     A.   She saw me on a Sunday and bonded me out on

18  a Friday.  And I went frequently to MacNeal Hospital.

19  And my mother --

20     MR. MORRISSEY:  There's no question --

21  BY MR. CATANIA:

22     Q.   How did you get to MacNeal Hospital?

23     A.   I got a ride from a girl that was leaving

24  there with her husband.  And they gave me a ride to

1    MacNeal.

2          Q.    And where is MacNeal located?

3          A.    43rd and Harlem.

4                Because my mom couldn't come and pick me up

5    in time.  And I wanted to get out of that area.

6          Q.    I understand that.

7                Would she have picked you up if she had been

8    able to get there?

9          A.    Yes.

10         Q.    All right.

11         A.    So she met me at the hospital.  She already

12   talked to my doctor.  And the emergency room was

13   waiting for me, and they immediately admitted me.

14         Q.    Okay.  And who was the doctor that admitted

15   you?

16         A.    Dr. Cusick.

17         Q.    What symptoms were you suffering at the time

18   you arrived at MacNeal?

19         A.    Cramping, pain, urinating, anxiety, crying,

20   hysteria, fear.

21         Q.    So you had some physical affects of the

22   infection; is that right?

23         A.    Oh, definitely, yes.

24         Q.    You had some effects from your mental

Page 86

1    illness; is that right?

2        A.   Of course.

3        Q.   And those were all treated at MacNeal?

4        A.   They started with the -- I first went to the

5    psych unit, started my psych medication.  They took

6    blood within a half hour.  I was sent to the medical

7    unit ASAP and started on severe antibiotics because the

8    urinary -- untreated urinary infection had spread.

9        Q.   Did you --

10       A.   And that could be fatal, from what I

11   understand, and that put fear in me.

12       Q.   Did you take the antibiotic that was

13   prescribed to you?

14       A.   It was in my IV.  Yes.

15       Q.   At the jail, did you take the prescription

16   antibiotic that they prescribed for you as well?

17       A.   Yes, I did.

18       Q.   Okay.  And you don't remember the name of

19   that antibiotic?

20       A.   No.

21       Q.   Do you remember what days you received it?

22       A.   Within -- No.  Within the first week is when

23   I noticed the cramping and the burning.  I got a week's

24   dose, and they said I would get a follow-up, never got

1    one.  Filled another request to see the doctor because

2    it was still hurting.  And I told them usually I have

3    to take a double dose for any antibiotic, at least a

4    dose and a half.

5              Every week, I kept on putting one in.  And

6    they said, The more you do it, then when we see yours,

7    we put it at the bottom of the list.  And then they

8    say, If you're not dying or bleeding, you're not going

9    anywhere.

10        Q.   Okay.  These are things that were said to you

11   by --

12        A.   The guards.

13        Q.   By the guards?

14        A.   And the nurses.  Yes.

15        Q.   Okay.  Can you describe any of the people

16   that they said to you, When we see your request, we put

17   it at the bottom of the list?

18        A.   Huh?

19        Q.   Can you describe those persons?

20        A.   No.

21        Q.   Okay.  Can you just --

22        A.   You know what, I'm mistaken at that.  That

23   was when I was in prison and you requested shoes or new

24   clothes.  Okay.

Page 88

1          But all I know is they say whether you put

2     one in or you put ten in, it's there; so the more you

3     put, the more paperwork they have to go through; so we

4     always recommend to everybody, once you fill one out,

5     it gets there, no need to keep refilling.  But I never

6     got a follow-up visit.

7          Q.   Okay.  Are you talking about --

8          A.   Cook County.

9          Q.   -- Cook County incarceration --

10         A.   Yes.

11              And the other one where you bring it down to

12    the bottom, that was in prison.  I apologize.

13         Q.   Okay.  All right.  So what they said was,

14    Give us one request and we'll get --

15         A.   Yeah.  They're like, The more you write, the

16    more paperwork, the longer it's going to take.

17         Q.   All right.

18         A.   And I did fill out a couple.  And that's when

19    they told me, you know, You're not helping the issue,

20    situation any by doing it.

21         Q.   I'm going to have the court reporter mark an

22    exhibit so we can look at it.

23         MR. MORRISSEY:  Do you have copies of the

24    exhibits, Mr. Catania?

Page 89

1          MR. CATANIA:  No.

2                         (Khoury Deposition Exhibit No. 1

3                          marked as requested.)

4          MR. CATANIA:  Here's a 14-page exhibit.  Counsel

5     has seen these records, but I'm going to show it to him

6     again.  So we can take a little time for that.

7          MR. MORRISSEY:  If you're going to ask her

8     questions off of this exhibit, I would like to have a

9     complete copy of it.

10          MR. CATANIA:  You'll get a copy.

11          MR. MORRISSEY:  When you're asking her questions.

12          THE WITNESS:  May I ask what hospital that's from?

13     I see "hospital."

14          MR. CATANIA:  Can we go off the record at this

15     point.  Thank you.

16          THE VIDEOGRAPHER:  We're going off the video

17     record at 2:46 p.m.

18                         (Discussion off the record.)

19          THE VIDEOGRAPHER:  We're back on video record at

20     3:00 p.m.

21          MR. CATANIA:  Thank you.

22     BY MR. CATANIA:

23          Q.   Ma'am, we took a break so that I could make

24     copies so that your lawyer has a copy of the exhibits

Page 90

1    as I show them to you.  I'm going to show you what's

2    been marked Khoury No. 1.  And I just want to let you

3    and your attorney know that on some of the pages there

4    were two sides.  So there will be a couple of

5    duplicates in yours, front side and a backside, in

6    addition to what he sees in his, which is the --

7         A.   What, this is my copy?

8         Q.   That's the court reporter's copy.

9         A.   Oh, okay.

10        Q.   But that's the record I'm going to talk to

11   you about.  All right.

12             The first page of this exhibit is called

13   Medical Intake Form.  Do you see that at the upper

14   right-hand corner, Medical Intake Form?

15        A.   Oh, right-hand.  I'm looking at --

16        Q.   Yes.

17        A.   Yes, yes.

18        Q.   And there's a date under that.  And that date

19   appears to be November 5 of '05.  Do you see that?

20        A.   Okay.  Yes.  I'm looking --

21        Q.   All right.  And on the left side, there is a

22   Barr code.

23        A.   Mm-hmm.

24        Q.   And under the Barr code is a name.  Is that

Page 91

1    your name?

2        A.   That's my name.

3        Q.   And below that is a birth date.  Is that your

4    birth date?

5        A.   Yes.

6        Q.   And below that is a number, which is

7    20050087002.  Do you see that?

8        A.   Yes, I do.

9        Q.   Do you recognize that to be your prisoner

10   identification number?

11       A.   Almost all the number -- all of them.  Yeah.

12       Q.   And to the right of that, it says BKDT, which

13   I'll tell you means book date.  Do you see that?

14       A.   Mm-hmm.

15       Q.   Is that a yes or no?

16       A.   Yes.

17       Q.   Okay.  And it says 11/5 of 2005, right?

18       A.   Well, there's the H written over it.  So I

19   can't really tell if it's a 5 or a 6.  But I take your

20   word for it.

21       Q.   And the front of this page has written in it

22   hospital -- or "hosp takeover."  Do you see that in

23   handwriting?

24       A.   Mm-hmm, yes.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 92

1          Q.   And above that, it's -- in a little box it

2     says "Form Reviewed" and it's got some initials there.

3     Do you see that?

4          A.   Uh-huh.

5          Q.   And it says "Date, 11/10/05," right?

6          A.   Yes.

7          Q.   And it says "Sick-Call Needed," and the "Y"

8     is circled, meaning yes?

9          A.   Yes.

10         Q.   All right.  And below that, can you read what

11    that says?

12         A.   Right underneath it?

13         Q.   Yes.

14         A.   Looks like a W or an E or an M and an E.

15         Q.   Okay.  That's about what I can make out --

16         A.   Yeah.

17         Q.   I can't tell because I'm not a doctor.

18         A.   Right.

19         Q.   All right.

20         A.   But on the top, it says -- looks like an "M."

21         Q.   The next page is actually the backside of

22    that page.

23         A.   Okay.

24         Q.   Those are identical.

Page 93

1      A.   Right.

2      Q.   And that's just blank, right?

3      A.   Yep.

4      Q.   Other than the words "hosp takeover" on the

5    front, there's nothing else on there that's significant

6    to your intake, right?

7      A.   Mm-hmm.

8      Q.   All right.  The next page is Brief Primary

9    Psychological Screening Tool, RCDC.  All the way at the

10   top it says that.

11     A.   Mm-hmm.

12     Q.   Do you see that?

13     A.   Yes.

14     Q.   And it has a similar Barr code sticker with

15   your name, your --

16     A.   Yes.

17     Q.   -- date of birth, your prisoner number, and

18   the book date of --

19     A.   Yes.

20     Q.   -- 11/5/05, right?

21     A.   Yes.

22     Q.   And nothing is written on that page, except

23   on the bottom it says "hospital takeover," right?

24     A.   Right.

Page 94

1      Q.   Okay.  And that's also dated November 5, '05,

2   at 2:30 p.m.  Do you see that?

3      A.   Yes.

4      Q.   Nothing else is written on there?

5      A.   No.

6      Q.   The next page is another page that's called

7   Nonemergency Request for Psychiatric Consultation.  Do

8   you see that?

9      A.   Nonemergency where --

10     Q.   Request --

11     A.   Yes.

12     Q.   -- for Psychiatric Consultation.

13          All right.  And your name is written in

14   there, right?

15     A.   Right.

16     Q.   And below that is the same DOC prisoner

17   identification number ending in 87002?

18     A.   Yes.

19     Q.   Your date of birth is there, 4/2/61?

20     A.   Yes.

21     Q.   And Division, it says 4 Q2?

22     A.   Okay.  So I was right about that.

23     Q.   You were right.  Okay.

24          And there's a time written down there,

Page 95

1    1:00 p.m.?

2        A.    Mm-hmm.

3        Q.    Is that yes?

4        A.    Yes.

5        Q.    On 11/10 of '05?

6        A.    Yes.

7        Q.    So five days later, you were referred for

8    nonemergency request for psychiatric consultation?

9        A.    It was an emergency.

10       Q.    Okay.  But that's what it says on this page,

11   correct?

12       MR. MORRISSEY:  Well, there is no foundation that

13   she's ever seen this document before.

14       THE WITNESS:  No, I've never seen it before.

15       MR. MORRISSEY:  You're asking her to read from a

16   document that apparently was prepared by your client.

17       MR. CATANIA:  No, not really.  But if you want to

18   view it this way, fine.

19   BY MR. CATANIA:

20       Q.    Let's identify the document.  You've never

21   seen this document before?

22       A.    No, I have not.

23       Q.    But when you talked to me before in --

24   earlier in this deposition, you mentioned going for a

Page 96

1    treatment in which you said there was some

2    inappropriate behavior in the living unit, right, and

3    you were asked some questions and you were -- someone

4    made some observations about you, including that you

5    were anxious and confused, right?

6         MR. MORRISSEY:  I'm going to object.

7    BY MR. CATANIA:

8         Q.   Do you remember that testimony?

9         MR. MORRISSEY:  She can't testify to what

10   observations were made by a third party.

11        MR. CATANIA:  I'm going on what she testified

12   earlier, Tom, not what's in the third party's notes.

13   I'm asking her what she talked to me about before.  She

14   said she had been to a doctor or to some social worker

15   or some caseworker.

16   BY THE WITNESS:

17        A.   Are you asking about when I was at first

18   intake or when I requested it?

19        Q.   When you requested it.

20        A.   Okay.  Well, how could it be a nonemergency

21   when I was requesting it?

22        Q.   Okay.  Well, that, we're tossing semantics.

23   I'm just asking you originally did you talk about those

24   things earlier today.

Page 97

1      A.   About what?

2      Q.   About your condition when you had some

3   interview with a caseworker or social worker.

4      A.   Yes.  At intake and my first initial one,

5   yes.  It was the same conversation.

6      Q.   All right.  But you do agree with me that

7   when you testified earlier about your intake that you

8   actually arrived on the living unit sometime after

9   midnight, right?

10      A.   You know, I didn't pay attention.  But

11   everybody was sleeping.

12      Q.   Okay.  But you agree also that you came from

13   the hospital to the jail?

14      A.   I had to have.  I don't remember the drive,

15   but --

16      Q.   Okay.

17      A.   -- I was with the police officer, handcuffed.

18   And I don't see why we would stop.

19      Q.   Okay.  If you take a look at the page that

20   we're talking about, which is the Nonemergency

21   Emergency Request for Psychiatric Consultation, do you

22   see that?

23      A.   Yes.

24      Q.   All right.  It says Reason for Referral, is

Page 98

1    the heading.  And underlined -- And below that, it's

2    checked Inappropriate Behavior?

3         A.   Right.

4         Q.   Okay.  You testified earlier that you had had

5    some difficulty in your living unit and that your

6    behavior was told to you to be inappropriate, right?

7         A.   No.  What I had said is that my -- Here, it

8    says untidy, cleanliness, and careless -- is because of

9    the anxiety that I was feeling because lack of

10   medication.

11        Q.   Right.

12        A.   And, yes, I was told a few times within the

13   first few days that, yes, I was antagonizing and

14   calling names and so forth.  But that continued even

15   after I came to the realization, when the medication

16   from Christ Hospital wore off.  I was still very

17   irritable, wanting to be left alone.  So it was before,

18   during, and after.

19        Q.   Okay.  In any event, what you told me before

20   was that you had a couple of events that happened the

21   first few days when you were in custody and that led to

22   you being interviewed by a caseworker?

23        A.   No.

24        Q.   No?

Page 99

1        A.    No.

2        Q.    Okay.

3        A.    I requested.  But I don't know how soon after

4    my admittance I was allowed to go see a caseworker.

5        Q.    Okay.

6        A.    The exact date, I don't know because I was

7    not in the -- I was not in the right state of mind.

8        Q.    Okay.  All right.

9        A.    Even one week without medication can cause

10   irreversible harm.

11       Q.    In the bottom part of that page that you're

12   looking at where it says "Other, Please specify," do

13   you see that?

14       A.    Yes.

15       Q.    There's handwriting after that.  It says

16   "PT" -- meaning patient -- "has been evaluated

17   medically.  Schedule for sick call.  Please eval psych.

18   Says she take medication in the world."  Is that all --

19       A.    Yeah.

20       Q.    That's all true at that time, right?

21       A.    Yes.  I take medication in the world.

22       Q.    All right.  And there -- It's signed by an

23   individual, but not a security officer.  It's signed by

24   somebody, but it's crossed off "security officer,"

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 100

1    right?

2          A.    It's signed by whoever I spoke with.

3          Q.    All right.  And it was also received by

4    someone named D. Thomas.  And I believe that even

5    Mr. Morrissey would agree that that says "mental health

6    specialist" as her title.

7          A.    I wouldn't know.

8          Q.    Okay.  D. Thomas.

9          A.    Okay.

10         Q.    Do you agree with me that it says that?

11         A.    Yes, it does.

12         Q.    All right.  And the disposition says okay to

13   return to duty, right?

14         A.    Yes.

15         Q.    I'm sorry.  To Division 4.

16         A.    Mm-hmm.

17         Q.    So at that time, somebody spoke to you and

18   said you were okay to return to Division 4?

19         A.    In his opinion.

20         Q.    Okay.  That's all I'm asking, is what does

21   that say.

22         A.    Can I say why --

23         MR. MORRISSEY:  No.  There is no question pending.

24         THE WITNESS:  Okay.

Page 101

1    BY MR. CATANIA:

2         Q.   If you turn, now, two pages over --

3         A.   But I never saw this doctor.  I saw a female.

4    I never saw a male doctor at that --

5         Q.   Okay.

6         A.   At any intake.

7              So how could he say --

8         MR. MORRISSEY:  All right.

9         THE WITNESS:  Okay.

10        MR. MORRISSEY:  Ms. Khoury, there is no question

11   pending.

12   BY MR. CATANIA:

13        Q.   The next page after that is what I'm going to

14   refer to next.  Next page following that one, yes.

15        A.   I'm just curious what this is.

16             All right.

17        Q.   All right.  That next page that I wanted you

18   to look at is called Detainee Health Service Request

19   Form.  Is that what you were referring to earlier when

20   you said you made requests?

21        MR. MORRISSEY:  I'm going to object.  It appears

22   to be one request form filled out by the plaintiff.

23             You can answer.

24   BY MR. CATANIA:

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 102

1      Q.   Ma'am.

2      A.   And that was the 9th.

3      Q.   Yes, November 9th of '05.

4           Does that appear to be a Detainee Health

5    Service Request form that you filled out?

6      A.   Well, yeah, it's my handwriting.

7      Q.   Okay.  And what's requested on November 9th

8    of '05, according to your Detainee Health Request Form,

9    is that you're having pain swallowing, you're coughing

10   for six days in a row, you have a coated tongue, you're

11   dizzy, you have pain urinating, you're snoring,

12   bleeding nose when you blow your nose, and you're

13   coughing up blood; came from Christ Hospital with meds,

14   did not get any yet.  Is that right?

15     A.   Yep.

16     Q.   Okay.  That's the request that you made at

17   the time; is that right?

18     A.   Yes.

19     Q.   Okay.  If you turn back one page, there is a

20   Cermak Health Services Department of Mental Health

21   Services Admission Evaluation Form there.  Do you see

22   that?

23     A.   Yes.

24     Q.   That's your name on it?

0387a3ce-8e15-4353-8d24-24fca89fb6fd

1      A.   Yes.

2      Q.   Your DOC number?

3      A.   Yes.

4      Q.   Your date of birth?

5      A.   Yes.

6      Q.   And you're Division 4?

7      A.   Right.

8      Q.   Okay.  In the body of that, it's -- there's a

9   reason for referral, right?  "Patient is a 44-year-old

10  white female returned for evaluation due to reports of

11  previous psych history and psych drugs."  Do you see

12  that?  "Reason for referral."

13     A.   Oh, on the top?

14     Q.   Yes.

15     A.   Okay.  Reason for -- due to reports.  Right.

16  Okay.

17     Q.   So you had previous psych history and

18  previous psych drugs, right?

19     A.   Yes.

20     Q.   And you were then returned for an evaluation

21  at that time; is that right?  Whatever time this was,

22  that's when you retuned for evaluation?

23     A.   Well, this was 11/17.  I put in a request the

24  9th.

Page 104

1      Q.    Mm-hmm.

2      A.    So the evaluation was a week later roughly.

3      Q.    Doesn't this actually say your charge was

4  PCS, your bond was $5,000 --

5      A.    Yes.

6      Q.    -- your court was on November --

7      A.    Okay.  That was --

8      Q.    -- 17th of '05?

9      A.    Okay.

10      Q.    So this is sometime before November 17 of

11  '05?

12      A.    When I put in a request, yes.

13      Q.    Okay.  And you were seen by D. Thomas --

14      A.    No.

15      Q.    -- who signed the bottom of this page?

16      A.    I saw a female.

17      Q.    That's a female, Danielle Thomas --

18      A.    Okay.

19      Q.    -- right?

20            And if you look to where it says "Plan" right

21  above the signature, do you see that?  In little

22  writing, it says "Plan."

23      A.    Mm-hmm.

24      Q.    It says, "Okay to return to Division 4.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 105

1    Detainee declined admission to mental health services.

2    Detainee informed how to access admission in future to

3    mental health services as necessary." Is that what it

4    says?

5         A.   Yes, it is.

6         Q.   Okay.  At that point you were returned to

7    Division 4, right?

8         A.   Yes.  But her statement is 110 percent

9    untrue.

10        Q.   You didn't -- You didn't decline to be

11   treated --

12        A.   No.

13        Q.   -- in mental health services?

14        A.   I would never deny my medication because I

15   know what happens to me when I don't take it.

16        Q.   Well, that doesn't say you're denied

17   medication.  It says --

18        A.   I'm denying it.  No, I never would deny my

19   medication.

20        Q.   Okay.  But what the plan was -- is that you

21   declined admission to mental health services?

22        A.   No.  Why?  No.

23        Q.   Okay.  That's not -- It doesn't say anything

24   about medication.

Page 106

1      A.   Well, that's where I would go to get my meds,

2  isn't it?

3      Q.   That's not shown yet in the case.  I just --

4  I'm asking you if that's what this note says.

5      A.   Yeah.  Obviously I did go back to the unit

6  because I didn't go to the med unit.

7      Q.   Do you know who D. Thomas is?

8      A.   No.  I don't think it's a doctor.  I think

9  it's a --

10      Q.   Have you --

11      A.   -- caseworker.

12      Q.   Have you ever met that person before?

13      A.   If that's the person that I spoke with, no,

14  I've never met that person.

15      Q.   Have you ever seen that person again?

16      A.   I think the second time was a white person.

17  This was -- I believe the first one was a heavy-set,

18  middle-skinned person.  I don't believe I saw the same

19  one twice.  Maybe one of them, I might have seen twice.

20      Q.   Okay.

21      A.   But they all just brushed me off.  They're

22  like, Oh, you're an addict --

23      Q.   I understand.

24      A.   -- you just want drugs.

Page 107

1     Q.   Yes.

2     A.   So they just ...

3     Q.   Let me ask you, if you saw D. Thomas, would

4  you recognize her today?

5     A.   No.

6     Q.   Was that no?

7     A.   Definitely I would not recognize her.

8     Q.   Okay.  Would you agree that D. Thomas would

9  probably not recognize you again?

10    A.   Probably not.

11    Q.   All right.  On the date of your request form,

12 which is the next page where it tells you to stop; do

13 not write below this line.

14    A.   Yes.

15    Q.   There's some writing below that line; isn't

16 there?

17    A.   Yes.

18    Q.   And it's not your writing?

19    A.   No.

20    Q.   It's the writing of a provider?

21    A.   Yes.

22    MR. MORRISSEY:  I object.  She doesn't know who

23 wrote this document.

24    MR. CATANIA:  Okay.

Page 108

1      MR. MORRISSEY:  Does she have any personal

2  knowledge in regards to who wrote this out?  I don't

3  think so.

4      MR. CATANIA:  She's a witness who can testify to

5  what she sees in her medical record in front of her,

6  Tom.  Well, she --

7  BY MR. CATANIA:

8      Q.  All right.  Where it says --

9      MR. MORRISSEY:  There's no foundation for this

10 record.  I mean, if you want to bring in the doctor or

11 somebody.  But she can't lay a foundation for some

12 document that you're attempting to introduce here.

13 BY MR. CATANIA:

14     Q.  Ma'am, do you know what a medical record is?

15     A.  Yes, I do.

16     Q.  And you, in fact, have provided a medical

17 record to your attorney; isn't that right?

18     A.  Yes, I have.

19     Q.  And to your knowledge, he probably sent that

20 to us as well, right?

21     A.  No, I don't know, to my knowledge.  But I'm

22 assuming he did.

23     Q.  All right.  You have no quarrel with -- that

24 that's your medical record, right?

Page 109

```
 1      A.   It's the first I see it, but it's my

 2   handwriting.  So ...

 3      MR. MORRISSEY:  He's referring to the -- above

 4   that.  On -- You don't have this marked as -- the page

 5   number that we're talking.  It's a Group Exhibit 1.

 6           But above that, there's apparently something

 7   written in your own handwriting, correct?

 8      MR. CATANIA:  That's what she just identified,

 9   Tom.

10      THE WITNESS:  That's my handwriting.

11      MR. MORRISSEY:  But below that where -- "Stop.  Do

12   not write below this line" --

13      THE WITNESS:  That's not --

14      MR. MORRISSEY:  -- you didn't make any of the

15   entries --

16      THE WITNESS:  No.  That's not my -- "Harsh

17   productive cough, nose bleeding in mucous," no, I

18   didn't write that.

19      MR. CATANIA:  All right.

20      THE WITNESS:  But that's what she must have

21   observed obviously.

22   BY MR. CATANIA:

23      Q.   Now to get to my question, right above where

24   it says "secondary disposition," can you see the words
```

1   where it says "Seen in ER 11/9/05?"

2        A.   Okay.

3        Q.   Do you see that?

4        A.   Okay.

5        Q.   Yes?

6        A.   Yes, I do.

7        Q.   Okay.  And that's the same date that you made

8   a detainee request, right?

9        A.   Well, is that when I arrived at Cook County,

10  or is that when -- Because I was in the hospital for

11  quite a few days.  So did I arrive the 5th or did I

12  arrive the 9th?

13       Q.   Well, see, that's part of the problem with

14  the case because if you look on the front, it says

15  "hospital takeover," doesn't it?

16       A.   So that means it's when the hospital --

17  Christ Hospital took over me and then -- Where's the

18  paperwork that says the day I walked in?  What was the

19  date on that?

20       Q.   Well, you're assuming --

21       A.   Because this is four days.

22       Q.   Ma'am, you're assuming that you walked in,

23  but I'm telling you that we don't know that.

24       A.   Okay.  Well, we can find out, I'm sure.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 111

1      Q.   All right.  On that document, the page that

2  we just looked at, you looked and it says "seen in ER

3  11/9/05," right?

4      A.   Okay.

5      Q.   And it's signed by a provider, someone with

6  the last name of Mitchell.  Do you see that?

7      A.   Yes, I do.

8      Q.   The next page is another Detainee Health

9  Service Request Form.  Is that in your handwriting at

10  the top?

11     A.   Yes.  That's when I requested about --

12  regarding the urinating.

13     Q.   Right.  And that's dated 11/14/05?

14     A.   Okay.  So that was probably -- roughly, like

15  I said, a week after I -- my incarceration or so.

16     Q.   Okay.  And you described the problem as pain

17  urinating after catheter removed from hospital,

18  correct?

19     A.   That was my conclusion.  I'm not a doctor,

20  but I'm assuming that's where I got it.

21     Q.   That's your writing at the top?

22     A.   Yes, it is.

23     Q.   And you put down the date?

24     A.   Yes, I did.

Page 112

1     Q.   Okay.  There is nothing in there about not

2   getting medications, is there?

3     A.   No.  I told you I got medication.  But I

4   never got the follow-up that I was promised.  And a

5   urinary tract infection was not cleared up, and I ended

6   up sitting there for six weeks, ended up at MacNeal,

7   with the urinary tract infection spread throughout my

8   whole body.

9     Q.   The next page is another Detainee Health

10  Service Request Form.  Is that your writing on that

11  page?

12    A.   Yes.

13    Q.   And the date on that is what?

14    A.   The 27th.  I have slight comfort --

15  discomfort from --

16    MR. MORRISSEY:  All right.  He didn't ask you to

17  read.

18    THE WITNESS:  Okay.

19    MR. MORRISSEY:  He just asked you to identify it.

20  BY THE WITNESS:

21    A.   Yes, it is.

22    Q.   All right.  And, in fact, it's dated

23  November 27 of ' 05 --

24    A.   Mm-hmm.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 113

1      Q.   -- right?

2      A.   Yes.

3      Q.   And your signature appears there on the top

4   line, doesn't it?

5      A.   Yes, it does.

6      Q.   All right.  And you've described the problem

7   as I still have slight discomfort from the bladder

8   infection that I got after a catheter from the

9   hospital; the antibiotics you gave me helped, but I

10   think I need more; when I came here from the hospital

11   they doped me up with Xanax and Ativan for the anxiety

12   attacks I get; so when I came here, I don't remember

13   taking -- talking to the doctor or the psych doc; my

14   meds in the world are Prevacid for acid reflux,

15   Compuvent, Flovent for asthma, Trileptal, Buspar,

16   Lexapro, and Temazepam --

17      A.   Temazepam.

18      Q.   -- Temazepam --

19      A.   So I was pretty much --

20      Q.   -- for bipolar.

21      A.   Right, mm-hmm.

22      Q.   -- depression, sleep, anxiety, disorder, and

23   a tooth ache.  Is that right?

24      A.   Yes.

Page 114

1      Q.   "I did not have a period since" -- and then

2  it says October 13th?

3      A.   Right.

4      Q.   All that stuff, you wrote there; is that

5  right?

6      A.   Yes.

7      Q.   Okay.

8      A.   And I put down "Please help.  Thank you."

9      Q.   And you wrote down "Please help.  Thank you."

10     A.   Mm-hmm.

11     Q.   And then you wrote that on the 27th of

12  November?

13     A.   Yes.

14     Q.   All right.  The next page is a prescription

15  order.  Do you see that at the bottom?

16     A.   Yes.

17     Q.   It's got your name.

18     A.   Mm-hmm.  That was the 14th for the initial

19  complaint of the urinary tract infection.

20     Q.   Okay.  That's November 14th of '05?

21     A.   Yes.

22     Q.   And you got medication, namely Cipro?

23     A.   Never denied.

24     Q.   Okay.  And you got Salsalate --

Page 115

 1        A.   I guess.

 2        Q.   -- Benadryl, the things that you described

 3   earlier; is that right?

 4        A.   Mm-hmm.

 5        Q.   All right.  The next page is what's known as

 6   a medical administration record.  You see that?

 7        A.   Yes.

 8        Q.   And it has a date written on it of 11/12/05?

 9        A.   Mm-hmm.

10        Q.   That's for Albuterol?

11        A.   For my asthma, yes.

12        Q.   Okay.  And the following page -- you'll have

13   to flip it over -- shows the medication that we saw on

14   the prescription Cipro, Salsalate, and Benadryl, right?

15        A.   Right.

16        Q.   Okay.  And your name is at the bottom of that

17   page?

18        A.   What is this?  Right.  That's -- That's an

19   antibiotic and so forth, right.

20        Q.   Yes.

21        A.   Mm-hmm.

22        Q.   And that was to be taken by mouth for seven

23   days?  That's --

24        A.   Right.  That's for the urinary tract

1    infection.

2         Q.   And if you look in the middle there, there's

3    initials corresponding to several dates, 15, 16, 17,

4    18, 19, 20.  Do you see that?

5         A.   Yes.

6         Q.   Okay.  And it's -- For all the prescriptions,

7    there's initials for those dates?

8         A.   Yes.

9         Q.   All right.  If you look over two more pages,

10   you'll see one prescription written way at the bottom

11   of the page.

12        A.   Okay.

13        Q.   And it's got a date of 11/05 on it; is that

14   right?

15        A.   Uh-huh.

16        Q.   Your name appears at the bottom?

17        A.   Okay.

18        Q.   Your ID number, which is 87002.

19        A.   Uh-huh.

20        Q.   And your location, Division 4 Q2.  Do you see

21   that?

22        A.   Yes.

23        Q.   Okay.  And do you know what drug is --

24        A.   No.

1      Q.   -- that Pentoin?

2      A.   No.

3      Q.   Okay.

4      A.   I don't -- given what the --

5      MR. MORRISSEY:  There's no question pending.

6  BY MR. CATANIA:

7      Q.   Now, if you turn over to this -- last four

8  pages of that document, four or five.

9      A.   Okay.

10      Q.   Keep going.  And it looks like this, and it's

11  preprinted.

12      A.   Am I going in the wrong direction?

13      Q.   No.  You're going the right way.  There you

14  go.

15      A.   Okay.

16      Q.   All right.  That one is dated January of '06.

17  Do you see that?

18      A.   Yes, I do.

19      Q.   It says page 1 of 2?

20      A.   Mm-hmm.

21      Q.   Okay.  And there are several printed -- like

22  printed on a typewriter or printer prescriptions

23  written there.  Do you see that?

24      A.   Yes.

Page 118

1      Q.   And one of them is Clonazepam?

2      A.   Uh-huh.

3      Q.   The next one is Albuterol?

4      A.   Right.

5      Q.   And the next one is Beclomethasone?

6      A.   Mm-hmm.

7      Q.   And then the one below that is Lansoprazole.

8  Do you know those drugs?

9      A.   I don't know.  Those are the real names, but

10  whether it's -- You know, I use -- I don't know the

11  prescription names.  I just know the actual names, so I

12  don't know ...

13     Q.   It goes on with Naproxen below that.  Do you

14  see that?

15     A.   Okay.  That's for the arthritis.

16     Q.   And Oxcarbazepine.  Do you see that?

17     A.   That's the Trileptal, right.

18     Q.   Okay.  That's Trileptal.

19     A.   Okay.

20     Q.   Is that one that you were prescribed before

21  by Dr. --

22     A.   Dr. Cusick.

23     Q.   -- Cusick?

24          That's one of those --

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 119

1      A.    Mm-hmm.

2      Q.    -- antipsychotics; is that right?

3      A.    Right.

4      Q.    All right.  And it says that these were given

5    to you at least on January of '06 on the 1st, 2nd, 3rd,

6    and then you were discharged.  Do you see that?  It's

7    on the same page where -- January '06.  And then these

8    are the days of the month across the top here.  One,

9    two, three have initials in them.

10     A.    So four days.

11     Q.    Yes.

12           And it says "given" on those days, doesn't

13   it?

14     A.    The Albuterol was given only one day.

15     Q.    Right.

16     A.    And --

17     Q.    Did you get those medications that are listed

18   here?

19     A.    I don't remember.  If they signed it, then I

20   guess I got them.

21     Q.    All right.

22     A.    But it's not -- January 6th, November 5th,

23   eight weeks.  Took them long enough, huh?

24           MR. MORRISSEY:  There's no question pending.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 120

1      MR. CATANIA:  All right.  I'm going to ask the

2   court reporter to mark the second exhibit here.

3                        (Khoury Deposition Exhibit No. 2

4                         marked as requested.)

5   BY THE WITNESS:

6      A.   But still --

7      MR. MORRISSEY:  There's no question pending.

8      THE WITNESS:  All right.  All right.  All right.

9   BY MR. CATANIA:

10     Q.   All right.  I'm going to show you

11  Exhibit No. 2.  You can turn that one to the side for

12  now and focus in on number 2.  I'm handing a copy to

13  Mr. Morrissey.

14          And you can see that that one is called the

15  Cook County Jail History Card.  Have you seen this card

16  before?

17     A.   No.

18     Q.   Okay.  It's a group exhibit which consists of

19  pages 99 through 104.  That first page on the lower

20  left-hand side, is there a signature that you recognize

21  there?

22     A.   Yes.

23     Q.   Whose signature?

24     A.   Mine.

1      Q.   And in fact, it's twice, isn't it?

2      A.   Yes.

3      Q.   There's a signature in the box, and there's a

4  signature where it says at discharge, right?

5      A.   At discharge, yes.

6      Q.   And there's an ID number on the bottom which

7  is 87002?

8      A.   Uh-huh.

9      Q.   That was your ID number at the time?

10     A.   Right.

11     Q.   And up above, you'll see where it says "how

12 released"?

13     A.   Uh-huh.  Okay.  I was -- They released 1/03.

14     Q.   Yes.

15     A.   Okay.

16     Q.   And if you look right here, it says D, number

17 8009440.

18     A.   Okay.  Which means?

19     Q.   Well, do you recall bonding out or your

20 mother bonding you out at that time?

21     A.   Yes, she bonded me out.

22     Q.   In the upper left-hand corner is a case

23 number.  Do you see that?

24     A.   Uh-huh.

Page 122

1      Q.   And below that is another case number?

2      A.   Right.

3      Q.   Do you know why there's two case numbers

4   there?

5      A.   One was, I believe, because of resisting

6   arrest and one was for possession.

7      Q.   Okay.

8      A.   Or was that the second time I was arrested in

9   2007?

10     Q.   I don't know the answer to that.  But the one

11   that you went to Bridgeview on is the one with the

12   $50,000 bond; is that right?

13     A.   Right.

14     Q.   Okay.  And that was possession of a

15   controlled substance?

16     A.   Yes.

17     Q.   It doesn't indicate here how you entered into

18   the jail, does it?

19     A.   Well, there is only one way.  If you've been

20   there three, four times, there's only one way, one

21   door, one --

22     MR. MORRISSEY:  All right.  There's no question

23   pending.

24     THE WITNESS:  Right.  It's stupid.

Page 123

1    BY MR. CATANIA:

2         Q.   Well, we agree that you -- you came from the

3    hospital, though, right?

4         A.   Yes, we did.

5         Q.   All right.  Now, at any time during your stay

6    in the jail from November of '05 to January 3 of '06,

7    did you ever file a detainee grievance?

8         A.   Huh?

9         Q.   A detainee grievance.

10        MR. MORRISSEY:  I'm going to object.  I don't

11   think she said -- gave a specific date when she came

12   into the jail.

13        THE WITNESS:  I have a --

14        MR. MORRISSEY:  You can answer the question.

15        THE WITNESS:  I have a question.

16        MR. MORRISSEY:  No.

17        THE WITNESS:  No.  I mean, I want to show you

18   something.

19        MR. MORRISSEY:  No.

20        THE WITNESS:  Okay.  All right.

21        MR. MORRISSEY:  Answer his question.

22        THE WITNESS:  Okay.

23   BY THE WITNESS:

24        A.   What was it again?  Did I file a grievance?

Page 124

 1      Q.   Detainee grievance.

 2      A.   I don't know.

 3      Q.   Okay.  If you look at the last page of

 4  exhibit that I just showed you, page 104, you've never

 5  seen this page before, but --

 6      A.   The last page, this one?

 7      Q.   Yes.  It's a memorandum.  You see there where

 8  it says Cook County Department of Corrections

 9  Memorandum, and there's a box that's checked near the

10  bottom above a signature?  Do you see that?

11      A.   Yes.

12      Q.   It says "Nothing has been found" and it's

13  checked, right?

14      A.   Yes.

15      Q.   And if you look at this section here, what

16  does that say?

17      A.   Grievance -- Grievance report.

18      Q.   And it's got the prisoner number that you

19  entered in in '05 on it, that 87002.

20      A.   Okay.  So I sent one in, but they didn't like

21  it or they didn't acknowledge or they --

22      Q.   I believe what they're saying is they haven't

23  found a grievance filed by you.  Did you file a

24  grievance?

Page 125

1          A.   I don't remember.

2          Q.   Okay.

3          A.   I wasn't in the right state of mind.

4          MR. MORRISSEY:  All right.  You gave an answer.

5     BY THE WITNESS:

6          A.   I don't remember.

7          Q.   Okay.  After bonding out, you went to MacNeal

8     Hospital, right?

9          A.   Yes, I did.

10         Q.   And that was for a urinary tract infection --

11         A.   No.

12         Q.   -- that was severe?

13         A.   No.  It was to get my psychiatric medication

14    regulated because I had a nervous breakdown.

15         Q.   And you were not treated for a urinary tract

16    infection?

17         A.   They treated me, but they did not follow-up

18    when I told I told them I still had the infection.

19         Q.   I'm talking about MacNeal Hospital.

20         A.   Yes.  They treated me for -- I was in the

21    psych unit for a few hours.  They took blood work.  And

22    I was immediately rushed to the medical unit, and

23    started on antibiotic IV instantly.

24         Q.   For what?

Page 126

1        A.   For the urinary tract infection being

2   neglected.  And it was spreading throughout my body.

3        Q.   Okay.  Did you report to anybody after

4   arriving at MacNeal Hospital --

5        A.   Uh-huh.

6        Q.   Did you report to anybody that you hadn't had

7   your prescription medication while you were in the

8   jail?

9        A.   Yes.

10       Q.   Who --

11       A.   I told them I didn't get them until the last

12  few days.

13       Q.   Who did you report it to?

14       A.   Whoever was asking me all these questions.

15       Q.   Okay.  At MacNeal you --

16       A.   At MacNeal Hospital, you fill out forms.

17  They ask you questions.  And, you know, I don't leave

18  anything out when it comes to my psych medication

19  because I know what happens to me when I don't take it.

20       Q.   Aside from MacNeal, have you informed anybody

21  else other than in this lawsuit about not getting your

22  psych medications at the jail?

23       A.   Yes.

24       Q.   Who else?

Page 127

1     A.   People -- When I get in bad mood and I'm

2   manic and I'm angry and I'm crying and my friends ask

3   me why, yeah, and I tell them why.

4     Q.   What do you tell them?

5     A.   What do I tell them?

6     Q.   Yes.

7     A.   All my friends know I was in jail.  My church

8   knows, in jail.

9     Q.   Okay.

10    A.   I tell them my experience and that nobody

11  should go through what I've been through.

12    Q.   Who was the first person that you told

13  outside of the hospital -- outside of MacNeal that you

14  told that you did not get your psych medication until

15  the last few days?

16    A.   Okay.  First of all, it was my -- One of my

17  best friends that is a psych nurse that visited me

18  every week.

19    Q.   And what is her name?

20    A.   Her name is Donna Plia, P L I A, P L --

21  something like that -- P H L I A.  I can never ...

22    Q.   And is she an R.N., a registered nurse?

23    A.   She's a registered nurse, and she's a psych

24  nurse.  And she visited me every day for eight weeks.

1      Q.   And when did you have a conversation with

2   Donna Plia?

3      A.   First day she came to visit me in jail.

4      Q.   She visited you in jail?

5      A.   Every week.

6      Q.   In jail?

7      A.   Yes.  Because my parents wouldn't visit me

8   anymore in jail.

9      Q.   Did she visit you at the Cook County Jail

10  between November 5 of '05 --

11     A.   Every week.

12     Q.   -- and January 3 of '06?

13     A.   Every week.

14     Q.   All right.  Is she also a social friend with

15  you?

16     THE WITNESS:  That was the second arrest.

17  BY MR. CATANIA:

18     Q.   Did she also --

19     A.   She brought my mom that Sunday because she

20  told her I was deteriorating.  That Monday, my mom

21  bonded me out.  And I went directly to MacNeal Hospital

22  for 10 days or 14 days.

23     Q.   Okay.  Is she also a social friend of yours?

24     A.   Yes, she is.  I met her through the program.

Page 129

1    And I went to high school with her sister.

2             Talking too much again.  Go ahead.

3        Q.   Is she a treater of yours, or is she a social

4    friend?

5        A.   I'm sorry?

6        Q.   Is she a treater?  Does she treat you?

7        A.   No.  She's a friend of mine.

8        Q.   Okay.  She's a friend.  All right.

9             Where does she work; do you know?

10       A.   Well, she's in real estate right now.

11       Q.   Okay.  Do you know why she's working in real

12   estate right now?

13       A.   Well, it was a second job.  And then I guess

14   she's doing it full-time.  And it's hard to get a job.

15   I don't know.  She's been trying to find work in the

16   medical field, you know, but ...

17       Q.   Where did you have this initial conversation

18   with her about not getting your psych meds?

19       A.   In the visiting room at the jail.

20       Q.   At the jail.  Okay.

21            After being released from MacNeal, who is the

22   first person you informed about not getting the meds?

23       A.   Well, my mom met me in the hospital.  So it

24   would be her and whoever admitted me.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 130

1      Q.   Okay.  Aside from those people at MacNeal,

2   your mother, et cetera, anybody else that you --

3      A.   My father, my sister, my friends.

4      Q.   Did you ever inform anyone of the authorities

5   about it?

6      A.   Of the authorities?

7      Q.   Sure.

8      A.   I called Mr. Morrissey because I knew he

9   deals with these cases.  I told my doctor.  And during

10  the time of incarceration, yes, I went in front of the

11  judge.  And he gave me a court order that says

12  specifically these are the medications I take.

13     Q.   Okay.

14     A.   There's a letter from my doctor of the

15  medications I take and that I should see somebody that

16  is qualified --

17     Q.   Okay.

18     A.   -- to diagnose me properly.

19     Q.   And that was Dr. Cusick, right?

20     A.   Yes.

21     Q.   Okay.

22     A.   And I told them at the in- -- at the psych

23  evals, This is my fourth time here; please check my

24  past records and I was always given medication.

1      Q.   I understand that, ma'am.  Really, I'm not --

2   I'm just trying to find out information.

3      A.   I'm sorry.  I don't mean to get upset, but

4   it's just ...

5      Q.   Do you remember when it was that you first

6   told a judge about not getting your psych medication?

7      A.   Well, within those two months I was in jail.

8   It's dated.

9      Q.   Sometime in those two months?

10      A.   I told the public defender, yes.

11      Q.   Okay.

12      A.   I mentioned it once before but was unable, I

13   guess, to get it from the judge.  I don't know.  But I

14   eventually did get --

15      Q.   All right.  Who was the public defender?

16      A.   Well, I had Christine Feliz once, but I don't

17   think -- She was the second one.  The other one was a

18   taller, heavier lady with short brown hair.

19      Q.   Okay.  And you told her in the courtroom,

20   right?

21      A.   I told her in the talking room prior to going

22   in front of the judge.

23      Q.   She didn't visit you at the jail?

24      A.   No.

Page 132

1      Q.   Okay.

2      A.   It was a public defender.

3      Q.   I understand.

4           And you told her that you were on certain

5      medication, right?

6      A.   Yes.

7      Q.   Did you provide any documents in support of

8      that?

9      A.   Oh, no, I didn't.  But my parents many, many

10     times took the medication to County and this -- And I

11     guess -- I must have had the letter from the doctor,

12     otherwise I don't think the judge would order the same

13     medication that my doctor's giving me --

14     Q.   Okay.

15     A.   -- without somebody knowing during that time

16     this is what I'm medicated -- being on.  I hope I'm

17     making sense.

18     Q.   You are.

19          THE VIDEOGRAPHER:  This will be all for

20     Tape No. 2.  We're going off the video record at

21     3:34 p.m.

22                    (Discussion off the record.)

23          THE VIDEOGRAPHER:  This is the beginning of Tape

24     No. 3.  We're back on the video record at 3:35 p.m.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 133

```
 1        MR. CATANIA:  Thank you.

 2   BY MR. CATANIA:

 3        Q.   Ma'am, you said that you had gotten word to

 4   the court that you were on psychotropic medication --

 5        A.   Yeah.

 6        Q.   -- and you needed those medications, right?

 7             You said you did so through your public

 8   defender.  Could that be Maria Barrido?

 9        A.   Yes.  That was her name, yes.

10        Q.   All right.  And did Ms. Maria Barrido also

11   have with her a letter from your physician?

12        A.   I think so.

13        Q.   That would be physician Joseph -- Richard

14   Cusick?

15        A.   Yes, it is.

16        Q.   Ralph Cusick.  I'm sorry.

17             Do you know how your public defender got that

18   letter?

19        A.   I think my parents went and got it.  My dad,

20   my mom, my sister, somebody.

21        Q.   All right.  I'm going to --

22        A.   Or maybe he mailed it to them.

23        Q.   I'm going to show you what I'm going to ask

24   to be marked number 3.
```

Page 134

1          MR. CATANIA:  I don't have a copy, but I will, for

2     you.

3                         (Khoury Deposition Exhibit No. 3

4                          marked as requested.)

5     BY MR. CATANIA:

6          Q.   Do you recognize that page, number 3?

7          A.   Yes.

8          Q.   What is it?

9          A.   Letter from my doctor.

10         Q.   Who is it addressed to?

11         A.   "Attention Donna."  Okay.  My girlfriend

12    Donna.  "Leila Khoury is under my care."

13         Q.   And Donna is who?

14         A.   Donna is my girlfriend, the psychiatric

15    nurse.

16         Q.   Donna Plia?

17         A.   Yes.

18         Q.   Okay.  And it's addressed to her --

19         A.   Okay.

20         Q.   -- from your personal physician, right?

21         A.   Okay.  So it wasn't to my parents.  So what?

22         Q.   What does it list --

23         MR. MORRISSEY:  Don't --

24

0387a3ce-8e15-4353-8d24-24fca89fb6fd

1   BY MR. CATANIA:

2       Q.   What does it list as --

3       A.   Trileptal and Buspar.  That's for the

4   bipolar, yes.

5       Q.   Okay.  And that's what the letter refers to,

6   right?

7       A.   Yes.

8       Q.   Okay.  Could I have that back for a moment.

9            There's no other medications written on this

10  letter from Dr. Cusick --

11      A.   Right.

12      Q.   -- other than those two?

13      MR. CATANIA:  All right.  I'm go to ask that this

14  be marked number 4.

15                  (Khoury Deposition Exhibit No. 4

16                   marked as requested.)

17  BY MR. CATANIA:

18      Q.   If you could take a look at this order.

19      MR. MORRISSEY:  Do you mind showing it to me prior

20  to showing it to the witness.

21  BY MR. CATANIA:

22      Q.   Other than the letter from Ralph Cusick that

23  was sent through Donna --

24      A.   Uh-huh.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 136

1      Q.    -- to her attention and then brought to

2   court, was there any other document that was given to

3   the court?

4      MR. MORRISSEY:  If you know.

5   BY MR. CATANIA:

6      Q.   If you know.

7      A.   No.

8      Q.   Okay.  That is the court order that you

9   mentioned that was drafted by Maria Barrido, is that

10  right --

11     A.   Yes.

12     Q.   -- public defender?

13          And that's in the -- in the case in which you

14  were awaiting trial at that point, which is the case

15  number that's on Exhibit 2, Case No. 05C5506170, right,

16  up here?

17     A.   Yes.

18     Q.   Okay.  Same case number.  So that's the order

19  that was written in your criminal case; is that right?

20     A.   Yes.

21     Q.   All right.  That court order makes some

22  statements including a diagnosis --

23     A.   Mm-hmm.

24     Q.   -- right, bipolar disorder?

1      A.   Yes.

2      Q.   And it lists some medications, doesn't it?

3      A.   Yes, it does.

4      Q.   Can you tell me what medications are listed.

5      A.   Trileptal, Buspirone, Lexapro, Temazepam,

6   Prevacid, Compuvent inhaler, Clarinex.

7      Q.   Okay.  And other than the Trileptal and the

8   Buspar, there's a group of other medications listed --

9      A.   Mm-hmm.

10     Q.   -- right?

11     A.   Yes.

12     Q.   Okay.  So in addition to what was listed by

13  your physician, there's other medications in that

14  order?

15     A.   Yes.

16     Q.   And those medications are the ones that are

17  on that chart that you said was -- I guess it's the

18  fourth from the back -- the medical admission record --

19     A.   Mm-hmm.

20     Q.   -- of January of '06?

21     A.   '06.  Hmm, okay.

22     Q.   All right?

23     A.   Right.

24     Q.   Those are the ones that are listed, right?

Page 138

1      A.   Some of them.

2      Q.   Okay.  So --

3      A.   They're giving me Naproxen when it wasn't on

4  here.  So there's a few things that they're giving me

5  that were not medication that I was taking.

6      Q.   So far as you know?  Because you said before

7  those are medication names that you may not be familiar

8  with.

9      A.   Well, I know the Clonazepam.  I'm taking it

10 now.

11          Okay.  What's the point?

12     Q.   That's a document that was ordered by the

13 court; isn't it?

14     A.   Yes.

15     Q.   So based that court order listing some

16 medications, you started receiving those medications --

17     A.   No.

18     Q.   -- in January of '06?

19     A.   It says so in '06.  But that's another story

20 that I need to discuss with my lawyer.

21     Q.   Okay.  All right.  May I have that back.

22 Thank you.

23          It's signed Judge Sterba; isn't it?

24     A.   And the date was on December 2nd.

Page 139

1        Q.   So it's signed by Judge Sterba December 2nd

2   of '05?

3        A.   Right, right.

4        Q.   Do you know that you didn't start receiving

5   medications until January of '06 for a fact?

6        A.   Mm-hmm.  January 6?

7        Q.   January of '06.  In fact January 2nd, 3rd --

8   1st, 2nd, and 3rd, according to this medical

9   administration record.  1st, 2nd, and 3rd, you were

10  receiving medications.

11       A.   Right.  But not all of them the whole week.

12  The Albuterol was just given one day.

13       Q.   But the Albuterol is --

14       A.   An inhaler for asthma.

15       Q.   Right.

16            And you had that in your possession after it

17  was given to you, right?

18       A.   I don't remember.

19       Q.   Okay.

20       A.   I don't know.  When you're in the psych unit,

21  they're rarely --

22       MR. MORRISSEY:  There is no question.

23       THE WITNESS:  Yeah.

24       MR. MORRISSEY:  No question pending.

Plaintiffs' Exhibit 41                          Page 139

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 140

1    BY MR. CATANIA:

2         Q.   In any event, do you know for a fact that you

3    did not get those other medications before January 1st

4    of 2006?

5         A.   No.  All I know is that I did not get

6    medication when I requested it for a very long time.

7         Q.   Okay.

8         A.   Very long time.

9         MR. MORRISSEY:  Mr. Catania, are there any other

10   medical administration records that are in the custody

11   of your client that are not part of Exhibit No. 1?

12        MR. CATANIA:  No.

13   BY THE WITNESS:

14        A.   You got 2006.  This is ...

15        Q.   Have you told me everybody that you informed

16   immediately after leaving MacNeal Hospital that you did

17   not receive the medication you requested when you were

18   in the jail?

19        A.   Everybody knew.  And I'm trying to remember

20   even if my uncle came -- that lives in Dubai came to

21   visit me and saw me in that condition.  I don't

22   remember which time I was in jail.  But, yes, I told

23   everybody.

24        Q.   Okay.

Page 141

1      A.   Everybody knew I was on medication.  When

2   they saw me coming out, they asked me what the hell

3   happened.  And I told them because I didn't get my

4   medication.  I relapsed three weeks later because my

5   psyche was not right and picked up another case and

6   ended up in prison.  I mean, it is -- enough is enough.

7      Q.   Okay.  Do you have any prescription forms for

8   the prescriptions that are listed in the court order?

9      A.   My parents showed it to them.  My --

10  Dr. Cusick put the two medications, the main

11  medications, for the psych.  The Prevacid is for

12  heartburn.  So there was more than one doctor.  They

13  brought all my medication, showed it to somebody in

14  order to get the judge to allow that court order to be

15  written.  So somehow, some way the public defender saw

16  all my meds.  Which way?  I don't know.

17     Q.   What I want to know is, do you have any

18  prescription forms that describe the medications you're

19  talking about at the time when you entered into the

20  jail?  Did you have those prescription forms?

21     A.   You mean describing what which one does?

22     Q.   No.  Describing that you're talking the

23  Trileptal and the Buspar.

24     A.   We -- I had that.  And the other ones are --

Page 142

1    I don't know.  I told her what I was taking.  Whether

2    my parents showed it to him at one time or another --

3    Somehow there was enough proof for the judge to say,

4    Yes, this is her medication.

5         Q.   All right.  And that was Judge Sterba?

6         A.   He's not going to fill out it out unless

7    there was proof.

8         Q.   All right.  Are you currently taking your

9    medication?

10        A.   Oh, yes.

11        Q.   And does it help you with the symptoms?

12        A.   Well, we were trying to regulate it.

13        Q.   Okay.

14        A.   Because knowing that this was coming, it's

15   been very traumatic.

16        Q.   And by "this," you mean your deposition?

17        A.   Yes.

18             And you can ask anybody that's known me

19   before and after Cook County and they all tell me I'm

20   not the same.  And my cousin's an internist at

21   Northwestern.  And he understands perfectly well what

22   has happened to me.

23        Q.   Do you attribute all of your symptoms to the

24   fact that for a couple of months in '05 that you did

1    not have your medication?

2        A.   Yes, I do.

3        Q.   Okay.  Has any doctor suggested to you that

4    there is a direct relation between not having your

5    medications from '05 to January 1st of '06?

6        A.   Yes.  When I first started seeing

7    Dr. Gokhale, which is my doctor right now.

8        Q.   Okay.  Could I have that name, please?

9        A.   Gokhale, G O H A L E.  I have his card

10   somewhere.

11       Q.   Do you have it with you now?

12       A.   I might.  Mostly everything is in the

13   computer.  I'm not a good speller.

14            And -- Yes, and I broke down in front of him

15   many times.

16       Q.   Thank you.

17       MR. CATANIA:  I've been handed a business card.

18   BY THE WITNESS:

19       A.   I don't know if it's at 103rd -- 105th and

20   Cicero, that address, because he's moved.

21       MR. CATANIA:  The name on the card is Sudhir,

22   S U D H I R, M., Gokhale, G O K H A L E, M.D.,

23   psychiatry.  And the address listed is 10522 South

24   Cicero, Suite 2D in Oak Lawn, Illinois 60453.

Plaintiffs' Exhibit 41

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 144

1    BY MR. CATANIA:

2        Q.    And he's your current physician; is that

3    right?

4        A.    I see him and his associate Mary and -- And

5    I'm seeing a therapist, Victoria also in the same

6    office, a psychologist.

7        Q.    And both of those individuals are in the same

8    office?

9        A.    Yes, they are.

10       Q.    All right.  And you're saying that

11   Dr. Gokhale has told you that there is a direct

12   relationship to not having medication in November and

13   December of '05 --

14       A.    Well --

15       Q.    -- to what your symptoms are now?

16       A.    I've seen Dr. Gokhale early on in the

17   diagnosis and I saw Dr. Cusick, went back and forth,

18   and -- So Dr. Gokhale's known me before and after.

19   And --

20       Q.    Has Dr. Cusick known you before and after?

21       A.    Yes.

22       Q.    Okay.

23       A.    And Dr. Gokhale definitely -- when I told

24   him, you know, he says, There's a very good possibility

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 145

1  that you did have a break down, because -- the way I

2  was behaving in front of him.  And I told him that's

3  how I was for eight weeks.

4       Q.   Has Dr. Gokhale ever offered an opinion that

5  your use of controlled substances -- illegal controlled

6  substances after your discharge from jail was related

7  to not having your medication while inside of the jail?

8       A.   Has he?

9       Q.   Yes.

10      A.   His diagnosis is that addicts self-medicate

11 when they have a chemical imbalance.

12      Q.   Is that his diagnosis of you?

13      A.   Huh?

14      Q.   Is that his diagnosis of you?

15      A.   That is the diagnosis of the American Medical

16 Society.

17      Q.   Okay.  And where did you determine that?

18      A.   I have read it over and over again in

19 treatment that self-medicating is a symptom of the

20 addiction just like sneezing is a symptom of the cold.

21      Q.   All right.  Aside from your treating

22 physicians, are there any other doctors, physicians,

23 psychiatrists or otherwise that have given the opinion

24 to you that your relapse into taking elicit drugs is

Page 146

1    related in any way to not getting the medications while

2    you were inside the jail?

3         A.   How could they actually say that when they

4    weren't living in my skin?  All I can tell you is from

5    experience.  When I take medication, I don't use.  When

6    I'm not medically stable, I use.

7              So whatever the opinion of the doctor is,

8    chances are he would agree with me.  But they make

9    suggestions.  They don't tell you yes or no.  But for

10   the past 19 years, in and out of jail, in and out of

11   medicine and drugs, that's the cycle.  You could put

12   whatever name you want on it.  When I don't get my

13   meds, I use.

14        Q.   Okay.

15        A.   I was released from the hospital.  Three

16   weeks later, because my meds were not stable, I picked

17   up another case.  And it's all because of the eight

18   weeks being denied.  And I'm angry.  And it shouldn't

19   have happened to me.  And it's not going to happen to

20   anyone else, and I'm going to make sure of it.  That's

21   why I'm here.

22        MR. MORRISSEY:  All right.  You don't have to --

23   BY MR. CATANIA:

24        Q.   Is that your personal opinion, ma'am?

Page 147

1          A.    What?   Which one?

2          Q.    What you just said about the relationship

3     between your medication and lack of it and your picking

4     up another case, is that your --

5          A.    From my experience, yes.

6          Q.    Okay.   That's from your personal experience?

7          A.    Yes.

8          Q.    Has any doctor said that to you?

9          A.    I never asked.

10         MR. CATANIA:  Okay.  I have no further questions.

11         MR. MORRISSEY:  Go off the record.

12         THE VIDEOGRAPHER:  We're going off the record at

13    3:51 p.m.

14                        (Discussion off the record.)

15         THE VIDEOGRAPHER:  We're back on the video record

16    at 4:02 p.m.

17                        CROSS-EXAMINATION

18    BY MR. MORRISSEY:

19         Q.    Ms. Khoury, I'm going to ask you a few

20    clarifying questions because I think that a few items

21    kind of got misstated during the course of this

22    deposition through some of the questioning by

23    Mr. Catania.

24               Looking at these documents that Mr. Catania

Page 148

1    presented to you as Khoury Exhibit No. 1, I would ask

2    you to turn to the sixth page of this group exhibit.

3    It's the document that is dated 11/9/08.  And it's a

4    Detainee Health Service Request Form.  Do you see that

5    document?

6         A.   Yes, I do.

7         Q.   Now, under the third line, there is a

8    notation that -- that it looks like booked 11/08/05.

9    Do you see that on that document, on --

10        A.   Booked 11/8/05.

11        Q.   Is that your handwriting --

12        A.   No.

13        Q.   -- or is that somebody else's?

14        A.   That's not my handwriting.

15        Q.   Okay.  Now, turning to page 1 of that

16   exhibit.  Mr. Catania asked you some questions about an

17   entry on the left-hand side which looks like a

18   preprinted form which has your name and date of birth

19   and CIMIS number, and then it case BKDT 11/05/2005.  Do

20   you see that?

21        A.   Yes.

22        Q.   And the top sheet, that page to the

23   right-hand side says "Hospital Takeover."  Do you see

24   that?

Page 149

1        A.   Hospital, Q2, yes.

2        Q.   Okay.  Now, when you were arrested in

3    November of 2005, do you recall that you were taken to

4    court?

5        A.   After our conversation in there, yes, I do

6    recall what happened, that incident.

7        Q.   Do you recall, prior to going to the

8    hospital, going to a court building?

9        A.   No, I don't, actually.  But I do remember

10   being in the holding tank waiting for the bus to pick

11   me up.  I remember waking off the floor with the

12   paramedic giving me smelling salt, whether it was --

13       Q.   Was that in a court building?

14       A.   Yes, that was in a court building.

15            And after speaking with you, I believe it was

16   this incident.  Because I've been arrested so many

17   times, the police have taken me so many times.  But

18   there was one incident where I wake up with the

19   paramedic giving me smelling salt in the basement of

20   the courthouse.

21       Q.   Which courthouse was it?

22       A.   Bridgeview courthouse.

23            So it's a good possibility --

24       Q.   When you were taken from the Bridgeview

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 150

1    courthouse, were you taken to Christ Hospital?

2         A.   Yes.

3         Q.   Okay.  And you testified earlier to -- this

4    afternoon that you recall being in the Christ Hospital

5    for several days before you arrived at Cook County --

6         A.   Yes.

7         Q.   -- correct?

8              So looking at Group Exhibit No. 1, page 6,

9    does that refresh your memory that on or about

10   November 8th, 2005, you actually entered the Cook

11   County Jail?

12        MR. CATANIA:  Object to the form of question.

13   BY THE WITNESS:

14        A.   I'm sorry.

15        MR. MORRISSEY:  Stop right there.  What is your

16   objection in regard to the form of the question?

17        MR. CATANIA:  Form of the question.

18        MR. MORRISSEY:  That's usually your -- form

19   objection that you usually make, but ...

20   BY THE WITNESS:

21        A.   Now, your question was again?

22        Q.   My question is -- is, looking at the Detainee

23   Health Service Request Form dated 11/9/08, does that

24   refresh your memory that you may have entered Cook

1   County Jail on November 8th, 2005?

2        MR. CATANIA:  Objection to the form of the

3   question.

4   BY THE WITNESS:

5        A.   I don't remember what date I entered.

6        Q.   Okay.

7        A.   If I saw them that day I walked in, the day

8   after.  I saw somebody and told them.

9        Q.   Okay.  You recall being in Christ Hospital,

10  though?

11       A.   Oh, yes.

12       Q.   For three or four days, right?

13       A.   Yes.

14       Q.   And you recall during one of your

15  incarcerations you were taken from --

16       A.   Bridgeview.

17       Q.   -- Bridgeview --

18       A.   Yes.

19       Q.   -- and taken directly to Christ?

20       A.   Right.  And the more I think of it, I believe

21  there's a possibility that it could have been this one

22  since I had a bond.

23       Q.   That's all right.

24       A.   I mean, it makes sense that this is the time.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 152

1    But it did not come to mind until after we were

2    speaking in there.  Then I remembered the smelling salt

3    by the paramedic because I had passed out in the

4    holding cell.

5         Q.   Now, you've previously -- prior to November

6    of 2005, you had been in Cook County Jail, correct?

7         A.   Three times at least that I can remember.

8         Q.   Okay.  And you had been taking psychotropic

9    medications for over a decade?

10        A.   1991.

11        Q.   Okay.  And you're aware that when you don't

12   take your psychotropic medication that your health --

13   mental health deteriorates, correct?

14        A.   I self-medicate, yes.

15        Q.   Now, when you came into Cook County Jail in

16   November of 2008 -- 2005, did you want to continue your

17   medications?

18        A.   Of course.

19        Q.   And when you came in from Christ Hospital in

20   November of 2005, did you have in your possession or

21   were your medications transported with you from Christ

22   Hospital?

23        A.   My medications were in my purse, yes.  And I

24   believe they were transported with me.  And I think

Page 153

1    they threw them out.

2         Q.   Okay.

3         A.   And they said that they cannot distribute

4    medication from the outside, that it has to come from

5    inside.  At least that's what I recall to the best of

6    my -- you know -- their policy.  I think that's what it

7    is.

8         Q.   Okay.  On the request form that you made on

9    November 9th, 2008, the last line of that request "Came

10   from Christ Hospital with meds.  Did not get any yet,"

11   is that your handwriting?

12        A.   Yes, it is.

13        Q.   So does that refresh your memory that when

14   you came from Christ Hospital to the jail that you had

15   your medication -- your psychotropic medication?

16        A.   Yes.

17        MR. CATANIA:  Objection, form of the question.

18   BY MR. MORRISSEY:

19        Q.   Now, shortly after coming to the Cook County

20   Jail, did you receive a psych evaluation?

21        A.   Yes.

22        Q.   And do you know if that was in the emergency

23   room or ...

24        A.   Well, long corridor.  But I don't know if

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 154

1    that was the time I took the long corridor for that

2    evaluation or the other two or three.

3         Q.   Okay.

4         A.   But it was in Cermak with doctors, with

5    guards, people being wheeled in, wheeled out, people

6    waiting to see a doctor.  That was at intake.

7              Now, all the other evaluations, I was taken

8    from Q2 to a separate-looking room that had like three

9    cubicles.  And I believe the shelves had blue folders.

10   But it was not the same room as in intake, but I

11   remember -- or intake or the original room where I told

12   her.  And I was told that -- that I should -- I was

13   going to see a psychiatrist.  And she wrote down all my

14   medication.  And then after that, I was given my

15   clothes, taken a shower, and went to bed.

16        Q.   Okay.  I'm showing you what -- Exhibit No. 1,

17   page 4.  It's the form that Mr. Catania showed you.

18   This is CCDOC Nonemergency Request for Psychiatric

19   Consultation.  Do you see that form?

20        A.   Yes.

21        Q.   Now, you requested a psychiatric evaluation?

22        A.   Yes, I did.

23        Q.   Okay.  And there is -- In the lower portion

24   of that document, it says "Other, please specify.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 155

1   Patient has been evaluated medically."  And then

2   there's some -- some entry here.  I can't make it out.

3        A.   Scheduled.

4        Q.   Scheduled.

5             Sick call; please evaluate psych; says she

6   takes medication in the world.

7             Now, did you make that comment to the social

8   worker or --

9        A.   Yes.

10       MR. CATANIA:  Objection.  Form of the question,

11  objection.

12  BY THE WITNESS:

13       A.   She wrote it down, didn't she?

14       Q.   So your intent when you talked, apparently,

15  to this D. Thomas on 9/10/05 is you wanted your

16  medications; is that correct?

17       A.   Yes.

18       MR. CATANIA:  Object to the form.

19  BY THE WITNESS:

20       A.   I wanted my medication.  And she wrote it

21  down because I said it.

22       Q.   Now, the next page apparently is an

23  evaluation done at some time by D. Thomas, the same

24  person, correct?

Page 156

1       A.    Yes.

2       Q.    Okay.

3       A.    Looks like the same signature.

4       Q.    And her plan was, Okay to return to

5  Division 4; detainee declined admission to Mental

6  Health Services; detainee informed on how to access

7  admission in future to Mental Health Services if

8  necessary.

9             Did you ever decline mental health services?

10      A.    No.

11      Q.    And you knew how -- You knew that prior to

12 getting your medication at the jail that you had to go

13 through Cermak Health Services, correct?

14      A.    Yeah.  Two, three days, they start you.  Then

15 they put you on the third division, Division 3.  At

16 least that's what it was the last time, you know.

17            History, current treatments.

18      Q.    All right.  In that same document, Current

19 Symptoms, Patient reports I'm fine and don't need to go

20 to the crazy floor; denies any SH suicide -- SHI at

21 present time.

22            Did you tell Mrs. Thomas on that day that you

23 were fine?

24      A.    No.  Why would I go ask for a psych eval and

0387a3ce-8e15-4353-8d24-24fca89fb6fd

1    then tell them I'm fine?

2        Q.   Okay.

3        A.   And it says here "current treatment."  It's

4    got all my medication written down.  Where would she

5    get the names of the medications unless I told her,

6    right here?

7        Q.   You're referring to that same --

8        A.   Yeah.

9        Q.   -- document, the Admission/Evaluation --

10       A.   Right.  With a signature saying that I

11   denied.  Where would she get all the names of the

12   medication if I didn't tell her?

13            Oxy, mood, tired, speech, full range.  And

14   then prior to this is I was untidy and all that.  I

15   mean, put it all together.

16       Q.   Now, to the best of your recollection, you

17   didn't receive any psychotropic medication until the

18   last few days that you left Cook County Jail?

19       A.   Mm-hmm.

20       Q.   You have to answer yes or no.

21       A.   Yes.

22       Q.   And after you saw -- Let me see that

23   document.

24            MR. MORRISSEY:  Go off the record for a record.

Page 158

1       THE VIDEOGRAPHER:  Going off the record at

2   4:14 p.m.

3                       (Discussion off the record.)

4       THE VIDEOGRAPHER:  Back on the video record at

5   4:15 p.m.

6       Q.   After you received this court order on

7   December 2nd, 2005, you were evaluated again by some

8   psychiatrist or psychologist at Cermak Health Services?

9       A.   This was what --

10      Q.   December 2nd, 2005.

11      A.   December 2nd, well, obviously, yeah.  I bet

12  you it's in here somewhere.  Or maybe not.  Maybe

13  because I was waiting for them to comply with this, the

14  waiting game.  I don't know.  If I did, it would be in

15  here unless it's -- they didn't put it in here.

16          But believe me, I did whatever I could, so

17  did my parents, so did everybody.  My parents went down

18  with my medication, talked to the warden, talked to

19  everybody.  Thank God she got a hold of Gary the

20  psychologist.  And he's the one that said, Thank God

21  for your mother getting a hold of me or else you

22  wouldn't be here right now.

23      Q.   There appears -- Looking at this record, it

24  appears that you were seen again in the emergency room

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 159

1    on 12/12/05, if you look at the sixth document from the

2    end.

3         A.   Yes, I see it.

4         Q.   Okay.  And then looking at the medication

5    administration record for January of 2006, there is a

6    series of drugs which apparently are psychotropic

7    medication, the last three, Lanso- -- What is it,

8    Lanso- --

9         A.   Temazepam.

10        Q.   Well, no there is one --

11        A.   Oh, I'm looking at --

12        Q.   If you look at the --

13        A.   -- the wrong page.

14             Where are we?  The list of medications?

15        Q.   Right.

16        A.   Benadryl, 11/14.  That's for the infection.

17   I don't seem to find that page.  I passed it up.  I'll

18   find it.

19        Q.   Looking at the medication administration

20   record for January of '06, looks like there is a series

21   of drugs that were prescriptions that may or may not

22   have been ordered on 12/9/05.

23        A.   I can't find it.

24        Q.   But there's no prescription order in this

Page 160

1    medical form.  Apparently the medical records tendered

2    by Mr. Catania are not complete.

3         MR. MORRISSEY:  I have no further questions.

4         MR. CATANIA:  I have a few questions.

5                     REDIRECT EXAMINATION

6    BY MR. CATANIA:

7         Q.   You said that when you arrived initially in

8    November of '05 that you had medications in your purse,

9    right?

10        A.   Yes.

11        Q.   Okay.  And you say that they were thrown out?

12        A.   I believe so.  One of the times --

13        Q.   What is the basis --

14        A.   -- I was arrested, they threw them out.  One

15   time I was arrested, I had the medication when I left.

16   Which time?  I don't know.  But one of the times, yes;

17   one of the times, no, out of four, five times I've been

18   there.

19        Q.   Okay.  So you don't know for sure that in

20   this case in November of '05 your medications --

21        A.   No.

22        Q.   -- were thrown out?

23        A.   I can't say a hundred percent.  But one of

24   the times, they did; and one of the times, I had them

Page 161

1    when I was released.

2         Q.   Are you aware of any laws that require the

3    sheriff to take any of the medication away?

4         A.   No, I don't know what they do.

5         Q.   Okay.

6         A.   And neither does anybody know what they do in

7    Cook County.

8         MR. MORRISSEY:  All right.  There's ...

9    BY THE WITNESS:

10        A.   I'm just tired.

11        Q.   All right.  I'm confused about what the

12   sequence was since you said that you remember now that

13   in the basement of the courthouse you awoke because of

14   smelling salts.

15        A.   In one incident when I was arrested going to

16   County, it was in the courthouse.  That was the only

17   time.  All the other times was from the police station,

18   so -- And since I was told that there was a bond

19   hearing, then I'm like, Oh, wait, maybe that's the time

20   that I was taken from the courthouse.

21        Q.   So as far as you remember, it's possible that

22   you were taken from the courthouse to Christ Hospital

23   following a bond hearing?

24        A.   Yes.  The more I think of it, the greater

Page 162

1    possibility and chances are that's what happened.

2        Q.   And that information about having a bond

3    hearing came to you after we took a break?

4        A.   I don't remember the bond hearing.  But I

5    remember the smelling salt and being taken from the

6    courthouse.

7        Q.   Okay.  Was that as a result of a conversation

8    you had at the break that you remembered that?

9        A.   Yeah.  We were talking.  We were talking.

10   And I was saying -- You were taken from here to there;

11   are you sure it wasn't from -- from, you know, the

12   courthouse; where were you; was it right after; because

13   you got a bond hearing, so you must have seen the judge

14   somehow between this and that; it's almost impossible.

15          And then I'm like, Wait a minute, I did get

16   taken from the courthouse.  Because how could you get a

17   bond hearing without seeing the judge right away --

18       Q.   All right.

19       A.   -- and go from the hospital to Cook County

20   Jail without going to probable cause?

21       Q.   Was there any documents shown to you during

22   the conversation you had with Mr. Morrissey at the

23   break?

24       A.   No.

1       Q.   Okay.

2       A.   Just this, whatever -- this thing here.

3       MR. MORRISSEY:  Exhibit No. 1.

4       THE WITNESS:  Right.

5    BY MR. CATANIA:

6       Q.   Aside from being told about it being

7    impossible to get to the jail without having had a bond

8    hearing, did Mr. Morrissey tell you anything else at

9    the break?

10      A.   Well, he didn't really say "impossible."  He

11   says, Well, you must have had a bond hearing.

12      Q.   Okay.

13      A.   You got the bond.

14      Q.   Okay.

15      A.   He didn't say, you know, that it's

16   impossible.

17      Q.   Aside from that, did he tell you anything

18   else at the break?

19      A.   No.

20      Q.   Okay.

21      A.   To calm down.

22      Q.   As you sit here today, your memory of the

23   time you were in jail from November 5 of '06 to

24   January 3 of --

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 164

1        MR. MORRISSEY:  Object.  She didn't say --

2   BY MR. CATANIA:

3        Q.   December 5 of '05 to January 6 of '06 --

4        MR. MORRISSEY:  Objection --

5        MR. CATANIA:  All right.  I'll start the whole

6   question over since you're trying to interrupt.

7   BY MR. CATANIA:

8        Q.   As you sit here today, your memory of your

9   incarceration from November 5 of '05 to January 3 of

10  '06, the only time during that period that you received

11  medication for your bipolar disorder was the beginning

12  of January of '06; is that right?

13       A.   I remember it was a few days before I was

14  bonded out.

15       Q.   A few days before you bonded out?

16       A.   Yes.

17       Q.   And you bonded out on January 3rd of '06?

18       A.   That's what it says.

19       Q.   Okay.  So are you saying that as far as your

20  memory is concerned, you don't remember getting any of

21  those medications in the month of December of '06 --

22  '05?  I'm sorry.  '05.

23       A.   I'm a hundred percent sure that I did not get

24  any medication until a few days before I was released,

Page 165

1    and it was not nice.

2         Q.   Okay.  All right.  And you're saying that the

3    result of not getting your medication is -- the

4    condition that you feel you're in now of your -- if

5    you're not getting medication, you're more likely to go

6    out and find street drugs?  Is that what you're saying?

7         A.   Well, more likely.  It's -- I've proven it in

8    the past 19 years.

9         Q.   Okay.  That's your view, is that you've

10   proven it?

11        A.   That's my cycle.  That's my --

12        Q.   All right.

13        A.   The insanity of my life.

14        Q.   But, in fact, the street drugs started before

15   getting any treatment at all for the bipolar disorder,

16   right?

17        A.   I wasn't diagnosed with bipolar until I went

18   into treatment.

19        Q.   Okay.

20        A.   But growing up, I was always very, you know,

21   hyper and, you know, defiant.

22        Q.   And so the answer then is yes, you started --

23        A.   Yes.

24        Q.   -- street drugs first?

1          Okay.  Have you seen your booking photos from

2     the times that you have been arrested in the past?

3          A.   I've seen -- I have one that they were able

4     to give us.  I think that must have been 2002.

5          Q.   Okay.

6          A.   Before they changed, when they were

7     laminated.

8          Q.   And have you noticed any changes over that

9     period of time in yourself, in your appearance and

10    other ways?

11         A.   When I don't use, there's a drastic

12    difference.

13         Q.   You don't think that there's been a

14    progression of change over the period of time that

15    you've been using street drugs, right?

16         A.   The progression of change has been up and

17    down, up and down, up and down, up and down, that the

18    change is so drastic that I can't describe it.  I mean,

19    but now, you know, physically I look better.  I'm

20    healthier.  But, you know, emotionally temperwise and

21    what others tell me how I was before and after the

22    incarceration -- Even my doctor notices a difference.

23         Q.   And today how old are you?

24         A.   48.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 167

1      Q.   Do you recall your first arrest?

2      MR. MORRISSEY:  Mr. Catania, this is beyond the

3  scope of cross-examination.  So I hope you're not going

4  to be terribly long.

5      MR. CATANIA:  It's a deposition.

6      MR. MORRISSEY:  Mr. Catania, you always have a

7  come-back.

8  BY MR. CATANIA:

9      Q.   Do you recall the first arrest?

10      MR. MORRISSEY:  Mr. Catania, are you going to be

11  much longer?

12      MR. CATANIA:  No, I won't.  Very short.

13      MR. MORRISSEY:  All right.

14  BY MR. CATANIA:

15      Q.   Do you recall the first arrest?  That was for

16  the burglary/theft that you talked about.

17      A.   No.  I was using before that.

18      Q.   Okay.

19      A.   I think I was in -- When I got in the car

20  accident in '91, I believe that's when they found like

21  5, $10 worth of crack in my car.

22      Q.   Okay.  So you --

23      A.   Can't quote me on that because my memory is

24  not all that.

0387a3ce-8e15-4353-8d24-24fca89fb6fd

1      Q.   I understand.

2      A.   But I believe that was my first offense of

3   possession.  Prior to that, when I was dating my

4   husband in 1989, a girl stole my wallet, came after me,

5   and I hit her in the face out of protection.

6      Q.   Okay.

7      A.   Maybe that's the first time.

8      Q.   All right.

9      A.   But when it comes to jail, medication,

10  breakdown, the way I am now, started in 1991 --

11     Q.   Okay.

12     A.   -- with my medication.

13     Q.   I'm going to show you a series of booking

14  photos.

15     MR. CATANIA:  I'm going to ask that they be marked

16  as a group exhibit.

17     MR. MORRISSEY:  Mr. Catania, I caution you.  This

18  is beyond the scope of cross-examination.

19     MR. CATANIA:  I understand.  It will be very

20  quick.

21                    (Khoury Deposition Exhibit No. 5

22                     marked as requested.)

23  BY THE WITNESS:

24     A.   I don't see what pictures have anything to do

Page 169

1    with ...

2         Q.   I'm going to show you a group exhibit which

3    is booking photos and arrest reports for various dates.

4    And I'll tell you the dates.  March 20 of 1998;

5    November 4, 2005; January 28, 2006; April 27, 2008; and

6    May 15th, 2008.  Okay?

7         MR. MORRISSEY:  Are these documents that haven't

8    been previously --

9         MR. CATANIA:  Yes.  They've not been tendered in

10   discovery, yes.

11        MR. MORRISSEY:  And now you're going to present

12   them to this witness --

13        MR. CATANIA:  Yes, I am.

14        MR. MORRISSEY:  -- when you have not presented

15   them during discovery nor Rule 26?

16        MR. CATANIA:  Correct.

17   BY MR. CATANIA:

18        Q.   That photograph, does that fairly and

19   accurately depict to you --

20        MR. MORRISSEY:  And you haven't tendered them to

21   me.  You're showing them to the witness without showing

22   them to me.

23        THE WITNESS:  Again.

24        MR. CATANIA:  I just offered them to you,

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 170

1    Mr. Morrissey.  But you preferred to interpose an

2    objection.

3    BY MR. CATANIA:

4         Q.   So I'm just asking you to look at them now.

5    I'm only concerned about the top page of each.

6         A.   You mean the way I look?

7         Q.   Yes.

8         A.   Well, of course they're all going to be

9    different when you're on drugs and when you're on

10   medication and when you're not using and plus bed-head

11   in the morning.

12        Q.   The top photo, does that accurately depict

13   you as you appeared on the date of your arrest on 20 of

14   March of 2000 -- or 1998?

15        A.   In March -- March 20th, eleven years ago, I'm

16   supposed to remember what I looked like?

17        Q.   Does that look like -- Is that how you

18   appeared --

19        A.   That's me.

20        Q.   -- on the date of your booking?

21        A.   Pictures don't lie, do they?

22        Q.   The next one which is, I believe, dated

23   October -- I'm sorry -- November 5 of 2001 --

24        A.   2001.

Plaintiffs' Exhibit 41                                    Page 170

Page 171

1      Q.   -- does that fairly and accurately depict

2  your appearance on the date of that arrest?

3      A.   How could anybody say no to that?

4      Q.   All right.

5      A.   I'm sorry.  But stupid questions just really

6  annoy me.

7      Q.   And does that next photo --

8      A.   Yes.

9      Q.   -- accurately depict you?

10      A.   It's my face.

11      Q.   And the next one which is 20 of June 200- --

12      A.   January 2006, yes.  That's when I picked up

13  the second case because I didn't get my medication

14  here.  And I was self-medicating because it takes --

15      MR. MORRISSEY:  All right.

16  BY MR. CATANIA:

17      Q.   And that arrest there?

18      A.   April 2008.

19      Q.   Does that fairly and accurately depict you at

20  that time?

21      A.   I don't remember what this arrest was for.

22  It's a black eye, looks like I had, and the lip.  And I

23  don't recall what that's -- that was for, April

24  of 2008.

Page 172

1      Q.   All right.  And the next one, which is 15 May

2  of 2008, can you tell me if that accurately depicts you

3  at the time of that arrest?

4      A.   I would like to know what this one was for.

5      Q.   And by "this one," you're referring to

6  27 April 2008?

7      A.   Yes.  I'm just starting to think.

8          I don't recall being arrested last year

9  April.  What does it say for that?  Oh, paraphernalia.

10  Okay.  Yeah.  The 21st, right.  Yeah, that was thrown

11  out, I believe, because -- No.  Is this from Hickory

12  Hills or is that from Cook County?

13      MR. MORRISSEY:  The question is only is that how

14  you looked on that date of 2008.

15      THE WITNESS:  Well, obviously, yeah.  But I'm

16  trying to remember why.

17  BY MR. CATANIA:

18      Q.   And the next one, is that how you looked on

19  the 15th of May 2008?

20      A.   Pictures don't lie.

21      Q.   Okay.  Would you agree with me that those

22  photographs depict you in a progression of both aging

23  and having shown the signs of the use of drugs over the

24  period of time we're talking about?

Page 173

1        A.   No, not progressing because --

2        MR. MORRISSEY:  I'm going to object.

3    BY THE WITNESS:

4        A.   I mean, the ones before in '98, I look worse

5    than I look over in 2006.  Addiction cycles.

6        MR. MORRISSEY:  All right.  You don't agree.

7    BY THE WITNESS:

8        A.   The way you look cycles.

9         MR. MORRISSEY:  You don't agree.

10   BY THE WITNESS:

11       A.   This is irrelevant.

12       Q.   All right.

13       A.   I mean --

14       MR. MORRISSEY:  All right.  Just --

15   BY THE WITNESS:

16       A.   Yeah.

17       MR. MORRISSEY:  -- yes or no.  You don't agree.

18   BY MR. CATANIA:

19       Q.   Do you agree, though, that the pictures speak

20   for themselves?

21       A.   Yeah.  I look better in one year, and I look

22   worse in the other year.  But the year after the first

23   year, I look worse than the first time I was arrested.

24   It's --

 1        MR. MORRISSEY:  All right.  Just --

 2   BY THE WITNESS:

 3        A.   I mean ...

 4        MR. MORRISSEY:  There's no question pending.

 5   BY THE WITNESS:

 6        A.   Believe me, when you're arrested, you're not

 7   Miss Queen America.

 8        Q.   Right.  I understand.

 9        A.   You don't get arrested --

10        MR. CATANIA:  Thank you.

11   BY THE WITNESS:

12        A.   -- for looking good.

13        MR. CATANIA:  No further questions.

14        MR. MORRISSEY:  We have no follow-up questions

15   about the pictures.

16        THE WITNESS:  Are we done?

17        THE VIDEOGRAPHER:  This is all for Tape No. 3 and

18   will be the conclusion of today's deposition.  We're

19   going off the video record at 4:30 p.m.

20                     (Witness excused.)

21

22

23

24

Plaintiffs' Exhibit 41

0387a3ce-8e15-4353-8d24-24fca89fb6fd

Page 175

```
 1   UNITED STATES OF AMERICA        )
     NORTHERN DISTRICT OF ILLINOIS   )
 2   EASTERN DIVISION                ) SS.
     STATE OF ILLINOIS               )
 3   COUNTY OF COOK                  )

 4

 5           I, Teresa Resendez, Certified Shorthand

 6   Reporter and Notary Public, do hereby certify that

 7   LEILA S. KHOURY was first duly sworn by me to testify

 8   the whole truth and that the above deposition was

 9   reported stenographically by me and reduced to

10   typewriting under my personal direction.

11           I further certify that the said deposition

12   was taken at the time and place specified and that the

13   taking of said deposition commenced on the 14th day of

14   September, A.D., 2009, at 1:20 p.m.

15           I further certify that I am not a relative or

16   employee or attorney or counsel of any of the parties,

17   nor a relative or employee of such attorney or counsel,

18   nor financially interested directly or indirectly in

19   this action.

20

21

22

23

24
```

Plaintiffs' Exhibit 41                                    Page 175

Page 176

1          In witness whereof, I have hereunto set my

2    hand and affixed my seal of office at Chicago,

3    Illinois, this 7th day of October, A.D., 2009.

4

5

6

7

8

9
                          _____
10                        TERESA RESENDEZ, CSR
                          39 South LaSalle Street
11                        Suite 625
                          Chicago, Illinois  60603
12                        Phone:  (312) 236-9211

13
     CSR No.  084-003718
14

15

16

17

18

19

20

21

22

23

24

Plaintiffs' Exhibit 41                              Page 176

**Exhibit 4&**

Cermak Health Services of Cook County
2800 S. California Avenue
Chicago, IL 60608

**Department of Mental Health Services**
**Brief Primary Psychological Screening Tool (RCDC)**

Last Na ||||||||||||||| 29050    e:_____ DOB:_____ DOC#:_____

Addres **KHOURY, LEILA** F _____ Phone:_____

**04/02/1961**

Charg **20050087002** **BKDT:11/05/2005** d:_____ Court:_____
1st Degree murder / ....    and ____ close associate ___ none___

Race: ☐ W   ☐ B   ☐ Sp   ☐ Asian   ☐ Other:_____ SS#:_____

Employed: ☐ Yes   ☐ No  Occupation:_____

1. Have you ever been in Cook County Jail before? ☐ No ☐ Yes  What division?_____

2. Have you ever been hospitalized for psychiatric treatment? ☐ No ☐ Yes  How many times?_____

   Last date:_____ What reason:_____ Where:_____

3. Are you currently receiving outpatient psychiatric treatment? ☐ No ☐ Yes  Why?_____

   Last visit date:_____ Location:_____ Doctor's name:_____

4. Are you now taking psychotropic medication(s)? ☐ No ☐ Yes  Name(s):_____

5. Do you drink alcohol? ☐ No ☐ Yes  How much?_____

   Do you use drugs? ☐ No ☐ Yes  What drugs?_____ How much?_____

6. Have you ever attempted suicide? ☐ No ☐ Yes  Last attempt:_____ How?_____

7. Do you feel suicidal now? ☐ No ☐ Yes

8. Are you feeling homicidal now? ☐ No ☐ Yes  Explain:_____

9. Have you ever had special education classes? ☐ No ☐ Yes  Explain:_____

10. Are you now homeless? ☐ No ☐ Yes  Where do you stay?_____

11. Are you a Veteran? ☐ No ☐ Yes  Branch of Service/Type of Miltary Discharge_____

**Is this detainee's behavior appropriate in the RCDC area?** ☐ Yes  ☐ No  Describe:_____

_____ _Hospital_

_____ _takeover_

**Mental Health Screening Plan:**  ☐ General Population  ☐ Admission/Evaluation Form
☐ Mental Health Secondary Interview   ☐ Other:_____

Signature Mental Health Staff:_____

Date: 1/5    Time: 2340

Form#: 87417 Rev: Nov. 2004

Plaintiffs' Exhibit 42

|||||||| . C H S 8 7 4 1 7

||||||||| 29050 F
KHOURY, LEILA
04/02/1961    BKDT:11/05/2005
20050087002    Khouri 00003
Page 1

**Exhibit 4'**

Interdisciplinary Patient Placement Evaluation

Name: Driscoll, Sean          RIN          SSN:          Diagnosis: 30400

Admission Date: 2/26/08   Review Period: 3/26/08 - 4/26/08   Next Review Period: 4/26/08 - 5/26/

Program:        Methadone        Adult Outpatient        Adolescent Outpatient        DUI

Type of Evaluation:     Admission        Continued Stay        Discharge        Transfer

Change in Level of Care:        Yes    No        Date of Change in Level of Care:    N/A

Client 18 Years of Age or Older: Yes    No        Alcohol/Barbiturate Use w/ OMT: Yes    No    N/A

appears to be social drens

| ASAM Dimension & Assessed Level of Care | Client Assessment / Progress on Treatment Plan Goals & Objectives |
|---|---|
| **Overall Assessed Level of Care (Circle one):** AC  OMT  1.0  2.0  2.1  2.5  3.0  3.1  3.3  3.5  3.7  4.0 | |
| 1 - Withdrawal Potential  Level 1.0 OMT | Level 6 - Dose - 175mg  UA's 3/20/08. Pos - Marijuana, |
| 2 - Biomedical Conditions  Level 1.0 OMT | Responsible for accessing health care on own |
| 3 - Emotional/ Behavioral/ Cognitive  Level 1.0 OMT | Private doctor has prescribed xanex. Comes regularly to PEER for methadone + admits he has an anger problem. Explains he has had it since childhood. Beginning to talk about solutions. |
| 4 - Readiness to Change  Level 1.0 OMT | After some talking, he agreed to work on anger minimally. I will discuss attending education group |
| 5 - Relapse/ Continued Use or Problem  Level 1.0 OMT | Presently using marijuana, Will discuss RPP w/ clt. |
| 6 - Recovery Environment  Level 1.0 OMT | Lives w/ parents. Will discuss support in depth. S.O. also is involved in methadone clinic if he does not use |
| Discharge/ Aftercare Planning | New at PEER, not appropriate time |

CS7

Plaintiffs' Exhibit 43

**Exhibit 4(**

# THE BOBBY BUONAURO CLINIC, INC

## PHYSICIAN ORDER SHEET

IENT NAME: _Sean Driscoll_      SS#:

| DATE | NOTE: Physician's order must be dated & signed legibly; telephone orders should later be countersigned. PHYSICIAN ORDERS | SIGNATURE |
|------|-----------------------------------------------------------------------------------------------------------------------|-----------|
| 9.6.06 | Takin Valium 10g BID x 2 mo from St Frances, wants to Δ PL to here C/o waking up in the night<br>Valium 10g BID #60<br>↑ methadone to 100g | |
| 10.4.06 | Stable c parents. Sleep poor c init & mid. Takes extra Valiums when sleep back ran out ~1 week ago. No sedation any time p dose<br>↑ methadone to 130mg begin today<br><br>Valium 10g BID #30 ref x1 | |
| 11.1.06 | Out of Valium x1 week. Everything in turmoil, in jail, homeless, car totalled, parents put him out (most ) this also being c current GF. Pt has been loudly bragging (c GF) that he can get anything he wants from me/clinic.<br>Referred to C4<br>no more prescriptions<br><br>ADD: pt on phone to GF in hall, saying "I can't get anything from the ****ing **." | |
| | | |
| | | |

Physician Order Sheet-BBC-01/01/02

Plaintiffs' Exhibit 44     

A 16

**Exhibit 4)**

# Problem List

Printed On Jan 25, 2008

Opioid Dependence (304.00)

  Onset:
 Status: ACTIVE
SC Cond: UNKNOWN
Exposure: None

Provider: LIM,PATRICIA
  Clinic: WS/PAC-PSYCHOLOGIST

Recorded: , by LIM,PATRICIA
 Entered: 2/14/07, by LIM,PATRICIA
 Updated: 2/14/07

---

Cannabis Abuse (305.20)

  Onset:
 Status: ACTIVE
SC Cond: UNKNOWN
Exposure: None

Provider: LIM,PATRICIA
  Clinic: WS/PAC-PSYCHOLOGIST

Recorded: , by LIM,PATRICIA
 Entered: 2/14/07, by LIM,PATRICIA
 Updated: 2/14/07

---

Anxiolytic Dependence (304.10)

  Onset:
 Status: ACTIVE
SC Cond: UNKNOWN
Exposure: None

Provider: LIM,PATRICIA
  Clinic: WS/PAC-PSYCHOLOGIST

Recorded: , by LIM,PATRICIA
 Entered: 2/14/07, by LIM,PATRICIA
 Updated: 2/14/07

---

| PATIENT NAME AND ADDRESS (Mechanical imprinting, if available) | VISTA Electronic Medical Documentation |
|---|---|
| DRISCOLL, SEAN<br>WICKLIFFE, ILLINOIS<br>081746512 | Printed at JESSE BROWN VAMC |

C/25

**Exhibit 4\***

The longest period of time in which Mr. Driscoll reports no drug or alcohol use was the 8 months he was in the military. Following the 8 months, he was honorably discharged and is currently receiving disability benefits. According to Mr. Driscoll he suffers from arthritis of the knees and is currently on prescription medication for treatment. In addition, he reports taking Valium for the past year and half to treat anxiety. His prescription for the Valium is given by his psychiatrist.

Mr. Driscoll reports being adopted as an infant and as a result has no information regarding his family background or medical history. He reports a relatively stable and close relationship with both his adopted mother, and step-father. In addition, Mr. Driscoll reports being in a committed relationship for the past year and a half, although recently has been experiencing some problems. Outside of family, and his girlfriend, Mr. Driscoll reports having a few close friends that he considers to be supportive of him.

Mr. Driscoll has a history of numerous encounters with law enforcement. His most recent charge is that of theft, and reports being placed on 2 years probation. He reports "not liking" to use violence, but admits if he feels threatened he may become physical. He appears to accept responsibility for his actions regarding his past offenses and complete the necessary steps to move on with his life.

Mr. Driscoll expressed he is currently experiencing feelings of depression, as he is discouraged regarding his current unemployment status. He feels he is eating less, and has lost interest in activities he previously had enjoyed. He maintains his anxiety is "under control" and taking his prescribed medication from his psychiatrist.

SUMMARY

Mr. Driscoll presents as a 24-year old with a long history of drug use. Although he has been able to discontinue his use with the majority of the drugs, he is able to recognize his continued need for methadone treatment for his heroin addiction. Mr. Driscoll is not naïve to the fact that his past actions have made his options at the current time more limited, however he exhibits the attitude and behavior that he is willing to make a concerted effort to make changes in his life.

RECOMMENDATIONS

It is recommended that Mr. Driscoll participate in outpatient methadone treatment. In addition, his participation in individual, and group counseling would also be beneficial for his ongoing struggles with depression and anxiety.

If I can be of further assistance, please call me at 847-‌‌‌‌‌ extension 1304.

_____, LCSW      1/28/08
Gretchen Igliori, LCSW           date

C84

**Exhibit 4+**

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

MICHAEL PARISH, CURTIS L. OATS,  )

LEILA KHOURY, SEAN DRISCOLL,    )

CARLA LOFTON, ROY CLEAVES, LISA  )

BROWN, DAN TAYLOR, DEAN MILLER,  )

KEVIN SANDERS, STACEY CLARK, and )

CARLOTTE WATSON,            ) No. 07 C 4369

    Plaintiffs,          )

    vs.              )

SHERIFF OF COOK COUNTY and COOK  )

COUNTY,                )

    Defendants.          )


    The deposition of SEAN DRISCOLL, called

for examination pursuant to notice and the Rules

of Civil Procedure for the United States District

Courts pertaining to the taking of depositions,

taken before Martha C. Newton, a notary public

within and for the County of Kane and State of

Illinois, at the Richard J. Daley Center, Room

302, Chicago, Illinois, on the 2nd day of June

2011, at the hour of 10:13 a.m.


Reported By:  Martha C. Newton, CSR, RPR, RMR

License No.:  084-003632

2

1      APPEARANCES:

2        THOMAS MORRISSEY, LTD., by

3        MR. THOMAS G. MORRISSEY

4        tgmlaw@ameritech.net

5        10249 South Western Avenue

6        Chicago, Illinois  60643

7        (773) 233-7900

8          Representing the Plaintiffs;

9

10       COOK COUNTY STATES ATTORNEY, by

11       MR. FRANCIS J. CATANIA

12       francis.catania@cookcountyil.gov

13       500 Richard J. Daley Center

14       Chicago, Illinois  60602

15       (312) 603-5440

16          Representing the Defendants.

17

18     ALSO PRESENT:

19       Mr. Frank Oles

20       Ms. Alison Zamora

21

22

23

24

3

1               I N D E X

2    WITNESS               EXAMINATION

3    SEAN DRISCOLL

4       BY MR. CATANIA              4

5       BY MR. MORRISSEY            140

6       FURTHER BY MR. CATANIA      155

7

8

9               E X H I B I T S

10   NUMBER               MARKED FOR ID

11   Driscoll Exhibit

12   Exhibit No. 1            17

13   Exhibit No. 2            17

14   Exhibit No. 3            19

15   Exhibit No. 4            64

16   Exhibit No. 5            85

17   Exhibit No. 6            104

18   Exhibit No. 7            137

19

20

21

22

23

24

4

1          (Witness sworn.)

2      MR. CATANIA:  Sir, would you please state

3   your full name for the record.

4      THE WITNESS:  Sean Driscoll.

5      MR. CATANIA:  This is the federal deposition

6   of Sean Driscoll pursuant to notice to all parties

7   and continued from time to time by the agreement

8   of the parties.  Thank you for coming in today

9   rather than later in the month.

10          SEAN DRISCOLL,

11   called as a witness herein, having been first duly

12   sworn, was examined and testified as follows:

13          EXAMINATION

14   BY MR. CATANIA:

15      Q.  Sir, have you ever been deposed before?

16      A.  I believe once.

17      Q.  What kind of a case?

18      A.  I don't recall.

19      Q.  How long ago was that?

20      A.  Number of years.

21      Q.  Was it a lawsuit that you had filed or

22   somebody else had filed and you were a witness?

23      A.  I think somebody else.

24      Q.  Okay.  Could I have your date of birth?

5

1     A.  7/27/83.

2     Q.  And where were you born?

3     A.  I was born in Rochester, New York.

4     Q.  And off the record could I have your

5  social security number?

6              (Discussion off the record.)

7  BY MR. CATANIA:

8     Q.  And the 081 refers to the fact that

9  you've been -- you were born in New York; is that

10  right?

11     A.  I believe so.

12     Q.  Do you have a driver's license?

13     A.  I have a state ID.

14     Q.  Did you ever have an Illinois driver's

15  license?

16     A.  (Nonverbal response.)

17     Q.  Can I take a look at your ID.  Show it to

18  your lawyer first.

19     MR. CATANIA:  I've been handed,

20  Mr. Morrissey, an Illinois state ID card that has

21  two pictures on it, both bearing the resemblance

22  of the man sitting across the table from me.

23  Indicating a date of July 27, 1983.  License

24  expires July 27 of 2013, issued April 16 of 2010,

6

1    the number on it is 6⬛⬛⬛⬛ as in "David."

2    BY MR. CATANIA:

3        Q.  Sir, it lists an address at ⬛⬛⬛

⬛  ⬛⬛⬛  third floor.  Is that a current address?

5        A.  Yes, sir.

6        Q.  And that's in Chicago, Illinois; is that

7    right?

8        A.  Yep.

9        Q.  The description says five foot nine

10   inches, 175, hazel eyes; is that accurate?

11       A.  Seems to be.

12       Q.  Okay.  Thank you very much.

13           Are you currently living at ⬛⬛⬛

14   Huron.⬛⬛⬛

15       A.  Yes.

16       Q.  Is that three front --

17       A.  Yes.

18       Q.  -- 3F?

19           What other addresses have you had in the

20   last ten years?

21       A.  ⬛⬛⬛⬛  in Wilmette.  That's

22   the only one I ever lived at for any length of

23   time.

24       Q.  Have you ever stayed at other addresses?

7

1    A.   Yeah.

2    Q.   You understand what I mean by stay;

3    right?

4    A.   You mean just like at a friend's house

5    for a period of time?

6    Q.   Sure.

7    A.   Yeah.

8    Q.   All right.  Do you recall any of those

9    addresses or general locations?

10   A.   One was on the north side on Granville.

11   Q.   Any others that you can think of?

12   A.   I don't know.  I lived in Wrigleyville

13   for a couple of months on Waveland, lived in

14   Glenview for a couple of months.

15   Q.   Can you tell me all the addresses where

16   you received mail in the last ten years?

17   A.   No.

18   Q.   Okay.

19   A.   I don't know the exact addresses.

20   Q.   Any of those you receive mail at?

21   A.   Well, yeah, the one I live at currently

22   and 1      R          Lane.  That's where I receive

23   my mail.

24   Q.   Okay.  In the past had you received mail

8

1      on the Granville Avenue residence?

2          A.   I don't believe so.

3          Q.   How about the Wrigleyville residence?

4          A.   Yeah.

5          Q.   Can you tell me a little bit about your

6      educational background.  Where did you go to grade

7      school?

8          A.   I went to Holy Name over on Chicago and

9      State.  I think it's called St. Francis now,

10     though.

11         Q.   There's a methadone clinic right next to

12     that, isn't there?

13         A.   I never went there.  I don't know.

14         Q.   Where did you go to high school?

15         A.   New Trier.

16         Q.   When did you graduate?

17         A.   '01.

18         Q.   And it was a graduation not an

19     equivalency; is that right?

20         A.   Yes, that's correct.

21         Q.   Did you go to college?

22         A.   I went to Oakton for a little while,

23     Truman for a little while but never finished.

24         Q.   After -- after high school and after

9

1      community college, did you do anything else?

2          A.  I joined the Army.

3          Q.  You joined the Army?  When did you join?

4          A.  In 2001.  I shipped out in January of

5      '02.

6          Q.  Okay.  Where did you go in '02?

7          A.  Fort Knox.

8          Q.  Did you ever have combat duty --

9          A.  No.

10         Q.  -- in combat zone?

11             Other than the military, can you tell me

12     about your employment history, where have you

13     worked in the past?

14         A.  I've worked for Starbucks.  I've worked

15     for a couple of different medical supply

16     companies.  And currently I'm doing door security.

17         Q.  Door security?

18         A.  Yeah.

19         Q.  Where at?

20         A.  Apartment building on the north side.

21         Q.  The address?

22         A.  I'd rather not say.

23         Q.  Is it north side of Chicago?

24         A.  Yeah.

10

1      Q.   Okay.  And you're not telling me because

2   you don't know or because you choose not to tell

3   me?

4      A.  I choose not to.  It's my work.  I don't

5   see what it has relevancy here.

6      Q.   Okay.  You're not making any claim for

7   lost wages throughout the damages portion of the

8   case?

9      A.   No.

10      Q.   Can you tell me where the medical supply

11   company that you worked at is located?

12      A.   One was in Northbrook and another one was

13   in Chicago on Oakley.  I don't know the exact

14   address.

15      Q.   The name of the one that's in Northbrook?

16      A.   Planned Eldercare.

17      Q.   I'm sorry?

18      A.   Planned Eldercare.

19      Q.   And did you handle heart equipment or

20   other medication or medical devices?

21      A.   No, I did wheelchairs, hospital beds.

22      Q.   And the same thing with the one in

23   Chicago?

24      A.   Yep.

11

1    Q.   Same type of work?

2    A.   Same thing.

3        Q.   Why did you leave the medical supply

4    company?

5    A.   Well, the last one went out of business.

6    Q.   Okay.

7    A.   So find a new job.  And I don't recall

8    the reason for the first one.

9    Q.   Okay.  Have you ever been discharged from

10   employment?  Fired.

11   A.   Once in high school I think.

12   Q.   Do you have a security license to work

13   security?

14   A.   No.

15   Q.   Do you have any licenses or certificates

16   currently?

17   A.   No.

18   Q.   What type of discharge did you have from

19   the military?

20   A.   Honorable.

21   Q.   And when was that discharge?

22   A.   The end of 2002.  I was only there for a

23   little less than a year.

24   Q.   That's certainly not the amount of time

12

1    that you had originally contracted with?

2        A.  No.

3        Q.  So you left early?

4        A.  Yes.

5        Q.  And was voluntarily dismissal or

6    leaving --

7        A.  No.  I developed severe stress fractures

8    in my legs, and the Army doctors gave me a medical

9    discharge and forced me to leave, but I would have

10   liked to stay.

11       Q.  Have you ever filed any lawsuits aside

12   from this one?

13       A.  No.

14       Q.  Any workers' comp claim?

15       A.  No.

16       Q.  You've been arrested in the past; right?

17       A.  Yes.

18       Q.  How many times have you been arrested?

19       A.  A whole bunch.

20       Q.  Any arrests while you were in the

21   military?

22       A.  No.

23       Q.  Have you ever been arrested by military

24   police?

13

1    A.  No.

2    Q.  What agencies have locked you up?

3    A.  Local police municipalities.

4    Q.  All in Illinois?

5    A.  Yes.

6    Q.  Any outside of Illinois?

7    A.  No.

8    Q.  And you've seen the inside of police

9  lockups; is that right?

10   A.  Yes.

11   Q.  You've been convicted of offenses; right?

12   A.  Yes.

13   Q.  And some felony offenses?

14   A.  Yes, I have one.

15   Q.  What's your felony?

16   A.  For retail theft.

17   Q.  And the retail theft that you were

18  convicted of, the felony, was that handled in

19  Skokie?

20   A.  Yes.

21   Q.  Was that Judge Orr?

22   A.  I don't recall.

23   Q.  Okay.  That retail theft, was that a --

24  could you tell me what was the store that was

14

1    involved?

2       A.   I believe it was Bloomingdales.

3       Q.   And do you consider theft to be a crime

4    of dishonesty?

5       A.   Yes.

6       Q.   Tell me a little bit about your medical

7    history.  Have you ever been diagnosed with a

8    physical illness before any of your incarcerations

9    in Cook County?

10      A.   What do you mean by physical illness?

11      Q.   Well, you told me that you had been

12   discharged medically from the military for stress

13   fractures in your legs.

14      A.   Yes.

15      Q.   That's what I mean.  Any physical

16   disability or illness that -- that you had before

17   you were incarcerated in jail.

18      A.   Well, yeah, my stress fractures from the

19   Army.

20      Q.   Okay.  Well, the stress fractures in the

21   Army occurred between '01 and '02; is that right?

22      A.   Yes.

23      Q.   You've been arrested before '01, though.

24      A.   Yeah.  But that was in high school.  I

15

1    was -- I don't know, juvenile stuff.  Never had a

2    felony or anything serious before then.

3        Q.   You believe that felonies are serious; is

4    that right?

5        A.   Well, I believe it's a serious blemish on

6    your record.

7        Q.   Okay.  You had been arrested for

8    misdemeanors before you joined the military;

9    right?

10       A.   Yes.

11       Q.   Were any of those dispositions

12   convictions?

13       A.   I don't recall.  It's a long time ago.

14       Q.   Besides the stress fractures, did you

15   have any other physical illnesses before being

16   incarcerated in jail?

17       A.   I don't believe so, no.

18       Q.   Okay.  Did you have any physical injuries

19   or physical disease after being incarcerated in

20   jail?

21       A.   Physical, no.

22       Q.   Do you know what the cause was for the

23   stress fractures?

24       A.   I believe it was just all the exercising,

16

1    everything else just took a toll on me.

2        Q.   Okay.  Is anyone in your family prone to

3    that type of injury or that type of --

4        A.   Not --

5        Q.   -- defect, disease?

6        A.   -- that I'm aware of.

7        Q.   Before you were incarcerated in the jail,

8    Cook County jail, I don't mean lockups in police

9    stations, but in the county jail the first time,

10   were you prescribed any medication before that

11   first incarceration?

12       A.   Yes.

13       Q.   What?

14       A.   Methadone.

15       Q.   Okay.  And who first prescribed

16   methadone?

17       A.   It was a doctor at Bobby Buonauro Clinic.

18       Q.   Do you recall the name of the doctor?

19       A.   No, I don't.

20       Q.   When was it that you were diagnosed as

21   needing methadone?

22       A.   I believe it was around 2005.

23       Q.   Other than the Bobby Buonauro Clinic,

24   have you been to any other clinics since then?

17

1 A. Yes.

2 Q. You've -- I'm going to make as Exhibit

3 No. 1 -- actually, let me start with the notice of

4 deposition as Exhibit No. 1.

5     (Driscoll Deposition Exhibit

6     No. 1 was marked for

7     identification.)

8 BY MR. CATANIA:

9 Q. I've marked as Exhibit No. 1, as you can

10 see, it's a three-page notice of deposition,

11 signed by me and served on Thomas Morrissey and

12 Kenneth Flaxman.  Do you see that?

13 A. Yep.

14 Q. And the date of this notice was July 9 of

15 2009.  And I just wanted to point out you're

16 listed here as being set for deposition September

17 8 of 2009 at 9 o'clock.

18 A. Okay.

19 Q. Were you ever notified about that

20 deposition date?

21 A. I don't believe so.

22 MR. CATANIA:  Ask that Exhibit 2 for your

23 deposition be marked.

24     (Driscoll Deposition Exhibit

18

1          No. 2 was marked for

2              identification.)

3     BY MR. CATANIA:

4         Q.   I'm showing you what's been marked as

5     Exhibit 2 for your deposition.  Do you see in

6     front of you a document that has a caption Michael

7     Parish versus the Sheriff of Cook County,

8     et cetera, and plaintiffs' supplemental

9     disclosures is the title?

10        A.   Yes.

11        Q.   On the first page of that there's a list

12    under paragraph one that includes your name; is

13    that right?

14        A.   That's correct.

15        Q.   It lists methadone, anxiety disorder as

16    the plaintiff's required medication for the

17    following conditions.  Do you see that?

18        A.   Yes.

19        Q.   What condition -- what medication did you

20    require for anxiety disorder when you were

21    incarcerated?

22        A.   Diazepam.

23        Q.   Okay.  When was that first -- was that

24    the first incarceration that you had that

19

1     medication prescribed for you?

2         MR. MORRISSEY:  I'm going to object.  Can you

3     give him a date in regards to what incarceration

4     you're referring to.

5         THE WITNESS:  Yes.

6     BY MR. CATANIA:

7         Q.   The Cook County jail.

8         A.   Which time?

9         Q.   First time.

10        A.   I don't believe so.

11        Q.   Okay.  The second time?

12        A.   Possibly.

13        Q.   And could you tell us for the record what

14    the common name for diazepam is.

15        A.   Valium.

16                  (Driscoll Deposition Exhibit

17                  No. 3 was marked for

18                  identification.)

19    BY MR. CATANIA:

20        Q.   What was the Valium prescribed for?

21        A.   Anxiety disorder.

22        Q.   Who first prescribed Valium to you?

23        A.   It was the psych doctor at Bobby

24    Buonauro.

20

1    Q.  And what is the name of that psych doctor

2  at Bobby Buonauro?

3    A.  I don't recall.

4    Q.  I'm going to show you what's been

5  previously marked as Exhibit 3 for your

6  deposition.  Do you recognize what that is?

7    A.  Yes.

8    Q.  All right.  Page through it and tell me

9  if it's in the condition as it was when you first

10  saw that page -- that document.

11    A.  No.

12    Q.  What's different about this document?

13    A.  There are the answers to my questions on

14  there.

15    Q.  Okay.  When you -- when you first saw it

16  there were no answers, is that what you're saying?

17    A.  Yes.

18    Q.  On the last page, page 5 there's a line

19  and then there's something that's handwritten on

20  that last page.  What is that?

21    A.  That's my signature.

22    Q.  And you signed these interrogatory

23  answers?

24    A.  Yes.

21

1      Q.  And did you do so on the date that's on

2   page 4 of the exhibit?

3      A.  Yes.

4      Q.  That would be March 15 of 2011 --

5      A.  Yes.

6      Q.  -- this year?

7      A.  Yes.

8      Q.  Where did you sign these -- this

9   document?

10     A.  At Mr. Morrissey's offices.

11     Q.  That would be 102nd and Western?

12     A.  Yes.

13     Q.  If you look at paragraph 1 of the

14   interrogatories it asks you to identify all

15   persons including parties to the case or their

16   employees who have knowledge of the facts

17   concerning the occurrences complained of.  And you

18   list yourself; is that right?

19     A.  Yep.

20     Q.  And your mother, Annette Hickman?

21     A.  Yes.

22     Q.  She's not a psychiatrist; right?

23     A.  No.

24     Q.  Because that paragraph says my mother,

22

1    Annette Hickman, a psychiatrist during my last

2    incarceration.  Are those two different people?

3        A.  Yes.

4        Q.   Who is the psychiatrist you're referring

5    to here?

6        A.  I don't recall their name.  That's why

7    there's no name.

8        Q.   Okay.  It also says other medical

9    personnel during each incarceration and various

10    cellmates throughout incarceration.  Is that a

11    complete sentence, complete answer?

12        A.  It is to the best of my ability.

13        Q.   Okay.  Is there anybody that you recall

14    at this time that you would add to the list of

15    people that you believe have information about it?

16        A.  Not that I'm aware of.

17        Q.   Okay.  In paragraph three, which is on

18    page 2, it asks for you to describe the history of

19    mental health problems or drug dependency or

20    treatment that you've had, and you list several

21    facilities.  Three to be exact, Bobby Buonauro

22    Clinic on Howard in Evanston?

23        A.  Yep.

24        Q.   Sundance Methadone Treatment on Broadway?

23

1      A.  That's correct.

2      Q.  And Peer Services on Davis Street in

3   Evanston; right?

4      A.  Yep.

5      Q.  At each of those locations you were

6   prescribed methadone; is that right?

7      A.  That's correct.

8      Q.  Were you prescribed any anxiety

9   medication at those locations?

10     A.  Not at those locations, no.

11     Q.  Where were you -- were you -- where were

12   you prescribed anxiety medication?

13     A.  Illinois Masonic outpatient psych

14   treatment and same thing through the V.A.

15     Q.  Okay.  It says here that you're unsure of

16   the years you were on Valium but you know it was

17   before each incarceration; right?

18     A.  Yes.

19     Q.  And how were you certain that it was

20   before each incarceration?

21     A.  Because I know there was a number of

22   times that I was locked up that I had asked for it

23   and it was always told to me, no, you cannot have

24   it.

24

1       Q.   Okay.  It says you were on methadone

2   program from approximately 2005 through 2009.  Is

3   that a true answer?

4       A.   Yes.

5       Q.   Can you tell me when was it in 2009 that

6   you stopped having methadone treatment?

7       A.   See, about three weeks after I entered

8   the county.

9       Q.   Okay.

10      A.   In January.

11      Q.   So in January of '09 after your discharge

12   in February of '09, that's when you stopped --

13      A.   I wasn't discharged in February.

14      Q.   All right.  After three weeks of

15   treatments in the jail --

16      A.   Yes.

17      Q.   -- in '09, that's the last time you were

18   on a methadone program; is that correct?

19      A.   Yes, that's correct.

20      Q.   So it worked for you; right?

21      MR. MORRISSEY:  I'm going to object to asking

22   him -- he can testify in regard to his own

23   status.  Thoughts as far as medical.....

24   BY MR. CATANIA:

25

1     Q.   You can answer.

2     A.   I'm -- I guess.  I don't know what you

3   mean by that.

4     Q.   Well, let me -- let me tell you that in

5   the jail the methadone program is a methadone

6   detox program.  You understood that; right?

7     A.   Yes.

8     Q.   You went through --

9     A.   I was very well aware of that.

10     Q.   You went through a course of treatment in

11   which the amount of methadone that you received

12   daily was reduced day by day; is that right?

13     A.   That's correct.

14     Q.   Over the course of 21 days?

15     A.   Yes.

16     Q.   And at the end of that 21 days you no

17   longer had methadone; right?

18     A.   Correct.

19     Q.   You were on methadone because of a

20   heroin addiction; is that right?

21     A.   That's correct.

22     Q.   Have you ever admitted to any court that

23   you were a heroin addict?

24     A.   I believe so.

26

1      Q.  Do you remember if it was in the retail

2  theft case that you admitted that?

3      A.  Not that one I don't think.

4      Q.  Which case to your memory?

5      A.  It was my first retail theft case when I

6  was in Lake County jail.

7      Q.  At that time you admitted to the judge

8  that you were an addict on heroin; right?

9      A.  Yes.

10      Q.  Any other substance that you were

11  addicted to at the time?

12      A.  No.  Not at that time, no.

13      Q.  When was that arrest?

14      A.  I don't recall.

15      Q.  Well, because you've listed these

16  locations, Buonauro Clinic and the Sundance Clinic

17  and the Peer Services Clinic and Illinois Masonic,

18  I'm going to ask you if you are able to give me a

19  consent, because that's what's required for these

20  records, to obtain records from each of those

21  clinics?

22      A.  Yeah.

23      Q.  You have no problem with that?

24      A.  No.

27

1      Q.  Well, we can start by -- we can do that

2    at a break because I have to go retrieve the

3    consent form.

4      A.  That will make things a lot easier, clear

5    up a lot of the date issues and everything else

6    like that.

7      Q.  Sure.  Was Valium effective in reducing

8    your anxiety?

9      A.  Yes.

10     Q.  When were you first diagnosed with this

11   anxiety disorder?

12     A.  If I remember, 2005 when I started at

13   Bobby Buonauro.

14     Q.  Now, the anxiety disorder that you're

15   talking about, is that something that was

16   precipitated or caused by being in the military in

17   any way?

18     A.  I don't know.  I'm not really sure what

19   brought it on.

20     Q.  Has anyone ever told you the cause for

21   that anxiety disorder?

22     A.  No.

23     Q.  Are you currently on any medication for

24   that anxiety disorder?

28

1      A.   No, not currently.

2      Q.   I should have asked you this way at the

3   beginning, but I'll ask it now.  Is there anything

4   that you have ingested today, either drugs or

5   alcohol or anything like that, would prevent you

6   from giving me truthful answers today?

7      A.   No.

8      Q.   Are you currently taking any psychotropic

9   medication?

10      A.   No.

11      Q.   Do you know what psychotropic means?

12      A.   Like anti-psychotic, I don't know,

13   anti-psychotic medications, like, stuff like that.

14      Q.   Have you ever had that type of

15   medication?

16      A.   Long time before high school.

17      Q.   What kind of medication was that?

18      A.   I had Zoloft and Depakote and couple of

19   other things.  I don't recall exact names.

20      Q.   Has anybody else in your family ever been

21   diagnosed with having anxiety disorder?

22      A.   No.

23      Q.   Do you know who your birth father is?

24      A.   No.  Or my birth mother.  I'm adopted.

29

1    Q.  Were you adopted by your mother and her

2  present husband?

3    A.  No.

4    Q.  What is your mother's name?

5    A.  Annette.

6    Q.  Annette Hickman?

7    A.  Yeah.

8    Q.  When did she marry Mr. Hickman?

9    A.  I don't know, '80-something, '88, '87.

10    Q.  And who was your adoptive father at the

11  time that you were adopted?

12    A.  John Driscoll.

13    Q.  Is that John Driscoll of Connecticut?

14    A.  (Nonverbal response.)

15    Q.  Is he still living do you know?

16    A.  I haven't seen him since I was, like,

17  two.

18    Q.  Other than the name Driscoll, have you

19  ever gone by any other name?

20    A.  Sean Hickman.

21    Q.  Was that given as an alias name or did

22  you change your name?

23    A.  Well, after my mom got remarried, you

24  know, I -- after couple years I told her, you

30

1    know, we'll have the same last name, be a family.

2    But she never legally did it.  And so, you know, I

3    went through school and everything saying Sean

4    Hickman.  But when I turned 18 and had to get a

5    real ID and everything else, I had to go by what

6    was on my Social Security card and that was

7    Driscoll.

8        Q.   Okay.  So after you turned 18 you stopped

9    using the name Hickman?

10       A.   Yeah.

11       Q.   What kind of symptoms do you experience

12   when you're experiencing anxiety?

13       A.   My chest gets tight and shortness of

14   breath, need to, like, get away from everybody and

15   everything, be alone.  More like a panic, you

16   know, a gob of people around, I need to get away.

17       Q.   Okay.  What particular stressors cause

18   those feelings?

19       A.   It can be anything, just all the sudden

20   it's just random trigger.  I haven't pinned them

21   down.  I never.....

22       Q.   Have you ever undergone psychotherapy?

23       A.   I'm not sure what you mean by that.

24       Q.   Have you ever talked to a psychologist

31

1    and what's known as talk therapy.

2        A.   Yes.

3        Q.   Has any psychologist ever asked you

4    series of questions to discover the cause of your

5    anxiety?

6        A.   I believe so.  I don't know if we ever

7    got down to it, though.

8        Q.   When and where were those things done?

9        A.   At Illinois Masonic I went to groups once

10   a month or so roughly.

11       Q.   Okay.  Were those groups always at

12   Illinois Masonic?

13       A.   Yeah, in their outpatient psych.

14       Q.   During the time when you were doing the

15   group therapy and the talk therapy, were you also

16   taking medication?

17       A.   Yes.

18       Q.   What medication?

19       A.   I was taking diazepam and methadone.

20       Q.   The methadone have anything to do with

21   the anxiety therapeutically?

22       A.   I don't think so.

23       Q.   Okay.  Did the symptoms subside, the

24   chest tightening, the wanting to get away, the

32

1    panic, was that subsiding when you were taking the

2    Valium?

3        A.   Yes.

4        Q.   When you were in the jail during your

5    various incarcerations, was there any time that

6    you were given medication similar to or the same

7    as Valium?

8        A.   No.

9        Q.   Never received it?

10       A.   No.  And on my drug test last time I was

11   in because they changed the methadone program or

12   whatever and they drug tested you now, they saw

13   that I was legitimately taking a benzodiazepine

14   which was Valium or diazepam and they still

15   refused to give it to me.

16       Q.   Where do you have the results of that

17   test that you're talking about?

18       A.   Pull up the county records.

19       Q.   You know that because you've seen county

20   records?

21       A.   Yes.

22       Q.   Okay.  Can you --

23       A.   I saw the results of my drug test.

24       Q.   Can you tell me all the things that you

33

1     have reviewed in order to testify today, all the

2     documents that you reviewed?

3       A.  I did not review that.  I saw that when I

4     was in the county.  I saw -- they showed you my

5     test results from my medical chart when they went

6     and talked to them at the medical clinic or

7     whatever for the program, and they told me I

8     tested positive for marijuana and benzo's.

9       Q.  And that's not the first time that you

10    testified positive for marijuana and benzo's,

11    though; right?

12       A.  I don't believe so.

13       Q.  At the time that you were at the Bobby

14    Buonauro Clinic, have you ever had any random

15    tests?

16       A.  Yes.

17       Q.  Did you ever have any positive tests?

18       A.  Yes.

19       Q.  When you were at the Sundance Methadone

20    treatment clinic, did you ever have any random

21    tests?

22       A.  All the time.

23       Q.  Did you ever have any positive tests?

24       A.  Yeah.

34

1    Q.   For diazepam or for --

2    A.   Yes.  Diazepam and marijuana.

3         Q.   And same thing at Peer Services, did you

4    ever have those tests?

5    A.   Yep.

6         Q.   And did you ever have positive tests for

7    elicit street drugs?

8    A.   I don't believe so.  Except for

9    marijuana.

10        Q.   You don't consider marijuana to be an

11   illicit drug?

12   A.   No.

13        Q.   How long have you used marijuana?

14   A.   Since I was about 12.

15        Q.   And what -- what is it that leads you to

16   believe that there is no harm in marijuana?

17   A.   Studies, reports.

18   Q.   Internet?

19   A.   (Nonverbal response.)

20   Q.   Do you use the Internet?

21   A.   Yes.

22        Q.   Have you posted anything on the Internet

23   regarding this case?

24   A.   No.

35

1      Q.   Have you joined any blogs discussing this

2   case?

3      A.   No.

4      Q.   Has any doctor, physician, medical doctor

5   told you that marijuana is not something to be

6   concerned about in terms of its effects on the

7   body?

8      A.   I have heard that.

9      Q.   From a doctor?

10     A.   I don't -- yes.  I can't give you a name

11   or anything like that.

12     Q.   That's what I'm after.  Is there a doctor

13   that you can identify --

14     A.   No.

15     Q.   -- that has told you that?

16     A.   No.

17     Q.   You signed your interrogatory answers in

18   March of this year 2011.  Can you tell me when it

19   was the first time that you were asked to remember

20   the events of your incarcerations in the Cook

21   County jail?

22     A.   When I filled this out.

23     Q.   Okay.  At the time when you filled out

24   the document; right?

36

1     A.   Yeah.

2        Q.   And there's nothing you want to add to

3     the document today; is that right?

4        A.   I don't believe so.

5        Q.   All right.  Do you recall being

6     incarcerated at Cook County jail on August 18,

7     2005?

8        A.   I'm not sure exact dates.

9        Q.   Do you remember the year 2005?

10       A.   Roughly.

11       Q.   Okay.  Were you in the custody of the

12    Cook County jail at the time?

13       A.   I know I was in there in '05, yes.

14       Q.   What was the -- what was the claim or the

15    charge against you?

16       A.   I have no idea.

17       Q.   Can you think of any reason why your

18    testimony at trial in the future will be different

19    from your testimony today?

20       A.   No.

21       Q.   Other than the Social Security number you

22    gave us earlier off the record, do you use any

23    other Social Security numbers?

24       A.   No.

37

1     Q.  You did receive methadone during your

2    incarcerations; is that right?

3     A.  Yeah, usually after a day or two.

4     Q.  Are you familiar with how methadone is

5    metabolized in the body?

6     A.  Roughly.  I know it usually lasts for 24

7    hours and slowly releases itself, you know,

8    throughout.

9     Q.  You were on a methadone maintenance

10   program from 2005 until your last incarceration in

11   '09; is that right?

12    A.  That's correct.

13    Q.  You understand the difference between

14   methadone maintenance and methadone detox?

15    A.  Yes.

16    Q.  The methadone maintenance program that

17   you were on, did any physician who prescribed you

18   methadone also prescribe you anti-anxiety

19   medication?

20    A.  Yes, originally Bobby Buonauro.

21    Q.  At Bobby Buonauro?

22    A.  Yeah.

23    Q.  The same doctor prescribed both?

24    A.  I believe so.

38

1    Q.   The first day that you went to Bobby

2    Buonauro, was that the first methadone clinic you

3    had gone to?

4    A.   Yes.

5    Q.   Before that had you tried to detox from

6    heroin on your own?

7    A.   Yes.

8    Q.   What did you do to try to detox from

9    heroin?

10   A.   Cold turkey.

11   Q.   Did you use any other medications before

12   that?

13   A.   No.

14   Q.   So it was always a cold turkey address?

15   A.   Yes.

16   Q.   How many times did you try to detox

17   before going to Bobby Buonauro?

18   A.   A number.  I can't -- a bunch.

19   Q.   Was it more than ten times?

20   A.   Probably five, six.

21   Q.   And by detox do you understand I'm saying

22   abstaining from using heroin?

23   A.   Yeah.

24   Q.   Okay.  When you were doing the detox on

39

1    your own, what kind of symptoms did you feel?

2        A.  Chills, vomiting, nausea, sweating, not

3    sleeping, pain in your joints, bones, back.

4        Q.  When you were using heroin, would you

5    purchase that on the street?

6        A.  Yeah.

7        Q.  No doctor ever prescribed heroin to you;

8    right?

9        A.  No.

10       Q.  When you were using heroin, what

11   mechanism did you use to administer it?

12       A.  Injected.

13       Q.  You injected it?

14       A.  Yeah.

15       Q.  Always injected?

16       A.  Well, I started sniffing it but, you

17   know, it only lasts for so long.

18       Q.  So the benefits of injection is a longer

19   high; is that right?

20       A.  Well, it's better instantaneous high.

21       Q.  You still think about that first time

22   that you tried heroin?

23       A.  Yeah.

24       Q.  You had been arrested a couple of times,

40

1    numerous times I should say, for crimes other than

2    possession of heroin; right?

3        A.  Yes.

4        Q.  Possession of cannabis on occasion; is

5    that right?

6        A.  Yeah.

7        Q.  Retail theft?

8        A.  (Nonverbal response.)

9        Q.  Is that right?

10       A.  Yeah.

11       Q.  Okay.  Do you believe that you stand a

12   chance of being incarcerated even if you're not

13   using heroin?

14       A.  I don't believe so.  I mean, anything's

15   possible, you know, but I don't think -- not as

16   great of a chance.

17       Q.  All right.  Since you left the methadone

18   treatment in the jail and since you got out of the

19   Cook County jail, did you get a job right away

20   after that?

21       A.  Not right away.

22       Q.  How long did it take you to find a job?

23       A.  Few months.

24       Q.  Is it the same job that you don't want to

41

1    tell me the name of, the door security?

2        A.  No.  Originally I worked at some pet shop

3    for a week or two, and then I did signatures to

4    get some governor on a ballot for summer last

5    summer and then I got this job.

6        Q.  Which was the senator that you were

7    trying to get on the ballot?

8        A.  I don't know, something for the

9    constitution party or something.  I don't know.

10   They paid a dollar for every signature I got, so.

11       Q.  What pet shop was it you worked at?

12       A.  I don't know, somewhere in Lincoln Park.

13       Q.  At the time that you got out of the jail,

14   what address did you go back to live at?

15       A.  I went --

16       Q.  Talking about '09.

17       A.  I went to live at a halfway house in

18   Humboldt Park.

19       Q.  How long were you at the halfway house?

20       A.  Couple months.

21       Q.  And then from there?

22       A.  I went to live with my friend over on the

23   north side in Granville.

24       Q.  Okay.  When was it that you took your

42

1   current residence which I think you said is

2   1475 --

3       A.  Yeah, Huron.

4       Q.  -- Huron?

5       A.  February of last year.

6       Q.  You haven't been arrested since then,

7   have you?

8       A.  No.  Actually, yeah, I was arrested once.

9       Q.  When was that?

10      A.  I don't recall, maybe summer of '09 or

11  something like that.  But because I guess I had a

12  warrant for not paying a ticket, and so the cops

13  came because we were being too loud at the house

14  and they picked me up for having a warrant, an old

15  warrant for not paying.

16      Q.  Okay.  And where was that arrest done?

17      A.  In Glencoe.

18      Q.  Do you consider yourself to be an

19  independent person?

20      A.  Yeah.

21      Q.  When is the last time that you were

22  dependent on, for example, your mother?

23      A.  I lived at her house not too long ago

24  right before February after the Granville

43

1    address.  I went back there for a few months.

2        Q.  And that's in Wilmette?

3        A.  Yeah.

4        Q.  On Richmond.

5            Did she post bond for you when you got

6    out of jail?

7        A.  Which time?

8        Q.  Any of the times.

9        A.  There were a number of times she posted

10   bond for me, yeah.

11       Q.  Did anybody else besides your mother post

12   bond for you?

13       A.  My stepdad.

14       Q.  Okay.  Anybody else?

15       A.  I don't believe so.

16       Q.  Were any --

17       A.  Well, I was house arrested to an

18   ex-girlfriend's house once.  I don't know if that

19   counts as posting bond, was kind of, you know.

20       Q.  Well, you were not behind the walls of

21   the jail at the time; right?

22       A.  Well, yeah, I was let loose with an ankle

23   bracelet.

24       Q.  What was that girlfriend's name?

44

1     A.   Maria.

2     Q.   Last name?

3     A.   Something with a "B."

4     Q.   See if I have it.  Blight?

5     A.   Yeah.

6     Q.   Was that in November of '07?

7     A.   Possibly.

8     Q.   Was that for the arrest that took place

9     at Old Orchard by the Skokie Police Department?

10     A.   I believe so.

11     Q.   That was the felony?

12     A.   Yes.

13     Q.   While you were in the programs at

14     Buonauro or Sundance or Peer Services, did you

15     have a job?

16     A.   I worked on and off.

17     Q.   Okay.  Do you recall what schedule you

18     had at the time you were working?

19     A.   Well, I had one -- when I first started

20     at Bobby Buonauro I had a job at Planned

21     Eldercare, that medical supply company, so it was

22     a 9 to 5 gig.

23     Q.   Okay.  So you had a regular 9 to 5 job at

24     the time when you started the methadone program?

45

1      A.   Yeah.

2      Q.   The methadone is distributed generally in

3   the morning time; is that right?

4      A.   Yeah.

5      Q.   How did you work the methadone schedule

6   into your work schedule?  What did you do?

7      A.   Just go before work in the morning.  They

8   usually open at, like, five in the morning and

9   they close at 10 or 11, so.

10     Q.   And that's 10 or 11 a.m. that they

11   closed; right?

12     A.   Yes.

13     Q.   When did you start going to the Peer

14   Services Clinic in Evanston?

15     A.   I don't recall the exact date.

16     Q.   Was it in '05?

17     A.   No.

18     Q.   Was it in '08?

19     A.   Possibly.  It was the last place that I

20   went to --

21     Q.   All right.

22     A.   -- for methadone treatment.

23     Q.   And were you dropped from that program?

24     A.   Well, I got locked up so, no, I don't

46

1    think so.

2        Q.   You got locked up in July of '08?

3        A.   Well, no.  January of '09.

4        Q.   Okay.  Were you still in the program in

5    January of '09?

6        A.   Yeah.

7        Q.   The address of the Peer Services you list

8    as being at 906 Davis Street in Evanston; is that

9    right?

10       A.   I believe so.

11       Q.   That's a building that's kind of between

12   the "L" tracks and the Metra tracks; right?

13       A.   Yeah.

14       Q.   Were you ever arrested right across the

15   street from there?

16       A.   Possibly, yes.

17       Q.   Did you -- you were arrested for theft

18   that time; right?

19       A.   Yes.

20       Q.   Was it something that you had taken from

21   Peer Services?

22       A.   No, no.

23       Q.   Did you ever tell any police officers

24   even from Evanston, Wilmette or Glencoe or Chicago

47

1    that you were taking Xanax?

2        A.   I believe so.

3        Q.   Okay.  When you told that officer about

4    taking Xanax, you didn't have any trouble

5    disclosing that; right?

6        A.   No, I probably had some on me, so I

7    probably told them.

8        Q.   Did you have any trouble telling any of

9    the intake people at the jail that you were taking

10   Xanax?

11       A.   No.

12       Q.   And the place where you made the

13   disclosure of taking Xanax or some other

14   medication, Valium, for example, that was in the

15   receiving area; right?

16       A.   Yeah.

17       Q.   Did privacy ever enter your mind about

18   whether you were going to tell somebody about it?

19       A.   No.

20       Q.   Did you ever have a doctor prescribe both

21   methadone and Xanax?

22       A.   Not methadone and Xanax, no.  Methadone

23   and Valium, yes, but that's the same class of

24   drugs.

48

1      Q.   Have you ever joined Narcotics Anonymous?

2      A.   Yeah.

3      Q.   Are you currently in it?

4      A.   On and off.

5      Q.   Where do you go?

6      A.   Lincoln Park once in a while.  I don't --

7   kind of an anonymity thing.

8      Q.   But you certainly know the name of your

9   sponsor; right?

10     A.   Yeah.

11     Q.   What's your sponsor's name?

12     A.   John.

13     Q.   Seems like you get around the city and

14   the suburbs pretty quickly and very often.

15   Lincoln Park is where you go for NA, Evanston for

16   methadone, Chicago for methadone.

17     A.   Well, I mean, I'm staying in Lincoln Park

18   now.

19     Q.   Okay.

20     A.   I live right down the street from Lincoln

21   Park.  I wasn't a member of NA when I was in

22   methadone back then.

23     Q.   Have you ever admitted to a family member

24   that you are a heroin addict?

49

1    A.  Yeah.

2    Q.  Which family member?

3    A.  My mom and my dad, aunts, uncles.

4    Q.  Which aunts and which uncles?

5    A.  They live in New York.  Want their names

6    and everything?

7    Q.  Sure.

8    A.  There's Linda, Lorraine and John.  I

9    don't know, I think that's about it.

10   Q.  They all have the same last name?

11   A.  No.

12   Q.  What's Linda's last name?

13   A.  Marino.

14   Q.  Lorraine's last name?

15   A.  DePerry.

16   Q.  And John's last name?

17   A.  Marino.

18   Q.  Are Linda and John married?

19   A.  Yeah.

20   Q.  Under what circumstances did you disclose

21   to Linda and John that you were a heroin addict?

22   A.  Well, I think my mom probably told them

23   first and -- she was so shocked.  And then when we

24   go there for Christmas and everything else, you

50

1    know, family care, you know, they brought it up

2    and we talked about it.

3        Q.   Ever talk about how you first started?

4        A.   No.

5        Q.   Was never a question?

6        A.   No.

7        Q.   How did you first start?

8        A.   Had some new roommates and, you know, and

9    they were getting messed up.  And I saw how high

10   they were getting.  I was like, hey, what are you

11   guys doing, you know?  What's going on here?  And

12   one thing led to another.  And I tried it and that

13   was that.

14       Q.   You had some experience before that with

15   other intoxicants; right?

16       A.   Yeah.

17       Q.   The cannabis, alcohol?

18       A.   Yeah.

19       Q.   And you liked the way you feel when you

20   have those things; right?

21       A.   Yeah.

22       Q.   When was it that you first tried heroin?

23       A.   I guess I was around 23 I think.

24       Q.   And how old are you today?

51

1      A.  27.

2      Q.  Do you know many people in the

3   neighborhood where you currently live on Huron?

4      A.  Fair number.

5      Q.  Have you ever worked with any of those

6   individuals in your neighborhood?

7      A.  No.

8      Q.  Ever attend any social events with them?

9      A.  Sure.

10      Q.  Are you familiar with what people in your

11   neighborhood say about your character for honesty?

12      A.  No.

13      Q.  In the --

14      A.  Are you aware of what they say?

15      Q.  Could be.

16          Are you aware of what people in the Bobby

17   Buonauro Clinic feel about your reputation for

18   truth and honesty?

19      A.  No.

20      Q.  While you were in the Cook County

21   Department of Corrections, did you ever file a

22   detainee grievance?

23      A.  I don't recall.

24      Q.  Do you know what a detainee grievance is?

52

1      A.   Yeah, one of those little white forms.  I

2   believe so.  I might -- I may have.

3      Q.   You're familiar with forms at the jail to

4   some degree; right?

5      A.   Yeah.

6      Q.   Did you ever fill out a yellow form?

7      A.   What was the yellow form?

8      Q.   Medical request.

9      A.   I believe so.

10     Q.   What type of medical request do you

11  believe that you made out?

12     A.   Tried to go to -- for methadone or

13  something along those lines, something that I

14  needed.

15     Q.   Do you remember which incarceration it

16  was that you might have filled out a yellow form?

17     A.   No.  May have been the last one.  After I

18  stopped the program, I got real sick and I had

19  requested to go to Cermak.  I don't remember if I

20  filled out a form or not.

21     Q.   Okay.  In the last incarceration in '09

22  you say that you were in the detox program?

23     A.   Yep.

24     Q.   After the program you got sick?

53

1    A.  During the program.

2    Q.  What type of sickness?

3    A.  I didn't sleep the whole time and for

4  probably a couple weeks after that I didn't

5  sleep.  I had diarrhea the whole time.  I was just

6  achy the whole time, like my bones aching.  I was

7  getting like small seizures from not having my

8  Valium, from abruptly stopping it the way that

9  they stopped me.

10   Q.  Okay.  Tell me what that means.

11   A.  I was, like, twitching out.  I don't know

12  how else to describe it.  I read somewhere that it

13  was some kind of severe, like when you stop

14  medication like that.  But I would just literally

15  like just twitch out randomly just sitting there.

16   Q.  While you were in the custody of the

17  jail?

18   A.  Yes.

19   Q.  And observed daily by correctional staff?

20   A.  Yes.

21   Q.  And you say that that was a seizure;

22  right?

23   A.  That's what I read somewhere is that it

24  was a small -- it's technically a small seizure,

54

1    yeah.

2       Q.  Did any doctor ever tell you that they

3    diagnosed you as having a seizure?

4       A.  No.  I never was able to see a doctor

5    about it.

6       Q.  Well, you got out of jail at some point;

7    right?

8       A.  Yeah.

9       Q.  When was that?

10      A.  In May something of '09.

11      Q.  Did you immediately go to a doctor at

12    that time?

13      A.  No.

14      Q.  And of course you did not go back to the

15    methadone clinic at that time?

16      A.  No.

17      Q.  Have you been to a doctor since your

18    discharge from the jail in '09?

19      A.  Yes.

20      Q.  What doctor?

21      A.  At the V.A.

22      Q.  Do you know the name of the doctor at the

23    V.A.?

24      A.  It was -- I don't know, it was some --

55

1    like a cattle call in there.  You show up, you get

2    a number, they call you.

3        Q.  What was the visit to the doctor at the

4    V.A. for?

5        A.  I got some omeprazole for my stomach,

6    some heartburn medication.

7        Q.  What's that medication called again?

8        A.  Omeprazole.

9        Q.  O-m-n-i?

10        A.  I have no idea how to spell it.

11        Q.  Anything else?

12        A.  No.

13        Q.  Did you fill that prescription?

14        A.  Yeah.

15        Q.  When did you fill it?

16        A.  Immediately.

17        Q.  At the V.A.?

18        A.  Yeah, that day.

19        Q.  And did you start taking it?

20        A.  Yeah.

21        Q.  Did you take all of it?

22        A.  Yeah.

23        Q.  Did you get it refilled?

24        A.  No.

56

1     Q.  Any doctors other than the one at the

2  V.A.?

3     A.  No.

4     Q.  Has any doctor ever told you that the

5  reason why you had the symptoms of lack of sleep,

6  diarrhea, achiness and small seizures was related

7  to not having methadone?

8     A.  No.

9     Q.  Is it based only on your independent

10  review of what's on the Internet?

11     A.  It's based on my actual knowledge of what

12  happened to me.

13     Q.  So you felt symptoms; right?

14     A.  Yes.

15     Q.  And you confirmed those symptoms by

16  looking it up on the Internet?

17     A.  I confirmed those symptoms from being a

18  heroin addict and knowing what it feels like to be

19  dope sick.

20     Q.  You considered yourself to be dope sick;

21  right?

22     A.  Yeah.

23     Q.  Do you know where the term "dope sick"

24  comes from?

57

1      A.  No.

2      Q.  Is it the same thing as withdrawing?

3      A.  Yes, I believe so.

4      Q.  So heroin withdrawal is in your mind the

5   same thing as dope sick?

6      A.  Yeah.

7      Q.  In your experience based on going to

8   methadone clinics and having both snorted and

9   injected heroin and knowing people that do both,

10   have you ever experienced anybody who had died as

11   a result of withdrawal from heroin?

12      A.  No.

13      Q.  How about from methadone?

14      A.  No.

15      Q.  Why did you change one methadone clinic

16   to another?

17      A.  We -- Bobby Buonauro, I got in a fight

18   with somebody in the parking lot, and so I had to

19   find a different place to go.

20      Q.  Because that violated their rules; is

21   that right?

22      A.  Yeah.  Peer -- or the one over on

23   Broadway, Sundance, it was expensive, and I just

24   stayed there until I got into Peer Services which

58

1    is a free clinic.

2        Q.   How much did it cost for the Sundance

3    maintenance clinic?

4        A.   I believe it was $50 a week.

5        Q.   Who paid that money?

6        A.   My mom.

7        Q.   Did she pressure you to find a free

8    clinic?

9        A.   Yes.

10       Q.   Do you recall the times that you'd been

11   housed in the Cook County jail what locations you

12   were housed in?

13       A.   For the most part.

14       Q.   Were you ever housed in Division 8?

15       A.   I don't recall.

16       Q.   Do you know what Division 8 is?

17       A.   No.  Well --

18       Q.   Ever housed in the residential treatment

19   unit?

20       A.   Yes.

21       Q.   The R unit?

22       A.   HRDI.

23       Q.   Well, HRDI is the drug unit.  You were

24   housed there?

59

1      A.  Yes.

2      Q.  Were you ever housed on 2 north?

3      A.  Yes.

4      Q.  When?

5      A.  During the last time I was there.

6      Q.  Was that after the methadone program or

7   during or before?

8      A.  I believe it was -- it was right after or

9   right as it was ending, somewhere.  It was right

10  near the end of the program.  I'm not sure if I

11  had already stopped or had just stopped.

12     Q.  And you were housed in -- in 2N --

13     A.  Yep.

14     Q.  -- as a result of a court order; is that

15  right?

16     A.  Yes.

17     Q.  Was that from Judge Orr or some other

18  judge in Skokie?

19     A.  I believe it was Axelrood.

20     Q.  Axelrood.  Okay.  What was it that

21  prompted Axelrood to order you to be evaluated in

22  the psych ward?

23     A.  Because I had explained to him that I was

24  taking diazepam and the county would not give it

60

1    to me, and I needed to see, you know, a

2    professional about, you know, my issues, so he

3    ordered a psych eval.

4        Q.   Okay.

5        A.   Then he said I can get help that way.

6        Q.   Was that done in the open courtroom, that

7    discussion?

8        A.   I believe so.  I don't recall.

9        Q.   Was it on the record?

10       A.   I don't -- I have no idea.  I've never

11   seen the records.  I couldn't tell you.

12       Q.   Well, was your lawyer present?

13       A.   I think so.

14       Q.   And the judge was on the bench at the

15   time?

16       A.   I think so.

17       Q.   Did you have any problems telling the

18   judge at that time that you were taking diazepam

19   for mental illness?

20       A.   Obviously not.

21       Q.   So privacy of the courtroom was not an

22   issue for you?

23       A.   No.

24       Q.   But you -- you did know that in order to

61

1    get that that you would need to see a

2    professional, a psychiatrist, right --

3        A.   Yeah.

4        Q.   -- for evaluation?

5        A.   Yes.

6        Q.   And that was done, wasn't it?

7        A.   Yes.

8        Q.   You had an evaluation?

9        A.   Yes.

10       Q.   Do you know what the diagnosis was?

11       A.   That I was all right.

12       Q.   Did you agree with the diagnosis?

13       A.   To get the hell out of 2N, yeah, I did.

14       Q.   Okay.

15       A.   I knew he -- he said he wasn't going to

16   give me my medication even though I had valid

17   prescriptions for it, so what am I going to do,

18   just hang around and.....

19       Q.   Did you have valid prescriptions with you

20   at the time?

21       A.   Yes.

22       Q.   On your person?

23       A.   Not on my person, no.  But I told him

24   where he could call to -- and I'm pretty sure I

62

1    told him doctors' names at that time.

2        Q.   Okay.

3        A.   Pretty sure I still knew them and told

4    them, hey, call over here, call over here, you

5    know.

6        Q.   You're certain that you know that;

7    right?  That you knew the doctors' names, for

8    example?

9        MR. MORRISSEY:  Asked and answered.  He

10   already said that.

11       THE WITNESS:  Pretty sure I did.  I don't

12   recall if I told him exactly the doctors' names

13   but I told him where I was seeking treatment and

14   where I was getting treatment from.

15   BY MR. CATANIA:

16       Q.   Do you recall what words you told the

17   doctor at the time?

18       A.   No.

19       Q.   At this time, today's date, do you recall

20   the places where you were seeking treatment back

21   in '09?

22       A.   Yes.

23       Q.   Where?

24       A.   At Illinois Masonic and West Side V.A.

63

1      Q.   And at the time in '09 you knew the names

2   of the doctors that were treating you?

3      A.   I'm pretty sure I did or better

4   understanding than I have now.

5      Q.   Is that because time has passed and

6   memory fades?

7      A.   Yes.

8      Q.   Do you have any documents at home that

9   would help you to recall the names of the doctors

10   you saw at the V.A.?

11      A.   Not anymore.  I don't think so.

12      Q.   How about Illinois Masonic?

13      A.   I don't think so.

14      Q.   Were you ever asked by the attorneys in

15   this case to provide the names and information

16   regarding the doctor's at the V.A.?

17      A.   Did I sign a HIPAA for them so they can

18   get that information, yes.

19      Q.   No.  Did you provide the names to them?

20      A.   Not aware of the names that's why I gave

21   them a HIPAA so we can find out the names.

22      Q.   Did they show you any documents that

23   demonstrate the names of the people that were

24   involved in treating you at the V.A.?

64

1      A.   No.

2      Q.   You are aware that the V.A. is a federal

3   agency; right?

4      A.   Yes.

5      Q.   And you are also aware that they would

6   have to have your consent to obtain the records;

7   right?

8      A.   No.

9      Q.   Well, that's why they asked for it and

10   you gave them a consent form; is that right?

11      A.   Yeah, you're talking about a HIPAA?

12      Q.   Yes.

13      A.   Yeah, yeah.

14      Q.   You know what HIPAA is?

15      A.   Yeah.

16      Q.   What is a HIPAA?

17      A.   It's basically allowing disclosure of

18   medical records and stuff like that to somebody.

19      Q.   Okay.  And you gave that HIPAA waiver to

20   Mr. Morrissey in the case; right?

21      A.   Yes.

22      Q.   And was that in March of this year?

23      A.   Yes.

24              (Driscoll Deposition Exhibit

65

1          No. 4 was marked for

2          identification.)

3    BY MR. CATANIA:

4      Q.   Going to show you what's marked as

5    Driscoll 4 for this deposition.  It's a HIPAA

6    privacy authorization.  And just want -- tell me

7    if that's what you recall signing on March 15 of

8    2011?

9      A.   Yep.

10     Q.   Okay.  And the paragraph that describes

11   who's to get the records, No. 4, what does that

12   say?

13     A.   Tom Morrissey.

14     Q.   So that would be the attorney next to

15   you; right?

16     A.   Right.

17     Q.   Actually, it's says Thomas G. Morrissey,

18   Limited; right?

19     A.   Okay.

20     Q.   That's a corporation; right?

21     A.   I have no idea.

22     Q.   And this is the form you were talking

23   about; right?

24     A.   Yeah.

66

1    Q.   To your knowledge, have these forms ever

2    been obtained pursuant to this authorization?

3    A.   I have no idea.

4    Q.   You weren't shown any documents from the

5    V.A.?

6    A.   No.

7    Q.   So there's nothing that you've been shown

8    prior to this deposition that would help you

9    refresh your memory about who the doctor was that

10   you saw at the V.A.?

11   A.   No.

12   Q.   How about at Illinois Masonic, is there

13   anything that you have that would help you refresh

14   your memory as to who the doctors were at the --

15   at the Illinois Masonic?

16   A.   No.

17   Q.   Were you ever asked to provide any

18   documents from your home to Mr. Morrissey or

19   Mr. Flaxman's office?

20   A.   I don't think so.

21   Q.   Do you have any documents at home from

22   either Illinois Masonic or the V.A.?

23   A.   Any documents?

24   Q.   Yes.

67

1    A.  I probably have some from the V.A.,

2  yeah.  Not pertaining to this case but I have tons

3  of documents from the V.A. I'm sure.

4    Q.  Okay.  Any of them pertaining to the time

5  frame August 3 of '05 to the present?

6    A.  Possibly.

7    Q.  That's the class period that we're

8  talking about in the case; right?

9    A.  Sure.

10    Q.  Well, you sign -- you actually were

11  participating as a class representative in the

12  case, weren't you?

13    A.  Yes.

14    Q.  And so you are the one who's responsible

15  for making the case move forward in terms of

16  representing the class; right?

17    A.  I believe so.

18    Q.  And you understand that; right?

19    A.  Yeah.

20    Q.  Okay.  When was it that you first learned

21  that there might be money involved with

22  prosecuting this case?

23    A.  Just recently when I filled this thing

24  out.

68

1      Q.   Okay.  The interrogatory answers?

2      A.   Yeah.

3      Q.   And that's where you asked for a thousand

4   dollars per day?

5      A.   Yes.

6      Q.   Where did you come up with the number a

7   thousand dollars per day?

8      A.   Just seems like a fair amount.  I don't

9   know.

10     Q.   Well, the clinic costs $50 a week when

11   you pay for it; right?

12     A.   Uh-huh.

13     Q.   So you think that that is a fair

14   assessment of the value of not having methadone

15   for some days?

16     A.   You're not suffering.  I mean, you're on

17   the clinic, you're paying to stay feeling normal

18   and feeling good.  You're not not sleeping, and

19   being slowly tortured basically.

20     Q.   You've been in jail before this date,

21   though?

22     A.   Yeah.

23     Q.   Before the '09 incarceration?

24     A.   Yes.

69

1     Q.  Did you have any trouble sleeping in the

2   previous incarcerations?

3     A.  Yeah.

4     Q.  You're in Division 2 at some point;

5   right?

6     A.  Yes.

7     Q.  Dormitories?

8     A.  Yes.

9     Q.  Division 2 has a lot of guys in it?

10    A.  Yes.

11    Q.  Kind of noisy?

12    A.  Not so much at night.

13    Q.  But they do prevent you from sleeping

14  when you might want to sleep because there's so

15  many of them; right?

16    A.  Not really.  I mean, I was in the Army so

17  I slept in dorm rooms before.  I understand, you

18  know, what it's like to sleep with a whole bunch

19  of people.  It was more of, you know, not

20  receiving my proper dose of methadone that made me

21  not sleep.

22    Q.  Okay.  And you believe that the lack of

23  sleep was because you were not getting a proper

24  dose of methadone?

70

1      A.   Yes.

2      Q.   Do you think that what you did get was a

3   proper dose of methadone?

4      A.   At the clinic?

5      Q.   Yes.

6      A.   Yes.

7      Q.   Even though you were aware that every day

8   you were getting less and less and less of

9   methadone; right?

10     A.   Yes.  What are you talking about?  I'm

11   saying like at the clinic, like, Peer Services or

12   whatever, I was getting my proper dose of

13   methadone.

14     Q.   I'm talking about when you were at the

15   jail and you were getting your methadone.

16     A.   Yes, I was not receiving -- I was getting

17   less and less every day, and you would feel it

18   more and more every day as it went down.  And by

19   the last day I was so sick they took me to Cermak

20   or whatever.

21     Q.   Okay.  Well, my question is, do you

22   believe that when you were at the clinic at Cermak

23   getting your methadone --

24     A.   Yeah.

71

1    Q.  -- by going down to the pharmacy and

2    having it administered to you there, do you think

3    that you were getting a proper dose of methadone?

4    A.  No.

5    Q.  And that's based on your experience at

6    outside clinics; right?

7    A.  Yes.

8    Q.  Did you understand at the time -- was it

9    described to you at the time that you were on a

10    methadone detox program?

11    A.  Yes.

12    Q.  And the purpose of the detox program was

13    to get you off of methadone; right?

14    A.  Yes.

15    Q.  To address your symptoms of withdrawal by

16    gradually reducing the amount of methadone that

17    you receive; right?

18    A.  Yes.

19    Q.  You understand that at the time?

20    A.  I understood what they were trying to do,

21    yes.

22    Q.  All right.  Do you believe that this case

23    is about whether or not methadone detox is better

24    or worse than methadone maintenance?

72

1    A.  I'm not exactly sure.

2    Q.  What do you think this case is about?

3    A.  About not receiving medications in a

4    timely manner or at all and the methadone being

5    reduced in such a dramatic fashion that it's not

6    safe and healthy.

7    Q.  Has any doctor ever told you that

8    reducing the amount of methadone that you're

9    getting is not healthy?

10   A.  No.  I have not heard that personally.

11   Q.  When you were going to the three clinics

12   that you were going to you had the choice about

13   whether you go or not; is that right?

14   A.  Yes.

15   Q.  Okay.  And you went there voluntarily in

16   order to get methadone; right?

17   A.  Yes.

18   Q.  And the methadone that you were getting

19   at that time was in place of street drugs; is that

20   right?

21   A.  Yes.

22   Q.  They're no street drugs in the jail;

23   right?

24   A.  No.  Lots of street drugs in the jail.

73

1    Q.   What kind of street drugs?

2    A.   Anything you want.

3    Q.   Did you want heroin in the jail?

4    A.   Yeah.

5    Q.   Did you get heroin in the jail?

6    A.   No.

7    Q.   Did you want cannabis in the jail?

8    A.   Yes.

9    Q.   Did you get cannabis in the jail?

10   A.   No.

11   Q.   Did you want cocaine in the jail?

12   A.   No.

13   Q.   Did you get cocaine in the jail?

14   A.   No.  I didn't get any drugs in the jail.

15   I mean, it's something I'd rather not mess with.

16      Q.   Okay.  And you say that there are street

17   drugs in there because people have told you so?

18      A.   I've seen them.  You see people smoking

19   pot, you see people, you know, doing lines, you

20   know.  I mean it's not.....

21      Q.   Who do you see doing lines?

22      A.   Other inmates.

23      Q.   And you're talking about cocaine; right?

24      A.   I guess.

74

1    Q.   You've seen inmates do that inside the

2    jail?

3    A.   Yeah.

4    Q.   Have they ever invited you to

5    participate?

6    A.   No.

7    Q.   Have they ever asked you if you want to

8    purchase any?

9    A.   No.

10    Q.   But it was available, in your mind; is

11    that right?

12    A.   Yeah.

13    Q.   Did you ever see that substance that they

14    were using tested --

15    A.   No.

16    Q.   -- for what it was?

17    A.   No.

18    Q.   You just assumed that it was cocaine or

19    heroin?

20    A.   Yeah.

21    Q.   Did you attend any drug or alcohol

22    rehabilitation programs?

23    A.   Yes.

24    Q.   What programs?

75

1      A.   One in Florida after I got locked up in

2   Lake County and I told judge I had a heroin

3   problem, like I told you earlier, asked for

4   treatment.

5      Q.   How long was that program?

6      A.   I think it was 45 days or something like

7   that.

8      Q.   And did you complete the program?

9      A.   Yes.

10     Q.   And you got out?

11     A.   Yes.

12     Q.   And you go back and use heroin?

13     A.   Yes.

14     Q.   Any other rehab programs?

15     A.   HRDI.

16     Q.   And that's a program inside the jail;

17  right?

18     A.   Yep.

19     Q.   Did you complete that program?

20     A.   I don't think so.  I don't think I have

21  an official completion from the program, no.

22     Q.   Did you ever see people come in the

23  program and then get bonded out and leave?

24     A.   Yes.

76

1    Q.   Nobody has control over whether they get

2    bonded out other than the person who's bonding

3    them out; right?

4    A.   Yeah.

5    Q.   So really it's not something that the

6    jail can control --

7    A.   No.

8    Q.   -- is that right?

9         When you came into the jail the very

10   first time that you entered into the Cook County

11   jail, and I believe that date is August 18 of

12   2005, does that sound familiar?

13   A.   Yes.

14   Q.   Okay.

15   A.   You said earlier.

16   Q.   When you came into the jail, were you

17   suffering any mental illness?

18   A.   I don't recall.

19   Q.   But you were taking methadone at the

20   time?

21   A.   Yes.

22   Q.   Did you get methadone at the methadone

23   clinic during that incarceration in August of

24   2005?

77

1      A.  I think after a day or two.

2      Q.  Okay.  You actually signed a consent form

3   and they did an investigation and they approved

4   you for methadone in August of '05; right?

5      A.  I believe so.

6      Q.  The problem that you have is that it took

7   a couple of days before you got in?

8      A.  Yeah.

9      Q.  How many days?

10     A.  I don't recall, two.  One, two.

11     Q.  Okay.

12     A.  Something like that.

13     Q.  But you were started on the program;

14   right?

15     A.  I believe so.

16     Q.  Do you remember how you got out of jail

17   in August of '05?

18     A.  No.

19     Q.  Do you recall the person that was that

20   did the interview of you regarding your physical

21   and mental status at the time you entered the

22   jail?

23     A.  No.

24     Q.  The person that you saw at that time in

78

1    August of '05, do you think you've seen that

2    person again?

3        A.  Probably.

4        Q.  At the jail?

5        A.  Probably.  They seem to have the same

6    group of intake workers that have been there

7    throughout the years.

8        Q.  Okay.  Did you have a screen for mental

9    health while you entered the jail in August of

10   '05?

11       A.  Yes.

12       Q.  Do you recall the person who did the

13   mental health screen of you at the time?

14       A.  No.

15       Q.  Have you ever had any contact with any of

16   the screening personnel at the jail after being

17   out of the jail?

18       A.  No.

19       Q.  So if you saw them on the street you

20   would not recognize them?

21       A.  Probably not.

22       Q.  If Johnny Musa says that he's the one who

23   screened you on August 18 of 2005 and he asked you

24   about your mental health illness or issues and you

79

1    said you have none and he wrote that down in his

2    report, would his report be accurate on that

3    issue?

4        A.  I don't know.

5        Q.  Well, did you tell him that you had --

6    that you had a mental health issue at the time?

7        A.  I told you I don't recall.

8        Q.  Did you tell him that you use heroin?

9        A.  Possibly.

10       Q.  Did you also tell him that you use

11   methadone?

12       A.  Yeah, and I need to be on the program.

13       Q.  And based on that you filled out some

14   other paperwork to get on the program; is that

15   right?

16       A.  I believe so.

17       Q.  So while you were in custody of the

18   police department before going to the jail, did

19   you have any heroin?

20       A.  No.

21       Q.  Did you have any methadone?

22       A.  Well, I don't think so.  Probably that

23   morning before I got arrested.

24       Q.  How long were you in the custody of

80

1    the -- of the local police agency?

2        A.  Probably overnight.  That's what it

3    usually is if you go to the county.  Usually

4    you're there for overnight so then.....

5        Q.  Okay.  They didn't give you anything for

6    your withdrawal symptoms at the time?

7        A.  No.  So, you know, you're locked up

8    overnight at the police station, and then you go

9    to -- you know, you go to court in the county in

10   the morning and then that's one day of not getting

11   your medication.  And then, you know, the next day

12   if county doesn't put you on, that's two days.

13   And then by the time the county hits you it's like

14   the third day.  If they make you wait two days,

15   then you're deathly ill by then.

16       Q.  Okay.  When you say "deathly ill," you

17   don't mean that you're going to die?  It's that

18   you feel sick?

19       A.  You're laying on the floor, you know,

20   shivering and shaking, puking.

21       Q.  Bringing this now back to you in

22   August -- on August 18 of 2005, when you were

23   intaked into the jail, were you on the floor

24   shivering and shaking and puking?

81

1      A.   Yes.

2      Q.   You were?

3      A.   Yes.

4      Q.   In the receiving area?

5      A.   Yes.

6      Q.   And the officers that were present would

7   have seen you --

8      A.   Oh, yeah.

9      Q.   -- in that condition?

10         And Johnny Musa, when he did an interview

11   of you and did an evaluation would have seen that?

12     A.   Probably.

13     Q.   And Ms. Billingsly who did the mental

14   health screen would also have seen that?

15     A.   Probably.  But I don't know.  Those

16   people sit, you know, in their little booth, the

17   mental health and the physical people.  So they

18   don't really look the cells too much.  They just

19   see you when you walk up to their little window

20   and plop down on a booth in front of them.

21     Q.   So you walked to the window where you

22   were interviewed by the mental health specialists?

23     A.   Yes.

24     Q.   And you walked to the place where they

82

1    were conducting the medical screen; right?

2        A.   Yes.

3        Q.   Other than that, were you in a bullpen?

4        A.   Yeah.

5        Q.   And you know what a bullpen is; right?

6        A.   Yes.

7        Q.   Temporary housing during the time you're

8    processing; right?

9        A.   Yeah.

10       Q.   It's not a place where you're going to

11   sleep the night?

12       A.   No, but you're going to be there for a

13   number of hours, you know, jam packed, you know,

14   with a whole bunch of.....

15       Q.   Other people?

16       A.   Other people.

17       Q.   Charged with crimes?

18       A.   Yes.  And other people also dope sick and

19   crazy homeless people and, you know, it's an

20   interesting number of hours that you're trapped in

21   that bull.

22       Q.   Are you saying that at the time that you

23   were brought into the jail for intake in August of

24   '05 that you were having vomiting and nausea while

83

1      talking with the screener; is that what you're

2      saying?

3          A.   Not in their face, no.  But was I not

4      feeling well while I was talking with them the

5      first time I was locked up, yeah.

6          Q.   And the feeling that you were

7      experiencing was withdrawal from heroin and

8      methadone; right?

9          A.   Yeah.

10         Q.   Did you ever have heroin while taking the

11     methadone?

12         A.   Yeah.

13         Q.   The heroin gives you a nice -- nice

14     feeling, a warm feeling and the methadone

15     stretches it out longer, right, if you take them

16     together?

17         A.   I guess.

18         Q.   Well, I don't want you to guess.  So tell

19     me is the reason that you took the methadone and

20     the heroin at the same time was to experiencing --

21     experience a better, longer high and not have any

22     symptoms of withdrawal?

23         A.   Yeah, but it's not really what it was, so

24     I only did that a couple times and then I never

84

1    really mixed the two again, because you can't

2    really get high on heroin when you're on

3    methadone.  The methadone kind of just takes you

4    to a level and puts you there, and you can't

5    really get past it.  Doesn't matter how much dope

6    you do.  The methadone kind of puts a cap on like

7    all those receptors or whatever I guess and it

8    doesn't work the same.

9        Q.   That's based on your -- your reading

10   about --

11       A.   That's based on my personal experiences

12   with both drugs.

13       Q.   In October of '06, October 9 of '06 were

14   you also intaked into the jail?

15       A.   I don't recall specific dates.

16       Q.   At the time you came into the jail, did

17   you tell the intake personnel about your medical

18   history?

19       A.   Probably.

20       Q.   That was a medical screen; is that right?

21       A.   (Nonverbal response.)

22       Q.   And you also told a mental health

23   specialist about your mental health history;

24   right?

85

1     A.  Probably.

2     Q.  Did you tell the mental health worker at

3  the time that you were taking any medication for

4  mental illness in October of '06?

5     A.  I don't recall.

6     Q.  Did you tell the mental health worker,

7  Jennifer Moore at the time, you were not taking a

8  psychotropic medication?

9     A.  I don't recall.

10     Q.  Did you tell her that you were using

11  cannabis?

12     A.  Probably.

13     Q.  So if she recorded both of those answers

14  in her report about the interview, the screen,

15  would you agree that she was accurate in recording

16  what you said?

17     A.  I don't know --

18     MR. MORRISSEY:  I'm going to object.

19     THE WITNESS:  -- because I don't recall what

20  I said.

21  BY MR. CATANIA:

22     Q.  Would you like me to show you what you

23  said?

24     A.  Yes.

86

1      Q.  Okay.

2      MR. MORRISSEY:  Take a moment to look at it.

3              (Driscoll Deposition Exhibit

4              No. 5 was marked for

5              identification.)

6      MR. CATANIA:  Are we taking a break?

7      MR. MORRISSEY:  We're taking a break.

8              (A break was taken.)

9      MR. CATANIA:  Back on the record.

10     BY MR. CATANIA:

11     Q.  Mr. Driscoll, did you have an opportunity

12     to review the records that were previously

13     provided to counsel labeled Driscoll 01 through

14     Driscoll 33?

15     A.  Yes.

16     Q.  Okay.  And those are records of Cermak

17     Health Services of Cook County; right?

18     A.  Uh-huh.

19     Q.  Before we get to that questioning, I did

20     take the break time moment to obtain the request

21     forms for release of information forms, and I was

22     going to ask if you would be so kind as to sign

23     the forms that I need signed and also we --

24     because we're asking for drug records, we need to

87

1    have them witnessed.  I'm going to ask the court

2    reporter to witness the signature.  Okay?

3         So here's the first one.  It's pertaining

4    to military records.

5              (Mr. Morrissey exited.)

6    BY MR. CATANIA:

7       Q.   Before you leave, I'll give you a copy of

8    everything that you sign.

9         Next one is Bobby Buonauro, and you can

10   see that we're looking for specific records

11   including alcohol and abuse treatment.  There's a

12   special notice on here but because of this law of

13   Illinois we need to have your signature on this

14   line and today's date and then the witness will

15   sign and date it as well.

16        This is the Sundance Methadone, same

17   form, same information is being sought.

18        And here's the Peer Services treatment.

19   And Illinois Masonic.

20        On the military form I have to fill out a

21   little more information which I can only get from

22   you.

23      A.   Okay.

24      Q.   Were you in the Army active the whole

88

1    time?

2        A.  Yeah.

3        Q.  So the branch of service is Army?

4        A.  Yeah.

5        Q.  And the date you entered, month, year?

6        A.  January of '02 is when I shipped out.

7            (Mr. Morrissey entered.)

8    BY MR. CATANIA:

9        Q.  Date released?

10       A.  July or August of same year.

11       Q.  Do you remember your service number?

12       A.  I think it was my social.

13       Q.  Okay.  I'll let them fill it in because

14   it says if unknown, write unknown.  And you're not

15   a reservist?

16       A.  No.

17       Q.  You're not in the National Guard?

18       A.  No.

19       Q.  Thank you.  Sir, I wanted to make sure we

20   had a record that the court reporter was a witness

21   to your signature on consent and then my partner

22   is going to make copies for you.

23       A.  Okay.

24       Q.  All right.  Getting to the medical record

89

1    that you had a chance to review, on October 9 of

2    '06, page 5 of that record, is that your signature

3    that appears in the consent for treatment box, it

4    says patient signature?

5        A.   Yep.

6        Q.   At the bottom of the page -- this record

7    being prepared at the time of your intake

8    apparently, it says in the bottom box substance

9    use box it says injection drug, yes, five years,

10   $20 heroin; right?

11       A.   Yes.

12       Q.   Was that accurate when it was -- when it

13   was recorded?

14       A.   Not entirely.

15       Q.   What's -- what's inaccurate about it?

16       A.   Being five years.  The fact that I'm not

17   on -- it says I'm not taking methadone.  There's a

18   few things that are inactive (sic) in that box

19   there.

20       Q.   In October of '06, were you active in a

21   methadone program?

22       A.   Yes.

23       Q.   What program was it?

24       A.   I don't recall at that time.

90

1    Q.   Okay.

2    A.   Might have been Bobby Buonauro still.

3        Q.   If you look to page 9 which refers to the

4    same intake date, bottom -- bottom left -- bottom

5    right corner is the page numbers.

6        On that page it's got your name listed

7    as -- as on the top it says Driscoll, first name

8    Sean; right?

9    A.   Yeah.

10   Q.   And it has your date of birth on the top

11   line?

12   A.   Uh-huh.

13   Q.   It says your address was [REDACTED]

14   Waveland?

15   A.   Yep.

16   Q.   Is that where you stayed at the time?

17   A.   Yep.  Well, that was my apartment in

18   Wrigleyville I told you about when you asked me

19   places I lived.

20   Q.   Right.  So that's the apartment that you

21   were staying at in October of '09; is that right?

22   A.   Yes.

23   Q.   It says below that charge, manufacturer

24   delivery, do you see that?

91

1    A.  Yes.

2    Q.  Do you know what that refers to?

3    A.  Yeah.

4    Q.  What was it for?

5    A.  I had some cannabis plants.

6    Q.  So you were growing cannabis in the

7    apartment?

8    A.  Yes.  Less than five, though, so it was

9    just a misdemeanor.

10   Q.  And the bond was at $50,000, though; is

11   that right?

12   A.  Yes.

13   Q.  Did you provide the information that's in

14   that top portion to the screener, in this case

15   Jennifer Moore?

16   A.  I believe so.

17   Q.  Do you remember Jennifer Moore?

18   A.  Not by name.  Maybe by face but not by

19   name.

20   Q.  There's a series of 11 questions on this

21   page, and there are answers to all of them.  You

22   see that?

23   A.  Yeah.

24   Q.  And the first question is have you ever

92

1    been at Cook County jail before, and of course

2    it's checked yes; is that right?

3        A.   Yes.

4        Q.   And it indicates Division 2?

5        A.   Yep.

6        Q.   You had been in Division 2 before October

7    of '09; is that right?

8        A.   Yep.

9        Q.   It asks have you ever been hospitalized

10   for psychiatric treatment.  And the answer marked

11   is no.  Was that true at the time?

12       A.   Yeah.

13       Q.   You had never been hospitalized for --

14       A.   Still never been hospitalized for

15   psychiatric.

16       Q.   Outpatient only; right?

17       A.   Yeah.

18       Q.   And then it asks have you -- are you

19   currently receiving outpatient psychiatric

20   treatment.  And the answer is no; is that right?

21       A.   Yes.

22       Q.   Was it true at the time that you were not

23   currently receiving outpatient treatment?

24       A.   I don't recall.

93

1      Q.   It asks in number four whether you were

2   taking psychotropic medication, and it's marked

3   no.  Do you agree with that?

4      A.   Yes, I agree with that.

5      Q.   And in number five it asks if you drink

6   alcohol.  The box is checked yes, six-packs two

7   times a month.  Does that sound accurate?

8      A.   Yeah, I guess.

9      Q.   And below that it asks do you use drugs,

10  and it's checked yes; is that right?

11     A.   Yes.

12     Q.   And it says the drug that you describe

13  was cannabis.  Was that accurate at the time?

14     A.   Yep.

15     Q.   Number six asks, have you ever attempted

16  suicide.  The answer is no; is that true?

17     A.   That's true.

18     Q.   At the time it was true, you never

19  attempted suicide?

20     A.   No.

21     Q.   It also asked do you feel suicidal now,

22  and the answer is no; is that right?

23     A.   That's correct.

24     Q.   And question No. 8 says, are you feeling

94

1    homicidal now, and the answer is checked no; is

2    that true?

3        A.  No.

4        Q.  Didn't feel like killing anybody.  Do you

5    feel like killing anybody today?

6        A.  No.

7        Q.  Number nine asks, have you ever had

8    special education classes, and the box is checked

9    yes.  Is that true you had special ed classes?

10       A.  Yeah, in high school.

11       Q.  What classes did you have?

12       A.  I went to an alternative high school.

13       Q.  Which high school was that?

14       A.  North Shore Academy.

15       Q.  Okay.  Before you had said that you were

16   at New Trier?

17       A.  Yes.

18       Q.  Did you ever have special ed at New

19   Trier?

20       A.  Yeah, I did New Trier West for a while.

21       Q.  I'm sorry?

22       A.  I did New Trier West for a while.

23       Q.  Do you recall who it was that taught the

24   special ed classes in New Trier?

95

1       A.   No.

2       Q.   Male or female?

3       A.   Both.

4       Q.   Number ten asks if you are now homeless,

5   and the box is checked no.  Do you see that?

6       A.   Yes.

7       Q.   And that's true, you had an address at

8   the time; right?

9       A.   Yes.

10      Q.   And No. 11 asks, are you a veteran, and

11  first it was checked no, and above it is written

12  error.  And then the box yes is circled.  Do you

13  see that?

14      A.   Yes.

15      Q.   And that's true you were in the -- you

16  are a veteran; right?

17      A.   Yep.

18      Q.   And you were honorably discharged from

19  the Army; is that true?

20      A.   Yes.

21      Q.   Do you think at the time that you were

22  intaked into the jail that Jennifer Moore

23  accurately recorded your answers to the questions

24  1 through 11 there?

96

1     A.  Possibly.

2     Q.  Do you think that her -- that she

3  accurately recorded that your behavior was

4  appropriate for general population?

5     A.  Yeah.

6     Q.  You see there's a date and time at the

7  bottom of that page.  It's October 9, 2006 at

8  3:29 p.m.; right?

9     A.  Yep.

10    Q.  Does that sound like that was the first

11  thing that occurred while you came into the

12  receiving area that you were given these screening

13  questions?

14    A.  Possibly.

15    Q.  Now, you say that you did not receive --

16  go ahead.

17    A.  I just had one question about page 7 and

18  5.

19    Q.  Okay.

20    A.  Aren't they the same thing?  Is that like

21  a -- is that two different people who did that?

22    Q.  It sure looks like two different people

23  give you an intake screen.  Do you recall that

24  happening?

97

1      A.  I do not, and I'm -- seem to have

2    different answers and everything on them.  So, you

3    know, I don't really know about the validity of

4    these people who write these sheets.

5      Q.  Is that because your lawyer has told you

6    to question the validity of the people that wrote

7    these sheets?

8      A.  No, he did not.  I noticed that all on my

9    own.

10      Q.  Okay.  All on your own because there are

11   two pages of --

12      A.  Two pages.

13      Q.  -- October 9 of '06; right?

14      A.  Yep.  And they have two different sets of

15   answers.

16      Q.  But they also still have the same

17   prisoner number on both of those; right?

18      A.  Yes.  So that means it was from the same

19   day, same intake process.

20      Q.  You say that there are different answers

21   on these; right?

22      A.  Yes --

23      Q.  What answers are different?

24      A.  -- in that bottom box there.

98

1     Q.  What answer is different?

2     A.  It says on one injection drug use, yes on

3  Page 5.  And on page 7 it says injection drug use,

4  no.

5     Q.  Okay.

6     A.  There's no answer about methadone here on

7  page 7.

8     Q.  And there's an answer "no" on page 5;

9  right?

10    A.  Yep.

11    Q.  Okay.

12    A.  And then substance alcohol it says no on

13  page 5, and it says yes on page 7.

14    Q.  Okay.  Other than the bottom box that

15  talks about substance abuse, are there any

16  differences in the answers throughout the medical

17  history and the current medical problems or mental

18  health problems lists?

19    A.  No.  It looks like they just went through

20  and circled no all the way down on both of them.

21    Q.  And your opinion for them circling no is

22  because no was incorrect?

23    A.  No.  I mean, it was just -- it's a real

24  quick thing and on medications, no.

99

1    Q.   Right.  But those things are circled no

2    all the way on the list; is that right?

3    A.   Yep.

4    Q.   Okay.  On both -- both -- both of the

5    intake screens --

6    A.   Yeah.

7    Q.   -- from October 9?

8    A.   And it's on -- yeah.

9    MR. MORRISSEY:  He hasn't completed.

10   THE WITNESS:  And they both say that I'm not

11   taking any medication during all those noes.

12   BY MR. CATANIA:

13   Q.   Okay.

14   A.   And I am taking methadone.

15   Q.   I understand that, but we're talking

16   about what's written down on both of these October

17   9 of '06 screens; right?

18   A.   Right, I understand that.  Everything is

19   checked no.

20   Q.   And when you did these interviews, these

21   intake interviews, the two medical intake screens

22   and the one psychological screen on October 9 of

23   2006, at that time when you were intaked you knew

24   the people you were talking to were either mental

100

1    health specialists or paramedics; is that right?

2        A.  Correct.

3        Q.  So you were not caught unawares about who

4    it was?

5        A.  No.

6        Q.  You knew that there was not a medical

7    doctor asking you the initial screening questions?

8        A.  Yes.

9        Q.  So there was no surprises about who they

10    were?

11        A.  No.

12        Q.  You had been familiar with screening in

13    other settings besides the jail; right?

14        A.  Yes.

15        Q.  For example, in the lockup at a police

16    station they ask you some screening questions

17    before they put you in the lockup; right?

18        A.  Yeah.

19        Q.  They ask you are you taking medication?

20        A.  Yeah.

21        Q.  They ask you if you've ever suffered some

22    mental illnesses?

23        A.  Yeah.

24        Q.  They ask you what kind of medications?

101

1    A.   Yeah.

2    Q.   They make observations about your

3    condition?

4    A.   Yeah.

5    Q.   In fact, you remember one time being

6    arrested for driving under the influence of

7    alcohol; right?

8    A.   No.

9    Q.   You don't remember that?

10   A.   No, I was never -- I never had a DUI.

11   Q.   Okay.  Aside from the answer about

12   illicit drug use no on one and elicit drug --

13   injection drug use on the other, they still both

14   mention heroin; is that right?  Both pages 7 and 5

15   mention heroin?

16   A.   Yeah, two different amounts.  One says

17   $20 heroin, the other one says a hundred so --

18   Q.   Okay.  You think those answers were not

19   given by you; is that what you're saying?

20   A.   I'm saying that I don't recall the

21   answers I gave, and, you know, they have two

22   different versions of -- and that doesn't really

23   jive with me.  So I don't really -- I don't really

24   trust the validity of what these people say

102

1    because I know I told them I was on medication and

2    they still checked no here on the side boxes.  So

3    I mean they obviously didn't listen to me.

4        Q.   Okay.  They certainly heard you when you

5    said heroin; right?  They didn't put that on you,

6    because you were taking heroin -- using heroin;

7    right?

8        A.   No.

9        Q.   In one instance it says noninjection yes

10    and the other instance it says injection drug use

11    yes; right?

12        A.   Yeah.

13        Q.   But both of them say heroin?

14        A.   Yeah.

15        Q.   The different amounts, one says 20 that's

16    on page 5 and one says a hundred dollars on page

17    7.

18        A.   Uh-huh.

19        Q.   Were either of those accurate for your

20    estimated use of heroin?

21        A.   At this time, no.

22        Q.   This was not your first intake into the

23    jail, was it?

24        A.   No, it was my second I believe.

103

1        Q.   And the first one where you were assigned

2    to Division 2 was back in August of '05; is that

3    right?

4        A.   Yes.

5        Q.   And at that time you said that you were

6    in a methadone program?

7        A.   Yep.

8        Q.   But in October of '06 the records suggest

9    that you did not say that you were in methadone at

10   least on one of them; right?

11       A.   Yes.

12       Q.   The other one --

13       A.   I did receive my methadone that time.

14       Q.   The other one, the one that's on page 7,

15   the answer to the methadone question and the

16   question "other" is blank, there's no answer;

17   right?

18       A.   Correct.

19       Q.   Did you get a secondary screen?

20       A.   I --

21       Q.   For methadone?

22       A.   I --

23       Q.   Did you fill out any paperwork in October

24   of '09?

104

1       A.  I don't recall.

2       Q.   Are you saying that your memory is

3    exhausted about whether or not you received

4    methadone in October of -- of '09 -- of '06?

5       A.   What I'm saying it shows that I did

6    receive my methadone.  And on the screening sheets

7    it says that I'm not taking any medication and I'm

8    not on methadone.  So that's what I'm saying.  I

9    don't understand, you know, the seriousness that

10   those intake workers took to fill out these forms

11   because I actually got my methadone in October of

12   '06.

13      Q.   Okay.  You say it's obvious because on

14   page 31 it indicates for October 10 of '06 and

15   October 11, '06 that you received methadone in the

16   methadone clinic; right?

17      A.   Correct.

18                (Driscoll Deposition Exhibit

19                No. 6 was marked for

20                identification.)

21   BY MR. CATANIA:

22      Q.   Marking as Exhibit No. 5 the prescription

23   profile reflecting your name, Sean A. Driscoll,

24   beginning and end dates.  And it does show on page

105

1    1 of this record October 10 of '06 you got a

2    measure of 13 for methadone and on December -- on

3    October 11 of '06 you got a measure of 12.4

4    methadone; right?

5        A.  Uh-huh.

6        Q.  On that stay in October of '06, do you

7    remember when it was that you bonded out?

8        A.  No.

9        Q.  The medication that you believe that you

10   would have told them in October of '06 is the

11   medication methadone; right?

12       A.  Yes.

13       Q.  Other than methadone clinics, do you know

14   of any medical use for methadone?  Are you aware

15   of any other medical use?

16       A.  Pain management I believe.

17       Q.  Following surgery as an alternative to

18   morphine?

19       A.  Yeah.

20       Q.  Have you ever had that situation?

21       A.  No.

22       Q.  So the only way that you've experienced

23   methadone is through a methadone maintenance

24   program or a methadone detox program; correct?

106

1      A.   Correct.

2      Q.   In March of '07 starting on page 10 of

3   Exhibit No. 4 or was it No. 5?  Well, it's the

4   medical records which we haven't marked.  We'll

5   mark them Exhibit No. 6; right?  Oh, it is marked

6   Exhibit No. 5.

7      MR. CATANIA:  For the record, we're

8   correcting the exhibit number for the drug profile

9   for Sean Driscoll to reflect Driscoll No. 6.

10   BY MR. CATANIA:

11      Q.   On Exhibit No. 5 on page 10 of the

12   medical records of that exhibit it shows an intake

13   date of March 3 of 2007; is that right?

14      A.   Yep.

15      Q.   And that's your name on the top in that

16   sticky that's on the top with the bar code; is

17   that right?

18      A.   Yep.

19      Q.   And there's your signature on the consent

20   for treatment line; is that right?

21      A.   Yep.

22      Q.   And then there are questions that are

23   asked below that by Johnny Musa?

24      A.   Uh-huh.

107

1      Q.   Do you recall this intake in March of

2   '07?

3      A.   Not specifically, no.

4      Q.   Do you recall the screener?

5      A.   Possibly.

6      Q.   But you're not certain?

7      A.   Not certain.  I think I know who you're

8   talking about, not certain.

9      Q.   Was it the same screener that you saw in

10   August of '05?

11      A.   I don't know.

12      Q.   In any event, under this screen intake

13   form under the question for medical history 8 it

14   says mental illness and the box is marked yes.  Do

15   you see that?

16      A.   Yep.

17      Q.   And next to it is something that looks

18   like RX?

19      A.   Valium.

20      Q.   Valium.  Okay.  So at that time were you

21   taking Valium?

22      A.   I believe so.

23      Q.   So Johnny Musa accurately recorded what

24   you said to him regarding screening at that time?

108

1      A.   Yes.

2         Q.   And below that it also lists in substance

3    abuse, elicit noninjection heroin.  That's

4    circled; right?

5      A.   Yep.

6         Q.   Okay.  But that was in March of '07.

7    Were you using heroin as a noninjection drug?  In

8    other words, were you snorting it?

9      A.   No.

10        Q.   Were you using injection form of it at

11   the time?

12     A.   Maybe occasionally.

13        Q.   And the last time you used it on that

14   intake, do you remember what that was?

15     A.   I don't know.

16        Q.   On the form it says March 1 of '07.

17     A.   So probably couple days earlier.

18        Q.   So you believe that your last dose of

19   heroin was a couple days before the intake?

20     A.   Yep.

21        Q.   Perhaps the day of your arrest?

22         If you look on page 12 of that exhibit

23   it's your mental health screening form.  Do you

24   see that?

109

1     A.  Yep.

2     Q.  Do you recognize the name of the

3  signature of the bottom of who the mental health

4  staff member was that interviewed you?

5     A.  No.

6     Q.  Take a look at that page.  Do you think

7  any of the questions are answered differently on

8  that page from your memory of March 3 of '07?

9     A.  Probably.

10     Q.  What's different from what you remember

11  answering?

12     A.  Drank alcohol occasionally, you know, the

13  psychotropic medication told her I was taking -- I

14  had a script for the Valium, receiving treatment

15  for outpatient.  It says are you a veteran, no.

16     Q.  Okay.  So you think that that document

17  inaccurately records the things that you said on

18  March 3 of 2007?

19     A.  Yes.

20     Q.  All right.  At the time that you were

21  intaked into the jail on March 3 of 2007, did you

22  know Kimberly Myers?

23     A.  I don't believe so.

24     Q.  That's the screening person's signature

110

1    at the bottom, Kim Myers.  Do you see that?

2        A.  Yep.

3        Q.  Okay.  When she asked you these screening

4    questions, did she ask you about your use of

5    drugs?

6        A.  Probably.

7        Q.  Did you answer her question?

8        A.  Yep.

9        Q.  Well, what's recorded here is heroin, no

10   use in six months and methadone, 130 milligrams

11   per day; is that right?

12       A.  Yep.

13       Q.  Were those accurate answers at the time?

14       A.  Obviously not.

15       Q.  They weren't accurate because you were

16   using heroin?

17       A.  Well, because the last person said that I

18   told him I had just got high three days ago.

19       Q.  Well, it does say, though, that on this

20   page that it was recorded as not using it in six

21   months; right?

22       A.  That's what I'm saying.  I don't think

23   this -- I don't agree with what this page says.

24       Q.  Because it differs from the medical

111

1    screen or because you remember your answer?

2        A.   Differs from the medical screen and it

3    does not -- I mean, I wouldn't say I'm not a

4    veteran.  I wouldn't say I don't drink alcohol.  I

5    wouldn't say these things.

6        Q.   Okay.  But you would say that you were

7    arrested for criminal damage to property and

8    assault; is that right?

9        A.   Yeah, I guess.  If that's what it was at

10   the time.

11       Q.   Do you recall the event in March of '07,

12   the basis for your arrest?

13       A.   No.

14       Q.   Do you remember being in the area of

15   Belmont and Western at a motel area?

16       A.   (Nonverbal response.)

17       Q.   You don't remember that?

18       A.   No.

19       Q.   Do you remember being arrested in the

20   parking lot at the police station at Belmont and

21   Western?

22       A.   No.

23       Q.   When you turned yourself in, you don't

24   remember that?

112

1    A.  No.

2    Q.  Okay.  Is your memory that exhausted as

3  to the events of March 3 of '07?

4    A.  Yeah, I was using heroin.  I was shooting

5  dope.  You know, I just.....

6    Q.  Do you think that your answers to the

7  intake questions are only as valid as your memory

8  and honesty at the time you're giving your

9  answers?

10    MR. MORRISSEY:  I'm going to object.  I don't

11  understand the question.

12    THE WITNESS:  Yeah.

13    MR. CATANIA:  That's enough.

14    MR. MORRISSEY:  Do you understand it?

15    THE WITNESS:  Sort of.

16  BY MR. CATANIA:

17    Q.  Can you answer the question?

18    A.  No.

19    Q.  Is it because you don't understand the

20  question?

21    A.  I would say no because there -- I had no

22  reason not to tell them, you know, everything, and

23  it doesn't accurately portray things that I would

24  say.  I know my -- you know, things I would say

113

1    and they're not reflected on this sheet.

2        Q.   On March 3 of 2007 during the psychiatric

3    screen which is on page 12 that's in front of you

4    there, was the fact that the screening was done in

5    a cubicle surrounded by Plexiglas in an area where

6    there were other people present, does that have

7    anything to do with your either disclosing or not

8    disclosing your use of psychotropic medication?

9        A.   No, because the medical screen was done

10   in the same place.

11       Q.   Okay.  Precisely the same spot or was it

12   a different -- a different cubicle?

13       A.   One cubicle over.  You know how you

14   rotate cubicles.  You know, this one psych, two

15   cubicles down is medical, you know, two around the

16   other side is like classification or whatever.

17       Q.   Okay.  And that's based on your

18   experience of numerous arrests into the jail;

19   right?

20       A.   Yes.

21       Q.   It's not based on conversations with

22   other people --

23       A.   No.

24       Q.   -- about how things are done?

114

1       A.   No, that's firsthand knowledge.

2       Q.   Okay.  So you're -- are you being precise

3   when you say two cubicle down is where you have a

4   medical screen?

5       A.   Not precise.  You know, I mean it depends

6   on how many people were in an intake right there.

7   Sometimes it was right next to each other,

8   sometimes there was, you know, three medicals and

9   three psychs and they were on back to back from

10  each other.

11      Q.   Okay.  Did the fact of this space being

12  used prevent you from disclosing to the psych

13  worker or the medical worker what your use of

14  illicit drugs was at the time?

15      A.   No.

16      Q.   Did it prevent you from describing your

17  use of Valium at the time?

18      A.   No.

19      Q.   You weren't ashamed of the fact that you

20  were using Valium; right?

21      A.   No.  Wasn't ashamed to tell them I shot

22  dope and was on methadone.  I mean, why would I be

23  ashamed to tell them I have a legitimate medical

24  condition that I need help for?

115

1      Q.   Okay.  That, of course, was not

2   responsive because I didn't ask you a question,

3   but thank you for the information.

4      A.   No worries.

5      Q.   On page 13 there appears to be a mental

6   health services secondary interview form.  Do you

7   see that?

8      A.   Uh-huh.

9      Q.   Is that yes?

10      A.   Yes.

11      Q.   On the bottom it has your name listed on

12   the sticky; is that right?

13      A.   Yes.

14      Q.   Sean Driscoll, with your age and your

15   prisoner number at that time says 2009 5951.  Do

16   you see that?

17      A.   Yes.

18      Q.   Does this refer to the last intake into

19   the jail you experienced?

20      A.   Yes.

21      Q.   January 26 of 2009?

22      A.   That's correct.

23      Q.   Is that the date you were actually

24   intaked into the jail or was this a later date?

116

1    A.  What was the date on here you said?

2    Q.  Well, on this form it looks like it says

3  February 15 of '09, but in --

4    A.  So that was --

5    Q.  -- the sticky it says January 26 of '09.

6    A.  Well, the sticky is my intake.  That was

7  when I was intaked into the jail.

8    Q.  So you were seen in -- by a mental health

9  screener on February 15 of '09 based on this

10  record.  Does that sound right?

11    A.  Yes.

12    Q.  Okay.  So after your intake, sometime

13  after --

14    A.  Yes.

15    Q.  -- then you saw the psych?

16    A.  Yes.

17    Q.  That's the same thing as you said earlier

18  about being treated for 21 days and then wanting

19  to get out of 2N; is that right?

20    A.  Yes.  Well, I was just put in 2N for a

21  night, but yeah.

22    Q.  When was it that you were put in 2N?

23    A.  It was right around the time I was ending

24  the methadone program, so.....

117

1      Q.   On -- on the date of February 15, which

2   is the date on here, February 15, 2009 at

3   8:20 p.m., do you recall being interviewed by

4   Nicole Boyle, a mental health specialist?

5      A.   Not really.

6      Q.   Okay.

7      A.   Sort of.  I know I remember that night

8   that they took me over to 2N and I talked to a

9   bunch of people.  I was held down in Cermak for a

10  while because my blood pressure was out of whack.

11     Q.   Was that the same day that the judge

12  ordered you to be evaluated?

13     A.   When he had put the order in weeks ago,

14  weeks like immediately when he sent me to jail he

15  had put the order in, but it took, you know,

16  almost three weeks for them to come and get me.

17     Q.   In the interview that was done by Nicole

18  Boyle that's reflected on Driscoll No. 13 of

19  Exhibit No. 5 here, do you recall any of these

20  questions and answers being given?

21     A.   Yeah.

22     Q.   Do you believe that this interview was

23  more in depth than the previous interview done by

24  a psych worker at the time that you were screened

118

1    at intake?

2        A.  Yeah.

3        Q.  In fact, it asks about your history of

4    abuse?

5        A.  Yes.

6        Q.  That means you're being abused by

7    somebody either physically or emotionally or

8    sexually; right?

9        A.  Uh-huh.

10       Q.  None of that happened to you?

11       A.  No.

12       Q.  You were asked about history of substance

13   abuse, and I believe your answer there says uncle;

14   is that right?  Do you have an uncle that suffered

15   a history of substance abuse?

16       A.  Yeah.

17       Q.  Who's that uncle?

18       A.  He lives down in Florida.

19       Q.  It's not the John you spoke of earlier?

20       A.  No.

21       Q.  If you turn to the next page, page 14, it

22   appears that there's an emergency room record of

23   February 15 of '09 as well.  Do you see that?

24       A.  Yep.

119

1    Q.   And it says 9:03 p.m.  Is that about the

2    time you remember being triaged in the emergency

3    room?

4    A.   I guess.

5    Q.   And you said that your blood pressure was

6    out of whack?

7    A.   Yeah.

8    Q.   Do you remember in what way it was out of

9    whack?

10   A.   It was either too high or too low.  I

11   don't --

12   Q.   Not too many options between those two.

13   A.   I don't know.  No doctor.

14   Q.   Okay.  Do you have any training in mental

15   health?

16   A.   No.

17   Q.   Do you have any training in paramedic?

18   A.   No.

19   Q.   Do you have any correctional training?

20   A.   No.

21   Q.   Turn to page 17 there's a prescription

22   order on that page.  Do you see the bottom order

23   which is dated February 15, '09?

24   A.   Uh-huh.

120

1     Q.  You have to answer yes or no.

2     A.  Yes.  Sorry.

3        Q.  I believe you can see that it says admit

4     2N.  Do you see that?

5     A.  Yep.

6        Q.  So do you believe that you were admitted

7     to 2N for psychiatric evaluation?

8     A.  Yes.

9        Q.  Okay.  There's also referral to

10    methadone; is that right?

11    A.  Yes.

12       Q.  And something is scheduled for tomorrow.

13    Do you recall what it was that was scheduled for

14    tomorrow?

15    A.  Appears to be like the last day.  I

16    believe it was the last day I was on my methadone.

17       Q.  Do you remember being interviewed by

18    Dr. Mynatt, a medical doctor, on January 16 of '09

19    at around 10:56 a.m.?

20    A.  Yes.

21       Q.  And that was the doctor that decided that

22    you should be discharged back to general

23    population?

24    A.  Yes.

121

1    Q.   Did you agree with the doctor?

2    A.   Yes, I did.

3    Q.   Because you wanted to be out of 2N?

4    A.   Yes.

5    Q.   Okay.  Do you realize that the reason why

6    you were in 2N was because of a court order at the

7    time?

8    A.   Yes.  Because I told the judge I needed

9    my medication, and he said that was the only way I

10   would be able to get it.

11   Q.   In fact, that's also described on page 19

12   of that record; is that right?

13   A.   Yeah.

14   Q.   Says the chief complaint, patient's own

15   words, denies anxiety, complains of not wanting to

16   be here on two north; states he had a court order

17   two weeks ago for eval per judge.  That sound like

18   exactly what you just said?

19   A.   No, because I didn't deny my anxiety.

20   Q.   Okay.

21   A.   I said I didn't want to be up here on

22   2N.  There were people smearing shit on the walls

23   of their cell and acting crazy and yelling and

24   screaming.  And I mean, you're talking to me now.

122

1    I'm not in that same kind of realm with those

2    people.

3        Q.   Okay.

4        A.   I don't have imaginary friends and things

5    of that nature, and I did not want to be there.

6    And that's what I told them, I don't want to stay

7    here.

8        Q.   So you're saying that your words are not

9    correctly recorded here under chief complaint?

10       A.   Yes.

11       Q.   Do you know Dr. Mynatt?

12       A.   I don't know him personally, no.  I met

13   him that one time.

14       Q.   If you turn to the next page, page 20,

15   under drug use, drug alcohol use, ETOH is

16   alcohol.  It says history of marijuana and

17   alcohol, mild usage weekend.  Does that sound like

18   something you said at the time?

19       A.   No.

20       Q.   You said you used a lot of alcohol and

21   cannabis?

22       A.   Yeah.

23       Q.   Below that under history of head injuries

24   it's denied.  You never had any history of head

123

1    injury; right?

2        A.  No.

3        Q.  Ever have a history of seizure?

4        A.  No.

5        Q.  You ever have any other medical

6    condition?

7        A.  No.

8        Q.  Below that pertinent observations and/or

9    background, in other words, homelessness, Social

10   Security income or family info it says patient is

11   a 25-year-old white male, single, one child; is

12   that accurate?

13       A.  No.

14       Q.  You don't have a child?

15       A.  No.

16       Q.  Or are you an only child?

17       A.  I'm an only child.

18       Q.  Okay.  Reports being incarcerated for

19   three weeks.  Was that accurate at the time?

20       A.  Roughly, yeah.

21       Q.  Denies wanting to be on 2N, requesting

22   transfer; right?

23       A.  That is correct.

24       Q.  Under the admission problem list,

124

1   recommendations it says stable.  Do you see that?

2       A.  Yes.

3       Q.  Below that there's something called

4   diagnostic impression.  The doctor that signed

5   this, Dr. Mynatt, wrote on there axis one, rule

6   out.  Do you see that?  And then next to it, it

7   says no DX.  Do you see that?

8       A.  Yeah.

9       Q.  Okay.  Do you know what no DX means?

10      A.  No diagnosis.

11      Q.  Very good.

12          On the next page, page 21 is a nursing

13  assessment.  In the middle of that box there's an

14  indication of medication being methadone.  Do you

15  think that that was accurately recorded by the

16  nurse on February 16 of '09, you were on methadone

17  then?

18      A.  Yeah, that was accurately recorded.

19      Q.  You were actually getting methadone up

20  until that time; right?

21      A.  That was my last day I think or close to

22  it.

23      Q.  On page 24 of this exhibit is the

24  psychiatrist discharge transfer summary; is that

125

1    right?

2        A.  Yep.

3        Q.  On that page, which is signed by

4    Dr. Mynatt, a medical doctor, on February 16 of

5    '09 under the diagnosis at discharge it says axis

6    one, opioid dependence.  That means that you're

7    dependent on heroin, opioids?

8        A.  Yep.

9        Q.  All right.  It also says benzodiazepine

10   dependence.  Do you see that?

11       A.  Yes.

12       Q.  Do you know what that refers to?

13       A.  A dependence on benzodiazepine.

14       Q.  Okay.  Next to that it says ETOH and

15   cannabis abuse.  Do you know what that means?

16       A.  Alcohol and weed.

17       Q.  Okay.  That you abuse them?  You use them

18   sometimes to excess?

19       A.  Yep.

20       Q.  And then next to it says R slash O

21   anxiety disorder; is that right?

22       A.  Yep.

23       Q.  Do you know what the R slash O means?

24       A.  No.

126

1        Q.  If I tell you that that's how doctors

2    refer to a differential diagnosis rule out anxiety

3    disorder, that means that they have not diagnosed

4    it but they're trying to figure out whether you

5    have it.  Do you agree with that?

6        A.  If that was his opinion, sure, or if

7    that's what RO means, sure.

8        Q.  Below that where it says psychiatrist

9    discharge transfer note in this shaded box here,

10    patient has multidrug abuse dependency.  Do you

11    agree with that?

12        A.  Yes.

13        Q.  Currently stable.  Do you agree with

14    that?

15        A.  Sure.

16        Q.  Next to it it says no SI or suicidal

17    ideation.  Do you agree with that?

18        A.  Yes.

19        Q.  HI, homicidal ideation, do you agree with

20    that?

21        A.  Yep.

22        Q.  Below that it says mood in quotes okay.

23    Does that sound like the way you felt at the time?

24        A.  No.

127

1      Q.   If it says next to it affect

2    enthusiastic, do you agree with that?

3      A.   Maybe to leave 2N I was enthusiastic.

4      Q.   Okay.  Below that it says history of

5    withdrawal symptoms.  Do you agree you had a

6    history of withdrawal symptoms?

7      A.   Yes.

8      Q.   Below that is the doctor's order of

9    discharge to general population inactive.  Do you

10   see that?

11     A.   Yep.

12     Q.   And that's what happened; right?  You

13   were discharged to general population from there?

14     A.   Yes.

15     Q.   Following that on page 25 to 27 there's

16   these three pages called the initial psychiatric

17   assessment.  You see that?

18     A.   Yep.

19     Q.   Okay.  Do you know when this assessment

20   was done?

21     A.   No.

22     Q.   On the last page it says 10:50 a.m. of

23   2/16 of '09.

24     A.   Okay.

128

1    Q.  And that is next to the evaluator's

2  signature, and evaluator's signature Dr. Mynatt,

3  medical doctor.  Do you recall that doctor

4  interviewing you?

5    A.  It was the same doctor.

6    Q.  Same doctor.  So that -- that doctor also

7  did all the interview questions regarding your

8  chief complaints and your history before coming to

9  the diagnosis that we already looked at; right?

10    A.  Yep.

11    Q.  Did you know that you were talking to a

12  psychiatrist at the time?

13    A.  Yes.

14    Q.  Was the location where that interview

15  took place a place that you were not able to feel

16  comfortable in disclosing that you had a

17  psychiatric disorder?

18    A.  No.

19    Q.  The doctor did not prescribe any Valium

20  for you; right?

21    A.  No.

22    Q.  Since you got out of jail from that

23  intake in '09, have you had Valium?

24    A.  No.

129

1    Q.  It's not been prescribed since then?

2    A.  No.

3    Q.  Do you have any disagreement with the

4    doctor's course of treatment, diagnosis and -- and

5    prescription orders for that time?

6    A.  Yes.

7    Q.  Being no -- no further prescriptions?

8    A.  Yeah.

9    Q.  Okay.  You have a disagreement with that?

10   A.  Yeah.

11   Q.  Why?

12   A.  Because it was something I needed at the

13   time and wasn't able to get and the way that I was

14   taken off of it I didn't feel was the proper way.

15   Q.  Okay.  You survived that occurrence?

16   A.  Yeah.

17   Q.  You wouldn't have done less time because

18   of it; right?

19   A.  No.

20   Q.  You wouldn't have done more time even

21   though you were doing time in jail while

22   undergoing your withdrawal; right?

23   A.  Yep.

24   Q.  You would have done more time?

130

1      A.  No, I wouldn't have done more time.

2      Q.   Did the fact that you were off of heroin

3   and methadone and Valium affect your criminal

4   sentence in any way?

5      A.  No.

6      Q.   You weren't ordered to do drug treatment

7   as part of a sentence?

8      A.  Well, I did HRDI, but I wasn't required

9   to finish the whole 120 days or whatever.

10      Q.  Right.

11      A.  I still twitch once in a while from

12   abruptly stopping Valium the way that I was forced

13   to stop.

14      Q.  Has any doctor told you that that

15   twitching was as a result of stopping Valium the

16   way you stopped?

17      A.  No, I just read up on it.

18      Q.   So based on your personal investigation

19   about it?

20      A.  About why it happened, yes.

21      Q.  And that's on the Internet?

22      A.  Yeah.

23      Q.  You said earlier that before you started

24   the methadone program you had attempted on your

131

1    own to detox by going cold turkey; right?

2        A.  Uh-huh.

3        Q.  Was the time in jail -- that was yes;

4    right?

5        A.  Yes.  I'm sorry.

6        Q.  Was the time in jail in '09 similar to or

7    not as bad as attempting to detox on your own

8    going cold turkey?

9        A.  After my methadone I had completely

10   stopped, like after the final day it was just as

11   bad.

12       Q.  So you had reached the 21st day and you

13   felt like you still needed methadone; is that

14   right?

15       A.  Yes.

16       Q.  Did you feel like you needed heroin?

17       A.  Yes.

18       Q.  Did you go out after discharge and buy

19   heroin?

20       A.  I was still locked up for another two

21   months, two and a half months after that.

22       Q.  But there was heroin available in the

23   jail; right?

24       A.  Yeah.

132

1      Q.   You didn't partake in that?

2      A.   I tried to get some but I wasn't able

3   to.  I didn't have the right connections.

4      Q.   What were the right connections?

5      A.   I don't know, more money, commissary, you

6   know.

7      Q.   Other than the cold turkey attempts that

8   you had made and the methadone, did you use any

9   other medications to detox from heroin?

10     A.   No.

11     Q.   Before August 10 of 2006, before your

12   arrest by the Kenilworth Police Department, did

13   you know Officer Smaha, S-m-a-h-a?

14     A.   I don't believe so.

15     Q.   How about Officer Hornstein,

16   H-o-r-n-s-t-e-i-n?

17     A.   No.

18     Q.   When you were processed at the

19   Kenilworth Police Department they asked you some

20   intake questions before they put you in a lockup

21   area; right?

22     A.   I believe so.

23     Q.   If Officer Hornstein said that he asked

24   you medical questions before putting you in the

133

1    lockup on August 10, 2006 and wrote down your

2    answers at the time that you gave them, would you

3    have any reason to think he was lying about what

4    he wrote down?

5        A.  I don't know.  I've never seen it.

6        Q.  Do you remember what you said to him

7    about it?

8        A.  No, I don't even really remember that

9    arrest.

10       Q.  Do you remember the arrest on October 8

11   of 2006, Chicago Police Department?

12       A.  I was arrested a lot.

13       MR. MORRISSEY:  October 8 -- I'm sorry.

14       MR. CATANIA:  October 8, 2006.  You don't

15   have that one?

16       THE WITNESS:  I don't think I was

17   incarcerated at all.

18   BY MR. CATANIA:

19       Q.  We had talked about an intake date into

20   the jail after a possession of production of

21   cannabis charge.  Remember that?

22       A.  Yeah.

23       Q.  Okay.  You were arrested at 823 West

24   Waveland?

134

1     A.   Yeah, my apartment.

2     Q.   That was after a neighbor had complained

3   to police about smelling marijuana being smoked

4   and police arriving and seeing plants growing;

5   right?

6     A.   I don't know what led them to come.  I

7   know they knocked on my door and they told me that

8   somebody had spray painted my -- the hallway to my

9   apartment building, like, graffitied it, and I

10  needed to sign something for the landlord.  And I

11  opened the door and they all came rushing in with

12  guns.

13    Q.   Did you know Officer Giannos,

14  G-i-a-n-n-o-s, before that date?

15    A.   No.

16    Q.   Did you know Officer Morfeus Bey, B-e-y?

17    A.   No.

18    Q.   If Officer Bey said that he asked you

19  medical questions before you were put into the

20  lockup and wrote down your answers at the time you

21  gave them, would you have any reason to think that

22  he was lying about what was written down?

23    A.   I have no idea.  I know they weren't

24  happy with me, though, because I told them what

135

1    the law was regarding the plants that I had.

2        Q.   What is the law regarding the plants?

3        A.   That five or more was a -- or five and

4    under was a misdemeanor in the state of Illinois.

5        Q.   So you consciously --

6        A.   And it was for personal use.

7        Q.   You consciously decided that you could

8    stay under the felony charge by producing under

9    five; right?

10       A.   And I only had two.  And they weren't

11   even producing yet so.  They were not too happy

12   with me when they realized that they had this

13   whole SWAT team and production come, you know,

14   running through my apartment and they told me I

15   was getting a class X felony and rubbing it in my

16   face, and this and that and weighed all the dirt

17   and everything and, yeah, they weren't too happy

18   with me.

19       Q.   But you were pleased with yourself by

20   having the forethought of not having too much

21   marijuana?

22       A.   Oh, yeah.

23       Q.   Do you remember being convicted of retail

24   theft in Rolling Meadows in 2005?

136

1    A.  No.

2    Q.  You don't?

3    A.  Roughly.

4    Q.  Okay.  You agree that there is such a

5    conviction for retail theft, though; right?

6    A.  I believe so.

7    Q.  Okay.

8    A.  From a Dominick's maybe?

9    Q.  I believe it was from a grocer.

10       I would say that in 2007 would you agree

11   with me -- I should say would you agree with me

12   that you had a pretty bad year in 2007?

13   A.  It's possible.

14   Q.  Arrested February 27 of '07?

15   A.  Okay.

16   Q.  Arrested March 2 of '07?

17   A.  Okay.

18   Q.  Arrested July 7 -- July 23 of '07?

19   A.  Okay.

20   Q.  Arrested August 2 of '07?

21   A.  Okay.

22   Q.  Arrested October 10 of '07?

23   A.  Yeah, I'd say it was a bad year.

24   Q.  Arrested November 7 of '07?

137

1      A.   Yep.

2          Q.   Following all of those arrests, you

3      nonetheless got arrested a couple more times for

4      narcotics-type behavior; right?

5      A.   Yeah.

6          Q.   So you were on a downward spiral at the

7      time in '07 and '08?

8      A.   Seems that way.

9          Q.   Since your discharge from the jail in '09

10     your life has actually turned around, hasn't it?

11     A.   Yep.

12     Q.   More stable?

13     A.   Yep.

14     Q.   Got a job?

15     A.   Yep.

16              (Driscoll Deposition Exhibit

17              No. 7 was marked for

18              identification.)

19     BY MR. CATANIA:

20         Q.   I'm going to show you what's been marked

21     as Driscoll No. 7.  We're going to have to share

22     it a little bit because there's only one copy

23     here.  Mr. Morrissey has one.  Bates stamped 257

24     CCSAO.  You see that?

138

1      A.  Yep.

2      Q.  Okay.  There's several pages here that go

3   from 257 to 262.  Do you see that your name

4   appears numerous times on those pages regarding

5   the methadone detox work sheet?

6      A.  Yes.

7      Q.  Now, I don't know the origin of this

8   particular page because -- or these pages because

9   they were in discovery in a file before I received

10  it.  But your name appears there and then other

11  names are blacked out; is that right?

12     A.  I don't know.

13     Q.  Well, your name is the only one that

14  appears to be not blacked out throughout all those

15  pages; right?

16     A.  Oh, yeah, yeah, yeah.  Okay.  Yeah.

17     Q.  During the time when you were in the

18  methadone program, there were other people also in

19  the program; right?

20     A.  Yes.

21     Q.  And everybody was marched down to the

22  pharmacy in order to get their methadone; right?

23     A.  Yep.

24     Q.  Did you ever have to wait in line to get

139

1    it?

2        A.  Yep.

3        Q.  So you knew that there were other people

4    also getting methadone; right?

5        A.  Yes.

6        Q.  So do you agree with me that the program

7    was being administered to more than one person?

8        A.  Yes.

9        Q.  Just like when you're on the outside, you

10   go to methadone program there's other people

11   present?

12       A.  Exactly.

13       Q.  Do you have any reason to believe that

14   the methadone program is incorrectly administered

15   at the jail?

16       MR. MORRISSEY:  I'm going -- I'm going to

17   object to the question as asking for a narrative

18   and it's overall question.  It's too broad.

19          If you can answer, go ahead.

20   BY MR. CATANIA:

21       Q.  Can you answer the question?

22       A.  No.

23       Q.  No you can't answer the question or the

24   answer's no?

140

1      A.   I mean the answer is no.  I don't think

2   it's administered properly.  I think the 21 days

3   is way too quick.  I think you get too sick too

4   soon, and it's not a healthy way to do this.

5      Q.   So you agree with me that the question

6   didn't actually call for a narrative but only a

7   yes or no answer; right?

8      A.   Yeah.

9      Q.   Your disagreement over the type of

10  treatment that you receive is not the same as a

11  statement that you received no treatment; right?

12     A.   Yes.

13     MR. CATANIA:  If I can have just a moment.  I

14  believe I've asked all the questions I want to

15  ask.  I don't know if Mr. Morrissey wants to

16  suggest anything else for the record but we'll

17  find out.

18               EXAMINATION

19  BY MR. MORRISSEY:

20     Q.   Mr. Driscoll, you were incarcerated at

21  least six times between August of 2005 and January

22  of 2009; correct?

23     A.   Yep.

24     Q.   And during that period of time you were

141

1      on a methadone program; correct?

2          A.   Correct.

3          Q.   And each time you entered the jail you

4      had been in the police custody for a day or two?

5          A.   Yes.

6          Q.   And in your experience having been on a

7      methadone program for four -- four years, what

8      happened after you haven't received your

9      methadone -- strike that.

10             Describe the nature of the methadone

11     treatment.  Do you understand the question?

12         A.   The treatment is every day you get your

13     medication and it lasts for one day.  And after

14     that one day you start to feel ill effects of not

15     having your medication.

16         Q.   How quickly do those ill effects occur

17     after one day?

18         MR. CATANIA:  Objection to the form of the

19     question.

20         THE WITNESS:  Immediately.

21     BY MR. MORRISSEY:

22         Q.   What ill effects do you start

23     experiencing after one day of not receiving

24     methadone?

142

1      A.   You start with like aching bones in your

2    knees and your back and if you continue throughout

3    that day without getting it further and you sweat

4    a lot, probably throw up, have some diarrhea.

5    You're not going to sleep that night.  It's just

6    going to keep going along that pattern until you

7    get your methadone.

8      Q.   Does it progress, the symptoms, for a

9    period of time?

10      MR. CATANIA:  Objection to the form.

11   BY MR. MORRISSEY:

12      Q.   You can answer.

13      A.   Yes.  It progresses for the next week or

14   so until you eventually get it all out of your

15   system.

16      Q.   How do you feel after, let's say, two

17   days of not having received methadone?

18      A.   Like you can't move.  You feel as if all

19   you want to do is lay down but you can't because

20   your legs hurt, you need to move them, but it

21   hurts to stand up because your knees are aching,

22   you're sweating, you have chills, vomiting and

23   occasionally you have hallucinations and see

24   things.  It's not good.

143

1      Q.   Now, you mentioned that generally by the

2   time you physically entered the jail during the --

3   during the times you were in the jail between 2005

4   and 2009, you had normally been in police custody

5   for a day or two?

6      A.   Yep.

7      Q.   So at the point of entering the jail

8   during that period of time, what symptoms would

9   you have been experiencing?

10     A.   Depend if I had, you know, been able to

11  get my dose yet for the day.  If I was able to

12  dose, I would be fine until, you know, the next

13  morning when I went to court and then I would

14  start to feel ill effects of being sore and -- and

15  wanting to get my methadone but you can't.  I

16  don't know, it's a hard feeling to describe.

17  It's.....

18     Q.   Did you -- during that four-year period,

19  did you ever receive methadone the same day you

20  entered the jail?

21     A.   No.

22     Q.   Now, Mr. Catania asked you a question

23  whether or not you objected to the methadone

24  withdrawal process at the jail.

144

1    A.  (Nonverbal response.)

2    Q.  You answered affirmatively that you did?

3    A.  Yes.

4    Q.  Why -- why did you agree with the methods

5    that were used by the jail in taking you off

6    methadone?

7    A.  Why didn't I agree?

8    Q.  Yeah.

9    A.  Because it was too -- it was too soon.

10   It was too rapid of a detox, and you still felt a

11   majority of the ill effects the whole time, and it

12   just kind of stretched it out.  And it was just

13   too soon, too quick.

14   Q.  Now, in August of 2005, why had your

15   medical doctor put you on methadone in the first

16   place?

17   MR. CATANIA:  Objection.  Form of the

18   question.

19   BY MR. MORRISSEY:

20   Q.  To your knowledge.

21   A.  Because I requested to be on it and I

22   tested positive in a drug test for opiates.

23   Q.  And for what reason why -- to your

24   knowledge, why were you put on methadone?

145

1      A.  I had a heroin addiction.

2      Q.  So the heroin is being used -- or strike

3  that.

4          The methadone was being used as a form of

5  medical treatment for you?

6      A.  Correct.

7      MR. CATANIA:  Objection.  Form of the

8  question.

9      THE WITNESS:  Correct, and it was prescribed

10  by a medical doctor.

11  BY MR. MORRISSEY:

12      Q.  Now, each day that you did receive --

13  strike that.

14          When you did receive methadone at the

15  jail, each day they reduced the quantity of the

16  methadone; is that correct?

17      A.  Yes, that's correct.  They divided it by

18  21, so it didn't matter if you came in there on

19  200 milligrams or you came in there on 20

20  milligrams, each person is going to get divided by

21  21 days.  And you're taking a much bigger hit the

22  higher number of milligrams you are each day down.

23      Q.  So if you came into the jail and you were

24  say on extremely high dose of methadone --

146

1      A.   Your detox would be worse.

2      MR. CATANIA:  Objection.  Form of the

3   question.

4   BY MR. MORRISSEY:

5      Q.   How would you as a patient feel as the --

6   as gradually the amount of methadone given to you

7   on a daily basis is reduced?

8      A.   You would feel okay at first and then you

9   wouldn't -- like I said, I had started with not

10  sleeping.  You don't -- you didn't sleep for those

11  21 days and after for the most part, and had

12  horrible diarrhea and vomiting mostly the whole

13  time.  And I went to Cermak right after it was

14  over with because I was laying on the floor in

15  Division 11 and they told me to go see the doctor.

16     Q.   During which of the incarcerations?

17     A.   This last one.

18     Q.   Now, another time when you detoxed when

19  you -- when they attempted to detox you off of

20  methadone when you got out, did you seek medical

21  attention?

22     A.   Yes.  I had to go to St. Francis

23  Hospital.

24     Q.   Why was that?

147

1      A.   After I -- I did not receive my

2   medication at the jail and by that time it had

3   been my third of fourth day without having it and

4   I was very sick.

5      Q.   Now, each time between 2004 up until your

6   last incarceration in 2009 when -- when you would

7   leave the jail, would you need additional

8   medication?

9      A.   Yes.

10      Q.   Where -- you go back to your methadone

11   clinic?

12      A.   Yeah.

13      MR. CATANIA:  Objection.  Form.

14   BY MR. MORRISSEY:

15      Q.   And what was the consequence of having

16   been prescribed this withdrawal process in jail?

17      MR. CATANIA:  Objection.  Form.

18      THE WITNESS:  Well, it would -- it would

19   upset the maintenance process and because you

20   would go back to the clinic feeling ill, then you

21   would have to renegotiate your dose and more times

22   than not you would keep going up in dosage because

23   you got sick for a little bit and now you needed

24   slightly more to compensate.

148

1    BY MR. MORRISSEY:

2        Q.   So the -- it'd be correct to say that the

3    titrating you off of methadone in the jail was

4    counterproductive?

5        A.   Yes.

6        Q.   And when you got out and resumed

7    treatment under methadone, you would have to have

8    a higher dose of methadone to treat your opiate

9    addiction?

10       A.   Yes.

11       Q.   Now, in 2009 you were placed on 2N;

12   correct?

13       A.   Yes.

14       Q.   And when you went into -- when you were

15   treated at Cermak in the emergency room before

16   going to 2N, what symptoms were you experiencing?

17       A.   I just hadn't been sleeping for a while

18   and I had had diarrhea and vomiting for like those

19   last couple of weeks.  And by the time I got there

20   they did, like, a blood pressure screening before

21   they let you go up on 2N and she said my blood

22   pressure was all out of whack and made me stay

23   down there and gave me fluids and some pills or

24   something to take and made me sit down there for a

149

1    few hours.

2        Q.   Now, prior to going into the jail you

3    had -- the court had ordered the sheriff to do a

4    psychological evaluation on you?

5        MR. CATANIA:  Objection.  Form.

6    BY MR. MORRISSEY:

7        Q.   Is that correct?

8        A.   Yes.

9        Q.   And that was the judge in Skokie?

10       A.   Yes.

11       Q.   And did they immediately do a

12   psychological evaluation?

13       A.   No.  It took them almost three weeks.

14       Q.   And when you went into the jail -- prior

15   to going into the jail you were under a doctor's

16   prescription for Valium?

17       A.   Yes.

18       Q.   And were you in need of Valium at that

19   time prior to going to the jail?

20       MR. CATANIA:  Objection.  Form.

21       THE WITNESS:  Yes.

22   BY MR. MORRISSEY:

23       Q.   Why?

24       A.   Because I had -- was diagnosed with an

150

1    anxiety disorder.

2        Q.   Now, when you were evaluated by the

3    psychiatrist during your admission to the 2N, I

4    believe you told the psychiatrist that you're

5    stable; is that correct?

6        A.   I believe that's what it says, yes.

7        Q.   But were you in fact psychologically

8    stable at that time?

9        MR. CATANIA:  Objection to form.

10       THE WITNESS:  No.

11   BY MR. MORRISSEY:

12       Q.   Why not?

13       A.   Well, I had spent the night before up on

14   2N with people screaming and smearing feces on

15   their walls and walking, yelling and being

16   restrained and having to watch staff jump on

17   people and it's traumatic being up there.

18       Q.   Were you given a bed, do you recall?

19       A.   No, I was in this boat-type thing.

20       Q.   What is a boat-type thing?

21       MR. CATANIA:  Objection to the form of the

22   question.

23       THE WITNESS:  It looks like a little canoe

24   thing.  I think there's something about them some

151

1    years ago with -- when the jail was overcrowded

2    they put these little cot things in cells, and I

3    believe it was one of those.  It was one of those

4    little cots.

5    BY MR. MORRISSEY:

6        Q.  How crowded was 2N?

7        A.  It was fairly crowded.

8        Q.  Were there sufficient beds for each

9    patient?

10       MR. CATANIA:  Objection.  Form.

11       THE WITNESS:  No.

12   BY MR. MORRISSEY:

13       Q.  How were the patients treated by the

14   correctional staff in 2N?

15       MR. CATANIA:  Objection.  Form.

16       THE WITNESS:  They were pretty much

17   indifferent to them.  I mean, they made everyone

18   sit down in a chair all day and/or be in their

19   cell all day.  So like the correctional staff was

20   just kind of like, all right, here, you sit here,

21   don't bother me, I don't bother you.  Was pretty

22   much it.  You weren't allowed to walk around or,

23   you know, do anything.

24   BY MR. MORRISSEY:

152

1    Q.  So would you -- did you -- prior to that

2  you were in Division 11; correct?

3    A.  Yeah.

4    Q.  And how -- how -- were the restrictions

5  greater on a -- on a prisoner placed in 2N than in

6  Division 11?

7    MR. CATANIA:  Objection.  Form.

8    THE WITNESS:  Yes.

9  BY MR. MORRISSEY:

10    Q.  How -- how was -- how were the

11  restrictions greater --

12    MR. CATANIA:  Objection.  Form.

13  BY MR. MORRISSEY:

14    Q.  -- in 2N than in Division 11?

15    MR. CATANIA:  Objection.  Form.  I never know

16  when you're done with a question.  Sorry.

17    THE WITNESS:  Like I said, in 2N you're

18  forced to sit in a chair all day if you're out in

19  the day room.  You're not allowed to walk around.

20  You're not allowed to change the TV.  You're not

21  allowed to have any kind of books or anything like

22  that in your cell with you.  You're not -- you

23  don't get the commissary.  You don't get any

24  privileges.  You don't get anything at all up on

153

1    2N.

2        And Division 11, yeah, may be medium

3    security and higher risk inmates or whatever for

4    violence and gangs and whatnot, but you can have a

5    book in your cell with you.  You can order stuff

6    from commissary.  You can, you know, use the phone

7    a lot more frequently.  You can make it a little

8    more, like, bearable to live for where you are.

9    BY MR. MORRISSEY:

10       Q.   How was your -- did you feel about your

11   personal security in Division 11 as opposed to

12   Division 2?

13       MR. CATANIA:  Objection.  Form.

14       THE WITNESS:  I felt way safer in Division

15   11.  I mean the people in 2N, I didn't know what

16   the hell they would do.  I mean, one guy was all

17   beat up on 2N.  This other guy was, like, you see

18   that, I did that.  You know, you're going to give

19   me your lunch or I'm going to do that to you.  I

20   mean, that never happened up on deck, you know.  I

21   mean, granted we didn't get to eat lunch with

22   other people in the crazy -- you know, up in 2N

23   but, you know, I guess that was all just.....

24   BY MR. MORRISSEY:

154

1       Q.   So when you sat -- what was your -- your

2    intentions when you sat down with a psychiatrist

3    in 2N?

4       MR. CATANIA:  Objection.  Form.

5       THE WITNESS:  I tried to get my Valium, my

6    medication.  And he looked at my drug test

7    results.  He told me that he couldn't believe that

8    no one had given it to me up until this point

9    because my levels were so high.  And then he said

10   that I probably wasn't going to get it here in the

11   jail.  So I told him everything was all good and

12   just let me go back to Division 11 and I don't

13   want to stay here.  I'm not like these people.  I

14   want to go back to where I can, you know, at least

15   have a bed and not sleep on the floor on some

16   plastic cot thing and, you know, get all my

17   commissary items back and all the things I had,

18   quote/unquote, going for me in the jail.

19   BY MR. MORRISSEY:

20      Q.   Did you -- were you still suffering from

21   severe anxiety --

22      A.   Yeah.

23      Q.   -- when you were talking to the

24   psychiatrist?

155

1       MR. CATANIA:  Objection.  Form.

2       THE WITNESS:  Yeah.  Well, like I said, he

3   told me I wasn't going to get my medication, and I

4   mean, I had known that from previous times being

5   in the jail.  So I just requested to be

6   transferred back.

7   BY MR. MORRISSEY:

8       Q.  So your mental status when you sat down

9   with the psychiatrist was not stable?

10      A.  No, I needed my medication.

11      MR. CATANIA:  Objection.  Form of the

12  question.

13      THE WITNESS:  And when I realized I wasn't

14  going to get it, I just did what I had to do to

15  get away from 2N.

16      MR. MORRISSEY:  I have nothing further.

17          FURTHER EXAMINATION

18  BY MR. CATANIA:

19      Q.  Just a few more questions.

20      A.  Sure.

21      Q.  Just for clarity, you were in 2N for an

22  overnight --

23      A.  Yes.

24      Q.  -- is that right?

156

1        And the basis of your knowledge about all

2    the other stuff you were talking about is from

3    Mr. Morrissey?

4        A.  What other stuff?

5        Q.  About 2N.

6        A.  From me being there that night.

7        Q.  One night?

8        A.  Yep.

9        Q.  Okay.  So your knowledge about the

10    absence of certain privileges was based on one

11    night being in 2N?

12        A.  Yes, because they removed them all from

13    me when I arrived there.

14        Q.  Did you tell anybody including Dr. Mynatt

15    about feeling anxiety symptoms at the time of your

16    interview with Dr. Mynatt?

17        A.  I'm sure I did.  I don't exactly recall

18    everything I told him.

19        Q.  Have you ever suffered a significant

20    physical injury in your life?

21        A.  What do you qualify significant?

22        Q.  Well, we already established that you've

23    had no traumatic brain injury; right?

24        A.  Yeah, I had a concussion little over a

157

1    year ago, got hit by a car.

2        Q.   You were hit by a car recently?

3        A.   Little over a year ago, yeah.

4        Q.   After you arrived in the jail?

5        A.   Yeah.

6        Q.   Was that an experience that you recall to

7    this day?

8        A.   Yeah.

9        Q.   Did you suffer some pain from that?

10       A.   Yeah.

11       Q.   Do you have any lasting effects from that

12   injury?

13       A.   Not really.

14       Q.   So you don't have a loss of memory as a

15   result of that car crash?

16       A.   I don't believe so.

17       Q.   Have you ever suffered any -- were you

18   ever the victim of a crime?

19       A.   Yeah.

20       Q.   Was it a physical crime, a crime that

21   harmed your physical person?

22       A.   Yeah.

23       Q.   When did that happen?

24       A.   I don't recall.

158

1       Q.   Was it a loved one that perpetrated that

2   crime on you?

3       A.   No.

4       Q.   Was it in the nature of a mugging or

5   something like that?

6       A.   I believe it was just a disagreement

7   about something.  It was in Evanston out front of

8   Peer Services.

9       Q.   Okay.  And that resulted in a physical

10  altercation?

11      A.   Yeah.

12      Q.   Were any charges brought as a result of

13  that?

14      A.   Yeah.

15      Q.   Were you the victim or the --

16      A.   Yes, I was the victim.

17      Q.   -- accused?

18           Okay.  Were you hospitalized?

19      A.   For a day maybe.

20      Q.   Was that at St. Francis?

21      A.   Yes.

22      Q.   Do you have bills from that?

23      A.   I believe Crime Victim Services took care

24  of it.

159

1       Q.  Do you have any bills from the time when

2   you were discharged from the jail going to

3   St. Francis?

4       A.  I believe so.

5       Q.  Where are those bills?

6       A.  Collection somewhere.

7       Q.  You realize that we had requested those

8   bills among the answers to document production;

9   right?

10      A.  Uh-huh.

11      Q.  Did you ever produce those to your

12  lawyer?

13      A.  No.

14      Q.  So you're not making a claim for -- for

15  those bills, are you?

16      A.  If I can get them, sure.

17      Q.  Well, you haven't produced them to us, so

18  we don't know.

19      A.  Well, that's why I gave you the release

20  so you can access.  I have no idea how to go about

21  finding.  It's been, you know, few years.  It's

22  been in collections.  You know, my credit is not

23  the best, sir.  And, you know, I don't know how

24  to go about finding that information out, so.....

160

1     Q.   You're saying, though, that you did

2     provide the bills to Mr. Morrissey?

3     A.   No, I did not.

4     Q.   Did you provide them to Mr. Flaxman?

5     A.   No.

6     Q.   Has anyone ever diagnosed you with

7     posttraumatic stress disorder?

8     A.   I don't think so.

9     Q.   Okay.  In terms of comparing the

10    experience of the 21-day program in the jail and

11    suffering an accident in which you had a traumatic

12    brain injury or a concussion, which was worse?

13    A.   Twenty-one days.

14    Q.   In jail?

15    A.   Yeah.

16    Q.   Okay.  Have you ever had anything else

17    happen to you aside from that and the altercation

18    that you were the victim of?

19    A.   I don't believe so.

20    Q.   Was being in boot camp a traumatic

21    experience?

22    A.   No.  I loved it.

23    Q.   Although you did get injured as a result

24    of it; right?

161

1    A.   Yeah.

2        Q.   So those physical pains did not bother

3    you when you were going through the boot camp;

4    right?

5        A.   No.

6        Q.   Is that because you had the -- the end

7    game in mind, you knew you were going to get out

8    of boot camp and move onto an assignment?

9        A.   And you saw yourself every day, you know,

10   getting more muscles and, you know, trimming down

11   and I mean saw, you know, transformation

12   physically, mentally, you know, you went to

13   classes, talked to, you know.

14       Q.   When you were going through the detox

15   program, methadone detox program, you saw that

16   there was an end game, that there was going to be

17   an end to that program 21 days later; right?

18       A.   Yep.

19       Q.   And you knew that that was a goal, a

20   touchdown for you to finish that detox program and

21   be done with it; right?

22       MR. MORRISSEY:  I object as to --

23       THE WITNESS:  No, it's not -- there was no

24   positive side to ending the methadone.  Ending the

162

1    methadone you see sickness and pain and like

2    torture almost.  It's not something like, oh, I'm

3    going to get off of it.  It's something that, you

4    know, you really need to mentally and physically,

5    like, take the time to work your way down and have

6    all the support structure in place.

7    BY MR. CATANIA:

8        Q.   And you did that, right, in jail?

9        A.   I had no choice.

10       Q.   You did that?  You got down, you got off,

11   you got away from all the substances, didn't you?

12       A.   Yep.

13       Q.   There was a series of questions I wanted

14   to ask you, but I don't have them with me so I'll

15   move on.

16           Has any doctor ever told you that you

17   must go through methadone in order to get off of

18   heroin?

19       A.   No.

20       Q.   After your release from the jail in 2009,

21   had you been diagnosed with anxiety disorder

22   following that?

23       A.   Would you repeat that.

24       MR. MORRISSEY:  Objection.  Asked and

163

1    answered previously and that's beyond the scope of

2    my cross-examination.

3    BY MR. CATANIA:

4        Q.  I'll ask again because I think you didn't

5    hear me.  After being discharged from the jail in

6    2009, has any doctor diagnosed you with anxiety

7    disorder?

8        A.  No.

9        Q.  Okay.  You're not suffering anxiety right

10   now, are you?

11       A.  Not at this moment or this period in my

12   life, no.

13       Q.  Did the diagnosis of anxiety disorder

14   correspond to your use of illegal drugs?  Did it

15   happen at the same time?

16       A.  It was around the same time, yeah.

17       Q.  And now you're not using illegal drugs?

18       A.  No.

19       Q.  You said that the reason why you think

20   that you have a claim here is because a doctor had

21   prescribed anti-anxiety medication for you that

22   you didn't receive; is that right?

23       A.  Yeah.

24       Q.  Have doctors ever been wrong about

164

1    prescribing anti-anxiety medication to your

2    knowledge?

3        MR. MORRISSEY:  I'm going to object.

4        THE WITNESS:  Don't know --

5        MR. MORRISSEY:  He has --

6        THE WITNESS:  -- no idea.

7    BY MR. CATANIA:

8        Q.   Is it your position that you have a claim

9    here because you were on a methadone maintenance

10   program before you went into the jail and when you

11   arrived at the jail instead you were placed on a

12   methadone detox program?

13       A.   Partially and didn't receive it for a day

14   or two after being in the jail, yeah.

15       Q.   In '06 when you were in for those two

16   doses, was it after that that you were discharged

17   from the jail?

18       A.   I believe so.

19       Q.   Did you then go to the methadone program

20   and start it up again?

21       A.   Yeah.

22       Q.   So the jail discharged you back to a

23   maintenance program after your discharge?

24       A.   Yep.

165

1    Q.  They didn't have any problem with

2  starting you up again at the methadone program,

3  did they?

4    A.  No.

5    Q.  In fact, they don't turn away many

6  patients at all, do they?

7    A.  Sure, they do.

8    Q.  Patients that are not compliant; right?

9    A.  Yes.

10    Q.  Patients that might break their rules;

11  right?

12    A.  Yes.

13    Q.  Patients that might use illicit street

14  drugs at the same time as they're in the program;

15  right?

16    A.  Yes.

17    Q.  Those are the rules that are broken and

18  those would cause a discharge from the program;

19  right?

20    A.  Yes.

21    Q.  But if people are willing to accept and

22  follow their rules, they take all comers; isn't

23  that right?

24    A.  As long as you have a valid -- can prove

166

1    a valid substance abuse problem with, you know,

2    series of drug tests and physicals, track marks.

3    You know, as long as you can prove you have some

4    kind of substance abuse issues, then yeah.

5        Q.   So anytime someone arrives there who has

6    a verifiable narcotics addiction, addiction to

7    heroin, those people can be accepted into the

8    program?

9        A.   Yes.

10       MR. MORRISSEY:  I'm.....

11   BY MR. CATANIA:

12       Q.   Do you know anything about how each of

13   those programs is financed?

14       A.   No.

15       MR. MORRISSEY:  You know, this is well beyond

16   anything that I asked him.

17       MR. CATANIA:  Tom, there is no such rule in a

18   deposition despite what you may believe about it.

19       MR. MORRISSEY:  There is.  You had your

20   opportunity.  You said you were through and now

21   you're asking a whole different line of

22   questioning, much of which he has no actual

23   knowledge.

24   BY MR. CATANIA:

167

1      Q.   You understand why you're being asked

2   questions at this deposition?

3      A.   Yeah.

4      Q.   You understand that this is my only

5   opportunity to ask you questions before trial?

6      A.   Okay.

7      Q.   You understand that Mr. Morrissey also

8   benefits from this deposition should you disappear

9   for some unknown reason?  Do you understand that?

10     A.   Okay.

11     Q.   Do you understand also that his questions

12  to you after my original questions had to do with

13  damages; right?

14     A.   Yeah.

15     Q.   What you suffered; right?

16     A.   Yeah.

17     Q.   Do you understand that all of my

18  questions following that also had to do with your

19  knowledge about damages; right?

20     A.   Yeah.

21     MR. CATANIA:  All right.  I have no further

22  questions now.  And I don't know if Mr. Morrissey

23  has anything to follow up on.

24     Do you?

168

1      MR. MORRISSEY:  You're all done.

2      MR. CATANIA:  At this stage you have the

3  right to reserve signature to review the

4  transcript should it be typed up, or you can waive

5  that right and let the court reporter type up the

6  transcript trusting her to have gotten all of this

7  information correct.  It's your choice, though.

8      MR. MORRISSEY:  You can waive your signature.

9      THE WITNESS:  All right.

10     MR. CATANIA:  Waive signature?

11     THE WITNESS:  Yeah.

12          (1:08 p.m. further deponent

13          saith not.)

14

15

16

17

18

19

20

21

22

23

24

169

1    STATE OF ILLINOIS )

2              ) SS:

3    COUNTY OF C O O K )

4        I, MARTHA C. NEWTON, a notary public within

5    and for the County of Kane and State of Illinois,

6    do hereby certify that heretofore, to-wit, on the

7    2nd day of June 2011, personally appeared before

8    me, at the Richard J. Daley Center, Third Floor,

9    Chicago, Illinois, SEAN DRISCOLL, in a cause now

10   pending and undetermined in the United States

11   District Court, wherein MICHAEL PARISH, et al. are

12   the Plaintiffs, and SHERIFF OF COOK COUNTY and

13   COOK COUNTY, are the Defendants.

14       I further certify that the said witness was

15   first duly sworn to testify the truth, the whole

16   truth and nothing but the truth in the cause

17   aforesaid; that the testimony then given by said

18   witness was reported stenographically by me in the

19   presence of the said witness, and afterwards

20   reduced to typewriting by Computer-Aided

21   Transcription, and the foregoing is a true and

22   correct transcript of the testimony so given by

23   said witness as aforesaid.

24       I further certify that the signature to the

170

1    foregoing deposition was waived by counsel for the

2    respective parties.

3        I further certify that the taking of this

4    deposition was pursuant to Notice, and that there

5    were present at the deposition the attorneys

6    hereinbefore mentioned.

7        I further certify that I am not counsel for

8    nor in any way related to the parties to this

9    suit, nor am I in any way interested in the

10   outcome thereof.

11       I have hereunto set my hand this 13th day of

12   June 2011.

13

14

15   _____

     NOTARY PUBLIC, KANE COUNTY, ILLINOIS

16

17

18

19

20

21

22

23

24

**Exhibit 4,**

Cermak Health Services of Cook County
2800 S. California Avenue
Chicago, IL 60608

**Department of Mental Health Services**
**Brief Primary Psychological Screening Tool (RCDC)**

Last Name: Driscoll  First Name: Sean  DOC#: 5879

Address: 1801 Richmond Ln. Wilmette  Phone: (____)

Charge: CDP / Assault  Bond: $71K  Court: 3.80

1st Degree murder Alleged Victim: family___ friend___ close associate___ none___

Race: ☑W ☐ B ☐ Sp ☐ Asian ☐ Other:_____ SS#:_____

Employed: ☐ Yes ☑No  Occupation:_____

1. Have you ever been in Cook County Jail before? ☐ No ☑Yes  What division? ___

2. Have you ever been hospitalized for psychiatric treatment? ☑No ☐ Yes  How many times?_____

   Last date:_____ What reason:_____ Where:_____

3. Are you currently receiving outpatient psychiatric treatment? ☑No ☐ Yes  Why?_____

   Last visit date:_____ Location:_____ Doctor's name:_____

4. Are you now taking psychotropic medication(s)? ☑No ☐ Yes  Name(s):_____

5. Do you drink alcohol? ☑No ☐ Yes  How much?_____

   Do you use drugs? ☐ No ☑Yes  What drugs? Heroin  How much? Ø use in lemont
   Methadone  130 mg/day

6. Have you ever attempted suicide? ☑No ☐ Yes  Last attempt:_____ How?_____

7. Do you feel suicidal now? ☑No ☐ Yes

8. Are you feeling homicidal now? ☑No ☐ Yes  Explain:_____

9. Have you ever had special education classes? ☑No ☐ Yes  Explain:_____

10. Are you now homeless? ☑No ☐ Yes  Where do you stay?_____

11. Are you a Veteran? ☑No ☐ Yes  Branch of Service/Type of Military Discharge_____

**Is this detainee's behavior appropriate in the RCDC area?** ☑Yes ☐ No  Describe:_____

_____

_____

**Mental Health Screening Plan:** ☑General Population ☐ Admission/Evaluation Form
☐ Mental Health Secondary Interview ☐ Other:_____

Signature Mental Health Staff: K Myers MHSII

Date: 3.3.07  Time: 351 pm

Form#: 87417  Rev: Nov. 2004

DRISCOLL, SEAN   M

490845

BKDT:03/03/2007

**Exhibit ( -**



**CERMAK HEALTH SERVICES**
2800 South California Avenue
Chicago, Illinois 60608

C.C.D.O.C. NON-EMERGENCY REQUEST FOR PSYCHIATRIC CONSULTATION

<u>Note:</u> Must be attached to movement form if patient is to be transferred.

<u>ORIGIN</u>

Name: __LOFTON, Carla__    Date of Birth: ____

CCDOC #: __20070012396__    DIVISION/LOCATION: __IV   CC__

Date: __27 Feb 07__    Time: ____

<u>REASON FOR REFERRAL</u>:

[ ] Inappropriate Behavior      [ ] Refusing Medication:

                            Dates _____ Times ____

<u>OBSERVATION</u>:

<u>PERSONAL HYGIENE</u>         <u>AFFECT</u>

_____ CLEAN AND NEAT      __X__ DEPRESSED
_____ UNTIDY              _____ LAUGHS ALL THE TIME
_____ UNCLEAN           _____ ANGRY
_____ CARELESS          _____ ANXIOUS
_____ BODY ODOR         _____ STARES INTO SPACE
                          _____ CHANGES MOOD

<u>BEHAVIOR</u>

                               <u>COGNITION</u>

_____ UNABLE TO SIT STILL
_____ SITS ALONE ALL THE TIME      _____ DOES NOT KNOW WHO HE IS
_____ PACES ALL THE TIME         _____ DOES NOT KNOW WHERE HE IS
_____ WANDERS IN OTHER'S AREA    _____ DOES NOT KNOW WHAT HE IS
_____ TREMBLES, SHAKES                    DOING
_____ WRINGS HANDS             _____ CONFUSED
_____ UNUSUAL GAIT             _____ UNABLE TO CONCENTRATE
_____ WHISPERS                  _____ SUICIDAL
_____ TALKS LOUD ALL THE TIME    _____ ASSAULTIVE
_____ DOES NOT SPEAK AT ALL      _____ SUSPICIOUS
_____ TALKS VERY SLOWLY        _____ EXCESSIVE SEXUAL
_____ TALKS VERY RAPIDLY                PREOCCUPATION
_____ SLEEPING PROBLEMS        _____ EXCESSIVE RELIGIOSITY
_____ EATING PROBLEMS          _____ AUDITORY HALLUCINATIONS
_____ STEALS FROM OTHERS       _____ VISUAL HALLUCINATIONS

OTHER: (Please specify) __Detainee States She Need her__
__(Psych Meds)__.

_____

<u>SECURITY</u>: Charge: _____ Bond: _____

Signature: __OFC. Smart__
               (Security Officer)

Date Rec'd: _____ By: _____ Disposition: _____

                                         **874.03**

Original - Psych Dept.      Yellow - Psych Staff      Pink - File

Plaintiffs' Exhibit 49

**Exhibit 5$**

```
 1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION
 3
    MICHAEL PARISH; CURTIS L. OATS;           )
 4  LEILA KHOURY; SEAN DRISCOLL; CARLA        )
    LOFTON; ROY CLEAVES; LISA BROWN; DAN      )
 5  TAYLOR; DEAN MILLER; KEVIN SANDERS;       )
    STACEY CLARK; and CARLOTTE WATSON,        )
 6                                            )
                    Plaintiffs,        ) No. 07CV4369
 7                                            )
            vs.                               )
 8                                            )
    SHERIFF OF COOK COUNTY and COOK           )
 9  COUNTY,                                   )
                                              )
10                  Defendants.               )
11
12          The deposition of CARLA LOFTON, called by
13  the Defendants for examination, taken pursuant to
14  notice and pursuant to the Federal Rules of Civil
15  Procedure for the United States District Courts
16  pertaining to the taking of depositions, taken before
17  Teresa Resendez, Certified Shorthand Reporter and
18  Notary Public, at 500 Daley Center, Suite 500, Chicago,
19  Illinois, commencing at 10:00 a.m. on the 15th day of
20  July, C.E., 2009.
21
22
23
24
25
```

Page 2

```
 1      LAW OFFICE OF KENNETH N. FLAXMAN, P.C.
 2      MS. CECILE L. SINGER
 3      200 South Michigan Avenue
        Suite 1240
 4      Chicago, Illinois 60604
        Phone:  (312) 427-3200
 5
             On behalf of the Plaintiffs;
 6
        ASSISTANT STATE'S ATTORNEY
 7      CIVIL ACTIONS BUREAU
        MR. FRANCIS J. CATANIA
 8      500 Daley Center
        Suite 500
 9      Chicago, Illinois 60602
        Phone:  (312) 603-6572
10
             On behalf of the Defendants.
11
12
13                    *    *    *    *    *    *
14
15
16
17
18
19
20
21
22
23
24

25                    I N D E X
```

Plaintiffs' Exhibit 50

Page 3

```
1   WITNESS                                    PAGE

2   CARLA LOFTON

3       Direct Examination by Mr. Catania .....    4

4

5               E X H I B I T S

6   LOFTON DEPOSITION EXHIBIT

7       Nos. 1 and 2 ........................    73

8       No. 3 ..............................    75

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25              (Witness sworn.)
```

Page 4

1    WHEREUPON:

2                         CARLA LOFTON,

3    called as a witness herein, having been first duly

4    sworn, was examined and testified as follows:

5                    DIRECT EXAMINATION

6    BY MR. CATANIA:

7         Q.   Ma'am, will you please state your name and

8    spell your last name for the court reporter.

9         A.   Carla Lofton, L O F T O N.

10        Q.   Ms. Lofton, this is the discovery deposition,

11   Federal deposition, in the case of Parish vs. The

12   Sheriff of Cook County.

13             Have you ever had a deposition taken before?

14        A.   Yes.

15        Q.   Okay.  On what occasion did you have that

16   done?

17        A.   A car accident.

18        Q.   Okay.  I'm going to go over a few of the

19   basic ground rules just so that we don't have any

20   misunderstandings.  Okay?

21        A.   Yes.

22        Q.   I'm going to ask you a bunch of questions

23   which are taken down by the court reporter, you under

24

25   oath.  And she is going to be recording this as well as

1   taking it down in shorthand.  It will later be

2   transcribed into what we call a transcript, which is a

3   record of the things that are said here today.  Do you

4   understand all that?

5        A.   Yes.

6        Q.   You understand that by being under oath is

7   the same thing as like being in court with a judge?  Do

8   you understand that?

9        A.   Yes.

10       Q.   Okay.  It's important that you understand the

11   questions that I ask and that there is a clear record

12   of your answers.  So I would just ask that you allow me

13   to complete a question; and I, in turn, will try to

14   allow you to complete your answer before asking the

15   next question.  Okay?

16       A.   Yes.

17       Q.   If at any time you need to take a break,

18   there is no problem.  I just ask that if there is a

19   question that I've asked that you answer the question

20   before we break.  But if you need to take a break, just

21   ask.  Is that okay?

22       A.   Yes.

23       Q.   Before appearing for the deposition today,

24

25   did you review any documents?

Page 6

```
 1      A.   No.

 2      Q.   Did you look at any papers?

 3      A.   No.

 4      Q.   Were you shown any photographs?

 5      A.   No.

 6      Q.   In this case, which you are a named

 7  plaintiff, we're examining some of the policies and

 8  procedures at the jail that involve the delivery of

 9  medical care.  Do you understand that that's the case

10  we're talking about?

11      A.   Yes.

12      Q.   Okay.  Did you provide any medical records to

13  any of your lawyers, any of the class counsel in the

14  case?

15      A.   No, I did not.

16      Q.   Okay.  I don't mean any offense by asking you

17  this.  It's just something that's important for

18  purposes of identification.  But have you ever been

19  known by any other names?

20      A.   No.

21      Q.   Do you have any street names that you might

22  be known by?

23      A.   Just my middle name.

24

25      Q.   And what is that?
```

Page 7

```
1        A.    Demetrius.

2        Q.    Could you spell that for the court reporter.

3        A.    D E M E T R I U S.

4        Q.    And is that your middle name given to you by

5  your parents?

6        A.    Yes.

7        Q.    Okay.  Have you ever received any mail that

8  would be addressed to somebody with a similar name to

9  you at your address?

10       A.    No.

11       Q.    Has anyone ever mistakenly spelled your name

12 a different way that might appear on a credit report as

13 a misspelling?

14       A.    Yes.

15       Q.    Okay.  What other misspellings of your name

16 are you aware of?

17       A.    Last name, L O F T I N, L O F T E N.

18       Q.    Thank you.

19             Could you tell me if you're currently

20 married.

21       A.    Single.

22       Q.    Now, by "single," I understand it to mean

23 that you are a woman who has never been married.  Is

24

25 that the way you understand "single"?
```

Page 8

```
 1        A.    Yes.
 2        Q.    So there's no prior divorce or prior
 3   marriages, right?
 4        A.    No.
 5        Q.    Okay.  Do you have any children?
 6        A.    None.
 7        Q.    Where do you currently live?
 8        A.    _____, Chicago.
 9        Q.    And what's the zip code there?
10        A.    60621.
11        Q.    And how long have you resided there?
12        A.    Life span.
13        Q.    Is that a house or apartment?
14        A.    House.
15        Q.    And do you own that house?
16        A.    Parents.
17        Q.    And do you live with anybody there?
18        A.    Parents.
19        Q.    What are their names?
20        A.    Charles Lofton, my father.
21        Q.    Anyone else?
22        A.    No.
23        Q.    Is your mother still living?
24
25        A.    Deceased.
```

Page 9

```
 1         Q.    And when did she die?
 2         A.    May 6th, 2009.
 3         Q.    I'm sorry to hear that.  My sympathies to
 4    you.
 5         A.    Thank you.
 6         Q.    Have you ever resided with anybody else at
 7    that location?
 8         A.    No.
 9         Q.    Have you ever resided temporarily at any
10    other location?
11         A.    No.
12         Q.    And what is your date of birth?
13         A.    ██████████
14         Q.    And we are discussing your medical history
15    and your psychological history, mental health history
16    in this case.  So I'm going to ask if you will identify
17    later on in this deposition the places that you have
18    gone to for treatment for either one, either medical or
19    mental health.  Do I have your permission to obtain
20    from them records regarding their treatment of you?
21         A.    Yes.
22         Q.    And I'm going to ask you if you would be kind
23    enough to sign a waiver, HIPAA waiver authorization
24
25    form, which I'm going to show your attorney, which
```

Page 10

1    would authorize us to use a company known as Record

2    Copy to obtain those medical records.  Would that be

3    something you would be willing to sign?

4         A.   Yes.

5         Q.   Okay.  It's right there in front of you.  If

6    you want to examine it, it would simply take your -- I

7    think it's your signature on the bottom, authorizing

8    me -- I'm named there in the middle -- to obtain those

9    records.

10          And if you'll look in the upper right-hand

11    corner, I have already typed in what I was told was

12    your Social Security number.  Is that your Social

13    Security number?

14         A.   Yes.

15         Q.   Okay.  Can you read it into the record for

16    me.

17         A.

18         Q.   I'm going to put down the date here and print

19    your name if that's all right with you.

20         A.   Yes.

21         Q.   Thank you.

22          Do you have an Illinois state driver's

23    license?

24

25         A.   Yes.

1     Q.   Do you have that with you today?

2     A.   Yes.

3     Q.   Could I take a look at it, please.  You could

4  show it to your lawyer first.

5     MR. CATANIA:  Thank you.  I've been handed an

6  Illinois state driver's license --

7  BY THE WITNESS:

8     A.   I'm sorry.  That's my state ID.  But I have

9  both.

10     Q.   This is your driver's license.

11     A.   Oh, okay.

12     MR. CATANIA:  It has two pictures on it.  They're

13  identical pictures.  And the picture resembles the

14  person sitting across from me at the table.

15        It says Illinois state driver's license

16  issued on June 18th of '09, expires June 11th of 2010.

17  BY MR. CATANIA:

18     Q.   It indicates your license number is

19  L135-1047-0766 with a date of birth of June 11th of

20  1970.  Happy belated birthday.

21     A.   Thank you.

22     Q.   It says it's a duplicate driver's license.

23  Did you have one that was lost or stolen prior?

24

25     A.   Yes.

1      Q.    Okay.  It also has Class D on it, and it has

2  a Restriction B.  Do you know what the restriction is

3  on your license?

4      A.    Prescription eyeglasses.

5      Q.    And the glasses are pictured in the

6  photograph as well as you're wearing them today; is

7  that right?

8      A.    Correct.

9      Q.    It also indicates Carla D. Lofton with the

10  address of 903 West 71st Street, Chicago,

11  Illinois 60621.  And it also states your height,

12  weight, and your eye color.  Thank you very much.

13          Has your license ever been suspended or

14  revoked?

15     A.    No.

16     Q.    Any restrictions aside from the eyeglasses?

17     A.    No.

18     Q.    Have you ever been called in for a retest by

19  the Secretary of State regarding your driver's license?

20     A.    No.

21     Q.    Could you tell me a little bit about your

22  prior education.  What's the highest level of school

23  you attained?

24

25     A.    I completed the eleventh grade.  I received

1    my GED, and I have some college.

2         Q.    Okay.  When did you complete the eleventh

3    grade?

4         A.    1987.

5         Q.    And when did you obtain the GED?

6         A.    When?

7         Q.    Yes.

8         A.    1994.

9         Q.    Okay.  When did you -- Where did you attend

10   school up to the eleventh grade?

11        A.    Simeon Vocational High School.

12        Q.    Is that located in Chicago, Illinois?

13        A.    Yes.

14        Q.    And do you know where approximately it's

15   located?

16        A.    8247 South Vincennes.

17        Q.    And did you obtain the GED at that location

18   or someplace else?

19        A.    Someplace else.

20        Q.    Where did you go for that?

21        A.    Dixon Correctional Center.

22        Q.    And that's one of the facilities of the

23   Illinois Department of Corrections?

24

25        A.    Yes.

1      Q.    Now, you say you have some college.  Did you

2   attend a college or did you take college courses

3   through the correctional center?

4      A.    I attended college and college courses

5   through the correctional facility as well.

6      Q.    And what college did you attend?

7      A.    Lewis University.

8      Q.    And what location?

9      A.    Romeoville, Illinois.

10     Q.    And what was your course of study -- Or did

11   you have a major course of study?

12     A.    Vocational.

13     Q.    What vocation were you pursuing?

14     A.    Commercial arts and photography.

15     Q.    Are you currently employed?

16     A.    No.

17     Q.    When is the last time you were employed?

18     A.    January of 2009.

19     Q.    And what was your job or occupation at that

20   time?

21     A.    Inventory specialist.

22     Q.    And what company did you work for?

23     A.    R G I S.

24

25     Q.    And what does that stand for?

1     A.   I'm not sure.

2     Q.   Where are they located?

3     A.   5450 Cumberland, Chicago.

4     Q.   Is that North Cumberland?

5     A.   Yes.

6     Q.   And what are the things that were inventoried

7 with RGIS?

8     A.   Various items at various stores.  Each day

9 you're assigned -- well, not each day -- whatever your

10 schedule is, you're assigned to different store

11 locations.  And whatever the store sells, that's what

12 you inventory, everything that's in the entire store.

13     Q.   I see.

14     So they do inventories for retail

15 establishments?

16     A.   Yes.

17     Q.   Okay.  How long had you been working for

18 RGIS?

19     A.   Just six months.

20     Q.   And could I ask what was the reason for

21 leaving them?

22     A.   I was incarcerated.

23     Q.   Were you incarcerated in the end of 2008 or

24

25 in 2009?

```
 1      A.    2008.

 2      Q.    Where were you incarcerated?

 3      A.    Cook County, then transferred to Dwight.

 4      Q.    So based on that, I'm guessing that your

 5  criminal case was -- you were found guilty of it?

 6      A.    Yes.

 7      Q.    What was the charge?

 8      A.    Possession of a controlled substance.

 9      Q.    And were you convicted of possession of a

10  controlled substance?

11      A.    Yes.

12      Q.    Was that on a plea of guilty or trial?

13      A.    A plea of guilty.

14      Q.    Have you ever been convicted of any crime

15  involving dishonesty?

16      A.    Yes.

17      Q.    What kind of crime?

18      A.    Retail theft and forgery.

19      Q.    Were either of those convictions within the

20  last ten years?

21      A.    Yes.

22      Q.    When was the retail theft conviction?

23      A.    2005/2006.

24

25      Q.    And the forgery conviction?
```

Page 17

1       A.    2003/2004.

2       Q.    Have you ever been in the military?

3       A.    No.

4       Q.    Aside from the things you've told me about,

5  the possession of controlled substance, the retail

6  theft, and the forgery, do you have any convictions for

7  any felonies beyond those?

8       A.    No.

9       Q.    Have you ever been found in contempt of

10 court?

11      A.    No.

12      Q.    All right.  Prior to -- Well, I've been told

13 that your case involves incarceration at the Cook

14 County Department of Corrections in -- it's difficult

15 for me to tell when -- it looks like 2007 and 2008.  Is

16 that your understanding, that those are the times we

17 are talking about you entered the Department of

18 Corrections, Cook County Department of Corrections?

19      A.    Repeat that again.

20      Q.    Certainly.

21            The case that we're talking about here

22 involves several of your incarcerations at the Cook

23 County Jail when you're going to be talking about your

24

25 medical care at the jail.  I know that you have other

1    dates of entry into the jail what is your understanding

2    about which of those dates we're talking about?

3         A.    2007, 2008.

4         Q.    Prior to your entry into the Cook County

5    Department of Corrections in 2007, can you tell me if

6    you had been diagnosed with any physical illness?

7         A.    No.

8         Q.    Have you ever -- Had you ever been

9    hospitalized prior to your entry into the jail in 2007

10   prior -- meaning before -- your entry into the jail?

11        A.    I understand.  For medical?

12        Q.    Yes.

13        A.    No.

14        Q.    Had you ever been diagnosed with any mental

15   illness prior to your incarceration in 2007?

16        A.    Yes.

17        Q.    When was the first time you were diagnosed

18   with a mental illness prior to, or before, your

19   incarceration in 2007?

20        A.    At the age of 14/15.

21        Q.    And what was the mental illness that you were

22   diagnosed with at age 14/15?

23        A.    Chronic depression.

24

25        Q.    And who was the physician or medical provider

1    who made the diagnosis?

2          A.    Karen Egan.

3          Q.    Do you know what her title is?

4          A.    No, I'm not sure.

5          Q.    And where was Karen Egan working at the time

6    she made that diagnosis?

7          A.    Charter Barclay.

8          Q.    And what is Charter Barclay?

9          A.    A hospital.

10         Q.    And where is that located?

11         A.    1500 North Clarendon.

12         Q.    Is that in Chicago, Illinois?

13         A.    Yes.

14         Q.    Do you know the zip code of the hospital?

15         A.    No.

16         Q.    Okay.  Do you know if she's still on staff or

17   working at that location?

18         A.    No, I do not.

19         Q.    Do you have any idea of what the initials

20   were that followed her name?

21         A.    I don't understand what you mean.

22         Q.    Some people have an M.D. after their name.

23   Ms. Singer has a JD after her name.  Do you know

24

25   what --

1      A.   I'm not sure.

2      Q.   All right.  After that first diagnosis of

3 chronic depression, have you ever been diagnosed with

4 any other mental illness?

5      A.   Yes.

6      Q.   What other mental illness?

7      A.   Again, chronic depression, sleep deprivation,

8 and I'm thinking -- I don't want to say it wrong.  I

9 always get -- affective schizophrenia.

10      Q.   Who made the diagnosis of sleep deprivation?

11      A.   Psychologists or a psychiatrist from Cermak

12 Health Services at Cook County.

13      Q.   Do you remember when that was?

14      A.   Not exactly.

15      Q.   Okay.  Who made the diagnosis of chronic

16 depression, the second one?

17      A.   Psychologists/psychiatrists at Cermak Health

18 Services at the Cook County Jail.

19      Q.   And when was that diagnosis?

20      A.   I do not recall.

21           Also at Dwight Correctional Facility.

22      Q.   Was that the most recent stay at Dwight that

23 that was diagnosed?

24

25      A.   No.  My most recent diagnosis is from my

1  psychiatrist that I'm currently seeing.

2      Q.   Okay.  And that is -- I think you said it was

3  affective schizophrenia.  Affective schizophrenia or

4  schizo-affective disorder, is that what it is?

5      A.   Yes.

6      Q.   Who is your current psychiatrist?

7      A.   Alessandra -- But let me spell -- You know

8  how we would spell "Alexandra"?  It's not that way.

9  It's not that way.  It's A L E S S A N D R A.

10     Q.   And do you know her last name?  Or is that

11 the last name?

12     A.   T A C H -- T A U C H E R.

13     Q.   And you said that she is a psychiatrist?

14     A.   Yes.

15     Q.   Okay.  And do you know where she works?

16     A.   Fantus Clinic.

17     Q.   Which is a department in the John H.

18 Stroger, Jr. Hospital; is that right?

19     A.   Yes.

20     Q.   Is that the first diagnosis of

21 schizo-affective disorder?  Or did you have one prior

22 to that?

23     A.   Prior to that, at the jail.

24

25     Q.   Okay.  Was the jail diagnosis the first one

Page 22

1   of schizo-affective disorder?

2        A.   Yes.

3        Q.   Okay.  Who was your physician or psychiatrist

4   or psychologist who made that diagnosis at the jail?

5        A.   I do not recall.

6        Q.   Okay.  Did you have any medication prescribed

7   to you before your incarceration at the Cook County

8   Department of Corrections in 2007?

9        A.   Yes.

10       Q.   What medication was prescribed?

11       A.   Elavil.

12       Q.   Could you spell that, please.

13       A.   E L A V I L.

14       Q.   Who prescribed Elavil to you?

15       A.   I do not recall the doctor's name, but I know

16  the name of the facility.

17       Q.   What facility was it?

18       A.   Community Mental Health Center.

19       Q.   And where are they located?

20       A.   82nd or 83rd and Woodlawn, Chicago.

21       Q.   And before that was diagnosed, were you

22  examined by the physician or psychiatrist?

23       A.   Yes.

24

25       Q.   And was testing performed on you?

Page 23

```
 1      A.   Yes.

 2      Q.   Had you had extensive interviews?

 3      A.   Yes.

 4      Q.   And once that was diagnosed, did you fill the

 5  prescription that was prescribed at that time, this

 6  Elavil?

 7      A.   Yes.

 8      Q.   Where did you fill that prescription?

 9      A.   I believe it was either Target or Walmart.

10      Q.   Is it a Target or Walmart located near 82nd

11  and Woodlawn?

12      A.   No.

13      Q.   Which location?

14      A.   Well, yeah.  I guess you would say yeah.  I'm

15  sorry.  Yes.

16      Q.   And do you know --

17      A.   I was going to say closer to my home.  But

18  it's in the middle.  It's between The Community Mental

19  Health place and my home.

20      Q.   Okay.  And do you know the address or cross

21  streets where it's located?

22      A.   87th and Cottage Grove.

23      Q.   Is that pharmacy still there?

24

25      A.   Yes.
```

Page 24

1      Q.    And did you refill that prescription at any

2    time after it was initially dispensed?

3      A.    Yes.

4      Q.    And did you take the prescription that was

5    dispensed to you?

6      A.    Yes.

7      Q.    And did you do so according to the doctor's

8    order?

9      A.    Yes.

10     Q.    Okay.  Any other prescriptions at that time

11   besides the Elavil?

12     A.    No.

13     Q.    Were you taking any other prescription

14   medication at the time of your intake in 2007?

15     A.    No.

16     Q.    Okay.  Were you prescribed any medication

17   before your intake into the Cook County Jail in 2007?

18     A.    Yes.

19     Q.    What prescriptions?

20     A.    Elavil.

21     Q.    Aside from Elavil, any others besides that?

22     A.    Oh, no.

23     Q.    Okay.  Do you have any other diagnosed mental

24

25   illness aside from the ones that you've told me about?

Page 25

1        A.    No.

2        Q.    Have you been diagnosed ever with any

3    physical illness other than the one you told me about?

4        A.    No.  Well, I'm sorry.  I don't know if you

5    would call this a diagnosis.  But in 2005, I suffered

6    from Bell's palsy.

7        Q.    And do you take any medication for the

8    symptoms of Bell's palsy?

9        A.    At that time when I suffered from it.

10        Q.    Okay.  And what prescriptions were you taking

11    at that time?

12        A.    I do not recall the names of the medication,

13    but I -- One was Prednisone and one was an antiviral

14    nerve medication.  And I don't recall the rest.

15        Q.    And did you fill those prescriptions at the

16    same location, at the Target or --

17        A.    No.

18        Q.    Okay.  Where did you fill those?

19        A.    At Fantus.

20        Q.    After that initial dispensing of that

21    medication, did you refill it at any time?

22        A.    No.

23        Q.    Did you take the medicine that was

24

25    prescribed?

1      A.   Yes.

2      Q.   Did you only take it during the time that it

3  was prescribed?

4      A.   Yes.

5      Q.   And did you take all of the medicine that was

6  prescribed?

7      A.   Yes.

8      Q.   Do you remember who it was that prescribed

9  that medicine?

10     A.   No, I do not.

11     Q.   Okay.  Do you have any family history of

12 mental illness?

13     A.   Not to my knowledge.

14     Q.   The medication that you said was prescribed

15 before your incarceration in 2007 was Elavil?

16     A.   Correct.

17     Q.   Okay.  Was that medication effective?

18     A.   Yes.

19     Q.   What symptoms was it controlling?

20     A.   It kept me calm where I wasn't so antsy.  It

21 allowed me to be able to sleep consistently in --

22 straight through the night without my sleep being

23 interrupted and not being able to go back to sleep.

24

25     Q.   Any other symptoms that it helped to control?

1      A.   It kept my mood at an even keel.

2      Q.   And how often did you take the Elavil per

3  day?

4      A.   At that time, once a day.

5      Q.   Has that prescription been adjusted in any

6  way since it was first prescribed?

7      A.   Yes.

8      Q.   In what way was it adjusted?

9      A.   I had an increase of dosage.

10     Q.   When did that increase of dosage take place?

11     A.   I do not recall.

12     Q.   Was it before the incarceration in 2007?

13     A.   Oh, yes.

14     Q.   All right.  Upon your entry into -- You were

15 taken into the Cook County Jail on June 10th, 2004, as

16 well; is that right?

17     A.   I don't recall.

18     Q.   Okay.  At the time in 2004, had you been

19 taking or using any street drugs?

20     A.   Yes.

21     Q.   What street drugs?

22     A.   Heroine and marijuana.

23     Q.   And were you taking the heroine by injection

24

25  or by other means?

1       A.   By other means.

2       Q.   What other means?

3       A.   Snort.

4       Q.   Were you on any kind of a Methadone program

5   at that time?

6       A.   No.

7       Q.   Have you ever been on a Methadone program?

8       A.   No.

9       Q.   At that time were you using any other

10  substances such as alcohol or tobacco?

11      A.   Tobacco.

12      Q.   And had you ever had any periods of time in

13  which you were using alcohol?

14      A.   No.

15      Q.   How long had you been smoking -- I'm assuming

16  you were smoking tobacco?

17      A.   Yes.

18      Q.   How long had you been smoking tobacco by

19  2004?

20      A.   About 15 years.

21      Q.   Up until that time of 2004, had you been

22  doing anything else aside from taking medication to

23  improve your symptoms or improve your life such as diet

24

25  or exercise?

Page 29

1       A.    Repeat again.

2       Q.    Sure.  We're talking about 2004, actually,

3   June 10th, 2004, this record shows.  Had you been doing

4   anything aside from taking medication and using street

5   drugs to improve your physical condition at that time?

6       A.    No.

7       Q.    So you were not dieting or exercising up

8   until that time?

9       A.    No.

10      Q.    Okay.  At the time of your incarceration in

11  2007, were you doing anything else aside from taking

12  prescribed medication to improve your condition of life

13  such as diet or exercise?

14      A.    Prior to or during the year of 2007?

15      Q.    Before the incarceration in 2007.

16      A.    I guess you could say maybe dieting.

17      Q.    Have you ever belonged to a gym such as

18  Ballys or some other gymnasium?

19      A.    Yes.

20      Q.    What gym do you belong to or did you belong

21  to?

22      A.    Ballys.

23      Q.    Are you currently a member?

24

25      A.    No.

1      Q.   When is the last time you were a member at

2  Ballys?

3      A.   2004.

4      Q.   Did you use your membership at Ballys?

5      A.   Yes.

6      Q.   About how frequently were you using your

7  membership at Ballys?

8      A.   Two to three times a week.

9      Q.   And when did you stop using Ballys?

10     A.   2004 or -5.

11     Q.   Any other gyms after that?

12     A.   That I visited, but not a member.

13     Q.   What gyms did you visit that you were not a

14  member?

15     A.   Women's Workout World.

16     Q.   How often did you go to Women's Workout

17  World?

18     A.   I would say three times out of a month.

19     Q.   What location?

20     A.   Schaumburg.

21     Q.   When is the last time you went to Women's

22  Workout World?

23     A.   About 2004 or -5.

24

25     Q.   And were you employed at the time that you

1    were using the Schaumburg Women's Workout World?

2         A.    Yes.

3         Q.    What job did you have at that time?

4         A.    I worked at Sara Lee Outlet Store.

5         Q.    If I worked there, I would have to be going

6    to the gym every day.

7               And how long did you work at the Sara Lee

8    Outlet Store?

9         A.    A year.

10        Q.    And what year was that?

11        A.    2004 to -5 or 2003 to -4.  It's either three

12   to four or four to five.  I'm not exactly sure.

13        Q.    All right.  And did you work for the Sara Lee

14   Company, or was there some other means?

15        A.    The Sara Lee Company, Sara Lee Outlet.

16        Q.    All right.  And who was your supervisor?

17        A.    I remember first name; I don't remember last

18   name.

19        Q.    What was the first name?

20        A.    Bob.

21        Q.    And were you working there full-time or

22   part-time?

23        A.    Full-time.

24

25        Q.    And did you work the retail or some other

Page 32

```
 1   function?
 2        A.   Retail and other functions.
 3        Q.   What other functions?
 4        A.   I opened and closed the store.  I inventoried
 5   general cleaning, debits and credits of checks and
 6   credit cards, cash.
 7        Q.   Aside from the Sara Lee outlets and the RGIS
 8   that you told me about, have you worked at any other
 9   locations in the last ten years?
10        A.   Yes.
11        Q.   What other locations and when?
12        A.   Haymarket.
13        Q.   And Haymarket is an abuse --
14        A.   Substance abuse.
15        Q.   Substance abuse center?
16        A.   Yes.
17        Q.   What did you do there?
18        A.   My title a milieu tech, but that's the same
19   thing as a case aide.
20        Q.   When did you work there?
21        A.   2003.
22        Q.   And who was your supervisor at that location?
23        A.   Remember first name; don't remember last
24
25   name.  First name, Patricia.
```

1        Q.    Any other jobs aside from those three that

2    you've told me about in the last ten years?

3        A.    Monterey Security.

4        Q.    What did you do for them?

5        A.    Crowd control.

6        Q.    And where is Monterey Security located?

7        A.    I have a card in my ...

8        Q.    Okay.

9        A.    1649 West Cermak Road.

10       Q.    Is that in Chicago?

11       A.    Yes.

12       Q.    And how long did you work for them?

13       A.    Seasonal.

14       Q.    Would that be summers?

15       A.    Yes.

16       Q.    Okay.  And when did you work for them?

17       A.    Summers and winters, 2005.

18       Q.    Have you now told me all the places that you

19   recall working during the period of time in the last

20   ten years?

21       A.    I believe so.

22       Q.    Okay.  Prior to your incarceration in 2007,

23   can you tell me what specific symptoms you were

24

25   experiencing as you entered into the Cook County Jail?

Page 34

1      A.    Repeat the question.

2      Q.    You were incarcerated in 2007 according to

3   what this lawsuit seems to be talking about.

4      A.    (Nodding.)

5      Q.    Before your incarceration, I mean,

6   immediately before you entered the jail, were you

7   experiencing any symptoms of your mental illness that

8   you've already described?

9      A.    Prior to entering the jail?

10     Q.    Yes.

11     MS. SINGER:  Objection.  Can you be -- par down

12  the time period prior.

13  BY MR. CATANIA:

14     Q.    Do you recall the circumstances of your

15  arrest before you were incarcerated at that time in

16  '07?

17     A.    Well, during my initial arrest, I had been

18  locked up maybe a 24-hour period prior to making it to

19  Cook County.

20     Q.    What agency arrested you at that time?

21     A.    Chicago Police Department.

22     Q.    And the charge at that time or the arrest

23  basis at that time?

24

25     A.    I believe, retail theft.

1      Q.   Where were you arrested?

2      A.   Chicago.

3      Q.   Location?

4      A.   I don't recall.

5      Q.   Do you remember the retail establishment?

6      A.   I don't recall.

7      Q.   Do you remember what police station you were

8  taken to?

9      A.   I believe, 79th and Halsted, and then

10  transferred to 111th.

11      Q.   At 111th Street, did you have any type of

12  hearing in front of a judge?

13      A.   Yes.

14      Q.   And was that a bond hearing?

15      A.   I'm sorry.  No.  No, I did not, not at

16  111th Street.

17      Q.   All right.  Were you transported from

18  111th Street to 26th and California?

19      A.   Yes.

20      Q.   And the arrest, was that for a felony charge

21  of retail theft?

22      A.   Yes.

23      Q.   Okay.

24

25      A.   I'm not exactly sure.  I believe it was

Page 36

1    either a felony or it was a misdemeanor enhanced to a

2    felony.

3         Q.   Okay.  All right.  And the enhancement would

4    have been for a prior conviction of retail theft,

5    correct?

6         A.   Correct.

7         Q.   All right.  Between the time of your arrest

8    and the time that you were brought to the 26th and

9    California courtroom, the bond courtroom, were you

10   suffering any of the symptoms of your mental illness

11   that you've told us about?

12        A.   Yes.

13        Q.   What symptoms?

14        A.   Well, I was unable to sleep, and anxiety, you

15   know, antsy, not completely focused.

16        Q.   How long had you been in custody before you

17   arrived at the 26th and California courthouse?

18        A.   A little over 24 hours.

19        Q.   How many hours of sleep did you have during

20   that period of time?

21        A.   I don't recall at this time.

22        Q.   Okay.  And you were at two locations during

23   that 24-hour period of time, right?

24

25        A.   Correct.

1        Q.    Okay.  And each of those locations, were you

2    brought into a lockup area?

3        A.    Yes.

4        Q.    And at both locations were you, then,

5    fingerprinted and photographed or just one of them?

6        A.    Just at one location.

7        Q.    Which one was it?

8        A.    111th.

9        Q.    Okay.  Did you talk to a lockup keeper at the

10   111th Street address?

11       A.    Yes.

12       Q.    And did you also talk to someone who took

13   your fingerprints and photographs?

14       A.    Yes.

15       Q.    Did they ask you any questions at that time

16   about your medication?

17       A.    Not my medication, but they asked do I take

18   meds.

19       Q.    Okay.  And did you tell them?

20       A.    Yes.

21       Q.    What did you tell them?

22       A.    I told them, yes, I take meds.

23       Q.    Did you tell them what meds?

24

25       A.    Yes, I did.

Page 38

1      Q.   What meds did you tell them you take?

2      A.   At that time I told them I took psychotropic

3  meds named Elavil.

4      Q.   And who told you that Elavil is a

5  psychotropic medication?

6      A.   Psychiatrists and psychologists.

7      Q.   And did you tell the Chicago police officer

8  that you were taking a psychotropic medication?

9      A.   Yes.

10     Q.   Okay.  Did that officer ask you what that

11  meant?

12     A.   No.

13     Q.   Okay.  Any other medications that you told

14  them at that time besides the Elavil?

15     A.   No.

16     Q.   Can you tell me, before your arrest, when is

17  the last time that you slept?

18     A.   The night before.

19     Q.   And did you sleep a full eight hours' night

20  sleep?

21     A.   Yes.  That I can remember, yes.

22     Q.   And when is the last time you took your

23  medication before your arrest?

24

25     A.   The night before.

1      Q.   And do you orally take your medication at

2  night?

3      A.   Yes.

4      Q.   Okay.  The day of your arrest, did you have

5  any medication with you?

6      A.   No.

7      Q.   Did you have any prescription forms with you

8  the day of your arrest?

9      A.   No.

10      Q.   Did you have any contact information in

11  writing with you at the time of your arrest?

12      A.   No.

13      Q.   Had you ever informed any family members

14  about your use of Elavil?

15      A.   Yes.

16      Q.   What family members were informed?

17      A.   Both my parents, my sister, cousins, aunts.

18      Q.   And what is your sister's name?

19      A.   Della Hayes -- well, Patterson.  Della Hayes

20  Patterson.

21      Q.   And how old is Della Hayes Patterson?

22      A.   Right now, 46.

23      Q.   Did you speak with any of your family members

24

25  or any friends between the time of your arrest and the

1    time you were transported to the 26th and California

2    courthouse?

3         A.    No.

4         Q.    When you got to the 26th and California

5    courthouse, did you speak with a public defender or a

6    public defender's investigator?

7         A.    Yes.

8         Q.    Okay.  And at that time did you inform the

9    public defender or the public defender's investigator

10   about any of your symptoms?

11        A.    No.

12        Q.    Did you inform the judge at any time about

13   any of your symptoms?

14        A.    No.

15        Q.    Did you appear before a judge in a courtroom?

16        A.    I can't recall at this time because I can't

17   remember if I actually saw a judge or if it was TV

18   court.

19        Q.    And by "TV court," you mean a closed-circuit

20   television video bond court, correct?

21        A.    Correct.

22        Q.    Had you ever been to a video bond court?

23        A.    Yes.

24

25        Q.    Aside from not being physically present in

Page 41

1    the room with the judge, is the proceeding the same as

2    in a courtroom bond hearing?

3         A.   Yes.

4         Q.   And your bond was set at that time?

5         A.   Yes.

6         Q.   Do you remember what the amount was of the

7    bond?

8         A.   I'm not exactly sure, but I think 90,000.

9         Q.   90?  Nine-zero thousand?

10        A.   Yes.

11        Q.   So it would have cost you 9,000 to get out of

12   jail?

13        A.   Correct.

14        Q.   Did you have the ability to post bond at the

15   time?

16        A.   No, I did not.

17        Q.   Could you tell me -- I'm looking at a chart

18   right now that I'm pretty certain was a -- provided to

19   your attorney.  But could you tell me how many times

20   you have been incarcerated in the Cook County

21   Department of Corrections?

22        A.   I can't say exactly, but I'll guesstimate it

23   at least ten times.

24

25        Q.   Was your 2007 arrest -- or 2007 processing

Page 42

1    into the jail on February 27th of '07?  Does that sound

2    familiar?

3        A.   Yes.

4        Q.   Okay.  All right.  What was the next previous

5    time to that February 2007 arrest that you were at the

6    Cook County Jail?

7        A.   I do not recall.

8        Q.   Were you arrested sometime mid 2006, July 21,

9    2006, somewhere around that time?

10       A.   It's very possible, but I can't recall at

11   this time.

12       Q.   Okay.  Let me correct that.  I have a record

13   here that indicates an intake date of March 15th of

14   '06.  Does that sound more probable that that was about

15   the date in '06?

16       A.   Yes.

17       Q.   About how many occasions during the class

18   period --

19       MR. CATANIA:  Do you know when the class period

20   runs?

21       MS. SINGER:  I don't want to answer that because

22   I'm not certain which --

23   BY MR. CATANIA:

24

25       Q.   I believe that the class period began in

1    August of '05 and runs through the present.

2              How many times had you been incarcerated at

3    the Cook County Department of Corrections since August

4    of 2005?

5         A.   Until the present?

6         Q.   Mm-hmm.

7         A.   Also a guesstimation, five.  I'm just

8    guessing because I'm not exactly sure.

9         Q.   On each of your intakes from August of 2005

10   to the present, did you inform people at the jail about

11   your prescription medication?

12        A.   Yes.

13        Q.   Has it always been the same prescription

14   medication?

15        A.   No.

16        Q.   What prescription medication did you inform

17   the jail about in 2006?  That would be March of 2006.

18        A.   That would still be Elavil.

19        Q.   And who did you first tell at the Cook County

20   Department of Corrections about the Elavil?

21        MS. SINGER:  Meaning -- Are you asking a name of

22   someone?

23        MR. CATANIA:  Or title or description.

24

25   BY THE WITNESS:

Page 44

1        A.   During my intake process, what they call it,

2   or history.

3        Q.   Okay.  So did you inform anybody at the bond

4   court about Elavil?

5        A.   No.

6        Q.   And you did tell somebody during your medical

7   intake?

8        A.   Yes.

9        Q.   Okay.  And the medical intake is part of the

10  general intake process into the jail which includes

11  social history, mental health history, medical

12  history --

13       A.   Correct.

14       Q.   -- some testing, physical testing, X-Rays,

15  things like that?

16       A.   Yes.

17       Q.   Okay.  And did you tell a mental health

18  specialist about Elavil as being your prescription?

19       A.   Yes.

20       Q.   All right.  Did you have the Elavil with you

21  in 2006?

22       A.   No.

23       Q.   Did you have it when you were arrested in

24

25  2006?

```
 1        A.    No.
 2        Q.    So it wasn't inventoried by the Chicago
 3   Police Department?
 4        A.    No.
 5        Q.    It wasn't inventoried by the Sheriff?
 6        A.    No.
 7        Q.    Okay.  All right.  Did you inform the mental
 8   health specialist about taking the Elavil?
 9        A.    Yes.
10        Q.    How did you do that?
11        A.    I was asked do I take any medications for
12   mental illness, and I said yes.  I was asked what
13   medications did I take.  I stated what medications I
14   take.
15        Q.    Were you also asked at that time about use of
16   street drugs?
17        A.    Yes.
18        Q.    Did you tell them that you were occasionally
19   also using heroine?
20        A.    Yes.
21        Q.    Did you tell them how you were administering
22   or using the heroine?
23        A.    Yes.
24
25        Q.    Do you remember what you told them?
```

1      A.   Snort.

2      Q.   Did you also speak with a correctional

3  medical technician about your physical health at that

4  intake?

5      A.   Yes.

6      Q.   Were you also asked at that time about what

7  prescriptions you were taking?  I'm talking about

8  March 15th of 2006.

9      A.   No, I wasn't asked if I was taking any

10  prescription medications for medical.

11      Q.   Okay.  Did you tell the mental health worker

12  that you were also taking Risperdal?

13      A.   Yes.

14      Q.   What is Risperdal?

15      A.   It's also a psychotropic medication for

16  hearing voices and other symptoms, but in my case for

17  hearing voices.

18      Q.   Okay.  When were you first prescribed

19  Risperdal?

20      A.   At the same time I was prescribed the Elavil.

21      Q.   Okay.  The same physician or psychiatrist?

22      A.   Yes.

23      Q.   When was the last time before your March 15th

24

25  of '06 intake did you have the Risperdal?

1    A.    I do not recall at this time.

2    Q.    Do you remember how frequently you're

3  required to have the Risperdal?

4    A.    Once a day.

5    Q.    When you use the word "psychotropic," are you

6  just talking generally about medicine that you take for

7  mental health?  In other words, are you equating psych

8  drugs with psychotropic medication?  Is that the same

9  thing in your mind?

10    A.    Yes.

11    Q.    Okay.  Where was it that you were first

12  prescribed the Risperdal, Elavil before the March 15th

13  of '06 intake date?

14    A.    Where?

15    Q.    What location?

16    A.    That it was prescribed to me at?

17    Q.    Yes.

18    A.    Community Mental Health.

19    Q.    Does Community Mental Health also go by the

20  name Bobby Wright?

21    A.    No.

22    Q.    Is there a place that you're familiar with

23  called Bobby Wright?

24

25    A.    Yes.

Page 48

1       Q.    And where is that located?

2       A.    10 South Kedzie, Chicago.

3       Q.    And were you also treated by any

4   psychiatrist, psychologist, or physician at Bobby

5   Wright?

6       A.    Yes.

7       Q.    Which was it:  a psychologist, physician, or

8   psychiatrist?

9       A.    Both.

10      Q.    Do you mean by that all three, or

11  psychiatrists and physician?

12      A.    Oh, I'm sorry.  A psychiatrist and a

13  psychologist.

14      Q.    Okay.  Do you remember the name of the

15  physician who was treating you at Bobby Wright?

16      A.    The psychologist, Aaron Bell.  The

17  psychiatrist, I do not recall his name at this time.

18  He was a foreigner, so I can't pronounce or remember

19  the name.

20      Q.    Was there a time when you did have memory of

21  the name?

22      A.    No.  Only probably if it was said to me or I

23  seen it in writing.

24

25      Q.    Do you remember what symptoms you had, if

1    any, at the time of your March 15th of '06 intake?

2         A.   I do not recall at this time what my symptoms

3    were.

4         Q.   Do you remember when it was that you were

5    arrested before your intake on March 15th of '06?

6         A.   Repeat that.

7         Q.   Sure.  What was the date or time of the

8    arrest that led you to be brought into the jail on

9    March 15th of '06?

10        A.   Oh, no, I do not recall.

11        Q.   After you had told the intake person about

12   the Elavil and the Risperdal, were you then brought to

13   the emergency room?

14        A.   No.

15        Q.   Okay.  Did you go to the emergency room at

16   all on the date of your intake in March of '06?

17        A.   Not that I can remember.

18        Q.   Were you admitted to Cermak at the time of

19   your intake in March of '06?

20        A.   I'm not exactly sure.  I believe I was.  I

21   can't remember exactly for sure.  But I do know that

22   during one of my arrests, when I reported that I took

23   psych meds, I was admitted into Cermak Health Services,

24

25   which was the, what they call, psych unit.

1        Q.    Okay.  Do you remember what they called that

2   particular unit?

3        A.    Psych unit.

4        Q.    Aside from "psych unit."

5        A.    Cermak Health Services, Cermak.

6        Q.    Do you remember the term "Two West"?

7        A.    Two West, yeah.

8        Q.    Okay.  Is that the location where you were

9   assigned?

10       A.    Yes.

11       Q.    Okay.  At that time, had you told the people

12   at intake about the psych medication that you had been

13   taking when you were assigned to Two West?

14       A.    Yes.

15       Q.    Okay.  So they were aware that you were in

16   need of mental health treatment?

17       A.    Yes.

18       Q.    Is that the only time that you were assigned

19   to Cermak at intake?

20       A.    Is that the only time?

21       Q.    Yes.  In the ten arrests that you had

22   mentioned, ten incarcerations at the Cook County Jail,

23   is that the only time that from intake you went -- you

24

25   were actually assigned to Cermak Health Services?

Page 51

1        A.    No.  Maybe one other time.

2        Q.    Do you remember if that was in '06 or '07,

3   that other time?

4        A.    Not in '07.

5        Q.    How about in '08?

6        A.    Yes.

7        Q.    Okay.  So in '08 you also revealed that you

8   were taking mental health medication, and they admitted

9   you into Cermak Health Services?

10       A.    Yes.

11       Q.    Okay.  Do you remember if on either of the

12  occasions that you were admitted into Cermak, the Two

13  West, that you had been suffering any immediate

14  symptoms before being admitted?

15       A.    Had I suffered any immediate symptoms?

16       Q.    Yes.  Were you displaying any symptoms at the

17  time that you were admitted?

18       A.    Not that I recall at this time other than

19  being antsy, on edge, not being able to sit still.

20       Q.    Okay.  That, in addition to reporting that

21  you were taking the psychotropic medication or some

22  type of mental health medication, right?  You reported

23  it and then you also were feeling antsy, and then they

24

25  admitted you?  Is that about --

1      A.    No.

2      Q.    Okay.

3      A.    I was asked the questions during my -- the

4   history, the intake process, what meds, if any, did I

5   take for mental illness.  I told them what meds I took,

6   what doctor I was seeing.

7      Q.    Mm-hmm.

8      A.    What -- What outpatient location I was going

9   to.

10          And then I was admitted to the psych unit,

11  Two West.

12     Q.    Okay.  In the March 15 of '06 intake when you

13  were admitted to Two West, did you see a psychologist

14  or psychiatrist after your admission into Two West?

15     A.    Yes.

16     Q.    And when was it in relation to the time you

17  were admitted?

18     A.    Within one to two days of my admission.

19     Q.    Had you been provided any of the medication

20  that you were previously prescribed during that one or

21  two days?

22     A.    No.

23     Q.    Did anybody provide any medication to you on

24

25  the day that you saw the physician or psychiatrist?

Page 53

```
 1        A.    That night.

 2        Q.    On that night?

 3        A.    Yes.

 4        Q.    And what medication were you given?

 5        A.    Sinequan or another -- other name known,

 6   Doxepin.

 7        Q.    Were those the --

 8        A.    No.  Doxepin and Sinequan is the same thing.

 9        Q.    I understand.

10        A.    Okay.

11        Q.    Was that prescribed to you by a physician

12   that you saw or the psychologist/psychiatrist that you

13   saw that day or two after being admitted?

14        A.    Yes.

15        Q.    Okay.  Did you discuss the medication at all

16   with that psychologist/psychiatrist or physician?

17        A.    Yes.

18        Q.    Did you tell the psychiatrist or physician

19   that you would not take that medication?

20        A.    No.

21        Q.    Did you take that medication?

22        A.    Yes.

23        Q.    Was that medication effective in treating any

24

25   of your symptoms?
```

1       A.      Not completely.

2       Q.      To what degree was it effective in treating

3    your symptoms?

4       A.      It kept me from being fidgety and antsy.

5       Q.      Did it help you in any way with rest at

6    night?

7       A.      To some degree.

8       Q.      Before seeing the psychologist or

9    psychiatrist or physician who prescribed the

10   medication, can you tell me if you suffered any

11   symptoms before seeing the physician?

12      A.      Prior to seeing the physician?

13      Q.      Yes.  In March of '06, is what I'm talking

14   about.

15      A.      No, not that I can remember.

16      Q.      When you were taking the street drugs, the

17   heroine, did that assist you or help you with any of

18   the symptoms that you were suffering with?

19      A.      Did they assist me --

20      Q.      Did it help alleviate any of your symptoms,

21   your mental health symptoms?

22      A.      When I was actively using the street drug,

23   did it alleviate?

24

25      Q.      Yes.

1     A.   I can't answer that honestly because I don't

2   know if it would -- if the medicine worked effectively

3   because I was using the street drug as well at the same

4   time, so I can't -- I can't say that it was working

5   effectively.

6     Q.   Okay.  One way or another, you don't know

7   whether you were helped by using the heroine along with

8   the prescription medication or whether the prescription

9   medication was effective without it, is that right,

10  without the heroine?

11     A.   Well, I can say that it was effective without

12  it, but I can't say that it was effective with it.  But

13  when I -- When I'm not under the influence -- when I'm

14  not using the street drug and I'm taking just my

15  medication only, it's effective.

16     Q.   Okay.  Have you ever had a period of time

17  where you were using only the street drug and not the

18  mental health medication?

19     A.   Yes.

20     Q.   And during the time when you were using only

21  the street drug of heroine, did you suffer the symptoms

22  that you suffer when you're not taking your medication?

23     A.   Yes.

24

25     Q.   Okay.  I don't know if I asked you this,

Page 56

1    but -- Do you have any children?

2         A.    No.

3               You did ask.

4         Q.    Did you have any children in the past?

5         A.    No.

6         Q.    Do you recall ever telling anybody that you

7    had children?

8         A.    No.

9               I have a question.

10        Q.    Yes.

11        A.    How much longer?  Not that I have anyplace to

12   be.  I just need a break.  That's why I ask.

13        MR. CATANIA:  We can take a break.

14                       (A short break was had.)

15   BY MR. CATANIA:

16        Q.    We've been talking mostly about that earlier

17   intake of March of '06.  Have you told me everything

18   you remember about what you informed the people at that

19   time about your medication?

20        A.    Yes.

21        Q.    Okay.  Do you have any problem with the way

22   the medical mental health staff treated you on that

23   intake in March of '06?

24

25        A.    Yes.

1     Q.    What problems do you have?

2     A.    During the initial intake, it's a rushed

3  process.   No one appears, to me, to like really care

4  about whether or not you actually take psych meds or if

5  you have a mental illness.   And I say that because of

6  my different incarcerations where there is -- There

7  were times when I came in in the intake process, and I

8  revealed what my problem was.   And I was able to go

9  straight into the psych unit, to Two West.   And, you

10  know, then there were times where I didn't at all.

11     Q.    Okay.

12     A.    So I don't think it's addressed properly.

13     Q.    Okay.   In your life outside of being

14  incarcerated, in your ordinary life, you, I believe,

15  reside at home with your parents, right?

16     A.    Correct.

17     Q.    If you go to a clinic, they don't necessarily

18  admit you into the hospital, right, when you complain

19  about the psychological problems?   They send you home,

20  don't they?

21     A.    Well, it depends on what you describe your

22  problem is.

23     Q.    Okay.   Have you been admitted to --

24

25     A.    If I say that I want to commit suicide or I

Page 58

1    want to hurt someone else, homicide, then, yes, they

2    would.

3         Q.   Has that happened to you?  Have you indicated

4    a desire to commit suicide outside of being at the

5    jail?

6         A.   I have made an attempt.

7         Q.   Okay.  And were you committed by a physician

8    at that time?

9         A.   That's when I was in Charter Barclay.

10        Q.   Okay.  Was it as a result of the attempt, or

11   was it the statement "I feel suicidal" that you were

12   committed to Charter Barclay?

13        A.   As a result of the attempt.

14        Q.   And was the attempt something that happened

15   at home?

16        A.   Yes.

17        Q.   Okay.  Do you agree that the proper course of

18   action was to place you inside the hospital for

19   observation?

20        A.   Yes.

21        Q.   And that was as a result of your attempt,

22   right?

23        A.   Yes.

24

25        Q.   When you entered into the Cook County Jail in

1   March of '06, did you tell them about that attempt of

2   suicide?

3        A.   I don't recall at this time.  I'm sure if I

4   was asked the question if I have ever made an attempt,

5   then I answered the question honestly.  But I can't

6   remember at this time if I was or not.

7        Q.   That's fair enough.  It's difficult to

8   remember all the details.

9             Can you tell me about the questions that were

10  asked of you at intake on each of the -- I believe it's

11  three intakes that are relevant to the class period,

12  the one in '06, the one in '07, and the one in '08 --

13  were you asked the same questions on each of those

14  entries?

15       A.   Give or take, yes.

16       Q.   Did it appear to you that they were being

17  asked off of a form called a Brief Primary

18  Psychological Screening Tool?

19       A.   Well, I don't know what the name of the form

20  is.  But, yes, it seemed -- it appeared that they were

21  asking questions from a form.

22       Q.   Okay.  And each time that they asked the

23  questions off of that form, were you also then taken

24

25  for a secondary evaluation by another person?

1  A.  No.

2  Q.  Okay. In your medical chart here -- which

3 we're not going to make part of the record yet. But in

4 your medical chart, it indicates on numerous occasions

5 that you received a secondary interview on the same day

6 as the intake. It's called Secondary Interview, which

7 comes after an additional interview.

8   Do you recall ever, during those intakes,

9 speaking to somebody such as Leslie Stein in the

10 receiving room?

11  A.  Not during an intake process. When I went on

12 what they call a psych evaluation, meaning that if

13 you -- if I was placed in general population and I said

14 that I was having a problem and I needed a psych

15 evaluation. And I remember seeing -- Well, now that

16 you said the name, her name sounds familiar. But never

17 during that intake process that I went from one person

18 to the next.

19  Q.  Okay. The people that you spoke to that read

20 questions off of a form, do you know what their job

21 titles were? Do you have any idea?

22  A.  Not exactly. I think I would probably say

23 psychologist.

24

25  Q.  Okay. Did any of them ever introduce

Page 61

1    themselves as mental health specialists?

2        A.   I can't recall at this time.

3        Q.   Okay.  At least on each intake somebody asked

4    you questions off of a form; is that right?

5        A.   Yes.

6        Q.   All right.  And at least on those intakes --

7    two of those intakes, you were then sent to Two West;

8    is that right?

9        A.   Yes.

10       Q.   Okay.  The intake where you were not sent to

11   Two West, where were you housed?

12       A.   General population, I believe, Division 4.

13       Q.   Okay.  And where is Division 4 in relation to

14   Cermak; do you know?

15       A.   It's a separate building.

16       Q.   Is it right next to Cermak?

17       A.   I wouldn't know from the inside of the jail.

18       Q.   Okay.  All right.  Was it a dormitory setting

19   that you were in in Division 4?

20       A.   No.

21       Q.   It's separate cells?

22       A.   Two people to a cell.

23       Q.   Okay.  And did you have a cell mate at that

24

25   time?

1        A.    Yes.

2        Q.    And were there also correctional officer

3   guards at that time?

4        A.    Yes.

5        Q.    Were you familiar in your ten incarcerations

6   about the medical request form?

7        A.    Yes.

8        Q.    And had you ever filled out medical request

9   forms in your stays there?

10       A.    Yes.

11       Q.    Had you ever had an occasion when your

12   medical request form was not addressed?

13       A.    Yes.

14       Q.    What occasion was it that your medical

15   request form was not addressed?

16       A.    I don't remember exact dates.  But I put in

17   like for a dentist.  Never saw a dentist.  I think on

18   an occasion or two, I had what they call an abscess or

19   a boil.  It wasn't addressed.  By the time they

20   addressed it, the problem had gone away.

21       Q.    Okay.  In medical terminology they say that

22   it resolved on its own, the boil, right?

23       A.    Yes.

24

25       Q.    Okay.  Are you familiar through your various

1    incarcerations with the grievance process at the jail?

2        A.    Yes.

3        Q.    And you're familiar that -- with -- if you

4    have a problem that you need to address that's not

5    being addressed in other ways, you can fill out a form

6    that goes to a social worker that complains about that

7    issue, right?

8        A.    Yes.

9        Q.    And that's called a grievance form?

10       A.    Yes.

11       Q.    Had you ever filed any grievances in your

12   incarcerations of '06, '07, and '08?

13       A.    I believe so.

14       Q.    What did you address in your grievances in

15   '06?

16       A.    I can't recall exactly what my grievances

17   were each year, but I can remember things that I

18   grieved.

19       Q.    Can you tell me what some of those things

20   are?

21       A.    Not having hot water, no heat, personal

22   property being taken -- being taken from me by

23   correctional officers during a shake-down -- but it

24

25   shouldn't have been confiscated because they were

1    purchased items from either commissary or what they

2    call a care package that was given as a gift from

3    outside, you know, guests that come into the jail --

4    things of that sort.  But I can't remember -- I can't

5    place what -- the specific incident with the specific

6    years and dates.

7         Q.   Okay.  Fair enough.

8              Have you now told me about all the subjects

9    that you recall at this point that you grieved during

10   your incarcerations for -- during the '06, '07, and '08

11   incarcerations?

12        A.   That I can pretty much remember.  Maybe one

13   or two other things.  But for the most part, I think I

14   did.

15        Q.   All right.  I'm going to call your attention,

16   now, to the February 27th of '07 intake.  Did you have

17   occasion to speak with a psychologist or mental health

18   worker at intake?

19        A.   Yes.

20        Q.   And were you also at that time suffering any

21   symptoms of mental illness that you recall in February

22   of '07?

23        A.   Was I suffering symptoms at the intake

24

25   process?

1     Q.   Yes.

2     A.   Probably just being fidgety and antsy, maybe.

3     Q.   Let me ask you this, which I probably should

4  have asked way at the beginning:  Have you taken your

5  medication for today?

6     A.   I take it at night.

7     Q.   Okay.  Did you take it last night?

8     A.   Yes.

9     Q.   Okay.  Is there any reason why you should be

10  suffering any symptoms during this deposition?

11     A.   No.

12     Q.   Okay.  And do you feel okay for this

13  deposition?

14     A.   Yes.

15     Q.   Is there anything that would prevent you from

16  actually giving full and correct answers in this

17  deposition?

18     A.   No.

19     Q.   Do you remember what medications you informed

20  the staff on your February of '07 intake, what you were

21  taking at that time?

22     A.   Did I inform them what medication I was

23  taking?

24

25     Q.   Yes.

1      A.   Yes.

2      Q.   What medications were you taking in February

3 of '07?

4      A.   Seroquel.

5      Q.   Who prescribed the Seroquel that you were

6 taking in February of '07?

7      A.   Dr. Tahara.

8      Q.   And what was the Seroquel for?

9      A.   Sleep deprivation, depression.

10      Q.   Okay.  Any other medications at that time

11 besides for sleep disorder?

12      A.   Any other medications?

13      Q.   That you were taking at that time.

14      A.   I can't pronounce the name of the medication.

15 Citolpram.  I think you spell it C I T O L P R A M or

16 P H R A M.  I don't know how to pronounce it.

17      Q.   And what was that medication prescribed for?

18      A.   Depression and sleep deprivation.

19      Q.   And did you inform them at intake that you

20 were taking that medication as well?

21      A.   Yes.

22      Q.   And at that time in February of '07, were you

23 then referred for another interview, a second

24

25 interview?

1       A.   I don't recall at this time.

2          I have a question.

3       Q.   Yes.

4       A.   I know you keep saying a "second interview."

5  And I've never recalled -- I don't know if you saying

6  it different and I'm not receiving it correctly.  You

7  keep saying a "second interview."  And I've never had

8  nothing that's a second interview.  It's the intake

9  process where the mental health specialist or

10  psychologist, whatever their job title is, where they

11  read you the questions off the form.  And you answer

12  the questions.

13        And from that point on, it's either if they

14  found me to be fit for Two West, I go to Two West from

15  that point; if they did not, I went to general

16  population.  There was never a second interview.  I

17  don't know what that is.  I'm not --

18       Q.   All right.

19       A.   I'm missing it.

20       Q.   This is what I'm talking about.  We already

21  agree that there was a group of questions that was

22  generally asked each time that you entered that talked

23  about your mental health.  That's what I'm calling the

24

25  primary or first interview.  The second interview is

Page 68

1    simply a secondary interview.  It could be the same

2    person asking the questions, but it would be more in

3    detail.

4           Do you recall seeing -- or having both of

5    those things happen, a group of questions followed by

6    some that are in more detail?

7         A.   Everything happened at one time, not a second

8    interview, not a separate time.

9         Q.   Okay.  I'm not talking about a separate time

10   necessarily.  It could be immediately after the first

11   group of those familiar questions that you've heard

12   each time, another interview, set of questions that's

13   more detailed asking you about specifics about your

14   suicidal ideations or things like that, like when and

15   where that happened and when you were treated.  Did

16   those questions come up at the same interview?

17        A.   I'm not being able -- I can't differentiate

18   the two when you're saying "a second."  To me, it was

19   just one sheet of questions.

20        Q.   All right.  Fair enough.

21          All right.  In that intake in February

22   of '07, were you prescribed medication?

23        A.   You said during the intake?

24

25        Q.   Yes.

Page 69

1       A.   I was already taking medication.

2       Q.   But did you also get at the intake -- Did you

3    have your medication with you at the intake?

4       A.   No.

5       Q.   Did you get any prescription medication at

6    the intake?

7       A.   No.

8       Q.   Were you prescribed -- In other words, did

9    somebody write a prescription for you at the intake?

10      A.   No.

11      Q.   When was the next time at that intake,

12   February of '07 intake, that you got a prescription

13   written for you?

14      A.   After being assigned to Two West.

15      Q.   Okay.

16      A.   And seeing a psychologist and psychiatrist.

17      Q.   So you were assigned to Two West in the

18   February '07 intake, right?

19      A.   I don't remember if it was the intake or when

20   I attempted suicide where I drank liquids from a hot

21   and cold pack and I had to go to the emergency room.

22   Then from the emergency room -- I don't remember if I

23   saw a psych worker or not after the emergency room.  I

24

25   don't remember if I did or not.  But I know, after

Page 70

1    that, I was assigned to Two West.  After being assigned

2    to Two West, seeing a psychiatrist and psychologist, I

3    was given a prescription for medication.

4         Q.   Okay.  All right.  When you say that you

5    tried to drink liquids from a hot/cold pack, did you

6    actually drink liquids from a hot/cold pack?

7         A.   I never said that I tried to.  Yes, I did

8    actually drink it.

9         Q.   Was it witnessed?

10        A.   By my cellmate.

11        Q.   Okay.  And did you ever find out what those

12   liquids were?

13        A.   No, I did not.

14        Q.   In that event when it was witnessed by your

15   cellmate, is that when you were then admitted to

16   Two West?

17        A.   Not immediately.  I went to the emergency

18   room first.

19        Q.   Okay.  Was it the emergency room within

20   Cermak Health Services?

21        A.   Yes.

22        Q.   You weren't taken off site to another

23   hospital or anything like that, right?

24

25        A.   No.

Page 71

1      Q.   Okay.  And following the emergency room

2  visit, you were admitted to Two West?

3      A.   Yes.

4      Q.   Was there -- How long were you in the

5  emergency room before being admitted into Two West?

6      A.   Maybe four hours.

7      Q.   Were you prescribed medication in the

8  emergency room?

9      A.   No, I wasn't prescribed any medication.  But

10  I was given a substance to drink to, I guess, flush out

11  the poison that I had drank.

12      Q.   Okay.  So they did some poison control with

13  you at the emergency room; is that right?

14      A.   Yes.

15      Q.   Okay.  Was it something to cause you to

16  regurgitate or vomit the substance that you drank or to

17  flush it?

18      A.   Flush it.

19      Q.   Okay.  Did you see a psychologist or

20  psychologist shortly after that?

21      A.   I don't recall at this time.

22      Q.   Okay.  You were prescribed medication when

23  you got to Two West, though, right?

24

25      A.   Yes.

Page 72

1      Q.    What medication were you prescribed?

2      A.    I was given Doxepin.

3      Q.    Were you actually administered the

4    medication, or just was a prescription written at that

5    time?

6      A.    Prescription written.

7      Q.    Were you given any prescription medication at

8    that time?

9      A.    Not until that night after the

10   prescription -- the night of, after the prescription

11   was written.

12     Q.    Were you prescribed any other medication

13   besides the Doxepin?

14     A.    No.

15     Q.    All right.  Do you remember if it was

16   approximately March 1st of '07 that you were placed in

17   Two West?

18     A.    I don't know exactly.

19     Q.    Okay.  Did you actually take the Doxepin?

20     A.    Yes.

21     Q.    Were you also prescribed Fluoxetine?

22     A.    I don't recall.

23     Q.    At any time during that stay in the hospital

24

25   in February and March of '07, were you prescribed

Page 73

1    Prozac?

2         A.    I don't believe so.

3         Q.    Did you take either the Fluoxetine or the

4    Prozac?

5         A.    No.

6         Q.    I'm going to show you two exhibits which I'm

7    showing to your attorney right now.  Do you recognize

8    your signature on either one or both of those

9    documents?

10        A.    Yes, I do.

11        Q.    And they're both signed by you?

12        A.    Yes.

13        Q.    And both of those documents indicate that a

14   prescription was written for you, and both indicate

15   that you refused to take that prescription; is that

16   right?

17        A.    That is correct.

18        Q.    One of them is Exhibit 1 which says the

19   Fluoxetine was refused on February 28th of '07; is that

20   right?

21        A.    Correct.

22        Q.    And the second one is Prozac that was refused

23   on March 1st of '07?

24

25        A.    Correct.

1      Q.   Okay.  Do you want to tell us why you refused

2   those medications?

3      A.   Yes, I would like to.  I refused those

4   medications because early on in my diagnosis, I was

5   prescribed Prozac before and Prozac does not work for

6   me.  And when speaking to the psychologist or the

7   psychiatrist, the person that wrote out the

8   prescription, I explained that -- I believe it was told

9   to me what medications were about to be prescribed to

10  me.  And I told them that Prozac doesn't work for me,

11  that I had been prescribed that years ago and it

12  doesn't work for me.

13     Q.   Okay.  Which you --

14     A.   So I refused it.

15     Q.   Would you characterize your refusal and your

16  discussion with the doctor -- that you had a difference

17  of opinion with the doctor about whether that was

18  appropriate medication for you at the time?

19     A.   Would I characterize it as a difference of

20  opinion?

21     Q.   Yes.

22     A.   Well, I guess you can say that, yes.

23     Q.   Have you ever informed any of the medical

24

25  staff that you don't have any problems in the jail, in

Page 75

1    August of '07, and that they just brought you to the

2    emergency room?  Did you ever tell anybody that?

3         A.   Repeat that again.

4         Q.   Sure.  Specifically August 17th of 2007 at

5    around 3:41 p.m., were you brought to the emergency

6    room at Cermak Health Services by security staff?

7         A.   I don't recall.

8         Q.   Okay.  I'm showing this Exhibit No. 3 to your

9    attorney.

10           Take a look at that Exhibit No. 3, please,

11   and tell me if in the lower right-hand area you see

12   your signature.

13        A.   Yes.

14        Q.   Okay.  And you see up at the top there is a

15   date on there?  Looks like it says August 17th, 2007;

16   is that right?

17        A.   Yes.

18        Q.   Okay.  And in the -- Near the top it

19   indicates what your complaint is, what you've

20   communicated.  It starts with the word "I."  Can you

21   read that?

22        A.   Can I read it?  Yes.

23        Q.   Would you read it out loud.

24

25        A.   "I don't have any problems.  They brought me

Page 76

1    over here."

2        Q.    Okay.  And do you recall making statements to

3    that effect about August 17th of '07?

4        A.    No, I do not.

5        Q.    Okay.

6        A.    This is a response.  This is allegedly my

7    response.  But what was the question?

8        Q.    Okay.  The question, if I could take a look

9    at that, is History, slash, Complaints.  That's the

10   question.  Do you see that in the box?

11       A.    That's not a question.

12       Q.    Okay.  Well, that box is usually written into

13   by a nurse.

14       A.    What I'm saying is if this is my alleged

15   statement -- so in order for me to make an alleged

16   statement, I've had to have been asked a question.  And

17   that would be my answer.

18       Q.    Right.

19       A.    What was the question?

20       Q.    I don't know what the question is.  But I

21   know that that box talks about your statement about

22   your complaints.

23       A.    Right.  And I'm reading what's under there.

24

25   And I'm wondering if it's related to "Patient denies

Page 77

1    taking illegal drugs, heroine, slash, cocaine."

2         Q.   Right.  I understand.  They may be related.

3    I'm just asking you if you remember the situation of

4    August of -- 17th of 2007 speaking with a nurse in the

5    emergency room having been brought there?  Do you

6    remember that?

7         A.   Not exactly.

8         Q.   Do you remember being brought there to the

9    emergency room based on someone saying that you were

10   taking heroine and cocaine while in the custody of the

11   sheriff at the jail?

12        A.   I remember the incident, yes.

13        Q.   Okay.  And apparently the response was you

14   denied taking any illegal drugs, heroine, or cocaine to

15   the question about why you were brought there, right?

16        A.   Correct.

17        Q.   Okay.  Had you ever seen heroine or cocaine

18   inside the jail?

19        A.   No.

20        Q.   Had you ever seen contraband of any kind

21   inside of the jail?

22        A.   Yes.

23        Q.   Had you ever seen a homemade alcoholic

24

25   beverage known as Hooch inside the jail?

Page 78

1       A.   No Hooch.  But something they made
2   themselves, but not Hooch, no.
3       Q.   Okay.  What is the something they make
4   themselves?
5       A.   Kool-Aid and juices.  And they dissolve their
6   own medication in it.
7       Q.   Okay.  So they dissolve medication into a
8   drink; is that right?
9       A.   Correct.
10      Q.   And do they share that with other people that
11  have not been prescribed their medication?
12      A.   I don't know.
13      Q.   Had you ever had any of that?
14      A.   No.
15      Q.   Okay.  Any other contraband aside from drugs
16  seen by you in the jail?
17      A.   I never said I seen drugs in the jail.
18      Q.   What do you mean when you say you have
19  observed contraband in the jail?
20      A.   You asked me had I observed any contraband
21  other than drugs, and I said yes.
22      Q.   What?
23      A.   Contraband such as nail polish, fingernail
24
25  files, tweezers, nail clippers, coins, matches,

Page 79

1    cigarettes, lighters, perfume, hand sanitizer,

2    clothing.

3         Q.   Had you ever seen marijuana in the jail?

4         A.   No.

5         Q.   Had you ever smelled marijuana burn in the

6    jail?

7         A.   No.

8         Q.   All right.  I know you don't want to be here

9    much longer, and I think your lawyer also wants to get

10   out of here.

11        But is there anything else that you think of

12   that I should know about your mental health treatment

13   in the jail that I haven't asked you about?

14        A.   Why they gave me a prescription -- Why they

15   gave me medication other than what was prescribed to me

16   that I was previously taking on the street prior coming

17   into the jail.

18        Q.   Okay.  So you have a question about why it is

19   you had a substitute of a medication, right?

20        A.   Yes.

21        Q.   Was that substitution made by the

22   psychologist or psychiatrist you saw in Two West?

23        A.   Yes.

24

25        Q.   Okay.  Did you ask that psychologist or

1    psychiatrist that question?

2         A.    Yes.

3         Q.    Did you ever receive a satisfactory response

4    to it?

5         A.    No.

6         Q.    Okay.  Have you come to have any

7    understanding of why a substitution was made on your

8    medication?

9         A.    Yes.  I've come to understand on one occasion

10   it was because the budget.  They said that the State

11   doesn't pay for it or the -- it costs too much and so

12   they don't give Seroquel out because the budget and the

13   State don't pay for it.

14        Q.    And who was it that told you that?

15        A.    The psychiatrist or a psychologist.

16        Q.    Do you remember the name?

17        A.    No, I do not.

18        Q.    Do you remember any description of that

19   person?

20        A.    If I seen him, yes.

21        Q.    You would recognize them?

22        A.    Yes.

23        Q.    That person?

24

25        A.    Yes.

Page 81

1     Q.   Had you seen that person on more than one

2  occasion at the jail?

3     A.   Yes.

4     Q.   And was it Leslie Stein, the lady we talked

5  about before?

6     A.   I can't remember for sure.

7     Q.   Does the name Carrington sound familiar?

8     A.   That name doesn't sound familiar at all.

9     Q.   Okay.  Did the doctor say that what was being

10  prescribed was not effective to treat what it was being

11  prescribed for?

12     A.   She did not say if it was effective or not

13  effective, but that it was related to or in the same

14  family of the drugs that I take on the street.

15     Q.   Okay.  Do you have any evidence that that is

16  untrue?

17     A.   That it's related?

18     Q.   Or that it's not related?

19     A.   Or not related?

20     Q.   Yes.

21     A.   I don't have any evidence that it's true.

22  But when I've spoken to different psychologists and

23  psychiatrists, I've gotten different answers.  I've had

24

25  some say that -- tell me that they are in the same

Page 82

1    family, and I've had some that say that they are

2    nowhere near in the same family.

3        Q.    Okay.  So you have --

4        A.    And because I'm not a physician, I don't know

5    really what it related to.

6        Q.    So you have some evidence that physicians

7    have a difference of opinion amongst themselves about

8    whether or not this drug is in the same family and

9    therefore is effective like the drug that you were

10   prescribed by another physician?

11       A.    That they have a difference of opinion?

12       Q.    Yes.

13       A.    Yes.  That would be safe to say, yes.

14       Q.    Now, when did you first become involved in

15   this litigation that's got the name of Michael Parish

16   as the first name in the suit?

17       A.    When did I first become involved?

18       Q.    Yes.

19       A.    March 2008.

20       Q.    Were you contacted by anyone before you

21   became involved in this case?

22       A.    No.

23       Q.    How did you first learn about it?

24

25       A.    Through another inmate.

1    Q.    And who was that inmate?

2    A.    I don't recall their name.

3    Q.    Was it in Two West that you heard about it?

4    A.    No.

5    Q.    Where was it?

6    A.    In the jail.

7    Q.    Did they tell you at that time the name of

8    any of the class counsel that's involved with the case?

9    A.    I believe so.  Or not the name of counsel,

10   but the address or the phone number.

11   Q.    Okay.  Could have been the address, could

12   have been the phone number?

13   A.    Yes, one or the other.

14   Q.    Which address, which phone number?

15   A.    I don't know the phone number by heart.  And

16   I would assume it was the address of the location of

17   her office.

18   Q.    Okay.  Whose office are you talking about?

19   A.    Cecile's office.

20   Q.    Okay.  Did you personally go to 200 South

21   Michigan Avenue?

22   A.    Yes, I did.

23   Q.    Did you go to the twelfth floor?

24

25   A.    Yes, I did.

1     Q.   When did you do that?

2     A.   Yesterday.

3     Q.   When is the first time that you had met with

4  class counsel?

5     A.   Yesterday.

6     Q.   And how were you contacted?

7     A.   How was I contacted?

8     Q.   Yes.

9     A.   By phone.

10    Q.   Okay.  And how did class counsel get your

11  phone number?

12    A.   I contacted them initially.

13    Q.   Okay.  When was it that you initially

14  contacted them?

15    A.   March 2008.

16    Q.   Okay.  What was your understanding about what

17  the lawsuit pertained to in March of 2008?

18    A.   That it took an excessive amount of time to

19  get prescribed psych meds.

20    Q.   Okay.  And it was psych meds specifically; is

21  that right?

22    A.   That was what was told to me by the other

23  inmate.

24

25    Q.   Did the other inmate tell you what the

Page 85

1    lawyers thought was an excessive amount of time?

2         A.   No.

3         Q.   Was that person that informed you about this

4    lawsuit also a psych patient?

5         A.   I'm not sure.  I believe so, but I'm not

6    exactly sure.

7         Q.   Okay.  Did you ask how that person had found

8    out about this lawsuit?

9         A.   I believe I did.

10        Q.   And do you remember what the answer was?

11        A.   Word of mouth.

12        Q.   Did that person tell you what mouth the word

13   came from?

14        A.   No.

15        Q.   Before your involvement in March of '07 in

16   this case, had you known either Thomas Morrissey or

17   Kenneth Flaxman?

18        A.   No.

19        Q.   I'm sorry.  It was March of '08.

20             Had you known Cecile Singer?

21        A.   No.

22        Q.   Had you ever seen Thomas Morrissey's name on

23   any of the papers that are posted around the jail?

24

25        A.   Yes.

1    Q.   So you had some idea already about who Thomas

2  Morrissey was?

3    A.   Not who -- Well, yeah, I guess you can say.

4  Well, I knew he was a lawyer.

5    Q.   All right.  I think I am almost done, but I

6  just wanted to make sure I understand all of the places

7  where I can request your medical records from.  We had

8  talked about Cook County and Dwight as places where

9  there might be medical records, right?

10    A.   Dwight Correctional Facility.

11    Q.   Yes.

12    A.   Dixon Correctional Facility, which is no

13  longer co-ed anymore, maybe Logan Correctional

14  Facility.

15    Q.   Okay.

16    A.   And Charter Barclay Hospital.

17    Q.   Okay.  Charter Barclay Hospital, Community

18  Mental Health Center?

19    A.   Bobby Wright.

20    Q.   Bobby Wright.  Okay.  When were you at Bobby

21  Wright?

22    A.   Between 2004 and -6.  I don't remember

23  exactly.

24

25    Q.   Okay.  Are you familiar with all -- with the

Page 87

1    record keeping at the Illinois Department of

2    Corrections?  Are you familiar with that?

3         A.   Am I familiar with --

4         Q.   How they keep their records.

5         A.   No.

6         Q.   Okay.  The Illinois Department of Corrections

7    keeps a master file for the people that are prisoners

8    at the Department of Corrections -- that would include

9    your medical record as well -- that goes from location

10   to location.  In order to obtain them, I have to send

11   in a request with a HIPAA waiver that's on their form

12   that asks for your master file.  Do I have your

13   permission to do that?

14        MS. SINGER:  This -- Are we talking about the

15   medical records in the mental records?

16        MR. CATANIA:  Yes.

17        MS. SINGER:  So the HIPAA --

18        MR. CATANIA:  HIPAA would apply.

19        MS. SINGER:  -- applies to both of those?

20        MR. CATANIA:  Right.

21        MS. SINGER:  And just those?

22        MR. CATANIA:  Yes.

23        MS. SINGER:  You should answer now.  He asked you,

24

25   so you answer.

Page 88

1    BY THE WITNESS:

2         A.   Oh, yes.  That's fine.

3         Q.   Okay.  And Fantus Clinic?

4         A.   Correct.

5         Q.   Okay.  Are there any others that we've left

6    out?

7         A.   No.

8         MS. SINGER:  We'll let you know if she recalls

9    another one.

10        MR. CATANIA:  That would be great.

11   BY THE WITNESS:

12        A.   Charter Barclay, Bobby Wright, Community

13   Mental Health, the correctional facility, Fantus and

14   Cook County, yeah.

15        MR. CATANIA:  Okay.  Very good.  I have no further

16   questions.  Thank you very much.  I don't know if your

17   lawyer has anything for you.

18        MS. SINGER:  You're ordering?

19        MR. CATANIA:  Yes.

20             You have no questions, then?

21        MS. SINGER:  I have no questions.

22        MR. CATANIA:  Okay.  You have the right to review

23   the transcript once it's prepared.  And that right

24

25   allows you to take a look at it within a certain time

Page 89

1    period and to make corrections or things that you think

2    ought to be corrections.  Or you can waive that right,

3    trust the court reporter who's done a fine job of

4    taking everything down here today.  It's your choice,

5    though.  You just have to tell us now.

6         THE WITNESS:  I would like ...

7         MR. CATANIA:  To review it?  You could review it.

8         THE WITNESS:  At a later date or right now?

9         MR. CATANIA:  After it's typed up at a later date.

10        THE WITNESS:  Yes, I would like to.

11        MR. CATANIA:  It's reserved.

12                     (Witness excused.)

13

14

15

16

17

18

19

20

21

22

23

24

25          IN THE UNITED STATES DISTRICT COURT

Page 90

```
 1              NORTHERN DISTRICT OF ILLINOIS
 2                   EASTERN DIVISION
 3    MICHAEL PARISH; CURTIS L. OATS;      )
      LEILA KHOURY; SEAN DRISCOLL; CARLA   )
 4    LOFTON; ROY CLEAVES; LISA BROWN;     )
      DAN TAYLOR; DEAN MILLER; KEVIN       )
 5    SANDERS; STACEY CLARK; and CARLOTTE  )
      WATSON,                              )
 6              Plaintiffs,               ) No. 07 CV 4369
                                           )
 7       -vs-                              )
                                           )
 8    SHERIFF OF COOK COUNTY and COOK      )
      COUNTY,                              )
 9              Defendants.                )
10              I, CARLA LOFTON, being first duly sworn, on
11    oath, say that I am the deponent in the aforesaid
12    deposition, that I have read the foregoing transcript
13    of my deposition taken July 15, 2009, consisting of
14    Pages 1 through 90 inclusive, taken at the aforesaid
15    time and place and that the foregoing is a true and
16    correct transcript of my testimony so given.
17
18              Corrections have been submitted
                No corrections have been submitted
19
                     CARLA LOFTON, Deponent
20
21    SUBSCRIBED AND SWORN TO
      before me this     day
22    of      , C.E., 2009.
23
24    Notary Public
```

25                                    ERRATA SHEET

```
 1   CASE NAME:     Young vs. Cook County
 2   CASE NUMBER:  07 CV 4369
 3   WITNESS:  CARLA LOFTON     REPORTED ON:  July 15, 2009
     REPORTED BY:  Teresa Resendez, CSR
 4
     I wish to make the following changes for the following reasons:
 5
     PAGE     LINE
 6
                     CHANGE:
 7
                     REASON:
 8
                     CHANGE:
 9
                     REASON:
10
                     CHANGE:
11
                     REASON:
12
                     CHANGE:
13
                     REASON:
14
                     CHANGE:
15
                     REASON:
16
                     CHANGE:
17
                     REASON:
18
                     CHANGE:
19
                     REASON:
20
                     CHANGE:
21
                     REASON:
22
                     CHANGE:
23
                     REASON:
24           The above corrections are made to correct an error(s) in
     the reporting or transcription of my answer(s).
25
```

Page 92

```
1   Signed:                              Date:

2   NORTHERN DISTRICT OF ILLINOIS )

3   EASTERN DIVISION              )

4   STATE OF ILLINOIS            )  SS:

    COUNTY OF COOK               )

5

6            I, Teresa Resendez, Certified Shorthand

7   Reporter and Notary Public in and for the County of

8   DuPage, State of Illinois, do hereby certify that on

9   the 15th of July, C.E., 2009, the deposition of the

10  witness, CARLA LOFTON, called by the Defendants, was

11  taken before me, reported stenographically and was

12  thereafter reduced to typewriting through

13  computer-aided transcription.

14           The said witness, CARLA LOFTON, was first

15  duly sworn to tell the truth, the whole truth, and

16  nothing but the truth, and was then examined upon oral

17  interrogatories.

18           I further certify that the foregoing is a

19  true, accurate and complete record of the questions

20  asked of and answers made by the said witness, at the

21  time and place hereinabove referred to.

22           The signature of the witness was not waived

23  by agreement.

24           Pursuant to Rule 30(e) of the Federal Rules

25  of Civil Procedure for the United States District
```

Page 93

1    Courts, if deponent fails to read and sign this

2    deposition transcript within 30 days or make other
3    arrangements for reading and signing thereof, this
4    deposition transcript may be used as fully as though
5    signed, and the instant certificate will then evidence
6    such failure to read and sign this deposition
7    transcript as the reason for signature being waived.
8             The undersigned is not interested in the
9    within case, nor of kin or counsel to any of the
10   parties.
11            Witness my official signature and seal as
12   Notary Public, in and for DuPage County, Illinois, on
13   this 31st day of July, C.E., 2009.
14
15
16
17                Teresa Resendez, CSR
                  Notary Public
18                39 South LaSalle Street, Suite 625
                  Chicago, Illinois 60603
19
20
     License No. 084-003718
21
22
23

24
25

**Exhibit 5%**

**CERMAK H** CLEAVES, ROY 52507
03/24/1957
20070025445
M
BKDT:04/07/2007

**COOK COUNTY** **Medical Intake Form**

Last Name: _____

Date: _____

Sex: M / F    Date of Birth: _____

Division: _____

## Consent for Treatment

I consent to a medical and mental health history and physical including screening for tuberculosis and sexually transmitted diseases as part of the intake process of the Cook County Jail. I also consent to ongoing medical treatment by Cermak Health Services staff for problems identified during this process. I understand I may be asked to sign forms allowing other medical treatments. I understand that every effort will be made by CHS staff to keep my medical problems confidential. I understand the policy of CHS regarding access to health care at Cook County Jail.

*patient's signature*

## Medical History

Remarks (reference by question number)

| | | | |
|---|---|---|---|
| 1. Seizures/ Epilepsy / Fits | Yes | No | |
| 2. Heart Trouble / Heart Attack | Yes | No | |
| 3. High Blood Pressure | Yes | No | |
| 4. Asthma / Emphysema | Yes | No | |
| 5. Diabetes | Yes | No | |
| 6. Cancer | Yes | No | |
| 7. Assistive Devices (prosthesis, cane, etc.) | Yes | No | |
| 8. Mental Illness | Yes | No | |
| 9. Tuberculosis | Yes | No | |
| 10. HIV/AIDS | Yes | No | |
| 11. Liver Disease (specify)/Hepatitis B/C | Yes | No | |
| -ever had DTs (delirium tremens) | Yes | No | |
| 12. Kidney Disease | Yes | No | |
| 13. Peptic Ulcer Disease | Yes | No | |
| 14. Sickle Cell Disease | Yes | No | |
| 15. Other (specify) | Yes | No | |

(1) BiPoLar disorder -by

Form Reviewed: MC
Date ___ / ___ / ___
Sick-Call Needed: Y / N

Scheduled: ___ / ___ / ___
-by _____

## Current Problems

| | | | |
|---|---|---|---|
| 1. On Medications (list) | Yes | No | |
| 2. Under Doctor Care | Yes | No | |
| 3. Dental Problems (tooth ache, bleeding gums, etc., refer to dental if present) | Yes | No | |
| 4. Current Disabilities (assistance with ADL) | Yes | No | |
| 5. Recent trauma or hospitalization | Yes | No | |
| 6. Current cough, fever, night sweats | Yes | No | |
| 7. Current vaginal/penile discharge/sores /dysuria | Yes | No | |
| 8. Other (specify) | Yes | No | |
| 9. Females – Menstrual History – LMP | / | | |
| Currently pregnant | Yes | No | |
| Number of past pregnancies / deliveries | / | | |

(1) Seriqui'l

PT. S/S.

Allergies: N/K/

Understands English? Y / N

## Substance Use

| | Tobacco | Alcohol | Injection Drug Use | Illicit, Non-Injection | Methadone | Other |
|---|---|---|---|---|---|---|
| | Y / N | Y / N | Y / N | Y / N | Y / N | Y / N |
| How Long ? (years) | | | | | | |
| Last Used (today, yesterday, 1 week etc.) | | | | | | |
| How much per day? | | | | | | |

Comments: (1) PT Denies Any current distress.

CMT/ERT    6:55 PM

Signature of CMT/Paramedic/Title

C H S 8 6 3 8 4

PATIENT LABEL
Cleaves 00001

**Exhibit 5&**

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL PARISH, CURTIS L. OATS,      )
LEILA KHOURY, SEAN DRISCOLL, CARLA   )
LOFTON, ROY CLEAVES, LISA BROWN, DAN )
TAYLOR, DEAN MILLER, KEVIN SANDERS,  )
STACEY CLARK, and CARLOTTE WATSON,   )
                                     )
                  Plaintiffs,        ) No. 07CV4369
                                     )
        vs.                          )
                                     )
SHERIFF OF COOK COUNTY and COOK      )
COUNTY,                              )
                                     )
                  Defendants.        )

        The videotaped deposition of ROY C. CLEAVES,
called by the Defendants for examination, taken
pursuant to notice and pursuant to the Federal Rules of
Civil Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
Teresa Resendez, Certified Shorthand Reporter and
Notary Public, at 500 Daley Center, 50 West Washington
Street, Suite 500, Chicago, Illinois, commencing at
11:00 a.m. on the 10th day of September, A.D., 2009.

        PERSCRIBO REPORTING, INC. (312) 236-9211

```
 1   APPEARANCES:
 2        THOMAS G. MORRISSEY, LTD.
          MR. THOMAS G. MORRISSEY
 3        10249 South Western Avenue
          Chicago, Illinois  60643
 4        Phone:  (773) 233-7900
 5             On behalf of the Plaintiffs;
 6        LAW OFFICE OF KENNETH N. FLAXMAN
          MR. KENNETH N. FLAXMAN
 7        200 South Michigan Avenue
          Chicago, Illinois 60604
 8        Phone:  (312) 427-3200
 9             On behalf of the Plaintiffs;
10        ASSISTANT STATE'S ATTORNEY
          CIVIL ACTIONS BUREAU
11        MR. FRANCIS J. CATANIA
          500 Daley Center
12        50 West Washington Street
          Suite 500
13        Chicago, Illinois  60602
          Phone:  (312) 603-6572
14
               On behalf of the Defendants.
15
16   ALSO PRESENT:  Mr. Brian C. Falk
                    Legal-Ease Video Services
17                  (773) 262-4472
18
19             *    *    *    *    *    *
20
21
22
23
24
```

```
 1                        I N D E X

 2   WITNESS                                   PAGE

 3   ROY C. CLEAVES

 4        Direct Examination by Mr. Catania .....    4

 5        Cross-Examination by Mr. Morrissey ....  128

 6        Redirect Examination by Mr. Catania ...  134

 7

                       E X H I B I T S

 8

     CLEAVES DEPOSITION EXHIBIT

 9

          No. 1 ................................   49

10

          No. 2 ................................   57

11

          No. 3 ................................   76

12

          No. 4 ................................   82

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 4

```
 1        THE VIDEOGRAPHER:  We're going on the video record
 2   at 11:03 a.m.  My name is Brian Falk.  I'm the
 3   videographer from Legal-Ease Video Services in
 4   association with Perscribo Reporting.  My address is
 5   3550 North Lake Shore Drive, Chicago, Illinois.  The
 6   court reporter is Teresa Resendez of Perscribo
 7   Reporting.
 8            This will be the videotaped deposition of Ray
 9   Cleaves taking place --
10        THE WITNESS:  Excuse me.  Roy.
11        THE VIDEOGRAPHER:  -- Roy C. Cleaves taking place
12   on Thursday, September 10th, 2009, at 50 West
13   Washington, Chicago, Illinois.
14            This deposition is being taken in the matter
15   of Michael Parish, Curtis Oats, Leila Khoury, Sean
16   Driscoll, Carla Lofton, Roy C. Cleaves, Lisa Brown, Dan
17   Taylor, Dean Miller, Kevin Sanders, Stacey Clark, and
18   Carlotte Watson vs. The Sheriff of Cook County and Cook
19   County in the U.S. District Court for the Northern
20   District of Illinois, Eastern Division,
21   Case No. 07 CV 4369.
22            This deposition is being taken on behalf of
23   the defendant.  The party at whose instance this
24   deposition is being recorded on an audiovisual
```

Page 5

1    recording device is the defendant.

2         Will Counselors now please announce their

3    appearances for the record.

4         MR. CATANIA:  Francis Catania for the defendants

5    in the case.

6         MR. MORRISSEY:  Thomas Morrissey on behalf of the

7    class.

8         THE VIDEOGRAPHER:  Will our court reporter now

9    swear the witness, please.

10                        (Witness sworn.)

11        THE VIDEOGRAPHER:  Please proceed.

12   WHEREUPON:

13                        ROY C. CLEAVES,

14   called as a witness herein, having been first duly

15   sworn, was examined and testified as follows:

16                        DIRECT EXAMINATION

17   BY MR. CATANIA:

18        Q.   Sir, would you please state your full name

19   and spell your last name for the court reporter.

20        A.   Roy C. Cleaves, C L E A V E S.

21        Q.   And, sir, have you ever been deposed before?

22        A.   Clarify "deposed."

23        Q.   Have you ever answered questions under oath

24   with a court reporter present?

1      A.    Yes.

2      Q.    Okay.  When was the last time that occurred?

3      A.    I don't remember.

4      Q.    Was it a civil case or a criminal case?

5      A.    Criminal.

6      Q.    I'm sorry?

7      A.    Criminal case.

8      Q.    Criminal case.

9            Was it in a courtroom with a judge?

10     A.    Yes.

11     Q.    Okay.  So are you talking about testimony

12  during a criminal trial?

13     A.    During my trial that I was incarcerated

14  recent --

15     Q.    All right.

16     A.    -- the last one that we're on -- we're on --

17  talking about here.

18     Q.    Okay.  Sir, I'm going to be asking you a

19  bunch of questions.  And you are under oath.  The court

20  reporter is taking down all the testimony that's being

21  given.  And you're being videotaped.  Do you understand

22  all of that?

23     A.    Yes.

24     Q.    Do you understand that we need to have a

1   clear record of your testimony for this purpose?

2       A.   Yes.

3       Q.   And do you understand that -- this testimony

4   to be the same as if you were testifying at court with

5   a judge present?

6       A.   Yes.

7       Q.   Do you understand that we're going to have a

8   transcript prepared of your testimony; at some point

9   you'll be able to review that for correctness?  You

10  understand that?

11      A.   Mm-hmm.

12      Q.   And there's also a videotape being prepared

13  for this purpose.  Do you understand that?

14      A.   Yes.

15      Q.   Okay.  You have the right as a deponent to

16  ask for any clarifications or respelling or rephrasing

17  of questions.  All I ask you to do is to inform me if

18  you don't understand something.  And then I will

19  attempt to clarify it for you.  Do you understand that?

20      A.   Yes.

21      Q.   Okay.  You do understand that your answers

22  are under oath?

23      A.   Yes.

24      Q.   And that at some point if you change your

Page 8

1    testimony, there's going to be questions about why

2    you've changed your testimony?

3         A.    Uh-huh.

4         Q.    Okay.  I would ask that you answer all of the

5    questions verbally.  In other words, say "yes" or "no."

6    Don't shrug your shoulders or nod or shake your head

7    because that can't be taken down by the court reporter.

8    Is that okay?

9         A.    Yes.

10        Q.    All right.  Sir, can you tell me, have you

11   ever been known by any other names besides Roy C.

12   Cleaves?

13        A.    No.

14        Q.    Have you ever had any other alias dates of

15   birth besides the one that I believe you're going to

16   tell me now?

17        A.    No.

18        Q.    What is your date of birth?

19        A.    ▆▆▆▆▆▆▆

20        Q.    And, sir, could I have your Social Security

21   number?

22        A.    ▆▆▆▆▆▆▆▆

23        Q.    And, sir, do you have a driver's license?

24        A.    No.

1     Q.   Do you have a state ID card?

2     A.   Yes.

3     Q.   Do you have that with you?

4     A.   Yes.

5     Q.   Could I take a look at it, please?

6     A.   Sure.

7     Q.   You could show it to your attorney first.

8     MR. CATANIA:  I've been handed an Illinois state

9 identification card with the number 4&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608; as

10 in Charles.  The date of birth on the card is the one

11 just given to me, &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;.  The card -- The ID

12 expires &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

13 BY MR. CATANIA:

14     Q.   Now, sir, it says an address of

15 &#9608;&#9608;&#9608;&#9608;&#9608; Keeler Avenue, Apartment 204, Oak Lawn,

16 Illinois 60453.  Is that your current address?

17     A.   Yes.

18     Q.   Okay.  It describes you as being 5, 10;

19 220 pounds; with brown eyes.  Is that all correct?

20     A.   Yes, yes.

21     Q.   And it's also indicated as a duplicate --

22     A.   Yes.

23     Q.   -- identification card?

24     A.   Yes.

Page 10

1    Q.   What happened to the original?

2    A.   Expired.  I lost -- Lost.

3    Q.   All right.  Thank you.  Thank you very much.

4         Sir, aside from that address that we just

5    read into the record, have you had any other addresses

6    within the last five years?

7    A.   No.

8    Q.   Who do you live at that address with?

9    A.   Mother.

10   Q.   What is her name?

11   A.   Frances, same last.

12   Q.   Is that F R A N C E S?

13   A.   Yes.

14   Q.   Could you tell me about your education.

15   What's your highest level of education?

16   A.   First year high school, freshman.

17   Q.   What high school was that?

18   A.   Bogan.

19   Q.   I'm sorry?

20   A.   Bogan, B O G A N.

21   Q.   And that's a public school in Chicago; is

22   that right?

23   A.   Yes.

24   Q.   Have you had any education or GED since then?

1          A.    No.

2          Q.    Okay.  Could you tell me a little bit about

3    your employment.  Are you currently employed?

4          A.    No.  I'm currently on Social Security.

5          Q.    When is the last time you had a job?

6          A.    Five years ago.

7          Q.    Where did you work five years ago?

8          A.    The Tweeter Center, Aramark.

9          Q.    And you're referring to Aramark Corporation?

10         A.    Yes.

11         Q.    And you were working at the location of the

12   Tweeter Center?

13         A.    Yes.

14         Q.    And what city is that located in?

15         A.    Tinley Park.

16         Q.    And what were your job duties at that time?

17         A.    Food and beverages.

18         Q.    Could you tell me the name of your supervisor

19   when you were --

20         A.    No.

21         Q.    -- working that job?

22         A.    I don't remember.  Don't remember.

23         Q.    All right.  We are here to talk about events

24   that are complained of in a civil rights class action

1    lawsuit.  Do you understand why you're here?

2         A.   Yes.

3         Q.   Okay.  The complaint itself mentions that you

4    were arrested in April of 2007?

5         A.   Yes.

6         Q.   Do you remember what date it was you were

7    arrested?

8         A.   No, not approximately.  Seventh, on the 7th,

9    I think.

10        Q.   April 7th of 2007?

11        A.   I'm not positive.  I'm pretty sure.

12        Q.   And what agency arrested you?

13        A.   Eighth district, Chicago.

14        Q.   Do you remember the name of the officer that

15   arrested you?

16        A.   No.

17        Q.   Do you remember anything about the officer

18   that you could use as a description?

19        A.   Big guy.

20        Q.   Anything further?

21        A.   No.

22        Q.   White, black?

23        A.   White.

24        Q.   White?

1      A.   Yeah.

2      Q.   Aside from the date of the arrest, had you

3  seen him since then?

4      A.   No.

5      Q.   Was he present at all during the court

6  proceeding?

7      A.   Yes.

8      Q.   Did you see him at the court proceeding?

9      A.   Yes.

10      Q.   Were there any other officers that assisted

11  in the arrest aside from the big white guy that you

12  described?

13      A.   Not that I could recollect.  It was a few,

14  but I don't know their names or ...

15      Q.   Would you say you would be able to recognize

16  and identify the big white officer that --

17      A.   Possibly.

18      Q.   At the time of your arrest, could you tell me

19  where that location was?

20      A.   Kedzie and Columbus Avenue.

21      Q.   And what time of day was it?

22      A.   Evening, early -- early after- -- early

23  evening, yes.

24      Q.   Prior to that arrest, had you ever been

1    arrested by any other agencies?

2         A.    Yes.

3         Q.    What other agencies?

4         A.    I can't recollect.

5         Q.    Had you ever been arrested by the Chicago

6    police before --

7         A.    Yes.

8         Q.    -- that?

9         A.    Yes.

10        Q.    About how many times?

11        A.    Couple, few, couple, few.

12        Q.    And by a "couple" or a "few," you mean two or

13   three or more than that?

14        A.    Three or more.

15        Q.    Three or more?

16              When you were arrested on March 7th, 2007,

17   were you bought to a police station?

18        A.    Yes.

19        Q.    And at the police station, were you brought

20   to an area where they asked you some questions?

21        A.    No.

22        Q.    Were you booked at the police station?

23        A.    Yes.

24        Q.    Fingerprinted?

1      A.    Yes.

2      Q.    And were you placed in a lockup?

3      A.    Yes.  But --

4      Q.    Do you remember how many officers or other

5  persons were present when you were processed and

6  fingerprinted?

7      A.    The desk sergeant and maybe one or two other,

8  you know ...

9      Q.    Were they all in uniform?

10     A.    Yes.

11     Q.    And to the best of your knowledge, were they

12  all employees of the --

13     A.    Yes.

14     Q.    -- City of Chicago?

15     A.    Yes.

16     Q.    And they were all police officers --

17     A.    Yes.

18     Q.    -- to the best of your knowledge?

19     A.    Yes.

20     Q.    Had you ever seen any of those officers

21  before?

22     A.    No.

23     Q.    Did you have any inkling at all that any of

24  those officers knew you prior to that time?

1     A.   No.

2     Q.   All right.  Do you remember what it was you

3 were arrested for?

4     A.   Possession of a stolen vehicle.

5     Q.   And you knew that at the time that you were

6 first encountered with the police --

7     A.   Yes.

8     Q.   -- is that right?

9     A.   Yes.

10     Q.   On your prior times with the Chicago Police

11 Department, were you also processed by having

12 fingerprints and photographs taken?

13     A.   Yes.

14     Q.   On each of those occasions, were you also in

15 a room with other officers who were asking you

16 questions?

17     A.   Yes.

18     Q.   Questions about your personal history?

19     A.   Yes.

20     Q.   Okay.  In your experience with the Chicago

21 Police Department in the four or more times including

22 this arrest of April 7th, 2007, you were aware that the

23 Chicago police does not dispense medication; is that

24 right?

1    A.    Yes.

2    Q.    Okay.  And if you were in distress, you knew

3  that the Chicago police would have to take you to a

4  hospital if you needed something?

5    A.    Yes.

6    Q.    So they have no facility there for providing

7  medication?

8    A.    Understood.

9    Q.    Okay.  And that is true, right?

10    A.    Yes.

11    Q.    Okay.  At the time of your arrest for

12  possession of a stolen motor vehicle, were you also

13  charged with another offense?

14    A.    Yes.

15    Q.    What was the other offense?

16    A.    Possession of a controlled substance and -- I

17  don't know.  I'm not sure of the other.  I think there

18  was one more.  I don't recollect.

19    Q.    Would it be possession of drug paraphernalia?

20    A.    That's what it was originally, yes.

21    Q.    Okay.

22    A.    It wasn't controlled substance, but they

23  upgraded it when I got to court.

24    Q.    What was that substance?

1      A.   It was a pipe.

2      Q.   And was that a crack pipe?

3      A.   Yes.

4      Q.   And crack is a version of cocaine; is that

5  right?

6      A.   Yes.

7      Q.   And they charged you with that offense

8  originally when you went to court?

9      A.   Yes.

10     Q.   And that's possession of a controlled

11  substance, cocaine?

12     A.   No.  It was possession of paraphernalia.  But

13  when I got to court after I was incarcerated, they

14  upgraded it to possession.

15     Q.   Okay.  That's what I was talking about.  When

16  you got to court --

17     A.   Yes.

18     Q.   -- they charged you with possession --

19     A.   Yes.

20     Q.   -- of a controlled substance?

21     A.   Yeah.  They upgraded it.

22     Q.   All right.  I just want to take one step back

23  a moment.  I didn't ask you.  But have you ever been in

24  the military?

1     A.    No.

2     Q.    Okay.  We've talked about prior arrests.  But

3  I also need to know, have you ever been convicted of

4  any offenses aside from the one you mentioned about

5  possession of a stolen motor vehicle?

6     A.    Yes.

7     Q.    What other offenses?

8     A.    A DUI.

9     Q.    When was that?

10    A.    I don't know.  I don't remember.  It was so

11 long ago, over ten years.

12    Q.    Any other offenses?

13    A.    No, not that I recollect.

14    Q.    Okay.  Have you ever been convicted in -- to

15 your knowledge, of any other felonies aside from

16 possession of a stolen motor vehicle?

17    A.    Yes.

18    Q.    What other felonies?

19    A.    I don't recollect.

20    Q.    And possession of a stolen motor vehicle, to

21 your knowledge, is a felony; is that right?

22    A.    Yes.

23    Q.    And it's a Class II felony?

24    A.    I'm not sure.

1      Q.   All right.  Before you were arrested on

2   April 7th of 2007, had you received any medical

3   treatment by any physician?

4      A.   Yes.

5      Q.   When was the last time before April 7th of

6   2007 that you were treated by a physician?

7      A.   I don't know.  Couple weeks previously.

8      Q.   And what is the physician's name that treated

9   you two weeks prior to your arrest?

10     A.   Dr. Smith, I'm pretty sure.

11          I went to the hospital too a couple times

12   because I moved from Tinley to Oak Lawn.  And my -- my

13   acting physician was -- I was out of his district.

14     Q.   Okay.  Now, you say Dr. Smith.  Do you know

15   his first name?

16     A.   Her.

17     Q.   Her first name.

18     A.   Roseanne.

19     Q.   Roseanne.

20          Do you know what hospital she's affiliated

21   with?

22     A.   Christ.

23     Q.   And that's in Oak Lawn; is that right?

24     A.   Yes.

Page 21

```
 1        Q.    Is she still affiliated with Oak Lawn --

 2        A.    Yes.

 3        Q.    -- Christ Hospital in Oak Lawn?

 4        A.    Yes.

 5        Q.    And what is her specialty?

 6        A.    Family physician.

 7        Q.    Aside from Roseanne Smith, who you saw two

 8   weeks prior to being arrested in April of '07, had you

 9   seen any other medical provider?

10        A.    Yes.

11        Q.    What other provider?

12        A.    Dr. Bonguard.

13        Q.    And could you spell the name for me?

14        A.    B O N G U A R D.

15        Q.    Do you know the first name?

16        A.    No.

17        Q.    Male or female?

18        A.    Male.

19        Q.    And do you know what -- Is that doctor

20   affiliated with any hospitals?

21        A.    No.  Grand Prairie Services.  Grand Prairie

22   Services.  That was my psychiatrist.

23        Q.    When was the last time you saw Dr. Bonguard

24   at Grand Prairie Services before this arrest?
```

1  A. Probably six months, six months.

2  Q. And you described him as your psychiatrist --

3  A. Yes.

4  Q. -- is that right?

5  A. Yes.

6  Q. And do you know that he is a psychiatrist as

7 opposed to a psychologist?

8  A. Yes.  I know the difference.  He's a

9 psychiatrist.

10  Q. Okay.  And do you know where Grand Prairie

11 Services is located?

12  A. It's like Lincoln and Halsted.  Lincoln

13 Highway is about 200, I think.

14  Q. Lincoln Highway?

15  A. Yes.

16  Q. Do you know what city that is?

17  A. I think it's Hazel Crest.  I'm not sure.  I'm

18 not sure.

19  Q. Do you still go to Grand Prairie Services?

20  A. No, no.

21  Q. Okay.  Are you still obtaining psychiatric

22 services?

23  A. Yes.

24  Q. Where?

1        A.     At -- Through Christ.

2        Q.     When is the last time you saw a treater at

3   Christ for psychiatric services?

4        A.     A month.

5        Q.     And you're talking one month prior to today;

6   is that right?

7        A.     Yes, yes.

8        Q.     What type of treatment did you have at that

9   time?

10       A.     For my medication.

11       Q.     Okay.  Did you just have a renewal of your

12   medication?

13       A.     About a month ago.

14       Q.     What was that medication?

15       A.     Seroquel and Klonopin.

16       Q.     Could you spell the second one for me?

17       A.     No.  You could probably spell as good as me.

18       Q.     And you said it was Klonopin; is that right?

19       A.     Klonopin, yes.  K or C.

20       Q.     When was the last time you were prescribed

21   the Klonopin?

22       A.     Last month.

23       Q.     Okay.  When is the first time you were

24   prescribed Klonopin?

1      A.   Four years ago.

2      Q.   Who prescribed it first?

3      A.   Dr. Bonguard.

4      Q.   And where did you have the prescription

5 filled?

6      A.   Walgreens.

7      Q.   Do you know why Klonopin was prescribed to

8 you?

9      A.   For panic attacks.

10     Q.   And you're currently on that medication?

11     A.   Yes, sir.

12     Q.   All right.  And did you take your

13 medication --

14     A.   Yes.

15     Q.   -- timely for today?

16     A.   Yes.

17     Q.   And the same thing with the Seroquel?  You

18 took that today?

19     A.   Yes.  Every day.

20     Q.   Do those medicines give you any difficulty in

21 answering questions today?

22     A.   Sometimes.  All depends.

23     Q.   But now you feel okay; is that right?

24     A.   For the moment.

1      Q.    All right.  Did you also get the prescription

2   Seroquel four years ago?

3      A.    Yes.

4      Q.    And have you consistently had Seroquel and

5   Klonopin prescribed --

6      A.    Yes.

7      Q.    -- for you since then?

8      A.    Yes.

9      Q.    All right.  When you were arrested, did you

10  have either one of those medicines with you?

11     A.    No.

12     Q.    Did you have any prescriptions for those

13  medications with you when you were arrested?

14     A.    No, no.

15     Q.    So there would be no property list that would

16  say that you had those?

17     A.    No, no.

18     Q.    The medications that you're talking about,

19  the Seroquel and the Klonopin, what is the Seroquel

20  for?

21     A.    Voices.  I hear voices.

22     Q.    Is that your understanding of the reason for

23  it?

24     A.    Just about.

1      Q.   Okay.  And when you say "voices," are you

2   referring to thoughts that you have or are you talking

3   about auditory?

4      A.   Auditory.

5      Q.   So you're saying you have some auditory --

6      A.   I hear voices at times, yes.

7      Q.   Okay.  As opposed to thoughts; is that right?

8      A.   Right, right.

9      Q.   When did you first encounter hearing voices

10   at times?

11      A.   Approximately four to five years ago.

12      Q.   And do you hear them consistently?

13      A.   Not while I'm on the medications, no.

14      Q.   Have you ever gone a period of time where

15   you've not taken Seroquel?

16      A.   Not -- No, not -- Not no lengthy periods.

17      Q.   Have you --

18      A.   Until I was incarcerated.

19      Q.   Have you ever missed a dose aside from being

20   incarcerated?

21      A.   No.

22      Q.   So your doses are daily; is that right?

23      A.   Yes.

24      Q.   Okay.  What is the dosage size that you take?

1     A.   200 milligrams of Seroquel.  And I'm not sure

2  about the Klonopins.  I know they're yellow.  I think

3  they're one gram or one -- one milligram, I think.

4     Q.   All right.  Do you have any habit as to how

5  and when you take the medication?

6     A.   I need it every day.

7     Q.   What is your habit?

8     A.   Three times a day.

9     Q.   Three times a day?

10    A.   Yes.

11    Q.   Both of them?

12    A.   Yes.

13    Q.   What was the time that you last took it on

14 April 7th of 2007?

15    A.   I didn't.  I didn't take it that day.

16    Q.   Okay.  When was the last time before

17 April 7th, 2007, that you took your --

18    A.   Couple days.  I had just ran out of my

19 prescription.  I was in the process of being -- having

20 it renewed.

21    Q.   When did the prescription run out?

22    A.   About the 4th or -- the 4th.

23    Q.   So approximately April 4th of '07 --

24    A.   Yeah.

Page 28

1        Q.    -- you ran out?

2        A.    Yes.

3        Q.    Did you have any appointments with the doctor

4   between April 4th and April 7th --

5        A.    I don't remember.

6        Q.    -- of '07?

7        A.    Not that I recollect.  I'm sure I did.  But

8   as I said, I was going to the hospital.  After I was

9   out of Dr. Bonguard's zone, I was going to the hospital

10  for my prescriptions once a month.

11       Q.    That would be Christ Hospital?

12       A.    Yes, yes.  In emergency.

13       Q.    All right.  You've mentioned these two

14  locations?

15       A.    Right.

16       Q.    Grand Prairie and Christ?

17       A.    Right.

18       Q.    Has anyone at Christ ever prescribed Seroquel

19  to you?

20       A.    Yes.

21       Q.    And Klonopin?

22       A.    Yes.

23       Q.    Okay.  Are you going to Grand Prairie at all

24  anymore?

Plaintiffs' Exhibit 52                                    Page 28

1      A.   No.

2      Q.   Okay.  Are those the only two locations

3  you've been seeking psychiatric treatment?

4      A.   Yes.

5      Q.   All right.

6      A.   I'm in the midst of -- I'm in the process of

7  going to see another psychiatrist on the 21st.  I don't

8  have his name with me.  I -- It's on 111th and Western.

9  But, see, I'm -- He's a regular psychiatrist, which my

10  family physician more or less insisted that I went to

11  see the proper, you know, physician.  So he didn't --

12      Q.   So you're going to be going right near

13  Mr. Morrissey's office, then?

14      A.   I don't know where his office is.

15      Q.   South Western Avenue.

16      A.   Oh, okay.  Well, fine.  I just met

17  Mr. Morrissey so ...

18      Q.   Could you tell me again when it was that you

19  were first identified as having a problem with hearing

20  voices?

21      A.   Four to five years ago, panic attacks.

22      Q.   The location of that place.

23      A.   Tinley Park.

24      Q.   And was the doctor that -- that first

1    diagnosed you as having panic attacks or needing

2    Seroquel, what was the name of that doctor?

3         A.   I don't know.  I don't recollect.

4         Q.   All right.  And the name of the place you

5    went to in Tinley Park?

6         A.   It was Tinley Park mental institution.

7         Q.   Were you ordered to go to Tinley Park mental

8    institution?

9         A.   I was taken there.

10        Q.   By?

11        A.   By Christ Hospital.

12        Q.   Okay.  What was your reason for going to

13   Christ Hospital?

14        A.   Attempted suicide.

15        Q.   Where did you attempt suicide?

16        A.   In a vehicle.  I don't know.  I don't

17   remember where.

18        Q.   Was it the same day of the attempt suicide

19   that you went to Christ Hospital?

20        A.   Yes.

21        Q.   And then on the same day, were you brought to

22   the Tinley Park location?

23        A.   Yes.

24        Q.   And you don't remember the name of the

Page 31

1    treater for that; is that right?

2         A.   No.

3         Q.   Or the name of the place, Tinley Park mental

4    institution?

5         A.   No.  It was on Harlem, I think.  I don't

6    know.  It was in Tinley Park.  It's -- There's records.

7    There's records.

8         Q.   You have records of those things?

9         A.   Yes, I do.

10        Q.   Okay.  Have you provided those to your

11   lawyer?

12        A.   No.

13        Q.   Okay.

14        A.   No.  I'm not even sure if I still have them,

15   you know.  It's so long ago.

16        Q.   Any records that you have, medical records,

17   since this case involves a medical question including

18   your treatment, would you please retain those records

19   and provide them to your attorney so he can provide

20   them to me?

21        A.   Sure.

22        Q.   All right.

23        A.   I gave him records that I'm -- On previous --

24   I gave him copies that I'm previously on -- I'm pretty

Page 32

1    sure -- that I'm previously on Social Security, yes.

2         Q.   Okay.  So you do have -- You have provided

3    some records to your lawyer?

4         A.   Yes.

5         Q.   All right.  Is there any reason why those

6    records have not been provided to me, to your

7    knowledge?

8         A.   No.

9         MR. MORRISSEY:  Objection.

10   BY MR. CATANIA:

11        Q.   Could you tell me if anyone in your family

12   was prone to any mental illness, to your knowledge?

13        A.   No.

14        Q.   No other persons?

15        A.   No.

16        Q.   Have you ever been diagnosed as having any

17   problem with substance abuse?

18        A.   No.

19        Q.   You mentioned that you had been arrested at

20   some point for a DUI.  Was that DUI alcohol or some

21   other form?

22        A.   Alcohol.

23        Q.   And you don't remember exactly when that was,

24   but you said it was more than ten years ago?

Page 33

```
 1        A.   Yes.

 2        Q.   Is that when you lost your license?

 3        A.   No.

 4        Q.   When did you lose your license?

 5        A.   I don't recollect.

 6        Q.   Okay.  And your license is currently revoked;

 7   is that right?

 8        A.   Yes.

 9        Q.   Was it revoked after April --

10        A.   Suspended.

11        Q.   -- 7th of 2007?

12        A.   No.

13        Q.   It was back -- It was before that?

14        A.   Prior, yes.

15        Q.   Okay.  So at the time that you were arrested

16   in April of 2007, did you have a valid Illinois

17   license?

18        A.   No.

19        Q.   Were you also charged with driving while

20   license suspended or revoked?

21        A.   Yes.

22        Q.   What happened with that case, the driving

23   while license suspended or revoked?

24        A.   It was thrown out.
```

Page 34

1      Q.   Was that part of a -- some type of plea

2  agreement --

3      A.   Yeah, yes.

4      Q.   And by "plea agreement," I mean that you pled

5  guilty after negotiating with the prosecutor.  Is that

6  right?

7      A.   Yes.

8      Q.   All right.  All right.  You mentioned that

9  you had run out of your medications about April 4th of

10  2007?

11      A.   Yes, yes.

12      Q.   Had it ever happened to you prior to that or

13  before that --

14      A.   No.

15      Q.   -- that you ran out of medication?

16      A.   No, no.

17      Q.   So until that point, you had always

18  consistently maintained your prescription?

19      A.   Yes.

20      Q.   All right.  Have you always filled your

21  prescription at the same location?

22      A.   Yes, approximately.  It's Walgreens or, you

23  know ...

24      Q.   What Walgreens did you refill at?

1      A.   On 95th and Cicero.

2      Q.   The medication that you are taking and were

3  taking in April 2007, was it effective for the purpose

4  you were taking it for?

5      A.   Yes.

6      Q.   And that was to quiet the voices?

7      A.   Yes.

8      Q.   And to reduce the panic attacks?

9      A.   Yes.

10     Q.   Okay.

11     A.   Paranoia, schizophrenia.

12     Q.   Now, you just mentioned something else to me,

13  paranoia, schizophrenia?

14     A.   Yes.

15     Q.   Okay.  Has any physician or psychiatrist ever

16  diagnosed you with paranoia?

17     A.   Yes.

18     Q.   Who has?

19     A.   Same doctor, Bonguard, Bonguard.

20     Q.   When was that diagnosis first made?

21     A.   The same time as with the last.

22     Q.   At the same time as what?

23     A.   The present.  All my other medication, so

24  just ...

1      Q.    All right.  When you were prescribed

2  originally the Seroquel --

3      A.    Yes.

4      Q.    -- that's when the diagnosis was made?

5      A.    Yes, yes.

6      Q.    Okay.  And those records are records that you

7  have, the diagnosis records?

8      A.    Yes.

9      Q.    All right.  And you've provided those to your

10 attorney?

11     A.    Yes.

12     Q.    Aside from the these prescriptions, have you

13 undertaken any other treatment or self-treatment for

14 the symptoms you've talked about?

15     A.    No.

16     Q.    No?

17     A.    No.

18     Q.    Have you ever self-medicated with alcohol?

19     A.    No.

20     Q.    Have you ever taken other illicit drugs such

21 as cocaine or heroine?

22     A.    No.  I don't understand the question.  Go --

23 come again with it.

24     Q.    Sure.  You understand that the drugs Seroquel

1   and Klonopin are prescribed by a physician for you --

2        A.   Yes.

3        Q.   -- right?

4             Have you ever taken any other medications,

5   either legal or illegal medications, that were not

6   prescribed by a physician?

7        A.   No.

8        Q.   Okay.  Have you ever taken -- Have you ever

9   undertaken any other mental health treatment aside from

10  medication?

11       A.   No.

12       Q.   Have you ever employed any kind of a diet and

13  exercise program?

14       A.   No.

15       Q.   Aside from the attempt suicide from -- I

16  believe you said it was four to five years ago?

17       A.   Yes.

18       Q.   (Continuing) -- have you ever attempted

19  suicide since then?

20       A.   No.

21       Q.   Can you tell me what it was you attempted to

22  do in the suicide?

23       A.   Cut my throat.

24       Q.   What were you attempting to cut it with?

Page 38

1    A.   A knife.

2    Q.   And that was in a car?

3    A.   Yes.

4    Q.   Was it your car?

5    A.   Yes.

6    Q.   What type of car was it?

7    A.   I don't know.  Chevy.

8    Q.   Do you currently own any motor vehicles?

9    A.   No.

10    Q.   Does your mother own any motor vehicles?

11    A.   No.

12    Q.   Does anyone own any motor vehicles in their

13   name but for you?

14    A.   No.

15    Q.   From the time that the attempt suicide

16   occurred until April 7th of 2007, had you had any other

17   occurrences when you were not taking medication?

18    A.   No.

19    Q.   So you've always consistently taken

20   medication until that time?

21    A.   Until my incarceration.

22    Q.   Okay.  Until your prescription ran out; is

23   that right?

24    A.   Yes.  And that's -- That was only a couple

1   days before my incarceration.

2       Q.   All right.

3       A.   Then I received none.

4       Q.   And we're still talking about Seroquel and --

5       A.   Yes.

6       Q.   -- Klonopin?

7       A.   Yes.

8       Q.   All right.  Those four -- Those two or three

9   days between when your prescription ran out and the

10  time of your incarceration by the Chicago Police

11  Department, did you have any symptoms during that

12  period of time?

13      A.   Not too many.

14      Q.   Okay.  Have you ever attended any drug

15  classes or drug rehabilitation classes at all?

16      A.   Yes.  AA.

17      Q.   AA?

18      A.   Yes.

19      Q.   When did you do that?

20      A.   On and off for years.

21      Q.   Currently you're on parole; is that right?

22      A.   Yes.

23      Q.   Is there any particular program that you're

24  involved with as a condition of your parole?

1     A.   No.  Just seeing, you know, psychiatric help.

2  That's counseling.

3     Q.   All right.  When you were in the custody of

4  the Illinois Department of Corrections, did you have

5  any programs that you were involved in?

6     A.   No.

7     Q.   No programs?

8     A.   No.

9     Q.   Okay.  No drug treatments?

10    A.   No.

11    Q.   No alcohol abuse treatments?

12    A.   No.

13    Q.   All right.  Had you been diagnosed by any

14  physicians while incarcerated in the Illinois

15  Department of Corrections?

16    A.   I went to one, yeah, but they didn't give me

17  no medication.  It's all I wanted, was my medication.

18    Q.   Okay.

19    A.   Because I was going through --

20    Q.   All right.

21    A.   All my symptoms were coming up.

22    Q.   Just for clarity's sake, when was it that you

23  were sent to the Illinois Department of Corrections?

24    A.   The prison, you mean?

1      Q.    Yes.

2      A.    Three months prior to my arrest.  I was in

3   Cook County for three months.

4      Q.    Okay.  So you were in Cook County, and then

5   three months after your arrest you went to the Illinois

6   Department of Corrections?

7      A.    Yes, yes.

8      Q.    So approximately, I think the complaint says,

9   in July of 2007; is that right?

10      A.    Yes.

11      Q.    Okay.  And you are saying that at the time

12   that you were sent to the Illinois Department of

13   Corrections that you were not getting any medication

14   for your symptoms?

15      A.    As soon as I got out of Cook County and I

16   went to Logan, I was not getting no medication

17   except -- but Trazodone, which didn't do nothing.

18      Q.    Okay.  Was there a physician that prescribed

19   Trazodone to you?

20      A.    Yes.

21      Q.    And what is Trazodone; do you know?

22      A.    No.

23      Q.    Who was the physician --

24      A.    I don't know.

1      Q.   -- that prescribed it?

2      A.   I don't know.

3      Q.   Was it an employee of Cook County --

4      A.   Yes, yes.

5      Q.   -- or an employee of Logan?

6      A.   Cook County.

7      Q.   Cook County.  Okay.

8           And do you remember when it was that you saw

9    the physician that prescribed Trazodone?

10     A.   No.

11     Q.   All right.  Have you looked at any records in

12   preparation for this deposition today?

13     A.   No.

14     Q.   Have you seen any documents or pieces of

15   paper --

16     A.   Yes.

17     Q.   -- in preparation --

18          What documents have you seen?

19     A.   My hospital report, my diagnosis, whatever.

20     Q.   The ones that your attorney brought with him?

21     A.   Yes, yes.

22     Q.   And those are parts of the medical chart from

23   Cermak Health Services; is that right?

24     A.   I'm not sure.

Page 43

1       THE WITNESS:  Why don't guys help me out here a

2  little bit.

3  BY THE WITNESS:

4       A.   No, I don't know.

5       Q.   Well, I'm going to be marking and showing you

6  an exhibit in a few minutes --

7       A.   Fine.

8       Q.   -- and then we'll cover that again.

9       A.   Fine.

10      MR. MORRISSEY:  Can we take a few-minutes break

11 for a moment?  I want to talk to my client.

12      MR. CATANIA:  Do you need to take a break, sir?

13      THE WITNESS:  Yes.

14      MR. CATANIA:  All right.  Then we can take a

15 break.

16          But, Tom, I just want you to understand that

17 under the federal rules, coaching is not permitted.

18 And I will be asking questions about your conversation.

19      MR. MORRISSEY:  Well, we can take a break.

20      MR. CATANIA:  Thank you.

21      THE VIDEOGRAPHER:  Going off the video record at

22 11:36 a.m.

23                     (Discussion off the record.)

24      THE VIDEOGRAPHER:  We're back on the video record

1    at 11:41 a.m.

2    BY MR. CATANIA:

3        Q.   Mr. Cleaves, are you doing okay now?

4        A.   Yes, I'm doing a little better.

5        Q.   We took a little break.

6        A.   Yeah.

7        Q.   And did you have a chance to use the bathroom

8    or whatever you needed to do?

9        A.   Yes, yes.

10       Q.   Now, I was asking you what documents you

11   looked at before coming to this deposition today.  You

12   mentioned that there was some medical records you

13   looked at?

14       A.   Briefly.

15       Q.   And those are the records that you got --

16   that you saw with your lawyer; is that right?

17       A.   Yes.

18       Q.   All right.  Had you ever seen those medical

19   records before today?

20       A.   Yes.

21       Q.   Had you seen them at his office before today?

22       A.   I'm not sure.

23       Q.   Okay.  Aside from feeling a little bit

24   anxious about this deposition, did you discuss anything

1    else about the deposition with the attorneys?

2         A.    No.

3         Q.    All right.  Now I'm going to move to your

4    incarceration in the Cook County Department of

5    Corrections because that's what this lawsuit is

6    directly about.  Okay?

7              You were arrested by Chicago and you were

8    transported to a bond court hearing; is that right?

9         A.    Yes.

10        Q.    Was that at 26th and California?

11        A.    Yes.

12        Q.    Was that in front of a judge or via video

13   bond court system?

14        A.    A judge.

15        Q.    In front of a judge?

16        A.    Yes.

17        Q.    Okay.  And at that time -- Do you remember

18   the name of the judge?

19        A.    No.

20        Q.    All right.  Was it a female judge?

21        A.    No.

22        Q.    Male judge?

23        A.    Yes.

24        Q.    At the bond hearing?

1     A.   Yes.

2     Q.   All right.  And your bond was set at $30,000;

3  is that right?

4     A.   Yes.

5     Q.   You did not post bond, right?

6     A.   No.

7     Q.   So you were then processed into the Cook

8  County Jail?

9     A.   Yes.

10    Q.   Is that the first time you were ever

11  processed into Cook County Jail?

12    A.   No.

13    Q.   You had been to the jail before; is that

14  right?

15    A.   Yes.

16    Q.   All right.  When you got to the processing

17  area of the jail, you walked there, is that right --

18    A.   Yes.

19    Q.   -- from the court?  Okay.

20        When you got there, did you see anybody there

21  that you recognized as people you had seen before?

22    A.   No.

23    Q.   Did you know any of the correctional officers

24  from before?

Page 47

```
1        A.    No.

2        Q.    Did you know any of the mental health

3   specialists from before?

4        A.    No.

5        Q.    Did you know any correctional medical

6   technicians before?

7        A.    No.

8        Q.    Did you notice any persons other than those

9   in the blue uniform of corrections that were in the

10  area where you were processed?

11       A.    No.

12       Q.    All right.  Were you spoken to by anyone

13  other than correctional officers in uniform?

14       A.    No.

15       Q.    Are you certain that you never spoke to

16  anybody?

17       A.    No.

18       Q.    In your --

19       A.    Yes.  Yes, I'm sure.

20       Q.    Okay.  In your complaint, one of the things

21  that you allege is that you had informed people about

22  the drugs that you were on, right?

23       A.    Yes.

24       Q.    Do you remember who it was that you informed
```

Page 48

1    about the medicines?

2        A.   No.

3        Q.   Can you describe the person that you first

4    informed --

5        A.   No.

6        Q.   -- about the medicines?

7             Had you informed anybody at the Chicago

8    police station about medicines?

9        A.   Yes.

10       Q.   Who did you inform?

11       A.   The desk sergeant.

12       Q.   Was that after you were fingerprinted?

13       A.   Yes.

14       Q.   After you were photographed?

15       A.   Yes.

16       Q.   After you were placed in a lockup?

17       A.   Yes.

18       Q.   Under what circumstances did the desk

19   sergeant talk to you about medicines?

20       A.   I informed him.

21       Q.   Okay.  Did you inform the lockup keeper that

22   you were on medicines?

23       A.   Yes.

24       Q.   Okay.  Do you know the lockup keeper?

1     A.   No.

2     Q.   Do you know the name of any of the officers

3 that arrested you and processed you?

4     A.   No.

5     MR. CATANIA:  Okay.  I'm going to ask the court

6 reporter to mark this exhibit.

7                (Cleaves Deposition Exhibit No. 1

8                 marked as requested.)

9 BY MR. CATANIA:

10    Q.   I'm going to show you what's been marked as

11 Exhibit 1 for this deposition.  Cleaves 1 is what it's

12 marked, today's date.  I'm showing a copy to your

13 attorney.

14       And, sir, I know you've never seen this type

15 of record before today.  But I just want to ask you if

16 you recognize the photograph that's on the right side

17 under the word "mug shot."

18    A.   Yes.

19    Q.   And who is that?

20    A.   Me.

21    Q.   Okay.  Can you tell me what date is on the

22 arrest record.  It's in the upper right-hand area.  Do

23 you see where I'm pointing to here?

24    A.   Oh, yeah.  April 7th.

Page 50

1        Q.   Could that be April 5th --

2        A.   '07.

3        Q.   -- of '07?

4             Five --

5        A.   Five, yes.

6        Q.   Okay.  And the time that's on there, it says

7   approximately 23:05 --

8        A.   20 --

9        Q.   -- hours?

10       A.   Yes, yes.

11       Q.   Does that refresh your memory as to the date

12   and time of your arrest by Chicago police?

13       A.   Yes.

14       Q.   Okay.  I would ask you to turn to page 3 of 4

15   pages.  And as soon as you're there, on that page

16   you'll see a box in the bottom which says

17   "Involved Employees Information."  Do you see that box?

18       A.   No.  Where?

19       Q.   It is right here.

20       A.   Okay.

21       Q.   Okay.  "Involved Employees Information," do

22   you see that?

23       A.   Yeah.

24       Q.   Okay.  And there's, under it, listed several

1    names, Employee Role.  It says "1st Arresting Officer."

2         A.    Yeah.

3         Q.    The last name Bickham, Robert.

4         A.    Yes.

5         Q.    Do you know Robert Bickham?

6         A.    No.

7         Q.    Okay.  And 2nd Arresting Officer, it says

8    Westcott, Logan.

9         A.    Yes, yes.

10        Q.    Do you know a Logan Westcott?

11        A.    No, no.

12        Q.    Do you see the name down below that says

13   Lockup Keeper, Solis, Juan?

14        A.    Yeah.

15        Q.    And Searched By Solis, Juan?

16        A.    Yes.

17        Q.    Do you know Juan Solis at all?

18        A.    No.

19        Q.    Do you know Joseph Henderson, Sr.?

20        A.    No.

21        Q.    He's the one that took your fingerprints

22   according to this --

23        A.    No.

24        Q.    -- is that right?

Page 52

1          Do you see that last name down there?  It

2   says "Fingerprinted By" --

3       A.   Yes.

4       Q.   -- "Henderson, Sr."?

5       A.   Yes.

6       Q.   All right.  Now I'm going to ask you to turn

7   back one page where it says "Arrestee Questionnaire."

8   Do you see where it says "Arrestee Questionnaire"?

9       A.   Yes.

10      Q.   And under the first question, it says,

11  Question 1, "Presently taking medication?"  And the

12  response, what does that say?

13      A.   No.

14      Q.   All right.  And below that it says, number 3,

15  "First time ever been arrested?"  The answer?

16      A.   No.

17      Q.   And that was true; is that right?  It was not

18  the first time?

19      A.   Yes.

20      Q.   All right.  And below that, 4, "Attempted

21  suicide/serious harm?"

22      A.   Yes.

23      Q.   Do you see that?  What's the answer?

24      A.   No.  Incorrect.

Page 53

1      Q.   And below that it says "Are you receiving

2  treatments?"  And the answer below -- next to that?

3      A.   No.  Incorrect.

4      Q.   All right.  And number 5, it says "Serious

5  medical or mental problems?"  The answer?

6      A.   No.  Incorrect.

7      Q.   All right.  So those responses appear on the

8  Chicago Police Department arrest report for April 5 of

9  '07?

10     A.   Yes.

11     Q.   All right.  And the people that processed you

12 into the Chicago police jail at that time were unknown

13 to you; is that right?

14     A.   Yes.

15     Q.   Okay.

16     A.   Could I ask you a question?

17     MR. MORRISSEY:  No.  There is no question pending.

18     THE WITNESS:  I apologize.

19     MR. MORRISSEY:  It's not your role.

20 BY MR. CATANIA:

21     Q.   At any time did you tell the person at the

22 Chicago Police Department lockup that you were under

23 any medication?

24     A.   Yes.

Page 54

1     Q.    Okay.   It says nothing about that here --

2 there, is that right, in the report?

3     A.    Yes.

4     Q.    Okay.   Is the report incorrect or false?

5     A.    Incorrect.

6     Q.    All right.   You say you told somebody after

7 you were in the lockup?

8     A.    Yes.

9     Q.    Where was that?   Where did that conversation

10 take place?

11     A.    63rd and St. Louis.

12     Q.    And where in the police station at 63rd and

13 St. Louis did that conversation take place?

14     A.    At the desk and in the -- when I was locked

15 up in the cell.

16     Q.    So you're saying that you told a Chicago

17 police officer at the desk, the desk sergeant --

18     A.    Yes, yes.

19     Q.    -- and the lockup keeper that you were on

20 medication?

21     A.    Yes.

22     Q.    What medications did you tell them you were

23 on?

24     A.    Seroquel and Klonopin.

Page 55

1      Q.   Okay.  And yet this arrest report doesn't

2  indicate that; is that right?

3      A.   No.

4      Q.   All right.  Now, when you arrived at the Cook

5  County Jail it was actually a couple of days later;

6  isn't that right?

7      A.   Couple days later of what?

8      Q.   From that arrest.

9      A.   Yes.

10     Q.   Okay.  In fact, you entered the Cook County

11 Department of Corrections on April 7th of 2007?

12     A.   Yes.

13     Q.   So the arrest of April 5th, 2007, to the --

14 to the processing time of April 7th of 2007, where were

15 you?

16     A.   63rd --

17     Q.   So you --

18     A.   -- and St. Louis.

19     Q.   You spent those couple of days at --

20     A.   Yes.

21     Q.   -- 63rd and St. Louis?

22     A.   In the hospital.

23     Q.   What hospital did you go to?

24     A.   Holy Cross.

1      Q.   Where is Holy Cross Hospital located?

2      A.   Chicago, 69th and California.

3      Q.   So are you telling me now that you went from

4 the police station at 63rd and St. Louis to Holy Cross

5 Hospital before you went to the Cook County Jail?

6      A.   Yes.

7      Q.   Who transported you there?

8      A.   Chicago, 8th district.

9      Q.   What time of day were you transported to the

10 hospital?

11     A.   Evening, late evening.

12     Q.   Were you seen by any physicians at Holy Cross

13 Hospital?

14     A.   Yes.

15     Q.   Do you remember those physicians' names?

16     A.   No.

17     Q.   Were you seen in the emergency room?

18     A.   Yes.

19     Q.   So there will be a record from Holy Cross

20 Hospital, to the best of your knowledge, right?

21     A.   Yes.

22     Q.   What were you seen at Holy Cross Hospital

23 for?

24     A.   Panic attacks and voices, my medication.

Page 57

1    Q.   Did you provide any information to your

2  lawyers about Holy Cross Hospital?

3    A.   Yes.

4    Q.   I'm going to show you what's going to be

5  marked number 2.

6                    (Cleaves Deposition Exhibit No. 2

7                     marked as requested.)

8  BY MR. CATANIA:

9    Q.   I've already given a copy of this to your

10 attorney, but I'm going to ask you if you -- Have you

11 ever seen any of these documents that I put in front of

12 you, which is a group exhibit marked Cleaves 0001 to

13 Cleaves 0044 with the exception of 0003?  Have you seen

14 this document on page 1 before today?

15   A.   No.

16   Q.   And page 2, have you ever seen that before

17 today?

18   A.   Not that I recollect.

19   Q.   All right.  The person that you spoke to

20 about your problems when you first entered into the

21 receiving area that was not in the blue uniform of the

22 Department of Corrections, was that person a short

23 African-American medical technician?

24   A.   What -- Repeat that, please.

1      Q.    In receiving --

2      A.    Yes.

3      Q.    -- into the jail, did you speak with a short

4   African-American medical technician who was not in a

5   police -- in a Department of Corrections uniform?

6      A.    At 8th district, are you talking about?

7      Q.    No.  I'm talking about at the jail, Cook

8   County Jail.

9      A.    Not that I recollect.

10     Q.    All right.  Did you talk with a female about

11  your mental health conditions at all during that time?

12     A.    Not that I recollect.

13     Q.    Do you know anyone named James Myvet, a

14  correctional medical technician at the jail?

15     A.    No.

16     Q.    All right.  You see in the upper right-hand

17  corner, it's got a date.  Could you tell me what date

18  is listed on that first page?

19     A.    4/7/07.

20     Q.    And that comports with the date that you

21  believe you entered the jail; is that right?

22     A.    Yes.

23     Q.    All right.  On the left side, there's a

24  little sticker.  Right below the UPC code, it's got a

1   name on it.  Could you read that name?

2          A.    Where is that now?

3          Q.    Right below the code.

4          A.    Yeah.

5          Q.    Could you read the name?

6          A.    There is no name.

7          Q.    Right where I'm indicating.

8          A.    Oh, yeah, me, Roy Cleaves.

9          Q.    Okay.  And below that, it's got a date of

10   birth.

11         A.    3/24/57.

12         Q.    That's your date of birth?

13         A.    Yes.

14         Q.    And so you are 51 years old?

15         A.    Two.

16         Q.    52 years old?

17         A.    Yes.

18         Q.    And it has next to that a symbol that says

19   BKDT and after that a date; is that right?

20         A.    Yes.

21         Q.    And that date is also April 7th of '07?

22         A.    Yes.

23         Q.    All right.  That form, does anything on that

24   form appear to be something that you wrote on?

1      A.    No.

2      Q.    How about in the box that says "Consent for

3  treatment"?  Do you see anything there that's your

4  writing?  Let me help you out.

5      A.    Yes, that's my signature.

6      Q.    That's your signature; is that right?

7      A.    Yes.

8      Q.    And so you saw this page at least one time

9  when you wrote your signature on it?

10     A.    Yes.

11     Q.    Do you see on the left side, there's --

12  there's a medical history and there's a series of

13  things that are numbered --

14     A.    Yes.

15     Q.    -- 1 through 15?  Do you see that?

16     A.    Yes.

17     Q.    And those things identify certain medical

18  problems that a person might have; is that right?

19     A.    Yes.

20     Q.    And next to that is a column that says "yes"

21  and a column that says "no"?

22     A.    Yes.

23     Q.    And there's one that's identified that says

24  on number 8 "Mental Illness."

Page 61

```
 1          A.    Yes.

 2          Q.    Do you see that?

 3          A.    Yes.

 4          Q.    And then on the right side of that, there is

 5    an 8 and a circle and it says "bipolar disorder."

 6          A.    Yes.

 7          Q.    Did you tell the medical technician that --

 8    that you appeared in front of that you had bipolar

 9    disorder?

10          A.    Yes.

11          Q.    And below it says "Current Problems," and

12    it's numbered 1 through 9.  Do you see that?

13          A.    Yes.

14          Q.    And number 1 says "On Medications."

15          A.    Yes.

16          Q.    And then it says "List."  Do you see that?

17          A.    Yes.

18          Q.    It's marked "yes"?

19          A.    Yes.

20          Q.    And next to that is a number 1 and something

21    called Seroquel.

22          A.    Yes.

23          Q.    Do you see that?

24          A.    Yes.
```

1      Q.    Did you tell the medical technician that you

2    were taking Seroquel at that time?

3      A.    Yes.

4      Q.    The person you told those two things to, can

5    you describe that person?

6      A.    No.

7      Q.    Do you think you would recognize him if you

8    saw him again?

9      A.    No.

10     Q.    And on the right side of that page next to

11   where it says "Seroquel," it says "Allergies."  Do you

12   see that?

13     A.    Yes.

14     Q.    And it says NK, and that's actually cut off

15   A.  NKA.

16     A.    Yes.

17     Q.    Do you know what that means?

18     A.    No.

19     Q.    If I told you that it says "no known

20   allergies," would that be correct?

21     A.    Yes.

22     Q.    And below, it says in the Comments section --

23   in quotes it says "Patient denies any current

24   distress."  Do you see that?

Page 63

 1      A.   Yes, I see it.

 2      Q.   And did you tell the person who asked you the

 3  questions that you were not suffering any distress at

 4  that time?

 5      A.   No, I didn't.

 6      Q.   You did not?  Okay.

 7           And below that, it's got a time.  Do you see

 8  that?

 9      A.   Yes.

10      Q.   6:55 p.m.?

11      A.   Yes.

12      Q.   All right.  If you turn to the next page,

13  you'll see that your name has appeared on that page as

14  well; is that right?

15      A.   Yes.

16      Q.   On the top box where there's a little bar

17  code --

18      A.   Yes.

19      Q.   -- below that, it says your name?

20      A.   Yes.

21      Q.   If you turn to the next following page, which

22  is page 4, 0004, that's an emergency room record which

23  is dated April 10th of '07, right?

24      A.   Yes.

1      Q.   And in that record it says "needs medication"

2  as the area of complaint.  Do you see that?

3      A.   Yes.

4      Q.   And it says "Meds, Seroquel and Klonopin" --

5      A.   Yes.

6      Q.   -- right?

7           Is that the first time you told anybody that

8  you needed Klonopin?

9      A.   From the 8th district?  Yes.

10     Q.   No.  This is -- This is --

11     A.   Oh --

12     Q.   -- Cermak Health Services.

13     MR. MORRISSEY:  If you recall.

14  BY THE WITNESS:

15     A.   No.  That I recall, no.

16     Q.   Okay.  Now, the date of that is April 10th of

17  '07, right?

18     A.   Yes.

19     Q.   And it's 6:05 a.m. on that date where you

20  arrived at the emergency room?

21     A.   Yes.

22     Q.   If you turn to the next page, which is

23  Cleaves 0005, can you tell me what document title is on

24  that page?

Page 65

1          A.     No.   Where is that?

2          Q.     Title of the page.

3          A.     Oh, Cermak Health Service Department of

4      Mental Health Service.

5          Q.     And below that it says?

6          A.     Admission/Evaluation Form.

7          Q.     Were you admitted to the Cermak Health

8      Services Department of Mental Health Services on 4/10

9      of '07?

10         A.     Yes.

11         Q.     Do you recall having a conversation with any

12     mental health specialist on 4/10 of '07?

13         A.     Yes.

14         Q.     And do you understand that at that time you

15     were being transferred from general population to a

16     living unit in mental -- the Cermak Health Services?

17         A.     Yes.

18         Q.     All right.  And so you told them about your

19     current symptoms; is that right?

20         A.     Yes.

21         Q.     In fact, you told them that you had a history

22     of alcohol abuse?

23         A.     Yes.

24         Q.     And you told them that you had a history of

1    cocaine use?

2        A.    Yes.

3        Q.    And that you last used six months prior?

4        A.    Yes.

5        Q.    And you told them that your current

6    treatments were Seroquel and Klonopin, right?

7        A.    Yes.

8        Q.    And those treatments were current on the date

9    of 4/10 of '07?

10       A.    No.

11       Q.    Okay.  Well, that's what it says on the page,

12   though, doesn't it?

13       A.    Right.

14       Q.    It also says that -- under your exam, mental

15   health -- or mental status exam, that you're alert,

16   right?

17       A.    Yes.

18       Q.    I'll show you if you can't find it.

19       A.    Yes.

20       Q.    Does that say you're alert?

21       A.    Yes, yes.

22       Q.    And next to it, it says you're oriented?

23       A.    Yes.

24       Q.    And if you look where it says "diagnosis" --

Page 67

1    Do you see where it says "diagnosis"?

2          A.   Yes.

3          Q.   Axis I, do you know what that refers to?

4          A.   Yes.

5          Q.   And it says "rule out major depression,"

6    doesn't it?

7          A.   Yes.

8          Q.   All right.  And below that it says "Axis II,

9    to deferred."  Do you see that?

10         A.   Yes.

11         Q.   And then to the right of that, it says "rule

12   out alcohol dependence."

13         A.   Yes.

14         Q.   Below that, it says "blind right eye."

15         A.   Yes.

16         Q.   And you are, in fact, blind in your right

17   eye; is that right?

18         A.   Yes.

19         Q.   That information is recorded in your medical

20   chart for that admission into Cermak Health Services;

21   isn't that right?

22         A.   Yes.

23         Q.   You were actually admitted to 2 North?

24         A.   Yes.

Page 68

```
 1       Q.    Do you know what 2 North refers to?

 2       A.    No.

 3       Q.    If you turn to page 7.

 4       A.    Six, seven.

 5       Q.    Right.

 6             Could you tell me what is this chart -- this

 7  page of the chart called?

 8       A.    Demographics and Admission Data.

 9       Q.    Okay.

10       A.    Administrative data.

11       Q.    And it refers to the patient name being

12  Cleaves, Roy --

13       A.    Yes.

14       Q.    -- is that right?

15       A.    Yes.

16       Q.    And it includes your age and your date of

17  birth?

18       A.    Yes.

19       Q.    Your sex, male?

20       A.    Yes.

21       Q.    Your race, Caucasian?

22       A.    Yes.

23       Q.    And it says that you're received from the

24  back door.  Do you see that?
```

```
 1        A.    Yes.

 2        Q.    Do you have any idea what that refers to?

 3        A.    No.

 4        Q.    Okay.  Where it says "Chief Complaint/HPI,"

 5   do you see that bold heading?

 6        A.    Chief complaint?

 7        Q.    Well, you can see "complaint," slash, "HPI"

 8   where -- right above the text.

 9        A.    Oh, yeah, yeah.

10        Q.    Complaint/HPI.

11        A.    Yes.

12        Q.    All right.  You have a conversation with a

13   mental health treater at that time?

14        A.    Yes.

15        Q.    Can you read the text that's written there?

16        A.    Yes.

17        Q.    All right.  And it does indicate that you

18   told that person, the treater at that time, that you

19   had a significant substance abuse problem?

20        A.    Yes.

21        Q.    That you used alcohol to the amount of a pint

22   of vodka per day?

23        A.    Yes.

24        Q.    And you drink as much as possible when you
```

1    could, right?

2        A.    Yes.

3        Q.    And that you used cocaine to the amount of

4    $200 per week; is that right?

5        A.    I read that.  Not true.

6        Q.    Okay.  But that's what it says here?

7        A.    Yes, yes, yes.

8        Q.    Okay.  And it says that you've done so since

9    age 25.

10       A.    Yes.

11       Q.    All right.  And it also says that you last

12   used cocaine about a week prior; is that right?

13       A.    Yes.

14       Q.    All right.  It also indicates that you

15   revealed at that time that you attempted suicide by

16   trying to cut your throat but, quote, I didn't know

17   what I was doing because I was blacked out.

18       A.    Yes.

19       Q.    Is that all true?

20       A.    Yes.

21       Q.    All right.  Next it says "Patient reports

22   hearing voices that present as thoughts in his head

23   rather than sounds in the room."

24       A.    Yes.

1        Q.    Does that sound like something you said to

2    the provider at that time?

3        A.    No.

4        Q.    All right.  Do you know who that provider

5    was?

6        A.    No.

7        Q.    That provider know you?

8        A.    No.

9        Q.    Could you take a look at page 9, Cleaves

10   0009.  And you'll see a section that's called

11   Assessment, slash, Plan.  You know what that means,

12   right?

13       A.    Yes.

14       Q.    All right.  That means that that's what

15   they're assessing your physical or mental health to

16   be --

17       A.    Uh-huh.

18       Q.    -- and what their plan of treatment is,

19   right?

20       A.    Yes.

21       Q.    All right.  And look where it says Axis I.

22       A.    Yes.

23       Q.    Do you see what's listed there?

24       A.    Yes.

Page 72

1     Q.   Cocaine and alcohol dependence, right?

2     A.   Yes.

3     Q.   And then Axis II is still deferred?

4     A.   Yes.

5     Q.   And then the physical, which is Axis III, is

6  that your right eye is blind?

7     A.   Yes.

8     Q.   All right.  If you look down below that, it

9  says -- under Axis V, below that it says

10  "Scheduled Psychotropic Medications."  Do you see that?

11     A.   Uh-huh.

12     Q.   And what's written to the right of that?

13     A.   "None."

14     Q.   That's right.

15          And that's, in fact, what you're complaining

16  about, that you didn't get any psychotropic

17  medications?

18     A.   Yeah.

19     MR. MORRISSEY:  Objection.  The complaint speaks

20  for itself.

21  BY MR. CATANIA:

22     Q.   And the date and time on that evaluator's

23  signature is April 10th of '07 at 10:50.  Do you see

24  that?

1      A.   Yes.

2      Q.   At that point do you believe that there had

3   been a treatment plan for you while incarcerated at the

4   Cook County Department of Corrections --

5      A.   No.

6      Q.   -- instituted?

7      A.   No, not that I know of.

8      Q.   Okay.  But that's what this says, right?

9      A.   Yes.

10     Q.   All right.  Are you denying at this time that

11  when you were incarcerated in April of '07 that you

12  were cocaine dependent?

13     A.   Yes.

14     Q.   So at that time you were not dependent on

15  cocaine --

16     A.   No.

17     Q.   -- is that right?

18     A.   I was not.

19     Q.   You were familiar with a treatment conducted

20  at Cermak Health Services from prior to that date,

21  before that date; is that right?

22     A.   No.

23     Q.   Okay.  So you had no prior treatment at

24  Cermak Health Services in prior incarcerations?

1     A.   No.

2     Q.   This is the first time you had Cermak Health

3  Services, correct?

4     A.   Yeah, that I can recollect.

5     Q.   At the time when you were evaluated on

6  April 10th, 2007, were you suffering any symptoms of

7  distress?

8     A.   Yes.

9     Q.   If you look to page 10 where it says

10  Cleaves 0010 on bottom.

11     A.   Page 10, yeah.

12     Q.   All right.  It's got a little area that's

13  called SXHX in a box on the left column.  Do you see

14  that?

15     A.   Where is that?

16     Q.   I'll point to you.  Right here.

17     A.   Yes.

18     Q.   Okay.  And next to that it says "Panic

19  attacks."

20     A.   Yes.

21     Q.   "Began, quit drinking about three years ago."

22     A.   Yes.

23     Q.   "Often frequent, daily until began Klonopin,

24  triggers are stress and my ex-fiance."  Do you see

Page 75

1    that?

2         A.   Yes.

3         Q.   Are those things that you told the evaluator

4    at the time?

5         A.   Yes.

6         Q.   If you look down below, it says "Last panic

7    attack 4/9/07 p.m."  Do you see that?

8         A.   Uh-huh.  Where?  Where?

9         MR. MORRISSEY:  Where are you, Frank?

10   BY MR. CATANIA:

11        Q.   About five lines up from the bottom of that

12   text where it says -- on the left side, it says "Last

13   months, last panic attack 4/9/07 p.m."  Do you see

14   that?

15        A.   Yes.

16        Q.   Okay.  Is that something you told the

17   evaluator at the time?

18        A.   Yes.

19        Q.   That your last panic attack was the previous

20   night?

21        A.   Yes.

22        Q.   Okay.  Because this evaluation took place on

23   April 10th, '07.

24        A.   We're still in County, right?

1     Q.   Yes.

2     A.   Okay.

3     Q.   All right.  You can close that up right now.

4  I think we're done with that.

5         But you said earlier that you -- you agreed

6  you're on parole; is that right?

7     A.   Yes.

8     MR. CATANIA:  I'm going to ask that this be

9  marked.

10                (Cleaves Deposition Exhibit No. 3

11                 marked as requested.)

12  BY MR. CATANIA:

13     Q.   I'm going to have to show this to your

14  attorney because there's only one page -- one copy of

15  it here.

16     MR. CATANIA:  Tom, if you want to take a few

17  minutes to review it, we have to change tapes anyway.

18     MR. MORRISSEY:  All right.  Go ahead.

19     THE VIDEOGRAPHER:  This will be all for

20  Tape No. 1.  We're going off the video record at

21  12:07 p.m.

22                (Discussion off the record.)

23     THE VIDEOGRAPHER:  This is the beginning of

24  Tape No. 2.  We're back on the video record at

1    12:12 p.m.

2    BY MR. CATANIA:

3         Q.    Mr. Cleaves, could you take a look at

4    Exhibit No. 3, which is an 11-page rap sheet.

5         A.    Yes.  Yes.

6         Q.    Have you ever seen this before?

7         A.    This particular one?  No.

8         Q.    Have you seen your rap sheet from Chicago

9    before?

10        A.    No.

11        Q.    Okay.  Is that your picture that's on there?

12        A.    Yes.

13        Q.    And at the top is says "on parole."  Do you

14   see that?

15        A.    Yes.

16        Q.    And it also has a number on it which is -- I

17   believe its K--

18        A.    79 --

19        Q.    -- 79611.

20        A.    Where is that again here?  Yeah.

21        Q.    Okay.  And that's your Illinois Department of

22   Corrections number; is that right?  You're familiar

23   with that number?

24        A.    Yes, I am.

Page 78

```
 1        Q.    Currently you are on parole; is that right?
 2        A.    Yes.
 3        Q.    So this document is accurate?
 4        A.    Yes.
 5        Q.    And if you look at the bottom where your
 6   index finger is right now --
 7        A.    Yeah.
 8        Q.    -- you see what it says there?
 9        A.    IDOC Event.
10        Q.    And below that?
11        A.    Yes.
12        Q.    I'll just indicate or you -- Could you read
13   what that says?
14        A.    Yes.
15        Q.    What does that say?
16        A.    Conditions of parole, drug abuse, PM -- PGM
17   condition.
18        Q.    Okay.  So you have a condition of your parole
19   that you're to be doing drug -- drug abuse treatment;
20   is that right?
21        A.    I've been going to AAs, you know.
22        Q.    Okay.  So when I asked you earlier about
23   whether you have a substance abuse problem for which
24   you're receiving treatment and you said no, did you not
```

1    understand my question?

2         A.   No, I didn't.

3         Q.   Okay.  But you are, in fact, participating in

4    some drug abuse --

5         A.   Yes.

6         Q.   -- treatment program --

7         A.   Yes.

8         Q.   -- as a condition of your parole, correct?

9         A.   Yes, yes.

10        Q.   Okay.  Now, you've mentioned quite a few

11   places for which you have obtained prescriptions or

12   treatments?

13        A.   Yes.

14        Q.   In fact, if I go through my notes, I can tell

15   you one of them was Christ Hospital.  The other was

16   Grand Prairie.  Then there was Tinley Park Mental

17   Health and then finally Holy Cross Hospital, right?

18        A.   Yes.

19        Q.   Okay.  In order to complete our record in

20   this case, I would need to get records from all of

21   those locations.  Would you be willing to sign what's

22   known as a HIPAA waiver which allows me to obtain those

23   records by subpoena?

24        A.   Yes.

1       Q.   Your attorneys would also get those.

2       A.   Yes.

3       Q.   All right.  I've got a HIPAA waiver here that

4    I would ask if you would please sign.  I put the date

5    on it already, and your name is spelled out.  But

6    essentially what I will do is I will take this along

7    with a request from a company called Record Copy and

8    ask them to obtain the records at great expense to us.

9    But we'll attempt to get those records from the

10   hospitals.  Is that okay?

11      A.   Yes.

12      Q.   All right.

13      MR. MORRISSEY:  Continue.  I'm going to look at

14   the form.  Go ahead.

15   BY MR. CATANIA:

16      Q.   All right.  In addition, you said that you

17   were at the Illinois Department of Corrections.  Did

18   you obtain any psychological or psychiatric treatment

19   at the Illinois Department of Corrections?

20      A.   Not that I recollect.

21      Q.   Did you have any meetings at all in which you

22   were prescribed any medications at the Illinois

23   Department of Corrections?

24      A.   Yes.

Page 81

1     Q.   All right.  Are you familiar with a term

2  known as "master file"?

3     A.   No.

4     Q.   Okay.  Are you aware that they keep a record

5  of you from Department of Corrections that goes to

6  whatever location you're at?

7     A.   No.

8     Q.   Okay.  There is such a record which is called

9  a master file.

10    A.   Okay.

11    Q.   And they require another form, which while

12  we're talking, I'll have your attorney review them.

13  But those two forms would permit me to obtain records

14  from the Illinois Department of Corrections regarding

15  your mental health and psychiatric treatment as well as

16  your medical treatment.

17    A.   Yes.

18    Q.   Okay.  All right.  I realize that you say

19  that you didn't remember who it was that asked you the

20  questions that are on that form that's in front of you.

21    A.   Uh-huh.

22    Q.   Which is that exhibit that you're looking at

23  now, number 2.

24    A.   Right.

Page 82

1     Q.    To your memory, was there more than one

2   person who spoke to you about your medical and mental

3   health issues?

4     A.    Not that I recognize.

5     Q.    I'm going to show you what I'm going to have

6   marked right now as Exhibit No. 4 for this deposition

7   and just take a look at that.

8                    (Cleaves Deposition Exhibit No. 4

9                     marked as requested.)

10  BY MR. CATANIA:

11    Q.    Do you see at the bottom it says Cleaves

12  0003?  Do you see that, bottom right side?

13    A.    Right here?

14    Q.    Yes.

15    A.    The stamp?

16    Q.    Yes.

17    A.    Yeah.

18    Q.    Okay.  It also has a bar code similar to the

19  one that was on the Exhibit No. 2 in front of you,

20  right?

21    A.    Yeah, yeah.

22    Q.    It's got your name on it --

23    A.    Uh-huh.

24    Q.    -- your date of birth, your book date of 4/7

1    of '07?

2         A.   Yes.

3         Q.   What's the title of this document which is

4    Cleaves 0003?

5         A.   The title?

6         Q.   Yes.  All the way up in the upper right side.

7         A.   Department of Mental Health Services Brief

8    Primary Psychological Screening.

9         Q.   And then next to that it says "RCDC"?

10        A.   Yes.

11        Q.   Okay.  Do you know what RCDC stands for?

12        A.   No.

13        Q.   That's another term for the receiving room

14   where you first were intake'd into the jail.

15        A.   Okay.

16        Q.   Okay.  Your name appears there.  It says

17   Cleaves, Roy, right?

18        A.   Yes, yes.

19        Q.   The date of birth that's listed, that's

20   correct; isn't that right?

21        A.   Yes.

22        Q.   And the DOC number that's to the right of

23   that, that is also correct; isn't it?

24        A.   Yes.

Page 84

1    Q.   And below that, it's got an address of

2  9717 South Keeler in --

3    A.   Yes.

4    Q.   -- Oak Lawn?

5    A.   Yes.

6    Q.   That's correct, isn't it?

7    A.   Yes.

8    Q.   All right.  The person that filled out this

9  form, that was not you, right?

10   A.   No.

11   Q.   And do you know who K. Myers is, whose

12 signature appears on the bottom?

13   A.   No.

14   Q.   Have you ever seen a person named K. Myers,

15 to your knowledge?

16   A.   Not to my knowledge.

17   Q.   Below that signature is a date of 4/7/07.  Do

18 you see that?

19   A.   Yes.

20   Q.   And there's a time on it that says 6:25 p.m.

21   A.   Yes.

22   Q.   If you look back on the first one which is

23 Exhibit No. 2, it's got a time on it of 6:55 p.m.

24 that's at the bottom of this exhibit here.  Do you see

Page 85

1   that?

2        A.   Yes.

3        Q.   So it's within a few minutes of speaking to

4   this K. Myers that you spoke to somebody that I believe

5   is James Myvet; is that right?

6        A.   Yeah.

7        Q.   All right.  If you look on the box that's

8   marked as number 1, the question is "Have you ever been

9   in Cook County Jail before?  And it's circled "yes."

10  Is that right?

11       A.   Yes.

12       Q.   What division were you in?

13       A.   Two.

14       Q.   Okay.  And that's -- that's what it says,

15  what division, 2?

16       A.   Yes.

17       Q.   So that's correct; is that right?

18       A.   Yes.

19       Q.   And below that it says "Have you ever been

20  hospitalized for psychiatric treatment?"  And it's

21  circled "no."  Is that right?

22       A.   Yes.

23       Q.   Okay.  And below that it says "Are you

24  currently receiving outpatient psychiatric treatment?"

Plaintiffs' Exhibit 52

1    And it's circled "no."  Is that right?

2         A.   Yes.   Incorrect.

3         Q.   And then below that, number 4, it says "Are

4    you now taking psychotropic medications?"  And it's

5    circled "no."  Right?

6         A.   Incorrect.  Yes.

7         Q.   Do you know what psychotropic medications

8    are?

9         A.   Not at the time, no.

10        Q.   You didn't know in April of '07 --

11        A.   No.

12        Q.   -- what they were?

13        A.   No, no.

14        Q.   All right.  And how did you gain information

15   or knowledge about what psychotropic medications are?

16        A.   Just now.

17        Q.   From this?

18        A.   Yeah.  I never knew that that was like

19   medication that I take.

20        Q.   And number 5, it says "Do you drink alcohol?"

21   And it says "no."  Is that right?

22        A.   Yes.

23        Q.   And it says "Do you use drugs?"  And it's

24   circled "no."

1          A.    Yes.

2          Q.    And below that it says "Have you ever

3     attempted suicide?"  And it's circled "no."

4          A.    Yes.

5          Q.    Number 7 says "Do you feel suicidal now?"

6     And it says "no."

7          A.    Yes.

8          Q.    Below that it says, on number 8, "Are you

9     feeling homicidal now?"  And you circled "no."

10          A.    Yes.

11          Q.    And below that it says "Have you ever had

12     special education classes?"  And it says "no."

13          A.    Yes.

14          Q.    And that's correct?  You've never had special

15     education classes?

16          A.    Not to my knowledge.

17          Q.    Okay.  And below that it asks "Are you now

18     homeless?" in number 10.

19          A.    Yes.

20          Q.    And you're not homeless, right?

21          A.    No.

22          Q.    So it's correct when it's circled "no"?

23          A.    Yes.

24          Q.    And it asks, number 11, "Are you a veteran?"

1    A.   Yes.

2    Q.   And it says "no."

3    A.   Yes.

4    Q.   And that is correct also, right?

5    A.   Yes.

6    Q.   All right.  Below that it says "Is the

7    detainee's behavior appropriate in the RCDC area?"  And

8    it's circled "yes."

9    A.   Yes.

10   Q.   And at that time you were not suffering from

11   any current distress, right?

12   A.   No.  Yes, I was.

13   Q.   You were?

14   A.   Yes.

15   Q.   Okay.  Well, on a previous exhibit, which is

16   Exhibit 2, at the bottom of the page it says "Patient

17   denies any current distress," right?

18   A.   Uh-huh.

19   Q.   Do you see that?

20   A.   Where?

21   Q.   Right across the bottom --

22   A.   Yes.

23   Q.   -- in the Comments section, "Patient denies

24   any current distress."

Page 89

1       A.   Yes.

2       Q.   And that's signed by somebody below that,

3  right?

4       A.   Yes.

5       Q.   A person who's a CMT, right?  It's -- Next to

6  their signature, it says CMT.

7       A.   Uh-huh.

8       Q.   Do you know what that is?

9       A.   No.

10      Q.   Do you know what a paramedic is?

11      A.   Yes.

12      Q.   Okay.  Well, this fellow is a correctional

13  medical technician, which means he has a paramedics

14  license.

15      A.   Mm-hmm.

16      Q.   Do you -- Is this the first time you've heard

17  this?

18      A.   Yeah.

19      Q.   Okay.  Did you make those statements to a

20  mental health specialist on April 7th of 2007?

21      A.   Not to my knowledge.

22      Q.   Is it that you don't remember making those

23  statements?

24      A.   I just don't remember, no.

Page 90

1      Q.   All right.  But it's possible that you did?

2      A.   Possible.

3      Q.   Okay.  All right.  This case is regarding the

4  complaint that you made about your entry into the jail

5  in April of '07.  Do you remember us talking about that

6  way at the beginning?

7      A.   Yes.

8      Q.   Okay.  One of the allegations you made is

9  that you informed the psych worker on admission to the

10  jail of your specific psychiatric diagnosis and of the

11  fact that you had been taking anti-psychotic medication

12  for several years.

13      A.   Yes.

14      Q.   Do you remember making those allegations?

15      A.   No, not --

16      MR. CATANIA:  Counsel, it's Allegation No. 41 of

17  your complaint.

18  BY MR. CATANIA:

19      Q.   All right.  The form that's in front of you,

20  Exhibit No. 4, which is the one that one -- That one,

21  yes.  That one is a Brief Primary Psychological

22  Screening Tool, the one we talked about, yes.

23      A.   Number 4 here?

24      Q.   Yes.

1          In that one, doesn't it also indicate that

2    the psych worker was told that you were not in any

3    distress and not taking medications?

4          A.   I don't know.

5          Q.   Okay.  Well, we went through all the

6    questions, right?

7          A.   Right, right.

8          Q.   And you don't remember what answers you gave?

9          A.   No.

10         Q.   All right.  You also allege in the complaint

11   that you made daily requests to see a physician to

12   obtain treatment for symptoms you were experiencing.

13   Do you remember that?

14         A.   Yes.

15         Q.   I'm going to ask you to look back in

16   Exhibit No. 2, which is the larger bunch right here.

17   And if you would turn to page 20, Cleaves 0020, the top

18   of that one is called Detainee Health Service Request

19   Form.

20         A.   Mm-hmm.

21         Q.   Do you see that?

22         A.   Yes.

23         Q.   Okay.  Do you remember writing this request?

24         A.   Wait.  Yes.

1      Q.   Okay.  And it's got the date on it that you

2   wrote the request, Today's Date?

3      A.   Uh-huh, yeah.

4      Q.   What date was that?

5      A.   That was 4/30.

6      Q.   April 30th of '07?

7      A.   Yes.

8      Q.   Okay.  And what is the request that you made?

9   It says "Describe your problem."  Could you read that

10   to us, please.

11      A.   Please would you send me to medical deck due

12   to the fact that I am -- that I need -- that I am on

13   psych meds, broken ribs; I was injured at the time of

14   my arrest; and I'm allergic to wool; would like

15   different material blankets.

16      Q.   Okay.  Do you remember making those requests?

17      A.   Yes.

18      Q.   Okay.  You asked for different blankets

19   because --

20      A.   Yeah.

21      Q.   -- you're allergic to wool?

22      A.   Yes.

23      Q.   All right.  You asked that you be treated on

24   the medical because you had broken ribs from your

1    arrest?

2         A.    Uh-huh.

3         Q.    All right.  And it also says that you're on

4    psych meds, right?

5         A.    Right.

6         Q.    All right.  The date of that request was

7    April 30th of '07 --

8         A.    Yes.

9         Q.    -- right?

10             Other than that request, can you think of any

11   other requests that you made that are in your

12   handwriting for medical services?

13        A.    No.  Not in my handwriting, no.

14        Q.    So in the complaint when it says that you

15   made daily requests to see a physician to obtain

16   treatment for symptoms you were experiencing -- that's

17   number 43 in the complaint --

18        A.    Mm-hmm.

19        Q.    -- were those oral requests or written --

20        A.    Yes.

21        Q.    -- requests?

22             Oral requests?

23        A.    Yes.

24        Q.    Who did you make those requests to?

Page 94

1        A.    To the guard on deck, on the deck.

2        Q.    All right.

3        A.    And the -- And the medical, Cermak, the

4    hospital, you know.

5        Q.    All right.  The guard on deck?

6        A.    Right.

7        Q.    And by "on deck," you're referring to the

8    guard --

9        A.    The CO.

10       Q.    -- that was in your living unit?

11       A.    Yes.

12       Q.    The CO?

13       A.    Yes.

14       Q.    Okay.  If you look on page 20 again, which is

15   the one we just looked at, it has a division

16   identification on that page --

17       A.    Yes.

18       Q.    -- where it says 2, dash, 01, dash, D.

19       A.    Yes.

20       Q.    That is -- Actually, it might be 2, dash, D1,

21   dash, D.

22       A.    Yes.

23       Q.    That's your housing unit?

24       A.    It was.  I was in a few of them.

Page 95

1    Q.   That refers to Division 2?

2    A.   Right.

3    Q.   So sometime between your entry into the jail

4 and being admitted to 2N that you talked about from

5 4/10 of '07, you were transferred to Division 2?

6    A.   Yes.

7    Q.   Do you know who made that decision?

8    A.   No.

9    Q.   What information do you have that describes

10 why that decision was made to transfer you to Division

11 2?

12   A.   None.

13   Q.   All right.

14   A.   That I recollect.

15   Q.   In your Allegation No. 44, it says "After

16 several weeks, Cleaves was permitted to see a

17 physician.  Cleaves told the physician about his

18 symptoms, medical history, diagnosis, and prescribed

19 medication.  The physician told Cleaves that he could

20 not as a matter of jail policy prescribe anti-psychotic

21 medication but could instead prescribe an

22 antidepressant."

23   A.   Yes.

24   Q.   Okay.  Do you remember making that

1    allegation?

2         A.    No.

3         Q.    All right.  Do you have any idea what that

4    allegation means?

5         A.    No.

6         Q.    Did anybody ever tell you that you could not

7    be prescribed anti-psychotic medication as a matter of

8    jail policy?

9         A.    No.

10        Q.    Do you have any idea what jail policy is?

11        A.    No.

12        Q.    In fact, you were actually seen in Cermak

13   Health Services and admitted to 2N, which is in Cermak,

14   three days after you entered into the jail on

15   April 10th of '07, right?

16        A.    Uh-huh.

17        Q.    Is that true?

18        A.    Yes, yes.

19        Q.    While you were in the jail, at any time did

20   any family member, friend, attorneys bring you copies

21   of your prescription forms?

22        A.    No.

23        Q.    Did you have any prescription forms for them

24   to bring?

1      A.    No.

2      Q.    And that's because your prescription had

3   expired on April 4th --

4      A.    No.

5      Q.    -- 2007?

6      A.    No.

7      Q.    That's not right?

8      A.    Yes, yes.

9      Q.    Okay.  So you had an expired prescription,

10  but no current prescription, right?

11     A.    Right.  I needed one.

12     Q.    All right.  You needed one.  But in order to

13  get it, you had to see a physician; is that right?

14     A.    Right.

15     Q.    Do you have any reason to think that the

16  treaters that you saw at Cermak Health Services were

17  not qualified to treat you for your psychiatric issues?

18     A.    They wouldn't.

19     Q.    What information do you have that leads you

20  to conclude that they were not qualified to treat you

21  for your psychiatric condition?

22     A.    I never received them.

23     Q.    So based on not receiving them, you think

24  that they're not qualified?

1     A.    Right.

2     Q.    Do you have any information, aside from the

3   fact that you did not receive the psychiatric

4   medication you asked for, that the diagnosis and

5   treatment plan were incorrect?

6     A.    Yes.

7     Q.    What information do you have?

8     A.    That I never received them.

9     Q.    Only that; is that right?

10     A.    Yes.

11     Q.    All right.  And did you receive any of those

12   psychiatric medications when you were at the Illinois

13   Department of Corrections June 30th of '07 and beyond?

14     A.    No.

15     Q.    Okay.  So even in the Illinois Department of

16   Corrections, you did not receive psychiatric

17   medication?

18     A.    That's Cook County, right?

19     Q.    No.  Illinois Department of Corrections,

20   Logan.  Logan.

21     A.    Yes, I did receive them.

22     Q.    What did you receive at Logan?

23     A.    Seroquels -- I mean, Klonopins.  My fault.

24     Q.    Klonopin?

Page 99

1       A.   Yes.

2       Q.   Okay.  And that would have been sometime

3    after June 30th of 2007; is that right?

4       A.   As soon as I was -- As soon as I was sent to

5    Stateville, I started receiving my medication.

6       Q.   Okay.  The record that I showed you earlier,

7    which is your Chicago Police Department rap sheet --

8       A.   Yes.

9       Q.   -- indicates that you were transferred to the

10   Illinois Department of Corrections June 30th of 2007

11   and received at Stateville at that time.

12      A.   Yes.

13      Q.   Do you have any reason to doubt that that's

14   the correct date?

15      A.   No, not that I know of.

16      Q.   Okay.  So from June 30th of 2007, you started

17   receiving Klonopin?

18      A.   Yes.

19      Q.   Did you see a physician at that time?

20      A.   Yes.

21      Q.   Psychiatrist?

22      A.   I'm not sure.

23      Q.   Okay.  Do you know for certain it was a

24   physician?  Or could it have been a mental health

Page 100

1    specialist?

2         A.   Either/or.

3         Q.   Could it have been a physician assistant?

4         A.   I'm not sure.

5         Q.   You have no idea what the title of the person

6    was --

7         A.   No.

8         Q.   -- that you saw?

9         A.   No.

10        Q.   The only thing you do know is that sometime

11   at that time, June 30th of '07, you started to get

12   Klonopin?

13        A.   Yes.

14        Q.   All right.  Prior to -- that means before --

15   getting the Klonopin, what symptoms did you have?

16        A.   Panic attacks, nervousness, racing thoughts.

17        Q.   Okay.  Now, before going to the Illinois

18   Department of Corrections and being received at

19   Stateville, you went to court for the criminal case,

20   right?

21        A.   Yes.

22        Q.   And, in fact, you went to court in

23   Bridgeview?

24        A.   Yes.

Page 101

1    Q.    And who was the judge; do you remember?

2    A.    No.

3    Q.    Okay.  At some point during the process of

4    going to court, did you ever tell the judge that you

5    needed to have Klonopin?

6    A.    That I was -- Yes.

7    Q.    Did the judge ever issue an order about that?

8    A.    No.

9    Q.    Did you ever tell the -- Who is your attorney

10   for that criminal case?

11   A.    Public defender.

12   Q.    Did you ever tell your public defender that

13   you were not receiving Klonopin?

14   A.    I don't remember.  I'm pretty sure I did.

15   Q.    Was there a hearing in which you were asked

16   about whether or not you were competent to enter a plea

17   of guilty?

18   A.    Yes.

19   Q.    And you did plead guilty, right?

20   A.    Yes.  At -- Not at first.

21   Q.    Okay.

22   A.    I said I was confused.

23   Q.    All right.  You were confused about the legal

24   aspect --

Page 102

1     A.   Yes.

2     Q.   -- or the sentence?

3     A.   Yes.  Legal aspects, yes.

4     Q.   Okay.  And how long the sentence would be?

5     A.   Yes.  I was confused about -- Because I

6  didn't have my medication for a while and -- while I

7  was incarcerated in County.  So I was kind of confused

8  about the whole situation.

9     Q.   Okay.  Were you sent to a doctor, then, after

10  you told the judge you were confused?

11     A.   I was evaluated, yes.

12     Q.   Okay.  Who evaluated you?

13     A.   Cook County doctor.

14     Q.   When was it; do you know?

15     A.   No.

16     Q.   Do you remember when it was that you first

17  informed the judge about that?

18     A.   No.

19     Q.   Was it part of a conference you had, called a

20  402 conference?

21     A.   Yes.

22     Q.   And you understood that to mean that you were

23  discussing with the prosecutor and negotiating a

24  sentence for your plea of guilty, right?

1      A.   Yes.

2      Q.   Okay.  Would that have been in May of '07?

3      A.   I'm not sure.

4      Q.   All right.  And there was a psychiatric exam

5  filled out at some point by the doctor?

6      A.   Yes, yes.

7      Q.   Where did that take place, that exam?

8      A.   In County.

9      Q.   At the jail or on the tenth floor of the --

10     A.   Tenth floor.  Yeah, tenth floor.

11     Q.   So you were brought to the tenth floor?

12     A.   Yes.

13     Q.   And do you know what the finding was from

14  that exa- -- that psychiatric examination?

15     A.   That I was capable of going -- of going to

16  court, you know, taking a plea, whatnot.

17     Q.   So you were found fit to plea?

18     A.   Yes, yes.

19     Q.   And at that time you were not receiving any

20  psychiatric or psychotropic medication?

21     A.   No.  I was still confused.

22     Q.   Okay.  But there was a finding by a court

23  that you were fit to plead guilty; is that right?

24     A.   Yes.

Page 104

1        Q.    And you did so?

2        A.    Yes.

3        Q.    You pled guilty and you were found guilty

4    because you pled guilty; is that right?

5        A.    Yes.

6        Q.    And you didn't have a pre-sentence

7    investigation, right?

8        A.    Not that I know of.

9        Q.    You waived the right to have that

10   evaluation --

11       A.    Yes.

12       Q.    -- done by probation?

13       A.    Yes.

14       Q.    Okay.  And you were sentenced to three years;

15   is that right?

16       A.    Yes.

17       Q.    And that was at the Illinois Department of

18   Corrections, the three years?

19       A.    Yes.

20       Q.    Do you happen to know what the three-year

21   sentence was for?

22       A.    Yes.

23       Q.    What was it for?

24       A.    Possession of a stolen vehicle.

Page 105

1     Q.   Okay.  Only that charge; is that right?

2     A.   Yes.

3     Q.   And all the other charges that were mentioned

4  were all dismissed; is that right?

5     A.   Yes.

6     Q.   Okay.  And you went to the prison and you

7  were serving that sentence?

8     A.   Yes, I did.

9     Q.   All right.  Did you have an actual hearing

10  regarding your fitness for -- to stand -- to plead

11  guilty?

12     A.   Not that I know of.

13     Q.   Was there a report of the psychiatrist that

14  was filed with the court that you were found fit?

15     A.   Yes.

16     Q.   Did your lawyers stipulate that the report

17  said you were fit to --

18     A.   Yes.

19     Q.   -- plead guilty?

20     A.   Yes.

21     Q.   Okay.  And you understood at that time the

22  stipulation meant that they were all agreeing that you

23  were fit to plead guilty in front of Judge Wazaluski?

24     A.   Yes.

1      Q.   And you understood what the charges were at

2  the time?

3      A.   Yes.

4      Q.   And you understood what that sentence was at

5  the time?

6      A.   Yes.

7      Q.   And you understood what the possible minimum

8  and maximum sentences were for that crime --

9      A.   Yes.

10     Q.   -- is that right?

11     A.   Yes.

12     Q.   Can you tell me, aside from your feeling the

13  panic attack or panic -- panicky feeling during those

14  couple of months that you were at the Cook County

15  Department of Corrections, what effects not having the

16  medication had on you for that period of time?

17     A.   Terrible.

18     Q.   What effects?  Tell me.

19     A.   Scared, paranoid.  My heart felt like it was

20  going to blow out of my chest.

21     Q.   Anything else?

22     A.   No.

23     Q.   Have you now told me all of the symptoms that

24  you felt during the couple of months between your

1    arrest and the time that you were transported to the

2    Illinois Department of Corrections at Stateville?

3         A.   Pardon me?

4         Q.   Have you told me all of the things --

5         A.   Yes.

6         Q.   -- that you felt?

7         A.   Yes.

8         Q.   Okay.  Who did you tell that you were scared?

9         A.   Everyone.

10        Q.   Can you tell me who specifically?

11        A.   The CO on duty, the doctors, whoever I seen,

12   the -- when they sent me to the -- to the doctors, you

13   know, down in County.

14        Q.   Okay.  So April 10th, you told them?

15        A.   Yeah.  I was telling them every time I seen

16   them.

17        Q.   All right.  Who did you tell that you were

18   paranoid?

19        A.   Same people.

20        Q.   At the same time?

21        A.   Yes.

22        Q.   All right.  Who did you tell that your heart

23   felt like it was going to burst?

24        A.   Same people.

1       Q.    Okay.  Aside from the COs and the doctors,

2   who else did you tell?

3       A.    No one.

4       Q.    You didn't tell your public defender?

5       A.    No.

6       Q.    You didn't tell the judge that you were in

7   court with?

8       A.    Yeah.  I told him I -- that I was refused my

9   medication.

10      Q.    Okay.  You told the judge that you were

11  refused medication and you are confused, right?

12      A.    Right.

13      Q.    Okay.  That's what you said before.

14      A.    Yes.

15      Q.    I just want to make sure.

16      A.    Yes.

17      Q.    And that was in May of '07 that you said

18  that?

19      A.    Every time I seen him.

20      Q.    Okay.  And the judge's action was to order

21  that you have a BCX; is that right?

22      A.    Evaluation?

23      Q.    Yes.

24      A.    Yes.

1      Q.    Behavioral clinical examination, right?

2      A.    Yes.

3      Q.    And you know from your experience that

4  that -- that is called BCX, right?

5      A.    Now, yeah.

6      Q.    Okay.  And that's, again, the evaluation you

7  had on the 10th floor at the administration building?

8      A.    Yes, yes.

9      Q.    Okay.  Did you file any grievance while in

10  the Cook County Department of Corrections?

11      A.    Yes, yes.

12      Q.    You filed a grievance?

13      A.    Several.

14      Q.    Okay.  Do you have copies of your --

15      A.    No.

16      Q.    -- grievances?

17      A.    No.

18      Q.    When did you file your first grievance?

19      A.    I don't know.  I don't know.

20      Q.    Was it before you were seen on April 10th --

21      A.    Yes.

22      Q.    -- of '07?

23      A.    Yes.

24      Q.    Did you provide any copies of the grievances

1    to anybody?

2         A.    No.

3         Q.    What did you do with the grievance that you

4    wrote up?

5         A.    I don't know.

6         Q.    Can you describe the paper that you wrote it

7    on?

8         A.    No.  It was a form, grievance, I gave them to

9    the CO all the time.

10        Q.    All right.  I showed you before on page 20 of

11   that packet in front of you -- That's a request form.

12   Is that what you're talking about, or is it something

13   else?

14              It would be more toward the middle of that

15   pack, actually.

16        A.    Yes, yes.

17        Q.    That's what you're talking about?

18        A.    I'm pretty sure, yes.

19        Q.    All right.  And it's not a form in which it

20   says "Detainee Grievance" at the top?

21        A.    It did say that, yes.

22        Q.    Okay.

23        A.    The grievance.

24        Q.    Are you saying --

Page 111

1        A.    The form I filled out said this is a
2    grievance form.

3        Q.    Okay.

4        A.    Yeah.

5        Q.    All right.  Just for clarity of the record,
6    page 20 of that Exhibit No. 2 --

7        A.    Right.

8        Q.    -- is a Detainee Medical Request Form; is
9    that right?

10       A.    Right, right.

11       Q.    You're talking about a grievance form which
12   is not this form?

13       A.    Yes.

14       Q.    Did you fill out two forms, this form --

15       A.    I'm not --

16       Q.    -- and another one?

17       A.    I'm not sure.

18       Q.    All right.  Is it possible that you're
19   actually referring --

20       A.    Possible.

21       Q.    -- to this form?

22       A.    Possible.  No.  Both.

23       Q.    Both?

24       A.    Yes.

1     Q.   Okay.  And when you submitted the grievance,

2  do you remember where you put it?

3     A.   I gave it to the CO.

4     Q.   To the CO?

5     A.   Yes.

6     Q.   Okay.  Did you see what the CO did with the

7  grievance?

8     A.   Gave it to the -- someone else.  Gave it to

9  the head of the medical department, I think.  I'm not

10  sure.  I'm not sure who he gave it to.

11     Q.   Have you told me everything you remember

12  about how the grievance form was handled by you?

13     A.   Everything I know, yeah.

14     Q.   Were you ever spoken to by a social worker

15  about the grievance that you filled out?

16     A.   Yes, I'm pretty sure.

17     Q.   Do you remember the social worker's name?

18     A.   No.

19     Q.   Can you describe the social worker --

20     A.   No.

21     Q.   -- you spoke to?

22     A.   No.

23     Q.   Was it in Division 2 that you spoke to the --

24     A.   Yes.

1       Q.    -- social worker?

2       A.    Yes.

3       Q.    Did you ever speak to a social worker while

4   you were in 2N at Cermak Health Services?

5       A.    I'm -- I'm not sure.  Yes, I think so.

6       Q.    Okay.

7       A.    I think so.

8       Q.    Did you talk to that social worker in 2N at

9   Cermak Health Services about your grievance?

10      A.    Yes.

11      Q.    What did you specifically grieve about?

12      A.    My medication.

13      Q.    About the medication you received or --

14      A.    That I wouldn't -- That I couldn't receive,

15  that I needed.

16      Q.    Did you receive a response?

17      A.    No.

18      Q.    Did you talk to anyone about the grievance --

19      A.    No.

20      Q.    -- besides the person you gave it to?

21      A.    Not that I recollect.

22      Q.    All right.  Did you ever appeal any decisions

23  made by a grievance committee?

24      A.    No.

1      Q.   Have you ever heard of a term called "drug

2   seeking behavior"?

3      A.   No.

4      Q.   Have you ever purchased illicit drugs on the

5   street?

6      A.   No.

7      Q.   Never have?

8      A.   No.

9      Q.   Okay.  Have you ever obtained illicit drugs

10   from friends?

11      A.   During my incarceration?

12      Q.   At all.

13      A.   Yeah.

14      Q.   Okay.  And we're talking cocaine?

15      A.   Yes.

16      Q.   Anything -- Any other drugs?

17      A.   No, no.

18      Q.   Was that obtained from friends?

19      A.   Yes.  Not during my parole.

20      Q.   I understand that.  I'm really -- It's not my

21   purpose to trip you up or trick you into anything.  I

22   just need to know about your background.

23           After being released from Cook County Jail

24   and going to Stateville, do you remember who it was

1    that you first told about your mental health issues?

2         A.   No.

3         Q.   Do you remember the circumstances under which

4    you mentioned your mental health issues?

5         A.   During my processing.

6         Q.   During processing?

7         A.   Yes.

8         Q.   At Stateville?

9         A.   Before I got to Stateville, yes -- or in

10   Stateville.

11        Q.   And you were then transferred to Logan; is

12   that correct?

13        A.   Yes.  From Stateville.

14        Q.   And you spent your time at the Logan

15   Correctional; is that right?

16        A.   Yes.

17        Q.   Did you tell anybody at Logan about your

18   mental health issues?

19        A.   Yes.

20        Q.   And do you know the title of the person that

21   you told?

22        A.   Psychiatrist.

23        Q.   Do you know the name of that person?

24        A.   No.

1    Q.   All right.  Can you tell me when it was that

2  you first spoke with anyone aside from the people at

3  Logan or Stateville about not getting medicine at the

4  Cook County Jail?

5    A.   No.

6    Q.   All right.  You don't know when you first

7  talked about it?

8    A.   No.

9    Q.   All right.  When was the first time that you

10  spoke with either Mr. Flaxman or Mr. Morrissey?  And I

11  preface this by saying I don't want to the know the

12  substance of your conversation, but just when it was

13  that you first spoke with Mr. Morrissey or Mr. Flaxman

14  about this case?

15    A.   I don't remember.

16    Q.   Was it more than a year ago?

17    A.   Yes.

18    Q.   Was it more than two years ago?

19    A.   I'm not sure.

20    Q.   Were you still in the Illinois Department of

21  Corrections --

22    A.   Yes.

23    Q.   -- at the time?

24    A.   Yes.

1     Q.   Did you contact them or did they contact you?

2     A.   I contacted them.

3     Q.   And how did you first hear about it?

4     A.   Word of mouth.

5     Q.   Word of mouth?

6     A.   Yes.

7     Q.   Whose words and what mouth?

8     A.   I don't know.

9     Q.   Was it at the IDOC that you heard about it?

10    A.   Yes.

11    Q.   Did you see any notices or any descriptions

12 about this case?

13    A.   No.

14    Q.   Is your memory now exhausted as to who told

15 you first about the case called Parish vs. the City ---

16 the County --

17    A.   Yes.  I forgot.

18    Q.   You forgot who?

19    A.   Yes.

20    Q.   All right.  Would you recognize the person if

21 you saw that person --

22    A.   No.

23    Q.   -- again?

24    A.   No.

1      Q.   So you would not be able to identify that

2  person if they came into the room right now?

3      A.   No.

4      Q.   Was it somebody who shared living space with

5  you at Logan that you heard it from?

6      A.   No, no.

7      Q.   After hearing about this Parish case, when

8  was the first time you had an in-person contact with

9  either Mr. Flaxman or Mr. Morrissey?

10     A.   I'm not sure -- After my -- After I was

11 released.  I wrote a letter, but I didn't speak to him

12 until after my release.

13     Q.   When did you write that letter?

14     A.   During my incarceration.

15     Q.   Who did you address it to?

16     A.   Mr. Flaxman.

17     Q.   Do you have a copy of that letter?

18     A.   No.

19     Q.   Does Mr. Flaxman have a copy of that letter?

20     A.   I don't know.

21     MR. CATANIA:  Tom, I need a copy of that letter.

22 BY MR. CATANIA:

23     Q.   From word of mouth, what was your

24 understanding about what this lawsuit was talking

Page 119

```
 1   about?

 2        A.   That Cook County would not give me my

 3   medication.

 4        Q.   You specifically?

 5        A.   That's all I cared about.

 6        Q.   Okay.  And is that your understanding right

 7   now?

 8        A.   Yes.

 9        Q.   All right.

10        A.   There's more than me.  I know now.

11        Q.   I'm sorry?

12        A.   Nothing.

13        Q.   There's more people than you?  Is that what

14   you're saying?

15        A.   That's what I thought.

16        Q.   And you know that because you were told that?

17        A.   Yes.

18        Q.   Other than being told that, do you have any

19   other independent knowledge of who might else --

20        A.   No.

21        Q.   -- be involved?

22        A.   No, I have no idea.

23        Q.   Okay.  Aside from the letter that you say you

24   sent to Mr. Flaxman, have you ever spoken to anybody
```

1   else about the lawsuit that we're sitting --

2        A.   No.

3        Q.   -- here for today?

4        A.   No.

5        Q.   Did you ever tell your mother about it?

6        A.   Yes.

7        Q.   Okay.  When did you first tell your mother

8   about it?

9        A.   When I found out about -- that I had a

10  lawsuit.

11       Q.   Can you tell me when that was?

12       A.   No, I don't remember exact date.

13       Q.   Was it before your letter to Mr. Flaxman or

14  after?

15       A.   After.

16       Q.   Aside from the symptoms that you described

17  earlier about feeling your heart as if it was going to

18  burst and feeling the panic and all that, is there any

19  other change in your life aside from the period of time

20  when you didn't have your medication?

21       A.   No.

22       Q.   So pretty much after you got to Stateville,

23  you were feeling fine again?

24       A.   Better, yes.

Page 121

1      Q.   Okay.  Better than when you were in the

2  County?

3      A.   Yes, much.

4      Q.   Okay.  Was there ever a period of time when

5  you were at the Illinois Department of Corrections that

6  you did not have your medication?

7      A.   No.

8      Q.   So consistently you always had the Klonopin

9  and the Seroquel?

10     A.   Yes.

11     Q.   And that was every day, three --

12     A.   Yes.

13     Q.   -- times a day?

14     A.   Yes.  Two times a day, I'm pretty sure.

15     Q.   What is your current prescription for

16  Klonopin and for Seroquel?

17     A.   Three times a day, each of them, same doses,

18  300 -- 200 milligrams, Seroquel; one milligram, the

19  Klonopin.

20     Q.   Okay.  That's your current prescription?

21     A.   Yes.

22     Q.   And was it the same prescription before your

23  arrest in April of '07?

24     A.   Yes.

Page 122

1      Q.    Okay.  But when you were at the --

2      A.    I'm pretty sure, yes, pretty sure, not exact,

3   but ...

4      Q.    When you were at the Illinois Department of

5   Corrections, you had this prescription given to you

6   twice a day; is that right?

7      A.    Yes.

8      Q.    Okay.  Have you ever spoken to your treating

9   physician about the antidepressant that you were given

10  at Cook County Jail?

11     A.    No.

12     Q.    Did anyone, any physician, medical doctor --

13  and I don't mean a lawyer -- but any medical doctor

14  ever tell you that the prescription that you were given

15  at Cook County Department of Corrections was not

16  correct?  That's the Trazodone.

17     A.    No.

18     Q.    If you open up again to page 35, which is a

19  prescription order.  Now, in Exhibit 2, page 0035, you

20  see that prescription at the bottom --

21     A.    Yes.

22     Q.    -- which says, Trazodone, 200 milligrams

23  per os at bedtime?  You see that?

24     A.    Yes.

Page 123

1     Q.   And the date that prescription was written

2  was May 24th of '07, correct?  It's on the right

3  side --

4     A.   Yes, yes.

5     Q.   Okay.  The next page, which is page 36,

6  there's a prescription order on that page as well?

7     A.   Yes.

8     Q.   It's also for Trazodone?

9     A.   Yes.

10    Q.   And it says 100 milligrams per os at

11 bedtime --

12    A.   Yes.

13    Q.   -- for six weeks.  Do you see that?

14    A.   Yes.

15    Q.   All right.  And the date on that prescription

16 order is May 31 of '07?

17    A.   Yes.

18    Q.   Do you know of any reason why the

19 prescription was changed?

20    A.   No.

21    Q.   If you look on page 37, there's a

22 prescription order there.

23    A.   Yes.

24    Q.   Which is dated June 14th of '07.  Do you see

1   that?

2        A.   Yes.

3        Q.   What does that say?  Can you read that?

4        A.   No.  I really -- Changed to -- something --

5   50 milligrams.  I don't know.

6        Q.   To 50 milligrams?

7        A.   Something, yeah.

8        Q.   So at that time you were -- your prescription

9   was being reduced even further?

10       A.   Yes.

11       Q.   Did anybody ever tell you why --

12       A.   No.

13       Q.   -- your prescription was being reduced?

14       A.   No.

15       Q.   Aside from the description that you gave me

16  about the feeling panicky, having your heart feeling

17  like it was going to burst, has there been any lasting

18  effect as a result of not having your medication during

19  that period of time?

20       A.   Yeah, I'm still -- Yes.

21       Q.   What lasting effect do you have?

22       A.   Traumatized about it, just -- nightmares.

23       Q.   Have you told any physician about those

24  things?

Plaintiffs' Exhibit 52

Page 125

```
 1       A.   No.
 2       Q.   All right.  What are you doing to alleviate
 3  those things?
 4       A.   Nothing.
 5       Q.   All right.  And how is it that you know that
 6  it's related to not getting the medication?
 7       A.   Because the nightmares are about that, about
 8  my experience there and not having --
 9       Q.   Your experience in jail?
10       A.   Yeah.  Not having my medication.
11       Q.   Okay.  Have you ever been treated for that
12  particular problem?
13       A.   No.
14       Q.   No physician has ever talked to you about the
15  nightmares?
16       A.   No.
17       Q.   All right.  Who is the first person you told
18  that you were traumatized about it?
19       A.   My mother.
20       Q.   When did you tell her first?
21       A.   Immediately after my -- After I went to
22  Logan, I told her.
23       Q.   After you went to Logan?
24       A.   Yes.
```

Page 126

1      Q.   Was it after you had word-of-mouth
2   information about this lawsuit?
3      A.   No.  Before.
4      Q.   A minute ago you told me that you first told
5   your mother about your experience at Cook County Jail
6   after you had received information about this lawsuit.
7      A.   I'm not sure.
8      Q.   All right.
9      A.   I'm not sure.
10      Q.   So you don't know exactly when it was you
11   first --
12      A.   No.
13      Q.   -- told your mother about --
14      A.   No.
15      Q.   -- the traumatization?
16      A.   No.  Before, after, during.  I'm not sure.
17      Q.   All right.  Before you were arrested by
18   Chicago police, I believe you said that you were not
19   employed.  Is that right?
20      A.   Yes.
21      Q.   And currently you're not employed; is that
22   right?
23      A.   Yes.
24      Q.   So your employment aspect has not changed at

1    all?

2        A.    No.

3        Q.    Has your disability changed at all?

4        A.    No.

5        Q.    So you're currently receiving the same

6    benefits that you were receiving before your

7    incarceration?

8        A.    Yes.

9        Q.    All right.  What is it that's different in

10   your life right now from what it was -- what your life

11   was before your arrest aside from age?

12       A.    Nothing.

13       Q.    All right.

14       A.    That I recollect.

15       MR. CATANIA:  Thank you.  I have no further

16   questions, sir, other than that I would like that you

17   sign the requests that we've made for your medical

18   records.

19       MR. MORRISSEY:  Yeah, you can sign those.

20       THE WITNESS:  Okay.

21       MR. MORRISSEY:  I have a few questions.

22       THE WITNESS:  Yes.

23       MR. CATANIA:  Thank you.

24

```
 1                    CROSS-EXAMINATION

 2   BY MR. MORRISSEY:

 3        Q.   Mr. Cleaves, you mentioned that prior to

 4   entering the Cook County Jail on April 7th, 2007, you

 5   had received treatment with two prescriptions, Seroquel

 6   and Klonopin, correct?

 7        A.   Yes.

 8        Q.   And for how long a period of time had you

 9   been taking that medication?

10        A.   Previously to my arrest, previous --

11        Q.   Prior to your incarceration --

12        A.   Three years.

13        Q.   -- of '07.

14             And for those three years -- that three-year

15   period, had you consistently been taking Seroquel --

16        A.   Yes.

17        Q.   -- and Klonopin?

18        A.   Yes.  Yes, I have.  Excuse me.

19        Q.   And when your prescription would expire, you

20   would contact your psychiatrist to have the

21   prescription filled?

22        A.   Yes.

23        Q.   And were you in the process of contacting

24   your psychiatrist prior to your incarceration to have
```

1    your prescription filled?

2        A.    Yes.

3        Q.    Okay.  Did you have any indication that you

4    would -- that your physician would not fill the

5    medication?

6        MR. CATANIA:  Objection, form, speculation.

7        MR. MORRISSEY:  You can answer the question.

8    BY THE WITNESS:

9        A.    Yes.  No, no reason why they would not.

10       Q.    Okay.  Now, you mentioned that after you were

11   arrested by the Chicago police that while you were

12   in -- being held by the Chicago police they took you to

13   Holy Cross Hospital?

14       A.    Yes.

15       Q.    And why did you -- Why were you treated at

16   Holy Cross Hospital?

17       MR. CATANIA:  Objection, basis of knowledge.

18   BY THE WITNESS:

19       A.    I was treated for lack of medication.  I

20   needed my medication at the time.

21       Q.    Okay.

22       A.    Yeah.

23       Q.    Did you receive any medication --

24       A.    Yes.

1        Q.    -- at the hospital?

2        A.    Yes.

3        Q.    What medications did you receive at the

4    hospital?

5        A.    Seroquel and Klonopin.

6        Q.    And what date was that, do you recall,

7    approximately?

8        A.    Approximately the same day as my arrest or

9    same -- next day.

10       Q.    Now, when you came into the jail, did you --

11   You went through a medical intake, correct, when you

12   came into the jail?

13       A.    County?

14       Q.    Yeah.

15       A.    Yes.

16       Q.    Okay.  And did you want to tell the medical

17   person about the medication you were taking?

18       MR. CATANIA:  Objection, form of the question.

19   BY THE WITNESS:

20       A.    Yes, I did.

21       Q.    In fact, did you tell a medical person that

22   you were on psychiatric medication?

23       A.    Yes.  To my knowledge, yes.

24       Q.    And why did you do that?

Page 131

1    A.   Because I wanted to receive it.  I mean, I
2  know I needed them.
3    Q.   Okay.  When -- Prior to going into the jail
4  in April of 2007, if you didn't receive your medication
5  within a period of time, what symptoms would you
6  experience?
7    A.   Panic attacks, paranoia, voices.
8    Q.   So was it important to you to tell the
9  medical person when you came into the jail that you
10  needed your medication?
11    A.   Yes.
12    Q.   And did you describe to the medical person
13  that you had a mental disorder?
14    A.   Yes.
15    Q.   Did that medical person that you talked to
16  about your medical history and your current problems
17  tell you whether or not you would receive your
18  medication --
19    A.   No.
20    Q.   -- in the jail?
21    A.   They didn't tell me nothing.
22    Q.   Okay.  Now, after you went through the
23  medical intake, April 7th, 2007, did you begin to
24  experience any type of symptoms?

1        A.    Not right away.

2        Q.    Okay.  After a day or two, did you start --

3        A.    Yes.

4        Q.    What type of symptoms did you experience?

5        A.    Racing thoughts, my heart -- I just got

6   paranoid, scared.

7        Q.    Okay.  And did you convey that information to

8   any person?

9        A.    Every employee I seen of Cook County.

10       Q.    Okay.  And then on April 10th, you were seen

11  in the emergency room, correct, at Cermak Health

12  Services?

13       A.    Yes.

14       Q.    And did you then tell them again, the people

15  that you saw on April -- the medical personnel that you

16  saw on April 10th, 2007, that you had been receiving

17  prescription medication for your mental illness?

18       A.    Yes.

19       Q.    Now, in fact, you didn't receive any medical

20  prescriptions for your psychiatric problems until

21  April 24th, 2007, correct?

22       A.    What?  In --

23       Q.    While you were in the jail, there was a delay

24  of two or three weeks before you got any type of

1    medication?

2         A.    Any type, yes.

3         Q.    When you finally received Trazodone, did that

4    help your symptoms?

5         A.    No.  Helped me sleep for about two hours.

6    And other than that, boom, I was up again.

7         Q.    So the Trazodone didn't have any impact in

8    regards to your panic attacks?

9         A.    No, none whatsoever.

10        Q.    How about your other symptoms?  Did it treat

11   your other symptoms?

12        A.    Nothing.

13        Q.    When you -- Do you recall when you came in to

14   the jail specifically talking to a psych worker?

15        A.    Yes, vaguely.

16        Q.    Do you recall whether or not you told the

17   psych worker whether or not you were on psych meds or

18   not?

19        A.    Yes, I recall that.

20        Q.    Did you tell the psych worker that you were

21   on medication?

22        A.    Yes.

23        Q.    Why would you have told the psych worker that

24   you needed medication?

Page 134

1      A.   Because I needed it.  I was taking them three

2   years prior to my arrest.  I mean, you just take

3   medication -- You just cut someone off of their

4   medication, and there's circum- -- there's -- Things

5   happen in your mind.

6      Q.   Do you know whether or not Trazodone is a

7   psychotic medication?

8      A.   I don't know.

9      MR. CATANIA:  Objection, basis of knowledge.

10  BY THE WITNESS:

11     A.   I don't know.

12     Q.   Now, prior to your arrest in April of 2007,

13  you did use alcohol, correct?

14     A.   Yes.

15     Q.   On a daily basis?

16     A.   More or less.

17     Q.   Okay.  And you did use cocaine?

18     A.   Occasionally.

19     MR. MORRISSEY:  Okay.  I have nothing further.

20     MR. CATANIA:  I just have a few questions to

21  follow up on that.

22                    REDIRECT EXAMINATION

23  BY MR. CATANIA:

24     Q.   When you say that you spoke to a mental

1   health specialist, before when I was asking about that,

2   you didn't have any independent memory of that; is that

3   right?

4        A.   Right, right.

5        Q.   And can you describe the person that you just

6   were talking about --

7        A.   No.

8        Q.   -- when your attorney was asking the

9   questions?

10       A.   No.

11       Q.   If you turn to page 9 of that big Exhibit

12  No. 2 in front of you --

13       A.   Mm-hmm.

14       Q.   -- that's the one that's dated April 10th of

15  2007 at 10:50?

16       A.   Yes.

17       Q.   At the top where it says "mood" --

18       A.   Yes.

19       Q.   -- do you see next it in quotes it says

20  "bad," in quotes?

21       A.   Right, right.

22       Q.   And you -- All the way at the top, the word

23  "bad" is in quotes, all the way up at the top on the

24  right -- on the left side.  Let me point to it.  It's

Page 136

1    right here.

2         A.    Oh, yeah.

3         Q.    Where it says "mood" --

4         A.    Yes.

5         Q.    -- next to that in quotes is "bad," right?

6         A.    Right.

7         Q.    And you understand when quotes are used that

8    that's referring to your words, right?

9         A.    Yes.

10        Q.    Okay.  And below that, it says your effect

11   and it's circled "expansive," right?  Do you see where

12   it --

13        A.    Yes.

14        Q.    -- says "expansive"?

15        A.    Yes.

16        Q.    And then to the right of that it says

17   "depressed" and above it says "slightly"?

18        A.    Yes.

19        Q.    And those are your words, you're slightly

20   depressed, right?

21        A.    Yes.

22        Q.    When it says "Additional MSE Narrative," do

23   you see that bold --

24        A.    Yes.

Page 137

1       Q.   -- underline?

2       A.   Yes.

3       Q.   Okay.  It says, Male voice, unrecognizable,

4  present as thoughts in head rather than voices in room.

5  And then it says, Last, time three months ago.

6       A.   Yes.

7       Q.   Three months ago refers to January or

8  February of '07, right?

9       A.   Mm-hmm.

10      Q.   Yes?

11      A.   Yeah.

12      Q.   And during that period of time from what

13 you've already told us, you were taking your Seroquel

14 and your Klonopin?

15      A.   Previously to my incarceration, yes.

16      Q.   Okay.  And yet you still had thoughts as --

17 voices as thoughts in your head, not voices in the

18 room, right?

19      A.   Yes.

20      Q.   Okay.

21      A.   Slight.

22      Q.   And then where -- under the Assessment, which

23 we talked about before a little bit, it says Axis IV --

24 That's the Roman numeral four.

1      A.   Uh-huh.

2      Q.   "Moderate."

3      A.   Mm-hmm.

4      Q.   And then it says "List Psychosocial

5  Stressors."

6      A.   Mm-hmm.

7      Q.   Do you see what it said next to that?

8      A.   "Substance."

9      Q.   "Substance and legal" --

10     A.   Yeah.

11     Q.   -- right?

12          And to your understanding that refers to the

13  substance that you're no longer getting, which is

14  cocaine, right?

15     A.   No, I don't understand that.

16     Q.   All right.  And legal, do you understand that

17  to mean your then current legal problems of being

18  incarcerated for this possession of a stolen motor

19  vehicle?

20     A.   Yes.

21     Q.   Okay.  So those were the stressors that you

22  told them about at the time, right?

23     A.   Uh-huh.

24     Q.   Is that a yes?

1       A.    No.

2       Q.    That's not the stressors you told them about?

3       A.    Not that I recollect.

4       MR. CATANIA:  All right.  I have no further

5  questions.  Thank you very much, sir.

6       THE WITNESS:  Are these copies mine?

7       MR. CATANIA:  No.  Those are the court reporter's.

8       THE WITNESS:  They just look interesting.

9       MR. CATANIA:  That concludes this federal

10  deposition.

11       THE VIDEOGRAPHER:  This will be all for

12  Tape No. 2.  It will be the conclusion of this

13  deposition.  We're going off the video record at

14  1:03 p.m.

15                    (Witness excused.)

16

17

18

19

20

21

22

23

24

Page 140

```
 1   UNITED STATES OF AMERICA          )

     NORTHERN DISTRICT OF ILLINOIS     )

 2   EASTERN DIVISION                  )   SS.

     STATE OF ILLINOIS                 )

 3   COUNTY OF COOK                    )

 4              I, Teresa Resendez, Certified Shorthand

 5   Reporter and Notary Public, do hereby certify that ROY

 6   C. CLEAVES was first duly sworn by me to testify to the

 7   whole truth and that the above deposition was reported

 8   stenographically by me and reduced to typewriting under

 9   my personal direction.

10              I further certify that the said deposition

11   was taken at the time and place specified and that the

12   taking of said deposition commenced on the 10th day of

13   September, A.D., 2009, at 11:00 a.m.

14              I further certify that I am not a relative or

15   employee or attorney or counsel of any of the parties,

16   nor a relative or employee of such attorney or counsel,

17   nor financially interested directly or indirectly in

18   this action.

19

20

21

22

23

24
```

1          In witness whereof, I have hereunto set my

2     hand and affixed my seal of office at Chicago,

3     Illinois, this 24th day of September, A.D., 2009.

4

5

6

7

8

9
                          _____

10                        TERESA RESENDEZ, CSR

                          39 South LaSalle Street

11                        Suite 625

                          Chicago, Illinois  60603

12                        Phone:  (312) 236-9211

13

14

      CSR No.  084-003718

15

16

17

18

19

20

21

22

23

24

**Exhibit 5'**

```
1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3

4    MICHAEL PARISH, CURTIS L. OATS,      )
     LEILA KHOURY, SEAN DRISCOLL,         )
5    CARLA LOFTON, ROY CLEAVES, LISA      )
     BROWN, DAN TAYLOR, DEAN MILLER,      )
6    KEVIN SANDERS, STACEY CLARK, and     )
     CARLOTTE WATSON,                     )
7                                         )
               Plaintiffs,                )
8                                         )
         -vs-                             )
9                                         )
     SHERIFF OF COOK COUNTY and COOK      ) No. 07 CV 4369
10   COUNTY,                              )
                                          )
11             Defendants.                )
12

13

14             The deposition of LISA A. BROWN, called by
15   the Defendant for examination, pursuant to notice
16   and pursuant to the Federal Rules of Civil
17   Procedure for the United States District Courts
18   pertaining to the taking of depositions, taken
19   before Noreen E. Thompson, Registered Professional
20   Reporter and Notary Public within and for the
21   County of Cook and State of Illinois, at 50 W.
22   Washington Street, Suite 500, Chicago, Illinois,
23   commencing at the hour of 9:00 a.m. on the 11th day
24   of September, C.E., 2009.
```

Page 2

```
 1   A P P E A R A N C E S:
 2        MR. KENNETH N. FLAXMAN
          200 S Michigan Ave, Suite 1240
 3        Chicago, IL 60604
          (312) 427-3200
 4
 5            Appeared on behalf of the Plaintiffs;
 6
          MR. FRANCIS J. CATANIA
 7        ASSISTANT STATE'S ATTORNEY
          500 Daley Center
 8        Chicago, Illinois  60602
          Phone:  (312) 603-6572
 9
              On behalf of the Defendants.
10
11
     ALSO PRESENT:
12
          Brian C. Falk
13        Legal-Ease Video Services
14
15
16
17
18
19
20
21
22
23
24
```

1                    I N D E X

2

    WITNESS                          EXAMINATION

3

    LISA BROWN

4

        BY MR. CATANIA                    5
5       BY MR. FLAXMAN                    89
        BY MR. CATANIA                    95

6

7

8


                E X H I B I T S

9

    LISA BROWN
10  DEPOSITION EXHIBIT              MARKED FOR ID
11      No. 1                           44
12

13

14

15

16

17

18

19

20

21

22

23

24

Plaintiffs' Exhibit 53

1        THE VIDEOGRAPHER:  We're going on the

2   video record at 9:07 a.m.  My name is Brian Falk.

3   I am the videographer from Legal-Ease Video

4   Services in association with Perscribo Reporting.

5   My address is 3550 North Lake Shore Drive, Chicago,

6   Illinois.  The court reporter is Noreen Thompson of

7   Perscribo Reporting.

8        This will be the videotaped deposition of

9   Laurie [sic] Brown taking place today, Friday,

10  September 11th, 2009, at 50 West Washington,

11  Chicago, Illinois.

12        This deposition is being taken in the

13  matter of Michael Parish, Curtis L. Oats, Leila

14  Khoury, Sean Driscoll, Carla Lofton, Roy Cleaves,

15  Lisa Brown, Dan Taylor, Dean Miller, Kevin Sanders,

16  Stacey Clark, and Carlotte Watson vs. The Sheriff

17  of Cook County and Cook County in the U.S. District

18  Court for the Northern District of Illinois,

19  Eastern Division, Case No. 07 CV 4369.

20        This deposition is being taken on behalf

21  of the Defendants.  The parties whose instance this

22  deposition is being recorded on audiovisual

23  recording are the Defendants.

24        Will counselors now please announce their

Page 5

1    appearances for the record.

2            MR. CATANIA:  Francis Catania for the

3    Defendants.

4            MR. FLAXMAN:  Kenneth Flaxman for the

5    Plaintiffs.

6            THE VIDEOGRAPHER:  Will the court reporter

7    now swear the witness, please.

8                    (Witness duly sworn.)

9    WHEREUPON:

10                   LISA A. BROWN,

11   called as a witness herein, having been first duly

12   sworn, was examined and testified as follows:

13                   EXAMINATION

14   BY MR. CATANIA:

15      Q.   Ma'am, will you please state your full

16   name and spell your last name for the court

17   reporter.

18      A.   My name is Lisa Ann Brown.  My last name?

19      Q.   Yes, please spell it.

20      A.   B R O W N.

21      Q.   Ms. Brown, this is a federal deposition

22   which is intended to preserve your testimony; and

23   there are a few ground rules I'd like to explain

24   before we begin.  Could you tell me if you've ever

Page 6

1    had a deposition before?

2        A.    No.

3        Q.    Have you ever testified in a courtroom

4    under oath before?

5        A.    No.

6        Q.    For that reason, I want to just explain a

7    couple things.  First, the court reporter here is

8    taking down everything we say; and it is important

9    that she get every word that we say because it

10   forms a record of these proceedings.  Do you

11   understand that?

12       A.    Yes.

13       Q.    You are also under oath, meaning that you

14   have to tell the truth.  Do you understand that?

15       A.    Yes.

16       Q.    Have you ever heard the term "perjury"

17   before?

18       A.    No.

19       Q.    It means there is a penalty for not

20   telling the truth.  Do you understand that?

21       A.    Yes.

22       Q.    Essentially, I'm going to ask you a bunch

23   of questions; you're going to give your answers

24   under oath; and the court reporter is going to type

1   that up in a transcript.  And we also have a

2   videographer who is taking everything down on

3   videotape.  Do you understand all of that?

4        A.   Yes.

5        Q.   And the reason why that is important is

6   because it may be used later at a trial; and if you

7   say something different later at a trial, there is

8   going to be some questions about why you changed

9   your testimony.  Do you understand that?

10       A.   Yes.

11       Q.   It is also important that you understand

12   what I'm asking and that I understand what you are

13   saying.  If I ask a question you don't understand,

14   please stop me and ask for a clarification.  If you

15   answer, we'll just assume that you understood the

16   question; is that okay?

17       A.   Yes.

18       Q.   I ask that you ask me for clarifications

19   and definitions because I'm the one that's

20   conducting the deposition, and your attorney is not

21   here to answer questions.  He's here just to

22   protect rights, mainly that I don't abuse you in

23   any way.  Do you understand?

24       A.   Yes.

1    Q.   Can you please tell me, have you ever been
2  known by any other name?

3    A.   Yes.

4    Q.   What other names?

5    A.   Shawn Jones, Teshina Jones, Lisa Brown.
6  The rest of them I don't remember.

7    Q.   Are there more, though, that you've been
8  known by?

9    A.   Not sure.

10   Q.   Do you have a copy of a birth certificate
11 for yourself?

12   A.   Not with me.

13   Q.   You have one at home?

14   A.   No.  I lost it.

15   Q.   Could you please raise your microphone up
16 a little bit higher so that we can -- just lift it
17 higher on your clothing.

18        You don't have your birth certificate?

19   A.   No.

20   Q.   Did you have one at some time?

21   A.   Yes.

22   Q.   What was the name on the birth
23 certificate?

24   A.   Lisa A. Brown.

```
 1        Q.   And is that a birth certificate from the

 2   Chicago area, Cook County, Illinois?

 3        A.   No.

 4        Q.   Where was it from?

 5        A.   Kenneth, Missouri.

 6        Q.   Could you spell Kenneth for me?

 7        A.   K E N N E T H.

 8        Q.   And that's the place you were born?

 9        A.   That's right.

10        Q.   Where do you currently live, the address?

11        A.   5508 West Des Moines Street.

12        Q.   And is that in Chicago, Illinois?

13        A.   Yes.

14        Q.   And that's near North Avenue; is that

15   right?

16        A.   Exactly.

17        Q.   How long have you lived at that location?

18        A.   About two years.

19        Q.   Who do you live there with?

20        A.   My daughter.

21        Q.   What's your daughter's name?

22        A.   Teshina Jones.

23        Q.   And how old is Teshina Jones?

24        A.   22.
```

1    Q.    And could you tell me what your birth date

2    is?

3    A.    7

4    Q.    Have you ever been known to have other

5    birth dates or have you ever given other birth

6    dates to anybody?

7    A.    Not that I remember.

8    Q.    Okay.  And could I have your social

9    security number, please.

10   A.    3

11   Q.    Can you tell me a little bit about your

12   education?  What's the highest level of education

13   you've attained?

14   A.    I completed the eighth grade, started the

15   ninth.

16   Q.    Where did you complete eighth grade at?

17   A.    Suder School.

18   Q.    Suder?

19   A.    Uh-huh.

20   Q.    And where is that located?

21   A.    On Damen and Washington.

22   Q.    And where did you start the ninth grade?

23   A.    It was Kreuger and they turned the name

24   into McKinley.

1    Q.    And you started your ninth year, but

2    you -- did you drop out?

3    A.    Yeah.

4    Q.    Have you attained any certificates or

5    other special training after that?

6    A.    No.

7    Q.    And can you tell me about your employment

8    history?  Are you currently working?

9    A.    No.

10    Q.    Have you ever worked?

11    A.    No.

12    Q.    Can you tell me what it is that you

13    believe that we're here to talk about today?

14    A.    My case.

15    Q.    And by your case, do you mean the case

16    that has the name Michael Parish and you and other

17    people that were described earlier by the

18    videographer?  Is that the case you're talking

19    about?

20    A.    Yes.

21    Q.    Do you know what is the date that we're

22    talking about regarding you in this case?

23    A.    What's the date?

24    Q.    Yes.

1     A.   Today's date?

2     Q.   No.  The date we're talking about

3  regarding your case.

4     A.   No.

5     Q.   You don't know, okay.  I have been told

6  that the date that we're focusing in on for

7  purposes of this case -- and this is based on

8  what's in your complaint -- is January 15th, 2008.

9  Does that sound right?

10     A.   Yeah, it do.

11     Q.   I've been told by the attorney that that's

12  the date that we're talking about regarding the way

13  that you were -- the way you entered into the Cook

14  County Jail.  Do you understand that that's what

15  we're talking about?

16     A.   Yes.

17     Q.   Prior to -- and that means before -- that

18  date, had you ever been to the Cook County Jail

19  before?

20     A.   Yeah.

21     Q.   About how many times?

22     A.   Numerous times.

23     Q.   And in each of the times that you ended up

24  going into the Cook County Jail, was that as a

1    result of an arrest by the Chicago Police

2    Department?

3        A.   Yeah.

4        Q.   Have you ever been arrested by other

5    police agencies besides Chicago?

6        A.   No.

7        Q.   On each of those arrests by the Chicago

8    Police Department, were you first brought to a

9    local police station before you were transported to

10   the jail?

11       A.   Yes.

12       Q.   And by "local police station," you

13   understand that I mean a police station in a

14   neighborhood of Chicago?

15       A.   Yeah.

16       Q.   My records that I have indicate that you

17   have been arrested 54 times by the Chicago Police

18   Department.  Does that sound about right?

19       A.   Yeah.

20       Q.   Have you ever been convicted of a felony

21   crime?

22       A.   Yes.

23       Q.   When were you convicted of a felony crime?

24       A.   I don't recall the dates and everything.

1      Q.    Was it within the last five years?

2      A.    Yeah.

3      Q.    Do you remember what the charge was that

4  you were convicted of?

5      A.    Fighting.

6      Q.    And by that, do you mean battery or

7  aggravated battery?

8      A.    Something similar.

9      Q.    Okay.  Have you ever been convicted of a

10  crime that involved theft or dishonesty?

11      A.    Yes.

12      Q.    Have you ever been convicted of that type

13  of a crime within the last five years?

14      A.    Yes.

15      Q.    When you were arrested before the book

16  date that we're talking about of January 15th,

17  2008, how many days was it before that date that

18  you were arrested by the police?

19          MR. FLAXMAN:  Object to the form of the

20  question.

21  BY MR. CATANIA:

22      Q.    Okay.  Were you arrested the same day that

23  you were booked into the jail?

24      A.    Was I arrested the same day?

1      Q.    Yes.

2      A.    Yes.

3      Q.    So on January 15th, 2008, to the best of

4   your knowledge, was the day that you were arrested?

5      A.    I think I was arrested the 14th.

6      Q.    The 14th, okay.  Do you remember where you

7   were arrested at on the 14th of January 2008?

8      A.    Where they took me to?

9      Q.    Yes.

10     A.    I believe Grand and Central.

11     Q.    Is that the place where you were

12   processed; meaning booked, photographed,

13   fingerprinted?

14     A.    Yes.

15     Q.    And did you enter into a lockup at that

16   location?

17     A.    Yes.

18     Q.    Before going into the lockup, were you

19   spoken to by police officers?  Did they ask you

20   questions about your medical condition, for

21   example?

22     A.    No, they didn't.

23     Q.    They didn't ask you any questions like

24   that?

```
 1       A.   No.

 2       Q.   Do you remember what it was that you were

 3  charged with after that arrest?

 4       A.   Fighting.

 5       Q.   And that would be fighting with your --

 6  with whom?

 7       A.   A friend.

 8       Q.   Could I have the name of the friend?

 9       A.   Anita Clippard.

10       Q.   Could you spell her last name?

11       A.   C L I P P A R D.

12       Q.   And is that somebody that you had a

13  relationship with?

14       A.   Yes.

15       Q.   Were you roommates?  What was the

16  relationship?

17       A.   It is a -- we've been in a relationship

18  for some time.

19       Q.   Was it a dating relationship?  Is that how

20  you would call it?

21       A.   No.

22       Q.   Did you ever live in the same apartment or

23  dwelling together with Anita Clippard?

24       A.   Yeah.
```

1      Q.    And the arrest then, was that for a

2   domestic battery?

3      A.    Yes.

4      Q.    Is that the first time you'd been arrested

5   for domestic battery?

6      A.    Yes.

7      Q.    When you were arrested, was Anita Clippard

8   also brought to Grand and Central?

9      A.    No.

10      Q.    Did any family members come to Grand and

11   Central while you were there?

12      A.    No.

13      Q.    And you had been to Grand and Central

14   before that date, right?

15      A.    Yeah.

16      Q.    On numerous occasions?

17      A.    Yes.

18      Q.    And at Grand and Central, there is also a

19   couple courtrooms; is that right?

20      A.    Yes.

21      Q.    Can you tell me what physical illnesses

22   you suffered at the time that you were arrested on

23   January 15th of 2008?

24      A.    On the 15th?

Page 18

1      Q.    Yes.

2      A.    None.

3      Q.    Were you physically ill at all on that

4   day?

5      A.    No.

6      Q.    You were not in need of any emergency

7   medical treatment when you were arrested?

8      A.    No.

9      Q.    And you didn't subsequently have an

10   emergency medical condition occur, is that right,

11   after that?  After your arrest, you didn't get

12   sick?

13      A.    No.

14      Q.    Let me try to clarify.  When you were in

15   the custody of the Chicago police after you were

16   arrested January 14th, 2008, you didn't have to go

17   to a hospital, right?

18      A.    No.

19      Q.    You didn't become sick while you were in

20   police custody?

21      A.    No.

22      Q.    Before that date of January 14th, 2008,

23   can you tell me if you were ever diagnosed with any

24   medical disease or defect?

1    A.   Yes.

2    Q.   What medical disease were you diagnosed

3  with before that date?

4    A.   HIV.

5    Q.   When were you diagnosed with HIV?

6    A.   I do believe in '95.

7    Q.   When did you begin treatment for HIV?

8    A.   I do believe 2003.

9    Q.   Where did you begin that treatment?

10    A.   The Core Center.

11    Q.   And The Core Center is the center that is

12  operated by the County of Cook, is that right, Cook

13  County Hospital, Stroger Hospital?

14    A.   Yes.

15    Q.   Who was it that diagnosed you with HIV?

16    A.   I'm not sure.

17    Q.   When you were at The Core Center in 2003,

18  who was your doctor?

19    A.   Dr. McGuinn (phonetic).

20    Q.   And do you know Dr. McGuinn's specialty?

21    A.   Doctor.

22    Q.   I mean, do you know what special area of

23  medicine that doctor practices?

24    A.   I'm not sure.

Page 20

1      Q.   Do you know Chad Zawith (phonetic) from
2   The Core Center?
3      A.   No.
4      Q.   Is Dr. McGuinn your current doctor?
5      A.   No.
6      Q.   Who is your current doctor?
7      A.   I don't know the name.
8      Q.   Where do you go currently for treatment
9   right now?
10      A.   Core Center.
11      Q.   When is the last time you went to The Core
12   Center for examination or treatment?
13      A.   Wednesday.
14      Q.   Okay.  Is that the 1:00 o'clock
15   appointment that prevented our deposition earlier?
16      A.   Yes.
17      Q.   And did you get a prescription on
18   Wednesday of this week?
19      A.   No.
20      Q.   On January 14th, 15th, 2008, did you have
21   any prescriptions that you were supposed to be
22   taking?
23      A.   My medication?
24      Q.   Yes.

Page 21

1       A.   Yes.

2       Q.   What prescriptions were you supposed to be

3    taking on January 14th and 15th of '08?

4       A.   Combivir, Sustiva.

5       Q.   When was the first time you were

6    prescribed Combivir?

7       A.   I believe 2003.

8       Q.   And Sustiva?

9       A.   Same.

10      Q.   And was it Dr. McGuinn that prescribed

11   those?

12      A.   Yes.

13      Q.   And in what form do you take those

14   medications?

15      A.   What do you mean?

16      Q.   Are they pills?

17      A.   Yes.

18      Q.   And do you know what the prescription

19   amount is of each Combivir and Sustiva that you're

20   supposed to take at that time?

21      A.   You mean the dosage?

22      Q.   Dosage.

23      A.   One of them is 600 and the other one is

24   150, slash, 300, I think, I do believe.

Page 22

1      Q.   And do you know which one is which?

2      A.   Yeah.

3      Q.   Which one is the 600?

4      A.   You know what?  I confuse my ...

5      Q.   Can you tell me what color the Combivir

6 comes in?

7      A.   White.

8      Q.   And the Sustiva?

9      A.   Yellow.

10      Q.   And have you had those medicines

11 prescribed to you since 2003?

12      A.   Yes.

13      Q.   Have you ever had any changes in those

14 prescriptions since then?

15      A.   No.

16      MR. FLAXMAN:  Answer so that we can hear.

17 BY THE WITNESS:

18      A.   No.

19      Q.   Other than those two prescriptions, were

20 you taking any other medicines when you entered

21 into the custody of the police on January 14th,

22 2008?

23      A.   Seroquel and Clonidine.

24      Q.   Okay.  Who prescribed the Seroquel to you?

Page 23

1       A.    Jackson Park Hospital.

2       Q.    When?

3       A.    I can't remember.

4       Q.    Was that prescription current?  In other

5    words, did you have a valid prescription at the

6    time of your arrest in January 2008?

7       A.    Yes.

8       Q.    And the same thing for the Clonidine?

9       A.    Yeah.

10      Q.    Do you remember at all the name of the

11   doctor that prescribed those?

12      A.    The Clonidine, Dr. Henry.

13      Q.    Stafford Henry?

14      A.    Dr. Henry, that's all I know.

15      Q.    An African-American physician, is that who

16   we're talking about, Dr. Henry?

17      A.    African-American?

18      Q.    A black doctor.

19      A.    No.

20      Q.    And when was it that you first were

21   prescribed this Clonidine?

22      A.    About two years.

23      Q.    Two years before January 15th of '08?

24      A.    Yes.

Page 24

1      Q.    When you get that prescription filled,

2   where do you fill that prescription?

3      A.    Raymar's Clinic.

4      Q.    Where is that located?

5      A.    60th and Halsted.

6      Q.    And when is the last time you filled that

7   prescription at that location?

8      A.    I just received that.  The 8th.

9      Q.    Of September?

10      A.    Yes.

11      Q.    When that prescription was first written

12   for you by Dr. Henry, did it include any refills?

13      A.    Yes.

14      Q.    How many?

15      A.    Two.

16      Q.    And how many pills on each refill?

17      A.    30.

18      Q.    And have you gone to a physician each

19   month to have that prescription refilled, or is it

20   every three months you've gone to --

21      A.    Yeah, like, every three months.

22      Q.    Always at the same location?

23      A.    Yeah.

24      Q.    And what location was it?

1     A.    60th and Halsted.

2     Q.    The clinic name, could you spell that for

3   me because I don't recognize it.

4     A.    I do believe R A Y M A R Clinic.

5     Q.    When you were arrested by the Chicago

6   Police Department, did you have any of your

7   medication with you on your person?

8     A.    No.

9           MR. FLAXMAN:  Let me object to the -- the

10  question assumes -- you said any other medication

11  with you.  I don't think that you established that

12  she had any medication with her at all.

13  BY MR. CATANIA:

14    Q.    When you were arrested by the Chicago

15  Police Department on January 14th, 2008, did you

16  have any of your medication with you?

17    A.    No.

18    Q.    When is the last time you had a dose of

19  any of your medication before you were arrested by

20  the Chicago police January 14th of '08?

21    A.    The day I was arrested.

22    Q.    What time of day did you have that dose on

23  the day you were arrested?

24    A.    The morning.

Page 26

1  Q. What time of day were you arrested?

2  A. I was -- what time of day was I arrested?

3  Q. Yes.

4  A. The 14th.

5  Q. And what time of the day?  Morning?

6 Afternoon?

7  A. Over the afternoon.

8  Q. And who was the first person you told that

9 you were supposed to be taking daily medication?

10  A. Who is the first person I told?

11  Q. Yes.

12  A. At what time are you talking about?

13  Q. On the date of your arrest.

14  MR. FLAXMAN:  That assumes that she told

15 somebody on the first day of the arrest.  Object to

16 the form of the question.

17 BY MR. CATANIA:

18  Q. Since there is an objection, can you

19 answer my question or no?

20  A. No.

21  Q. Who is the first person that you told

22 after being arrested that you were on medication?

23  A. Oh, when I got to the county.

24  Q. Okay.  Did you know the police officer

1    that arrested you on January 14th, 2008?

2        A.   No.

3        Q.   Did you know any of the other police

4    officers that were present during any of the

5    processing?

6        A.   No.

7        Q.   If you saw those officers, would you

8    recognize them today?

9        A.   No.

10       Q.   Where was it that you were arrested for

11   the domestic battery?

12       A.   Where was I?

13       Q.   Yes.

14       A.   In Family Dollar.

15       Q.   That's a retail store?

16       A.   Yes.

17       Q.   Is that on North Avenue?

18       A.   Yeah.

19       Q.   Do you remember the name of the officer

20   that arrested you?

21       A.   No.

22       Q.   Do you remember the name of the lockup

23   keeper that you spoke to at the police station?

24       A.   No.

1    Q.   Do you remember the name of the person who

2 searched you at the police station?

3    A.   No.

4    Q.   How about the person that fingerprinted

5 you?

6    A.   No.

7    Q.   Were they each different people that did

8 those things?

9    A.   Yeah.

10    Q.   When you were arrested, did you turn in

11 any personal property to the Chicago Police

12 Department?

13    A.   I don't remember.

14    Q.   At the time when you were arrested, did

15 you have any prescription forms with you at the

16 Chicago Police Department?

17    A.   No.

18    Q.   When you got to the county -- I'm talking

19 about the county for a bond hearing -- was that

20 done in a courtroom or was it a video bond court?

21    A.   A video.

22    Q.   What time of day was it that you went to

23 the video bond court?

24    A.   I could say around about what time.

Page 29

1    Q.   About what time?

2    A.   I think it could have been around 11:00.

3    Q.   11:00 a.m. on the 15th?

4    A.   Yeah.  I'm not sure though.

5    Q.   All right.  From the time of your arrest

6    until the time of your bond hearing, were you

7    always in the custody of the Chicago Police

8    Department?

9    A.   Yeah.

10   Q.   Were they different officers from the ones

11   that arrested you that brought you to the bond

12   hearing?

13   A.   Yeah.

14   Q.   Did you tell any of them about medications

15   that you were on or supposed to be taking?

16   A.   After getting to the county?

17   Q.   No, before that.  Before your bond

18   hearing, did you tell any Chicago police officers

19   about medicine that you were supposed --

20   A.   They didn't ask me.

21   Q.   Did you tell them?  Did you volunteer it?

22   A.   No.

23   Q.   By then, it was the morning of

24   January 15th of 2008, right, when you went to the

1    bond hearing?

2        A.   Yeah.

3        Q.   So was that the time you ordinarily would

4    be taking your medicine, in the morning?

5        A.   Yeah.

6        Q.   Did you tell anybody before your bond

7    hearing that you needed to take medicine?

8        A.   No.

9        Q.   Did you tell the judge in the bond hearing

10   that you needed to take medicine?

11       A.   I didn't get a chance to talk to a judge.

12       Q.   Okay.  Did you have a chance to talk with

13   an investigator or a public defender's

14   investigator?

15       A.   No.

16       Q.   Did you talk with a public defender at

17   your bond hearing?

18       A.   I don't think so.

19       Q.   Did you see any court services officers in

20   the bond hearing?

21       A.   No.

22       Q.   Were there any officers near you or

23   attending to you during that period of time?

24       A.   Yeah.

1     Q.   Did you tell any of those officers about

2  the need to take medicine that morning?

3     A.   No, I didn't.

4     Q.   Before that date of January 15th, 2008,

5  had there ever been a date that you had missed your

6  doses?

7     A.   Before?

8     Q.   Before that date, did you ever miss a

9  dose?

10     A.   Before the 15th?

11     Q.   Yes.

12     A.   No.

13     Q.   Did you ever run out of your medicine

14  before the 15th of '08?

15     A.   No.

16     Q.   And I'm talking about all of the medicines

17  that you described earlier.  Did you ever run out

18  of any of those medicines?

19     A.   Before the 15th?

20     Q.   Yes.

21     A.   I'm not sure.

22     Q.   Going back to when you were first

23  prescribed the HIV antiviral medicines in 2003, has

24  there ever been a time from then until

1   January 15th, 2008, that you missed a dose, did not

2   take a dose on a particular day?

3        A.   It probably have.

4        Q.   Okay.  When you missed a dose, did you

5   have any ill effect from not having the dose that

6   day?

7        A.   No, because it was only, like, a day.

8        Q.   So in your experience with your own

9   medication, it would be possible to miss a day and

10  not suffer any harm; is that right?

11       A.   A day, yeah.

12       Q.   Have you ever missed more than one day?

13       A.   No.

14       Q.   When you are taking your medicine, do you

15  take it out of a bottle?

16       A.   Yeah, from a bottle.

17       Q.   So you take a pill from each bottle when

18  you take your medicine; is that right?

19       A.   Yes.

20       Q.   So you don't have, like, a weekly pill

21  bottle with each day marked off?

22       A.   No, I don't.

23       Q.   Has there ever been a time when you

24  thought, Did I take my medicine today?

1       A.    Yeah.

2       Q.    And have you then taken it when you

3    thought about that?

4       A.    Yeah.

5       Q.    Even though it is possible you took it

6    earlier?

7       A.    I, basically, know when I take it.

8       Q.    How is it that you know when you've taken

9    it?

10       A.    Because I remember.

11       Q.    But you do agree with me there are times

12    when you have forgotten and then remembered later;

13    is that right?

14       A.    I think later, like, Did I take my

15    medicine; Okay, I took it.

16       Q.    So as far as you know, you've always taken

17    your medicine in the morning?

18       A.    Yeah.

19       Q.    Do you take your medicine with a meal or

20    without any food?

21       A.    I eat.

22       Q.    These medicines that you're taking for the

23    HIV, do you find them to be effective?

24       A.    You mean affect me?

1    Q.    Do they work?

2    A.    Yeah, they good.

3    Q.    So you are not suffering from symptoms of

4    AIDS or the HIV problem?

5    A.    Exactly.

6    Q.    Why do you take the Clonidine?

7    A.    For hypertension.

8    Q.    And why do you take the Seroquel?

9    A.    Depression.  It helps me sleep.

10    Q.    And have you been taking those medicines

11    for over a -- I guess it's over three years now?

12    A.    Yes.

13    Q.    The Clonidine and the Seroquel?

14    A.    Yeah.

15    Q.    Have you had any change in those

16    medications over that past three years?  Have they

17    adjusted the dosage amount?

18    A.    No, I have not had a change.

19    Q.    And how many times have you been to the

20    physician who prescribed the Clonidine and

21    Seroquel?

22    A.    How many times?

23    Q.    Yes.

24    A.    Numerous times.

1     Q.   And have all of those times been at the

2  same clinic, the Raymar Clinic?

3     A.   Yes.

4     Q.   You wouldn't happen to know the address of

5  the Raymar Clinic, would you?

6     A.   Not offhand, I don't know it.

7     Q.   I think you said it is at 60th?

8     A.   Yes, 60th and Halsted.

9     Q.   When you were arrested for the domestic

10  battery, did you give an alias name or your name?

11     A.   My name.

12     Q.   The paperwork in which you were charged,

13  did you ever see that paperwork?  Did your public

14  defender ever have that paperwork?

15          MR. FLAXMAN:  Object to the two questions

16  that you asked.

17          MR. CATANIA:  I agree.  I'll separate

18  them.

19  BY MR. CATANIA:

20     Q.   Did you ever see the charging document,

21  the document that said you are charged with

22  domestic battery?

23     A.   I don't think so.

24     Q.   You never saw a form that said the People

1    of the State of Illinois vs. Shaqueta Brown?

2       A.   I don't think so.

3       Q.   Is that the name that you gave the police

4    when you were arrested on this charge, Shaqueta

5    Brown?

6       A.   Lisa Brown.

7       Q.   That's what you think you gave as a name?

8       A.   Yeah.

9       Q.   And Shaqueta, the spelling that I have is

10   S H A Q U E T A.  Does that sound like a name that

11   you ever gave to the police?

12      A.   I gave it once before.

13      Q.   And did you also give a different birth

14   date when you gave the name of Shaqueta Brown?

15      A.   I might have.

16      Q.   In fact, did you give the date of

17   September 11th, 1982?

18      A.   Yeah.

19      Q.   Happy birthday for your alias birthday.

20         When you were processed at the police

21   station on the arrest of January 14th of 2008, I

22   asked you if they asked you any questions off of a

23   screen, a monitor.  Do you remember that question

24   earlier?  I asked you questions about your medical

Page 37

1    condition.

2         A.    Did you ask me questions?

3         Q.    Yeah.  Do you remember being asked

4    questions about your medical condition by the

5    police?

6         A.    Yes.

7         Q.    Were you asked questions such as are you

8    presently taking medication?

9         A.    I'm not sure.

10        Q.    Were you asked if you are pregnant?

11        A.    I'm not sure.

12        Q.    Were you asked if it is the first time

13   you've ever been arrested?

14        A.    I'm not sure.

15        Q.    Were you asked did you ever attempt

16   suicide or to seriously harm yourself?

17        A.    I'm not sure.

18        Q.    Were you asked whether you have any

19   serious medical problems?

20        A.    That, I'm not sure about.

21        Q.    Were you asked if you have any serious

22   mental problems?

23        A.    That, I'm not sure about neither.

24        Q.    Were you asked if you are receiving

1    treatment at that time?

2         A.    That, I'm not sure about neither.

3         Q.    At the time when you were arrested, you

4    had no physical injury on your person, right?

5         A.    No.

6         Q.    And you had no infection?

7         A.    Infection?

8         Q.    Aside from the HIV that you've already

9    talked about, you had no apparent infection?

10        A.    No.

11        Q.    And you were not under the influence of

12   alcohol or drugs at the time?

13        A.    No.

14        Q.    And you were not in a drug or alcohol

15   withdrawal at the time, right?

16        A.    No.

17        Q.    You were not irrational?

18        A.    Irrational?

19        Q.    Yes.  You were not talking like a crazy

20   person, for example?

21        A.    No.

22        Q.    And you were not carrying any medication

23   at the time, right?

24        A.    No.

1      Q.   You had been arrested before that time

2   approximately 50 times by the Chicago police,

3   right?

4      A.   Yes.

5      Q.   And so that you were aware that the police

6   have no ability to provide you any medicine, right?

7   You knew that they don't have a pharmacy in the

8   jail --

9      A.   Yes.

10     Q.   -- in the police lockup?

11     A.   Yeah.

12     Q.   But at that time, based on your

13   experience, you were aware that the county jail has

14   a pharmacy available, right?

15     A.   Yes.

16     Q.   Have you ever heard of that drug that you

17   described, Clonidine, being called baby heroin?

18   Did you ever hear of that?

19     A.   No.

20     Q.   Did you ever hear the drug Seroquel being

21   called baby heroin?

22     A.   No, I have not.

23     Q.   Have you ever heard other prisoners that

24   have been in the custody of Cook County Jail talk

Page 40

1    about Seroquel and Clonidine?

2        A.   No.

3        Q.   Never have?

4        A.   No.

5        Q.   All right.  Now, going to the time when

6    you had your bond hearing, at that time when you

7    had your bond hearing, there were not any Chicago

8    police officers there, right?

9        A.   No.

10       Q.   And it was just people in dark blue

11   uniforms?

12      A.   Right.

13      Q.   Court services officers that work for the

14   court?

15      A.   Right.

16      Q.   After your bond hearing -- What was the

17   amount of the bond, by the way?

18      A.   3,000.

19      Q.   3,000 to post?

20      A.   Something in that range.

21      Q.   And you were not going to be able to post

22   that money, right?

23      A.   No.

24      Q.   Therefore, you were then brought over to

```
 1    the jail from the bond hearing, right?

 2         A.    Yes.

 3         Q.    Along with other women?

 4         A.    Yes.

 5         Q.    And you were brought to what's known as

 6    the female intake area?

 7         A.    Yes.

 8         Q.    And you had been there before, right?

 9         A.    Yes.

10         Q.    In that area, they have various people

11    that staff that area, right?

12         A.    Yes.

13         Q.    They have paramedics that staff that area;

14    do you know?

15         A.    No, I don't know about the paramedics.

16         Q.    CMTs, correctional medical technicians?

17         A.    Okay.

18         Q.    Have you ever heard that term before,

19    "CMT"?

20         A.    No.

21         Q.    How about mental health specialists, have

22    you ever seen those persons over there?

23         A.    Psych.

24         Q.    Psych?
```

1      A.   Yes.

2      Q.   You've seen psych people in receiving, the

3   female receiving, right?

4      A.   Yeah.

5      Q.   And from your experience, you know that

6   they ask you various questions at the intake about

7   your present health and mental health conditions,

8   right?

9      A.   Yeah.

10     Q.   So before you even got to the receiving

11  room on January 15th of 2008, you already had some

12  idea of what was going to be happening?

13     A.   Yeah.

14     Q.   Before you spoke to anybody in the

15  receiving area, did you have to step on a body scan

16  machine?

17     A.   No.

18     Q.   Put your hands up and have an X-ray taken

19  of your whole body?

20     A.   X-ray, I think a chest X-ray.  I may have

21  taken a chest X-ray.

22     Q.   But you didn't have to go on a body

23  scanner?

24     A.   No.

Page 43

1     Q.   When you were first spoken to by somebody

2  who was asking questions of you, was that an

3  officer in a uniform or someone that was in plain

4  clothes?

5     A.   Officer in uniform.

6     Q.   Did you know that officer?

7     A.   No.

8     Q.   Had you ever seen any of the officers in

9  the receiving room before that day, to your

10  knowledge?

11     A.   Might have been some of the other arrests.

12     Q.   You might have --

13     A.   You know, the faces.

14     Q.   Did you recognize anybody as someone you

15  had seen before?

16     A.   Not at this time.  Not at this arrest.

17     Q.   Not on January 15th, '08?

18     A.   Right.

19     Q.   So the people that you saw on January 15th

20  of '08 were not people you knew before?

21     A.   Right.

22     Q.   Do you remember talking with a CMT who

23  asked you questions about whether you had any

24  seizures, epilepsy or fits, heart trouble or heart

1    attack?  Do you remember any of those questions?

2        A.    No.

3        Q.    Was there a place that you were brought in

4    which you sat across a small desk from an

5    individual who was asking you questions and showed

6    you a piece of paper?  And I'm going to actually

7    have this be marked and show it to you now.

8                        (Whereupon, Deposition Exhibit

9                        No. 1 was marked for

10                       identification, NET.)

11             MR. CATANIA:  For the record, I'm going to

12   be showing her a document that's Bates stamped

13   Brown 25, 26, 27, 28, 29, 30, 31, 32, and 33.  I'm

14   showing it to Counsel.

15                       (Document tendered.)

16   BY MR. CATANIA:

17       Q.    Take a look at that document in front of

18   you.  Can you tell me, have you seen that document

19   before today?

20       A.    I'm not sure.

21       Q.    Can you tell me, in the box that says

22   "Consent For Treatment," which is near the top of

23   the page, there is an "X" with a signature next to

24   it.  Do you see that?

Page 45

1      A.   Yeah.

2      Q.   Is that your signature?

3      A.   Yes, it is.

4      Q.   It says "Lisa Brown," right?

5      A.   Yes.

6      Q.   In the upper left-hand corner there is a

7  little bar code label, upper left-hand corner of

8  the page.  Do you see the bar code, UBC code?  The

9  other side.

10     A.   Right here?

11     Q.   Above that.  Do you see that?

12     A.   Yes.

13     Q.   And the name that appears there below the

14  bar code, do you see that name?

15     A.   Yeah.

16     Q.   What does it say?

17     A.   Shaqueta Brown.

18     Q.   And it has a date of birth on it of

19  7/19/66.  That's your birth date, right?

20     A.   Yes.

21     Q.   And it says that there is a date BKDT,

22  which is book date, of January 15th of 2008?

23     A.   Yes.

24     Q.   And on the right side, it also says

1    January 15th, '08.  Do you see that?

2         A.    Right.

3         Q.    Do you remember seeing this document

4    before when you signed it?

5         A.    I pay no attention.

6         Q.    Okay.  At the bottom, there is a signature

7    line that says Jones and CMT is circled, right?

8         A.    Yes.

9         Q.    Do you know that correctional medical

10   technician, Jones?

11        A.    No.

12        Q.    Would you remember enough to recognize

13   that person if you saw that person again?

14        A.    I wouldn't.

15        Q.    On that page, there are a group of

16   questions under the thing called "Medical History."

17   Do you see that?

18        A.    Yeah.

19        Q.    And if you look, No. 10 is circled and it

20   says HIV, slash, AIDS.  Do you see that?

21        A.    Yes.

22        Q.    And to the right of that, it says patient

23   states -- that Pt. sts -- positive for three years?

24        A.    Yes.

1      Q.    Did you tell the medical technician Jones

2   that three years is how long you had that disease?

3      A.    I'm not sure.

4      Q.    And below that, where it says "Current

5   Problems," No. 1, which says "On medications" is

6   also circled?

7      A.    Yeah.

8      Q.    And it is also circled "yes"; and next to

9   that it says, "Patient states antiviral meds"?

10     A.    I see that.

11     Q.    Was that true at the time, you were taking

12   antiviral meds?

13     A.    Yes.

14     Q.    And below that, on the right side, it says

15   "Allergies," and it says "NKA" next to that.  Do

16   you see that?  Let me point to it.  Right here.

17     A.    Okay.

18     Q.    Do you see what I'm pointing to?

19     A.    Yes.

20     Q.    Do you know what NKA means?

21     A.    No.

22     Q.    No known allergies, does that sound about

23   like something you said, you don't know if you have

24   any allergies?

1          A.    I'm not sure.

2          Q.    But do you have any allergies, to your

3     knowledge?

4          A.    No.

5          Q.    And in the box that's called "Substance

6     Abuse," do you see the box near the bottom?

7          A.    Yeah.

8          Q.    It says, "Heroin."  Do you see that?

9          A.    Yes, I see that.

10         Q.    Is that a substance that you had in the

11    past been abusing?

12         A.    Yeah, in the past.

13         Q.    And, in fact, there is a box to the

14    right -- to the right of that area on that same

15    box, it says, "Illicit Noninjection."  Do you see

16    that?

17         A.    Yes, I see it.

18         Q.    And that is circled "Y" for yes, correct?

19         A.    Yes.

20         Q.    And at that time, you were using illicit

21    noninjection drugs, namely heroin, right?

22         A.    It is possible.

23         Q.    If you look on that same page, on the

24    upper right-hand corner, do you see up in that

1   circled area it says "PA"?

2       A.   Yeah.

3       Q.   Do you know what that stands for?

4       A.   No.

5       Q.   And in the middle of that box -- the

6   medical history box, under "Remarks," there is

7   another box inside of that, which says "Form

8   Review."  Do you see that?

9       A.   Yeah.

10      Q.   And in the area where it says "Sick Call

11  Needed," "yes" is circled, right?

12      A.   Yes.

13      Q.   And below that, it says "2W"?

14      A.   Yes.

15      Q.   Do you know what that means?

16      A.   No.

17      Q.   Have you ever come to know what sick call

18  is in jail?

19      A.   Yeah.

20      Q.   What is sick call?

21      A.   Where you go and talk to nurses and, you

22  know, let them know about your history, medical

23  history or whatever.

24      Q.   And did you ever have that experience when

1    you were arrested on January 15th of '08?

2        A.    No.

3        Q.    Do you remember when it was that you got

4    out of custody after that arrest on January 15th?

5        A.    When I got released?

6        Q.    Yes.

7        A.    It was -- I'm not sure exactly what date

8    it was.

9        Q.    Was it more than two weeks later or less

10   than two weeks later?

11       A.    Around two weeks.

12       Q.    Do you remember where it was that your

13   case was disposed of that you were released from

14   jail?

15       A.    Where I was released from?

16       Q.    Yes.

17       A.    Cook County.

18       Q.    Do you remember what courthouse you went

19   to before that?

20       A.    555 Harrison.

21       Q.    So the domestic violence courthouse,

22   right?

23       A.    Yes.

24       Q.    Harrison and Canal?

1      A.    Yes.

2      Q.    The court records, which are public

3  record, I'm going to show it to your attorney so he

4  knows.

5                    (Document tendered.)

6  BY MR. CATANIA:

7      Q.    On the last page of that, which we're not

8  going to mark as an exhibit, it says the date of

9  January 29, 2008, is the date your case was

10  dismissed.  Do you see that?

11      A.    I see that.

12      Q.    Do you have any reason to doubt the

13  court's record that that's when your case was

14  dismissed and you were released?

15      A.    No.

16      Q.    So it was probably on that date?

17      A.    Yes, it is possible.

18      Q.    Thank you.  When you were asked questions

19  by the correctional medical technician Jones, did

20  you say that you were on antiviral meds?  Were

21  those your words?

22      A.    Yes, I did.

23      Q.    Did you tell that person at that time what

24  those medications were?

Page 52

1      A.   Yeah.

2      Q.   That same person?

3      A.   I told her -- I'm not sure.

4      Q.   But you saw somebody after that, a

5  physician assistant after that, right?

6      A.   Yeah, I do believe I did.

7      Q.   If you turn to the second page, which is

8  marked page 26?

9      A.   Okay.

10      Q.   You see there is a lot of handwriting on

11  that one, right?

12      A.   Yes.

13      Q.   And also at the bottom, it's got a

14  signature, although we can't really read what that

15  signature is, right?

16      A.   Yeah.

17      Q.   It is different from Jones though, isn't

18  it?

19      A.   Signature?

20      Q.   On the bottom left, it says "Provider

21  Signature Title."  Do you see that on the bottom

22  left?

23      A.   Okay.  Yes.

24      Q.   It is not Jones; it is something else?

1    A.    Okay.

2    Q.    There is the writing above that which says

3  "Recent hospitalization."  Do you see that?  It is

4  printed and next to that there is some handwriting?

5    A.    Yeah, I see it.

6    Q.    There's an "Rx" and two dots?

7    A.    Yeah.

8    Q.    Next to that it says, "Sustiva" and

9  "Combivir," right?

10    A.    Yes.

11    Q.    And those are the medications that you

12  told the PA, physician assistant, that you were

13  taking, right?

14    A.    Yeah.

15    Q.    And at that time, the PA gave you a

16  prescription for Sustiva and Combivir?

17    A.    I didn't receive a prescription.

18    Q.    I'm talking about a prescription and not

19  the medication, right?

20    A.    I didn't receive.

21    Q.    After you were admitted into the jail, did

22  you ever have occasion to go to sick call?

23    A.    No.

24    Q.    Did you ever make a request to go to sick

1    call?

2         A.    Yes.

3         Q.    How did you do that?

4         A.    When they bring -- the nurses come to the

5    tiers with the med cart.  I talked with that nurse;

6    and I was explaining to her that I was on these

7    meds, that I needed my meds, that I was not

8    receiving my meds.

9         Q.    What meds are you talking about

10   specifically?

11        A.    My HIV meds.

12        Q.    You were not talking about your psych

13   meds, were you?

14        A.    No, I wasn't focussed with that at the

15   time.

16        Q.    If you turn to page 31, do you see that

17   document that's marked Brown 31?  It is called

18   "Detainee Health Service Request Form."

19        A.    Yeah.

20        Q.    Is that your name on it?

21        A.    Yes.

22        Q.    And is that your ID number below it at the

23   time of that arrest?

24        A.    I don't remember the ID number.

1      Q.   But if you turn back to the first page,

2  which is 25, in the upper left-hand corner, you see

3  a bar code?  Do you see the bar code, upper

4  left-hand corner?

5           MR. FLAXMAN:  It is the same number.

6           THE WITNESS:  Okay.  All right.

7  BY MR. CATANIA:

8      Q.   It is 3708, right?

9      A.   All right.

10     Q.   And that's the number that is written down

11 as the ID number for that arrest date?

12     A.   Yes.

13     Q.   On the right side, it says "Today's Date."

14 What date did you write this request?

15     A.   Huh?

16     Q.   What date did you put in the request for

17 medical services?

18     A.   The date 17th.

19     Q.   So that's a couple days later you asked

20 for some type of medical service, right?

21          MR. FLAXMAN:  Object to the form of the

22 question.

23 BY MR. CATANIA:

24     Q.   Okay.  Is that what it says, January 17th

Page 56

1    of '08?

2         A.    Yes, it does.

3         Q.    And below that is a birth date.  It's July

4    19th of '66?

5         A.    Yes, it is.

6         Q.    And that is your birth date?

7         A.    Yes, it is.

8         Q.    And that's your location where you were,

9    Division III?

10        A.    Yes, it was.

11        Q.    By the way, what is Division III?

12        A.    A medical division, I think.

13        Q.    Medical division at the jail?

14        A.    Yes.

15        Q.    And below that it says, "Describe your

16   problem"; and there is some writing.  Is that your

17   writing?

18        A.    It is.

19        Q.    And it says, "I need to see the psych

20   doctor as soon as possible, please, thank you"?

21        A.    Yes.

22        Q.    And that's the information that you put on

23   that request form, right?

24        A.    Yes.

Page 57

1    Q.   If you look to the next page after that,

2  which is Brown 32, that's another request form.  Do

3  you see that?

4    A.   Yeah, I see it.

5    Q.   And this one is written -- it says today's

6  date of January 24, '08?

7    A.   Yes.

8    Q.   And it says -- under the box, it says,

9  "Describe your problem."  It says, "I have

10  infection," right?

11    A.   Yes.

12    Q.   And that's in your writing?

13    A.   Yes, it is.

14    Q.   The box next to -- above that, does it

15  say, I want information about HIV, AIDS, that's not

16  checked, correct?

17    A.   No.

18    Q.   You didn't need any information about

19  that?

20    A.   No.

21    Q.   Is the infection that it's talking about,

22  is that the HIV infection that you were talking

23  about on this request?

24    A.   Yes.

Page 58

1      Q.   And, in fact, you were discharged on

2   January 29th of '08, right?

3      A.   Yes.

4      Q.   So you never did go to sick call for the

5   infection?

6      A.   No.

7      Q.   But you put in a request for it?

8      A.   Yes.

9      Q.   And before you were scheduled, you were

10   discharged?

11      A.   I never went.

12      Q.   But before you were scheduled, you were

13   already out of the jail, right?

14          MR. FLAXMAN:   Object to the form of the

15   question.   Assumes facts not in evidence.

16   BY MR. CATANIA:

17      Q.   I understand you never went to sick call.

18      A.   Right.

19      Q.   But it was January 29th of '08 that you

20   were discharged?

21      A.   Yes.

22      Q.   And that was two weeks after you were

23   intaked, correct?

24      A.   Yes.

1      Q.   Can you tell me what was the effect of you

2   not having your HIV medicine for those two weeks?

3   What happened to you?

4      A.   My HIV meds?

5      Q.   Yes.

6      A.   Nothing.

7      Q.   And you went to your regular doctor after

8   you were discharged for your HIV meds, right?

9      A.   Yes.

10      Q.   When was it that you went after

11   January 29th of '08 that you went to the doctor?

12      A.   I can't remember.

13      Q.   And was it the county doctor that you went

14   to at The Core Center?

15      A.   No.

16      Q.   Where did you go after for your HIV

17   medicine?

18      A.   Raymar's Clinic.

19      Q.   You don't remember the day that you went

20   after January 29th of '08 to Raymar Clinic?

21      A.   No.

22      Q.   But you do remember that it was for the

23   HIV as well?

24      A.   Yes.

Page 60

1    Q.   Was it also for the Seroquel and Klonopin?

2    A.   Yes.

3    Q.   Do you have any prescription form with you

4    for Seroquel and Klonopin?

5    A.   No.

6    Q.   Do you have any records of the

7    prescription that you had for Seroquel and Klonopin

8    just before your arrest, the most recent

9    prescription before the arrest?

10   A.   Yeah, I have records.

11   Q.   Where are those records?

12   A.   With the doctor.

13   Q.   Has your lawyer asked you to get those

14   records?

15   A.   No.

16   Q.   What doctor?

17   A.   Raymar's.

18   Q.   At Raymar, okay.

19        Is this the first time anyone has ever

20   asked you to tell where your records are being

21   kept?

22   A.   Yes, it is.

23   Q.   So no lawyer has asked you before now; is

24   that right?

Page 61

1          MR. FLAXMAN:  Object to the question

2     insofar as it asks for conversations that she had

3     with me.

4          MR. CATANIA:  I'm not asking her about

5     substance.  I'm asking about timing.

6          MR. FLAXMAN:  I think it's the context --

7     the subject matter you are talking about.  You

8     can't ask her that.

9     BY MR. CATANIA:

10    Q.   When you arrived at the Cook County Jail

11    on January 15th, 2009, did you have any --

12         MR. FLAXMAN:  You said 2009.

13    BY MR. CATANIA:

14    Q.   -- 2008, did you have any symptoms of

15    mental health problems at that time?

16    A.   Before?

17    Q.   When you got there on January 15th of '08,

18    did you have any symptoms?

19    A.   I was depressed.

20    Q.   Did you have any outward symptoms of that

21    depression that you were aware of?

22    A.   Yeah, I had some symptoms.

23    Q.   What symptoms did you have?

24    A.   Hallucinating, like.

1    Q.   I'm sorry.  Hallucinating when?

2    A.   Hallucinating.

3    Q.   What type of hallucinations were you

4  having?

5    A.   I was, like, vision things that -- vision

6  things.

7    Q.   So you had visual hallucinations?

8    A.   Yes.

9    Q.   What, to your knowledge, was the diagnosis

10  that you had before you were given the Seroquel?

11    A.   My diagnosis?

12    Q.   Yes.

13    A.   Major depression, psychotic.

14    Q.   And the doctor that made that diagnosis

15  was who?

16    A.   I don't remember.

17    Q.   Do you have any medical records in your

18  possession that show those diagnoses?

19    A.   Not in my possession.

20    Q.   And was that the one that you said was

21  diagnosed in 2003?

22    A.   Yes.

23    Q.   Is there any mental illness history in

24  your family?

Page 63

1     A.   I'm not sure.

2     Q.   To your knowledge, has anyone in your

3  family ever been diagnosed with any mental illness?

4     A.   I'm not sure.

5     Q.   What about your daughter?

6     A.   I'm not sure.

7     Q.   Have you ever been committed to a hospital

8  for mental problems?

9     A.   Yes.

10    Q.   What hospital?

11    A.   ISSBY.

12    Q.   Could you spell that for me?

13    A.   Wow.  I S S B Y.

14    Q.   And where is that located?

15    A.   I'm not sure.  Chicago area though.

16    Q.   So it is not Missouri; it is Chicago?

17    A.   Right.

18    Q.   Have you ever told anybody that you've

19  never been hospitalized for psychiatric treatment?

20    A.   Have I ever told anybody?

21    Q.   That you were never hospitalized for

22  psychiatric treatment?

23    A.   I don't believe so.

24    Q.   Did you ever tell anybody that you were

Page 64

1    not currently receiving psychiatric treatment?

2         A.    I don't think so.

3         Q.    Could you take a look at page 27.

4         A.    Okay.

5         Q.    Have you ever seen that page before or a

6    page like that before?

7         A.    I don't remember.

8         Q.    And at the top, it says Shaqueta Brown and

9    it's got a CIMIS number, the same one we talked

10   about, 3708, right?

11        A.    Yes.

12        Q.    And it also has the book date of

13   January 15th of 2008 printed on that same label?

14        A.    Yes.

15        Q.    And there is a series of 11 questions that

16   are there, numbered questions.  Do you see that?

17        A.    Yes.

18        Q.    It asks, No. 1, "Have you ever been at

19   Cook County Jail before"; and the answer is marked

20   "yes."  That was true, right?

21        A.    Yes.

22        Q.    And you were previously in Division IV,

23   right?

24        A.    Yes.

1     Q.   Which is not the medical division for

2  woman?

3     A.   Right.

4     Q.   And No. 2 says, "Have you ever been

5  hospitalized for psychiatric treatment"; and the

6  box is checked "no"; is that right?

7     A.   Yes.

8     Q.   And below that it says, "Are you currently

9  receiving outpatient psychiatric treatment"; and

10  the box is checked "no"; is that right?

11     A.   Yes.

12     Q.   It asks, "Are you now taking psychotropic

13  medications"; and the box is checked "no."  Do you

14  see that?

15     A.   Yes.

16     Q.   And below that it asks, "Do you drink

17  alcohol"; and it is checked "no," right?

18     A.   Yes.

19     Q.   And that was true at the time; you were

20  not drinking alcohol at the time?

21     A.   No.

22     Q.   You were -- Okay.

23         THE VIDEOGRAPHER:  This will be all for

24  Tape No. 1.  We're going off the video record at

Page 66

1    10:10 a.m.

2                      (Whereupon, a break was taken,

3                      after which the following

4                      proceedings were had:)

5              THE VIDEOGRAPHER:  This is the beginning

6    of Tape No. 2.  We're back on video record at

7    10:20 a.m.

8              MR. CATANIA:  Thank you.

9    BY MR. CATANIA:

10      Q.   You had a chance to take a break, right?

11      A.   Yes.

12      Q.   I believe that we've been talking about

13   the arrest that's relevant to your lawsuit.  Do you

14   understand it to be the same case that you were

15   arrested on that we've been talking about that's

16   relevant to your lawsuit?

17      A.   Yes.

18      Q.   So there is not another date out there

19   that you're complaining you didn't get the drugs

20   that you informed people of that you were on other

21   than this date of January 15th of 2008?

22      A.   No.

23      Q.   Okay.  We were looking at Exhibit No. 1,

24   page 27, which is the psych screening tool?

Page 67

1     A.   Yes.

2     Q.   And I was at the point of asking you

3  No. 5, "Do you drink alcohol."  The answer checked

4  is "no."  Was that true at the time; you were not

5  drinking alcohol at that time?

6     A.   Yes.

7     Q.   The one after that, it says, "Do you use

8  drugs."  The box is checked "yes."  And then the

9  question is "What drugs," "heroin."  That was true

10  at the time, right?

11     A.   Yes.

12     Q.   No. 6, it says, "Have you ever attempted

13  suicide."  That box is checked "no"; is that right?

14     A.   Yeah.

15     Q.   And that was true at the time as well,

16  right?

17     A.   Yes.

18     Q.   You have not attempted suicide?

19     A.   Right.

20     Q.   And the question, "Do you feel suicidal

21  now," that box is checked "no."  Do you see that?

22     A.   Yes.

23     Q.   Is that correct?

24     A.   Yes.

Page 68

1       Q.   And No. 8, "Are you feeling homicidal

2   now"; and it is checked "no"; is that correct?

3       A.   Yes.

4       Q.   You were also asked the question No. 9,

5   "Have you ever had special education classes"; and

6   the box "no" is checked; is that right?

7       A.   Yes.

8       Q.   And it says next to that -- first, it

9   says, "8" and then it says "9" over it, "9 grade."

10  Do you see that?

11      A.   Yes.

12      Q.   And that's the same thing you told me

13  earlier in the deposition about your highest level

14  of education, right?

15      A.   Yes.

16      Q.   No. 10, it asks, "Are you now homeless";

17  and it is checked "no."  That was correct at the

18  time?

19      A.   Yes.

20      Q.   What address were you living at at the

21  time of that arrest, January of '08?

22      A.   5508 West Des Moines.

23      Q.   Just like it says at the top under the

24  address at the top of this page?

Page 69

1      A.    Yes.

2      Q.    Okay.  And the box No. 11, it says, "Are

3  you a veteran"; and it is checked "no"; is that

4  correct?

5      A.    That's correct.

6      Q.    You've never been in the military?

7      A.    No.

8      Q.    It is indicated on the bottom of this page

9  that -- under mental health screening plan, it says

10  "general population."  Do you see that?

11      A.    Yes.

12      Q.    And, in fact, you were placed in the

13  medical division of the jail, right?

14      A.    Yes.

15      Q.    And that's because -- to your knowledge,

16  it is because of what you told the CMT that is

17  listed on page 1, that you had some HIV medication

18  that you needed, right?

19      A.    Yes.

20      Q.    If you looked on page 28, which I believe

21  is the next page following?

22      A.    Yes.

23      Q.    There is a prescription form there.  Do

24  you see that on the bottom?  It says "prescription

1   order."

2        A.   Yeah, I see it.

3        Q.   And it has the patient name of Brown,

4   Shaqueta?

5        A.   Right.

6        Q.   And it has the same SIMIS number, that

7   3708 number.  Do you see that?

8        A.   Yes.

9        Q.   And it is dated.  What is the date that it

10  gives?

11       A.   January 15th, '08.

12       Q.   So that was the date of your intake for

13  this arrest, right?

14       A.   Yes.

15       Q.   And there is a couple drugs that are

16  listed below that that are printed and then one

17  handwritten in.  Do you see that?

18       A.   Yes.

19       Q.   There's Prochlorperazine, 5 milligrams, PO

20  bid.  Do you see that?

21       A.   Yes.

22       Q.   And it says for three days?

23       A.   Yes.

24       Q.   That Prochlorperazine, do you know what

1    that was for?

2         A.    Heroin.

3         Q.    Is that for withdrawal medicine?

4         A.    It could have been.

5         Q.    What about the Loperamide, which is below

6    that, do you know what that is for?

7         A.    I'm not sure.

8         Q.    And how about Atarax, do you see that

9    written in, A T A R A X?

10        A.    Yeah, I see it.

11        Q.    What that is for; do you know?

12        A.    I wasn't sure.

13        Q.    If you look to the right, there is kind of

14   a little line pointing like an arrow to the right?

15        A.    Yes.

16        Q.    And next to that it says, "stat," S T A T?

17        A.    Yeah.

18        Q.    "Given at 7:50 p.m.," do you see that

19   written in there?

20        A.    Yes.

21        Q.    On that date, January 15th of 2008, were

22   you given those medications that are listed on the

23   prescription form?

24        A.    It is possible.

Page 72

1      Q.   Do you know who wrote that prescription?

2      A.   No.

3      Q.   If you look to the next page, it's marked

4    29 but it is in the opposite direction.  If you

5    turn this way like you're looking at it right now,

6    you'll see there is three things written,

7    Prochlorperazine, Loperamide, and Atarax.  Do you

8    see that?

9      A.   Yes.

10     Q.   And if you look toward the middle of the

11   page, you see these little initials that are given

12   in the middle of the page on 16 and 17.  Do you see

13   that?

14     A.   Yeah.

15     Q.   Were you present when those things were

16   written, these initials?

17     A.   I'm not sure.

18     Q.   Were you given those medications on the

19   16th and 17th of January of 2008?

20     A.   It is possible.

21     Q.   So you received medicine within 24 hours

22   of being intaked into the jail, right?

23     A.   It is -- 24 hours?

24     Q.   Yes.  You received it exactly on the date

1    you were admitted?

2        A.    It is possible.

3        Q.    While you were in the jail during that

4    couple of weeks period of time, did you have any

5    occasion to make any phone calls to family members?

6        A.    Yeah.

7        Q.    Who did you call?

8        A.    I called my daughter.

9        Q.    When did you call your daughter?

10       A.    Probably was the next day on the tier.

11       Q.    When you were on the tier?

12       A.    Yeah.

13       Q.    During that next day when you were on the

14   tier, which is Division III of the jail, right?

15       A.    Right.

16       Q.    Did you have occasion to see

17   Dr. Richardson?

18       A.    I'm not sure.

19       Q.    Do you know who Dr. Richardson is?

20       A.    No.

21       Q.    Did you see Dr. Couture?

22       A.    I'm not sure.

23       Q.    Is it possible that you saw

24   Dr. Richardson?

1          A.   I'm not sure, sir.

2          Q.   All right.  Were you ever screened --

3     after you were admitted into the jail, were you

4     ever screened for pregnancy?

5          A.   I might have been.

6          Q.   Did you ever have anyone offer to you a

7     Pap smear on January 16th of 2008?

8          A.   I don't believe I received a Pap smear.

9          Q.   Were you offered a Pap smear?

10         A.   I don't believe so.

11         Q.   Had you had one within 12 months previous

12    to the date of entry of January 15th of 2008?

13         A.   It is possible I could have.

14         Q.   Do you still have a friendly relationship

15    with Anita Clippard?

16         A.   Yes.

17         Q.   She's still your friend now?

18         A.   Yes.

19         Q.   Did you talk to Anita Clippard about your

20    criminal case, the domestic battery case before

21    January 29th of '08?

22         A.   About the case?

23         Q.   Yes.

24         A.   No.

Page 75

1      Q.    Did you talk to your daughter in your

2   phone conversation about --

3      A.    Yes, I did.

4      Q.    And did you have any message delivered to

5   Anita Clippard about the case through your

6   daughter?

7      A.    Yes.

8      Q.    And your daughter is Tanisha Jones, right?

9      A.    Teshina.

10     Q.    Teshina Jones, I'm sorry.  T E S H I N A?

11     A.    Right.

12     Q.    And did you tell Teshina Jones what the

13  next court date was for you for your case?

14     A.    Yes, I did.

15     Q.    January 29th, 2008?

16     A.    Yes.

17     Q.    Did you tell her -- what message did you

18  tell your daughter to give to Anita Clippard?

19     A.    What message?

20     Q.    Yes.  You gave her a message to give to

21  Anita, right?

22     A.    Yeah.

23     Q.    What was the message?

24     A.    I believe it was come to court.

Page 76

1       Q.    Did she come to court?

2       A.    Yes, she did.

3       Q.    You saw her on the 29th of January?

4       A.    Yes, I did.

5       Q.    Did she visit you at any time before that

6    in jail?

7       A.    Visit me?  She might have.

8       Q.    She might have visited you at the jail?

9       A.    She might have.

10      Q.    Did your daughter visit you at the jail?

11      A.    No.

12      Q.    When she came to court, did she tell Judge

13   Haliberry (phonetic) that she did not want to

14   proceed with the case?

15      A.    Yes.

16      Q.    So she dropped the charges?

17      A.    Exactly.

18      Q.    You've given me information on places that

19   you have had medical and mental health treatment.

20   I believe I have all of them, but I just want to

21   make sure.  You've been to the Raymar Clinic?

22      A.    Yes.

23      Q.    You've been to The Core Center?

24      A.    Yes.

1       Q.   You also received treatment at Cermak

2   Health Services, which is those papers in front of

3   you, right?

4       A.   Yes.

5       Q.   On more than one occasion have you

6   received treatment at Cermak Health Services?

7       A.   Yes.

8       Q.   Each time you have been in custody, have

9   you received some treatment from Cermak personnel?

10      A.   Yes.

11      Q.   I have a form which is a HIPAA privacy

12  authorization form.

13          MR. FLAXMAN:  When the deposition is done,

14  so we're not paying the court reporter.  She'll

15  sign the form later.

16          MR. CATANIA:  In any event, I want your

17  signature on a form that allows me to get your

18  records.

19          MR. FLAXMAN:  We'll do that when the meter

20  stops running.

21  BY MR. CATANIA:

22      Q.   Is there anything else about your physical

23  or mental health treatment from the arrest and the

24  incarceration of January 14th, 15th, 2008, that you

Page 78

```
 1    have not already told me about?

 2         A.    No.

 3         Q.    Have you now told me everything that

 4    happened to you during that incarceration regarding

 5    your medication?

 6         A.    Yes.

 7         Q.    And you say that you did not receive your

 8    HIV medication?

 9         A.    Exactly.

10         Q.    But you did receive other medication,

11    right?

12         A.    Yeah.

13         Q.    The ones that are listed on the MAR, the

14    medical administration record?

15         A.    Yes.

16         Q.    And that medication, to your

17    understanding, was to help you with the effect of

18    withdrawal from heroin, right?

19         A.    Yes.

20         Q.    Was that a problem you were having at the

21    time, withdrawal from heroin?

22         A.    Yes.

23         Q.    And that is a problem that you told them

24    about, right, at the jail?
```

1     A.   Yes.

2     Q.   And when you told them about it at the

3 jail, you were actually seeking some kind of help

4 for the discomfort that is associated with heroin

5 withdrawal?

6     A.   Yes.

7     Q.   And you had had heroin within a few days

8 of your arrest, right?

9     A.   Yes.

10    Q.   During the period of time when you were

11 taking your Clonidine and your Seroquel that you

12 told us about earlier, were you also using heroin?

13    A.   Yes.

14    Q.   So in addition to the two psychotropic

15 medications that you've talked about, you were also

16 using heroin, which affects your brain; isn't that

17 right?

18    A.   Yes.

19    Q.   But no doctor prescribed heroin to you,

20 right?

21    A.   No.

22    Q.   Have you ever had any treatment for the

23 abuse of heroin?

24    A.   No.

Page 80

1      Q.   Never been in any kind of drug treatment

2   program?

3      A.   Yes, I have.

4      Q.   Has it been ordered by a court?

5      A.   Yes.

6      Q.   Did you ever go to a drug treatment

7   program on your own without being ordered by a

8   court?

9      A.   Yes.

10      Q.   When is the most recent time you went to a

11   drug treatment program?

12      A.   July.

13      Q.   Of this year?

14      A.   Yes.

15      Q.   Are you currently in a program?

16      A.   No.

17      Q.   Are you in any kind of follow-up care?

18      A.   No.

19      Q.   You are not in Narcotics Anonymous or

20   anything like that?

21      A.   No.

22      Q.   Was this July of 2009 treatment program a

23   court-ordered treatment program?

24      A.   No.

Page 81

1       Q.   And where did you have that treatment

2   program?

3       A.   Loretto Hospital.

4       Q.   And of course, that's in Austin, right?

5       A.   Yes.

6       Q.   And that's in the neighborhood where you

7   live?

8       A.   Yeah.

9       Q.   I don't want to get any of the substance

10  of conversations you've had with attorneys.  Can

11  you tell me when it is -- just when it is, the time

12  that you first had conversation with the attorneys

13  that are handling this lawsuit?

14      A.   When is the first time?

15      Q.   Yes.

16      A.   It was '09.

17      Q.   In '09?  Okay --

18      A.   In '08, I mean.  I'm confused.

19      Q.   Sometime during the year of 2008 you had

20  your first contact with the attorneys that are

21  handling this case?

22      A.   I believe it was '09.  Sorry.

23      Q.   How did you first hear about them?

24      A.   Through conversation, hearing people talk.

Page 82

1      Q.   You heard people talking?

2      A.   Yeah.

3      Q.   Where was that conversation where you

4  heard them talking about this case?

5      A.   Where was I at?

6      Q.   Yes.  Where did you first hear

7  conversation that was discussing this case?

8      A.   I don't remember.  I just remember

9  hearing.

10     Q.   Was your first contact with the attorneys

11  in person or by mail?

12          MR. FLAXMAN:  Object to the form of the

13  question.  It is not -- there are other ways to

14  have contact.

15  BY MR. CATANIA:

16     Q.   Can you tell me what form your first

17  contact with the attorneys came in?

18     A.   I believe phone, I believe.

19     Q.   By phone?

20     A.   I believe.

21     Q.   Was that your phone that was called, your

22  home phone?

23     A.   I'm not sure.

24     Q.   Did you make the call to the attorneys?

Page 83

1      A.    I did.

2      Q.    How did you get the number?

3      A.    I received the number from someone.

4      Q.    Do you remember who it was?

5      A.    No.

6      Q.    What is it that you expect from this

7  lawsuit?

8      A.    Could you discuss that with my lawyer?

9      Q.    I just want to know what it is that you

10  expect, not what your lawyer expects.  I know what

11  he expects.

12     A.    That it never happens again to anyone

13  else.

14     Q.    And by "it," you mean that somebody is

15  denied medication by --

16     A.    Exactly.

17     Q.    -- by the jail, right?

18     A.    Yeah.

19     Q.    Are you expecting to get money out of this

20  litigation?

21     A.    I'm not sure what to expect.

22     Q.    Has anyone ever told you that the lawsuit

23  is asking for money damages?

24     A.    No.

Page 84

1      Q.   Have you ever read the complaint that was
2   filed in this lawsuit?
3      A.   No.
4      Q.   Have you ever read any paper about the
5   lawsuit at all?
6      A.   I have not.
7      Q.   Would you agree with me that when someone
8   enters into the jail without any prescriptions or
9   prescription forms with them that there has to be
10  an examination by a physician before a prescription
11  can be given to them?
12     A.   Yes.
13     Q.   So there should be some examination done
14  before prescriptions are given, right?
15     A.   Yes.
16     Q.   Have you ever filed a grievance in the
17  jail regarding the lack of getting medicine at
18  intake?
19     A.   No.
20     Q.   You are familiar with the grievance
21  procedure, right?
22     A.   I didn't know I could file a grievance.
23     Q.   You didn't know you could file a
24  grievance?

Page 85

1     A.   No.

2     Q.   When you came into the jail on the

3 first -- for the first time on January 15th, 2008,

4 there was a time when they took a fingerprint of

5 you, right?

6     A.   Yes.

7     Q.   And a photograph of you, right?

8     A.   Yes.

9     Q.   And they gave you an ID card?

10    A.   Yes.

11    Q.   When they took your fingerprint, it was a

12 one single digit fingerprint, your index finger,

13 right?

14    A.   I believe so.

15    Q.   Your right index finger?

16    A.   I believe so.

17    Q.   One print?

18    A.   Yeah.

19    Q.   And they put it on a card which had some

20 writing on it, some printing?

21    A.   Right.

22    Q.   And among the preprinted area was a box

23 that you were asked to read and sign, is that

24 right, on that same card with your fingerprint?

1      A.    They just say fingerprint.

2      Q.    And they asked for your signature as well?

3      A.    Yeah, they do.

4      Q.    And that signature does a couple things,

5   including inform you that if money is sent to you

6   while you are in the jail that the jail will take

7   care of that money for you in your commissary

8   account, right?

9      A.    I'm not sure.

10      Q.    Has that ever happened, that someone sent

11   money to you at the jail?

12      A.    Yes.

13      Q.    Where does it go?

14      A.    Where the money go?

15      Q.    Yes.

16      A.    On my books.

17      Q.    And when you sign that fingerprint card,

18   there's a paragraph that talks about where that

19   money goes, right?

20      A.    I never read it.

21      Q.    Did you ever read the portion of that same

22   box that says, I have been given the rules and

23   regulations of the Cook County Department of

24   Corrections?

Page 87

```
 1        A.    I don't never read it.  I never read it.

 2        Q.    In the dayroom in Division III, have you

 3   ever seen posted rules and regulations for

 4   detainees?

 5        A.    I don't be reading it.

 6        Q.    Did you talk about the rules and

 7   regulations with any of the other detainees while

 8   you were there?

 9        A.    No.

10        Q.    If you wanted to get to see a doctor, you

11   were aware of how to put in a medical request form,

12   right?

13        A.    Yes.

14        Q.    And that's what we talked about earlier,

15   which is in that group of pages in front of you?

16        A.    (Nodding head.)

17        Q.    If you wanted to complain about not

18   getting see the doctor, you were aware that you

19   would fill out a piece of paper called a grievance,

20   right?

21        A.    I never knew that I could file a

22   grievance.  I mean, I never knew.  That's why I

23   always -- I never knew.

24        Q.    So not knowing that you had a grievance
```

1    procedure available to you, you didn't follow a

2    grievance procedure, right?

3        A.    That's my reason.

4        Q.    Again, you never filed a grievance about

5    not getting your HIV medicine?

6        A.    Exactly.

7        Q.    And you never appealed any grievance

8    because you never filed one?

9        A.    Right.

10       Q.    Aside from this entry of January 15th,

11   2008, is there any other time that you entered into

12   the jail that you did not receive the medicine that

13   you told them you were supposed to be on?

14       A.    This was the first time.

15       Q.    Is there a time after this January of '08

16   that you did not receive medicine?

17       A.    I ain't been back.

18       Q.    And no offense, but we hope you don't come

19   back.

20             MR. CATANIA:  I have no further questions.

21   Thank you very much.  Your lawyer might have some

22   questions.

23             MR. FLAXMAN:  I do.

24

Page 89

1                          EXAMINATION

2    BY MR. FLAXMAN:

3         Q.    When you went into the jail and you were

4    talking to the person who filled out the form

5    that's page 27, which I'll put in front of you, do

6    you remember being asked, Are you now taking

7    psychotropic medication?

8         A.    I don't remember.

9         Q.    And did you know whether or not Seroquel

10   was a psychotropic medication?

11        A.    Yeah, I did.

12        Q.    And is there any reason why you wouldn't

13   have told the psych worker that you were taking

14   Seroquel?

15        A.    Is there any reason why I didn't tell

16   them?

17        Q.    Yes.  Is there any reason why you would

18   not have done that?

19        A.    No.

20        Q.    Now, there is a request where you said you

21   wanted to see the psych worker, the psych doctor.

22   It is page 31.  Do you remember why you filled that

23   out?

24        A.    Yeah.

Page 90

1          Q.    Why did you fill that out?

2          A.    I had started feeling the need for my

3     psych meds.

4          Q.    What was happening to you?

5          A.    I was having hallucinations and -- yeah.

6          Q.    And did you ever see the psych doctor?

7          A.    No, I didn't.

8          Q.    Before you filled out the request, had you

9     done anything else to get the see the psych doctor?

10         A.    I talked to the nurses that come to the

11    tier.

12         Q.    And what would you tell them?

13         A.    I asked them -- I would hand them my

14    request and ask them is it possible that I see a

15    psych doctor.

16         Q.    Did you fill out more than one request to

17    see a psych doctor?

18         A.    It is possible.

19         Q.    Do you -- is part of your treatment to get

20    your -- to get some kind of T-cell count?

21         A.    Yeah.

22         Q.    And do you know what your T-cell count was

23    before you went into the jail in January 2008?

24         A.    Yeah.

1     Q.    What was it?

2     A.    In the range of 9.

3     Q.    900?

4     A.    Yeah.

5     Q.    And did you get your T-cell count measured

6    after you got out of the jail in --

7     A.    Yeah, I did.

8     Q.    And I think that's the end of January.

9    And what was your T-cell count then?

10          MR. CATANIA:  Objection, foundation.

11   BY MR. FLAXMAN:

12    Q.    You can answer.

13    A.    It had dropped.

14    Q.    How much had it dropped?

15    A.    Down to 4, 4-something.

16    Q.    And how did you find out that it was

17   4-something?

18    A.    I went and had my virals and everything --

19   my blood drawn.

20    Q.    And where did you go for your blood work?

21    A.    I went to Loretto Hospital.

22    Q.    Is there a particular reason why you went

23   to get your blood done after you got out?

24    A.    I was curious.  I wanted to know where I

Page 92

1    was.

2         Q.   And when you found out that your T-cell

3    count was 400-something, did you tell any doctor

4    about that?

5         A.   Well, the doctor told me.

6         Q.   And when the doctor told you, did the

7    doctor change your prescription?

8         A.   No, he didn't change it.  I remained at

9    the same dose.

10        Q.   And when is the next time you had your

11   blood work done?

12        A.   I had it done again in July.

13        Q.   Well, you had it done in the end of

14   January of 2008.  Did you not have it done until

15   July?

16        A.   No.  I had it done end of January.  I had

17   it done again.

18        Q.   Do you remember where you had it done the

19   next time?  Loretto Hospital?

20        A.   Yeah.

21        Q.   So you go to the Raymar Clinic to get the

22   meds.  Are you getting regular treatment at Loretto

23   Hospital?

24        A.   I got it done also at Raymar's Clinic.

Page 93

1    Q.   Okay.  All right.  And what was your

2  T-cell level up to the next time you had it done

3  after you got out of the jail and after it was

4  4-something?

5    A.   It jumped to 809.

6    Q.   Okay.  Now, let's look at the first page.

7    A.   Okay.

8    Q.   Somebody wrote "antiviral meds."  Did you

9  tell the person who was talking to you when this

10  was being written the names of the medications you

11  were on?

12    A.   Yes.

13    Q.   Did you tell them where you were getting

14  them from?

15    A.   It is possible I did.

16    Q.   Did you ever see this form after it was

17  filled out up until today?

18    A.   No.

19    Q.   Now, do you remember being in the jail the

20  time before this -- do you remember being in the

21  jail in 2007?  And the records that the County

22  produced showed you were there twice, once in

23  January 29th, 2007 until February 20th and then

24  again June 25th, 2007 until July 20th, 2007.  Do

1    you remember that?

2         A.    Yeah, I believe so.

3         Q.    Okay.  Did you -- do you remember if you

4    got your HIV meds either time you were there?  Both

5    times you were there?

6         A.    Yeah, I believe so.

7         Q.    Okay.  Have you ever gotten psych meds at

8    the county jail?

9         A.    I'm not sure.

10        Q.    Now, are you on any kind of disability?

11        A.    Yes.

12        Q.    What kind of disability are you on?

13        A.    SSI.

14        Q.    And what is the nature of your disability?

15   What do you tell them in order to get on

16   disability?

17        A.    HIV and also depression.

18        Q.    Okay.  So it is for mental problems and

19   for HIV?

20        A.    Yes.

21        Q.    How long have you been on disability?

22        A.    I've been on disability, I believe, ever

23   since 2003, somewhere around there.

24        Q.    Did anybody ever ask you at the county

Page 95

1    jail whether you were on SSI disability?

2        A.    No.

3              MR. FLAXMAN:   Thank you.   I have nothing

4    further.

5              MR. CATANIA:   I just have a few follow-up

6    questions.

7                     FURTHER EXAMINATION

8    BY MR. CATANIA:

9        Q.    When you first learned that you were HIV

10   positive, that was a pretty depressing situation,

11   right?

12       A.    Yes.

13       Q.    Is your depression relate to the HIV?

14       A.    Yeah, I think so.

15       Q.    Now, when I was asking you questions about

16   your seeking medical treatment after January 29th,

17   2008, when you were released, I understood that you

18   had not immediately gone to seek a physician.   When

19   did you seek a physician after January 29th, 2008?

20       A.    When?

21       Q.    Yes.

22       A.    I don't know the date and all that.

23       Q.    Did you go on January 30th, 2008?

24       A.    I'm not sure.

Page 96

1     Q.   Did you go on January 31st, 2008?

2     A.   I'm not sure.

3     Q.   Can you tell me if it was in the next

4  month after your release of January 29th, 2008,

5  that you went to the doctor?

6     A.   It is possible.

7     Q.   Do you know for certain that it was within

8  30 days of being released?

9     A.   Yeah.

10    Q.   When you were arrested for the domestic

11 battery, you knew at that time that Anita simply

12 had some red marks on her, right?

13    A.   Some what?

14    Q.   Some red marks, some redness on her.  She

15 was not seriously injured.  You knew that?

16    A.   Right.

17    Q.   And you also knew at the time that it was

18 likely that she was going to come to court and say

19 all is forgiven and she didn't want to proceed?

20 You knew that when you were arrested?

21    A.   No, I didn't know that.

22    Q.   When did you first find out that she was

23 going to come to court and say she didn't want to

24 proceed?

1    A.    When did I first find out that she was

2    going to come to court and not proceed?

3    Q.    Yes.

4    A.    She was still upset with me.

5    Q.    Okay.  She was upset with you, but you

6    also knew that she was going to be coming to court

7    because you had relayed that message?

8    A.    Yeah, I did know that.

9    Q.    You also knew that if she came in and said

10   that she didn't want to proceed that you would be

11   released from custody?

12   A.    Yes.

13   Q.    When did you first know that if the case

14   was dismissed you would be released from custody?

15   A.    The day that I went to court.

16   Q.    Well, that's the day that you knew that

17   you were going to be released; but when did you

18   know if it was dismissed you would be released?

19   A.    I'm not sure.

20   Q.    You knew right away that if a case is

21   dismissed you are released, right?

22   A.    Right, right, right.

23   Q.    So if you expected the case to be

24   dismissed, then you knew you would be able to go

1    out to your own doctor and seek medicine, right?

2         A.    Exactly.

3         Q.    At the time when you spoke to the

4    physician assistant on the date of your intake of

5    January 15th of '08, you told the physician

6    assistant that at that time you were entirely

7    stable, right?  Your HIV was stable?

8         A.    I didn't tell them I was stable.

9         Q.    You didn't tell them that?

10        A.    No.

11        Q.    Were you having any particular problems at

12   the time with your HIV?

13        A.    I was not having no problems neither.

14        Q.    Were you given some education about HIV at

15   the time when you came into the jail?

16        A.    No.

17        Q.    When in terms of time was it that you

18   spoke to the physician assistant after speaking to

19   the mental health worker?

20             MR. FLAXMAN:  Object to the form of the

21   question.  It assumes facts not in evidence about

22   timing.

23   BY MR. CATANIA:

24        Q.    Well, turn to page 27.  At the bottom of

1    that page, there is a date, January 15th, '08, and

2    a time.  Do you see that?

3        A.   Yeah.

4        Q.   It says 6:38 p.m.?

5        A.   Right.

6        Q.   If you turn back to page 26, on the top of

7    that page, there is a time.  Do you see that?

8        A.   6:45?

9        Q.   6:45 p.m.

10       A.   Right.

11       Q.   And that was written by CMT Jones, the

12   first CMT you spoke to, right?

13            MR. FLAXMAN:  Objection.  It's beyond her

14   knowledge who wrote it.

15   BY MR. CATANIA:

16       Q.   Well, the person who signed below where it

17   says "provider signature," it looks like LJ, CMT

18   circled is the same as the front of that page,

19   which is page 25, where it says Jones.  Do you see

20   that?  You see it says Jones here?  Turn back to

21   the first page.

22       A.   Yes.

23       Q.   Turn now to page 26.  In this box here, it

24   looks like it says LJ CMT, doesn't it?

1      A.    I can understand the L, but I can't

2   understand the last one.

3      Q.    Okay.  But that's a signature that says

4   provider signature and CMT is circled, right?

5      A.    Okay.

6      Q.    And that's the time, 6:45 p.m.?

7      A.    Okay.

8      Q.    So within a few minutes of telling mental

9   health specialists that you are not getting psych

10  treatment, you were also being spoken to by the

11  intake correctional medical technician where you

12  said you were on antiviral meds?

13     A.    Right.

14     Q.    So almost at the same time of that whole

15  intake you informed them of both problems, right?

16     A.    Possible.

17     Q.    But only one problem appears on this

18  record, and that's that you are on antiviral

19  medication?

20     A.    Yeah.

21     Q.    And you spoke to somebody after the CMT

22  that did some kind of exam about your HIV, the

23  person who wrote Sustiva and Combivir, right?

24     A.    Yeah.

1       Q.   Do you have any of the hospital results

2   from Loretto Hospital that show you had a drop in

3   your T-cell count?

4       A.   No.

5       Q.   You don't have those records?

6       A.   No.

7       Q.   Did you think that that was important for

8   this case, that you have your records regarding

9   that?

10      A.   No.

11      Q.   You just thought because you come in and

12  say that you didn't get your medicine that you

13  should get money?

14      MR. FLAXMAN:  Objection.  That's an

15  improper question and you know it.

16  BY MR. CATANIA:

17      Q.   Aside from The Core Center, Raymar Clinic,

18  and Loretto Hospital, are there any other locations

19  that we need to know about to get your medical

20  records?

21      A.   Jackson Park Hospital.

22      Q.   Any other places that you fill

23  prescriptions?

24      A.   Raymar's Clinic, Jackson Park.

Page 102

1       Q.    No other places like Walgreens or anything

2    like that?

3       A.    In the past, yeah.

4       Q.    What Walgreens have you gone to?

5       A.    I don't remember.

6       Q.    Has it been within the last three years

7    that you've been to Walgreens?

8       A.    I don't believe so.

9       Q.    Within the last five years, have you been

10   to a Walgreens?

11      A.    It is possible, yeah.

12      Q.    Any other locations now that you've gone

13   to for prescriptions or for treatments within the

14   last, say, ten years?

15      A.    I can't remember.

16      Q.    Have you ever been to Bethany Hospital?

17      A.    Bethany?  I think so.

18      Q.    Was that within the last ten years?

19      A.    I'm not sure.  I'm really not sure.

20      Q.    Have you ever been admitted to Stroger

21   Hospital?

22      A.    Admitted?

23      Q.    Yes.

24      A.    I don't think so.

Page 103

1      Q.   Have you ever had surgeries?

2      A.   One.

3      Q.   When did you have that surgery?

4      A.   I think '97.

5      Q.   And both of your children are adults; is

6   that right?

7      A.   Yes.

8      Q.   So your deliveries were many years ago,

9   22 years or more years ago?

10      A.   Exactly.

11           MR. CATANIA:  I have no further questions.

12   Thank you.

13           MR. FLAXMAN:  I have no questions.  We'll

14   waive signature.

15           THE VIDEOGRAPHER:  This will be all for

16   Tape No. 2 and will be the conclusion of today's

17   deposition.  We're going off the video record at

18   11:00 am.

19                     WITNESS EXCUSED

20

21

22

23

24

```
 1   NORTHERN DISTRICT OF ILLINOIS )

     EASTERN DIVISION              )
 2   STATE OF ILLINOIS            )

                                  )  SS:

 3   COUNTY OF COOK               )
```

4          I, Noreen E. Thompson, Registered

5   Professional Reporter and Notary Public in and for

6   the County of Cook, State of Illinois, do hereby

7   certify that on the 11th of September, C.E., 2009,

8   the deposition of the witness, LISA BROWN, called

9   by the Defendant, was taken before me, reported

10  stenographically and was thereafter reduced to

11  typewriting through computer-aided transcription.

12          The said witness, LISA BROWN, was first

13  duly sworn to tell the truth, the whole truth, and

14  nothing but the truth, and was then examined upon

15  oral interrogatories.

16          I further certify that the foregoing is a

17  true, accurate and complete record of the questions

18  asked of and answers made by the said witness, at

19  the time and place hereinabove referred to.

20          The signature of the witness was waived by

21  agreement.

22          The undersigned is not interested in the

23  within case, nor of kin or counsel to any of the

24  parties.

Plaintiffs' Exhibit 53

Page 105

1          Witness my official signature and seal as

2      Notary Public, in and for Cook County, Illinois on

3      this 30th day of September, C.E., 2009.

4

5

6

7

8              Noreen E. Thompson, CSR, RPR

               Notary Public

9              39 South LaSalle Street, Suite 625

               Chicago, Illinois  60603

10

11     License No. 084-004182

12

13

14

15

16

17

18

19

20

21

22

23

24

**Exhibit 5(**

**CERMAK HEALTH SERVICES OF COOK COUNTY**   **Medical Intake Form**

Last Name: TAYLOR, DAN M   .c: _____   Date: 12/30/05

06/29/1951

Sex: M   20050100785   BKDT:12/30/2005   CDOC#: _____   Division: 05

**Consent for Treatment**

I consent to a medical and mental health history and physical including screening for tuberculosis and sexually transmitted diseases as part of the intake process of the Cook County Jail. I also consent to ongoing medical treatment by Cermak Health Services staff for problems identified during this process. I understand I may be asked to sign forms allowing other medical treatments. I understand that every effort will be made by CHS staff to keep my medical problems confidential. I understand the policy of CHS regarding access to health care at Cook County Jail.

X Dan Taylor

*patient's signature*

| Medical History | | | Remarks (reference by question number) SHARON SHIEH, PA |
|---|---|---|---|
| 1. Seizures/ Epilepsy / Fits | Yes | No | **Form Reviewed:** _____ |
| 2. Heart Trouble / Heart Attack | Yes | No | Date __/__/__ |
| 3. High Blood Pressure | Yes | No | Sick-Call Needed: Y / N |
| 4. Asthma / Emphysema | Yes | No | |
| 5. Diabetes | Yes | No | |
| 6. Cancer | Yes | No | |
| 7. Assistive Devices (prosthesis, cane, etc.) | Yes | No | |
| 8. Mental Illness | Yes | No | Scheduled: __/__/__ |
| 9. Tuberculosis | Yes | No | |
| 10. HIV/AIDS | Yes | No | -by _____ |
| 11. Liver Disease (specify)/Hepatitis B/C | Yes | No | |
| -ever had DTs (delirium tremens) | Yes | No | |
| 12. Kidney Disease | Yes | No | |
| 13. Peptic Ulcer Disease | Yes | No | #1,5 2-Rupture Disk ① Back 2x20YRS ago |
| 14. Sickle Cell Disease | Yes | No | |
| 15. Other (specify) | Yes | No | |
| **Current Problems** | | | |
| 1. On Medications (list) | Yes | No | #1, I.N.H & B6 |
| 2. Under Doctor Care | Yes | No | |
| 3. Dental Problems (tooth ache, bleeding gums, etc., refer to dental if present) | Yes | No | |
| 4. Current Disabilities (assistance with ADL) | Yes | No | |
| 5. Recent trauma or hospitalization | Yes | No | |
| 6. Current cough, fever, night sweats | Yes | No | |
| 7. Current vaginal/penile discharge/sores /dysuria | Yes | No | Allergies: X-RAY DYE |
| 8. Other (specify) | Yes | No | |
| 9. Females – Menstrual History – LMP | / / | | Understands English? Y / N |
| Currently pregnant | Yes | No | N/A |
| Number of past pregnancies / deliveries | / | | |

| Substance Use | Tobacco | Alcohol | Injection Drug Use | Illicit, Non-Injection | Methadone | Other |
|---|---|---|---|---|---|---|
| Heroin | X / N | Y / X | Y / N | Y / X | X / N | Y / X |
| How Long ? (years) | 20YRS | | 33YRS | | 3 YRS | |
| Last Used (today, yesterday, 1 week etc.) | ½' | | $75 co daily | | | |
| How much per day? | ½ ppd | | | | | |

**Comments:**

RR (CMT)/ERT

*signature of CMT/Paramedic/Title*

PATIENT LABEL   Page 1

**Exhibit 5)**

TAYLOR, DAN          M
06/29/1951
62147   ...BKDT:06/08/2008

**...RVICES OF COOK COUNTY    Medical Intake Form**

First Name: _____    Date: 5 0 8 0 8

Sex: M / F    Date of Birth: _____    CCDOC#_____    Division: _____

**Consent for Treatment**

I consent to a medical and mental health history and physical including screening for tuberculosis and sexually transmitted diseases as part of the intake process of the Cook County Jail. I also consent to ongoing medical treatment by Cermak Health Services staff for problems identified during this process. I understand I may be asked to sign forms allowing other medical treatments. I understand that every effort will be made by CHS staff to keep my medical problems confidential. I understand the policy of CHS regarding access to health care at Cook County Jail.

_patient's signature_

**Medical History**    Remarks (reference by question number)

| | | | |
|---|---|---|---|
| 1. Seizures/ Epilepsy / Fits | Yes | No | |
| 2. Heart Trouble / Heart Attack | Yes | No | |
| 3. High Blood Pressure | Yes | No | |
| 4. Asthma / Emphysema | Yes | No | |
| 5. Diabetes | Yes | No | |
| 6. Cancer | Yes | No | |
| 7. Assistive Devices (prosthesis, cane, etc.) | Yes | No | |
| 8. Mental Illness | Yes | No | |
| 9. Tuberculosis | Yes | No | |
| 10. HIV/AIDS | Yes | No | |
| 11. Liver Disease (specify)/Hepatitis B/C | Yes | No | |
| -ever had DTs (delirium tremens) | Yes | No | |
| 12. Kidney Disease | Yes | No | |
| 13. Peptic Ulcer Disease | Yes | No | |
| 14. Sickle Cell Disease | Yes | No | |
| 15. Other (specify) | ~~Yes~~ | No | |

Form Reviewed:
Date 5/8/8
Sick-Call Needed: Y / N

Scheduled: ___/___/___

-by_____

ChEsT PAin x 14 +
Postute 2 yr
BAck Pain 1985
MEthodonE PRogRAm
SASI #2314 ← Johnson

**Current Problems**

| | | |
|---|---|---|
| 1. On Medications (list) | ~~Yes~~ | No |
| 2. Under Doctor Care | Yes | No |
| 3. Dental Problems (tooth ache, bleeding gums, etc., refer to dental if present) | Yes | No |
| 4. Current Disabilities (assistance with ADL) | Yes | No |
| 5. Recent trauma or hospitalization | Yes | No |
| 6. Current cough, fever, night sweats | Yes | No |
| 7. Current vaginal/penile discharge/sores /dysuria | Yes | No |
| 8. Other (specify) | Yes | No |
| 9. Females – Menstrual History – LMP | / | / |
| Currently pregnant | Yes | No |
| Number of past pregnancies / deliveries | / | |

S 4yrs AgE

Allergies: NKDA

Understands English? Y / N

**Substance Use**

| | Tobacco | Alcohol | Injection Drug Use | Illicit, Non-Injection | Methadone | Other |
|---|---|---|---|---|---|---|
| | Y / N | Y / N | Y / N | Y / N | Y / N | Y / N |
| How Long ? (years) | | | | | | |
| Last Used (today, yesterday, 1 week etc.) | | | | | | |
| How much per day? | | | | | | |

**Comments:**

_____ CMT/ERT
signature of CMT/Paramedic/Title

Taylor 0113

PATIENT LABEL

Page 1

**Exhibit 5***

## HEALTH SERVICES OF COOK COUNTY — Medical Intake Form

20080056132
TAYLOR, DAN M
06/29/1951

62147    BKDT:08/05/2008

**Consent for Treatment**

First Name: _____      Date: _____

_____ CCDOC# _____      Division: _____

I consent to a medical and mental health history and physical including screening for tuberculosis and sexually transmitted diseases as part of the intake process of the Cook County Jail. I also consent to ongoing medical treatment by Cermak Health Services staff for problems identified during this process. I understand I may be asked to sign forms allowing other medical treatments. I understand that every effort will be made by CHS staff to keep my medical problems confidential. I understand the policy of CHS regarding access to health care at Cook County Jail.

_____
patient's signature

| Medical History | | | Remarks (reference by question number) |
|---|---|---|---|
| 1. Seizures/ Epilepsy / Fits | Yes | No | |
| 2. Heart Trouble / Heart Attack | Yes | No | **Form Reviewed:** _____ |
| 3. High Blood Pressure | Yes | No | *Date* __/__/__ |
| 4. Asthma / Emphysema | Yes | No | Sick-Call Needed: Y / N |
| 5. Diabetes | Yes | No | |
| 6. Cancer | Yes | No | |
| 7. Assistive Devices (prosthesis, cane, etc.) | Yes | No | **Scheduled:** __/__/__ |
| 3. Mental Illness | Yes | No | |
| 9. Tuberculosis | Yes | No | |
| 10. HIV/AIDS | Yes | No | -by_____ |
| 11. Liver Disease (specify)/Hepatitis B/C | Yes | No | |
| -ever had DTs (delirium tremens) | Yes | No | |
| 12. Kidney Disease | Yes | No | |
| 13. Peptic Ulcer Disease | Yes | No | |
| 14. Sickle Cell Disease | Yes | No | |
| 15. Other (specify) | Yes | No | |

**Current Problems**

| | | | |
|---|---|---|---|
| 1. On Medications (list) | Yes | No | |
| 2. Under Doctor Care | Yes | No | |
| 3. Dental Problems (tooth ache, bleeding gums, etc., refer to dental if present) | Yes | No | |
| 4. Current Disabilities (assistance with ADL) | Yes | No | |
| 5. Recent trauma or hospitalization | Yes | No | |
| 6. Current cough, fever, night sweats | Yes | No | Allergies: _____ |
| 7. Current vaginal/penile discharge/sores /dysuria | Yes | No | |
| 8. Other (specify) | Yes | No | |
| 9. Females – Menstrual History – LMP | / | / | Understands English? Y / N |
| Currently pregnant | Yes | No | |
| Number of past pregnancies / deliveries | / | | |

| Substance Use | Tobacco | Alcohol | Injection Drug Use | Illicit, Non-Injection | Methadone | Other |
|---|---|---|---|---|---|---|
| | Y / N | Y / N | Y / N | Y / N | Y / N | Y / N |
| How Long? (years) | | | | | | |
| Last Used (today, yesterday, 1 week etc.) | | | | | | |
| How much per day? | | | | | | |

**Comments:**

_____ CMT/ERT
signature of CMT/Paramedic/Title

PATIENT LABEL

**Exhibit 5+**

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

MICHAEL PARISH, CURTIS  )

L. OATS, LEILA KHOURY,  )

SEAN DRISCOLL, CARLA  )

LOFTON, ROY CLEAVES,  )

LISA BROWN, DAN TAYLOR,  )

DEAN MILLER, KEVIN  )

SANDERS, STACEY CLARK,  )

and CARLOTTE WATSON,  )

     Plaintiffs,  )

  vs.  ) No. 07 CV 4369

SHERIFF OF COOK COUNTY  )

and COOK COUNTY,  )

     Defendants.  )

     The deposition of DAN M. TAYLOR, JR., called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Deborah E. DeSanto, a Notary Public within and for the County of Cook and State of Illinois, at 50 West Washington Street, Room 302, Chicago, Illinois, on the 6th day of June, 2011, at the hour of 1:51 o'clock p.m.

(The deposition concluded at 4:28 p.m.)

Reported By:  Deborah E. DeSanto, CSR

License No:  084-1384

2

1  APPEARANCES:

2   THOMAS G. MORRISSEY, LTD.

3   BY:  MR. THOMAS G. MORRISSEY

4   10249 South Western Avenue

5   Chicago, Illinois  606543

6   (773) 233-7900

7    Representing the Plaintiffs;

8

9   ANITA ALVAREZ

10  STATE'S ATTORNEY OF COOK COUNTY, ILLINOIS

11  BY:  MR. FRANCIS J. CATANIA

12    and

13    MR. FRANK OLES

14  50 West Washington Street

15  Suite 500

16  Chicago, Illinois  60602

17  (312) 603-3000

18   Representing the Defendants.

19

20

21

22

23

24

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois  (312) 263-0052**

Plaintiffs' Exhibit 57                   Page 2

3

1                    I N D E X

2      WITNESS                    EXAMINATION

3      DAN M. TAYLOR, Jr.

4         By Mr. Catania              4

5

6

7

8

9

10                  E X H I B I T S

11     NUMBER                    MARKED FOR ID

12     Taylor Deposition Exhibit

13         No. 1                  51

14         No. 2                  52

15         No. 3                  63

16         No. 4                  130

17         No. 5                  137

18

19

20

21

22

23

24

4

1                    (Whereupon, the witness was duly

2                    sworn.)

3                    DAN TAYLOR,

4     having been first duly sworn, was examined and

5     testified as follows:

6                    EXAMINATION

7     BY MR. CATANIA:

8        Q.   Sir, will you please state your full name

9     for the record?

10       A.   Dan M. Taylor, Jr.

11       Q.   Sir, what does the "M" stand for?

12       A.   Marrion, Marrion, M-a-r-r-i-o-n.

13          MR. CATANIA:  This is the Federal

14    deposition of Dan Taylor pursuant to notice.

15             We'll be following the applicable rules of

16    the Northern District of -- United States District

17    Court, Northern District of Illinois, as well as

18    the Federal Rules of Civil Procedure.

19    BY MR. CATANIA:

20       Q.   Sir, can you tell me, what is your date of

21    birth?

22       A.   6/30/53.

23       Q.   How old are you today?

24       A.   57.

5

1    Q.   What is your current address?

2    A.                             third floor

3   apartment.

4    Q.   Is that in Chicago?

5    A.   Chicago, Illinois 60653.

6    Q.   Okay.  And have you in the last five years

7   had other addresses that you have resided at?

8    A.   Yes.

9    Q.   What other addresses?

10   A.   IDOC, County jail.

11   Q.   Where else?

12   A.   Lower Wacker Drive.

13   Q.   I believe that by saying that, you're

14   implying that you were homeless?

15   A.   I was homeless, yes.

16   Q.   Did you ever reside at              Federal?

17   A.   Yes, Apartment 702, 705.

18   Q.   Okay.  What is located at

19   Federal?

20   A.   That was a relative, a different home, CHA

21   project.

22   Q.   So CHA is the owner of the building?

23   A.   Yes, sir.

24   Q.   Okay.  And that's Chicago Housing

6

1    Authority?

2        A.   Chicago Housing Authority.

3        Q.   You said you were staying with a relative

4    there?

5        A.   Yes.

6        Q.   What's the relative's name?

7        A.   Robert Johnson.

8        Q.   Is Robert Johnson a member of the class

9    that you are representing?

10       A.   No.

11       Q.   Now, you are a class representative in

12   this case, is that right?

13       A.   I believe so.

14       Q.   Okay.  Your name is in the caption?

15       A.   Yes, ma'am.  Excuse me.  Yes, sir.

16       Q.   Okay.  You are complaining in the

17   complaint about certain dates that you came into

18   the jail, at which time you gave information about

19   medication and you didn't receive it, is that

20   right?

21       A.   Correct.

22       Q.   What is it that you expect from the

23   litigation?

24       A.   A change of policy.

7

1    Q.  Okay.  Do you realize that the lawsuit was

2  actually one that was written for damages, for

3  money damages; did you know that?

4    A.  No, I wasn't aware of that.

5    Q.  Okay.  So you don't expect any money as a

6  result of litigation, do you?

7      MR. MORRISSEY:  I'm going to object.  He's

8  not an attorney.

9      THE WITNESS:  No.

10      MR. MORRISSEY:  The complaint speaks for

11  itself.

12  BY MR. CATANIA:

13    Q.  You don't expect any money as a result of

14  the lawsuit, is that right?

15    A.  If I'm going to be blessed with some, yes.

16    Q.  Okay.  If you're blessed with some money,

17  you'll be happy, right?

18    A.  Yes.

19    Q.  Could you tell me if you've ever gone by

20  any other name besides Dan Taylor?

21    A.  Yes.

22    Q.  What other name?

23    A.  Well, Dan Tyler, Danny Tyler.  I can't

24  remember all hundred of them.

8

1    Q.   How many?

2    A.   A hundred.

3    Q.   A hundred?

4    A.   Yes.

5    Q.   Okay.  You've used a lot of alias names?

6    A.   Yes, sir, I have.

7    Q.   Okay.  What was your reason for using

8    alias names?

9    A.   To elude the system.

10   Q.   Okay.  And by "the system," do you mean

11   the criminal justice system?

12   A.   Yes, sir.

13   Q.   You've had a lot of experience with the

14   criminal justice system?

15   A.   Yes, sir.

16   Q.   Okay.  Could you tell me where you were

17   born?

18   A.   Chicago, Illinois.

19   Q.   Your current marital status?

20   A.   Single.

21   Q.   Have you ever been married?

22   A.   No, sir.

23   Q.   Any children?

24   A.   No, sir.

9

1     Q.   Any siblings?

2     A.   All deceased.

3     Q.   Okay.

4     A.   Mother, father, everybody's deceased.

5     Q.   Did you grow up with both parents in the

6   household?

7     A.   Yes, yes, sir.

8     Q.   Where did you grow up?

9     A.   In a house with a beautiful mother that

10   took care of us at home and a father that went to

11   work everyday.

12     Q.   What's your mother's name?

13     A.   Janie V. Harris Taylor.

14     Q.   Is that a hyphenated name, hyphen?

15     A.   No.

16     Q.   Okay. And your father's name?

17     A.   Dan Taylor, Sr.

18     Q.   Were you the oldest?

19     A.   No, I was the middle of five.

20     Q.   Okay. And how did your parents die?

21     A.   That's a good question.

22     Q.   Do you know when your mother died?

23     A.   My mother died in '94.

24     Q.   And your father?

10

1    A.  2009.

2    Q.  So recently your father died?

3    A.  Yes.

4    Q.  And before he passed away, did you have

5    occasion to see him on any occasions?

6    A.  Yes, in passing, yes.

7    Q.  Did he reside in a house?

8    A.  He resided at -- in the senior apartment

9    on 31st and Wentworth.

10   Q.  Okay.  At any time in the last ten years,

11   did you reside with anybody in the same household?

12   A.  Family member?

13   Q.  Family or friends?

14   A.  No.  I was carrying a stick with several

15   people, at several people's houses.

16   Q.  Staying at people's houses?

17   A.  Okay.  Staying at people's houses.

18   Q.  Is that what you were doing?

19   A.  Yes.

20   Q.  Okay.  All right.  Can you tell me what

21   time frame you believe your information is relevant

22   to in terms of this lawsuit?

23   A.  From the year of '06.

24   Q.  Okay.  What about the year of '06 do you

11

1    think makes it relevant to this lawsuit?

2        A.   Because I was denied my medication.

3        Q.   Other than '06, when you have been in the

4    custody of the Cook County Department of

5    Corrections, have you received your medication?

6        A.   In -- over a period of time, yes.

7        Q.   Okay.

8        A.   But not immediately, never.

9        Q.   Well, when you say "immediately," do you

10   mean while you're standing there telling them what

11   your medicines are?

12       A.   Right.

13       Q.   Okay.  Because you've gone to Public

14   Health outside of the jail, right?

15       A.   Yes.

16       Q.   And you've experienced long waits when you

17   go to, for example, Stroger or --

18       A.   Right, correct.

19       Q.   So nothing is ever immediate when you go

20   to Public Health?

21       A.   Nothing.

22       Q.   So you were not particularly surprised

23   about having to wait for medication in the jail,

24   were you?

12

1     A.  Over the period of time that I had to

2  wait, yes.

3     Q.  Why were you surprised?

4     A.  Because with the system like it is in the

5  County jail, with the processing system, you don't

6  expect to get it that same day, but you do expect

7  to get it that following day.

8     Q.  Because that's what they aim to do, is

9  that right?

10     A.  That's what they aim to do.  But they

11  don't.

12     Q.  Has anyone ever told you or informed you

13  that the concept of getting medication the

14  following day is a standard?

15     A.  Only the paramedics.

16     Q.  Did the paramedics tell you that?

17     A.  Yes.  They tell you you'll only get your

18  medication the following day.

19     Q.  All right.

20     A.  If the pharmacist is closed that day.

21     Q.  Do you have any children?

22     A.  No.

23     Q.  Can you tell me what is the highest grade

24  you completed?

13

1      A.   Third year of high.

2      Q.   Where did you go to high school?

3      A.   Wendell Phillips, 39th Pershing Road,

4   Chicago, Illinois, 1968 to 1971.

5      Q.   Okay.  Did you ever get a diploma?

6      A.   No.

7           I'm going to school at the present time

8   for a GED.

9      Q.   For a GED?

10     A.   Yes.

11     Q.   Where are you doing that?

12     A.   I'm at De La Salle.

13     Q.   When did you start the GED program?

14     A.   I started that -- oh, 2010 we just started

15   back, yes.

16     Q.   Okay.  And how much time do you think it

17   will take you to obtain the GED?

18     A.   I think I'm ready now, but the teacher's

19   telling me that I should do another semester.

20     Q.   Okay.  All right.  Other than pursuing the

21   GED, the equivalency, do you have any other

22   schooling?

23     A.   No.

24     Q.   Okay.  Did you ever have any school

14

1    problems while you were in high school?

2    A.  Yes.

3    Q.  Did you ever have special education

4    classes?

5    A.  No.

6    Q.  What kind of problems did you have in high

7    school?

8    A.  Missing school.

9    Q.  Did you ever have any counseling while in

10    school?

11    A.  No.

12    Q.  Were you ever left behind a grade?

13    A.  Yes.

14    Q.  Okay.  When were you left behind a grade?

15    A.  When I was in grammar school in -- I got

16    demoted in the third grade.

17    Q.  Okay.  Other than that, have you ever been

18    left behind a grade?

19    A.  No.

20    Q.  Okay.  Any suspensions while in high

21    school?

22    A.  Yes.

23    Q.  What for?

24    A.  Fighting.

15

1    Q.   Okay.  Have you ever belonged to an

2    organized street gang?

3    A.   Yes.

4    Q.   What gang?

5    A.   The Del Vikings.

6    Q.   I'm sorry?

7    A.   Del Vikings.

8    Q.   Del Vikings?

9    A.   Uh-huh.

10   Q.   Where where they located?

11   A.   From what, 35th Street to 40th Street,

12   Wentworth to the Lake.

13   Q.   Any other street gangs?

14   A.   No.

15   Q.   When did you belong with the Del Vikings?

16   A.   1975.

17   Q.   Did you ever tell any police officers that

18   you were involved in any other street gangs?

19   A.   Any other street gangs?

20   Q.   Yes.

21   A.   No.

22       They always labeled me as a GD.

23   Q.   That's what I was going to ask you.

24   A.   Yes.

16

1    Q.   So they labeled you as a Gangster

2  Disciple?

3    A.   Yes.

4    Q.   Okay.  Did they come up with that based on

5  any admissions you ever made about that?

6    A.   No.

7    Q.   You never said to anybody that you were a

8  Gangster Disciple?

9    A.   No.

10    Q.   Okay.  What did your father do for a

11  living when he was --

12    A.   He was a longshoreman.

13    Q.   A longshoreman?

14    A.   Yes, with the docks.

15    Q.   Have you ever described your own work as

16  longshoreman?

17    A.   Yes.

18    Q.   Do you ever describe your work as a

19  northshoreman?

20    A.   No.

21    Q.   Okay.  Did you ever do work as a

22  longshoreman?

23    A.   Yes.

24    Q.   Where at?

17

1     A.  When the Sun Times dock was over at Navy

2    Pier before Navy Pier was transformed.  And that's

3    the Sucrest Sugar Company over on the pier.

4     Q.  How long ago was it that you worked as a

5    longshoreman?

6    A.  1970.

7    Q.  1970?

8    A.  Yes, 1970.

9     Q.  While growing up, did you ever experience

10   any fights in the home?

11   A.  Yes.

12   Q.  Any abuse?

13   A.  No.

14   Q.  Any DCFS or police ever call you?

15   A.  No.

16   Q.  Okay.  Was anyone in your family ever

17   physically or sexually abused to your knowledge?

18   A.  Yes.

19   Q.  Who was?

20   A.  The whole family.

21   Q.  By whom?

22   A.  Not sexually but physically and mentally

23   abused.

24   Q.  Okay.

18

1     A.  By my father's behavior sometimes.

2     Q.  As a result of any of that abuse by your

3  father, did anybody ever get treated for any

4  psychological injuries?

5     A.  Nope.

6     Q.  Aside from your own experience, have any

7  of your siblings or parents been arrested in the

8  past?

9     A.  No.

10    Q.  Okay.

11    A.  I'm the black sheep of the family.

12    Q.  Anyone in your family have any serious

13  mental disease?

14    A.  No.

15    Q.  Anyone in your family involved in any

16  litigation?

17    A.  No.

18    Q.  Have you ever filed a lawsuit?

19    A.  Yes.

20    Q.  What other lawsuits?

21    A.  In IDOC.

22    Q.  Okay.  What did you sue about?

23    A.  About getting -- about the food supervisor

24  hitting me in the back of a table.

19

1  Q. When did that happen?

2  A. In '85 in Menard Correctional Center?

3  Q. Menard?

4  A. Yes.

5  Q. Okay.  And did you sue in a court for

6 that?

7  A. Yes.

8  Q. What courthouse?

9  A. Southern Illinois.

10  Q. In the Federal Court?

11  A. Federal Court.

12  Q. Okay.  And did you win any money in that

13 lawsuit?

14  A. No.

15  Q. What happened with it?

16  A. It was dismissed.

17  Q. When was it dismissed?

18  A. In, oh, in -- no.  In 1987.

19  Q. Did you have a lawyer for that lawsuit?

20  A. Yes.

21  Q. Who was the lawyer?

22  A. Attorney Simms, southern Illinois.

23  Q. Okay.  Other than that lawsuit, have you

24 ever filed any other lawsuits?

20

1       A.  Yes, small claims.

2       Q.  Where were you filing small claims?

3       A.  Northern Illinois.

4       Q.  In the Circuit Court of Cook County?

5       A.  Yes.

6       Q.  In this building here?

7       A.  I filed -- I guess it would be this

8    building, because I filed from Stateville.

9       Q.  Okay.  Who were you suing in that small

10   claims?

11      A.  I was suing the Department of Corrections.

12      Q.  And for what?

13      A.  For damaged property.

14      Q.  Okay.  Any other lawsuits aside from

15   those?

16      A.  No.

17      Q.  Are you involved in any other class

18   actions?

19      A.  Personally?

20      Q.  Yes.

21      A.  I'm not aware of it.

22      Q.  Are you a claimant in any of the class

23   actions?

24      A.  Not -- oh, the strip search.

21

1    Q.   Okay.  Any others?

2    A.   No.

3    Q.   Not the lost property class action?

4    A.   No.  I wasn't aware of that, no.

5    Q.   Any dental class action?

6    A.   No.

7    Q.   Any STD testing class action?

8    A.   No.

9    Q.   Okay.

10   A.   Oh, yes.  You mean the urinary doctor?

11   Q.   Yes.

12   A.   Yes.

13   Q.   You were a claimant in that class?

14   A.   I was a participant in it.

15   Q.   Okay.  Now that I've reminded you of a few

16   of the class actions that Mr. Morrissey has

17   brought, can you tell me if you are remembering

18   any others that you were involved in?

19   A.   No, no others.

20   Q.   Okay.  Now, you were not a class

21   representative in any of those?

22   A.   No.

23   Q.   Okay.  What do you think it means to be a

24   class representative?

22

1    A.  I think that's the individual or

2  individuals who take the forefront and step up and

3  whose name is presented on the claim at the

4  beginning of the suit.

5    Q.  All right.  And if you don't prevail in

6  this class action, what do you think might happen

7  to a class representative?

8    A.  What might happen to them?

9    Q.  Yes.

10    A.  Nothing.

11    Q.  Okay.  So it's really a win-win for you,

12  there's really no down side to being a class

13  representative?

14    MR. MORRISSEY:  I object to the

15  argumentative nature of the question.

16    You can answer.

17    THE WITNESS:  I'm not following you.

18  BY MR. CATANIA:

19    Q.  Well, if you win, in your view you may get

20  some money, you may be blessed with some money?

21    A.  Okay.

22    Q.  If you lose, nothing else is going to

23  happen.  So it's really no difference?

24    A.  Right.  We're at a standstill, a

23

1    stalemate.

2        Q.   All right.  Can you tell me when is the

3    last time you had a paying job in which you

4    received money?

5        A.   A paying job?

6        Q.   Yes.

7        A.   Just a couple of weeks ago.

8        Q.   What kind of a job was that?

9        A.   It was a -- organizing an elderly person

10   movement.

11       Q.   And do you mean that you helped someone

12   move from one place to another place?

13       A.   I helped supervise.

14       Q.   Helped supervise?

15       A.   Yes.

16       Q.   Were you working for a company at the

17   time?

18       A.   No.

19       Q.   It was like a casual arrangement?

20       A.   Yes.

21       Q.   All right.  So there was no contract or

22   anything like that?

23       A.   No, there wasn't no contract.

24       Q.   How were you paid?

24

1      A.  Cash.

2      Q.  In this lawsuit, is part of what you're

3  expecting to obtain would be damages because of

4  lost time at work?

5      A.  No.

6      Q.  Okay.  So there's no lost wage claim that

7  you're making?

8      A.  No.

9      Q.  Other than the two week ago job of helping

10 somebody move, have you had any recent jobs that

11 you've earned money doing?

12     A.  No.

13     Q.  Okay.  When's the last time that you had a

14 job in which you obtained a paycheck?

15     A.  About, oh, about 25 years ago.

16     Q.  What kind of job was that?

17     A.  That was a cooking job.

18     Q.  Where at?

19     A.  At Church's Chicken.

20     Q.  What location?

21     A.  It was -- it's no longer there, but it was

22 on 44th and Cottage Grove.

23     Q.  All right.  How many years would you say

24 you have been or experienced a condition of

25

1    homelessness?

2        A.  30.

3        Q.  30 years?

4        A.  Uh-huh.

5        Q.  During that 30 years' time, have you ever

6    sought or been required to obtain any mental health

7    treatment?

8        A.  No.

9        Q.  Is the homelessness that you've

10   experienced been a matter of choice for you?

11       A.  In part.

12       Q.  Have you ever been on Public Aid?

13       A.  Yes.

14       Q.  Are you currently on Public Aid?

15       A.  I guess you would say so, yes.

16       Q.  Okay.

17       A.  I get a Link card.

18       Q.  Have you ever been on Social Security

19   Disability?

20       A.  Yes.

21       Q.  What was the disability?

22       A.  Physical.

23       Q.  Okay.  Are you still on Social Security

24   Disability?

26

1      A.   Yes.

2      Q.   When were you first determined to be a

3   disabled person for that purpose?

4      A.   April of 2010 it was finalized.

5      Q.   Before that, had you ever received any

6   Social Security benefits?

7      A.   No.

8      Q.   Where do you have your checks sent?

9      A.   I have a payee.  I have a person that gets

10   my funds and manages it for me.

11      Q.   Okay.  Who is that payee?

12      A.   Robert Johnson.

13      Q.   Does he do it for a fee?

14      A.   No.

15      Q.   Okay.  Are you a veteran?

16      A.   No.

17      Q.   Did you ever serve in the military?

18      A.   No.

19      Q.   Okay.  Have you ever had any serious

20   illnesses as a child or an adult?

21      A.   Not as a child, but as an adult, yes.

22      Q.   What illnesses?

23      A.   A ruptured disk of the left nerve, a

24   swollen left nerve.

27

1        Q.  Was that as a result of the injury at

2   Menard?

3        A.  Yes.

4        Q.  Okay.

5        A.  Enlarged prostate.

6        Q.  Anything else?

7        A.  Depression.

8        Q.  Have you ever been diagnosed with

9   depression?

10       A.  Yes.

11       Q.  By whom?

12       A.  By a psychiatrist at Stroger's Hospital.

13       Q.  Do you remember the name of the

14   psychiatrist.

15       A.  No.

16       Q.  When was it that you were diagnosed?

17       A.  2010.

18          COPD.

19       Q.  Do you know what that is?

20       A.  Yes.

21       Q.  What is it?

22       A.  An asthmatic, one step away from

23   emphysema.

24       Q.  Okay.  Do you understand what the cause of

28

1    that is?

2        A.  Yes.

3        Q.  What is it?

4        A.  It's dealing with a respiratory problem.

5    The cause, the cause of it is from -- I was told

6    since me smoking.

7        Q.  From smoking?

8        A.  Yes.

9        Q.  Do you still smoke?

10       A.  No.

11       Q.  When did you stop?

12       A.  March 10, '09.

13       Q.  When you were in the jail, did you smoke

14   in jail?

15       A.  No.

16       Q.  Because they have a no-smoking policy?

17       A.  No-smoking policy.

18       Q.  Can you tell me if you have any hobbies?

19       A.  Yes.

20       Q.  What are your hobbies?

21       A.  I like music.  I like sports.

22       Q.  Do you play music or just enjoy listening

23   to it?

24       A.  I just enjoy listening to it.

29

1     Q.   What sports?

2     A.   Basketball, football.

3     Q.   Okay.  Are you a spectator, or do you

4  participate?

5     A.   Spectator.

6     Q.   Okay.  How often do you go out to the

7  movies?

8     A.   Maybe once every six months.

9     Q.   Okay.  Can you tell me who you consider to

10  be your closest friend?

11     A.   Stanley McLawlance, a childhood buddy.

12     Q.   Okay.  Could you spell his last name for

13  me?

14     A.   M-c-L-a-w-l-a-n-c-e.

15     Q.   And you've known him since childhood,

16  right?

17     A.   Yes, since over 50 years.

18     Q.   Have you ever resided in the same

19  residence with Stanley McLawlance?

20     A.   No.

21     Q.   Okay.  Now, you said, you mentioned 2006

22  as a time frame that you were focusing in on for

23  this case, is that right?

24     A.   Uh-huh, yes, sir.

30

1    Q.  Do you remember when it was you were

2  arrested in 2006?

3    A.  Yes.

4    Q.  When was it?

5    A.  September 26, '06.

6    Q.  All right.  That's the arrest date that

7  you're talking about, right?

8    A.  Yes, sir.

9    Q.  Can you tell me all the things that you

10  did to prepare for testifying about September 26th

11  of 2006?

12    A.  Go over it in my mind, my event of being

13  been arrested, processed at the police station,

14  transferred to the criminal court building,

15  detained in front of a judge, and transferred to

16  receiving of the County jail.

17    Q.  All right.  And when were you first asked

18  to try to remember those events?

19    A.  I've been remembering them.

20    Q.  When were you first asked to do that?

21    A.  I don't understand.

22    Q.  Okay.  Do you remember when it was that

23  you joined the lawsuit that we are here for?

24    A.  I believe it was -- what was it?  '07,

31

1    '08, '08.

2        Q.   Okay.  How was it that you became involved

3    in the lawsuit?

4        A.   Because I was inquiring about the penis

5    lawsuit, and it came to my attention that there was

6    also a litigation being drawn up for people who

7    didn't receive medication in a certain time frame

8    while incarcerated at the County jail.

9        Q.   So you made an inquiry as a class member

10   in the Jackson case, right?

11       A.   I guess that was the case.  I don't really

12   remember.

13       Q.   And the lawyers informed you about another

14   suit that they were planning, right?

15       A.   Yes, sir.

16       Q.   Okay.  That's how you became aware of it?

17       A.   That's how I became aware.

18       Q.   So you didn't seek them out for your

19   complaint, they found you because you were involved

20   in something else?

21       A.   Right.

22       Q.   Okay.  Was your first contact with them

23   based on having filed a claim with them, or did you

24   go to their office?

32

1      A.  I went to their office.

2      Q.  Okay.  Do you have any idea how many times

3  you have been arrested?

4      A.  Yes.

5      Q.  How many times?

6      A.  About 180.

7      Q.  Have all of those arrests been in

8  Illinois?

9      A.  Yes.

10      Q.  Okay.  Have all of them been in the City

11  of Chicago?

12      A.  Yes.

13      Q.  Okay.  Have you been convicted of any

14  crimes?

15      A.  Yes, sir.

16      Q.  What crimes have you been convicted of?

17      A.  Armed robbery.

18      Q.  When was that?

19      A.  1977.

20      Q.  Okay.  Any since then?

21      A.  Yes.

22      Q.  Okay.  In the armed robbery, were you

23  sentenced to the penitentiary?

24      A.  Yes, sir.

33

1    Q.  What term of years?

2    A.  Six years.

3    Q.  Did you complete those six years?

4    A.  Yes, sir, half of them.

5    Q.  Half of them?

6    A.  Yes.

7    Q.  So you got day-for-day credit?

8    A.  Yes, sir.

9    Q.  So you were out by 1980?

10    A.  Yes, sir, exactly, January 4th.

11    Q.  And you were on mandatory supervised

12  release or parole at the time?

13    A.  Yes, sir.

14    Q.  All right.  Were you arrested ever while

15  on parole?

16    A.  At that time, no.

17    Q.  Okay.  What other felonies have you been

18  convicted of?

19    A.  Another armed robbery.

20    Q.  When was that?

21    A.  1983.

22    Q.  And were you sentenced to the

23  penitentiary?

24    A.  Yes, sir.

34

1    Q.  How long?

2    A.  Seven years.

3    Q.  Any others?

4    A.  Yes, sir.

5    Q.  What else?

6    A.  Possession of UUW.

7    Q.  Okay.  Unlawful use of weapons?

8    A.  Yes, sir.

9    Q.  Was that as a felon following the other --

10   A.  No, that was before those.

11   Q.  Before.  Okay.

12   A.  That was 1971.

13   Q.  Okay.  Any convictions in this century?

14   A.  Yes.

15   Q.  Tell me the first conviction you had in

16   this century.

17   A.  Okay.  2001.

18   Q.  What was the conviction for?

19   A.  Possession.

20   Q.  Would that be --

21   A.  Controlled substance.

22   Q.  -- possession of a controlled substance?

23   A.  Yes, sir.

24   Q.  Okay.  What substance was it?

35

1    A.   Heroin.

2    Q.   Have you ever been -- have you ever

3    admitted to being an addict to heroin?

4    A.   Yes, sir.

5    Q.   When did you first admit heroin addiction?

6    A.   When did I first recognize it or first

7    admit it?

8    Q.   Admit it?

9    A.   Okay.  I first admitted it in 19- -- I

10   would say 1983.

11   Q.   Okay.  And following your admitting that

12   you were an addict to heroin, did you pursue any

13   treatment?

14   A.   Yes, sir.

15   Q.   Was the treatment court ordered, or was

16   it --

17   A.   No, it was on my own.

18   Q.   Okay.  Have you ever had court-ordered

19   treatments?

20   A.   No.

21   Q.   What was the treatment you first had?

22   A.   Inpatient.

23   Q.   Where at?

24   A.   At Safari (phonetic) Hospital on 62nd and

36

1    Wentworth, which is no longer there.

2        Q.   Any other time that you have admitted that

3    you are a heroin addict?

4        A.   Yes, sir.

5        Q.   When?

6        A.   In 2009, January.

7        Q.   And who did you admit that to?

8        A.   My parole officer.

9        Q.   What were you on parole for?

10       A.   Possession.

11       Q.   Do you remember what the sentence was that

12   you got?

13       A.   Yes.

14       Q.   What was it?

15       A.   18 months.

16       Q.   Do you remember the name of the judge?

17       A.   No, sir.

18       Q.   Was that a Cook County arrest --

19       A.   Yes, sir.

20       Q.   Okay.  Did you obtain any substance abuse

21   counseling as a result of that admission to your

22   parole officer?

23       A.   Yes, sir.

24       Q.   What kind of a --

37

1      A.   Admitted myself to Gateway Treatment

2   Foundation on west Taylor Street.

3      Q.   Okay.

4      A.   For a period of six months.

5      Q.   All right.  You said you admitted

6   yourself?

7      A.   Yes, sir.

8      Q.   So it wasn't part of a court order to do

9   so?

10     A.   No, no.

11     Q.   Okay.  All right.  Have you taken any

12  drugs or alcohol or anything at all that would

13  interfere with your ability to testify truthfully

14  and clearly today?

15     A.   No.

16     Q.   Okay.  Did you take any medicines today?

17     A.   Yes, sir.

18     Q.   What medicines?

19     A.   800 Ibuprofen, multivitamins.

20     Q.   What else?  Anything?

21     A.   No, not this morning, no.

22     Q.   Okay.  Are you taking any medications for

23  your prostate problem?

24     A.   Yes, sir.

38

1     Q.   What are you taking right now?

2     A.   Right now I'm taking Flomax, 4 milligrams.

3     Q.   And your problem with your prostate you

4     said I believe is it's enlarged, is that right?

5     A.   Yes, sir.

6     Q.   Is that also called benign prostatic

7     hyperplasia?

8     A.   I'm not sure, no, because that's -- you're

9     talking about cancer then.

10    Q.   No.  I'm talking about benign, meaning non

11    cancer?

12    A.   Non cancer.

13    Q.   So you don't have cancer?

14    A.   No.

15    Q.   Do you frequently get the test for --

16    A.   Yes, sir.

17    Q.   PSA test?

18    A.   Yes, sir.

19    Q.   Okay.  And most men over the age of 50

20    would probably be doing that?

21    A.   They should.

22    Q.   They should do it?

23    A.   Yes.

24    Q.   All right.  How many convictions do you

39

1   believe you have in total?

2     A.  Felony convictions?

3     Q.  All convictions?

4     A.  All convictions?  32.

5     Q.  Okay.  Since the '09, I'm sorry, the '06

6   arrest that you want to talk about in this case, --

7     A.  Yes.

8     Q.  -- have you been arrested since then?

9     A.  Yes.

10     Q.  And you've been convicted since then?

11     A.  Yes, sir.

12     Q.  Okay.  How many times do you think you've

13   been in the Cook County jail?

14     A.  About 100.

15     Q.  Okay.  How much time do you think in total

16   you have spent incarcerated?

17     A.  33-1/2 years and 5 days.

18     Q.  So nearly -- actually, more than half of

19   your life --

20     A.  Yes, sir.

21     Q.  -- you've spent in custody?

22     Have you ever heard a judge describe that

23   as serving a life sentence on the installment plan?

24     A.  Yes, sir.  Yes, Judge Brosnahan.

40

1      Q.  Brosnahan?

2      A.  Yes.

3      Q.  What is your current legal status?  Are

4   you on parole or anything like that?

5      A.  Free.

6      Q.  Do you have any charges pending?

7      A.  Free.

8      Q.  Okay.  You've avoided being arrested for

9   awhile, hah?

10     A.  Yes, sir.

11     Q.  How long?

12     A.  Since I've been clean.

13     Q.  Okay.

14     A.  Since I've been out, out of prison in '09,

15   January 16th.

16     Q.  Okay.  Took a long time to --

17     A.  To wake up, yes, sir.

18     Q.  Can you tell me how many times you think

19   you have been strip searched in your life?

20     A.  Oh, about I'd say a hundred.

21     Q.  Have all those been in the Cook County

22   jail?

23     A.  Yes, sir.

24     Q.  Never strip searched in the IDOC?

41

1      A.  Yes, sir.

2      Q.  You have been?

3      A.  In my entire life you're saying?

4      Q.  Yes.

5      A.  Right.  Okay.  Well, we're going to up the

6   ante to about 150.

7      Q.  All right.  Have you ever considered

8   filing a lawsuit complaining about the 150 times

9   you've been strip searched?

10     A.  Yes.

11     Q.  Have you ever actually done it?

12     A.  No.

13     Q.  Why not?

14     A.  Because I was -- I've been distracted for

15   the past three years focusing on more important

16   things, like my recovery and sustaining my

17   education and doing the right things.

18     Q.  Comparing the time that you were strip

19   searched to facing the reality of your addiction

20   and the problems associated with it, which do you

21   think was worse, the strip search or facing the

22   addiction problem?

23     A.  Being honest about it, my addiction.

24     Q.  Okay.  Can you tell me if you've ever had

42

1    any serious losses or emotional traumas in your

2    life?

3        A.   Yes.

4        Q.   Can you tell me the one that you consider

5    to be the worst?

6        A.   Yes.  The loss of my mother.

7        Q.   Okay.  Have you ever experienced any

8    serious physical injury to yourself aside from the

9    1985 incident involving Menard Correctional?

10       A.   Yes.

11       Q.   What other physical injury?

12       A.   When I can't get my medication, the pain

13   and suffering I go through.

14       Q.   Pain and suffering?

15       A.   Yes, sir.  Not being able to urinate.

16       Q.   Okay.  Do you know anybody else that has

17   suffered chronic pain?

18       A.   Yes.

19       Q.   Who else do you know?

20       A.   I know a guy, a couple of guys that suffer

21   with my condition.

22       Q.   Okay.  You're talking about back pain?

23       A.   Back pain.

24       Q.   And I'm sure you know more than a couple

43

1    guys who have suffered with enlarged prostate?

2    A.  Yes, sir.

3    Q.  And the chief complaints that you had

4    early on with the prostate enlargement is that you

5    have to urinate frequently, right?

6    A.  Yes, sir.

7    Q.  And a lot of people have to go through

8    that, right?

9    A.  Yes.

10   Q.  Have you ever yourself been shot or

11   stabbed in your life?

12   A.  Yes.

13   Q.  When were you shot or stabbed?

14   A.  I was shot twice in 1981.

15   Q.  Okay.  Do you consider that to be a

16   traumatic event in your life?

17   A.  At the time, no.

18   Q.  Was it someone you knew who shot you?

19   A.  No.

20   Q.  Have you ever been held captive by

21   somebody?

22   A.  Yes.

23   Q.  Ever been tortured?

24   A.  No.

44

1    Q.  How do you rank being held captive by

2  somebody compared to being shot, for example?

3    A.  I think being held captive is more severe

4  because it's more on the mind.

5    Q.  Okay.  And how do you rank being held

6  captive with the loss of a loved one, like your

7  mother?

8    A.  Personally I think the loss of the mother

9  outweighs it.  I know it.

10    Q.  All right.  I believe that you mentioned

11  that you were arrested and charged and held in the

12  County jail in September of 2006, is that right?

13    A.  Yes, sir.

14    Q.  How many times in 2006 were you arrested?

15    A.  Twice.

16    Q.  Okay.  Did you go to the jail both times?

17    A.  No.

18    Q.  Before testifying today, did you review

19  any documents in order to help you remember the

20  events that you're going to testify about?

21    A.  Me and my counselor tried to have a little

22  private conversation out in the hall, but to no

23  avail.

24    Q.  Okay.  The conversation you were trying to

45

1    have out in the hall, was that --

2        A.   Was pertaining --

3        Q.   Was it the public space out here?

4        A.   Yes, sir.

5        Q.   Okay.

6        A.   In his office.

7        Q.   His office?

8        A.   Yes.

9        Q.   Okay.  All right.  Interesting.

10           And were you shown any documents at that

11   time?

12       A.   No.

13       Q.   Okay.  Have you ever been in that hallway

14   before?

15       A.   No.

16       Q.   Have you ever owned a motor vehicle?

17       A.   Yes.

18       Q.   What motor vehicle?

19       A.   An old Cutlass, 1980.

20       Q.   Do you still own that?

21       A.   No.

22           A Ford Taurus, '92, an old Cutlass Sierra,

23   1995, which I own now.

24       Q.   Okay.  So you have a driver's license?

46

1    A.  Yes, sir.

2    Q.  Do you have it with you?

3    A.  Yes, sir.

4    Q.  Can I take a look at it?

5    A.  Sure can.  (Indicating) There you go.

6        MR. CATANIA:  Do you want to see it?

7        MR. MORRISSEY:  Yes.

8        THE WITNESS:  I'm a donor.

9    BY MR. CATANIA:

10   Q.  I've been handed an Illinois State

11   driver's license with two photographs on it that

12   look much like the man sitting across the table

13   from me, although you look like you've lost a

14   little weight since this photograph was taken?

15   A.  Yes.

16   Q.  And you also had a little facial hair at

17   the time?

18   A.  Right.

19   Q.  The license number on it is T as in Tom

20   [          ]          It indicates an address of [          ]

21   46th Place, Chicago, Illinois 60653.  Date of birth

22   is [          ] expires [          ] and was issued

23   April 12th of 2011, this year, right?

24   A.  Yes, sir.

47

1      Q.   Okay.  All right.  Thank you.

2      A.   You're welcome.

3      Q.   When did you obtain that license?

4      A.   The date that's on here.

5      Q.   Okay.  Did you have a license before that?

6      A.   Yes.

7      Q.   When did you first obtain an Illinois

8   license?

9      A.   Back in 1980.

10     Q.   Have you ever had your license suspended

11   or revoked?

12     A.   No.

13     Q.   Have you ever had it expire?

14     A.   Yes.

15     Q.   Okay.  When we first started talking, when

16   we had discussed your alias names and you told me a

17   few of them, right?

18     A.   Yes, sir.

19     Q.   Do you know how many alias names you have

20   used?

21     A.   Yes, sir.

22     Q.   How many?

23     A.   About 26.

24     Q.   Every time you used an alias name when you

48

1    were entering into the Cook County Department of

2    Corrections, did you have any concept as to what

3    that might mean in terms of your care and

4    treatment?

5         A.   Not at the time.

6         Q.   Okay.  Have you now come to realize that

7    it might have an effect?

8         A.   Yes, sir.

9         Q.   And you have in fact used alias names when

10   entering the jail, haven't you?

11        A.   Yes, sir.

12        Q.   For example, in 2006, September of 2006 do

13   you remember what name you used when entering the

14   jail?

15        A.   Dan Taylor.

16        Q.   Both arrests you used Dan Taylor?

17        A.   No.

18        Q.   Okay.  In 2005 you were arrested and spent

19   some time in the jail, right?

20        A.   Yes, sir.

21        Q.   What name did you use in 2005?

22        A.   I believe -- I'm not sure.  I think it was

23   Robert Thomas.

24        Q.   Okay.  When you were arrested in January

49

1    of 2005, did you use the name of James McDowell

2    when you entered the jail?

3        A.  Yes.

4        Q.  That was an alias that you had used

5    before?

6        A.  Yes, sir.

7        Q.  Okay.

8        A.  Donald McDowell.

9        Q.  Do you know anybody that is named

10   McDowell?

11       A.  Yes.

12       Q.  Would it have been one of your attorneys

13   perhaps?

14       A.  No, I don't think.  My oldest brother.

15       Q.  Different last name than you?

16       A.  Yes.

17       Q.  When you used his name, was he still

18   alive?

19       A.  Yes.

20       Q.  Okay.

21       A.  And he was pretty mad at me about it.

22       Q.  I'm sure he was.

23           Have you ever gotten discharged from jail

24   on bond or on an I bond or some furlough when

50

1    you've used an alias name?

2        A.  Yes, sir.

3        Q.  And you were aware that if a warrant was

4    issued, it would be issued under that different

5    name?

6        A.  That different name.

7        Q.  And that would have assisted you in

8    avoiding being captured?

9        A.  Eluding capture.

10       Q.  So you're aware of that?

11       A.  Yes, sir.

12       Q.  Do you consider that tactic to be one of

13   honesty or dishonesty?

14       A.  Dishonesty.

15       Q.  Have you ever been convicted of burglary?

16       A.  Yes, sir.

17       Q.  When were you convicted of burglary?

18       A.  In -- I was arrested for it in 2006.  I

19   was convicted for it November of 2007.

20       Q.  Was that after a trial, or did you plead

21   guilty?

22       A.  No, that was a plea bargain.

23       Q.  Did you plead guilty?

24       A.  Yes, sir.

51

1      Q.  Have you ever gone to trial on any other

2   cases?

3      A.  Yes, sir.

4      Q.  Okay.  And you've testified I think you

5   said, right?

6      A.  Yes, sir.

7      Q.  Ever testified at a deposition before?

8      A.  Yes, sir.

9      Q.  And you understand that the deposition is

10   the same -- essentially the same thing?

11      A.  It's testimony, yes, sir, in court.

12      Q.  All right.  You also in the case that

13   we're here for, you've actually signed

14   interrogatory answers, right?

15      A.  Could you clarify that for me?

16      Q.  Sure.  I'll show you.

17         Before we show you that, let me show you

18   one other document first.

19            (Whereupon, Taylor Deposition

20             Exhibit No. 1 was marked for

21             identification.)

22   BY MR. CATANIA:

23      Q.  Okay.  I'm going to show you what's been

24   marked Exhibit No. 1 for your deposition.  It's

52

1    also marked in the left side Plaintiff's Exhibit 1,

2    do you see that?

3        A.  Yes, sir.

4        Q.  Okay.  Is your name listed on the first

5    page?

6        A.  Yes, sir.

7        Q.  It says "Dan Taylor", and next to it it

8    says "pain", is that right?

9        A.  Pain, correct.

10       Q.  The paragraph that we're talking about, it

11   says, "The named plaintiffs required medication for

12   the following conditions:  Dan Taylor, pain."

13           You required pain medication?

14       A.  Yes, sir.

15       Q.  All right.  And the pain medication that

16   you required was Ibuprofen?

17       A.  Yes, sir.

18       Q.  Okay.  Now I'm going to show you what's

19   going to be marked as Exhibit No. 2.

20               (Whereupon, Taylor Deposition

21                Exhibit No. 2 was marked for

22                identification.)

23   BY MR. CATANIA:

24       Q.  Take a look at this exhibit which is

53

1    marked -- take a look at all the pages of it if you

2    could?

3        A.   Yes, sir.

4        Q.   You can flip through it.  There's actually

5    five sheets here.  I just want to make sure you

6    look at all of them.

7        A.   (Indicating) Yes, sir.

8        Q.   So you had a chance to read the document?

9        A.   Yes, sir.

10       Q.   The last page and the second to last page

11   contain your signature, is that right?

12       A.   Correct.

13       Q.   When did you last see this document before

14   today?

15       A.   On that day.

16       Q.   Okay.  On August --

17       A.   Yes, August 12th.

18       Q.   August 12th of 2010, right?

19       A.   Yes, sir.

20       Q.   When you saw this document last on

21   August 12th of 2010 when you signed it, were you

22   present when it was created?

23       A.   Yes, sir.

24       Q.   Where were you?

54

1      A.   In the law office on 200 South Michigan.

2      Q.   Okay.

3      A.   Kenneth Flaxman.

4      Q.   And that's exactly how it is described on

5   his answering machine, too, isn't it, the Law

6   Office at 200 South Michigan?

7      A.   Yes, sir.

8      Q.   Okay.  When you were there, did you

9   provide the information that's included as the

10   answers to these questions?

11      A.   I provided the answers, yes, sir.

12      Q.   Did you understand when you signed this

13   that you were doing it under penalties of perjury?

14      A.   Perjury.

15      Q.   Under the Federal law?

16      A.   Yes, sir.

17      Q.   Okay.  So is there anything about these

18   answers that you wish to change at this time?

19      A.   No, sir.

20      Q.   Okay.  The last page is known as a "IPAA

21   Privacy Authorization" is that right?

22      A.   Correct.

23      Q.   And on this page your name appears, is

24   that right?

55

1      A.  Correct.

2      Q.  And it's signed at the bottom with the

3   date on it?

4      A.  Yes, it does.

5      Q.  But in the second paragraph of it, there's

6   no provider's names listed, is that right?

7      A.  True.

8      Q.  Okay.  In the interrogatory answers itself

9   in Paragraph 3, --

10     A.  Yes.

11     Q.  -- which is on Page 2, --

12     A.  Right.

13     Q.  -- you list some names of providers, is

14   that right?

15     A.  Correct.

16     Q.  Specifically you list the Heartland

17   Medical Clinic at 1550 West Lawrence?

18     A.  Yes, sir.

19     Q.  The Fantus Clinic, is that right?

20     A.  Yes.

21     Q.  John H. Stroger, Jr., Hospital, Cook

22   County?

23     A.  Correct.

24     Q.  Cermak Health Services?

56

1    A.  Yes, sir.

2    Q.  Komed Health Service?

3    A.  Yes, sir.

4    Q.  Menard Correctional and the Illinois

5    Department of Corrections?

6    A.  Yes, sir.

7    Q.  Dr. Diane Judd?

8    A.  Yes.

9    Q.  Dr. Narrajan?

10    A.  Yes, sir.

11    Q.  And Dr. Mason, right?

12    A.  Yes.

13    Q.  Are those all of your doctors?

14    A.  No.  I got a new one.

15    Q.  Okay.  At the time when you signed it,

16    were those your doctors?

17    A.  No.

18    Q.  Were any of those doctors your doctors in

19    September of 2006?

20    A.  No.

21    Q.  Can you tell me who was your doctor in

22    September of 2006?

23    A.  I'm going to keep it honest with you.  I

24    can't even remember because I went to the emergency

57

1      at Mercy Hospital.

2         Q.   At Mercy?

3         A.   Yes, I was treated at Mercy Hospital.

4         Q.   Is that when the police brought you?

5         A.   No.  I went in that time.

6         Q.   Okay.  And you went to the emergency room?

7         A.   Yes, sir.

8         Q.   And the treatments you went in for that

9      time was for a prostate problem?

10        A.   Prostate, because I couldn't -- because my

11     urinary tract was messing up on me.

12        Q.   Okay.  All right.  And did they diagnose

13     at that time that you had an enlarged prostate?

14        A.   They diagnosed and said that's what it

15     appeared to them to be, that I should do a

16     follow-up at Stroger's.

17        Q.   Okay.  Did you do a follow-up at Stroger?

18        A.   No, I did not.  I was arrested.

19        Q.   Okay.  Do you know why they wanted you to

20     follow up at Stroger?

21        A.   Because my -- I had no insurance at the

22     time, and they would not treat me any longer.

23        Q.   Did they give you any medication at Mercy

24     Hospital?

58

1      A.   Yes, yes, sir.

2      Q.   Do you remember what it was?

3      A.   I'm going to be honest with you, I know

4   one of them was Motrin 800.

5      Q.   Okay.

6      A.   And another one I believe was Naproxen.

7      Q.   Okay.  And which is also a pain

8   medication?

9      A.   Pain medication, that's right.

10     Q.   Did they give you Hytrin, H-y-t-r-i-n?

11     A.   I'm not sure.  I don't know the name of

12   it.  I'm not going to lie to you.  I don't know,

13   remember the name of it.

14     Q.   Did they give you any medication --

15     A.   They gave me some --

16     Q.   -- for the prostate?

17     A.   -- for the prostate, yes.

18     Q.   Okay.

19     A.   It was a blessing.

20     Q.   All right.  When you signed the

21   interrogatory answers, did you know that you were

22   answering interrogatories that were specifically

23   about this litigation?

24     A.   I was -- at the time, I knew it was about

59

1    a litigation.

2         And specifically I was told I would be on

3    one by myself.

4    Q.   Okay.  At the time that you signed these

5    answers last summer, in August of 2010, --

6    A.   Yes, sir.

7    Q.   -- were you aware that we were looking at

8    the time that you were in custody in September of

9    2006?

10   A.   Yes, sir.

11   Q.   That's the time that you think we should

12   focus on, right?

13   A.   That's what time I'm focusing on.

14   Q.   Okay.  All right.  So when you were asked

15   to tell about the people that attended to you for

16   your medical needs, --

17   A.   Yes, sir.

18   Q.   -- you didn't understand that we wanted to

19   know who your doctors were in September of 2006?

20   A.   You should want to know.

21   Q.   Okay.  Have you found out the names of

22   those doctors since 2006?

23   A.   Yes.  No, sir.

24   Q.   After I received the answers to

60

1   interrogatories, I wrote a letter to your lawyers

2   asking for some clarity about the names that are in

3   the interrogatory answer.

4       A.  Yes, sir.

5       Q.  I was wondering if you were ever contacted

6   for any clarification about the names that are in

7   your answers to interrogatories?

8       MR. MORRISSEY:  I'm going to object to

9   your question.  He can answer if he knows the

10  answer.

11      THE WITNESS:  Could you repeat your

12  question?

13  BY MR. CATANIA:

14      Q.  Sure.  Were you ever contacted after

15  August 12th of 2010 and asked for clarification

16  about your treaters, Diane Judd, Dr. Narrajan, Dr.

17  Apur?

18      A.  Yes, sir.

19      Q.  And Dr. Mason?

20      A.  Yes, sir.

21      Q.  All right.  Did you provide information to

22  your lawyers about those doctors?

23      A.  I gave it to them already.  It was the

24  same information, the phone numbers, addresses.

61

1    Q.  Okay.

2    A.  And okayed them to get any kinds of

3    documents they needed from them.

4    Q.  At the time that you signed this, you did

5    that, right?

6    A.  I did.  And I also reiterated it, on it at

7    the time of the conversation over the phone.

8    Q.  All right.  So you did speak with them

9    about it?

10   A.  Yes.

11   Q.  In Paragraph 1 of the interrogatory

12   answers in front of you, I believe that you say

13   that "I don't know the names of intake personnel"

14   who you shared medical history with?

15   A.  Correct.

16   Q.  Do you know the titles of those personnel?

17   A.  Paramedic, receiving room paramedic,

18   paramedic, tier paramedic for the tier that I was

19   on, and the physicians.

20   Q.  Okay.

21   A.  The two physicians.

22   Q.  When you came into the jail in September

23   of 2006, had you recognized any of the personnel in

24   receiving at that time?

62

1    A.   No.

2    Q.   You had seen people in receiving in the

3    past, correct?

4    A.   Yes, yes.

5    Q.   Different people?

6    A.   Yes, sir.

7    Q.   Okay.

8    A.   I used to work in receiving for a period

9    of time.

10   Q.   As a trustee worker?

11   A.   As a trustee worker.

12   Q.   Okay.  All right.  Do you remember when it

13   was, what day it was when you entered the jail in

14   September of 2006?

15   A.   What day?

16   Q.   Yes.

17   A.   To be honest about it, no.

18   Q.   Do you remember what day of the week it

19   was?

20   A.   That's what I'm saying, the day of the

21   week I don't remember.  The date I remember.

22   Q.   What was the date?

23   A.   Okay.  The 27th.  It was the next day

24   after I was arrested.

63

1      Q.   All right.  There's a set of records in

2  front of you which I'm going to have the court

3  reporter mark.

4                    (Whereupon, Taylor Deposition

5                     Exhibit No. 3 was marked for

6                     identification.)

7  BY MR. CATANIA:

8      Q.   Take a look at Exhibit 3 if you would.

9  And in the upper right-hand corner of that exhibit

10  you'll see a date that says 12 -- I mean 9/26,

11  2006, right?

12     A.   Okay.  Yes.

13     Q.   Okay.  So is it likely that the date of

14  your arrest was 9/25 of 2006?

15         MR. MORRISSEY:  If you know.

16         THE WITNESS:  Not -- I'm not sure.  I was

17  always set on September the 26th.

18  BY MR. CATANIA:

19     Q.   Okay.  All right.

20     A.   But it's possible, 'cause that was the

21  date I went in front of the judge, September 26th.

22     Q.   All right.

23     A.   So the day before was my arrest date.

24     Q.   Okay.  Can you take a look in the upper

64

1   left-hand corner of that page.  There's a bar code

2   and a name under it and a date of birth and a book

3   number.  Do you see that?

4       A.  Yes, sir.

5       Q.  What's the name on it?

6       A.  Dan Taylor.

7       Q.  That's your name, right?

8       A.  Yes, sir.

9       Q.  And the date of birth on there?

10      A.  6/29/51.

11      Q.  Is that your birth date?

12      A.  No, it isn't.

13      Q.  What is your birth date?

14      A.  June 30, 1953.

15      Q.  All right.  When you were arrested at that

16  time, which was September 25 of 2006, did you give

17  the birth date of 6/29, 1951?

18      A.  It's a possibility.

19      Q.  You have used other birth dates?

20      A.  Yes, sir.

21      Q.  Okay.  And, again, that would be to assist

22  you in avoiding --

23      A.  Yes, sir.

24      Q.  -- future arrests and future problems with

65

1    the system, right?

2        A.  Yes, sir.

3        Q.  All right.  Do you remember who arrested

4    you in September of 2006?

5        A.  No, sir, I can't recall.

6        Q.  Do you remember how many days you spent at

7    the police station in 2006, September?

8        A.  Yes, sir.

9        Q.  How many?

10       A.  One.

11       Q.  Okay.  Do you remember where you were

12   arrested on that day?

13       A.  Yes, sir.

14       Q.  Where?

15       A.  1350 South State Street.

16       Q.  What's located at that location?

17       A.  Right now?

18       Q.  At the time?

19       A.  At the time, a construction site.

20       Q.  Okay.  And now?

21       A.  Now, a condominium apartment building.

22       Q.  Okay.  Do you remember where you resided

23   at the time of that arrest?

24       A.  Yes, on 29th Street, Lower Wacker Drive,

66

1    wherever I could find a warm spot at.

2        Q.   Did you give an address to the police when

3    you were arrested on that date?

4        A.   I probably did.

5        Q.   Did you give to Officer Paskuly,

6    P-a-s-k-u-l-y, the address of 2910 South Dearborn

7    Street, Apartment 705?

8        A.   I probably did.

9        Q.   Okay.  He didn't make that up?

10       A.   No, he didn't make that up, no.

11       Q.   In your interrogatory answers,

12   Paragraph 3 -- so we're back on the Exhibit No. 2

13   there.

14       A.   Yes, sir.

15       Q.   Paragraph 3 says that you had pain since

16   1985 from an assault by an Menard Correctional

17   employee, right?

18       A.   Yes, sir.

19       Q.   And you told me before you sued that

20   person?

21       A.   Yes, sir.

22       Q.   You've had problems with pain since then?

23       A.   Ever since.

24       Q.   Okay.  Have those problems from pain

67

1    prevented you from working?

2        A.  Yes.

3        Q.  Have those problems with pain prevented

4    you from committing crimes?

5        A.  Yes.

6        Q.  Okay.  So you've not been able to commit

7    crimes since 1985?

8        A.  No, I have.

9        Q.  Okay.

10       A.  Because I got arrested for possession.

11       Q.  All right.  We're talking from 1985 until

12   September of '06.

13       A.  Okay.

14       Q.  How many times do you think you were

15   arrested?

16       A.  About 15.

17       Q.  And some of those arrests were for

18   criminal cases, right?

19       A.  Yes, sir.

20       Q.  In fact, some of them were possession of a

21   controlled substance?

22       A.  Yes, sir.

23       Q.  Heroin, in fact?

24       A.  Yes, sir.

68

1    Q.  Some of them were for other crimes, like

2    the burglary charge?

3    A.  Yes, sir.

4    Q.  During the time from 1985 until September

5    of 2006, did you have any finding by any agency of

6    the Government that you were a disabled person?

7    A.  No, sir.

8    Q.  Okay.  You said in Paragraph 3 that you

9    had the treaters that I mentioned earlier?

10    A.  Yes.

11    Q.  At this time, I would ask if you would be

12    kind enough to execute a HIPAA Privacy

13    Authorization for me to obtain records from those

14    places, because I was unable to obtain records

15    before based on having information that I thought

16    was incorrect as to the doctors, Judd, Narrajan,

17    and Mason.

18    A.  I don't have no problems.

19    Q.  Okay.

20    A.  But you're right.

21    Q.  What I have here is a HIPAA Privacy

22    Authorization which I'll show to your lawyer.

23    A.  Yes, sir.

24    Q.  The address that's on here is an address

69

1    that I got off of the previous record that I had.

2    So this one is wrong.  We can fix that.

3        A.  Right.

4        Q.  But there's a space for your name and the

5    date here.

6        A.  Yes, sir.

7        Q.  Would you be so kind as to sign that and

8    date it?

9        A.  Yes, sir.  Today's the 8th?

10       Q.  Yes.

11       A.  All right.

12       Q.  All right.  And you'll note that in the

13   Box 2, which was blank on the previous one that we

14   got from the lawyer, there's Heartland Medical

15   Clinic listed, Fantus Clinic, Stroger, Cermak,

16   Komed, Humboldt Park Family Health, and Menard

17   Correctional, and then the doctor's names are

18   listed as well?

19       A.  Yes, sir.

20       Q.  Any other doctor's names you think ought

21   to be on here?

22       A.  Yes, sir.

23       Q.  What other names?

24       A.  Dr. Michael Argilla.

70

1     Q.   Is that your current doctor?

2     A.   Current.

3     Q.   Okay.  I'm not sure that it would need to

4   be on there, because we're talking about 2006.

5     A.   Oh, okay.

6     Q.   Unless you think there's something

7   relevant there for us.  Okay.

8     A.   No.

9     Q.   I have to also tell you that in order to

10   obtain Menard Correctional and the Illinois

11   Department of Corrections records, we need a

12   release of information signed by you --

13     A.   Yes.

14     Q.   -- and witnessed by the court reporter.

15     A.   Yes, sir.

16     Q.   That's these two forms (indicating).

17     A.   Yes.

18     Q.   Your signature goes on the first line and

19   the date goes all the way over.

20         This is the form that needs the witness

21   signatures.  So you would sign on the line I'm

22   pointing to and date it this side, and then I need

23   you to initial all the boxes that are checked up

24   there.

71

1      A.  Yes, sir (indicating).

2      Q.  Thank you.  I filled that out.  Thank you,

3  sir.

4      A.  You're welcome.

5      Q.  All right.  You say in Paragraph No. 3

6  that you have no records, is that right, no reports

7  or records?

8      A.  No.

9      Q.  You still have no records in your

10  possession?

11      A.  Still no records.

12      Q.  In Paragraph 4 you say that during the

13  intake in September of 2006, you had urination

14  trouble?

15      A.  Yes, sir.

16      Q.  And you had had this problem since July of

17  2006?

18      A.  Yes.

19      Q.  That's when you went to Mercy?

20      A.  When I went to Mercy.

21      Q.  Okay.  When you entered into the jail, did

22  you tell anybody that you had problems with

23  urination in 2006?

24      A.  Yes, sir.

72

1  Q. All right. Do you remember who the person

2 was that you told?

3  A. I told a couple of officers. I told --

4 that was in receiving. I told a paramedic that I

5 saw that interviewed me.

6  Q. The one at intake?

7  A. The one at intake.

8  Q. Okay.

9  A. The following day I told up on the tier, I

10 told a paramedic and asked them did they have any

11 medication for me and was informed that I would

12 have to see a doctor first.

13  Q. Okay. Did you -- on the following day,

14 what tier were you on when you --

15  A. DD1.

16  Q. DD1?

17  A. Yes, sir, which is really Division 11.

18  Q. Do you recall who the paramedic was that

19 was there at the time?

20  A. No, sir.

21  Q. How about the officer that was there at

22 the time?

23  A. No.

24  Q. Okay. How long were you living in that

73

1    living unit in Division 11?

2         A.   I was in Division 11 for 14 months.  But

3    in that specific, on that specific tier, 12 months.

4    Yes, 12 months.

5         Q.   All right.  And when you left the jail,

6    you left and went to the Illinois Department of

7    Corrections?

8         A.   Yes, sir.

9         Q.   And you had a credit against your sentence

10   for the time you spent in the Cook County jail?

11        A.   Yes, sir.

12        Q.   So all the time that you were in jail, you

13   got credit for?

14        A.   Yes, sir.

15        Q.   All right.  What specific medication did

16   you tell the CMT on your intake date that you were

17   receiving?

18        A.   I told him Ibuprofen 800.  I told him

19   about the Naproxen.  I told him about the

20   Tylenol 3.  I told him about some -- the prostate

21   medication.  I didn't know -- I couldn't -- I

22   didn't know the name of it at the time, so I just

23   threw it out there like that, medication for

24   prostate, enlarged prostate, because that's what I

74

1    was told at Mercy Hospital.

2        Q.   All right.  Okay.

3        A.   What it was for.

4        Q.   When you -- at the time of intake -- well,

5    you had a chance to look at the medical records,

6    which is Exhibit No. 3, right?

7        A.   Yes, sir.

8        Q.   All right.  If you look on the first page

9    of that record, which is called Taylor 00034 all

10   the way down here at the bottom, that's the Bates

11   stamp?

12       A.   Yes, sir.

13       Q.   Could you tell me if you recognize your

14   signature on that page?

15       A.   No.

16       Q.   That's not your signature under the box

17   that says "Consent for treatment"?

18       A.   No, sir.

19       Q.   Okay.  Do you know whose signature it is?

20       A.   No.

21       Q.   Does it appear to you to say Dan Taylor?

22       A.   It appears almost.

23       Q.   In the upper box where it says "Division",

24   it says Division 11, right?

75

1    A.  Yes, sir.

2    Q.  Okay.  Was there any other Dan Taylor's to

3    your knowledge in Division 11 when you were there

4    in September of '06?

5    A.  No.

6    Q.  Do you remember your prisoner ID number at

7    the time you entered into the jail in September of

8    '06?

9    A.  No, sir.

10   Q.  All right.  If you look in the box that's

11   got the bar code, you'll see a number that says

12   20060074649, does that sound familiar?

13   A.  Yes, it does.

14   Q.  4649?

15   A.  Yes, sir.

16   Q.  All right.

17   A.  Yes, it sounds very familiar.

18   Q.  At the time when you entered into the jail

19   on September 26, 2006, did you tell the intake

20   paramedic that you felt like you had tuberculosis?

21   A.  I told him I felt like I had symptoms,

22   yes.

23   Q.  You had had a diagnosis of tuberculosis in

24   the past?

76

1    A.  Yes, sir.

2    Q.  Okay.  So in the box that says "Medical

3    history" where's there's a number 9 that's circled

4    and it says "Tuberculosis", --

5    A.  Yes.

6    Q.  -- and it's circled "Yes" next to it, --

7    A.  Correct.

8    Q.  -- does that sound like something you

9    might have said, you felt like you had a

10   temperature?

11   A.  Yes, sir.

12   Q.  All right.  And you felt like you had

13   those symptoms for about a month?

14   A.  Yes.

15   Q.  At that time, had you been homeless for

16   about a month?

17   A.  Yes, sir.

18   Q.  All right.  Below where it says "Substance

19   use," in the box below, you'll see it's under the

20   word "Tobacco", the "Y" is circled for yes, right?

21   A.  Yes.

22   Q.  And next to that, it says "1/2 pack

23   daily."  Do you see that?

24   A.  Yes, sir.

77

1    Q.  Is that about what you were smoking at the

2    time?

3    A.  Yes.

4    Q.  All right.  And a little bit further to

5    the right, it says "Elicits non-injection drugs"

6    and the "Y" is circled, right?

7    A.  Correct.

8    Q.  And it says heroin?

9    A.  Yes, sir.

10    Q.  And for the last dose, it says 9/25/06?

11    A.  Yep.

12    Q.  Is that about what your memory tells you?

13    A.  Yes, sir.

14    Q.  All right.  Below there there's a time, it

15    says 6:01 p.m.?

16    A.  Correct.

17    Q.  Does that sound about what the time was

18    when you were talking with a paramedic?

19    A.  Pretty much, yes, sir.

20    Q.  Did you then speak with a physician

21    assistant after talking with the paramedic?

22    A.  Yes, sir.

23    Q.  On the next page, which is Taylor 00035,

24    you'll see some writing in a box below "Secondary

78

1    health assessment," right?

2    A.  Yes, sir.

3    Q.  And there's a box that's called "HPI/ROS",

4    "HPI" meaning history of present illness?

5    A.  Yes.

6    Q.  And "ROS" means symptoms?

7    A.  Yes, sir.

8    Q.  "Patient states he has taken" and then

9    there's a +B next to the -- below that +B?

10    A.  Yes.

11    Q.  And then it's something else that looks

12    like it says Z, Zythramycin; does that sound like

13    you were taking Zythramycin at the time?

14    A.  Yes, sir.

15    Q.  At Stroger Hospital?

16    A.  Yes.

17    Q.  Okay.  So does that comport with your

18    memory about being given some antibiotic at the

19    time before you got into custody?

20    A.  Yes.

21    Q.  Okay.  Down below that, it says "Follow-Up

22    TB clinic."  Do you understand what that means?

23    A.  Yes.

24    Q.  They wanted you to go to the tuberculosis

79

1    clinic?

2        A.  Exactly.

3        Q.  Did you go to the TB clinic?

4        A.  Yes.

5        Q.  Did you in fact see the TB specialist?

6        A.  Yes.  And was told that I was -- I took

7    the medication and that I was straight.

8        Q.  Okay.  Do you remember the name of the

9    doctor you saw at the time?

10       A.  No, sir.

11       Q.  Does Dr. Connie Mennella sound familiar?

12       A.  No, I don't.

13       Q.  Dr. Dupulniak (phonetic)?

14       A.  Some type of accent.  I'm --.

15       Q.  Okay.  I just was wondering if you

16   remember based on my giving you a little reminder

17   of who your doctors might have been.

18           On that first and second page, do you see

19   anything in there that says that you were taking

20   anything for pain?

21       A.  No.

22       Q.  Okay.

23       A.  No.

24       Q.  On that page, the first and second page of

80

1    that exhibit, do you see anything that says that

2    you were taking anything for a prostate problem?

3        A.  No.

4        Q.  Okay.  Did you receive treatment after

5    your intake in September of '06 for your prostate

6    problem?

7        A.  Yes, sir.

8        Q.  Is your problem with it that you didn't

9    receive prostate medicine that day or the following

10   day?

11       A.  I don't understand.

12       Q.  The problem that you've raised in this

13   lawsuit, --

14       A.  Yes, sir.

15       Q.  -- is that because you didn't receive

16   prostate medicine the day you entered the jail?

17       A.  Right.

18       Q.  Or the following day?

19       A.  Or the following day.

20       Q.  Okay.  But you do agree that you got

21   prostate medicine after that?

22       A.  No.

23       Q.  Okay.

24       A.  It took awhile.

81

1     Q.  Well, some time after that?

2     A.  Yes, quite a while after that.

3     Q.  Okay.  Were you still in custody in June

4  of 2007?

5     A.  Yes, sir.

6     Q.  Were you using the name of Dan Taylor?

7     A.  Yes, sir.

8     Q.  Or were you using the name of McDowell?

9     A.  Dan Taylor.  But they had transferred it

10  from McDowell.

11     Q.  Any time that you were in custody during

12  that 14 months that you've described before you

13  pled guilty and went to the penitentiary, did you

14  see a urologist?

15     A.  Yes, I did.

16     Q.  Okay.

17     A.  A female.

18     Q.  All right.  Were you given any medication

19  from that urologist?

20     A.  Yes, sir.

21       She explained to me that yes, I do have an

22  enlarged prostate and it's not cancerous, but she

23  was going to prescribe me in order for me to have

24  regular urinary function, she would prescribe me

82

1    medication for it, and that I should receive it

2    within a day.

3        Q.   Okay.  And did you receive it?

4        A.   No.

5        Q.   Did you receive it within a couple of

6    days?

7        A.   No.

8        Q.   When was it that you first remember

9    receiving it?

10       A.   I received it after I went back to the

11   doctor in about three or four weeks, and he called

12   the pharmacist to see why I hadn't received it.

13       Q.   And during the time when you were waiting

14   for that medication and not receiving it, can you

15   tell me what symptoms you had?

16       A.   Oh, constant pain, swelling of the

17   bladder, unable -- constant symptoms of having to

18   urinate but not able to urinate, you know, when I

19   would asleep.

20       Q.   Okay.  When you say you had pain, was the

21   pain associated with the back or with the

22   urination?

23       A.   The pain was more so with the urination.

24       Q.   Okay.  Did you still have back pain?

83

1      A.  With back pain, yes, sir.  But I was still

2    -- the pain from the prostate was overpowering the

3    pain of the back.

4      Q.  All right.  Did you receive any pain

5    medication at all while you were in the custody of

6    the sheriff?

7      A.  Yes, sir, Naproxen, Robaxin, Ibuprofen,

8    and --.

9      Q.  Did those things help with the symptoms,

10   the medications?

11     A.  Yes, to be honest with you, yes, they did.

12     Q.  When you started taking your medication

13   for the prostate enlargement, which, according to

14   the record, if you want to see on Page 69, is

15   Hytrin, H-y-t-r-i-n.

16     A.  Hytrin, I'm familiar with it.

17     Q.  Okay.  Did you have any relief when

18   starting to take that medication?

19     A.  Yes, I -- oh, yes, sir.

20     Q.  Did it take a few days for you to have

21   enough in your system in order for --

22     A.  For it to actually work totally properly.

23     Q.  Okay.  So that helped?

24     A.  Yes.

84

1      Q.   During the time that you were waiting for

2   that medication or in order to see a doctor to get

3   that medication, did you file any health service

4   requests?

5      A.   Yes, sir, I filed a grievance.

6      Q.   Okay.  You say you filed a grievance?

7      A.   Yes, sir.

8      Q.   Did you file any health service requests?

9      A.   Yes, I filed requests to see the

10   physician.

11     Q.   When did you first file a request to see

12   the physician?

13     A.   I filed --  I can't remember the exact

14   dates, but I filed three of them on three different

15   occasions.

16     Q.   Were they all for the same thing?

17     A.   They was for the same treatment.

18     Q.   For the prostate treatment?

19     A.   Prostate.

20     Q.   Okay.  And you say you also filed a

21   grievance, right?

22     A.   Yes, sir.

23     Q.   And just to be clear, we're talking about

24   two different things, right?

85

1      A.   Two different forms.

2      Q.   When did you file the grievance?

3      A.   I filed the grievance after the second

4   time from filing a request to see a physician after

5   running out of medication, not receiving it.

6      Q.   Tell me what you do when you file a

7   grievance as you did in this case.

8      A.   You write up a statement, like incident

9   report of what the grievance was pertaining to and

10   date and time and place of the occurrence or the

11   incident and the results you're looking for.

12      Q.   Okay.

13      A.   So I did that.

14      Q.   What did you do with it after you wrote

15   it?

16      A.   I submitted it, put it in the grievance

17   box.

18      Q.   Okay.

19      A.   On the day on the tier.

20      Q.   We're talking about Division 11, right?

21      A.   Division 11, their big black box.

22      Q.   Did you ever speak with a social worker

23   while you were in Division 11?

24      A.   Yes.

86

1    Q.   Okay.  Did the social worker acknowledge

2    that they had received a grievance?

3    A.   They received the grievance.

4    Q.   Okay.  Did you receive a response?

5    A.   Yes.  She told me right then and there

6    that she would go and check on it.

7    Q.   Did you receive a response to the

8    grievance?

9    A.   Not in writing.

10   Q.   Did you receive a copy of the grievance

11   from the social worker?

12   A.   No.

13   Q.   Do you have a copy of the grievance?

14   A.   No, sir.

15   Q.   The form is in triplicate, right, three

16   forms you press down on, making several copies?

17   A.   Yes, sir.

18   Q.   All right.  Did you keep your copy?

19   A.   At the time, yes.

20   Q.   Where is that now?

21   A.   In the garbage somewhere in IDOC.

22   Q.   You didn't send a copy of your grievance

23   to Mr. Morrissey, right?

24   A.   No.

87

1     Q.  Or Mr. Flaxman?

2     A.  No.

3         Q.  Going back to your interrogatory answers,

4  which is Exhibit No. 2?

5     A.  Yes, sir.

6         Q.  In Paragraph 6 I think that you

7  specifically say that you have no income, is that

8  right?

9     A.  At that time.

10        Q.  You currently have income from Disability,

11  right?

12     A.  Disability, yes, sir.

13        Q.  What were the sources -- how did you

14  support yourself at the time that you were in

15  custody in 2006?

16     A.  Living off the State at the County.

17        Q.  Okay.  And before your arrest, how did you

18  support yourself?

19     A.  Cans, aluminum cans, collecting aluminum

20  cans.

21        Q.  All right.  Any other sources?

22     A.  Being an errand boy, running to the store

23  for people to get a meal.

24        Q.  Okay.  All right.  Burglarizing

88

1    construction sites?

2        A.  No.

3        Q.  Begging?

4        A.  No.

5        Q.  You have been arrested in Chicago before

6    for begging, though, right?

7        A.  No.

8        Q.  Okay.  Do you know what it means to be

9    charged under the ordinance that used to be --

10       A.  Panhandling.

11       Q.  -- one of them called panhandling?

12       A.  Yes, sir.

13       Q.  And before that it was called mendicance

14   and vagrance, do you remember that?

15       A.  Uh-huh.

16       Q.  Were you ever arrested for those things?

17       A.  Not for soliciting.

18       Q.  In Paragraph 7 of your interrogatory

19   answers, you say that the losses that you're

20   claiming are pain and suffering and emotional

21   distress?

22       A.  Yes, sir.

23       Q.  Can you tell me what is the difference

24   between pain and suffering and emotional distress?

89

1    A.  Emotional distress is dealing with mental

2    aspects of a person's pain.

3    Q.  Okay.  Did you ever seek any treatment for

4    the result of the pain?

5    A.  Yes.

6    Q.  What treatment did you receive?

7    A.  I went to the psych emergency over at

8    Stroger's.

9    Q.  As a result of not having your medication

10   in the jail?

11   A.  Oh, no.

12   Q.  For a different reason?

13   A.  For a different reason.

14   Q.  Did you receive any emotional distress

15   treatment or counseling as a result of not getting

16   your medication?

17   A.  Of not getting my -- no.

18   Q.  Okay.  The pain and suffering you're

19   talking about, that was the pain and suffering

20   associated with the symptoms of your back injury?

21   A.  Back injury.

22   Q.  And your prostate?

23   A.  And prostate, yes, sir.

24   Q.  The pain you're talking about is pain

90

1    associated with a swollen bladder, is that right?

2    A.  Yes, sir.

3    Q.  Did you ever have any bleeding when trying

4    to urinate?

5    A.  Once, just once.

6    Q.  Was that after you had an STD test?

7    A.  No.  That was after -- that was I couldn't

8    get the medication, prostate medication.

9    Q.  Okay.

10   A.  For a period of time.

11   Q.  Did you ever ask a physician what was the

12   cause of the bleeding?

13   A.  Yes.

14   Q.  And what was the answer?

15   A.  The answer was strain.

16   Q.  Okay.  Strain of urinating?

17   A.  From trying to urinate.

18   Q.  Okay.  Did any doctor ever tell you that

19   the cause of the -- the blood in your urine, that's

20   what was it, blood in your urine, right?

21   A.  Right, correct.

22   Q.  That the cause of the blood in the urine

23   was because of not getting medication?

24   A.  Yes.

91

1    Q.  Which doctor was that?

2    A.  Every doctor I ever confronted with and

3    asked about it.

4    Q.  Okay.  How many doctors did you ask that

5    specific question of?

6    A.  I asked two.

7    Q.  What doctors did you ask was the cause of

8    the blood in your urine?

9    A.  The doctor in Division 11 in '07.

10   Q.  Okay.

11   A.  Then the prescribing physician, the

12   specialist over in Cermak.

13   Q.  Okay.

14   A.  In '07.

15   Q.  That would be the urologist?

16   A.  Yes, yes, sir, who explained to me that I

17   would have to take the medication for the rest of

18   my life.

19   Q.  Okay.  That's interesting.

20       You're not taking the same medication now,

21   though, you're taking Flomax now?

22   A.  I'm taking Flomax, which they said is more

23   potent.

24   Q.  And when you say "they," are you talking

92

1    about the doctors said this?

2        A.  Doctors, yes.

3        Q.  All right.

4        A.  My present physician.

5        Q.  In Paragraph 9 you say that you expect to

6    have more than $25,000 from a jury; is that right?

7        A.  I don't remember saying it.

8        Q.  Well, --

9        A.  I see it there.

10       Q.  Okay.

11       A.  I see it.

12       Q.  Well, what is it that you do expect?

13       A.  A change in policies at the jail for one,

14   the main one.

15       Q.  Are you planning on going back?

16       A.  No, I'm not.  But for those that do go

17   there.

18           I'm not never going back again.

19       Q.  All right.  Have you ever had experience

20   in any other jails aside from Cook County jail?

21       A.  No.

22       Q.  Okay.  Have you ever had any training in

23   correctional practices?

24       A.  Yes.

93

1       Q.   What training have you had in correctional

2    practices?

3       A.   Experiencing.

4       Q.   Observing?

5       A.   Observing how it works.

6       Q.   Okay.  Have you ever had any training?

7       A.   Communicating with the staff there.

8       Q.   Have you ever had any training on what are

9    best practices for corrections?

10      A.   No, but I had them explained to me by

11    several wardens and directors.

12      Q.   All right.  And when you say you've had

13    things explained to you by directors, who are you

14    talking about?

15      A.   I'm talking about at the time Director

16    Gasberg (phonetic) Garcia.

17      Q.   Garcia?

18      A.   Ramirez, Ramirez, Director Ramirez that

19    was over the County jail at the time.

20      Q.   Okay.  When you say Director, do you say

21    that because that's what you called him?

22      A.   No.  That was his title.

23      Q.   Okay.

24      A.   Director.

94

1    Q.   And you say that it was Ramirez, right?

2    A.   Yes, sir.

3    Q.   Okay.  Is it perhaps Godinez?

4    A.   Godinez and Ramirez.

5    Q.   Okay.  And you're saying that Ramirez and

6    Godinez told you how corrections is supposed to be

7    done, right?

8    A.   Right.

9    Q.   Okay.  And what did they tell you?

10   A.   They informed me that by being as crowded

11   as it presently is at that time, that things do

12   take a little longer, but they're not supposed to

13   take as long as they have in my case.

14   Q.   Okay.  When was it that you had --

15   A.   That was in '07 when I talked to them.

16   Q.   In '07 you had that conversation?

17   A.   Yes, sir.

18   Q.   Okay.  Do you know --

19   A.   We'd see them on the deck.

20   Q.   Okay.  Do you remember what the jail

21   population was in '07?

22   A.   No.  My understanding is it was close to

23   over 10,000.

24   Q.   Okay.  Do you know what the capacity of

95

1    the jail is?

2        A.  Yes.

3        Q.  All right.

4        A.  It's under 10,000.

5        Q.  All right.  Is your information about both

6    the population in '07 and the capacity based on

7    hearsay?

8        A.  Yes, sir.

9        Q.  Okay.  You didn't actually conduct a

10   study?

11       A.  Conduct a study, no, sir, or get -- obtain

12   documents pertaining to it, no.

13       Q.  Have you read anything about the

14   conditions at the jail?

15       A.  Yes.

16       Q.  What have you read?

17       A.  I read that it's still overcrowded.

18       Q.  And where did you read that?

19       A.  In several newspapers, Sun Times, Tribune,

20   and also in this -- the Red.

21       Q.  The Red Eye?

22       A.  Yes, the Red Eye.

23       Q.  The Red Eye?

24       A.  Uh-huh.

96

1      Q.   Okay.

2      A.   Also on cable TV, Chicago Neighborhood

3  Awareness.

4      Q.   Okay.

5      A.   Community bulletin.

6      Q.   And did those newspapers and cable TV

7  provide with specific facts and figures about the

8  numbers of people at the jail?

9      A.   Not specific.

10     Q.   They just say generally overcrowded?

11     A.   No.  They give a percentage, you know,

12 that are quoted.  They quote numbers, figures.

13     Q.   Do you believe that the reason why you

14 didn't get your medication on the day you entered

15 or the day after that was because of overcrowding?

16     A.   No.

17     Q.   Okay.  What was the reason?

18     A.   The reason, for lack of functioning of

19 staff.

20     Q.   Okay.  So it was a staff problem?

21     A.   I believe it was a staff problem more so

22 than overcrowding.

23     Q.   Do you think that the staff --

24     A.   -- neglected to do -- perform their duties

97

1    at the appropriate time, yes.

2        Q.   Okay.  Which staff members are you talking

3    about?

4        A.   I'm talking about from the paramedic.

5        Q.   Okay.

6        A.   To the pharmacist back to the paramedic,

7    who delivered the medication.

8        Q.   Do you agree with me that the pharmacist

9    would not be involved unless there's a physician

10   order?

11       A.   Order.

12       Q.   Okay.  Did the physician order

13   prescription medicine for you?

14       A.   At one time -- no.  At two times, yes.

15       Q.   How about at the receiving in September of

16   '06?

17       A.   No.  He said he was -- the physician that

18   they took me in the back room, he said he was going

19   to order me some, but I never got it.

20       Q.   All right.  You were referred to the TB

21   clinic I think it says on Page 35?

22       A.   Yes, sir.

23       Q.   Okay.

24       A.   But the conversation we had --

98

1    Q.   What specific medication was ordered in

2    your mind on September 26th?

3    A.   In my mind, the prostate medication and

4    Ibuprofen.

5    Q.   Did you know what the prostate medication

6    was at the time?

7    A.   At the time I didn't know the name of it.

8    I was just going on what he -- you know, because he

9    had more knowledge of it than me.

10   Q.   If you didn't know what the name of the

11   prostate medication was and you couldn't tell the

12   paramedic or the physician assistant what it

13   was, --

14   A.   No.

15   Q.   -- do you think --

16   A.   The physician assistant told me.

17   Q.   Okay.  All right.  I think we're talking

18   about two different things.

19   A.   How's that?

20   Q.   If you were unable to tell the physician

21   assistant what it was and you were unable to tell

22   the paramedic what it was, do you agree that you

23   would have to be examined, including a lab test --

24   A.   By a physician.

99

1    Q.   -- by a physician?

2    A.   Yes.

3    Q.   Did you obtain a lab test?

4    A.   Yes.

5    Q.   Do you remember when?

6    A.   No, I don't remember the exact date.

7    Q.   At the time when you obtained the lab

8    test, do you remember also being treated for

9    tuberculosis or the suspicion of tuberculosis?

10   A.   The suspicion, yes.

11   Q.   And during the time when you were being

12   treated for the suspicion of tuberculosis, you had

13   a chance to talk with doctors, too, right?

14   A.   Yes, sir.

15   Q.   All right.  Did you tell those doctors

16   about your problem with urination?

17   A.   Yes, sir.

18   Q.   Do you remember which doctors?

19   A.   Every doctor I saw I would tell.  I would

20   talk to them about -- I would complain about my

21   prostate, not being able to urinate, that I wasn't

22   receiving medication for my -- the prostate.

23   Q.   Okay.

24   A.   And everyone that I talked to reassured me

100

1    that they would prescribe the medication for me.

2        Q.  All right.

3        A.  After a physical.

4        Q.  Okay.  Take a look at Page 40.

5        A.  Uh-huh.

6        Q.  Page 40.  All right.  That page is called

7    "Consultation Request Form."  Do you see that.

8        A.  Yes, sir.

9        Q.  And in the box, the preprinted section

10   that says "Date referral generated, January 11,

11   2007", do you see that (indicating)?  I'm pointing

12   to it.

13       A.  Okay.  Yes, sir.

14       Q.  January 11, 2007, when was that in

15   relation to your intake into the jail in September

16   of '06?

17       A.  That was over three months later.

18       Q.  All right.  On that date, there was a

19   consultation form filled out for urology, is that

20   right?

21       A.  Yes.

22       Q.  It describes the reason for referral.  It

23   says, "55-year-old African American male complains

24   of increased urinary frequency.  PSA ordered."  Do

101

1    you see that?

2       A.  Yes, sir.

3       Q.  And it says 0.6 nanograms per milliliter

4    PSA?

5       A.  Uh-huh.

6       Q.  Okay.  At the time of the referral for

7    urology, they also did a test of urine?

8       A.  Yes.

9       Q.  And that was in January of '07?

10      A.  Yes.

11      Q.  Okay.  And the result was .6 nanograms,

12   right?

13      A.  Right.

14      Q.  Do you know what the normal range is for a

15   PSA?

16      A.  No, I don't.

17      Q.  Has anyone counseled you on what the

18   normal range is for PSA?

19      A.  Yes, but I don't recollect.

20      Q.  If you turn to Page 46, just a few pages

21   later, --

22      A.  Yes.

23      Q.  -- there's a lab report on that page,

24   right?

102

1    A.  Yes.

2      Q.  It's got your patient name Dan Taylor in

3  there?

4    A.  Right.

5      Q.  It says date of collection was

6  December 28, 2006, do you see that?

7    A.  Yes.

8      Q.  So some time before the referral was

9  listed, they actually drew the sample for testing,

10  is that right?

11    A.  Yes.

12      Q.  So you were getting treatment ongoing even

13  then for this question about your prostate?

14    A.  True.

15      Q.  Okay.  If you look where it says "Test

16  Result Limits Lab," that line, --

17    A.  Yes.

18      Q.  -- if you look under "Test", it says

19  "Prostate - Specific antigen, Serum," do you see

20  that?

21    A.  Yes, sir.

22      Q.  And next to that it says "Result", and it

23  says .6 nanograms per milliliter?

24    A.  Yes, sir.

103

1      Q.   And to the right of that it says,

2   "Limits", do you see that?

3      A.   Yes.

4      Q.   Limits are 0.0?

5      A.   Right.

6      Q.   To 4.0?

7      A.   Right.

8      Q.   Do you think that the 0.6 result that you

9   had was closer to the 0.0 or closer to the 4.0?

10     A.   Closer to the 0.0.

11     Q.   Okay.  So it was marginally above the

12   normal limit, right?

13     A.   Yes, yes.

14     Q.   Okay.  If you turn back one page, Page 45,

15   it looks to me as though they requested another lab

16   test on the same date as the clinician asked for

17   your referral, right?

18     A.   Yes.

19     Q.   Okay.  It says date on the bottom left, it

20   says date of order 1/11 of '07?

21     A.   Yes.

22     Q.   And they drew your sample for testing,

23   right?

24     A.   Yes, sir.

104

1     Q.  Okay.  So you had ongoing treatment for a

2    problem that they were trying to identify?

3     A.  Yes.

4     Q.  Okay.  During the time of September 26 to

5    -- September 26 of '06 to January 11th of '07 when

6    the consultation with urology was ordered, did any

7    doctor tell you your diagnosis is enlarged

8    prostate?

9     A.  Yes.

10     Q.  Which doctor?

11     A.  The doctor in Division 11.

12     Q.  Which doctor?

13     A.  I don't remember his name.

14     Q.  Did the doctor say, "Your diagnosis is"?

15     A.  The doctor -- as a matter of fact, the

16    doctor that referred me to the neurologist.

17     Q.  Okay.

18     A.  Because I had to see him in order to get

19    to the neurologist.

20     Q.  We're talking a urologist, right?

21     A.  Yes.

22     Q.  Okay.  Can you describe that doctor?

23     A.  Indonesian doctor, been there about

24    15 years.

105

1    Q.  Did you have any difficulty understanding

2  the language?

3    A.  No.

4    Q.  Okay.

5    A.  No, sir.

6    Q.  Male or female?

7    A.  Male.

8    If I'm not mistaken, he's the senior

9  physician of -- in Division 11.

10    Q.  Okay.  And you say that he told you that,

11  "We are diagnosing enlarged prostate"?

12    A.  He told me that I had an enlarged prostate

13  because he did a physical exam.

14    Q.  Okay.  And you're certain that it was that

15  and not that he was going to rule out enlarged

16  prostate, right?

17    A.  No, he told me that he felt my enlarged

18  prostate.

19    Q.  How did he do that?

20    A.  He went up in my rectum, stuck his finger

21  in my rectum and felt around.

22    Q.  Okay.  So you had a proctological exam?

23    A.  Yes.

24    Q.  Okay.  When did you first have pain when

106

1    urinating?

2        A.  The real pain came about two or three

3    weeks after I was incarcerated.

4        Q.  Okay.  So it wasn't prior to the receiving

5    screening that you had this pain, it was after?

6        A.  I'm not following you.

7        Q.  Okay.  You said that the real pain

8    happened two to three weeks after?

9        A.  Right.

10       Q.  Is that after you entered into the jail?

11       A.  After I entered into the jail.

12       Q.  Okay.  And when you entered --

13       A.  Before then, it was just discomfort.

14       Q.  Okay.

15       A.  There's a difference.

16       Q.  Yes, there certainly is.

17           So you had discomfort when you entered

18   into the jail?

19       A.  True.

20       Q.  Later on you had some pain associated with

21   it?

22       A.  Pain associated with it.

23       Q.  Could it have been on December 27th of '06

24   that you first started having pain while urinating?

107

1    A.   No, before then.

2    Q.   Okay.  Do you know when?

3    A.   Yes, around right before Thanksgiving.

4    Q.   Okay.  Who did you complain to?

5    A.   The paramedic that came on the tier.

6    Q.   Okay.  All right.  So now we're talking

7    about two months after intake, you started to have

8    pain rather than discomfort?

9    A.   Yes, sir.

10   Q.   And at that point, you then were -- you

11   were referred to a doctor?

12   A.   After I signed up, and yes, I was referred

13   to the paramedics, who referred me to a doctor.

14   Q.   All right.  So somebody did respond to the

15   request for a followup on that pain by giving you a

16   sick call appointment with the doctor?

17   A.   Yes.

18   Q.   And you saw the doctor?

19   A.   No.

20   Q.   You didn't see a doctor on the 27th of

21   January, 27th of December?

22   A.   Oh, yes, on the 27th.

23   Q.   Okay.  The 27th of December of '06 you saw

24   a doctor?

108

1    A.  Yes.

2    Q.  All right.  Did any doctor ever tell you

3  that the delay from Thanksgiving to December 27th

4  caused additional harm to you, that delay caused

5  some additional specific harm?

6    A.  No.  They just told me that it was going

7  to be more painful before I even get the right

8  amount of doses in me because it took so long --

9    Q.  Okay.  So you understood that?

10   A.  Yes, I understood that.

11   Q.  Okay.  It takes time for the medication to

12  come to a therapeutic level, you understood that?

13   A.  Yes, I understood that.

14   Q.  Okay.  Did you say -- did the doctor tell

15  you that the problem was that it took so long to

16  get you started on the medication?

17   A.  They said I -- he said I went too long

18  without it.

19   Q.  Okay.  You went too long without it?

20   A.  Yes, that I received it.

21   Q.  Which doctor said that?

22   A.  The doctor that prescribed it.

23   Q.  If you look on Page 67 of the record, --

24   A.  Yes, sir.

109

1      Q.   -- you'll see that the date on that bottom

2   prescription form says 9/26/06.  That was the date

3   of your intake, right?

4      A.   True.

5      Q.   And the intake location is RCDC?

6      A.   Yes, sir.

7      Q.   And then there is typewritten medications

8   that were prescribed for you, right?

9      A.   Yes, sir.

10     Q.   Routine A, do you know what that is?

11     A.   Yes.  That's what they give withdrawing

12   addicts.

13     Q.   And did you get that?

14     A.   No.

15     Q.   Okay.  Did you get Prochlorperazine?

16     A.   I didn't get any of the medications.

17     Q.   You got none of these three?

18     A.   Got none of them for what, over 30 days.

19     Q.   Okay.

20     A.   It took me 30 days to get them.

21     Q.   And you did not have any symptoms of it,

22   of withdrawal, did you?

23     A.   Yes, I had symptoms.

24     Q.   Okay.  Did you ever file a grievance about

110

1    those symptoms?

2        A.  I was -- yes, I did file a grievance with

3    it.

4        Q.  About those symptoms?

5        A.  About those specific, about not receiving

6    medication.

7        Q.  When?

8        A.  Two weeks after I was there.

9        Q.  Okay.  Do you have a copy of that?

10       A.  In my possession, no.

11       Q.  Where is that?

12       A.  That's also in the garbage in IDOC.

13       Q.  Okay.  So the treating doctor that you saw

14   in Division 11 told you that because you hadn't had

15   prostate medication for a period of time, that it

16   was going to take a little longer to get you back

17   up to a therapeutic level?

18       A.  Right, correct.

19       Q.  You understood what he meant by that?

20       A.  I understood, yes.

21       Q.  Did you have any problem with that?

22       A.  No.

23       Q.  Okay.

24       A.  Because he had no control over that.  It's

111

1    my body that has to work.

2        Q.   Have you ever run out of your medication

3    while you were taking it?

4        A.   Yes, sir.

5        Q.   Okay.  Have you ever experienced a couple

6    of days without it?

7        A.   Yes, sir.

8        Q.   And as a result of that, do you experience

9    symptoms coming back --

10       A.   Yes, sir.

11       Q.   All right.  How many times has that

12   happened to you?

13       A.   It happened to me a couple times while I

14   was in the jail after starting -- after seeing the

15   neurologist, urologist, or whatever.

16       Q.   Okay.

17       A.   You know.  It happened to me -- as a

18   matter of fact, in specific three times when I ran

19   out and they didn't deliver my medication.

20       Q.   Okay.  Three times in jail you ran out?

21       A.   In the County jail, yes.

22       Q.   All right.

23       A.   Between '06 and '07.

24       Q.   And at that time when you ran out, you

112

1      started experiencing symptoms returning?

2          A.   Yes, sir.

3          Q.   When did they start, immediately or over

4      time?

5          A.   After 24 hours after not receiving it.

6          Q.   What symptoms?

7          A.   Feeling of discomfort in my groins,

8      hurting pain sensation when I urinate.

9          Q.   Okay.

10         A.   Then as it go on, not being able to

11     urinate at all.

12         Q.   Okay.

13         A.   And straining to try to urinate and a

14     bowel movement instead of urinating.

15         Q.   Do you think that there are other men over

16     the age of 50 that might experience similar

17     symptoms of having an enlarged prostate besides

18     you?

19         A.   I would imagine so.

20         Q.   Would you think that there was men that

21     experienced those symptoms and are able to identify

22     what you're talking about?

23         A.   Yes, sir.

24         Q.   Okay.  Did anyone ever tell you that those

113

1    symptoms are life-threatening symptoms?

2        A.   Yes.

3        Q.   Who told you that?

4        A.   The physician, the young lady who

5    prescribed the medication, did the test on me,

6    ordered all the tests on me.

7        Q.   Okay.  Do you recall where that --

8        A.   In Cermak Hospital.

9        Q.   Okay.  She told you that it's life

10   threatening?

11       A.   It could be life threatening if I don't

12   urinate, because it closes up the urinary tract,

13   you can't urinate.  And as it goes on, it swells

14   more and more and presses the bladder.

15       Q.   Okay.  Did that happen to you?

16       A.   I just got swelling, I started getting

17   swelling.  It shows signs of it, you know.

18           But it started messing with me mentally.

19   So, you know, I started complaining so bad that

20   they got the medication.

21       Q.   Okay.  So you think that because you

22   started complaining, that you were then treated,

23   right?

24       A.   Yes.

114

1    Q.   Okay.  So you say that it was a female

2    physician who told you that if you don't get your

3    medication, it's life threatening?

4    A.   Over a period of time if I don't get it.

5    Q.   Did she give you an amount of time?

6    A.   No, she didn't give me -- she wasn't

7    specific.

8    Q.   Okay.

9    A.   She said, you know, if it's over three or

10   four days, you know, it can become life threatening

11   because bacteria sets up in me.

12   Q.   Okay.  Was that a physician that told you

13   that?

14   A.   She was a physician.  She was a specialist

15   in that field.

16   Q.   You're talking about the urologist, right?

17   A.   Yes.

18   Q.   And so when did you have that

19   conversation, do you remember?

20   A.   On the second exam.

21   Q.   Okay.

22   A.   In '07.

23   Q.   If you take a look at the record in front

24   of you, I believe that you will find that on that

115

1     page that I described earlier, which was I believe

2     40, Page 40, you'll see in the middle "Consultation

3     date seen," do you see that?

4         A.  Yes, sir.

5         Q.  And that's March 30th of '07?

6         A.  Yes, sir.

7         Q.  All right.  Is that the date you're

8     talking about that this --

9         A.  Yes, sir.

10        Q.  -- doctor spoke with you?

11        A.  I believe it is.

12        Q.  Can you read the doctor's notes on that

13    page?

14        A.  No, I can't.

15        Q.  The doctor ordered an exam or tests as

16    well?

17        A.  Right.

18        Q.  Is that right?

19        A.  I remember that.  As a matter of fact, two

20    tests.

21        Q.  Right.  Take a look at Page 49.

22        A.  Yes, sir.

23        Q.  Is there a test result on that page?

24        A.  Yes, it is.

116

1      Q.  It says, "Date of collection July 6th of

2  '07," right?

3      A.  Yes.

4      Q.  So that was four months after the

5  examination you had by this urologist on March 30th

6  of '07, right?

7      A.  Yes.

8      Q.  Okay.  If you look at the result, the test

9  results, it's 0.8 nanograms per milliliter?

10      A.  Yes.

11      Q.  Okay.  By then you had been taking the

12  medication, is that right?

13      A.  Yes.

14      Q.  And even with the gaps in the time that

15  you say when you ran out, --

16      A.  Right.

17      Q.  -- you got it again, your result was still

18  0.8, which is well within the limits of .0.0 to 4.0

19  for normal limits, right?

20      A.  Yes, yes.

21      Q.  At the lower end?

22      A.  Yes.

23      Q.  So was there any doctor that told you that

24  the delay, even those missing days when you didn't

117

1    have the medication, caused significant permanent

2    damage to you?

3        A.  The female doctor also in IDOC when I was

4    in -- down at Stateville informed me that it's not

5    safe for an individual after taking this, being on

6    this medication for a period of time, to miss any

7    time.

8        Q.  Okay.

9        A.  Because it can result in other problems.

10       Q.  All right.  My question is different than

11   that.  Thank you for that.

12           But my question is, did any doctor tell

13   you that as a result of missing doses because of

14   running out and waiting to get doses, that that

15   caused permanent injury to you?

16       A.  Yes.

17       Q.  Which doctor?

18       A.  The doctor at IDOC.

19       Q.  Told you that permanent injury resulted?

20       A.  Permanent.

21       Q.  Okay.  What is that doctor's name?

22       A.  I don't know her name.

23       Q.  Okay.  All right.

24       A.  It's in my -- she's in my medical records.

118

1      Q.   Are you saying that when you got to the

2   IDOC, there were subsequent PSA tests, right?

3      A.   Correct.

4      Q.   And they showed that you have cancer?

5      A.   No.

6      Q.   Okay.  What permanent injury does that

7   doctor -- is that doctor expected to say?

8      A.   That doctor is expected to say that over

9   -- by me going without medication over a period of

10   time, that it caused my testicles to create growth

11   inside, which I have now.

12     Q.   All right.  You're saying --

13     A.   Unnormal growth.

14     Q.   -- the doctor at the IDOC told you that?

15     A.   Yes.

16     Q.   Okay.  Did that doctor say that as a

17   result of not getting medication on September 26th

18   of '06 --

19     A.   She didn't specifically -- no, she didn't

20   specify no dates 'cause she didn't know about those

21   dates.

22     Q.   Has any doctor ever specified those dates?

23     A.   No.

24     Q.   Okay.  Is any doctor prepared to testify

119

1    on your behalf in this case, that will say that you

2    have additional harm as a result of the delay?

3    A.  Yes.

4    Q.  Which doctor?

5    A.  Dr. Diane Judd.

6    Q.  Diane who?

7    A.  Judd.  That's in there.

8    Q.  Okay.  You have spoken to Dr. Diane Judd?

9    A.  Yes, yes.  She know all about it.

10    Q.  Okay.  And Diane Judd who's named in

11    here --

12    A.  Yes, sir.

13    Q.  -- under your paragraph answer No. 3 is

14    the one expected to say that?

15    A.  Yes, sir.

16    Q.  And then when I asked you the question --

17    A.  And Dr. Narrajan, my present physician.

18    Q.  Which is the present physician?

19    A.  Dr. Narrajan.  Not Dr. Narrajan.  Dr.

20    Narrajan will testify to it, too.

21    Q.  Okay.

22    A.  From Humboldt Park.

23    Q.  And you've spoken to both of them about

24    testifying --

120

1      A.  Not recently.  No, I haven't spoken to

2   them about testifying, no.

3      Q.  Okay.  That's what I'm asking?

4      A.  No.

5      Q.  Okay.  You don't know of any doctor that

6   is prepared to testify in this case on your behalf

7   that the delay caused --

8      A.  I know for a fact that they're willing to

9   testify on my behalf in this case, that by me not

10  receiving my medication for over a period of time

11  created other problems for me, physical problems.

12     Q.  All right.  Are you -- you feel like

13  you're in better physical shape today than you were

14  in 2006?

15     A.  Somewhat, somewhat, yes.

16     Q.  Do you feel that you're in better shape --

17     A.  Mentally, yes.

18     Q.  Do you think you're in better shape now

19  than at the time when you were released from the

20  IDOC?

21     A.  Since going through recovery, yes.

22     Q.  Okay.  In Paragraph 10 of Exhibit 2 the

23  question was have you any experts, physicians,

24  surgeons, technicians, medically trained persons,

121

1    experts in any scientific or nonscientific field

2    who have been contacted for expert opinions

3    regarding this case on your behalf?

4        A.   None of them have ever been, you know,

5    questioned about this case.

6        Q.   Are you telling me today that you have Dr.

7    Judd prepared to testify on your behalf as an

8    expert about the delay causing harm to you?

9        A.   I'm saying that Dr. Judd can testify to

10   the fact that by me not having my medication, as a

11   professional can testify on my behalf that it did

12   cause more harm to me by not having my medication

13   over a period of time.

14       Q.   Okay.  My question is a little bit more

15   precise than that.

16           My question is, will either of the doctors

17   or any of the doctors you just mentioned that you

18   have not yet contacted on your behalf, --

19       A.   Right.

20       Q.   -- will any of them testify that the delay

21   that you experienced either in September of '06 or

22   those two or three other times after that caused

23   additional harm to you than the course of your own

24   disease?

122

1    A.  I believe so.

2    Q.  Okay.  What do you have to base that

3  belief on?

4    A.  By you getting in contact with them,

5  bringing them, or I'll have them come here.

6    Q.  Okay.

7    A.  Or come to court, or whatever.

8    Q.  None of them to this day have said that to

9  you, though, right?

10    A.  About testifying, no.

11    Q.  Or about the course of your disease?

12    A.  About the course of my disease, only Dr.

13  Diane.

14    Q.  Okay.  And that's Diane Judd?

15    A.  Yes, sir.

16    Q.  And that's one of those doctors that I was

17  unable to locate on any list of physicians in

18  Illinois?

19    A.  I don't see why, because she has an

20  office, several offices.

21    Q.  Is it possible that you gave me the wrong

22  name for the doctor?

23    A.  No, sir.

24    Q.  Diane Judd, J-u-d-d?

123

1    A.  Yes, sir.

2    Q.  Do you know what her initials are after

3    the name?

4    A.  Dr. Diane Judd.

5    Q.  Is she an M.D., do you know?

6    A.  She's an M.D., yes.

7    Q.  She's not a Ph.D.?

8    A.  No.  She's an M.D.

9    Q.  Okay.

10   A.  From Heartland, Heartland Alliance.

11   Q.  Okay.  And Heartland Alliance, what type

12   of --

13   A.  That's what they -- they treat homeless

14   people.

15   Q.  Do you know what her specialty is, Dr.

16   Judd?

17   A.  No, I don't.

18   Q.  Have you ever heard of posttraumatic

19   stress disorder?

20   A.  Yes, I've heard of it.

21   Q.  Have you ever read anything about it?

22   A.  No.

23   Q.  Okay.  Have you ever discussed your

24   symptoms that you say that you suffered in '06 with

124

1    any expert?

2        A.   Nobody but my physicians.

3        Q.   Are you saying that you suffered

4    posttraumatic stress disorder as a result of not

5    getting your medication?

6        A.   On a couple occasions it worried the hell

7    out of me.

8        Q.   Okay.

9        A.   And it still bothers me today.

10       Q.   Still?

11       A.   Still.

12       Q.   Even though you're in better shape now?

13       A.   Every time I think about those episodes,

14   yes, I do, you understand, it do bother me

15   mentally, you know.

16       Q.   Do you keep remembering the time when you

17   entered into the jail in September --

18       A.   Sure do.

19       Q.   Let me finish my question.  Okay.

20           Calling your attention to September 26th

21   of '06 --

22       A.   Yes, sir.

23       Q.   -- do you keep remembering the event of

24   not getting medication on that day or the following

125

1    day even if you don't want to remember it?

2        A.   Yes.

3        Q.   Okay.  Do you ever have bad dreams or

4    nightmares about not getting your medication on the

5    26th or the 27th?

6        A.   Only a couple times I've had.

7        Q.   Do you ever feel or act -- feel like the

8    event is happening again even when it's not?

9        A.   Yes, sir.

10       Q.   When has that occurred?

11       A.   It occurred a couple of weeks ago.

12       Q.   Okay.  Under what circumstances?

13       A.   When I was asleep.

14       Q.   All right.  I've reminded you of this

15   event September 26th and 27th of 2006 throughout

16   this afternoon.  I don't think that you've gotten

17   upset about it, have you, remembering it?

18       A.   No.

19       Q.   Okay.  When you remember it, do you think

20   that your heart is beating faster when you remember

21   it?

22       A.   I know it is.

23       Q.   Okay.

24       A.   Yes.

126

1      Q.   Have you ever had trouble falling asleep?

2      A.   When I think about it.

3      Q.   Okay.  Do you ever lose your temper as a

4  result of it?

5      A.   I wouldn't say totally, but I do get kind

6  of high strung thinking about it.

7      Q.   And after September 26th of 2006, did you

8  feel like you have difficulty in concentrating?

9      A.   Yes, for about a year.

10     Q.   Do you think the cause of it was not

11  getting medication on the 26th and 27th?

12     A.   I wouldn't -- I wouldn't -- I can't

13  honestly say so.

14     Q.   Okay.

15     A.   No.

16     Q.   Okay.  Do you think that you might have

17  difficulty concentrating because of past use of

18  heroin?

19     A.   Not just that.

20     Q.   What else?

21     A.   Because of other times and things in my

22  life, the times when I didn't get it, get my

23  medication in IDOC.

24     Q.   Okay.  So that's happened in IDOC as well?

127

1      A.  As well.

2      Q.  Okay.  Did you file any lawsuits against

3   the IDOC for that, for those delays?

4      A.  No.  I had to go through the grievance

5   procedures first.

6      Q.  Do you know Charlotte Whittington,

7   W-h-i-t-t-i-n-g-t-o-n?

8      A.  No.

9      Q.  After the events of entry into the jail in

10   September of '06, September 26th of '06, do you

11   feel jumpy or easily startled by ordinary noises?

12      A.  No.

13      Q.  Do you deliberately try to not think about

14   the event of entering in the jail of September of

15   '06?

16      A.  Yes, I try not to.

17      Q.  Okay.  Do you avoid places or people or

18   activities that might remind you of the events?

19      A.  Yes.

20      Q.  What places or people or activities do you

21   avoid?

22      A.  By -- I avoid when I have to travel past

23   the County jail, I try to go avoid it.

24      Q.  Okay.  I think all people that are

128

1    reasonable would try to do that.

2         A.  I don't know about all people.  I know I

3    do.

4         Q.   Are there any activities that you avoid

5    because of being reminded of the event?

6         A.  Not that I can -- no, I can't say I do.

7         Q.   Okay.  Do you understand that my questions

8    are about whether or not you have these experiences

9    as a result of the intake in September of 2006 and

10   not about being in jail in general?

11        A.  Yes.

12        Q.   Okay.  You've been in jail quite a few

13   times right?

14        A.  Yes.

15        Q.   In fact, I have a list here from '93, 1,

16   2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 times that

17   you were admitted to the jail --

18        A.   That's all?

19        Q.   Do you have any memory lapse about the

20   event of September 26th of 2006?

21        A.   Memory lapse?

22        Q.   Yes, where you just don't remember it?

23        A.   No.  I always remember it.

24        Q.   Any part of it you don't remember?

129

1      A.  No, no, sir.

2      Q.  Of all of the 13 intakes into the jail

3  that are on the record that I've seen, is this the

4  only one that you remember?

5      A.  Clearly, yes, sir.

6      Q.   Is part of the reason why it's the one you

7  clearly remember because of this lawsuit?

8      A.  No.  Because of the treatment that I was

9  subjected to.

10     Q.  Okay.  And by that you mean you didn't get

11  the medication for your prostate?

12     A.  Yes, yes.

13     Q.  Okay.

14     A.  It sticks with me.

15     Q.  All right.

16         MR. MORRISSEY:  Much longer, Frank?

17         MR. CATANIA:  Could be.

18         MR. MORRISSEY:  Do you want to take a few

19  minute break?

20         MR. CATANIA:  Not really.  We'll do one

21  more thing before that.

22         I'm going to ask the court reporter to

23  mark this exhibit, which you'll want to see instead

24  of waiting.

130

1          (Whereupon, Taylor Deposition

2          Exhibit No. 4 was marked for

3          identification.)

4    BY MR. CATANIA:

5        Q.   I'm going to show you what's been marked

6    as Exhibit No. 4 for this deposition, which I want

7    you to take a look at because you haven't looked at

8    it before now.

9        A.   Okay.

10       Q.   Take a look at Exhibit No. 4 in the front

11   page.  It asks for copies of grievance reports and

12   grievances processed as requests?

13       A.   Yes, sir.

14       Q.   Do you see that?

15       A.   Yes.

16       Q.   All right.  And then there's a couple of

17   columns.  One it says "Check if found" and the

18   other one says "Check if not found."  Do you see

19   that?

20       A.   Uh-huh.

21       Q.   And all of the grievances under the intake

22   numbers for '05, '06, and '08 are checked as no

23   grievance found, right?

24       A.   Right.

131

1     Q.   Okay.  And do you recognize the numbers

2     that are associated with each one of those five

3     intakes?

4     A.   Not really.

5     Q.   Okay.  On the next page, you'll see on

6     Page 2 of this exhibit, you'll see "Booking History

7     Print Screen"?

8     A.   Yes, sir.

9     Q.   Okay.  There are the 13 intakes that I was

10    talking about?

11    A.   Right.

12    Q.   Since July of 2003, and there are 5 of

13    those that refer to the same numbers that appear on

14    the first page starting with 20051904 and going to

15    200856132, do you see that?

16    A.   Yes.

17    Q.   Okay.  And those all refer to Dan Taylor.

18    That's you, right?

19    A.   Yes, sir.

20    Q.   Okay.  In each of those five intakes, if

21    you look to the "Release Reason" column, --

22    A.   Yes.

23    Q.   -- it says in each one of those five

24    intakes since 2005 that you were released to the

132

1    Illinois Department of Corrections.  Is that true?

2        A.   Correct, yes.

3        Q.   Okay.  Did you ever appeal the grievance

4    that you say that you filed in 2006 for not getting

5    medications?

6        A.   Yes.

7        Q.   What did you do to appeal it?

8        A.   I rewrote it to the -- directly to the

9    Director.

10       Q.   In the same form, on a grievance form?

11       A.   The same form, yes.

12       Q.   Okay.  All right.  Did you get -- did you

13   do the same thing with that, provide it to the

14   social worker?

15       A.   I did, yes, I had to turn it in to the

16   social worker, right.

17       Q.   And did you get a copy of that one back?

18       A.   No.

19       Q.   Okay.  So are you saying the social worker

20   didn't give you a copy of your grievance?

21       A.   No, she didn't.

22       Q.   Okay.  Other than your say so, do you have

23   any evidence that says that you submitted a

24   grievance in each of those times?

133

1      A.  If I can recall my cellee's (phonetic)

2   names, they was witnesses.

3          As a matter of fact, the whole tier was

4   witnesses, because several of them filed grievances

5   about not receiving, you know, medication.

6      Q.  Okay.  We're talking about a specific

7   time, intake screening, when you didn't receive it

8   then?

9      A.  I can't -- no.  Besides me, no.

10     Q.  Okay.  This document is signed by

11  Charlotte Whittington on today's date, June 8th of

12  2011, indicating that a diligent search was

13  conducted for the above documents and none was

14  found?

15     A.  That wouldn't be the first time.

16     Q.  You've had exhibits that you've not be

17  able to find at the jail?

18     A.  Yes, quite a few times in the County jail.

19     Q.  Have you --

20         MR. MORRISSEY:  Are you now finished with

21  that exhibit or --

22         MR. CATANIA:  No.

23         MR. MORRISSEY:  I want to take a break.

24             (Whereupon, a short break was

134

1           taken.)

2     BY MR. CATANIA:

3        Q.  At the break, did you have a chance to

4     call Dr. Judd and see if she's going to be your

5     expert?

6        A.  No, no.

7        Q.  Okay.  Back in September of 2006, did you

8     have a cell phone?

9        A.  No.

10       Q.  Okay.  You have one now, right?

11       A.  Yes, sir.

12       Q.  What's the company that you have it with?

13       A.  Cricket.

14       Q.  Oh, okay.

15       A.  It's the cheap one, the good one.

16       Q.  You're not saying after looking at Exhibit

17    No. 2, which is this record of your -- actually,

18    it's No. 3, the record of your medical treatment in

19    September of '06 to I believe it's the '07

20    discharge date, you're not saying you didn't

21    receive medication at all, are you?

22       A.  No, I'm not saying that.

23       Q.  You're saying that there were times when

24    you had gaps in your medication?

135

1    A.   Gaps.

2    Q.   And a time at the beginning when you

3  didn't receive it?

4    A.   At all.

5    Q.   Okay.  Are you saying that the record

6  shows that you told paramedics, medics, or medical

7  doctors at the time of intake that you were taking

8  medication for prostate?

9    A.   You know, I don't see it here.

10   Q.   Okay.  I don't either.  That's why I'm

11  asking.

12   A.   You know.

13   Q.   Other than you telling people at the

14  intake what medication you were on, is there any

15  way for them to know what medication you're on at

16  intake?

17   A.   Yes, by making a call, like they usually

18  do.

19   Q.   To whom?

20   A.   To the hospital.

21   Q.   Okay.  At 6 p.m. on the date of intake

22  when you were interviewed, --

23   A.   Yes.

24   Q.   -- they could have made a call to the

136

1    hospital?

2        A.   They could have made a call.  Mercy is

3    open 24 hours a day.

4        Q.   Oh, Mercy Hospital?

5        A.   Yes, sir.

6        Q.   Would they have called and given the name

7    of Dan Taylor at Mercy Hospital?

8        A.   Yes, yes.

9        Q.   They wouldn't have called and given the

10   name --

11       A.   Or McDowell.

12       Q.   Or McDowell?

13       A.   Yes.

14       Q.   Okay.  Would they have gotten --

15       A.   As a matter of fact, that's the name they

16   would have used, McDowell.

17       Q.   In '06?

18       A.   Yes, sir.

19       Q.   Okay.  At Mercy?

20       A.   At Mercy.

21       Q.   So if I were to contact Mercy Hospital,

22   I'd look for records for McDowell?

23       A.   McDowell, yes.

24       Q.   Do you recall what date of birth you gave

137

1      when you gave the name McDowell?

2      A.  No, sir.

3      Q.  I believe that I have counted 18 alias

4      names on the Chicago police record?

5      A.  Yes, sir.

6      Q.  Does that sound about right?

7      A.  It might be missing a few.

8          MR. CATANIA:  All right.  Let's mark this

9      as an exhibit.

10                (Whereupon, Taylor Deposition

11                Exhibit No. 5 was marked for

12                identification.)

13     BY MR. CATANIA:

14     Q.  I'm sure you've been shown this exhibit

15     before in some form by your lawyer.  But take a

16     look at it now.

17         MR. MORRISSEY:  Do you have an extra copy?

18         MR. CATANIA:  Yes.  I'm handing it to you

19     now as you're asking for it.

20         MR. MORRISSEY:  Oh, okay.

21     BY MR. CATANIA:

22     Q.  Is that a picture of you on the front page

23     of that?

24     A.  Yes.

138

1      Q.   At the time when that picture was taken,

2    you didn't have your dentures?

3      A.   No, sir.  I was undernourished, homeless,

4    and everything.

5      Q.   All right.  Take a look at the "Key

6    Historical Identifiers" on the first page, that's

7    this box here (indicating).  The first one on that

8    list says alias or AKA used Taylor, Dan?

9      A.   Yes, sir.

10     Q.   Used 3 August 2008.  What date of birth

11   did you give at that time?

12     A.   June 30, '53.

13     Q.   Okay.  Was that your current date of

14   birth?

15     A.   Yes, sir.

16     Q.   Okay.  What was the first arrest that you

17   recall by Chicago police?

18     A.   Ever?

19     Q.   Ever?

20     A.   1970, 1970.

21     Q.   Take a look on Page 2, which is the same

22   box of key identifiers, where it says date of

23   arrest, December 10, 1969; do you see that last

24   one?

139

1     A.   Yes, sir.

2     Q.   What date of birth was given on that first

3     arrest for which you gave the name of Dan Taylor?

4     A.   June 30 of '51.

5     Q.   Okay.  Which is different from the date

6     you just gave?

7     A.   Yes.

8     Q.   Okay.  What's your Social Security number?

9     A.   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.

10    Q.   Okay.  All right.  On June 30th of -- I'm

11    sorry, August 3rd of 2008 did you use 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?

12    A.   I probably did.

13    Q.   And who's is that?

14    A.   I don't know.

15    Q.   Okay.  Did you have permission to use that

16    Social Security number?

17    A.   No, I didn't.

18    Q.   On April 27, 2008, under the name of James

19    Taylor did you use the Social Security number of

20    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?

21    A.   What was it?

22    Q.   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?

23    A.   It's a possibility.

24    Q.   Okay.

140

1    A.  I'm not sure.

2    Q.  On May 7th of 2008 did you use the name of

3  James Jamison?

4    A.  Yes, sir.

5    Q.  Okay.  On January 6th of 2005 did you use

6  the name of James McDowell?

7    A.  Yes, sir.

8    Q.  And on January 8th of 2004 did you use the

9  name of James Smith?

10    A.  Yes, sir.

11    Q.  And on April 4th of 2000 did you use the

12  name Mike McDowell?

13    A.  Yes, sir.

14    Q.  And on January 24th of 2000 did you use

15  the name Dan Gregory?

16    A.  Yes, sir.

17    Q.  And on September 23rd of '98 did you use

18  the name of David Jackson?

19    A.  I believe so.

20    Q.  And on March 22 of '93 did you use the

21  name Marrion Taylor?

22    A.  Yes, sir.

23    Q.  And on February 14th of '93 did you use

24  the name of Calvin McDowell?

141

1    A.  Yes, sir.

2    Q.  There's many more of those similar --

3    A.  Yes, sir.

4    Q.  -- differences?

5        Okay.  At any time did you use those names

6    at any medical facility?

7    A.  Yes, sir.

8    Q.  So they're not all going to be under the

9    name of Dan Taylor?

10   A.  No, sir.

11   Q.  Those records?

12       Do you think that might pose some

13   difficulty in the care and treatment of Dan Taylor,

14   to have medical records under various names?

15   A.  It's a possibility.  I'm not sure.

16   Q.  When you are going to clinics such as the

17   ones that you've named, like the Heart?

18   A.  Heartland.

19   Q.  Heartland?

20   A.  Yes, sir.

21   Q.  Do they keep your information on a

22   computer system?

23   A.  Yes.

24   Q.  Do they write things on paper as well?

142

1    A.  Both.

2    Q.  Okay.  And at the Fantus Clinic, do they

3    write things on paper?

4    A.  Both.

5    Q.  And at Stroger they do the same thing?

6    A.  Yes, sir.

7    Q.  All right.  At Cermak all the time that

8    you've come into the jail, they's used paper,

9    haven't they?

10   A.  Yes, sir.

11   Q.  At Komed Health Center do they use paper?

12   A.  Both.

13   Q.  And at Humboldt Park do they use paper?

14   A.  Yes, sir.

15   Q.  And at Menard Correctional do they use

16   paper?

17   A.  Yes, yes, sir.

18   Q.  And if someone wanted to review your

19   record, would they have any difficulty finding the

20   record based on alias names do you think?

21   A.  I don't think so.

22   Q.  Why do you think they would not have

23   trouble finding your record?

24   A.  Because it all comes back to the same

143

1    individual.

2        Q.  Okay.  Under various times, right?

3        A.  Yes, sir.

4        Q.  Okay.  Have you been to Mr. Morrissey's

5    office?

6        A.  No.

7        Q.  Have you ever been to Mr. Flaxman's

8    office?

9        A.  Yes.

10       Q.  Do they use paper there?

11       A.  Yes, some.

12       Q.  Do they file things according to the name

13   of the client?

14       A.  Yes.

15       Q.  Okay.  Do you think it might be difficult

16   to file something if it's made to the name of

17   McDowell when it refers to Dan Taylor?

18       A.  It's possible.

19       Q.  Not only is it possible, it's probable

20   that those documents would be filed differently

21   than Dan Taylor, right?

22       A.  More likely.

23       Q.  Do you remember being in the jail in

24   August of 2008, August 5th of 2008?

144

1      A.   Yes, sir.

2      Q.   On that date, August 5th of 2008, were you

3   being treated for your BPH, your benign prostatic

4   hyperplasia, your enlarged prostate?

5      A.   Yes.

6      Q.   Okay.  You had no other problems at that

7   time, right?

8      A.   No, because I got the medication.

9      Q.   In your experience in life, do you know of

10  anybody who's ever died from enlarged prostate?

11          MR. MORRISSEY:  I'm going to object.  He's

12  not a medical doctor.

13          THE WITNESS:  I'm not a physician.

14          MR. CATANIA:  I'm talking about his

15  experience.

16          MR. MORRISSEY:  I don't think we've

17  established that Mr. Taylor has treated people for

18  prostate conditions.

19  BY MR. CATANIA:

20     Q.   Are you listening to what your lawyer is

21  saying?

22     A.   Pardon me?

23     Q.   Are you listening to what your lawyer's

24  saying?

145

1      A.  I'm listening to what everyone's saying.

2      Q.  Can you answer my question?

3      A.  No, I can't.

4      Q.  Why not?

5      A.  Because I don't -- I can't recollect.  My

6    memory won't serve me that well to recollect

7    anyone, knowing anyone that I've treated, you know,

8    or by me saying treated, cared for that ever died.

9      Q.  Okay.

10     A.  Except for, you know, a couple of people

11   that I knew.  But I wasn't close to them.

12     Q.  Okay.  And they've died?

13     A.  Yes, from prostate.

14     Q.  But you don't know -- for prostate?

15     A.  Yes.

16     Q.  Or prostate cancer?

17     A.  I believe it was prostate cancer as I

18   recall.

19     Q.  And you don't have prostate cancer?

20     A.  No, I don't think so.  Unless I got it

21   overnight.

22     Q.  Okay.  And at the time when you were in

23   the custody of the Sheriff back in September of

24   '06, you didn't have prostate cancer?

146

1      A.   I wasn't really familiar with prostate,

2   period.

3      Q.   Okay.  In January of '07, you had a couple

4   of tests that said that you did not have prostate

5   cancer, right?

6      A.   Correct.

7      Q.   And you were made aware of those things?

8      A.   Yes.

9      Q.   So you had no reason to fear getting

10   prostate cancer, right?

11      A.   No, no, I do.  You do have a reason to

12   fear, because it can come.

13      Q.   Okay.  Are you fearful that you're going

14   to get prostate cancer because for two days in

15   September of '06, you did not have medication?

16      A.   Not specifically those two days, no.

17      Q.   Okay.  Is your reason for suing in this

18   case because of fear of getting prostate cancer?

19      A.   No.  It's because I didn't receive my

20   medication.

21      Q.   Okay.  I'm trying to get at what damages

22   you're talking about?

23      A.   Right, right, right.  I'm talking about

24   specifically me not receiving my medication in

147

1    appropriate time.

2        Q.   And what is the damage that you suffered

3    as a result of not getting your --

4        A.   Pain and suffering.

5        Q.   Pain and suffering?

6        A.   Mentally and physical.

7        Q.   Is it the worst pain and suffering you've

8    experienced in your life?

9        A.   To be honest about it, it's the worst and

10   the scariest.

11       Q.   The worst and scariest?

12       A.   Yes.

13       Q.   Even remembering back at the beginning of

14   the deposition when I asked you about the death of

15   your mother?

16       A.   Yes.

17       Q.   It compares the same as the death of your

18   mother?

19       A.   It's up there, yes.

20       Q.   Okay.  And you want us to believe that?

21       A.   I don't care what you believe, but that's

22   what it is, you know.

23       Q.   All right.  Did you tell anybody about

24   that back in September of '06, that you were

148

1    afraid, most afraid in your life as a result of not

2    getting medication in September of '06?

3        A.   Yes, to my cellee.

4        Q.   Your cell mate?

5        A.   Yes, my cell mate.

6        Q.   What's his name?

7        A.   James Jamison, his real name.

8        Q.   And have you seen James Jamison since

9    then?

10       A.   Once.

11       Q.   Have you discussed this case with him?

12       A.   No.

13       Q.   Have you discussed this case with anybody

14   else?

15       A.   No.

16       Q.   Have you discussed this case with any of

17   the other named plaintiffs?

18       A.   I don't even know them.

19       Q.   So the answer is no?

20       A.   No, sir.

21       Q.   Okay.  Can you tell me under what

22   circumstances you told James Jamison that you were

23   more afraid of not having had medication for a

24   prostate enlargement than anything else in your

149

1    life other than the death of your mother?

2        A.   You're not talking about anything else?

3    No.

4        Q.   Under what circumstances did you have the

5    conversation about it?

6        A.   Oh, because we were cellees, and he was

7    seeing how I was constantly trying to urinate

8    and couldn't.  He was seeing the changes I was

9    going through, the problems I was having trying to

10   urinate and couldn't for three and four days.  And

11   I was disturbing him.

12       Q.   So he saw you while you were going through

13   the symptoms which are associated with enlarged

14   prostate?

15       A.   Yes, sir.

16       Q.   And under those circumstances, you told

17   him that it was the worst thing that ever happened

18   to you in your life other than the death of your

19   mother?

20       A.   Yes.

21       Q.   And as a result of getting medication for

22   that, those symptoms subsided?

23       A.   After awhile.

24       Q.   I understand that.

150

1     A.   Yes, after awhile --

2     Q.   -- after the symptoms subsided?

3     A.   Yes.

4     Q.   Do you still think that those symptoms are

5   the worst thing that has ever occurred to you in

6   your life?

7     A.   Besides my mother's death, yes.

8     Q.   Is it worse than homelessness?

9     A.   Yes, yes, because you're dealing with your

10   life.  Homelessness, you can go through it.

11        This pain and suffering, you know, you

12   can't -- you have no control over it.

13     Q.   Okay.  Is this the only type of pain and

14   suffering you have suffered in your life?

15     A.   No.

16     Q.   What other pain have you suffered?

17     A.   Withdrawals.

18     Q.   Is it worse than withdrawal?

19     A.   Yes.

20     Q.   Okay.

21     A.   Yes.

22     Q.   Is it worse than the injury you suffered

23   in the IDOC in 1985?

24     A.   Yes.

151

1    Q.   And just so we're clear, you're talking

2    about the pain and suffering as a result of not

3    having medication in September of '06?

4    A.   Yes, sir.

5    Q.   Okay.  At the present time, you're taking

6    Flomax, right?

7    A.   Yes, sir.

8    Q.   Okay.  Do you take your Flomax out of a

9    bottle of pills?

10    A.   Yes, sir.

11    Q.   Okay.  Are those pills prescribed for you

12    on a regular basis?

13    A.   Yes, sir.

14    Q.   How long, how many refills do you get with

15    each prescription for Flomax?

16    A.   Six.

17    Q.   And where do you fill it?

18    A.   At Jackson Park Hospital, Jackson Park

19    pharmacy on 75th.

20    Q.   And do you pay for your prescription?

21    A.   I have insurance.

22    Q.   What insurance do you have?

23    A.   Medical insurance.

24    Q.   Medicaid?

152

1      A.   Medicaid.

2      Q.   And you would have to pay or you would

3   have to obtain that prescription at the Jackson

4   Park pharmacy even if you had never been in the

5   jail, right?

6      A.   Yes.

7      Q.   Okay.  So having to continue the

8   medications is as a result of the disease, right?

9      A.   Yes.

10      Q.   Okay.  You would have had that disease if

11   you had never been arrested by the Chicago police,

12   right?

13      A.   It's a possibility.  I'm not sure.

14      Q.   Well, the police didn't cause it?

15      A.   Right, they didn't cause it.  So, you

16   know, uh-huh.

17      Q.   Did you have to pay for the medication

18   that you got when you were in the jail?

19      A.   No.

20      Q.   Okay.  Since you've been out of jail, have

21   you ever run out of Flomax?

22      A.   No.

23      Q.   Is the medication delivered to your home

24   by mail?

153

1     A.   No, sir.

2     Q.   You have to go somewhere to pick it up?

3     A.   I have to go to the pharmacy to pick it

4  up.

5     Q.   Okay.  Have you ever reached the bottom of

6  the pill bottle and realized you have to go --

7     A.   Yes.

8     Q.   Okay.  And on the day that you reach the

9  bottom of the bottle, have you missed a dose that

10  morning?

11    A.   No.

12    Q.   You always have time to go to the

13  pharmacy?

14    A.   Yes, sir.

15    Q.   On that day that you run out?

16    A.   Yes, sir, I have to.

17    Q.   Has that ever occurred on a holiday?

18    A.   No.

19    Q.   Do you keep a planner to help remind you

20  to take your medicine?

21    A.   No.  My body.

22    Q.   Okay.  Have you ever missed a dose?

23    A.   Yes.

24    Q.   Okay.  More than a day?

154

1     A.  Oh, no, no.

2     Q.  So you remember it because you suffer

3   symptoms within 24 hours?

4     A.  I have to -- my body tells me.

5     Q.  What are the symptoms you suffer within 24

6   hours?

7     A.  Discomfort in my bladder, my --

8     Q.  Okay.  So suffering the symptoms would

9   remind you to take the medication, is that right?

10    A.  Yes, sir.

11    Q.  Okay.  Other than suffering symptoms, do

12  you have any other mechanism for reminding you when

13  to take your medication?

14    A.  Just my mental capacity.

15    Q.  Okay.  You don't have a weekly pill box

16  with divided dates or --

17    A.  No, sir.

18    Q.  You don't have anybody living with you to

19  remind you?

20    A.  No, sir.

21    Q.  Do you take any other medications at the

22  present time besides Flomax?

23    A.  Yes, sir.

24    Q.  What else?

155

1    A.   Ibuprofen 800, Naproxen 500, Robaxin,

2  Flexeril, Benadryl, some sinus medication, allergy

3  sinus spray.

4    Q.   Do you take all of those everyday?

5    A.   Everyday.

6    Q.   Okay.  Do you keep all of those in

7  separate pill bottles?

8    A.   Yes, sir.

9    Q.   Okay.  And are those all kept at your

10  home?

11    A.   Yes.

12    Q.   And that home is the one you gave us way

13  at the beginning on --

14    A.   Yes, sir.

15    Q.   -- 46th Place on the third floor?

16    A.   Yes, sir.  They tried to switch me --

17        MR. MORRISSEY:  There's no question

18  pending.

19        THE WITNESS:  Okay.

20  BY MR. CATANIA:

21    Q.   When did you switch from -- when did you

22  switch to the Flomax?

23    A.   In '09.

24    Q.   Okay.  What did you switch from?

156

1       A.  The medication I was getting, I don't

2   remember the name of it.  I don't remember the name

3   of it.

4       Q.  Okay.  Other than the two, Flomax and the

5   other you don't remember the name of, any other

6   medication for prostate?

7       A.  Yes.

8       Q.  What other?

9       A.  Aviguard (phonetic).

10      Q.  Did you take Aviguard?

11      A.  Yes.

12      Q.  When did you take that?

13      A.  A couple months ago.

14      Q.  Was that a supplement to the Flomax?

15      A.  Yes, because the -- I had to take too much

16  of the Flomax.

17      Q.  Do you still take Aviguard?

18      A.  No.

19      Q.  Other than those three, any other

20  medications for prostate?

21      A.  No.

22          MR. CATANIA:  I have no further questions

23  at this time.

24          MR. MORRISSEY:  I have hours of questions.

157

1   Do you want to take a break?

2       MR. CATANIA:  No.

3       MR. MORRISSEY:  I have nothing further.

4       MR. CATANIA:  I'm sure your lawyer has

5   explained to you about signature on the deposition

6   transcript, has he?

7       THE WITNESS:  No.

8       MR. CATANIA:  Okay.  Well, since the

9   client is a named plaintiff, why don't you?

10      MR. MORRISSEY:  You have the right to go

11  Downtown and review the transcript if and when it

12  is transcribed by the defendant, or you can trust

13  that the court reporter sitting here has done her

14  job properly today and taken down accurately the

15  questions and answers that you gave.

16      I would suggest that you rely on the court

17  reporter.

18      THE WITNESS:  Yes, I would suggest that.

19      MR. CATANIA:  Waived.

20       (FURTHER DEPONENT SAITH NOT.)

21

22

23

24

158

1    STATE OF ILLINOIS  )

2                )  SS:

3    COUNTY OF C O O K  )

4           I, Deborah E. DeSanto, a Notary Public

5    within and for the County of Cook County and State

6    of Illinois, do hereby certify that heretofore,

7    to-wit, on the 8th day of June, 2011, personally

8    appeared before me, at 50 West Washington Street,

9    Room 302, Chicago, Illinois, DAN M. TAYLOR, JR., in

10   a cause now pending and undetermined in the Circuit

11   Court of Cook County, Illinois, wherein Michael

12   Parish, et al., are the Plaintiffs and Sheriff of

13   Cook County and Cook County are the Defendants.

14          I further certify that the said DAN M.

15   TAYLOR, JR., was first duly sworn to testify the

16   truth, the whole truth and nothing but the truth in

17   the cause aforesaid; that the testimony then given

18   by said witness was reported stenographically by me

19   in the presence of the said witness, and afterwards

20   reduced to typewriting by Computer-Aided

21   Transcription, and the foregoing is a true and

22   correct transcript of the testimony so given by

23   said witness as aforesaid.

24          I further certify that the signature to

159

1    the foregoing deposition was waived by counsel for

2    the respective parties.

3        I further certify that the taking of this

4    deposition was pursuant to notice and that there

5    were present at the deposition the attorneys

6    hereinbefore mentioned.

7        I further certify that I am not counsel

8    for nor in any way related to the parties to this

9    suit, nor am I in any way interested in the outcome

10   thereof.

11       IN TESTIMONY WHEREOF:  I have hereunto set

12   my hand and affixed my notarial seal this 27th day

13   of June, 2011.

14

15

16

17

18   _____

19       NOTARY PUBLIC, COOK COUNTY, ILLINOIS

20           LIC. NO. 084-1384

21

22

23

24

**Exhibit 5,**

1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

MICHAEL PARISH, CURTIS     )

L. OATS, LEILA KHOURY,     )

SEAN DRISCOLL, CARLA      )

LOFTON, ROY CLEAVES,      )

LISA BROWN, DAN TAYLOR,    )

DEAN MILLER, KEVIN       )

SANDERS, STACEY CLARK,     )

and CARLOTTE WATSON,      )

     Plaintiffs,    )

  vs.       )  No. 07 CV 4369

SHERIFF OF COOK COUNTY    )

and COOK COUNTY,         )

     Defendants.    )

    The deposition of KEVIN SANDERS, called

for examination pursuant to the Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken

before Deborah E. DeSanto, a Notary Public within

and for the County of Cook and State of Illinois,

at 50 West Washington Street, Room 302, Chicago,

Illinois, on the 14th day of June, 2011, at the

hour of 1:27 o'clock p.m.

(The deposition concluded at 3:40 p.m.)

Reported By:  Deborah E. DeSanto, CSR

License No:  084-1384

2

1      APPEARANCES:

2          THOMAS G. MORRISSEY, LTD.

3          BY:  MR. THOMAS G. MORRISSEY

4          10249 South Western Avenue

5          Chicago, Illinois  606543

6          (773) 233-7900

7             Representing the Plaintiffs;

8

9          ANITA ALVAREZ

10         STATE'S ATTORNEY OF COOK COUNTY, ILLINOIS

11         BY:  MR. FRANCIS J. CATANIA

12         50 West Washington Street

13         Suite 500

14         Chicago, Illinois  60602

15         (312) 603-3000

16            Representing the Defendants.

17

18

19

20

21

22

23

24

3

1          I N D E X

2     WITNESS                    EXAMINATION

3     KEVIN SANDERS

4        By Mr. Catania          4, 124

5        By Mr. Morrissey          118

6

7

8

9

10          E X H I B I T S

11    NUMBER                    MARKED FOR ID

12    Sanders Deposition Exhibit

13        No. 1                 31

14        No. 2                 57

15        No. 3                 82

16        No. 4                 115

17

18

19

20

21

22

23

24

4

1          (Whereupon, the witness was duly

2           sworn.)

3               KEVIN SANDERS

4    having been first duly sworn, was examined and

5    testified as follows:

6               EXAMINATION

7    BY MR. CATANIA:

8      Q.  Sir, would you please state your full name

9    for the record?

10     A.  Kevin Sanders, S-a-n-d-e-r-s.

11        MR. CATANIA:  This is the Federal

12   deposition of Kevin Sanders set pursuant to notice

13   and continued over and over and over again to

14   today's date.

15   BY MR. CATANIA:

16     Q.  Mr. Sanders, do you know what a deposition

17   is?

18     A.  No, sir.

19     Q.  What do you think this deposition is

20   about?

21     A.  A lawsuit with Cook County jail when I did

22   not receive my medication.

23     Q.  Okay.  And what is the source of your

24   information about the basis for the lawsuit?

5

1     A.   That I was suffering for three days.

2     Q.   Okay.  Why do you think there's a court

3   reporter here?

4     A.   To keep the records.

5     Q.   What will you do if you don't hear a

6   question I've asked?

7     A.   Say can you know repeat it.

8     Q.   What will you do if you don't understand a

9   question I did?

10     A.   I don't understand.

11     Q.   Okay.  As the court reporter said, I would

12   ask that you keep your voice a little bit louder

13   than normal because we have a lot of ambient noise

14   due to the way that the heat/cooling system is set

15   up here.  Okay?

16     A.   Yes, sir.

17     Q.   Is there anything on your mind today that

18   would make it difficult for you to concentrate on

19   the questions I'm asking?

20     A.   No, sir.

21     Q.   Have you taken any medications today?

22     A.   I took my seizure pill.

23     Q.   And what is that seizure pill?

24     A.   I don't know how to pronounce it right.

6

1     Carbamazepine, something like that, Carbamazepine.

2     Q.  Okay.  And what do you take that for?

3     A.  Seizures.

4     Q.  What kind of seizures?

5     A.  I don't really know.

6     Q.  Okay.  When did you start taking this

7     particular medication?

8     A.  In 2006.

9     Q.  That predates the date that we're talking

10    about in the case, do you understand that?

11    A.  Yes, sir.

12    Q.  Okay.  Other than that medication, have

13    you taken any other drugs or medications or alcohol

14    that would interfere with your ability to give me

15    answers today?

16    A.  No, sir.

17    Q.  Okay.  Is there anything else that you're

18    aware of that would interfere with your ability to

19    give truthful and complete answers today?

20    A.  No, sir.

21    Q.  What will you do if I cut you off or

22    interrupt you while you're answering?

23    A.  Say "Excuse me, sir."

24    Q.  All right.  What will you do if you need

7

1    to look at a document in order to answer a

2    question?

3         A.   "Could I please have a minute to look at

4    it?"

5         Q.   And if there's nothing presented to you,

6    in front of you, what will you do?

7         A.   Ain't nothing I can do.

8         Q.   I would just ask that you tell me that

9    there's a document that you would like to look at

10   before you answer.  If you let me know that, then

11   there won't be a problem.  Okay?

12        A.   Okay.

13        Q.   Can you think of any reason why your

14   testimony at a trial of this case in a courtroom

15   would be different from your testimony today?

16        A.   I don't understand.

17        Q.   Okay.  Well, if this case goes to trial

18   some time in 2012 or 2013 or 2014, whenever we have

19   a trial, is there any reason why you think that

20   your testimony at that trial will be different from

21   what you say today?

22        A.   No.

23        Q.   Okay.  What have you done to help yourself

24   remember the events that we're going to be talking

8

1    about in this case?

2       A.   Really nothing.

3       Q.   Okay.  Do you understand everything that

4    we've covered so far?

5       A.   Yes, sir.

6       Q.   Okay.  So just as a way to put it all into

7    one paragraph, a deposition is your testimony taken

8    under oath recorded by the court reporter, who will

9    later transcribe that into a transcript, and you'll

10   have an opportunity to look at that transcript if

11   it is ordered.

12          Do you understand all of that?

13      A.   Yes, sir.

14      Q.   Okay.  If the transcript is prepared and

15   you take a look at it and you decide that you want

16   to make a correction to spelling or a correction

17   because something was misunderstood, will you

18   please make these corrections according to the

19   rules, which means within 30 days, and give your

20   reasons for those corrections?

21      A.   Yes, sir.

22      Q.   Okay.  How is your memory today?

23      A.   It's good.

24      Q.   I understand by looking at some of the

9

1    documents and your interrogatory answers that you

2    have had some experience using street drugs; is

3    that right?

4    A.  Yes, sir.

5    Q.  Have using street drugs ever caused

6    blackouts?

7    A.  No, sir.

8    Q.  Have you ever lost time as a result of

9    using heroin or cocaine?

10    A.  No, sir.

11    Q.  Could you please tell me, what's your

12    current age?

13    A.  30 years old.

14    Q.  You're 30.  Okay.  And your date of birth?

15    A.

16    Q.  Did you ever use any other birth dates

17    besides

18    A.  No, sir.

19    Q.  Okay.  Do you have any identification on

20    you?

21    A.  Yes, sir.

22    Q.  Could I take a look at it, please?

23    A.  Yes.

24    Q.  Show it to your lawyer first.

10

1    A.   (Indicating)

2         MR. MORRISSEY:  Okay.

3         MR. CATANIA:  I've been handed an Illinois

4    State ID card which is a duplicate ID card.  It has

5    two pictures on it, it looks like the person

6    sitting across the table from me.  The ID number is

7    ████████████████████.  The date of birth on it

8    is ████████████████████, and it was

9    issued on April 4th of 2009.

10   BY MR. CATANIA:

11   Q.   Mr. Sanders, it has your name on here as

12   well, and it also has an address of ████████████

13   Court, Elmwood Park, Illinois 60707.

14        Is that all correct and current

15   information?

16   A.   Yes, sir.

17   Q.   It also says that you're five-nine.  Is

18   that right?

19   A.   Yes, sir.

20   Q.   And you weigh 186 pounds?

21   A.   I weigh more than that now.

22   Q.   Okay.  How much do you weigh now?

23   A.   240.

24   Q.   Now, this is a duplicate ID card.  Did you

11

1    lose the original?

2        A.  Yes, I did.

3        Q.  Believe it or not, some people get a

4    duplicate even if they haven't lost their original.

5            Okay.  Do you have an Illinois driver's

6    license?

7        A.  No, sir.

8        Q.  Have you ever had one?

9        A.  No, sir.

10       Q.  Did you take driver's ed?

11       A.  No, sir.

12       Q.  Can you tell me your addresses going back

13   ten years?

14       A.  I believe it's 2242 North Lawler.

15       Q.  Was that a house or an apartment?

16       A.  A house.

17       Q.  Did you own the house?

18       A.  My aunt did.

19       Q.  What's her name?

20       A.  Pamela Kappit (phonetic).

21       Q.  Could you spell that for me?

22       A.  I don't know how to spell it, sir.

23       Q.  Okay.  And you say that she was your aunt.

24   Was she related to you by blood?

12

1     A.  Yes.  That would be my mom's twin sister.

2     Q.  And your mother's name?

3     A.  Judy A. Sanders.

4     Q.  Okay.  And have you ever gone by any other

5  name aside from Sanders?

6     A.  No, sir.

7     Q.  Have you ever used a middle initial?

8     A.  No, sir.

9     Q.  What is your middle name?

10    A.  I don't have none.

11    Q.  And who do you live with currently?

12    A.  I live with my uncle and his wife.

13    Q.  Okay.  And where do you currently live?

14    A.                              Park,

15  Illinois 60707.

16    Q.  Is that a house or an apartment?

17    A.  That would be a house.

18    Q.  And how long have you lived at that

19  address?

20    A.  I've been living there eight years.

21    Q.  Do you pay rent?

22    A.  No, sir.

23    Q.  Is the house owned by your uncle?

24    A.  Yes, sir.

13

1    Q.  And what is your uncle's name?

2    A.  Daniel P. Dorgan, D-o-r-g-a-n.

3    Q.  And your aunt's name?

4    A.  Diane G. Dorgan.

5    Q.  And what is the relationship with Daniel

6  P. to you?

7    A.  That would be my mom's brother.  So my

8  uncle.

9    Q.  And why do you live with your aunt and

10  uncle in Elmwood Park?

11    A.  Because my uncle and his wife are elderly,

12  and I help them with stuff.

13    Q.  Are they older than 70?

14    A.  My aunt is.  My uncle is 69.

15    Q.  Did you grow up in a family with your

16  parents and a household with your parents?

17    A.  Yes, sir.

18    Q.  Both parents living at the time?

19    A.  Yes, sir.

20    Q.  And your father's name?

21    A.  Kenneth Sanders.

22    Q.  Is he still alive?

23    A.  Yes, sir.

24    Q.  How old is he?

14

1    A.  59.

2    Q.  Do your parents still live at the -- where

3  do they live?

4    A.  5120 South Laporte, Illinois 60638.

5    Q.  So that's Chicago, right?

6    A.  Yes.  Sorry about that.

7    Q.  That's all right.

8      Is that a house?

9    A.  Yes.

10    Q.  Is that the house you grew up in?

11    A.  No, sir.

12    Q.  How long have they lived at that address?

13    A.  I'd say six years.

14    Q.  Did you ever stay at that house?

15    A.  Yes, sir.

16    Q.  When was the most recent time you stayed

17  there?

18    A.  This weekend just passed.

19    Q.  Okay.  So is that just an overnight visit?

20    A.  Yes.

21    Q.  Ever have your mail delivered to that

22  address?

23    A.  No.

24    Q.  Can you tell me a little bit about your --

15

1    well, where were you born?

2        A.  I was born in Chicago, Illinois.

3        Q.  Do you know what hospital?

4        A.  Cook County Hospital.

5        Q.  Are you currently married, sir?

6        A.  No, sir.

7        Q.  Have you ever been married?

8        A.  No, sir.

9        Q.  Do you have any children?

10       A.  I got one son that I do not see.

11       Q.  What's your son's name?

12       A.  Nicholas Sanders.

13       Q.  And then mom's mother, or mom's name?

14       A.  Nicole Spino, S-p-i-n-o.

15       Q.  Have you ever resided with Nicole Spino?

16       A.  I don't understand what you mean.

17       Q.  Did you ever live with her?

18       A.  Yes, sir.

19       Q.  Where did you live together?

20       A.  Montrose and Milwaukee.  I do not know the

21   address.

22       Q.  Okay.  When did you live with her?

23       A.  Back in 2002.

24       Q.  How long a period of time were you living

16

1    together?

2        A.   One year.

3        Q.   And what was the reason for you to split

4    up?

5        A.   Too much problems.

6        Q.   Okay.  And how old is your son?

7        A.   He is 11 years old.

8        Q.   Okay.  You pay child support?

9        A.   No, sir.

10       Q.   Is there any child support order?

11       A.   No, sir.

12       Q.   Was there ever a finding of paternity?

13       A.   No, sir.

14       Q.   Have you always admitted paternity?

15       A.   Yes.

16       Q.   Can you tell me, what's the highest level

17   of education you've completed?

18       A.   Sixth grade.

19       Q.   Where did you go to school?

20       A.   Pulaski Academy.

21       Q.   Why did you only go to the sixth grade?

22       A.   I was too much into gang banging and

23   selling drugs and getting into trouble.

24       Q.   Could you tell me what street gang you

17

1    were gang banging with?

2        A.  I used to be an Insane Unknown.

3        Q.  And you've admitted that to the police,

4    haven't you?

5        A.  Yes, sir.

6        Q.  And police being police, they probably

7    took photographs of your tattoos and things like

8    that, right?

9        A.  Yes, sir.

10       Q.  Do you have tattoos?

11       A.  Yes, sir.

12       Q.  What type of tattoos do you have?

13       A.  I have prayer hands right here, "Rest in

14   Peace, Timothy."

15       Q.  Okay.  And that's on your left arm?

16       A.  Right.

17       Q.  Who's Timothy?

18       A.  My cousin.

19          I got "Love Mom" on my right arm.  I got

20   my son's name on my back.

21       Q.  Okay.

22       A.  And I got this one (indicating), it's

23   supposed to be "Player" right here.

24       Q.  Indicating your left hand?

18

1    A.  Yes.

2    Q.  "Player"?

3    A.  Yes.  It was a gang coverup.

4        THE COURT REPORTER:  I'm sorry?

5        THE WITNESS:  A gang coverup, to try and

6    cover up five dots.

7        And I got a wizard on my ankle.  And I got

8    "Rest in Peace" on my ankle.

9    BY MR. CATANIA:

10   Q.  What does that refer to?

11   A.  I was going to put my grandmother's name

12   on there when I got a chance.

13       And then I got "KS" up here on the muscle

14   up here (indicating).

15   Q.  That's your left thigh?

16   A.  Yes.

17   Q.  "KS"?

18   A.  Yes.

19   Q.  What does that refer to?

20   A.  My initials.

21   Q.  Okay.  And, of course, you've got a tattoo

22   on your back, too, right?

23   A.  Yes.

24   Q.  What is that tattoo?

19

1    A.  It says Nicholas.

2    Q.  Did you ever get an equivalency, a GED?

3    A.  No, sir.

4    Q.  Ever take any classes in jail?

5    A.  No, sir.

6    Q.  How about in prison?

7    A.  No, sir.

8    Q.  And you've been to prison, right, a couple

9    of times?

10   A.  Yes, sir.

11   Q.  When were you in prison?

12   A.  2003 I got out.

13   Q.  Ever have any special education classes in

14   grade school?

15   A.  Yes, I have.

16   Q.  And during all the time that you were in

17   grade school, were you living in the home with your

18   parents?

19   A.  Yes, sir, I have.

20   Q.  Ever been left behind a grade?

21   A.  Yes.

22   Q.  More than once?

23   A.  About, yes, twice.

24   Q.  Any suspensions from grade school?

20

1    A.   Several.

2    Q.   When you were left behind a grade, did

3    that disturb you?

4    A.   Yes.

5    Q.   And how about when you were suspended; did

6    that cause you some disturbance or distress?

7    A.   No.

8    Q.   All right.  The Insane Unknowns, where are

9    they located in the City?

10   A.   On the northwest side.

11   Q.   Have you ever been arrested for selling

12   drugs?

13   A.   Yes, I have.

14   Q.   As an adult?

15   A.   Yes.

16   Q.   Did those cases ever go to court, the

17   selling drugs?

18   A.   Yes.

19   Q.   Were you ever convicted of that offense?

20   A.   Yes.

21   Q.   When were you convicted of selling drugs?

22   A.   2002, 1.  I don't remember the other

23   times.

24   Q.   Okay.  Any other convictions?

21

1     A.   Retail theft conviction.

2     Q.   And was that retail theft a felony or

3  misdemeanor?

4     A.   Felony.

5     Q.   And what was the store that you were --

6     A.   A Dominick's.

7     Q.   Was the felony based on the amount?

8     A.   Yes.

9     Q.   More than $150?

10    A.   Yes.

11    Q.   And you were convicted of that retail

12  theft as a felony?

13    A.   Yes.

14    Q.   So you have drug convictions and theft

15  convictions as felonies, right?

16    A.   Right.

17    Q.   Any convictions for misdemeanors?

18    A.   Not that I remember.

19    Q.   Okay.  Have you ever pled guilty to a

20  misdemeanor?

21    A.   Not that I remember.

22    Q.   Okay.  Were you ever involved in a

23  misdemeanor involving your girlfriend, the baby's

24  mother?

22

1    A.  Yes, I have.

2    Q.  What was that?

3    A.  Domestic.

4    Q.  Is that domestic battery?

5    A.  Yes.  But I beat it, though, in court.

6    Q.  And that means that you were not found

7  guilty?

8    A.  Right.

9    Q.  You were found not guilty?

10    A.  Right.

11    Q.  Have you ever been arrested and convicted

12  of domestic battery?

13    A.  No.

14    Q.  Did you try the case?  Did you go to trial

15  on the case, the domestic battery case?

16    A.  No, sir.

17    Q.  How did you beat it?

18    A.  Just threw it out.  She didn't show up,

19  and they threw it out.

20    Q.  Are you certain of that?

21    A.  Yes.

22    Q.  What are your parents' occupations?  Your

23  father?

24    A.  I don't understand what you mean.

23

1      Q.  Job?

2      A.  My dad works for Supreme Catering food

3   truck.

4      Q.  And your mother, was she working?

5      A.  She don't work.

6      Q.  Has she ever?

7      A.  Yes, she has.

8      Q.  What did she do when she was working?

9      A.  She used to work for Armstrong Tools.

10      Q.  Where were they located?

11      A.  On Elston and Central.  And the company

12   closed.

13      Q.  Okay.  When she was working, what shift

14   did she work?

15      A.  First.

16      Q.  And your father was a daytime worker?

17      A.  He works from day to night.

18      Q.  Long days?

19      A.  Yes.

20      Q.  Were you ever physically or sexually

21   abused while growing up?

22      A.  No, sir.

23      Q.  Was DCFS ever called while you were

24   growing up?

24

1     A.  Yes, sir.

2     Q.  How did DCFS being involved in your life

3  make you feel?

4     A.  It made me feel bad.  I was not listening,

5  not going to school, so they took me away from

6  my --

7         THE COURT REPORTER:  I'm sorry?

8         THE WITNESS:  I wasn't listening or going

9  to school, and they took me away from my mom and

10  put me in a place, a home.

11  BY MR. CATANIA:

12     Q.  Where was that home?

13     A.  In Wisconsin, Dousman, Wisconsin.

14     Q.  When was that?

15     A.  Back in '92, '93.

16     Q.  Okay.  Were you ever adjudicated to be a

17  delinquent back in '92 or '93?

18     A.  Yes.

19     Q.  And is that the reason why they ordered

20  you to be placed in a home in Wisconsin?

21     A.  Yes.

22     Q.  Okay.  How did it make you feel to be away

23  from your family during that time?

24     A.  Miserable.

25

1       Q.   Were there any good things that came out

2    of that, being placed in Wisconsin?

3       A.   Yes.

4       Q.   What was good?

5       A.   I straightened my act up.

6       Q.   I'm sorry?

7       A.   I straightened my act up.

8       Q.   For awhile, hah?

9       A.   For awhile.

10      Q.   Other than working as a drug dealer, did

11   you have any other work history?

12      A.   No, sir.

13      Q.   How do you support yourself now?

14      A.   I don't really.

15      Q.   Okay.  I take it by that, you mean that

16   you live on gifts given by your family members,

17   right?

18      A.   Right.

19      Q.   They provide you money and a roof?

20      A.   Right.

21      Q.   You're not on disability?

22      A.   No, sir.

23      Q.   Have you ever had -- have you ever

24   attempted to become identified as a disabled

26

1    person?

2        A.  I tried, but they denied me.

3        Q.  What was the disability that you were --

4        A.  My heart problem and I have Hepatitis C.

5        Q.  The Hep C, was that as a result of

6    injection drug use?

7        A.  Yes, it was.

8        Q.  When you were injecting drugs, was that

9    heroin?

10       A.  Yes.

11       Q.  Are you using heroin at the present time?

12       A.  No, sir.

13       Q.  Are you using any other street drugs at

14   the present time?

15       A.  No, sir.

16       Q.  Have you ever tried to get a legitimate

17   job?

18       A.  Yes, I have.

19       Q.  What type of job did you try to get?

20       A.  I try for any job really, and everyone

21   denies me.

22       Q.  And why is that?

23       A.  Because of my health.  I have seizures and

24   stuff.

27

1    Q.   Does not having a source of income ever

2    cause you any stress?

3    A.   Yes.

4    Q.   Have you ever been homeless?

5    A.   No, sir.

6    Q.   Ever on Public Aid?

7    A.   No, sir.

8    Q.   According to the records as well as your

9    interrogatory answers, we're talking about an

10   intake into the Cook County jail in December

11   of 2007.  Do you recall that?

12   A.   Yes, sir.

13   Q.   Okay.  Since you were released from the

14   Cook County jail in '07, have you attempted to get

15   any jobs?

16   A.   Yes, I have.

17   Q.   Have you sought any assistance in getting

18   jobs?

19   A.   Are you talking about, like, assistance,

20   like a place to give me a job or something?

21   Q.   Yes?

22   A.   No.

23   Q.   For example, you've been on the West Side

24   a few times.  Have you ever gone to Danny Davis's

28

1    office --

2        A.  No, sir.

3        Q.  Okay.  Do you have any other interests

4    besides the things you've already talked about?

5        A.  No, sir.

6        Q.  In regards to your own future, what is it

7    that you hope for?

8        A.  I hope to get a job and start life the

9    right way.

10       Q.  Do you have any kind of plan as to how

11   you're going to accomplish that?

12       A.  Not really.

13       Q.  How does that make you feel?

14       A.  It makes me feel like I ain't worth -- I'm

15   worthless.  I can't find a job and stuff.  It's all

16   of my own fault, though; I should have stayed in

17   school.

18       Q.  Have you thought about going back to

19   school?

20       A.  Yes, but I give up too easy because I have

21   a learning disability.  And I tried a couple times,

22   and I did not succeed on getting my GED.

23       Q.  And who is it that told you that you have

24   a learning disability?

29

1    A.  Several doctors.

2    Q.  Any recent doctors?

3    A.  No.  I ain't been diagnosed in a long

4    time.

5    Q.  Was it when you were a child?

6    A.  Yes, sir.

7    Q.  Were you given any medication as a child?

8    A.  Yes.

9    Q.  What kind?

10   A.  Ritalin, Lexapro.

11   Q.  And how did those work on you?

12   A.  It worked.

13   Q.  Did it work to even out your moods?

14   A.  Yes.

15   Q.  Any serious illnesses as a child?

16   A.  No, sir.

17   Q.  Any serious illnesses as an adult?

18       MR. MORRISSEY:  Other than his heart

19   problem?

20       MR. CATANIA:  That's why I'm asking him

21   the questions.

22       THE WITNESS:  That's the only thing, right

23   there, is the heart problem.

24   BY MR. CATANIA:

30

1    Q.   Okay.  Any serious illnesses as an adult?

2    A.   That's the only thing, is the heart.

3    Q.   Okay.  When did you have that heart

4  problem?

5    A.   2006 of April.

6    Q.   Can you tell me all the things that you

7  looked at in preparation for today's deposition?

8    A.   Really nothing.

9    Q.   Did you look at the medical records?

10    A.   No.

11    Q.   Did you look at any other records today?

12    A.   No, sir.

13    Q.   Were any of those records read to you in

14  the public space outside?

15    A.   Yes, by my attorney.

16    Q.   Were you led to believe that if it's read

17  to you, then you can honestly answer you didn't

18  look at any documents?

19    A.   I did not look at no documents.

20    Q.   Okay.  Who was the doctor that diagnosed

21  you as having heart problems?

22    A.   Dr. Thomas James at Gottlieb Hospital.

23    Q.   When did he diagnose that?

24    A.   In April of 2006, but I'm not sure what

31

1    day it was.

2         To be honest with you, I don't know what

3    day I had my heart surgery.

4         Q.  You don't know?

5         A.  No.  I was so under, they had me so under,

6    I don't remember.

7         Q.  All right.  Do you remember who was your

8    surgeon?

9         A.  Yes.

10        Q.  Who was the surgeon?

11        A.  Brescopp.

12        Q.  Could you spell that?

13        A.  I don't know how to spell it, Brescopp.

14        Q.  And where is that doctor affiliated?

15        A.  Gottlieb Hospital.

16        Q.  Okay.  I'm going to show you what we're

17   going to mark as Exhibit 1.

18             (Whereupon, Sanders Deposition

19              Exhibit No. 1 was marked for

20              identification.)

21   BY MR. CATANIA:

22        Q.  Showing you what's been marked Exhibit 1

23   for identification, -- he has his own copy; in

24   fact, he has more than one copy --  can you page

32

1    through and tell me how many pages you have in

2    front of you

3    A.  (Indicating) 1, 2, 3, 4.  4.  I'm sorry.

4    Q.  It's four pages?

5    A.  Yes.

6    Q.  On the last page of the four pages, is

7    that your signature?

8    A.  Yes.

9    Q.  And the date that's on it, I think it says

10    3/14 of 2011, right?

11    A.  Yes.

12    Q.  When were you first asked to answer

13    interrogatories in this case?

14    A.  Oh, this one (indicating)?

15    Q.  Yes.

16    A.  14.

17    Q.  On that day?

18    A.  Yes.

19    Q.  Okay.  What did you do to prepare to

20    answer the interrogatories that are on these four

21    pages?

22    A.  My attorney asked me what happened, and I

23    explained to him what happened and --.

24    Q.  And your attorney asked you the questions

33

1    that are contained in the interrogatories?

2        A.   Yes.

3        Q.   And you answered, right?

4        A.   Correct.

5        Q.   Okay.  In the first question on Page 1, I

6    ask you to identify all persons, including parties,

7    who have knowledge of the facts that happened in

8    this case?

9        A.   Right.

10       Q.   And if they're incarcerated, to include

11   their inmate number and the name of the

12   institution.

13       A.   Nobody's incarcerated.

14       Q.   You don't know anybody that was there at

15   the time that you were incarcerated?

16       A.   No, sir.

17       Q.   Okay.  Do you know the names of any of the

18   jail people that were there?

19       A.   No, sir.

20       Q.   If you saw any of the jail people that

21   were there at the time, would you recognize them

22   today?

23       A.   To be honest, no.

24       Q.   You say in answer to Paragraph 1, "My

34

1    uncle, Daniel P. Dorgan, 3102 North 77th Court,

2    Elmwood Park, Illinois 60707-1003 was present when

3    I was arrested.  He came to court and he saw me

4    when I was released"?

5        A.  Yes.

6        Q.  Okay.  What arrest are you referring to in

7    that answer?

8        A.  The retail theft.  They picked me up on a

9    warrant.

10       Q.  So you understood that it was a retail

11   theft warrant?

12       A.  Yes.

13       Q.  That you're talking about?

14       A.  Well, actually, it was really a violation

15   of probation warrant, but I was on probation for

16   the retail theft.

17       Q.  Okay.  So you have a good understanding of

18   what the reason for your arrest was?

19       A.  Yes.

20       Q.  And you're saying that your uncle, Daniel

21   Dorgan, was present when you were arrested?

22       A.  Yes, he was.

23       Q.  Where?  Where was that?

24       A.  In North Chicago.  A Mack 2 truck backed

35

1    into him.  The guy wouldn't give him his license or

2    insurance card.  So the cops were called.  I had to

3    show my ID knowing -- I did not know I had a

4    warrant because I had 29 months, 29 days, 1 day of

5    probation left, and the guy violated me.

6         No sheriffs came to the house.

7         So I got arrested.  And that's -- my uncle

8    brought all my pills to the police station.  The

9    police took me to Lake County.  I was in Lake

10   County.  I had my pills.

11        Q.  Okay.  You were in North Chicago police

12   station?

13        A.  Right.

14        Q.  Okay.  And do you remember when that was?

15        A.  No.  It was on the 18th I was in the

16   County.  So it had to have been on the 15th.

17        Q.  On the 15th?

18        A.  Right.

19        Q.  Okay.  And that's 12/15 of 2007, right?

20        A.  Right.

21        Q.  Okay.  Which court did your uncle see you

22   in?

23        A.  He didn't see me in no court.

24        Q.  Okay.  Well, this says, "He came to court

36

1    and he saw me when I was released."

2        A.   No.

3        Q.   Which court is that referring to?

4        A.   No.  He was in court at Cook County.

5            When I got released, he was there, when I

6    got released.  He's the one that picked me up.

7        Q.   All right.  Was he in court before he came

8    to pick you up?

9        A.   The day I got discharged?

10       Q.   No.  Any other day?

11       A.   He was in court all three days.

12       Q.   Okay.  In Paragraph 2 I ask you to state

13   whether you or anyone acting on your behalf has any

14   statements, including any oral statements, about

15   the facts concerning the incidents you complain

16   about.  And your answer to that question is no.

17           Nobody has given you any statements about

18   the incidents in question?

19       A.   I don't understand.

20       Q.   Nobody has given you any description of

21   the incidents?

22       A.   No.

23       Q.   Okay.  In Paragraph 3 I ask you to

24   describe your history of mental health problems,

37

1    drug dependency, or treatment beginning the first

2    time you experienced such conditions.

3         I don't see anything here about your drug

4    dependency or treatment.

5         Have you ever been treated for drug

6    dependency?

7    A.   No.  I went myself cold turkey.

8         THE COURT REPORTER:  I'm sorry?

9         THE WITNESS:  I cold turkeyed myself.

10   BY MR. CATANIA:

11   Q.   When did you do that?

12   A.   It will be six months tomorrow.

13   Q.   Is that the first time you have attempted

14   to cold turkey?

15   A.   That will be my third time.

16   Q.   And the two other times that you

17   attempted, when were those?

18   A.   Last year some time.  But this is the

19   first time that I've actually stuck to it.

20   Q.   Okay.  In the answer to No. 3, you respond

21   that in April of 2006, you had a mitral valve

22   replaced in your heart?

23   A.   Yes, mitral valve, yes.

24   Q.   And when you say that it was replaced, do

38

1    you mean that you had open heart surgery?

2        A.  Yes, sir.

3        Q.  So they opened your chest cavity

4    completely open?

5        A.  Yes, sir, and put a pig valve.

6        Q.  Okay.  They didn't repair, but they

7    replaced?

8        A.  Replaced.

9        Q.  And the physician that did that is the

10   this Dr. Brescopp?

11       A.  Yes.

12       Q.  Have you ever seen that doctor since?

13       A.  No, sir.

14       Q.  Did that doctor prescribe any medication

15   for you after you were discharged from the

16   hospital?

17       A.  After my heart surgery, yes.

18       Q.  Dr. Brescopp did?

19       A.  He -- I believe so.  He was the one that

20   recommended Amiodarone, the heart pill.  I'm

21   assuming he did, because, you know, he's a heart

22   doctor, so.

23       Q.  I don't want you to assume.  And that's

24   probably something your lawyer instructed you.  But

39

1    if you know, then just simply say you know.  If you

2    don't know, it's perfectly acceptable to say that

3    you don't.

4        A.   I really don't know.

5        Q.   Okay.  The next line in your answer to

6    Paragraph 3 is that, "These meds had been

7    prescribed for me by Dr. Thomas James at Gottlieb

8    in Melrose Park"?

9        A.   Right.

10       Q.   Okay.  It says -- you told me earlier that

11   your uncle went to get your medication and brought

12   it to the North Chicago police station?

13       A.   Yes.

14       Q.   How do you know that?

15       A.   Because I seen him bring it.  When they

16   was putting me in the police car, my uncle just

17   pulled up and told the police officers, "Will you

18   wait a minute" and walked up to the police officer

19   and gave him the pills.  And the next --

20       Q.   Was that on the street?

21       A.   No.  It was behind the police station.

22       Q.   At the police station?

23       A.   Yes.

24       Q.   Okay.  Where did he get your medicines

40

1    from?

2        A.  He drove all the way to Elmwood Park,

3    where I was living, and got them from there.

4        Q.   In the time that it took for you to be

5    taken from the side of the road to the North

6    Chicago police station, he had driven back to

7    Elmwood Park?

8        A.  Yes.  I was in there practically about

9    four hours, inside a cell.

10       Q.  In North Chicago?

11       A.  Yes.

12       Q.  Before you went into the cell, had you

13   been processed on the arrest?

14       A.  Yes.

15       Q.  Did they take your fingerprints?

16       A.  Yes.

17       Q.  And your photograph?

18       A.  Picture, yes.

19       Q.  And they also asked you questions before

20   placing you in a lockup?

21       A.  Yes.

22       Q.  Questions about your background, like your

23   address, things like that?

24       A.  Right.

41

1    Q.   Questions about your health?

2    A.   Yes.

3    Q.   Okay.

4    A.   And they had me in a supervision cell,

5    close-watched cell.

6    Q.   Okay.  How many cells do they have in

7    North Chicago?

8    A.   About four rows, about a gallery

9    (indicating).

10    Q.   Okay.  From being in that cell for four

11    hours, were you taken someplace else?

12    A.   I was taken to Lake County.

13    Q.   And that's in Mundelein?  I'm sorry, in

14    Waukegan?

15    A.   Yes.

16    Q.   Okay.  So you went to the main Sheriff's

17    police department in --

18    A.   Right.

19    Q.   What street is that on, do you know?

20    A.   I don't recall.  I don't know.

21    Q.   Is that a Martin Luther King Drive, 25

22    South Martin Luther King Drive?

23    A.   Yes, it is.

24    Q.   Okay.

42

1    A.  Yes.  When you said that, it refreshed my

2    memory.

3        Q.  You didn't see your uncle at the police

4    station in Waukegan, did you?

5        A.  No.

6        Q.  The Sheriff's police station?

7        A.  No.

8        Q.  And you were held in that lockup at the --

9        A.  Yes, I was held in a cell.

10       Q.  Okay.

11       A.  And spent the night in a cell.  And then

12   they sent me upstairs because I had a County, a

13   Cook County warrant.

14       Q.  Okay.  So you went to a judge in Lake

15   County about that, right?

16       A.  No.  I went to Maywood.

17       Q.  Okay.  You didn't see a judge first in

18   Lake County before going to Maywood?

19       A.  No, no.

20       Q.  So they just brought you to Maywood to

21   have you step in front of a judge there?

22       A.  Right.

23       Q.  Okay.  When was that?

24       A.  The 18th.

43

1      Q.   Okay.  So on 12/18, the same day that you

2   were admitted to the Cook County jail, is when you

3   went before a judge in Maywood?

4      A.   Yes.

5      Q.   When you went before the judge in Maywood,

6   do you remember if that was at the Maywood

7   courthouse?

8      A.   Yes, it was.

9      Q.   Okay.  Do you remember the judge's name?

10     A.   No.

11     Q.   Was it a male or female judge?

12     A.   Male.

13     Q.   Had you ever been to that courthouse

14   before?

15     A.   Yes, I was.

16     Q.   And that hearing, it was a bond hearing,

17   wasn't it?

18     A.   Right.

19     Q.   And that judge had some of your paperwork

20   at the time that you had that hearing, right?

21     A.   Right.

22     Q.   And that judge had a face-to-face bond

23   hearing with you, didn't he?

24     A.   Right.

44

1    Q.  Okay.  Did you have a lawyer?

2    A.  No, sir.

3    Q.  Did you have a Public Defender?

4    A.  Yes, sir.

5    Q.  Okay.  You know Public Defenders are

6  lawyers, right?

7    A.  No idea.

8    Q.  All right.

9    A.  They gave me no bond.

10    Q.  And from that courtroom, did the judge

11  order you to be held in custody?

12    A.  Yes.

13    Q.  Did you have an opportunity at that court

14  hearing to tell your Public Defender anything about

15  yourself?

16    A.  No.

17    Q.  Did you tell the judge anything about

18  yourself?

19    A.  No.

20    Q.  Did you try to?

21    A.  No.

22    Q.  When you were in the custody of the

23  Sheriff's police, did you try to tell them anything

24  about yourself?

45

1    A.  Yes.

2    Q.  What did you tell them?

3    A.  That I have heart problems.  So they put

4  me in the same thing, a close-watched cell, so they

5  keep an eye on me so nothing happens.

6    Q.  Okay.  When you left the Sheriff in Lake

7  County, the custody of the Sheriff in Lake County,

8  how were you transported?

9    A.  A van.

10    Q.  And that was all the way to Maywood?

11    A.  Yes.

12    Q.  Was it the Cook County Sheriff's police

13  van?

14    A.  Yes.

15    Q.  Anybody else in the van with you?

16    A.  Two other people.

17    Q.  Were they two other prisoners?

18    A.  Yes.

19    Q.  Did they also have warrants to your

20  knowledge?

21    A.  Yes.

22    Q.  Did you talk to them?

23    A.  No.

24    Q.  Did you see the officers that were

46

1    transporting you?

2        A.   Yes.

3        Q.   Did you know any of the officers that were

4    transporting you?

5        A.   No.

6        Q.   Did you have a conversation with any of

7    those officers transporting you?

8        A.   Well, the lady I did because she asked me,

9    "Are these your heart pills" at Lake County before

10   I left Maywood.  And I was like, "Yes."

11       Q.   Okay.

12       A.   And she was like, "Did they give you any?"

13   I was like, "No."  And that's when she gave me

14   them, because she had the same problem, a leaky

15   valve, and she took the same medication.  So she

16   knows how it feels when you don't have it.

17           So she gave it to me then.

18           But when I got to Cook County jail, they

19   didn't give me nothing.

20       Q.   Did your lawyers instruct you in

21   preparation for this deposition to only talk about

22   the things that you know?

23           MR. MORRISSEY:  I'm going to object to any

24   attorney/client conversations.

47

1   BY MR. CATANIA:

2     Q.  All right.  Well, let me ask you it this

3  way.  The female officer you're talking about,

4  you've never seen her before that date, right?

5     A.  No.

6     Q.  Have you seen her since that date?

7     A.  No.

8     Q.  You had a conversation with that officer

9  at the Lake County jail?

10    A.  Yes.

11    Q.  Okay.  Was that officer a Cook County

12  police officer?

13    A.  Cook County Sheriff, yes.

14    Q.  Was there a male and female?

15    A.  There was a female officer and a male

16  officer, yes.

17    Q.  When the female was speaking with you, was

18  that done in front of the male officer?

19    A.  Yes.

20    Q.  Were there any Lake County Sheriffs

21  present for the conversation?

22    A.  No.

23    Q.  All right.  And are you saying that you

24  did not have any of your medication before you saw

48

1    the Sheriff's police officer?

2       A.   Nope.

3       Q.   What are you saying?

4       A.   I didn't have no medication.  I didn't

5    have nothing.

6       Q.   You didn't have any medication before you

7    saw the Sheriff's police officer?

8       A.   No, I didn't.

9       Q.   Okay.  Did the Sheriff's police officer

10   give you medication?

11      A.   Yes, she did.

12      Q.   And it was your prescription medication?

13      A.   My prescription.

14      Q.   Which one?

15      A.   The heart pill.

16           All of them, actually, the heart, what is

17   it, Lexapro, Protonix, the Amiodarone, and

18   Metoprolol.

19      Q.   All right.  So the medications that are

20   listed in the answer to No. 3 are the ones that the

21   female Sheriff's police, Cook County Sheriff's

22   police officer gave you?

23      A.   Yes.

24      Q.   And that was on December 18th of 2007?

49

1      A.   Yes.

2      Q.   Okay.  All right.  Where did she get the

3   medication from?

4      A.   It was in my property.

5      Q.   Okay.  When you say "your property", do

6   you mean that it was in a property bag that the

7   Lake County Sheriff's police had prepared for you?

8      A.   Yes.

9      Q.   Okay.  Did she take that bag when she

10   transported you?

11      A.   Yes.

12      Q.   The Sheriff's police officer?

13      A.   Yes, she did.

14      Q.   After she gave you the medication, what

15   did you see her do with that bag?

16      A.   Put it right back in my property.

17      Q.   Was that bag sealed in your presence?

18      A.   Yes, it was.  She sealed it right in front

19   of me.

20      Q.   What did she use to seal it?

21      A.   Staples.  She stapled it across.

22      Q.   Did you have a receipt for your property

23   issued by the Lake County Sheriffs?

24      A.   No.

50

1     Q.  Did you get a receipt from the Cook County

2  Sheriff for your property?

3     A.  Yes.

4     Q.  Where is that receipt now?

5     A.  I don't know.  I have no idea.

6     Q.  When you left the Cook County jail, did

7  you get your property back?

8     A.  Yes.

9     Q.  The receipt that we're talking about, was

10  that issued from the Sheriff's police officer that

11  transported you or from the jail itself?

12     A.  From the jail itself.

13     Q.  Okay.  When you turned in your property at

14  the jail, was that at the property counter of the

15  receiving area?

16     A.  I did not turn it in.  They turned it in.

17     Q.  Okay.  The Sheriff's police officer turned

18  it in for you?

19     A.  Yes.

20     Q.  And you got a receipt from the property

21  counter?

22     A.  No.  She brought it to me.

23     Q.  Okay.  So when you got to the jail, your

24  property was inventoried and held by the Sheriff?

51

1    A.  Right.

2    Q.  Okay.  At that time when you got the

3    receipt from the female police officer, did you say

4    anything to her about your medicine?

5    A.  I said, "Is my medicine still in back?"

6    She's like, "Yes."

7    Q.  Who was present when you said that?

8    A.  Nobody.

9    Q.  Where did this happen?

10   A.  Inside the bullpen down in receiving.

11   Q.  Okay.  And you're saying it was the same

12   officer that transported you, right?

13   A.  Yes.

14   Q.  Did you ever come to know the name of that

15   officer?

16   A.  No, sir.

17   Q.  All right.  When you were answering

18   Paragraph 3, did anybody tell you to limit your

19   answer to December of '07 and the medications that

20   you were taking at that time?

21   A.  No.

22   Q.  Because it doesn't mention the name of

23   your surgeon in here, right?

24   A.  Right.

52

1    Q.   Do you have any other medical history

2   aside from what's listed in your response to

3   Paragraph 3?

4    A.   No.

5        MR. MORRISSEY:  Other than he's testified

6   before?

7        MR. CATANIA:  That's why I used the word

8   "other."  Thank you, Tom.

9        MR. MORRISSEY:  You're welcome.

10   BY MR. CATANIA:

11   Q.   Before you had this valve disease and

12   surgery, did you have any symptoms that led you to

13   believe that there was a problem?

14   A.   Yes.

15   Q.   What symptoms?

16   A.   I was weak.  I couldn't sleep at night.  I

17   was throwing up.  I could hardly breathe.  And I

18   was having severe chest pains.

19   Q.   Before that, when did you first start

20   having those symptoms?  Did you have that in April

21   of '06?

22   A.   Yes.

23   Q.   Okay.  Immediately before the surgery you

24   had them?

53

1      A.   Uh-huh.

2      Q.   You have to answer yes or no?

3      A.   Yes.  Sorry about that.

4      Q.   That's all right.

5           It is just difficult to tell on the record

6   whether it's uh-huh or huh-huh or what it is.

7      A.   Right.  Sorry about that.

8      Q.   Did you have any swelling of your ankles?

9      A.   Not that I remember.  No, I didn't.  I'm

10   sorry.

11      Q.   Did you ever have any heart palpitations?

12      A.   What's that mean?

13      Q.   Where your heart feels like it's speeding

14   up or slowing down or --

15      A.   It felt like it was slowing down.

16      Q.   Okay.  And you had those symptoms before

17   you had the surgery, right?

18      A.   Right.

19      Q.   After the surgery, did you have those same

20   symptoms?

21      A.   No.  Sometimes here and there I'll get

22   chest pains.

23      Q.   Okay.  Even now today?

24      A.   Yes, because of the tissue, the wound.

54

1    Like when the weather changes, I'll get little

2    chest pains.

3        Q.   Okay.  Is it attributable to the scarring

4    from the surgery itself or --

5        A.   Yes, it is from the scarring.

6        Q.   When's the last time you had chest pains

7    like you've just described?

8        A.   I really don't know.

9        Q.   Was it during this year, 2011, that you

10    had that sensation?

11        A.   Yes.

12        Q.   Have you gone back to any heart

13    specialists after the surgery?

14        A.   No, sir.

15        Q.   Did you tell the heart surgeon about your

16    use of street drugs?

17        A.   Yes.  They had me under for three days.

18        Q.   Have you ever had -- when you were trying

19    to get off of heroin, have you ever had withdrawal

20    symptoms?

21        A.   Yes, I have.

22        Q.   Do some of those symptoms include

23    vomiting?

24        A.   Yes.

55

1      Q.   Shortness of breath?

2      A.   Yes.

3      Q.   Weakness?

4      A.   Weakness, diarrhea.

5      Q.   When you were withdrawing from heroin, did

6   you ever feel like you were going to die?

7      A.   No, 'cause it's different.  Like, it's

8   like a different, like, body pain, like chest pains

9   and stuff.

10     Q.   I understand that.  I'm just talking about

11  your feeling?

12     A.   No, I've never felt like that.

13     Q.   Were you ever afraid that this might not

14  end, these withdrawal symptoms?

15     A.   Yes.

16     Q.   And you knew that there was a solution to

17  the withdrawal, and that was to use heroin, right?

18     A.   Right.

19     Q.   In Paragraph 4, which is on Page 3 of your

20  interrogatory answers, you were asked to describe

21  your physical symptoms and to give me the nature

22  and extent of each symptom and the length of time

23  you experienced it.

24        Your answer was you had severe chest

56

1    pains.

2         When did you have severe chest pains?

3         MR. MORRISSEY:  Do you understand the

4    question?  It relates to -- can you give him a

5    foundation as far as when?

6         MR. CATANIA:  The question has a

7    foundation in it.

8    BY MR. CATANIA:

9         Q.   It says, "When you were held in the Cook

10   County jail, please include the nature and extent

11   of each symptom and the length of time you

12   experienced each symptom."  Your answer was, "I had

13   severe chest pain."

14        So I want to know when you started to feel

15   severe chest pains?

16        A.   Like, when the night started coming around

17   and I didn't get my pill, that's when I started

18   having severe chest pains.  And I told the nurse,

19   "I'm having chest pains.  That I need to see a

20   doctor."  And she said, "We'll send you to Cermak."

21   And they never did.  And I told her, "I need my

22   medication," and they never gave it to me.

23        Q.   Okay.  We have to break that down a little

24   bit.  Okay?

57

1    A.   Okay.  That's the reason why I was having

2    chest pains, because I didn't have my medication.

3        Q.   You had your medication on December 18th,

4    the day that you went to jail?

5        A.   In the morning, right.

6        Q.   By the evening time, you had been

7    processed into the jail, right?

8        A.   Yes.

9        Q.   Okay.  Do you know when the processing

10   started for you?

11       A.   I don't know the time or nothing, no.

12       Q.   Did you know any of the officers that

13   first spoke to you when you got to the basement of

14   Division 5?

15       A.   No, sir.

16           MR. CATANIA:  Mark this Exhibit 2.

17               (Whereupon, Sanders Deposition

18                Exhibit No. 2 was marked for

19                identification.)

20   BY MR. CATANIA:

21       Q.   Okay.  I'm going to show you what's been

22   marked Exhibit 2 for identification.  It is two

23   pages.  Have you ever seen those two pages before?

24       A.   No, sir.

58

1     Q.  Look at the next page if you would.

2     A.  (Indicating)

3     Q.  Does that look familiar to you at all?

4     A.  No, sir.

5     Q.  Okay.  In December, on December 18th of

6  2007, when you entered into the Cook County

7  Department of Corrections on the VOP warrant for

8  your felony retail theft, the booking time that's

9  on the page here, which is on Page 2 of this

10  exhibit, and I'll point to it so you can see what

11  I'm talking about (indicating), it says "Book Time"

12  17:35 hours.  Do you recognize that to be

13  5:35 p.m.?

14     A.  To tell you the truth, I don't know what

15  time it was.

16     Q.  Okay.

17     A.  And there's no clocks out there.

18     Q.  All right.  Do you remember that the first

19  thing that happened when you went through

20  processing was that an officer did what's known as

21  rapid book, where he asks you if you've ever been

22  here to jail before and they assign you a number?

23     A.  Yes.

24     Q.  Okay.  According to this page, Officer

59

1    Peter Giunta signed on to the computer for the

2    processing and at 17:35 hours or 5:35 p.m., you

3    received your CIMIS number, your prisoner ID

4    number?

5        A.  Correct.

6        Q.  That's what that paper indicates.

7            Do you have any reason to think that Peter

8    Giunta or any other officer was inaccurate about

9    the time that it was printed out?

10       A.  No.

11       Q.  Okay.  On the center portion of the page,

12   it talks about emergency contacts.  Do you see

13   that?

14       A.  Yes.  Old contact.

15       Q.  And it says Spino, Nicole, right?

16       A.  That's an old contact there.

17       Q.  That's an old contact?

18       A.  Yes.

19       Q.  Okay.  And it also indicates the number of

20   children as one?

21       A.  One.

22       Q.  And that your physical condition was good,

23   do you see that?

24       A.  Yes.

60

1      Q.   Okay.  In December of 2007, did you still

2    have any conversation or any relationship at all

3    with Nicole Spino?

4      A.   No.

5      Q.   If you look at the first page, the book

6    date that's listed on the first page where it says

7    "Booked," it says December 18 of '07.  That

8    comports with your memory of it, right?

9      A.   Right.

10      Q.   All right.  If you look above that a half

11    an inch, it says discharged.  What's the discharge

12    date listed on there?

13      A.   20.

14      Q.   December 20 of '07?

15      A.   That's what it says.

16      Q.   Okay.  Does that comport with your memory

17    of the events?

18      A.   I could have swore it was the 21st I got

19    discharged.  It had to have been the 21st.  I was

20    in there three days.

21         MR. MORRISSEY:  Do you want to take a

22    moment?

23         THE WITNESS:  Yes.

24

61

1          (Whereupon, a short break was

2          taken.)

3    BY MR. CATANIA:

4      Q.   In Paragraph 5 of the first exhibit, the

5    question asks you to describe the evidence you have

6    in your possession, including documents, that

7    supports your claim that you had a serious medical

8    need for psychotropic medication, or for

9    medication, it shouldn't say psychotropic, and that

10   the defendants were deliberately indifferent to

11   those serious medical needs.  And the answer was

12   that you have no evidence.  Yet it says,

13   "Investigation continues.

14         Which is it?  Do you have any documents

15   that supports your serious medical needs?

16     A.   Records.

17     Q.   Records?

18     A.   I can get them from the doctor.

19     Q.   Okay.  Do you have any at home?

20     A.   I will have to look.

21     Q.   Were you ever asked to look back in --

22     A.   I was never --

23     Q.   Back on March 14th?

24     A.   I was never told.  If I was, I would have

62

1    brought them.

2        Q.   Okay.  Now that we are three months into

3    your continuing investigation, have you found any

4    records that might support the aspect of your case

5    that says you had a serious medical need at the

6    time you entered the jail?

7        A.   No.

8        Q.   Do you think you had more than one serious

9    medical need when you entered the jail on

10   December 18th of '07?

11       A.   I don't understand.

12       Q.   Well, besides having heart trouble?

13       A.   No.  That was the only thing I had, was

14   the heart trouble.

15       Q.   Well, weren't you also using heroin at the

16   time?

17       A.   Yes.

18       Q.   And so you were likely to have heroin

19   withdrawal symptoms, right?

20       A.   They gave me something for that.

21       Q.   Okay.

22       A.   Which shows in the paper.

23           But that's the only thing they gave me.  I

24   said I really don't need it.

63

1          I was more interested in my heart pills

2     and my medication for my heart than in drug pills,

3     you know, for drug withdrawal.

4        Q.   Right.  Do you think that by telling them

5     that you were using heroin, that the jail personnel

6     would have had some reason to think that it was

7     appropriate to give you the antinausea medication

8     and the belladonna alkaloids and things like that?

9          MR. MORRISSEY:  Wait.  I don't

10    understand --

11         THE WITNESS:  I don't understand.

12         MR. MORRISSEY:  Do you understand the

13    question?

14         THE WITNESS:  I don't understand.

15         MR. MORRISSEY:  Could you repeat or

16    simplify your question?

17         THE WITNESS:  I really don't understand.

18    BY MR. CATANIA:

19        Q.   Sure.

20         MR. CATANIA:  I believe that's called an

21    objection as to form.

22         MR. MORRISSEY:  Well, it's -- the question

23    isn't understandable.  So if you could rephrase it

24    so that the witness can understand it, we would

64

1    appreciate it.

2    BY MR. CATANIA:

3        Q.   All right.  Did you understand my

4    question?

5        A.   No, I really didn't.

6        Q.   Do you understand that when you entered

7    into the jail, the records show that you informed

8    personnel that you had used heroin?

9        A.   Yes, I did tell them.  When they asked me,

10   I did tell them of my use of heroin.

11       Q.   Do you think that following your

12   examination after you admitted that you used

13   heroin, their response, which was to order

14   medication for you, was appropriate based on what

15   you told them about using heroin?

16       A.   It was, yes.  It was nice of them, yes.

17       Q.   Okay.  Paragraph No. 6 of the

18   interrogatory answers asks for your sources of

19   income to be itemized.

20            On the date that you entered into the

21   jail, what were your sources of income?

22       A.   None.

23       Q.   Okay.  I understand that your answer is,

24   "None.  I was not employed at the time"?

65

1      A.  I was not employed at the time.

2      Q.  I understand that to be your answer.  But

3   it's also true that nobody can survive on air.  Do

4   you understand what I'm saying?

5      A.  I understand that, yes.

6      Q.  Okay.  So how were you supporting yourself

7   or being supported at the time that you were

8   arrested in December of '07?

9      A.  My uncle was supporting me.

10     Q.  Paragraph No. 8 asks if you have any

11  dependents.  "State the names and addresses and the

12  dates of birth and relationship of persons who are

13  dependent on you for financial support."

14         I believe you said earlier that you have a

15  son, but you don't provide any support, right?

16     A.  Right.

17     Q.  Okay.  Have you wanted to provide support?

18     A.  I do, but I have nothing to give him.

19     Q.  Okay.  Paragraph 7 -- sorry to bring you

20  back one, but Paragraph 7 asks you to list your

21  expenses or losses that are claimed as a result of

22  the acts or omissions of the defendant.  And your

23  response is that you went through three days of

24  hell because you were denied access to your

66

1      medication?

2          A.  Right.

3          Q.  Do you think perhaps that it was two days

4      of hell based on the records?

5          A.  Yes.

6          Q.  Okay.  And when you say you were denied

7      access, do you mean because the medication that you

8      had in your property was still in the property?

9          A.  Yes.

10         Q.  And that's what you mean by "denied

11     access"?

12         A.  Yes.

13         Q.  Okay.  Are you aware of any -- well, do

14     you have any background in corrections, running a

15     jail?

16         A.  No.

17         Q.  Have you done any studying about the rules

18     that are imposed upon correctional facilities?

19         A.  No.

20             But if it was recommended from a judge to

21     go in my property and get my pills and they still

22     didn't do it, what can I say.

23         Q.  Which judge was that?

24         A.  Judge Feinerman.

67

1      Q.   Are you talking about the judge in this

2  case?

3      A.   Yes.

4      Q.   This judge has not made any

5  recommendations to any parties.

6      A.   Whatever judge was up there that day?

7      Q.   Okay.  You're talking about when you were

8  presented on the warrant, right?

9      A.   Right.

10      Q.   You say that there was a judge in Maywood

11  that --

12      A.   No, in Cook County, because my uncle was

13  there.

14      Q.   Okay.

15      A.   And he said, my uncle told me that the

16  judge told them to go in my property and get my

17  pills.

18      Q.   Okay.  Now, what you've just said to me

19  was that your uncle told you that somebody else

20  told him, right?  Do you understand what that is?

21      A.   I understand what you're saying.

22           What I said is my uncle, when I came out,

23  told me that he heard the judge tell them, the

24  Sheriff, to call Division, to call the property --

68

1    whoever, I don't know, it's probably their -- to

2    call Cermak and tell them to call property to get

3    my pills.

4        Q.   All right.  I'm going to move to strike

5    the answer because it's not responsive.

6            The answer that you just gave is based on

7    hearsay; do you understand that?

8        A.   I understand, yes.

9        Q.   All right.  In Paragraph 7 you say that

10   you believe the jury would award you $50,000 per

11   day for you distress and physical injury, right?

12       A.   Yes.

13       Q.   What injury are you talking about?

14       A.   The suffering.

15       Q.   Okay.  So the distress and the injury are

16   really one thing, right?

17       A.   Yes.

18       Q.   So $50,000 per day means that you're

19   looking for a jury to give you a hundred thousand

20   dollars for the two days, right?

21       A.   Yes.

22       Q.   Is that included in the answer to No. 9,

23   which asks for physical injury, pain and suffering,

24   and emotional distress, $150,000?

69

1    A.  Yes.

2    Q.  Okay.  The answer to No. 9 refers to, for

3    you to itemize each element of damages and the

4    dollar amount assigned to each.

5        Okay.  So you say that all of those things

6    together are $150,000?

7    A.  Yes.

8    Q.  Okay.  Which would be reduced to a hundred

9    thousand dollars because it's two days, right?

10   A.  Correct.

11       MR. MORRISSEY:  Well, I'm going to object.

12   He came in on the 18th, the 19th, and if he got

13   discharged on the 20th, we're talking three days.

14   BY MR. CATANIA:

15   Q.  Paragraph 9 asks you to state the manner

16   in which you came up with the damages estimate.

17   Are you able to do that?

18   A.  What, estimate --

19   Q.  How did you come up with that estimate?

20   A.  I didn't come up with it.

21   Q.  Okay.  That was recommended to you?

22   A.  I was asked do I want to sue for that much

23   a day, and I said yes.

24   Q.  Okay.  So it's not based on how much you

70

1   would have made on those two days in terms of

2   income, right?

3       MR. MORRISSEY:  Well, we have the 18th,

4   19th, and 20th.

5       MR. CATANIA:  All right.  I presume that

6   was an objection as to form?

7       MR. MORRISSEY:  Well, you're saying two

8   days.  The records state that he was in custody of

9   the Sheriff for three days.

10      MR. CATANIA:  Yes.  But the deponent, Mr.

11   Morrissey, has stated that he received his

12   medication on the 18th.

13      MR. MORRISSEY:  He did, but he didn't

14   receive it --

15      THE WITNESS:  I received my morning

16   medication at Lake County, but I did not receive my

17   night medication and so forth at all at Cook

18   County.

19   BY MR. CATANIA:

20    Q.  I presume that that was the purpose for

21   the break, so we could talk about that.

22      All right.  Sir, when you received your

23   medication in Lake County, it was administered by

24   the Sheriff of Cook County, right?

71

1 A. Right.

2 Q. Okay.  Has any doctor told you that your

3 time without your medication has caused you any

4 physical harm?

5 A. If I don't take it.

6 Q. Those two days?

7 No, no.  Has any doctor told you that

8 those two days without your medication for your

9 heart caused you any physical harm?

10 MR. MORRISSEY:  I'm going to object,

11 because you keep saying two days, and the witness

12 has said that he was in custody --

13 THE WITNESS:  I don't understand.  Would

14 she --

15 MR. CATANIA:  All right.  Mr. Morrissey,

16 please, just say form.  Okay.  We have a

17 disagreement about the concept of a day without

18 medication.  That's pretty well established.

19 BY MR. CATANIA:

20 Q. My question to the deponent is only, has

21 any doctor ever told you that those two or three

22 specific days without your medication has caused

23 any physical harm?

24 A. It can, yes, it can.

72

1     Q.  No.  You're not understanding my question.

2         Has anyone told you that it did cause

3     harm?

4         MR. MORRISSEY:  Well, let him explain.

5         Would you explain?

6         THE WITNESS:  If it did cause harm for

7     those two days?

8     BY MR. CATANIA:

9     Q.  Yes.

10    A.  Yes.  I was having chest pains.

11    Q.  No, no.  Did any doctor say that it caused

12    you harm?

13    A.  To my body, no.

14        I understand what you're trying to say.

15    Q.  On December 18th, all day on December 18th

16    of 2007 did you suffer any shortness of breath?

17    A.  Yes.

18    Q.  Did you suffer any fatigue?

19    A.  What's fatigue?

20    Q.  Tired?

21    A.  Yes.

22    Q.  Did you suffer any swelling of your

23    ankles?

24    A.  No, sir.

73

1      Q.   Heart palpations?

2      A.   Heart chest pains, you mean?

3      Q.   No, heart palpations, speeding up?

4      A.   No.  It was slowing down.  It was slowing

5   down.

6      Q.   Skipping beats?

7      A.   Yes.

8      Q.   All right.  When on the 18th of December

9   of 2007 did you have those symptoms?

10      A.   From the 18th until the 20th I had those

11   symptoms and I was complaining.

12      Q.   You were complaining and complaining,

13   right?

14      A.   Yes.

15      Q.   On December 18th were you shy about

16   telling any medics about your medication?

17      A.   No, no.

18      Q.   Were you embarrassed by it?

19      A.   No.

20      Q.   Did the conditions of the jail enter into

21   your decision to talk to medics at all?

22      A.   They said they would, but I don't know if

23   they did.  The Sheriff said, "I'll talk with a

24   nurse" about what I told him, or tell a nurse.

74

1        I don't know if he did, because they never

2    came to me and gave me my pills.  And when the

3    nurse came for medication for other inmates, I

4    would tell her.  She'd just say, "Go to Cermak.

5    Cermak got them."

6        Q.   What medication were you taking in

7    December of '07?

8        A.   The Protonix, the Lexapro, the Amiodarone,

9    the Metoprolol.

10       Q.   Okay.

11       A.   That's the medication I was taking.

12       Q.   Who prescribed the Lexapro?

13       A.   Dr. Thomas James, my doctor.

14       Q.   And why do you take Lexapro?

15       A.   At the time I don't remember why I was

16   taking it.  I know I was taking blood pressure, a

17   heart pill, and I forgot what the other one was

18   for.

19       Q.   When was Lexapro first prescribed by Dr.

20   James?

21       A.   The day I got out of the hospital.  And

22   that was 90 out of 100 days.  So, that was in July.

23       Q.   Okay.  Were you using heroin during 2006?

24       A.   Yes.

75

1      Q.  Were you using heroin during 2007?

2      A.  Yes.

3      Q.  2008?

4      A.  Yes.

5      Q.  2009?

6      A.  Yes.

7      Q.  2010?

8      A.  Yes.

9      Q.  Did any doctor ever tell you that you

10    should combine Lexapro with heroin?

11     A.  No.

12     Q.  Protonix, why do you take that?

13     A.  I don't remember what it's for.

14     Q.  When was it first prescribed?

15     A.  All these were prescribed the day I got

16    out of the hospital.

17     Q.  Okay.  All right.  And that was Gottlieb?

18     A.  Right.

19     Q.  Well, Protonix is designed for excess

20    stomach acid.  Did anyone ever tell you that that's

21    why you were taking it?

22     A.  I didn't know what they were for.

23     Q.  Did any doctor ever tell you to combine

24    Protonix with heroin?

76

1      A.   No.

2      Q.   Another medication that you said in your

3   interrogatory answers you were taking is

4   Amiodarone?

5      A.   (Nodding)

6      Q.   Do you know what that's for?

7      A.   I don't know.  I think it's for my heart.

8      Q.   Okay.  And you say that was also

9   prescribed for you the first time when you got out

10   of the hospital?

11      A.   Right, all these meds, yes.

12      Q.   Was any other heart medication ever

13   prescribed for you before that?

14      A.   In the hospital, but I don't remember what

15   the names of them are.

16      Q.   All right.  Did any doctor ever tell you

17   that it was for life-threatening heart conditions?

18      A.   No.

19      Q.   Has any doctor ever told you that it could

20   take up to several months for this particular

21   medicine to clear out of your body?

22      A.   No, no doctor told me that.

23      Q.   Did any doctor ever tell you to combine

24   the Amiodarone with heroin?

77

1      A.  No.

2      Q.  Another medicine you indicated that you

3  were taking is Metoprolol, M-e-t-o-p-r-o-l-o-l,

4  which I think is spelled with a "z" in the

5  interrogatory answers.  What do you take that more?

6      A.  I think that was the blood pressure.

7      Q.  Did any doctor ever tell you that you

8  ought to improve your diet and to exercise also

9  while taking that medication?

10     A.  Yes.

11     Q.  Did you do that?

12     A.  Somewhat, yes.

13     Q.  Did any doctor ever tell you that you

14  should combine this Metoprolol with heroin?

15     A.  No.

16     Q.  Dr. Thomas James is your general

17  physician, right?

18     A.  Yes.

19     Q.  And he is a family practice doctor?

20     A.  Right.

21     Q.  When you were arrested in December of '07,

22  do you remember what day of the week it was?

23     A.  No.

24     Q.  Okay.  And you said before that it was for

78

1    a violation of probation for a felony retail theft

2    probation that you were on, right?

3        A.  Right.

4        Q.   And I believe that you said that it was a

5    female officer that picked you up from Lake County

6    along with a male officer, right?

7        A.  Cook County Sheriffs, yes.

8        Q.   Two officers from the Cook County

9    Sheriff's?

10       A.  Yes.

11       Q.   Okay.  When you say that Daniel Dorgan was

12   present in your interrogatory answers, were you

13   talking about the day that the Sheriff picked you

14   up from Cook County?

15       A.  Not that day, the next day in court.

16       Q.  Okay.

17       A.  No, the same -- sorry.  The same day when

18   they took me from Lake County to Maywood he was

19   present in bond court.

20       Q.  In Maywood?

21       A.  Right.

22       Q.  But he wasn't in Lake County?

23       A.  No.

24       Q.   Do you remember what courtroom it was that

79

1    you were in in Maywood?

2        A.   107 I think it is.

3        Q.   Were you the only person transported from

4    Lake County to that courtroom that day?

5        A.   There was two other inmates.

6        Q.   To that courtroom?

7            MR. MORRISSEY:  If you know.  Don't guess.

8            THE WITNESS:  Where?  The Maywood

9    courtroom?  Yes, there was two other inmates

10   BY MR. CATANIA:

11       Q.   Two other inmates in the Maywood

12   courtroom?

13       A.   Right.

14       Q.   Okay.

15       A.   In the bullpen with me going into bond

16   court.

17       Q.   Did you have any conversations with those

18   two inmates?

19       A.   No.

20       Q.   Do you remember them?

21       A.   No.

22       Q.   Did you get their names?

23       A.   No.

24       Q.   Did you tell any of the court personnel

80

1    about your medication while you were there?

2        A.  I told the Sheriffs that.

3        Q.  Which Sheriffs?

4        A.  Cook County.

5        Q.  Okay.  And that was after you had already

6    received your morning medication, right?

7        A.  Right.

8        Q.  And your bond hearing was in the morning,

9    right?

10       A.  Right.  I told them I have a heart

11   problem, to keep an eye on me.  They put me in a

12   close-watched cell, which is in front of their

13   desk.

14       Q.  Okay.  And that was at the lockup in the

15   basement of Maywood, right?

16       A.  Right.

17       Q.  Okay.  Have you talked to Mr. Daniel

18   Dorgan about your testimony today?

19       A.  Yes.

20       Q.  When's the last time you spoke to him

21   about this testimony?

22       A.  This morning I was talking about it.

23       Q.  Do you expect that he will be a witness

24   for you in this case?

81

1     A.   Yes.

2     Q.   Has your lawyer talked to Mr. Dorgan?

3     A.   No, sir.

4     Q.   Why do you think he will be a witness for

5   you in this case?

6     A.   Because the days I was in front of the

7   judge, the two days I was in front of the judge, he

8   was.

9     Q.   So he was there for your bond hearing,

10   right?

11     A.   And the other two times.

12     Q.   And that's -- you know the other two days

13   based on what Daniel told you, right?

14     A.   Right.

15     Q.   Okay.

16     A.   Which I know my uncle won't lie to me.

17          But he's the one that said he heard the

18   judge say, and he told me, "If you guys want to --"

19   how should I say this, on what the judge said, what

20   would you -- these people that does the typing, to

21   get those records from these.

22     Q.   Okay.  Did you ever tell your lawyers that

23   they ought to order the transcript of the

24   proceedings when you had your bond hearing?

82

1      A.  No.

2      Q.  Okay.  Is this the evidence that you were

3   investigating between the time you signed your

4   interrogatory answers and today?

5      A.  No.

6      Q.  Okay.  Do you have any present illness?

7      A.  No.

8      Q.  Can you tell me what symptoms you felt on

9   December 18th at 4:55 p.m.?

10     A.  I felt weak, chest pains, I had a seizure,

11   and I couldn't hardly walk.

12     Q.  If you turn to -- well, we haven't marked

13   it yet.

14         MR. CATANIA:  So let's mark this exhibit.

15              (Whereupon, Sanders Deposition

16               Exhibit No. 3 was marked for

17               identification.)

18   BY MR. CATANIA:

19     Q.  I'm going to show you what's been marked

20   as Exhibit No. 3, which you've had a chance to look

21   at it already.

22         Exhibit 3 is a "Medical Intake Form", a

23   "Primary Health Assessment" form, a "Residential

24   Unit" form, a "Department of Mental Health Services

83

1    Brief primary psychological screening tool", an

2    emergency room record, and prescription orders.

3    A.  Uh-huh.

4    Q.  And they're numbered at the bottom

5    Sanders 1 through Sanders 6.  Do you see that in

6    the bottom right there's numbers?

7    A.  Down here (indicating)?

8    Q.  Down at the bottom here?

9    A.  Okay, yes.

10    Q.  Sanders 3.  Okay.

11    If you look at Sanders 1, the front page,

12    on the upper right, upper left-hand corner, there's

13    a bar code, and below that, that's your name,

14    right?

15    A.  Yes.

16    Q.  And it has a date, a book date of 12/18/07

17    under it?

18    A.  Yes.

19    Q.  That's the day that you entered into the

20    jail, right?

21    A.  Yes.

22    Q.  If you look at the right side, it's got

23    the date handwritten in, too, below where it says

24    "Medical Intake Form.".  do you see that, 12/18/07?

84

1      A.   Yes.

2      Q.   Below that, is there any division written

3   down?

4      A.   No.

5      Q.   What division did you go to?

6      A.   8.

7      Q.   Okay.  Had you ever been in 8 before that

8   day?

9      A.   No.

10      Q.   Okay.  Below the box that says "Form

11   Reviewed" in the middle of the page there, --

12      A.   Yep.

13      Q.   -- there's a phone number.  Do you know

14   who's number that is?

15      A.   My uncle's.

16      Q.   Okay.  And below it, it says "Dan", right?

17      A.   Right.

18      Q.   How did that number get put there?

19      A.   I told them.

20      Q.   Okay.  You told the medic that was

21   entering you?

22      A.   Yes.

23      Q.   In fact, you signed this page where it

24   says "Consent for Treatment" up here, right?

85

1      A.  Right.

2      Q.  And under "Medical History," when Question

3   2 asks for heart trouble, you answered yes, right?

4      A.  Yes.

5      Q.  And you answered heart trouble?

6      A.  Correct.

7      Q.  And where it says "Current Problems",

8   No. 1, it says "On Medications", it's circled,

9   right?

10      A.  Yes.

11      Q.  And next to it there's like a little

12   scribble, right?

13      A.  Right.

14      Q.  Below that where the"Substance Use" box

15   appears, there's a tobacco line?

16      A.  Yes.

17      Q.  And that's circled yes.  Do you smoke?

18      A.  Yes.

19      Q.  Has anyone ever told you to stop smoking?

20      A.  Yes.

21      Q.  Has any doctor told you to do that?

22      A.  No.

23      Q.  And then to the right of "Tobacco" where

24   it says "Illicit, Non-injection", there's a yes

86

1    circled, and it says "Heroin" under that, right?

2        A.   Right.

3        Q.   All that information was accurate at the

4    time that you entered into the jail to answer these

5    questions, right?

6        A.   Right.

7        Q.   If you look on the next page, at the top

8    of the page, there's a section that says "Vitals"?

9        A.   Right.

10       Q.   Do you recall people checking your vital

11   signs?

12       A.   Yes.

13       Q.   Your temperature?

14       A.   Yes.

15       Q.   It says 98.7.  Is that normal?

16       A.   I don't know.  I really don't know.

17       Q.   All right.  And next to it, it says BP,

18   113 over 86.  Is that normal for you?

19       A.   I really don't pay attention.  So I don't

20   know.

21       Q.   Pulse, next to it, it says 71?

22       A.   Right.

23       Q.   "RR", which is respiration rate, it says

24   20?

87

1    A.  Right.

2        Q.  And where it says weight, it says 176.  Do

3    you think back in December of '07 you were 176?

4    A.  Yes.

5        Q.  Okay.  Below the line that says "Secondary

6    Health Assessment" there is a date and time line.

7    Do you see that?

8    A.  Yes.

9        Q.  And the date says 12/18/07?

10   A.  Right.

11       Q.  That's the same day that you entered the

12   jail?

13   A.  Yes.

14       Q.  And the time says 1854, do you see that?

15   A.  Right.

16       Q.  And do you recognize that to be military

17   time for 6:54 p.m.?

18   A.  Yes.

19       Q.  Below that, where it says "HPI/ROS" in the

20   preprinted section, --

21   A.  Right.

22       Q.  -- the "HPI/ROS" is a review of symptoms

23   and history of present illness, that's what those

24   two initial, sets of initials mean?

88

1      A.  Right.

2      Q.  It says you're a 26-year-old white male

3    who presents with a history of leaking valve about

4    one-and-a-half year ago; do you see that?

5      A.  Yes.

6      Q.  And then it says, "takes question mark

7    meds"?

8      A.  Right.

9      Q.  Did you tell the physician assistant that

10   you don't know what your medication is?

11     A.  No.  I told her what it was.

12     Q.  Okay.  Did you ever see this physician

13   assistant before that date?

14     A.  Before that day?

15     Q.  Yes.

16     A.  No.

17     Q.  All right.  Have you ever seen this

18   physician assistant after that day?

19     A.  No.

20     Q.  It says in the next line, "Last dose this

21   a.m."  That was accurate, right?

22     A.  Yes.

23     Q.  You had that dose in the morning, right?

24     A.  Correct.

89

1     Q.   It also says, "History of heroin abuse.

2   Last use 2 days"?

3     A.   Right.

4     Q.   Does that sound accurate?

5     A.   Yes.

6     Q.   Under "Assessment/Plan/Referrals," it

7   says, 1, History of leaking heart valve, to ER for

8   M.D." do you see that?

9     A.   Yes.

10     Q.   And there's a checkmark after that?

11     A.   Yes.

12     Q.   The second one, No. 2 says, "Heroin

13   withdrawal, Compazine Imodium."  Do you see that?

14     A.   Yes.

15     Q.   Are those medications you think, Compazine

16   and Imodium?

17     A.   Yes.

18     Q.   In the box down at the bottom where it

19   says "Follow-Up," in the circle it says "ER"?

20     A.   Correct.

21     Q.   Do you recognize ER to refer to emergency

22   room?

23     A.   Yes.

24     Q.   Were you transported to the emergency

90

1    room?

2        A.  No.

3        Q.  Okay.  Take a look on Page Sanders 05.  Up

4    at the top where it says "Emergency Room Record,"

5    do you recall arriving at the emergency room at

6    8:36 p.m.?

7        A.  I was never took off Cook County grounds.

8        Q.  Okay.  You were taken to Cermak, though,

9    right?

10       A.  Yes.

11       Q.  Okay.  Do you understand emergency room to

12   mean exclusively out of Cook County grounds?

13       A.  I thought it meant like Cook County

14   Hospital emergency room.

15       Q.  Okay.  You're not saying that you didn't

16   go to speak with doctors on December 18th at

17   8:36 p.m., right?

18       A.  At Cermak?

19       Q.  Yes.

20       A.  Yes, I did.

21       Q.  Okay.  If you look on that page, you'll

22   see that there are dates for the time arrived and a

23   date for time triaged?

24       A.  Right.

91

1     Q.  Time arrived, 8:36 p.m., time triaged,

2    8:55 p.m.  Would you say that at least between

3    those two times, you were always in Cermak what

4    they call the emergency room?

5     A.  Right.

6     Q.  Okay.  Your name is listed on this page.

7    It's got Sanders, Kevin, right?

8     A.  Right.

9     Q.  And your prisoner ID number, which ends in

10   94005, is the same as the one that appears on your

11   intake form, the first page of this exhibit, 94005,

12   is that right?

13    A.  Right.

14    Q.  Okay.  It also indicates that there's a

15   location that you're supposed to go to,

16   Division 11, do you see that up here?

17    A.  Division 11.

18    Q.  Is that what that says, X and a 1?

19    A.  I don't know.  I was in Division 8.

20    Q.  I understand that.  But at the time you

21   arrived to the emergency room, they understood that

22   you were going to be assigned to Division 11; do

23   you see that?

24    A.  Yes.

92

1    Q.  Okay.  Your date of birth appears there?

2    A.  Yes.

3    Q.  Do you think that information was given by

4  you to the nurse that wrote this page?

5    A.  Well, I don't know where they get 5/14,

6  because it was 5/15/81.

7    Q.  Under "History and Complaints," it says,

8  "Status post heart surgery May of '06."

9    A.  Right, April.

10    Q.  Okay.  I understand that you say it's

11  April, but does this page say "Status post heart

12  surgery in May of '06"?

13    A.  Uh-huh.

14    Q.  Yes?

15    A.  Yes.

16    Q.  Okay.  Do you know the nurse Bettie

17  Barnes?

18    A.  No, sir.

19    Q.  You had heart surgery, right?

20    A.  Yes.

21    Q.  And this visit to the Cermak emergency

22  room was after the heart surgery, right?

23    A.  No.

24    Q.  You had your heart surgery before

93

1    December 18th of '07?

2        A.   Yes.

3        Q.   Okay.  So when you went to Cermak's

4    emergency room on December 18th of '07, your heart

5    surgery had happened before?

6        A.   Yes.

7        Q.   And they were there to examine you for

8    your status after your heart surgery?

9            MR. MORRISSEY:  I'm going to object to

10   what they were going to do.  He isn't qualified to

11   testify --

12   BY MR. CATANIA:

13       Q.   Are you qualified to tell me what you told

14   the nurse?

15       A.   I don't remember.

16       Q.   Okay.  If the nurse wrote down, if Bettie

17   Barnes, the R.N. who did your interview and

18   discussed with you your history and present

19   complaint, if she wrote down that you were there

20   following a heart surgery that happened in May of

21   '06, would that information have come from you?

22       A.   Yes.

23       Q.   Okay.  Where it says drug abuse for 13

24   years, --

94

1      A.   Uh-huh.

2      Q.   -- does that sound accurate?

3      A.   Yes.

4      Q.   And it says, "Heroin $20 daily," right?

5      A.   Yes.

6      Q.   Last used December 16th of '07?

7      A.   Uh-huh.

8      Q.   Is that all true information?

9      A.   Yes.

10     Q.   Okay.  There is other handwriting on that

11   page as well, especially in the margin.  It says,

12   "He states he is not on Coumadin."  Do you see

13   that?

14     A.   I'm not on Coumadin, yes.

15     Q.   Is that something you would have said at

16   the time?

17     A.   Yes.  I would have told them I'm not on

18   Coumadin.

19     Q.   And you know what Coumadin is, right?

20     A.   Yes.  It's to regulate your mechanical

21   valve.

22     Q.   Blood thinner perhaps?

23     A.   Blood thinner, yes.

24     Q.   Okay.  In the typewriting that's between

95

1    the two lines here, it appears to say

2    "Cardiovascular surgeon, Dr. Prescof," right?

3        A.  Uh-huh.

4        Q.  And that's similar to the name that you

5    said earlier, right?

6        A.  Right.

7        Q.  Would Bettie Barnes or any doctor have

8    gotten that name from anybody else but you at that

9    time?

10       A.  No, they got it from me.

11       Q.  Okay.  And above that it says surgery at

12   Gottlieb Hospital, do you see that?

13       A.  Uh-huh.

14       Q.  And that's also true?

15       A.  Uh-huh.

16       Q.  You have to answer yes?

17       A.  Yes.

18       Q.  Yes or no depending on what the answer is.

19           You had an examination at the Cermak

20   emergency room, right?

21       A.  Uh-huh, yes, yes.

22       Q.  Okay.  And that included checking your

23   temperature, pulse, respirations, and blood

24   pressure, right?

96

1      A.  Yes, sir.

2      Q.  Okay.  And that's reflected on this cover

3    page, right?

4      A.  Yes, sir.

5      Q.  All right.  There's also an area that says

6    "Treatment."  Do you see the box that says

7    "Treatment and Advice"?

8      A.  Yes.

9      Q.  All right.  It says Compazine, you see

10   that?

11     A.  Right.

12     Q.  Imodium?

13     A.  Yes.

14     Q.  Atarax, do you see that?

15     A.  Yes.

16     Q.  And belladonna?

17     A.  Yes.

18     Q.  When it says below that "Given at

19   9:50 p.m.", what do you understand that to mean?

20     A.  I don't understand it, because I was never

21   given nothing.

22     Q.  Okay.  Earlier you said that you were

23   given something at Cermak?

24     A.  That's while I was at Cermak they gave it

97

1    to me.

2        Q.  Okay.  Understand that --

3        A.  Is that what they're trying to say they

4    gave me?

5        Q.  That's what it says here.

6        A.  Okay.  Yes.

7        Q.  Do you agree that they gave you medicine

8    for your withdrawal symptoms?

9        A.  Yes, they did.

10       Q.  Okay.  All right.  The bottom of the

11   written section includes a couple of signatures.

12   Is one of those yours?

13       A.  Yes.

14       Q.  And that's the one where it's your consent

15   to the examination, right?

16       A.  Right.

17       Q.  Above that there's a doctor's signature.

18   Do you see that?

19       A.  Yes.

20       Q.  Does the name Dr. Cruz sound familiar to

21   you?

22       A.  Yes.

23       Q.  If you look on the next page, there are

24   three prescription order forms also known as doctor

98

1     orders.  Do you see that?

2        A.   Yes.

3        Q.   Okay.  And on that side margin of the top

4     prescription order form, you'll see there's some

5     writing?

6        A.   Yes.

7        Q.   Okay.  When it says, "Prochlorperazine,

8     Loperamide, Atarax, belladonna, aspirin, sick call

9     in 2 days," those are doctor's orders, right?

10       A.   Right.

11       Q.   Okay.

12       A.   Yes.  I'm sorry.

13       Q.   It also says here, "Blisters given in ER

14    2/18/07," do you see that?

15       A.   Yes.

16       Q.   Did they give you blister packs of the

17    medicine for your --

18       A.   What's a blister pack?

19       Q.   Okay.  More than one dose.  Did they give

20    you more than one dose?

21       A.   Oh, yes, yes.

22       Q.   To keep on your person?

23       A.   Yes.

24       Q.   To take as you need?

99

1    A.  Yes.

2    Q.  Okay.  Did they do that when you were in

3  the emergency room of Cermak Hospital?

4    A.  Yes.  I told you that --

5      MR. MORRISSEY:  I'll object.  It looks

6  like there's an arrow.  It looks like certain

7  things but not all those drugs were given to him.

8      Do you see that?

9      THE WITNESS:  There, right here

10  (indicating)?

11      MR. CATANIA:  Okay.

12      MR. MORRISSEY:  So that it looks like you

13  got Atarax and something called P-e-t-d-r-a in

14  blister pack, is that correct?

15      THE WITNESS:  Yes.

16  BY MR. CATANIA:

17    Q.  Is it correct, because your lawyer has

18  misread it?

19    A.  No, it's correct.

20    Q.  Okay.  They did give you a blister park of

21  Atarax and belladonna --

22    A.  Yes.

23    Q.  -- at that time?

24    A.  Yes, they did.

100

1     Q.  And the last order says, "Sick call in 2

2  days", do you see that?

3     A.  Yes.

4     Q.  So a doctor examined you, and his order

5  was for you to be brought back to sick call in 2

6  days from December 18th of '07, right?

7     A.  Right.

8     Q.  Two days from that date you were released?

9     A.  Right.

10     Q.  So you never went to sick call?

11     A.  No.

12     Q.  Okay.  The next order down below that

13  says, "Admit to RU medical," right?

14     A.  Right.

15     Q.  And that's where you were admitted, right?

16     A.  Correct.

17     Q.  You were admitted to Division 8

18  residential treatment unit?

19     A.  Right.

20     Q.  Okay.  Below it says, "Allergy, no known

21  allergies."  And below that, it says, "Condition

22  stable."

23       At the time when you were seen by Dr.

24  Cruz, was your condition stable?

101

1      A.  Not really, no.

2      Q.  Did you tell the doctor that your

3   condition was not stable?

4      A.  Yes, I did.

5      Q.  If you told the doctor your condition was

6   not stable, do you think he would have written it

7   down someplace?

8      A.  I don't know.

9      Q.  Okay.  When you say that it was not

10  stable, what do you mean?

11     A.  I was having -- I couldn't -- I was weak.

12  I had chest pains.  And that's when they tried to

13  put aspirin.  I cannot take aspirin --

14         THE COURT REPORTER:  I'm sorry.  What was

15  that?

16         THE WITNESS:  Give me aspirin.  I cannot

17  take aspirin because of my hepatitis.

18  BY MR. CATANIA:

19     Q.  Okay.  Do you know what the amount of

20  aspirin was that they were ordering for you?

21     A.  I don't know.  I cannot read what it says.

22     Q.  Okay.  I'll point to it (indicating).

23  Does that look like it says 81 milligrams?

24     A.  Yes.

102

1    Q.  And that's the dose that's ordinarily

2    given to heart patients, right?

3    A.  Right.

4    Q.  If you look on Page Sanders 3, which is

5    back a couple of pages, you'll see on that page

6    that the same doctor, Cruz, also signed that one on

7    December 18th of '07, right?

8    A.  Correct.

9    Q.  And the caption of this one, the name of

10   this one is "Residential Unit Medical Dormitory

11   Admission Form," do you see that?

12   A.  Uh-huh.

13   Q.  Does that mean --

14   A.  Yes.

15   Q.  Does that mean that you were actually

16   admitted into a dormitory?

17   A.  Yes.

18   Q.  Okay.  Your name appears at the top?

19   A.  Yes.

20   Q.  Same prisoner number?

21   A.  Yes.

22   Q.  It says 5/14/81 is your birth date, right?

23   A.  Right.

24   Q.  Is that true?

103

1    A.   No.

2    Q.   Okay.  Under the "Diagnoses" section, the

3  first diagnosis says "Heroin abuse," right?

4    A.   Right.

5    Q.   And the second one says "Status post

6  cardiac surgery for leaky valve"?

7    A.   Right.

8    Q.   Was that true?

9    A.   Yes.

10   Q.   Okay.  Your medication list appears below

11  that.  It says Prochlorperazine, Loperamide,

12  Atarax, belladonna, and I believe it says aspirin,

13  which is No. 5; do you see all that?

14   A.   Right, yes.

15   Q.   Okay.  To the left of that, can you read

16  what it says in the doctor's handwriting?

17   A.   I cannot read it.

18   Q.   How about if I help you?  Does it seem to

19  say here, "Patient can't remember --"

20   A.   Right, yes.

21   Q.   " -- his other meds"?

22   A.   That's not true.

23   Q.   Well, the doctor wrote that, didn't he?

24   A.   Yes, he did.

104

1    Q.   And then now where it says "Special

2    Therapy", it says, "Sick call 1 to 2 weeks" and

3    it's signed by somebody else, but it says, "Sick

4    call," it looks like it says January 4 of '08; do

5    you see that?

6    A.   Yes, yes.

7    Q.   But below that it says, "Sick call in 2

8    days," do you see that, "12/20/07"?

9    A.   Right, yes.

10   Q.   That's what's signed by the doctor?

11   A.   Yes.

12   Q.   And as I said before, you were discharged

13   before the sick call?

14   A.   Yes.

15   Q.   All right.  If you look on Page 4, this

16   form here, have you ever seen this before?

17   A.   No.

18   Q.   Did you see it before you testified today?

19   A.   No.

20   Q.   It was shown to you in the hallway?

21   A.   No.

22   Q.   Okay.  This is known as a "Brief Primary

23   Psychological Screening Tool," which is a tool

24   that's designed to be used by a mental health

105

1    specialist or someone who's trained.  And there's a

2    date and time at the bottom; do you see that?

3        A.   Yes.

4        Q.   It says December 18, '07?

5        A.   Yes.

6        Q.   4:55 p.m., do you see that?

7        A.   Yes.

8        Q.   And above it, it says, "Mickey Myles."  Do

9    you know who Mickey Myles is?

10       A.   No, sir.

11       Q.   Your name appears at the bottom, it says

12   Sanders, Kevin with your book date and your

13   prisoner number on that bar code label?

14       A.   Yes.

15       Q.   Okay.  Does it sound like at the time that

16   you were intaked, you were spoken to and asked the

17   questions that appear on this page?

18       A.   Yes.

19       Q.   Okay.  Among the questions, it asks if

20   you've ever been hospitalized, No. 2, for

21   psychiatric treatment, do you see that?

22       A.   Yes.

23       Q.   And the answer was given as no, right?

24       A.   Right.

106

1    Q.  You were never actually hospitalized for

2  psychiatric treatment?

3    A.  No, sir.

4    Q.  No. 1 asks if you've ever been in Cook

5  County jail before, and you answered yes?

6    A.  I had been.

7    Q.  And that was in Division 5?

8    A.  Yes.

9    Q.  Okay.  If you look to No. 5, it asks, "Do

10  you drink alcohol," and that's checked no?

11    A.  I don't.

12    Q.  And then it asks if you ever used drugs,

13  it's checked yes?

14    A.  Uh-huh.

15    Q.  It says heroin, right?

16    A.  Right.

17    Q.  $10 a day?

18    A.  Right.

19    Q.  And was all of that information

20  information you provided to Mickey Myles during

21  that interview?

22    A.  Yes.

23    Q.  All right.  Did it also say at the top

24  that you believed that your court date was

107

1    December 19th of '07?

2        A.   Yes.

3        Q.   And your bond was no bond, right?

4        A.   Right.

5        Q.   What courtroom were you going to on

6    December 19th of '07?

7        A.   307 or something like that.

8        Q.   Did you actually go to that courtroom?

9        A.   Yes.

10       Q.   All right.  Do you remember who the judge

11   was?

12       A.   No, sir.

13       Q.   And that was on December the 19th of '07?

14       A.   Um, --

15           MR. MORRISSEY:  Are you confused?

16           THE WITNESS:  I'm confused.

17   BY MR. CATANIA:

18       Q.   Well, this says that you said to the -- to

19   Mickey Myles that you were there on a warrant?

20       A.   Right.

21       Q.   And that you were -- your bond was no

22   bond?

23       A.   Yes.

24       Q.   Where your next court date --

108

1          MR. MORRISSEY:  Where are you referring

2     to?  Oh, the top part?

3     BY MR. CATANIA:

4          Q.   Next court date, 12/19/07, right?

5          A.   Right.

6          Q.   Did you actually go to court on 12/19 of

7     '07?

8          A.   I did not see the judge, but that was the

9     actual court date, yes.

10         Q.   You didn't see the judge?

11         A.   No.  They would not let me out of the

12    bullpen.

13         Q.   Has your uncle, Daniel Dorgan, ever been

14    present with you during any other arrests besides

15    this one?

16         A.   No.

17         Q.   Do you recall being arrested in Chicago --

18         A.   Yes, I have.

19         Q.   -- on May 17th of 2005?

20         A.   Yes.

21         Q.   Was your uncle with you at that time?

22         A.   No.

23         Q.   Okay.  Do you know anybody else that's

24    named Daniel Dorgan?

109

1     A.  Yes.  It's my uncle.

2     Q.  Okay.  Do you know anybody else besides

3  him that's named that?

4     A.  No.

5     Q.  And is his date of birth April 17th of

6  1942?

7     A.  Yes.

8     Q.  Okay.

9     A.  Is that --

10    Q.  I'm sorry?

11    A.  I don't understand.  What is that one?

12    Q.  These are my notes.

13    A.  Oh, okay.

14    Q.  This is not a document.

15       Are you saying that you were not arrested

16  at 4856 West Iowa Street in Chicago on May 17th of

17  '07?

18    Q.  Yes, he was with me on that one, he was.

19  But he was not arrested.  He was present at the

20  time.

21    Q.  He was present?

22    A.  Yes.  He did not go with me.

23    Q.  Okay.  Did he go with you to the 15th

24  District police station?

110

1     A.   Yes, because he had worked and his working

2     money with him.  And they did not want him to walk.

3     So they took him to the police station just to give

4     him a ride out of the area.

5     Q.   Okay.  All right.  Were you present during

6     a discussion that Daniel Dorgan had with a police

7     officer about going to the station?

8     A.   Yes.

9     Q.   Okay.  And it's your understanding that

10    the police recommended that he go with them?

11    A.   Yes.

12    Q.   Okay.  But you do remember that it was

13    because -- that he was afraid to walk in the Austin

14    neighborhood carrying $1,385, right?

15    A.   That's why.

16    Q.   Okay.  The case that you were appearing on

17    based on the warrant, the felony warrant, was the

18    retail theft case, right?

19    A.   Right.

20    Q.   Where was the courtroom that you were

21    first assigned; do you know?

22    A.   I do not recall.  I don't remember.

23    Q.   Do you remember what courthouse?

24    A.   Cook County.

111

1    Q.  Was that at 26th and California?

2    A.  Yes.

3    Q.  When you first had that case, did you post

4    bond?

5    A.  Yes.

6    Q.  Who posted bond for you?

7    A.  My uncle.

8    Q.  The same uncle we're talking about,

9    Daniel --

10   A.  Yes.

11   Q.  Okay.  And was that bond money used for

12   the lawyer that represented you?

13   A.  Yes.

14   Q.  Do you remember the lawyer's name?

15   A.  David J. Peilet.

16   Q.  And is that the same Dave Peilet that

17   works with Rick Beuke?

18   A.  I think so.

19   Q.  Okay.  How do you know Rick Beuke?

20   A.  I don't.  But I heard his name through my

21   lawyer.

22   Q.  The first part of your case since it

23   started, which was in July of '04, your case was

24   continued from time to time based on your request

112

1    for continuances, your lawyer's request, right?

2        A.  Right.

3        Q.  Okay.  And then some time in '05, February

4    2nd of '05 to be exact, you were sentenced to

5    probation, right?

6        A.  Right.

7        Q.  And that was a special probation, wasn't

8    it?

9        A.  Well, I think so.

10       Q.  You were ordered to do TASC?

11       A.  Yes.

12       Q.  That's Treatment Alternative to Street

13   Crimes?

14       A.  Right.

15       Q.  Okay.  When was it that you first learned

16   there was a violation of probation filed about that

17   probation?

18       A.  Well, when I got locked up at North

19   Chicago.

20       Q.  In 2007?

21       A.  Yes.

22       Q.  Okay.  There wasn't a violation filed

23   immediately after the probation was started in

24   March of '05?

113

1    A.  Not that I recall, no.

2    Q.  Okay.  Well, didn't you have to sign a

3    bond slip on May 5th of '05?

4    A.  I don't know.

5    Q.  An I bond?

6    A.  I don't remember.

7    Q.  Okay.  In June of '05, you were in custody

8    on a violation of probation, right?

9    A.  I don't -- I don't remember.

10       To be honest with you, I don't remember

11   back then.

12   Q.  All right.  Do you remember Daniel Dorgan

13   posting another thousand dollars for you at that

14   time, on June 2nd of '05?

15   A.  I believe so, yes.

16   Q.  Aside from the TASC probation, were there

17   any other conditions besides TASC?

18   A.  Nope.

19   Q.  Did you complete TASC?

20   A.  No, sir.

21   Q.  Did you start TASC?

22   A.  No, sir.

23   Q.  In order to start TASC, you would have

24   first had to admit that you have an addiction,

114

1    right?

2        A.  Right.

3        Q.  And did you?  Did you ever admit that you

4    have an addiction?

5        A.  No, I did -- sorry, I take that back.  I

6    went to Haymarket, and I walked out of Haymarket.

7        Q.  Okay.

8        A.  I walked out.

9        Q.  All right.  You were there based on the

10   order of probation, right?

11       A.  Right.

12       Q.  Did you ever do any drug treatment on that

13   probation?

14       A.  No.

15       Q.  Did you ever have to pay fines on that

16   probation?

17       A.  No.

18       Q.  Probation costs?

19       A.  Not that I remember.

20       Q.  Were they deducted from the bond that your

21   uncle posted?

22       A.  I don't remember.

23       Q.  In this case, also on March 4th of 2011,

24   or March 14th, which date, I'm not sure, you

115

1    provided a HIPAA privacy authorization form that

2    was sent to me.  I'm going to show you that form

3    right now.  We can make it an exhibit as well.

4              (Whereupon, Sanders Deposition

5               Exhibit No. 4 was marked for

6               identification.)

7    BY MR. CATANIA:

8        Q.  On that form, that's your signature at the

9    bottom, is that right?

10       A.  Yes, sir.

11       Q.  And it's dated March 4th of 2011, right?

12       A.  Correct.

13       Q.  In the Box No. 2 where it says, "This

14   authorization is directed to and applies to

15   protected health information maintained by," those

16   lines are completely blank, right?

17       A.  Right.

18       Q.  Can you tell me what entities and doctors

19   need to be filled in in order for me to get your

20   records for this case?

21       A.  The regular doctor has the papers.

22       Q.  Dr. Thomas James?

23       A.  Right.

24       Q.  And your surgery was at Gottlieb?

116

1       A.   Right.  He has the papers.

2       Q.   Dr. James has the papers?

3       A.   Yes.

4       Q.   Okay.  Does he have an office at Gottlieb,

5   or is there another location?

6       A.   He has an office there.

7       Q.   Okay.  Is that the only place you see him?

8       A.   Yes.

9       Q.   Okay.  Now, your surgeon, the one who

10   performed the surgery in April or May of 2006,

11   could you spell or attempt to spell his name for

12   me?

13      A.   It's Brestkopp.

14      Q.   Okay.  I'm going to go with phonetic,

15   B-r-e-s-t-k-o-p-p.

16      A.   Okay.

17      Q.   All right.  I'm going to put those names

18   on this form.

19      A.   Okay.

20      Q.   And ask if I have your permission to

21   obtain those records from the doctors?

22      A.   Yes, you do.

23      Q.   Thank you.

24           Now, you could see I've included the three

117

1    names.  Do you see that?

2        A.  Yes.

3        Q.  Do you agree with me that I wrote down

4    correct Dr. James, Thomas, Dr. Brestkopp, and

5    Gottlieb Memorial Hospital?

6        A.  Correct.

7        Q.  Are there any other hospitals or doctors

8    that we need to put on this list?

9        A.  No.

10       Q.  All right.  Have you told me everything

11   now through this deposition about your injury that

12   you believe that you had back on December 18th to

13   December 20th of '07 that you think will be told to

14   a jury?

15       A.  Yes.

16       MR. MORRISSEY:  I'm going to object to the

17   open nature.

18       THE COURT REPORTER:  I'm sorry?

19       MR. MORRISSEY:  I'm going to object to the

20   form, the open nature of the question.

21   BY MR. CATANIA:

22       Q.  Is there anything that you can remember

23   today that you would like to add regarding the way

24   you felt and your injuries that you felt that you

118

1    had between December 18th of '07 and December 20th

2    of '07?

3        A.  No.

4        MR. CATANIA:  Well, I have no further

5    questions.

6        MR. MORRISSEY:  Okay.  I want to take a

7    break for a few moments.

8            (Whereupon, a short break was

9             taken.)

10           EXAMINATION

11   BY MR. MORRISSEY:

12       Q.  Mr. Sanders, you mentioned when you came

13   in to the jail --

14       A.  Right.

15       Q.  -- on December 18, '07, you were taking

16   prescription medication, right?

17       A.  Right.

18       Q.  Did you have or was the medication in your

19   possession?

20       A.  It was not in my possession.  It was in my

21   property bag.

22       Q.  By "your property bag," what do you mean?

23       A.  My personal stuff, like my wallet, my

24   money, the phone, anything they take away and put

119

1    it in a plastic evidence bag I want to say about

2    this bag (indicating), about this wide.

3        Q.   How did the medication wind up in the

4    property bag?

5        A.   Because my uncle had brung it to North

6    Chicago police station, and the officer that was

7    taking me to Lake County took it with us.  And we

8    turned it over to them, and they put it in my

9    personal property.

10           And when the Sheriffs came and got me to

11   go to Maywood, she had brang my prescription, my

12   pills in the morning.  They were still in my

13   property, and they all went to County then.

14       Q.   Now, when you -- in the receiving room

15   when you sat down with the medic to tell them that

16   you had a heart problem, which is Exhibit 3, the

17   history, did you -- what did you tell them about

18   your heart problem when they asked you about

19   medications?

20       A.   I did not know the names of the

21   medications, but I told them it's in my property,

22   that I need them for that night and the following

23   day, that I cannot miss one day.

24       Q.   Did you tell them where your

120

1    medications --

2        A.  Yes, I told them.

3        Q.  Why did you -- did you give them the name

4    of your Uncle Dan?

5        A.  Yes, I did.

6        Q.  Why did you give them the name of your

7    uncle?

8        A.  Because they wanted someone that -- I

9    guess they wanted some family member that knew more

10   about the medications names, because I didn't know

11   the names.  So they called him for the names.

12          But I kept telling them, "It's in my

13   property, you know."  But no one ever listened.

14       Q.  Do you know if this nurse or CMT that's

15   listed down here on the first page of Exhibit 3,

16   whether or not they ever called your Uncle Dan?

17       A.  I think they did call him, and he did give

18   them the names of two, I think.  I'm not really for

19   sure.

20       Q.  Now, that same night you saw a -- briefly

21   you saw a doctor in Cermak, right?

22       A.  Right.

23       Q.  And did you tell the doctor where your

24   medication was?

121

1    A.  Yes, I did.

2    Q.   And what did you tell the doctor?

3    A.  I said, "I'm on medication in my

4    property."

5        And they kept telling me they cannot go in

6    my property, once the property's put away, it's put

7    away.

8    Q.   Did they ask you whether or not you had

9    the -- did you tell the person, the nurse during

10   triage when you came in to Cermak, the name of your

11   doctor?

12   A.  Yes, I did.

13   Q.   And the name of the surgeon?

14   A.  Yes.

15   Q.   And did you tell her about where your

16   medications were?

17   A.  Yes, I told everybody that I seen about my

18   medication, where it's at.

19   Q.   Why were you so emphatic to tell each and

20   every person on intake that you take medication?

21       MR. CATANIA:  Objection, form.

22   BY MR. MORRISSEY:

23   Q.   You can answer.

24   A.  Because I was worried about my health.

122

1     Q.  And had your doctor ever told you why you

2     needed to take the medication?

3          MR. CATANIA:  Objection, form.

4          THE WITNESS:  To keep my heart regulated.

5     BY MR. MORRISSEY:

6     Q.  And was it your practice to take the

7     medication twice a day?

8          MR. CATANIA:  Objection, form.

9          THE WITNESS:  It is.

10    BY MR. MORRISSEY:

11    Q.  And on December 18, '07, were you given

12    your heart medication?

13    A.  Yes.

14    Q.  In the evening?

15    A.  No.

16    Q.  Okay.

17    A.  The morning, yes.

18    Q.  The next morning, on December 19, '07, did

19    they have a nurse come through the RTU, the one you

20    were in, with medications?

21    A.  No, because I asked her, I asked her

22    several times, and she told me she ain't got it.

23    Q.  Okay.  My question was, was there a nurse

24    in the RTU where you were housed?

123

1      MR. CATANIA:  Objection, asked and

2  answered.

3      THE WITNESS:  Yes.  I couldn't see him

4  because the Sheriff wouldn't tell him.

5      He kept telling me, "What do you need",

6  and they would not do anything about it.

7  BY MR. MORRISSEY:

8    Q.  And my question is, is it part of the

9  routine in the RTU, Division 8, that periodically

10  during the day, that a nurse would come by with

11  medication?

12      MR. CATANIA:  Objection, form.

13      THE WITNESS:  No.

14  BY MR. MORRISSEY:

15    Q.  If you know?

16    A.  I do not know.

17    Q.  Did the nurse ever have any medication for

18  you in the housing division?

19      MR. CATANIA:  Objection, form.

20      THE WITNESS:  No.

21  BY MR. MORRISSEY:

22    Q.  Did you receive any medication on the 20th

23  of December?

24    A.  No.

124

1     Q.  And how did you feel when you weren't

2  receiving your medication?

3     A.  I felt horrible.  I felt weak, chest

4  pains, I couldn't walk, no energy.

5        MR. MORRISSEY:  I have nothing further.

6        EXAMINATION (Cont'd)

7  BY MR. CATANIA:

8     Q.  Just a few brief followups

9        When you say that somebody at the jail

10  called your uncle, what is your basis for saying

11  that?

12     A.  Well, I meant to say the intake nurse.

13  I'm sorry.

14     Q.  At the Cermak --

15     A.  No, the intake, the processing nurse.

16     Q.  Okay.  The processing person called your

17  uncle?

18     A.  Yes.

19        MR. MORRISSEY:  If you know.

20  BY MR. CATANIA:

21     Q.  And what is your basis of knowledge?

22     A.  I guess he told her the names of the

23  pills.

24     Q.  No.  How do you know that your uncle was

125

1    called by this processing nurse?

2        A.  Because it was right in front of me.

3        Q.  So there was a phone in front of you at

4    the time?

5        A.  Her phone, yes.

6        Q.  Okay.  Can you you tell me what medication

7    you were supposed to get on December 18th p.m.?

8        A.  The Lexapro, the Protonix, the Amiodarone,

9    and Metoprolol.

10       Q.  Okay.  And what dose were you supposed to

11   get at the p.m.?

12       A.  All of them, all them pills, the dosage.

13       Q.  What dose, do you know?

14       A.  I don't know the dosages.

15       Q.  Okay.  When you were arrested by the North

16   Chicago Police Department, you didn't have your

17   medication on you?

18       A.  No.

19       Q.  What time of day was it?

20       A.  I would say they shipped me to Lake County

21   by 8:30, 9:00 at night.

22       Q.  Can you estimate based on that when it was

23   that you were taken into custody by the North

24   Chicago Police?

126

1    A.  About 3:30 in the afternoon.

2    Q.  3:30 p.m.?

3    A.  Yes.

4    Q.  Okay.  And just for clarity, at the time

5    that you were arrested, it was because they had

6    determined based on your identity that there was

7    this warrant, right?

8    A.  Right.

9    Q.  Okay.  Why did you have to give your

10   identity?

11   A.  Because I was the person in the truck with

12   my uncle.

13   Q.  Was your uncle the one that was driving?

14   A.  Yes.

15   Q.  And the truck was hit?

16   A.  It was parked.

17   Q.  It was parked?

18   A.  It was parked.

19   Q.  Okay.

20   A.  And the guy backed into it.

21   Q.  Did your uncle drive that truck back home?

22   A.  Yes.

23   Q.  So it was drivable then?

24   A.  Yes.

127

1    Q.  What kind of truck?

2    A.  2500 heavy duty Silverado, Chevy.

3    Q.  So a pickup truck?

4    A.  Right.

5    Q.  Who did you first tell that your

6  medication was in a property bag in the property

7  room?

8    A.  First person I seen.

9    Q.  And who was that?

10    A.  Cook County Sheriff when I went through

11  the scanner.

12    Q.  Okay.  What scanner?

13    A.  Down in intake.

14    Q.  Are you talking about the metal detector?

15    A.  Yes, where -- your body scanner.

16    Q.  Body scanner.  And that was on

17  December 18th of '07?

18    A.  Yes.

19    Q.  Was that the first time you had been in a

20  body scanner?

21    A.  Yes.

22    Q.  After telling the deputy that you had

23  medication in your property, did you tell anybody

24  else?

128

1        A.  I told everybody I seen.

2        Q.  Okay.  So you were not at all concerned

3    about your personal privacy about your medical

4    care, right?

5        A.  No.

6        Q.  Okay.  You told the CMT?

7        A.  I told everybody, yes.

8        Q.  And the CMT wrote down that you have heart

9    trouble?

10       A.  Yes.

11       Q.  Wrote down your uncle's phone number and

12    name?

13       A.  Yes.

14       Q.  Wrote down your heroin use?

15       A.  Yes.

16       Q.  Your tobacco use?

17       A.  Yes.

18       Q.  Wrote down your vital signs?

19       A.  Yes.

20       Q.  Referred you to a physician assistant?

21       A.  Yes.

22       Q.  But didn't write down that you said that

23    you had medication in your property bag?

24       A.  Right.

129

1      Q.   The same thing with the physician

2  assistant; they wrote down your information about

3  your history of a leaking valve, your surgery,

4  right?

5      A.   Right.

6      Q.   That you take meds, that you don't know

7  what they are?

8      A.   I told them it's in my property, I do not

9  know the names.

10     Q.   Okay.  And that the last dose you had was

11  in that morning, right?

12     A.   Right.

13     Q.   That you had a history of heroin abuse and

14  last used two days prior?

15     A.   Right.

16     Q.   And then they wrote all those things down,

17  right?

18     A.   Right.

19     Q.   But they didn't write down that you said

20  that the medication was in your property bag?

21     A.   Right.

22     Q.   Okay.  And when Dr. Cruz interviewed you

23  and examined you in the emergency room and wrote

24  down, "Patient can't remember his other meds," are

130

1   you saying that you told him that it was in your

2   property bag?

3       A.  Yes.

4       Q.  And he didn't write that down?

5       A.  No.

6       Q.  But he did write down that you're not on

7   Coumadin?

8       A.  Right.

9           MR. MORRISSEY:  I'm going to object.

10  Apparently that was in the handwriting of the

11  nurse.  It's to the left of the nurse's notes.  It

12  apparently was entered by the triage nurse.

13          MR. CATANIA:  Well, it's interesting that

14  you would do that.  It baffles me that you would do

15  that.

16          MR. MORRISSEY:  Why so, Mr. Catania?

17          MR. CATANIA:  Well, because right now

18  you're trying to insert evidence that is false.

19          MR. MORRISSEY:  Well, you're --

20          MR. CATANIA:  If that's what you want to

21  do, fine.

22          MR. MORRISSEY:  Well, you're inserting

23  evidence that it is Dr. Cruz.  It looks like it's

24  opposite where the history and complaints were.

131

1        MR. CATANIA:  Yes.  But as you can tell,

2    there's two different handwritings there in the

3    exhibit, which speaks for itself.

4        Thank you, Mr. Morrissey.

5        MR. MORRISSEY:  Well, I don't know; I'm

6    not a handwriting analyst.

7    BY MR. CATANIA:

8        Q.   Are you saying through your testimony that

9    three different people were aware that you had

10   medication and three different people separately

11   decided not to write down that medication and

12   instead to give you different medication at the

13   jail?

14       A.   Yes.

15       Q.   Okay.  People that you don't know?

16       A.   Yes.

17       Q.   Okay.  One of them a physician?

18       A.   If that's what you want to call them.

19       Q.   Well, Dr. Cruz has an M.D. after his name.

20       Is it your position that this lawsuit is

21   based on the three days, to use Mr. Morrissey's

22   time frame, that you did not get medication that

23   you were unable to describe the names of?

24       MR. MORRISSEY:  I'm going to object.  He

132

1    didn't say he was unable to describe.  He said he

2    had the medication.

3        That's a misstatement,

4    mischaracterization?

5        MR. CATANIA:  We could go over the

6    transcript if you want.

7    BY MR. CATANIA:

8    Q.   But, sir, you did say that you couldn't

9    remember the name, is that --

10   A.   I did say I couldn't remember; but I told

11   them, "I cannot remember the names, but the

12   medication is in my property."

13       I still remember -- to this day, I don't

14   know how to pronounce them.

15   Q.   Could I ask you a question about the

16   lawsuit itself?  You understand that you're a class

17   representative, right?

18   A.   Right.

19   Q.   Okay.  Do you understand what that means?

20   A.   No, sir.

21   Q.   Okay.  You also understood that you signed

22   interrogatory answers in this case which are

23   Exhibit No. 1; you understood that these were your

24   interrogatory answers --

133

1      A.  Yes.

2      Q.  -- that were under oath, right, under

3   penalties of perjury?

4      A.  Yes.

5      Q.  You understood that, right?

6      A.  Yes.

7      Q.  And you understood that that was the same

8   oath that you took for testimony here today, right?

9      A.  Yes.

10     Q.  Okay.  How did you find out about the

11  lawsuit itself?

12     A.  Mr. Flaxman talked to my uncle.  And I

13  guess -- I don't know how it started.  I really

14  don't know how.  He never explained it to me, about

15  how it happened or what happened.

16     Q.  Do you know any of the other class

17  plaintiffs in the case?

18     A.  No.

19     Q.  The case is captioned Michael Parish and

20  everybody else, do you see that?

21     A.  Yes.

22     Q.  Do you know Michael Parish?

23     A.  No, I don't.

24     Q.  When did you first understand that this

134

1    lawsuit was about money?

2        A.   I don't -- I don't understand.

3        Q.   Okay.  Well, in your interrogatory

4    answers, you talk about the money damages that you

5    think should be awarded, right?

6        A.   Yes.

7        Q.   When did you first understand that --

8        A.   When Mr. Flaxman explained it to me.

9        Q.   Before that time, did you think that you

10   needed to hire a lawyer?

11       A.   Yes.

12       Q.   Did you ever complain to anyone about the

13   three days --

14       A.   Yes.

15       Q.   -- that you were in lockup and you didn't

16   have your medication?

17       A.   Yes.

18       Q.   Who did you complain to?

19       A.   I complained to Mr. Flaxman, and he said,

20   "We think we have a lawsuit here."

21       Q.   Okay.  Did you complain to anybody else

22   besides Mr. Flaxman?

23       A.   No.

24       Q.   Did you talk to the Attorney General's

135

1    Office?

2       A.   No.

3       Q.   The U.S. Attorney's Office?

4       A.   No.

5       Q.   The State's Attorney of Cook County?

6       A.   No.

7       Q.   The Cook County Sheriff's Police?

8       A.   No.

9          MR. CATANIA:  I have no further questions.

10   Thank you, sir.

11         MR. MORRISSEY:  We'll waive his signature.

12           (FURTHER DEPONENT SAITH NOT.)

13

14

15

16

17

18

19

20

21

22

23

24

136

1    STATE OF ILLINOIS  )

2            )  SS:

3    COUNTY OF C O O K  )

4        I, Deborah E. DeSanto, a Notary Public

5    within and for the County of Cook County and State

6    of Illinois, do hereby certify that heretofore,

7    to-wit, on the 14th day of June, 2011, personally

8    appeared before me, at 50 West Washington Street,

9    Room 302, Chicago, Illinois, KEVIN SANDERS, in a

10   cause now pending and undetermined in the Circuit

11   Court of Cook County, Illinois, wherein Michael

12   Parish, et al., are the Plaintiffs and Sheriff of

13   Cook County and Cook County are the Defendants.

14       I further certify that the said KEVIN

15   SANDERS was first duly sworn to testify the truth,

16   the whole truth and nothing but the truth in the

17   cause aforesaid; that the testimony then given by

18   said witness was reported stenographically by me in

19   the presence of the said witness, and afterwards

20   reduced to typewriting by Computer-Aided

21   Transcription, and the foregoing is a true and

22   correct transcript of the testimony so given by

23   said witness as aforesaid.

24       I further certify that the signature to

137

1    the foregoing deposition was waived by counsel for

2    the respective parties.

3        I further certify that the taking of this

4    deposition was pursuant to notice and that there

5    were present at the deposition the attorneys

6    hereinbefore mentioned.

7        I further certify that I am not counsel

8    for nor in any way related to the parties to this

9    suit, nor am I in any way interested in the outcome

10   thereof.

11       IN TESTIMONY WHEREOF:  I have hereunto set

12   my hand and affixed my notarial seal this 30th day

13   of June, 2011.

14

15

16

17

18       Deborah E. DeSanto

19   NOTARY PUBLIC, COOK COUNTY, ILLINOIS

20       LIC. NO. 084-1384

21

22

23

24

**Exhibit) -**

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL PARISH, CURTIS L. OATS,          )
LEILA KHOURY, SEAN DRISCOLL, CARLA       )
LOFTON, ROY CLEAVES, LISA BROWN, DAN     )
TAYLOR, DEAN MILLER, KEVIN SANDERS,      )
STACEY CLARK, and CARLOTTE WATSON,       )
                                         )
                    Plaintiffs,          ) No. 07CV4369
                                         )
          vs.                            )
                                         )
SHERIFF OF COOK COUNTY and COOK          )
COUNTY,                                  )
                                         )
                    Defendants.          )

          The videotaped deposition of STACEY CLARK,
called by the Defendants for examination, taken
pursuant to notice and pursuant to the Federal Rules of
Civil Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
Teresa Resendez, Certified Shorthand Reporter and
Notary Public, at 500 Daley Center, 50 West Washington
Street, Suite 500, Chicago, Illinois, commencing at
9:30 a.m. on the 14th day of September, A.D., 2009.

          PERSCRIBO REPORTING, INC. (312) 236-9211

Page 2

```
 1   APPEARANCES:
 2        LAW OFFICE OF KENNETH N. FLAXMAN
          MS. CECILE SINGER
 3        200 North Michigan Avenue
          Suite 200
 4        Chicago, Illinois 60604
          Phone:  (312)  427-3200
 5
              On behalf of the Plaintiffs;
 6
          ASSISTANT STATE'S ATTORNEY
 7        CIVIL ACTIONS BUREAU
          MR. FRANCIS J. CATANIA
 8        500 Daley Center
          50 West Washington Street
 9        Suite 500
          Chicago, Illinois  60602
10        Phone:  (312) 603-6572
11            On behalf of the Defendants.
12
     ALSO PRESENT:  Mr. Brian C. Falk
13                  Legal-Ease Video Services
                    (773) 262-4472
14
15                 *    *    *    *    *    *
16
17
18
19
20
21
22
23
24
```

1                      I N D E X

2    WITNESS                                    PAGE

3    STACEY CLARK

4         Direct Examination by Mr. Catania .....   5

5         Cross-Examination by Ms. Singer .......  108

6         Redirect Examination by Mr. Catania ...  110

7

8                    E X H I B I T S

9    CLARK DEPOSITION EXHIBIT

10        No. 1 ................................   53

11        No. 2 ................................   60

12        No. 3 ................................   91

13        No. 4 ................................   97

14

15

16

17

18

19

20

21

22

23

24

Page 4

1          THE VIDEOGRAPHER:  We're going on the video record

2    at 9:34 a.m.  My name is Brain Falk.  I'm the

3    videographer from Legal-Ease Video Services in

4    association with Perscribo Reporting.  My address is

5    3550 North Lake Shore Drive, Chicago, Illinois.  The

6    court reporter today is Teresa Resendez of Perscribo

7    Reporting.

8               This will be the videotaped deposition of

9    Stacey Clark taking place today, Monday,

10   September 14th, 2009, at 50 West Washington, Chicago,

11   Illinois.

12              This deposition is being taken in the matter

13   of Michael Parish, Curtis L. Oats, Leila Khoury, Sean

14   Driscoll, Carla Lofton, Roy Cleaves, Lisa Brown, Dan

15   Taylor, Dean Miller, Kevin Sanders, Stacey Clark, and

16   Carlotte Watson, vs. The Sheriff of Cook County and

17   Cook County, in the U.S. District Court for the

18   Northern District of Illinois, Eastern Division,

19   Case No. 07 CV 4369.

20              This deposition is being taken on behalf of

21   the defendant.  The party whose instance this

22   deposition is being recorded on an audiovisual

23   recording device is the defendant.

24              Will Counselors now please identify

Page 5

1    themselves for the record.

2         MR. CATANIA:  Francis Catania for the defendants.

3         MS. SINGER:  Cecile Singer here for the Law Office

4    of Kenneth Flaxman.  I am representing plaintiff Clark.

5         THE VIDEOGRAPHER:  Will our court reporter now

6    swear the witness, please.

7                        (Witness sworn.)

8         THE VIDEOGRAPHER:  Please proceed.

9         MR. CATANIA:  Thank you.

10                       DIRECT EXAMINATION

11   BY MR. CATANIA:

12        Q.   Sir, would you please state your full name

13   and spell your first and last name for the court

14   reporter.

15        A.   Stacey Clark, S T A C E Y, C L A R K.

16        Q.   And, sir, have you ever been deposed before?

17        A.   Excuse me?

18        Q.   You ever sit for a deposition like we are

19   here today?

20        A.   Yes.

21        Q.   Okay.  When was the most recent thing -- time

22   that you did sit for a deposition?

23        A.   It was some years ago.  I don't remember

24   when.

Page 6

1      Q.   Do you remember what type of a case it was?

2      A.   Medical treatment.

3      Q.   And was it in the Circuit Court of Cook

4   County or --

5      A.   No, sir.

6      Q.   Where was it?

7      A.   It was in Marion, Illinois.

8      Q.   Was it in any way related to the penitentiary

9   in Marion, Illinois?

10      A.   No.  It was the county jail.

11      Q.   The Marion County Jail?

12      A.   Mm-hmm.

13      Q.   You have to say --

14      A.   Yes, sir.

15      Q.   Okay.  Sir, I know you've had a deposition

16   before based on what you just told me, but there are

17   some ground rules that I just want to cover just so

18   that we understand each other and so that we have a

19   good record once we're through with this today.  Okay?

20      A.   Okay.

21      Q.   What I'm going to do is I'm going to ask you

22   a bunch of questions about the events that's in the

23   complaint that was filed on your behalf by the lawyers.

24      A.   Okay.

1          Q.   I have a copy of the complaint here which I

2    can show you if we need it.

3               You'll have to answer them under oath.  That

4    means that you've been sworn to tell the truth.  Do you

5    understand that?

6          A.   Yes, sir.

7          Q.   Okay.  The lady next to you is a court

8    reporter.  She is taking down everything that's said.

9    And of course this is a videotaped deposition, so

10   you're also being videotaped during this deposition.

11   Do you understand all that?

12         A.   Yes, sir.

13         Q.   Okay.  At the end of all of this, there'll be

14   a transcript which is a written document of all the

15   things that is being taken down.  And you'll have a

16   chance to look at that and review it.  Do you

17   understand that?

18         A.   Yes, sir.

19         Q.   Okay.  You have the right, as the deponent,

20   to ask for clarifications if there's something you

21   don't understand.  You also have the right to ask for

22   an explanation or a definition.  You can ask for

23   documents if you wish.

24              But I just want you to understand that if you

1    do have a question, that you ask me for those things,

2    for any explanation of the document.  And I'll do my

3    best to help you out.  Okay?

4        A.    Okay.

5        Q.    If you do answer a question, it's going to be

6    assumed that you understood the question in its full

7    meaning.  Is that all right?

8        A.    All right.

9        Q.    If at any time you need to make a -- to stop

10   to take a bathroom break or whatever, all I ask is that

11   you let me know that you want to take a break.  And

12   we'll take a break.  The only condition is that if

13   there's a question that I've asked that hasn't been

14   answered yet that you answer the question before we

15   take a break.  All right?

16       A.    All right.

17       Q.    All right.  Sir, before coming here for your

18   deposition, did you review any records, any documents,

19   or papers?

20       A.    No.

21       Q.    When you got here today, did you review

22   anything in preparation for your deposition?

23       A.    No.  My grievance.

24       Q.    Okay.  And by that you're talking about a

Page 9

1    grievance that you filed with the Sheriff of Cook

2    County regarding the time that you were in our custody

3    at some point, right?

4         A.    Yes, sir.

5         Q.    Okay.  Do you have any documents with you

6    aside from the grievance?

7         A.    No, sir.

8         Q.    Do you have any prescription forms?

9         A.    I have my doctor's name and ...

10        Q.    You don't have any prescription forms?

11        A.    No.

12        Q.    Okay.  Do you have any medical records?

13        A.    No, not with me.

14        Q.    Do you have any available to you at home?

15        A.    Yes.  No.  I can go to the hospital and get

16   it.

17        Q.    You don't have any records, though?

18        A.    No.  It's all at the hospital.

19        Q.    We'll explore that in just a few minutes.  I

20   basically want to know what you have with you, if

21   anything, today.  Okay?

22        A.    Okay.

23        Q.    Could you tell me, what is your date of

24   birth?

Page 10

1      A.    [REDACTED]

2      Q.    Have you ever gone by any other name aside

3  from Stacey Clark?

4      A.    No.

5      Q.    Have you ever used any other date of birth

6  aside from [REDACTED]

7      A.    No.

8      Q.    Do you have an Illinois driver's license?

9      A.    No.

10     Q.    Do you have an Illinois state identification

11 card?

12     A.    Yes.

13     Q.    Do you have it with you today?

14     A.    Yes.

15     Q.    Could I take a look at it?  Show it to your

16 lawyer first.

17     MR. CATANIA:  I've been handed an Illinois state

18 identification card which has the ID number of

19 [REDACTED]        as in Charles.  It's got the date of

20 birth of [REDACTED]     , expires [REDACTED]

21 2011, was issued on July 8th of 2008.  And it's a Type

22 Corrected.

23          It has a picture -- actually, two pictures on

24 it, one on the left side and one in the lower right

1   which are identical.  And they appear to be the person

2   who is sitting across from me at the table here today.

3   BY MR. CATANIA:

4        Q.   Sir, it says that it's a corrected Illinois

5   ID card.  What was corrected?

6        A.   The other one had broke.  So I just went and

7   got a replacement.

8        Q.   Okay.  Could you tell me your current

9   address?

10       A.   _____ Avenue.

11       Q.   And is that in Chicago, Illinois?

12       A.   Yes, sir.

13       Q.   And the zip code?

14       A.   60617.

15       MR. CATANIA:  And those are the -- That's the same

16  information that's on the Illinois ID card that I've

17  been shown.

18            Thank you very much, sir.

19  BY MR. CATANIA:

20       Q.   And could I have your Social Security number,

21  sir?

22       A.   _____

23       Q.   And, sir, do you currently reside with anyone

24  at _____?

1    A.   My wife and my son.

2    Q.   And what is your wife's name?

3    A.   Rolanda Clark, R O L A N D A, C L A R K.

4    Q.   How long have you been married?

5    A.   Thirteen years.

6    Q.   And your son's name?

7    A.   Stacey Denim Clark, D E N I M.

8    Q.   I M?

9    A.   I M, yes, sir.

10   Q.   And how old is Stacey Denim Clark?

11   A.   Four.

12   Q.   How long have you resided at the address we

13   just spoke of?

14   A.   I think, four years.

15   Q.   And what was the next prior address that you

16   stayed at before that?

17   A.   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

18   Q.   In Chicago?

19   A.   Yes, sir.

20   Q.   And how long did you live at that address?

21   A.   I think about four years, three or four

22   years.

23   Q.   Could you tell me a little bit about your

24   prior education.  What's the highest grade you

1    attained?

2         A.    I graduated high school.

3         Q.    What high school?

4         A.    Cosmopolitan Prep.

5         Q.    And where is that located?

6         A.    It was downtown.  It's closed down now.

7         Q.    When did you graduate?

8         A.    In 1987.

9         Q.    Where did you go to grade school?

10        A.    St. Gregory.

11        Q.    And is that located in Chicago?

12        A.    Yes, sir.

13        Q.    On the North side?

14        A.    I think it was 201 North Ashland.  It's on

15   Ashland and Adams.

16        Q.    And when did you graduate there?

17        A.    '83.  I think, '83.  Yeah, '83.

18        Q.    Aside from the high school diploma, have you

19   gotten any degrees or certificates?

20        A.    I got a certificate in carpentry and mold

21   abatement.

22        Q.    Are you in a union?

23        A.    No, sir.

24        Q.    Have you ever worked in the carpentry field?

1      A.    Yes.

2      Q.    What kind of carpentry do you do?

3      A.    Drywalling, things of that nature, home

4  improvement.

5      Q.    When did you get the certificate in

6  carpentry?

7      A.    It was this year.  I think it was in August,

8  August of this year.

9      Q.    And how about the mold abatement?

10     A.    I got that back in 2006, something like that.

11 I'm not really sure.

12     Q.    Okay.  And who is your current employer?

13     A.    No one now.

14     Q.    You're unemployed?

15     A.    Yes.

16     Q.    When you were working, who were you working

17 for?

18     A.    I have his card somewhere.  My -- The last

19 job I had was with Kelly Services.

20     Q.    The temporary service?

21     A.    Yes.

22     Q.    When did you work through the temporary

23 service?

24     A.    In September, I think.  No, not September.

1   August.  It was sometime in August.

2        Q.   Of what year?

3        A.   This year.

4        Q.   Of this year?  Okay.

5        A.   Yeah.

6        Q.   Okay.  So you've only recently become

7   unemployed?

8        A.   Right.

9        Q.   Do you remember the name of your supervisor

10  when you were last employed?

11       A.   From the service?

12       Q.   Yes.

13       A.   Rich.

14       Q.   And from the job itself?

15       A.   I don't remember from the job.

16       Q.   Did you work at a particular job site?

17       A.   Yes.  I was -- I was doing warehouse work.  I

18  wasn't doing carpentry.  I was doing warehouse work at

19  Knights Packing.  It's located on 72nd and Cicero.

20       Q.   Do you remember the name of the business?

21       A.   Knights Packing.

22       Q.   Knights Packing?  Is that K N I G H T?

23       A.   Yes.

24       Q.   Thank you.

1          How long did you work at that particular job?

2      A.   I worked two days.  I had a warrant.  I

3  worked two days, and I got picked up on the warrant.

4  And as I was trying to bond out, they were saying I had

5  a no-bond warrant.  So I couldn't bond out, so I lost

6  the job.  But on my paperwork, it stated I had a bond.

7  So I don't understand why it was --

8      Q.   Okay.

9      A.   -- being held.

10     Q.   When -- When you were picked up on the

11  warrant, what agency picked you up?

12     A.   The State troopers.

13     Q.   And where were you arrested on the warrant?

14     A.   From home.

15     Q.   Was it a failure-to-appear warrant?

16     A.   Yes.

17     Q.   Okay.  And where was the court located

18  that --

19     A.   Urbana/Champaign.

20     Q.   Were you brought to Urbana/Champaign on that

21  warrant?

22     A.   Yes.  They -- Cook County held me for two

23  weeks.  And they denied me bond so -- but I had a bond.

24     Q.   Okay.  All right.  You were held at the Cook

1    County Jail then?

2         A.   For two weeks, yes.

3         Q.   When was that?

4         A.   I think it was the 30th, 7/30/09.

5         Q.   Okay.  Now, you're looking at a document

6    right now?

7         A.   Yes.

8         Q.   That's kind of one of the things I was asking

9    about when I asked if you reviewed any documents or

10   papers.  Is that a document that you reviewed before

11   today's deposition?

12        A.   No.  This is totally -- This is something

13   else.

14        Q.   Okay.

15        A.   This is just -- I was trying to figure out

16   the dates that I was incarcerated.

17        Q.   Okay.  Are those notes that you've taken

18   about those dates?

19        A.   This is something that I retrieved because,

20   like I said, I had a warrant.

21        Q.   Okay.

22        A.   I had a warrant, and I was denied bail when I

23   tried to bond out.  So I got this to show the attorney

24   that it states I had a bond.  But they wouldn't let me

1    bond out.  And I was trying to figure out why because I

2    lost my job as a result of this.

3         Q.   Okay.  Could I take at look at those records?

4         A.   Yes, you can.

5         Q.   Thank you very much.

6         MR. CATANIA:  For the record, I've been handed a

7    Clerk of the Court, Circuit Court record from Champaign

8    County, Illinois, the name of Linda S. Frank as Clerk

9    of the Court.  And it appears to be a Traffic Case

10   Lookup History for a case 09 TR 007433, which

11   apparently is for the charge of driving while license

12   suspended, a Class A misdemeanor, according to the note

13   from, looks like, April 2nd of '09.

14   BY MR. CATANIA:

15        Q.   Is that the day that you got ticketed from

16   Champaign County?

17        A.   Yes.

18        Q.   Okay.  And that's the document that you say

19   was -- that shows that there was a warrant issued for

20   you?

21        A.   Mm-hmm.

22        Q.   And that you didn't appear in court on a

23   certain day, right?

24        A.   Right.

1       Q.    Okay.  Do you remember what day you were

2   supposed to appear in court?

3       A.    I appeared.  I was just late.

4       Q.    Okay.

5       A.    So they didn't accept -- They wouldn't let me

6   in the courtroom.

7       Q.    All right.  In any event, were you arrested

8   from your home by State troopers --

9       A.    Yes.

10      Q.    -- on July 30th of '09?

11      A.    Yes.

12      Q.    Okay.  And they were serving a bench warrant

13  for failure to appear in Champaign County?

14      A.    Yes.

15      Q.    And then you went from there to what

16  location?

17      A.    I went to 111th and -- I don't know the exact

18  address.  It's a police station on 111th.

19      Q.    Okay.  And were you brought by the troopers,

20  the State troopers to that location?

21      A.    Yes.

22      Q.    And that's a Chicago police lockup; is that

23  right?

24      A.    Yes.

1      Q.    Okay.  Were you brought into the lockup area?

2      A.    Yes.

3      Q.    Was that before or after bond court?

4      A.    I didn't go to bond court then.  I went to

5   bond court in Cook County.  I went there -- When they

6   took me there, they told my wife she could come bond me

7   out because I had a $500 warrant.

8      Q.    Okay.

9      A.    $5,000; ten percent, 500.

10           So when she got there, they started saying

11   that I had a no-bond warrant.  But after my attorney in

12   Car- -- in Urbana retrieved this, he told me that I had

13   a warrant.

14      Q.    Okay.

15      A.    So I should have been able to post bond.

16      Q.    To your knowledge, was that the only warrant

17   that was --

18      A.    Yes, sir.

19      Q.    -- in effect at the time?

20      A.    Yes, sir.

21      Q.    Okay.  Have you since then realized that

22   there were other holds on you besides that?

23      A.    There is no other holds on me.

24      Q.    All right.  This morning you had court; is

1    that right?

2          A.    Yes, sir.

3          Q.    Okay.  9:00, in this building?

4          A.    Yes, sir.

5          Q.    And that was on the fourth floor?

6          A.    Basement.

7          Q.    Okay.  What kind of a case was that in the

8    basement?

9          A.    Driving.

10         Q.    Was it a speeding ticket?

11         A.    Yes.

12         Q.    All right.  Were you charged at all with that

13   ticket for driving while license suspended?

14         A.    No.

15         Q.    But you were driving, right?

16         A.    Yes.

17         Q.    And it was in the state of Illinois?

18         A.    Yes.

19         Q.    And your license currently is not valid; is

20   that right?

21         A.    Yes, sir.

22         Q.    Did you get ticketed for not having a

23   driver's license on your person?

24         A.    Yes.

1        Q.    All right.  When you got to court, in court,

2    did you resolve your case?  Are you done with it?

3        A.    No, sir.

4        Q.    Okay.

5        A.    It's continued.

6        Q.    All right.  At 111th Street, you say that you

7    were brought into a lockup --

8        A.    Mm-hmm.

9        Q.    -- pending the posting of bond; is that

10   right?

11       A.    Yes, sir.

12       Q.    Did they fingerprint you?

13       A.    Yes, sir.

14       Q.    Take your picture?

15       A.    Yes, sir.

16       Q.    They ask you a series of booking questions?

17       A.    Yes.

18       Q.    And when they booked you in, did they ask you

19   about your current medical condition?

20       A.    No, sir.

21       Q.    Did they ask you if you were in distress in

22   any way?

23       A.    No, sir.

24       Q.    They just put you in a lockup?

Page 23

1        A.    Yes.

2        Q.    Is that because you expected to post bond?

3        A.    Yes, sir.

4        Q.    All right.  And after you sat there, you say

5    that you were told that you would not be able to post

6    bond; is that right?

7        A.    Yes, sir.

8        Q.    And where did they -- Did they leave you in

9    the jail then at --

10       A.    They took me -- They transferred -- I sat

11   there for three days.  Then they transferred me to the

12   County jail.

13       Q.    Okay.

14       A.    Which I sat until -- for two weeks until

15   Champaign came and got me.

16       Q.    Okay.  And your sitting for two weeks was

17   because Champaign was going to come pick you up, is

18   that right --

19       A.    Right.

20       Q.    -- on the warrant?

21       A.    Right.

22       Q.    At any time at Cook County Jail, did you post

23   bond?

24       A.    They wouldn't let me.  They -- I went to a

1    bond hearing.

2        Q.   At 26th Street?

3        A.   Yes.

4        Q.   Okay.

5        A.   And they told me that I had a no-bond

6    warrant.

7        Q.   Okay.  At any time after your bond hearing

8    where they told you you had a no-bond warrant, did you

9    attempt to post $5,000 or $500 bond at the jail?

10        A.   Yeah.  My wife was there at court.

11        Q.   Did you try to post bond?

12        A.   No.

13        Q.   Did you have a credit card for posting the

14    bond?

15        A.   No.

16        Q.   Okay.  So your wife was at the bond

17    hearing --

18        A.   Yes, sir.

19        Q.   -- at 26th Street?

20        A.   Yes, sir.

21        Q.   Okay.  Did you have any other charges on you

22    at the time you went to the bond hearing?

23        A.   No, sir.

24        Q.   Just that warrant?

Page 25

```
 1        A.   Yes.

 2        Q.   And the traffic tickets?

 3        A.   Mm-hmm.

 4        Q.   Is that yes?

 5        A.   Yes.

 6        Q.   Okay.  And one of those was a -- driving with

 7   no license; is that right?

 8        A.   Yes.

 9        Q.   Okay.  And what class of a charge is driving

10   with no license; do you know?

11        A.   No.

12        Q.   Okay.

13        A.   I think, it's -- they charged me with a Class

14   A misdemeanor, I think.

15        Q.   Okay.

16        A.   I think.  I don't know.  I'm not sure.

17        Q.   All right.  Have you ever been in the

18   military?

19        A.   No, sir.

20        Q.   You mentioned earlier that there was a prior

21   lawsuit that involved Marion County Jail?

22        A.   Yes.

23        Q.   Okay.  When was that lawsuit filed?

24        A.   I don't remember.
```

1     Q.    Where was it filed, what courthouse?

2     A.    I think, I guess, in Carbondale.

3     Q.    Is it more than five years ago that that

4    lawsuit was pending?

5     A.    Yes.

6     Q.    And that arose out of being incarcerated by

7    Marion; is that right?

8     A.    Yes.

9     Q.    All right.  And you said that it was a

10    medical case, right?

11     A.    Yes.

12     Q.    Did they -- Were you treated at Marion -- at

13    Marion County?

14     A.    Yes.  After the suit was filed, they took me

15    to the dentist because I had a tooth --

16     Q.    Okay.

17     A.    -- infected.

18     Q.    All right.  So you were trying to get dental

19    care while you --

20     A.    Yes.

21     Q.    -- were in custody?

22     A.    Yes.

23     Q.    All right.  And that was custody pending a

24    charge; is that right?

Page 27

1      A.   Time being served.

2      Q.   Okay.  So you were serving a sentence at the

3  time?

4      A.   Yes.

5      Q.   And what type of charge was it again for

6  that?

7      A.   Driving.

8      Q.   Was that driving charge a felony or

9  misdemeanor?

10     A.   A misdemeanor.

11     Q.   Have you ever been convicted of a felony

12  charge?

13     A.   Yes.

14     Q.   What felony?

15     A.   Driving on revoked.

16     Q.   When was that?

17     A.   I don't remember.

18     Q.   And your license is actually still revoked;

19  is that right?

20     A.   Yes, sir.

21     Q.   And by "revoked," that means that you have to

22  satisfy the Secretary of State before you're permitted

23  to drive again, right?

24     A.   Pending a year.  After one -- After a year,

1   I'm eligible to do that.

2        Q.   Right.  You're eligible to ask the Secretary

3   of State --

4        A.   Yes.

5        Q.   -- to grant you a license?

6        A.   Yes.

7        Q.   All right.  And to this date, you haven't

8   done that?

9        A.   No.

10       Q.   Okay.  Aside from that felony, have you ever

11  been convicted of any other felony?

12       A.   No.

13       Q.   And you mentioned misdemeanors and serving a

14  sentence on a misdemeanor charge.  You've been

15  convicted of traffic misdemeanors; is that right?

16       A.   Yes.

17       Q.   Any other misdemeanors besides traffic

18  misdemeanors?

19       A.   No.

20       Q.   And so that we're both talking about the same

21  thing, a misdemeanor is a charge which you can go to

22  jail for up to a year, right?

23       A.   I believe so.

24       Q.   And a felony is one for which you can go to a

1    penitentiary for more than a year, right?

2         A.   Yes.

3         Q.   Prior to -- Well, tell me when it was that

4    you are alleging that the Sheriff of Cook County denied

5    you medical treatment that's the subject of the lawsuit

6    here today.

7         A.   I had went to court and parked in Bridgeview,

8    I believe.  And when I went to court, the judge had

9    upgraded my bond.  So I had to go to the County jail.

10   And when I went to the County jail and I went to

11   receiving, they asked me did I have any medical

12   problems.

13        Q.   Okay.

14        A.   I told them I had acid reflux.

15        Q.   All right.  We'll get to those facts in just

16   a moment.  I just want to know what time frame are we

17   talking about regarding that --

18        A.   45 days.

19        Q.   When was --

20        A.   But I don't -- I have to look on the

21   grievance.

22        Q.   Okay.

23        A.   And I don't -- I don't remember the day I

24   went in and the day I got out.

1      Q.    Is that the first time that you had been to

2  the Cook County Jail?

3      A.    No, sir.

4      Q.    How many times before that time had you been

5  to the County jail?

6      A.    I don't -- I don't -- About two or three.

7      Q.    And each time you went to the County jail

8  before that, did you also enter into an intake area?

9      A.    Yes.

10      Q.    And did you discuss your medical issues with

11  people in the intake area?

12      A.    Yes.

13      Q.    Okay.  When -- Can you tell me approximately

14  when those other prior times were that you went into

15  the jail?

16      A.    No.  I can't tell you approximately.

17      Q.    Now, you mentioned a grievance.  Is that the

18  document you reviewed earlier?

19      A.    Yes.

20      Q.    Would it help you to remember the date that

21  you came into the jail by looking at the grievance?

22      A.    It might.

23      Q.    Why don't you just take a look at it and tell

24  me if your memory is refreshed.

1       A.   This was on the 12th -- 12/11/07.

2       Q.   All right.  Would you say it was --

3       A.   It had to be like in November.

4       Q.   Okay.  And that would be November of '07?

5       A.   Yes.

6       Q.   Do you remember who it was that arrested you

7    in November of '07?

8       A.   No, sir.

9       Q.   Do you remember what agency it was?

10      A.   Chicago police, I believe.

11      MR. CATANIA:  Can I take a look at that?

12      MS. SINGER:  Sure.

13      MR. CATANIA:  Thank you.

14   BY MR. CATANIA:

15      Q.   When you were arrested by the Chicago police

16   for the November of '07 arrest, were you -- where were

17   you?

18      A.   I was in court.  I was arrested in court.

19      MR. CATANIA:  All right.  I've been handed a Cook

20   County Department of Corrections Detainee Grievance

21   form.

22   BY MR. CATANIA:

23      Q.   It appears as if you dated it December 11th

24   of 2007.  The date that's on here, is that the date you

1    wrote the grievance?

2         A.   Yes.

3         Q.   Okay.  And it says in Brief Summary, I feel I

4    am being denied medical treatment; when I first got

5    here, I told the staff in receiving I had acid reflux

6    and I have a prescription for -- and it's blank -- if I

7    told the nurse -- for it -- I'm sorry -- for it; I told

8    the nurse and nothing happened; could someone please

9    reply; I'm in serious pain.  And it's signed at the

10   bottom, Stacey Clark.  That's your signature?

11        A.   Yes, sir.

12        Q.   And below that, there's another signature.  I

13   can't really read what it is.  It begins with the

14   letter B, I believe, and it has a date of 12/12/07.

15        A.   Yes.

16        Q.   And it's next to something that says CRW's

17   signature.  Do you know what CRW is?

18        A.   No, sir.

19        Q.   Okay.  Page 2 of this same grievance form

20   also has the name written Stacey Clark and an

21   ID No. 2007-0090960.  And the CRW's summary of the

22   complaint is "Detainee alleges lack of medical

23   attention."  This was given to Cermak on December 13th

24   of '07.  That's what it says on the document, right?

1          A.    Yes, sir.

2          Q.    Okay.  And the response was that it was

3    referred to a divisional physician and Patient Care

4    Services.  Do you remember that response?

5          A.    Yes.

6          Q.    In fact, when that response was given to you

7    by Leroy Warren on December 17th, you actually signed

8    it -- Actually, December 20th of '07, you signed it; is

9    that right?

10         A.    Yes, sir.

11         Q.    Okay.  When was it that you were released

12   from Cook County Jail during this incarceration?

13         A.    I don't remember.

14         Q.    Was it before or after you received that

15   response to the grievance?

16         A.    It was before.  Wait.  No.  I think I

17   received that -- Yeah.  I received that before I was

18   released.

19         Q.    Were you released in 2007?

20         A.    Yes.

21         Q.    Did you go see a physician or Patient Care

22   Services?

23         A.    No, sir.

24         Q.    All right.  Do you know if you were scheduled

1   for those procedures?

2       A.   No, I do not.

3       Q.   Okay.  Now, you say that when you came into

4   the jail in November of '07 that you told them about a

5   physical illness that you had at the time.  What

6   illness was that?

7       A.   Acid reflux.

8       Q.   Okay.  When were you first diagnosed with

9   acid reflux?

10      A.   In '96.

11      Q.   So at the time you entered the jail, you had

12   already had that disease for at least 11 years, right?

13      A.   Yes, sir.

14      Q.   And what were you taking for that acid

15   reflux?

16      A.   I took Nexium, Prevacid.  And now my doctor

17   has me on another medication because I switched

18   doctors.

19      MS. SINGER:  Can I spell out what the other

20   medication is, just the spelling of it?

21      MR. CATANIA:  Spelling?

22      MS. SINGER:  It's Omeprazole,

23   O M E N P R A Z O L E.  It's a generic for Prevacid.

24      MR. CATANIA:  Thank you.

Page 35

1      MS. SINGER:  Okay.

2  BY MR. CATANIA:

3  BY MR. CATANIA:

4      Q.   All right.  Could you tell me what is the

5  cause of your illness?

6      A.   I have no idea.  I just start having heart

7  burn real bad.

8      Q.   Okay.

9      A.   And I went to the doctor.

10     Q.   Aside from the prescriptions that you've

11 described, have you ever used over-the-counter

12 medication?

13     A.   No.

14     Q.   Okay.  Aside from the prescriptions that

15 you've mentioned including the generic form of it, have

16 you ever done anything else to alleviate the symptoms?

17     A.   No.

18     Q.   Okay.

19     A.   Nothing else helps.

20     Q.   When you came into the jail, I take it you

21 were at least there for the several weeks that the

22 grievance was pending, right?

23     A.   Mm-hmm.

24     Q.   Yes?

Page 36

```
 1        A.    Yes.

 2        Q.    All right.  Did you have any particular

 3   dietary needs at the time?

 4        A.    No.

 5        Q.    Did you do anything different in terms of

 6   your diet?

 7        A.    No.  I just had to eat what they gave me.

 8        Q.    Which is a pretty bland diet; isn't it?

 9        A.    Yeah.

10        Q.    Tasteless?

11        A.    Yeah.

12        Q.    Okay.  Is anybody else in your family prone

13   to this particular disease?

14        A.    No.

15        Q.    In your treatment plan with any of the

16   doctors that you've had since 1996, aside from the

17   medication, has there been any other treatment that's

18   been recommended?

19        A.    No.

20        Q.    No doctor told you to avoid certain foods?

21        A.    No.

22        Q.    No doctor told you to have a different kind

23   of diet than the one you were currently having?

24        A.    Just stop eating greasy -- a lot of greasy
```

1    food.  That's it.

2        Q.   So you were told not to eat greasy food?

3        A.   Yes.

4        Q.   Were you told at any time not to drink

5    alcoholic beverages?

6        A.   Yeah.

7        Q.   And that's what I was talking about when I

8    asked if you had made any changes in your diet.

9        A.   Oh, okay.

10        Q.   Did you change to not eating greasy food?

11        A.   Yeah.  I still eat it sometimes because, you

12    know, it's hard to ...

13        Q.   Do you sometimes also drink alcoholic

14    beverages?

15        A.   Beer, yeah.

16        Q.   Okay.  How many times had you had a

17    prescription written for you for the acid reflux?

18        A.   Once a month since '96, 30-day prescription.

19        Q.   All right.  So your doctor would have you

20    come back monthly to rewrite the prescription; is that

21    right?

22        A.   Yes.

23        Q.   All right.  What type of injuries were caused

24    by the acid reflux?

1      A.   I had erosions in my esophagus from the acid

2   coming up.

3      Q.   And was that back in 1996?

4      A.   This is recently.

5      Q.   Recently?  Okay.

6           When did you have erosion in your esophagus

7   first diagnosed?

8      A.   I think it was two years ago.

9      Q.   Two years ago, you were first diagnosed with

10  having that erosion, right?

11     A.   Yes.

12     Q.   Okay.  When specifically in the year, two

13  years ago, was it diagnosed?

14     A.   I'm not sure.

15     Q.   Was it before the incarceration of November

16  of '07?

17     A.   I'm not sure.

18     Q.   Okay.  Is there anything that would refresh

19  your memory about when it was that you were diagnosed

20  with the erosion of your esophagus?

21     A.   I go to the doctor almost once a month.  So

22  it's just -- You know, if I -- If I know I can't get to

23  him, I ask him to, you know, write a prescription

24  for -- write me two prescriptions.  He'll write me a

1    prescription for the month that I'm there, and then

2    he'll write it for the next month.  Then I won't have

3    to go see him and then, you know, so on and so on.  It

4    started getting so bad that he had scoped my esophagus,

5    and that's when he seen erosions, you know, so ...

6         Q.   Okay.

7         A.   That's when I really started laying off the

8    greasy food and stuff like that.

9         Q.   All right.  Did you also at that time lay off

10   the alcoholic beverages?

11        A.   Yeah, yes.

12        Q.   Okay.  All right.  What's the name of the

13   doctor that did that procedure, the scope?

14        A.   Dr. Islib.

15        Q.   Could you spell it for me?

16        A.   I think it's I L -- I S L I B.

17        Q.   And do you know the doctor's first name?

18        A.   No, sir.

19        Q.   And do you know what his specialty is?

20        A.   No, sir.

21        Q.   Is he a medical doctor?

22        A.   Yeah.  He's my physician.

23        Q.   Okay.

24        A.   Was.

Page 40

```
 1        Q.    How long had he been your physician?

 2        A.    About a year.

 3        Q.    When was it that was -- he was your

 4   physician?

 5        A.    I think in '97.

 6        Q.    Okay.  Aside from Dr. Islib from 1997, had

 7   you seen any other doctors?

 8        A.    Yes, sir.

 9        Q.    What other doctors?

10        A.    My current doctor now is Dr. Levine.

11        Q.    Is that L E V I N E?

12        A.    Yes.

13        Q.    And is he also a medical doctor?

14        A.    Yes.

15        Q.    Do you know where he practices?  What's

16   his --

17        A.    Mercy Hospital.

18              Dr. Islib practiced there too at Mercy.

19        Q.    And would you see the doctors at Mercy

20   Hospital or at the --

21        A.    Yes.

22        Q.    -- medical center?

23        A.    At Mercy Hospital.

24        Q.    Okay.  And you say that Dr. Levine is your
```

1    current doctor; is that right?

2         A.   Yes.

3         Q.   When did you first start seeing Dr. Levine?

4         A.   About five months ago.

5         Q.   Did you see any doctor after being released

6    from custody in the '07 arrest?

7         A.   No.  I just started back taking my medicine.

8         Q.   I'm not sure if I understand totally.  But

9    what was the reason you were in custody in

10   November of '07?

11        A.   Driving on revoked.

12        Q.   And that was a Chicago police arrest?

13        A.   Yes.

14        Q.   Okay.  All right.  When you arrived at the

15   Cook County Jail for that arrest --

16        A.   Mm-hmm.

17        Q.   -- did you come from a police lockup?

18        A.   Yes.

19        Q.   What police lockup?

20        A.   If -- No.  I think I had turned myself in at

21   court.  I think I was sentenced, and I went to court

22   and turned myself in.

23        Q.   Okay.  That's very helpful.

24             So you were -- You turned yourself in

Page 42

1    court -- into the courtroom?

2         A.   Mm-hmm.

3         Q.   Is that right?

4         A.   Yes.

5         Q.   And you were sentenced to serve a sentence --

6         A.   Yes.

7         Q.   -- on the driving revoked?

8         A.   Yes.

9         Q.   And so your time in jail was during serving

10    that sentence; is that right?

11        A.   Yes.

12        Q.   All right.  And you told the people in the

13    intake area that you were -- that you had acid reflux,

14    right?

15        A.   Yes.

16        Q.   Do you remember who it was you first told

17    about the acid reflux?

18        A.   No, I don't remember who it was.

19        Q.   Okay.  Did you tell the Chicago police

20    officers about the acid reflex?

21        A.   No.

22        Q.   Okay.  The court services officers in the

23    courtroom, did you tell them about the acid reflex?

24        A.   No.

Page 43

```
 1        Q.    Were you aware at the time that you
 2   surrendered in court to serve your sentence that you
 3   were going to be serving a sentence?
 4        A.    Yes.
 5        Q.    And that was because you had worked out a
 6   plea agreement for that case?
 7        A.    Yes.
 8        Q.    And you knew that you were going to be
 9   serving the sentence before you even got to the
10   courtroom?
11        A.    Yes.
12        Q.    Okay.  Did you know how long the sentence
13   was?
14        A.    I think it was seven days or something.  I
15   don't quite remember.
16        Q.    Okay.  And, now, we are still talking about
17   the incident that brought you to the jail that's in the
18   complaint; is that right?
19        A.    Mm-hmm.
20        Q.    The written complaint.
21        A.    Okay.
22        Q.    I'm going to open up this complaint and show
23   you.  This is Document 21 in the Case No. 07 CV 4369,
24   which is the complaint that we're here for.  And I want
```

Page 44

1   you to take a look at paragraphs 72 through 75 which

2   are on page 14.

3          MS. SINGER:  Can I see that first, please?

4          MR. CATANIA:  I thought you wrote it.

5          MS. SINGER:  You wanted all the way to what?

6          MR. CATANIA:  Just the ones that are under his

7   name.  I think it's through 75, 72 to 75.

8          MS. SINGER:  Okay.

9   BY MR. CATANIA:

10          Q.   All right.  Those paragraphs, if you just

11   take a quick moment to review those few paragraphs.

12          Okay.  You've had a chance to look at those,

13   right?

14          A.   Yes.

15          Q.   And in paragraph 72, it says that you were

16   admitted to jail in December of 2007.  Is that about

17   what time you were enter -- you entered the jail?

18          A.   No.  Before then, I think.

19          Q.   Before then.

20          But it was in 2007?

21          A.   Yeah, it was in 2007.

22          Q.   Okay.  And you informed the medical

23   technician upon admission that you suffered from acid

24   reflux and were taking prescription medication to

Page 45

1    control it?

2         A.    Yes.

3         Q.    And you told you the -- And "The technician,

4    it says, "refused to permit Clark to see a physician

5    and Clark was admitted to the jail without medication."

6    Right?

7         A.    Right, yes.

8         Q.    Is the person you informed that you were

9    talking prescription medication the person who refused

10   to send you to the doctor?

11        A.    Excuse me.  I didn't understand that.

12        Q.    Okay.  The person that you told that to, the

13   medical technician --

14        A.    Uh-huh.

15        Q.    -- is that the person that refused to send

16   you to the doctor?

17        A.    I suppose.  No.  I guess the person that

18   refused to send me to the doctor is when I got to the

19   division I was in.  Before you get to the division, you

20   go through a doctor.

21        Q.    Okay.

22        A.    Because they draw blood and stuff from you.

23        Q.    All right.

24        A.    And I told them then that I had acid reflux.

Page 46

1      Q.   Okay.

2      A.   And I -- They asked me what prescription did

3  I take.  And I told them.  And they said, well, they --

4  it costed too much.

5      Q.   All right.  What prescription did you tell

6  them you were taking at that time?

7      A.   I think I was taking Prevacid at that time.

8      Q.   Okay.  All right.  You were -- You told the

9  medical technician or doctor --

10     A.   Mm-hmm.

11     Q.   -- that you were taking Prevacid; is that

12 right?

13     A.   Yes.

14     Q.   All right.  Can you describe the person that

15 you told?

16     A.   No, I can't describe them.

17     Q.   All right.  If you saw that person again

18 today, would you be able to identify that person?

19     A.   I can't say for sure.

20     Q.   If you saw them on the street, would you be

21 able to recognize that person?

22     A.   I can't say.

23     Q.   Aside from the general not being able to

24 describe, is there anything in particular about the

1   person that stands out in your memory?

2        A.   He was tall, Caucasian.

3        Q.   Tall Caucasian?

4        A.   Yeah.

5        Q.   Was he wearing any particular uniform?

6        A.   He had on a medical coat.

7        Q.   Okay.  Are you certain it was not a shortish

8   African-American man named James Myvet?

9        A.   No.

10       Q.   You're not certain?

11       A.   I'm not certain.

12       Q.   Okay.  You spoke with more than one person at

13   intake, right?

14       A.   Right.

15       Q.   Did you only tell one of them about the acid

16   reflux?

17       A.   I told -- told the person who writes

18   down on -- he checks off a list of what illness or

19   whatever you have.

20       Q.   Okay.

21       A.   And then when I went around where they draw

22   my blood, I told them I had it, told them too.

23       Q.   Aside from those two people, did you tell

24   anybody else about the acid reflux and the

Page 48

1    prescription?

2         A.   Yes.  When I got on the deck, when I got to

3    my division.

4         Q.   Okay.

5         A.   I told the guard.  And then I talked to the

6    nurse, and I told the nurse.

7         Q.   What division were you in?

8         A.   I'm -- I forgot.

9         Q.   Okay.  Is it a division you had been in

10   previously before that when you were in the jail?

11        A.   I don't think so.

12        Q.   Did you tell the nurse on the same day that

13   you entered the division or sometime after?

14        A.   Sometime after because she didn't -- I -- You

15   come out at certain times, so it's hard for you to

16   catch the nurse unless you out.

17        Q.   Okay.  Did you tell the guard when you first

18   arrived at the location?

19        A.   Yes.

20        Q.   Can you describe the nurse that you told

21   sometime later?

22        A.   No.

23        Q.   Anything about the nurse that you can

24   describe?

Page 49

1      A.   No.

2      Q.   So you wouldn't remember the race of the

3   nurse?

4      A.   I think she was black, yeah,

5   African-American.

6      Q.   Is that the only nurse that you described

7   your condition and your prescription to?

8      A.   I think so.  I'm not sure.

9      Q.   Okay.  Was that nurse there to pass out

10  medication at the time?

11     A.   Yes.

12     Q.   Did she ask you to fill out any form at that

13  time?

14     A.   No.

15     Q.   Did you fill out any forms requesting medical

16  treatment?

17     A.   I filled out a doctor request form or

18  something like that.

19     Q.   And when you filled out that form, what did

20  you do with it?

21     A.   I put it in a box.  It's a box they have that

22  you put your stuff in.

23     Q.   Okay.  And what you're talking about is not

24  the detainee grievance that you showed us earlier,

Page 50

1   right?

2       A.   No.

3       Q.   Okay.  When you first told the guard about

4   the prescription and your need for it, that was when

5   you first arrived at the division?

6       A.   The next day.

7       Q.   Okay.  Do you remember what shift?

8       A.   First shift.

9       Q.   And when you told that guard, could you tell

10  me -- can you describe the guard?

11      A.   No.

12      Q.   Is there anything about the guard that you

13  could tell me in terms of description?

14      A.   No.

15      Q.   Okay.

16      A.   I don't even remember what race he was.  It

17  would be two and three of them, so I don't want to ...

18      Q.   If you saw either the nurse or that guard on

19  the street, would you recognize them?

20      A.   No.

21      Q.   Now, Paragraph No. 75 of that complaint in

22  Document No.  21 says "Clark experienced great pain and

23  suffering at the jail because he was not permitted to

24  take appropriate medication for his serious medical

Page 51

1    condition."  What is the great pain that you were

2    suffering from?

3         A.   The acid from my stomach comes up through my

4    esophagus, and it burns.  That's how I got the erosions

5    in my esophagus because it eats up everything that it

6    touches as it comes up.

7         Q.   Okay.  When you felt that feeling of burning

8    sensation from the acid reflux, who was the first

9    person you told about that in the jail?

10        A.   The guard.

11        Q.   Okay.  Do you remember when it was you told

12   the guard?

13        A.   No.

14        Q.   Did it relieve that pain if you did not eat

15   anything?

16        A.   No.  Once it start digesting, it made it

17   worser.

18        Q.   Okay.  So when you ate, it actually got worse

19   when you ate?

20        A.   Yeah.

21        Q.   Did you attempt to stop eating then?

22        A.   I -- I slowed down eating.  I didn't try to

23   stop completely because I knew I had to eat.  I just

24   didn't eat that much.

1      Q.    When you saw the social worker, the CRW, did

2    you tell that social worker about the sensation of

3    pain?

4      A.    Yeah.

5      Q.    Do you remember when it was that you said

6    that?

7      A.    No.

8      Q.    The detainee grievance that I have here says

9    that it was received by the CRWs on 12/12/07, and it

10   says that you received a response on 12/20/07.  Were

11   either one of those dates the dates that you told that?

12     A.    I don't know.  The social worker didn't bring

13   me that back.  The guard gave me that back.

14     Q.    Okay.

15     A.    When I finally talked to the social worker,

16   she told me that the County wasn't going to -- the

17   medicine cost too much so I wasn't going to get that

18   medication.

19     Q.    Was it the social worker that told you that?

20     A.    Yes.

21     Q.    Okay.

22     A.    And I asked the social worker can -- is it

23   possible that my wife can bring my prescription and

24   I -- they issue it out to me that way.  And they say,

Page 53

1    no, that wasn't going to happen either.

2         Q.    Okay.  The social worker that you told this

3    to and told you that it was too expensive, could you

4    describe that person for me?

5         A.    It was Ameri -- a black American --

6    African-American female.  That's all I remember.

7         Q.    No height, no weight, nothing like that?

8         A.    No.  She was --

9         Q.    Approximate age?

10        A.    I guess between 35 and 40, something like

11   that.

12        Q.    Was she the social worker assigned to your

13   division at the time?

14        A.    I believe so.

15        Q.    Aside from that one time, did you see her any

16   other time?

17        A.    Yeah.  But I was in my cell, so I couldn't

18   get out to talk to her.  She only came on certain days.

19        Q.    All right.  The grievance form that you've

20   given me, I have received a copy from Mr. Flaxman which

21   I'm going to mark as Exhibit 1.

22                       (Clark Deposition Exhibit No. 1

23                        marked as requested.)

24

1    BY MR. CATANIA:

2        Q.    Sir, I just want you to take a look at

3    Exhibit 1 and tell me if that is a true and accurate

4    photocopy of the grievance that was just shown to us.

5        A.    Yes.

6        Q.    Can you look on the second page.  Is that

7    page also true and accurate?

8        A.    Yes.

9        Q.    Okay.  So that is a copy of the grievance

10   that you showed me this morning; is that right?

11       A.    Yes.

12       Q.    Okay.  On that copy on page 2, there's a box

13   below where your signature appears and it says

14   "appeal."  Did you appeal the finding in this

15   grievance?

16       A.    No.  Because I was released.

17       Q.    When were you released?

18       A.    I was released like two or three days after I

19   received this.

20       Q.    Aside from this grievance, had you shown or

21   given anybody any other information in writing about

22   the denial of medical care --

23       A.    No.

24       Q.    -- that you're claiming?

Page 55

1        A.    No.

2        Q.    All right.  Now, you said earlier that the

3   physician that diagnosed you at Mercy Hospital was -- a

4   diagnosis in 1997; is that right?

5        A.    That wasn't Mercy.

6        Q.    Okay.

7        A.    I don't remember.  I can find out, but I

8   don't recollect.

9        Q.    What other locations besides Mercy had you

10  been diagnosed and/or treated?

11       A.    Northwestern.

12       Q.    Northwestern Memorial Hospital?

13       A.    Yes.

14       Q.    When did you go there?

15       A.    I'm not -- I don't remember.  It was back in

16  the '90s.

17       Q.    Were you treated at Northwestern for the acid

18  reflux?

19       A.    Yes.

20       Q.    Do you remember the name of the doctor that

21  treated you?

22       A.    No, sir.

23       Q.    And after Northwestern, where else were you

24  treated for?

Page 56

1      A.    I believe that was it, just Northwestern and

2  Mercy, because I've been at Mercy for a long time.

3      Q.    Is your memory now exhausted as to all the

4  places that you were treated for the acid reflux?

5      A.    That's all I can remember.

6      Q.    Okay.  And you were actually seen at the

7  hospital, at Mercy Hospital, once a month for the

8  years -- the 11 years intervening?

9      A.    No.  I was at Northwestern before Mercy.

10     Q.    Okay.  But after going to Mercy, then it

11 was --

12     A.    Yeah.

13     Q.    -- every month you went there?

14     A.    Almost every month.  Like I say, sometimes --

15 Like now, my prescription, my -- The doctor I have now,

16 he wrote my prescription out for 90 days.  So I don't

17 have to go back and see him until my 90 -- my

18 prescription is up.

19     Q.    Okay.  But the other doctors had you coming

20 back every month or so?

21     A.    Yeah.

22     Q.    Okay.  Aside from the two physicians that you

23 mentioned, are there any other doctors that you

24 remember the names of?

1      A.   Uh-uh, I can't remember.

2      Q.   When you were speaking with the intake

3   medical technician that was writing the information

4   down after asking you questions --

5      A.   Mm-hmm.

6      Q.   -- were there other people around you at the

7   time?

8      A.   Yes.

9      Q.   How close were they at the time?

10     A.   Like right here, because they -- Somebody was

11  doing the same thing to them, but they was asking them

12  questions too.

13     Q.   Okay.  Were you seated at a place where

14  there's Plexiglass dividers --

15     A.   Yes.

16     Q.   -- between people?

17     A.   Yes.

18     Q.   So you were one on one with a technician --

19     A.   Yes.

20     Q.   -- answering questions?

21     A.   Yes.

22     Q.   The person next to you also was one on one

23  with a technician; is that right?

24     A.   Yes.

Page 58

1          Q.    And this was in the receiving area of the

2    RCDC?

3          A.    RCDC?

4          Q.    Receiving Classification Diagnostic Center.

5          A.    Yes.

6          Q.    Okay.  The intake area is what --

7          A.    Yes.

8          Q.    And that intake area is a large room; is that

9    right?

10         A.    Yes.

11         Q.    And inside that large room, there's several,

12   what they call, bull pens but they're more like

13   fenced-off areas?

14         A.    Yes.

15         Q.    All right.  And you were in and out of

16   several of those areas that were called bullpens,

17   right?

18         A.    Yes.

19         Q.    And you were in and out talking to different

20   people during that processing, right?

21         A.    Yes.

22         Q.    And then at some station you had your

23   photograph taken?

24         A.    Yes.

Page 59

1    Q.   Your fingerprint taken?

2    A.   Yes.

3    Q.   You had an identification card made for you?

4    A.   Yes.

5    Q.   And you signed a piece of paper that --

6    that's -- you put your fingerprint on; is that right?

7    A.   Yes.

8    Q.   All right.  And after going through all the

9    processes including talking to the medical personnel,

10   that's finally when you were assigned to a living unit;

11   is that right?

12   A.   Yes.

13   Q.   Okay.  One of the processes that happened at

14   the time of going through from bullpen to location, you

15   spoke with a psychiatrist or a mental health

16   specialist, right?

17   A.   Yes.

18   Q.   And that person asked you questions about

19   your mental health history?

20   A.   Right.

21   Q.   And you answered those questions?

22   A.   Yes.

23   Q.   And that person also asked you questions

24   about your history of using drugs and alcohol, right?

Page 60

```
 1        A.   Yes.

 2        Q.   And you answered those questions?

 3        A.   Yes.

 4        Q.   Were your answers to that person truthful?

 5        A.   Yes.

 6        Q.   And you wanted them to take care of you and

 7   understand what it is that you were undergoing at the

 8   time you came in, right?

 9        A.   Yes.

10        Q.   Including the mental health, the medical

11   technician that was asking you about specific things,

12   you wanted them to take care of you while you were in

13   jail, so you were being truthful about that, right?

14        A.   Yes.

15        Q.   All right.  That's why you mentioned the

16   Prilosec or the other medication, right?

17        A.   Yes.

18        MR. CATANIA:  All right.  I'm going to ask that

19   this be marked as Exhibit No. 2.

20                      (Clark Deposition Exhibit No. 2

21                       marked as requested.)

22   BY MR. CATANIA:

23        Q.   It's a four-page exhibit.  Can you take a

24   look at that exhibit, all the pages, right now.
```

Page 61

```
 1        A.   Okay.

 2        Q.   You've had a chance to look at the four pages

 3   that's Exhibit No. 2, right?

 4        A.   Yes.

 5        Q.   All right.  At the top left there's a bar

 6   code and underneath it is your name, right, Stacey

 7   Clark?

 8        A.   Yes.

 9        Q.   And below that it says that your date of

10   birth is 8/6 of 1969?

11        A.   Yes.

12        Q.   And below that and a little bit to the right

13   on that label it says Book Date or BKDT 12/5 of 2007,

14   right?

15        A.   Yes.

16        Q.   Does that refresh your memory as to when you

17   actually entered into the Cook County Jail in that

18   time?

19        A.   Yeah, it do now.

20        Q.   Okay.  December 5 of '07 sounds right?

21        A.   Yes.

22        Q.   All right.  It says also to the right of

23   that, Division 6.  Does that remind you of the division

24   you were in --
```

Page 62

```
 1        A.    Yes.

 2        Q.    So it was Division 6?

 3        A.    Yes.

 4        Q.    Below that, there's a little box that's

 5   marked consent for treatment.  Do you see that?

 6        A.    Yes.

 7        Q.    And your signature appears on the patient

 8   signature line, right?

 9        A.    Yes.

10        Q.    The questions that are below Medical History,

11   are those the types of questions that the medical

12   technician was asking you that you described when you

13   were sitting in the Plexiglass booth?

14        A.    I don't remember.

15        Q.    Well, did they ask if you have seizures?

16        A.    Yeah.

17        Q.    Do you?

18        A.    No.

19        Q.    Did they ask if you have heart trouble?

20        A.    No.

21        Q.    Do you?

22        A.    No.

23        Q.    High blood pressure?

24        A.    No.
```

Page 63

```
 1        Q.   You don't have that?

 2        A.   Uh-uh.

 3        Q.   Asthma, you don't have that?

 4        A.   No.

 5        Q.   Diabetes, you don't have that?

 6        A.   No.

 7        Q.   Cancer, you don't have that?

 8        A.   No.

 9        Q.   You don't have any assistive devices, is that

10   right --

11        A.   No.

12        Q.   -- a prosthesis or a cane?

13        A.   No.

14        Q.   You don't have mental illness?

15        A.   No.

16        Q.   You didn't have tuberculosis at the time?

17        A.   No.

18        Q.   You don't -- You're not HIV or have AIDS

19   or anything --

20        A.   No.

21        Q.   You don't have liver disease?

22        A.   No.

23        Q.   Kidney disease?

24        A.   No.
```

Page 64

```
1         Q.   Peptic ulcer disease?

2         A.   No.

3         Q.   Sickle cell disease?

4         A.   No.

5         Q.   Any other disease?

6         A.   No.

7         Q.   Okay.  And all the boxes there are checked

8    "no," right?  There's a line through -- drawn through

9    "no" for all those?

10        A.   Right.

11        Q.   All of those answers, then, were true and

12   correct at the time, right?

13        A.   Yes.

14        Q.   And down below under Current Problems, number

15   1 says "on medication" and there is a --

16        A.   Yes.

17        Q.   It's circled, right?

18        A.   Yes.

19        Q.   And it's actually crossed as checked "yes"?

20        A.   Yes.

21        Q.   And to the right of that, you'll see

22   something that looks like, HX acid reflux.  Do you see

23   that?

24        A.   Mm-hmm.
```

Page 65

1       Q.    Yes?

2       A.    Yes.

3       Q.    And below that, it looks like it says, RX,

4   period, right?

5       A.    Yes.

6       Q.    And a little question mark after that?

7       A.    Yes.

8       Q.    At the time when you had the interview, you

9   told the CMT that you had acid reflux?

10      A.    Yes.

11      Q.    But you didn't know what prescription you

12  were on at the time?

13      A.    Yeah.  I -- I always know what prescription

14  I'm on.

15      Q.    Well, there's a question mark next to RX,

16  right?

17      A.    I told them Prevacid.  They told me that the

18  County couldn't -- wouldn't pay for Prevacid.

19      Q.    But that was a social worker that said that

20  after you were admitted, right?

21      A.    The people at intake told me that too.

22      Q.    Okay.

23      A.    Everyone that I referred -- Everyone I told I

24  had acid reflux and what medication I was on told me

Page 66

1    that the County was not going to -- I wouldn't be able

2    to get that prescription because it cost too much.

3         Q.   All right.   The bottom below that says

4    Substance Abuse.   Do you see that, the box that says

5    Substance Abuse?

6         A.   Yes.

7         Q.   And if you read across from Substance Abuse,

8    it says, Tobacco; Alcohol; Injection Drug Use; Illicit,

9    Non-Injection; Methadone; and Other.   Do you see that?

10        A.   Yes.

11        Q.   All right.   There's a circle around Tobacco

12   for yes; is that right?

13        A.   Yes.

14        Q.   And you were smoking Tobacco at the time?

15        A.   Yes.

16        Q.   And there's a circle around Alcohol.   You

17   were using alcohol at the time?

18        A.   Yes.

19        Q.   Below that, it says three times a week.   Was

20   that accurate?

21        A.   Yes.

22        Q.   That's what you told the --

23        A.   Mm-hmm.

24        Q.   -- medical technician?

1         A.    Yes.

2         Q.    Injection Drug Use is no; non-injection

3    illicit drug use is no?

4         A.    Yes.

5         Q.    Methadone is no?

6         A.    No.

7         Q.    What -- There's one that's circled that says

8    Other.  What's the "other"?

9         A.    Marijuana.

10        Q.    Okay.  And you told them all those things at

11   the time?

12        A.    Yes.

13        Q.    If you turn to -- Well, before we turn, in

14   the center -- I'll point to it here --

15        A.    Okay.

16        Q.    -- you see a little box there that says "Form

17   Reviewed," right?

18        A.    Yes.

19        Q.    And there's someone's initial there, right?

20        A.    Yes.

21        Q.    And there's a date next to that.  It says

22   12/11/07.

23        A.    Mm-hmm.

24        Q.    Do you see that?

Page 68

1        A.    Yes.

2        Q.    And below that it says "Sick-call Needed,"

3   and Y is circled.  Right?

4        A.    Yes.

5        Q.    Can you read what's written below the Y?

6        A.    It look like "six weeks."

7        Q.    Okay.  And it also says below that something

8   called Scheduled and a little colon, right?

9        A.    Yes.

10       Q.    1/16/08 is what's scheduled, right?

11       A.    Mm-hmm.

12       Q.    Is that a yes?

13       A.    Yes.

14       Q.    Okay.  All right.  You didn't know anything

15  about that box until I just showed it to you, right?

16       A.    Right.

17       Q.    Have you ever seen -- Aside from when you put

18  your signature on this form, have you seen this form

19  since the day that it was written?

20       A.    No.

21       Q.    You weren't -- You didn't review this with

22  your lawyers?

23       A.    No.

24       Q.    Okay.  If you turn to the third page, there's

Page 69

```
 1    something that's got the title Department of Mental

 2    Health Services Brief Primary Psychological Screening

 3    Tool, RCDC.  Do you see that?

 4         A.   Yes.

 5         Q.   And below that it's got your name written; is

 6    that right?

 7         A.   Yes.

 8         Q.   Your date of birth?

 9         A.   Yes.

10         Q.   That's correct, right?

11         A.   Mm-hmm.

12         Q.   And below that it says, Address, 9538 South

13    Desmond?

14         A.   That's incorrect.

15         Q.   Okay.  What is the current -- the correct

16    address?

17         A.   9538 South Bensley.

18         Q.   South Bensley?

19         A.   Yes.

20         Q.   So someone made a mistake, right?

21         A.   Yes.

22         Q.   And below that is a charge.  It says DRI.  Do

23    you see that?

24         A.   Yes.
```

Page 70

1      Q.   What's the bond amount that's written in

2  there?

3      A.   180,000.

4      Q.   All right.  Does that sound familiar to you

5  now?

6      A.   Yes.

7      Q.   So bond for your driving under -- while

8  license revoked was $180,000?

9      A.   Yes.

10      Q.   Okay.  And you had a court date scheduled of

11  1/15, it says, '07, right?

12      A.   Yes.

13      Q.   All right.  Was that perhaps a mistake about

14  '07 since this was December of '07?

15      MS. SINGER:  Objection.  How's he supposed to know

16  whether that was a mistake or not?

17  BY MR. CATANIA:

18      Q.   Well, do you think it was a mistake?

19      A.   I don't know.

20      Q.   All right.  There's a series of 11 questions

21  below there.  Do you see those?

22      A.   Yes.

23      Q.   Those questions specifically ask if you've

24  ever been to the County jail before.  The answer was

Page 71

1    yes --

2         A.    Yes.

3         Q.    -- Division 2.  Does that sound right?

4         A.    Yes.

5         Q.    Okay.  "Have you ever been hospitalized for

6    psychiatric treatment?"  The checked -- The box is

7    checked "no."  Is that right?

8         A.    Yes.

9         Q.    Was that true at the time?

10        A.    Yes.

11        Q.    Still true today?

12        A.    Yes.

13        Q.    Number 3 says "Are you currently receiving

14   outpatient psychiatric treatment?"  And the box "no" is

15   checked.  Is that still true?

16        A.    Yes.

17        Q.    Was it true then?

18        A.    Yes.

19        Q.    Then number 4 asks, "Are you now taking

20   psychotropic medication?"  Do you see that?

21        A.    Yes.

22        Q.    And the box "no" is checked?

23        A.    Correct.

24        Q.    Do you know what psychotropic medication is?

Page 72

```
 1        A.    No.

 2        Q.    All right.  Number 5 says, "Do you drink

 3   alcohol?"  And the "yes" box is checked?

 4        A.    Yes.

 5        Q.    And next to that, it says "How much?"  And

 6   you see what's written in there?

 7        A.    12 pack a week.

 8        Q.    Is that about correct?

 9        A.    Yeah.

10        Q.    And below that, it says "Do you use drugs?"

11   And the "yes" box is checked, right?

12        A.    Yes.

13        Q.    And the next question is "What drugs?"  Can

14   you read what it says?

15        A.    Look like it say marijuana.

16        Q.    And the next question after that is "How

17   much?"

18        A.    A bag a week.

19        Q.    Is that -- Was that accurate at the time?

20        A.    Yes.

21        Q.    And all the other boxes except the final one,

22   which said -- asks if the detainee behavior is correct,

23   those are all checked "no."  Is that right?

24        A.    Yes.
```

Page 73

```
 1        Q.   All right.  Can you see the person's name
 2    who's written at the bottom?
 3        A.   D. Thomas.
 4        Q.   If I told you that was Daniel Thomas, you
 5    wouldn't have any reason to doubt that, right?
 6        A.   I guess not.
 7        Q.   And the date below that says 12/5 of '07?
 8        A.   Mm-hmm.
 9        Q.   Is that a yes?
10        A.   Yes.
11        THE VIDEOGRAPHER:  We're just about done, just to
12    let you know.
13        MR. CATANIA:  Why don't we just go off.
14        THE VIDEOGRAPHER:  That'll be all -- That'll be
15    all for Tape No. 1.  We're going off the video record
16    at 10:38 a.m.
17                        (Discussion off the record.)
18        THE VIDEOGRAPHER:  This is the beginning of
19    Tape No. 2.  We're back on the video record at
20    10:39 a.m.
21    BY MR. CATANIA:
22        Q.   Sir, would you please take a look at the next
23    page following which says Progress Notes.  At the
24    bottom of that page, do you see a little box where it's
```

Page 74

1    written in, below that bar code, your name?

2         A.   Mm-hmm, yes.

3         Q.   And next -- And below that, it's got 2007,

4    dash, 0090960.  Do you know what that number

5    represents?

6         A.   I guess, my ID number.

7         Q.   All right.  And if you look on the front page

8    again, do you see where under the bar code it also has

9    an ID number in this box here?

10        A.   Yes.

11        Q.   And that's the same number; isn't that right?

12        A.   Yes.

13        Q.   Okay.  The --

14        MS. SINGER:  Objection -- Oh, I see.  I'm sorry.

15   BY MR. CATANIA:

16        Q.   All right.  And this is called Progress Note,

17   this final page of that set; is that right?

18        A.   Mm-hmm.

19        Q.   Is that --

20        A.   Yes.

21        Q.   Okay.  And what's the date on that progress

22   note?

23        A.   1/16/08.

24        Q.   And we saw that date previously on that first

Page 75

1    page where it says, Schedule, 1/16/08, right, on that

2    box there, this box?

3         A.    I guess.

4         Q.    Okay.  So this progress note was written on

5    1/16/08 if we take it at face value that that's what it

6    says, right?

7         A.    Yes.

8         Q.    And it says "no show."  Do you see that?

9         A.    Yes.

10        Q.    Do you know why you were a no-show on

11   1/16/08?

12        A.    No.

13        Q.    Do you have any memory of when it was that

14   you were released from Cook County Jail at the time of

15   this arrest?

16        A.    No, I don't.

17        Q.    All right.  But you do remember that at that

18   time you were serving a sentence?

19        A.    Yes.

20        Q.    All right.  How many times have you been

21   convicted of driving while your license was revoked?

22        A.    I don't know.

23        Q.    Could it be more than ten?

24        A.    Yes.

1      Q.   More than 20?

2      A.   No.

3      Q.   Somewhere between 10 and 20?

4      A.   Yeah.

5      Q.   And each of those is a misdemeanor; is that

6    right?

7      A.   Except for one, I believe.

8      Q.   And the one was a felony?

9      A.   Yes.

10     Q.   All right.  Do you remember what the original

11   reason for the revocation was?

12     A.   Out-of-state DUI.

13     Q.   And what state was that?

14     A.   Wisconsin.

15     Q.   Okay.  And from what you've learned from your

16   14 or so convictions for driving while your license was

17   suspended, an out-of-state conviction causes a

18   revocation of your Illinois license; is that right?

19     A.   Yes.

20     Q.   For DUI, I should say.

21     A.   Yes.

22     Q.   Okay.  Before the diagnosis of the erosion of

23   your esophagus that you told us about, was there any

24   prior diagnosis of erosion of esophagus?

Page 77

1     A.   No.

2     Q.   So you never had that before?

3     A.   No.

4     Q.   And when was it that you had the erosion of

5     the esophagus diagnosis?

6     A.   I don't remember.  But it's in 2007 sometime.

7     I don't remember the date or the month or anything.

8     Q.   Okay.  And was that the reason, do you think,

9     for the sensation of pain that you had when you told

10    them at -- in your grievance that you had pain?

11    A.   No.  I don't -- It was just -- It's a burning

12    sensation.  You know, it's hard for me to lay down.

13    You know, I have to stay sitting up.

14    Q.   Okay.

15    A.   You know, and it's just -- It burns.  It's a

16    bad feeling.

17    Q.   Right.

18    A.   You know, it's just -- I don't know if I had

19    the erosion before or after that.  I'm not going to lie

20    to you.  I don't know.

21    Q.   Okay.

22    A.   It's just when I went to the doctor, you

23    know, he told me I had erosions.  I don't remember if I

24    went to him before or after I was incarcerated.

1      Q.    Okay.

2      A.    But it's just --

3      Q.    Would you say that the pain that you

4  experienced throughout the whole course of the acid

5  reflux disease that you have --

6      A.    Mm-hmm.

7      Q.    -- has been about the same or has it gotten

8  worse steadily over time?

9      A.    It's gotten better since I've been -- As long

10 as I take my medication, I have no problems.

11     Q.    Okay.

12     A.    Once -- If I don't take my medicine, I

13 automatically have hurt burn.

14     Q.    Okay.  All right.

15     A.    So without my medicine, it's just -- I need

16 my medicine.

17     Q.    All right.  What has changed in your life as

18 a result of not having had the medication that you

19 first requested when you entered the jail in December

20 of '07?

21     A.    I don't understand the question.

22     Q.    What's different now about your life from

23 before you entered the jail?

24     A.    What's different?

1        Q.    Yes.   About your medical life.

2        A.    I'm -- As long as I take my medicine, I can,

3   you know, work and stuff.   Because if I don't take my

4   medicine, it's hard for me to get up.   I can't even get

5   up to go to work sometimes when I do have employment.

6   You know, so I have to have medicine.

7        Q.    All right.

8        A.    I have to have my meds.

9        Q.    When you went to the jail for the intake of

10  December 5 of '07, did you have your medication with

11  you?

12       A.    No.

13       Q.    Okay.

14       A.    I had took it that morning.   I only take it

15  once a morning, and it lasts all day.

16       Q.    But you didn't have any other medication with

17  you at the time?

18       A.    No.

19       Q.    Did you have any prescription forms with you

20  on December 5 of '07?

21       A.    No.

22       Q.    Did you have the name of your doctor with you

23  at the time you entered into the jail on 12/5 of '07?

24       A.    At that time I knew who my doctor was because

Page 80

```
 1    I was seeing him.

 2         Q.   And what was that doctor?

 3         A.   Dr. Islib.  I think it was Islib.

 4         Q.   And did you tell anybody at the jail the

 5    doctor's name?

 6         A.   I told them my doctor was at Mercy; they can

 7    call Mercy.

 8         Q.   Okay.  But you didn't mention the name,

 9    right?

10         A.   Yeah, I did.

11         Q.   Okay.  Who did you tell the name of the

12    doctor?

13         A.   I don't remember who I told them it was.

14         Q.   You're familiar with the concept of "sick

15    call," right?

16         A.   Mm-hmm.

17         Q.   You have to answer "yes" or "no."

18         A.   Yes.

19         Q.   Okay.  And had you ever been to a sick call

20    before December 5 of '07 while in a jail?

21         A.   I don't think so.

22         Q.   Did you ever go to sick call when you were in

23    the Marion County Jail?

24         A.   No.  They let my wife bring my prescription
```

1   up there.

2       Q.    Okay.  So you never went to a sick call?

3       A.    No.

4       Q.    Even when you wanted to have dental

5   treatment, you didn't do a sick call.

6       A.    No.  That's why I hired another attorney.

7       Q.    Okay.  In sick call, you are -- you were at

8   the -- December of '07, you were familiar with what

9   sick call was before you entered, right?

10      A.    Yes.

11      Q.    Okay.  So you knew that if you needed to get

12  something in terms of medicine or treatment that you

13  could do so by filling out a request for medical

14  treatment?

15      A.    Yes.

16      Q.    And that's very similar to picking up the

17  phone and calling your doctor to make an appointment,

18  isn't it?

19      A.    Excuse me?

20      Q.    It's very similar to picking up the phone if

21  you're on the outside and calling your doctor to make

22  an appointment?

23      A.    Yes.

24      Q.    So filling out the form --

Page 82

1      A.    You have to fill out a form, yes.

2      Q.    -- is like making an appointment?

3      A.    Yes.

4      Q.    All right.  Did you fill out any medical

5   request forms that you remember?

6      A.    Yes.

7      Q.    Can you tell me what they look like?

8      A.    They have -- They like -- They have more than

9   just sick call on there.  They have law library and

10  things of that nature on there where you can go -- the

11  barber shop and stuff like that on there.  And you

12  check "sick call" and you tell them what's your

13  problem, and you put it in a box.

14     Q.    Okay.  And you say that you did that?

15     A.    Yes.  Several times.

16     Q.    And where was that box located?

17     A.    Right between the guard and the guard booth.

18     Q.    Have you ever seen a form that specifically

19  says "detainee medical request"?

20     A.    No.

21     Q.    So what you're talking about is a request for

22  any other activities?

23     A.    Right.  A request to see a doctor, that's

24  what I filled out.

Page 83

1       Q.    Okay.  When you saw the nurse sometime during

2   the few weeks that you were there, did you ask the

3   nurse for a Detainee Request form?

4       A.    I asked her what did I need to do to get some

5   medication because I had acid reflux.  And like every

6   time I went in there and I talked to a nurse, they told

7   me that I was -- I tried to get Malox from the nurse.

8   She denied me Malox.

9       Q.    Okay.  Tell me --

10      A.    You know, so --

11      Q.    Describe the person who denied you Malox.

12      A.    She was an African-American, black woman.  I

13  guess she was from 30 to 40 or something like that,

14  kind of short.

15      Q.    Was it before January 16th of '08 that you

16  asked for the Malox?

17      A.    This was -- I don't know -- the last time I

18  was there.  Yeah, I think so, '08.  Yeah, yeah.

19      Q.    Okay.

20      A.    It was '08.

21      Q.    Do you know when the lawsuit that we're here

22  for was filed?

23      A.    No, I don't.

24      Q.    Okay.  And you don't remember the precise day

Page 84

1    that you were released from jail, right?

2         A.    No.

3         Q.    Okay.  After you got out of the jail,

4    whatever date that was, for the December 5 of '07

5    incarceration, can you tell me, who was the first

6    person that you spoke to after getting out of jail?

7         A.    My wife.

8         Q.    Did she pick you up?

9         A.    Yes.

10        Q.    Do you remember if there was anybody else

11   present when she picked you up?

12        A.    My son.

13        Q.    And at the time your son was a two-year-old?

14        A.    Yeah.

15        Q.    Anybody else?

16        A.    No.

17        Q.    Did you tell your wife about your experience

18   in the jail at that time?

19        A.    I was telling her as I was in there.

20        Q.    Oh, so you had conversations with her by

21   phone?

22        A.    Yes.

23        Q.    Did she ever come to visit you?

24        A.    Yes.

Page 85

1      Q.    How many times did you call her on the
2   telephone?

3      A.    I don't know.  Probably two, three times a
4   day.

5      Q.    And how many times do you think she came and
6   visited you during that period of time?

7      A.    Every visit.

8      Q.    Did anybody else visit you during that period
9   of time?

10      A.    I think I got a visit from my brother.

11      Q.    What's his name?

12      A.    Donald Clark.

13      Q.    Donald?

14      A.    Yeah.

15      Q.    Anybody else that you remember?

16      A.    No.

17      Q.    Have you now told me all the people that came
18   to visit you while you were in jail from December 5 of
19   '07 until --

20      A.    I believe so.

21      Q.    Okay.  Did you tell your brother, Donald
22   Clark, specifically about not getting medicine for acid
23   reflux?

24      A.    No.

1    Q.   Did you tell your wife specifically about not

2  getting medicine --

3    A.   Yes.

4    Q.   -- for acid reflux?

5         Did she bring anything to you at the jail in

6  terms of perhaps medicine?

7    A.   No.  Because they told me they wasn't going

8  to allow it, so I didn't.

9    Q.   Okay.  Who told you they would not allow it?

10    A.   The guards and the people at intake.

11    Q.   Did your wife write any letters to the

12  director of the jail?

13    A.   No.

14    Q.   Did she make any phone calls to the director

15  of the jail?

16    A.   I don't know.

17    Q.   After being released, did you write letters

18  to the director of the jail?

19    A.   No.

20    Q.   Did you make any phone calls to the jail

21  director?

22    A.   No.

23    Q.   Did you complain to anybody else about not

24  getting your acid reflux medicine while in jail?

1      A.    My cellee.

2      Q.    Who is your cellee?

3      A.    Mike Hogan.

4      Q.    You wouldn't remember his ID number, would

5  you?

6      A.    No.

7      Q.    How about his age?

8      A.    He was 20-something.

9      Q.    Was he your cellmate the whole period of

10 time?

11     A.    Yeah.  He came in like a week after I got

12 there, and he was there until I left.

13     Q.    Do you know what he was charged with?

14     A.    Drugs.

15     Q.    In what way was he charged with drugs?

16     A.    I don't know.

17     Q.    Did you discuss your case with him?

18     MS. SINGER:  What case?

19 BY MR. CATANIA:

20     Q.    The case that held you serving a sentence.

21     A.    Yes.

22     Q.    Okay.  So he knew that you were there for a

23 traffic violation?

24     A.    Yes.

Page 88

1       Q.   And that you were serving a sentence on a

2  traffic misdemeanor?

3       A.   I wasn't serving a sentence.  I was being

4  held on bond.  And when I went to court, they gave me

5  time served.

6       Q.   Okay.  All right.  So you were a pre-trial

7  detainee until you went to court?

8       A.   Yes.

9       Q.   All right.  Do you have any idea when it was

10  that you went to court?

11       A.   No.

12       Q.   Do you know where you went to court?

13       A.   Bridgeview.

14       Q.   How much time did you get sentenced to?

15       A.   I didn't get sentenced.  I went to court.

16  That's when -- when I said my bond was 180,000.

17       Q.   Yes.

18       A.   I had went to court.  She upgraded my bond to

19  180,000.  They took me to the County jail.  I couldn't

20  post 18,000.  So my next court date, I went to court

21  and they gave me time served.

22       Q.   Okay.  How much time did they give served?

23       A.   45 days.  I think, 45 days, something like

24  that.

Page 89

```
 1        Q.    Did you serve actually 45 days?

 2        A.    I'm not sure.  Between 40 and 45 days,

 3   something like that.

 4        Q.    Do you remember the name of the judge?

 5        A.    No.

 6        Q.    Was it a male or female judge?

 7        A.    The one that gave me the bond?  A female.

 8        Q.    The one that sentenced you?

 9        A.    The one that upgraded my bond.  She didn't

10   sentence me.

11        Q.    Okay.  But the one that sentenced you, was

12   she male -- was that a male or female judge?

13        A.    Male.

14              That gave me time served?

15        Q.    Yes.

16        A.    It was a male.

17        Q.    Did they give you any sentence of

18   probation -- that's the male judge --

19        A.    No.

20        Q.    -- in addition to the time served?

21        A.    No.

22        Q.    Conditional discharge?

23        A.    What you mean?

24        Q.    Do they have you fill out any paperwork
```

Page 90

1   saying that for a period of time, you're under the

2   court's jurisdiction?

3        A.   No.

4        Q.   Okay.

5        A.   It was just time served and it was -- that

6   was it.

7        Q.   Okay.  And that would have been in '08; is

8   that right?

9        A.   Yes.

10       Q.   Did you have any other charges at the time in

11  '08?

12       A.   No.  I have -- I didn't have -- I shouldn't

13  of had no -- I had no traffic tickets in '08.  I didn't

14  get pulled over until --

15       Q.   I understand that.  But you were serving a

16  sentence that was given to you in 2008.  Time served --

17       A.   Yeah.

18       Q.   -- was the sentence.

19            Okay.  Do you know what -- Do you have any

20  idea what date it was that you were --

21       A.   No.

22       Q.   -- sentenced?

23       A.   I guess the date they had on there while I

24  was in Cook County Jail.

1       Q.    Okay.  Were you released immediately after

2    you went back to the jail for serving the time-served

3    sentence?

4       A.    I -- No, I wasn't released immediately.

5    Until about --

6       Q.    Well, within a day?

7       A.    Yeah, within a day I was released.

8       Q.    So within a day of that sentence date, you

9    were released?

10      A.    Yes.

11      Q.    Okay.  And that's what "time served" means,

12   you've already served your sentence, right?

13      A.    Yes.

14      Q.    Okay.  I'm going to show you four pages that

15   are filled with codes, but I'm going to show your

16   lawyer first.  And I'm going to ask you about one of

17   those pages.

18      MR. CATANIA:  There's one more page there.

19      MS. SINGER:  Hmm?

20      MR. CATANIA:  There's one more page there

21   underneath.

22      MS. SINGER:  Oh.  Okay.

23      MR. CATANIA:  Thank you.

24         Why don't we mark this.

Page 92

1                    (Clark Deposition Exhibit No. 3

2                      marked as requested.)

3    BY MR. CATANIA:

4         Q.   We've marked this as Exhibit No. 3.  And I

5    specifically want you to take a look at the last page

6    of this Exhibit No. 3.

7              But first looking on the first page, it's got

8    your name on it, doesn't it?

9         A.   Yes.

10        MS. SINGER:  Excuse me.  Can you -- Can you give

11   it a name of --

12        MR. CATANIA:  Sure.

13        MS. SINGER:  -- whatever it is.

14        MR. CATANIA:  I'm about to do that.

15        MS. SINGER:  Okay.

16   BY MR. CATANIA:

17        Q.   It's got your name on it, right?

18        A.   Yes.

19        Q.   On the right side, it's got some numbers that

20   are listed.  And one of them is your State of Illinois

21   identification number, the one we read into the record

22   before.  Do you see that on the right side of that, top

23   right?

24        A.   Yes.

1      Q.    Okay.  And below that is your driver's

2   license number, which is very similar to the State of

3   Illinois ID number except that the letter is in front

4   rather than at the end.  Do you see that?

5      A.    Yes.

6      Q.    Okay.  This is a Secretary of State Driver's

7   Abstract printout.  And I'm going to tell you, just for

8   purposes of this, that when you see a 94 in the column

9   over here --

10      A.    Mm-hmm.

11      Q.    -- I've taken the time to underline each one

12   of them -- that 94 means conviction for the charge.

13      A.    Okay.

14      Q.    And you understand that when you're charged

15   with driving while license suspended that the charge

16   section number is 6, dash, 303?  Do you remember that?

17      A.    Excuse me.  Can you --

18      Q.    6, dash, 303, you've heard that before,

19   right?

20      A.    No.

21      Q.    Driving while license revoked.

22      A.    I've heard it now, but I didn't ...

23      Q.    Okay.  On the fourth page of that document

24   near the top, you'll see that there is a 94.

1      A.   Mm-hmm.

2      Q.   And there is a date -- a couple of dates, one

3   of them is a date in November.  Do you see that?  I

4   think it's November 9th of '07.  Do you see that?

5      A.   Yeah.

6      Q.   Okay.  And then to the right of that, there's

7   another date that says January 15th of '08.

8      A.   January 15th.  Okay.  Yeah.

9      Q.   Okay.  Does this help you remember the date

10   that you were sentenced for that charge of driving

11   while license suspended or revoked?

12      A.   If that's what it says, I believe so.

13      Q.   Okay.  The date that you talked about earlier

14   was November as a date when you were arrested.  Do you

15   remember that?

16      A.   Yes.

17      Q.   And then you said that when you got to court,

18   your bond was upgraded to --

19      A.   Yes.

20      Q.   And then you went back to court later and you

21   pled guilty after you couldn't post bond, right?

22      A.   Yes.  I pled guilty and got time served.

23      Q.   Right.  Okay.

24           So when you got the 45 or so days time

1    served, likely that was January 15th of 2008 like it

2    says there, right?

3          A.    I believe so.

4          Q.    Okay.  And of course January --

5          A.    But --

6          Q.    Go ahead.  Do you want to say something?

7          A.    On the -- I believe that on the 15th, my

8    license was up for renewal.  It was off of revoked on

9    the 15th.  That could be what that means.  I'm not

10   sure, though.  I know I had got letters -- received a

11   letter from the Secretary of State saying as of the

12   15th of the first year, first -- January 15th of '08, I

13   would be eligible to get my license back again.

14         Q.    Okay.

15         A.    So I don't know if that's what that means or

16   not.

17         Q.    Next to January 15th of '08, you'll see a

18   6-303.  Do you see that next to it?

19         A.    Yes.

20         Q.    And then it says "A" next to that.  Do you

21   see that?

22         A.    Yes.

23         Q.    Okay.  You don't have to believe this at this

24   point, but I'm telling you that that Secretary of State

Page 96

1    record shows a conviction on January 15th of '08 for

2    driving while license suspended or revoked.  That's

3    what that record shows.

4         A.   Okay.

5         Q.   And at the time of trial, if it comes to

6    that, we'll probably have a certified record that says

7    exactly the same thing.

8              I just want to know if now your memory

9    recollects that it was on January 15th of '08 that you

10   pled guilty and were convicted of that charge of

11   driving suspended or revoked.

12        A.   Yes.

13        Q.   Okay.  All right.  And like I said, when you

14   first said that you were arrested, it was the date of

15   November?

16        A.   Mm-hmm.

17        Q.   And that shows a stop date or arrest date of

18   November --

19        A.   Yes.

20        Q.   -- I think it was, 9 of '07, right?

21        A.   Yes.

22        Q.   Okay.  So, really, this record does

23   corroborate what you said earlier in your testimony?

24        A.   Yes.

1    Q.   Okay.  Now, I understand why we're here, the

2    second amended complaint and what it says in the second

3    amended complaint.

4         When was it that you first thought that you

5    were part of this complaint, which actually predates

6    when you joined it?

7    A.   Last week, I found out.

8    Q.   Last week?

9    A.   Yes.

10   Q.   Okay.  Did you have any input into what was

11   said in the second amended complaint, with the way it

12   was written?

13   A.   No.

14   Q.   Okay.  And it has the date of March 31 of '08

15   when it was -- when it was filed, but it's a second

16   amended complaint.  Do you agree with me on that?

17   A.   Yes.

18   MR. CATANIA:  In fact, we can actually mark this

19   as an exhibit.

20   BY THE WITNESS:

21   A.   What does "second amended" mean?

22   Q.   We'll get to that after it's marked.

23   A.   Okay.

24        (Clark Deposition Exhibit No. 4

Page 98

1                    marked as requested.)

2    BY MR. CATANIA:

3        Q.    You can take a look at the whole document

4    now, which is marked number 4 for your deposition.  We

5    showed you part of it earlier, which was paragraph 72

6    through 75.

7        A.    Mm-hmm.

8        Q.    Okay.  That's the reason why we're here

9    today, that complaint.  And your lawyer can corroborate

10   this.  But the reason it's called Second Amended

11   Complaint is because before this was filed in March

12   of '08, there were two other versions of it that were

13   filed before that.  There was a complaint, and then

14   there was an amended complaint before this.  This

15   complaint supersedes the others.  That means this one

16   is the one that's operative.  This one is the one we're

17   discussing now.

18       A.    Okay.

19       Q.    All right.  Is that the first time you've

20   seen that document?

21       A.    Yes.

22       Q.    Okay.  I don't want you to tell me anything

23   about your conversation with the lawyers that are

24   involved in prosecuting this case.  But can you tell me

Page 99

1    when it was you first had contact with them, with the

2    lawyers that are prosecuting the case?

3         A.   Back in '08.

4         Q.   And could you tell me if that was in person

5    or was it by some other means?

6         A.   By mail.

7         Q.   Okay.  Did you receive a notice from those

8    lawyers, or a letter?

9         A.   He was trying to call me, but I never was at

10   home.  So he sent me something in the mail saying that

11   he was trying to contact me --

12        MS. SINGER:  You don't need to say, you know, what

13   he --

14        THE WITNESS:  Oh, I'm sorry.

15   BY MR. CATANIA:

16        Q.   Okay.

17        A.   Yeah, I was contacted my mail.

18        Q.   All right.  Other than the letter which said

19   that someone was trying to contact you, was there any

20   attempt to contact you by telephone that you have

21   personal knowledge of?

22        A.   Yes.

23        Q.   Were there messages left?

24        A.   His name was on the caller ID.

Page 100

```
 1        Q.   I see.

 2             So there was no message?  It was just his

 3   name appeared --

 4        A.   I didn't have a message.  He couldn't leave a

 5   message.

 6        Q.   Okay.  And by "he," are we talking about Ken

 7   Flaxman?

 8        A.   Yes.

 9        Q.   Okay.  When you had your first contact by

10   mail with Ken Flaxman, when was that?

11        A.   Last week.

12        Q.   Okay.

13        A.   I don't remember the date, no.  Last week.

14        Q.   Was that by mail?

15        A.   Yes.

16        Q.   Do you have that letter?

17        A.   Not with me.

18        Q.   Do you have it at home?

19        A.   Yes.

20        Q.   Do you remember what date was on the letter?

21        A.   No.  I received it last Saturday, whatever

22   date that was.

23        Q.   September 12th of 2009?

24        A.   I don't know.  I just know it was last
```

1    Saturday.

2         Q.    Okay.

3         A.    The Saturday before the holiday.

4         Q.    All right.  And just so I understand, that's

5    the first letter that you received from Mr. Flaxman; is

6    that right?

7         A.    Yes.

8         Q.    Okay.  And the holiday we're talking about is

9    the Labor Day holiday --

10        A.    Yes.

11        Q.    -- of 2009?

12        A.    Yes.

13        Q.    Okay.  Can you tell me what is it that you

14   expect to get from this litigation?

15        A.    I don't know.  I just wanted -- so everybody,

16   when they go in there, they can get medical treatment.

17   I don't want nobody to suffer like I did in there.  You

18   know, if I get compensated for it, I'll -- you know,

19   I'll take it.  But, you know, I just don't want nobody

20   else to go through what I went through in there.

21        Q.    Okay.  So you have two reasons.  One is

22   because you want that everybody gets medical

23   treatment --

24        A.    Right.

1     Q.   -- and, two, that if there is compensation or

2   money out of it, then you'll take that?

3     A.   Yeah.

4     Q.   Okay.  Did anybody ever discuss with you your

5   function as a named plaintiff that appears in the

6   caption here?

7     MS. SINGER:  I object when you say "anybody"

8   discussing with him because of privilege between

9   attorney and client.

10   BY MR. CATANIA:

11     Q.   All right.  Did you know that your name

12   appeared in the caption of this Second Amended

13   Complaint?

14     A.   I didn't know it was on here.  But he told me

15   I was involved in it.

16     Q.   Okay.

17     A.   Mr. Flaxman.

18     Q.   And that -- That was in that letter that you

19   got a couple Saturdays ago?

20     A.   After I got the letter, I talked to him on

21   the phone.  And he told me --

22     MS. SINGER:  No.  What he -- Okay.

23   BY MR. CATANIA:

24     Q.   All right.  So now you know that your name

1    appears in the caption of this case, right?

2         A.    Mm-hmm.

3         Q.    Is that yes?

4         A.    Yes.

5         Q.    Okay.  What do you understand your job to be

6    as a person whose name appears in the caption?

7         A.    To come here and tell the truth.

8         Q.    Okay.  Do you have any idea of on whose

9    behalf you are testifying?

10        A.    My own behalf.

11        Q.    On your own behalf.  Okay.

12              How many times have you met in person with

13   the attorneys handling the class action?

14        A.    None.

15        Q.    So this morning when you met Cecile Singer

16   that was --

17        A.    Yes.

18        Q.    -- the first in person?

19        A.    Yes.

20        Q.    Okay.  Aside from Cook County and Champaign

21   County, have you been convicted of any of these traffic

22   misdemeanors or felonies in any other county?

23        A.    Mm-mmm.

24        Q.    Is that no?

1      A.   No.  Cook, Marion, and the one I'm going

2  through Urbana with.  That's three of them right there.

3      Q.   Is the case in Urbana still open?

4      A.   Yes.

5      Q.   Still pending?

6      A.   Yes.

7      Q.   Is that a felony or misdemeanor?

8      A.   Misdemeanor.

9      Q.   Okay.

10     A.   Driving on suspended.

11     Q.   Aside from Chicago Police Department and Cook

12 County, Marion, and Urbana, have there been any other

13 police lockups that you've been in?

14     MS. SINGER:  As a --

15     MR. CATANIA:  As a person who is arrested.

16 BY THE WITNESS:

17     A.   I don't know.  I don't believe so.

18     Q.   You mentioned before that when you were

19 arrested by the Chicago police -- or, actually, I think

20 it was the State troopers -- and brought to a Chicago

21 police station --

22     A.   Mm-hmm.

23     Q.   -- that they did not ask you any questions

24 about your medical condition?

Page 105

1    A.    No.

2    Q.    Okay.  At any time at any Chicago police

3  lockup, were you ever asked questions about your

4  medical condition?

5    A.    I think so.

6    Q.    Okay.  Do you remember when that was?

7    A.    It's a process they put you through.  You

8  know, you go through there.  And I don't remember

9  exactly what it would -- we was doing.  But they asked

10  me if I had an illness, and I told them I did.

11    Q.    Okay.  Do you remember --

12    A.    Wherever I go, I tell them I have an illness.

13    Q.    Okay.  Do you remember, if after telling the

14  police department lockup people that you had an

15  illness -- And I think you mean you have the acid

16  reflux, right?

17    A.    Yes.

18    Q.    (Continuing.) -- did any of them provide you

19  with medication?

20    A.    No.

21    Q.    Okay.  And that would include also the county

22  jails in Marion and Urbana, right?

23    A.    I haven't went to jail in Urbana.

24    Q.    Okay.

1        A.    But in Marion, like I said, they let my wife

2    bring my prescription up there --

3        Q.    Right.

4        A.    -- so ...

5        Q.    I understand that.  But you didn't get it

6    provided by the Marion County?

7        A.    No.

8        Q.    Okay.  When was it that you first came to

9    expect that the Cook County Department of Corrections

10   would provide you with medication?

11       A.    When I first went in there.

12       Q.    And did you get that information by word of

13   mouth from people that were also being detained?

14       A.    No.

15       Q.    How did you find out first that they were to

16   provide you with medication for your acid reflux?

17       A.    Because I'm a ward of the State.  As long as

18   I'm in their custody, I'm a ward of the State.

19       Q.    Where did you get that understanding?

20       A.    My wife is a social worker.  So, you know ...

21       Q.    And where is she a social worker?  Who

22   employs her?

23       A.    Hull House, Jane Adams Hull House.

24       Q.    Any other source of information besides your

Page 107

1    wife who works at the Jane Adams Hull House?

2         A.    No.

3         Q.    Okay.  Is the State expected to provide for

4    everything that the detainee wants, to your knowledge?

5         A.    No.

6         Q.    What things are they expected to provide for?

7         A.    Medical treatment, a place to lay down, and

8    food.

9         Q.    Okay.  When you entered into the jail in

10   December of '07, you had a place to lay down; you were

11   assigned to Division 6?

12        A.    Yes.

13        Q.    And you had food?

14        A.    Yes.

15        Q.    And you were provided, at intake, medical

16   screening; is that right?

17        A.    Yes.

18        Q.    And you were given a future date for sick

19   call, weren't you?

20        A.    Yes.

21        Q.    Would you think that the intake screening was

22   a provision of medical care?

23        A.    Yes.

24        Q.    And also that the sick call is also a

1    provision of medical care?

2         A.   Yes.

3         Q.   And the sick call date that you had that's on

4    the first page of the exhibit and the last page of the

5    exhibit, number 2, is January 16th of '08, right?

6         A.   Correct.

7         Q.   And you were actually discharged before that

8    date?

9         A.   Correct.

10        MR. CATANIA:   I have no further questions.

11        MS. SINGER:   I have a few questions.

12                         CROSS-EXAMINATION

13   BY MS. SINGER:

14        Q.   When you -- You were first diagnosed at

15   Northwestern; is that correct?

16        A.   Yes.

17        Q.   Okay.  Now, at the time that you were

18   diagnosed there, did you undergo any kind of test?

19        A.   No.  I just went in there and told the doctor

20   my symptoms.  And he said, Well, it sounds like acid

21   reflux.  He gave me a trial medicine.  And when I

22   started taking it, I stopped having heart burn.  And

23   when I went back, I told him.  So he just prescribed it

24   to me.

Page 109

1          Q.    Okay.  And the -- I don't recall what you

2     referred to -- but the scan of the esophagus --

3          A.    Uh-huh.

4          Q.    -- how many times did you have that done?

5          A.    Once.

6          Q.    And that was done at Mercy?

7          A.    Mercy Hospital, yes.

8          Q.    And did you have to be put under any kind of

9     sedation?

10         A.    Yes.

11         Q.    And were you unaware of the procedure while

12    under sedation?

13         A.    No.  I was completely asleep, so I don't

14    know.

15         Q.    And do you know the milligrams that you're

16    taking?

17         A.    Now I'm taking 40.

18         Q.    Were you taking some other amount of

19    milligrams before that?

20         A.    Twenty.  It was 20.  But the 20 wasn't doing

21    anything, so ...

22         Q.    Okay.  So they --

23         A.    I switched doctors.

24         Q.    You're up to 40?  You're up to 40?

Page 110

1      A.   Yeah, now I'm at 40.

2      Q.   Okay.  And how frequently are you supposed to

3  take the medication?

4      A.   Every day.

5      Q.   Okay.  And you've been doing that every day

6  while you were out of custody?

7      A.   Yes.

8      MS. SINGER:  I don't have anything else.

9                    REDIRECT EXAMINATION

10  BY MR. CATANIA:

11      Q.   When was it that your prescription was

12  changed from 20 milligrams to 40 milligrams?

13      A.   When I switched doctors last year.

14      Q.   And the doctor that switched you, was that

15  Dr. Levine?

16      A.   No, I can't remember the ...

17      Q.   Okay.  Did Dr. Levine continue the

18  prescription of 40?

19      A.   Yes.

20      Q.   When in point of time did you have the

21  esophageal scan?

22      A.   I think, in 2007.

23      Q.   And was it at Northwestern University?

24      A.   No.  This was at Mercy.  The last five or six

Page 111

1    years, I've been at Mercy.

2         Q.   All right.  That reminds me of one thing I

3    needed to ask you.  And that's, because I received no

4    medical records in this case, would you be willing to

5    sign a HIPAA waiver for me to obtains those records?

6         A.   Yes, I will.

7         Q.   All right.  Before you leave today, I can

8    print one out and we can have you sign it before you

9    leave.  Okay?

10        A.   Okay.

11        MR. CATANIA:  I have no further questions.

12        MS. SINGER:  I have nothing else.

13        THE VIDEOGRAPHER:  That will be all for Tape No. 2

14   and will be the conclusion of today's deposition.

15   We're going off the video record at 11:17 a.m.

16                  (Witness excused.)

17

18

19

20

21

22

23

24

Page 112

```
 1   UNITED STATES OF AMERICA          )

     NORTHERN DISTRICT OF ILLINOIS     )

 2   EASTERN DIVISION                  )   SS.

     STATE OF ILLINOIS                 )

 3   COUNTY OF COOK                    )

 4

 5             I, Teresa Resendez, Certified Shorthand

 6   Reporter and Notary Public, do hereby certify that

 7   STACEY CLARK was first duly sworn by me to testify to

 8   the whole truth and that the above deposition was

 9   reported stenographically by me and reduced to

10   typewriting under my personal direction.

11             I further certify that the said deposition

12   was taken at the time and place specified and that the

13   taking of said deposition commenced on the 14th day of

14   September, A.D., 2009, at 9:30 a.m.

15             I further certify that I am not a relative or

16   employee or attorney or counsel of any of the parties,

17   nor a relative or employee of such attorney or counsel,

18   nor financially interested directly or indirectly in

19   this action.

20

21

22

23

24
```

Page 113

1          In witness whereof, I have hereunto set my

2    hand and affixed my seal of office at Chicago,

3    Illinois, this 24th day of September, A.D., 2009.

4

5

6

7

8

9

                        _____

10                      TERESA RESENDEZ, CSR

                        39 South LaSalle Street

11                      Suite 625

                        Chicago, Illinois  60603

12                      Phone:  (312) 236-9211

13

14

     CSR No.  084-003718

15

16

17

18

19

20

21

22

23

24