IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Michael Parish, et al.,        )
        )
       *Plaintiffs,*     )
        )  No. 07 CV 4369
     *-vs-*     )
        )  *(Judge Lee)*
Sheriff of Cook County and Cook  )
County,        )
        )
        )

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT (Document 173)

Plaintiffs have moved for summary judgment on liability, asserting that previous lawsuits, monitoring reports in the *Duran* litigation, and the CRIPA investigation by the Department of Justice gave defendants notice about deficiencies in providing previously prescribed prescription medication for detainees entering the Cook County Jail.

An Alice in Wonderland quality pervades defendants' response. For example, defendants describe improvements mandated by the consent decree in *United States v. Cook County*, 10-cv-2946, as changes needed "to create a better ambience for the inmates." (Document 204 at 23.) This concern for a "more pleasant jail experi-

ence" is more than somewhat disingenuous: Defendants admitted in *United States v. Cook County* that the intake area "was inadequate." (Plaintiffs' Exhibit 25, Cook County's Response to Monitor's Report, *United States v. Cook County*, 10-cv-2948, Document 45 at 10.) Similarly, defendants maintain that mental health screeners at the Jail were "excellent," (Document 205 at 7, par. 22), because persons in need of psychotropic medication "would be picked up" after being admitted to the jail, when they began to complain about untreated symptoms of mental illness. (Document 204 at 24, Response to par. 39.) This callous disregard of the need to continue psychotropic medication was not accepted by the monitor in *United States v. Cook County*, 10-cv-2946, who described the intake assessment process as "problematic" because there were 11% positive screens, rather than the 20-25% expected. (*United States v. Cook County*, 10-cv-2946, Document 33-1, Exhibit 88 at 5.)

Defendants respond in fourteen separate documents of equal obfuscation,[1] and may well aspire to be one of the "ships that pass in the night and speak each other in passing."[2] Defendants, however, are unable to avoid the conclusion that the policies and practices at the Cook County Jail deprived many persons entering the Jail of medication that a physician had previously prescribed for a serious health need.

## I.   The Elements of Plaintiffs' Claim

Plaintiffs' burden is to establish "first, that defendants' policies and practices resulted in the discontinuation of medication that had been prescribed for a serious health need, and second, that defendants were on notice that their policies and practices were inter-

---

[1]   Defendants have filed a response to plaintiffs' motion for summary judgment (Document 203), a response to plaintiffs' Rule 56.1 statement (Document 204), and a statement of additional facts. (Document 205.) Defendants have also filed a Motion to Decertify the Class (Document 177); Response to Plaintiffs' Motion for Summary Judgment (Document 203); Motion to Strike DOJ Report (Document 189), Motions to Strike Plaintiffs' Experts Whitman (Document 188), Holland (Document 183), King (Document 184), and Stewart (Document 185). Each defendant has also filed a separate motion for summary judgment (Sheriff, Document 191, County, Document 190), supported by separate Rule 56.1 Statements (Sheriff, Document 192), County, Document 195).

[2]   Longfellow, The Theologian's Tale: Elizabeth in Tales of a Wayside Inn 252 (1913 ed), available at `http://hdl.handle.net/2027/uva.x002418944?urlappend=%3 Bseq=258` (visited September 13, 2012)

fering with the continuation of medication prescribed for a serious health need." (Plaintiffs' Summary Judgment Memorandum, Document 175, at 30-31.)

Defendants acknowledge the holding of *Zentmyer v. Kendall County*, 220 F.3d 805, 810 (7th Cir. 2000) that a jail policy or practice which allows a non-physician to discontinue medication that had been prescribed for a serious health need offends the Eighth and Fourteenth Amendment.[3]

Defendants also agree that the non-psychotropic medications at issue in plaintiffs' motion for summary judgment are "used to treat serious medical conditions."[4] (Response to Rule 56 Statement, par. 60, Document 204 at 38.) Defendants argue, however, that plaintiffs must also prove that any discontinuation of prescribed medication caused "clinically significant" harm. (Defendants' Reply Memorandum, Document 203 at 8.) According to defendants, plain-

---

[3] Defendants limit their argument on this issue to defending their policy for methadone. (Defendants' Reply Memorandum, Document 203, 18-22.) Plaintiffs respond to the methadone issues below at 19-20.

[4] Defendants deny that each of the psychotropic medications at issue in plaintiffs' motion for summary judgment is "used to treat a serious mental illness." (Response to Rule 56 Statement, par. 51, Document 204 at 38.) Defendants are unable to support this denial, and the related denials to paragraphs 52-57, with anything other than argument of counsel. These denials are therefore not entitled to any weight. See *infra* at 11-15.

tiffs must come forward with "corroborative medical testimony" of harm to each class member, *id.*, "rather than some general statistical cohort." *Id.* at 9. The Court should reject this legal argument.[5]

## A. Damages Are Not an Element of Liability

Defendants base their claim of individual harm on *Henderson v. Sheahan*, 196 F.3d 839 (7th Cir. 1999).[6] (Defendants Memorandum in Opposition to Summary Judgment, Document 203 at 8-9.) The prisoner in *Henderson* failed to allege a serious medical need.[7] As

---

[5] Defendants raised the same argument in their motion to decertify the class. (Document 171-1.) Plaintiffs demonstrated in their response to that motion (Document 182) that the Supreme Court rejected defendants' theory in *Helling v. McKinney*, 509 U.S. 25, 33 (1993), as reflected in the decisions of the Seventh Circuit in *Board v. Farnham*, 394 F.3d 469 (7th Cir. 2005) and *Gil v. Reed (II)*, 535 F.3d 551 (7th Cir. 2008). (Document 182 at 17-18.)

[6] Defendants also rely on *Wehmeier v. UNR Industries, Inc.*, 213 Ill.App.3d 6, 572 N.E.2d 320 (2010) and *Adams Apple Distrib. Co. v. Papeleras Reunidas, S.A.*, 773 F.2d 925 (7th Cir. 1985). Neither case supports defendants' position.

*Wehmeier* turned on whether the trial court had erred in admitting as speculative the plaintiff's evidence "of his increased risk of contracting cancer." 572 N.E.2d at 338. *Adams Apple* applied Illinois law on contract damages. 773 F.3d at 930.

[7] "Henderson's complaint does not allege that a physician either diagnosed him as having a medical condition that necessitated a smoke-free environment or treated him for any condition or ailment brought about by his exposure to second-hand smoke-even though he made several trips to medical facilities during the course of his stay at the Cook County jail. Moreover, conspicuously absent from Henderson's complaint is any allegation that a physician ever recommended or ordered that he be removed from the allegedly smoky tier in which he was housed and placed in a non-

the Seventh Circuit subsequently explained in *Alvarado v. Litscher*, 267 F.3d 648 (7th Cir. 2001), the plaintiff in *Henderson* "failed to state a claim under § 1983 because he had never been diagnosed as having a medical condition that necessitated a smoke-free environment nor had he been treated for any medical problems brought about by his exposure to ETS." *Id.* at 652. This case is different from *Henderson*. Here, s defendants admit each class member is a person who "had been taking prescription medication for a serious health need." (Response to Rule 56.1 Statement, par. 1, Document 204 at 1.)

The recent decision of the Seventh Circuit in *Cotts v. Osafo*, ___ F.3d ___ (7th Cir., No. 10-3687, August 10, 2012, reproduced in the Addendum, *infra*, at 1-15), makes plain the lack of merit in defendants' theory. The jury in *Cotts* had been instructed that the plaintiff was required "to prove he 'suffered damage' to show liability." (Addendum 9.) The Court of Appeals held that this was error requiring a new trial because "[d]amages are not an element of liability in a deliberate indifference claim." (Addendum 10.) The Court should reject defendants' argument to the contrary.

---

smoking environment." *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999).

-6-

### B. Plaintiffs May Use Statistical Evidence to Prove their Case

Defendants also assert in cursory fashion that plaintiffs may not use statistical evidence as part of the mosaic of circumstantial evidence to show deliberate indifference. (Defendants' Memorandum in Opposition to Plaintiffs' Memorandum for Summary Judgment, Document 203 at 7-8.) This single sentence argument is the type of superficial presentation that courts routinely reject as "underdeveloped, conclusory, or unsupported by law." *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).

Defendants misread *Chavez v. Illinois State Police*, 251 F.3d 612 (7th Cir. Ill. 2001) to support their argument that "the Seventh Circuit has already limited the use of statistics … to statutory schemes which utilize the *McDonnell-Douglas* burden shifting frame-work, like Title VII, and thus it cannot be used here."[8] (Def.Mem., Document 2-3 at 7-8.) The actual holding of *Chavez* is, however, quite different.

---

[8] Defendants quote from footnote 8 in *Chavez*, where the Court of Appeals explained its reasons for rejecting plaintiffs' attempt to prove their equal protection claim "under the pattern and practice analysis used in *Int'l Bhd of Teamsters.*" *Chavez v. Illinois State Police*, 251 F.3d 612, 638 n.8 (7th Cir. 2001).

The plaintiffs in *Chaevz* sought to show that the Illinois State Police "utilize impermissible classifications in determining whom to stop, detain and search." 251 F.3d at 635. The district court refused to permit the plaintiffs to prove their case with statistical evidence, *id.* at 637, but the Seventh Circuit rejected this limitation. The Court of Appeals discussed the use of statistics in discrimination cases, *id.* at 637-40, and concluded that statistics "can be sufficient to establish discriminatory effect." *Id.* at 640. The Court analyzed the plaintiffs' statistics and concluded that the data failed to prove discriminatory effect. *Id.* at 645. The Court of Appeals then turned to whether the statistics established discriminatory intent. *Id.* After discussing a variety of situations in which statistical evidence had been used to prove intent to discriminate, the Seventh Circuit found that the statistical evidence presented by the plaintiffs in *Chavez* was not enough to show intentional discrimination. *Id.* at 648.

Statistical evidence, of course, has been used both before and after *Chavez* in a variety of cases that do not involve intent to discriminate.[9] Thus, in *Costello v. Oppenheimer & Co., Inc.*, 711 F.2d

---

[9] In its report to the Judicial Conference in 1990, the Federal Courts Study Committee recognized that "Economic, statistical, technological, and natural and social scientific data are becoming increasingly important in both routine and complex litigation." Report, *supra*, at 97.

1361 (7th Cir. 1983), the Court referred to "traditional forms of statistical evidence." *Id.* at 1363.

The Supreme Court has approved the use of statistical sampling to enforce food and drug laws, *Jones v. Rath Packing Co.*, 430 U.S. 519, 531 (1977), and to support the "potential risk" of intentional vehicular flight. *Sykes v. United States*, 131 S.Ct. 2267, 2279 (2011). The Supreme Court has also approved the use of statistical evidence in anti-trust cases, *United States v. E.I. DuPont De Nemours & Co.*, 366 U.S. 316 (1961), both to sample stockholders, *id.* at 350, and as evidence about market consequences. *Id.* at 351. The Court recently relied on statistical evidence in *Brown v. Plata*, 131 S.Ct. 1910 (2011) to uphold an order requiring California to reduce its prison population:

> Expert witnesses produced statistical evidence that prison populations had been lowered without adversely affecting public safety in a number of jurisdictions, including certain counties in California, as well as Wisconsin, Illinois, Texas, Colorado, Montana, Michigan, Florida, and Canada.

*Brown*, 131 S.Ct. at 1942.

There is no merit in defendants' claim that plaintiffs may not use statistical evidence to prove their case. As the Seventh Circuit recognized in *United States v. Veysey*, 334 F.3d 600 (7th Cir. 2003)

"statistical evidence" is no different than any other evidence: "Statistical evidence is merely probabilistic evidence coded in numbers rather than words." *Id.* at 605. The Court should reject defendants' assault on plaintiffs' use of statistical evidence.

## II. Defendants Fail to Genuinely Dispute the Facts Material to Plaintiffs' Motion for Partial Summary Judgment

### A. Standards for Rule 56 Statements

Defendants play fast and loose with the requirements of Rule 56 of the Federal Rules of Civil Procedure, as that rule is supplemented by Local Rule 56.1 of the Northern District of Illinois.

Local Rule 56.1(a)(1)(3) requires the party moving for summary judgment to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law ..." Each paragraph of a Local Rule 56.1(b)(3) response should follow one or more of the procedures set out in F.R.C.P 56(c)(1)(A) through which a party opposing summary judgment may respond to an asserted fact.

First, the "party asserting that a fact cannot be or is genuinely disputed" may cite to "particular parts of materials in the record" to shows that the contention is disputed. F.R.C.P. 56(c)(1)(A).

Alternatively, the party may show "that the materials cited do not establish the absence or presence of a genuine dispute." F.R.C.P. 56(c)(1)(A).

A third authorized response is to show "that an adverse party cannot produce admissible evidence to support the fact." *Id.*

The final permissible response "functions much as an objection at trial, adjusted for the pretrial setting. " Advisory Committee Note, 2010 Amendment to F.R.C.P. 56. To make such an objection, the opposing party asserts "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." F.R.C.P. 56(c)(2). Defendants disregard these standards.

### A. Defendants Flout Local Rule 56.1

Local Rule 56.1(b)(3) sets out the format for responding to a statement of material facts. Rule 56.1(b)(3) requires, *inter alia*, "a response to each numbered paragraph in the moving party's statement." The Rule 56.1(b)(3) response "is not the place for purely argumentative denials." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D.Ill. 2000). Nor is the response "a platform … to present a par-

ty's argument." *Levie v. Sears Roebuck & Co.*, 676 F.Supp.2d 680, 683 (N.D.Ill. 2009).

Defendants violate the standards for Rule 56.1 statements and seek to manufacture disputes about the indisputable. For example, plaintiffs contend that "Defendant Cook County provides health care to prisoners." (Plaintiffs' Rule 56.1 Statement, par. 8.) Although defendant Sheriff relies on this contention to support his motion for summary judgment (Sheriff's Rule 56.1 Statement, Document 192, par. 6), defendants first deny this contention, and then "admit that Cook County, through the Health and Hospitals System Board, does provide health care to detainees at the jail." (Document 204, par. 6.) The Court should disregard these argumentative responses. *See, e.g., Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995); *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005); *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 644 (7th Cir. 2008).

Defendants deny that the Sheriff controls the Jail (Document 204 at 2, par. 6), and apparently ask the Court to disregard the holding of *DeGenova v. Sheriff of DuPage County*, 209 F.3d 973 (7th Cir. 2000) that the Sheriff runs the county jail. *Id.* at 976. Defendants

likewise deny that the Sheriff is dependent on Cook County for funds to run the jail. (Document 204 at 3, par. 7.) Defendants may not, however, ignore the plain holding of *Askew v. Sheriff of Cook County*, 568 F.3d 632 (7th Cir. 2009) that "[t]he Sheriff's office is financed by public funds, appropriated to that office by Cook County." *Id.* at 636.

Defendants similarly seek to manufacture a dispute about plaintiff's contention that defendants entered into the *Duran* decree in 1982. (Document 204 at 4-5, par. 10.) It is unclear what advantage defendants seek to achieve by these tactics or by denying that the monitor in *Duran* filed periodic reports, criticizing aspects of health care at the Jail. (Document 204 at 5-7, pars. 12-15.)  In other litigation, a judge in this district complained "the State's Attorney's Office has an unfortunate practice of invoking the John Howard Association's reports as conclusive proof that matters were not as the plaintiff alleged." *Hall v. Sheahan*, 2001 WL 111019 *2 n.1 (N.D.Ill. 2001) (Addendum, *infra*, at 18) (citations omitted). It is unseemly that defendants now urge that plaintiffs may not rely on the John Howard reports to show defendants' knowledge about problems at the Jail.

Defendants continue their disregard of Local Rule 56 in argumentative responses (Document 204 at 7-14, pars. 16-27), and then try to hide from the truth in responding to the fact that "in late 2006, Cook County sought to solve its budgetary crisis by cutting health care at the Jail." (Document 204 at 14, par. 28.) The Sheriff acknowledged these budgetary cutbacks in a court-filing in the *Duran* litigation. Sheriff's Status Report and Response to John Howard Court Monitoring Report, *Duran v. Dart*, 74-cv-2949, Document 954, filed in this case as Plaintiffs' Exhibit 24, Document 174-7 at 56-90.) There, the Sheriff stated that he was "deeply concerned about cutbacks which have been imposed on Cermak Health Services." (Plaintiff's Exhibit 24 at 30, Document 174-7 at 85.) The Sheriff pointed out that "[t]he budget cuts to Cermak Health Services" required correctional officers to perform additional duties. (Plaintiffs' Exhibit 24 at 27, Document 174-7 at 82.)

The Seventh Circuit acknowledged the budget crisis in *Everett v. Cook County*, 655 F.3d 623 (7th Cir. 2011):

> By late 2006, Cook County was in the throes of a budget crisis. The County had a budget shortfall of 500 million dollars, and Cook County President Todd Stroger determined that 100 million dollars of that shortfall had to be cut from the County's health care budget. In December 2006, Stroger directed Dr. Robert Simon, the Inter-

im Bureau Chief of Cook County's Bureau of Health, to submit recommendations for health care budget cuts. Stroger gave Simon until February 2007 to find ways to cure the health care budget's woes.

*Everett v. Cook County*, 655 F.3d at 725.

Defendants ask this Court to disregard the Seventh Circuit's finding in *Everett* (Document 204 at 14, par. 28), even though the Court based this finding on evidence defendant Cook County had submitted in *Everett*. Plaintiffs include in their addendum, *infra*, at 19-33 the Local Rule 56.1 Statement filed by Cook County in *Everett*, 07-cv-0554, Document 79. Relevant here are paragraphs 10 and 11, reproduced in the Addendum, *infra*, at 21:

11. In 2007, the Cook County budget had a shortfall of $500 Million, and $130 Million of that amount was to be cut from the health care budget. (TAB 5, p. 7, line 19-23)

12. On January 7, 2007, President Stroger and his administration directed Dr. Simon to submit a series of recommendations to trim the health care budget, including the Cermak budget, to meet the financial goals set forth by the President and the County Board while having the least possible impact on essential services and quality of care. (TAB 5, p. 6, line 7-23; p. 7, line 6-p. 8, line 22) The recommendations were to be submitted within six weeks, prior to the budget approval deadline of February 29, 2009. (TAB 5, p. 8, line 3-9)

The Court should apply Local Rule 56.1, reject each of defendants' argumentative responses, and deem all of plaintiffs' contentions to be admitted. *Craco v. Vitran Exp., Inc.*, 559 F.3d 625, 632

-15-

(7th Cir. 2009); *Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006). This is especially true for plaintiffs' contentions relating to the statistical evidence.

### B. Denials about Statistical Evidence

Defendants continue their improper tactics in responding to plaintiffs' contentions about the statistical evidence. (Document 204 at 25-32, 36-38,  pars. 40-50, 58-59.)

First, defendants dispute that they produced, in computer readable form, information about each admission to the Jail from August 3, 2005 through March 30, 2011. (Document 204 at 25, par. 40.) Defendants do not, however, point to any evidence that they served a false response to plaintiffs' document request. (One response is reproduced in the addendum, *infra*, at 34-35.)

Second, defendants dispute that they produced, in computer readable form, records for each prescription written and filled from August 3, 2005 through March 30, 2011. (Document 204 at 26, par. 41.) Defendants support this bizarre charge with deposition testimony of their correctional medicine expert, Dr. Lynn Sander. Nothing in the quoted excerpt suggests that defendants failed to produce the information specified in their response to plaintiffs' documents re-

quest. See Letter from Catania to Morrissey and Flaxman, August 23, 2011, reproduced in the addendum, *infra*, at 36.

Third, defendants deny that the prescription records included, *inter alia*, the name of the patient, date when prescription was issued, name and strength of drug, and quantity. (Document 204 at 26, par. 42.) This denial cannot be squared with defense counsel's agreement (Addendum at 36) with plaintiffs' description of the computer data which defendants had produced, reproduced in the Addendum, *infra*, at 37-38.

After these insincere denials, defendants challenge each of plaintiffs' contentions about the analysis performed by their statistician, Dr. Steven Whitman. (Document 204 at 27-32, pars. 44-50.) Defendants agree with one contention (Document 204 at 29-30, par. 48), but otherwise offer argumentative denials, as condemned in *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D.Ill. 2000).

Defendants appear to argue that Dr. Whitman is not qualified to analyze data (or, as defendants state, to "put information into his computer and … perform[] a mathematical calculation." (Document 204 at 28, par. 45.) This claim is insulting to "a statistician who analyzes data about health," *Obrycka v. City of Chicago*, 2011 WL

2600554 at *3 n.5 (N.D.Ill. 2011) (attached in the addendum, *infra*, at 41-47) – one who has "impressive credentials and experience as a biostatistician and epidemiologist," *Id.*

Defendants also charge that Dr. Whitman "dredged data" Document 204 at 28, par. 44), but fail to support this calumny with anything other than blustering argument.

Defendants raise a variety of objections based on "par stock." Defendants assert that medication was dispensed when detainees entered the Jail, but that the prescriptions written for this medication would not be entered into the computer system until the next day. Defendants argue that Dr. Whitman did not consider this procedure when he analyzed delays in filling prescriptions. There are three flaws with this argument.

First, defendants fail to present any reliable evidence about the extent to which medication was dispensed but not recorded until the next day. Defendants chose not to analyze the data (Plaintiffs' Exhibit 36, Blackwell Dep. 115:8-9), but instead rely solely on the arguments of counsel.

Second, the par-stock defense has nothing to do with psychotropic medication, which could not dispensed in the receiving room

until after defendants changed their intake procedures in October of 2010. (Plaintiffs' Rule 56 Statement, par. 38, Document 174 at 14.)

Third, and perhaps of greatest importance, the par-stock defense has nothing to do with the 14 day period on which plaintiffs rely in their cross-motion for summary judgment: the "blister packs" that could be dispensed during intake processing provided medication for only seven days. (Plaintiffs' Exhibit 12, Stadnicki Dep. 105:16-18.) Plaintiffs base their summary judgment motion on improvements in providing non-psych meds in the *14* day period following intake. (Plaintiffs' Rule 56 Statement, par. 59, Document 174 at 22.) Plaintiffs shaped their summary judgment motion using the 14 day point to avoid any factual dispute about "par stock" and medication dispensed during intake. Defendants' "par stock" defense is pure smoke screen.

## III.  Methadone

Plaintiffs challenge the mandatory "methadone tapering" policy defendants apply to all non-pregnant prisoners at the jail. (Plaintiffs' Summary Judgment Memorandum at 34-36, Document 175 at 41-43.) Defendants do not respond to plaintiffs' challenges, but assert that "[i]t certainly is not settled that there is a right to a metha-

done program in jail." (Defendants' Memo at 18, Document 203 at 18.)

"Settled law" is part of the qualified immunity calculus. This case, however, is an action against governmental entities for whom qualified immunity does not apply. *Owen v. City of Independence*, 445 U.S. 622, 657 (1980). This rule is fully applicable to defendants in this case. *Ruffino v. Sheahan*, 218 F.3d 697, 700 (7th Cir. 2000).

## IV.  Conclusion

For the reasons above stated and those previously advanced, the Court should grant partial summary judgment on liability in favor of the plaintiff class.

Respectfully submitted,

/s/  <u>Kenneth N. Flaxman</u>
Kenneth N. Flaxman,
ARDC No. 830399
200 S Michigan Ave, Ste 1240
Chicago, Illinois 60604
(312) 427-3200

Thomas G. Morrissey.
10249 S Western Ave
Chicago, Illinois 60643
*Attorneys for Plaintiffs*

# ADDENDUM

In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-3687

PETER COTTS,

*Plaintiff-Appellant,*

*v.*

SETH OSAFO, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 05 CV 1150—**Harold A. Baker**, *Judge.*

ARGUED SEPTEMBER 9, 2011—DECIDED AUGUST 10, 2012

Before CUDAHY, POSNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Peter Cotts maintains that prison officials were deliberately indifferent to the complications from his painful hernia. Both parties agreed that the jury should receive instructions based on our pattern jury instructions for deliberate indifference claims. Yet the instructions the jury received, over objections from both sides, suggested that "cruel and unusual

punishment" was an independent element of liability above and beyond a showing that the defendants were deliberately indifferent to Cotts's serious medical need. They also incorrectly suggested that damages were an element of liability. The misleading instructions prejudiced Cotts, and so we remand for a new trial.

## I. BACKGROUND

Peter Cotts was injured in November 2004 while incarcerated at the Illinois River Correctional Facility. He went to the prison's health care unit and complained of intense pain in the area of his right groin. Dr. Seth Osafo diagnosed Cotts with an inguinal hernia in his lower right abdomen, two inches in diameter, that was pushing into his groin. Over the next five months, Cotts visited Illinois River's health care unit sixteen times to seek help for his painful hernia, and he told the health professionals that the pain was interfering with his ability to walk, sleep, and use the restroom. He did not receive the surgery he requested. Instead, the health care providers treated his hernia by "reducing" it, that is, by manually shoving it back into Cotts's abdomen. Cotts testified that this procedure was very painful and that often, when he returned to a seated position, the hernia would pop right back out. Nonetheless, Cotts said, Dr. Osafo told him that no matter how much he complained of the pain from his hernia, Dr. Osafo would not allow him to be considered a candidate for surgical repair because the hernia was reducible.

No. 10-3687 3

After his release on parole on May 20, 2005, Cotts went to the county hospital in Chicago to seek help for his hernia. During a November 2005 appointment, a doctor scheduled a surgery date for May 12, 2006. Several months after the appointment, in early 2006, Cotts was admitted to the emergency room with "unbearable" hernia pain. He later visited a doctor at a clinic who offered to perform the surgery if Cotts could pay for it, but Cotts could not. On May 9, 2006, Cotts was arrested for violating his parole. He was sent back to prison three days before his surgery was to take place.

When he returned to prison, Cotts was first housed at Stateville Correctional Center. A doctor examined him at that facility's health care unit on May 19, 2006. Cotts testified that the doctor told him his hernia looked "very bad" and necessitated surgery, and that the doctor said he would make that note in Cotts's medical records for the benefit of the medical provider at the facility where Cotts would be housed. At this point, Cotts's hernia was the size of a grapefruit in his groin and a small grapefruit in his right scrotum. Four days later, Cotts was transferred to Shawnee Correctional Center, where he was taken to the health care unit immediately after he was processed. He returned repeatedly to that facility's health care unit over the next eight months but was told he could not have surgery because the hernia was reducible. Finally, on February 9, 2007, Cotts was allowed to see a general surgeon, who repaired his hernia three days later.

Cotts filed this lawsuit pursuant to 42 U.S.C. § 1983. He alleged that doctors including Dr. Osafo, as well as

Wexford Health Sources, Inc., a private company that provided the health care services at the prisons where Cotts was housed, were deliberately indifferent to a serious medical need by failing to provide prompt and adequate treatment for his hernia. The district court denied the defendants' motion for summary judgment, and the case proceeded to trial. There, the parties disputed the reason that the defendants denied Cotts's surgery requests. Cotts maintained that they did so because Wexford's policy on hernias did not allow surgery for "reducible" hernias, regardless of pain level, and because Wexford would have been responsible for paying for the surgery. He introduced Wexford's guideline for the treatment of an abdominal wall inguinal hernia: "Patients with stable abdominal wall hernias are not, in general, candidates for [hernia repair surgery] and will be monitored and treated with appropriate non-surgical therapy." The defendants' position was that Cotts's hernia did not necessitate surgery. Two doctors testified that Wexford's clinical guidelines were educational tools and not direct orders.

The parties agreed to use instructions modeled after the Seventh Circuit's pattern jury instructions for deliberate indifference claims. Despite that agreement, and over the objection of both parties, the district court refused several of the parties' jointly proposed instructions and instead gave its own. The jury returned a verdict finding the defendants not liable, and Cotts appeals.

No. 10-3687                                                    5

## II. ANALYSIS

Cotts maintains that the jury instructions given in his trial were incorrect and confusing, and that they may well have led the jury to rule against him. A district court has discretion when deciding which instructions to give a jury. *Alcala v. Emhart Indus., Inc.*, 495 F.3d 360, 363 (7th Cir. 2007). But the instructions it gives must fairly and accurately state the governing law. *Huff v. Sheahan*, 493 F.3d 893, 899 (7th Cir. 2007). To determine whether they are fair and accurate, we look at the instructions as a whole and conduct a de novo review. *Id.* Instructions that misstate or insufficiently state the law warrant a new trial when the instructions prejudice the losing party. *Cruz v. Safford*, 579 F.3d 840, 843 (7th Cir. 2009).

### A. Elements Instruction

Cotts takes issue with several of the instructions the jury received, but his principal challenge is to the "elements instruction" that told the jury what Cotts needed to prove to succeed on his claim. Cotts's first contention is that the elements instruction given to the jury over both sides' objection erroneously added "cruel and unusual punishment" as an element of liability.

The constitutional source of a deliberate indifference claim is the Eighth Amendment's ban on cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). That said, the Supreme Court has long made clear that proving deliberate indifference to a serious medical

need itself establishes an Eighth Amendment violation. *See id.* (stating deliberate indifference to a prisoner's serious medical need constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment); *see also Farmer v. Brennan*, 511 U.S. 825, 828 (1994). No separate showing of cruel and unusual punishment is or may be required, and the jurors here did not need to know the underlying basis of the claim to decide the case. *See, e.g., Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (stating elements of a deliberate indifference claim with no reference to "cruel and unusual punishment").

Indeed, neither party wanted the words "cruel and unusual punishment" included in the instructions. Both sides objected to their inclusion. And the Seventh Circuit pattern jury instruction does not include those words. Pattern civil jury instruction 7.12 states, without any reference to "cruel and unusual punishment":

> To succeed on his claim of failure to provide medical attention, Plaintiff must prove each of the following things by a preponderance of the evidence:
>
> 1.  Plaintiff had a serious medical need;
>
> 2.  Defendant was deliberately indifferent to Plaintiff's serious medical need;
>
> 3.  Defendant's conduct caused harm to Plaintiff.
>
> . . . .

No. 10-3687                                                    7

The court rejected the parties' agreement to use an in-
struction based on the pattern instruction. Instead, the
jury was instructed:

> The plaintiff has the burden of proving each of the
> following propositions to recover on his claim
> against a defendant regarding a violation of the
> plaintiff's Eighth Amendment right to freedom
> from cruel and unusual punishment. . .

> Second, that in so acting the defendant violated
> the plaintiff's right to be free from cruel and un-
> usual punishment. Specifically, the plaintiff must
> prove that: (a) he had a serious medical need;
> and (b) that the defendant under consideration
> was deliberately indifferent to that need.

The instruction is puzzling. No mention of "cruel and
unusual punishment" was necessary or wanted by the
parties, yet the instruction told the jury Cotts needed
to prove the defendants violated his "right to be free
from cruel and unusual punishment." What follows
is also unclear. The defendants contend that the "specif-
ics" are simply an explanation of cruel and unusual
punishment. But a reasonable juror might read the in-
struction as directing that Cotts needed to make an inde-
pendent showing of cruel and unusual punishment
in addition to the two "specifics." Stating "specifically
the plaintiff must prove" two propositions is not the
same as stating that cruel and unusual punishment
"means" proving the two propositions that follow it.
The use of "specifically" suggests that what follows is
not an explanation of what "cruel and unusual punish-
ment" means; instead, it looks like something else.

Sometimes other jury instructions can explain with sufficient clarity any ambiguity in a challenged instruction. *Francis v. Franklin*, 471 U.S. 307, 318-19 (1985). Here, another instruction elaborated on the deliberate indifference claim's source in the Eighth Amendment and the Amendment's "cruel and unusual punishment" language, but as in *Franklin*, this other, more general instruction did not "dissipate the error in the challenged . . . instruction." *See id.* at 320.

Indeed, the inclusion, and repeated inclusion, of "cruel and unusual punishment" in the instructions only had the potential to confuse the jury. Even if an instruction were perfectly clear that "cruel and unusual punishment" is not an independent element of a plaintiff's deliberate indifference claim, there is good reason that the phrase should not appear in the jury instructions. To a lawyer, "cruel and punishment" is a term of art found in the Constitution's Eighth Amendment. But to a lay person, the words "cruel and unusual punishment" can evoke a parade of horribles. Stoning, a breaking wheel, boiling to death, impalement, waterboarding, the death penalty—who knows what thoughts come to mind when hearing the words "cruel and unusual punishment"? A jury might think that the conduct needed to approach those levels. And it is particularly dangerous to inject the concept of "cruel and unusual punishment" into a case about deliberate indifference because a juror might think that to prevail the plaintiff needs to show that the defendants affirmatively "punished" him. The defendants here did not "punish" Cotts in the lay sense of that term. The conten-

tion in this case, as it is in many similar cases, is that the defendants were deliberately indifferent to Cotts's medical needs—but not as a penalty for something Cotts had done. To inject the idea of "punishment" into a deliberate indifference case like this one only makes the instructions more confusing for the jury. *Cf. Miller v. Neathery*, 52 F.3d 634, 638 (7th Cir. 1995) (stating court should define "'enigmatic terms' that leave the jury to speculate on their meaning").

We agree with Cotts that the instruction suggests Cotts needed to make an independent showing of cruel and unusual punishment (which is wrong under the law, as proving deliberate indifference to a serious medical need is enough), and that it is not clear that he only needed to prove a serious medical need about which the defendants were deliberately indifferent. Now certainly a judge is not precluded from giving the jury instructions which differ from those proposed by the parties or reflected in the pattern instructions. *See, e.g., Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 433 (7th Cir. 2009). Judges have a duty to ensure they are accurately instructing jurors in the law. *Alcala*, 495 F.3d at 366. But when a judge varies from the pattern instructions, he should do so to make things clearer for the jury, not more confusing. Here, unfortunately, the instruction did not clearly state the law to a lay person.

Cotts also maintains that the elements instruction wrongly required him to prove he "suffered damage" to show liability. (The written instructions that each juror received stated "suffered damage"; orally, the judge said "suffered damages.") Cotts objected to this phrasing,

arguing that the law required him to show "harm" but not "damage" to make the defendants liable. As with "cruel and unusual punishment," neither party wanted "damage" in the elements instruction. Seventh Circuit pattern instruction 7.12, to which the parties agreed, states that to find the defendants liable, the plaintiff must prove the defendants "caused harm" to the plaintiff.

Damages are not an element of liability in a deliberate indifference claim. *See Calhoun v. DeTella,* 319 F.3d 936, 941 (7th Cir. 2003) (noting our approval of the award of nominal damages for Eighth Amendment violations when prisoners could not establish actual compensable harm); *see also Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 265 (7th Cir. 1996) (requiring a plaintiff to prove "actual injury" when it is not an element of the claim was not harmless error). And in a civil trial, the liability determination comes first, and only if a jury finds liability should it consider damages. *See, e.g., Thomas v. Cook Cnty. Sheriff's Dep't,* 604 F.3d 293, 312 (7th Cir. 2009) (stating that a verdict form "should not ask a jury to assess damages before liability"). The two inquiries are distinct, with the liability inquiry the threshold one.

On appeal, the defendants maintain that any difference between "harm" and "damage" is minimal and that no prejudice resulted from the use of "damage" in the elements instruction. But the use of "damage(s)" in the instructions as a whole is confusing and renders its meaning in the critical elements instruction unclear. The elements instruction stated that Cotts had "the burden of proving each of the following proposi-

No. 10-3687                                          11

tions," one of which was "that the plaintiff suffered damage." The instruction then told the jury:

> [I]f you find from your consideration of all the evidence that the plaintiff has failed to prove any of these propositions, then your verdict should be for the defendant under consideration and against the plaintiff.

So the elements instruction made "damage(s)" a prerequisite for a liability determination. Then other instructions used "damage(s)" to at times mean something different than a component of liability. Another instruction, for example, told the jury (our emphasis added):

> If you decide the plaintiff is entitled to *damages*, you must fix the amount of money which will reasonably and fairly compensate the plaintiff for the following element of *damage* proved by the evidence to have resulted from the conduct of the defendant(s), taking into consideration the nature, extent, and duration of any injury:

> The pain and suffering endured by the plaintiff.

> Whether this element of *damage* has been proved by the evidence is for you to determine.

> If you find in favor of plaintiff, but find that the plaintiff has failed to prove compensatory *damages*, you must return a verdict for Plaintiff in the amount of one dollar ($1.00).

> If you decide for the defendants on the question of liability, you will have no occasion to consider the question of *damages*.

The use of the same word—"damage(s)"—in both the elements instruction and this one, to mean different things, renders its meaning in the elements instruction unclear. And the way it is used here only adds to the confusion. The first sentence here, directing the jury that if it finds "the plaintiff is entitled to damages" it must determine the amount of money "for the following element of damage" is difficult for even a lawyer to understand. (Pattern civil jury instruction 7.23, in contrast, states: "If you find in favor of Plaintiff, then you must determine the amount of money that will fairly compensate Plaintiff for any injury that you find he sustained as a direct result of . . . .").

Reading this instruction in conjunction with the elements instruction would likely leave a reasonable juror confused. The last sentence here, for example, does not make sense when read in conjunction with the elements instruction: although the last sentence here says the jury would have no occasion to consider the question of damages if it ruled for the defendants on liability, the liability elements instruction explicitly made part of the inquiry whether Cotts suffered damages. Like the use of "cruel and unusual punishment," the inclusion of the term of art "damage" in the elements instruction made the instruction more confusing, with the result that it did not clearly state the law for the jury.

The confusion in the instructions prejudiced Cotts. *See Byrd v. Ill. Dep't of Pub. Health*, 423 F.3d 696, 705 (7th Cir. 2005) ("If an instruction is so misleading that an

appellant is prejudiced, reversal is required."). The erroneous instruction went to the elements of Cotts's claim. *See United States v. Perez*, 43 F.3d 1131, 1139 (7th Cir. 1994). The confusion was not clarified by other instructions. And this was not a slam-dunk victory for the defendants. A reasonable jury could have believed evidence suggesting that for almost three years, the defendants refused to repair Cotts's hernia surgically because they followed an inflexible policy against surgery for reducible hernias. They might also have believed that the fact that Wexford would have to pay for any surgery impacted the decision not to allow it. In short, a factfinder could have reasonably concluded that the defendants "substantially departed from professional judgment by refusing to authorize surgical repair for [Cotts's] painful hernia." *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011). A new trial is necessary.

B.   Other Instructions

Because we are remanding for a new trial, we only briefly comment on Cotts's remaining contentions. One involves the instruction regarding policy. Because Wexford was a private corporation, Cotts needed to show that a policy adopted or condoned by Wexford caused him to receive constitutionally inadequate care. *See Minix v. Canarecci*, 597 F.3d 824, 834 (7th Cir. 2010). The written instructions told the jury:

A corporation can only act through its officers and employees. Any act or omission of an officer or employee within the scope of his employment

and pursuant to the policies of the corporation
is the act or omission of the corporation.

Orally, the judge added: "Here in this case Wexford
Health Sources, Inc., the corporation, in order for
liability to be established against it, has to have a policy
that would be construed by you as resulting in delib-
erate indifference to a serious medical need."

The district court denied Cotts's request to instruct the
jury that a policy constitutes a "rule or regulation insti-
tuted by Wexford's directors" or a "decision or policy
statement made by Wexford's corporate officers,"
and Cotts maintains that the instructions as given im-
properly allowed the jury to believe Wexford could only
be found liable if its employees acted pursuant to a
*written* policy. The instructions did not specify that a
written policy was necessary to find Wexford liable.
Nonetheless, in formulating instructions on remand,
we invite the district court to consider cases such as
*Woodward v. Correctional Medical Services*, 368 F.3d 917,
928 (7th Cir. 2004), where we found evidence of an
actual practice, as opposed to a written policy, sufficient
to establish deliberate indifference.

Similarly, the district court can consider on remand
Cotts's requests for additional damages instructions
including a specific instruction telling the jury it could
consider "the physical, mental and emotional pain and
suffering" he experienced. (The jury was told it could
consider "[t]he pain and suffering endured by the plain-
tiff.") As the defendants' only response on appeal is
that the failure to give the instruction was harmless

No. 10-3687                                              15

because the jury did not reach the question of damages, and we are remanding for a new trial, the district court can consider the propriety of giving such an instruction on remand.

### III. CONCLUSION

The judgment of the district court is REVERSED and this case is REMANDED for further proceedings consistent with this opinion. Circuit Rule 36 shall apply.

8-10-12

2001 WL 111019
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

Andre HALL, Plaintiff,

v.

Michael SHEAHAN, et al., Defendants.

No. 2000 C 1649.  |  Feb. 2, 2001.

Opinion

### MEMORANDUM OPINION AND ORDER

MORAN, J.

**\*1** Plaintiff Andre Hall filed this action on March 15, 2000, complaining that Cook County Sheriff Michael Sheahan, an unnamed superintendent, and "Officer Baker" violated his constitutional rights by ignoring a broken toilet that repeatedly spread water and fecal matter on the floor of his cell at the Cook County Jail (Jail). He repeatedly asked that the toilet be fixed, and was told that it had leaked for seven months before he was assigned to the cell. On October 16, 1998, Hall slipped in the mess and fell, injuring his hip and back. After Hall returned from the hospital, he was put in another cell until a plumber came and determined that the toilet should have been replaced.

The court granted Hall leave to proceed *in forma pauperis* on June 12, 2000. Only Sheriff Sheahan and Cook County have been served with process; the other two defendants have not yet been identified or served. Sheahan and Cook County have moved to dismiss his suit under Rule 12(b)(6), contending that (a) it is barred by the Prison Litigation Reform Act (PLRA), because Hall did not utilize the institutional grievance procedure; (b) Hall has not stated a claim against Cook County; (c) Hall has not alleged that defendants had the requisite intent, and (d) defendants are entitled to qualified immunity.

A motion to dismiss should not be granted unless the court concludes that "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984). In deciding a motion to dismiss, we assume that the alleged facts are true and draw every reasonable inference in the plaintiff's favor. *LeBlang Motors, Inc. v. Subaru of America,*

*Inc.,* 148 F.3d 680, 690 (7th Cir.1998). A pro se complaint is held to less stringent standards than a complaint drafted by an attorney, *Swofford v. Mandrell,* 969 F.2d 547, 549 (7th Cir.1992), and for a pro se plaintiff the court considers the allegations contained in all documents filed with the court. *Swofford,* 969 F.2d at 549.

### A. EXHAUSTION

The PLRA contains a comprehensive administrative exhaustion requirement: "[n]o action shall be brought with respect to prison conditions ... by a prisoner ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Hall acknowledges that he did not use the Jail's grievance procedure, but alleges that he was unaware of it. Hall does allege that he complained repeatedly to Jail personnel.

A plaintiff can plead himself out of court by alleging facts showing he has no viable claim, *Jackson v. Marion County,* 66 F.3d 151, 153-54 (7th Cir.1995), but Hall has not done so here. Defendants are correct that a plaintiff may not deliberately bypass the grievance procedure because he believes it futile. *Perez v. Wisconsin Dept. of Corrections,* 182 F.3d 532, 536-37 (7th Cir.1999). But Hall claims he did not know of the grievance procedure, and in some circumstances that could excuse exhaustion.

**\*2** An institution cannot keep inmates in ignorance of the grievance procedure and then fault them for not using it. A grievance procedure that is not made known to inmates is not an "available" administrative remedy. *Cf. Johnson v. Garraghty,* 57 F.Supp.2d 321 (E.D.Va.1999)(if correctional officials prevented plaintiff from using grievance procedure, it would excuse exhaustion). On the other hand, correctional officials are entitled to the benefit of § 1997e(a) as long as the institution has made a reasonable, good-faith effort to make a grievance procedure available to inmates; an inmate may not close his eyes to what he reasonably should have known. When a plaintiff claims ignorance of the grievance procedure, it becomes a question of fact whether the grievance procedure was an available administrative remedy he was required to exhaust.

To be entitled to judgment on grounds of non-exhaustion, defendants would need to establish that the grievance procedure was posted in such a manner that Hall could reasonably be expected to see it, or that Jail employees explained the procedure to him. Such questions of fact are not normally resolved by a motion to dismiss. Defendants ask the court to take judicial notice that "CCDOC has a well

established and well published grievance procedure," because it is "well documented" in the May 12, 2000 status report of the John Howard Association, the monitor of Jail conditions appointed by this court in *Duran v. Sheahan,* No. 74 C 2949.

While the court can take judicial notice of matters of public record in deciding a motion to dismiss, *Henson v. CSC Credit Services,* 29 F.3d 280, 284 (7th Cir.1994), this sort of offhand reference is unacceptable. [1] In the first place, taking judicial notice of public records is not the same thing as taking judicial notice of the truth of what is stated in them. Second, counsel does not explain how the May 12, 2000 status report, addressing conditions in the Jail in the preceding year, is relevant to events occurring in 1998. And, third, however trustworthy such reports may be, general observations in a report are, at most, some evidence of the conditions encountered by a particular detainee at a particular time; they are not likely to be conclusive.

On its own motion the court has examined the relevant report of the John Howard Association filed September 30, 1998. The report states that "grievance boxes were still serviceable and in use and grievance forms generally available during the year." *Duran v. Sheahan,* No. 74 C 2949, dkt. no. 791 (JHA 1998 Report) at 110. The report also states that "since the issuance of the revised inmate handbook in February 1998, a written explanation of the grievance procedure has been generally available to inmates." *Id.* at 116. This hardly establishes as a matter of law that Hall had notice of the grievance procedure, constructive or actual.

There is also the further possibility that the conduct of Jail employees estops the defendants from invoking the exhaustion requirement. Hall states in response to the defendants' motion that Baker told him she would have the toilet fixed, and told him to stop asking her about it. This raises the question whether Baker effectively represented (or misrepresented) to Hall that he had done all he needed to do, or that the grievance procedure was useless, i.e., "available," but not a "remedy." [2] These are all issues of fact that cannot be resolved on a motion to dismiss.

## B. CLAIM AGAINST COOK COUNTY

**\*3** The court agrees that Hall has not stated a claim against Cook County. While *Thompson v. Duke,* 882 F.2d 1180, 1187 (7th Cir.1989), *cert. denied,* 495 U.S. 929 (1990), concluded that a county could not be liable for the decisions of a sheriff, a separate constitutional officer, that conclusion may be subject to reconsideration in light of *Brokaw v. Mercer County,* 235

F.3d 1000 (7th Cir.2000). Perhaps the sheriff, as a county officer, acts on behalf of the county. We do not reach that issue, however, because the County can be liable only if Hall's injury can be directly attributed to some custom or policy of the County. *Monell v. Department of Social Services of City of New York,* 436 U.S. 658 (1978); *Lanigan v. Village of East Hazel Crest,* 110 F.3d 467, 478-79 (7th Cir.1997). Hall refers vaguely to "an ongoing custom/policy of providing an unsafe & unsafe [sic] living condition at the Cook County Jail." He also alleges that Sheahan, who undoubtedly has policymaking authority, "failed to train and supervise [subordinates] on the proper maintenance of cells and the safety & protection of pretrial detainees." These allegations are insufficient to state a claim against Cook County.

In a recent opinion, the Seventh Circuit acknowledged that "district courts continue to struggle with this and other courts' pronouncements as to exactly what a plaintiff bringing a municipal liability suit must plead to survive a motion to dismiss-and with reason." *McCormick v. City of Chicago,* 230 F.3d 319, 324 (7th Cir.2000). Contrasting opinions such as *Jackson v. Marion County, supra,* which endorsed "conclusory" notice pleading, with others such as *Kyle v. Morton High School,* 144 F.3d 448, 455 (7th Cir.1998), holding that the plaintiff could not state a claim by simply attaching a "bare conclusion to the facts he narrates," the court chose the former as being more consistent with *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163 (1993). As this is the Court of Appeals' latest (though not necessarily last) word on the subject, we will follow it here.

Hall's allegation of "an ongoing custom/policy of providing an unsafe & unsafe [sic] living condition at the Cook County Jail" does not provide defendants with fair notice of what they are alleged to have done. Even in the realm of "notice pleading," a plaintiff may not "[leave] out facts necessary to give the defendants a complete understanding of the claims made against them," and must give defendants "notice of the crux of the plaintiff's charges." *McCormick,* 230 F.3d at 325. To accuse Cook County of a "policy" of making the Jail unsafe is meaningless. *Cf. Payne v. Churchich,* 161 F.3d 1030, 1043 (7th Cir.1998)(allegation that county maintained its own confinement facility with deliberate indifference and callous disregard for the welfare of inmates did not allege municipal policy).

Hall's claim of inadequate training fails for a different reason. Only in limited circumstances will failure to train be characterized as a municipal policy under § 1983. The

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

2

Supreme Court held in *City of Canton, Ohio v. Harris,* 489 U.S. 378, 388 (1989), that "the inadequacy of police training may serve as the basis for [section] 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." This standard is met only if "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." *City of Canton,* 489 U.S. at 390.

 *4 Here, no reasonable inference links Hall's injury to a failure to train. No reasonable person could find the need for training obvious in itself. It requires no training to recognize an overflowing or leaking toilet, or to recognize that it presents a health and safety hazard. Nor has Hall alleged a general pattern of toilet neglect, known to county policymakers, that might lend some plausibility to a failure-to-train claim. *See id.,* 489 U.S. at 390 n. 10; *Robles v. City of Fort Wayne,* 113 F.3d 732, 735-36 (7th Cir.1997). Cook County is dismissed as a defendant.

## C. CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

Defendants' brief correctly sets forth the applicable legal framework. The Constitution is offended only if the plaintiff has experienced "punishment." The Due Process Clause of the Fourteenth Amendment prohibits any punishment of pretrial detainees without due process of law. *Tesch v. Village of Green Lake,* 157 F.3d 465, 472-73 (7th Cir.1998). For

conditions of confinement to be considered "punishment" in the constitutional sense, both an objective and a subjective test must be met: the conditions inflicted on the plaintiff must be both objectively severe and imposed either with an actual intent to punish or with deliberate indifference to the prisoner's discomfort. *Wilson v. Seiter,* 501 U.S. 294 (1991); *Tesch,* 157 F.3d at 473-74.

Defendants do not contend that the objective test has not been met, but point out that Hall did not allege that Sheriff Sheahan had personal knowledge of the conditions in Hall's cell and so could not have had the requisite state of mind. Defendants are correct that personal knowledge or participation is required for § 1983 liability, and there is no *respondeat superior* liability under § 1983. *Whitford v. Boglino,* 63 F.3d 527, 530-31 (7th Cir.1995). The complaint does not state a claim against Sheahan.

Nevertheless, this does not require that the complaint be dismissed at this time. Although Sheahan is the only individual defendant now before the court, he is not the only individual defendant named in the complaint. Hall has also sued an unknown-named superintendent and an "Officer Baker" who was insufficiently identified to be served. A supervisory person without actual liability, such as Sheriff Sheahan, may be named as a defendant so that the plaintiff may conduct discovery to learn the identities of the real defendants. *Donald v. Sheahan,* 95 F.3d 548, 554-555 (7th Cir.1996); *Billman v. Indiana Dept. of Corrections,* 56 F.3d 785, 790 (7th Cir.1995). Until Hall has had an adequate opportunity to discover the correct defendants, Sheahan will not be dismissed.

**Footnotes**

1      In defending claims arising from conditions of confinement at the Jail, the State's Attorney's Office has an unfortunate practice of invoking the John Howard Association's reports as conclusive proof that matters were not as the plaintiff alleged. *See Gordon v.. Sheahan,* No. 96 C 1784, 1998 WL 341796 (Manning, J.); *Miller v. Pinson,* No. 94 C 2157, 1996 WL 596501 (Grady, J.); *Pryor v. Sheahan,* No. 94 C 103, 1996 WL 464193 (Manning, J.).

2      The September 1998 Report noted that only about half of the grievances received responses that were reasonably timely, and this meant only that some kind of written response was given, not that the inmate received any kind of appropriate relief. JHA 1998 Report at 115-16.

                    © 2012 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CAROL A. EVERETT,                      )
                                       )
            Plaintiff,                 )          Case No. 07 C 5440
                                       )
v.                                     )          Judge Virginia M. Kendall
                                       )
COOK COUNTY,                           )
                                       )
            Defendant.                 )

## DEFENDANT'S LOCAL RULE 56.1
## STATEMENT OF FACTS IN SUPPORT OF SUMMARY JUDGMENT

Defendant, COOK COUNTY, by and through its attorney, hereby submits its Local 56.1

statement of material facts[1] to which there is no genuine issue.

**PARTIES**

1.      Plaintiff, Carol A. Everett, is a Caucasian female resident of the Northern District

of Illinois and was employed as a dentist at Cermak Health Services of Cook County ("Cermak")

from June 14, 1982 until March 30, 2007.  (TAB 1, Second Amended Complaint, ¶ 2, 8, 13)

2.      Defendant is Cook County.  (TAB 1, ¶ 9)

**JURISDICTION AND VENUE**

3.      Plaintiff's Second Amended Complaint invokes jurisdiction pursuant to the

consent decrees and judgments entered in *Shakman v. Democratic Organization of Cook County,

et al.*, No. 69 C 2145 (the "*Shakman Decree*"), the First Amendment of the United States

Constitution under 42 U.S.C. §1983, 42 U.S.C. §1981, and Title VII of the Civil Rights Act of

1964, 42 U.S.C. §2000 *et seq.* (TAB 1, ¶1, 4)  Plaintiff's Second Amended Complaint also

---

[1]      For purposes of this motion only, the statements made herein are taken as true.  Defendant
reserves the right to challenge Plaintiff's deposition statements and allegations in the complaint outside
the context of its motion for summary judgment.

1

invokes supplemental jurisdiction over Plaintiff's state law writ of certiorari claim pursuant to 42 U.S.C. §1367(a).  (TAB 1, ¶ 7)

 4. Venue is proper in this Court because all of the events at issue occurred in this judicial district.  (TAB 1, ¶10)

**PLAINTIFF'S EMPLOYMENT**

 5. Plaintiff began working for Cermak as a Dentist I in June, 1982.  (TAB 2, Plaintiff's Deposition, p. 7, line 17-p. 8, line 4)

 6. From 1982-1990 or 1991, Plaintiff worked full-time.  (TAB 2, p. 9, line 3-11) From 1990 or 1991-2005, Plaintiff worked less than full-time.  (TAB 2, p. 9, line 7-p. 10, line 8) Then, from 2005-2007, Plaintiff worked full-time.  (TAB 2, p. 10, line 8, p. 12, line 17-20)

 7. Plaintiff's position was reclassified to a Dentist II in January, 2003, along with the other dentists at Cermak.  (TAB 2, p. 13, line 13-p. 14, line 10; TAB 3, Dentist Reclassification Documents)

 8. During her employment at Cermak, Plaintiff provided dental care to detainees within various dental clinics set up in divisions of the Cook County Jail facility located at 26th and California.  (TAB 2, p. 14, line 14-15, p. 15, line 20-22)

 9. From January, 2007 until April or March, 2008, Dr. Robert Simon served as the Interim Bureau Chief of the Bureau of Health for Cook County.  (TAB 5, Dr. Simon Deposition, p. 5, line 6-25)  Dr. Simon reported directly to Cook County Board President Todd Stoger. (TAB 5, p. 6, line 1-2)

 10. In 2007, David Fagus was the Chief Operating Officer of Cermak, Dr. Sergio Rodriguez and Dr. Connie Manella were the Medical Directors at Cermak.  (TAB 6, Dr. Couture

2

Deposition, p. 26, line 25–p. 27, line 2; TAB 9, Dr. Knox Deposition, p. 21, line 10-12; TAB 2, p. 24, line 18-22)

**BUDGET CUTS**

     11.     In 2007, the Cook County budget had a shortfall of $500 Million, and $130 Million of that amount was to be cut from the health care budget.  (TAB 5, p. 7, line 19-23)

     12.     On January 7, 2007, President Stroger and his administration directed Dr. Simon to submit a series of recommendations to trim the health care budget, including the Cermak budget, to meet the financial goals set forth by the President and the County Board while having the least possible impact on essential services and quality of care.  (TAB 5, p. 6, line 7-23; p. 7, line 6-p. 8, line 22)  The recommendations were to be submitted within six weeks, prior to the budget approval deadline of February 29, 2009.  (TAB 5, p. 8, line 3-9)

     13.     Dr. Simon put together a team of people to evaluate the facilities and present recommendations to effectuate $100 Million in cuts from the County's health care budget.  (TAB 5, p. 8, line 10-21)  Each of these directors presented their recommendations detailing the restructuring and the impact it would have.  (TAB 5, p. 32, line 17-24)

     14.     Dr. Simon made the final decisions regarding the budget cut recommendations. (TAB 5, p. 25, line 13-15)

     15.     In December, 2006-January, 2007, Dr. Simon assigned Dr. Eileen Couture to evaluate all of the programs at Cermak, including the Dental Department, on the basis of productivity, services provided, and patient numbers, to determine what services were necessary and essential according to the National Commission on Correctional Healthcare and achieve a 17% cut from the budget.  (TAB 6, p. 28, line 6-p. 29, line 2, p. 29, line 12-20; TAB 5, p. 5, line 6-25)

3

16.     Dr. Couture was the Director of Emergency Services at Cermak from 2000 or
2001 to 2004.  (TAB 6, p. 7, line 15-22)  Then Dr. Couture was transferred to Oak Forest
Hospital as the Clinical Chair of Emergency Services, but remained an attending physician at
Cermak in the Emergency Department.  (TAB 6, p. 7, line 15-22; p. 13, line 4-7)  From
February, 2007–August, 2008, Dr. Couture was the Interim Medical Director at Cermak.  (TAB
6, p. 7, line 15-22)

17.     The Personnel Rules for Physicians and Dentists governed the terms and
conditions of employment of the dentists at Cermak in 2007.  (TAB 2, p. 111, line 22-p. 112, line
11; TAB 4 Cook County Bureau of Health Services Personnel Rules For Physicians And
Dentists)   Rule 7 sets forth the procedure for administering a layoff and does not require that
Cook County use seniority in implementing a layoff or contain any provision for review of a
layoff decision.  (TAB 4, Rule 7)  Rule 8 identifies the procedures for administering discipline,
including a grievance process for review of disciplinary action.  (TAB 4, Rule 8)

18.     There are no rules that require Cook County to use seniority alone in
implementing layoffs of physicians and dentists.  (TAB 5, p. 36, line 25-p. 37, line 3; TAB 4)

19.     On January 17, 2007, Dr. Simon met with Kim Gilmore, Chief of Cook County
Human Resources, and Lance Tyson, Chief of Staff to President Stroger, to discuss how to
develop a selection process for non-union employees, such as physicians and dentists, wherein
they use criteria that would allow the selection of the best possible candidate since they did not
have to make the determination only on seniority.  (TAB 5, p. 27, line 3-p. 28, line 14, p. 37, line
25-p. 39, line 6; TAB 13, Memo from Dr. Simon dated January 18, 2007)

20.     For physician and dentist positions, it was important to consider factors other than
seniority because in many situations, especially in the County system, those individuals with the

4

most seniority do less clinical work, are primarily administrative, or may not have as much experience in a particular area, and the decision should be made as to who is best for the patients, not just on seniority. This is particularly true where a restructuring is taking place. (TAB 5, p. 35, line 5-p. 36, line 24)

21.    Dr. Simon directed the medical directors, including Dr. Couture, to determine the best person for the remaining physician and dental positions and if that person has the highest seniority then it was not necessary to conduct any interviews to determine who would retain the position. If, however, the person recommended for the position after the reduction does not have the highest seniority, the recommendation must be based on objective and fair criteria which can be justified, such as productivity, management skills, position requirements, evaluations, and hours worked. If everything else was equal, the most senior person should be retained. (TAB 5, p. 21, line 9-p. 22, line 20, p. 33, line 19-p. 34, line 2)

22.    Interviews of physicians to determine who would remain were conducted where a group of positions was reduced to a few spots, such as ten positions reduced to three. (TAB 5, p. 11, line 17-p. 13, line 22, p. 22, line 5-20) Interviews were not necessary where one person was being retained and the director could make the determination based on the data and information available, such as was the case in the Cermak Dental Department. (TAB 5, p. 22, line 5-20, p. 23, line 2-11)

**CERMAK DENTAL DEPARTMENT**

23.    In February, 2007, there were five salaried dentists working at Cermak: Dr. Jack Liu, a Chinese-American male, Dr. Shandra Bundy-Smith, an African-American female, Dr. Townsend, an African-American male, Dr. Allen Knox, an African-American male, and Plaintiff, a Caucasian female. (TAB 2, p. 28, line 10-20, p. 203, line 14-p. 204, line 1; TAB 1, ¶

5

2) Dr. Allen Knox was the Dental Director and the others held the position of Dentist II. (TAB 2, p. 29, line 6-p. 30, line 8)

24.    Dr. Couture identified that the standards for dentistry pursuant to the National Commission on Correctional Health Care require that emergency dentistry must exist and the detainees must have access to it. The standard does not require that a certain number of dental patients a day or that a root canal must be performed and, as such, Dr. Couture believed that dental services at Cermak would be reduced to serving only recommended emergent needs. (TAB 6, p. 35, line 15-24, p. 50, line 2-9)

25.    In mid-late January, Dr. Simon determined that in light of the amounts that needed to be cut from the budget and the fact that the law required only that dental services be provided in emergency situations, the dental department could be reduced to one dentist at Cermak. (TAB 5, p. 17, line 23-p. 18, line 18; TAB 5, p. 21, line 2-5) At no time did Dr. Simon consider retaining two dentists at Cermak. (TAB 5, p. 21, line 6-8)

26.    Dr. Couture was not required to conduct interviews of the dentists at Cermak because only one dentist was being retained. (TAB 5, p. 41, line 2-5)

27.    Dr. Couture never considered the selection of the remaining dentist to be a choice between Dr. Townsend and Dr. Everett. (TAB 6, p. 53, line 5-7)

28.    Prior to Dr. Simon's and Dr. Couture's involvement in 2007 with Cermak, two previous bureau chiefs were directed to prepare a plan to cut the Cermak budget. (TAB 6, p. 38, line 12-25) Dr. Couture included the reduction plans from the previous bureau chief, Dr. Rodriguez, in her recommendations to Dr. Simon. (TAB 6, p. 39, line 1-21)

29.    Dr. Couture had experience working with the dentists at Cermak both when she worked at Cermak and when she worked as an Emergency Room physician at Stroger, and

6

became aware of the work habits of the dentists, their responses or lack thereof to calls from ER physicians, their failure to treat patients or complications from their treatment resulting in the ER visit. (TAB 6, p. 63, line 2-20)

30.     Dr. Couture's decision as to which dentist to retain relied upon knowledge, skills, and abilities in performing necessary and essential dental services working in correctional dentistry with limited resources and more constraints, meaning the ability to deal with pain, suffering, decay, infection, and extractions, not preventive care, root canals or fillings in private practice. (TAB 6, p. 74, line 15-p. 76, line 10, p. 77, line 14-15, p. 78, line 7-15)

31.     Dr. Couture depended on people other than the dentists at Cermak to evaluate the skills, abilities, productivity, leadership, or previous management experiences of the dentists because the dental office was atrocious, disorganized, and full of papers. (TAB 6, p. 56, line 1-14)

32.     Dr. Couture reviewed the personnel files of the dentists to evaluate their qualifications. (TAB 6, p. 57, line 14-p. 58, line 1)

33.     Prior to the layoff, Dr. Couture reviewed productivity reports for the Dental Department generated in the normal course of data collection by nursing, administration, or the dental assistants. (TAB 6, p. 68, line 23-p. 69, line 25)  The reports she utilized would be more current than 2003 and likely would be for 2005-2006 and identified the number of people being serviced and the size of the division. (TAB 6, p. 70, line 15-25, p. 71, line 20-25)

34.     Dr. Couture recommended that Dr. Robert Townsend be the one dentist retained at Cermak, based primarily on her personal experience as well as her evaluation of the program and recommendations and opinions of others. (TAB 6, p. 31, line 8-16, p. 46, line 8-16, p. 62, line 5-15, p. 80, line 11-22)

35.      Dr. Couture needed to retain someone with management experience and who could be flexible in providing dental care to the detainees after the whole system was being dismantled and in her experience at Cermak, she had gotten that response from Dr. Townsend in the past.  (TAB 6, p. 65, line 2-p. 66, line 8)

36.      In her experience at Cermak, Dr. Townsend always returned Dr. Couture's calls, spoke with her regarding dental care, exhibited knowledge, offered his services, was flexible in squeezing patients into his schedule for emergent care, had a grasp of more than just the patients he was treating, including system problems, not just individual problems.  (TAB 6, p. 81, line 19-p. 83, line 3)

37.      Dr. Townsend had management experience because he served as the Acting Director of Dental Services numerous times beginning under Dr. Scott, and through Dr. Reynolds, and Dr. Knox, where each requested that he be responsible in his/her absence, including extensive leaves under Dr. Knox.  (TAB 7, Dr. Townsend Deposition, p. 33, line 12-24)  In that capacity, his clinical responsibilities remained the same, but he also performed all of the duties of the Director, including attending department head meetings, signing the vacations forms, make the schedules, change the schedules, and anticipate court orders.  (TAB 7, p. 43, line 5-p. 44, line 6)

38.      Dr. Couture determined that Dr. Townsend had greater leadership skills than Dr. Everett and that Dr. Townsend would be the one who could reorganize the Dental Department with two assistants and himself and be the most productive.  (TAB 6, p. 64, line 14-19, p. 85, line 11-24, p. 89, line 14-25)

8

39.     Dr. Couture was advised by medical professionals of criticism of Dr. Everett, including criticism for being slow and that some of her dental patients had to be seen by other dentists.  (TAB 6, p. 90, line 17-p. 91, line 5)

40.     In January – February 2007, Dr. Couture submitted her report of recommendations to Dr. Simon as to how to cut the required budget while retaining the necessary and essential services.  (TAB 6, p. 29, line 4-7, 21, 23-p. 30, line 7, 11-19)

41.     Dr. Couture was not involved in the decision to lay off physicians.  (TAB 6, p. 40, line 18; p. 41, line 4)  The final decision as to who was retained and who was laid off was made by Dr. Simon.  (TAB 5, p. 25, line 13-15)

42.     Dr. Couture advised Dr. Simon that she selected a dentist for retention who was not the most senior, but the person whom she thought had the best productivity, the best ability to do management or experience with management and who was the best of the dentists at Cermak.  (TAB 5, p. 25, line 18-p. 26, line 18)

43.     Dr. Couture never provided Dr. Simon with any written document explaining how she arrived at the decision to recommend that Dr. Townsend be retained as the dentist at Cermak. (TAB 5, p. 33, line 3-7)

44.     Dr. Couture made recommendations based on the program and what was needed when the Dental Department changed after the layoffs, not based on seniority or age, political considerations, gender, or race.  (TAB 6, p. 45, line 9-p. 46, line 2, p. 102, line 3-7, 14-16, 18-20)

45.     Dr. Couture was never aware of any political position or affiliation held by either Dr. Townsend or Dr. Everett.  (TAB 6, p. 102, line 8-13)

46.     Dr. Simon does not know Dr. Everett, Dr. Townsend or Dr. Liu.  (TAB 5, p. 28, line 23- p. 29, line 1-12)

47.     Dr. Simon's decision as to who would remain the sole dentist at Cermak was not based on politics in any way.  At no time did anyone from the administration ask Dr. Simon to keep a doctor or a nurse or a dentist in place based upon who they wanted or interfere in any way with the process.  (TAB 5, p. 37, line 4-12)

48.     At no time did Dr. Simon use race or gender in any way as a determining factor with regard to the layoff of dentists at Cermak.  (TAB 5, p. 37, line 13-21)

49.     Dr. Everett admits she has no information or knowledge that Dr. Couture knew about Dr. Townsend's political affiliation, if any.  (TAB 2, p. 193, line 16-19)

50.     Dr. Everett admits she has no information or knowledge that Dr. Simon was aware of Dr. Townsend's political affiliation, if any.  (TAB 2, p. 193, line 23-p. 194, line 2)

51.     Dr. Everett admits she has no information that Dr. Couture based any of her decisions relating to the dentists at Cermak on race or gender.  (TAB 2, p. 209, line 10-14, p. 214, line 17-22)

52.     Dr. Everett admits she has no information that Dr. Simon based any of his decisions regarding the dentists at Cermak on race or gender.  (TAB 2, p. 209, line 15-18, p. 214, line 23-p. 215, line 3)

53.     In February, 2007, layoff letters were sent to three of the dentists at Cermak: Dr. Liu, Dr. Bundy-Smith, and Dr. Knox.  (TAB 2, p. 28, line 5-20)  The letters were erroneously issued and subsequently rescinded.  (TAB 17, Memo from Dr. Simon dated February 22, 2007)

54.     On March 29, 2007, Dr. Everett was laid off.  (TAB 2, p. 48, line 20-p. 49, line 4, p. 49, line 15-16; TAB 12, Layoff Letter to Dr. Everett dated March 27, 2007)

55.     Dr. Everett first became aware that Dr. Townsend was retained when he called her Monday night and advised her that he went to work on Monday after being off Thursday and

10

Friday and went into Dr. Couture's office to relinquish his ID wherein he was advised by Dr.

Couture that he was selected as the remaining dentist.  (TAB 2, p. 56, line 16-p. 57, line 8)   Dr.

Everett thought that Dr. Townsend inferred that since she was laid off, he also would be laid off

because she was the senior dentist.  (TAB 2, p. 58-line 21-p. 60, line 6)

**COMPARATORS**

56.    Dr. Ronald Townsend was hired on January 25, 1993 as a Dentist at Cermak.

(TAB 7, p. 6, line 15-p. 7, line 4)  Dr. Townsend's always worked full time.  (TAB 7, p. 7, line

5-7)  Dr. Townsend is currently a Dentist II.  (TAB 7, p. 15, line 6-8)

57.    In dental school, Dr. Townsend was a Department of Public Health scholarship

recipient and, as such, his dental school was paid in exchange for a commitment of service to

preselected entities after graduation.  Cermak was on this list and Dr. Townsend applied.  (TAB

7, p. 7, line 8-p. 8, line 3)  Dr. Townsend was interviewed by Dr. Pouisis and Dr. Scott.  (TAB 7,

p. 8, line 6-19)  No references were submitted on his behalf.  (TAB 7, p. 8, line 23-p. 9, line 4)

He received a letter in the mail advising him he was hired.  (TAB 7, p. 8, line 20-22)

58.    Dr. Townsend began a private dental practice in 1990-1991 at 654 E. 75th Street.

(TAB 7, p. 9, line 8-20)  Dr. Townsend moved his practice to 452 E. 75th Street around 2004.

(TAB 7, p. 9, line 17-p. 10, line 10)  His practice has always been part time.  (TAB 7, p. 10, line

17-19)

59.    Dr. Townsend's dental clinic made a single $300.00 campaign contribution to the

8th Ward Regular Democratic Organization in September, 2000.  (TAB 7, p. 36, line 15-25; TAB

11, Contribution List)  Dr. Townsend's dental clinic made two campaign contributions to

Citizens for Lyle in April, 2006 and May, 2006 totaling $225.00.  (TAB 7, p. 36, line 15-25;

TAB 11)  No other campaign contributions were made prior to the layoffs in March, 2007.

(TAB 11)

60.    Dr. Townsend does not know who the 8th Ward is, where the 8th Ward is located, or if it is adjacent to the ward in which his office is located.  (TAB 7, p. 37, line 24-p.38, line 3, p. 38, line 22-p. 39, line 1)  Dr. Townsend is not aware that Todd and John Stroger's political base is in the 8th Ward.  (TAB 7, p. 39, line 21-24)  Dr. Townsend made the contribution to the 8th Ward because he bought tickets from and was going to attend the event with Dr. Knox.  (TAB 7, p. 39, line 2-20)

61.    Dr. Townsend knows his office is in the 6th Ward and that his City of Chicago Alderman is Ms. Lyle.  (TAB 7, p. 38, line 14-21)  Dr. Townsend knows William Beavers, who previously was a City of Chicago Alderman.  (TAB 7, p. 38, line 6-11)

62.    Dr. Knox believes that Dr. Everett's going after Dr. Townsend was the wrong thing to do because Dr. Townsend has no clout.  (TAB 9, p. 39, line 16-p. 40, line 2)

63.    Prior to the layoffs, Dr. Townsend was not interviewed and he did not have any conversations with Dr. Couture, Dr. Simon, Mr. Fagus, Dr. Knox, or anyone associated with Cook County government regarding the reduction in force, his skills, productivity, leadership abilities, previous management experience, why he was retained, or any desire on his part to assume a leadership role at Cermak.  (TAB 7, p. 26, line 15-p. 29, line 5)

64.    Later in 2007, because the dental services at Oak Forest Hospital were being eliminated, Dr. Couture and the CEO of Oak Forest Hospital decided to transfer Dr. Tom Prozorovski to Cermak to provide dental services there. (TAB 6, p. 9, line 24 –p. 10, line 1-20; TAB 10, David Fagus Deposition, p. 25, line 5-25)  Dr. Prozorovski was the Chief Dental Surgeon at Oak Forest.  (TAB 7, p. 15, line 23-25)  There was not an open position at Cermak;

12

rather Dr. Prozorovski was borrowed to Cermak and paid out of the Oak Forest budget.  (TAB 6, p. 10, line 25–p. 11, line 23)  Dr. Prozorovski was transferred to the Cermak budget in 2008. (TAB 6, p. 12, line 16-25)

65.      Dr. Prozorovski is a 47-48 year old Caucasian male who speaks four languages, including fluent Spanish.  (TAB 7, p. 18, line 12-17, p. 19, line 7-11)

66.      In 2008, Dr. Liu was hired as a dentist at the Juvenile Temporary Detention Center ("JTDC") four days a week and at Cermak one day a week for a short period of time while repairs and upgrades were made at the JTDC.  (TAB 7, p. 21, line 6-p. 22, line 7; TAB 10, p. 26, line 15-p. 27, line 1)

67.      Dr. Townsend first learned that Cook County was considering a reduction in force related to the dentists at Cermak from Dr. Everett about six months prior to the layoffs.  (TAB 7, p. 22, line 23-p. 23, line 6)  Dr. Everett told Dr. Townsend that she would be the remaining dentist.  (TAB 7, p. 23, line 8-p. 24, line 14.)

68.      Dr. Everett never told Dr. Knox that she wanted to be the Acting Director.  (TAB 9, p. 26, line 24-p. 27, line 8)  If Dr. Everett wanted to be the Acting Director in his absence, she could have told him.  (TAB 9, p. 27, line 4-5)

69.      Dr. Knox conducted evaluations of Dr. Townsend and felt his performance of his duties and responsibilities was quite sufficient, he is a very good dentist, is successful, and has done very well.  (TAB 9, p. 45, line 11-20)

70.      Dr. Everett claims that she assumed a management role at times when she was the only dentist available when a clinical emergency arose and she covered for another dentist, but she cannot remember when any such instance occurred and has no specific recollection of this occurring between 2005-2007.  (TAB 2, p. 18, line 19-p. 20, line 16)

13

71.     Dr. Everett claims that she assumed a management role because she supervised the dental assistants that worked under her direction and acknowledges that all of the dentists at Cermak perform this role.  (TAB 2, p. 20, line 17-p. 21, line 1)

72.     Dr. Everett claims that she assumed a management or leadership role because she prepared letters to management 5-10 times on behalf of the dentists regarding clinical and staffing issues, but she cannot recall doing so between 2005-2007.  (TAB 2, p. 21, line 2-p. 22, line 24)

73.     Dr. Everett claims that she first became aware that there would be layoffs at Cermak when layoff letters were sent to all of the dentists except her and Dr. Townsend in February, 2007.  (TAB 2, p. 27, line 12-p. 28, line 9)

74.     Dr. Everett claims that she had a conversation with Dr. Townsend in late February-March, 2007, the sum and substance of which consisted of Dr. Townsend telling her that the two of them would be the two remaining dentists at Cermak and she did not say anything.  (TAB 2, p. 37, line 19-p. 38, line 12, p. 43, line 18-24)

75.     On June 26, 2007, Dr. Everett was sent a letter explaining the basis for the layoff. (TAB 8, Letter from David Fagus dated June 26, 2007)  David Fagus prepared the letter based upon information provided to him by Dr. Couture.  (TAB 10, p. 36, line 16-20, p. 37, line 2-3, 7-24)

76.     Pursuant to a request by Dr. Everett, Cook County conducted a hearing by an independent hearing officer for the purpose of reviewing the decision to layoff Dr. Everett. (TAB 14, Letter from Plaintiff's counsel dated May 9, 2007)  A hearing was conducted on June 29, 2007 and a decision was issued upholding the layoff decision.  (TAB 15, Letter dated August 2, 2007 from hearing officer)

14

77.    In 1972, Cook County entered into a Consent Decree, which prohibited Cook County from, *inter alia*, "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." (TAB 16, Supplemental Relief Order) In 1994, Cook County entered into a Consent Decree which incorporated and extended the provisions of the 1972 Consent Decree. (TAB 16) On November 30, 2006, Cook County entered into the Supplemental Relief Order For Cook County which established a plan of compliance pursuant to the Consent Decrees. (TAB 16)


Respectfully Submitted,

ANITA ALVAREZ
State's Attorney of Cook County

By:    /s/ Lisa M. Meador
       Lisa M. Meador
       Assistant State's Attorney
       500 Richard J. Daley Center
       Chicago, Illinois 60602
       (312) 603-4186
       Fax (312) 603-3000
       ARDC Number 6270259

2011 WL 2600554
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Karolina OBRYCKA, Plaintiff,

v.

CITY OF CHICAGO et al., Defendants.

No. 07 C 2372.  |  June 29, 2011.

**Attorneys and Law Firms**

Terry A. Ekl, Patrick Laurence Provenzale, Tracy L. Stanker, Ekl, Williams & Provenzale LLC, Lisle, IL, Gustavo Munoz, Munoz & Wilkes, Ltd., Summit, IL, for Plaintiff.

George John Yamin, Jr., Geri Lynn Yanow, City of Chicago, Department of Law, Barrett Elizabeth Rubens, Borkan and Scahill, Michael J. Malatesta, Apceilla & Malatesta LLC, Chicago, IL, Kenneth C. Apicella, Apicella Law Firm, LLC, Palatine, IL, for Defendants.

**Opinion**

### MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Judge.

**\*1** Before the Court is Defendant City of Chicago's motion to exclude the expert testimony of Dr. Steven Whitman pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). For the reasons discussed below, the Court grants in part and denies in part Defendant's motion.

### INTRODUCTION

On April 30, 2007, Plaintiff Karolina Obrycka ("Plaintiff") filed the underlying lawsuit against Defendants City of Chicago ("City"), Anthony Abbate, Jr., Gary Ortiz, and Patti Chiriboga for violating her First and Fourteenth Amendment rights.[1] Plaintiff also brings a *Monell* claim against the City. *See Monell v. Dep't of Soc. Servs. of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff alleges that on the night of February 19, 2007, while working as a bartender/waitress at Jesse's Shortstop

Inn in Chicago, Defendant Officer Abbate—an off-duty Chicago police officer who had been drinking at the bar that evening—approached Plaintiff after she refused to serve him additional alcoholic beverages. With no warning, Defendant Officer Abbate proceeded to viciously beat, kick, and punch Plaintiff. Plaintiff alleges specific facts which, she contends, unequivocally demonstrate that the City conducted a sham investigation into the incident, in bad faith, and designed to protect Defendant Officer Abbate. She also alleges facts which, she argues, demonstrate that other City employees —including other Chicago police officers—conspired to prevent her from filing charges against Defendant Officer Abbate or from otherwise bringing the alleged misconduct to light.

In Plaintiff's *Monell* claim, she contends, *inter alia,* that the City has *de facto* policies and practices of concealing officer misconduct, of failing to sufficiently investigate allegations of officer misconduct, and of investigating complaints against off-duty police officers differently than it investigates complaints against other citizens. In her *Monell* claim, Plaintiff also alleges that a "code of silence" exists within the Chicago Police Department ("CPD") whereby officers conceal each others' misconduct, in contravention of their sworn duties. Plaintiff claims that all of these policies, practices and customs, individually and collectively, encourage Chicago police officers—and, specifically in this case, Defendant Officer Abbate-to engage in misconduct with impunity and without fear of official consequences.

Plaintiff has proffered Dr. Steven Whitman to provide expert testimony in support of her *Monell* claim against the City. Dr. Whitman is a statistician and epidemiologist. As discussed below, Plaintiff provided Dr. Whitman with data the City produced during fact discovery concerning excessive force complaints filed against Chicago police officers. Plaintiff asked Dr. Whitman to analyze the data and (1) "[p]resent all evidence that speaks to the question of whether Officer Anthony Abbate had reason to believe that he could act with impunity, that is, that he had reason to believe that he would not be punished regardless of what he did to Karolina Obrycka"; (2) address whether "any of the data speak to whether a 'code of silence' exists in the CPD"; and (3) analyze a small data set of complaints filed against Chicago police officers for driving under the influence of alcohol. (R. 266–1, Whitman Rept., at 8, 16, 19[2].) In his expert report, Dr. Whitman calculates the "sustained" rates for investigations into allegations of police misconduct in the relevant Districts in this case.[3] He then compares his

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

1

findings to analyses that he and others have performed on the "sustained" rates of the CPD citywide, and of other large metropolitan police departments in the United States. Dr. Whitman draws conclusions from those comparisons to answer Plaintiff's questions.

**\*2** In its motion, the City challenges the reliability of Dr. Whitman's opinions under Rule 702. [4] Specifically, the City argues that (1) Dr. Whitman is not qualified to offer expert testimony on police matters, (2) some of his opinions are based on misrepresentations of data and are thus unreliable, (3) some of his opinions are unreliable because he relied on Plaintiff's attorneys' summaries of facts, and (4) his conclusions about the "conduct of police officers" are pure *ipse dixit*. (R. 255, City Mot. to Exclude Steven Whitman.) Having carefully reviewed Dr. Whitman's report, the parties' briefs, and the transcript of Dr. Whitman's February 5, 2010 deposition, the Court grants in part and denies in part the City's motion.

### LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir.2009). "The Federal Rules of Evidence define an 'expert' as a person who possesses 'specialized knowledge' due to his 'skill, experience, training, or education' that 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' " *Banister v. Burton*, 636 F.3d 828, 831 (7th Cir.2011) (quoting Fed.R.Evid. 702). Rule 702 also requires that: (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case. *Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 881 (7th Cir.2011) (quoting Fed.R.Evid. 702).

"The district court functions as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir.2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). District courts must employ a three-part analysis before admitting expert testimony: (1) the expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the

expert's reasoning or methodology underlying his testimony must be scientifically reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to determine a factual issue. See *Myers v. Illinois Central R.R. Co.*, 629 F.3d 639, 644 (7th Cir.2010); *see also United States v. Pan sier*, 576 F.3d 726, 737 (7th Cir.2009) ("To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion."). As the Seventh Circuit instructs, " '[t]he focus of the district court's *Daubert* inquiry must be solely on principles and methodology, not on the conclusions they generate.' " *Winters v. Fru–Con Inc.*, 498 F.3d 734, 742 (7th Cir.2007) (quoting *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir.2002)). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir.2007) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

**\*3** "Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education.... An expert's testimony is not unreliable simply because it is founded on his experience rather than on data." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir.2010) (emphasis in original) (quoting Fed.R.Evid. 702). Nevertheless, district courts must still "ensure that the expert testimony at issue both rests on a reliable foundation and is relevant to the task at hand." *Trustees of Chicago Painters & Decorators Pension, Health & Welfare v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787 (7th Cir.2007) (quoting *United States v. Cruz–Velasco*, 224 F.3d 664, 660 (7th Cir.2000) (internal quotation and citation omitted)). Ultimately, "[t]he proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis*, 561 F.3d at 705.

### ANALYSIS

#### I. Dr. Whitman's Qualifications, Methodology & Opinions

##### A. Qualifications

Dr. Whitman is a statistician and epidemiologist. [5] He received a masters degree in biostatistics from the University of Pittsburgh, and a Ph.D. in biostatistics from Yale University. (R. 280–1, PL's Resp. to Mot. to Bar Whitman, Ex. A–Whitman Curriculum Vitae ("CV"), at 2.) For the

Addendum

past thirty-three years, Dr. Whitman has worked as an epidemiologist, studying public health patterns in Chicago communities. He is currently the Director of the Sinai Urban Health Institute, a research institute whose mission is "[t]o develop and implement effective approaches that improve the health of urban communities through data-driven research, evaluation, and community engagement." *See* Sinai Urban Health Institute Vision & Mission, http:// www.suhichicago.org/about-suhi/vision-and-mission (last visited June 22, 2011). Dr. Whitman created the Sinai Urban Health Institute in March 2000. Prior to that, he was the Director of the Epidemiology Program at the Chicago Department of Public Health. He began his career as an epidemiologist in March 1978 at the Center for Urban Affairs and Police Research at Northwestern University, where he worked on a multi-disciplinary research study on "Epilepsy in the Urban Environment" and conducted studies of other public health issues affecting Chicago's poorest communities. Dr. Whitman began his career in academia, as a college level mathematics professor. (*Id.* at 3–5.)

Dr. Whitman has no education, training, or professional experience [6] in criminology, or in matters involving policing, the CPD, the ways in which citizens file complaints against Chicago police officers, the process by which the CPD investigates allegations of police officer misconduct, or the CPD's disciplinary process. (Whitman Dep., 27:10–31:1.) Indeed, at his deposition, Dr. Whitman admitted that he had never reviewed a Complaint Register ("CR") file, *id.* at 30:5–7, and that he does not know—and has not attempted to ascertain—what constitutes a "proper" or "improper" method of conducting a CR investigation, *id.* at 30:12–16.

**B. Data & Methodology**

 **\*4**  During fact discovery, the City produced the following data sets to Plaintiff, who in turn tendered them to Dr. Whitman for use in his analysis: (i) City-created data sheets summarizing the contents of all CR files involving excessive force complaints against Chicago police officers assigned to the 20th District between May 2005 and March 2007 (Defendant Officer Abbate's assignment at the time of the incident); (ii) City-created data sheets summarizing the contents of all CR files involving excessive force complaints against Chicago police officers assigned to the 11th. District between February 2002 and May 2005 (Defendant Officer Abbate's previous assignment); (iii) CR files involving excessive force complaints against on-duty Chicago police officers assigned to the 25th District between January 2005 and February 2007 (the District where the incident took place, for the time period in which the four Chicago police officers who responded to the incident were assigned to that District); and (iv) CR files involving complaints against off-duty Chicago police officers, citywide, between 2002 and 2007. (Whitman Rept., 1–7.)

Dr. Whitman hired a research assistant to help him code, input, and analyze the data. He imported the City-created data sheets into SAS, a statistical software package. For the 25th District and citywide data, where the City produced copies of the actual CR files, Dr. Whitman relied on summaries created by Plaintiff's counsel, which his research assistant independently verified for accuracy. To create those summaries, Plaintiff's counsel coded each CR file for various variables, including but not limited to whether the incident occurred on or off duty, the date of the incident, whether or not the complainant signed the affidavit required to initiate an investigation, whether the accused officer provided a statement to the CPD investigators, whether any other police officers were present during the alleged incident, and the investigator's ultimate finding. (*Id.* at 4.) Dr. Whitman's research assistant entered those summary coding sheets into a database, spot checking them to independently verify the accuracy of Plaintiff s counsel's coding and to "ensure that bias (intentional or unintentional) did not influence the collection of the data and thus [Dr. Whitman's] findings." (*Id.* at 5.)

In order to contextualize his data analyses and draw conclusions therefrom, Dr. Whitman compared his results to data set forth in a U .S. Department of Justice, Bureau of Justice Statistics Report entitled "Citizen Complaints About Police Use of Force" (hereinafter, the "DOJ Report"). (R. 280–1, Pl.'s Resp. to Mot. to Bar Whitman, Ex. E–Itemization of Data Sets Examined by Dr. Steven Whitman, at 39.) He also relied on his previous analysis of complaints against Chicago police officers in *Bond v. Utreras et al.,* in which he analyzed 10,646 CR files involving complaints of brutality, false arrest, and planting evidence against Chicago police officers citywide between January 1999 and December 2004. (*Id.* at 37.) For his analysis in *Bond,* Dr. Whitman also looked specifically at "repeater" data—Chicago police officers against whom multiple complaints (ten or more) had been filed between May 2001 and May 2006. (*Id.* at 37–38.) Dr. Whitman employed standard statistical tests of significance in conducting his comparisons.

**C. Dr. Whitman's Opinions**

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

**\*5** Dr. Whitman's opinions fall into two categories: quantitative data analysis, and qualitative conclusions presumably drawn therefrom. In his quantitative data analyses, Dr. Whitman calculated the percentage of excessive force complaints that the CPD's investigative department "sustained" [7] for each of the relevant data sets he reviewed (11th District, 20th District, 25th District, and citywide). From these calculations, he determined whether the differences between the rates are or are not statistically significant (i.e., whether they are "meaningfully" significant due to "real" causes, or whether the variance is due to random chance). He performed the same comparison between the CPD sustained rates and the sustained rates listed for other large police departments in the DOJ Report. Separately, Dr. Whitman reviewed the complaints in each data set to determine the number of "repeaters" (i.e., Chicago police officers against whom citizens filed multiple excessive force complaints), and for those "repeaters," calculated how frequently the CPD sustained complaints against them. Dr. Whitman also reviewed the data sets to attempt to discern whether and how often Chicago police officers witnessed —but did not report—incidents of police misconduct about which citizens complained. He then calculated the frequency with which the CPD charged officer-witnesses who did not report the incidents for their failure to report the incidents. Finally, Dr. Whitman analyzed a small data set of CR files initiated against Chicago police officers for driving under the influence of alcohol ("DUI"), and compared that data to general DUI statistics.

Dr. Whitman's qualitative analyses address the questions Plaintiff posed at the outset—namely, (1) whether the data "speaks to the question of whether Officer Anthony Abbate had reason to believe that he could act with impunity," (2) whether the data suggests the existence of a "code of silence" in the CPD, and (3) what the DUI data "describe." (Whitman Rept., at 8, 16, 19.) Using the results of his data analyses as a backdrop, Dr. Whitman offers several opinions. He opines that "the probability of an excessive force complaint being sustained in the City is very low," and that "the situation is even gloomier than these data would suggest." (Id. at 11, 12.) Dr. Whitman additionally observes that the "true" sustained rate is likely considerably lower than his calculations suggest due to citizens underreporting complaints and the Police Board's frequent reversals of "sustained" findings. (Id. at 13.) Dr. Whitman opines on the connection between sustained rates and "effective deterrence," and on the "implications of all of these officers being complained against time and time again for excessive force with the result being virtually

no sustained complaints," before concluding, "[a]ll of this suggests that there is indeed a pervasive environment of impunity." (Id. at 12, 16.)

**\*6** To address Plaintiff's question regarding the existence of a "code of silence," Dr. Whitman uses the 'failure to report' data as a proxy and makes findings of how many police officers "should have" been charged with failure to report and the significance of the CPD's failure to charge those officers. (Id. at 16–18.) Dr. Whitman states that his data support the existence of a "code of silence" in two ways: first, by suggesting that the CPD's internal investigations "conceal" instances in which Chicago police officers "fail[ ] to report the misconduct of another officer by failing to investigate such allegations." (Id. at 18 n. 4.) Dr. Whitman also opines that the data suggests that the CPD is "complicit in the 'code of silence' of its members by not properly recording the number of instances in which an officer is accused of failing to report the misconduct of another officer, which results in the CPD having no data identifying the problem at all." (Id) Finally, Dr. Whitman cites his analysis of the DUI data as "point[ing] toward a code of silence." (Id. at 21.) He arrives at this conclusion because, in his opinion, "the most likely explanation for so few arrests is that off-duty CPD officers are pulled over for DUI and then let go when the potential arresting officer finds out that the potential DUI driver is also an officer." (Id.)

## II. Dr. Whitman Lacks Foundation For His Qualitative Conclusions

" 'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.' " *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir.2010) (quoting *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir.1990)). In performing its gatekeeping function, the Court must ascertain not just whether "an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question." *Id.* at 617 (internal quotation and citation omitted). Assuredly, "experts commonly extrapolate from existing data." *Zenith Electronics Corp. v. WH–TV Broadcasting Corp.,* 395 F.3d 416, 419–20 (7th Cir.2005) (quotation omitted). "Reliable inferences," however, "depend on more than say-so, whether the person doing the saying is a corporate manager or a putative expert." *Id.* (citation omitted). "The court is not obligated to admit testimony just because it is given by an expert." *United States v. Mamah,* 332 F.3d 475, 478 (7th Cir.2003) (internal citations omitted)).

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

Here, Dr. Whitman lacks foundation for his qualitative conclusions. Despite Dr. Whitman's impressive credentials and experience as a biostatistician and epidemiologist, by his own admission, he knows nothing about police departments, police misconduct, investigations into police misconduct, or the process by which the CPD disciplines its police officers-the subjects that lie at the heart of this case. In response to the City's questions on these points at his February 5, 2010 deposition, Dr. Whitman consistently admitted that his expertise lies in data analysis, and that what he was "trying to do in this [case] is display all the data [he] had, explain what it meant as well as [he] could, and not go beyond [his] professional expertise." (Whitman Dep., 144:21–24.) *See also id.* at 27:10–31:1 (conceding he has no background in or familiarity with policing, investigations into police misconduct, police departments' disciplinary systems, or mechanisms by which citizens may file complaints against police officers), 143:3–144:24 (admitting that he has no knowledge of what an "appropriate" sustained rate would be to prevent creating a "pervasive environment of impunity"), 185:20–187:1 (admitting that he has no understanding of what effectively deters police misconduct), 194:17–20 (conceding he has no understanding of the effect of sustained rates on officers' conduct), 208:21–212:5 (agreeing that his opinions about a "code of silence" are not based on his professional experience, but rather make sense to him on a personal level), 213:4–214:1 (conceding that his "code of silence" theory is a starting point for a discussion, and that the value in his opinion is his data analysis), 233:11–236:10 (questioning the reliability of the DUI data Plaintiff provided him and expressing discomfort with his attendant analysis).

**\*7** Although Dr. Whitman's quantitative background provides him with sufficient foundation to present his data analysis, nothing in his academic or professional pursuits provides a basis for the conclusions he presumes to derive from the data in this case. It is clear that he simply models his conclusions off Plaintiff's questions. "[A] court is expected to reject any subjective belief or speculation." *Ammons v. Aramark Unif. Servs.,* 368 F.3d 809, 816 (7th Cir.2004) (internal citations omitted). *See also Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago,* 877 F.2d 1333, 1339 (7th Cir.1989) (finding expert's opinion inadmissible where he "presented nothing but conclusions ... no discussion of hypotheses considered and rejected"). The Court thus grants the City's motion in part and excludes Dr. Whitman's qualitiative conclusions as to what his data analyses suggest about the CPD.

### III. Dr. Whitman's Quantitative Analyses Are Generally Admissible

While not contesting Dr. Whitman's mathematics credentials, the City disputes the reliability of Dr. Whitman's methodology. Specifically, the City challenges his reliance on (1) the data summaries the City produced involving complaints against Chicago police officers assigned to the 11th and 20th Districts, (2) Plaintiff's counsel's summaries of CR files for the 25th District, and (3) a U.S. Department of Justice analysis of complaints against police officers. In a footnote, the City also challenges the relevance of the *Bond* analysis to this case. The Court considers each argument in turn to determine whether the City's criticisms of Dr. Whitman's report impacts the admissibility of his quantitative analyses, "or only, as the Supreme Court put it in *Bazemore,* their 'probativeness' or weight." *Adams v. Ameritech Servs., Inc.,* 231 F.3d 414, 425 (7th Cir.2000) (citing *Bazemore v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986)).

### A. Dr. Whitman's Analyses of Sustained Rates In The 11th & 20th Districts Are Admissible

The City argues that Dr. Whitman's analyses regarding the 11th and 20th Districts are unreliable because the underlying data overstates the actual number of CR files initiated against Chicago police officers in those Districts during the relevant time periods. According to the City, this "overcounting" of data results from Plaintiff's imprecisely worded document request—the discovery request that dictated which documents the City produced in this case —which requested information about complaints against police officers *assigned* to the 11th and 20th Districts at the same time as Defendant Officer Abbate, but did not limit the request to complaints filed against the officers *during* those periods. To illustrate the effect of that phrasing on Dr. Whitman's analysis, the City cites as an example one Chicago police officer who was assigned to the 11th District at the same time as Defendant Officer Abbate (between February 2002 and May 2005). The City produced 49 CR files relating to complaints against that officer, which Dr. Whitman included in his analysis of the 11th District. Fifteen of those complaints, however, arose from incidents occurring after May 2005. Dr. Whitman did not exclude those post-May 2005 CR files from his analysis. On that basis, the City contends that Dr. Whitman's analyses of the 11th and 20th Districts are unreliable and should be excluded. In response, Plaintiff asserts that the time periods are unimportant, and that

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

the relevant information is the proportion of complaints that are deemed "sustained" following an investigation.

**\*8** *Daubert* 's "framework for assessing expert testimony is applicable to social science experts, just as it applies to experts in the hard sciences." *Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 263 (7th Cir.1996) (citations omitted). Although "the test of reliability is 'flexible,' and *Daubert* 's list of specific factors neither necessarily nor exclusively applies to all experts or in every case," *Kumho Tire Co.,* 526 U.S. at 141 (quoting *Daubert,* 509 U.S. at 594); *see also Mihailovich,* 359 F.3d at 919 ("[T]he *Daubert* framework is a flexible one that must be adapted to the particular circumstances of the case and the type of testimony being proffered."), the methodology used by social science experts to reach their conclusions must "adhere to the same standards of intellectual rigor that are demanded in [their] professional work" in order to be reliable. *Chapman v. Maytag Corp.,* 297 F.3d 682, 688 (7th Cir.2002) (citation omitted). "A district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Bryant v. City of Chicago,* 200 F.3d 1092, 1098 (7th Cir.2000) (citing *Kumho Tire Co.,* 526 U.S. at 141). Because Dr. Whitman based his analyses of the sustained rates in the 11th and 20th Districts on reliable evidence and arrived at reasonably informed estimates, the Court denies the City's request to exclude these data analyses. The City can address its challenges through cross examination.

**B. Dr. Whitman Independently Verified the Accuracy of Plaintiffs Summaries**

Next, the City argues that Dr. Whitman's reliance on coded data sheets that Plaintiff's counsel created to summarize the CR files relating to the 25th District and off-duty Chicago police officers is impermissible under Rule 702 and *Daubert.* As in its other motions to exclude Plaintiff's expert witnesses, the City relies primarily on *Sommerfield v. City of Chicago,* 254 F.R.D. 317 (N.D.Ill.2008) for this proposition. Based on Dr. Whitman's description of the process by which he independently verified the accuracy of Plaintiff's coded data sheets-a process he undertook with the express goal of ensuring that his analyses were not tainted by any "intentional or unintentional" bias in Plaintiff's counsel's coding—the Court rejects the City's argument. *See Walker v. Soo Line R.R. Co.,* 208 F.3d 581, 587 (7th Cir.2000) (district courts are responsible for determining whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed."). Dr. Whitman may present his analyses of these data.

**C. Dr. Whitman May Rely On The Government Report**

The City argues that Dr. Whitman misinterprets the findings of the DOJ Report and that the opinions he draws therefrom are thus unreliable. "[I]t is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Deputy v. Lehman Bros., Inc.,* 345 F.3d 494, 506 (7th Cir.2003). Furthermore, "the rules of evidence do not limit what type of information an expert may rely upon in reaching his opinion; even if that information would not otherwise be admissible in a court proceeding, an expert witness may rely upon it so long as it is the type of information on which others in the field reasonably rely." *Boim v. Holy Land Found. For Relief & Dev.,* 549 F.3d 685, 703 (7th Cir.2008). The DOJ Report, entitled "Citizen Complaints about Police Use of Force," "presents data on citizen complaints about use of force and complaint dispositions in large [police] agencies." (R. 310, City Reply in Support of its Mot. to Exclude Steven Whitman, Ex. B–DOJ Report.) Specifically, the DOJ Report analyzes data from the 2003 Law Enforcement Management and Administrative Statistics survey, which is sponsored by the Bureau of Justice Statistics and the Office of Community Oriented Policing Services. (*Id.*) This government report is relevant to Dr. Whitman's analysis, and it was reasonable for Dr. Whitman to rely on it in conducting his analysis for this case.

**D. Dr. Whitman's *Bond* Analysis Is Relevant**

**\*9** In a footnote, the City asks the Court to exclude Dr. Whitman's incorporation of his prior analysis of police misconduct complaints from *Bond v. Utreras et al.* on the grounds of relevance. (R. 266, City Mot. to Exclude Steven Whitman, at 8 n. 26.) Because Dr. Whitman's analysis is relevant, the Court denies the City's request. The Seventh Circuit has clearly stated that "in order for an expert's testimony to qualify as 'relevant' under Rule 702 it must assist the jury in determining *any* fact at issue in the case." *Smith,* 215 F.3d at 720 (emphasis added). "No one piece of evidence has to prove every element of plaintiff's case; it need only make the existence of 'any fact that is of consequence' more or less probable." *Adams,* 231 F.3d at 425 (citing Fed.R.Evid. 401).

Here, Plaintiff offers Dr. Whitman's data analysis to support her *Monell* claim against the City. To establish *Monell* liability against the City, Plaintiff must show that (1) she suffered a deprivation of a federal right, (2) as a result of

either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority, that (3) proximately caused her constitutional injury. *Ovadal v. City of Madison,* 416 F.3d 531, 535 (7th Cir.2005); *see also Valentino v. Vill. of South Chicago Heights,* 575 F.3d 664, 674 (7th Cir.2009) ("A municipality ... may be liable for a section 1983 violation if, among other things: (1) it has a permanent and well-settled municipal customer or practice that, although not authorized by official law or policy, was the moving force behind the plaintiff's constitutional injury"). Unconstitutional policies or customs include: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that a person with final policymaking authority caused the constitutional injury. *See Walker v. Sheahan,* 526 F.3d 973, 977 (7th Cir.2008); *see also Simmons v. Chicago Bd. of Educ.,* 289 F.3d 488, 494 (7th Cir.2002) ("One way or another, the policy must be shown to be that of the municipality itself"). "If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer there is a policy at work." *Lewis v. City of Chicago,* 496 F.3d 645, 656 (7th Cir.2007) (quoting *Phelan v. Cook County,* 463 F.3d 773, 789 (7th Cir.2006) (citation omitted)). Dr. Whitman's analysis of the complaint data in *Bond* provides additional relevant data for Plaintiff's *Monell* claim, and it is thus relevant and admissible.

As a general observation, if the City wishes to further challenge the data upon which Dr. Whitman relied, or the results he reached in his data analyses, it may cross-examine Dr. Whitman about "his conclusions and the facts on which they are based." *Smith,* 215 F.3d at 719. "Vigorous cross-examination, presentation of contrary evidence, and careful jury instruction ... are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596.

## CONCLUSION

**\*10** For the foregoing reasons, the Court grants in part and denies in part Defendant's motion to exclude Dr. Whitman's expert testimony. Dr. Whitman's quantitative data analyses are admissible. Dr. Whitman lacks foundation to offer qualitative opinions on those data, and his opinions in that regard are thus excluded.

Footnotes

1   Pursuant to the parties' stipulated agreements, Gary Ortiz and Patti Chiriboga are no longer defendants in this lawsuit. *See* R. 241, 12/2/2009 Order (dismissing Gary Ortiz without prejudice); R. 262, 9/2/2010 Order (dismissing Patti Chiriboga with prejudice).

2   For ease of reference for the remainder of this litigation, the Court will cite to the page numbers in Dr. Whitman's expert report rather than to the page numbers on the Docket.

3   In order to determine the "sustained" rates, Dr. Whitman counted the number of excessive force complaints filed against Chicago police officers in the relevant Districts at the relevant times, and determined how many of those complaints resulted in a finding of "sustained"—i.e., the investigators found the complaint meritorious.

4   The City does not dispute the relevance of Dr. Whitman's analysis to the issues in this case.

5   As Dr. Whitman succinctly stated at his deposition, he is "a statistician who analyzes data about health." (R. 331, Whitman Dep ., 6:1–2.)

6   Dr. Whitman has been retained twice before to submit expert testimony in federal civil rights cases. Both prior engagements required him to conduct statistical analyses of complaints against Chicago police officers. The last section of his expert report in this case draws on work he did for one of those cases, *Bond v. Utreras et al.* (04 C 2617) (Lefkow, J.). In that civil rights case, Plaintiff Diane Bond filed a nine count amended complaint against the City of Chicago, several CPD officers, the then- and former-CPD superintendents, and the former administrator of the CPD's Office of Professional Standards. As in this case, Bond brought a *Monell* claim against the City. *See Bond v. Utreras,* Case No. 04 C 2617, R. 222 (9/12/06 Minute Entry). Although Dr. Whitman analyzed data of reported police misconduct and drafted a report to support Bond's claims, the case settled before his testimony could be evaluated by the court. *Id.* at R. 248 (Release & Settlement Agreement), R. 249 (3/23/07 Agreed Order of Dismissal). The other case, *Ramirez v. City of Chicago et al.,* is presently set to go to trial in October 2011. *See Ramirez,* Case No. 05 C 317, R. 391 (6/3/11 Minute Entry). That court has suggested it may admit Dr. Whitman's expert testimony at trial. *Id.* at R. 330 (11/17/09 Mem. Op. & Order).

7   When the CPD "sustains" a complaint against a Chicago police officer, it finds that the allegation was supported by sufficient evidence to justify disciplinary action (i.e., the allegation was meritorious and founded).

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 2600554
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Karolina OBRYCKA, Plaintiff,

v.

CITY OF CHICAGO et al., Defendants.

No. 07 C 2372. | June 29, 2011.

**Attorneys and Law Firms**

Terry A. Ekl, Patrick Laurence Provenzale, Tracy L. Stanker, Ekl, Williams & Provenzale LLC, Lisle, IL, Gustavo Munoz, Munoz & Wilkes, Ltd., Summit, IL, for Plaintiff.

George John Yamin, Jr., Geri Lynn Yanow, City of Chicago, Department of Law, Barrett Elizabeth Rubens, Borkan and Scahill, Michael J. Malatesta, Apceilla & Malatesta LLC, Chicago, IL, Kenneth C. Apicella, Apicella Law Firm, LLC, Palatine, IL, for Defendants.

**Opinion**

### MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Judge.

**\*1** Before the Court is Defendant City of Chicago's motion to exclude the expert testimony of Dr. Steven Whitman pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). For the reasons discussed below, the Court grants in part and denies in part Defendant's motion.

### INTRODUCTION

On April 30, 2007, Plaintiff Karolina Obrycka ("Plaintiff") filed the underlying lawsuit against Defendants City of Chicago ("City"), Anthony Abbate, Jr., Gary Ortiz, and Patti Chiriboga for violating her First and Fourteenth Amendment rights.[1] Plaintiff also brings a *Monell* claim against the City. *See Monell v. Dep't of Soc. Servs. of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff alleges that on the night of February 19, 2007, while working as a bartender/waitress at Jesse's Shortstop

Inn in Chicago, Defendant Officer Abbate—an off-duty Chicago police officer who had been drinking at the bar that evening—approached Plaintiff after she refused to serve him additional alcoholic beverages. With no warning, Defendant Officer Abbate proceeded to viciously beat, kick, and punch Plaintiff. Plaintiff alleges specific facts which, she contends, unequivocally demonstrate that the City conducted a sham investigation into the incident, in bad faith, and designed to protect Defendant Officer Abbate. She also alleges facts which, she argues, demonstrate that other City employees —including other Chicago police officers—conspired to prevent her from filing charges against Defendant Officer Abbate or from otherwise bringing the alleged misconduct to light.

In Plaintiff's *Monell* claim, she contends, *inter alia,* that the City has *de facto* policies and practices of concealing officer misconduct, of failing to sufficiently investigate allegations of officer misconduct, and of investigating complaints against off-duty police officers differently than it investigates complaints against other citizens. In her *Monell* claim, Plaintiff also alleges that a "code of silence" exists within the Chicago Police Department ("CPD") whereby officers conceal each others' misconduct, in contravention of their sworn duties. Plaintiff claims that all of these policies, practices and customs, individually and collectively, encourage Chicago police officers—and, specifically in this case, Defendant Officer Abbate-to engage in misconduct with impunity and without fear of official consequences.

Plaintiff has proffered Dr. Steven Whitman to provide expert testimony in support of her *Monell* claim against the City. Dr. Whitman is a statistician and epidemiologist. As discussed below, Plaintiff provided Dr. Whitman with data the City produced during fact discovery concerning excessive force complaints filed against Chicago police officers. Plaintiff asked Dr. Whitman to analyze the data and (1) "[p]resent all evidence that speaks to the question of whether Officer Anthony Abbate had reason to believe that he could act with impunity, that is, that he had reason to believe that he would not be punished regardless of what he did to Karolina Obrycka"; (2) address whether "any of the data speak to whether a 'code of silence' exists in the CPD"; and (3) analyze a small data set of complaints filed against Chicago police officers for driving under the influence of alcohol. (R. 266–1, Whitman Rept., at 8, 16, 19[2].) In his expert report, Dr. Whitman calculates the "sustained" rates for investigations into allegations of police misconduct in the relevant Districts in this case.[3] He then compares his

findings to analyses that he and others have performed on the "sustained" rates of the CPD citywide, and of other large metropolitan police departments in the United States. Dr. Whitman draws conclusions from those comparisons to answer Plaintiff's questions.

**\*2** In its motion, the City challenges the reliability of Dr. Whitman's opinions under Rule 702. [4] Specifically, the City argues that (1) Dr. Whitman is not qualified to offer expert testimony on police matters, (2) some of his opinions are based on misrepresentations of data and are thus unreliable, (3) some of his opinions are unreliable because he relied on Plaintiff's attorneys' summaries of facts, and (4) his conclusions about the "conduct of police officers" are pure *ipse dixit*. (R. 255, City Mot. to Exclude Steven Whitman.) Having carefully reviewed Dr. Whitman's report, the parties' briefs, and the transcript of Dr. Whitman's February 5, 2010 deposition, the Court grants in part and denies in part the City's motion.

## LEGAL STANDARD

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)." *Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir.2009). "The Federal Rules of Evidence define an 'expert' as a person who possesses 'specialized knowledge' due to his 'skill, experience, training, or education' that 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' " *Banister v. Burton,* 636 F.3d 828, 831 (7th Cir.2011) (quoting Fed.R.Evid. 702). Rule 702 also requires that: (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case. *Zamecnik v. Indian Prairie Sch. Dist. No. 204,* 636 F.3d 874, 881 (7th Cir.2011) (quoting Fed.R.Evid. 702).

"The district court functions as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch,* 359 F.3d 892, 918 (7th Cir.2004) (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). District courts must employ a three-part analysis before admitting expert testimony: (1) the expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the

expert's reasoning or methodology underlying his testimony must be scientifically reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to determine a factual issue. See *Myers v. Illinois Central R.R. Co.,* 629 F.3d 639, 644 (7th Cir.2010); *see also United States v. Pan sier,* 576 F.3d 726, 737 (7th Cir.2009) ("To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion."). As the Seventh Circuit instructs, " '[t]he focus of the district court's *Daubert* inquiry must be solely on principles and methodology, not on the conclusions they generate.' " *Winters v. Fru–Con Inc.,* 498 F.3d 734, 742 (7th Cir.2007) (quoting *Chapman v. Maytag Corp.,* 297 F.3d 682, 687 (7th Cir.2002)). "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett,* 487 F.3d 482, 489 (7th Cir.2007) (quoting *Kumho Tire Co.,* 526 U.S. at 152).

**\*3** "Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience,* training, or education.... An expert's testimony is not unreliable simply because it is founded on his experience rather than on data." *Metavante Corp. v. Emigrant Sav. Bank,* 619 F.3d 748, 761 (7th Cir.2010) (emphasis in original) (quoting Fed.R.Evid. 702). Nevertheless, district courts must still "ensure that the expert testimony at issue both rests on a reliable foundation and is relevant to the task at hand." *Trustees of Chicago Painters & Decorators Pension, Health & Welfare v. Royal Int'l Drywall & Decorating, Inc.,* 493 F.3d 782, 787 (7th Cir.2007) (quoting *United States v. Cruz–Velasco,* 224 F.3d 664, 660 (7th Cir.2000) (internal quotation and citation omitted)). Ultimately, "[t]he proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis,* 561 F.3d at 705.

## ANALYSIS

### I. Dr. Whitman's Qualifications, Methodology & Opinions

#### A. Qualifications

Dr. Whitman is a statistician and epidemiologist. [5] He received a masters degree in biostatistics from the University of Pittsburgh, and a Ph.D. in biostatistics from Yale University. (R. 280–1, PL's Resp. to Mot. to Bar Whitman, Ex. A–Whitman Curriculum Vitae ("CV"), at 2.) For the

past thirty-three years, Dr. Whitman has worked as an epidemiologist, studying public health patterns in Chicago communities. He is currently the Director of the Sinai Urban Health Institute, a research institute whose mission is "[t]o develop and implement effective approaches that improve the health of urban communities through data-driven research, evaluation, and community engagement." *See* Sinai Urban Health Institute Vision & Mission, http:// www.suhichicago.org/about-suhi/vision-and-mission (last visited June 22, 2011). Dr. Whitman created the Sinai Urban Health Institute in March 2000. Prior to that, he was the Director of the Epidemiology Program at the Chicago Department of Public Health. He began his career as an epidemiologist in March 1978 at the Center for Urban Affairs and Police Research at Northwestern University, where he worked on a multi-disciplinary research study on "Epilepsy in the Urban Environment" and conducted studies of other public health issues affecting Chicago's poorest communities. Dr. Whitman began his career in academia, as a college level mathematics professor. (*Id.* at 3–5.)

Dr. Whitman has no education, training, or professional experience [6] in criminology, or in matters involving policing, the CPD, the ways in which citizens file complaints against Chicago police officers, the process by which the CPD investigates allegations of police officer misconduct, or the CPD's disciplinary process. (Whitman Dep., 27:10–31:1.) Indeed, at his deposition, Dr. Whitman admitted that he had never reviewed a Complaint Register ("CR") file, *id.* at 30:5– 7, and that he does not know—and has not attempted to ascertain—what constitutes a "proper" or "improper" method of conducting a CR investigation, *id.* at 30:12–16.

**B. Data & Methodology**

 **\*4** During fact discovery, the City produced the following data sets to Plaintiff, who in turn tendered them to Dr. Whitman for use in his analysis: (i) City-created data sheets summarizing the contents of all CR files involving excessive force complaints against Chicago police officers assigned to the 20th District between May 2005 and March 2007 (Defendant Officer Abbate's assignment at the time of the incident); (ii) City-created data sheets summarizing the contents of all CR files involving excessive force complaints against Chicago police officers assigned to the 11th. District between February 2002 and May 2005 (Defendant Officer Abbate's previous assignment); (iii) CR files involving excessive force complaints against on-duty Chicago police officers assigned to the 25th District between January 2005 and February 2007 (the District where the incident took

place, for the time period in which the four Chicago police officers who responded to the incident were assigned to that District); and (iv) CR files involving complaints against off-duty Chicago police officers, citywide, between 2002 and 2007. (Whitman Rept., 1–7.)

Dr. Whitman hired a research assistant to help him code, input, and analyze the data. He imported the City-created data sheets into SAS, a statistical software package. For the 25th District and citywide data, where the City produced copies of the actual CR files, Dr. Whitman relied on summaries created by Plaintiff's counsel, which his research assistant independently verified for accuracy. To create those summaries, Plaintiff's counsel coded each CR file for various variables, including but not limited to whether the incident occurred on or off duty, the date of the incident, whether or not the complainant signed the affidavit required to initiate an investigation, whether the accused officer provided a statement to the CPD investigators, whether any other police officers were present during the alleged incident, and the investigator's ultimate finding. (*Id.* at 4.) Dr. Whitman's research assistant entered those summary coding sheets into a database, spot checking them to independently verify the accuracy of Plaintiff s counsel's coding and to "ensure that bias (intentional or unintentional) did not influence the collection of the data and thus [Dr. Whitman's] findings." (*Id.* at 5.)

In order to contextualize his data analyses and draw conclusions therefrom, Dr. Whitman compared his results to data set forth in a U .S. Department of Justice, Bureau of Justice Statistics Report entitled "Citizen Complaints About Police Use of Force" (hereinafter, the "DOJ Report"). (R. 280–1, Pl.'s Resp. to Mot. to Bar Whitman, Ex. E– Itemization of Data Sets Examined by Dr. Steven Whitman, at 39.) He also relied on his previous analysis of complaints against Chicago police officers in *Bond v. Utreras et al.,* in which he analyzed 10,646 CR files involving complaints of brutality, false arrest, and planting evidence against Chicago police officers citywide between January 1999 and December 2004. (*Id.* at 37.) For his analysis in *Bond,* Dr. Whitman also looked specifically at "repeater" data—Chicago police officers against whom multiple complaints (ten or more) had been filed between May 2001 and May 2006. (*Id.* at 37–38.) Dr. Whitman employed standard statistical tests of significance in conducting his comparisons.

**C. Dr. Whitman's Opinions**

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

**\*5** Dr. Whitman's opinions fall into two categories: quantitative data analysis, and qualitative conclusions presumably drawn therefrom. In his quantitative data analyses, Dr. Whitman calculated the percentage of excessive force complaints that the CPD's investigative department "sustained"[7] for each of the relevant data sets he reviewed (11th District, 20th District, 25th District, and citywide). From these calculations, he determined whether the differences between the rates are or are not statistically significant (i.e., whether they are "meaningfully" significant due to "real" causes, or whether the variance is due to random chance). He performed the same comparison between the CPD sustained rates and the sustained rates listed for other large police departments in the DOJ Report. Separately, Dr. Whitman reviewed the complaints in each data set to determine the number of "repeaters" (i.e., Chicago police officers against whom citizens filed multiple excessive force complaints), and for those "repeaters," calculated how frequently the CPD sustained complaints against them. Dr. Whitman also reviewed the data sets to attempt to discern whether and how often Chicago police officers witnessed —but did not report—incidents of police misconduct about which citizens complained. He then calculated the frequency with which the CPD charged officer-witnesses who did not report the incidents for their failure to report the incidents. Finally, Dr. Whitman analyzed a small data set of CR files initiated against Chicago police officers for driving under the influence of alcohol ("DUI"), and compared that data to general DUI statistics.

Dr. Whitman's qualitative analyses address the questions Plaintiff posed at the outset—namely, (1) whether the data "speaks to the question of whether Officer Anthony Abbate had reason to believe that he could act with impunity," (2) whether the data suggests the existence of a "code of silence" in the CPD, and (3) what the DUI data "describe." (Whitman Rept., at 8, 16, 19.) Using the results of his data analyses as a backdrop, Dr. Whitman offers several opinions. He opines that "the probability of an excessive force complaint being sustained in the City is very low," and that "the situation is even gloomier than these data would suggest." (Id. at 11, 12.) Dr. Whitman additionally observes that the "true" sustained rate is likely considerably lower than his calculations suggest due to citizens underreporting complaints and the Police Board's frequent reversals of "sustained" findings. (Id. at 13.) Dr. Whitman opines on the connection between sustained rates and "effective deterrence," and on the "implications of all of these officers being complained against time and time again for excessive force with the result being virtually no sustained complaints," before concluding, "[a]ll of this suggests that there is indeed a pervasive environment of impunity." (Id. at 12, 16.)

**\*6** To address Plaintiff's question regarding the existence of a "code of silence," Dr. Whitman uses the 'failure to report' data as a proxy and makes findings of how many police officers "should have" been charged with failure to report and the significance of the CPD's failure to charge those officers. (Id. at 16–18.) Dr. Whitman states that his data support the existence of a "code of silence" in two ways: first, by suggesting that the CPD's internal investigations "conceal" instances in which Chicago police officers "fail[ ] to report the misconduct of another officer by failing to investigate such allegations." (Id. at 18 n. 4.) Dr. Whitman also opines that the data suggests that the CPD is "complicit in the 'code of silence' of its members by not properly recording the number of instances in which an officer is accused of failing to report the misconduct of another officer, which results in the CPD having no data identifying the problem at all." (Id ) Finally, Dr. Whitman cites his analysis of the DUI data as "point[ing] toward a code of silence." (Id. at 21.) He arrives at this conclusion because, in his opinion, "the most likely explanation for so few arrests is that off-duty CPD officers are pulled over for DUI and then let go when the potential arresting officer finds out that the potential DUI driver is also an officer." (Id.)

## II. Dr. Whitman Lacks Foundation For His Qualitative Conclusions

" 'Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.' " *Gayton v. McCoy,* 593 F.3d 610, 616 (7th Cir.2010) (quoting *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir.1990)). In performing its gatekeeping function, the Court must ascertain not just whether "an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question." *Id. at 617* (internal quotation and citation omitted). Assuredly, "experts commonly extrapolate from existing data." *Zenith Electronics Corp. v. WH–TV Broadcasting Corp.,* 395 F.2d 416, 419–20 (7th Cir.2005) (quotation omitted). "Reliable inferences," however, "depend on more than say-so, whether the person doing the saying is a corporate manager or a putative expert." *Id.* (citation omitted). "The court is not obligated to admit testimony just because it is given by an expert." *United States v. Mamah,* 332 F.3d 475, 478 (7th Cir.2003) (internal citations omitted)).

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

4

Here, Dr. Whitman lacks foundation for his qualitative conclusions. Despite Dr. Whitman's impressive credentials and experience as a biostatistician and epidemiologist, by his own admission, he knows nothing about police departments, police misconduct, investigations into police misconduct, or the process by which the CPD disciplines its police officers- the subjects that lie at the heart of this case. In response to the City's questions on these points at his February 5, 2010 deposition, Dr. Whitman consistently admitted that his expertise lies in data analysis, and that what he was "trying to do in this [case] is display all the data [he] had, explain what it meant as well as [he] could, and not go beyond [his] professional expertise." (Whitman Dep., 144:21–24.) *See also id.* at 27:10–31:1 (conceding he has no background in or familiarity with policing, investigations into police misconduct, police departments' disciplinary systems, or mechanisms by which citizens may file complaints against police officers), 143:3–144:24 (admitting that he has no knowledge of what an "appropriate" sustained rate would be to prevent creating a "pervasive environment of impunity"), 185:20–187:1 (admitting that he has no understanding of what effectively deters police misconduct), 194:17–20 (conceding he has no understanding of the effect of sustained rates on officers' conduct), 208:21–212:5 (agreeing that his opinions about a "code of silence" are not based on his professional experience, but rather make sense to him on a personal level), 213:4–214:1 (conceding that his "code of silence" theory is a starting point for a discussion, and that the value in his opinion is his data analysis), 233:11–236:10 (questioning the reliability of the DUI data Plaintiff provided him and expressing discomfort with his attendant analysis).

 **\*7** Although Dr. Whitman's quantitative background provides him with sufficient foundation to present his data analysis, nothing in his academic or professional pursuits provides a basis for the conclusions he presumes to derive from the data in this case. It is clear that he simply models his conclusions off Plaintiff's questions. "[A] court is expected to reject any subjective belief or speculation." *Ammons v. Aramark Unif. Servs.,* 368 F.3d 809, 816 (7th Cir.2004) (internal citations omitted). *See also Mid–State Fertilizer Co. v. Exchange Nat'l Bank of Chicago,* 877 F.2d 1333, 1339 (7th Cir.1989) (finding expert's opinion inadmissible where he "presented nothing but conclusions ... no discussion of hypotheses considered and rejected"). The Court thus grants the City's motion in part and excludes Dr. Whitman's qualitative conclusions as to what his data analyses suggest about the CPD.

## III. Dr. Whitman's Quantitative Analyses Are Generally Admissible

While not contesting Dr. Whitman's mathematics credentials, the City disputes the reliability of Dr. Whitman's methodology. Specifically, the City challenges his reliance on (1) the data summaries the City produced involving complaints against Chicago police officers assigned to the 11th and 20th Districts, (2) Plaintiff's counsel's summaries of CR files for the 25th District, and (3) a U.S. Department of Justice analysis of complaints against police officers. In a footnote, the City also challenges the relevance of the *Bond* analysis to this case. The Court considers each argument in turn to determine whether the City's criticisms of Dr. Whitman's report impacts the admissibility of his quantitative analyses, "or only, as the Supreme Court put it in *Bazemore,* their 'probativeness' or weight." *Adams v. Ameritech Servs., Inc.,* 231 F.3d 414, 425 (7th Cir.2000) (citing *Bazemore v. Friday,* 478 U.S. 385, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986)).

### A. Dr. Whitman's Analyses of Sustained Rates In The 11th & 20th Districts Are Admissible

The City argues that Dr. Whitman's analyses regarding the 11th and 20th Districts are unreliable because the underlying data overstates the actual number of CR files initiated against Chicago police officers in those Districts during the relevant time periods. According to the City, this "overcounting" of data results from Plaintiff's imprecisely worded document request—the discovery request that dictated which documents the City produced in this case —which requested information about complaints against police officers *assigned* to the 11th and 20th Districts at the same time as Defendant Officer Abbate, but did not limit the request to complaints filed against the officers *during* those periods. To illustrate the effect of that phrasing on Dr. Whitman's analysis, the City cites as an example one Chicago police officer who was assigned to the 11th District at the same time as Defendant Officer Abbate (between February 2002 and May 2005). The City produced 49 CR files relating to complaints against that officer, which Dr. Whitman included in his analysis of the 11th District. Fifteen of those complaints, however, arose from incidents occurring after May 2005. Dr. Whitman did not exclude those post- May 2005 CR files from his analysis. On that basis, the City contends that Dr. Whitman's analyses of the 11th and 20th Districts are unreliable and should be excluded. In response, Plaintiff asserts that the time periods are unimportant, and that

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

the relevant information is the proportion of complaints that are deemed "sustained" following an investigation.

**\*8** *Daubert* 's "framework for assessing expert testimony is applicable to social science experts, just as it applies to experts in the hard sciences." *Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 263 (7th Cir.1996) (citations omitted). Although "the test of reliability is 'flexible,' and *Daubert* 's list of specific factors neither necessarily nor exclusively applies to all experts or in every case," *Kumho Tire Co.,* 526 U.S. at 141 (quoting *Daubert,* 509 U.S. at 594); *see also Mihailovich,* 359 F.3d at 919 ("[T]he *Daubert* framework is a flexible one that must be adapted to the particular circumstances of the case and the type of testimony being proffered."), the methodology used by social science experts to reach their conclusions must "adhere to the same standards of intellectual rigor that are demanded in [their] professional work" in order to be reliable. *Chapman v. Maytag Corp.,* 297 F.3d 682, 688 (7th Cir.2002) (citation omitted). "A district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Bryant v. City of Chicago,* 200 F.3d 1092, 1098 (7th Cir.2000) (citing *Kumho Tire Co.,* 526 U.S. at 141). Because Dr. Whitman based his analyses of the sustained rates in the 11th and 20th Districts on reliable evidence and arrived at reasonably informed estimates, the Court denies the City's request to exclude these data analyses. The City can address its challenges through cross examination.

**B. Dr. Whitman Independently Verified the Accuracy of Plaintiffs Summaries**

Next, the City argues that Dr. Whitman's reliance on coded data sheets that Plaintiff's counsel created to summarize the CR files relating to the 25th District and off-duty Chicago police officers is impermissible under Rule 702 and *Daubert.* As in its other motions to exclude Plaintiff's expert witnesses, the City relies primarily on *Sommerfield v. City of Chicago,* 254 F.R.D. 317 (N.D.Ill.2008) for this proposition. Based on Dr. Whitman's description of the process by which he independently verified the accuracy of Plaintiff's coded data sheets-a process he undertook with the express goal of ensuring that his analyses were not tainted by any "intentional or unintentional" bias in Plaintiff's counsel's coding—the Court rejects the City's argument. *See Walker v. Soo Line R.R. Co.,* 208 F.3d 581, 587 (7th Cir.2000) (district courts are responsible for determining whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed."). Dr. Whitman may present his analyses of these data.

**C. Dr. Whitman May Rely On The Government Report**

The City argues that Dr. Whitman misinterprets the findings of the DOJ Report and that the opinions he draws therefrom are thus unreliable. "[I]t is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Deputy v. Lehman Bros., Inc.,* 345 F.3d 494, 506 (7th Cir.2003). Furthermore, "the rules of evidence do not limit what type of information an expert may rely upon in reaching his opinion; even if that information would not otherwise be admissible in a court proceeding, an expert witness may rely upon it so long as it is the type of information on which others in the field reasonably rely." *Boim v. Holy Land Found. For Relief & Dev.,* 549 F.3d 685, 703 (7th Cir.2008). The DOJ Report, entitled "Citizen Complaints about Police Use of Force," "presents data on citizen complaints about use of force and complaint dispositions in large [police] agencies." (R. 310, City Reply in Support of its Mot. to Exclude Steven Whitman, Ex. B–DOJ Report.) Specifically, the DOJ Report analyzes data from the 2003 Law Enforcement Management and Administrative Statistics survey, which is sponsored by the Bureau of Justice Statistics and the Office of Community Oriented Policing Services. (*Id.*) This government report is relevant to Dr. Whitman's analysis, and it was reasonable for Dr. Whitman to rely on it in conducting his analysis for this case.

**D. Dr. Whitman's *Bond* Analysis Is Relevant**

**\*9** In a footnote, the City asks the Court to exclude Dr. Whitman's incorporation of his prior analysis of police misconduct complaints from *Bond v. Utreras et al.* on the grounds of relevance. (R. 266, City Mot. to Exclude Steven Whitman, at 8 n. 26.) Because Dr. Whitman's analysis is relevant, the Court denies the City's request. The Seventh Circuit has clearly stated that "in order for an expert's testimony to qualify as 'relevant' under Rule 702 it must assist the jury in determining *any* fact at issue in the case." *Smith,* 215 F.3d at 720 (emphasis added). "No one piece of evidence has to prove every element of plaintiff's case; it need only make the existence of 'any fact that is of consequence' more or less probable." *Adams,* 231 F.3d at 425 (citing Fed.R.Evid. 401).

Here, Plaintiff offers Dr. Whitman's data analysis to support her *Monell* claim against the City. To establish *Monell* liability against the City, Plaintiff must show that (1) she suffered a deprivation of a federal right, (2) as a result of

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

either an express municipal policy, widespread custom, or deliberate act of a decision-maker with final policy-making authority, that (3) proximately caused her constitutional injury. *Ovadal v. City of Madison,* 416 F.3d 531, 535 (7th Cir.2005); *see also Valentino v. Vill. of South Chicago Heights,* 575 F.3d 664, 674 (7th Cir.2009) ("A municipality ... may be liable for a section 1983 violation if, among other things: (1) it has a permanent and well-settled municipal customer or practice that, although not authorized by official law or policy, was the moving force behind the plaintiff's constitutional injury"). Unconstitutional policies or customs include: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that a person with final policymaking authority caused the constitutional injury. *See Walker v. Sheahan,* 526 F.3d 973, 977 (7th Cir.2008); *see also Simmons v. Chicago Bd. of Educ.,* 289 F.3d 488, 494 (7th Cir.2002) ("One way or another, the policy must be shown to be that of the municipality itself"). "If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer there is a policy at work." *Lewis v. City of Chicago,* 496 F.3d 645, 656 (7th Cir.2007) (quoting *Phelan v. Cook County,* 463 F.3d 773, 789 (7th Cir.2006) (citation omitted)). Dr. Whitman's analysis of the complaint data in *Bond* provides additional relevant data for Plaintiff's *Monell* claim, and it is thus relevant and admissible.

As a general observation, if the City wishes to further challenge the data upon which Dr. Whitman relied, or the results he reached in his data analyses, it may cross-examine Dr. Whitman about "his conclusions and the facts on which they are based." *Smith,* 215 F.3d at 719. "Vigorous cross-examination, presentation of contrary evidence, and careful jury instruction ... are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596.

## CONCLUSION

**\*10** For the foregoing reasons, the Court grants in part and denies in part Defendant's motion to exclude Dr. Whitman's expert testimony. Dr. Whitman's quantitative data analyses are admissible. Dr. Whitman lacks foundation to offer qualitative opinions on those data, and his opinions in that regard are thus excluded.

Footnotes

1       Pursuant to the parties' stipulated agreements, Gary Ortiz and Patti Chiriboga are no longer defendants in this lawsuit. *See* R. 241, 12/2/2009 Order (dismissing Gary Ortiz without prejudice); R. 262, 9/2/2010 Order (dismissing Patti Chiriboga with prejudice).

2       For ease of reference for the remainder of this litigation, the Court will cite to the page numbers in Dr. Whitman's expert report rather than to the page numbers on the Docket.

3       In order to determine the "sustained" rates, Dr. Whitman counted the number of excessive force complaints filed against Chicago police officers in the relevant Districts at the relevant times, and determined how many of those complaints resulted in a finding of "sustained"—i.e., the investigators found the complaint meritorious.

4       The City does not dispute the relevance of Dr. Whitman's analysis to the issues in this case.

5       As Dr. Whitman succinctly stated at his deposition, he is "a statistician who analyzes data about health." (R. 331, Whitman Dep ., 6:1–2.)

6       Dr. Whitman has been retained twice before to submit expert testimony in federal civil rights cases. Both prior engagements required him to conduct statistical analyses of complaints against Chicago police officers. The last section of his expert report in this case draws on work he did for one of those cases, *Bond v. Utreras et al.* (04 C 2617) (Lefkow, J.). In that civil rights case, Plaintiff Diane Bond filed a nine count amended complaint against the City of Chicago, several CPD officers, the then- and former-CPD superintendents, and the former administrator of the CPD's Office of Professional Standards. As in this case, Bond brought a *Monell* claim against the City. *See Bond v. Utreras,* Case No. 04 C 2617, R. 222 (9/12/06 Minute Entry). Although Dr. Whitman analyzed data of reported police misconduct and drafted a report to support Bond's claims, the case settled before his testimony could be evaluated by the court. *Id.* at R. 248 (Release & Settlement Agreement), R. 249 (3/23/07 Agreed Order of Dismissal). The other case, *Ramirez v. City of Chicago et al.,* is presently set to go to trial in October 2011. *See Ramirez,* Case No. 05 C 317, R. 391 (6/3/11 Minute Entry). That court has suggested it may admit Dr. Whitman's expert testimony at trial. *Id.* at R. 330 (11/17/09 Mem. Op. & Order).

7       When the CPD "sustains" a complaint against a Chicago police officer, it finds that the allegation was supported by sufficient evidence to justify disciplinary action (i.e., the allegation was meritorious and founded).

Addendum

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

# CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of September, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:  Francis Catania, Ass't State's Atty, 302 Daley Center, Chicago, IL 60602, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:  none.


/s/  Kenneth N. Flaxman

_____
Kenneth N. Flaxman
ARDC Number 08830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604-2430
(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com (email)