IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Micheal Parish, Curtis L. Oats, Leila Khoury, Sean Driscoll, Carla Lofton, Roy Cleaves, Lisa Brown, Dan Taylor, Dean Miller, Kevin Sanders, Stacey Clark, and Carlotte Watson, | ) ) ) ) ) | |
| | ) | No. 07 CV 4369 |
| *Plaintiffs,* | ) ) | |
| | ) | *Judge John Z. Lee* |
| *-vs-* | ) | Judge Presiding |
| | ) | |
| Sheriff of Cook County and Cook County, | ) | Courtroom 1225 |
| | ) | |
| *Defendants.* | ) | |

**Exhibit 40
Deposition of Jess Mason
May 12, 2011**

**Exhibit 40, Mason Dep.**

**Page 1**

```
       IN THE UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF ILLINOIS
                 EASTERN DIVISION
MICHAEL PARISH, CURTIS L. OATS,  )
LEILA KHOURY, SEAN DRISCOLL,     )
CARLA LOFTON, ROY CLEAVES, LISA  )
BROWN, DAN TAYLOR, DEAN MILLER,  )
KEVIN SANDERS, STACEY CLARK, and )
CARLOTTE WATSON,                 ) No. 07 C 4369
          Plaintiffs,            )
     vs.                         )
SHERIFF OF COOK COUNTY and COOK  )
COUNTY,                          )
          Defendants.            )
```

The deposition of JESS S. MASON, called for examination pursuant to notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Martha C. Newton, a notary public within and for the County of Kane and State of Illinois, at the Richard J. Daley Center, Fifth Floor, Chicago, Illinois, on the 12th day of May 2011, at the hour of 11:20 a.m.

Reported By: Martha C. Newton, CSR, RPR, RMR
License No.: 084-003632

**Page 2**

1  APPEARANCES:
2    THOMAS MORRISSEY, LTD., by
3    MR. THOMAS G. MORRISSEY
4    tgmlaw@ameritech.net
5    10249 South Western Avenue
6    Chicago, Illinois 60643
7    (773) 233-7900
8       Representing the Plaintiffs;
9
10   COOK COUNTY STATES ATTORNEY, by
11   MR. FRANCIS J. CATANIA
12   francis.catania@cookcountyil.gov
13   500 Richard J. Daley Center
14   Chicago, Illinois 60602
15   (312) 603-5440
16      Representing the Defendants.
17
18 ALSO PRESENT:
19   Ms. Alison Zamora
20
21
22
23
24

**Page 3**

```
              I N D E X
WITNESS              EXAMINATION
JESS S. MASON
  BY MR. CATANIA             4
  BY MR. MORRISSEY         136
  FURTHER BY MR. CATANIA   164


              E X H I B I T S
NUMBER              MARKED FOR ID
Mason Exhibits
Exhibit No. 1            12
Exhibit No. 2           129
Exhibit No. 3           139
Exhibit No. 4           146
```

**Page 4**

1              (Witness sworn.)
2              JESS S. MASON,
3  called as a witness herein, having been first duly
4  sworn, was examined and testified as follows:
5              EXAMINATION
6  BY MR. CATANIA:
7     Q.  Sir, will you please state your full name
8  for the record.
9     A.  Jess S. Mason.
10    Q.  And can you tell me what the "S" stands
11 for?
12    A.  Steven.
13    Q.  And, Mr. Mason, this is the federal
14 deposition made pursuant to notice to the other
15 side, to your lawyer and the other lawyers
16 involved in the case.  We're here for your
17 deposition.  Do you understand that?
18    A.  Yes, sir.
19    Q.  Do you know what a deposition is?
20    A.  Yes.  My attorney has explained
21 everything to me.
22    Q.  Okay.  Just for clarity of the record, a
23 deposition is me asking you a bunch of questions
24 which are answered under oath.  You understand

1 that?
2   A.  Yes, sir.
3   Q.  Okay.  What do you think this deposition
4 is about?
5   A.  You know, it's -- in my personal words,
6 you know, it's about people going to jail that
7 are -- you know, got problems socially, mentally
8 and emotionally and they don't get the help they
9 need when they go to jail, which going to jail is
10 a byproduct of the problems that existed before
11 they were there.
12   Q.  Are those your words, sir?
13   A.  These are my words from my heart, yes,
14 sir.
15   Q.  Where do you find these words?
16   A.  In my heart.
17   Q.  So you know from your own heart that
18 other people have problems when they go to jail?
19   A.  Well, obviously they wouldn't be here
20 unless they -- they did.
21   Q.  Okay.  Why do you think there's a court
22 reporter here?
23   A.  Get this story straight.
24   Q.  Okay.  What will you do if you don't hear
                                                    5

1   A.  What do you mean a mistake?  How can I
2 make a mistake if I'm telling the truth?
3   Q.  Well, you always tell the truth; right?
4   A.  Absolutely.
5   Q.  If you -- are you on any drugs or
6 medications today?
7   A.  Yes.
8   Q.  What kind of drugs or medications?
9   A.  The ones my doctors prescribe me.
10   Q.  Okay.  Can you tell me what they are?
11   A.  Is that relative?
12   Q.  To the case?
13   A.  To the case --
14   Q.  It is the case.
15   A.  From my medicine from then to now has
16 changed.
17   Q.  What medication are you on today?
18   A.  I really don't want to divulge that
19 because, you know, the HIPAA laws.  I mean, I
20 don't have to tell you what I'm on now.  But at
21 the time those were the meds I was on.
22   Q.  Sir, this deposition is for the
23 purpose --
24   A.  Why is my medication now relative to the
                                                    7

1 a question that I ask?
2   A.  I will ask you to repeat it.
3   Q.  Thank you.
4       What will do you if you don't understand
5 a question that I ask?
6   A.  I would ask you to explain it in a way
7 that I would understand.
8   Q.  Thank you.
9       Is there anything on your mind today that
10 will make it difficult for you to concentrate
11 during this deposition?
12   A.  No, but my mind does want to wander.
13   Q.  Okay.
14   A.  So if I do have a moment like that,
15 please, you know, get my attention again, please.
16   Q.  I'll try to do that.
17   A.  Thank you.
18   Q.  But also if you feel like you've made a
19 mistake in answering a question and you want to
20 make a change, what will you do to -- to let us
21 know?
22   A.  I'm not understanding the question.
23   Q.  Well, if you make a mistake or it
24 occurs --
                                                    6

1 case of this?
2   Q.  It's relative --
3   A.  Why.
4   Q.  -- to the case because --
5   A.  I don't want to answer that.
6   Q.  -- if you are on any medications or
7 alcohol --
8   A.  It's my personal life and I really don't
9 want to tell you what I'm on.  Because I'm under
10 my doctor's care.  I'm in society.  I'm not being
11 arrested no more.  I'm pretty much as stable as I
12 can get.  I am on disability.  And that's my
13 answer.
14   Q.  Okay.
15   MR. MORRISSEY:  Let me talk to my client.
16   MR. CATANIA:  No, sir.  We're not taking any
17 breaks at lib during this deposition.  We just
18 started.
19   MR. MORRISSEY:  There's no question pending.
20   MR. CATANIA:  We just started.
21   MR. MORRISSEY:  I understand that, but I --
22 BY MR. CATANIA:
23   Q.  Sir, do you need to take a break?  Do you
24 need to take a break?
                                                    8

2 (Pages 5 to 8)

1    A. Yeah, if he tells me take a break, I got
2  to take a break.
3    MR. CATANIA: All right. Tom, I'm calling
4  the judge.
5    MR. MORRISSEY: Why are you calling the
6  judge?
7    MR. CATANIA: Because of these interruptions
8  in every deposition we've had in this case.
9    MR. MORRISSEY: Well, I'm going to explain to
10  him why he needs to explain to you what meds he's
11  on. Okay? So that will be helpful.
12    (Off the record.)
13    THE WITNESS: I apologize, sir. I'm on --
14    MR. CATANIA: Hold on.
15    THE WITNESS: I'm on generic Celexa. I'm on
16  Ativan which is a p.r.n. which I take it only when
17  I need it. So if I have a bipolar moment or I get
18  upset I usually take them. I'm also on Norco for
19  back pain, on Norco, the little ones. I don't
20  know, whatever they call them, 500 milligrams.
21  Now, I do have a very, very bad back from back in
22  the day when I was working construction.
23    And then what else am I on? I'm on
24  Flonase Combivent for allergies which I only use

9

or alcohol that you think will interfere with your
2  ability to give truthful answers to my questions?
3    A. No, not at all.
4    Q. Is there anything else you're aware of
5  that will keep you from giving a full and complete
6  answer to my questions?
7    A. No, I don't see any problems.
8    Q. Okay. What will you do if I cut you off
9  during an answer?
10    A. I would probably deserve it. I don't
11  know.
12    Q. I would just ask that you let me know
13  you're not finished.
14    A. Okay.
15    Q. And then I'll allow you --
16    A. Sounds reasonable.
17    Q. Okay. What will you do if you realize
18  that you gave me an answer that you think might be
19  wrong.
20    A. Like -- well, you know, for a while there
21  I was getting -- going to jail a couple times --
22  lot of these times I want to forget about it. So
23  my memory's not too good about it, but the dates
24  and everything, all that, so it's a little

11

when I have a bad allergy moment. Take a lot of
2  over -- over-the-counter drugs. I take Benadryl,
3  take two of them a day, veratridine which is
4  another antihistamine. See, what else I take? I
5  think that's -- yeah, that's about it I think.
6  BY MR. CATANIA:
7    Q. Did you take Ativan today?
8    A. No, not this morning. No.
9    Q. Did you take Celexa today?
10    A. No. Usually I -- you know, not yet today
11  but I will I mean as soon as I get home.
12    Q. Okay.
13    A. I'll be honest with you. I forgot to
14  take it because I was worried about making it here
15  on time. I usually don't get up till about 9. I
16  had to get up at 5:30 in order to get here on
17  time. So my whole day is messed up, and I'm a
18  creature of habit. I have to do the same thing
19  every day.
20    Q. Okay. Do you think that having not taken
21  your Celexa or your Ativan today will interfere
22  with your ability to give truthful answers today?
23    A. No. It just makes me crabby.
24    Q. Okay. Are you on any other medications

10

confusing to me. But, you know, I did go over it
2  with his counterpart and associate and we kind of
3  nailed it down, you know, to what it is. It is
4  what it is, so.
5    Q. Okay.
6    A. You know, I just do the best I can.
7  That's all I can do. It's all I can tell you.
8    Q. Thank you.
9    A. You're welcome.
10    Q. I'm going to show you what's been marked
11  as Exhibit 1 for this deposition in just a moment
12  when it's marked.
13    (Mason Deposition Exhibit
14    No. 1 was marked for
15    identification.)
16  BY MR. CATANIA:
17    Q. This is a copy of what was given to me by
18  the lawyers for the other side.
19    A. Oh, yeah, yeah. Yes, that is what I
20  did. Yes, this is correct.
21    Q. Okay. There's three pages in front of
22  you; right?
23    A. Yes, sir.
24    Q. Is it now in the same condition as it was

12

3 (Pages 9 to 12)

1  when you last saw it?
2    A.  Oh, yes. Absolutely.
3    Q.  When did you last see this document?
4    A.  Probably, I don't know, I'd say maybe ten
5  days ago, maybe a week ago. I couldn't give you
6  exact date, wasn't too long ago.
7    Q.  Okay. Where did you see the document ten
8  days ago approximately?
9    A.  At my home.
10    Q.  Do you have a copy of it at home?
11    A.  Yeah, but good luck finding it. Probably
12  somewhere I got somewhere in some drawer. I save
13  things but I'm not too organized.
14    Q.  When you received that copy, was it a
15  copy with your signature and date on it?
16    A.  No. It was empty. I had to sign it and
17  send it back.
18    Q.  All right. And it does have your
19  signature on the last page, doesn't it?
20    A.  That's it.
21    Q.  And next to it is a date that says
22  January 22 of 2011; right?
23    A.  Yeah, that's correct.
24    Q.  Is that when you signed it?

                       13

1    A.  Yeah, that has to be because that's my
2  handwriting. That's when I signed this one.
3    Q.  Before that date, did you meet with --
4    A.  Excuse me a second. Can I say something
5  on this. You know, there was also another case
6  concerning strip searches, so maybe the paperwork
7  I thought maybe, you know, that must have been the
8  one that I signed about ten days ago. I just
9  wanted to correct that statement. This date is
10  correct.
11    Q.  Okay. That's the last time you saw this
12  paper?
13    A.  That's correct.
14    Q.  Exhibit 1.
15    A.  That's correct. It was my mistake on
16  that because I have more paperwork on -- on the
17  other strip search one.
18    Q.  Okay.
19    A.  So I mean, I'm really messed up with the
20  paperwork.
21    Q.  Can you tell me what the date that you
22  signed this paper the first time you were asked to
23  remember the events that happened on October 20,
24  2005?

                       14

1    A.  Repeat that question for me, please.
2    A.  Sure. The date that's on this Exhibit 1
3  is January 22 of 2011.
4    A.  Yeah.
5    Q.  Is that the -- is that the only time you
6  were asked to remember the things that happened on
7  October 20 --
8    A.  No.
9    Q.  -- 2005?
10    A.  No. We had to propound -- propound to go
11  through it because it was so confusing for me the
12  dates and the times I was arrested. So I had to
13  put it together in my head and me, you know, being
14  a little, you know, a little off but this is true
15  whatever is said here.
16    Q.  Okay.
17    A.  We went over --
18    Q.  You're pointing to Exhibit 1?
19    A.  -- and I wrote it down -- right. I wrote
20  it down on my own paper and I -- because it was
21  kind of hard to put it together because there were
22  so many different occurrences and each time was
23  kind of like a little different, so, you know, it
24  was kind of hard on me, it really was. It was

                       15

1  very, very, very difficult.
2    Q.  The paper that you wrote that down on,
3  where is it now?
4    A.  In my drawers somewhere, my chaotic life.
5    Q.  You have it at home?
6    A.  It's probably in a spiral notebook, yeah.
7    Q.  Okay. And where do you currently live?
8    A.  6207 Sharon Lane.
9    Q.  What city is that?
10    A.  Hodgkins, Illinois.
11    Q.  And that's the address that's listed on
12  the affidavit; right?
13    A.  That's correct.
14    Q.  It says in that affidavit you were born
15  on April 13 of 1970; right?
16    A.  Uh-huh.
17    Q.  Is that right?
18    A.  Uh-huh.
19    Q.  It also lists your Social Security
20  number?
21    A.  Uh-huh.
22    Q.  Is that all true?
23    A.  Uh-huh.
24    Q.  I would just ask that if you answer, that

                       16

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois   (312) 263-0052**

Ex 40  Mason Dep 004

1  you answer in words so the court reporter can take
2  it down in words because uh-uh and uh-huh sound
3  the same thing -- or look the same way on the
4  transcript. Okay? You have to say yes or no.
5      A. If you're unclear on my answer ask me
6  again and I'll try to rephrase it so you do
7  understand.
8      Q. Okay. It's not a matter of me. The
9  record is the record. And if you don't give us a
10 word it can't be taken down correctly. Okay?
11     Were you asked to remember any other
12 dates besides October 20 and May 5 of 2007 for
13 this deposition?
14     A. Repeat -- I'm not -- it's too much to
15 think about at one moment.
16     Q. Okay. Let me break it down.
17     A. Let's break it down. Please do.
18     Q. No problem. You were arrested numerous
19 times in the past; is that right?
20     A. Yes.
21     Q. Were all of your arrests in Cook County,
22 Illinois?
23     A. Yes, I believe so.
24     Q. You weren't arrested by any other county
                                                    17

1      A. No.
2      Q. All right. Was it related to a mental
3  illness?
4      A. Yes.
5      Q. It was not related to --
6      A. It was related to all my health issues,
7  not just my mental illness, sir. I've had over 12
8  surgeries in my whole life. I've had over six eye
9  operations. Loyola University pulled my left eye
10 out of my eye socket, reattached the muscles and
11 put it back in. I had a corneal transplant. I --
12 I been to hell and back. So I don't know what
13 your point is you're trying to prove on this.
14     Q. Well, you don't --
15     A. I'm messed up.
16     Q. Has anyone explained --
17     A. I needed the help.
18     Q. Has anyone explained to you the point of
19 the lawsuit?
20     A. Yes.
21     Q. Have you read any documents regarding
22 that? Have you read any papers?
23     A. No, just from what my attorney has talked
24 to me about.
                                                    19

1  or in any other state?
2      A. Well, yeah, years -- I mean, I think
3  there was driving -- some driving offenses in Will
4  County, and I think that's about it, yeah.
5      Q. Do you remember when that was?
6      A. That was probably when I first got on
7  disability, that was probably in 2004, '5, maybe
8  '6 even, you know, roughly. I was living with my
9  brother in Romeoville at the time.
10     Q. Okay. Now, you say that you were on
11 disability?
12     A. Yes.
13     Q. At that time?
14     A. Yes, I still am.
15     Q. Okay. When was it you were first placed
16 on disability?
17     A. Took me -- it was the whole way rough.
18 Probably -- when I first got it was probably about
19 2000 -- beginning of 2004 I believe. I think
20 that's about the right time.
21     Q. Okay. And was the disability at all
22 related to driving?
23     A. Why would it be related to driving?
24     Q. I'm asking. I don't know why.
                                                    18

1      Q. So your attorney has told you what the
2  lawsuit is about; right?
3      A. He explained the situation to me and to
4  where I can understand, yes.
5      Q. Has he explained to you the defenses in
6  the lawsuit?
7      A. No. No, that's his business, ain't my
8  business.
9      Q. Do you have any reason to think why your
10 testimony at a future trial might be different
11 than your testimony here today?
12     A. I'm -- like I said, I always tell the
13 truth, but sometimes I get confused. I am on
14 medication. I'm just really trying to do my best,
15 sir.
16     Q. What have you done to help yourself
17 remember about the things you're going to testify
18 to today?
19     A. Dates, dates and times. I remember each
20 occurrence, but like I said, it's jumbled because,
21 you know, there was, you know, a few arrests.
22     Q. Okay.
23     A. So when you talking about a certain
24 occurrence, I have to get it clear in my mind
                                                    20

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois   (312) 263-0052**

Ex 40  Mason Dep 005

1 which occurrence it was to make sure I give the
2 right answer.
3    Q. All right. My question is a little bit
4 narrower than that. I just want to know what you
5 did to prepare yourself to testify here today?
6    A. I signed this paper. I conversated with
7 him and his counterpart, and I was told to show up
8 here for this deposition today.
9    Q. Okay.
10    A. I did what I was supposed to do.
11    Q. And who was the counterpart you're
12 talking about that you spoke to?
13    THE WITNESS: One of your associates,
14 correct?
15    MR. CATANIA: Mr. Morrissey, would you like
16 to start testifying?
17    MR. MORRISSEY: No, Mr. Catania.
18 BY MR. CATANIA:
19    Q. So was it an associate of Mr. Morrissey
20 that you spoke to?
21    A. Yes, because I told him about the problem
22 I had about remembering everything.
23    Q. Okay. And when was it --
24    A. And they helped me put it together. We

21

1 right?
2    A. I didn't know -- no, I did not know
3 the -- come on, guy. How am I going to remember a
4 number on the thing I got arrested for two, three
5 years ago.
6    Q. I understand that. I'm just asking you
7 if all the information in there was --
8    A. This is correct.
9    Q. -- is information you provided?
10    No, no. Did you provide all of the
11 information in there?
12    A. All right. You're going to have to wait
13 now. I have to read this all, make sure that it's
14 all correct again because, you know, you're making
15 me nervous.
16    Yeah, this is all correct. These are all
17 my words. This is the real deal.
18    Q. Okay. You had a chance to look at --
19    A. Yes.
20    Q. -- Exhibit No. 1?
21    A. Yes.
22    Q. Okay. My question is, did you provide
23 all of the information that --
24    A. Yes --

23

1 had the dates and everything and the times and all
2 that. I told them about, you know, the medication
3 and all that. Obviously, this is what this is all
4 about. Okay. And, you know, sometimes some days
5 are better than others. Some days I can put it
6 together, some days I can't. It's that simple.
7    Q. When did you meet with the associate of
8 Mr. Morrissey?
9    A. When did I meet? Never did.
10    Q. You didn't do anything in person?
11    A. Never. This is the first time actually
12 I've seen this gentleman in my life.
13    Q. Well, I understand that. I'm talking
14 about his associate that you spoke to.
15    A. Never saw the associate.
16    Q. Okay. Was that all by phone?
17    A. Yeah, she had to get my information. She
18 took my personal information. You know, they sent
19 me some letters in the mail, you know.
20    Q. Are you saying that you provide all the
21 information that's on that form in front of you,
22 that Exhibit No. 1?
23    A. Absolutely.
24    Q. So you knew what your CIMIS number was;

22

1    Q. -- is in there?
2    A. -- absolutely.
3    Q. Okay. Now, was any of the information
4 provided to you from the lawyers?
5    A. The --
6    MR. MORRISSEY: It's been asked and
7 answered. He said the CIMIS.
8    THE WITNESS: Yeah, that's -- I don't know
9 the numbers. Those were the only things that
10 they -- they -- they did for me was the numbers,
11 because how am I supposed to remember arrest
12 numbers and the dates and all that.
13 BY MR. CATANIA:
14    Q. Now, have you told me about all of the
15 information that was provided to you for that
16 affidavit, for that -- that sworn declaration?
17    A. What information that was provided? Not
18 all of it, just the numbers that were provided.
19 Everything else in here I gave.
20    Q. Okay.
21    A. That's my testimony.
22    Q. That's all I want to know. I just want
23 to have it clear that other than the CIMIS numbers
24 all the other information was provided by you; is

24

6 (Pages 21 to 24)

1   that right?
2     A.  That's correct.
3     Q.  Okay.  All right.  We've already talked
4   about your arrests in Cook County, Illinois.
5     A.  Yes.
6     Q.  Would you say that you've been arrested
7   13 times in Cook County, Illinois?
8     A.  I couldn't even tell you.
9     Q.  Do you remember when was the first
10  arrest?
11     A.  Probably 18.  I was 18 probably.  I
12  probably got a DUI.  Caught my girlfriend cheating
13  on me.  I was drinking.  I was stupid.
14     Q.  And you were about age 18 at that time?
15     A.  Yeah, roughly.
16     Q.  Aside from the traffic arrests --
17     A.  Yes, sir.
18     Q.  -- do you know how many criminal arrests
19  you've had?
20     A.  Well, you know, being on disability ain't
21  a fun thing, and things are rough.  And, you know,
22  it is what it is.  Let's start this over.  Reask
23  me the question and break it down just a little
24  bit more for me.
                                  25

1     Q.  Okay.  The clerk's record for misdemeanor
2  arrests and felony arrests --
3     A.  Yes.
4     Q.  -- it lists 13 times that you've been
5  arrested and charged with various crimes.  That
6  sound about right?
7     A.  Can I see that paper that you have with
8  that information on it?
9     Q.  These are my notes, so no.
10    A.  Well, okay.  Well, I'd like to see it
11  because then I can recall your question and answer
12  the question if I have something in front of me.
13  I am a bit autistic.  I'm a visual.  I'm very
14  symbolic, so if I see something, then I'll
15  remember like that quick.  But, you know, I just
16  can't recall.
17     Q.  Okay.  Have you ever been convicted?
18     A.  Yes.
19     Q.  Any convictions for felonies?
20     A.  I believe so.
21     Q.  Any convictions for fraud or dishonesty?
22     A.  I did steal there for a while.  I was
23  stealing because things were rough.
24     Q.  Do you know any of the named plaintiffs
                                  26

1   in the case and I'll give you their names, just to
2  ask if you know them.  Do you know Michael Parish?
3     A.  No.
4     Q.  Do you know Carla Lofton?
5     A.  No.
6     Q.  Do you know Curtis Oats?
7     A.  No.
8     Q.  Do you Leila Khoury?
9     A.  No.
10    Q.  Do you know Lisa Brown?
11    A.  No.
12    Q.  Do you know Dan Taylor?
13    A.  No.
14    Q.  Sean Driscoll?
15    A.  No.
16    Q.  Roy Cleaves?
17    A.  No.
18    Q.  Dean Miller?
19    A.  No.  That name rings a bell.  I may have
20  went to school with one of the Millers.  I'm not
21  sure.
22    Q.  Kevin Sanders?
23    A.  No.
24    Q.  Stacey Clark?
                                  27

1     A.  No.
2     Q.  Carlotte Watson?
3     A.  No.
4     Q.  Dean Miller, is that somebody that you've
5  seen --
6     A.  No --
7     Q.  -- in the last five years?
8     A.  -- because I went to school with some
9  people that named Miller.  That's it,
10  though.  That's probably -- you know, lot of
11  people are named Miller.
12    Q.  Sure.
13    A.  Like I said, it just sounded like it rang
14  a bell.
15    Q.  Have you seen that person since August 3
16  of 2005?
17    A.  What person?
18    Q.  Dean Miller or any Miller.
19    A.  Who's Dean Miller?
20    MR. MORRISSEY:  Objection.  He didn't say he
21  saw Dean Miller.
22    THE WITNESS:  All I said was that that name
23  rang a bell, that I might have went to school with
24  somebody that was named Miller.
                                  28

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois   (312) 263-0052**

Ex 40  Mason Dep 007

BY MR. CATANIA:

Q. I heard your answer, sir. My question is only probing whether or not you've had any relationship at all in the last five years with somebody named Miller?

A. No.

Q. Thank you.

Other than your meeting with Mr. Morrissey in our outer office here today, did you meet with the attorneys for the other side at all?

A. No.

Q. Did you go to any places in preparation for this deposition?

A. No, I stay at home. I keep myself out of trouble.

Q. Have you signed any written statements aside from Exhibit 1 in front of you?

A. No, this is it.

Q. Have you spoken to any reporters --

A. No.

Q. -- about your time in jail?

A. Absolutely not.

Q. Have you notified any government

29

officials about any complaints you had about your time in jail?

A. Yeah.

Q. Did you say no or yes?

A. I said no.

Q. Thank you. I mean you have your hand in front of your face. I just didn't -- wasn't sure I heard the answer correctly.

A. Like I told you before with the question that you asked earlier, when Mr. Morrissey sent me this letter I read it --

Q. Pointing --

A. -- signed it.

Q. Pointing to the declaration.

A. Right. And we got to the bottom of it. We did all the work we had to do. That's what brought us to this point here. I hope I answered your question with that.

Q. Do you have a home computer?

A. Yes.

Q. Do you use that computer for the Internet?

A. Yes, I do.

Q. Have you posted any statements about the

30

events that are involved in this suit on the computer?

A. Yes, I did. I might have.

Q. Okay. Where did you post those notes or statements?

A. When did I?

Q. Where.

A. Where?

Q. What Internet sites, if you remember?

A. I don't remember. I can't recall but I mean I might have said something about it.

Q. Did you post --

A. I mean, I'm talking to my friends. I mean, private conversations.

Q. Okay. Have you ever written any -- on any blogs about your experiences in the Cook County jail?

A. There was one I do remember that I did wrote about -- about -- about the police coming over and beating me up.

Q. Okay. Was that the most recent arrest?

A. Yeah.

Q. And that was in 2010, last year?

A. Yes, I believe so.

31

Q. Have you read any statements by other witnesses in this case about the case?

A. No.

Q. Have you --

A. I said I stay at home. I keep myself out of trouble. I don't talk to nobody.

Q. I'm asking if you read anything.

A. No.

Q. Have you read any depositions that were taken in this case?

A. No.

Q. Have you listened to any recorded statements about this case?

A. No.

Q. Okay. Did you look at any diagrams or photographs related to this case?

A. No.

Q. Okay. How did you find Mr. Morrissey?

A. He actually found me. I had a notice in the mail and read it and was really concerned about it, and I had remembered how horrible things were at the -- at the county jail, and, you know, I felt in my heart I was compelled to move forward with this.

32

8 (Pages 29 to 32)

Ex 40 Mason Dep 008

1    Q.  Okay.
2    A.  Absolutely.
3    Q.  When was it that Mr. Morrissey reached
4  out to you?
5    A.  Oh, I --
6    MR. MORRISSEY:  I'm going to object.  He said
7  he received a notice in the mail.
8    THE WITNESS:  Thank you.
9  BY MR. CATANIA:
10   Q.  Now, what we've just heard is
11 Mr. Morrissey instructing you as to your next
12 answer.
13   A.  No, but that is the correct answer.
14   Q.  Okay.
15   A.  You're being a little pushy with me, and
16 he's trying to stick up for me.
17   Q.  I'm sorry but Mr. Morrissey brings out
18 the worst in everybody on this floor.
19   A.  That's not my problem.  This is my
20 problem.
21   Q.  Do you have a driver's license, sir?  Do
22 you have a driver's license?
23   A.  No, it's revoked, sir.
24   Q.  What is it revoked for?

33

1    A.  Driving under the influence.  Two days
2  before 9/11 I got arrested for driving under the
3  influence.  I haven't seen my license since then
4  and, you know, being on disability going through
5  all that rough stuff, I couldn't afford to pay the
6  attorney to get my license back, and that
7  snowballs also in, you know, the depression and
8  the bipolar.  I mean, it's life.  It is life.
9  It's life.  It is what it is.
10   Q.  Okay.  Do you have a state ID?
11   A.  Yes, I do.
12   Q.  Can I take a look at it.  Show it to your
13 lawyer.
14   A.  It's out of date but I mean I do got it.
15 It's in bad shape.  Bear with me.  I've got my bus
16 card.  There's another one.  That's old.  That's
17 current.  I got a Social Security card, public aid
18 card, insurance card.  I don't have a car.  It's
19 hard to get around.  I've been meaning to get to
20 Bridgeview to get a new ID but sometimes it's just
21 not in the cards for me.
22   MR. CATANIA:  I've been handed from
23 Mr. Morrissey two cards that have photographs on
24 them.  One is an Illinois -- State of Illinois

34

1  identification card with the number of
2  2504-3770-106M issued June 28 of 2005, expires
3  April 13 of 2010, not extended.
4  BY MR. CATANIA:
5    Q.  It lists the name of Jess S. Mason, 6207
6  Sharon Lane, Hodgkins, Illinois 60525, with birth
7  date of April 13 of 1970.  Is that all current
8  information?
9    A.  Yes, it is.
10   Q.  It also lists your weight at 325 pounds.
11 Is that current?
12   A.  No.  I wish.
13   Q.  Well, the photograph on here does show
14 your photograph or your picture; is that right?
15   A.  Yes, sir.
16   Q.  And that resembles the way you looked
17 back in May of --
18   A.  Yeah, that's me.
19   Q.  June of '05; right?
20   A.  Yeah, it's me.  Rub-a-duck.
21   Q.  And you've also handed me a Regional
22 Transportation Authority --
23   A.  I get that from --
24   Q.  -- ride free card.

35

1    A.  -- the State because I'm on disability.
2    Q.  Okay.
3    A.  It's very nice to have because I can jump
4  on the train and the bus.  You know, I know Rod
5  was a bad guy but still he -- at least he did
6  something right there.
7    Q.  So this is a free ride?
8    A.  Yes.
9    Q.  And it expires on June 30 of this year.
10   A.  Yeah, I just sent my new application.  I
11 should get one in the next month or two.
12   Q.  And it also has a picture which looks
13 like the man sitting across the table from me and
14 also resembles the photograph that's on the
15 Illinois ID card.  Thank you, sir.
16   A.  No, thank you, sir.
17   Q.  You've listed a Social Security number in
18 your sworn declaration.  Is that a current Social
19 Security number?
20   A.  Yes, it is, sir.
21   Q.  Have you ever had another one?
22   A.  No.
23   Q.  Has the -- has the IRS ever issued to you
24 a number for personal identification theft?

36

9 (Pages 33 to 36)

1    A.  Personal identification?
2    Q.  Has anyone ever stolen your
3  identification?
4    A.  No.
5    Q.  Who do you live with at the address of
6  6207 Sharon Lane in Hodgkins?
7    A.  Nobody.  I'm single.
8    Q.  Does anybody ever stay with you for
9  any --
10    A.  Yes.
11    Q.  -- period of time?
12    Who stays with you?
13    A.  Well, I had a woman stay with me just for
14  a short time and another -- her daughter.  I mean
15  they were just street people that needed a place
16  to stay.  They were on the streets.
17    Q.  When was it that they stayed with you?
18    A.  I couldn't recall.
19    Q.  Was it within 2011, this year?
20    A.  No.  There was -- no, I been by myself
21  since -- for a while now.
22    Q.  Okay.  Back in 2005 which is the first
23  arrest mentioned in your affidavit, was there
24  anybody residing with you, staying with you?
                                                    37

1    A.  No.
2    Q.  In 2007, was there anybody residing with
3  you in February of 2007?
4    A.  I can't recall.  I mean, these are street
5  people.  They come for a couple of weeks and they
6  don't pay the rent and then they go because they
7  want to go out and run the streets.
8    Q.  These folks you're talking about --
9    A.  I don't know what to tell you.
10    Q.  -- do they -- do you meet them in
11  Hodgkins?
12    A.  Well, I used -- you know, I used to have
13  a drug problem, so I mean, I ran around with
14  that -- them kind of people.  So, you know, I'm a
15  good person.  Somebody got no place to live, they
16  come to my house, I let them in, you know.
17    Q.  Now, you said that you had a drug
18  problem.  What type --
19    A.  Yeah.
20    Q.  -- of drug was your problem or your
21  choice?
22    A.  You know, I really am uncomfortable
23  discussing that with you, and I don't think that's
24  any relative to this case.
                                                    38

1    Q.  Okay.  Was it in 2005?
2    A.  No.  I don't want to answer that.
3    Q.  Was it in 2007?
4    A.  I can't recall.
5    Q.  Okay.  Are you able to answer whether
6  it's in 2005?
7    A.  I don't understand the question.
8    Q.  Okay.  I understand that you don't want
9  to answer me.  The question is that if you were to
10  be --
11    A.  It's not that I don't want to answer
12  you.  I just don't recall.
13    Q.  All right.
14    A.  Please don't put words in my mouth.
15    Q.  I'm trying not to.
16    A.  Thank you.
17    Q.  I heard your answer to be that you don't
18  recall.
19    A.  I'm a little upset because you hit a cord
20  with me.
21    Q.  All right.  Do you have any network of
22  individuals who check in on you --
23    A.  Yes.
24    Q.  -- on occasion?
                                                    39

1    A.  My family and friends, yes.
2    Q.  Okay.  And can you tell me who are your
3  family members.
4    A.  My mom and my stepdad, Keith.
5    Q.  What's your mom's full name?
6    A.  Edith Heites.
7    Q.  Spell the last name for me.
8    A.  H-e-i-t-e.
9    Q.  And your stepfather?
10    A.  Keith Heites.
11    Q.  Do they live in Hodgkins?
12    A.  They used to.  Now they're in Atkinson,
13  Illinois.  They retired, you know.  They're good
14  people.
15    Q.  How far is Atkinson from Hodgkins, if you
16  know?
17    A.  It's about two and a half hours away,
18  just go past Joliet and then get on I-80 and just
19  go west until you hit Atkinson.
20    Q.  Have they lived in Atkinson earlier than
21  2005?
22    A.  Earlier than 2005?
23    Q.  Yes.
24    A.  I can't -- I don't even know how long
                                                    40

10 (Pages 37 to 40)

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois   (312) 263-0052**

Ex 40  Mason Dep 010

1 they lived there.
2     Q.  Okay.
3     A.  It would be -- no, they probably moved
4 out there about 2008, maybe 2007. I can't really
5 recall. I'm just guesstimating the dates here.
6     Q.  I understand. I understand. I just want
7 to know were they close to you at the time that
8 you were arrested for the events that are talked
9 about here?
10     A.  What event specifically are you talking
11 about?
12     Q.  All right. Let's talk about your three
13 days in the Cook County jail from October 20, 2005
14 to October 23, 2005 according to paragraph 15 of
15 your affidavit.
16     MR. MORRISSEY: Let's take a moment.
17     THE WITNESS: Yeah.
18     MR. MORRISSEY: No, just take a moment.
19     THE WITNESS: Oh, okay. Yeah, that was.....
20     MR. MORRISSEY: Take a moment and read that.
21 He's asking you for that.
22     THE WITNESS: Okay. Now, what's your
23 question? Rephrase your question.
24 BY MR. CATANIA:

41

1     Q.  My question was, were your -- was your
2 mother and stepfather living in the area of
3 Hodgkins at the time of that arrest, those three
4 days?
5     A.  It's hard to say. It's right on the cusp
6 where they might of have moved. I'm not really
7 sure. I can't recall.
8     Q.  Okay.
9     A.  I'll be really honest with you. I can't
10 recall that one.
11     Q.  After --
12     A.  I don't know if they -- they moved by
13 that or if they were still there or not. I, you
14 know.....
15     Q.  After --
16     A.  I could ask them. I can call them up.
17 You want me to ask them?
18     Q.  No.
19     A.  I can use my cell phone and go call them.
20     Q.  What I want to know is will they be
21 coming to court to testify in support of your
22 case?
23     A.  Obviously, after I go through all this
24 I'm going to tell them what's going on and you

42

1 damn straight they're going to be there.
2     Q.  Okay. The question is, did you talk to
3 them after you were discharged from the jail on
4 October 23, 2005?
5     A.  Rephrase the question, please.
6     Q.  Sure. Did you talk with either Edith
7 Heites or Keith Heites --
8     A.  About this case?
9     Q.  About the 2005 arrest, October 20, 2005
10 to October 23, 2005?
11     A.  Did I talk to them about it?
12     Q.  Yes.
13     A.  Yeah, because, you know, I got arrested.
14     Q.  What was the arrest for?
15     A.  It was for retail theft.
16     Q.  Did you tell them that?
17     A.  Yes. I -- I don't lie to my folks. I
18 don't lie. Everything I say is the truth.
19     Q.  All right.
20     A.  Everything, period, end of discussion on
21 that. I'm not a liar. Far from a liar because
22 I'm not such a man.
23     Q.  How many --
24     A.  I am who I am. I'm not trying to hide or

43

1 deny anything.
2     Q.  How many other family members do you have
3 that check in on you at the present?
4     A.  Daily. I talk to my mom two, three times
5 a day.
6     Q.  Do they come to visit daily?
7     A.  No.
8     Q.  Does anybody come to visit daily?
9     A.  Yeah, I got a couple friends in the park
10 there, you know, stop in, have a cup of coffee,
11 you know.
12     Q.  What are their names?
13     A.  I got my buddy Dan Cole across the
14 street. Let's see. There's another girl Rachel,
15 she got about four kids down the block. There's
16 another girl Debbie. You know, and I don't even
17 know these people's last names because that ain't
18 my business. They're nice people and they come
19 and visit and that's it, and we're nice neighborly
20 people. We all look out for each other. It's a
21 wonderful place to live.
22     Q.  Have you ever talked to Dan Cole about
23 your experiences in the jail?
24     A.  No, not that I recall. It's like a given

44

11 (Pages 41 to 44)

1    thing, he's been locked up too. We don't talk
2    about it because it's something you want to forget
3    about.
4       Q.  Has he been locked up in the Cook County
5    jail?
6       A.  I believe he has a criminal record, but
7    that's not my business either.
8       Q.  All right. Are you planning on calling
9    Dan Cole at the case -- if you're ever called to
10   testify is he ever gonna call -- called to testify
11   on your behalf?
12      A.  It's --
13   MR. MORRISSEY: I'm going to object.
14   THE WITNESS: Yeah, I don't know what's --
15   MR. MORRISSEY: Let me -- let me -- let me
16   state my objection. You're asking him --
17   MR. CATANIA: That's not an objection, sir.
18   MR. MORRISSEY: What?
19   MR. CATANIA: That's not an objection.
20   MR. MORRISSEY: My objection is you're asking
21   him a legal question --
22   MR. CATANIA: Thank you.
23   MR. MORRISSEY: -- be called to trial.
24   BY MR. CATANIA:

45

1      Q.  Sir, do you -- did you talk with Rachel
2    and her four -- and or with her four kids about
3    being in jail?
4      A.  No.
5      Q.  Did you talk to Debbie about that?
6      A.  No.
7      Q.  Thank you.
8      A.  Talk to nobody about my business. Keep
9    my mouth shut like I'm supposed to.
10     Q.  How many doctors do you have at the
11   present time?
12     A.  I couldn't even tell you. I got a lot of
13   doctors. See one, two, three, four, five, got
14   five at Loyola, Loyola University in Maywood. And
15   then I have my regular doctor I go to from
16   MacNeal. Now, he gives me all my meds, but then I
17   go to Loyola, I bump over to Loyola for my
18   specialty stuff like my pulmonary problems, my
19   ears, nose, throat problems, my eye problems, you
20   know. I was going there for psych, but we seem to
21   have nailed it down with the medications, so I
22   don't see the psych anymore but I still get my
23   medication through my regular doctor. Because
24   there's really no need to waste the State's money

46

1    going to see a psychiatrist. We know I'm a little
2    off. We know that I need the meds, so it's like a
3    given.
4       Q.  Who is your regular doctor?
5      A.  Dr. Bednard in --
6      Q.  Could you spell that for me, please.
7      A.  B-e-d-n-a-r-d. Now, he just gives me my
8    blood pressure medicine, my Norco. What else?
9    What's my list? My blood pressure med, you know,
10   and some other things too.
11     Q.  Okay.
12     A.  You know, I mean, you want to sign a
13   release to get the information, I'll be happy to
14   do it.
15     Q.  Well, actually you've already done
16   that --
17     A.  Okay. Good.
18     Q.  -- for this case.
19     A.  Well, then you guys are on it. I
20   appreciate that.
21     Q.  Is any single doctor aware of all of the
22   medications you're on?
23     A.  Yes.
24     Q.  Which doctor?

47

1      A.  Dr. Bednard.
2      Q.  And how does he know about all the other
3    medications?
4      A.  Because I don't lie to him. I tell him
5    everything. He's my doctor. He's in it for me,
6    so, I mean.
7      Q.  Is it based on information you've
8    provided to him?
9      A.  That's correct, yes.
10     Q.  Has he ever consulted with other doctors
11   regarding your medication?
12     A.  I'm sure he has.
13     Q.  Okay. How are you sure that he has?
14     A.  He's a doctor, that's what he does.
15     Q.  In your declaration in paragraph eight,
16   which is on page 1, it says that you have --
17     A.  First page? Okay. Go ahead.
18     Q.  You've identified "Adavan" it says, but I
19   believe you mean Ativan; right?
20     A.  Right.
21     Q.  Okay. And Lexapro as medications that
22   you were prescribed each time you were in jail; is
23   that right?
24     A.  No. I was never prescribed them in jail

48

12 (Pages 45 to 48)

1 at all. Never, not once of all the times I was
2 arrested.
3    Q. And that includes in August of 2010?
4    A. Yeah, includes being in -- in Hodgkins,
5 includes being in Willow Springs in the holding
6 cell, includes being in Bridgeview, includes going
7 into the jail.
8    Q. Okay. Now, I notice and I think there's
9 plenty of record other --
10    A. And they didn't list my proleve (sic)
11 either, it was from something else, you know, they
12 at least messed up my meds. It was bad. It
13 was -- go ahead.
14    Q. What is the Lexapro for?
15    A. Depression.
16    Q. What is the Trazodone for?
17    A. It's a beta blocker. It's supposed to --
18 I get racing thoughts when I go to sleep and I
19 can't sleep sometimes, so it stops that and helps
20 me sleep very much so. But I'm not on that
21 anymore.
22    Q. What is Ativan for?
23    A. That's so when I have an anxiety attack.
24 It's a p.r.n. I only take it when it happens. I

49

1 dentist, look at me here, I can even barely hold
2 this together. How do you hold all these doctor
3 appointments, surgeries and everything else
4 together? You know, my life's a train wreck. I
5 don't know what to tell you.
6    Q. You also claim in your affidavit here
7 that you have sleep apnea; right?
8    A. Major.
9    Q. When did you first get diagnosed with
10 sleep apnea?
11    A. Probably 2002. I was just fortunate. I
12 was living with my brother, Tony, and that is when
13 I was falling off from the ability of working to
14 the ability of being disabled, and.....
15    Q. Okay.
16    A. It's a hard thing for me, man.
17    Q. Since 2002 when you were diagnosed with
18 sleep apnea, have you also been a smoker?
19    A. Yeah, I smoke cigarettes.
20    Q. How much do you smoke a day?
21    A. About a half a pack, not even. Sometimes
22 I ain't got the money for it. Sometimes I go a
23 week without smoking a cigarette.
24    Q. And we've already noted that your weight

51

1 don't take it every day.
2    Q. Okay. And --
3    A. Like after today I will be home and I
4 will be taking it, thank you very much.
5    Q. Do you know what p.r.n. is?
6    A. Yeah, take it when you need it.
7    Q. And who is it that told you you should
8 take that when you need it?
9    A. My doctor, Bednard.
10    Q. Which doctor?
11    A. Dr. Bednard.
12    Q. Bednard?
13    A. Yes. He's an excellent, excellent
14 doctor.
15    Q. Did he prescribe that particular
16 medication?
17    A. Yes, he did. All my doctors in the past
18 have prescribed it to me. And when I went to him
19 because I had so many doctors, I had so many
20 prescriptions that I needed to consolidate and
21 have one doctor do everything so I can get all my
22 meds at the beginning of the month.
23    Q. Okay.
24    A. Now, when I'm jumping around going to

50

1 on your ID card and you say you weigh more now; is
2 that right?
3    A. Everybody lies on there -- yeah.
4    Q. Right, I understand that. Do you -- do
5 you agree that --
6    A. Actually, probably at the time I did. I
7 probably was maybe 325, but then I went up, you
8 know. You go up and down.
9    Q. Where do you think you are right now in
10 terms of weight?
11    A. Weight-wise?
12    Q. Yes.
13    A. I'm probably be about 360, 365 maybe.
14 That's the last time I weighed myself at the
15 doctor. I was 365. I was a little happy about
16 that because I was up to about 280 (sic) earlier
17 this year. I lost a few pounds, making me feel a
18 little better.
19    Q. Did you say 280 or 380?
20    A. Two eight -- 380.
21    Q. 380.
22    A. I meant 380.
23    Q. Have you been --
24    A. I wish I was 280.

52

13 (Pages 49 to 52)

1    Q.  Have you been clinically obese since the
2 1990's?
3    A.  I started getting obese when my sleep
4 apnea really started affecting me.  You know, by
5 the way, my pulmonary doctor, Dr. Undevia at the
6 University of Loyola, she had stated to me one
7 time when I was in for a visit, she said I had
8 some of the most severe sleep apnea she's ever
9 seen in her life, and it's a university professor
10 telling me that.  So that's why I was so concerned
11 about my meds and my machine when every time I was
12 going in there I was screaming to everybody that
13 was involved in the process about my health
14 issues, and it fell on deaf ears.
15    Q.  Well, let me ask you when you came into
16 the jail on each of those times that are in your
17 affidavit --
18    A.  Yes, sir.
19    Q.  -- you informed people about your sleep
20 apnea; right?
21    A.  And medication, my whole medical
22 situation.
23    Q.  Okay.  Do you recall raising your voice
24 to people in the --

53

1    A.  Screaming, yeah.  Oh, yeah.
2    Q.  All right.
3    A.  Absolutely.
4    Q.  When you lived on 3647 West Sunnyside in
5 Chicago --
6    A.  That was in Brookfield.
7    Q.  -- 1998 --
8    A.  Not Chicago.
9    Q.  Okay.  So you're saying you didn't live
10 in Chicago?
11    A.  Never.
12    Q.  When you lived at 36 --
13    A.  It must have been a typo.
14    Q.  -- 47 West Sunnyside in Brookfield --
15    A.  Yes, sir.
16    Q.  -- in 1988 --
17    A.  Yes, sir, I did live there.
18    Q.  -- were you over 270 pounds?
19    A.  No, I was in pretty good shape back
20 then.  I was -- I would say I was probably about
21 240.
22    Q.  Okay.
23    A.  I was doing good work, then.  I was
24 working for Muellermist Irrigation.  I was digging

54

1 holes and, you know, gonna -- you know, lived the
2 American dream, you know.
3    Q.  Have you ever been married?
4    A.  Yes.
5    Q.  Did that marriage end in divorce?
6    A.  Yes.
7    Q.  What is the name of your ex?
8    A.  Ex-wife?
9    Q.  Yes.
10    A.  Karen Mason.  Her maiden name was
11 Carnack, and I met her in Brookfield at the time I
12 was living in Brookfield.
13    Q.  Does she still live in the area?
14    A.  I have no idea where she's at.
15    Q.  Any children with Karen Mason Carnack?
16    A.  No.
17    Q.  Do you have any children?
18    A.  None that I know of.
19    Q.  Okay.  During your time in jail as you
20 describe in your sworn declaration, which is the
21 declaration under oath, were you ever transported
22 to a hospital?
23    A.  What do you mean?  Rephrase your
24 question.

55

1    Q.  Sure.  You have two dates here that
2 you --
3    A.  Oh, you mean did I go to the hospital
4 since I signed this stuff?
5    Q.  No.  Have you -- did you go to the
6 hospital between October 20, 2005 and October 23
7 of 2005?
8    A.  Probably several times.
9    Q.  Hospital.
10    MR. MORRISSEY:  I don't think he understood
11 the question.
12    THE WITNESS:  Yeah.  I don't understand.
13 What's your point?  Just get to the point.  Why we
14 got to chase around like this?
15 BY MR. CATANIA:
16    Q.  My question is, when you were in jail
17 between October 20, 2005 and October 23 of 2005,
18 were you transported --
19    A.  Hold on.  Excuse me a second.  I can't
20 look and hear because I'm hard of hearing.
21    Q.  So your lawyer is distracting you at this
22 point?
23    A.  No, he's not distracting me.  He's trying
24 to help me read.

56

14 (Pages 53 to 56)

1    Q.  Thank you.
2    MR. MORRISSEY:  Can you read back the
3  question --
4    THE WITNESS:  Yeah.
5    MR. MORRISSEY:  -- Ms. Reporter.
6    THE WITNESS:  You know this is really
7  frustrating for me.
8    MR. MORRISSEY:  The court reporter will read
9  it back.  Read back the question, please.
10          (The record was read as
11          requested.)
12    THE WITNESS:  Please finish.
13  BY MR. CATANIA:
14    Q.  Were you transported to an outside
15  hospital?
16    A.  Okay.  Start over.  Say it from the
17  beginning not just the end so I understand the
18  whole question.
19    Q.  Those three days that you were in jail
20  between October 20, 2005 and October 23 of 2005,
21  were you transported to an outside hospital?
22    A.  No.
23    Q.  Okay.  During the 23 days from February 5
24  of '07 to February 28 of '07, were you transported
                                                      57

1  jail --
2    A.  No.
3    Q.  -- to any other hospital?
4    A.  Absolutely not.
5    Q.  Okay.  Were you brought to the hospital
6  on February 4 of 2007?
7    MR. MORRISSEY:  Do you understand the
8  question?
9    THE WITNESS:  The day before I got arrested?
10  BY MR. CATANIA:
11    Q.  The day before you entered the jail.
12    A.  Hodgkins did -- no.  Yes, yes, that was
13  the assault from the neighbors next door.  Yes, I
14  was -- when I was arrested, I did go to the jail
15  and I had, like, I don't know, I guess an anxiety
16  attack or something.  And I guess by law they're
17  supposed to take me to the -- to the local
18  hospital which I believe -- I believe the hospital
19  was LaGrange, if I'm not mistaken.
20    Q.  Okay.  Were you hospitalized at LaGrange
21  on February 4?
22    A.  No, I was put back to the jail.
23    Q.  So you were cleared by a physician; is
24  that right?
                                                      59

1  to an outside hospital?
2    A.  Yes, I was when I was arrested.  I had a
3  major.....
4    Q.  When were you arrested?
5    A.  February.  I was arrested February 5,
6  yeah.  Yeah, that's correct.
7    Q.  The day that you came into the jail is
8  the date that you were arrested; is that right?
9    MR. MORRISSEY:  I don't think he --
10    THE WITNESS:  No.  I was arrested and then I
11  spent like a -- I don't know what happened.  It's
12  hard for me to recall all this.
13    MR. MORRISSEY:  Take a moment.
14    THE WITNESS:  Okay.  Yeah, that's correct.
15  The statement is correct.  Number 10 is -- or
16  No. 16 is correct.
17  BY MR. CATANIA:
18    Q.  My question is, during those days --
19    A.  Yes.
20    Q.  -- February 5 of '07 --
21    A.  Yes.
22    Q.  -- and February 28 of '07 --
23    A.  Yes.
24    Q.  -- were you taken out of the Cook County
                                                      58

1    A.  That is correct.
2    Q.  So the anxiety was over and you went back
3  to jail?
4    A.  They gave me -- I think they gave me
5  Demerol.  I was out of it.  I didn't know what the
6  hell I was doing.
7    Q.  In 2010 when you were in the custody of
8  the sheriff last year, were you transported to an
9  outside hospital during the period of time you
10  were incarcerated?
11    A.  No.  They came over and pulled me out of
12  my house and said I assaulted them and continued
13  to beat me in front of my house because I had
14  called on somebody I guess -- who knows what
15  happened.
16    MR. MORRISSEY:  There's no question pending.
17  BY MR. CATANIA:
18    Q.  In any event, when that happened, is that
19  what's referred to in paragraph 17?
20    MR. MORRISSEY:  Take a moment.
21    THE WITNESS:  Yes, yes.
22    MR. MORRISSEY:  Wait.  Take a moment and read
23  it, paragraph 17.
24          Are you referring to 2010 now or are
                                                      60

1  you --
2      MR. CATANIA: Yes.
3      THE WITNESS: Yeah, that's what I thought.
4      MR. CATANIA: I'm asking.
5      MR. MORRISSEY: Yeah.
6      THE WITNESS: We have to be specific on these
7  dates because I'm really easily confused. You're
8  not making this any easier on me.
9      MR. MORRISSEY: Why don't you take a moment
10 and read your statement here.
11     THE WITNESS: Okay.
12     MR. MORRISSEY: 16 and 17.
13     THE WITNESS: Number 16 I was -- or No. 17 I
14 was arrested for battery and admitted to the Cook
15 County --
16     MR. MORRISSEY: Read to yourself.
17     THE WITNESS: Yeah, totally true. I do that
18 every time I went to the jail. I did that every
19 time. They put you in the bull pen, then you go
20 to that little table. You guys know the drill.
21 And they ask you the questions, then they just
22 pass you along like cattle and then you go to the
23 other one.
24 BY MR. CATANIA:

61

1  know?
2      A. Yes, sir.
3      Q. All right. Let's -- let's back up a
4  little bit, then.
5      MR. MORRISSEY: Let me take a break since
6  there's no question pending. I want to talk to
7  the witness.
8      MR. CATANIA: Mr. Morrissey, do you need to
9  take a break?
10     MR. MORRISSEY: We're taking a break for a
11 moment.
12          (A break was taken.)
13     THE WITNESS: All right. I cleared my head a
14 little bit. I understand now a little bit
15 better. But, yes, on the 2010 arrest there was
16 about -- took about seven days for them to give me
17 my sleep machine, and they did get some meds but
18 they weren't even close to the meds I was on.
19 BY MR. CATANIA:
20     Q. Okay. Does paragraph 17 refer to the
21 2010 arrest?
22     A. No.
23     Q. It refers to the 2007 arrest?
24     A. Yeah, the one in February; correct.

63

1      Q. Paragraph 17 refers to the arrest in
2  2010; is that right?
3      MR. MORRISSEY: That's not correct,
4  Mr. Catania.
5      THE WITNESS: No.
6      MR. MORRISSEY: You're trying to confuse the
7  gentleman.
8      THE WITNESS: Yeah. No, that's not correct.
9  All right. Restate your question now.
10 BY MR. CATANIA:
11     Q. Sure. Paragraph 17 --
12     A. Yes.
13     Q. -- refers to your 2010 arrest, doesn't
14 it?
15     A. Yes.
16     MR. MORRISSEY: No.
17     THE WITNESS: Wait a minute. I can't
18 recall. I'm not sure but rephrase the question
19 again. Can you make it clear. Maybe I can
20 understand a little better, rephrase it, please.
21 BY MR. CATANIA:
22     Q. I'll try. And if I don't --
23     A. Please. I appreciate everything.
24     Q. If I don't make it clear will you let me

62

1      Q. What was the arrest for for February of
2  2007?
3      A. For battery.
4      Q. In fact, weren't you arrested on July 31
5  of 2007 for delivery of cannabis?
6      A. July.
7      MR. MORRISSEY: Well, I'm going to object.
8  Are you asking him about the February --
9      THE WITNESS: Yeah --
10     MR. MORRISSEY: -- incident now?
11     THE WITNESS: -- you're jumping from back and
12 forth.
13     MR. CATANIA: No, I'm not. I'm talking about
14 the year of 2007, Mr. Morrissey.
15     MR. MORRISSEY: No. You asked him about
16 February of 2007. Now you're jumping to July of
17 2007.
18     THE WITNESS: That's correct.
19 BY MR. CATANIA:
20     Q. What were you arrested for in February of
21 2007?
22     A. Battery.
23     Q. What day of the week was it?
24     A. I couldn't tell you exactly.

64

16 (Pages 61 to 64)

1    Q.  Were you arrested on July 31 of 2007 for
2  delivery of cannabis?
3    A.  Yes, I was.
4    Q.  By the Hodgkins Police Department?
5    A.  Yes.
6    Q.  When you say that the battery is what's
7  referred to in paragraph 17, are you saying that
8  it's the arrest of February 5 of '07 or February 4
9  of '07, that was a battery arrest?
10    A.  Yeah, that is the one I'm referring to.
11    Q.  Who was the victim of the battery?
12    A.  Ted Hobart.  He was the guy that lived
13  next door.  Him and his wife lived there.  He's a
14  good guy but, you know, he was --
15    MR. MORRISSEY:  There's no question pending.
16    THE WITNESS:  All right.  All right.
17  BY MR. CATANIA:
18    Q.  Do you have any papers or calendars or
19  diaries covering the time frame of the arrest of
20  February 5 of '07 to February 28 of '07?
21    A.  No, it's something I want to forget.
22    Q.  Do you have any papers, calendars or
23  diaries covering the time frame of October 20 of
24  '05 to October 23 of '05?

                                                   65

1    THE WITNESS:  Right.  Sorry.
2    MR. CATANIA:  Is that an objection?
3    MR. MORRISSEY:  Pardon?
4    MR. CATANIA:  Is that an objection?
5    MR. MORRISSEY:  Well, it's -- it's an
6  instruction to my client to respond to your
7  questions only.
8    MR. CATANIA:  Well, that's nice but --
9    MR. MORRISSEY:  So if you have a question --
10    MR. CATANIA:  The legal effect of it is a
11  suggestion that it's nonresponsive.  That's my
12  objection, not yours.
13    MR. MORRISSEY:  Well, I'm instructing him to
14  respond to your questions.
15    MR. CATANIA:  All right.
16  BY MR. CATANIA:
17    Q.  My question is, when you wrote the notes
18  that we're just talking about, when you wrote
19  those notes, was that about the time when you were
20  preparing this affidavit?
21    A.  Yes.
22    Q.  Okay.  Do you have any notes that were
23  written at the time of the arrests and
24  incarcerations --

                                                   67

1    A.  Well, I do have the little list that I
2  put together trying to put all these dates
3  together.  That's about the only thing I have.  My
4  personal notes when we got all these dates
5  together and put -- because, you know, I'm
6  bipolar, so I gotta take time to put all this
7  together.  It is what it is.
8    Q.  Those notes that you just referred to,
9  are those notes that were prepared in order to do
10  this affidavit?
11    A.  Well, it was information because it was
12  so confusing because there were so many arrests
13  that each time -- just like what we're going
14  through now, it's being confusing to me and that's
15  what's going on and that's why I had to write it
16  down to make sure that what I was saying was true
17  about the time I was arrested.
18    Q.  Okay.
19    A.  You know, the one time about the battery,
20  the one time about the pot.
21    MR. MORRISSEY:  All right.  There's no --
22  there's no question pending.
23    THE WITNESS:  Right.
24    MR. MORRISSEY:  So let him ask the questions.

                                                   66

1    A.  No.
2    Q.  -- in jail?
3    Okay.  All right.  Now, have you told me
4  about everything that you have in terms of notes
5  that were relevant to your preparing the
6  affidavit?
7    A.  I can't recall.
8    Q.  Okay.
9    A.  I don't know what I have at home in my
10  drawer.  I don't know --
11    Q.  All right.
12    A.  -- exactly.  But all I know is what's on
13  here is what transpired of what happened.
14    Q.  Right.  And I understand that.  And I
15  appreciate it.  But what I need to know is if you
16  have notes at home will you provide those notes to
17  me, copies of those notes?
18    A.  I couldn't guarantee you I still have
19  them.
20    Q.  I understand that.  And if you say that
21  you don't have them anymore, that's fine.
22    A.  I can't recall.  I don't know if I do or
23  not, but I can look for them.  I will -- I will do
24  that.

                                                   68

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois   (312) 263-0052**

Ex 40 Mason Dep 017

Q. All right. I would ask if you could do that --

A. Yes, I will.

Q. -- today.

A. Okay.

Q. After leaving here.

A. Yes, sir.

Q. Provide them to your attorney so he can forward them to me. Is that all right?

A. Okay. But like I said, there's no guarantees on that because my house -- I mean, it looks nice but everything's in the drawers. It's chaotic.

Q. When you were released -- now going back to October of '05, when you were released on that third day, how did you get home?

A. Third day what did I do? Released from the arrest. How did I get home? I can't recall.

Q. How --

A. My ma or my brother might have picked me up. I'm not really sure. I can't recall.

Q. All right. How were you released?

A. You know, through the regular let you out the front door, through the bull pen.

69

Q. Based on bond, you posted bond?

A. No, no. I did my three days and I was out the door.

Q. Was that a sentence you were serving, the three days?

A. Well, the original -- this was for the retail theft; correct?

Q. Yes, according to your affidavit.

A. Yeah, I did do SWAP. I was sentenced to SWAP. Okay. And I was doing the SWAP and then me and one of the lady sheriffs got in a little argument. Well, she threw me out of the SWAP and then I went back to the court the next day I was supposed to have all my SWAP done. Well, the judge was a little upset that I didn't have it done. So he says, well, okay, just go to the clink and you'll be done. And I said okay.

But I did tell him about my medical stuff too at that time in the courtroom and when I got there and every time anybody was there, I was telling them about it because I was always concerned about my medical --

Q. Right.

A. -- because I don't want to, like, lose

70

it, catch another case because there's a lot of, you know, smart-mouth people in there, you know. And I want to make sure but it didn't help. It didn't help.

Q. You're not shy about letting people know about your medical problems; right?

A. That is correct.

Q. So you do tell people about it?

A. Every moment I can. I don't lie. I try and tell people the truth.

Q. When you were in the jail in February of '07, that's February 5 of '07 to February 28 of '07 according to your affidavit, how were you released? Was it on bond or some other way?

A. I did my time. I did what the judge told me to do.

Q. Okay. You were serving a sentence?

A. Well, I don't know. I can't recall.

Q. Do --

A. I just did what I was told to do.

Q. Do you recall how you got home?

A. On that occasion I do believe my folks picked me up.

Q. What is the name of the brother that may

71

have picked you up in October?

A. My brother, Tony Sass.

Q. Tony?

A. Yeah, Sass. He's my half brother. Yeah.

Q. S-a-s-s?

A. Yes, sir.

Q. How old is Tony Sass?

A. Tony's eight years older than me.

Q. And how old are you?

A. I'm 41.

Q. You say in your affidavit that you never got your sleep apnea machine -- is that right? -- while in jail?

MR. MORRISSEY: Well, I would ask you to refer him to the specific point.

THE WITNESS: Yeah, which -- which -- which one are you talking about? There's three major ones here. So let's break it down to each one, and I'll tell you what happened each time.

BY MR. CATANIA:

Q. The only paragraph out of all of these paragraphs to concern yourself with for this question is paragraph 20.

A. Okay.

72

18 (Pages 69 to 72)

1    MR. MORRISSEY: I'm going to object for the
2 record.
3    MR. CATANIA: Objection to the objection.
4    MR. MORRISSEY: I'm going to object.
5    MR. CATANIA: Can you state it in one word,
6 please.
7    MR. MORRISSEY: You misquote what he said in
8 the sworn --
9    MR. CATANIA: Thank you.
10    MR. MORRISSEY: -- statement.
11    MR. CATANIA: Thank you.
12 BY MR. CATANIA:
13    Q. Sir, can you answer my question about
14 whether you had a chance to read paragraph 20?
15    MR. MORRISSEY: Take a few moments.
16    THE WITNESS: Okay. All right. Statement
17 20.
18 BY MR. CATANIA:
19    Q. Before you answer anything about that
20 statement --
21    A. Yes, sir.
22    Q. -- did you have a chance to read it?
23    A. Yeah, I feel where you're going with
24 this.

73

1 BY MR. CATANIA:
2    Q. I think that your lawyer will ask you a
3 question.
4    MR. MORRISSEY: No, no --
5    THE WITNESS: Let me finish.
6    MR. MORRISSEY: -- you did not allow him to
7 finish, Mr. Catania.
8    THE WITNESS: Please, this is very important
9 to me. When I go into the jail I scream and yell
10 about my sleep apnea machine because I cannot
11 sleep without it. Okay. I died before in my
12 sleep. Okay. And woke up with blue lips all the
13 time because no sleep apnea machine. It's the
14 worst thing that you can do to a person. I can't
15 sleep without my machine.
16 BY MR. CATANIA:
17    Q. Okay.
18    A. And then when I go in the jail it takes
19 at least seven to ten days on every occasion that
20 I've gone in there for over seven to ten days to
21 get my sleep machine. And I wasn't even concerned
22 about the medication part of it because I can sit
23 there and grin and bear it and be miserable. But
24 I needed my sleep machine for death -- life and

75

1    MR. MORRISSEY: Take a moment and read --
2    THE WITNESS: Okay.
3    MR. MORRISSEY: -- paragraph 20 because
4 Mr. Catania is going to ask you a question and he
5 may ask it in a different way --
6    THE WITNESS: Okay.
7    MR. MORRISSEY: -- which is not --
8    THE WITNESS: Go ahead, sir.
9    MR. MORRISSEY: -- stated.
10    THE WITNESS: I -- now --
11 BY MR. CATANIA:
12    Q. After looking at paragraph 20 --
13    A. Yes, sir.
14    Q. -- and recalling the two intakes that are
15 described in this affidavit --
16    A. Yes.
17    Q. -- are you saying that you never received
18 a sleep apnea machine?
19    A. No, I did receive one.
20    Q. Okay.
21    A. But --
22    Q. Did you ever --
23    MR. MORRISSEY: Let him respond.
24    THE WITNESS: Can I please finish?

74

1 death purposes.
2    Q. Okay. So you were --
3    A. And they didn't care.
4    Q. So you were concerned for your life; is
5 that right?
6    A. Correct.
7    Q. That's --
8    A. Every time I was locked up.
9    Q. -- why you were asking for your -- your
10 sleep apnea machine; right?
11    A. Screaming --
12    Q. Okay.
13    A. -- for my sleep, not asking.
14    Q. Where --
15    A. Screaming is more like it.
16    Q. Where was -- where was your sleep apnea
17 machine at the time?
18    A. There was one time I did bring it to
19 court to bring it with me because, you know, I was
20 concerned about it. May I finish before you
21 interrupt me. And they said you can't bring it
22 and they just put it in the lockup, and then I had
23 to suffer for another ten days before I had
24 gotten -- now, I don't even remember exactly which

76

19 (Pages 73 to 76)

1  time it was.  But I'm just giving this as an
2  example of what transpires.  That's it.  That's my
3  statement.
4      Q.  Was it the most recent arrest that you
5  brought the sleep apnea machine to court?
6      A.  No.
7      Q.  Okay.  The most recent one being last
8  year.
9      A.  It was.....
10     MR. MORRISSEY:  If you recall.
11     THE WITNESS:  It was -- I think it was
12  the.....
13     MR. MORRISSEY:  I'm going to instruct you not
14  to guess.
15     THE WITNESS:  Yeah, I can't actually recall
16  because I wouldn't be confident in my answer
17  because there's so many of them, I get confused.
18  BY MR. CATANIA:
19     Q.  Okay.  Did you receive your hypertension
20  medications while in jail on the dates that you
21  described in your affidavit?
22     A.  Which number is that?
23     MR. MORRISSEY:  You're talking about the two
24  dates October 20, 2005 and February 5, 2007?

77

1  Probably, you know.
2      Q.  When have you heard for the first time
3  that the county might have lost that --
4      A.  I don't know.  I'm just assuming that.
5      Q.  All right.
6      A.  It's an assumption.  That's bad on my
7  part.
8      MR. MORRISSEY:  There's no question pending.
9  BY MR. CATANIA:
10     Q.  Has any physician, any medical doctor or
11  other physician ever told you that the cause of
12  your sleep apnea is obesity and smoking?
13     A.  They did warn me about the smoking of the
14  cigarettes.
15     Q.  And who was the doctor?
16     A.  Dr. Undevia at Loyola University.  She's
17  a professor.  She's head of the pulmonary
18  department.  You can talk to her.  She's an
19  excellent lady.  Wonderful person.
20     Q.  When did you last see Dr. Shick?
21     A.  Shick, he was my psychiatric.  I stopped
22  seeing him and went back to Loyola to see Jennifer
23  Peterson.  She was acting -- was psych doctor over
24  at building 54 at Loyola University.  Dr. Shick

79

1      THE WITNESS:  I can't recall.  Which one are
2  these?
3      MR. MORRISSEY:  October of 2005 is the last
4  one.
5      THE WITNESS:  October.  Okay.
6      MR. MORRISSEY:  Question is --
7      THE WITNESS:  What is it?
8      MR. MORRISSEY:  -- did you receive your blood
9  pressure medication?
10     THE WITNESS:  See, I'm remembering that.
11  No.  At that time at the 2005, no, I did not.
12  BY MR. CATANIA:
13     Q.  When you were without your blood pressure
14  medication in those three days in October of 2005,
15  what was the effect of not having your blood
16  pressure medication?
17     A.  My blood pressure was 180 over
18  something.  They got it in the medical stuff I'm
19  sure.
20     Q.  Do you --
21     A.  It was elevated, extremely high.
22     Q.  Do you know they have that information in
23  your --
24     A.  Well, at county they probably lost it.

78

1  was just pacifying me.  He wasn't really listening
2  to me, and I wasn't comfortable going to him
3  anymore so I had changed psychiatrists.  That was
4  the beginning when I started getting a little
5  better with the depression when I went to Loyola
6  because they address the issues a lot better.
7      Q.  All right.  In your affidavit you
8  identify psychotropic medication being prescribed
9  by a doctor I think you said Shick, S-h-i-c-k?
10     A.  Yes.
11     Q.  What is Dr. Shick's full name.
12     A.  I have no idea.  He's Dr. Shick.  I went
13  to the office, went and talked to him and that was
14  it.
15     Q.  One time only?
16     A.  No, it was bunch of appointments.
17     Q.  When was the last time?
18     A.  I can't recall, buddy.
19     Q.  Well, that was the question I asked you
20  earlier.  I just thought maybe by thinking about
21  it you'd have an answer.
22     A.  I can't recall.
23     Q.  When was the first time you saw
24  Dr. Jennifer at Loyola?

80

20 (Pages 77 to 80)

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois   (312) 263-0052**

Ex 40  Mason Dep 020

1    A.  I can't recall the exact date.
2    Q.  Okay.  Where did you see Dr. Shick?
3    A.  At his office on Ogden Avenue in
4  Riverside, just about a half a block west of
5  Harlem Avenue, west on Ogden Avenue.
6    Q.  How would you get there?
7    A.  Usually the bus or I sometimes with my
8  back, I got the bad back, so sometimes I would
9  call Dial-a-Ride which is a service that's
10  provided by public aid, that's usually because I
11  had a bad day and my back's all cramped up and I
12  can't, like, move for like weeks at time sometimes
13  and then other days are better and I can walk down
14  to the Wal-Mart and jump on the bus, so it depends
15  on, you know, my physical abilities at the time.
16    Q.  In any of the arrests that you've talked
17  about in your affidavit --
18    A.  Yes.
19    Q.  -- were you ever under the influence of
20  alcohol?
21    A.  No.
22    Q.  Were you ever under the influence of
23  drugs?
24    A.  No.

81

1    A.  It was my thing.  I did that.  I chose to
2  do it.  I paid the price.  I paid my price to
3  society.  I did my probation.  I did what the
4  judge told me to do.  I paid my fine.
5    MR. MORRISSEY:  All right.
6  BY MR. CATANIA:
7    Q.  But you didn't go to jail; right?
8    A.  I did go to jail.
9    Q.  You did?
10    A.  Yeah.  I went to jail for 71 days at the
11  Cook County jail.
12    Q.  For delivery of cannabis?
13    A.  Correct.
14    Q.  That's not a date that you complained
15  about in your affidavit, though, is it?
16    A.  It may be.  I don't know.  Let's see.
17  Yeah, it has to be because --
18    MR. MORRISSEY:  Take a moment, look at the
19  document.
20    THE WITNESS:  Let me get this straight in my
21  head.  See, you know.
22    MR. MORRISSEY:  Referring to now,
23  Mr. Catania --
24    THE WITNESS:  Which date is that, the 2007?

83

1    Q.  Before your arrest on July 31 of 2007 for
2  delivery of cannabis --
3    A.  Yes, sir.
4    Q.  -- did you know Officer Pawlowski of the
5  Hodgkins Police Department?
6    A.  Do I know him?
7    Q.  Did you know him before then?
8    A.  I don't know him personally but, you
9  know, there are officers in the town I might have
10  had some interaction with him being a police
11  officer and me walking around the town.  The
12  town's about this big.  You know Hodgkins you know
13  everybody.  They know when you go to the bathroom
14  in that town.
15    Q.  Did you know Officer N. Miller, the
16  lockup keeper on July 31, 2007?
17    A.  I've seen him around town but that's
18  about it.  I mean besides the time him coming to
19  my house.
20    Q.  You were charged with and later convicted
21  of a felony delivery of cannabis; right?
22    A.  Yes.
23    Q.  The reason for that arrest and conviction
24  have nothing to do with the jail; right?

82

1    MR. MORRISSEY:  He's referring to August 1,
2  2007.
3    THE WITNESS:  Yeah.
4    MR. MORRISSEY:  When you were in the jail;
5  right?
6    THE WITNESS:  Okay.  Thank you.  Okay.  Now,
7  restate your question.  Now I know where I'm at.
8  Okay.  Go ahead.
9  BY MR. CATANIA:
10    Q.  I'm not referring to August 1 of 2007.
11  I'm not referring to the date that's in the
12  affidavit.
13    A.  All right.  Just refer to the 2007.
14  You're trying to confuse me.
15    Q.  No, I'm not.  I'm trying to clarify.
16    A.  Okay.
17    Q.  I'm asking you if after your arrest for
18  delivery of cannabis --
19    A.  Yes.
20    Q.  -- on July 31 of 2007 --
21    A.  Yeah.
22    Q.  -- if you spent any time after that
23  arrest in custody of the Cook County jail as a
24  result of that arrest.

84

21 (Pages 81 to 84)

1    MR. MORRISSEY: I'm going to object. It's
2    been asked and answered. He just said he spent 71
3    days.
4    THE WITNESS: Right.
5    MR. MORRISSEY: So can we move on.
6    THE WITNESS: Yeah, please.
7    BY MR. CATANIA:
8    Q. I wanted you to clarify whether or not it
9    was in your affidavit that particular
10   incarceration, was it in your affidavit?
11   MR. MORRISSEY: Okay. Take a moment. Is
12   there anything in your document?
13   THE WITNESS: About the 2007?
14   MR. MORRISSEY: About August 2007.
15   THE WITNESS: Yeah, there is somewhere.
16   MR. MORRISSEY: Take your time.
17   THE WITNESS: Yeah.
18   MR. MORRISSEY: No.
19   THE WITNESS: No, no, no, they're not.
20   BY MR. CATANIA:
21   Q. Is that because Mr. Morrissey told you
22   there isn't?
23   MR. MORRISSEY: The document, Mr. Catania --
24   THE WITNESS: Yeah, don't --
                                                    85

1    A. Okay. I guess so.
2    Q. Exhibit 1 is the exhibit for this
3    deposition. Do you understand that?
4    A. Yes. Yes, I do.
5    Q. Do you understand that that exhibit
6    belongs to the court reporter?
7    A. Yes.
8    Q. Okay. I just want to make sure that you
9    understand that what that exhibit shows --
10   A. I understand what your point is, yes,
11   sir.
12   Q. All right.
13   MR. MORRISSEY: I'm going to take a washroom
14   break.
15   MR. CATANIA: Mr. Morrissey, would you like
16   to take another break?
17   MR. MORRISSEY: I'd like to take another
18   break, yes.
19          (A break was taken.)
20   THE WITNESS: I'm so sorry, sir, about the
21   confusion. It's the way my mind works. I
22   apologize.
23   MR. CATANIA: It's all right. Can we begin
24   without --
                                                    87

1    MR. MORRISSEY: -- speaks for itself.
2    THE WITNESS: Right, that's correct.
3    BY MR. CATANIA:
4    Q. You are referring quite frequently --
5    A. I put my name on it. I read it.
6    Everything on here is true.
7    Q. And I just would like to state for the
8    record that you are referring to Exhibit 1 which
9    is in front of you on the table; right?
10   A. Right.
11   Q. That's the page or pages, those three
12   pages that we've been talking about here in the
13   deposition; is that right?
14   A. Uh-huh.
15   Q. You have to answer yes or no.
16   A. Well, obviously it's not because you're
17   bringing up something else.
18   Q. We are talking about Exhibit 1; is that
19   right? Exhibit 1 for this deposition.
20   A. This paper here?
21   Q. Yes.
22   A. We're talking about this right here right
23   now.
24   Q. That's right.
                                                    86

1    MR. MORRISSEY: Yeah. She coming back?
2    MR. CATANIA: Zamora. She went to the
3    washroom. She thought there was a washroom break.
4    BY MR. CATANIA:
5    Q. In the cannabis case that I just referred
6    to from July 31 of 2007 which is not the one
7    that's listed --
8    A. Okay.
9    Q. -- in the affidavit...
10   A. That's listed, right.
11   Q. If it's -- in that case did you plead not
12   guilty by reason of insanity?
13   A. On?
14   Q. On the cannabis case.
15   A. No.
16   Q. On the retail theft case that is referred
17   to here in the affidavit, referring to paragraph
18   15 where it says 15A I was arrested for retail
19   theft.
20   A. Hold on. 15 it was -- okay. Now what's
21   the question again?
22   Q. The question is, did you plead not guilty
23   by reason of insanity?
24   A. No.
                                                    88

22 (Pages 85 to 88)

1    Q.  In the case that's referred to as a
2  battery case, February 5 of 2007, in paragraph 16
3  and 17?
4    A.  Okay.
5    Q.  Did you plead not guilty by reason of
6  insanity?
7    A.  No.  I pleaded guilty because I did 30
8  days for it.
9    Q.  All right.  On July 31, 2007 you told
10  Officer Miller that you had no current
11  medications; is that right?
12    A.  No.
13    Q.  Did you tell Officer Miller that you have
14  no current suicide intent?
15    A.  2007.  Slow down a second.
16    Q.  This is the -- this is delivery of
17  cannabis.
18    A.  For the --
19    MR. MORRISSEY:  We're talking --
20    THE WITNESS:  I might have said something
21  like around that because I was really emotionally
22  distraught at the time.  And, you know, I was
23  drinking.  I was, you know, talking stupid stuff.
24  They come and arrested me because I beat up my
89

1  neighbor.  It is what it is, sir.
2  BY MR. CATANIA:
3    Q.  All right.  I'm talking about --
4    A.  I can't recall.
5    Q.  Okay.  I understand that.
6    I'm talking about July 31 of 2007 which
7  is not on the affidavit, the arrest for delivery
8  of cannabis.
9    A.  Okay.  What about it?
10    MR. MORRISSEY:  I'm going to object.
11    THE WITNESS:  What is that --
12    MR. MORRISSEY:  Shush.  First of all, I don't
13  believe there was a July 31, 2007.
14    MR. CATANIA:  Why would you believe that,
15  Mr. Morrissey?  Are you going to refer to a
16  document that was not tendered?
17    MR. MORRISSEY:  We're referring now not to
18  the Cook County jail but the police station, is
19  that it?  Is that the question?
20    MR. CATANIA:  Yes.
21    MR. MORRISSEY:  Just so we're clear.
22    MR. CATANIA:  That's correct.
23    MR. MORRISSEY:  All right.
24    THE WITNESS:  Why didn't you tell me that?
90

1  BY MR. CATANIA:
2    Q.  Because I was asking you about --
3    A.  No, because --
4    Q.  -- specific officers on that date.
5  That's what I'm asking about.
6    A.  Okay.  Restate the question.
7  Specifically name the places you're -- you're
8  talking about please.
9    Q.  All right.  Specifically you spent no
10  time on July 31, 2007 at the Cook County jail;
11  correct?
12    A.  On the 31st of July; that is correct.
13    Q.  Okay.  You did spend that day in custody
14  of the Hodgkins police?
15    A.  Hodgkins police; correct.
16    Q.  And at that time you were processed into
17  their lockup --
18    A.  Yes, sir.
19    Q.  -- by Officer Miller?
20    A.  Yes.
21    Q.  N. Miller; right?
22    A.  Mr. Miller, yeah.  He's a sergeant in
23  Hodgkins.
24    Q.  And at no time did you tell him that you
91

1  had current medications that you needed to take?
2    A.  Yes, I did.
3    MR. MORRISSEY:  Are you talking about --
4    THE WITNESS:  No, I did tell him.  They all
5  know my medical condition.  They all know.  I been
6  living in town for eight years.  They been to my
7  house several times, like they didn't know.  Give
8  me a break.
9  BY MR. CATANIA:
10    Q.  Are you assuming that all the officers
11  knew your medications?
12    A.  They're not that stupid.  They're cops.
13  You didn't get to where you're at by being an
14  idiot.  They didn't get to where they're at by
15  being an idiot.  Insult me with that statement.
16    Q.  At that time of the arrest Officer Miller
17  noted down that you were not under the influence;
18  is that right?
19    A.  No, I wasn't.  I was being good.  Yeah, I
20  been good for a while now.  Very good.
21    Q.  You were not --
22    A.  I've been clean.  I've been doing the
23  right thing.
24    Q.  You were not despondent at the time;
92

23 (Pages 89 to 92)

1 right?
2    A. You mean I bond or something or --
3    Q. No.
4    A. -- somebody paid bond?
5    Q. You were not --
6    MR. MORRISSEY: I'm going object --
7 BY MR. CATANIA:
8    Q. You were not --
9    MR. MORRISSEY: -- apparently he doesn't
10 understand the question.
11    THE WITNESS: Yeah.
12    MR. MORRISSEY: And if you're reading from
13 something perhaps that was part of our agreement
14 you would turn over whatever document that you had
15 in regards to Mr. Mason. We did that and I think
16 it should be mutual. So if you have some
17 documents from Hodgkins from July 31, 2007, please
18 tender it.
19    THE WITNESS: Thank you, sir.
20 BY MR. CATANIA:
21    Q. I have no documents from Hodgkins from
22 2007.
23    A. Can I ask you a question?
24    Q. Sure.

93

1    Q. -- is an arrest that took place on May 15
2 of 2010. Do you remember that date?
3    A. May 15.
4    Q. Yes. You mentioned it already in the
5 deposition.
6    A. 2010, what the hell was that about. Oh,
7 yeah, that was with the -- with the problem was
8 with DeLisa Shine that was in by me by the -- by
9 the trailer park. And, you know, that's a whole
10 'nother thing. What does that got to do with
11 anything here, though?
12    Q. Before your arrest on May 15 of 2010 for
13 felony disorderly conduct, battery to police
14 officer and resisting arrest, did you know Officer
15 Carrasquillo of the Hodgkins Police Department?
16    A. No. I didn't know him personally but
17 I've seen him driving in his police car because my
18 town is so small like I stated before.
19    Q. You were charged with the offenses that I
20 just described and you went to Cook County jail on
21 that case, weren't you?
22    A. Correct.
23    Q. All right.
24    A. Which was all not true.

95

1    A. Then why you bringing it up?
2    Q. Because I'm wondering, and I will ask
3 this question at the end of my summary, but I'm
4 wondering why it's not in your affidavit. Can you
5 tell me why that arrest is not referred to in your
6 affidavit?
7    A. I can't recall. I don't understand.
8    Q. Okay. That's the reason.
9    I also want to know why you did not tell
10 Officer Miller that you had current psychological
11 problems at the time of that arrest?
12    MR. MORRISSEY: Objection.
13    THE WITNESS: I did tell him that.
14    MR. MORRISSEY: Objection.
15    THE WITNESS: Way before then, in the other
16 arrest, before. They all knew. They all know
17 what's going on. They're not stupid. He didn't
18 become sergeant by being an idiot. He knows what
19 he's doing.
20    MR. MORRISSEY: There's no question pending.
21 BY MR. CATANIA:
22    Q. All right. Another arrest that's not on
23 your affidavit --
24    A. Yes sir.

94

1    Q. Okay. Did you plead not guilty by reason
2 of insanity?
3    A. Yeah.
4    Q. Did you in fact plead guilty to --
5    A. Yes, I did.
6    Q. -- the charges, battery and resisting?
7    A. I did resist because I was so appalled
8 about the situation. They kind of like baited me
9 and I took the bait and then they arrested me.
10    Q. All right.
11    A. Pretty much that's what happened.
12    Q. Did you plead guilty in front of Judge
13 Janet Adams Brosnahan?
14    A. I can't recall who it was.
15    MR. MORRISSEY: Let him ask the question.
16 BY MR. CATANIA:
17    Q. -- on August 6 of 2010?
18    A. Did I plead guilty?
19    Q. Yes.
20    A. Yes, I did.
21    Q. Before pleading guilty --
22    A. Yes.
23    Q. -- were you scheduled for court on August
24 5 of 2010?

96

24 (Pages 93 to 96)

Ex 40 Mason Dep 024

1    A.  August 5, 2010 so that would be -- I
2  can't recall.  I don't know.  You know, I mean the
3  dates and everything of that arrest, you guys got
4  all the paperwork.
5    Q.  All right.
6    A.  Why are you asking me all these stupid
7  questions?
8    Q.  Okay.  On August 5 of 2010 the clerk's
9  records show that you were late for court and you
10  were taken into custody at the courthouse.
11    A.  Oh, yeah, because I missed the bus.
12  Yes.  I do remember that now.
13    Q.  On August 6 of 2010 you were back in
14  court in Bridgeview on the sheriff's bus; right?
15    A.  Right, right, right.
16    Q.  And on that same day you pleaded guilty
17  to battery and resisting; correct?
18    A.  Yes, I cut a deal with the -- right.
19    Q.  Right.  And that was the two
20  misdemeanors --
21    A.  Right, right.
22    Q.  -- instead of the felony of disorderly
23  conduct for a false alarm; right?
24    A.  Felony for false alarm?  It wasn't a
                                                97

1  false alarm.  This woman was harassing me and I
2  told everybody about it, and they continued to let
3  it happen.
4    Q.  All right.
5    A.  So I called my -- may I ask -- you know
6  what?  That's a whole 'nother subject.  That's got
7  nothing to do with this here.
8    Q.  Let me ask you, if you --
9    A.  So I'm not going to answer that question.
10    Q.  You did not include that incarceration in
11  this affidavit?
12    A.  That's correct.
13    Q.  The affidavit that was prepared after you
14  went to jail for the battery and resisting?
15    A.  I don't know what you're getting at,
16  buddy.
17    MR. MORRISSEY:  I'm going to object.
18    THE WITNESS:  You got me all twisted up.
19    MR. MORRISSEY:  Let me make my objection.
20  This sworn declaration stated -- I'm sorry.  I'll
21  withdraw my objection.
22  BY MR. CATANIA:
23    Q.  You pled guilty to Judge Brosnahan and
24  she sentenced you to 30 days in the Cook County
                                                98

1  jail?
2    A.  That is correct, sir.
3    Q.  So you pled guilty in exchange for a
4  sentence in the jail?
5    A.  Right, yes.
6    Q.  Even though you had had these experiences
7  that you referred to in your sworn declaration
8  before that?
9    A.  I am on disability.  I get $893 a month.
10  You think I got money for attorneys, buddy?  Take
11  my 30 days and go.
12    Q.  Let me ask you about the medications
13  again that you mentioned.  You take -- you were
14  taking Ativan?
15    MR. MORRISSEY:  Can we -- can we have a time
16  period in regards to when he was taking the
17  medications.  What medications?
18  BY MR. CATANIA:
19    Q.  When you were taking medications called
20  Lexapro and Ativan you were taking those at the
21  time of your incarceration in the jail; right?
22    MR. MORRISSEY:  Can we have -- he's been in
23  the jail multiple --
24    THE WITNESS:  I don't know --
                                                99

1    MR. MORRISSEY:  Let me -- let me make my
2  objection here.
3    THE WITNESS:  Thank you, sir,
4    MR. MORRISSEY:  He's been in the jail
5  multiple times.  Can you point to what point in
6  the jail that prior to entering the jail he was
7  taking medication.
8  BY MR. CATANIA:
9    Q.  Each time I was admitted to the jail I
10  had been taking, colon, Lexapro, Trazodone,
11  Ativan, Lisinopril hydrochlorothiazide,
12  flunisolide nasal spray, sleep apnea machine used
13  when sleeping; is that right?
14    A.  Yes.
15    Q.  That is true, you said that earlier;
16  right?
17    MR. MORRISSEY:  Let me --
18    THE WITNESS:  You got to understand
19  something.  When you're on -- when you have psych
20  problems, see, the doctors don't always hit it
21  right with the medicine, so they try to tweak it
22  and change it to where you can adjust and do
23  good.  Right now I'm doing good.  Okay.  I don't
24  know what you're trying to get at.  But
                                                100

25 (Pages 97 to 100)

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois   (312) 263-0052**

1    medications do change from time to time, but
2    whatever is in here is in stone. This is
3    correct. So if you're looking to find something
4    wrong with this, you're not going to find it
5    because everything in here is true.
6    BY MR. CATANIA:
7        Q. And you know that because?
8        A. Because I went over it in my head, went
9    over it with help from what I remembered. I put
10   it together the best that I had -- could.
11       Q. Did Mr. --
12       A. Period.
13       Q. -- Morrissey have any assistance in --
14       A. No.
15       Q. -- determining what dates and times --
16       A. He didn't put no words in my mouth. This
17   is all me.
18       Q. Did Mr. Flaxman show you any documents --
19       A. Who's Flaxman?
20       Q. Okay. Did any associate of Mr. Morrissey
21   show you any documents that listed medications
22   while you were in jail? Is that a document that
23   was used to help prepare the affidavit?
24       A. No.
                                                      101

1        Q. Okay. When you --
2        A. No. I did all that. I went over all the
3    medications in my head because we had a big, big
4    thing about that because I couldn't figure out
5    which way was -- just like we are now we're having
6    trouble because I am bipolar.
7        Q. Okay.
8        A. What don't you understand?
9        Q. Earlier in the deposition you said that
10   you were taking Ativan and Celexa currently;
11   right? Those and some other medications?
12       A. Currently.
13       Q. Currently.
14       A. Yes. I'm under the care of Dr. Bednard.
15       Q. Okay. And you said that Dr. Bednard gave
16   you those two medications; right?
17       A. He gives me all my meds now.
18       Q. Okay.
19       A. So I can only -- so I can only go to one
20   doctor, because I have so many doctors I was
21   getting so many prescriptions from different
22   doctors that my prescription, and me having a
23   limited income, I get my check, I pay my rent, I
24   pay all my bills, so if I get a prescription on
                                                      102

1    the 20th, I ain't got no money to buy that
2    prescription.
3        Q. Did Dr. Bednard also prescribe you
4    medication for your sleep apnea?
5        A. There's no medication for sleep apnea.
6        Q. Did he prescribe you medication --
7        A. Allergy medicine, yes.
8        Q. Hypertension?
9        A. Yes.
10       Q. Okay. So he's aware of all of those
11   things; right?
12       A. He's aware of everything.
13       A. He's aware that --
14       A. He's my doctor.
15       Q. -- you have sleep apnea?
16       A. He's aware of every aspect of my life.
17       Q. Did he ever warn you about the
18   interaction between Celexa and Ativan?
19       A. I don't know. He might have mentioned
20   it. I don't know. I think we may have addressed
21   the thing with it. But I can't recall. That's
22   between me and my doctor. That's really not none
23   of your business. Sorry.
24       Q. You are aware that there are connections
                                                      103

1    between the interaction of those two medications
2    and respiratory --
3        A. I'm not aware of anything.
4        MR. MORRISSEY: Let him finish the question.
5    BY MR. CATANIA:
6        Q. And respiratory problems?
7        MR. MORRISSEY: I'm going to object. He's
8    not a medical doctor. He can answer as a
9    layperson but he's not a pharmacologist.
10       THE WITNESS: Thank you.
11       MR. MORRISSEY: You can answer.
12   BY MR. CATANIA:
13       Q. Are you able to answer the question?
14       A. I'm not educated in medical field but if
15   there was an issue that was to be addressed about
16   that certain situation, Dr. Bednard was sure to
17   address it to me. He's an excellent physician and
18   I highly recommend him to anybody.
19       Q. Did you -- were you seeing Dr. Bednard in
20   January of 2011?
21       A. That's this year?
22       Q. Yes.
23       A. Yes.
24       Q. Okay. When did you start seeing
                                                      104

26 (Pages 101 to 104)

1    Dr. Bednard?
2        A.   Probably about two years ago I think
3    maybe roughly.  I can't really recall, buddy.
4        Q.   Okay.  Can you tell me --
5        A.   I'm not going to sit here do your job.
6    You want to find out this information you go dig
7    it up.
8        Q.   Can you tell me why Dr. Bednard is not
9    mentioned in your affidavit?
10       A.   Because it's irrelevant because I was
11   seeing other doctors at the time we're talking
12   about on these things.  Only the information
13   needed at the time.  Why do I have to give you my
14   whole life?
15       Q.   Has Dr. Shick ever conducted a CT scan or
16   other imaging of your head?
17       A.   I had that done at Loyola when I was
18   under Loyola when I was going to the psych doctor
19   at Loyola.
20       Q.   When was that?
21       A.   I can't recall.
22       Q.   Okay.
23       A.   You got the medical records.  You can
24   find out all the information.  You're asking me to

105

1    remember things about my life.  I can't remember
2    last week half the time.  You know what I'm
3    saying?  I can't --
4        MR. MORRISSEY:  All right.  There's no
5    question.
6        THE WITNESS:  -- put it together.
7        MR. MORRISSEY:  There's no question pending.
8    BY MR. CATANIA:
9        Q.   When you were processed into the jail on
10   the dates that you described in the affidavit --
11       A.   Okay.  Which number is this now?  Let's
12   refer to this by number so you don't confuse me.
13   Which number are you talking about on the
14   affidavit?
15       Q.   All right.  When you were processed into
16   the jail on February 5 of 2005 --
17       A.   Okay.
18       Q.   -- I'm sorry, October 20 of 2005, that's
19   the three days you spent in '05.
20       A.   Okay.  What about it?
21       Q.   You spoke to a correctional officer in
22   the receiving area; right?
23       A.   We went over this already.  Why are we
24   going over this again?

106

1        Q.   We didn't go over this.
2        A.   I told you every time I went into the
3    jail soon as I saw an officer, a medical
4    supervisor or a doctor, I advised them of all my
5    medical problems and all my medications at the
6    time I was taking currently.  End of story.
7        Q.   Okay.  That's the beginning of the
8    story.  After telling the correctional officer
9    about all of your medications --
10       A.   I told the correctional officer, the
11   psych person, and the doctor.  So get that
12   straight.
13       Q.   After telling the correctional officer --
14       A.   The psych doctor and the -- the medical
15   whatever guy who is at the booth there.  You know
16   what I'm talking about.
17       Q.   They asked you a lot of questions at
18   receiving, didn't they?
19       A.   Yes, and I explained I -- I was broken
20   down in tears I was so upset I was arrested, you
21   know.  I know right from wrong in my heart.
22       Q.   You answered all their questions?
23       A.   Absolutely.
24       Q.   Did you know the correctional officers?

107

1        A.   No, I don't know nobody there.
2        Q.   Did you know the medical technicians?
3        A.   I don't know nobody.
4        Q.   Any doctors?
5        A.   No.
6        Q.   And they likewise don't know you; right?
7        A.   Correct.
8        Q.   In order to address your issues that you
9    were raising at the time --
10       A.   Yes.
11       Q.   -- do you agree that it was appropriate
12   for them to ask questions?
13       A.   I don't understand.
14       MR. MORRISSEY:  I object to the question.  I
15   don't know if the witness understands your
16   question.
17       THE WITNESS:  Like I said, when I went into
18   the bull pen at Cook County jail and then they
19   give you -- you get that little thing there where
20   you go up and you talk to a little girl with the
21   computer and she puts your information in, I was
22   screaming, by the time I got in there screaming to
23   her, then you go around you go to the doctor, they
24   give you the blood test or whatever, screaming to

108

27 (Pages 105 to 108)

1  him too.  And anybody else in between along the
2  way where they work you to the tunnel to go up to
3  Cermak, any officers there I was telling them
4  about my sleep apnea and all my medications, and I
5  was so concerned about it, it was the only thing I
6  was talking about.  They were so sick of me
7  talking about it they didn't want to hear it no
8  more.
9  BY MR. CATANIA:
10  Q.  All right.  On each of the intakes that
11  are described in the affidavit and there's only
12  two of them.
13  A.  Thank you.
14  Q.  Those two times that you came into the
15  jail they took a photograph of you each time;
16  right?
17  A.  Yeah, they give you that little -- I
18  guess that SIMS number card or whatever that is;
19  right?  Is that what you're referring to?
20  Q.  Yes, I am.
21  A.  Okay.  Yes.
22  Q.  They took your photograph?
23  A.  Yes.
24  Q.  All right.  You would agree that that

109

1  can you describe the correctional medical
2  technician you spoke to?
3  A.  No.
4  Q.  How about the physician assistant you
5  spoke to?
6  A.  There's so many people you see when you
7  go through there how can you -- I don't even know
8  their names.
9  MR. MORRISSEY:  You answered.
10  BY MR. CATANIA:
11  Q.  On February 5 of '07 when you entered
12  into the jail, can you describe the correctional
13  medical technician you spoke to?
14  A.  No.
15  Q.  Can you describe the physician assistant
16  you spoke to?
17  A.  No.
18  Q.  Can you describe the mental health
19  specialist you spoke to?
20  A.  No, I mean.
21  Q.  Can you describe --
22  MR. MORRISSEY:  Wait.
23  THE WITNESS:  I mean, you see so many people
24  when you go in there, I mean how am I supposed to

111

1  photograph would clearly show your facial
2  expressions at the time; right?
3  A.  Was in black and white, probably not a
4  real good picture but, yeah, probably would, you
5  know.
6  Q.  You saw a print that was black and white?
7  A.  Right, right.  I don't know about the
8  real picture.  Right.
9  Q.  Okay.  Did you refuse any of the
10  directions by the correctional staff?
11  A.  Never.  I always follow the rules.
12  Q.  How about the paramedics?
13  A.  Always follow the rules.  I do what I'm
14  told.
15  Q.  You never refused any of their
16  directions; right?
17  A.  I can't recall on that.  There might have
18  been an incidence where I didn't agree with them
19  or maybe or something.  I don't know.  I can't
20  really tell.  It's so many times and it's been so
21  long ago.  We might have had a disagreement --
22  MR. MORRISSEY:  There's no question pending.
23  BY MR. CATANIA:
24  Q.  On the October 20 intake into the jail,

110

1  describe probably about 20 people that
2  different -- or 30 people that I have seen when
3  basically I want to forget the whole thing even
4  happened.
5  BY MR. CATANIA:
6  Q.  Okay.
7  A.  It's a subconscious thing.
8  Q.  Are you telling me now that you remember
9  no description of any of the people --
10  A.  Well, I mean --
11  Q.  -- you saw?
12  A.  -- if you show me a picture of them I can
13  tell you who the officer is.  If you put officers
14  down and you find an officer that was on my floor
15  and you gave me the picture, I can remember a face
16  like that.  But I couldn't tell you their name.
17  Q.  All right.  I'm talking about the
18  receiving area.
19  A.  What about it?
20  Q.  Do you remember a description of any of
21  the officers, correctional officers, medics --
22  A.  I don't know any correctional officers or
23  medics or anybody at Cook County jail period.
24  Q.  If you saw any of them on the street

112

28 (Pages 109 to 112)

1 today, would you recognize them?
2    A. Probably not.
3    Q. Do you agree that the paramedic that
4 asked you questions on each of the intakes
5 described in this, this affidavit --
6    A. Yes, sir.
7    Q. -- asked you questions about symptoms?
8    A. Yes.
9    Q. Current and past; right?
10    A. I don't think so. Just they asked me
11 what you're on period.
12    Q. Illnesses?
13    A. Yeah, they ask me about -- no, they
14 didn't ask me about illness. They just asked me
15 what medicines you're on. That was at the booth.
16 They didn't even ask, didn't even care about the
17 sleep apnea part. They didn't even want to hear
18 about the sleep apnea part, to be honest with you
19 on that one.
20    Q. You're talking about everybody; right?
21    A. Well, I'm talking about, you know, the
22 people -- the people who run the jail. I thought
23 the other --
24    MR. MORRISSEY: No question.
            113

1 that I'm a little psycho and a little -- got the
2 sleep apnea. I always address my health issues
3 because I don't want them to think I'm stupid and
4 I don't hear them and then beat me up for
5 something stupid just because I didn't hear them.
6    Q. All right.
7    A. Or you know what I mean?
8    Q. I do. I do.
9    A. Trying to do the right thing.
10    Q. You're not having any difficulty hearing
11 me today; right?
12    A. No, because you're being pretty loud and
13 forceful I might add.
14    Q. Well, you told me earlier that you had
15 some hearing trouble.
16    A. I do. I'm completely deaf in my left ear
17 and half deaf in my right ear. You're sitting
18 right across. See, if I sit like this, I couldn't
19 hear anything. But I'm sitting like this with my
20 ear turned. I'm making an effort to hear you.
21    Q. After you pled guilty you were sentenced
22 to 30 days on the charge of battery and resisting
23 a police officer; correct?
24    MR. MORRISSEY: Which -- which offense are we
            115

1    THE WITNESS: -- the other inmates are the
2 ones that gives me the heads up, you know.
3    MR. MORRISSEY: No question pending.
4 BY MR. CATANIA:
5    Q. When you entered into the jail in 2010 --
6    A. Yes, sir.
7    Q. -- and after you pled guilty before Judge
8 Brosnahan on August 6 --
9    A. 2010, that was for the -- when they came
10 to my house and said I belly bopped them; right?
11 The Officer Miller?
12    Q. I don't know the facts of the case. I
13 know only what's in the record, which --
14    A. Is that the case you're referring to?
15    Q. Yes, I am talking about Officer Miller
16 and Officer Pawlowski. I'm sorry. Officer Miller
17 and Officer Carrasquillo.
18    A. Right.
19    Q. You told Officer Carrasquillo upon your
20 arrest for that you were taking Celexa and Ativan;
21 right?
22    A. I can't recall but I -- if -- if -- if
23 that's what he said I did -- like I told you
24 before, if I ever get arrested I always tell them
            114

1 talking about?
2    MR. CATANIA: Still talking about the most
3 recent one.
4    THE WITNESS: 2010.
5 BY MR. CATANIA:
6    Q. 2010.
7    A. With -- the one with Officer Miller;
8 correct?
9    Q. Right.
10    A. Now, what's the question?
11    Q. Now the question is, you say that on each
12 of your intakes into the jail you did not get
13 certain medication, you did not get your sleep
14 apnea machine.
15    A. That's correct.
16    Q. You spent some time --
17    A. I did not get.....
18    Q. You spent some time in jail serving a
19 sentence; right?
20    A. Yeah.
21    Q. And was 30 days; right?
22    A. It was 30 days I believe so.
23    Q. And it was -- it was a battery
24 conviction; right?
            116

29 (Pages 113 to 116)

1    A.  I'm not sure about the particulars.  All
2  I did was what the judge told me to do.  I keep my
3  mouth shut.  I do what I'm told.
4    Q.  During that hearing on August 6, 2010,
5  did you tell the judge that you didn't have your
6  sleep apnea machine?
7    A.  Yes, I did.
8    Q.  Did you tell the judge that you didn't
9  have any medication?
10    A.  Yes, I did.
11    Q.  Did the judge write any orders --
12    A.  No.
13    Q.  -- for you to get those things?
14    A.  She sent me right to jail.  She didn't
15  care about it.  She thought I was lying or BS-ing
16  her, that I was just trying to make up excuses.
17  She was actually quite mean.
18    Q.  While you were --
19    A.  No compassion whatsoever.
20    Q.  While you were in the jail serving that
21  sentence, that included August of 2010; is that
22  right?  Was that month?
23    A.  August of 2010?
24    Q.  Right.

117

1  in my head.  I did not state that whatsoever to
2  anybody.
3    Q.  All right.
4    A.  I kept my mouth shut, did my time and got
5  out of there like I'm supposed to.
6    Q.  During the time that you were in jail
7  serving that sentence.....
8    A.  Oh, okay.  This helps.  That helps,
9  yeah.  Okay.  What about it?
10    Q.  All right.  Your lawyer just showed you a
11  document.
12    A.  Yes.
13    Q.  He's got something that's marked A75 I
14  believe?
15    A.  Yeah.
16    MR. MORRISSEY:  Is that what you're looking
17  at, Mr. Catania?
18    MR. CATANIA:  Of course, it is.
19  BY MR. CATANIA:
20    Q.  And on that document doesn't it say
21  patient states that he is off psych meds and
22  feeling well?
23    A.  I might have said that to him because of
24  the fact of, you know, like I just said.

119

1    A.  Yeah, that sounds about right, yeah.
2  It's about the time it happened, yeah.
3    Q.  On August 20 of 2010, did you see a
4  psychiatrist named Jonathan Howard, medical
5  doctor?
6    A.  Which location, where at and when?
7    Q.  On August 20, 2010 while serving a
8  sentence at Cermak Health Services, did you speak
9  with Dr. Jonathan Howard, M.D.?
10    A.  No, I don't recall.  Oh, is he a regular
11  doctor or psych doctor?
12    Q.  Psych doctor.
13    A.  I don't think so.  I -- I did talk to a
14  psych guy but it was like about two weeks after I
15  was there, and at that point I told them, I says
16  why bother giving me meds.  I'm going to be out of
17  here in a week or two.  Besides they never gave me
18  the right stuff to begin with.
19    Q.  Okay.  So --
20    A.  They always just patched it up with some
21  fake Prozac and some other stuff.  Was a joke.
22    Q.  All right.  Are you saying that you told
23  the doctor why bother with psych meds --
24    A.  No.  I said this is my personal thought

118

1    Q.  All right.
2    A.  I was going to be out of there in a week,
3  why put me on some meds which aren't even my right
4  meds.  So why -- you know, and all the other times
5  that we're talking about which is relative to the
6  case that really is the issue, that's why, that's
7  my reasoning.  And, you know, I'm a little off so
8  maybe my reasoning's a little wrong, but that's
9  why I did that.
10    Q.  Did you tell Dr. Howard also with your
11  C-Pap you're better?
12    A.  What do you mean?  What's -- what's C-Pap
13  better?  What is C-Pap?
14    Q.  Sleep apnea machine.
15    A.  What about it?
16    Q.  When -- when you -- did you tell
17  Dr. Howard that with your sleep apnea machine
18  you're better?
19    A.  Better at sleeping, not about my
20  mentalness.
21    Q.  Did you also tell Dr. Howard that you do
22  not have any new symptoms?
23    A.  I don't -- I can't recall.  I mean, I saw
24  the guy for about three minutes and the guy was

120

1  out the door.
2      Q.  At the time when you --
3      MR. MORRISSEY:  Mr. Catania, will you read
4  further in the notes in the history on the --
5      MR. CATANIA:  He states he does not want or
6  need --
7      MR. MORRISSEY:  On the notes.
8      MR. CATANIA:  -- medications.
9      MR. MORRISSEY:  History on the left-hand
10  side.
11  BY MR. CATANIA:
12      Q.  Fine.  We'll do this -- we'll do it the
13  way that your lawyer wants to do.
14          When you spoke with Dr. Howard, did you
15  give him a history?  Did you tell him the things
16  that were happening in your life?
17      A.  I can't recall.
18      Q.  All right.
19      A.  I can't recall.
20      Q.  Did you tell him that you went to jail on
21  August 5?
22      A.  August 5 what?
23      Q.  Of that year, of 2010?
24      A.  That I went to jail?
                                                        121

1      Q.  Yes.
2      A.  What date did he see me at?
3      Q.  August 20 of 2010.
4      A.  So the 5th to the 20th so it took 'em 15
5  days to get a psych guy to me; right?  Is that
6  what you're telling me?  Is that what your point
7  is?
8      Q.  Well, Mr. Morrissey wants you to explain
9  what it was that you said to the doctor which is
10  noted under history which is subjective.
11      A.  Okay.  What about it?
12      Q.  Mr. Morrissey doesn't understand that
13  when it says history that's you telling the doctor
14  about your past.
15      A.  Right.  Okay.
16      Q.  Do you understand that you were telling
17  the doctor about your past experience?
18      A.  You know what?  I might have said
19  something to him about this.  But like I said,
20  what did he say?  Prison.  What does it say?  I
21  can't even read his writing.  What does it say, CC
22  DUC 6X.  Oh, that's my shirt size; right?
23  Celexa -- oh, the medications.  Celexa, yeah, the
24  Ativan, yeah, I told him I was on that stuff.
                                                        122

1      Right.  Yeah, I did.
2      Q.  Okay.
3      A.  But, you know, what's the sense of it?  I
4  got arrested on the 5th, here they are on the 20th
5  and I'm gonna be out in a few days.  And it takes
6  about two or three weeks for the stuff to start
7  working from the education that I have from my
8  psych doctors.  So I'm thinking keep it real, get
9  out of here with that stuff.
10      Q.  So you've been -- you've been off of
11  medication now since August 5 --
12      A.  I have not been off medication.
13      Q.  At the time --
14      A.  I was off medication for the time I was
15  locked up only.
16      Q.  Okay.
17      A.  As soon as I got back out, I believe I
18  did go to my doctor immediately to get all my meds
19  redone.
20      Q.  At the time that you were seeing
21  Dr. Howard for an evaluation at Cermak --
22      A.  You mean the three minutes he came and
23  saw me?
24      Q.  At that time --
                                                        123

1      A.  Yeah.
2      Q.  -- when you saw Dr. Howard August 20 of
3  2010?
4      A.  So the three minutes on that day; right?
5      Q.  All right.  Where it says that you were
6  hyperverbal, do you agree with that?
7      A.  Yeah, I was a little upset.
8      Q.  All right.  And you were hyperverbal --
9      A.  Because you're going to come to me 15
10  days after I was locked up and you're going to
11  talk about meds to me after 15 days I was in that
12  hole?
13      Q.  When it says --
14      A.  Give me a break, bud.
15      Q.  When it says you were hyperverbal, do you
16  understand that to mean that --
17      A.  I'm being hyperverbal now.
18      Q.  Exactly.  That's what I was going to --
19  like you are now?
20      A.  I'm upset.  I'm emotional.  That's why
21  I'm bipolar.  This is part of my diagnosis.  This
22  is who I am.
23      Q.  At that time the doctor's observations of
24  you were that you had no suicidal ideation; is
                                                        124

31 (Pages 121 to 124)

1 that right? You didn't feel like killing
2 yourself?
3    MR. MORRISSEY: Hold on.
4    THE WITNESS: I can't recall.
5    MR. MORRISSEY: Wait a second.
6    THE WITNESS: I can't recall.
7    MR. MORRISSEY: Let me make my objection.
8 You're asking this witness what the doctor noted
9 in regards to his observations. That's
10 objectionable. You can ask him how he felt at the
11 time.
12    MR. CATANIA: Well, you have an objection,
13 however, this is evidence in the case. It's
14 admissible evidence.
15    THE WITNESS: With the three minutes he saw
16 me is evidence? I know we all got a job to do
17 here, sir.
18    MR. MORRISSEY: There's no question pending.
19    THE WITNESS: I'm just going to tell you the
20 truth.
21    MR. MORRISSEY: Listen, listen, listen,
22 there's no question pending.
23 BY MR. CATANIA:
24    Q. For the truth, for purposes of truth, you

125

1 for.
2    Q. And when -- when you told Dr. Howard and
3 he noted down under your history that you said you
4 were never in prison, was that true?
5    A. I've never been in -- I've been in county
6 jail, but I never been to the state penitentiary.
7 That is correct.
8    Q. Is it also true that you told him and he
9 noted down that you lived in Hodgkins, Illinois?
10    A. Maybe.
11    Q. How about that you were taking Celexa, 20
12 milligrams, that sound right?
13    A. That was my meds probably at the time,
14 yeah.
15    Q. That you had two years of college?
16    A. I have trade school.
17    Q. Okay.
18    A. Yeah.
19    Q. Two years?
20    A. Yeah, year and a half, plumbers -- Local
21 130. I was working at Muellermist Irrigation.
22 It's a union shop. And at night I was going to
23 the union hall for classes, you know, because
24 you -- I was working on doing sprinklers. You got

127

1 told the doctor, Dr. Howard, M.D. with a license
2 that you were in the jail from August 5; is that
3 right?
4    A. I can't -- I don't remember. I don't --
5 exactly what I said to him? I can't tell you
6 exactly what I said. From what I said and what he
7 wrote could be two different things. I don't
8 know.
9    Q. Okay. Are you saying that Dr. Howard
10 with the M.D., the license to practice medicine,
11 says that you said you were in the Cook County
12 jail six times, that that's something you told
13 him; right?
14    A. I was -- well, you guys got all the
15 records. I might have been wrong about exact
16 number of times. I might have been misinformed or
17 I might have been thinking about something else or
18 something. But, yeah, I was trying to let him
19 know that, yeah, I've been locked up before, you
20 know, and that I know the drill. And, you know,
21 him coming 15 days after I been locked up to give
22 me medicine on the way out the door, what good is
23 that? Where was he on the first day I was there?
24 And my sleep machine that I had to wait a week

126

1 to do this test. It's called a volume test. You
2 run the water, you do a column test. You measure
3 how far the water up, it gives you the volume of
4 water. It's all math. You know, and then how
5 much water you can use. You know, like -- you
6 know, it's plumbing.
7    Q. Right.
8    A. That's all.
9    Q. Okay. Did you tell him under the history
10 that you were living by yourself?
11    A. Maybe, yeah, probably did. At the time I
12 probably was, yeah.
13    Q. Did you also tell him --
14    A. Like I said, I had a friend or two, but
15 that doesn't even matter. It's irrelevant anyway.
16    Q. All right. The paper that Mr. Morrissey
17 showed you which is marked I think it's called
18 "A." What is it marked?
19    MR. MORRISSEY: You have the same document.
20 BY MR. CATANIA:
21    Q. A75, we'll make it an exhibit for in
22 deposition. All right.
23    MR. MORRISSEY: Would you like to take that
24 call?

128

32 (Pages 125 to 128)

1    THE WITNESS: I would like to, yeah.
2        (Mason Deposition Exhibit
3        No. 2 was marked for
4        identification.)
5        (A break was taken.)
6    BY MR. CATANIA:
7    Q.    We've marked this Exhibit No. 2 for your
8    deposition.  You have a copy --
9    A.    Yes, sir.
10    Q.    -- in front of you?  Okay.
11        We're making this part of the record
12    because this is your medical record.  Okay?
13    A.    Yes, sir.
14    Q.    When you were in the jail in February of
15    '07 you did receive some medications; right?
16    A.    February.
17    MR. MORRISSEY:  I'm going to object.  He was
18    in jail twice in '07.
19    THE WITNESS:  Yeah, which one are you
20    referring to?
21    BY MR. CATANIA:
22    Q.    That's why I said February to distinguish
23    it.
24    A.    February.  That was the one for 30 days

129

1    or like 23 days; right?
2    Q.    Your affidavit said that you were in
3    jail, paragraph 16, February 5 of '07 to February
4    28 of '07.
5    A.    Yeah.
6    Q.    You received some medications; right?
7    A.    Yeah, yeah, I did.  Yeah, that was just
8    for my face, acne stuff.  That was it.  And
9    some -- I think maybe Flonase.  I'm not sure.  I
10    don't even know what these medicines are, but it
11    wasn't like no psych meds, though, and then no
12    pain meds either.  I told them about my bad back
13    every time too.  We won't even get into that.
14    Q.    All right.  Now, these things that
15    happened to you in '05 and '07 at the jail --
16    A.    Yes, sir.
17    Q.    -- you didn't file any lawsuits about
18    those, did you?
19    A.    I didn't do nothing.
20    Q.    And you have essentially survived intact
21    since those occurrences, didn't you?
22    A.    It's not easy.  Every day above ground is
23    a blessing from God.
24    Q.    At the present time your need for

130

1    psychotropic medications is much diminished, isn't
2    it?
3    A.    No, not really.  I'm still pretty, you
4    know -- you know, just wild and crazy.  I'm
5    misunderstood.  I'm just, you know, bipolar.  I am
6    still bipolar very much.  Very, very ill.
7    Q.    Well, in terms of your mental status --
8    A.    Yes, sir.
9    Q.    -- you're not having any suicidal
10    ideations now?
11    A.    No, it's because I'm medicated.
12    Q.    No homicidal ideations?
13    A.    No, no, I would never hurt anybody.
14    Q.    You're not having any visual or auditory
15    hallucinations?
16    A.    No.
17    MR. MORRISSEY:  Listen to his questions.
18    THE WITNESS:  Pardon?
19    BY MR. CATANIA:
20    Q.    You're not having any auditory
21    hallucinations?
22    A.    What's auditory?  Like hearing things?
23    Q.    Yes.
24    A.    No.

131

1    Q.    You're not seeing things?
2    A.    No.
3    Q.    Were you evaluated by mental health staff
4    in your '07 intake into the jail?
5    A.    I can't recall.
6    Q.    Talking about February of '07?
7    A.    Can't recall.
8    Q.    How about in July of '07, do you recall?
9    A.    Can't recall.
10    Q.    If the mental health specialist and psych
11    doctors had conducted evaluations in February of
12    '07 --
13    A.    Yes.
14    Q.    -- and determined that you were not in
15    urgent need of any medication and put you into a
16    living unit, would you have a problem with their
17    using their medical judgment to make that
18    determination?
19    MR. MORRISSEY:  I'm going to object.
20    THE WITNESS:  I don't even understand the
21    question.  How can you make an assumption somebody
22    else's decision that's not even here to make it.
23    BY MR. CATANIA:
24    Q.    The assumptions that you're making, I

132

33 (Pages 129 to 132)

1  understand where they come from. I'm not
2  assuming. I'm looking at the reports including
3  the records that we have that we just made an
4  exhibit of which has to do with being treated --
5  you treated in the jail?
6      A.  Right.
7      Q.  During the time that you were in the
8  jail, you do agree that you received some medical
9  treatment; right?
10     A.  On the last -- the last arrest from 2010,
11 yes, I did get some meds and stuff. I mean, it
12 was -- there was a half-hearted effort. Yes,
13 there was.
14     Q.  And you also agree that even in your
15 affidavit you cite that you received some
16 medications?
17     A.  Correct.
18     Q.  And those --
19     A.  Yes.
20     Q.  -- medications you say were --
21     A.  We -- we went over --
22     Q.  -- for your acne?
23     A.  -- this, yes. And that looks proper.
24     Q.  All right. You're looking of course at a

133

1  and nobody was hearing me.
2      Q.  You didn't make any attempts after that;
3  right?
4      A.  No, because that's when I started using
5  the -- you know, I finally got into therapy, got
6  the psychologist and psychiatrist working with
7  me. I didn't have disability at the time. I
8  don't know. Have you done all your homework? Do
9  you know about my life?
10     Q.  I know what -- what the social --
11 criminal justice system has said about your life.
12     A.  Okay. I know. I understand that. But,
13 you know, I've had a rough life. You know, I had
14 a bad eye for a long time, a lot of social and
15 emotional problems. Okay. This is why I have the
16 problems I have today.
17     Q.  All right.
18     A.  I'm just trying to bottom line it for
19 you.
20     MR. CATANIA: Thank you. I appreciate that.
21 I have no further questions. Your lawyer might
22 have questions for you at this time.
23
24

135

1  document that Mr. Morrissey has in front of him
2  which is a summary --
3      A.  Well, yeah, those are some major
4  medications, and they got the big long names. So
5  I want to make sure, you know. That's why I keep
6  referring to it. It's not like anything else.
7      Q.  I understand. But you didn't create that
8  page, did you?
9      A.  No.
10     Q.  Or those pages? They're stapled
11 together; right? You didn't create that?
12     A.  How would I create that?
13     Q.  Do you know where it came from?
14     A.  I have no idea. That's the first time I
15 ever saw that.
16     Q.  Mr. Morrissey is showing you his notes
17 about medications.
18     A.  Right. He's sitting next to me. I can't
19 help but see.
20     Q.  The last suicide attempt that you
21 attempted was in 2002; is that right?
22     A.  Yeah, I cut my wrists.
23     Q.  And you --
24     A.  It was a cry out for help. I needed help

134

1               EXAMINATION
2  BY MR. MORRISSEY:
3      Q.  Mr. Mason, I'm going to ask --
4  Mr. Catania asked you some questions about your
5  intake on August 5, 2010. Did you come into the
6  jail on that date?
7      A.  Hodgkins jail when they arrested me, yes,
8  I did.
9      Q.  And then you were transferred that date
10 at some point --
11     A.  To Willow Springs I think.
12     Q.  Listen to my question.
13     A.  Okay.
14     Q.  August 5, 2010 were you admitted to the
15 jail, Cook County jail?
16     A.  On the 5th?
17     Q.  Of August.
18     A.  Yes.
19     Q.  Okay. And part of the intake process for
20 the jail, you come in the jail --
21     A.  Yes, sir.
22     Q.  -- generally they have a person do a
23 psychological screening of you; correct?
24     A.  Correct.

136

34 (Pages 133 to 136)

1    Q.  They ask you certain questions; correct?
2    A.  Correct.
3    Q.  And they have a form in front of them?
4    A.  Correct.
5    Q.  Do they take a long time or is it just a
6  short?
7    A.  (Sound effect).
8    MR. CATANIA:  Objection to the form of the
9  question.
10  BY MR. MORRISSEY:
11    Q.  How long did they spend with each person
12  to your knowledge?
13    MR. CATANIA:  Objection to the form of the
14  question.
15    THE WITNESS:  From personally what I saw from
16  the bull pen to the counter where they actually do
17  that, I'd say maybe two minutes maybe a person.
18  BY MR. MORRISSEY:
19    Q.  And do you recall them asking you this
20  question: Have you ever been -- on August 5,
21  2010, have you ever been hospitalized for
22  psychiatric treatment and your answer yes?
23    A.  Yeah, I told them the truth.
24    Q.  And at that time you had been

137

1  over it with the person in the booth, go over it
2  with the doctor, go over it with anybody that
3  would hear me about my meds and my sleep machine.
4    MR. MORRISSEY:  What number are we on as far
5  as exhibit?
6    MR. CATANIA:  Three.
7    MR. MORRISSEY:  I'm showing you what's going
8  to be marked and if we can get a copy of this,
9  appreciate it, Mr. Catania.  Going to be marked
10  as --
11    MR. CATANIA:  We have exhibit labels if you'd
12  like to use a label.
13    MR. MORRISSEY:  Okay.  That will be fine.
14        (Mason Deposition Exhibit
15        No. 3 was marked for
16        identification.)
17  BY MR. MORRISSEY:
18    Q.  I'm showing you what has been marked as
19  Mason Exhibit No. 3.  It's a document stated
20  Department Mental Health Services, Brief Primary
21  Psychological Screening Tool.  It has your name at
22  the top.  And it was signed by somebody who's a
23  mental health specialist at the jail on August 5,
24  2010 at 7:12 p.m. in the evening.  And does it

139

1  hospitalized four or five times?
2    A.  Yeah.
3    Q.  And the last date -- and the reason why
4  you were hospitalized was for what reason?
5    MR. CATANIA:  Objection.  Form of the
6  question.
7    THE WITNESS:  I can't -- I don't -- I
8  don't -- can't really recall but what day was it?
9  What did I say?  Depression 2003?  Yeah,
10  depression, yeah, that's why was hospitalized.
11  Oh,, yeah, definitely.
12  BY MR. MORRISSEY:
13    Q.  And in 2003 were you hospitalized in
14  Hinsdale Hospital?
15    A.  Yes, I was.  I was having another moment.
16    Q.  And were you asked whether you're
17  currently taking psychotropic medications?
18    A.  2003?
19    Q.  No, no, no.  On August.  August 5, 2010.
20    A.  Was I -- they asked me if I was?
21    Q.  Yeah.
22    A.  I don't think they asked me but I did
23  tell them.  I told them -- like I told you before,
24  every time I went to the county jail I would go

138

1  state on here, there's a question are you taking
2  psychotropic medications and the box is marked
3  yes; correct?
4    A.  Yeah.
5    Q.  And next to that what does it say?
6    A.  Celexa, Ativan and I don't know what is
7  this over here?  Last took two weeks ago.  Oh,
8  yeah, because they didn't give it to me for two
9  weeks over there.  I don't know.  Whatever it
10  says, I don't know.  I can't recall.  I don't
11  remember.  No, but it's true, though.  No, I told
12  them that, yeah.
13    Q.  You told them that you were taking --
14    A.  Yes, I did tell them.  Yes, I did.
15  Now I remember.
16    Q.  But does it say --
17    A.  Last took in this morning.  I took it the
18  morning I went in is what I did.
19    Q.  Okay.
20    MR. CATANIA:  What line are you pointing to
21  when you indicate that on the form?
22    MR. MORRISSEY:  Line four.
23    MR. CATANIA:  Okay.
24  BY MR. MORRISSEY:

140

35 (Pages 137 to 140)

1    Q. And does it ask in No. 6 have you ever
2  attempted suicide?
3    A. Yes. I tell them the truth every time.
4  I told you guys this.
5    Q. And you mentioned in January of 2002?
6    A. January 2002? Yeah. Yeah, that's about
7  right. Yeah.
8    Q. So would it be fair to say that when you
9  went in in August -- on August 5, 2010, you tell
10  the mental health person --
11    A. That I needed the meds, right. And then
12  they came back two weeks later.
13    Q. And then Mr. Catania showed you what I
14  guess is marked Mason Exhibit No. 2 that on August
15  20, 2010 you did see a psychiatrist; correct?
16    A. Uh-huh.
17    Q. And what was your reason that -- that you
18  didn't want the medicine --
19    A. The meds?
20    Q. -- at that time?
21    A. Because it's pointless. I mean, I don't
22  know if you've ever been on medication. I don't
23  know if you have anybody in your family like that,
24  but these meds, they take weeks to work, you

141

1  take 'em.
2    Q. Okay.
3    A. Until I'm hurting and then I got to go
4  take them.
5    Q. If you didn't take your psychotropic
6  medication each day, what would happen to you?
7    A. I would get upset, be emotional. I
8  probably end up -- back in the bin. The bin being
9  the mental -- mental ward at Hinsdale Hospital.
10    Q. You mentioned you become irritable
11  when --
12    A. Oh, majorly. Nobody even wants to be
13  around me.
14    Q. You become depressed?
15    A. Majorly. I start crying, yeah.
16    Q. What -- what symptoms do you experience
17  when you're depressed?
18    A. Crying, emotional, feeling bad about the
19  bad things I've done in my life, you know, all the
20  sorries, remorse, regret.
21    Q. When you state in your sworn document
22  that you're -- you have a bipolar disorder, what
23  do you mean by that?
24    A. I'm all over the place. I'm either, you

143

1  know. And what's the sense of taking something
2  when you know you're going to go home in a few
3  days, and I got my big fresh bottles of medicine
4  waiting for me. I would just have to take them
5  for a couple of weeks, get back on track, keep my
6  butt at home and out of trouble. I know what I'm
7  doing. I know myself. And that's why I did what
8  I did.
9    Q. When you're in the -- if -- on the
10  occasions -- didn't you -- when you're not
11  incarcerated what is your practice in regards to
12  taking psychotropic medication?
13    MR. CATANIA: Objection. Form.
14  BY MR. MORRISSEY:
15    Q. You can answer.
16    A. Okay. I usually take my meds in the
17  morning, you know. I get all my meds either from
18  Walgreens or Wal-Mart, which is real close to my
19  house. I'm real good about taking my meds in the
20  morning, the psychotropic ones. But the other
21  ones that I got to take multiple in days sometimes
22  I miss, but those are my pain pills. Now, those
23  don't got nothing to do with it. I'm just in pain
24  then so -- but, you know, sometimes I forget to

142

1  know, cleaning the house so massively or I'm stuck
2  to my bed where I can't move and I don't want to
3  talk to nobody.
4    Q. And when you were in the jail and they
5  didn't give you your meds in February of 2007 they
6  said you were in there for 23 days.
7    A. Yeah.
8    Q. How were you feeling after you didn't get
9  your meds?
10    A. I -- I really couldn't even really tell
11  you because I -- I don't know. It's coping
12  mechanism I do to myself to deal with the
13  situations like that. I just bury it in the back
14  of my head and I deal with it when -- when I'm
15  able to which I was hoping to at the time when I
16  got out and then I was going just -- so I was just
17  telling myself don't worry about, don't worry
18  about, just hold on, hang in there, be tough,
19  you'll get out of here and then you go see
20  everybody and you get everything all back on
21  track. I just want to get out of there. I can't
22  afford no lawyers and stuff. I'm a simple man.
23    Q. I know.
24    A. I'm on disability. I have a trailer.

144

36 (Pages 141 to 144)

1    Q. My question is when you didn't receive
2    your -- your medications --
3    A. Right.
4    Q. -- in February 2007 for 23 days, were you
5    irritable?
6    A. I think I got in a fight that time too.
7    I'm not sure. Somebody had insulted me or
8    something. I'm not quite sure. I was very, very
9    irritable. It was so traumatic, have no idea.
10   You know, I just really want to forget about
11   the -- the pain and suffering that was involved
12   with that. It really, pardon my layman term, but
13   it sucked.
14   Q. Were you depressed during --
15   A. Majorly.
16   Q. What do you mean by "majorly"?
17   A. I was irritable, you know. I was just,
18   you know -- I mean just wanted to punch the wall,
19   you know. The normal symptoms of being depressed
20   and bipolar from what I understand, from the
21   education that I have.
22   Q. Did you tell the medic when you went in
23   that --
24   A. Absolutely. I told everybody several,

145

1    several, several times. Anybody that would listen
2    to me, you know. Like I said, I said it so many
3    times that they were sick of hearing it from me.
4    Q. And in fact, on August 5, 2010,
5    showing -- you mentioned to the medic that -- that
6    you were -- had a mental illness; correct?
7    A. Uh-huh, correct. Probably, correct. If
8    it's -- yeah, sounds like something I would have
9    done. Yes.
10   Q. Did you tell the medic that you were on
11   Ativan when you came --
12   A. Yes.
13   Q. -- came in that day?
14   A. Yes, I did. I told everybody
15   everything. Every process along the way they were
16   told.
17   Q. Did you tell the medic that day that you
18   were on Celexa?
19   A. Yes.
20   MR. MORRISSEY: I'm going to mark this as
21   Mason Exhibit No. 4.
22   (Mason Deposition Exhibit
23   No. 4 was marked for
24   identification.)

146

1    BY MR. MORRISSEY:
2    Q. Having been in the Cook County jail
3    several occasions in the last five or six years --
4    MR. CATANIA: I didn't know that about you.
5    MR. MORRISSEY: Pardon?
6    MR. CATANIA: I didn't know that about you.
7    MR. MORRISSEY: I'm asking him.
8    MR. CATANIA: Oh, I thought you were talking
9    about yourself.
10   MR. MORRISSEY: Actually --
11   THE WITNESS: You guys are smart.
12   MR. MORRISSEY: He's being a little bit
13   flippant on me.
14   THE WITNESS: Ain't nothing wrong with that.
15   MR. MORRISSEY: That's fine.
16   BY MR. MORRISSEY:
17   Q. Mr. Mason, having been in the jail
18   several times --
19   A. Yes, sir.
20   Q. -- since 2005, can you explain the
21   process that you --
22   A. In my own words?
23   Q. As -- you as a person with -- suffering
24   from depression and --

147

1    A. Sleep apnea, you know --
2    MR. CATANIA: I'm going to object to the
3    question because when I asked the question I was
4    told by your witness that it's right here in
5    Exhibit 1, so I object.
6    MR. MORRISSEY: I don't understand the basis
7    of your objection.
8    MR. CATANIA: My objection is you're asking
9    him for a narrative. Okay. I know sometimes you
10   need an explanation. But the objection is a form
11   objection. Your request asks for a narrative.
12   BY MR. MORRISSEY:
13   Q. Mr. Mason?
14   A. Yes sir.
15   Q. As a person that suffers from bipolar
16   disorder --
17   A. Yes, sir.
18   Q. -- and depression --
19   A. Yes, sir.
20   Q. -- what do you do when you come into the
21   jail to --
22   A. Pray.
23   Q. -- attempt -- attempt to get your
24   appropriate medication?

148

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois (312) 263-0052**

1    MR. CATANIA: Objection. Form.
2    THE WITNESS: I -- well, you know, the
3    process. When you go in there you go in the bull
4    pen, you know, after court and everything. You
5    bring in a bus, you go in there yadda, yadda,
6    yadda. Go back in there, go back in the process,
7    whatever. And then you go in front of the people
8    that have that little desk there. You got these
9    dividers. You go and you sit down on these round
10   stools, you slide up to the table and you got a
11   girl with a computer there or, you know, taking
12   notes or whatever. And you tell them all your
13   problems. And, well, I did that every time.
14   Every time I go there I tell them about my sleep
15   apnea, tell them about all my psych meds. I tell
16   them everything, tell them all about everything.
17   And that's it. That's my story. I tell them, you
18   know, every time like I say. I tell everybody.
19   BY MR. MORRISSEY:
20   Q.   Where -- where you're conveying that
21   information --
22   A.   It's --
23   Q.   -- describe -- describe the room --
24   A.   Okay. In the Cook County jail when you

149

1    come in there's this big bull pen. They got them
2    all numbered different numbers. You got the guys
3    from state penitentiary, they got cases coming in
4    in their canary suits, you know, big yellow
5    suits. Then you got the, like, two or three down
6    here and then you got the big glass thing with the
7    different booths with the dividers which is,
8    pardon me from saying horse -- horse you know
9    what.
10   But anyway, you go into them little
11   booths. You got guys sitting all next to you, all
12   over. It's a big mess, big mess. Then you got to
13   try to explain somebody something so personal as
14   your mental health and your physical health, and
15   they don't even care. You know, and they just --
16   you know, you're like a piece of cow, move along,
17   move along, keep going, keep going. And then they
18   move you along the other side. Then you try to
19   get it across to them. Then you get over here to
20   the -- where the doctor, you see the doctor and
21   they're gonna draw blood from you. And then they
22   give you that little tag. And then they draw on
23   your arm where you're going to go with a marker.
24   I think. I think that's the process. If I

150

1    remember correctly, that's what happens.
2    Q.   How crowded is it --
3    A.   Oh.
4    Q.   -- in the room?
5    A.   It's unbearable. It's just pure
6    miserable.
7    Q.   How many people would you estimate --
8    A.   Well, you should see the bull pen
9    sometimes. Sometimes they got them so packed in
10   there you -- I had a breathing attack one time. I
11   had to actually come out of the jail. I had to
12   beg the guard to let me out. I just had an
13   anxiety. I couldn't breathe. You know, and I was
14   so tired because I didn't sleep with my machine
15   for so many days.
16   Q.   Describe what kind of bull pen it was.
17   Was there a --
18   A.   Grotesque. The toilet, oh, it was
19   grotesque, nasty, paint graffiti all over the
20   walls, you know, feces in the corner because the
21   guys can't wipe themselves. Well, you know, you
22   got to realize you got guys who are heroine
23   addicts. They're dope sick. So they're peeing
24   and pooping all over themselves, you know.

151

1    It's -- it's not right. They're treating them
2    like animals. These people are sick. They're
3    human beings. They're not animals, you know.
4    It's just bad. And heart wrenching to watch it
5    and then be depressed on top of it. It's just too
6    much. I just block it out of my mind.
7    Q.   How many people are in the bull pen with
8    you?
9    A.   It depends. It depends. I mean there
10   are some times in there it was fine. But then
11   other times when they get really crowded, it's
12   brutal. And then you're smelling all the bodies,
13   they're all next to you and everybody's upset and
14   mad and you, you know, and they just want to take it
15   out on the world.
16   Q.   Is it like you're enclosed in a cyclone
17   fence?
18   A.   Yeah. Oh, yeah. It's like you're --
19   you're like -- yeah, you're -- you know, you're in
20   a -- you're in this room, you know, like a garage
21   with a big fence across the front, and you're
22   about, you know, I don't know how many people they
23   would fit into one of them. But I'm telling you
24   probably be about 200 of them in one bull pen

152

38 (Pages 149 to 152)

1　easy. I couldn't give you an exact count, but
2　it's ridiculous. It's absolutely asinine to treat
3　anybody like this.
4　　Q. Is there any noise that's going on?
5　　A. Noise?
6　　Q. Yeah.
7　　A. So many people talking you can't even
8　hear yourself. I mean, it's just yadda, yadda,
9　yadda. Once in the while one of the white shirts
10　will come by and, you know, pop everybody down and
11　keep them quiet. That will be about it.
12　　Q. And then periodically you will be taken
13　out of those cages?
14　　A. Well, you would -- you know, then they
15　would process you. They take -- call your name
16　and then you take like about ten of them and then
17　you go get them little ID's you were talking about
18　with the numbers and stuff. You know, you get
19　that picture taken. That's all part of the
20　process. You guys all know the process.
21　　Q. Is there any privacy when you sat down
22　and talked to, for instance --
23　　A. No.
24　　Q. -- well, let me ask the question.

153

1　　When you talked to the mental health
2　specialist --
3　　A. You talking about at that counter?
4　　Q. -- August -- yeah.
5　　A. Yeah, no, there ain't nothing there.
6　　Q. August 5, 2010 --
7　　A. It's terrible --
8　　Q. -- when you sat down and talked to that
9　person for two minutes, how much privacy did you
10　have?
11　　A. Lady next door was there, there's a guard
12　behind me, call me big man. He says, oh, you're
13　here again, big man. You know, they try to be
14　nice to make you feel a little better because they
15　know it sucks. So, yeah, you know.
16　　Q. Were there any inmates around you?
17　　A. Yeah, they're all over. I mean, well,
18　you know, there's the guys next to you. The bull
19　pen ain't but this table length away from the
20　chair that he's sitting in that I would be talking
21　in explaining to the lady. The other bull pen is
22　right here. If a guy got good hearing, he can
23　definitely hear.
24　　Q. And about how much time did the mental

154

1　health specialist take with you on August 5
2　maximum?
3　　A. About two minutes.
4　　Q. Is there anything else you could have
5　told that mental health person that day --
6　　A. No, I told them everything. I screamed
7　at them, and they didn't want to hear it. I told
8　them about my breathing machine, about the
9　medication. Told them about my -- because I was
10　so concerned about it. I have a --
11　　Q. Let me ask you this.
12　　A. -- thing about dying in my sleep.
13　　Q. On August 5 after you told the mental
14　health person --
15　　A. Yeah.
16　　Q. -- did she give you any medication,
17　psychotropic medication?
18　　A. No, none.
19　　Q. Did she bring a psychiatrist over --
20　　A. No.
21　　Q. -- to talk to you?
22　　A. No.
23　　Q. Was any psychiatrist, to your knowledge,
24　in the receiving room?

155

1　　A. No.
2　　MR. CATANIA: Objection. Form.
3　　THE WITNESS: Recall.
4　　BY MR. CATANIA:
5　　Q. Did they have a psychologist speak to you
6　in the area?
7　　A. Nothing. No, none of the above.
8　　Q. And then on that same night did you talk
9　to the medic as far as a medical intake?
10　　A. Yeah.
11　　Q. How long --
12　　A. Yes, I did talk to somebody.
13　　Q. Okay.
14　　A. Yes.
15　　Q. And did you give them the same
16　information about --
17　　A. I gave them the same story. Like I told
18　you, I tell the truth. I tell everybody along the
19　way. Everybody knew.
20　　Q. Did the medic do anything to get you --
21　　A. No.
22　　Q. -- the medication?
23　　A. No.
24　　Q. Nobody did?

156

39 (Pages 153 to 156)

1  A.  No.
2  Q.  How about the next day, did you get
3  your --
4  A.  I think I got --
5  Q.  -- psychotropic?
6  A.  No, I didn't get psych yet.  But I got my
7  blood pressure I think and maybe some face stuff.
8  I'm not sure.
9  Q.  Okay.  Did you get your psychotropic
10  medications --
11  A.  No.
12  Q.  -- the next week?
13  A.  No.
14  Q.  In the next week?
15  A.  No.
16  Q.  How were you feeling during that --
17  A.  I was very depressed and very roughed up.
18  Q.  So it was two weeks?
19  A.  Right.
20  Q.  Prior to the time --
21  A.  Yeah.
22  Q.  -- you sat down with this Dr. Howard?
23  A.  Right.  And that's when he wanted to give
24  me something.  And I says I'm out of here in a

157

1  with this Dr. Howard --
2  A.  Yes.
3  Q.  -- after being in the jail for two
4  weeks --
5  A.  No kidding.
6  Q.  -- without medications --
7  A.  Yeah, go ahead.
8  Q.  -- what was going through your mind in
9  regards to --
10  A.  Get the hell out of there.  Get the hell
11  out of there so I could move forward and do what I
12  got to do.
13  Q.  And at that point -- what is your -- to
14  your knowledge and experience having been in the
15  Cook County jail, do they always put you -- if you
16  get medication, do they always put you on the same
17  medication that your doctor --
18  A.  No.
19  Q.  -- you're treating doctor has you on?
20  MR. CATANIA:  Objection.  Form of the
21  question.
22  BY MR. MORRISSEY:
23  Q.  Do you understand the question?
24  A.  Yes, I do.  And you know what?  It wasn't

159

1  week, you know.  And me knowing about the -- the
2  time it takes for these drugs to actually start
3  working, it's fruitless.  I mean, that's my point
4  why I told him that.
5  Q.  Did you know when you sat down with him
6  on August 20, 2010 how much more time you had to
7  do?
8  A.  Yeah, absolutely.
9  Q.  How much more time did you have to do?
10  A.  Well, at first, he said I was supposed to
11  do 15 days then all the sudden it turned into 30
12  days because I don't know, the judge says, okay,
13  and I had my lawyer because I was really upset.  I
14  had my ma -- my ma actually borrowed me the money
15  to give to my lawyer.  My lawyer's such a nice
16  guy.  Took payments and everything.  He's such a
17  good man.  About the -- now I forgot where I was.
18  Q.  Talking about your lawyer.
19  A.  Yeah.
20  Q.  Nice guy.
21  A.  See, that threw me off.  The.....
22  Q.  The question was --
23  A.  Yeah, go ahead.
24  Q.  -- when you sat down on August 20 briefly

158

1  even close.  I mean, the last time in 2010 after a
2  few days they did make a pretty good effort, but
3  all the times before it was like a joke.  It was a
4  joke.
5  Q.  So they wouldn't put you on the same
6  medication?
7  A.  It was like -- like putting Band-Aids on
8  it.
9  Q.  As a --
10  A.  Try to make it look good.
11  Q.  As a person suffering from depression --
12  A.  Yes, sir.
13  Q.  -- bipolar disorder, is it important, as
14  far as you know, to maintain the same medication?
15  A.  Absolutely.  It's imperative.
16  MR. CATANIA:  Objection to the form of the
17  question.
18  THE WITNESS:  It's imperative.  When you're
19  on medication that you take that medicine every
20  day because if you skip a day or two, then all the
21  sudden all that work that you done to build up to
22  that moment or that point, emotionally and with
23  the medication is all for nothing.  So this is why
24  I told them that about the -- the -- you know, I

160

40 (Pages 157 to 160)

1   don't need that stuff.
2 BY MR. MORRISSEY:
3   Q. So -- so if -- and prior to going to the
4 jail on August 5 you were taking Celexa?
5   A. Yes. And Ativan which was p.r.n.
6   Q. And Ativan. Celexa and Ativan, to your
7 knowledge, if -- as far as you knew, if Dr. Howard
8 prescribed you some other psychotropic medication
9 other than Celexa --
10   A. Right.
11   Q. -- to your knowledge what type of
12 reaction would you have?
13   MR. CATANIA: Objection. Form of the
14 question.
15 BY MR. MORRISSEY:
16   Q. Do you understand the question?
17   A. Yes, I do. Personally from my experience
18 when you're on a medication, because I had been on
19 several of them, when you're on Celexa, for
20 example, and then you switch to something else,
21 it's going to take long time for it to work. But
22 when you come off these drugs, these drugs are
23 very dangerous. You know, I mean, they mess with
24 your head. So you gotta be careful. You have to
                                    161

1   wean yourself off. And all the sudden be off of
2 them is very traumatic.
3   Q. What is your understanding in regards to
4 if you're going to stop taking one type of
5 psychotropic medication, what type of weaning
6 process do you need to --
7   A. Oh, you would have to --
8   MR. CATANIA: Objection to the form of the
9 question.
10 BY MR. MORRISSEY:
11   Q. Do you understand the question?
12   A. Yes, I understand. What form of
13 weaning? You would have to -- you'd have to do it
14 with a doctor's, you know, supervision. You know,
15 you have to tell the doctor, okay, you know, this
16 is the way I'm feeling with this. And then he
17 would say, okay, well, now we're going to try this
18 but we're gonna have to do this first and then get
19 you on this. So there was always a process. You
20 know what I'm saying?
21   Q. So either your psychiatrist or --
22   A. Whoever.
23   Q. -- medical doctor has previously
24 explained to you that if they're going to switch
                                    162

1   or change your psychotropic medication, they don't
2 just do it --
3   A. Oh, it's --
4   Q. -- at one point?
5   A. -- cruel. Hell, yeah.
6   Q. Why is that?
7   A. Because it messes your whole brain out.
8 It makes you go crazy, psychotic. Makes you be --
9 makes you hallucinate. It'll make you go crazy.
10 It'll make you feel all sorts of weird stuff. You
11 can't just do that. That's not good for anybody's
12 mental health.
13   Q. So would it be fair to say that you as a
14 person that's being treated for bipolar and
15 depression want to maintain the same --
16   A. Level, even keel.
17   Q. -- level?
18   A. Oh, absolutely.
19   MR. MORRISSEY: And I have nothing further.
20   MR. CATANIA: You sure?
21   MR. MORRISSEY: I believe so.
22   MR. CATANIA: Because I think there's some
23 theories of your case that you haven't asked him
24 yet.
                                    163

1   MR. MORRISSEY: If you want, maybe you can
2 enlighten me.
3         FURTHER EXAMINATION
4 BY MR. CATANIA:
5   Q. Okay. Could you tell me if when you
6 answered the questions to the medic on August 5 of
7 2010 you told the medic that you were taking
8 Celexa but you took it this morning?
9   A. But I took it this morning, I don't know
10 what he meant by that.
11   Q. Okay. Did you tell the medic that you
12 take Ativan but you last took it two weeks ago?
13   A. Maybe. That's a p.r.n., though. I only
14 need that when I have a moment. At that time if I
15 had it in jail I would have took it.
16   Q. So the Ativan you don't need to take
17 every day to maintain a level; right?
18   A. That's a p.r.n. That's the whole reason
19 behind the p.r.n., like when you get -- you have
20 an emotional moment, you know, and you feel like
21 you're ready to crawl out of your skin, you start
22 hyperventilating, well, you take one of them and
23 then in about 15, 20 minutes later everything
24 seems just a little bit better, it's not so bad.
                                    164

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois  (312) 263-0052**

Ex 40 Mason Dep 041

1  Helps you calm down.
2      Q.  Based on your experience you don't need
3  to take that to reach a level?
4      A.  No.
5      Q.  But the Celexa that you took in the
6  morning --
7      A.  Celexa I need to have that every day.
8      Q.  Okay.  All right.
9      A.  The Ativan, you know what I mean, you
10  just like -- like if somebody upsets you, you know
11  you take them and then you calm down.
12  Tranquilizer.
13      Q.  Did you bring any of your medication with
14  you today?
15      A.  No.
16      Q.  You didn't expect that I would upset you
17  today?
18      A.  I didn't know that it was going to be
19  this kind of rough, but if I knew, I would have
20  brought it.
21      Q.  Is it your habit to tell medical doctors
22  that you're feeling well when you're not?
23      A.  How can I answer this to where you can
24  understand?  I guess I'm just going to have to be

165

1  why I switched.
2      Q.  When you were --
3      A.  Personally that's my personal opinion.  I
4  may be wrong.  But, you know, I own my own
5  feelings so.....
6      Q.  When you were seeing Dr. Shick, did he
7  ever change your medication such that he would
8  want you to stop using one psychotropic and start
9  another?
10      A.  He might have but I can't recall.
11      Q.  How about your later doctors,
12  Dr. Bednard, did he ever change your psychotropic
13  medication from one to another?
14      A.  No.  No, he --
15      Q.  Did any --
16      A.  -- did not -- Dr. Bednard never diagnosed
17  my medications.  I got all that done through
18  Loyola University at the psych -- psych building,
19  building 54.
20      Q.  Okay.
21      A.  Once I became established with what I
22  knew that worked, then I went to my regular
23  doctor, Dr. Bednard and we discussed it.  And I
24  discussed him -- to him about the traveling

167

1  brute and blunt.  When I think they're full of
2  shit, I ain't got nothing to say to them.
3      Q.  When you --
4      A.  Sorry.  I didn't mean to swear like that,
5  but I mean.....
6      Q.  So you measured whether or not this
7  doctor, Jonathan Howard, was, as you say, full of
8  shit before you would answer a question
9  truthfully?
10      A.  I didn't mean to say that.  I mean, he's
11  not full of shit.  He's just -- you know, he's not
12  into me as a patient.  He's not like my real
13  doctor.  There's actual really care and, you
14  know -- you know, caring there.  He don't care.
15      Q.  Was doctor --
16      A.  So why am I wasting my breath talking to
17  this man who can't wait to go home?
18      Q.  Was Dr. Shick one of those doctors that
19  really cared?
20      A.  He's a good doctor.  He was a good
21  doctor.  But personally, my personal opinion on
22  him he was to egotistical, you know.  He wasn't
23  connecting with me as a -- as a regular person,
24  you know.  He's on another page than me, so that's

166

1  because it's difficult.  I don't have a license, I
2  don't have a car.  I'm disabled, you know.  I got
3  bad back sometimes and about getting -- going to
4  these appointments and also getting the
5  medication.  So he surmised that -- he suggested
6  that I get all my meds three months at a time
7  which has worked out wonderfully for me ever since
8  I saw Dr. Bednard.  He's the most awesome doctor I
9  have ever had.
10      Q.  During those three months at a time that
11  you have a prescription and you don't have to go
12  back to the doctor by dialing a ride to visit the
13  doctor --
14      A.  Right, right, right.
15      Q.  -- do you keep a logbook of your daily
16  use of the medication?
17      A.  No.  There are some days I -- I will
18  admit some days I do miss a dose here and there
19  but very rarely.  It's just because maybe somebody
20  came over or my ma or had to go somewhere.  Like
21  this morning I missed my thing because I had to
22  come here because I'm a creature of habit.  I take
23  my meds like 9, 9:30.  I do that every day.  But
24  see, I wasn't home today so I didn't do it.  So

168

42 (Pages 165 to 168)

Ex 40 Mason Dep 042

1   this -- this is my example that I'm using for what
2   you're talking about.
3       Q.   And right now you're feeling just fine,
4   right?
5       A.   I'm very anxious.  I can't wait to get
6   out of here, I'll be honest with you.  I feel like
7   my back's against the wall, so I'm -- this thing
8   makes me, you know, rise to the occasion.
9       Q.   Okay.  Over the course --
10      A.   I'm feeling very anxious, yes.
11      Q.   Over the course of the deposition --
12      A.   Yeah.
13      Q.   -- I've notice that you have become more
14  calm in your answers.  Do you agree with me on
15  that?
16      A.   I'm a little more relaxed now than I was
17  when I first came in, yes, sir.
18      Q.   Good.  I realize that it's a stressful
19  thing.
20      A.   It is.
21      Q.   But this process of asking questions is
22  because we only get one chance to find out.
23      A.   Yes, sir.
24      Q.   And that's this chance.
                                                    169

1   therapy because you missed a couple of
2   appointments in a row; right?
3       A.   Dr. Shick's office, that is correct.  And
4   that is why I did --
5       Q.   How about --
6       A.   -- leave that office.
7       Q.   How about at Loyola, did you have
8   psychotherapy at Loyola?
9       A.   Yes, I believe so.  Yes, I did.
10      Q.   Was the psychotherapy done at a time when
11  you were changing medications?
12      A.   I can't -- you'd have to look at the
13  medical records, talk to the professionals.
14  That's on --
15      Q.   You would trust the medical records on
16  that?
17      A.   I would guarantee Loyola's medical
18  records.
19      Q.   Would you -- strike that.
20           During the time that you were on the dorm
21  living unit in '07, in September of '07 --
22      A.   Okay.  Now, I was in several dorms there.
23      Q.   Dorm E3.
24      A.   So you gotta specifically say --
                                                    171

1       A.   I understand.
2       Q.   When you had a medication change, did you
3   have also at the same time psychotherapy?
4       A.   You mean the psychologist versus psych --
5   the psych -- the psychologist versus the
6   psychiatrist you're talking about?
7       Q.   Yes.
8       A.   Yeah, Dr. Shick did do -- he did try that
9   one time, but that was about the time I was
10  getting in trouble.  And then I -- when I got in
11  trouble I think that was for the stealing part,
12  when I was seeing him, Dr. Shick.  And from what I
13  remember the psychologist was going to see me but
14  I missed my appointment.  I missed it twice.  And
15  then I went to go see him a third time and he
16  wouldn't see me.  And that -- that was another
17  reason why I switched from him, Dr. Shick, in
18  Riverside back to Loyola because I didn't like
19  that.  That's part of the deal.  When you're
20  dealing with somebody with issues, they're gonna
21  miss appointments.  That's part of the thing.
22  That's part of the drill.
23      Q.   So a doctor, who you were essentially
24  paying to see you, dropped you from -- from
                                                    170

1       MR. MORRISSEY:  Just wait.
2   BY MR. CATANIA:
3       Q.   Dorm E3.
4       A.   Three what?
5       Q.   E3.
6       A.   E3 --
7       MR. MORRISSEY:  I object.  First of all, my
8   objection it's beyond the scope of my
9   cross-examination.
10      MR. CATANIA:  That's not an objection in a
11  deposition.
12      MR. MORRISSEY:  This is a new area of
13  inquiry.
14      MR. CATANIA:  It's not an objection in a
15  deposition.
16  BY MR. CATANIA:
17      Q.   But during the time --
18      MR. MORRISSEY:  It is.
19  BY MR. CATANIA:
20      Q.   -- when you were in a --
21      MR. MORRISSEY:  Mr. Catania, it is.  If
22  you're going to go into a new area which wasn't
23  raised by my --
24      THE WITNESS:  Yeah, I don't know.  First time
                                                    172

43 (Pages 169 to 172)

Ex 40  Mason Dep 043

1 I heard.
2 MR. MORRISSEY: Then it is an appropriate
3 objection. You've had your opportunity to ask the
4 gentleman. You said that you had no further
5 questions. I followed up with some additional
6 questions.
7 MR. CATANIA: And the follow ups have caused
8 this question.
9 MR. MORRISSEY: What is the question?
10 BY MR. CATANIA:
11 Q. When you were in the dormitory in '07,
12 September of '07 at the jail --
13 A. Uh-huh.
14 Q. -- did you have your psychotropic
15 medication at that time?
16 A. In '07, I believe so. I had some of
17 them. Yeah, they did a little bit better of a job
18 this -- that time than they did all the other
19 times. That was the time I got Trazodone. Yeah,
20 that's correct. Yes, yes. I would have to say
21 yes.
22 Q. Did you have any problems with other
23 detainees at that time?
24 A. I had -- think I got in a little scrap

173

1 other mental health treatment as a result of that
2 altercation?
3 A. No.
4 MR. CATANIA: Okay. I have no further
5 questions, Mr. Morrissey.
6 MR. MORRISSEY: We have no more.
7 (1:50 p.m. further deponent
8 saith not.)

175

1 there but that was over something, some shampoo
2 that was left in the shower and somebody just left
3 it there, and then of course, you know, you're in
4 jail, you're hungry. You grab it. So he got a
5 little upset and started beating me with his
6 cane -- with his cane and that's the altercation
7 that you're probably referring to. It was just a
8 misunderstanding. It was a -- not really a big
9 deal.
10 MR. MORRISSEY: All right. There's no
11 question.
12 BY MR. CATANIA:
13 Q. Did you say that you were in an
14 altercation where you got hit with a cane?
15 A. Got my head beat in.
16 Q. Was there also another altercation as a
17 result of someone disconnecting your sleep apnea
18 machine?
19 A. There was an argument. That was it.
20 Q. Were they pulling the plug on it?
21 A. You know, just messing -- you know, guys
22 when they're locked up they got nothing better to
23 do than to mess with people.
24 Q. As a result of that, did you have any

174

1 STATE OF ILLINOIS )
2 ) SS:
3 COUNTY OF C O O K )
4 I, MARTHA C. NEWTON, a notary public within
5 and for the County of Kane and State of Illinois,
6 do hereby certify that heretofore, to-wit, on the
7 12th day of May 2011, personally appeared before
8 me, at the Richard J. Daley Center, Fifth Floor,
9 Chicago, Illinois, JESS S. MASON, in a cause now
10 pending and undetermined in the United States
11 District Court, wherein MICHAEL PARISH is the
12 Plaintiff, and SHERIFF OF COOK COUNTY and COOK
13 COUNTY, Are the Defendants.
14 I further certify that the said witness was
15 first duly sworn to testify the truth, the whole
16 truth and nothing but the truth in the cause
17 aforesaid; that the testimony then given by said
18 witness was reported stenographically by me in the
19 presence of the said witness, and afterwards
20 reduced to typewriting by Computer-Aided
21 Transcription, and the foregoing is a true and
22 correct transcript of the testimony so given by
23 said witness as aforesaid.
24 I further certify that the signature to the

176

44 (Pages 173 to 176)

1  foregoing deposition was waived by counsel for the
2  respective parties.
3      I further certify that the taking of this
4  deposition was pursuant to Notice, and that there
5  were present at the deposition the attorneys
6  hereinbefore mentioned.
7      I further certify that I am not counsel for
8  nor in any way related to the parties to this
9  suit, nor am I in any way interested in the
10 outcome thereof.
11     I have hereunto set my hand this 31st day of
12 May 2011.
13
14
15  _____
    NOTARY PUBLIC, KANE COUNTY, ILLINOIS
16
17
18
19
20
21
22
23
24
                                        177

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois   (312) 263-0052**

Ex 40  Mason Dep 045