IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Micheal Parish, Curtis L. Oats, Leila Khoury, Sean Driscoll, Carla Lofton, Roy Cleaves, Lisa Brown, Dan Taylor, Dean Miller, Kevin Sanders, Stacey Clark, and Carlotte Watson, | ) ) ) ) ) | |
| | ) | No. 07 CV 4369 |
| *Plaintiffs,* | ) ) | |
| | ) | *Judge John Z. Lee* |
| *-vs-* | ) | Judge Presiding |
| | ) | |
| Sheriff of Cook County and Cook County, | ) ) | Courtroom 1225 |
| *Defendants.* | ) ) | |

**Exhibit 41**
**Deposition of Teria Beasley**
**May 6, 2011**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL PARISH, CURTIS L. OATS,  )
LEILA KHOURY, SEAN DRISCOLL,  )
CARLA LOFTON, ROY CLEAVES, LISA )
BROWN, DAN TAYLOR, DEAN MILLER, )
KEVIN SANDERS, STACEY CLARK, and )
CARLOTTE WATSON,        ) No. 07 CV 4369
        Plaintiffs,        )
    vs.        )
SHERIFF OF COOK COUNTY and COOK )
COUNTY,        )
        Defendants.        )

The deposition of TERIA BEASLEY, called for examination pursuant to notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Martha C. Newton, a notary public within and for the County of Kane and State of Illinois, at Richard J. Daley Center, Fifth Floor, Chicago, Illinois, on the 6th day of May 2011, at the hour of 11:22 a.m.

Reported by: Martha C. Newton, CSR, RPR, RMR
License No.: 084-003632

1

---

```
 1                      I N D E X
 2   WITNESS              EXAMINATION
 3   TERIA BEASLEY
 4     BY MR. CATANIA          4
 5
 6
 7
 8                   E X H I B I T S
 9   NUMBER            MARKED FOR ID
10   Beasley Exhibit
11   Exhibit No. 1          13
12   Exhibit No. 2          31
13   Exhibit No. 3          32
14   Exhibit No. 4          108
15
16
17
18
19
20
21
22
23
24
```
3

---

```
 1   APPEARANCES:
 2       THOMAS MORRISSEY, LTD., by
 3       MR. THOMAS G. MORRISSEY
 4       tgmlaw@ameritech.net
 5       10249 South Western Avenue
 6       Chicago, Illinois  60643
 7       (773) 233-7900
 8          Representing the Plaintiffs;
 9
10   COOK COUNTY STATES ATTORNEY, by
11       MR. FRANCIS J. CATANIA
12       francis.catania@cookcountyil.gov
13       500 Richard J. Daley Center
14       Chicago, Illinois  60602
15       (312) 603-5440
16          Representing the Defendants.
17
18   ALSO PRESENT:
19       Ms. Alison Zamora
20
21
22
23
24
```
2

---

```
 1                  (Witness sworn.)
 2       MR. CATANIA:  Ma'am, will you please give
 3   your full name for the record and spell your last
 4   name.
 5       THE WITNESS:  Teria Ann Rhodes Beasley,
 6   B-e-a-s-l-e-y.
 7       MR. CATANIA:  This is the federal deposition
 8   of Ms. Teria Beasley made pursuant to notice to
 9   all parties.
10          TERIA ANN RHODES BEASLEY,
11   called as a witness herein, having been first duly
12   sworn, was examined and testified as follows:
13               EXAMINATION
14   BY MR. CATANIA:
15       Q.  Ms. Beasley, could you tell me what is
16   your date of birth.
17       A.  8/5/71.
18       Q.  And how old are you today?
19       A.  39.
20       Q.  Do you still live in Dolton which is on
21   the affidavit which I'm going to make an exhibit?
22       A.  Yes, sir.
23       Q.  And that would be 324 Riverside Drive?
24       A.  Yes, sir.
```
4

---

1 (Pages 1 to 4)

1    Q.   How long have you lived there?
2    A.   That's about 11 -- four years -- three
3  years -- four years.  Three years.
4    Q.   Three years.
5    A.   Three years.
6    Q.   Where did you live before that?
7    A.   16630 Paulina Street, Markham, Illinois.
8    Q.   And how long did you live at that
9  address?
10   A.   I lived there over nine years.
11   Q.   Who do you currently live with?
12   A.   Me, my three kids and my husband.
13   Q.   Okay.  What are your children's names and
14  ages?
15   A.   Dallas Beasley is 17.  Frances Clark is
16  18.  Tamar Beasley is 14.
17   Q.   The second one's name is?  The middle
18  child.
19   A.   The middle child, Dallas Beasley.
20   Q.   Okay.  And she's --
21   A.   Dallas Beasley, Jr., he's a boy.
22   Q.   And he's 17?
23   A.   Yes, sir.
24   Q.   And he lives at that address and the

5

1  second one you named?
2    A.   Frances Clark, F-r-a-n-c-e-s.  She's 18.
3    Q.   Okay.
4    A.   And Tamar, T-a-m-a-r, Beasley, she's 14.
5    Q.   14.  Are you currently married?
6    A.   Yes, sir.
7    Q.   And what's the name of your husband?
8    A.   Elbert, E-l-b-e-r-t, Walton.
9    Q.   When did you get married?
10   A.   I got married September 10 of -- I been
11  married almost two years, so that's what?  I got
12  married September 10 last year.
13   Q.   Okay.  Of 2010 or 2009?
14   A.   2010.
15   Q.   Okay.  All right.  How long -- is Elbert
16  Walton the father of any of these three children?
17   A.   No.
18            (Mr. Morrissey entered.)
19  BY MR. CATANIA:
20   Q.   Have you ever been deposed before?  Have
21  you ever been in a room with a court reporter for
22  a deposition before?
23   A.   Not that I -- no.
24   Q.   What do you think this deposition is

6

1  about?
2    A.   What I do think it's about?  Me not
3  receiving my meds.
4    Q.   You not receiving your meds?
5    A.   Uh-huh.
6    Q.   Okay.  The term "meds," what does that
7  mean to you?
8    A.   What does that mean?
9    Q.   Yes.
10   A.   Medication that I'd been on all my life.
11   Q.   Okay.  Why do you think there's a court
12  reporter here?
13   A.   Why do I think it's one here?
14   A.   Uh-huh.
15   A.   I guess I'm not understanding your
16  question.
17   Q.   Okay.  I'm asking you what your -- what
18  you think is the reason why we have a court
19  reporter taking the information down.
20   A.   To find out I guess what happened.
21   Q.   Okay.  And do you remember a few moments
22  ago the court reporter told you to raise your
23  right hand and you gave an oath; right?
24   A.   Uh-huh.

7

1    Q.   What does that mean to you?
2    A.   That I'm going to tell the truth.
3    Q.   Okay.  What are you going to do if you
4  don't hear a question that I ask?
5    A.   What am I going to do?
6    Q.   Yeah.
7    A.   I'm going to let you know if you ask a
8  question I don't understand it or I don't remember
9  the question, I can respond to it.
10   Q.   Excellent.  All right.  I ask that you do
11  your best to keep your answer loud enough so that
12  Ms. Zamora can hear you.  She's at the end of the
13  table there, and she wants to be able to hear.
14  Okay?
15   A.   Uh-huh.
16   Q.   Is there anything on your mind today that
17  might make it difficult for you to concentrate?
18   A.   No.
19   Q.   Are you on any drugs or medications or
20  alcohol that you think will interfere with your
21  ability to give truthful answers to my questions?
22   A.   No.
23   Q.   Is there anything else that you're aware
24  of that would keep you from giving a full complete

8

2 (Pages 5 to 8)

1 answer to my questions?
2    A. No.
3    Q. What will you do if I interrupt you while
4 you're answering?
5    A. What will I do?
6    Q. Uh-huh.
7    A. I wait till you get through and then
8 respond.
9    Q. Okay. Perfect. All right. What will
10 you do if you need to look at one of the documents
11 you brought with you today?
12    A. What would I do?
13    Q. Yeah.
14    A. I would ask my attorney.
15    Q. Okay. Did you bring any documents with
16 you here today?
17    A. Did I bring any?
18    Q. Uh-huh.
19    A. Yeah.
20    Q. What did you bring?
21    A. One of my papers from the hospital. One
22 of the papers from one of the prescriptions that
23 they gave me from the county.
24    Q. From the county?
                                                          9

1    A. Uh-huh.
2    Q. What county?
3    A. The county jail.
4    Q. From the jail.
5    A. Uh-huh.
6    Q. Okay. When you answer I would just ask
7 if you can use words rather than a sound like
8 uh-huh because it sounds the same thing as uh-uh
9 on the record.
10    A. Okay.
11    Q. So if you just say yes or no it will help
12 the court reporter a lot. Okay?
13    A. Okay.
14    Q. If you realize after you've given an
15 answer that you think it might have been wrong,
16 what will you do to let us know about that?
17    A. Well, hopefully I'll think and won't give
18 a wrong answer.
19    Q. Yeah.
20    A. But if I do, I'll just have to rethink
21 and let you know that I'm not for sure.
22    Q. I'll appreciate that if you do that for
23 us.
24    A. Okay.
                                                          10

1    Q. Have you ever been a plaintiff or
2 defendant in another lawsuit?
3    A. No. Excuse me. I will take that back.
4 Yes.
5    Q. Okay.
6    A. A car accident I was in.
7    Q. When was that?
8    A. It's been -- I don't remember the year
9 but it's been some years.
10    Q. Okay.
11    A. More than five years.
12    Q. Do you have a driver's license?
13    A. No.
14    Q. Is it suspended?
15    A. Yes.
16    Q. Is it revoked?
17    A. No, just suspended.
18    Q. What is it suspended for?
19    A. I had tickets. I have tickets that I
20 need to -- that I have to pay and I'm on a payment
21 plan like.
22    Q. You're on --
23    A. I'm getting on a payment plan.
24    Q. You have unpaid traffic tickets?
                                                          11

1    A. Yes.
2    Q. Okay. And that caused your license to be
3 suspended?
4    A. Yes.
5    Q. Do you know who David Gerald is?
6    A. Yes.
7    Q. Who was David Gerald?
8    A. David Gerald was my ex-boyfriend's
9 brother.
10    Q. What's the boyfriend's name?
11    A. We call him Latino but his name was James
12 Costello.
13    Q. Have you ever had any litigation with
14 David Gerald?
15    A. Have we ever had a disagreement?
16    Q. And have you ever gone to court for it?
17    A. Yeah, we had a disagreement, yes. We
18 never went to court.
19    Q. Do you know who Harry Richardson is?
20    A. Who?
21    Q. Harry Richardson.
22    A. No.
23    Q. How about Irving Nicholson?
24    A. No.
                                                          12

3 (Pages 9 to 12)

1      Q.  I'm going to show you what I'm going to
2  ask the court reporter to mark as Exhibit 1.
3              (Beasley Deposition Exhibit
4              No. 1 was marked for
5              identification.)
6  BY MR. CATANIA:
7      Q.  I'm going to ask you to take a look at
8  these four pages and tell me if you recognize it.
9          MR. MORRISSEY:  Do you have a copy for us?
10         MR. CATANIA:  No, I don't.  I have one more
11 for me.
12         MR. MORRISSEY:  This document is the sworn
13 declaration --
14         MR. CATANIA:  Yes.
15         MR. MORRISSEY:  -- of Ms. Beasley?
16 BY MR. CATANIA:
17     Q.  You've had a chance to look at the four
18 pages?
19     A.  Yes, sir.
20     Q.  On the last page is that your signature?
21     A.  Yes, sir.
22     Q.  And did you sign it on January 19 of 2011?
23     A.  Yes, sir.
24     Q.  Where did you sign this?

                                                    13

1      A.  I signed this in my attorney's office.
2      Q.  Okay.  And that attorney is Mr. Morrissey
3  that's here?
4      A.  Yes, sir.
5      Q.  And where's his office?
6      A.  On Western.  I don't know the complete
7  address.
8      Q.  Okay.  Is that the --
9      A.  I just know how to get there.
10     Q.  Is that the first time you had been to
11 his office?
12     A.  That's the -- yes.
13     Q.  Okay.  How many times have you met with
14 Mr. Morrissey or Mr. Flaxman or Ms. Zamora?
15     A.  I spoken with -- I have a bad memory.
16 But I spoken with my -- I spoken with one
17 attorney.  Mr. Kenneth, and then I proceeded
18 speaking with Mr. Thomas, and I have spoke to
19 Mrs.....
20     Q.  Zamora.
21     A.  Zamora I think twice if I'm not mistaken.
22     Q.  When was the first meeting you had with
23 any of those people either by phone or in person?
24     A.  Oh, wow.  On phone I spoken with

                                                    14

1  Mr. Thomas.  I believe it was -- I spoken with him
2  I say about three times, two times maybe.
3      Q.  Is that in this year 2011?
4      A.  Uh-huh.
5      Q.  Did you speak with Mr. Morrissey or
6  Mr. Flaxman, that's Thomas or Kenneth, in 2010?
7      A.  Yes.
8      Q.  Did they come to your wedding?
9      A.  No.
10     Q.  Did you speak with them before you got
11 married?
12     A.  Was I married when I spoke to
13 Mr. Kenneth?  I believe -- I believe I was married
14 when I spoke with Mr. Kenneth.
15     Q.  Okay.  So you were married on September
16 10 of 2010?
17     A.  Uh-huh.
18     Q.  So sometime after that you spoke with
19 Kenneth?
20     A.  Right, I believe.
21     Q.  Was that on the phone?
22     A.  Yes, sir, and by mail.
23     Q.  Did you give him any information over the
24 phone about your stay at the jail?

                                                    15

1      A.  No, sir.  I just basically -- he
2  basically asked me what days had I been there and
3  what days and then he sent me some papers in the
4  mail.
5      Q.  Did you contact him first or did he
6  contact you first?
7      A.  He contact me by mail first and then I
8  was to contact him back when I -- that's what the
9  letter said, and I did so.
10     Q.  All right.  Did it say why you were to be
11 contacting him back?
12     A.  Did the letter say why?
13     Q.  Yes.
14     A.  Yes.  The letter was explaining just
15 briefly of what the case was, what he was -- what
16 he was calling, sending me the letter for trying
17 to get in contact with me because I had moved.
18     Q.  Do you have that letter?
19     A.  Do I have it?
20     Q.  Yes.
21     A.  I might have it at home.
22         MR. CATANIA:  Mr. Morrissey, correspondence
23 is one of the things that I requested and there's
24 no attorney-client privilege on the solicitation

                                                    16

                                          4 (Pages 13 to 16)

1    letter, so I'd like a copy of that letter.
2        MR. MORRISSEY: I believe she's referring to
3    the letter she received about the notice of this
4    litigation.
5        THE WITNESS: Right.
6        MR. CATANIA: Mr. Morrissey, don't do that.
7        MR. MORRISSEY: You asked in regards --
8        MR. CATANIA: I asked you to produce the
9    letter.
10       MR. MORRISSEY: And the letter is I'm telling
11   you is the --
12       MR. CATANIA: You can produce it without
13   coaching the witness as to what her next answer
14   will be.
15       MR. MORRISSEY: I'm not coaching her. You
16   asked and I told you what it was.
17       MR. CATANIA: And as you know, and this is
18   for the record, notice went out in 2008. She's
19   talking about 2010, two years later.
20       MR. MORRISSEY: I believe she has something
21   to add.
22       THE WITNESS: Yes. I had moved and -- from
23   16630 Paulina where the letter had originally went
24   and then when it came to me it was -- it came to

17

1    me when I -- when they got my new address to where
2    I was living and -- in Dolton, Illinois.
3    That's -- that's how the letter came to me from
4    Markham to Dolton, because I had moved, changed
5    addresses from Paulina to Dolton.
6    BY MR. CATANIA:
7        Q.  Okay.  Could you tell me if you've ever
8    seen Exhibit 1 before today?
9        A.  Had I ever seen it?
10       Q.  Yes, before today.
11       A.  No.  I just seen this -- this is -- I
12   hadn't read it but I seen it to sign the back of
13   this paper back here.  I had seen that.
14       Q.  Okay.  Are you saying that you signed
15   this four-page sworn declaration without reading
16   it?
17       A.  No.  This is -- what day was this I went
18   to -- I went to the office, and when I went to the
19   office this is the notice that I had got that we
20   had talked about.
21       Q.  Okay.  Is that the first time you saw
22   this document when you went to the office?
23       A.  Is this the first time?
24       Q.  No.  When you went to the office --

18

1    there's a date on there.  I think it says January
2    19, 2011.
3        A.  When I went to the office this hadn't
4    been did up yet I don't believe.  This is the
5    document that I gave him that I told him about.
6    Yes, I have seen this before now.
7        Q.  What did you do to prepare that document?
8        A.  What did I do?
9        Q.  Yes.
10       A.  I was talking to my lawyer, speaking with
11   my lawyer about what was -- what had went on.
12       Q.  Was that at Tom Morrissey's office?
13       A.  Yes.
14       Q.  It was not at Ken Flaxman's office;
15   right?
16       A.  No.
17       Q.  You spoke with Tom Morrissey about the
18   document, is that right, about that?
19       A.  Me and Mr. Morrissey talked.  This is
20   what -- these are what -- this -- everything in
21   here is what I said.
22       Q.  Everything?
23       A.  From what I read.
24       Q.  Okay.

19

1        A.  Is from everything from what I said, my
2    doctor's name, my diagnosis, my prescriptions, my
3    address, my doctor's addresses, and everything.
4    All this is my -- and my age and everything, my
5    arrest record, my dates that I think I remember.
6        Q.  Do you remember your CIMIS number?
7        A.  My ID number?
8        Q.  Yes.
9        A.  I remember part of it, yes.
10       Q.  Do you remember which -- which of the two
11   numbers that are listed there -- can you recite
12   them without reading them?
13       A.  What do you mean?  Without looking at
14   them?
15       Q.  Yes.
16       A.  No.
17       Q.  You need to refer to something to do
18   that?
19       A.  Yes, I need to refer to my papers.  I
20   have -- I keep -- I keep everything.  My -- like
21   when I went to the county, the papers they gave me
22   for my prescriptions and all that, I kept -- I
23   keep all that.
24       Q.  Okay.

20

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois   (312) 263-0052**

1    A.   And then it has the white tag with your
2  label number on it, your ID number which that's
3  what they call it, the ID number.
4    Q.   Did your lawyer tell you to bring those
5  things with you today?
6    A.   Did he ask me to bring that with me?
7    Q.   Yes.
8    A.   He asked me to bring one of my papers.  I
9  brung it to him before.  I sent one copy to his
10  office and I had brung a copy with me.
11    Q.   What about all those other papers you
12  just mentioned, the other piece of paper you got?
13    A.   I did that on my own.
14    Q.   Where are those papers?
15    A.   They're -- what, the ID number paper?
16    Q.   Yes.
17    A.   My ID number is on my paper sitting on
18  the table.
19    Q.   What about the other ID number?
20    A.   That's the paper that I found with my ID
21  and everything on it.
22    Q.   Where are all the papers that you say
23  that you collected while you were at the jail?
24    MR. MORRISSEY:  For the record, this is the

21

document that Ms. Beasley brought in today, this
2  morning which represents the document she has.
3    THE WITNESS:  That the county gave me.
4    MR. MORRISSEY:  We can make copies of it.
5    MR. CATANIA:  Well, we could do that if you
6  would stop interrupting and coaching the witness.
7  BY MR. CATANIA:
8    Q.   Can you tell me where all the papers that
9  you collected --
10    A.   This is what I found --
11    Q.   -- when you were at the jail?
12    A.   -- and that's what I brung.
13    Q.   Okay.  A moment ago --
14    A.   What I had.
15    Q.   Ma'am, a moment ago you told me that you
16  keep everything.
17    A.   Yes, I have numbers from the females that
18  gave me to write them and all that and my doctor's
19  papers and the label, the plastic bag with the
20  label with my ID number and everything on it.  I
21  have that bag with the ID number on it.
22    Q.   That question was, did your --
23    A.   It's at home.  No, I did not bring it.
24    Q.   Did your lawyer tell you to bring it with

22

1  you?
2    A.   No, he did not tell me to bring it, but I
3  brung it on my own.
4    Q.   Okay.  Did you bring it to his office?
5    A.   Yes, I brung --
6    Q.   In January of this year?
7    A.   Did I bring it to his office?
8    Q.   Yes, Mr. Morrissey's office.  Did you
9  bring that paperwork with you to his office?
10    A.   No.
11    Q.   On the date that's on this paper, January
12  19 of 2011, did you provide the information that's
13  contained in this paper, this sworn declaration?
14    MR. MORRISSEY:  I'll object.  It's been asked
15  and answered.
16    You can answer again.
17  BY MR. CATANIA:
18    Q.   Did you?
19    A.   Did I bring the papers with me?
20    Q.   No.  Did you bring -- did you provide the
21  information that's contained in here --
22    A.   I gave him the information that I had,
23  yes.  The information that I had in my papers and
24  the things I give him, I gave them to my lawyer.

23

1    Q.   Okay.
2    A.   So I guess I'm not understanding your
3  question.
4    Q.   Probably not.  What all things did you
5  give to your lawyer before you signed the document
6  in front of you, the sworn declaration?
7    A.   I sent -- gave a copy of my -- my meds
8  papers and my serial number piece, the tag.
9    Q.   Two pieces of paper?
10    A.   Yes, I gave one to -- up under his door
11  to his secretary and then I brung this one today.
12    Q.   Okay.  So know you've given two papers
13  only to your lawyer.  Is that what you're saying?
14    A.   That's what I told you the first time.
15  The papers that I had.
16    Q.   All right.  But you did say earlier in
17  this deposition which is why I was confused that
18  you kept every piece of paper that you got
19  while --
20    A.   I keep everything I have.
21    Q.   You said it again.
22    A.   I'm a pack rat.
23    Q.   Okay.  Do you have any other pieces of
24  paper --

24

EX 41 Beasley Dep 006

1     A.   I have --
2     Q.   -- from the jail?
3     A.   And I explained to you.  I have the label
4  that comes out -- that the paper came out of with
5  the bag with numbers of torn off papers from the
6  girls on the tier and my med papers showing the
7  only meds that they gave me.  That's what I told
8  you the first time and I'm telling you that the
9  second time.
10     Q.   Now have you told me about all the papers
11  that you have from the time that you were in the
12  jail?
13     A.   All of what papers?  They only give you
14  your med papers and you get papers that the girls
15  give you to write them.  That's what I'm
16  complying -- that's what I'm telling you.  I have
17  them papers.
18     Q.   I want a simple answer, ma'am.
19     A.   That is an answer.
20     MR. MORRISSEY:  I object.
21  BY MR. CATANIA:
22     Q.   Have you now --
23     MR. MORRISSEY:  You ask it -- let me --
24     THE WITNESS:  I'm getting frustrated.

25

1     MR. MORRISSEY:  -- formulate my objection.
2  Ms. Beasley is referring --
3     MR. CATANIA:  Object and state the reason,
4  please.
5     MR. MORRISSEY:  Well, I'm --
6     MR. CATANIA:  You're going to coach her.  You
7  are going to coach her.  Object and state the
8  reason.
9     MR. MORRISSEY:  My objection -- my objection
10  is you're badgering the witness.  That --
11     MR. CATANIA:  Incorrect.
12     MR. MORRISSEY:  That --
13     MR. CATANIA:  Incorrect.
14     MR. MORRISSEY:  Well, you're badgering her.
15     MR. CATANIA:  All right.  You finished --
16     MR. MORRISSEY:  She's given you --
17     MR. CATANIA:  You finished.
18     MR. MORRISSEY:  -- your responses.
19     MR. CATANIA:  Mr. Morrissey, I will call the
20  judge.
21     MR. MORRISSEY:  You can call the judge.  You
22  can't keep asking the same questions over --
23     MR. CATANIA:  I'm not asking the same
24  questions.

26

1     MR. MORRISSEY:  -- and over.
2     THE WITNESS:  Because he's confusing me
3  because I'm not understanding what he's saying.
4  BY MR. CATANIA:
5     Q.   All right.  It's this simple, ma'am.  You
6  told me about the papers that you had that you
7  gave to your lawyer --
8     A.   This paper and the paper with my -- that
9  the white -- that they give you, the white bags
10  with the -- they call it whatever pack, some kind
11  of pack they call it that they give you with your
12  meds in it.  The meds that they give you, you have
13  a label, white label on it.  And that is what I
14  brung to my lawyer and gave to my lawyer and I
15  gave him this one today because I found this one
16  out of the pack.  And numbers with the girls'
17  numbers on it, I did not give him that.  I just
18  gave him what's important that he needed from me.
19  That I thought he needed from me rather.
20     Q.   My question is and I'll say the whole
21  thing so you understand.  You've now just
22  mentioned the paper that you brought today, a
23  paper that was the strip of paper that's off of
24  the blister pack that you got while you were in

27

1  jail that told -- describes your prescriptions
2  and --
3     A.   And my number.
4     Q.   -- your number, and you have a paper that
5  has the names of women that were in the housing
6  unit that you were in --
7     A.   Yes.
8     Q.   -- back in 2008?
9     A.   Right.  But I didn't give him that, the
10  women's name of the housing number.  I gave him
11  that and the blister pack label.
12     Q.   Okay.  Now --
13     A.   That's only two things that -- that I
14  gave my lawyer.
15     Q.   Now, have you told me about all of the
16  papers that you --
17     A.   Them all the papers.
18     Q.   Ma'am, please.  I just want to finish my
19  question.
20     Have you now told me about all of the
21  papers that you have from your incarceration in
22  2007 and 2008?
23     A.   That's all the papers.
24     Q.   Thank you.  That's the question I was

28

1    asking.
2        A.   I answered that.
3        Q.   When you were preparing this affidavit
4    that's in front of you, did you refer to any other
5    documents besides the ones you've talked about?
6        A.   I provided him with my doctor's name, his
7    address, if that's what you're asking.
8        Q.   No, I'm asking about documents. Did you
9    provide any other documents?
10       A.   No. No.
11       Q.   Were any other documents shown to you?
12       A.   I don't have any other documents.
13       Q.   All right. Was the date of January 19,
14   2011 the first time you were asked to remember the
15   events that occurred on November 15 of '07 to
16   November 8 of '07, is that the first time you were
17   asked to remember those things?
18       A.   Is that the first time?
19       Q.   That you were asked to remember those
20   things.
21       A.   I think when I talked to Mr. Kenny he
22   asked me about them dates.
23       Q.   When was that?
24       A.   I don't remember.

                                                    29

1        Q.   Was it a date after your date of your
2    wedding?
3        A.   I don't remember.
4        Q.   Okay.
5        A.   I know I talked to him after my wedding,
6    but I don't remember what date it was.
7        Q.   All right. Was this the first time you
8    were asked to remember the events that occurred
9    between September 11 of 2008 to October 14 of 2008?
10       A.   I believe so.
11       Q.   Okay. Did you sign and date the HIPAA
12   privacy statement at the same time as this -- as
13   you signed this affidavit?
14       MR. MORRISSEY: I'm going to object to the
15   question. I don't know if a layperson understands
16   what HIPAA means.
17       THE WITNESS: Because I don't.
18   BY MR. CATANIA:
19       Q.   Ma'am, I understand that. And I will
20   show it to you in just a moment. Did you sign
21   another piece of paper at the same time as you
22   signed this affidavit?
23       A.   I signed papers with him. I don't
24   remember -- I truthfully honestly I don't remember

                                                    30

1    what papers I signed. I did sign a lot of papers
2    with my attorney.
3        Q.   Did you sign a contract with your
4    attorney?
5        A.   A contract?
6        Q.   Yes.
7                 (Beasley Deposition Exhibit
8                 No. 2 was marked for
9                 identification.)
10   BY MR. CATANIA:
11       Q.   Do you remember if you signed a contract?
12       MR. MORRISSEY: Can I see the document before
13   you show it to her. This is being marked as
14   Exhibit No. 2?
15       MR. CATANIA: Yes.
16       THE WITNESS: And I do remember signing this.
17   BY MR. CATANIA:
18       Q.   Okay. You've been shown Exhibit No. 2.
19   It's called HIPAA privacy authorization; is that
20   right?
21       A.   You asking me is that what this saying?
22       Q.   Yes.
23       A.   Yes, this is what it's saying.
24       Q.   Did you sign Exhibit No. 2 on January 19,

                                                    31

1    2011?
2        A.   Yes, I did.
3        Q.   And the names that are written up there
4    in the box about providers, are the names of
5    doctors and hospitals and pharmacies that you
6    provided to --
7        A.   Yes, they are.
8        Q.   -- Mr. Morrissey? All right.
9            Could you read the names that you
10   provided Mr. Morrissey?
11       A.   Dr. Songe at St. Bernard Hospital,
12   Dr. Moolayil at Ingalls Hospital, Walgreens Drugs
13   Company, CVS Drug -- CVS, Cermak Corporation.
14       Q.   All right. And those are the
15   information -- that's the information you provided
16   to --
17       A.   Yes.
18       Q.   -- Mr. Flaxman and Mr. Morrissey; right?
19       A.   Yes.
20       MR. CATANIA: Ask that you mark this as
21   No. 3, please.
22                (Beasley Deposition Exhibit
23                No. 3 was marked for
24                identification.)

                                                    32

1    BY MR. CATANIA:
2        Q.   The doctor that you described at Ingalls
3    is Moolayil; is that right?
4        A.   Yes, sir.
5        Q.   And his first name is Kumar, Kumar
6    Moolayil?
7        A.   Something like that.  I don't know how to
8    pronounce his name but he has a C --
9        Q.   I'm going to show you what's been marked
10   as Exhibit 3.
11       MR. MORRISSEY:  Mr. Catania, don't show the
12   witness a document without showing me.
13       MR. CATANIA:  You have a copy of this
14   document because your name is on the
15   authorization.
16       MR. MORRISSEY:  I don't have a copy.
17       MR. CATANIA:  You do.
18       MR. MORRISSEY:  Well, I'd appreciate seeing
19   the document before you show it to my client.  Do
20   you have copies of these?
21       MR. CATANIA:  You do.  I don't.
22   BY MR. CATANIA:
23       Q.   Ma'am, the document that's marked as
24   Exhibit No. 3 that's in front of you is certifying

33

1        MR. CATANIA:  Can the record reflect
2    Mr. Morrissey has asked his client to step into
3    the hallway.
4            (A break was taken.)
5        MR. CATANIA:  Ready?
6        MR. MORRISSEY:  Yes.
7    BY MR. CATANIA:
8        Q.   Ma'am, what did your lawyer tell you in
9    the hallway just now?
10       MR. MORRISSEY:  Objection.  That's
11   attorney-client privilege.
12       MR. CATANIA:  No, it's not.  She's on the
13   stand.  She's a witness testifying.
14       MR. MORRISSEY:  It was an attorney-client
15   privilege.  It was during the course of my
16   relationship with the client.  There was no
17   question pending.
18   BY MR. CATANIA:
19       Q.   You can answer the question.
20       MR. MORRISSEY:  There was no question
21   pending.
22       MR. CATANIA:  Are you asserting a privilege,
23   ma'am?  Are you?  Are you asserting an
24   attorney-client privilege?

35

1    that Dr. Moolayil is certifying to your lawyers
2    and to me that he has no records of you.  Is he
3    mistaken about that or are you?
4        A.   No, I'm not mistaken because I have the
5    prescription bottle.  I have the medication that
6    he gave me.
7        Q.   So then you're saying your doctor is
8    mistaken; is that right?
9        A.   I'm not saying he's mistaken.
10       Q.   Well, if you look --
11       A.   He sees a thousand patients, I mean.
12       Q.   If you look at the bottom of the page
13   there's a signature.  It says Kumar Moolayil,
14   M-o-o-l-a-y-i-l.  That's the doctor; is that
15   right?
16       A.   This is the doctor, yes.
17       Q.   All right.  He certified to me and to
18   Mr. Morrissey that he has no records of you.  Is
19   he mistaken?
20       A.   Yes, he's mistaken.
21       MR. MORRISSEY:  Can we take a moment.
22   BY MR. CATANIA:
23       Q.   Can you tell me if there's any reason --
24       MR. MORRISSEY:  Come out here.

34

1        THE WITNESS:  Yes.
2    BY MR. CATANIA:
3        Q.   Okay.  But for the claim that there is a
4    privilege, are you able to answer the question?
5        A.   No.
6        Q.   Then in other words, you don't know if
7    he -- if he said anything to you in the hallway or
8    not; is that what you're saying?
9        A.   I'm not saying that.
10       Q.   What are you saying?
11       A.   I'm saying I'm getting irritated.  I'm
12   irritated.
13       Q.   Have you ever been arrested before?
14       A.   Yes, I have.
15       Q.   After being arrested have you been given
16   court dates for those cases?
17       A.   Yes, I have.
18       Q.   How many times did you fail to show up to
19   court following an arrest?
20       A.   One, two.  If I'm not mistaken, keep from
21   telling a lie, I will say about two times.
22       Q.   Okay.
23       A.   Maybe more, but I only remember two.
24       Q.   Why is it that you don't remember more

36

9 (Pages 33 to 36)

1  than two?
2      A.  I have had two strokes and my memory is
3  not that good.
4      Q.  Do you know how many times you've been
5  arrested?
6      A.  In my life or?
7      Q.  Yes, in your life.
8      A.  No, I don't remember exactly how many
9  times I've been arrested.
10      Q.  Have you ever been convicted?
11      A.  Have I ever been convicted?
12      Q.  Yes.
13      A.  Yeah, I have been convicted.  I have
14  pleaded guilty if that's what you're asking me.
15      Q.  I'm asking you if you've ever been
16  convicted.
17      MR. MORRISSEY:  I'm going to object.  She
18  isn't an attorney.  She's trying to answer your
19  questions best of her ability.
20  BY MR. CATANIA:
21      Q.  Do you have any felony convictions?
22      A.  On the case that I was fighting during
23  the time I was in jail, yes, for protecting my
24  daughter, defending my daughter, yes.

                                                    37

1      A.  No.
2      Q.  Carla Lofton?
3      A.  No.
4      Q.  Curtis Oats?
5      A.  Curtis Oats?  Curtis Oats.  No.
6      Q.  Leila Khoury?
7      A.  No.
8      Q.  Lisa Brown?
9      A.  No.
10      Q.  Dan Taylor?
11      A.  Dan Taylor?  Dan Taylor?  No, I don't
12  know a Dan Taylor.  But I know Taylors.
13      Q.  Sean Driscoll?
14      A.  No.
15      Q.  Roy Cleaves?
16      A.  No.
17      Q.  Dean Miller?
18      A.  No.
19      Q.  Kevin Sanders?
20      A.  No.
21      Q.  Stacey Clark?
22      A.  No.
23      Q.  Carlotte Watson?
24      A.  No.

                                                    39

1      Q.  Would that be the aggravated battery
2  case?
3      A.  Yes.
4      Q.  Did you plead guilty in that case?
5      A.  I did.  I pleaded guilty to go home.
6      Q.  You pled guilty to a judge; right?
7      A.  Yes, I did.
8      Q.  And you admitted to the judge the facts
9  that were stated in the record; right?
10      A.  Whatever.
11      Q.  Okay.  Have you ever been convicted of an
12  offense of moral turpitude?
13      A.  What is that?
14      Q.  Okay.  Have you ever been convicted --
15  have you ever pled guilty to prostitution, for
16  example?
17      A.  Yeah, when I was young.
18      Q.  Did you --
19      A.  Very young.
20      Q.  Do you know the names that I'm about to
21  give you that are the names of the plaintiffs in
22  this case?  Do you know Michael Parish?
23      A.  Michael Parish.
24      Q.  Yes.

                                                    38

1      Q.  Did you meet with the other side -- with
2  Mr. Morrissey before today's deposition?
3      A.  Did I meet with him?
4      Q.  Yes.
5      A.  Before today's deposition?
6      Q.  Yeah.
7      A.  I met with him at his office when I told
8  you the first time when you asked me that.
9      Q.  In January?
10      A.  Yes.
11      Q.  Between January and today, did you meet
12  with him?
13      A.  No.
14      Q.  Okay.  Before we started the deposition
15  today, did you -- did you meet with him in our
16  office space out front?
17      A.  Before today, no.
18      Q.  Before this deposition.
19      A.  No.
20      Q.  Today?
21      A.  No.
22      Q.  Did you meet with him today?
23      A.  Yes.
24      Q.  In this open office -- office entryway?

                                                    40

1   A.   Yes, I was here for the deposition.
2   Q.   Okay.  Have you signed any other written
3   statements besides Exhibit No. 1 that's in front
4   of you?
5   A.   If I'm not mistaken, I believe I
6   signed -- yes, I believe I signed some other
7   papers.
8   Q.   Were they statements about the events
9   that happened at the jail?
10  A.   Were they statements?  No, I don't
11  believe so.
12  Q.   Did any employee of the county ever admit
13  to you anything about the circumstances of your
14  incarceration?
15  MR. MORRISSEY:  I'm going to object.
16  THE WITNESS:  I don't understand.
17  MR. MORRISSEY:  The question is vague and
18  ambiguous.
19  THE WITNESS:  I'm not understanding the
20  question.
21  BY MR. CATANIA:
22  Q.   Okay.  Fair enough.  Do you know any
23  people that were in jail at the time you were?
24  A.   Do I know anyone?

41

1   Q.   Uh-huh.
2   A.   What do you mean do I know anyone?
3   Q.   The people that were in the jail at the
4   same time you were in your housing division or in
5   the receiving area --
6   A.   No.
7   Q.   -- do you know any of them?
8   A.   No.
9   Q.   Do you know any of the correctional staff
10  that was working in those areas?
11  A.   I know when I was there I know people
12  there.
13  Q.   What names do you recall?
14  A.   I know, like, the one that hit me with
15  the -- with the walkie-talkie I know her name.  I
16  just know her first name.
17  Q.   What is her first name?
18  A.   Officer Davis.  I mean her last name
19  Officer Davis.
20  Q.   Okay.  Anybody else?
21  A.   I know the officer that I worked for on
22  the worker's tier.  His name was Officer Michaels.
23  I know an officer -- one of the tier workers was
24  name Officer Rogers.

42

1   Q.   Was that a female or male?
2   A.   A female.  Officer Pam.  I know a lot --
3   I know all the officers' name.
4   Q.   Okay.
5   A.   If that's what you're asking me.
6   Q.   And aside from knowing their names, have
7   you ever met with them on a social --
8   A.   No.
9   Q.   -- in a social way?
10  A.   No.
11  Q.   Did any of those people that you just
12  mentioned, those officers, ever tell you anything
13  about the circumstances of your medical treatment
14  at the jail?
15  A.   Say that again.
16  Q.   Sure.  Does Officers Davis, Michaels,
17  Rogers, Officer Pam, did any of them say anything
18  to you at all about the circumstances while you
19  were in jail that's part of the affidavit that you
20  have in front of you?
21  A.   One of the officers I was on her tier and
22  Officer Rogers sent me to the nurse to -- because
23  I was -- I had to explain to her I was feeling
24  depressed and sick and irritated.  And she sent me

43

1   to the -- what do you call it?  To see the doctor.
2   Q.   Okay.  In that -- in that instance when
3   she sent you to see the doctor, did she say
4   anything to you other than you have to see the
5   doctor, I'm going to send you?
6   A.   She said I need to go see the doctor if I
7   feel that way.
8   Q.   Anything else?
9   A.   She said a lot of things.  I just can't
10  recall all of them.
11  Q.   Can you remember anything that has to do
12  with medical treatment at the jail that any of the
13  people you've described have said?
14  A.   She told me I need to go see the -- to go
15  see the medical doctor to go over to Cermak.
16  Q.   Okay.
17  A.   To see them.
18  Q.   All right.  And that's -- have you now
19  told me everything that you can remember right now
20  today?
21  A.   What I can remember I'm telling you.
22  Q.   Have you now told me everything that you
23  remember as of today about what those people,
24  those officers said to you about seeking medical

44

11 (Pages 41 to 44)

1 attention?
2    A.  Yes, I'm telling you what I remember for
3 right now from what I remember. Something else
4 might pop into me.
5    Q.  I don't know if I asked you this question
6 before, but is there -- is there anything you can
7 think of or any reason you can think of why your
8 testimony at trial and the future will be
9 different than your testimony today?
10    A.  Is there any reason why it should be
11 different?
12    Q.  Yeah.
13    A.  At trial?
14    Q.  Yes.
15    A.  No, because I'm telling the truth
16 and.....
17    Q.  Okay.
18    A.  It will be the same thing.
19    Q.  Have you ever spoken to any reporters
20 about the events related to this lawsuit?
21    A.  No.
22    Q.  Have you ever spoken to any government
23 agencies about the things that are complained of
24 in this lawsuit?

                                      45

1    A.  No.
2    Q.  Okay. Have you ever been told that there
3 may be money involved with this lawsuit?
4    A.  No.
5    Q.  Have you ever posted any statements about
6 this lawsuit or the events that occurred to you
7 while you're in jail on any Internet site or any
8 blog?
9    A.  Have I?
10    Q.  Have you ever posted any statements or
11 any comments --
12    A.  No.
13    Q.  -- or blogs?
14    A.  No.
15    Q.  Did you read any statements of any other
16 witnesses before coming to testify today?
17    A.  No.
18    Q.  Did you read any of the documents related
19 to the case including the complaint that was filed
20 in this case before coming here today?
21    A.  Did I read it?
22    Q.  Yes.
23    A.  No.
24    Q.  Have you ever seen the complaint?

                                      46

1    A.  Have I seen a complaint?
2    Q.  Yes.
3    MR. MORRISSEY:  Object. I don't know --
4 foundation question, and it's a legal term. I
5 don't know if this witness will understand what a
6 complaint is. That's my objection, you're asking
7 her a lawyer's question.
8 BY MR. CATANIA:
9    Q.  Do you know -- do you know what a
10 complaint is?
11    A.  No, not really.
12    Q.  Okay. Have you ever seen a lawsuit
13 that's been filed on paper, what it looks like?
14    A.  No.
15    Q.  Have you ever seen a lawsuit in this case
16 that had the caption with the names that I gave
17 you earlier about Michael Parish, Carla Lofton,
18 Curtis Oats, Leila Khoury, Lisa Brown, Dan Taylor,
19 Sean Driscoll --
20    A.  No.
21    Q.  -- Roy Cleaves, Dean Miller, Kevin
22 Sanders, Stacey Clark, Carlotte Watson versus the
23 Sheriff of Cook County?
24    A.  No, I haven't seen that.

                                      47

1    Q.  Have you read anything at all that has to
2 do with the complaints made in this lawsuit?
3    A.  I have not read anything that has
4 anything to do with it.
5    Q.  Can you tell me everything that you did
6 to get ready for the deposition today?
7    A.  What have I did?
8    Q.  Uh-huh.
9    A.  I haven't did anything really.
10    Q.  Well, didn't you search for documents at
11 home?
12    A.  No, I didn't have to search for them. I
13 told you I had them papers at home. I knew where
14 they were.
15    Q.  Did you retrieve documents at home?
16    A.  Yes, I did.
17    Q.  And the ones you described; right?
18    A.  Yes, sir.
19    Q.  Did you meet with anybody anyplace before
20 coming here?
21    A.  No, sir.
22    MR. MORRISSEY:  Objection. We already --
23 it's been asked and answered.
24 BY MR. CATANIA:

                                      48

1    Q.   Have you visited anyplace in preparation
2  for coming to this deposition?
3    A.   No.
4    Q.   Have you been known by any other names
5  besides Teria Beasley?
6    A.   Let me think.  Lady T.  Is that what
7  you're asking me?
8    Q.   Yes.
9    A.   Yeah, Lady T.
10   Q.   Any others?
11   A.   No.
12   Q.   Have you ever used any alias names when
13  you were arrested?
14   A.   Let me think.  I'm going to have to say I
15  don't recall.  I don't believe I used any other
16  names.  I'm not for sure.
17   Q.   If I give you some names perhaps that
18  will help you remember.  Do you remember the name
19  of Teria Rhodes?
20   A.   That's not alias.  That is my name.
21   Q.   Do you remember the name Teri Dunlop?
22   A.   Teria Dunlop?  No, I never used -- I
23  don't remember using no Teria Dunlop.
24   Q.   How about Tara Tatum?

49

1    A.   That is -- that's my maiden name.  That's
2  my dad's name, and I don't remember ever using
3  that name.
4    Q.   Okay.  Do you remember ever being
5  arrested for disorderly conduct?
6    A.   Yeah, I been arrested for disorderly
7  conduct.
8    Q.   And when you've been arrested for
9  disorderly conduct, do you recall missing court?
10   A.   For disorderly conduct?
11   Q.   Yes.
12   A.   Disorderly conduct.  I don't believe so.
13  I can't remember because it had to be a long,
14  long, long time ago, because when I was young I
15  did a lot of things -- a lot of -- well, fighting.
16   Q.   What are you talking about in terms of
17  time?
18   A.   When I'm talking about time?
19   Q.   Yeah.
20   A.   I had to be, like -- I been out on the
21  street since 10 years old.  So somewhere from 10
22  to maybe 20, 24, 22, something like that.
23   Q.   Had you ever been arrested as a juvenile?
24   A.   As a juvenile?

50

1    Q.   Between age 10 and 16.
2    A.   I believe so.  I believe so.
3    Q.   You told me earlier about three children,
4  Dallas, Tamar and Frances.
5    A.   Uh-huh.
6    Q.   And have they always lived with you?
7    A.   Yes, they have lived with me but they
8  have -- when I got sick they was not in my
9  household.  They was staying with my sister.
10   Q.   Okay.  What's your sister's name?
11   A.   So they always lived with me, but when I
12  get sick and go in the hospital, my sister takes
13  care of my kids.  Jeanine Meders or Carlita
14  Rhodes, either one of them.
15   Q.   Do any of your children help you
16  regarding your mental health conditions?
17   A.   My children helps me a hundred percent.
18   Q.   And how do they help you?
19   A.   They basically try to keep me from being
20  upset.  They make sure -- ask me, Mama, did you
21  take your medicine; Mama, do you need your -- go
22  get your medicine.  They help me out in my
23  household to keep me from being stressed or
24  irritated.  They do whatever I need them to do.

51

1    Q.   And does your present husband help you as
2  well?
3    A.   Yes, he does.
4    Q.   You've identified in your -- your sworn
5  declaration in front of you that you take Abilify
6  and Depakote as medications.
7    A.   Yes, sir.
8    Q.   When you entered the jail, did you take
9  any other medications besides those two?
10   A.   Yes.  I took my blood pressure
11  medication.  I took my asthmatic pump.  I take --
12  at the time I think I had -- just had a tooth
13  removed and I was taking amoxicillin to keep me
14  from catching infection in my mouth.  I was taking
15  my blood pressure, my asthma, the Abilify, and I
16  was taking pain pills for the toothache, you know,
17  from them having.....
18   Q.   All right.  You also stated in the
19  affidavit that at the time of your intake you were
20  taking only Abilify; true?
21   A.   At which intake?
22   Q.   The first intake.
23   A.   The very first time I was arrested?
24   Q.   No, the first time that's discussed in

52

1  your affidavit.
2      A.  Okay.  See, that's where I'm getting
3  confused where you at because I was taking
4  Abilify, and Abilify was my medicine I was on.
5  And then after the second time I was taking
6  Abilify and Depakote because my mood swings and
7  my -- everything had got off whacked.
8      Q.  Okay.
9      A.  So --
10     Q.  In your affidavit in paragraph two, it's
11  right in front of you, when it says when I was
12  admitted to the jail I had only been taking
13  Abilify, is that a true statement?
14     A.  Okay.  That's what I'm asking you because
15  I don't want you to come back and say, no, you
16  said on this date you was only taking Abilify.
17  That's why I'm asking you that question.  But,
18  yes, I was only taking Abilify in this paragraph
19  two.
20     Q.  People taking that particular medication
21  sometimes talk about feeling restless.  Did you
22  feel restless taking that medication?
23     A.  Yes.
24     Q.  Sometimes they say they feel jittery.  Do

53

1  you feel jittery when you take that medication?
2      A.  I'm jittery all the time.
3      Q.  Do any of your blood relatives have any
4  of these conditions, blood disorder?
5      A.  Blood disorder?  No.
6      Q.  Dementia?
7      A.  You talking about Alzheimer's?  Yes.
8      Q.  Who has dementia?
9      A.  My grandmother had it.  My uncle has it.
10  Seem like I have it, my sister actually is
11  suffering from it now a little bit.
12     Q.  Your sister who?
13     A.  My uncle --
14     Q.  Which sister?
15     A.  Jeanine.  She has cancer and all that,
16  sugar diabetic, all that is coming down on her
17  from cancer.
18     Q.  When you say it seems like you have it,
19  is that because you personally recognize symptoms
20  about it --
21     A.  Yes.
22     Q.  -- or someone told you?
23     A.  No, I personally -- symptoms I.....
24     Q.  Okay.  It has not been diagnosed by a

54

1  physician?
2      A.  No.
3      Q.  And you say diabetes runs in the family?
4      A.  Yes.
5      Q.  Do you have diabetes?
6      A.  No, I don't.  From what I know, no.
7      Q.  Heart disease, does that run in the
8  family?
9      A.  I had -- yes, heart disease runs in my
10  family, and I have a heart problem because of me
11  taking overdose of my grandmother's Capoten pills,
12  her heart pills.  I took overdose when I was young
13  and tried to commit suicide and it affected me, my
14  heart.
15     Q.  Is there any record of that taking of the
16  Capoten pills?
17     A.  Yes, it's a record but I have to remember
18  what hospital they took me to when I took it.  I
19  have to ask my auntie.
20     Q.  At the time when you took the Capoten
21  pills, were you also taking other medication?
22     A.  No, at that time my mother and them
23  didn't know I was bipolar.
24     Q.  Any history of breast cancer?

55

1      A.  Yes.
2      Q.  Who has that?
3      A.  My mother died from it.  My sister is
4  dying from it.
5      Q.  Any history of head injuries?
6      A.  I have head injuries.
7      Q.  What do you have a head injury from?
8      A.  My husband hit me in the back of the head
9  with a hammer.
10     Q.  The present husband?
11     A.  No.  I was young.  My first husband.
12     Q.  Any irregular heartbeat run in the
13  family?
14     A.  My son has a heart murmur.
15     Q.  Which son is that?
16     A.  Dallas Beasley, Jr.
17     Q.  Kidney disease?
18     A.  Not that I know of.
19     Q.  Liver disease?
20     A.  My father died from liver disease.  Well,
21  was cancer with liver disease.
22     Q.  Seizures?
23     A.  I just developed seizures.
24     Q.  Has that been diagnosed?

56

1    A.  Was diagnosed at Ingalls Hospital.
2    Q.  Was it diagnosed in the emergency room at
3 Ingalls Hospital?
4    A.  Yes.
5    Q.  Were any tests run?
6    A.  Yes, they had tests ran.
7    Q.  Do you remember what tests?
8    A.  I really don't remember.
9    Q.  Were you prescribed anything for that?
10    A.  They were giving me I think it's called
11 Dilanta (sic).  Dilanta.
12    Q.  Do you continue to take that medication
13 now?
14    A.  The Dilanta?  No, they discontinued it.
15    Q.  Was it given to you just in the hospital?
16    A.  It was given to me in the hospital and
17 they sent me home on a prescription.
18    Q.  Who discontinued it?
19    A.  My Dr. Songe discontinue because he
20 didn't see where I -- I hadn't had another seizure
21 and he didn't see where I needed it from the -- I
22 guess the paperwork that they sent over.
23    Q.  So the hospital ordered it and then your
24 doctor --

57

1    A.  I believe --
2    Q.  -- October 14, 2008?
3    A.  I believe so.
4    Q.  Have you been back to the jail since
5 October 14, 2008?
6    A.  I been back?  That was the last time I
7 was in there, right, for the battery case?  I
8 haven't been back since but the one day, so I'm
9 not -- I'm not -- I'm not understanding.
10    Q.  Well, the question is, have you been
11 back, well, I'll just ask, in custody since then?
12    A.  Since I got out that one day?
13    Q.  Yeah.
14    A.  Is that what you asking?
15    MR. MORRISSEY:  I don't think you understand
16 the question.
17 BY MR. CATANIA:
18    Q.  Have you been in custody after October 14
19 of 2008?
20    A.  October 14?
21    Q.  That's the date that's in your affidavit,
22 ma'am.
23    A.  That's -- yeah.  I been one day in the
24 county for not completing SWAP.

59

1    A.  Discontinued it.
2    Q.  -- discontinued it?
3    That was his judgment call; right?
4    A.  I guess so.
5    Q.  Any history of drug abuse?
6    A.  Yes.
7    Q.  Who has a drug abuse history?
8    A.  I had a drug abuse history.
9    Q.  What kind of drug?
10    A.  Alcohol and cocaine.  What does that have
11 to do with the case?
12    Q.  It's a medical case.  This is the reason
13 I'm asking the questions.
14    You state in the declaration that you
15 entered the jail on November 5 of 2007 and you
16 were discharged on November 8 of 2007; right?
17    A.  I believe so.
18    Q.  And that was a three-day period of time?
19    A.  Yes.
20    Q.  You also say that you entered the jail on
21 September 11 of 2008 and were discharged October
22 14 of 2008; is that correct?
23    A.  January?
24    Q.  September 11, 2008, discharged --

58

1    Q.  And that was part of the same case;
2 right?
3    A.  Yeah.  But since -- I haven't been back
4 to jail since I got out for that one day.  I
5 haven't been back, if that's what you're asking.
6    Q.  Did you actually go to a housing unit
7 that one day?
8    A.  I went to "J." Tier -- in the "J." So I
9 don't know if you call that a housing tier.
10    Q.  I don't know.  I've not heard of that
11 term.
12    A.  See, I'm not --
13    Q.  Maybe Mr. Morrissey has.
14    A.  I'm not understanding.  Because when I
15 went there I was -- I was on -- I was on a deck in
16 a -- in a cell with -- with another woman, two to
17 a cell.  I was in that if that's what you're
18 asking me.
19    Q.  For one day?
20    A.  For one day.
21    Q.  Okay.  That is what I'm asking.
22    A.  And I got discharged to go home.
23    Q.  When was that?
24    A.  That was when I was in there for the one

60

1  day. That's what I'm trying to explain to you. I
2  don't remember the dates exactly.
3      Q.  Okay.
4      A.  But the last time I was there for the one
5  day I did go to a tier.
6      Q.  Okay. When you were first arrested for
7  what is contained in your affidavit, November 4 of
8  2007, do you remember what day of the week that
9  was?
10     A.  No, I don't. Truthfully I don't.
11     Q.  Do you remember who the officer was that
12 arrested you on November 4, 2007?
13     A.  No, I don't because it was a lot of
14 officers on us.
15     Q.  Do you remember the police department?
16     A.  It was Markham police. That was the very
17 first time I was locked up; right?
18     Q.  I'm just telling you what's in the
19 affidavit. I don't know the answer to that.
20     A.  If you're talking about --
21     Q.  It says November 4.
22     A.  Okay. That was the first date. I don't
23 remember the police officers.
24     Q.  All right.

61

1      A.  Or none of them.
2      Q.  And there were several police officers
3  you said?
4      A.  The first time that we -- that I got
5  locked up when they -- when they locked me up for
6  the battery.
7      Q.  Do you remember where you were when you
8  were arrested?
9      A.  We were right next door to Markham
10 skating rink. I went and got my daughter out of
11 the store and the girls charged her.
12     Q.  What type of weapon was involved?
13     A.  They say a knife.
14     Q.  Do you have any memory at all of the 36
15 days of time that you were in custody at the jail?
16     A.  The 36 days? Do I have any memory?
17     MR. MORRISSEY: I'm going to object. Your
18 jumping from the first incarceration which is in
19 her declaration to the second; is that correct?
20     MR. CATANIA: I'm not jumping. I'm combining
21 because they're combined here in the affidavit.
22     MR. MORRISSEY: Do you understand the
23 question?
24     THE WITNESS: I'm not understanding -- what

62

1  I'm not understanding is he say the 36 days. Are
2  you talking about the -- the day that I spent the
3  longest time and got into an incident? Is that
4  what he's talking about?
5  BY MR. CATANIA:
6      Q.  No.
7      A.  That time?
8      Q.  Let me ask again, ma'am, because it's
9  obvious that Mr. Morrissey doesn't understand it.
10     Your memory of the events that occurred
11 between your first incarceration, which was
12 January 4 -- or November 4 of '07 to your second
13 incarceration that ended on October 14 of 2008, is
14 your memory of that period of time based on what
15 is in your statement here, your affidavit Exhibit
16 1?
17     A.  It's a lot of them in here. That's what
18 I'm trying to explain to you. I go -- my memory
19 is not good, so when you say the first time I'm
20 thinking you saying when the police -- all the
21 police officers at Markham skating rink. That was
22 the first time I was locked up and what happened
23 when I went -- when I went to jail. Do I
24 remember? Yes, I remember partially of it.

63

1      And then if you're talking about the
2  second time I got picked up and went to jail for I
3  think it was -- the second time is when I did -- I
4  think I did more days. I did like some months in
5  there. I did months in there I believe.
6      Q.  Okay.
7      A.  So I don't know which one you're talking
8  about.
9      Q.  I'm talking about that whole experience
10 that's described --
11     A.  I can remember --
12     Q.  -- here.
13     A.  -- yeah, piece and bits of it I remember,
14 but I don't remember days and times or weeks.
15     Q.  Does this affidavit help you to remember
16 what occurred in terms of dates, times?
17     A.  Partially, yes.
18     Q.  Do you have any papers or calendars or
19 diaries that cover the time of November 4 of '07
20 to October 14 of '08?
21     A.  No, I don't.
22     Q.  In paragraph 13 of the sworn declaration,
23 which is on page 3, you state that after two weeks
24 you got into an altercation with another

64

16 (Pages 61 to 64)

1  detainee. Which two weeks?
2      A.  That had to be the second time when I did
3  the long -- the long time.
4      Q.  Okay. What kind of altercation?
5      A.  I was irritated. I was -- my mood swings
6  was off level and I was just real irritated. I
7  was depressed. I was just irritated real bad.
8      Q.  You were in jail at the time?
9      A.  Yeah.
10     Q.  Who was involved in the altercation?
11     A.  I don't know her name. It was three of
12  us. The incident do -- what are you asking me,
13  how did the incident start or what are you asking
14  me?
15     Q.  I'm wondering who was involved. Who are
16  the names of the people involved?
17     A.  I don't know them people name. They were
18  inmates.
19     Q.  Were you injured?
20     A.  Was I injured? Yeah, I was injured by
21  one of the guards.
22     Q.  Were you injured by one of the inmates?
23     A.  No.
24     Q.  Did you receive treatment for that

65

1  injury?
2      A.  Did I receive treatment? Yes.
3      Q.  Who treated you?
4      A.  They sent me to Cermak.
5      Q.  Who was the treater?
6      A.  I don't know.
7      Q.  Was any of the other two people that were
8  involved in it also injured?
9      A.  I think I injured the one young lady.
10     Q.  Was she pregnant?
11     A.  Yes, they said she was pregnant and she
12  was on our tier and she should have been on
13  pregnancy tier.
14     Q.  Were you placed in segregation as a
15  result?
16     A.  Yes, I was until I was found innocent.
17     Q.  Were you moved to a different living
18  unit?
19     A.  Yes, I was moved to the worker's tier.
20     Q.  And that was after the fight that you
21  were moved to the worker's tier?
22     A.  After I got out of -- at segregation or
23  whatever you call it, the hole, after they found
24  out I was innocent.

66

1      Q.  Was the other person -- to your
2  knowledge, was the other person that was involved
3  also disciplined?
4      A.  Say that again.
5      Q.  The person that you injured, for example,
6  was she disciplined as well?
7      A.  I don't believe there was. I think she
8  was moved to the pregnancy tier. The other one
9  was moved to another tier, and I was put into the
10  hole.
11     Q.  Okay.
12     A.  If I'm not mistaken, I believe I was the
13  only one -- I'm not for sure, but I believe I was
14  the only one put into the hole because they put me
15  straight to the hole from Cermak.
16     Q.  Were you ever charged with a new criminal
17  offense based on that incident?
18     A.  No.
19     Q.  Has any physician ever stated to you that
20  the incident that you've talked about in paragraph
21  13 was related to not having Abilify?
22     A.  No. They never -- no.
23     Q.  Has any lawyer ever led you to believe
24  that the altercation was caused by not having

67

1  Abilify?
2      A.  No. But I know how I was feeling.
3      Q.  Okay.
4      A.  And how I responded and how I talked to
5  my officers on deck.
6      Q.  In the first two weeks while you were at
7  the jail, because this says after two weeks you
8  got into the altercation, in the first two weeks
9  did you talk with any family members?
10     A.  Had I talked to any of my family members?
11     Q.  Yes.
12     A.  I was talking to my family members every
13  day.
14     Q.  Including your present husband?
15     A.  Including my husband and children and
16  brother-in-law.
17     Q.  So you did know your present husband at
18  that time?
19     A.  Yes.
20     Q.  We're talking about the period of time --
21     A.  Yes.
22     Q.  -- that you were in custody.
23     A.  We're going -- we were living together.
24  We had been together for five years.

68

17 (Pages 65 to 68)

1    Q.   And did those -- do -- to your knowledge,
2  did any of them come to visit you at the jail?
3    A.   Yes, my kids came and visit me.  My
4  ex-sister-in-law came and visit me.  My husband
5  came and visit me.
6    Q.   And where did those visits take place?
7    A.   In the jail in the visitor room.
8    Q.   Do you know which division?
9    A.   The division, no, I don't.  I know we go
10  out the annex building, walk over to the other
11  building.  That's about all I can tell you,
12  downstairs in the basement.
13    Q.   .Were you in the annex building
14  then?  You were assigned to the annex building?
15    A.   Yes.
16    Q.   Both incarcerations that are mentioned
17  here?
18    A.   Yes.
19    Q.   Okay.  And that's division three annex?
20    A.   Yes, I guess that's three.  I guess
21  that's three.  Don't quote me on that, but I know
22  it was annex.
23    Q.   Okay.
24    A.   Because they called it annex.

69

1    Q.   What other symptoms do you remember
2  having during those first two weeks?
3    A.   Whatchu mean symptoms?
4    Q.   You said that you felt --
5    A.   Sad.
6    Q.   Okay.  Depressed?
7    A.   Irritated, things was irritating me, the
8  girls talking, the noise, my mood swings was off
9  level where I knew I wasn't feeling good.  When I
10  say off swing I mean I get irritated quickly.
11  I --
12    Q.   Did you take your medication --
13    MR. MORRISSEY:  She hasn't completed her.....
14  BY MR. CATANIA:
15    Q.   Are you finished with your answer?
16    A.   I was sad.  I was crying a lot.  Them was
17  my symptoms.
18    Q.   Okay.  During that first two weeks period
19  of time when you were feeling those symptoms, did
20  any of the other detainees do anything about it?
21    A.   What do you mean?
22    Q.   Did they do anything about your symptoms?
23    A.   How can detainee -- whatchu mean, the
24  officers or the inmates?

70

1    Q.   The inmates.
2    A.   How can the inmates do anything about my
3  symptoms?  They were talking to me saying it's
4  going to be okay, stop crying, you know, you going
5  to be okay, you know, trying to make me laugh.
6  But what could they do?
7    Q.   Do you remember any of those people's
8  names?
9    A.   Truthfully, no.
10    Q.   At that time you were in the division
11  three annex, the annex anyway.  The first two
12  weeks that you were there, did you see any nursing
13  staff?
14    A.   What do you mean when I -- when I -- in
15  my tier, on my tier?
16    Q.   Yes.
17    A.   Yeah.  When the nurse come to your door
18  of your tier, I would tell her, the nurse, how I
19  was feeling.  My officer told me to tell the nurse
20  when she come how I'm feeling.  The officer told
21  the nurse I'm crying, constantly crying.  And they
22  send me down to the nurse's office and then the
23  nurse come down there and I tell the nurse.  And
24  she say she's going to put in for me -- she said

71

1  she's going to put in for me to go see a doctor,
2  and only thing they did was came back when it was
3  time for me to take my next blood pressure pill or
4  my inhaler or whatever.
5    Q.   Okay.  So you --
6    A.   Or to give other people they meds.  They
7  never gave me a slip or never said anything about
8  it.
9    Q.   During that first two weeks period of
10  time before the altercation, were you receiving
11  any medication at all?
12    A.   Before?
13    Q.   Before the altercation?
14    A.   Was I receiving -- whatchu mean any
15  medication?
16    Q.   Any --
17    A.   My bipolar?  I was only -- I was only
18  taking my blood pressure pills, my asthmatic pump,
19  what they gave me.  I wasn't -- they wasn't giving
20  me my bipolar medicine or my depression medicine
21  or my mood stabilizer.
22    Q.   What prescription medication were they
23  giving you?  During those first two weeks, what
24  were they giving you?

72

18 (Pages 69 to 72)

1    A.   What I told you, my blood pressure pill,
2  my asthma pump and the amoxicillin.  They gave me
3  a pack, a clear bag with the medicine in it, and I
4  would take that.  That's all I had to take.
5    Q.   Okay.  Did you take that on your own?
6    A.   Yes.
7    Q.   It wasn't handed to you dose by dose?
8    A.   No.
9    Q.   Has any physician ever determined the
10  cause of the other symptoms you've just described,
11  the feeling sad and the crying?
12    A.   You mean has any physician from the
13  county or from -- in the world?
14    Q.   Any at all.
15    A.   Yeah, yeah.  I have been -- I have been
16  diagnosed as bipolar mood disorder, schizophrenic.
17    Q.   What you're telling me I think is that
18  you have determined it.  I'm asking has any --
19    A.   No, I said a physician.  I have been seen
20  by doctors all my life.  I have been admitted into
21  hospitals.  I have been medicated all my life for
22  this.  I have to stay on this medicine in order to
23  keep a level head.
24    Q.   My question is only about the symptoms

73

1  during that two-week period of time.
2    A.   That wasn't what you said.
3    Q.   It was.
4    A.   You said have I ever been diagnosed.  And
5  I said do you mean in the jail or in the world.
6  You said have you been diagnosed period by a
7  doctor.  Yes, I'm telling you yes, I have been
8  diagnosed by doctors.
9    Q.   Then let me ask the question that I
10  thought I had asked.  Let me ask again.  Okay.
11      During that two-week period of time you
12  described symptoms that you were feeling including
13  feeling sad, depressed and crying, irritated and
14  that's the type of symptom you described.
15    A.   No one in the county diagnosed me.  No
16  one in the county would see me.  They -- no.  No.
17    Q.   After getting out of jail in October 14
18  of 2008, after getting out of jail, has any doctor
19  said that the cause of your feeling the way you
20  say you felt was because you didn't get Abilify in
21  jail?
22    A.   Have they said that?
23    Q.   Yes.
24    A.   They didn't even know I was in jail, so

74

1  what are you -- I mean, what are you saying?  Am
2  I -- I'm not understanding.
3      MR. MORRISSEY:  Okay.  You answered the
4  question.
5  BY MR. CATANIA:
6    Q.   When you were arrested on your arrest
7  date of July 28 of 2007, were you under the
8  influence of any drugs or alcohol?
9    A.   When I was what?
10    Q.   Arrested on July 28 of 2007.
11    A.   No.
12    Q.   When you were arrested on November 4 of
13  2007, were you under the influence of any drugs or
14  alcohol?
15    A.   No.
16    Q.   When you were arrested on September 10 of
17  2008, were you under the influence of any drugs --
18    A.   No.
19    Q.   -- or alcohol?
20      When you were arrested on July 21 of
21  2010, were you under the influence --
22    A.   No.
23    Q.   -- of any drugs or alcohol?  Okay.
24      On any of those arrest dates, and I'll go

75

1  through them again, were you off of your meds, the
2  ones that you were taking for your -- your mental
3  illness, were you off of your meds on July 28 of
4  2007?
5    A.   No.
6    Q.   Were you off of your meds on November 4,
7  2007?
8    A.   No.
9    Q.   How about September 10 of 2008?
10    A.   No.
11    Q.   How about July 21 of 2010?
12    A.   No.
13    Q.   Do you have any prejudices towards police
14  in general?
15    A.   No.
16    Q.   Do you understand your rights under
17  Miranda?
18    A.   Yes, when they read them to me, yes.
19    Q.   Is it your personal policy and practice
20  to refuse to speak to police because of your right
21  to remain silent?
22    A.   I'm not understanding that question
23  because I will talk to a police if I know I'm
24  right.  If I'm right and I did something or -- or

76

19 (Pages 73 to 76)

1 something's going on, I talk to them.
2    Q. How about after the arrest, do you talk
3 to them?
4    A. Yes, I do. I have -- my brother -- I
5 have people in my family that was police
6 officers. I mean, I have nothing against police
7 officers.
8    Q. Before your arrest on July 21 of 2010,
9 did you know Officer Sinnet of Harvey police?
10    A. Who?
11    Q. Officer Sinnet.
12    A. No. No.
13    Q. How about Brian Glass?
14    A. No.
15    Q. Do you know Officer Thomas of Harvey?
16    A. No. We have officers in our neighborhood
17 that lives in the neighborhood, but I don't know
18 them personally, no.
19    Q. On July 21 of 2010, you were arrested at
20 the Harvey Police Station; right? You were
21 arrested at the police station --
22    A. On what day?
23    Q. -- for a warrant?
24       July 21 of 2010, the most recent one.

77

1    A. 2000 -- I think I was in Harvey.
2    Q. And that was for a warrant for the
3 battery case?
4    A. Right.
5    Q. At the time that you were arrested did
6 you -- if you refused to provide information of
7 emergency contact to Officer Brian Glass and he
8 wrote that down at the time that you refused,
9 would you agree that the report that he wrote that
10 in accurately reflects what you told him?
11    A. No. That's not true.
12    Q. If you refused to provide address
13 information to Officer Glass and he noted down
14 that you refused to provide address information,
15 would you agree that the report is accurate?
16    A. That's not true.
17    Q. Did you refuse to provide address
18 information?
19    A. No, that's not true because I give
20 them -- any police officer, anything happen I hand
21 them my ID and my ID has my accurate address and
22 everything on it. I have no reason to lie, my
23 birth date, everything. I have no reason to lie.
24    Q. Did you -- I understand that you have no

78

1 reason to lie. But did you provide --
2    A. No, I --
3    Q. Did you refuse to provide emergency
4 contact information?
5    A. No.
6    Q. Who was your emergency contact in July of
7 2010?
8    A. My husband.
9    Q. On that arrest were you placed in a
10 lockup at Harvey Police Station?
11    A. Yes, I was.
12    Q. If you refused to answer any questions
13 related to booking asked by Officer Sinnet, Glass
14 or Thomas and they noted it down in your report,
15 would you agree that the report was accurate?
16    A. If I what?
17    Q. If you refused to provide any information
18 required by the booking process?
19    A. No, that's not true.
20    Q. Did you refuse to provide verbal
21 responses to booking and lockup questions?
22    A. No.
23    Q. Before your arrest on September 10 of
24 2008, did you know Officer Garkey of Harvey?

79

1    A. No.
2    Q. That arrest was for a traffic misdemeanor
3 and a warrant on the aggravated battery case?
4    A. That's when I got locked up. No. I gave
5 them my ID and he came back and told me I had a
6 bench warrant, so no.
7    Q. What ID did you provide to him?
8    A. My state ID.
9    Q. Were you driving at the time?
10    A. Yes, I was.
11    Q. And at the time you were driving your
12 license was suspended; right?
13    A. Right. My grandbaby was over with my
14 daughter with no -- no coat, nothing on. I went
15 to run and get her and thought I could just go get
16 her and come back and keep my grandbaby from
17 getting sick and it didn't happen. I went to
18 jail. They let my brother-in-law come and get my
19 baby -- my grandbaby and my car.
20    Q. Do you remember the officer at all from
21 that arrest?
22    A. I don't -- I don't know him, no. But if
23 I see him I will know him.
24    Q. Do you remember Officer Monica Garkey?

80

1    A.  No.
2    Q.  If Officer Monica Garkey noted down that
3  you refused to provide the name of an emergency
4  contact, would you agree that the report is
5  accurate?
6    A.  No.  No.
7    Q.  Did you refuse to provide an emergency
8  contact?
9    A.  No, because if they taken me to jail of
10  course I'm going to give them a contact to let my
11  husband know where I'm at to come and get me.  So,
12  no, that's not even true.
13    Q.  If you refused to answer any questions
14  related to booking to Officer Garkey and it was
15  noted down in the report that you refused, would
16  you agree that the report was accurate?
17    A.  No.
18    Q.  Did you provide verbal responses to
19  booking and lockup questions?
20    A.  When you said you did I reply, I answered
21  every question they asked me and gave them all the
22  information they needed to know, yes.
23    MR. MORRISSEY:  Let's take a break.
24    (A break was taken.)

81

1  BY MR. CATANIA:
2    Q.  Ma'am, did you take your psychotropic
3  medication today?
4    A.  Yes, I did.
5    Q.  What medication did you take today?
6    A.  I took my Abilify -- no, I took my
7  Depakote and half of Abilify because I just put in
8  this morning for a refill.
9    Q.  Okay.  And what -- what is the dosage
10  amount of the Depakote?
11    A.  My Depakote is -- I think it's 50
12  milligrams and my Abilify is 10.
13    Q.  And you took half of that?
14    A.  Uh-huh.
15    Q.  Is that yes?
16    A.  Yes, sir.  I'm sorry.
17    Q.  Are you feeling okay?
18    A.  Yeah.
19    Q.  You just appeared to be a little bit
20  aggressive to me.  That's why I'm asking.
21    A.  Yeah.
22    Q.  Before your arrest date on November 4 of
23  2007, that was in Chicago, did you know Officer
24  Steve Wilson of the Chicago Police Department?

82

1    A.  No.
2    Q.  Did you know Officer Cilistine Clark of
3  the Chicago Police Department?
4    A.  No.
5    Q.  You were arrested on that day at the area
6  two police headquarters, right, 51st and
7  Wentworth?
8    A.  I'm trying to remember that incident.
9  Maybe.  If you got it there and it says it.
10    Q.  Okay.
11    A.  I don't really remember that incident.
12    Q.  And that was again for a warrant for
13  battery, right, for the same case?
14    A.  Yeah, I guess.  I don't even remember.
15    Q.  That's the date -- that's the day before
16  your entry into the jail that's --
17    A.  Okay.  Yeah.
18    Q.  -- described here.
19    A.  That was a warrant.
20    Q.  And you say you didn't know either
21  Officer Wilson or Officer Clark --
22    A.  No.
23    Q.  -- at that time?
24    If Officer Wilson noted down at the time

83

1  that you were processed that you refused to give
2  the name of an emergency contact, would you agree
3  that the report is accurate?
4    A.  No.
5    Q.  Back on November 4 of 2007 what name did
6  you provide?
7    A.  November 2007, Teria Beasley.
8    Q.  No, the emergency contact person.
9    A.  Oh.  Elbert Walton.  Always my husband.
10    Q.  Would you say that the -- you did provide
11  that name?
12    A.  Uh-huh.
13    Q.  Is that yes?
14    A.  Yes, sir.  I'm sorry.
15    Q.  And would you say that the officer's
16  report of that that you refused to provide a name
17  is inaccurate?
18    A.  Is not true.
19    Q.  Okay.  In the lockup area Officer
20  Cilistine Clark signed a report that says that she
21  asked you booking questions.  Do you remember
22  Officer Cilistine Clark now?
23    A.  No.
24    Q.  If she noted down that you refused to

84

21 (Pages 81 to 84)

1  answer questions related to booking --
2      A.  That will not be true.
3      Q.  You did -- you did not refuse to provide
4  verbal responses?
5      A.  No, I answer any questions any officer
6  asked me.
7      Q.  When you were arrested on September 15 of
8  2004 at about midnight, were you off your meds
9  that day?
10     A.  No, I ain't never been off my meds.  I
11 take my meds faithfully every day.
12     Q.  Before your arrest on September 15 of
13 2004, did you know Officer Willie Thomas of the
14 Chicago Police Department?
15     A.  No.
16     Q.  How about Officer Jacquelyn Patterson?
17     A.  No.
18     Q.  Or Jackie Patterson?
19     A.  (Nonverbal response.)
20     Q.  You were arrested at 5901 South Halsted
21 in Chicago; is that right?
22     A.  5109?
23     Q.  5901.
24     MR. MORRISSEY:  I have a general objection.

85

1  You're talking about a period six, seven years
2  previous.
3      THE WITNESS:  Right.
4      MR. MORRISSEY:  Which has nothing --
5  absolutely nothing to do with this litigation.
6  There's no claim from 2004 in regards to the
7  defendants in this case.
8      But you can answer.
9  BY MR. CATANIA:
10     Q.  Did you understand all he said?
11     A.  Yes.
12     Q.  Do you remember September 15, 2004?
13     A.  I don't even remember them arrests.
14     Q.  Well, 5901 South Halsted is in the second
15 police district in Chicago; right?
16     A.  I'm not familiar.  I'm not sure but if
17 that's what you say.
18     Q.  Where did you live in September of 2004?
19     A.  2004?  Now, you want me to go way back.
20 2004.  I might have lived on Laflin.  I'm not for
21 sure.  Don't quote me on that because I'm not for
22 sure exactly.
23     Q.  It was in Chicago, though; right?
24     A.  Yeah, within the city I think.

86

1      Q.  All right.
2      A.  2005 I moved to Markham.
3      Q.  This was an arrest for which you pled
4  guilty to a charge; is that right?
5      A.  I don't even know.  I don't know what the
6  charge is.
7      Q.  The prostitution arrest?
8      A.  I was not prostituting but, yeah, I pled
9  guilty.  It wasn't a felony.
10     Q.  In paragraph six of your affidavit, which
11 is on the front page, it says that you get
12 depressed if you don't get your medication every
13 day.
14     Did you get depressed on November 4 of
15 2007?
16     A.  November 4?
17     Q.  Yeah.
18     A.  2007?  I was taking my meds.
19     Q.  Did you get depressed that day?
20     A.  I'm not understanding you.  2000...
21     Q.  '7.
22     A.  2007 of November.  See, you want me to
23 go -- you want me to answer this, but I can't
24 answer this if I don't remember.  I was

87

1  incarcerated then I believe, wasn't I?  Was I
2  incarcerated then?
3      Q.  It says in your affidavit paragraph eight
4  that you were arrested on November 4, 2007 and
5  charged with battery with a weapon.
6      A.  And this was before I got arrested?
7      Q.  Yes.
8      A.  I was taking my meds before I got
9  arrested, yes.
10     Q.  My question is, were you depressed on
11 November 4, 2007?
12     A.  No.
13     Q.  Were you depressed on November 5 of 2007?
14     A.  No.
15     Q.  Were you depressed on November 6 of 2007?
16     A.  No.
17     Q.  Were you depressed on November 7 of 2007?
18     A.  November 7?  I believe I was in there.
19 That's when I was asked -- telling the guard -- I
20 believe -- if I'm not mistaken, I believe so.  I
21 believe that's when I was talking to the -- to the
22 officer and explaining to her how I was feeling.
23     Q.  Okay.  So you told somebody at the time
24 that -- how you were feeling?

88

1    A.  Uh-huh.
2    Q.  Is that right?
3    A.  I was feeling irritated --
4    Q.  Okay.
5    A.  -- depressed if I'm not mistaken.  I
6  might have the dates mixed up but I believe that
7  was.....
8    Q.  Could you describe the person that you
9  said that to.
10    A.  I believe it was the officer on "C" which
11  was, if I'm not mistaken, I think it was --
12    MR. MORRISSEY:  You mentioned you might be
13  mistaken about the dates.
14    THE WITNESS:  Right.
15    MR. MORRISSEY:  Ask you to take a look at
16  your affidavit for a second.
17    THE WITNESS:  Okay.  So you say 2000 -- you
18  say September?  You said November; right?
19  BY MR. CATANIA:
20    Q.  Yes, I did.
21    A.  I was taking my meds then.
22    Q.  How about --
23    A.  Before.
24    Q.  How about on November 8 of 2007, were you
                                                    89

1  feeling depressed that day and did you report that
2  to somebody?
3    A.  I believe -- I believe that's when -- one
4  of them days.  I was in jail --
5    Q.  All right.  I just want to know who, if
6  you can tell me.
7    A.  Right.
8    MR. MORRISSEY:  Let her explain what her
9  confusion is.
10    THE WITNESS:  What I'm confused at is where
11  he said the dates, and I don't remember what date
12  I was in.  The date I was in I know I was in there
13  for three days and I got depressed and I told
14  Officer Rogers that I was feeling sick.  And that,
15  you know, I wasn't feeling good.  I was feeling
16  anxious, irritated, you know, depressed and all
17  this.  And that's when she sent me down to see the
18  doctor.  Now, that's -- I don't know what date
19  that exactly was.  I don't remember.  But I
20  know -- I know it was around -- around up in, I
21  want to say, the 8th or 14th or something like
22  that.
23  BY MR. CATANIA:
24    Q.  Okay.
                                                    90

1    MR. MORRISSEY:  Take a break.
2    THE WITNESS:  And me -- by me being
3  irritated, this is really -- it's like you're
4  confusing me.
5    MR. MORRISSEY:  Take a break.
6    (A break was taken.)
7  BY MR. CATANIA:
8    Q.  I believe the last question was whether
9  you could tell me or describe the person that you
10  told that you were depressed on the 7th of
11  November of 2007?
12    A.  I'm confused --
13    Q.  Okay.
14    A.  -- about the dates because I'm not
15  remembering.  But I know the -- I can tell you the
16  officer name that I did -- when I did tell her
17  about I was depressed it was Officer Rogers on
18  "C," on deck "C."
19    Q.  Do you know how many Officer Rogers there
20  are working at the jail?
21    A.  No, I don't.
22    Q.  Can you describe that person?
23    A.  She was a female officer.  Can I describe
24  how she look?  I know her if I see her.  I can't
                                                    91

1  describe her.
2    Q.  What were the precise words that you
3  spoke to her?
4    A.  Well, I was crying and everything, and I
5  was telling her I don't feel right, I'm irritated,
6  I'm bipolar mood disorder, schizophrenic.  She
7  said, oh, she said, you need to go see the nurse,
8  which she -- this -- I don't know what date this
9  was but I know it was when I -- when I asked to go
10  see the doctor and explain -- and she was telling
11  me I need to go see the doctor.  I was feeling
12  sad.  I was feeling irritated.  I was feeling,
13  like, real anxious, like I just could not -- I
14  walk in -- walk in the room back and forth, you
15  know, just irritated.
16    Q.  Do you think that that was during the
17  first incarceration --
18    A.  No.
19    Q.  -- or the second?
20    A.  It wasn't the first.
21    Q.  I'm talking the first one that's
22  mentioned in your affidavit.
23    A.  No, it wasn't the first one.
24    Q.  In the first one, was there any day
                                                    92

23 (Pages 89 to 92)

1  between the first day of the arrest November 4 of
2  2007 and your release day from jail of November 8,
3  2007 that you felt depressed?
4      A.  I was mad, anxious but not depressed to
5  where I -- like I was the last time.
6      Q.  Did you tell anybody during that period
7  of time that you were depressed?
8      A.  I told them when I went in, yeah.  Yes, I
9  did.
10     Q.  When you went into the jail?
11     A.  Yes.
12     Q.  You told them that you were depressed
13 when you entered?
14     A.  No, not when I entered.  I told them I
15 suffer from it.
16     Q.  All right.  Do you remember who it was
17 that you told that to?
18     A.  Yeah, the person that sits at the front
19 intake, the nurse I guess he was, and I told it to
20 the people -- the doctor in the back or whatever
21 he is in the back, I told it to them and I told it
22 to the health -- the health person, the mentally
23 health person.  I told it to them too.
24        Every time I was incarcerated I explained

93

1  to them that I was, you know, bipolar mood
2  disorder and that I needed my meds because I had
3  meds in my purse when I -- every time I get locked
4  up -- like now I got my meds in my purse
5  downstairs in my car.  I keep my meds with me.
6      Q.  Okay.  You're talking more than just
7  psychotropic medication?
8      A.  I'm taking Abilify and Depakote and my
9  blood pressure and my asthmatic and pain pills,
10 yeah.
11     Q.  All right.
12     A.  But I keep all my meds -- all my meds is
13 in my purse.  I carry them everywhere I go.
14     Q.  How long have you been hypertensive?
15     A.  Since my first baby at ten years old.
16     Q.  Mr. Morrissey can do the math I think but
17 I believe your oldest child is 18?
18     A.  No, I have -- I'm a mother of 13.  I have
19 seven living.  I have three that I have at home.
20 You asked me how many kids do I have at home with
21 me.
22     Q.  How many other children do you have?
23     A.  I have seven living.  I'm a mother of --
24 I birthed 13, though.

94

1      Q.  Thirteen births?
2      A.  Yes.
3      Q.  What are the names of the seven living?
4      A.  Les -- Leslie Taylor, James Taylor,
5  Katrinda Taylor, Fantasia Akins.  They're 20,
6  22 -- no, he's 23 I think.  23, 22 -- '88, '89,
7  '90, and '91.  So they all right behind each
8  other.
9      Q.  Are you employed currently?
10     A.  Am I?  No, I'm not.  Not anymore.
11     Q.  When's the last time you were employed?
12     A.  I was employed when I caught this case.
13 So that's.....
14     Q.  Okay.
15     A.  I was employed when I caught this case.
16     Q.  Okay.  When you say caught this case,
17 mean when you were arrested --
18     A.  When I was arrested, yes.
19     Q.  -- for the aggravated battery?  Okay.
20        And what was the job you had at this
21 time?
22     A.  I was a CNA nurse.
23     Q.  So you were a certified nursing
24 assistant?

95

1      A.  Yes, I'm a CNA slash LPN, but I was -- at
2  this time I was working under my CNA license
3  because I had a couple of strokes and my mind
4  wasn't good, so I couldn't do my LPN license
5  anymore.
6      Q.  Where were you working?
7      A.  I was working at -- well, at the time it
8  was called Washington Heights Rehabilitation.
9      Q.  And where's that located?
10     A.  1010 West 95th Street.  And I was working
11 over at South Suburban Rehabilitation on 19000 and
12 Halsted in Homewood.  I was working two jobs.
13     Q.  The 1010 West 95th Street, is that in Oak
14 Lawn?
15     A.  Chicago, Illinois.  And 19000 is 19000
16 and Halsted in Homewood, Illinois.
17     Q.  Is your husband working?
18     A.  My husband was a truck driver until he
19 just got laid off.
20     Q.  Where did he work last?
21     A.  Roadway.
22     Q.  Is that over-the-road trucker?
23     A.  Yes.
24     Q.  When did he get laid off?

96

24 (Pages 93 to 96)
EX 41 Beasley Dep 024

1    A.  He just got laid off two years ago.  He's
2  been laid off for two years rather.
3    Q.  When you got out of the jail on November
4  8 of 2007 where did you go?
5    A.  Whatchu mean?
6    Q.  Did you go home?
7    A.  Yeah.
8    Q.  Did you tell anybody else that you were
9  feeling depressed while you were on your way home
10  or at home?
11    A.  I went to my -- I started -- went home
12  and started back on my meds.  Well, I called my
13  doctor to make sure it was okay to -- just by me
14  being off of them the first time I got arrested
15  for the short time I was off, he say just start
16  taking them now from where you stopped at.
17    Q.  And who was that doctor?
18    A.  Dr. Songe.
19    Q.  Did you go in for a visit to Dr. Songe?
20    A.  No, I talked to him over the phone.
21    Q.  Did you talk to him personally or to
22  someone in the office?
23    A.  His secretary.  She said he said just
24  proceed and start -- she called me back and said

97

he said just start taking them.  I don't need to
come in.  Just start taking them from where I
stopped because it was a short period of time.  It
was like three days I think it was.  So I just
started back taking them like I was supposed to.
I didn't double up or anything.
7    Q.  When you were in custody for those first
8  three days November 5 to November 8 of '07, did
9  you phone home?
10    A.  Did I call home?
11    Q.  Yeah.
12    A.  Yeah.
13    Q.  Did you tell anybody at home that you
14  were not getting medication?
15    A.  Yes, I told my husband.  Well, my husband
16  asked me first.  And I was, like, they told me and
17  I explained to him what they told me.
18    Q.  Which was it, you told him or he asked
19  you?
20    A.  He asked me was I getting my meds in
21  there.
22    Q.  Did he ask you if you were get your
23  hypertensive medication?
24    A.  No, he was talking about my bipolar

98

1  medication because my husband know how I get if
2  I'm not on my meds.
3    Q.  Okay.
4    A.  Are you understanding?
5    Q.  I think so.  I guess my question is when
6  he asked you --
7    A.  Because he wanted to give me my meds at
8  the jail but they told him I couldn't take them in
9  there.
10    Q.  Okay.
11    A.  That was the purpose of him asking me
12  when I talked to him on the phone, when I got my
13  phone call.  He said, well, are they going to give
14  you your meds?  I said, Baby, they said that I
15  couldn't get the meds here.  He said, well, what's
16  going on?  I said, well, I don't know.  I say we
17  going to see the doctor.  I'll call you when I get
18  to my tier.  That's when, you know, you go right
19  in there you make -- you know when you go down to
20  the basement and the phones are right there and
21  they tell you after -- after the people talk to
22  you, mental health people talk to you, and they
23  put their number on you, they give you that one
24  phone call, that's when I talked to my husband.

99

1    Q.  So you're talking about, what, the first
2  day on the 5th of November?
3    A.  Uh-huh.
4    Q.  Is that right?
5    A.  Uh-huh.
6    Q.  You have to answer yes --
7    A.  I'm sorry.  Yes, sir.  Yeah.
8    Q.  All right.  So on that day you talked to
9  him.
10    A.  Uh-huh.
11    Q.  And you told him you can't get your meds
12  inside?
13    A.  He told me they wouldn't let him give me
14  my meds because I was telling the nurse, whatever
15  that person is, I was explaining to him that I was
16  taking that meds.  Because they asked is anyone
17  taking psych meds because he's a psych doctor.
18  And they was asking do you take psych meds.  And I
19  was, like, yeah, I told her that I was taking
20  psych meds at that time.
21    Q.  Okay.  So you knew who the psych doctor
22  was to speak to --
23    A.  Did I know?  No, they -- they -- no, when
24  you come in -- you have to go through process like

100

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

1   I did to understand what I'm trying to explain to
2   you. When you come off the bus and come -- come
3   down them stairs into that basement part where
4   the -- where the bull pen is you come through this
5   door. It's a guard sitting in this office that
6   calls your name tell you to step up, you give her
7   your name. They ask you have you been there
8   before. They give you your number on your arm.
9   Over here it's two booths. It's a woman
10  sitting -- at this time it was a woman sitting
11  here. And they -- she asked do I take meds. I
12  said yes. And she asked me what meds did I take
13  and what was they for. I explained that to her.
14  That's when she went off explain to me about the
15  process and all this and that and how the floor is
16  where I would have to go. And she said you don't
17  look like you want to be on that floor, you don't
18  look like you need to be on that floor. You can
19  be without your meds. This is the first time I
20  was in jail. Explain to me how I can be off the
21  meds for a while because I got the meds in my
22  system.
23      Q.  Okay. You're talking about a person who
24  told you that -- that you didn't need the meds

101

1   because you're only going to be in there for a
2   short time?
3       A.  No, they didn't know if I was going to be
4   in there for a short time. She was saying the
5   meds, by me being taking them for that many years
6   as long as I've been taking my meds, she's trying
7   to explain to me, which I know better, that I
8   can -- I got enough medicine in my system, you
9   know, to hold me. I don't -- you know, I don't
10  have to do that. When I get onto the tier then I
11  can tell them on the tier. But that's not how it
12  goes. That wasn't -- they didn't do nothing any
13  of that happened.
14      Q.  When you arrived November 5 of 2007 and
15  went through this processing area and you answered
16  questions given to you by certain individuals
17  working at the jail, did they know when your next
18  court date was?
19      A.  No.
20      Q.  Did you know when your next --
21      A.  No.
22      Q.  -- court date was?
23      A.  No.
24      Q.  What was the amount --

102

1       A.  I didn't even know what my bond was.
2       Q.  You didn't know the amount of your bond?
3       A.  No.
4       Q.  Did you appear before a judge?
5       A.  I appeared before a judge. You talking
6   about the first time?
7       Q.  Yes.
8       A.  I appeared before -- they told me my
9   court date when I got on annex. When I got on the
10  tier, they told me -- I asked the officer when
11  will I go to court. And that's when she went and
12  found out for me. She came back and let me know.
13      Q.  And at that time when you entered into
14  the jail November 5 of 2007 you were working as a
15  CNA at Washington Heights?
16      A.  Uh-huh.
17      Q.  Is that right?
18      A.  Uh-huh.
19      Q.  Yes?
20      A.  Yes. I'm sorry. Yes.
21      Q.  Do you remember who the paramedic or
22  correctional medical technician was that you first
23  spoke to?
24      A.  No, I don't.

103

1       Q.  Do you remember if it was a man or woman?
2       A.  I believe it was a woman, if I'm not
3   mistaken. I believe it was a woman. Because we
4   talked to two people now. You know you talk to
5   two med -- psych people.
6       Q.  Two psych people?
7       A.  Yeah.
8       Q.  Okay.
9       A.  From the psych. I guess they psych
10  unit.
11      Q.  Do you know what time of day it was that
12  you talked to someone from the psych unit that
13  day?
14      A.  No, I don't. You know it's dark in the
15  basement. You don't even know if it's day or
16  light.
17      Q.  Did you also talk with a person who asked
18  you about medical history?
19      A.  Yes.
20      Q.  Okay.
21      A.  That's the second person. That's back
22  there where they do the blood and all that. That
23  was -- that's the second person you talk to.
24      Q.  Had you ever seen --

104

26 (Pages 101 to 104)

1    A.  I talked to because she took me to a
2  round table, me and another lady that was there
3  with meds, that was on meds.
4    Q.  Did you ever see that lady ever again
5  after that date?
6    A.  No.
7    Q.  Do you know that person's name?
8    A.  No.
9    Q.  Can you describe that person?
10    A.  No.
11    Q.  Okay.  But it was a female?
12    A.  It was a female I believe.
13    Q.  Now, the second person that you talked
14  to, this lady.
15    MR. MORRISSEY:  I think she said she didn't
16  know if it was a man or woman.  You're misstating
17  her testimony.
18  BY MR. CATANIA:
19    Q.  Did you talk to a lady at a table who had
20  directed you and asked you questions for medical
21  purposes?
22    A.  Let me explain.  It's two people I talked
23  to, a man and a woman.
24    Q.  Right.

105

1  when you come in through process, I guess that's
2  what you-all call it, at the front when you first
3  come in, it's a person sitting there.
4    Q.  Okay.  And so now you've described a
5  number of people that you -- that you encountered
6  when you came into receiving on that day?
7    A.  That's what I told you; right.
8    Q.  November 5 of 2007; right?
9    A.  Right.
10    Q.  And you talked -- there was a nurse
11  present --
12    A.  It's the same process.  Right.
13    Q.  There was a nurse present, there was
14  other people present you had a chance to speak to;
15  is that right?
16    A.  I'm not understanding.  He's confusing
17  me.
18    Q.  Was there a nurse there?  I'm using your
19  words, ma'am.
20    A.  I don't know.  Okay.  Let me -- okay.
21  Let me -- let me rephrase this, then.  I don't
22  know if they're nurses, if they're doctors, if
23  they're licensed.  I know what they say.  The
24  woman that sat at the round table and the man that

107

1    A.  They -- I'm trying to remember for you
2  just so I can answer your question which one
3  was -- you asked for the one in the front or the
4  one in the back?
5    Q.  Did the one in front ask you questions
6  about mental health?
7    A.  Both of them ask me questions about
8  mental health.
9    Q.  Thank you.
10    A.  Both of them was from the mental health
11  place.
12    Q.  Okay.  Was there someone who asked you
13  questions about your medical health, medical?
14    A.  The doctor.  The nurse in the room.
15    Q.  Okay.  So there's a three --
16    A.  At the desk.
17    Q.  -- three different things; right?
18    A.  Right.
19    Q.  Okay.  Did you talk --
20    A.  It's actually four because you go see the
21  nurse then you go over here and draw the blood
22  then you go back behind this thing and see the
23  doctor and then out here it was a round table
24  where you seen the mental health person, and then

106

1  sat at the table they were saying they were from
2  mental health.  Okay.  That's -- maybe I should
3  put it like that.
4    Q.  That's perfect.
5    A.  They said they from mental health.
6    Q.  When you talked to the persons from
7  mental health, was one of them a man?
8    A.  One was a man one time and one of them
9  was a woman one time.  I don't know which one is
10  which.
11    Q.  Are you talking at the same intake or two
12  different intakes?
13    A.  At the intake, the same intake.
14    Q.  The same intake.  Okay.
15    A.  The same.....
16    Q.  You talked to two mental health people?
17    A.  Right.  You talk to one up front and then
18  when you get to the back they have the back one
19  talk to you, have you sign a paper.
20    Q.  Okay.  The person that you talked to in
21  front, if I said to you that that person -- and
22  I'm talking about page 3 of the medical record
23  here which we'll mark.
24    (Beasley Deposition Exhibit

108

1  No. 4 was marked for
2  identification.)
3  BY MR. CATANIA:
4  Q.  I've marked as Exhibit No. 4 for this
5  deposition this Exhibit No. 4 which is numbered
6  Beasley comma Teria, 1 through 28.  Do you see
7  that exhibit in front of you?
8  A.  Are you talking about this sheet?
9  Q.  Yes.
10  A.  This page?
11  Q.  Do you see that?
12  MR. MORRISSEY:  That's Exhibit No. 2;
13  correct?
14  MR. CATANIA:  No, number four.
15  MR. MORRISSEY:  Number four.
16  THE WITNESS:  Do I turn the page or you want
17  me on the same page?
18  BY MR. CATANIA:
19  Q.  You can -- you can look at the whole
20  thing.  I just want to know if it's sitting in
21  front of you --
22  A.  Oh, yes.
23  Q.  -- because the record can't see it.
24  A.  I'm sorry.  Yes, it's sitting in front of

109

1  me.
2  Q.  All right.  On that page in the upper
3  right-hand corner it has intake date of November 5
4  of 2007.  You see that?
5  A.  Uh-huh.  Uh-huh.
6  Q.  You have to answer yes.
7  A.  Yes.  I keep forgetting.
8  Q.  On that page on the lower left-hand
9  corner, is there a signature that says Jones, CMT?
10  A.  Yes.
11  Q.  If I told you that CMT's name is Luethel
12  Jones, does that stir your memory at all --
13  A.  No.
14  Q.  -- as to whether female or male?
15  A.  No.
16  Q.  On this page does your signature appear?
17  A.  Yes.
18  Q.  And it's under the thing that's called
19  consent for treatment; is that right?
20  A.  Yes.
21  Q.  On the left side there's some preprinted
22  information that's called medical history; is that
23  right?
24  A.  Yes.

110

1  Q.  Okay.  And then next to that there is
2  handwriting; is that right?
3  A.  Yes, it is.
4  Q.  If you look down to number three on the
5  medical history side, the preprinted side, it says
6  high blood pressure; is that right?
7  A.  Yes.
8  Q.  And it says yes, and it's circled; right?
9  A.  Yes.
10  Q.  And on the right side there's a three
11  written in which is also circled.  Do you see
12  that?
13  A.  Yes.
14  Q.  Okay.  And it says patient states history
15  of hypertension for 15 years; is that right?
16  A.  Yes.
17  Q.  Was that accurate at the time?
18  A.  Yes.  Can I say something about this what
19  you're reading off of?
20  Q.  Sure.
21  A.  This form right here is the form that the
22  nurse that sits in that room asks you all these
23  questions.  She circles them.  And then she writes
24  stuff down.  And when you, like -- like on this

111

1  day -- I remember this sheet.  On this day the
2  nurse wrote this down.  It was a female.  She
3  wrote -- it was a female wrote this down.  This is
4  the sheet that the nurse writes down and asks you
5  blood, do your blood -- does your blood pressure
6  and all that.  That's who did this form.
7  Q.  Okay.
8  A.  I remember this form.  And I told her
9  about I was bipolar mood disorder.
10  Q.  Okay.  All right.  She asked you the
11  questions that are on the form --
12  A.  On the form, yes.
13  Q.  -- is that right?
14  She asked you all the questions that are
15  on the form?
16  A.  Uh-huh.
17  Q.  Including the one asked about
18  medications?
19  A.  Right.  And I told her everything I was
20  taking at home.
21  Q.  All right.  Next to it -- next to that
22.  one that says current problems on medications and
23  lists, it's circled; is that right?  And you are
24  on medications and it's circled?  Do you see this

112

1  right here?
2      A.  Yeah.
3      Q.  And it says yes, and it's circled that
4  you're on medications; right?
5      A.  Uh-huh.
6      Q.  If you look on the right side there's
7  also a number one circled; right?  And there's a
8  question mark after that; right?
9      A.  Right.
10     Q.  If that was -- if it was true that you
11 were taking medications and she noted that down
12 correctly, she also noted down there was a
13 question mark about medication.
14     A.  I'm not understanding what -- you asking
15 me a question --
16     Q.  Yes.
17     A.  -- or you're telling me?
18     Q.  I'm asking you a question.  The question
19 is, did she write down, did that nurse named Jones
20 write down --
21     A.  She should have wrote down Abilify and
22 all my meds that I gave her.  All my meds should
23 be listed on here including my depression
24 medication.  So I don't know what this one

113

1  question mark means.
2      Q.  You agree with me that the medications
3  are not listed, though?
4      A.  The medications are not listed and they
5  were mentioned to her.
6      Q.  You also complained about pain; isn't
7  that right?
8      A.  Uh-huh.
9      Q.  You have to answer yes or no.
10     A.  Oh.  Yes.
11     Q.  And the pain was related to a cyst on
12 your left buttock; is that right?
13     A.  Yeah.
14     Q.  If you turn to the next page, page 2, I
15 believe you'll see in the upper right-hand corner
16 a time written down as 5:41 p.m.?
17     A.  Uh-huh.
18     Q.  Is that right?
19     A.  Uh-huh.
20     Q.  You have to answer yes or no.
21     A.  I'm sorry.  Yes.
22     Q.  Okay.  And there are vital signs taken
23 including your temperature, blood pressure, plus
24 respirations and weight; is that right?

114

1      A.  Yes.
2      Q.  Okay.  It shows your blood pressure as
3  having been checked and there's a time written
4  down below it that says 5:40 p.m.  Do you see
5  that?
6      A.  Yes.
7      Q.  And it says 155 over 83.  Do you agree?
8      A.  Yes.
9      Q.  And that's not really a very good blood
10 pressure.  It's a little high; right?
11     A.  Right.
12     Q.  You can see that there -- the provider
13 provided a signature below, it looks line an "L"
14 and a "J"; is that right?
15     A.  Yes.
16     Q.  And then from there you went and talked
17 to somebody else; is that right?
18     A.  Yes.
19     Q.  You see where it says secondary health
20 assessments right here in the middle of the page?
21     A.  Yes.
22     Q.  That's preprinted there?
23     A.  Uh-huh.
24     Q.  To the right of that --

115

1      A.  Yes.
2      Q.  -- is there a date and time?
3      A.  Yes, it say 11/5/07.
4      Q.  And the time?
5      A.  6 o'clock.  I don't know if that's a.m.
6  or p.m.
7      Q.  All right.  At that time did you speak
8  with or approximately that time did you speak with
9  a medical provider, a physician or physician
10 assistant at that time about your past medical
11 history?
12     A.  I speak with -- I'm not understanding
13 your question.
14     Q.  If you look right below where it says
15 secondary health assessment it says past medical
16 history.
17     A.  Uh-huh.
18     Q.  And there are some checked boxes there.
19     A.  Uh-huh.
20     Q.  Do you see where it says that the asthma
21 box is checked?
22     A.  Uh-huh.
23     Q.  And that's true, right, you have asthma?
24     A.  Yes.

116

McCorkle Court Reporters, Inc.
Chicago, Illinois  (312) 263-0052

1    Q.   Did you see also four over from that it
2  says HTN, that box is checked; right?
3    A.   Yes.
4    Q.   And that's the only box that's checked
5  besides asthma; right?
6    A.   Right.
7    Q.   Okay.  Below that it says HPI slash ROS
8  under recent hospitalization.  Do you see that
9  right here?
10    A.   Yes.
11    Q.   There's nothing written next to recent
12  hospitalization; right?
13    A.   Right.
14    Q.   And at that time it's true you had not
15  had a recent hospitalization; right?
16    A.   Are you talking about in the county or
17  outside?
18    Q.   Outside of the county.
19    A.   That's -- no.  Okay.  Now, I'm fittin' to
20  explain this to you because that's not what --
21  that's not -- I don't understand this.
22    Q.   Okay.
23    A.   Because the questions they asked you -- I
24  don't know -- I don't know what this is.  I have

117

1  no idea what this is.
2    Q.   Well, that's fine.  I'm asking you if at
3  the time you had this interview if you said you
4  had asthma and hypertension?
5    A.   And I have -- and every time I go in I
6  tell them that I have asthma, high blood pressure
7  and I'm bipolar mood disorder.
8    Q.   Okay.  Do you agree with me, though, that
9  this record shows --
10    A.   It's showing.
11    Q.   -- that you have asthma box checked and
12  the hypertension box checked?
13    A.   Yes.
14    Q.   And it also shows that cancer is not
15  checked; right?
16    A.   Yes.
17    Q.   Diabetes is not checked; right?
18    A.   She didn't check the psych.  She didn't
19  check that.
20    Q.   You're jumping ahead.  The only boxes
21  that are checked are hypertension and asthma but
22  there is a box also for substance abuse,
23  tuberculosis, psych problems, hepatitis, HIV,
24  seizures and a couple of other disorders; right?

118

1    A.   Yes, it is and she didn't check psych and
2  because I told her.
3    Q.   And there's also a box that says other
4  with a blank next to it; right?
5    A.   Right.
6    Q.   And that's not checked and there's
7  nothing filled in; right?
8    A.   Right.
9    Q.   Okay.  Below that where it says HPI slash
10  ROS it does say 36-year-old African American
11  female with history of that's, H slash O,
12  hypertension for 13 to 14 years; is that accurate?
13    A.   Yes.
14    Q.   There's also medication listed next to
15  it.  Do you recognize what that medication is?
16    A.   I see asthma.  Are you talking about
17  right there?
18    Q.   Talking about next to where it says 14
19  years, there's a medication written.
20    A.   My Lopressin .  Only the meds that they
21  gave me.  She didn't check -- she didn't check the
22  psych box.  She did not put down that I was
23  hospitalized, you know, before -- before for psych
24  evaluation.  She didn't do any of that.  Yes, I do

119

1  see that, and this is not accurate.
2    Q.   Does it also say that there is a
3  complaint by you of a boil on your left buttock?
4    A.   Yes.  That was from sitting too long on
5  the steel benches, yes.  But why she didn't put
6  down when I told her about my psych and why she
7  didn't put down my meds that I was taking, I
8  cannot answer that for you.
9    Q.   Okay.
10    A.   But I did tell them.
11    Q.   On the next page, page 3 in the lower
12  left-hand corner it says 11/5 of '07; correct?
13    A.   Yes.
14    Q.   And it says 2:53 p.m., doesn't it?
15    A.   Yes.
16    Q.   Above that there's a signature.  Do you
17  recognize what it says in the signature line above
18  the time line?
19    MR. MORRISSEY:  You're on page 3?
20    THE WITNESS:  Yeah.  Above the time?
21  BY MR. CATANIA:
22    Q.   Yes.
23    A.   It's some -- it's some name, a mental
24  health staff.

120

1  Q.  Mental health staff.  When you appeared
2  at the jail on November 5 of '07 and you saw Mark
3  Ganier, did he ask you the questions that appear
4  on this page?
5  A.  Yes.
6  Q.  He asked you your name and he wrote down
7  Beasley, is that right --
8  A.  Yes.
9  Q.  -- on the top line?
10      Lower right-hand corner it's got a little
11 code, bar code and your name under that except
12 that it says Tria; is that right?
13 A.  Yes.
14 Q.  Have you ever been known as Tria Bealey?
15 A.  No.  They just misspelled my name when
16 they pronounce it.  Everybody misspell my first
17 name.
18 Q.  Does it accurately show your date of
19 birth of August 5 of '71?
20 A.  Yes, it does.
21 Q.  Does it accurately show your -- your
22 prisoner ID number?
23 A.  Yes.
24 Q.  And how about the address?

121

1  Q.  Which was November 7 of '07?
2  A.  I guess so.
3  Q.  Couple days later?
4  A.  I guess so.
5  Q.  It says there also that your race is
6  black, that's correct; right?
7  A.  Yes.
8  Q.  And that you -- it says you were
9  employed; is that correct?
10 A.  Yes, I was.
11 Q.  And it says next to occupation LPN?
12 A.  Yes.
13 Q.  Did you provide that information to
14 Mr. Ganier?
15 A.  No, I didn't.  I told him I -- we were
16 talking about my meds, and I was explaining to him
17 you can't tell me that the meds can stay in my
18 system because me and him -- I was really getting
19 upset with him because he's trying to tell me --
20 like I told you beforehand, you can't tell me this
21 medicine is going to stay in my system, and me and
22 him was arguing.  I said because I'm an LPN/CNA
23 and I know the medicine does -- even though I got
24 the medicine in my system, it still not going to

123

1  A.  That's my address where I used to live on
2  Vine.
3  Q.  15408 Vine Avenue in Harvey; is that
4  right?
5  A.  Yes.
6  Q.  Were you living at that address in
7  November of '07?
8  A.  I don't remember when I was living at
9  that address, but I know I lived on Vine.
10 Q.  Okay.
11 A.  It could have been -- yes, it had to
12 be -- I mean, yeah, I guess.
13 Q.  And up near the top where it says charge,
14 next to that it says battery.  That's what you
15 were charged with; right?
16 A.  Yes.
17 Q.  Okay.  The information about bond, did
18 you tell Mark Ganier no bond?
19 A.  Yeah, because I had -- I had a no bond.
20 Q.  Okay.  Did you also tell him your next
21 court date?
22 A.  No.  The woman -- the officer in the
23 booth told us when my next court date, that's how
24 I found out when my next court date was.

122

1  help me.  I need to continue to take my meds.
2  That's what me and him was arguing about.  That's
3  where he got LPN from.  Because I wasn't working
4  under my LPN at that time.  If you remember I told
5  you I was working under my CNA at both of the
6  nursing homes.
7  Q.  I did hear you.  I hear you getting
8  anxious and upset again.  There's no need.
9      So we have identified, then, that Mark
10 Ganier is the one that discussed with you about
11 how medication will stay in your system; is that
12 right?
13 A.  Yes.
14 Q.  Okay.  He also asked if you had been in
15 the county jail before, question number one;
16 right?
17 A.  Yes.
18 Q.  And it's marked yes and it says division
19 four.  Was that accurate?
20 A.  Yes.
21 Q.  You had been in division four before
22 this?
23 A.  I believe the first -- what he was
24 implying to was the first time I was there.

124

1    Q.  Right.
2    A.  And I believe -- I told him I believe it
3  was division four.
4    Q.  Okay.
5    A.  Annex.
6    Q.  And the next question is, have you ever
7  been hospitalized for psychiatric treatment?
8    A.  And I told him yes.
9    Q.  But the box is checked no; is that --
10    A.  That's what he checked.  It wasn't -- I
11  told him I was hospitalized.
12    Q.  And paragraph No. 3 says are you
13  currently receiving outpatient psychiatric
14  treatment and it's checked no; is that right?
15    A.  No, I told him I see my doctor and I
16  get -- I take medication.  I get my medication
17  from my doctor, so that should have been checked
18  yes.
19    Q.  And No. 4 says are you now taking
20  psychotropic medications?
21    A.  And I said yes.
22    Q.  The box is checked no, though; right?
23    A.  It's checked no but I said yes.
24    Q.  All right.  And No. 5 says do you drink

125

1  alcohol?
2    A.  And I said no, because at that time I was
3  not drinking or doing drugs at that time.
4    Q.  And that's what it says on the next line,
5  do you -- doing drugs, no.
6    A.  No.
7    Q.  Number 6 says have you ever attempted
8  suicide and that's checked no.
9    A.  I told him yes.
10    Q.  It's checked no, though; right?
11    A.  Right, he checked no.
12    Q.  And No. 7 says do you feel suicidal now
13  and it's checked no?
14    A.  I told him, no, I didn't feel suicidal.
15    Q.  Number 8 says are you feeling homicidal
16  now.
17    A.  And I told him no.
18    Q.  How about those girls that were involved
19  with the attempt on your daughter, did you feel
20  homicidal towards them?
21    A.  No.
22    Q.  Okay.
23    A.  I was -- my -- no.
24    Q.  And No. 9 asks have you ever had special

126

1  education classes.  And that's checked no.
2    A.  I told him yes.
3    Q.  Where did you have special education?
4    A.  At Altgeld high -- at Altgeld Elementary
5  School and Englewood High School.  And from there
6  I was on meds and I was able to cope with the rest
7  of the class in a regular classroom.
8    Q.  Did you finish high school?
9    A.  Yes, I did.  I have a year and a half of
10  college.
11    Q.  Where did you go to college?
12    A.  Jarvis Christian College in Hoffman
13  (sic), Texas.
14    Q.  When did you have those two years?
15    A.  Now you taking me back again.  I left
16  there in -- mother died in '96.  Mom died in '96.
17  I think I left in -- no.  My mother died in '93.
18  So it had to be -- had to be in '90 I think.  I'm
19  not for sure.  Don't quote me on that.
20    Q.  Was that Jarvis, J-a-r-v-i-s?
21    A.  Uh-huh.
22    Q.  Is that yes?
23    A.  Jarvis.  Yes.
24    Q.  What Texas town?

127

1    A.  Hoffman, Texas.
2    A.  Hoffman?
3    A.  Hoffman, Texas.
4    Q.  Thank you.
5        Did you get any kind of certificate from
6  Jarvis Christian College?
7    A.  I received my LPN certificate from there.
8    Q.  Did you work in a hospital after that?
9    A.  I worked in nursing homes.
10    Q.  Were any of those --
11    A.  Years -- it was -- it wasn't right after
12  that because my mom wind up dying and I wind up --
13  I was taking care of her and then she wind up
14  dying, then I wind up getting a job after -- years
15  after that.
16    Q.  Okay.  Did you work at nursing homes in
17  the Chicago area?
18    A.  Yes.
19    Q.  Did you work at any in Texas?
20    A.  No.  I came home.
21    Q.  Number 10 asks, are you now homeless and
22  the box was checked no; is that right?
23    A.  Yes.
24    Q.  Is that accurate --

128

1   A.  I have my own place.
2   Q.  And No. 11 asks are you a veteran?
3   A.  No.
4   Q.  You never were in the military?
5   A.  No.
6   Q.  So that answer was; correct?
7   A.  Yes.
8   Q.  The next question is, is this detainee's
9   behavior appropriate in the RCDC area.  And it's
10  checked yes.  That was an evaluation made by Mark
11  Ganier when he saw you.  Do you agree with the
12  evaluation that your behavior was appropriate?
13  A.  Yeah, because I was on my meds when I got
14  there.
15  Q.  I understand.
16  A.  I was okay.
17  Q.  All right.  And you also agree that you
18  were discharged a couple of days after you got in;
19  is that right?
20  A.  Yes.
21  Q.  Okay.  Did you go back to court on the
22  7th of November?
23  A.  Yes.
24  Q.  And what happened with the case?

                                            129

1   A.  I was released on bond.  I believe if I'm
2   not mistaken I was released on bond.
3   Q.  Did you post bond?
4   A.  Yes, I believe my husband post bond.
5   Q.  So you were released on bond and the case
6   was still pending?
7   A.  I'm trying to remember.  I believe so.
8   Yeah.  Because we was waiting on -- yeah.
9   Q.  All right.  When you left the courthouse
10  and got discharged from the jail, at -- on bond,
11  at liberty on bond, you knew that you had to go
12  back to court; right?
13  A.  Huh?
14  Q.  You knew that you had to go back to
15  court?
16  A.  Yes.
17  Q.  Did you miss any of those court dates?
18  A.  No.  Hold on.  Let me remember.  Is this
19  the first -- yeah, I think I did go back to
20  court.  Yes, I did miss a court date.  No, I
21  didn't miss a court date.  I got pulled over for
22  driving without a license, and that's when a
23  warrant was issued for me for not reporting to
24  the -- what you call them, PO?

                                            130

1   Q.  Probation officer.
2   A.  Yeah.
3   Q.  So that was after you had pled guilty?
4   A.  No.  I hadn't -- I hadn't pled guilty to
5   anything if I'm not mistaken.  See, these days --
6   that's why I keep telling you the dates.  I -- I
7   was out on bond I think twice.  And this incident
8   11/7, I'm trying to remember is this the -- no,
9   this ain't the last one.  I post -- I think my
10  husband post bond on this one.
11  Q.  Okay.  All right.  Did you post --
12  husband post bond more than one time for you?
13  A.  Yes.
14  Q.  In fact, didn't you have quite a bit of
15  money up in bond?
16  A.  Yes.
17  Q.  And despite having that money up in bond,
18  there were times when you didn't go to a court and
19  a warrant issued; is that right?
20  A.  No, wasn't that I didn't go to court.  It
21  wasn't that I didn't apply to like the SWAP.  I
22  went to SWAP and got sick and then SWAP wouldn't
23  accept me back, and then the other ones like I
24  said, the -- Mr. Kenny wasn't in the basement and

                                            131

1   after court I was supposed to see him.  After
2   every court date I was supposed to go down there
3   and see him and talk to him and everything and
4   sign papers.  But this day he wasn't there and I
5   didn't know when he was going to be back, so I
6   wind up missing him and had a bench warrant issued
7   on me.
8   Q.  So you're saying there were no bond
9   forfeiture warrants; right?
10  A.  No.  I got all my bond money back.
11  Because I didn't forfeit my bond.  I was in court
12  when I was supposed to be.
13  Q.  You got all of the money back?
14  A.  Yeah, I got all but -- you know, they
15  take out so much for something.
16  Q.  Were there any fines involved with
17  disposition of the case?
18  A.  I paid my fines off.
19  Q.  When you were in the jail for those four
20  or five -- four days -- three days I guess from
21  November of '07, did any detainees ever tell you
22  to be afraid to go into Cermak?
23  A.  Any -- you mean detainees is like the
24  people that's in jail or the officers?

                                            132

1    Q.   The ones that are with you in jail.
2    A.   No.
3    Q.   Okay.  Did your lawyer ever tell you you
4  should be afraid to go to Cermak?
5    A.   Yes.
6    Q.   Did any correctional staff tell you --
7    A.   Yes.
8    Q.   -- to be afraid to go to Cermak?
9    A.   Yes.
10   Q.   What specifically did they tell you?
11   A.   Police officers and correctional
12  officers.
13   Q.   Which police officers?  From Harvey?
14   A.   From Harvey police station when they took
15  me in because they said it would -- it would slow
16  my process of being processed into the county, so
17  that take me longer to get into the county to get
18  my court date to go see the judge.
19   Q.   The Harvey police officers told you this?
20   A.   Yes.  Because they didn't want to take me
21  to I guess to do the paperwork for me to go over
22  to the hospital.
23   Q.   Okay.
24   A.   That's first.
                                                    133

1    Q.   Let's pause a moment for that.  Okay.
2  Harvey police were talking about taking you to a
3  hospital for treatment; right?
4    A.   Taking me so I can be evaluated or
5  something --
6    Q.   Right.
7    A.   -- or medicated.  I don't know.
8    Q.   That was before you went to court?
9    A.   Right.  Because I told them I was on
10  medication.  My medicine was upstairs in my purse
11  with my husband.
12   Q.   They were telling you that if they took
13  you to a hospital that would delay your
14  processing?
15   A.   Right.
16   Q.   And you might miss going to court that
17  day?
18   A.   Right.
19   Q.   And have to wait until the following day;
20  right?
21   A.   I don't know -- they don't know when you
22  have to -- when you be able to go to court.
23   Q.   Okay.
24   A.   But if you miss that court date you have
                                                    134

1  to wait for your turn.
2    Q.   Okay.  And based on that you chose to go
3  to court right away; is that right?
4    A.   I chose to go to court so I can go home
5  and get my medicine, yes.
6    Q.   Okay.
7    A.   I chose to not -- to not go.
8    Q.   All right.  When you were at the jail,
9  did any correctional officer tell you to be afraid
10  to go to Cermak?
11   A.   Not -- yeah, the -- the officers -- they
12  say you don't call them that.  But, yeah, the
13  officers -- the officer when you in the bull pen
14  and she -- they'll tell you -- you know, you
15  talking about going to Cermak, going over to
16  Cermak floor, you know, them are all crazy
17  people.  They tell you how bad it is and how the
18  people over there is sick and how they act and
19  all -- it was just -- I wouldn't want to go there
20  because that's not the type of lifestyle I live.
21   Q.   So this was --
22   A.   And they said everything -- you know,
23  people over there that's crazy, got some of
24  everything over there and all this and that.  And,
                                                    135

1  you know, they discourage you from even wanting to
2  get your meds because you want to just get through
3  this and get done and just go to sleep and get
4  your time so you can do what you got to do to get
5  out.
6    Q.   This was an officer in uniform saying
7  this?
8    A.   Yes, an officer.
9    Q.   Was it more than one officer saying this?
10   A.   It was like the one -- like, when you
11  come in into the bull pen, the people that -- you
12  know, that got that desk right there --
13   Q.   Yes.
14   A.   -- in front of the bull pen, them
15  officers.
16   Q.   Okay.
17   A.   And I even had a sarge tell me, you know,
18  with the white shirt on, tell me you don't want to
19  go over there.  Because when I went to the tier
20  and I got sick, she wanted -- a sarge told me I
21  didn't want to go over to that floor.
22   Q.   Can you describe the officers that were
23  in the area were your receiving is that told you
24  this?
                                                    136

34 (Pages 133 to 136)

1    A.  Can I describe them? I know what they
2  look like if I see them, but I know one of them is
3  a heavyset lady. She was real nice. And, you
4  know, she was talking to me because she said I
5  don't look like I need to be there and all this
6  and that.
7    Q.  Did you agree with her in that
8  assessment?
9    A.  About what?
10    Q.  That you didn't look like you needed to
11  be there?
12    A.  I mean, none of them -- none of us look
13  like we should be there, but I mean, we there
14  because of an issue that we did, something we did
15  wrong. But she was, you know, nice and she was
16  talk to me because she seen I was -- I was -- I
17  was real irritated, you know, because I'm getting
18  locked up. I'm fittin' to go to jail for
19  something I didn't do.
20    Q.  Right.
21    A.  So of course I was upset and angry and
22  mad.
23    Q.  Are you still upset about that?
24    A.  Am I upset about it? No, I mean, it's

137

1  know, I can stick it out until my court date.
2    Q.  Okay. Did you agree with her, then, that
3  you could stick it out till your court date?
4    A.  I was thinking on do I -- you know,
5  really everything she was saying in my head I was
6  thinking, you know, man, I can't go there because
7  I done been to Tinley Park. I know how some psych
8  hospitals are and how the people are. And I just
9  wanted to just basically get out of there. I
10  wanted to go see this judge and let my husband pay
11  the bond and get me out.
12    Q.  You understood, then, that going to the
13  psych unit would be similar to going to Tinley
14  Park; is that right?
15    A.  No, it was worse than at Tinley Park the
16  way they explained it.
17    Q.  All right. Was Tinley Park pretty bad?
18    A.  No, Tinley Park to me it wasn't really
19  bad because I was sick when I went in and they
20  really helped me. It wasn't, no -- but the way
21  she was explaining Cermak, if you went in there I
22  don't think you would have went either.
23    Q.  Do you know anybody that has ever wanted
24  to go to Cook County jail to be inside the jail?

139

1  done and over with.
2    Q.  Okay.
3    A.  I pleaded guilty. I was guilty because I
4  plead guilty because I fought two teenagers when I
5  could have did something else as a mother. But I
6  stood and had my daughter's back to keep them from
7  hurting my baby. So do I -- do I feel guilty? I
8  feel guilty for fighting them but not for the way
9  it happened. No. I feel guilty about them
10  getting hurt. Yes.
11    Q.  By the way, what was the name of the
12  daughter that was -- you were --
13    A.  Frances Clark.
14    Q.  Can you describe for me the sergeant that
15  told you that you should be afraid to go to
16  Cermak?
17    A.  She was medium height, dark skinned, wore
18  glasses. She was -- she wears glasses. I don't
19  know her name. Sergeant.
20    Q.  All right. And was this generally you
21  don't want to go to Cermak or was it something
22  more specific than that?
23    A.  She was just telling me I don't want to
24  go over there and the situation, and that, you

138

1    A.  No. Who do?
2    Q.  Did you?
3    A.  Of course not.
4    Q.  It's not a place where you'd want to be
5  to begin with; right?
6    A.  It's a place I'm never going again if the
7  Lord's will.
8    Q.  Have you heard anyone else besides these
9  officers describe the Cermak psych unit floor?
10  MR. MORRISSEY: Well, I'm going to object.
11  You mean this time in November of 2007 or some
12  other time?
13  BY MR. CATANIA:
14    Q.  At any time before this deposition other
15  than the officers that you've just described, did
16  anybody else describe the psych floor at Cermak?
17    A.  I have heard inmates --
18    Q.  Okay.
19    A.  -- talk about it.
20    Q.  That's what I was asking before when I
21  said detainees I meant inmates. You've heard them
22  talk about it?
23    A.  Yeah, I have heard one of them speak on
24  it because she didn't want to go over there.

140

1    Q.  Was that during the time in November of
2  '07 also?
3    A.  No, that was the second time I was locked
4  up.
5    Q.  Second time.  Okay.  So that didn't have
6  anything to do with your decision not to go in
7  that day; right?
8    MR. MORRISSEY:  I object.  I think you're
9  misstating what she said.  It's.....
10  BY MR. CATANIA:
11    Q.  Did you understand my question?
12    A.  I don't think I did.
13    Q.  Well, my question was very simple.  Only
14  that no detainee did anything or said anything
15  that convinced you one way or the other about
16  going to Cermak --
17    A.  No, it didn't.
18    Q.  -- that time?
19    A.  Okay.  Let me get this right, then,
20  because maybe I didn't.  You're saying did a --
21  did an inmate tell me, make me not want to go
22  there?
23    Q.  Yes.
24    A.  No.

141

1    Q.  Did an inmate ever describe for you in
2  the second incarceration what Cermak psych floor
3  was like?
4    A.  Yes.
5    Q.  Was that --
6    A.  But I had already heard from the first
7  time and the officers and the sarge, you know,
8  that wasn't a place that I wanted to go.
9    MR. MORRISSEY:  Take a break for a second.
10    (A break was taken.)
11  BY MR. CATANIA:
12    Q.  Before that break I think I asked you a
13  question, and I was wondering if there's any
14  answer you want to change?
15    MR. MORRISSEY:  Can you repeat the last
16  question and answer.
17    (The record was read as
18    requested.)
19  THE WITNESS:  Now, you remember you said the
20  first -- the first -- were you talking about the
21  first time?  See, that's where I'm getting
22  confused.  You -- you putting all the times -- I'm
23  not -- you doing time scales and I'm not.....
24  BY MR. CATANIA:

142

1    Q.  We are limited to what you have in your
2  affidavit plus your experiences in the jail.
3    A.  Uh-huh.
4    Q.  Okay.  That's what our limits are.
5    A.  Okay.
6    Q.  Your experiences in the jail include
7  conversations with the people that you've seen.
8  So that's where I'm talking about.  Okay?
9    A.  Okay.  So which part?
10    Q.  You've seen detainees, you've seen people
11  that you call the inmates before; right?
12    A.  The first time.  You talking about --
13    Q.  Both times.
14    A.  Both times.  See, that's what I'm saying,
15  you saying both times --
16    Q.  The first time I asked you already and
17  you said that, no, you hadn't talked to detainees
18  or inmates about that.
19    A.  Inmates, right.
20    Q.  You had never been on the floor itself,
21  have you, of the psych floor of Cermak?
22    A.  No.
23    Q.  Even to this day you've not been there;
24  right?

143

1    A.  No.
2    Q.  So you have no first -- firsthand
3  personal knowledge of it; right?
4    A.  No.
5    Q.  Did any detainees at the first intake
6  tell you that they had overheard you talking about
7  your psych problems?
8    A.  Detainees being?
9    Q.  Inmates.
10    A.  Inmates, no.
11    Q.  Okay.  Did any correctional officers tell
12  you that they had overheard you talking about your
13  psych problems?
14    A.  Yes.
15    Q.  Tell me who that was.
16    A.  You know the desk that I was telling you,
17  that's the incident I was telling you about, the
18  desk where it sits in front of the bull pen.
19    Q.  Yes.
20    A.  That's where the officers them was
21  explaining about -- talking about how the psych
22  floor is, the psych unit.
23    Q.  Right.
24    A.  Is what they call it.  And she was --

144

36 (Pages 141 to 144)

1  that's when she was explaining to me what goes on
2  on there, how it is, the process and everything
3  and what you got to go through and how long it
4  talks, all this and that. That's at the bull pens
5  window, that's officers talking to me.
6      Q. Let me ask you this. When the officer
7  was saying this information, was it said loud
8  enough for all the women, the detainees or inmates
9  to hear?
10     A. The ones that was sitting, the bench that
11 sits in front of the bull pen gate, they can hear
12 and the people over there heard her because the
13 young lady that -- that actually was going to go
14 to the floor until she heard that, she was sitting
15 over there, so yes.
16     Q. All right. So this was essentially an
17 announcement to everybody about what to expect --
18     A. No, she was talking but, you know, by
19 everybody talking, she was -- you know, it's
20 loud. And by everybody talking she was talking to
21 me, you know, we were talking. And I guess she
22 heard her sitting over there on that bench over
23 there.
24     Q. I don't want you to guess. I want you to

145

1      Q. Is that what you felt?
2      A. Yes, it was.
3      Q. Did that have anything to do with your
4  decision making about what to say and do?
5      A. No. I mean did it have -- okay.
6  Confusing me again now.
7      Q. All right.
8      A. The question is confusing me rather. You
9  say when he was talking to me and everybody was
10 lined up on the wall, you asking me?
11     Q. I'm asking you if you told people about
12 the boil on your butt --
13     A. No, I didn't.
14     Q. -- at the time?
15     A. No, didn't nobody know. Wasn't nobody
16 supposed to know.
17     Q. Okay. Did you tell Jones about that,
18 Luethel Jones, the female?
19     A. Yeah.
20     Q. Okay.
21     A. And she told me to tell the man behind
22 there.
23     Q. Right. When you told Luethel Jones about
24 it, was there anybody else around that -- that

147

1  talk about the things that you know.
2      A. Okay.
3      Q. Do you know if this particular officer
4  that you just described was talking only to you?
5      A. I'm not going to guess it, so I'm not
6  even going to answer because I don't even -- I
7  don't know if she was exactly just talking to me
8  but we were talking.
9      Q. Right.
10     A. So I don't know if she was talking to me
11 or talking loud enough for other people to hear or
12 what. I can't answer that.
13     Q. She was talking loudly to you, though;
14 right?
15     A. Yes.
16     Q. She was not really close to you when she
17 said it, was she?
18     A. No, she was sitting -- still sitting at
19 the desk.
20     Q. All right. Did the fact that she said
21 this out loud to you make you feel like what you
22 were talking to the CMT about, this Luethel Jones,
23 was not private?
24     A. It was not.

146

1  said something to you about it?
2      A. The ladies on the wall.
3      Q. What did they say?
4      A. They didn't -- they didn't say nothing.
5  They just -- you know how women snicker, you know,
6  like damn. And I don't know if they thought it
7  was a disease or what, but it wasn't. It was just
8  from -- you know how when you sleep on the cold
9  hard benches at the jail your butt -- your butt
10 hurts and you get a bump there, and I had on a
11 little thin summer dress that day I think it was.
12 I had on a dress, and my butt was hurting, and I
13 had a bump on my -- it wasn't even a boil. It was
14 just a bump, and it went down in a couple of days.
15     Q. All right. Did you hear anybody -- any
16 of the other ladies talking to Ms. Jones about
17 their medical problems?
18     A. Yeah, you can hear. They don't have --
19 you don't have no privacy.
20     Q. Did you ever mention to anybody about
21 that, about --
22     A. About no privacy?
23     Q. No, about their problems? Did you talk
24 to anybody about that?

148

McCorkle Court Reporters, Inc.
Chicago, Illinois  (312) 263-0052

1    A.  No, because that's not my problem.  One
2  girl had an STD and she was kind of embarrassed.
3  Like I told her, you know -- one girl was trying
4  to tell her that the medicine is not going to cure
5  it.  But like I explained to her that's not true.
6  If you take the pills like the doctor gave them to
7  you, they gave her a pack to take at one time, I
8  told her just take them all, it will clear up.
9  You know, you won't have to worry.  It's not like
10  gonorrhea, nothing like that that will come back.
11  And I was explaining that to her.
12    Q.  Okay.  Did she ask you for that
13  information?
14    A.  Well, she didn't ask me but her and the
15  other girl was talking and I -- they was talking
16  loudly and I heard her, so.
17    Q.  Where did that conversation take place?
18    A.  Right there where -- right there -- right
19  there in the --
20    Q.  In the sitting area?
21    A.  -- around the table, yeah.
22    Q.  So she got the medication in receiving;
23  right?
24    A.  Yeah, they gave it to her to clear it

149

1  up.  But she was scared.  I -- reason why I said
2  something because the girl made her feel like she
3  was going to keep the STD, but that wasn't true
4  with that disease that she had.  It wasn't -- it
5  was curable with the medicine.
6    Q.  She apparently knew that she had an STD?
7    A.  She found out when she got in there I
8  guess, because she said she didn't know.
9    Q.  Okay.  So was this in receiving?
10    A.  Yeah.
11    Q.  Now, the date that you were intaked after
12  that was September 11 of 2008.  That's what's in
13  your affidavit; right?
14    A.  Yes.
15    Q.  Okay.  On September 11 of 2008 you saw
16  the same female correctional medical technician;
17  right?
18    A.  I believe so.  I don't know if it was the
19  same one or not but I -- I believe so.
20    Q.  This time she asked you about whether you
21  had a history of high blood pressure and asthma
22  and she wrote down your answer?
23    A.  Uh-huh.
24    Q.  And did you find the page we're talking

150

1  about?
2    A.  This one right here?
3    Q.  Page No. 8.
4    A.  Is this it?  Yes.
5    Q.  Okay.  She asked you about whether you
6  had a history of high blood pressure and asthma,
7  and she wrote down your answer that you have a
8  37-year history of hypertension and asthma;
9  right?  Is that what it says?
10    A.  Are you over here?  Yeah, yeah, okay.  I
11  see.  Yes.
12    Q.  And at that time, November -- I'm sorry,
13  September 11 of 2008 you were 37 years old; right?
14    A.  Yes.
15    Q.  And like what you said to me earlier
16  several times, you've had these problems your
17  whole life; right?
18    A.  Yes.
19    Q.  Would you say that when she noted down
20  that you have a 37-year history of hypertension
21  and asthma that your last attack was a
22  month -- was a month prior, would you say that she
23  was accurate in noting that down?
24    A.  I believe so because I believe I had just

151

1  got out the hospital from a real bad cold I had
2  caught.
3    Q.  And if CMT Jones said to you that on
4  September 11, 2007 (sic) if she asked you about
5  whether you had a history of mental illness and
6  she wrote down your answer that you have no
7  history of mental illness, would you say she was
8  accurate about --
9    A.  I would say she's -- that's not true.
10    Q.  You would say she's lying?
11    A.  I would say that's not true.
12    Q.  Well, would you say that she's lying?
13    A.  Yes, I would.
14    Q.  Okay.  Did you know Luethel Jones?
15    A.  No, I didn't.
16    Q.  Did she know you?
17    A.  No, she didn't.
18    Q.  Can you tell me at this point today what
19  motivation you think she might have had for lying
20  on this form?
21    MR. MORRISSEY:  I'm going to object.  You're
22  asking this witness to opine what somebody else
23  may or may not have as far as a motive.
24    You can answer if you know.

152

1    THE WITNESS: I don't know.
2  BY MR. CATANIA:
3    Q.  Thank you.
4    A.  I mean I can't -- I can't answer what she
5  thinks or why she didn't.
6    Q.  When Ms. Jones asked you about whether
7  you have a history of taking medications and she
8  wrote your answer down that yes, you do take
9  medications and you think you take?
10    A.  I think?
11    Q.  Yes.  You think you take Lisinopril and
12  Albuterol, was that accurate when she wrote that
13  down?
14    A.  No, because why would "I think" when I
15  know what I take.  I know my medication.  I know
16  every name of them, every milligram.
17    Q.  Did she write that down accurately on
18  this page eight of the exhibit?
19    A.  No.
20    Q.  Did she also -- did she also ask you
21  whether you have any dental problems at that time?
22    A.  No.
23    Q.  If you look under where it says current
24  problems there's a circle around No. 3 and there's

153

1    Q.  At the time that you entered into the
2  jail on September 11 of 2008, were you still
3  suffering from hypertension?
4    A.  Yes.
5    Q.  And you still needed medication for that?
6    A.  Yes, I still take medication.
7    Q.  And at 7:50 p.m., which is listed on page
8  9, which is the side two of that page, see bottom
9  right it says page 9?
10    A.  Uh-huh.
11    Q.  It shows a blood pressure of 130 over
12  102.  Do you see that?
13    A.  Yes.
14    Q.  And that's elevated, isn't it?
15    A.  Yes.
16    Q.  Is there a time on the right side, it
17  lists a time of that examination?
18    A.  7:50 p.m.
19    MR. CATANIA:  Could I take a break just for a
20  moment, please.
21         (Off the record.)
22  BY MR. CATANIA:
23    Q.  On that next page, the one you're on page
24  9, in the bottom page where it says

155

1  a yes circled on No. 3; right?
2    A.  Yes.
3    Q.  And then in the right side there's a
4  circle written around a handwritten No. 3 and it
5  says patient states tooth extracted one week ago,
6  complains of pain at the wound site at this time.
7    A.  I'm sorry.  I did tell him -- remember I
8  told him -- I told you I had -- one time I went
9  into the jail I had just had a tooth done, and it
10  was hurting me and they gave me some ibuprofen.
11  This must be the time.  I'm sorry.  That's --
12  that's -- this is accurate, No. 3 with the
13  dentist, yes, I did have tooth problem.  Because
14  remember I told you that before here, before now.
15  I told you I was in there one time and I didn't
16  know what date it was.
17    Q.  So it's accurate, then, what -- what
18  Ms. Jones --
19    A.  This part --
20    Q.  -- wrote down?
21    A.  -- the dentist, yeah, because she -- they
22  had to give me pain pills.  But no about me
23  telling her I don't have no mental health issues,
24  that's not true.

154

1  assessment/plan/referrals you see that written, it
2  says No. 1 hypertension and then next to that
3  there's medication; right?
4    A.  Yes.
5    Q.  Enalapril.
6    A.  Yes.  And reason why they give me that
7  because he said he didn't have the Lopressin.  So
8  that was another brand that was like it, but it
9  didn't have the water pill in it.
10    Q.  All right.  So based on your knowledge
11  being your CNA license and all that, medication
12  substitutions are often done?
13    A.  Yes.
14    Q.  Below that it says HCTZ.  What is that
15  for?
16    A.  HTCZ (sic), that's -- I think that's
17  another -- like a water pill.
18    Q.  So he gave you two medications to --
19    A.  Right.
20    Q.  -- address that problem?
21    A.  Because they did the -- first one don't
22  have a water pill in it.  Lopressin has the water
23  pill and I believe.....
24    Q.  If you look where it says assessment

156

McCorkle Court Reporters, Inc.
Chicago, Illinois  (312) 263-0052

1  there's a number two written and it says asthma
2  and next to that it says Albuterol; right?
3      A.  Where?
4      Q.  Point to it.
5      A.  Okay.
6      Q.  Albuterol.  Do you agree with that?
7      A.  Yes.
8      Q.  And that was accurate, too; right?
9      A.  Yes.
10     Q.  So those two plans to give you enalapril
11 and HCTZ and asthma medication, Albuterol, those
12 were accurate?
13     A.  Uh-huh.
14     Q.  Is that right?
15     A.  Uh-huh.
16     Q.  You have to answer yes.
17     A.  Yes.
18     Q.  Under the HCTZ it says BP checkmark.
19 What does that mean?
20     A.  The blood pressure.
21     Q.  And then next to it it says?
22     A.  They want them to check it three times a
23 day --
24     Q.  All right.  And that's what it says --
                                                    157

1      A.  -- because it with elevated.
2      Q.  -- right?
3      A.  Yes.
4      Q.  So at that point you were given a
5  physician order to have medication --
6      A.  My blood pressure.
7      Q.  -- and blood pressure checks?
8      A.  Yes.
9      Q.  And below that there is a No. 3 which
10 says S slash p, status post, tooth extraction.
11     A.  Amoxicillin, 500 milligrams.
12     Q.  Okay.  And what is that?
13     A.  That's amoxicillin keep my -- keep me
14 from catching an infection where they did that
15 extraction on my tooth at.
16     Q.  And that was appropriate at the time as
17 well?
18     A.  Yes.
19     Q.  On the next page, page 10, also referring
20 to the same intake day of September 11, 2008, do
21 you see on the bottom it has the date written
22 down?
23     A.  Yes.
24     Q.  And a time?
                                                    158

1      A.  Yes.
2      Q.  7:33 p.m.; right?
3      A.  Yes.
4      Q.  Okay.  And the information at the top
5  includes your name next to -- under a bar code; is
6  that right?
7      A.  Yes.
8      Q.  And the book date also says September 11,
9  2008; right?
10     A.  Yes.
11     Q.  So this is the second time you came in;
12 right?
13     A.  Yes.
14     Q.  It has an address there of 16630 South?
15     A.  Paulina.
16     Q.  Paulina.
17     A.  Markham.
18     Q.  In Markham.  That's different from the
19 address on your previous intake?
20     A.  Yes.
21     Q.  So you moved in the interim?
22     A.  I moved back home with my husband which
23 was my boyfriend at the time, yes.
24     Q.  It still shows underneath that the charge
                                                    159

1  of battery.  Do you see that?
2      A.  Yes, that's the same case.
3      Q.  And there's a bond amount that says
4  10,000?
5      A.  Yes.
6      Q.  Do you know what that refers to?
7      A.  Yes.  That was my bond.  I had to have
8  2,000 to walk.
9      Q.  And it shows a court date of October 14
10 of '08?
11     A.  Yes.
12     Q.  Is that the date you anticipating going
13 back to court?
14     A.  Yes.
15     Q.  Did you post that bond?
16     A.  The second time?
17     MR. MORRISSEY:  If you know.
18     THE WITNESS:  I'm trying to remember.  I
19 don't even remember.  I think we did.  But I'm not
20 for sure.
21     MR. MORRISSEY:  Don't guess.
22     THE WITNESS:  Okay.  I'm not for sure.
23 BY MR. CATANIA:
24     Q.  Below the information about you it says
                                                    160

40 (Pages 157 to 160)

1  employed, and the box is marked yes; is that
2  right?
3     A. Yes.
4     Q. And you were employed at that time?
5     A. Yes.
6     Q. This time it says CNA slash LPN; right?
7     A. Yes.
8     Q. You were working under the CNA license at
9  the time?
10    A. Just the CNA.
11    Q. Also asks if you had ever been at Cook
12  County jail before and it's checked yes?
13    A. Yes.
14    Q. Division four; right?
15    A. Yes.
16    Q. It asks then have you ever been
17  hospitalized for psychiatric treatment. And it's
18  difficult to say what's checked, but next to that
19  it says how many times. And it's listed one to
20  two. Do you see that?
21    A. Yes.
22    Q. Was that accurate?
23    A. That was -- at that time when they asked
24  how -- how many times recently and it was like one

161

1  to two.
2     Q. Okay. When the next line asks when's the
3  last date, next to it it says several months; is
4  that right?
5     A. Right.
6     Q. And next to that it says what reason.
7  And it seems like it says bipolar. Do you agree
8  with that?
9     A. Yes.
10    Q. All right. It also asks the question
11  where. And next to that it says Tinley Park;
12  right?
13    A. Right.
14    Q. And all of those things at that time of
15  intake were things that you said to these mental
16  health specialist at the bottom; right?
17    A. Right.
18    Q. The next -- and so they're accurate;
19  right?
20    A. Yes.
21    Q. And the next line it says are you
22  currently receiving outpatient treatment. And yes
23  is circled. Do you see that?
24    MR. MORRISSEY: Actually the document looks

162

1  like --
2     THE WITNESS: No and then circled yes.
3  BY MR. CATANIA:
4     Q. Right. "No" is checked and then
5  scratched off and then "yes" is circled; right?
6     A. Yes.
7     Q. And the question next to that is why.
8  And there's a written answer there; right?
9     A. I don't know what that is.
10    Q. Does it look like it says depression?
11    MR. MORRISSEY: I'm going to ask her not to
12  guess whatever --
13    THE WITNESS: I don't know.
14    MR. MORRISSEY: -- this person put down.
15  BY MR. CATANIA:
16    Q. Well, were you being treated as an
17  outpatient for depression?
18    A. Yes, I was.
19    Q. And was the last visit date several
20  months before?
21    A. No, I don't think so. No.
22    Q. Number four asks are you now taking
23  psychotropic medication. Do you see that?
24    A. Yes.

163

1     Q. And it looks like there is a first check
2  that says no and then there's a circle that says
3  yes; right?
4     A. Yes.
5     Q. And next to that there's actually the
6  name of a drug written in there; right?
7     A. Yes.
8     Q. Looks like it does say Abilify, doesn't
9  it?
10    A. Yes.
11    Q. And that's what you and your affidavit
12  said that you were taking at the time that you
13  entered?
14    A. Yes.
15    Q. Can you explain to me No. 9 where it asks
16  have you ever had special education classes and
17  it's checked no.
18    A. I have no idea why it's checked no.
19    Q. But next to that it says there's an MS
20  and an RN; right?
21    A. Right.
22    Q. What do those refer to?
23    A. I don't know.
24    Q. The final written area is below where it

164

1    says is this detainee's behavior appropriate in
2    the RCDC area.  And yes is checked; right?
3         A.  Yes.
4         Q.  And below that it says don't want --
5    doesn't want psych admission.  And a question
6    mark; right?
7         A.  Yep.
8         Q.  And below that it says refer to medical;
9    right?
10        A.  Yes.
11        Q.  All right.  At that time that you were
12   interviewed at 7:33 p.m. by Charlotte Centers, the
13   mental health specialist, did you tell her that
14   you didn't want to be admitted for psych?
15        A.  Yes, I did.
16        Q.  Okay.
17        A.  Because of the things that the officers
18   them was saying and what they were saying about
19   the psych floor, and I didn't want to be on the
20   psych floor because I didn't -- I just needed my
21   meds.  I didn't need to be on the psych floor with
22   psych.  But they said in order to get the psych
23   meds you have to be on that floor in order to
24   receive your psychs.  And I never -- I didn't

                                                     165

1    never understand that.
2         Q.  Okay.  Well, let me ask you this.
3         MR. MORRISSEY:  Let her -- let her explain
4    her.....
5         MR. CATANIA:  I believe she did.
6         MR. MORRISSEY:  No, she didn't.
7         THE WITNESS:  No, I was explaining you.  And
8    when -- when -- when -- when it came down to when
9    they asked me, well, do I -- do I want to go on
10   the psych floor because that's the only way I'm
11   going to get my meds, I'm -- I was, like, no,
12   because that's not where I need to be.  I can cope
13   with the general population.  I just need my
14   medicine to keep me coping with the general
15   population.
16        Just because I'm on psych don't mean I
17   should have to go to the psych floor, and that's
18   actually the way I felt because I'm not crazy.  I
19   just sometimes need medicine to help balance me
20   out.  And that's what the medicine do.  It keeps
21   me balanced and leveled.  It keeps me, you know,
22   from feeling down or upset just -- and it's bad
23   that you have to be labeled to go to this floor
24   when you're in the county because of this

                                                     166

1    medication, because I'm on that medication.
2         But I'm not like them people that might
3    need that floor.  I wasn't like them.  And that's
4    what I was trying to explain to the sarge and the
5    officers them, and the doctor and the med doctor.
6    I'm psych but I'm not -- I'm not crazy.  I don't
7    need to be put directly onto that floor.  If you
8    give me my medicine on general population, and
9    they monitor you anyway because they have nurses
10   come around to bring you this medicine, the nurse
11   can stand there and watch me take my medicine and
12   I could have did that.  But they was, like, no,
13   you have to go to that floor and you don't want to
14   go to that floor because this is what goes on on
15   that floor and this is what they do, and this is
16   how they do it.  I didn't need that.  That wasn't
17   what I needed.
18   BY MR. CATANIA:
19        Q.  On this intake date of September 11 of
20   2008, did anybody tell you that you don't need to
21   go to that floor?
22        A.  Yes, the officers said.
23        Q.  Who did?
24        A.  The officer --

                                                     167

1         Q.  Who said that?
2         A.  Officer, what's her name, Baldwin I think
3    it is, Officer Davis, officer Patrick, officer --
4    the officer that was my tier work -- my tier
5    supervisor, what's his name, Officer Michaels, he
6    said I didn't want to be changed from that unit to
7    go to no psych floor.  He said that's not -- you
8    know, you go up there all these people up there
9    this and that and this is what goes on.  You know,
10   no, I wasn't fittin' to go to that floor after
11   hearing all that bad stuff and how they act and
12   how it is up there.  I didn't -- I didn't need --
13   that's not the floor I needed.
14        Q.  Did Charlotte Centers ever tell you that
15   you don't want to go to that floor?
16        A.  That's the nurse.  That's the mental
17   health.  Yes, she -- if that's -- if this is the
18   same woman that told me when I came in that I
19   didn't want to go that floor, yes.
20        Q.  Okay.  She told you --
21        A.  She told me I didn't --
22        Q.  -- you didn't want to go to that floor?
23        A.  -- need to be on that floor.  I didn't
24   need to be on that unit.  She -- I don't look like

                                                     168

1    I need to be on that unit. And that's when, you
2    know, they start explaining that the medicine is
3    in your system. Okay. I know the medicine is in
4    my system. But that doesn't mean that I don't
5    need my medicine. I need the medicine to keep the
6    medicine flowing in my system. Yes, if this is
7    the same woman that did my intake, yes, she did
8    tell me that.
9        Q.  Okay. You went to general population?
10       MR. MORRISSEY: Do you need to take a break?
11   How much longer, Mr. Catania?
12       MR. CATANIA: I don't know.
13       MR. MORRISSEY: Don't know.
14       THE WITNESS: Let's get through with this
15   because I'm --
16       MR. MORRISSEY: Less than a half hour, do you
17   believe?
18       MR. CATANIA: It might be a little bit more
19   than a half hour but it's certainly not going to
20   be an hour.
21       MR. MORRISSEY: You're all right with an
22   hour?
23       THE WITNESS: Yeah.
24   BY MR. CATANIA:

169

1        Q.  Talking about the time that started on
2    September 11 of 2008 and lasted for I believe it
3    says 33 days in your affidavit. That one.
4        A.  That's the second time I was locked up --
5        Q.  Yes.
6        A.  -- when I got into the fight.
7        Q.  At that time --
8        A.  Before I -- before I even got into the
9    fight I was explaining to them I needed my meds.
10   I couldn't do it. I couldn't last.
11       Q.  At that time were you -- on September 11
12   of 2008 when you were going through receiving,
13   were you suffering any symptoms at that time?
14       A.  No, not at that time, no. But I did want
15   my meds.
16       Q.  I understand that. Okay. I understand
17   that. When you were -- before this when you had
18   the prescription written for you on the outside by
19   a physician for --
20       A.  I was taking my meds.
21       Q.  -- Abilify -- I know -- for Abilify, did
22   that physician just write the prescription for you
23   and send you on your way?
24       A.  No. My doctor -- no. I see a

171

1        Q.  So when you were evaluated by this
2    particular mental health specialist, Charlotte
3    Centers, on September 11, 2008, did you speak with
4    any other psych personnel besides her?
5        A.  No. They was supposed to been when I was
6    on my tier -- when I was on my tier after getting
7    irritated and frustrated, I was supposed to see a
8    doctor. They never did put in for me to go get me
9    yellow slip to go see no doctor at Cermak because
10   at that point in time this -- at this time I was
11   irritated. I was depressed. I didn't care if I
12   had to go on that unit.
13       Q.  All right.
14       A.  I would have went but they never sent me
15   to that unit. They never sent me to that doctor
16   to get my medicine. To go to that unit --
17       Q.  All right. You said --
18       A.  -- because I was upset.
19       Q.  You said that at this time. You're
20   talking about on September 11?
21       A.  The second time I went to jail --
22       Q.  Yes.
23       A.  -- for and got -- and was there three
24   days. So when are you talking about?

170

1    psychiatrist and talk to them before anything, and
2    then my doctor gets the reports and then that's
3    how I get my medicine.
4        Q.  So you first have --
5        A.  I have -- excuse me. I do counselling.
6    I go to my doctor and talk -- I go and talk to a
7    counselor. I actually speak to a psychiatrist
8    because I do still have issues about the world
9    that I can't understand or I can't deal with and I
10   need to talk it out to keep -- things happened in
11   my past that's nobody's business that happened to
12   me that I talk to my psychiatrist about.
13       Q.  Okay.
14       A.  So, yes, I do talk to a psychiatrist. I
15   talks to him.
16       Q.  Okay. How many times have you seen a
17   psychiatrist in this year, 2011?
18       A.  How many times?
19       Q.  Yeah.
20       A.  Every, what, every two weeks. I see
21   Dr. Songe every two weeks, and I talk with him
22   down on my sessions every -- every two weeks I'll
23   say. But sometimes more because if I feel
24   depressed or irritated or upset or if something is

172

1 going on in my life and I'm just really upset,
2 I'll call him. His secretary make me an
3 appointment and she'll have me in either the next
4 day or the same day if they got time and got his
5 schedule open.
6 Q. And that's Dr. Songe, S-o-n-g-e?
7 A. Yes.
8 Q. And Dr. Songe was the first one to
9 prescribe medication for you?
10 A. No.
11 Q. Okay. He's your current prescriber?
12 A. No.
13 Q. Your current prescriber is this Moolayil?
14 A. Yes.
15 Q. When was the last time you saw Dr. Songe?
16 A. This is 2011. About 2000 -- I want to
17 say 2010 is when his office closed down because he
18 wasn't there when I got out of jail. His office
19 closed during the time I was in jail.
20 Q. Okay. You're talking about the jail
21 stint that was from September 11 to October 14 of
22 '08, right, sometime in that area?
23 A. Yeah, because when I got out to get my
24 meds, I couldn't find him and it was hard for me

173

1 to get my prescription. That's how I wind up with
2 this last doctor.
3 Q. When -- the first time you saw Dr. Songe,
4 did you spend time with him or is it a her? I'm
5 not sure.
6 A. I'm not understanding.
7 Q. Did you spend some time the first
8 instance with that doctor, did you spend some time
9 for an evaluation?
10 A. Is he talking about -- are you talking
11 about, like, do I go talk to him on -- talk to him
12 on sessions or?
13 MR. MORRISSEY: I think --
14 BY MR. CATANIA:
15 Q. The very first time.
16 MR. MORRISSEY: -- there's a problem with
17 foundation. Why don't you ask when she first saw
18 Dr. Songe and spring forward.
19 THE WITNESS: My first time seeing him was
20 when I was 18.
21 BY MR. CATANIA:
22 Q. Okay.
23 A. Is that what you're asking me?
24 Q. When you were 18 and you first saw him

174

1 the first time, how much time did he spend with
2 you?
3 MR. MORRISSEY: You're asking -- going back
4 18, 19 years ago? If you know.
5 THE WITNESS: Now, before then I was seeing a
6 doctor that the Social Security board had me
7 seeing. So what are you saying? Who diagnosed
8 me, is that --
9 BY MR. CATANIA:
10 Q. No.
11 A. -- what you're asking me?
12 Q. No, I'm not asking that. I'm asking
13 about the person you say prescribe medication,
14 Dr. Songe.
15 A. Okay. You asking about him.
16 Q. Yes.
17 A. I was 18 when I first started seeing
18 Dr. Songe.
19 Q. Okay.
20 A. What -- what do you mean when is the
21 first time I seen him?
22 Q. Did you walk into his office and say
23 hello to the secretary and get a prescription?
24 A. No.

175

1 Q. What happened?
2 A. I had to go through the process like
3 everybody else. I had to go -- first the Social
4 Security board doctor sent me to him. He
5 recommended me to him, and then I started having
6 sessions and then I got on medication. Then after
7 that I was -- been seeing him ever since until I
8 went to jail and he moved -- he moved his offices
9 or somebody say he got hit by a car, and he just
10 hadn't came back to that office no more. So I
11 don't know where he is. And then that's when I
12 kept going around to South Suburban drug treatment
13 center to see if they can help me because they're
14 a psych -- they have a psych unit in their drug
15 treatment center. They have a psych doctor. But
16 I couldn't see their psych doctor because I had to
17 go to get evaluated all over again in order to get
18 my medication.
19 Q. Okay. Based on your experience, then,
20 you have to see the doctor and be evaluated to get
21 a prescription?
22 A. Right.
23 Q. Okay.
24 A. You don't just go in there and tell them

176

44 (Pages 173 to 176)
EX 41 Beasley Dep 044

1   your name and tell them -- no. You have to talk
2   to these people and you have to go through
3   evaluations and answer questions and go to -- I
4   have schedule appointments that I have to make to
5   see him to sit down and talk. You have to go
6   through process.
7       Q.   Okay.
8       A.   They don't just give you medicine for
9   that. They don't just tell you you're bipolar.
10       Q.   Right.
11       A.   I'm not just get -- I'm not just getting
12   medicine because I want it. I'm getting it
13   because I need it because it helps me.
14       Q.   Between the time that you last saw
15   Dr. Songe and the time when you found your current
16   doctor, how many -- how many months or weeks or
17   whatever passed?
18       A.   After I got out of jail I didn't have --
19       MR. MORRISSEY: Talking about -- when you're
20   talking about getting out of jail, you're talking
21   about in November or --
22       THE WITNESS: The last --
23       MR. MORRISSEY: -- 2008?
24       THE WITNESS: Yeah, the last incident. When

177

1   I got out I had -- when I went in, I only had --
2   it was time for me to go for one of my sessions
3   and for him to re-evaluate me and see if the
4   medicine is -- because we have to take -- I don't
5   know if you knew about medicine, but with Depakote
6   you have to take medication -- you have to take
7   shots, level, to see how much level of your
8   medication you have in your system and all that.
9   So I had to do that. I didn't have any in my
10   system.
11   BY MR. CATANIA:
12       Q.   Okay.
13       A.   So I -- wouldn't no doctor just give me a
14   prescription. I had to go back through the
15   process of trying to find a doctor, but I couldn't
16   find a doctor because people wouldn't see you
17   unless you referred to them. So that's how I wind
18   up with this Dr. Moolayil because I had to go into
19   Ingalls -- I had got sick actually, real sick.
20   And I had to go into Ingalls emergency room
21   because I was off my meds so long I had started
22   drinking. I'm not even gonna lie to you. I
23   started drinking because I was off of my meds so
24   long and I needed something to stabilize me. And

178

1   that's what happened. That's how I got with him.
2   I went through depression and I was about to
3   commit suicide. And my husband took me to Ingalls
4   emergency room and explained to them what was
5   going on, and that's when they put me in the psych
6   ward there.
7       Q.   Okay.
8       A.   And -- and then they did all the
9   processes of talking and giving me appointments
10   and going to see doctors and give me my meds.
11   They was giving me my meds while I was in there.
12   I got better. The doctor was talking to me and he
13   was, like, well, I feel that you can go home, you
14   have enough in your system. And then he started
15   me -- he had done started me while I was in there
16   on this new medication, Depakote. And that's how
17   I wind up start taking Abilify and Depakote, and I
18   think the Depakote is what gave me -- started me
19   to having seizures.
20       Q.   Okay. I just want to know if you can for
21   me pinpoint when it was that you next got a
22   prescription or when you next got treatment.
23       A.   I don't -- I don't -- I can't even
24   remember back then. That's been --

179

1       Q.   2008 --
2       A.   Yeah.
3       Q.   -- is what I'm talking about.
4       A.   I know. This have no -- I don't -- I
5   don't remember. I'm not even fittin' to sit here
6   and lie. I don't -- I can't even give you a
7   date. But I know the date I got -- I don't even
8   have the paper with me here but I have a paper
9   showing the date that I went into the hospital.
10   That's all I can tell you.
11       Q.   Where do you have that paper?
12       A.   It's at my house.
13       Q.   Did you provide it to your attorney?
14       A.   Yes, I did.
15       Q.   When did you provide it to him?
16       A.   No, I didn't provide it to him. I gave
17   him the date. I didn't provide the paper to him.
18   I have my own paper. But I can provide it to my
19   attorney. That's no problem.
20       Q.   If you look on page 11 of the exhibit
21   that's in front of you you'll see that that is
22   called a Cermak Health Services Department of
23   Mental Health Secondary Interview. Do you see
24   that?

180

1     A.  Yes.
2     Q.  Were you seen by another person after you
3  talked with Ms. Centers?
4     MR. MORRISSEY:  If you recall.
5     THE WITNESS:  That's what I keep telling
6  him.  I don't remember.  I seen a lot of people
7  when I was in there, a lot of officers and nurses
8  that come to the tier and when I was going through
9  intake.  Like I say, I don't know if they was
10  doctor, nurses or I know two of them was mental
11  health, one of them was a nurse, one of them was
12  supposed to have been a doctor.  He the one gave
13  me the prescription.  I -- I don't -- I can't -- I
14  can't recollect.  I can't recall.
15  BY MR. CATANIA:
16     Q.  Back on page 10 it shows a time of
17  7:33 p.m.; right?
18     A.  I wish my mind was good.  Yes, it does.
19     Q.  And page 11 it also shows a time that
20  says September 11, '08 at 8 p.m.  Do you see that?
21     A.  Yes, I do.
22     Q.  So at two different times on that same
23  day you saw some mental health specialist of some
24  type; right?

181

1     A.  If I'm not mistaken this would be the
2  second person, mental health person, because you
3  see two people.  The one up front and the one back
4  there at the round table, that's two people you
5  see from mental health.  So which one is this one,
6  I don't know.
7     Q.  Okay.
8     A.  But, yes, I seen two mental health people
9  in that day and I told you that.
10     Q.  Your name appears on the top; is that
11  right?
12     A.  Yes.
13     Q.  And your birth date is correct?
14     A.  Yes.
15     Q.  And your DOC number is the same; right?
16     A.  Yes.
17     Q.  Okay.  It says that you were born in
18  Chicago; is that correct?
19     A.  Yes.
20     Q.  It says that you have four siblings; is
21  that correct?
22     A.  Yes.
23     Q.  Raised by your mother?
24     A.  Yes.

182

1     Q.  All that information that's written in
2  there is information that is correct and only you
3  would know it; right?
4     A.  Right.
5     Q.  It says under educational history your
6  highest level of achievement is MS.  Do you see
7  that?
8     A.  Yes.
9     Q.  And it says it's circled classes; right?
10     A.  What is that?
11     Q.  Well, the word "classes" is circled
12  there; right?
13     A.  Yes.
14     Q.  The reason for termination I think that
15  word next to it is foolish; is that right?
16     A.  That's what it saying, whatever it means.
17     Q.  Did you provide that information?
18     A.  No, I didn't.
19     Q.  When it says current living situation, it
20  looks like it's written in family.  Was that
21  accurate?
22     A.  What?
23     Q.  Current living situation.
24     A.  What they mean family?

183

1     Q.  That you reside with your family
2  currently?
3     A.  Yeah, that's correct.
4     Q.  In the center where it says allergic to I
5  believe it says HBP; right?
6     A.  Yeah.  What do that mean?
7     Q.  Could it mean high blood pressure?
8     A.  I'm not allergic to high blood pressure.
9     Q.  But was it accurate that you had high
10  blood pressure?
11     A.  Yes, it's accurate that I had high blood
12  pressure.
13     Q.  And right above that it says asthma; is
14  that right --
15     A.  Yes, it does.
16     Q.  -- checked?
17     And that was accurate too?
18     A.  Yes.
19     Q.  And at the current time in September of
20  '08 it says that you denied alcohol use, marijuana
21  use, opiate use, cocaine use, PCP use or other
22  substance abuse; is that right?
23     A.  If it's saying I didn't take it, I didn't
24  do it, yes, that's correct.

184

46 (Pages 181 to 184)
EX 41 Beasley Dep 046

1    Q.   Is that the extent of the examination
2   that you had while you were in the receiving room
3   on September 11 of 2008?
4    A.   Excuse me?
5    Q.   They didn't do any more examination of
6   you than these questions at that time; right?
7    A.   No, took my blood and sent me over there
8   to the doctor to get my blister pack.
9    Q.   And you got your -- your blister pack?
10    A.   Just my blood -- yeah.  I didn't get all
11   my meds.  I didn't get my bipolar, my Abilify or
12   my Depakote.
13    Q.   I understand that.
14    A.   I didn't get that.
15    Q.   If you look on page 12 it's a
16   prescription order sheet; is that right?
17    A.   Yes, it is.
18    Q.   And on September 11 it looks like it
19   lists six different orders by a physician; is that
20   right?
21    A.   Yeah.
22    Q.   And that's dated September 11; right?
23   The bottom prescription order.
24    A.   The bottom prescription date is September

185

1   on -- on no prescription look like this.  I don't
2   even -- this normal saline is only thing I
3   remember being on one of these sheets that -- that
4   I had.
5    Q.   Okay.
6    A.   So I'm not understanding this.
7    Q.   All right.  Well, that --
8    A.   And six things down here.
9    Q.   You do agree that that's a physician
10   order, that prescription order?
11    A.   Yes, it is a physician order.
12    Q.   Okay.  On the next page, page 13 it looks
13   like there is a request; right?
14    A.   Yes.
15    Q.   It's called a CCDOC nonemergency request
16   for psychiatric consultation; right?
17    A.   Yes.
18    Q.   And your name is on there; right?
19    A.   Yes.
20    Q.   And your date of birth is written in?
21    A.   Yes.
22    Q.   And the same DOC No. 66527?
23    A.   Yes.
24    Q.   It also says that your location is three

187

1   11.
2    Q.   And the one above that is dated September
3   23; is that right?
4    A.   Yes.
5    Q.   And on that one it says Motrin and normal
6   saline and some other things.  Do you know what
7   that's about?
8    A.   The normal saline was for my contacts
9   because I wear contacts.
10    Q.   Okay.
11    A.   And the Motrins, I don't even remember
12   getting Motrins.  I don't -- I don't know.  I
13   don't remember these other ones.
14    Q.   On the left side of that in a circle does
15   it say S slash C and three WK under it?
16    A.   Three weeks, yeah.
17    Q.   You know that to mean sick call in three
18   weeks; right?
19    A.   What that mean?
20    Q.   Sick call in three weeks, that you were
21   scheduled for a sick call three weeks after the
22   23rd of September.
23    A.   I don't remember this because I didn't
24   have nothing with this SK three weeks on there

186

1   annex C4 does that sound familiar?
2    A.   Yes.
3    Q.   C4.
4    A.   C4, yes, because that's where -- okay.
5   Yes.
6    Q.   The date that's on here is 14 September.
7   So a few days after your entry you made a request;
8   is that right?
9    A.   Yes.
10    Q.   Does your signature appear on this form
11   anywhere?
12    A.   No.
13    Q.   Who wrote this?
14    A.   I have no idea.
15    Q.   Okay.  Does it indicate in the right
16   column under affect depressed and anxious?
17    A.   Yes, that's what it says.
18    Q.   And that's what you felt at the time --
19    A.   Yes.
20    Q.   -- about the 14th?
21    A.   Yes, it was.
22    Q.   And below that it says detainee requests
23   psych eval, claims to be depressed.  Do you see
24   that written in?

188

1    A.  Yes.
2    Q.  So somebody wrote a request for you at
3  some point; right?
4    A.  Yes.  If I'm not mistaken I believe this
5  is when Officer Songe -- I mean Officer Rogers, I
6  don't know -- I never seen this sheet right here.
7  But I know when I was in there Officer Rogers did
8  send me down and told them that I was -- told
9  me -- told me to let them know I was angry, I was
10  depressed and everything and I believe this is the
11  time that I wanted to go to the psych floor.
12    Q.  Okay.
13    A.  To be evaluated because I needed my
14  medication because I was feeling this way.
15    Q.  All right.  So on this date, September 14
16  of 2008, you notified security and security then
17  filled out a form and sent you; right?
18    A.  Right.  She sent me down the hall to
19  sick -- to the nurses station.
20    Q.  If you turn to the next page, page 14, in
21  the middle of that page at the top above the solid
22  line you'll see a date.  I believe it says
23  9/14/08; is that right?
24    A.  Yeah.  Oh, I'm sorry.  Yes.

189

1    Q.  Above that is your name and your DOC
2  number; is that right?
3    A.  Yes.
4    Q.  And your date of birth; is that right?
5    A.  Yes.
6    Q.  And at the bottom it looks like there's a
7  signature of some evaluator; is that right?
8    A.  Yes.
9    Q.  So somebody spoke to you regarding
10  admission or evaluation for mental health services
11  on that date?
12    A.  No.
13    Q.  Nobody did?
14    A.  No.  No one came there and said anything
15  to me, didn't talk to me.  They didn't even --
16  they didn't even come and get me to take me down
17  the hall to the nurses station to get the meds or
18  to get evaluated.  No, that's not true.
19    Q.  Okay.  So are you saying that this form
20  that's filled out with your name on it, your
21  CIMIS number is untrue?
22    A.  This -- this is what happened on this
23  page right here.  But they never did come back and
24  tell me come on, let's go, let me -- let me take

190

1  you to talk to a psych eval, a mental health
2  person or nothing.  They didn't do that.  This is
3  not -- this is not true.  This is not what
4  happened.
5    But this one right here is.  Officer
6  Rogers did send me down to the doc -- to the
7  nurses station.  And she told -- she sent me back
8  to my tier and told me they will get in touch --
9  they will send someone to come and get me.  I
10  didn't even get a form, you know, for them to go
11  to Cermak or to say they're going to send me over
12  to Cermak.
13    Q.  The date --
14    A.  Or talk to me.
15    Q.  The date on your form, the request form
16  is 9/14/08; right?
17    A.  On this one?
18    Q.  Yes.  On page 13.
19    A.  Yes, September 14.
20    Q.  And on page 14 the date on that form is
21  also 9/14 of '08; is that right?
22  MR. MORRISSEY:  Can we take a break for a
23  moment?
24  THE WITNESS:  Yes, I guess that -- yeah,

191

1  that's 14.
2  MR. CATANIA:  All right.  Thank you.
3    (A break was taken.)
4  MR. CATANIA:  We're back on the record.
5  BY MR. CATANIA:
6    Q.  Just directing your attention again to
7  page 14 of Exhibit No. 4.  Can you tell me if you
8  believe that this page is a fraud?
9    A.  I'm going to just leave it at I don't
10  remember.  I -- I really don't.
11    Q.  And in the bottom where it says plan and
12  it says annex -- three annex, declined admission
13  to two north, informed how to receive further
14  mental health treatment if necessary.  Do you
15  think that's a fraud too?
16    A.  I don't remember.  I don't remember none
17  of this, none of this.
18    Q.  All right.  These events that we've been
19  talking about go back to 2008 and '7, 2007 and
20  2008; is that right?
21    A.  Yes.
22    Q.  That's what you talked about in your
23  affidavit?
24    A.  Yes.

192

48 (Pages 189 to 192)

1    Q.   Okay.  The doctor that you saw after you
2    were released in 2008 after you went through the
3    difficult time to find a new doctor did that
4    doctor ever tell you that the cause of your
5    extreme irritability was because you didn't have
6    medication in jail?
7    A.   No, he didn't because he didn't know I
8    was in jail.
9    Q.   So you didn't tell him all of the things
10   that occurred?
11   A.   No.
12   Q.   Did you believe that the cause of your
13   irritability was because you didn't have
14   medication in jail?
15   A.   Yes.
16   Q.   Would that cause continue for the period
17   of time in which it was a very tough process to
18   find a new doctor?
19   A.   The last -- see, I'm confused now.
20   Q.   Okay.  I'll rephrase the question, then.
21   I'll save you the worry.
22       In paragraph 15 you say the first time I
23   was released from jail I went straight home and
24   began taking my medication.  You agree with that;

193

1    right?
2    A.   Yes.
3    Q.   And then it says the second time I was
4    released, I was feeling very depressed and
5    irritable so I called Dr. Songe's office
6    immediately; right?
7    A.   Yes.
8    Q.   He was not there, though, at St. Bernard
9    so you had to find a new doctor?
10   A.   Yes.
11   Q.   You also said it was a tough process to
12   find a new doctor because you were depressed and
13   lacked motivation; is that right?
14   A.   That's right.
15   Q.   So you believe that you were depressed
16   and lacked motivation and that kept you from
17   finding a new doctor?
18   A.   No.  It was because of me not having my
19   medication.
20   Q.   So you believe that the reason is because
21   you didn't have your medication?
22   A.   Yes, I believe and I believe Dr. Moolayil
23   believed it too because if he didn't, I wouldn't
24   have been back in the hospital.  He put me in the

194

1    psych ward.  He gave me -- he got me with a
2    counselor and everything, and he started me back
3    on my medication and added Depakote to it to
4    stabilize my moods.
5    Q.   Not to irritate you anymore than I have
6    to but you also said that after that you started
7    drinking.  Is that the time you started drinking?
8    A.   No.  No.  Let me -- let me -- let me --
9    see, you getting it confused.  That was before.
10   That was when I -- when I -- when I got out the
11   hospital and I couldn't find a doctor and
12   everything, I didn't just start drinking.  I was
13   celebrating my anniversary and then I was just
14   drinking constantly every day.  It wasn't
15   something I wanted to do.  It wasn't something
16   that I was planning on doing.  It's something that
17   happened.  It kept -- it made me feel better.  You
18   understand what I'm saying?  People with
19   depression, if -- if you know anything about
20   people with depression and bipolar, when they're
21   not on medication they have a substitute to make
22   them feel the way they need to feel which they
23   lead to drugs, like liquor, maybe cocaine, maybe
24   shooting up, maybe tooting, them kind of things is

195

1    a -- is a stabilizer when people is on
2    depression.
3        If you -- when I was on depression and I
4    found out I was bipolar mood disorder, before I
5    got medicated the alcohol used to soothe me.  It
6    used to keep me level.  It used to keep my mind
7    level.  But I found out my medication helps me
8    better than going out drinking because I was
9    slowly killing myself.  So that's why I like
10   taking my medication because I like the way it
11   makes me feel, and I likes the way it keeps me
12   stable the way I need to be stable to cope with
13   this kind of world and the people in this world.
14   Q.   You do have a need for medication, then,
15   is that what you're saying?
16   A.   I have -- I have to have my medication.
17   Q.   How do you integrate your drug regimen
18   into your daily life?  What do you do?
19   A.   To stay away from drugs, is that what
20   you're asking me?
21   Q.   No.  I'm talking about your medication,
22   your drug regimen.  Those -- those things that you
23   think you need to take to stay stable.
24   MR. MORRISSEY:  I'm going to object.

196

1    THE WITNESS: I'm not understanding.
2    MR. MORRISSEY: I'm going to object to the
3 form of the question.
4    MR. CATANIA: Thank you. That's enough,
5 sir. That's enough.
6    MR. MORRISSEY: Because the inference --
7    MR. CATANIA: That's enough. This is the
8 point where you start instructing the witness. I
9 asked you before not to do it.
10    THE WITNESS: I'm not understanding what
11 you're asking me, though.
12 BY MR. CATANIA:
13    Q.  All right. Let me rephrase the question,
14 then. It will help. Okay. I want to know that
15 since you are taking medication to help you with
16 the bipolar disorder that you were -- you were
17 diagnosed with, and that's the Abilify and that's
18 the Depakote, okay, how do you work taking those
19 medications into your daily life? What do you do
20 to make sure you take your medication?
21    A.  What do you mean what do I do? I get up
22 in the morning. At the time I'm supposed to take
23 it, I make sure I take my medication.
24    Q.  What do you do to make sure?

197

1    A.  I'm not -- I'm not understanding.
2    Q.  Do you go to a medicine cabinet and take
3 bottles out and take a pill out of a bottle? Is
4 that what you do?
5    A.  Do I go to -- I have my medicine in -- in
6 my -- right by my bedside. I have my -- I have
7 medicine in my purse.
8    Q.  Okay.
9    A.  So what are you asking me?
10    Q.  I'm asking you what is it that you do to
11 make sure that you take your medication? Well,
12 let me ask you the question --
13    A.  That's a crazy question. I'm not
14 understanding it. What makes me take it because I
15 know I need it. I know it helps me. And I know I
16 don't want to be sick. I don't want to go crazy.
17 So of course I'm going to get up every morning and
18 take my medication. That's my first priority, eat
19 and take my medication.
20    Q.  Do you keep all of your medications in
21 the same place?
22    A.  I have some in my purse and I have some
23 my bedside.
24    What's in your purse?

198

1    A.  I have my Abilify and Depakote.
2    Q.  Okay.
3    A.  I have a bottle.
4    Q.  What's on your bedside?
5    A.  My little -- my little pack that's
6 labeled Sunday, Monday, Tuesday, Wednesday,
7 Thursday, Friday.
8    Q.  That's what I'm asking about. Do you
9 have a weekly pill pack?
10    A.  Yes.
11    Q.  Okay. Do you keep track of the pills,
12 then, that you take by using that weekly pill
13 pack?
14    A.  What do you mean do I keep track?
15    Q.  Well, you know that --
16    A.  All I have to do is -- if it's 3 o'clock
17 and I know it's 3 o'clock, it's time for me to
18 take my medicine, I'm going to take my medicine.
19    Q.  So you have to remember that it's 3
20 o'clock and then you take your medicine; is that
21 right?
22    A.  I take them -- you take them three times
23 a day. So if I take it at 3 o'clock every day, I
24 don't have to -- I'm not understanding. I'm not

199

1 understanding what you're asking me.
2    Q.  Well, I'm sorry you don't understand, but
3 I'll try to rephrase it, ma'am.
4    When you are taking your medication, do
5 you have an alarm that tells you when it is time
6 to take medication?
7    A.  No. I know what time I'm supposed to
8 take my medication.
9    Q.  Do you keep a book or checklist about
10 when to take your medication?
11    A.  No, I don't keep no book. I know I take
12 it at break -- I take it at breakfast, I take it
13 at lunch, and I take it a dinner.
14    Q.  Have you ever missed a dose?
15    A.  Have I ever missed a dose? Yes, I missed
16 a dose today. I missed a half -- a whole dose
17 today because -- what time is it? Probably lunch
18 time now. Yes, I have missed my dose. But what
19 does it have to do with anything?
20    Q.  When you miss a dose what do you do?
21    A.  When I leave here I'm going to the car,
22 get my water and take my medicine.
23    Q.  Have you ever thought you missed a dose
24 but weren't sure?

200

50 (Pages 197 to 200)

1    A.   No.
2    Q.   You talked about your children as being a
3  help to you in terms of taking medication; right?
4    A.   Yes.
5    Q.   Okay.  If they hear you wheezing, what do
6  they tell you?
7    A.   Well, my kids don't have to hear me
8  wheezing tell anything.  Because I know if I'm
9  wheezing I know I need to take a puff of my asthma
10  if I feel like I can't hardly breathe.
11    Q.   So they don't help with that; right?
12    A.   What do you mean?
13    Q.   They don't keep you on track with taking
14  and using --
15    A.   My kids would say, Mom, you about to get
16  sick, you know.  I mean, come on.
17    Q.   You brought a piece of paper that has
18  been kind of dancing around the table here.  Is
19  this piece of paper something you got from the
20  jail?
21    A.   Yes, it is.
22    Q.   And did you tear off the top which has
23  the identification of where it came from?
24    A.   No, that's not the top.  Here it is right

201

1    A.   For my -- it was for the asthma pump, my
2  blood pressure medicine, and the -- my blood
3  pressure medicine and I don't know what else this
4  is on here.  The -- I have no idea what else this
5  is on here because it's like faded away if you
6  look at it.
7    Q.   Were those medications that you did need
8  at the time?
9    A.   Yeah, I needed my blood pressure pills.
10  I needed my asthma pump, but it was not my
11  Depakote and my -- rather my Abilify that I
12  needed.  It wasn't that.
13    Q.   Has any doctor, physician, expert,
14  anybody ever said to you that the reason why you
15  are now taking Depakote in addition to Abilify is
16  because you were in jail and didn't get the
17  Abilify?
18    A.   No.  They say the reason why I'm taking
19  Depakote now is because I need a mood stabilizer
20  because Abilify is not working on helping, so they
21  had to add another pill to help me stabilize my
22  mood swings.
23    Q.   Okay.
24    A.   And from my understanding from my doctor

203

1  here.  Someone -- one of the inmates, like I said,
2  they write -- they were writing and I guess one of
3  them store it off and it goes -- it goes right
4  here.
5    Q.   So it goes on the bottom in the center;
6  is that right?
7    A.   Yes, it goes right here.
8    Q.   Did you tear that off?
9    A.   One -- I might have had, one of the
10  inmates might have had.  I might have gave it to
11  them to write their information on the back of it
12  like they did.
13    Q.   Okay.  Who tore off the top portion that
14  has the name?
15    A.   It probably got tore off.  This is my
16  name.  You see Teria first name, my date of birth,
17  my location, my number, my allergies and
18  everything.  That is mine.  And it might have got
19  tore up during process.  I probably wrote another
20  number on this part of it that was on here.
21    Q.   So you got this during processing; right?
22    A.   I got this -- yeah.
23    Q.   So you actually did get a prescription
24  form in your hand during processing?

202

1  now, he probably has to go up on my doses because
2  it's not enough.  It's not -- it's not helping
3  like it should he say.  But I thought it was.  But
4  he said it's not because of the doses I have in my
5  system.
6    Q.   Okay.
7    A.   But, no, they never -- no, I mean, they
8  don't even know I was in jail, so how would they
9  tell me it's due from me going to jail?  But I
10  know for a fact, you know, me not getting it, I
11  know that's part -- probably part of the problem
12  why I got real sick when I got out.
13    Q.   You know that; right?
14    A.   Yes.
15    Q.   Is that your opinion?
16    A.   That's my opinion.
17    Q.   What is it based on?
18    A.   It's based on me getting sick in jail.
19    Q.   Okay.
20    A.   What do you mean what is it based on?  I
21  got sick.  I didn't have my medicine.  I could
22  have caught another case from not having my
23  medicine.
24    Q.   Whoa, wait, wait.

204

51 (Pages 201 to 204)
EX 41 Beasley Dep 051

1    A.  I could have been in jail for another
2  case.
3    Q.  Are you saying that you got arrested
4  initially because you were not taking your
5  medication?
6    MR. MORRISSEY:  No.
7    THE WITNESS:  No, that's not what I said.
8  I'm saying me being in jail without my medication
9  I got -- me going to jail had nothing to do with
10  my medication.  Me going to jail was defending my
11  daughter, keeping my child that I birth and brung
12  in this world from ten girls hurting her and it
13  was just her, one child.  She didn't start it.
14  They didn't know her.  It wasn't her fault.  It
15  wasn't my fault.  I'm sorry for what happened.  I
16  went to jail.  I did what I had to do.  I did my
17  time.  I'm sorry for what happened to the kids,
18  but it wasn't me.
19    I -- it was no way to prove it.  The
20  evidence, nothing showed it was me, but the judge
21  saying the officer seen me.  I can't argue with
22  that.  The judge is gonna go by who she want to go
23  by, and that's what they did.  I can't help that.
24  That's done and over with.  But me being in jail

205

1  that second time without my medicine for long
2  period of time, I got sick.  I could have caught
3  another case in jail for hurting that young lady.
4  BY MR. CATANIA:
5    Q.  Is that what you were talking about --
6    A.  Because I didn't have my medication.
7    Q.  That's what you're talking about that you
8  could have caught another case?
9    A.  Yes.
10    Q.  But you also said that that wasn't your
11  fault; right?
12    A.  No, that wasn't my fault.  I seen an
13  officer getting hurt and I was helping the
14  officer.  The officer was getting hurt, and I
15  grabbed the young lady and maintain her until
16  another officer came in because the young lady hit
17  her so hard the officer was dazed.  That's how
18  come I got out the hole because I was helping the
19  officer because the officer was getting hurt and
20  everybody was jumping over my bed while I was
21  trying to help.
22    Q.  Okay.  So you were assisting again
23  somebody else who was getting hurt?
24    A.  An officer, yes.

206

1    MR. CATANIA:  I have no further questions.
2  Thank you very much.
3    MR. MORRISSEY:  We have no questions.  Thanks
4  a lot.  You want to advise her?
5    MR. CATANIA:  Yes.  Ma'am, you have the right
6  to review a transcript and make corrections if you
7  wish.  It's a little bit time sensitive.  You have
8  to be able to be available to do it within 30 days
9  of the transcript being prepared, or you can waive
10  your right to a signature and allow the court
11  reporter -- trust the court reporter to have taken
12  everything down properly.  That's called waiver of
13  signature.  But it's your choice.
14    THE WITNESS:  I won't waive my signature.
15  Thank you.
16    MR. CATANIA:  You will waive your signature?
17    THE WITNESS:  No.
18    MR. CATANIA:  Oh, you won't.  Okay.  I
19  just -- I didn't hear you.  Thank you.
20    (2:40 p.m. further deponent
21    saith not.)
22
23
24

207

1         IN THE UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF ILLINOIS
3                  EASTERN DIVISION
4  MICHAEL PARISH, CURTIS L. OATS,  )
   LEILA KHOURY, SEAN DRISCOLL,     )
5  CARLA LOFTON, ROY CLEAVES, LISA  )
   BROWN, DAN TAYLOR, DEAN MILLER,  )
6  KEVIN SANDERS, STACEY CLARK, and )
   CARLOTTE WATSON,                 )  No. 07 CV 4369
7         Plaintiffs,               )
          vs.                       )
8  SHERIFF OF COOK COUNTY and COOK  )
   COUNTY,                          )
9         Defendants.               )
10
11    This is to certify that I have read the
12  transcript of my deposition taken in the
13  above-entitled cause by Martha C. Newton,
14  Certified Shorthand Reporter, on May 6, 2011, and
15  that the foregoing transcript accurately states
16  the questions asked and the answers given by me as
17  they now appear.
18    _____
              TERIA BEASLEY
19
20  SUBSCRIBED AND SWORN TO
21  before me this _____, day
22  of _____ 2011.
23  _____
24    Notary Public

208

52 (Pages 205 to 208)
EX 41 Beasley Dep 052

1  STATE OF ILLINOIS )
2                    ) SS:
3  COUNTY OF C O O K )
4      I, MARTHA C. NEWTON, a notary public within
5  and for the County of Kane and State of Illinois,
6  do hereby certify that heretofore, to-wit, on the
7  6th day of May 2011, personally appeared before
8  me, at Richard J. Daley Center, Fifth Floor,
9  Chicago, Illinois, TERIA BEASLEY, in a cause now
10 pending and undetermined in the United States
11 District Court, wherein MICHAEL PARISH, et al. are
12 the Plaintiffs, and SHERIFF OF COOK COUNTY and
13 COOK COUNTY, are the Defendants.
14     I further certify that the said witness was
15 first duly sworn to testify the truth, the whole
16 truth and nothing but the truth in the cause
17 aforesaid; that the testimony then given by said
18 witness was reported stenographically by me in the
19 presence of the said witness, and afterwards
20 reduced to typewriting by Computer-Aided
21 Transcription, and the foregoing is a true and
22 correct transcript of the testimony so given by
23 said witness as aforesaid.
24     I further certify that the signature to the

209

---

1  foregoing deposition was not waived by counsel for
2  the respective parties.
3      I further certify that the taking of this
4  deposition was pursuant to Notice, and that there
5  were present at the deposition the attorneys
6  hereinbefore mentioned.
7      I further certify that I am not counsel for
8  nor in any way related to the parties to this
9  suit, nor am I in any way interested in the
10 outcome thereof.
11     I have hereunto set my hand this 19th day of
12 May 2011.
13
14
15
        NOTARY PUBLIC, KANE COUNTY, ILLINOIS
16
17
18
19
20
21
22
23
24

210

---

1  McCorkle Court Reporters, Inc.
   200 North LaSalle Street, Suite 300
2  Chicago, Illinois  60601-1014
3  May 19, 2011
4
   Ms. Teria Beasley
5  324 Riverside Drive
   Dolton, IL  60419
6
7  IN RE:  Michael Parish, et al. vs. Sheriff of Cook
           County, et al.
8  DATE OF DEPOSITION:  May 6, 2011
9  Dear Ms. Beasley:
10 Your deposition in the above-entitled cause is now
   ready for reading and signing as required by law.
11
   Please call the signature department upon receipt
12 of this letter to schedule an appointment to come
   to the above address to read and sign your
13 deposition.  You have 28 days from the date of
   this correspondence in which to appear for reading
14 and signing.
15 If you fail to appear, your deposition will be
   completed and forwarded to the attorneys and will
16 be "...used as fully as though signed.
17 _____ Procedure outlined in Rule 207(a) of the
          Illinois Supreme Court Rules.
18
   __X__ Procedure outlined in Rule 30(e) of the
19        Rules of Civil Procedure for the U.S.
          District Courts.
20
   Sincerely,
21
   Margaret Setina       Court Reporter Present:
22 Signature Department   Martha C. Newton, CSR, RMR
23 cc: Mr. Francis Catania
       Mr. Thomas Morrissey
24

211