IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Micheal Parish, Curtis L. Oats, Leila Khoury, Sean Driscoll, Carla Lofton, Roy Cleaves, Lisa Brown, Dan Taylor, Dean Miller, Kevin Sanders, Stacey Clark, and Carlotte Watson, | ) ) ) ) ) | |
| *Plaintiffs,* | ) ) | No. 07 CV 4369 |
| *-vs-* | ) ) ) | *Judge John Z. Lee* Judge Presiding |
| Sheriff of Cook County and Cook County, | ) ) | Courtroom 1225 |
| *Defendants.* | ) ) | |

**Exhibit 42**
**Deposition of Veronica Stuckey**
**June 6, 2011**

**Exhibit 42, Stuckey Dep.**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL PARISH, CURTIS )
L. OATS, LEILA KHOURY, )
SEAN DRISCOLL, CARLA )
LOFTON, ROY CLEAVES, )
LISA BROWN, DAN TAYLOR, )
DEAN MILLER, KEVIN )
SANDERS, STACEY CLARK, )
and CARLOTTE WATSON, )
    Plaintiffs, )
vs. ) No. 07 CV 4369
SHERIFF OF COOK COUNTY )
and COOK COUNTY, )
    Defendants. )

The deposition of VERONICA STUCKEY, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Deborah E. DeSanto, a Notary Public within and for the County of Cook and State of Illinois, at 50 West Washington Street, Room 302, Chicago, Illinois, on the 6th day of June, 2011, at the hour of 11:38 o'clock a.m.

(The deposition concluded at 2:05 p.m.)
Reported By: Deborah E. DeSanto, CSR
License No: 084-1384

1

---

**APPEARANCES:**

1. THOMAS G. MORRISSEY, LTD.
2. BY: MR. THOMAS G. MORRISSEY
3. 10249 South Western Avenue
4. Chicago, Illinois 606543
5. (773) 233-7900
6.     Representing the Plaintiffs;

ANITA ALVAREZ
STATE'S ATTORNEY OF COOK COUNTY, ILLINOIS
BY: MR. FRANCIS J. CATANIA
    and
MR. FRANK OLES
50 West Washington Street
Suite 500
Chicago, Illinois 60602
(312) 603-3000
    Representing the Defendants.

2

---

I N D E X

| WITNESS | EXAMINATION |
|---|---|
| VERONICA STUCKEY | |
|   By Mr. Catania | 4 |

E X H I B I T S

| NUMBER | MARKED FOR ID |
|---|---|
| Stuckey Deposition Exhibit | |
|   No. 1 | 17 |
|   No. 2 | 98 |
|   No. 3 | 102 |
|   No. 4 | 105 |

3

---

1     (Whereupon, the witness was duly
2     sworn.)
3   VERONICA STUCKEY,
4 having been first duly sworn, was examined and
5 testified as follows:
6     EXAMINATION
7 BY MR. CATANIA:
8   Q. Ma'am, would you please state your name
9 for the record?
10   A. Veronica Latrice Stuckey.
11   MR. CATANIA: This is the Federal
12 deposition of Veronica Latrice Stuckey, pursuant to
13 notice, scheduled to start today, June 6, 2011, by
14 agreement of the parties at 11:00 a.m. It's 11:40
15 a.m. right now.
16 BY MR. CATANIA:
17   Q. Ma'am, could you tell me what you think
18 this deposition is about?
19   A. It's about my medication, medication that
20 I didn't receive when I was in Cook County Jail.
21   Q. What is the source of your information as
22 to what it is about?
23   A. What is the source?
24   Q. Yes.

4

1 (Pages 1 to 4)

Ex 42 Beasley Dep 001

1    A.  What do you mean?
2    Q.  How did you first learn about what the
3 case concerns?
4    A.  Through a letter.
5    Q.  Okay.  Why do you think there's a court
6 reporter here to record everything that we say?
7    A.  Why do I think there's a what?
8    Q.  A court reporter, the lady that's sitting
9 here to your right?
10    A.  So everything could be wrote down and, you
11 know.
12    Q.  Okay.  You were asked to swear to tell the
13 truth, right?
14    A.  Yes.
15    Q.  You understand what that means, right?
16    A.  Yes, don't lie.
17    Q.  If you don't hear a question that I ask, I
18 would ask that you ask me to repeat it.  Okay?
19    A.  Okay.
20    Q.  If you don't understand a question I ask,
21 what will you do?
22    A.  If I don't understand?
23    Q.  Yes.
24    A.  I'll let you know I don't understand.

5

1    Q.  Thank you.
2       Will you do your best to make sure you're
3 loud enough so that even my partner here can hear
4 you?
5    A.  Yes.
6    Q.  Is there anything on your mind today that
7 might make it difficult for you to concentrate and
8 give answers that are truthful?
9    A.  No.
10    Q.  Are you on any drugs or medications or
11 alcohol that would interfere with your ability to
12 give truthful answers?
13    A.  No.
14    Q.  What will you do if I cut you off while
15 you're trying to answer?
16    A.  What would I do?
17    Q.  Yes.
18    A.  I'll continue to answer.
19    Q.  Okay.  I would ask that if I cut you off,
20 that you just let me know that you're not finished,
21 and I'll let you finish your answer.  Okay?
22    A.  Okay.
23    Q.  What will you do if you realize that an
24 answer that you gave to me was inaccurate?  Like if

6

1 you answer a question and then later on it occurs
2 to you that you should have said something
3 different, what will you do?
4    A.  Ask you can I go back.
5    Q.  Okay.  If you need to look at a document
6 in order to answer, what will you do?
7    A.  I don't need to.
8    Q.  You don't need to look at any documents?
9    A.  No.
10    Q.  Can you think of any reason why your
11 testimony today -- testimony, I should say
12 testimony at a trial in the future, why it would be
13 different than what you say today?
14    A.  (Nodding)
15    Q.  Do you understand everything that we've
16 done so far?
17    A.  Yes.
18    Q.  Do you have any questions before we get
19 started?
20    A.  No.
21    Q.  Okay.  How long would you like to go
22 before we take a break?
23    A.  I'll let you know.
24    Q.  All right.  Fair enough.

7

1       If you do need to take a break sooner,
2 you'll let me know, is that right?
3    A.  Uh-huh.
4    Q.  When did you first find out about this
5 deposition?
6    A.  That I'm not sure of.  The exact date, I'm
7 not sure of.
8    Q.  How about --
9    A.  The year.
10    Q.  -- within a month ago or before that?
11    A.  Way before a month ago.
12    Q.  Way before a month ago?
13    A.  Yes.
14    Q.  Okay.  More than two months ago do you
15 think?
16    A.  More than a year ago.
17    Q.  All right.  When the deposition is over,
18 the court reporter is going to probably type it up,
19 which is known as a transcript.
20    A.  I just thought about it.  You said when
21 did I find out about this period or the deposition?
22    Q.  The deposition.
23    Q.  Which is what we're doing today?
24    Q.  Correct.

8

2 (Pages 5 to 8)

McCorkle Court Reporters, Inc.
Chicago, Illinois  (312) 263-0052

**Page 9**

1  A. I found out about a month ago.
2  Q. Okay. Thank you.
3  A. Uh-huh.
4  Q. All right. When the deposition is over,
5  the court reporter is going to type it up. It will
6  be made available for you to review. Will you let
7  us know if there are any changes or corrections
8  that you need to -- that need to be made along with
9  the reasons why you're making changes?
10  A. Yes.
11  Q. Okay.
12  A. Will I get a copy?
13  Q. Sure.
14     Do you have any questions about what we
15  just talked about?
16  A. No.
17  Q. You've been arrested in the past, right?
18  A. Yes.
19  Q. Have you ever been convicted?
20  A. Yes.
21  Q. Any felony convictions?
22  A. Yes.
23  Q. For what?
24  A. Possession.

**Page 10**

1  Q. Is that possession of a controlled
2  substance?
3  A. Of a controlled substance.
4  Q. Have any of those been with intent to
5  deliver a controlled substance?
6  A. Yes.
7  Q. And intent to deliver is, you understand,
8  a legal term in Illinois for actually delivering a
9  controlled substance, it's the same thing, right?
10  A. Yes.
11  Q. All right. Have you had any convictions
12  for fraud?
13  A. No.
14  Q. Any for dishonesty?
15  A. No.
16  Q. Moral turpitude?
17  A. No.
18  Q. Do you understand what moral turpitude is?
19  A. No.
20  Q. Okay. Well, if you have ever been
21  arrested and convicted of, for example,
22  prostitution, that's the kind of crime they call a
23  crime of moral turpitude. Do you have any of
24  those?

**Page 11**

1  A. No.
2  Q. Okay. Have you ever been deposed before?
3  A. What do you mean?
4  Q. Like what we're doing here; has that ever
5  happened before in your life?
6  A. Yes.
7  Q. Okay. When were you deposed?
8  A. This year, this year.
9  Q. Okay. Where?
10  A. Well, Downtown Chicago. And it had
11  something to do with my disability.
12  Q. Okay.
13  A. Like the same setting.
14  Q. All right. You realized in that you were
15  also under oath, right?
16  A. Uh-huh.
17  Q. You have to answer yes or no?
18  A. Oh, yes.
19  Q. And that was Downtown Chicago some time
20  this year?
21  A. Uh-huh.
22  Q. Have you ever filed a lawsuit?
23  A. Yes.
24  Q. For what?

**Page 12**

1  A. For disability.
2  Q. Okay. Is that the only time?
3  A. For disability and for confidentiality.
4  Q. Does that mean that you sued somebody for
5  violating your confidentiality?
6  A. Exactly.
7  Q. Okay. When was that?
8  A. This year. It's still going on.
9  Q. Okay. Who is the defendant in that case?
10  A. Norwegian American Hospital nursing staff.
11  Q. Is that suit here in this building at the
12  Daley Center?
13  A. No.
14  Q. Where is it being held?
15  A. We haven't went nowhere with it yet. I've
16  just been getting letters in the mail.
17  Q. Do you have a lawyer for that?
18  A. Yes.
19  Q. Who is that lawyer?
20  A. Del (phonetic) Green.
21  Q. And it's not Mr. Morrissey, right?
22  A. No.
23  Q. When did you first meet Mr. Morrissey?
24  A. Today.

3 (Pages 9 to 12)
Ex 42 Beasley Dep 003

1   Q.   Okay.  And your first conversation with
2   Mr. Morrissey was in the outer office here in this
3   building, is that right?  Right outside the doors
4   here?
5   A.   Yes.
6   Q.   In that conversation with Mr. Morrissey,
7   you noticed that there were a lot of civilian
8   people that were coming to the desk, right?
9   A.   Yes.
10   Q.   In fact, you noticed some of those
11   civilian people were within a few feet of you
12   during that time?
13   MR. MORRISSEY:  Objection.  Objection to
14   how Miss Stuckey and I conversed this morning.
15   BY MR. CATANIA:
16   Q.   Do you understand my question?
17   A.   Yes.
18   Q.   There were people that were within a few
19   feet of you while you were conversing with Mr.
20   Morrissey this morning, right?
21   A.   Yes.
22   Q.   Those were people you didn't know?
23   A.   No.
24   Q.   I walked through a few times, didn't I?

13

1   A.   Correct.
2   Q.   And the court reporter walked through a
3   few times?
4   A.   Yes.
5   Q.   And other people that you didn't know
6   walked right past you and Mr. Morrissey?
7   A.   Yes.
8   Q.   So when you were preparing with Mr.
9   Morrissey today, that was in a public space, right?
10   A.   Yes.
11   Q.   Do you have a driver's license?
12   A.   No.
13   Q.   Have you ever had a driver's license?
14   A.   No.
15   Q.   Do you own any cars or trucks?
16   A.   No.
17   Q.   Have you ever been told that you cannot
18   obtain a driver's license?
19   A.   No.
20   Q.   Did you do driver's ed in high school?
21   A.   Yes.
22   Q.   Where did you go to high school?
23   A.   Marshall High.
24   Q.   And that's in Chicago, right?

14

1   A.   Yes.
2   Q.   Did you graduate?
3   A.   No.
4   Q.   How far did you go?
5   A.   11th grade.
6   Q.   Did you ever obtain an equivalency, GED?
7   A.   No.
8   Q.   Have you done any schooling after 11th
9   grade?
10   A.   Yes.
11   Q.   What kind of schooling?
12   A.   Bakery school.  I went to classes for
13   health education.  That's it.
14   Q.   Okay.  Where did you do the bakery school
15   classes?
16   A.   Sweet Miss Giving's.  It was in Chicago
17   originally.
18   Q.   Is it still around?
19   A.   Yes.
20   Q.   Is that also a place that sells bakery
21   items?
22   A.   Yes.
23   Q.   Okay.  And where did you do the health
24   education?

15

1   A.   Health education through the Core Center.
2   I'm still doing it.
3   Q.   All right.  And the Core Center is the
4   Ruth Rothstein Core Center For Infectious Disease,
5   right?
6   A.   Yes.
7   Q.   Are you known by any other names?
8   A.   Yes.
9   Q.   What other names?
10   A.   Mama.
11   Q.   That's kind of your street name, right?
12   A.   No.  That's what my family calls me.  I
13   don't have a street name.
14   Q.   Do you have any children?
15   A.   Yes.
16   Q.   What are their names and ages?
17   A.   His name.  Albert Cordaro Hurt (phonetic),
18   Jr.  He's 20.
19   Q.   Cordaro?
20   A.   C-o-r-d-a-r-o.
21   Q.   Cordaro?
22   A.   Uh-huh.
23   Q.   And he's 20?
24   A.   Yes.

16

McCorkle Court Reporters, Inc.
Chicago, Illinois  (312) 263-0052

1    Q.  Who's the father of Albert?
2    A.  Albert.  The same name.  Albert Hurt, Sr.
3    Q.  And your birth date is what?
4    A.  ████73.
5    Q.  Now, we obtained an affidavit which we're
6  going to mark as part of the records shortly.  But
7  on that affidavit is a Social Security number.
8         MR. CATANIA:  Let's mark it you now.
9            (Whereupon, Stuckey Deposition
10            Exhibit No. 1 was marked for
11            identification.)
12  BY MR. CATANIA:
13    Q.  I'm going to show you what's been marked
14  Stuckey Deposition Exhibit No. 1 for
15  identification.  Do you see that?
16    A.  Uh-huh.
17    Q.  Do you -- page through it and tell me if
18  it looks like what you've seen before and in fact
19  signed?
20    A.  (Indicating) Okay.
21    Q.  In front of you you have three pages.  Two
22  of them are called "Sworn Declaration", and the
23  third one is called "HIPAA Privacy Authorization",
24  right?

                                          17

1    A.  (Nodding)
2    Q.  Is that right?
3    A.  Uh-huh.
4    Q.  You have to answer out loud yes.
5    A.  Yes.
6    Q.  Okay.  On the second page, is that your
7  signature at the bottom?
8    A.  Yes.
9    Q.  Did you sign it on January 28, 2011, the
10  date that's on there?
11    A.  Yes.
12    Q.  Did you also sign the HIPAA authorization
13  on the same date?
14    A.  Yes.
15    Q.  And that is your name at the bottom and
16  signature above it?
17    A.  Yes.
18    Q.  All right.  It also lists on two of the
19  pages a Social Security number.  Just take a look
20  at Page 1, Paragraph 1 and the last page next to
21  your handwritten name at the top, and could you
22  tell me if those accurately reflect your Social
23  Security number?
24    A.  Yes.

                                          18

1    Q.  Have you ever used any other Social
2  Security numbers for any purpose at all?
3    A.  No.
4    Q.  Could you tell me your current address?
5    A.  ████████ Place, Apartment 202.
6    Q.  Okay.  And that's in Chicago, right?
7    A.  Chicago, Illinois 60615.
8    Q.  Do you receive mail at that address?
9    A.  Yes.
10    Q.  Do you have any other addresses currently?
11    A.  No.
12    Q.  Okay.  And that's called Division House,
13  right?
14    A.  Yes.
15    Q.  That's across the street from Cook
16  County's Provident Hospital, right?
17    A.  Yes, exactly.
18    Q.  Have you always been in Apartment 202?
19    A.  Yes.
20    Q.  Where were you living in 2006?
21    A.  I'm not sure.
22    Q.  But it wasn't at the 50th Place address?
23    A.  No.
24    Q.  When did you move to the 50th Place

                                          19

1  address?
2    A.  October the 1st, 2010.
3    Q.  Okay.  And in 2009, did you -- can you
4  recall what address you were living at at that
5  time?
6    A.  Let me think.
7    Q.  Uh-huh.
8    A.  4848, 4848 West North Avenue.
9    Q.  Okay.  Does anybody live with you at the
10  current address of 514 East 50th place,
11  Apartment 202?
12    A.  Only when school is out, my son, on
13  college breaks he's there with me.
14    Q.  All right.  And that's the same Albert
15  Cordaro Hurt, is that right?
16    A.  Yes.
17    Q.  Ordinarily you live alone at that address?
18    A.  Uh-huh, yes.
19    Q.  In the last ten years, have you resided at
20  addresses such as 3342 West Ohio Street?
21    A.  Yes.
22    Q.  What's that address?
23    A.  3342 West Ohio?
24    Q.  Yes, what kind of address?  Is that a

                                          20

1   house, an apartment?
2       A.  Apartment.
3       Q.  Okay.
4       A.  I was staying with my mom.
5       Q.  With your mom.  And what's your mom's
6   name?
7       A.  Rosie, R-o-s-i-e, Stuckey.
8       Q.  Was anybody else living with you there?
9       A.  Yes, my niece.
10      Q.  What's your niece's name?
11      A.  Same as my mom, Rosie Stuckey.
12      Q.  How old is Rosie Stuckey, your niece?
13      A.  Now she's 21.
14      Q.  When you were living with your mom and
15  Rosie Stuckey at 3342 West Ohio Street, were they
16  aware of any of the medications that you were
17  taking at the time?
18      A.  Not the name, but they know I was on
19  medications.
20      Q.  Okay.  Did they know what the reason was
21  that you were on medications?
22      A.  Yes.
23      Q.  And what reason?
24      A.  HIV, depression, asthma, bipolar.

                                                    21

1       Q.  Okay.  And when was it that you were
2   living at 3342 West Ohio Street?
3       A.  I'm not sure of the year.
4       Q.  Okay.  Was it within the years of '06 to
5   the present?
6       A.  Yes.
7       Q.  Okay.  And you mentioned that you were
8   living for a time at 4848 West North Avenue, is
9   that right?
10      A.  I want to correct that.
11      Q.  Okay.
12      A.  4848 West Rice.
13      Q.  West Rice.  Okay.  Did you know Alfonse
14  Metria (phonetic)?
15      A.  No.
16      Q.  Did you know who owned the building at
17  4848 West Rice?
18      A.  No.
19      Q.  Okay.  That was an apartment building,
20  right?
21      A.  Yes, first floor.
22      Q.  Did you ever live at 4856 West North
23  Avenue?
24      A.  Yes, there it is.

                                                    22

1       Q.  Okay.  And who did you live there with?
2       A.  My mom.
3       Q.  Okay.  And was that within the years of
4   '06 to the present time?
5       A.  Yes.
6       Q.  When you lived on Rice Street, at 4848
7   West Rice, was that during the years of 2006 to the
8   present?
9       A.  Yes.
10      Q.  Okay.  How about 846 North Mayfield; did
11  you ever live there?
12      A.  Yes.
13      Q.  That's a house?
14      A.  Yes.
15      Q.  Okay.  When did you live there?
16      A.  Not sure.
17      Q.  Okay.  How about 4400 West Jackson?
18      A.  Yes.
19      Q.  When did you live there?
20      A.  Wow, 21 years ago.
21      Q.  And you also lived for a time at Dwight
22  Correctional Center?
23      A.  Yes.
24      Q.  Have you ever been left behind a grade in

                                                    23

1   school?
2       A.  No.
3       Q.  Ever take special education classes?
4       A.  No.
5       Q.  Ever been a member of a street gang?
6       A.  No.
7       Q.  Did you grow up with both your parents in
8   the household?
9       A.  Yes.
10      Q.  What's your father's name?
11      A.  Henry Stuckey.
12      Q.  Any siblings, brothers, sisters?
13      A.  Yes.
14      Q.  What are their names?
15      A.  Wow.  Danny Stuckey, Charles Stuckey,
16  Ivory Stuckey, Gregory Stuckey, Mandy Stuckey,
17  Shirley Stuckey, Mary Ann Stuckey, Judy Ann
18  Stuckey, Shirley Ann Stuckey, Rochelle Stuckey,
19  Rose Stuckey, Rochelle.  Okay.  I named -- that's
20  it.
21      Q.  And where do you fit in that whole range?
22      A.  The last one.
23      Q.  The youngest?
24      A.  Yes.

                                                    24

**Page 25**

1    Q.  Okay.  Did you grow up with any of your
2  siblings living with you during the time you were
3  growing up?
4    A.  Uh-huh.
5    Q.  All of them?
6    A.  Uh-huh.
7    Q.  Okay.  Say yes.
8    A.  Yes.
9    Q.  All right.  Were there any physical fights
10  that you observed in your household while you were
11  growing up?
12    A.  No.
13    Q.  Was DCFS ever involved in your household?
14    A.  Never.
15    Q.  Are your siblings still living?
16    A.  Some of them.
17    Q.  Which ones have passed away?
18    A.  Danny, Mandy, Shirley, Rose, Judy,
19  Darnell.  That's it.  That's it.
20    Q.  Have any of them passed away as a result
21  of any type of disease?
22    A.  Yes.
23    Q.  Okay.  What type of disease?
24    A.  HIV.

**Page 26**

1    Q.  Okay.  Any others?
2    A.  No.
3    Q.  Do you know if any of them have been
4  arrested, any of the siblings of yours have been
5  arrested?
6    A.  Not to my knowledge.
7    Q.  So you're the only one with that
8  distinguishing ability?
9    A.  No.  My brother Charles' been arrested,
10  Gregory's been arrested, and Mary Ann's been
11  arrested.
12    Q.  Okay.
13    A.  That's it.
14    Q.  All right.  When you signed Exhibit 1
15  that's in front of you, was there a notary public
16  present?
17    A.  No.
18    Q.  Okay.  Was that signed in a lawyer's
19  office?
20    A.  No.
21    Q.  You signed it at home?
22    A.  Yes.
23    Q.  It was mailed to you?
24    A.  Yes.

**Page 27**

1    Q.  Okay.  Did anybody explain to you what it
2  meant to sign a sworn declaration?
3    A.  No.
4    Q.  When you signed it, did you understand
5  that the statements that you were making on that
6  were made under the penalty for perjury under the
7  Federal law?
8    A.  Meaning that -- yes, yes.
9    Q.  You did understand that?
10    A.  I understand that, yes.
11    Q.  Okay.  And what is the penalty for
12  perjury?
13    MR. MORRISSEY:  Objection.  She's not an
14  attorney.
15    MR. CATANIA:  I'm sorry?
16    MR. MORRISSEY:  Objection.  She's not an
17  attorney.
18    MR. CATANIA:  Okay.  What --
19    MR. MORRISSEY:  You're asking her for a
20  legal opinion.
21    MR. CATANIA:  You think so?  All right.
22  BY MR. CATANIA:
23    Q.  Do you know what the penalty for perjury
24  is?

**Page 28**

1    A.  To tell the truth.
2    Q.  Did you read over the whole declaration
3  before you signed it?
4    A.  Yes.
5    Q.  When you signed it, it was already typed
6  up, is that right?
7    A.  Yes.
8    Q.  Okay.  What did you do to help prepare the
9  document that's in front of you, Exhibit No. 1?
10    A.  What did I do?
11    Q.  Yes.
12    A.  I read it.
13    Q.  Okay.  Are the statements on that document
14  as you read them today, are they true and correct?
15    A.  Yes.
16    Q.  When you were preparing out in the hallway
17  earlier today, did you read this document that's in
18  front of you?
19    A.  No.
20    Q.  What documents did you look at out in the
21  hallway?
22    A.  I don't recall.
23    Q.  Okay.  Were you shown documents in the
24  hall?

7 (Pages 25 to 28)

Ex 42 Beasley Dep 007

**29**

1      A. Yes.

2          MR. CATANIA: Could I see the documents

3      that she was shown in the hallway?

4          MR. MORRISSEY: Mr. Catania, I'm not being

5      deposed. You can ask the witness.

6      BY MR. CATANIA:

7      Q. All right. Could I see the documents that

8      you were shown in the hallway, ma'am?

9      A. Not this (indicating).

10     Q. Okay. Where are the documents that you

11     were shown in the hallway?

12     A. (Indicating)

13         MR. MORRISSEY: For the record, she's

14     referring to Defendant's Exhibit No. 1.

15     BY MR. CATANIA:

16     Q. All right. Any other documents shown to

17     you in the hallway?

18     A. No.

19     Q. Okay. What did Mr. Morrissey tell you in

20     the hallway?

21     A. I'm going to object. That's

22     attorney/client privilege, Mr. Catania.

23         MR. CATANIA: Well, I believe the

24     privilege has been waived, sir.

**30**

1          MR. MORRISSEY: No, no, it has not been

2      waived.

3          MR. CATANIA: It has been waived.

4          MR. MORRISSEY: I'm going to object. It

5      has not.

6          I'm going to instruct her not to answer.

7          MR. CATANIA: All right.

8          MR. MORRISSEY: It has not been waived.

9          MR. CATANIA: It has been waived.

10         MR. MORRISSEY: It has not been waived,

11     Mr. Catania.

12         MR. CATANIA: Oh, are you raising your

13     voice in this deposition, Mr. Morrissey?

14         MR. MORRISSEY: No. You're attempting to

15     invade attorney/client privilege.

16         MR. CATANIA: I'm asking the client, your

17     witness, your client, the witness, to show me the

18     documents that she was shown in the hallway.

19     That's what I'm asking her.

20         MR. MORRISSEY: She's already done that.

21     She showed you the Exhibit No. 1.

22         MR. CATANIA: Thank you for testifying.

23     BY MR. CATANIA:

24     Q. Ma'am, what other documents were you shown

**31**

1      in the hallway besides Exhibit 1?

2      A. None.

3      Q. None, no other documents?

4      A. No.

5      Q. Okay. And when I was walking through the

6      hallway in the public space out here and I saw Mr.

7      Morrissey show you a medical record, you weren't

8      shown that document?

9      A. No.

10     Q. You weren't shown that? Okay.

11         Are you testifying under oath today that

12     the only document that you saw before this

13     deposition is the two pages of the sworn

14     declaration in front of you and your HIPAA waiver

15     that's on the last page?

16     A. Yes.

17     Q. Have you ever been determined to be

18     disabled?

19     A. Yes.

20     Q. By what agency?

21     A. Social Security.

22     Q. When was that disability determination

23     made?

24     A. What was the date? Let's see. 2000. I'm

**32**

1      not sure.

2      Q. Okay.

3      A. But I have been.

4      Q. Has that determination ever been withheld

5      during the time that you've been seeking

6      determination of disability?

7      A. What do you mean by --

8      Q. Delayed, not granted?

9      A. Yes.

10     Q. Okay. Was it ever reviewed since 2000?

11     A. Yes.

12     Q. Has it been reversed at any time since

13     2000?

14     A. Reversed, no.

15     Q. When was it reviewed?

16     A. I'm not sure.

17     Q. In the sworn declaration that's in front

18     of you, you identified Doxepin, Seroquel, and

19     Atripla as medications, right?

20     A. Doxepin, Seroquel, --

21     Q. Paragraph 3?

22     A. Yes.

23     Q. Okay. Did you identify those medications

24     as ones that you were taking in 2006?

1    A.  Yes.
2    Q.  Okay.  Who prescribed Doxepin to you?
3    A.  Pamela Vergara, Dr. Pamela Vergara.
4    Q.  When was that prescribed to you first by
5  Dr. Vergara?
6    A.  2005.
7      MR. MORRISSEY:  Let's go take a break.
8  Let's take a break here.
9      (Whereupon, a short break was
10      taken.)
11      MR. CATANIA:  We're back on the record.
12  BY MR. CATANIA:
13    Q.  In your affidavit, sworn declaration in
14  front of you, in Paragraph 3, in addition to
15  Doxepin, it also says Seroquel, is that right?
16    A.  Yes.
17    Q.  And Atripla, right?
18    A.  Yes.
19    Q.  Okay.  Were you taking all three of those
20  medications before May 11th of 2006?
21    A.  Yes.
22    Q.  All right.  Who prescribed the Seroquel?
23    A.  Dr. Pamela Vergara.
24    Q.  Now, her name is written in your affidavit

33

in Paragraph 5 as V-e-r-g-r-a.  Is that a
2  misspelling?
3    A.  V-e-r-g-r-a.  No, that's right.  That's
4  correct.
5    Q.  V-e-r-g-r-a.
6      Okay.  Mr. Morrissey showed you a record
7  from the Core Center earlier, is that right?
8      MR. MORRISSEY:  Objection.
9      THE WITNESS:  No.
10      MR. MORRISSEY:  She's already testified to
11  what she saw.
12      MR. CATANIA:  It is a question, Mr.
13  Morrissey.
14      MR. MORRISSEY:  It is the same question
15  that was asked before.
16  BY MR. CATANIA:
17    Q.  Are you saying that you were prescribed
18  that in 2005 at the same time as you got the
19  Doxepin?
20      MR. MORRISSEY:  I'm going to object.  She
21  didn't say she was -- you can answer.
22      THE WITNESS:  I don't know what year that
23  they prescribed it to me, but that was my
24  medication, yes.

34

1  BY MR. CATANIA:
2    Q.  Okay.  I understand that those are the
3  medications, yes.  You signed the affidavit in
4  2011, most recently, just like five months ago?
5    A.  Uh-huh.
6    Q.  I want to know if from your personal
7  memory, from your memory of the events, were you
8  prescribed all of these medications before May 11th
9  of 2006?
10    A.  Yes.
11      MR. MORRISSEY:  If you know.
12  BY MR. CATANIA:
13    Q.  All of your answers in this deposition are
14  if you know.  Okay.  That's kind of understood.
15    A.  Yes.
16    Q.  If you don't know, then just tell me you
17  don't know.  Okay?
18    A.  Yes.
19      MR. MORRISSEY:  Well, I'm going to
20  instruct you don't guess, just what you know.
21  Okay?
22      THE WITNESS:  Okay.
23  BY MR. CATANIA:
24    Q.  Many people say when they take Doxepin

35

1  they feel sleepy.  Do you feel sleepy when you take
2  Doxepin?
3    A.  No.
4    Q.  Okay.  What was Doxepin prescribed for?
5    A.  Depression.
6    Q.  Okay.  Do you know what type of
7  depression?
8    A.  No.
9    Q.  Now, your affidavit says that you got your
10  prescriptions from the Core Center pharmacy.  Is
11  that all three of those?
12    A.  Uh-huh.
13    Q.  Is that yes?
14    A.  Yes.
15    Q.  Okay.  When was the first time that you
16  saw Dr. -- I believe that it's actually Vergara,
17  V-e-r-g-a-r-a, is that right?
18    A.  Yes.
19    Q.  When did you first see Dr. Vergara the
20  first time?
21    A.  I'm not sure.  I'm not sure.
22    Q.  Do you know her first name?
23    A.  Pamela.
24    Q.  Okay.  Did anybody else then other than

36

1  Pamela Vergara prescribe to you Seroquel and
2  Atripla?
3      A.  Yes.
4          Pamela Vergara did not prescribe me
5  Atripla.  Only Todd, Todd Jezisek.
6      Q.  Okay.
7      A.  That is the primary doctor.
8          Pamela is the psych doctor.
9      Q.  All right.  So Todd Jezisek is the --
10     A.  Primary doctor.
11     Q.  You believe to be your primary doctor?
12     A.  Yes.
13     Q.  What type of doctor is Todd Jezisek?
14     A.  He is my medical doctor.
15     Q.  In the medical record, which we haven't
16 yet made a part of the record here, Atripla,
17 A-t-r-i-p-l-a, was prescribed by Todd Jezisek,
18 J-e-z-i-s-e-k, is that right?
19     A.  Yes.
20     Q.  All right.  Do you have any other primary
21 doctor besides Dr. Jezifek?
22         MR. MORRISSEY:  Mr. Catania, before the
23 deposition, I asked you whether or not you had any
24 records.  And apparently you have additional

37

1  records that I haven't seen.
2          So perhaps before you show that to the
3  witness, I can take a look at it.
4          MR. CATANIA:  Sure.  Just take a look in
5  the file that you have right there, which is the
6  Core Center records right in front of you that you
7  obtained by the same subpoena that I issued, and
8  you have a copy of it.  Those are all marked T,
9  also I believe A is the initial in front of it.
10         So those records are the same records that
11 you showed her earlier, right?
12         MR. MORRISSEY:  Mr. Catania, again, I'm
13 not being deposed.
14         MR. CATANIA:  But I can see them in front
15 of you on the table.
16         MR. MORRISSEY:  Thank you for referring me
17 to the records you're talking about.
18         MR. CATANIA:  Okay.
19         MR. MORRISSEY:  We'll take a break.
20 BY MR. CATANIA:
21     Q.  Before we do that, ma'am, do you need to
22 take a break?
23         MR. MORRISSEY:  We're taking a break.
24 BY MR. CATANIA:

38

1      Q.  Do you need to take a break?
2      A.  Yes.
3          (Whereupon, a short break was
4           taken.)
5          (Whereupon, the record was read
6           as requested.)
7      THE WITNESS:  No.
8  BY MR. CATANIA:
9      Q.  In your sworn declaration in front of you,
10 it mentions in Paragraph 9 in which you were
11 processed into the jail May 11, 2006, and released
12 May 31st of 2006, I believe it says 20 days, right?
13 Is that what it says there?
14     A.  Yes.
15     Q.  Okay.  And that is true, right?
16     A.  Yes.
17     Q.  What were you arrested for on May 11th of
18 2006?
19     A.  Possession of a controlled substance.
20     Q.  Then it says in Paragraph 10 you were
21 processed into the jail on January 24th of 2006,
22 then released on August 17th of 2006?
23     A.  Yes.
24     Q.  And it says I believe 24 days, right?

39

1      A.  Yes.
2      Q.  Are those the two intakes that you believe
3  we're here to discuss?
4      A.  Yes.
5      Q.  Okay.  What was the reason for your
6  release on August 17th of 2006?
7      A.  No probable cause.
8      Q.  And what was the reason for your release
9  on May 31 of 2006?
10     A.  No probable cause.
11     Q.  Okay.  And were each of those arrests for
12 possession of a controlled substance?
13     A.  Yes.
14     Q.  All right.  After those releases, were you
15 indicted?
16     A.  I'm not sure.
17     Q.  Okay.  Your affidavit in Paragraph 11 says
18 that during those two entries into the jail, you
19 told intake personnel that you were HIV positive
20 and on medication, right?
21     A.  Yes.
22     Q.  What personnel did you tell?
23     A.  Medical personnel down in intake.
24     Q.  Anybody else besides medical personnel in

40

10 (Pages 37 to 40)
Ex 42 Beasley Dep 010

1    intake?
2        A.  The psych worker.
3        Q.  Anybody else besides those?
4        A.  No.
5        Q.  Okay.  I believe that Paragraph 11 also
6    says that you were told to place your name on sick
7    call when you arrived at your assigned location, is
8    that right?
9        A.  Yes.
10       Q.  Who told you that?
11       A.  Medical personnel in intake.
12       Q.  The same two people?
13       A.  Yes.
14       Q.  Did you put your name on sick call in the
15   assigned division?
16       A.  Yes.
17       Q.  How did you do that?
18       A.  When the nurse came around to medicate the
19   inmates, I asked for a sick call, sick call sheet,
20   and I signed up.
21       Q.  Okay.  Where were you housed during those
22   two intakes?
23       A.  Division 3.
24       Q.  And Division 3 at that time in '06 was the

41

1    medical division, right?
2        A.  Yes.
3        Q.  Okay.  And so everyday on three shifts you
4    would see nursing staff, correct?
5        A.  Yes, twice a day.
6        Q.  At the time when you entered -- either of
7    those two times when you entered, were you
8    pregnant?
9        A.  No.
10       Q.  Okay.  In Paragraph 13 you say that you
11   complained to nurses about not receiving
12   medications, and they informed you the procedure to
13   receive psychotropic medication involves going
14   through a psychiatric evaluation in order to
15   receive medication.  "I never received a
16   psychiatric evaluation."  Is that right?
17       A.  No, that's not right.
18       Q.  That's Paragraph 13 of your affidavit,
19   right?
20       A.  Uh-huh.
21       Q.  Is that yes?
22       A.  Eventually I received a psychiatric
23   evaluation but not right then and there.
24       Q.  Okay.

42

1        A.  Eventually I did receive a psychiatric
2    evaluation.  But I had a little help receiving that
3    psychiatric evaluation.
4        Q.  All right.
5        A.  From the doctor.
6        Q.  When you complained to the nurses, who did
7    you complain to specifically?
8        A.  Nurses.  I don't know.
9        Q.  You didn't know their names?
10       A.  No.
11       Q.  Do you know the names of the medical
12   personnel or psych worker?
13       A.  No.
14       Q.  Can you describe the nurses that you told
15   that you didn't receive medications?
16       A.  How they look?
17       Q.  Yes?
18       A.  No.
19       Q.  All right.  When you say you didn't
20   receive, quote, "my medications", what are you
21   referring to?
22       A.  My medications?
23       Q.  Yes.
24       A.  My Atripla, my Seroquel, and psych med, my

43

1    asthma pump.
2        Q.  Okay.  Now, at the time when you were
3    intaked, you had been arrested for possession of a
4    controlled substance, was that per chance heroin
5    that you were arrested for?
6            MR. MORRISSEY:  Which arrest are you
7    referring to?
8            MR. CATANIA:  The arrests, both of them.
9            THE WITNESS:  I'm not sure.
10   BY MR. CATANIA:
11       Q.  Okay.  But you have in the past snorted
12   heroin, is that right?
13       A.  Yes.
14       Q.  Have you ever admitted to anybody that you
15   are a heroin addict?
16       A.  Yes.
17       Q.  Who did you admit that to?
18       A.  A lot of people.
19       Q.  Okay.  Were you ever ordered to
20   court-ordered treatment?
21       A.  No.
22       Q.  For drug abuse?
23       A.  Never.
24       Q.  But you've received some therapy for drug

44

11 (Pages 41 to 44)
Ex 42 Beasley Dep 011

1   abuse, right?
2       A.  Yes.
3       Q.  And that therapy goes back before May of
4   '06, is that right?
5       A.  Yes.
6       Q.  In fact, you received some therapy at the
7   Core Center, is that right?
8       A.  Yes.
9       Q.  Was that group therapy?
10      A.  Yes.
11      Q.  Do you recall any other group therapists
12  that you saw?
13      A.  Yes.  Melody is the group leader over
14  there, Melody Bobanauf (phonetic).
15      Q.  Could you spell that?
16      A.  It's a funny last name.  Melody B.
17      Q.  Okay.  And was that before May of 2006?
18      A.  Before, after, and now.
19      Q.  Is that the only therapist that you can
20  recall seeing at the Core Center for drug therapy,
21  for drug abuse therapy?
22      A.  Yes, that's the only -- yes, yes.
23      Q.  Okay.  Did the group therapy have a name?
24      A.  H Star.

                                                45

1       Q.  Do you know what the name referred to?
2       A.  No.
3       Q.  In Paragraph 14 it says you complained to
4   all officers about not receiving psychotropic
5   medications.  Is that a true statement?
6       A.  Yes.
7       Q.  And you're talking about correctional
8   officers, right?
9       A.  Yes.
10      Q.  Were those the ones in Division 5?  Or I'm
11  sorry.  Division --
12      MR. MORRISSEY:  She never testified she
13  was in Division 5.
14      THE WITNESS:  I don't know nothing about
15  Division 5.
16      MR. CATANIA:  Very good, Mr. Morrissey.
17  That's a good instructing question.
18  BY MR. CATANIA:
19      Q.  Were you ever in Division 5?
20      A.  No.
21      Q.  How about in receiving; were you ever in
22  receiving?
23      A.  Yes.
24      Q.  And that's in the basement of Division 5?

                                                46

1       A.  Oh, is it?
2       Q.  Yes.
3       A.  Oh.
4       Q.  Did you ever tell any of the officers in
5   Division 5 that you were in need of psychotropic
6   medication?
7       A.  No.
8       Q.  So you waited until you were in Division 3
9   to do that?
10      A.  Yes.
11      Q.  And you told officers there, right?
12      A.  Yes.
13      Q.  Did the fact that you were in receiving
14  going through a process with numerous other people
15  prevent you from telling people that you were in
16  need of psychotropic medication?
17      A.  The officers just in receiving?
18      Q.  Yes.
19      A.  It wouldn't do no good.
20      Q.  Okay.  You thought it wouldn't do any good
21  to ask?
22      A.  I know it wouldn't do any good.
23      Q.  And why is that, that you know it?
24      A.  They don't do nothing for you.

                                                47

1       Q.  Okay.  And that's based on your experience
2   in the jail?
3       A.  Yes.
4       Q.  That the receiving officers don't do
5   anything for you?
6       A.  Yes.
7       Q.  Okay.  All right.  So you didn't complain
8   to the officers at the receiving area only because
9   you knew that it wouldn't do any good?
10      A.  Yes.
11      Q.  So the fact that it was the receiving area
12  by itself wasn't the reason?
13      A.  No.
14      Q.  All right.  In Paragraph 14 it says that
15  you came to realize that getting in to receive an
16  evaluation for psychotropic medication is
17  difficult.  When did you come to realize that?
18      A.  When I see other people trying.
19      Q.  And by that you mean they've requested to
20  have an evaluation and you saw them wait for it?
21      A.  Yes.
22      Q.  Okay.  Do you know how long they were
23  waiting?
24      A.  No.

                                                48

1    Q. And were those people that you saw trying
2  the ones that were in Division 3 with you?
3    A. Eventually they came to Division 3.
4    Q. Do you know any of their names?
5    A. No.
6    Q. Have you had any contact with any of them
7  since being released in '06?
8    A. No.
9    Q. Did you ever see them again when you were
10 arrested in 2009?
11   A. No.
12      Arrested in 2009? No.
13   Q. Okay. You say in Paragraph 14 or 15 that
14 says that do not -- due to not getting medications,
15 you felt depressed. Is that right?
16   A. Yes.
17   Q. And the marker of your particular
18 diagnosed illness was depression, right?
19   A. Yes.
20   Q. Did you feel that you were hearing voices?
21   A. Yes.
22   Q. Okay. Did you ever feel that you were
23 hearing voices before your intake into the jail in
24 May of 2006?

49

1    A. Uh-huh.
2    Q. In Paragraph 16 you say that each time you
3  were in the jail, you were eventually hospitalized
4  in the psychiatric ward of Cermak, right?
5    A. Yes.
6    Q. Where are you referring to, what place?
7    A. 2 West.
8    Q. How did you become admitted to the psych
9  ward?
10   A. When you ask for a psychiatric evaluation,
11 that's where they take you to, to 2 West. And
12 you've got to stay there 24 hours during the
13 psychiatric evaluation to see how the medications
14 work on you.
15   Q. Okay. Were you attended to by
16 psychiatrists while you were at the psych ward on 2
17 West?
18   A. Yes, 24 hours a day.
19      MR. MORRISSEY: Can we take a break for a
20 second?
21      (Whereupon, a short break was
22       taken.)
23      THE WITNESS: I want to make a correction.
24 BY MR. CATANIA:

51

1    A. Not as long as I had my medication.
2    Q. Okay. When did you first identify that
3  you were hearing voices?
4    A. In the jail?
5    Q. In the jail?
6      Were these voices you heard while you were
7  in Division 3?
8    A. Yes.
9    Q. Okay. And Division 3 at the time when you
10 were there was a division containing a lot of
11 people that were medical patients, right?
12   A. Yes.
13   Q. And you were housed in cells rather than
14 dormitories, is that right?
15   A. Yes.
16   Q. Do you remember which tier you were on?
17   A. A, the third floor on the A side.
18   Q. All right. Was there -- there weren't any
19 pregnant females in that tier?
20   A. No. Pregnant people on the first floor.
21   Q. Were there any psych patients on that
22 tier?
23   A. Psych patients on the second floor.
24   Q. Okay. So you knew that already?

50

1    Q. Before you make your correction, I just
2  wanted to mention that was the third break that Mr.
3  Morrissey on his own requested.
4  BY MR. CATANIA:
5    Q. Go ahead.
6    A. No. 16, "Each time I was at the jail, I
7  was eventually hospitalized in the psych ward",
8  that's not true.
9    Q. Okay. That's in the sworn declaration,
10 which is Exhibit 1, is that right?
11   A. Yes.
12   Q. And it's on the same page where your
13 signature appears?
14   A. Yes.
15   Q. Okay. What is untrue?
16   A. I wasn't in the hospital both times. I
17 was only admitted in the hospital one time.
18   Q. Okay. When this form came to you, it was
19 already typed out, is that right?
20   A. Yes.
21   Q. Do you know who it was that came up with
22 the "Each time I was in jail" language in
23 Paragraph 16?
24   A. No, I don't.

52

1    Q.   So you're saying now that there was only
2    one time that you were hospitalized in the
3    psychiatric ward?
4    A.   Yes.
5    Q.   When was that?
6    A.   In November.
7    Q.   November of '06?
8    A.   Yes.
9    Q.   And that was when you were rearrested that
10   you describe in Paragraph 17, right?
11   A.   Yes.
12   Q.   Okay.  Were you processed on November 29
13   of 2006 and released from the jail 448 days later?
14   A.   No.
15   Q.   Okay.
16   A.   I was released to IDOC.
17   Q.   Okay.  When it says when you were released
18   from the jail 448 days later, on February 20th of
19   2008, is that the day that you were transferred to
20   Dwight?
21   A.   Yes.
22   Q.   Okay.  And you served time in Dwight from
23   February 21 of 2008 to November of 2008, is that
24   right?

53

1    A.   Is that true?  I'm not sure.
2    Q.   Okay.
3    A.   I'm not sure.
4    Q.   When you were transferred to Dwight, that
5    was based on being sentenced for the charge that
6    you were in custody for, right?
7    A.   Right.
8    Q.   And what was the charge?
9    A.   Possession.
10   Q.   Possession, straight possession of a
11   controlled substance or possession with intent to
12   deliver?
13   A.   I think it was a possession with the
14   intent --
15   Q.   Okay.
16   A.   -- to deliver.
17   Q.   Okay.  All right.  And were you --
18   A.   I was sentenced --
19   Q.   You were sentenced to a term in the
20   penitentiary, is that right?
21   A.   Yes.
22   Q.   Do you remember how many years?
23   A.   No.
24   Q.   You got credit for the 448 days that you

54

1    were in custody, right?
2    A.   Yes.
3    Q.   There was a credit for -- against the
4    sentence for the time you were in jail?
5    A.   Yes.
6    Q.   So all of that time, 448 days, that was
7    applied as a credit against your sentence, was part
8    of the punishment, is that right?
9    A.   Yes.
10   Q.   Now, in your affidavit it says in
11   Paragraph 18 that you were arrested on November 29
12   of 2006, is that what it says?
13   A.   Uh-huh.
14   Q.   Is that right?
15   A.   Yes.
16   Q.   Okay.  Is that a mistake in the affidavit,
17   that date?
18   A.   No.
19   Q.   Because it says you were processed into
20   the jail on the same day, November 29, 2006?
21   A.   That can't be possible.
22   Q.   Because you were actually arrested before
23   you were processed, right?
24   A.   Exactly.

55

1    Q.   A couple of days or one day?
2    A.   One day.
3    Q.   All right.  When you were arrested, you
4    didn't have your psychotropic medication with you,
5    right?
6    A.   No.
7    Q.   And what was that medication that you
8    didn't have with you on November 29 of 2006?
9    A.   All medications.
10   Q.   Well, it says psychotropic in
11   Paragraph 19.  So I'm asking about that one?
12   A.   Doxepin, Seroquel.
13   Q.   And you did not have that medication while
14   you were in police custody either?
15   A.   No.
16   Q.   So you didn't come to the jail with any
17   medications?
18   A.   No.
19   Q.   In Paragraph 21 you say that at intake you
20   told personnel that you were taking psych meds and
21   told intake personnel that you were on HIV meds, is
22   that right?
23   A.   Uh-huh.
24   Q.   Is that yes?

56

14 (Pages 53 to 56)
Ex 42 Beasley Dep 014

1    A.   Yes.
2    Q.   Okay. What personnel did you take -- did
3 you tell that you were taking those medications?
4    A.   Medical, medical personnel.
5    Q.   Can you describe the person that you told
6 that to?
7    A.   No.
8    Q.   When you told them that information about
9 taking psych meds and HIV meds, did you have any
10 expectation about when you would be receiving them?
11    A.   No.
12    Q.   Okay. It says that you asked to be placed
13 on sick call for needed meds and you asked a nurse,
14 is that right?
15    A.   Yes.
16    Q.   Which nurse did you ask?
17    A.   I don't know.
18    Q.   Was that in receiving that you asked the
19 nurse?
20    A.   No.
21    Q.   It was in your living unit area?
22    A.   Yes.
23    Q.   Was that also Division 3?
24    A.   Yes.

           57

1    Q.   And Division 3 is the medical unit even in
2 November of '06, is that right?
3    A.   Yes.
4    Q.   All right. Did you ever receive any
5 medications in Division 3 on any of those three
6 intakes?
7    A.   No.
8    Q.   Okay. No meds at all?
9    A.   No meds.
10    MR. MORRISSEY: Are you inquiring just to
11 psych or --
12    THE WITNESS: Or medical.
13 BY MR. CATANIA:
14    Q.   In Paragraph 23 you say that, "Due to not
15 receiving my psychotropic medications, I felt
16 depressed, I was hearing voices, and I felt like
17 things were crawling on me," right?
18    A.   Yes.
19    Q.   Did you tell anybody those three things
20 while you were in custody in November of 2009?
21    A.   No. It wouldn't do no good.
22    Q.   Did you tell anybody while you were in
23 custody in May of '06?
24    A.   No.

           58

1    Q.   Did you tell anybody those things in
2 November of '06?
3    A.   No.
4    Q.   And that's based on your belief that it
5 wouldn't do any good, right?
6    A.   Yes.
7    Q.   Did you ever tell any of the other
8 detainees that it wouldn't do any good to ask for
9 psychotropic medications?
10    A.   Yes, the words probably came out of my
11 mouth, yes.
12    Q.   Do you think that that might have
13 prevented other detainees from requesting
14 medication?
15    A.   No.
16    Q.   Why not?
17    A.   Because to each his own. To each his own.
18 Everybody for themselves.
19    Q.   Okay. Did you ever tell anybody in
20 Division 3 that unless you're bleeding, they won't
21 do anything to help you?
22    A.   No.
23    Q.   Okay. Paragraph 25 in the same affidavit,
24 it says that "I did not receive medications until

           59

1 two weeks after intake," you were given Doxepin and
2 Sertraline". Is that right? Is that what
3 Paragraph 25 says?
4    A.   Yes.
5    Q.   Okay. So you received medication before
6 you were in jail for 14 days, both the Doxepin,
7 which is a sleep aid, and Sertraline, right?
8    A.   Can you repeat that? I'm not
9 understanding what you're saying.
10    Q.   Sure. All right. Paragraph 25 says that,
11 "I did not receive any medications until two weeks
12 after intake, on December 13th of 2006, when I was
13 given the following psychotropic medications,
14 Doxepin hcl and Sertraline hcl?
15    A.   Two weeks later, yes.
16    Q.   Okay. So that was two weeks after the
17 intake in November of '06 that you received
18 medication?
19    A.   Uh-huh, psychotropic medication.
20    Q.   Okay. And, in fact, it was within 14 days
21 of actually entering into the jail that you
22 received Doxepin and Sertraline?
23    A.   No. It was after 14 days.
24    Q.   Sertraline is Zoloft, right?

           60

15 (Pages 57 to 60)
Ex 42 Beasley Dep 015

1    A.  I never took Zoloft.
2    Q.  Never took Zoloft.  Okay.
3        Paragraph 26 says, "After I was released
4  from the jail, I saw doctors at Jackson Park Mental
5  Institution and Northwestern Mental Institution,"
6  right?
7    A.  Yes.
8    Q.  Okay.  Are you talking about the release
9  in May of '06 that's referred to in Paragraph 9?
10   A.  I'm not sure which one.
11   Q.  Are you referring to the release in August
12 of '06 which is in Paragraph 10?
13   A.  I'm not sure which one.
14   Q.  How about the one that was on
15 February 20th of 2008; did you go to Jackson Park
16 or Northwestern after that?
17   A.  I'm not sure of the date.
18   Q.  Okay.  You were released from the jail in
19 February of '08 to the IDOC, right?
20   A.  From the November to the February?
21   Q.  Yes.
22   A.  I was released to IDOC, yes.
23   Q.  Okay.  So you went to IDOC and you stayed
24 there until they released you, right?

                                          61

1  December of 2008?
2    A.  I'm not sure which month it was.
3    Q.  Do you know if you went to Northwestern
4  Mental Institution?
5    A.  I'm not sure.
6        All I know is, those are the hospitals
7  that I went to when I came home, when I got out of
8  jail.
9    Q.  Okay.  And you're talking about out of
10 prison, when you got out of Dwight?
11   A.  That's what I'm not sure of.
12   Q.  Okay.  All right.  Do you have any
13 expectation that there will be money involved with
14 your testimony here, that you might receive money
15 at some future time?
16   A.  I'm not sure.
17   Q.  You have no expectation of that?
18   A.  No.
19   Q.  How many times have you been arrested in
20 your life?
21   A.  I don't know the exact number but more
22 than five.
23   Q.  Why did you go back to jail in July of
24 '06?

                                          63

1    A.  Right.
2    Q.  And when they released you, you were on
3  mandatory supervised release until May 28th of
4  2010?
5    A.  Yes.
6    Q.  Okay.  Were you out of custody in 2009?
7    A.  What month of 2009?
8    Q.  Well, you were released according to this
9  in November of '08 on mandatory supervised release.
10 That was your out date from Dwight?
11   A.  (Nodding)
12   Q.  No?
13   A.  No.
14   Q.  You were still in custody?
15   A.  Yes.
16   Q.  When did you get released from Dwight on
17 mandatory supervised release?
18   A.  Thanksgiving.
19   Q.  Okay.  Thanksgiving in November of 2008?
20   A.  I'm confused.
21   Q.  Okay.
22   A.  I'm confused with the dates.
23   Q.  Did you seek any kind of treatment from
24 Jackson Park Mental Institution in November or

                                          62

1    A.  For possession of a controlled substance.
2    Q.  A new arrest?
3    A.  I don't know if it was a new arrest or a
4  parole violation.
5    Q.  Okay.  Did you hear voices after being in
6  jail in May of 2006?
7    A.  Yes.
8    Q.  Okay.  What kind of voices did you hear?
9    A.  It's like they far away.
10       What do you mean, what kind?
11   Q.  Well, which ear did you hear them out of?
12   A.  Both ears.
13   Q.  You also said in your affidavit that you
14 felt like things were crawling on you.  Did you
15 feel that things were crawling on you in May of
16 2006 while you were in the jail?
17   A.  Yes.
18   Q.  Okay.  Did you have things crawling on you
19 in May of 2006?
20   A.  Yes.
21   Q.  What things?
22   A.  Like bugs.
23   Q.  And that actually happened, right?
24   A.  Yes.

                                          64

1  Q. Has any physician ever determined the
2 cause of the voices that you heard in May of 2006?
3  A. No.
4  Q. Has any physician ever determined the
5 feeling that things were crawling on you in May of
6 2006?
7  A. No.
8  Q. Okay. Were any medical tests ever run on
9 you to determine your depression?
10  A. Yes.
11  Q. What kinds of tests were run?
12  A. She had me to -- she showed me pictures.
13 She had me to read these things off the computer.
14  Q. Okay. You're able to read, right?
15  A. Yes.
16  Q. Okay. So you were able to complete those
17 tests?
18  A. Yes.
19  Q. Did any doctor tell you that you have any
20 kind of psychosis as a result of your testing?
21  A. I don't know what that is.
22  Q. Okay. Well, what was the diagnosis that
23 you received?
24  A. Depression, anxiety, I'm going to mess it

65

1 your brain during the -- before 2006, May of 2006?
2  A. Yes.
3  Q. Where was that done?
4  A. My CAT scan was done at Bethany, Bethany
5 Hospital.
6  Q. Was that before you were diagnosed with
7 depression?
8  A. Yes.
9  Q. Do you remember exactly when that was?
10  A. No.
11  Q. Generally when?
12  A. No.
13  Q. Was it more than five years ago?
14  A. Yes.
15  Q. Was it more than ten years ago?
16  A. Yes.
17  Q. On May 10th of 2006 you were arrested by
18 the Chicago police I believe it was at 4850 West
19 Rice, is that right?
20  A. I'm not sure.
21  Q. Do you recall that arrest?
22  A. No.
23  Q. Before that arrest, did you know the
24 arresting officer, her name's McGovern?

67

1 up, OCD, something, she said something about an
2 OCDC, something like that.
3  Q. The same doctor that ran the tests was
4 giving you that diagnosis?
5  A. Yes.
6  Q. When was that done, specifically?
7  A. It was this year. I don't know which
8 month.
9  Q. Did anybody ever tell you that your
10 version of depression is called major depressive
11 disorder?
12  A. I'm not sure.
13  Q. Okay. Did you ever have any medical tests
14 before this year to determine your depression?
15  MR. MORRISSEY: Do you understand what he
16 is asking you?
17  THE WITNESS: I'm always -- they're always
18 running tests on me.
19 BY MR. CATANIA:
20  Q. Okay. Were there any tests run on you --
21  A. Yes.
22  Q. -- about depression before May of 2006?
23  A. Yes.
24  Q. Okay. Did anybody ever do a CAT scan of

66

1  A. No.
2  Q. Did you know the lockup keeper, her name's
3 Catherine Burkhart, before that date?
4  A. No.
5  Q. How about the officer that was present for
6 the fingerprinting, Priscilla Jones; had you known
7 her?
8  A. No.
9  Q. Okay. Do you know which police station
10 you were at for that arrest?
11  A. Grand and Central.
12  Q. When you were arrested and brought to
13 Grand and Central, did you tell Officer McGovern or
14 Officer Burkhart or Officer Jones that you were
15 taking psychotropic medication?
16  MR. MORRISSEY: Objection. She doesn't
17 recall. Asked and answered.
18  MR. CATANIA: Thank you for the
19 instruction.
20 BY MR. CATANIA:
21  Q. Do you remember?
22  A. No.
23  Q. If you told Officer Catherine Burkhart
24 that you were taking HIV medication on May 10th of

68

McCorkle Court Reporters, Inc.
Chicago, Illinois (312) 263-0052

Ex 42 Beasley Dep 017

1 2006 when you were arrested at 4850 West Rice
2 Street and she wrote that down in her report, would
3 that be accurate of her?
4     A. I don't know.
5     Q. Well, were you taking HIV medication in
6 May of 2006?
7     A. Yes.
8     Q. Okay. If she wrote that in her report, do
9 you think that she was accurately recording what
10 you told her?
11     A. I don't know.
12     Q. Okay. Do you think that Officer Burkhart
13 would have known what medication you were taking
14 and for what if she didn't ask you?
15     A. No.
16     Q. Okay. Were you arrested on July 23 of
17 2006 in the area of 911 North Lamon Street?
18     A. You say was I arrested?
19     Q. Yes, were you arrested?
20     A. Yes.
21     Q. Okay. And that was on July 23 of 2006,
22 right?
23     A. Uh-huh.
24     Q. That was the day before you were processed

69

1 into the jail on July 24th of 2006?
2     A. Yes.
3     Q. You said earlier that was for possession
4 of a controlled substance with intent to deliver?
5     A. Yes.
6     Q. Okay. Do you recall any other charges you
7 had at that time?
8     A. No.
9     Q. At that time, did you know Officer John
10 Zinchuk, Z-i-n-c-h-u-k?
11     A. No.
12     Q. That was the arresting officer, right?
13     A. I don't know.
14     Q. Did you know the lockup keeper, Catherine
15 Myszkowski, M-y-s-z-k-o-w-s-k-i?
16     A. No.
17     Q. Do you recall being processed into the
18 jail at that time?
19     A. Yes.
20     Q. Where was that?
21     A. Grand and Central.
22     Q. Grand and Central. It wasn't at the 15th
23 police district, was it?
24     A. There's no women lockup there.

70

1     Q. Okay. So you went to the 25th police
2 district because they don't have a women's lockup
3 at the 15th, right?
4     A. Exactly.
5     Q. Do you recall being asked questions about
6 your physical health and mental health at the time
7 you entered into the lockup on July 23rd of '06?
8     A. They always ask you, "Do you feel sick?
9 Do you feel like you need to go to the emergency
10 room?" They always ask you that.
11     Q. So you believe that since they always ask,
12 then likely they asked you at that same time?
13     A. Uh-huh.
14     Q. Is that yes?
15     A. Yes.
16     Q. Okay. If Officer Myszkowski said that she
17 asked you if you were taking medication and you
18 told her that you were, would she -- and she wrote
19 that in her report, that's what you said,
20 would that be an accurate reciting of what you told
21 her at that time?
22     A. I don't know.
23     Q. Okay. Do you remember if you told Officer
24 Myszkowski that you were taking HIV medication and

71

1 ovarian cancer medication?
2     A. No.
3     Q. Okay. Do you recall telling Officer
4 Myszkowski that you took heroin the previous day?
5     A. I don't know.
6     Q. As of today's date, do you remember if you
7 did take heroin the previous day?
8     A. I don't know.
9     Q. When is the last time you had Doxepin
10 before today?
11     A. I've been off Doxepin now for more than a
12 year.
13     Q. Has there been something substituted for
14 Doxepin?
15     A. Yes.
16     Q. What is it?
17     A. Seroquel.
18     Q. Okay. When was the last time you had
19 Seroquel?
20     A. Last night.
21     Q. Is that when you take it?
22     A. Yes.
23     Q. Once a day at night?
24     A. Yes.

72

18 (Pages 69 to 72)

1    Q.   Is that something that helps you sleep?
2    A.   No, it don't help me sleep.
3    Q.   When's the last time you took Suboxone?
4    A.   It's been more than a year now.
5    Q.   And you know what Suboxone is for, right?
6    A.   Yes, Suboxone, yes, I do.
7    Q.   What's it for?
8    A.   Suboxone is a form of -- it keeps you from
9    going through withdrawals from heroin.
10   Q.   From heroin?
11   A.   Yes, it does.
12   Q.   So up to a year ago you were taking that,
13   is that right?
14   A.   Yes.
15   Q.   When's the last time you took Methadone?
16   A.   Today.
17   Q.   Okay.  Where did you take the Methadone
18   today?
19   A.   At the Methadone clinic.
20   Q.   What clinic?
21   A.   New Way, 635 East 75th Street.
22   Q.   The Seroquel that you take, is that in
23   pill form?
24   A.   Uh-huh.

73

1    doctor at the Core.
2    Q.   Okay.  That's the same location, right,
3    Core Center?
4    A.   No.
5    Q.   So your Atripla, do you take that more
6    than one time a day?
7    A.   No, once a day.
8    Q.   Once a day.  And Atripla is three HIV
9    medications in one, is that right?
10   A.   Medications, yes.
11   Q.   All right.  Do you take all the
12   medications at the same time?
13   A.   No, twice a day, different times.
14   Q.   Do you take them from a pill bottle like
15   you would get at a pharmacy?
16   A.   No.
17   Q.   How do you take them?
18   A.   I got a pill case that I get ready every
19   week Sunday through Saturday.
20   Q.   Is that pill case one that has a different
21   slot for each day of the week?
22   A.   Uh-huh.
23   Q.   Is that right?
24   A.   Yes, and different times.

75

1    Q.   Is that yes?
2    A.   Yes.
3    Q.   Okay.  Do you take any other pills besides
4    Seroquel?
5    A.   Yes.
6    Q.   What other pills currently?
7    A.   I take a multivitamin.  I take Atripla.  I
8    take Clonidine.  I take Xanax.
9    Q.   Are those all medications you are
10   currently taking?
11   A.   Uh-huh.
12   Q.   Is that yes or no?
13   A.   Yes.
14   Q.   Were they all prescribed by the same
15   physician?
16   A.   No.
17   Q.   Were they all prescribed by the same
18   location?
19   A.   No.
20   Q.   What location was the Xanax, I'm sorry,
21   the Xanax, Clonidine, and --
22   A.   My primary doctor, the Xanax and the
23   Clonidine.  My psych meds is through my psych
24   doctor at the Core.  My HIV meds through my medical

74

1    Q.   And different times?
2    A.   Uh-huh.
3    Q.   What color is the pill case?
4    A.   Blue and white.
5    Q.   Do you keep a daily planner?
6    A.   Uh-huh.
7    Q.   Is that a planner that you include your
8    medication in?
9    A.   Huh-huh.
10   Q.   You don't?
11   A.   Huh-huh.
12   Q.   You have to answer yes or no.
13   A.   No.
14   Q.   Okay.  In what kind of a planner do you
15   keep them?
16   A.   I write down my daily -- from the time
17   that I get up to the time that I go to sleep what I
18   do.
19   Q.   Okay.  So it's a diary?
20   A.   No, it's a planner.
21   Q.   Okay.  So you write about future things
22   you're going to be doing?
23   A.   No.  I write it down as I do it, what time
24   I did it.

76

19 (Pages 73 to 76)

Page 77

1    Q.   What types of things are listed in your
2    daily planner?
3    A.   My meetings, my shower, what I eat, did I
4    take my morning meds, did I take my night meds,
5    what time I took it.
6    Q.   Okay.  Do you keep track of your symptoms
7    also in your planner?
8    A.   How I feel?
9    Q.   Yes.
10   A.   Yes.
11   Q.   Okay.
12   A.   Most definitely.
13   Q.   Do you keep your planners from year to
14   year?
15   A.   Well, I only been doing it two years.  So
16   yes, I got it.
17   Q.   Okay.  So you've been doing it since '09
18   to the present, right?
19   A.   Yes.
20   Q.   Who suggested that you keep a planner?
21   A.   My psych doctor.
22   Q.   Which one?
23   A.   Pamela.
24   Q.   Do you share with Pamela your planner?

Page 78

1    A.   Yes.
2    Q.   And that's Pamela Vergara?
3    A.   Vergara.
4    Q.   Okay.  That was more for the court
5    reporter, but thank you.
6    A.   Okay.
7    Q.   Okay.  Ever run out of medication?
8    A.   No.
9    Q.   How do you avoid running out of pills?
10   A.   How do I avoid from running out of pills?
11   Q.   Uh-huh.
12   A.   I'll go to the doctor on a regular basis.
13   Q.   When you say "regular basis," how often do
14   you go to the doctor?
15   A.   Well, as needed, once a month, sometimes
16   twice a month.
17   Q.   Okay.  Have you traveled away from home in
18   the past five years?
19   A.   No.
20   Q.   Going back to your intake in May, May 11th
21   of 2006, when you entered into the jail, before you
22   entered the jail, had you been to a branch court
23   for a bond hearing?
24   A.   Before, yes.

Page 79

1    Q.   That was at Grand and Central also, May of
2    '06?
3    A.   It's the TV judge.
4    Q.   Okay.  You went to bond court at 26th and
5    California then?
6    A.   Yes.
7    Q.   When you went to the bond court for a bond
8    hearing, did you have a Public Defender?
9    A.   Yes.
10   Q.   Okay.  Did a Public Defender or the Public
11   Defender's investigator talk with you before the
12   bond hearing?
13   A.   No.
14   Q.   Any family members present for the bond
15   hearing?
16   A.   No.
17   Q.   And how do you know that?
18   A.   Because I know.
19   Q.   They did not -- were they informed about
20   your arrest?
21   A.   No.
22   Q.   You didn't call them, right?
23   A.   No.
24   Q.   And by "them", I'm talking about brothers,

Page 80

1    sisters, or your mother?
2    A.   I know what you mean.
3    Q.   During the time that you were being --
4    appearing before the bond judge, did you ever
5    refuse any of the orders by the personnel there?
6    A.   No.
7    Q.   You followed the directions?
8    A.   Yes.
9    Q.   All right.  Did you ever tell any of those
10   people that you were in need of medication?
11   A.   No.
12   Q.   Were you suffering any symptoms at that
13   time when you were before the bond judge?
14   A.   Yes.  The procedure for that is you go
15   back to lockup.  You stand there through the bond
16   hearing, or you go back to lockup.
17        If you go to the hospital, they'll let you
18   know it's going to be -- you're going to be there
19   for a couple of days, ain't no telling when you're
20   going to get a chance to see the judge.
21   Q.   Okay.  You're talking about when you're in
22   the police lockup, right?
23   A.   Exactly.
24   Q.   All right.  Did you see any -- did you go

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

1    to any hospital while you were --
2      A.  No.
3      Q.  -- in police custody?
4      A.  No.
5      Q.  All right.  How long had you been in
6    custody before you were turned over to the Cook
7    County Sheriff's police deputies in the jail?
8      A.  Two days.
9      Q.  And we're talking about the entry in May
10   of '06?
11     A.  Uh-huh.
12     Q.  Yes?
13     A.  Yes.
14     Q.  Okay.  All right.  When you were processed
15   into the jail, you saw correctional staff first,
16   right?
17     A.  Yes.
18     Q.  And they asked you questions about your
19   identity and your social history, where you live
20   and who your family members are?
21     A.  Yes.
22     Q.  They try to get an emergency contact?
23     A.  Yes.
24     Q.  Did you give them an emergency contact?

81

1      Q.  All right.  Did you ever refuse any of the
2    orders by correctional staff in May of '06?
3      A.  No.
4      Q.  Were you conscious at the time you entered
5    in the jail in May of '06?
6      A.  Yes.
7      Q.  Were you injured in any way?
8      A.  No.
9      Q.  Were you mentally stable at the time you
10   entered?
11     A.  Was I mentally stable?
12     Q.  Yes.
13     A.  No.
14     Q.  What was going on at the time you entered
15   in May of '06?
16     A.  All kinds of stuff was going through my
17   head.
18     Q.  Can you tell me what things were going
19   through your head?
20     A.  No, I can't.
21     Q.  Did you feel sad about being arrested?
22     A.  Yes.
23     Q.  Was that a feeling you expected to have
24   after being arrested?

83

1      A.  Yes.
2      Q.  Who was that?
3      A.  My mother, Rosie.
4      Q.  That conversation with the correctional
5    staff was face to face, right?
6      A.  Yes.
7      Q.  Okay.  Do you have a fingerprint taken?
8      A.  At the Cook County Jail?
9      Q.  Yes.
10     A.  Do they do that?  I don't recall.
11     Q.  Do you recall having a photograph taken?
12     A.  Yes.
13     Q.  At the County Jail?
14     A.  Yes.
15     Q.  That photograph would depict you as you
16   appeared when you were going through receiving,
17   right?
18     A.  Yes.
19     Q.  All right.
20     A.  And fingerprints, yes, they do.
21     Q.  Okay.  In each one of those things, you
22   were face to face with a correctional officer,
23   right?
24     A.  Yes.

82

1      A.  I don't know.
2      Q.  Did you have any unexpected symptoms at
3    the time?
4      A.  I don't know.
5      Q.  You had been sad before that arrest in the
6    past, haven't you?
7      A.  Yes.
8      Q.  So you knew what that was like, right?
9      A.  Yes.
10     Q.  Did you describe to the paramedic that you
11   felt sad?
12     A.  What paramedic?
13     Q.  The first person, the medical staff that
14   talked to you when you intaked in May of '06?
15     A.  Oh, I told him my symptoms, but -- and
16   they wrote it down.  That's it.
17     Q.  You told them what?  I'm sorry?
18     A.  My symptoms.
19     Q.  Okay.
20     A.  And they wrote it down.  That's it.
21     Q.  Do you remember what symptoms you told
22   them?
23     A.  Yes.
24     Q.  What?

84

1    A.  Stomach ache, runny nose, body aching.
2    Q.  Were those symptoms symptoms of
3  withdrawal?
4    A.  Yes.
5    Q.  Okay.  Did you see a physician assistant
6  after talking to the paramedic in May of '06?
7    A.  Yes, yes, you see the doctor.
8    Q.  Okay.  And were you given anything for the
9  symptoms at that time?
10    A.  They don't give you anything.
11    Q.  Can you describe the paramedic that you
12  told that you had a stomach ache and symptoms?
13    A.  No.
14    Q.  Have you ever seen that person again since
15  then?
16    A.  No.
17    Q.  Can you tell me their gender at least?
18    A.  Females.
19    Q.  Females?  Did the paramedic or the medical
20  personnel intaking you into the jail I'm talking
21  about, did he conduct an interview of you, or she
22  conduct an interview of you?
23    A.  Yes.
24    Q.  Was that done with a piece of paper, a

85

1    A.  No.
2    Q.  Did the paramedic person sitting across
3  taking or asking you questions check your blood
4  pressure?
5    A.  Yes.
6    Q.  Your pulse?
7    A.  Yes.
8    Q.  Temperature?
9    A.  Yes.
10    Q.  Your weight?
11    A.  Yes.
12    Q.  Did they do a chest x-ray?
13    A.  Yes.
14    Q.  Did you also speak with anybody who you
15  described earlier I think as a mental health staff
16  member?
17    A.  (Nodding)
18    Q.  You spoke with somebody then?  You have to
19  answer yes.
20    A.  Yes.
21    Q.  Because she can't take down a nod.
22    A.  Yes.
23    Q.  Did that person ask you about suicide?
24    A.  "Do you feel like harming yourself or

87

1  checklist in front of the person?
2    A.  Yes.
3    Q.  Okay.  Did that person ask you about
4  current illnesses?
5    A.  Yes.
6    Q.  Did you answer the questions?
7    A.  Yes.
8    Q.  Okay.  Did they ask you about serious
9  infectious diseases?
10    A.  Yes.
11    Q.  Did they ask you about allergies?
12    A.  Yes.
13    Q.  Recent hospitalizations?
14    A.  No.
15    Q.  Ask you about legal -- any illegal drug
16  use?
17    A.  No.
18    Q.  They didn't ask you about whether you use
19  cocaine or heroin or Methadone?
20    A.  No.
21    Q.  Okay.  Did they ask you about drug abuse
22  or withdrawal?
23    A.  No.
24    Q.  Ask you about alcohol use or withdrawal?

86

1  anybody else?"  Yes, they did ask me.
2    Q.  Okay.  You seem familiar with the
3  question, actually, two questions in one, "Do you
4  feel like harming yourself or another"?
5    A.  Yes.
6    Q.  You heard that type of question a lot?
7    A.  Yes.
8    Q.  In fact, it's kind of standard with all
9  psych screening, isn't it?
10    A.  Yes.
11    Q.  Did they ask you about your past history
12  of mental health treatments, hospitalizations?
13    MR. MORRISSEY:  If you recall.
14    THE WITNESS:  I don't recall.
15  BY MR. CATANIA:
16    Q.  Okay.  Did that person ask you about
17  psychotropic medication, whether you're taking any?
18    A.  No.
19    Q.  Okay.  Did that person use a form when
20  they were asking you questions about your mental
21  health history?
22    A.  No.
23    Q.  In May of 2006, do you recall where your
24  initial housing assignment was?

88

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

1     A.  All I know is Division 3.
2     Q.  Okay.
3     A.  Can I take a break?
4     Q.  Sure.
5         (Whereupon, a short break was
6          taken.)
7  BY MR. CATANIA:
8     Q.  In the Housing Division 3, there are three
9  shifts of officers everyday, right?
10    A.  Uh-huh.
11    Q.  Yes or no?
12    A.  Yes.
13    Q.  Okay.  Thank you.
14        And when you were in the jail for all the
15 three intakes that we're talking about on your
16 affidavit here, your sworn declaration, were you
17 aware of the grievance process for detainees?
18    A.  Yes.
19    Q.  Okay.  Did you ever file any grievances?
20    A.  No.
21    Q.  Did you ever file any requests for medical
22 treatment forms?
23    A.  No.
24    Q.  Okay.  When you were released from the

                                                      89

1  Illinois Department of Corrections, were you
2  arrested after that by the Chicago Police
3  Department?
4     A.  No.
5     Q.  Okay.  In December of 2009, did you go to
6  the Northwestern Memorial Hospital?
7     A.  I'm not sure what month I went.
8     Q.  Okay.  Did you ever live in a halfway
9  house after release from the Illinois Department of
10 Corrections?
11    A.  Yes.
12    Q.  Where did you stay?
13    A.  SOS, Sisters of Sobriety.
14    Q.  Okay.  And that's on the West Side?
15    A.  Yes.
16    Q.  And that's, that housing situation is not
17 an abstinence-based housing, is it?
18    A.  What do you mean?
19    Q.  They don't require you to abstain from
20 using drugs or alcohol?
21    A.  Yes, they do.
22    Q.  They do?
23    A.  Yes.
24    Q.  Okay.

                                                      90

1     A.  Random drops.
2     Q.  And if you do use alcohol or street drugs,
3  they will dismiss you from the program?
4     A.  Yes.
5     Q.  Did that happen to you?
6     A.  No.
7     Q.  Okay.  In July of '06, do you recall going
8  to a bond hearing after your arrest?
9     A.  Yes.
10    Q.  Was it the same thing, you went and saw a
11 bond judge on video, closed-circuit TV?
12    A.  Yes.
13    Q.  And that took place at 26th and
14 California?
15    A.  Yes.
16    Q.  And at that time, did you have any
17 symptoms of mental illness, at the bond hearing?
18    A.  Not to my knowledge.
19    Q.  Did you have any family members present at
20 the time?
21    A.  No.
22    Q.  Had you had your psychotropic medication
23 before that intake into the jail and that bond
24 hearing in July of '06?

                                                      91

1     A.  I had my medication the night before I got
2  arrested.
3     Q.  So you had been without it for at least a
4  day before the bond hearing?
5     A.  Yes.
6     Q.  Did you have any symptoms?
7     A.  Not to my knowledge.
8     Q.  Okay.
9     A.  I don't remember.
10    Q.  Did you tell anybody at the police station
11 about your needing medication?
12    A.  No.
13    Q.  Do you remember being arrested by the
14 Chicago Police Department on June 29th of 2009?
15    A.  Do I remember?
16    Q.  Yes.
17    A.  No.
18    Q.  Okay.  Did you review anything to help you
19 refresh your memory regarding the arrest on
20 June 29th of 2009?
21    A.  No.
22    Q.  Were you shown anything that you didn't
23 look at regarding that arrest in 2009?
24        MR. MORRISSEY:  I'm going to object here

                                                      92

23 (Pages 89 to 92)
Ex 42 Beasley Dep 023

1  to the question being "shown anything that you
2  didn't look at".
3      You can answer.
4      Do you understand the question?
5      THE WITNESS: No.
6  BY MR. CATANIA:
7      Q. Okay. Did Mr. Morrissey in the public
8  space out here outside of our offices show you a
9  medical intake form from June 30th of 2009?
10     MR. MORRISSEY: I'm going to object. It
11 was a private conversation.
12     THE WITNESS: No.
13 BY MR. CATANIA:
14     Q. He did not show it to you, right?
15     A. No.
16     Q. Okay. When you arrived, did you see him
17 hand me a medical intake form dated June 30th of
18 2009, which I'm going to show you right now?
19     A. Did I see him hand you that?
20     Q. Yes.
21     A. I don't recall.
22     Q. Did you see me hand it back to him after I
23 copied it?
24     A. I don't recall.

                                                        93

1      Q. Okay. Do you remember anything about the
2  intake of June 30th of 2009?
3      A. No.
4      Q. Do you remember what happened with the
5  possession of heroin case that you had on June 29th
6  of 2009 for which you were incarcerated?
7      A. No, I don't.
8      Q. You were on mandatory supervised release
9  when you were arrested in June of 2009, right?
10     A. Yes.
11     Q. And that was another word for parole after
12 being in the jail, in the prison, right?
13     A. Yes.
14     Q. Okay. On December 24th, I'm sorry,
15 December 22nd of 2009, did you admit yourself into
16 the Northwestern Mental Institution over here on
17 Ohio Street?
18     A. Yes, I went there.
19     Q. Why did you go there?
20     A. I felt suicidal.
21     Q. Okay. And was that feeling of suicidal in
22 fact five months after you were released from the
23 jail from your June, '09 arrest?
24     A. I'm not sure about the time, but.

                                                        94

1      Q. Well, you weren't in the custody of the
2  Cook County Jail any time in between June 30th of
3  '09 and December 22nd of '09, right?
4      A. Right.
5      Q. That's right, isn't it?
6      A. Yes.
7      Q. So there were no arrests in between?
8      A. Huh-huh, no.
9      Q. Okay. You were feeling suicidal when you
10 went to Northwestern Mental Institution on
11 December 22 of '09, right?
12     A. Yes.
13     Q. Do you know what your diagnosis was at
14 that time, at the time of intake?
15     A. No.
16     Q. Okay. Do you remember the name of your
17 doctor?
18     A. No.
19     Q. Do you remember what the discharge orders
20 were by the doctor when you were released on May
21 24th of 2009?
22     A. No.
23     Q. And you actually were released on
24 December 24th of 2009 from Northwestern, right?

                                                        95

1      A. I'm not sure about the date.
2      Q. Because you were voluntarily there, you
3  could have left any time you felt like it, right?
4      A. Well, to my understanding.
5      Q. I'm going to show you a page of your
6  medical records from Northwestern.
7      MR. MORRISSEY: What is the pending
8  question?
9          (Whereupon, the record was read
10         as requested.)
11     MR. MORRISSEY: Are you going to mark this
12 entire document as an exhibit?
13     MR. CATANIA: Not yet.
14     MR. MORRISSEY: Okay.
15     MR. CATANIA: There's some specific page I
16 wanted to show her.
17     MR. MORRISSEY: Okay. Should we mark it
18 for identification so she can --
19     MR. CATANIA: Not yet. It's Bates
20 stamped.
21     MR. MORRISSEY: Okay.
22 BY MR. CATANIA:
23     Q. I'm just going to refer you to Page C1 of
24 the medical record from Northwestern, that page

                                                        96

1  there (indicating). I just want you to have a look
2  at it.
3      A. (Indicating)
4      Q. Having had a chance to look at that, is
5  your memory refreshed as to who your doctor was at
6  Northwestern?
7      A. Yes, by looking at his name on the paper,
8  yes.
9      Q. Okay. What's his name?
10     A. I don't know how to pronounce it. Dr.
11 S-l-v-z-e-n.
12     Q. S-l-o-v-e-n perhaps?
13     A. Okay, S-l-o-v-e-n.
14     Q. Okay. Do you remember Dr. David Sloven at
15 all?
16     A. No, I don't.
17     Q. That's called at the top, it says "Patient
18 discharge instructions, 1 of 2," is that right?
19     A. Yes.
20     Q. On that page, does it tell you to go to
21 the Core Center for psychiatric and medical
22 follow-up?
23     A. Yes.
24     Q. You had been at the Core Center before

97

1  then, right?
2      A. Yes.
3      Q. Okay. Does it also tell you to go to
4  Lakeshore Hospital for chemical dependency
5  treatments?
6      A. Yes.
7      Q. Okay.
8      A. But I didn't.
9      Q. You didn't go there?
10     A. No.
11     Q. Okay. You went to the Core Center?
12     A. Yes.
13     Q. Does it also give you a crisis line number
14 or tell you to call 9-1-1 if you have crisis?
15     A. Yes.
16     Q. Okay. Let me take that back.
17            (Whereupon, Stuckey Deposition
18            Exhibit No. 2 was marked for
19            identification.)
20 BY MR. CATANIA:
21     Q. I'm going to show you what's been marked
22 as Exhibit No. 2 for identification. All right.
23 Have you had a chance to page through that Exhibit
24 No. 2 with your lawyer?

98

1      A. Uh-huh.
2      Q. Yes or no?
3      A. Yes.
4      Q. Okay. You see at the bottom there are
5  some numbers beginning with the letter T, I think
6  it says "TB"?
7      A. Yes.
8      Q. And then following that, you'll see pages
9  numbered sequentially T1 through T12, right?
10     A. Yes.
11     Q. Do you recognize that these are
12 prescriptions that are made out in your name from
13 the Core Center?
14     A. Yes.
15     Q. On Page T10 of that exhibit --
16     A. Yes.
17     Q. -- at the bottom of the page the last
18 prescription on that page, it says "Ensure powder"?
19     A. Yes.
20     Q. And the date of that prescription is
21 May 29th of '03 that's in that record, right?
22     A. Yes.
23     Q. All right. After that date, May 29th of
24 '03, there's no entry written until December 5 of

99

1  '08, is that right? You can flip through all the
2  pages to see?
3      A. What are you saying?
4      Q. Well, there was -- on Page T10, it says
5  that you received a prescription on May 29th of
6  '03?
7      A. Uh-huh.
8      Q. Then the next prescription above that is
9  December 5 of '08. But there are no prescriptions
10 that are indicated in that record between May 29 of
11 '03 and December 5 of '08, is that right?
12     A. Uh-huh.
13     Q. You have to answer yes or no.
14     A. Yes.
15     Q. Okay. On that same page, T10, it does
16 show that in January of '09 you were prescribed
17 Doxepin, do you see that, the third line from the
18 top on T10?
19     A. January 27, 2009.
20     Q. January 14th. The date on the
21 prescription itself right there (indicating), I'm
22 pointing to it, do you see the date?
23     A. Uh-huh.
24     Q. On January 14, '09, you had a prescription

100

1 for Doxepin written by Pamela Vergara, the doctor,
2 is that right?
3     A.  That's right.
4     Q.  Okay.  And next above that, it says that
5 you were written a prescription for Suboxone by
6 Virgilio Arenas, right?
7     A.  Uh-huh.
8     Q.  Is that right?
9     A.  Yes, that's right.
10     Q.  All right.  So this record does show that
11 you got those medications in '09, is that right?
12     A.  Yes.
13     Q.  Okay.  That's the year, also, that you
14 went to the Northwestern Memorial Hospital, as
15 evidenced by the record we have here, which is
16 December 22, '09, to December 24 of '09, is that
17 right?
18     A.  Yes.
19     Q.  Okay.
20        Do you recall a few moments ago that we
21 were talking about your intake in June of '09,
22 June 29th of '09; do you remember that, when you
23 went into the jail in '09?
24     A.  Yes.

101

1     Q.  And that was while you were on mandatory
2 supervised release or parole, do you remember that?
3     A.  Yes.
4        (Whereupon, Stuckey Deposition
5        Exhibit No. 3 was marked for
6        identification.)
7 BY MR. CATANIA:
8     Q.  I'm going to show you what's marked as
9 Exhibit No. 3 for identification.  I'm going to ask
10 you to turn to Page A5 if you would.  That's the
11 only page that I'm going to ask you about.
12     A.  It's mixed up here.  3, 2, 1.  So it
13 should be 1, 2, 3.  This is 1 again (indicating).
14     Q.  If I could take this, I'll put it in order
15 for you and I'll give everything back to you.
16     A.  Okay.  Yes.
17     Q.  Let me just show you the page I'm
18 referring to, which is A5 of that record.
19     A.  Okay.
20     Q.  And this is the record of the intake of
21 June 30th of '09.
22        On that page, do you see your name appears
23 on the prescription order under the patient name?
24     A.  Uh-huh.

102

1     Q.  Where it says, "Stuckey, Veronica," is
2 that right?
3     A.  Yes.
4     Q.  And across from that, it has a date of
5 birth of July 11 of 1973, right?
6     A.  Uh-huh.
7     Q.  Is that right?
8     A.  Yes.
9     Q.  Okay.  There's a date and time in that
10 prescription order, that physician order.  Do you
11 see that date?
12     A.  6/30/09.
13     Q.  Okay.  And can you tell me what the
14 physician orders are on that page?
15     A.  Atripla.
16     Q.  And that's medication you said that you
17 were taking, right?
18     A.  Yes.
19     Q.  And what else?
20     A.  I don't recognize the other medication.
21     Q.  So Prochlorperazine,
22 P-r-o-c-h-l-o-r-p-e-r-a-z-i-n-e?
23     A.  Uh-huh, i-n.
24     Q.  Loperamide?

103

1     A.  Yes.
2     Q.  And Hydroxyzine?
3     A.  Yes.
4     Q.  Do you see to the right of those
5 prescriptions, there's a little "g" and another
6 part of a word; do you see that "g"?
7     A.  Yes, 6 weeks or something.
8     Q.  Before the 6 weeks, there's also something
9 else written there?
10     A.  Yes.
11     Q.  It begins with a "g", is that right?
12     A.  Uh-huh.
13     Q.  And below the Hydroxyzine, it says,
14 "Belladonna Alkaloids with Phenobarbital per os BID
15 2 days," do you see that?
16     A.  Uh-huh.
17     Q.  Do you know what that is?
18     A.  Huh-huh.
19     Q.  Okay.
20     A.  No.
21     Q.  Okay.  That Belladonna Alkaloids with
22 Phenobarbital is designed to combat withdrawal
23 symptoms.
24        Okay.  Do you recall getting those

104

26 (Pages 101 to 104)

1  prescriptions on that day, June 30, '09?
2      A.  No, I don't.
3      Q.  Okay.  Was that the day of your intake
4  into the jail in June of '09?
5      A.  Yes.
6      Q.  Okay.  So at the very least, we know that
7  a prescription order was written for you, is that
8  right?
9      A.  Yes.
10     Q.  Okay.  But you don't recall getting things
11 for that?
12     A.  No, sir.
13     Q.  All right.  Can I have that back?  I can
14 take the exhibit back, the whole thing.
15     A.  (Indicating)
16     Q.  Thank you.
17         All right.  I'm going to show you some
18 pages of this next medical record.
19         MR. CATANIA:  Let's mark this one, and
20 I'll make a copy of it after.
21             (Whereupon, Stuckey Deposition
22             Exhibit No. 4 was marked for
23             identification.)
24 BY MR. CATANIA:

105

1      Q.  I'm marking this Exhibit A4, I'm sorry,
2  it's Dep No. 4, which is marked AA and then
3  starting with A1 through A75.
4          And I'm going to show you Page A75
5  initially.  It has my notes on it, but your
6  lawyer's having a chance to look at it.
7          MR. MORRISSEY:  (Indicating)
8          MR. CATANIA:  Again for the record, Mr.
9  Morrissey is requesting a break in order to review
10 records.
11         MR. MORRISSEY:  Well, Mr. Catania, we
12 asked prior to the deposition for any documents
13 that you --
14         MR. CATANIA:  And you have them is my
15 point.
16             (Whereupon, a short break was
17             taken.)
18 BY MR. CATANIA:
19     Q.  We're almost done.
20     A.  Okay.
21     Q.  All right.  On Page A75, that first page
22 that's opened there, --
23     A.  Uh-huh.
24     Q.  -- that's a referral -- there's a date on

106

1  there in the upper right-hand corner, January 15 of
2  '03, right?
3      A.  Yes.
4      Q.  And on that date, that referral refers you
5  to substance abuse treatments, right?
6      A.  Is that what the writing is saying?
7      Q.  Well, there's some writing on there that
8  says that it's for substance abuse treatment
9  referral.
10         In fact, there's a couple of places where
11 a signature appears.  You can see that, Margaret --
12     A.  Yes.
13     Q.  -- McClay?
14         And next to that, next to Margaret McClay
15 is CADC; do you see that?
16     A.  Yes.
17     Q.  Do you know what CADC is?
18     A.  No.
19     Q.  Certified Alcohol and Drug Addiction
20 Counselor, that's what she was.  Okay?
21     A.  Uh-huh.
22     Q.  On that page, if you take a look at the
23 handwriting, it says, "30-year-old African American
24 female single resides with her mother.  She is

107

1  unemployed with 10 years formal education.  She
2  reports 10-year history for alcohol and cocaine
3  abuse, 10-year history for dependency.  States she
4  drank alcohol 7 days last -- in last 30.  She
5  denies elicit drugs due to incarceration" and then
6  "36 months for the sale of controlled substances.
7  Treatment history, one medical detox.  Meds, on HIV
8  meds.  Denies mental health history."  Do you see
9  that?  "Referred to Core for chemical dependency."
10         Do you see all those words?
11     A.  Yes.
12     Q.  Okay.  That was the first referral that's
13 in this record at the Core Center.
14         If you look on Page 71, there's a date on
15 this page of December 5 of '08, do you see that,
16 A71 there's a December 5 of '08 date?
17         Do you see what kind of document that is?
18     A.  A psychological screening?
19     Q.  Right.  But it also says it's a new
20 patient assessment, right?
21     A.  A new patient?
22     Q.  Uh-huh.
23     A.  I wasn't a new patient.
24     Q.  Okay.  Well, it says, "Released from

108

27 (Pages 105 to 108)

1  prison November 28, '08.  Mandated drug treatment.
2  Wanted to get back on Prednisone to help her
3  sleep."  Do you see that?
4      MR. MORRISSEY:  Where are you reading
5  from, Frank?
6  BY MR. CATANIA:
7      Q.  Okay.  First, in this presenting problem,
8  it says "New patient."  Do you see that, that
9  paragraph on A71, "New patient", right?  And then
10 current symptoms, "Recently released from prison.
11 Reported five times, has reported five times lack
12 of sleep, unable to eat due to lack of appetite.
13 Past history of cocaine, heroin dependence but has
14 been reported clean for two years."  Do you see
15 that?  And down here where the Axis No. IV is
16 indicated, it says, "Recently released from
17 prison," do you see that?
18     A.  Uh-huh.
19     Q.  Okay.  And it's signed by a clinical
20 social worker during that interview for intake.  Do
21 you see that?
22     On the next page, which is A72, under
23 "Opioid abuse" -- let's see.  All right.  The
24 medication on A73 talks about Trazodone as one of

109

1  it.  Your attorney has it probably.  Do you see
2  that, though?
3      A.  Uh-huh.
4      Q.  Okay.
5      A.  Yes.
6      Q.  So that comports with the record of when
7  you got prescribed.  And those dates, of course,
8  are after the incarceration in '06 by three years,
9  isn't that right?
10     A.  (Nodding)
11     Q.  Are you able to answer the question?
12     MR. MORRISSEY:  Is there a question
13 pending?
14     MR. CATANIA:  Yes.
15 BY MR. CATANIA:
16     Q.  Is it right?
17     MR. MORRISSEY:  Is what?
18 BY MR. CATANIA:
19     Q.  That those prescriptions were written
20 after by three years the May of '06 entry into the
21 jail and the July of '06 entry into the jail?
22     MR. MORRISSEY:  So is the question was
23 Doxepin prescribed to you in February of '09?
24     MR. CATANIA:  It's actually January of

111

1  the medications you were on in the past.  Is that
2  what it says on that page?
3      A.  (Nodding)
4      Q.  All right.  I'm going to turn now to where
5  the diagnosis is.
6      Well, let me go back on -- to a different
7  topic, because on Page 64, A64 of the record, here
8  is a Core progress note dated February 11th of '09.
9  Do you see that date?  And that refers to you, that
10 page.  It's your medical record, right?  You have
11 to answer out loud.
12     A.  Yes.
13     Q.  Okay.  It says on that page that you
14 started Doxepin on January 14th of '09; do you see
15 that?
16     A.  No, I don't see that.
17     Q.  Let me point to it (indicating).  All
18 right.  "Complains of insomnia.  Was started on
19 Doxepin 1/14.  Reports able to sleep with above
20 meds.  Doxepin 1/14."  Okay.  And, remember, I
21 showed you the previous Page T10 where it says that
22 you were prescribed Doxepin 1/14 of '09.  That's on
23 Page T10 of Exhibit -- whatever the exhibit number
24 is here.  That would be Exhibit 2.  And I don't see

110

1  '09.
2      MR. MORRISSEY:  It looks like February of
3  '09, February 11th.
4      MR. CATANIA:  You have to look in the
5  body, where it says January 14th, which is
6  comported by the prescription order.
7  BY MR. CATANIA:
8      Q.  Is that when you got prescribed Doxepin,
9  in January?
10     A.  For the first time?
11     Q.  That's what it says; the record says that,
12 right?
13     A.  I'm not sure.
14     Q.  Okay.  On Page 29 of this record from the
15 Core Center, which is another progress note which
16 is dated November 20th of '09, you reported to the
17 doctor on November 20th of '09 that you're sleeping
18 better with Doxepin; do you see that?
19     A.  Yes, I see it.
20     Q.  "Sleeps better on Doxepin"?
21     A.  Yes.
22     Q.  If you look on Page 21 of the record,
23 which is an October of 2010 progress note,
24 October 6th of 2010, it's your name on the record

112

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

1   down here on the bottom; do you see that?
2       A.  Yes.
3       Q.  And it says here that, "Adherent to meds,"
4   question mark, do you see that?
5       A.  Yes.
6       Q.  Do you know what that refers to?
7       A.  No.
8       Q.  Do you think that maybe the doctor was
9   questioning about whether you're taking your
10  medication regularly?
11      A.  Was I taking it what?
12      Q.  Were you taking your medication?
13      A.  Yes, I was.
14      Q.  Well, that's what it says, "Question, not
15  sure'" that's what the doctor's saying?
16      A.  Oh, okay.
17      Q.  And it was after that, in December of '09
18  that you went into Northwestern Memorial Hospital,
19  is that right?
20      A.  I'm not sure.
21      Q.  Okay.  Did you ever go through the program
22  at the Gateway?
23      A.  In the jail, yes.
24      Q.  Okay.  And the Gateway is a drug abuse and

113

---

1   alcohol abuse treatment center, right?
2       A.  Yes.
3       Q.  Okay.  On Page A54 of this record, I just
4   wanted to show you this, "Patient with Core
5   follow-up has not been seen for over a year" and
6   then "not compliant," do you see that?  Do you know
7   what that refers to?
8       A.  No.
9       Q.  Apparently that doctor doesn't think that
10  you come often enough and that you're not taking
11  your medication as required.
12          Do you agree with the doctor's writing on
13  that page?
14      A.  Are you talking to me?
15      Q.  Yes.
16      A.  I'm not sure about a doctor's writing.
17      Q.  Okay.  Well, what it says is -- on June 8
18  of '09 you were asked about how you're feeling, and
19  you say -- and the remark is "Patient with poor
20  follow-up.  Has not been in for a year" and then
21  "not compliant"?
22      A.  That wasn't Dr. Vergara, was it?
23      Q.  The signature on the page is W. Or Y.
24  Walker, W-a-l-k-e-r?

114

---

1       A.  I don't even know that doctor.
2           MR. CATANIA:  I have no further questions.
3           MR. MORRISSEY:  I have no questions.
4           MR. CATANIA:  Thank you, ma'am.
5           At this point you have the right, again,
6   like I said before, to review the transcript once
7   it's written up and to make corrections.
8           And before I think you said that you would
9   let us know right away about whether you wanted to
10  make corrections and the reasons for those
11  corrections, is that right?
12          THE WITNESS:  Yes.
13          MR. CATANIA:  Do you want to have that
14  opportunity, or do you want to have the court
15  reporter type it up waiving the right to review it
16  before it's made final?
17          It's your choice whether you want to
18  review it or whether you want to waive that review.
19          THE WITNESS:  I'll waive it.
20          MR. CATANIA:  Thank you.
21          (FURTHER DEPONENT SAITH NOT.)
22
23
24

115

---

1   STATE OF ILLINOIS  )
2                      )  SS:
3   COUNTY OF C O O K  )
4           I, Deborah E. DeSanto, a Notary Public
5   within and for the County of Cook County and State
6   of Illinois, do hereby certify that heretofore,
7   to-wit, on the 6th day of June, 2011, personally
8   appeared before me, at 50 West Washington Street,
9   Room 302, Chicago, Illinois, VERONICA STUCKEY, in a
10  cause now pending and undetermined in the Circuit
11  Court of Cook County, Illinois, wherein Michael
12  Parish, et al., are the Plaintiffs and Sheriff of
13  Cook County and Cook County are the Defendants.
14          I further certify that the said VERONICA
15  STUCKEY was first duly sworn to testify the truth,
16  the whole truth and nothing but the truth in the
17  cause aforesaid; that the testimony then given by
18  said witness was reported stenographically by me in
19  the presence of the said witness, and afterwards
20  reduced to typewriting by Computer-Aided
21  Transcription, and the foregoing is a true and
22  correct transcript of the testimony so given by
23  said witness as aforesaid.
24          I further certify that the signature to

116

---

29 (Pages 113 to 116)
Ex 42 Beasley Dep 029

1  the foregoing deposition was waived by counsel for
2  the respective parties.
3       I further certify that the taking of this
4  deposition was pursuant to notice and that there
5  were present at the deposition the attorneys
6  hereinbefore mentioned.
7       I further certify that I am not counsel
8  for nor in any way related to the parties to this
9  suit, nor am I in any way interested in the outcome
10  thereof.
11       IN TESTIMONY WHEREOF: I have hereunto set
12  my hand and affixed my notarial seal this 23rd day
13  of June, 2011.
14
15
16
17
18  *Deborah E. Roberto*
19  NOTARY PUBLIC, COOK COUNTY, ILLINOIS
20  LIC. NO. 084-1384
21
22
23
24
                117

McCorkle Court Reporters, Inc.
Chicago, Illinois  (312) 263-0052