IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Micheal Parish, Curtis L. Oats, Leila Khoury, Sean Driscoll, Carla Lofton, Roy Cleaves, Lisa Brown, Dan Taylor, Dean Miller, Kevin Sanders, Stacey Clark, and Carlotte Watson, | ) ) ) ) ) | |
| | ) | No. 07 CV 4369 |
| *Plaintiffs,* | ) ) | |
| | ) | *Judge John Z. Lee* |
| *-vs-* | ) | Judge Presiding |
| | ) | |
| Sheriff of Cook County and Cook County, | ) | Courtroom 1225 |
| | ) | |
| *Defendants.* | ) | |

# Exhibit 43
# Deposition of John Holmes
# May 5, 2011

**Page 1**

```
          IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
                   EASTERN DIVISION
MICHAEL PARISH, CURTIS L. OATS,   )
LEILA KHOURY, SEAN DRISCOLL,      )
CARLA LOFTON, ROY CLEAVES, LISA   )
BROWN, DAN TAYLOR, DEAN MILLER,   )
KEVIN SANDERS, STACEY CLARK, and  )
CARLOTTE WATSON,                  ) No. 07 CV 4369
        Plaintiffs,               )
     vs.                          )
SHERIFF OF COOK COUNTY and COOK   )
COUNTY,                           )
        Defendants.               )
```

The deposition of JOHN HOLMES, called for examination pursuant to notice and the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Martha C. Newton, a notary public within and for the County of Kane and State of Illinois, at Richard J. Daley Center, Fifth Floor, Chicago, Illinois, on the 5th day of May 2011, at the hour of 11:38 a.m.

Reported By: Martha C. Newton, CSR, RPR, RMR
License No.: 084-003632

**Page 3**

```
              I N D E X
WITNESS                  EXAMINATION
JOHN HOLMES
    BY MR. CATANIA              4
    BY MR. MORRISSEY          164
    FURTHER BY MR. CATANIA    184




              E X H I B I T S
NUMBER              MARKED FOR ID
Holmes Exhibit
Exhibit No. 1            24
Exhibit No. 2          124
```

**Page 2**

```
1    APPEARANCES:
2      THOMAS MORRISSEY, LTD., by
3      MR. THOMAS G. MORRISSEY
4      tgmlaw@ameritech.net
5      10249 South Western Avenue
6      Chicago, Illinois  60643
7      (773) 233-7900
8        Representing the Plaintiffs;
9
10     COOK COUNTY STATES ATTORNEY, by
11     MR. FRANCIS J. CATANIA
12     francis.catania@cookcountyil.gov
13     500 Richard J. Daley Center
14     Chicago, Illinois  60602
15     (312) 603-5440
16       Representing the Defendants.
17
18   ALSO PRESENT:
19     Ms. Alison Zamora
20
21
22
23
24
```

**Page 4**

```
1               (Witness sworn.)
2       MR. CATANIA:  This is the -- this is the
3   federal deposition of John Holmes set pursuant to
4   notice to all parties.  Present in the room with
5   us is Mr. Morrissey representing the class and
6   Alison Zamora.
7       Do you work for Mr. Morrissey?
8       MS. ZAMORA:  With Ken Flaxman.
9       MR. CATANIA:  With Ken Flaxman.  Have you
10  filed an appearance in the case?
11      MS. ZAMORA:  No.
12      MR. CATANIA:  Are you planning on doing it?
13      MS. ZAMORA:  I don't believe so.
14            JOHN HOLMES,
15  called as a witness herein, having been first duly
16  sworn, was examined and testified as follows:
17            EXAMINATION
18  BY MR. CATANIA:
19      Q.  Sir, will you please state your full name
20  for the record.
21      A.  John Holmes.
22      Q.  Could you spell your last name for us,
23  please.
24      A.  H-o-l-m-e-s.
```

1 (Pages 1 to 4)

1    Q.   And, sir, have you ever been to a
2  deposition before?
3    A.   Yes.
4    Q.   Okay.  How many times?
5    A.   Twice.
6    Q.   Have you ever testified in court before?
7    A.   Yes.
8    Q.   What do you think this deposition is
9  about?
10   A.   Regarding the medical -- my medical for
11 Cook County jail.
12   Q.   Your medical?
13   A.   And psychiatric.
14   Q.   Okay.  Why do you think that there's a
15 court reporter here recording everything you and I
16 and your lawyers say?
17   A.   So I can't go back on my testimony?
18   Q.   Okay.  What will you do if you don't
19 understand a question I ask?
20   A.   I'm going to ask you.
21   Q.   Okay.  Thank you.
22        What will you do if you find you have
23 difficulty concentrating?  Will you let me know?
24   A.   Yeah.

5

1    Q.   Okay.  If you don't understand a question
2  I ask, what do you plan on doing?
3    A.   Raising my -- letting you know, saying I
4  don't understand.
5    Q.   Thank you.
6        Are you on any medications right now or
7  any alcohol right now that you think might
8  interfere with your ability to give me answers?
9    A.   No.
10   Q.   Okay.  Is there anything else that you're
11 aware of that would prevent you from giving
12 truthful answers today?
13   A.   No.
14   Q.   What will you do if you need to look at a
15 document since I think Mr. Morrissey has a whole
16 bunch of papers with him today?
17   A.   Look at them.
18   Q.   You'll let me know that you need to --
19   A.   Oh, I'll let you know if I need to look
20 at them.
21   Q.   All right.  What will you do if I cut you
22 off during your answer?
23   A.   Wait for whatever you decide to do.
24   Q.   Please just let me know that I've cut you

6

1  off or that you have more to say.  That's all.
2    A.   Okay.
3    Q.   All right.  Can you think of any reason
4  why your testimony today on this record would be
5  different from your testimony at a future trial?
6    A.   No.
7    Q.   What did you do to prepare for your
8  deposition today?
9    A.   Just tell my lawyer what happened, that's
10 all.
11   Q.   Okay.  Did you do anything to gather any
12 documents to bring with you for this deposition
13 today?
14   A.   I don't have no documents.
15   Q.   You don't?
16   A.   No.
17   Q.   Okay.  Did you have documents that you
18 gave to your lawyer --
19   A.   Yes.
20   Q.   -- regarding this case?
21   A.   Yes.
22   Q.   When did you give those to him?
23   A.   Today.
24   Q.   What documents did you give?

7

1    A.   My medical records.  I got a lot -- a lot
2  of medical records.
3    Q.   Okay.  Where do you normally keep those
4  records?
5    A.   At home.
6    Q.   Are they original records?
7    A.   Yes.
8    Q.   They're the original paper written on by
9  doctors and nurses?
10   A.   Yes.
11   Q.   All right.  How did you get those
12 records?
13   A.   They gave them to me.
14   Q.   Who did?
15   A.   The doctors -- the doctors and the nurses
16 plus I asked for them.
17   Q.   When did you ask for those records?
18   A.   On -- you know, upon discharge because
19 of -- and then because of disability I have a lot
20 of them.
21   Q.   Do you have any questions before we get
22 started with some specifics?
23   A.   How long this going to take?
24   Q.   Could be two and a half hours.  I don't

8

2 (Pages 5 to 8)

1  think it's going to be longer than that.
2      A.  All right.
3      Q.  You have an appointment today?
4      A.  No.
5      Q.  Okay.  You understand having been deposed
6  before that a deposition is a situation, a formal
7  situation where I ask you a bunch of questions
8  that are answered under oath.  They'll be
9  transcribed by a court reporter at some point.
10  You'll have an opportunity to read that transcript
11  and make corrections.  Do you understand all that?
12     A.  Uh-huh.
13     Q.  If you need to make any corrections, how
14  will you let me know that you need to make
15  corrections?
16     A.  If I see a part of something that's
17  wrong, I'll let you know.  I'll look at it and let
18  you know.
19     Q.  You'll let us know in writing, though;
20  right?
21     A.  Yes.
22     Q.  There may be a time frame for you to do
23  that.  You may be required to provide your changes
24  within 30 days.  Are you going to be able to do

9

1  that?
2      A.  Will I get a copy of the disposition
3  (sic)?
4      Q.  You could get a copy of the deposition if
5  it's ordered.
6      A.  Okay.
7      Q.  If you need to take a break at any time,
8  will you please let me know?
9      A.  Sure will.
10     Q.  Thank you.
11         You've been arrested before in the past;
12  right?
13     A.  Yes.
14     Q.  Have you ever been convicted of any
15  felonies?
16     A.  Yes.
17     Q.  Any convictions involving fraud,
18  dishonesty or moral turpitude?
19     A.  No.
20     Q.  Have you ever seen the named plaintiffs
21  in this case and I'll list their names for you.
22  Michael Parish?
23     A.  Michael Parish?
24     Q.  Uh-huh.

10

1      A.  No.
2      Q.  Carla Lofton?
3      A.  No.
4      Q.  Curtis Oats?
5      A.  No.
6      Q.  Leila Khoury?
7      A.  No.
8      Q.  Lisa Brown?
9      A.  No.
10     Q.  Dan Taylor?
11     A.  No.
12     Q.  Sean Driscoll?
13     A.  No.
14     Q.  Roy Cleaves?
15     A.  No.
16     Q.  Dean Miller?
17     A.  No.
18     Q.  Kevin Sanders?
19     A.  No.
20     Q.  Stacey Clark?
21     A.  No.
22     Q.  Carlotte Watson?
23     A.  No.
24     Q.  Other than the half hour before we

11

1  started this deposition today, have you seen
2  Mr. Morrissey before today?
3      A.  Once.
4      Q.  When was that?
5      A.  Friday.
6      Q.  This past Friday?
7      A.  Yes.
8      Q.  And where did you have that meeting?
9      A.  At his office.
10     Q.  And that's 102nd and Western?
11     A.  Yes.
12     Q.  Did you have any meetings by telephone
13  with Mr. Morrissey?
14     A.  No.
15     Q.  How about Mr. Flaxman?
16     A.  No.
17     Q.  Did you correspond with Mr. Morrissey by
18  mail?
19     A.  I corresponded with the secretary.
20     Q.  When -- how often did you do that?
21     A.  Well, maybe twice but I don't know which
22  one it was.
23     Q.  Okay.  Have you signed any written
24  statements about this case?

12

Ex 43 Holmes Dep 003

1    A.   Just for my medical records.
2    Q.   Just for your medical records; is that
3  right?
4    A.   Right.  Just for my medical records.
5  Yes, that's all.
6    Q.   Have you spoken to any reporters about
7  this case?
8    A.   No.
9    Q.   Have you spoken to any government
10 agencies about what you're questioned about this
11 case?
12   A.   No.
13   Q.   Did you read any depositions that were
14 taken before in this case?
15   A.   No.
16   Q.   In preparing for today's deposition, were
17 you shown any documents by Mr. Morrissey or -- or
18 Ms. Zamora?
19   A.   No.
20   Q.   And you understand what I mean by
21 document; right?
22   A.   Uh-huh, documents regarding this case.
23   Q.   All right.  Has anyone ever described to
24 you what the allegations are in the case?

                                                    13

1    A.   You mean the -- what's going on in this
2  case?
3    Q.   What the complaint that started this case
4  off, what that --
5    A.   Yeah, I seen it.  I seen it a long time
6  ago I think I seen it.  I don't know.  Heard about
7  it maybe in jail.
8    Q.   You heard about it in jail?
9    A.   I think so.
10   Q.   Before you received notice to come here
11 for this deposition, when is the time -- the most
12 recent time that you were contacted about the
13 case?
14   A.   Before I received notice?
15   Q.   To come here for the deposition, when's
16 the last time before that that you had been
17 contacted?
18   A.   Probably two or three months ago.  That's
19 why I was kind of surprised.
20   Q.   You were surprised that it took too long
21 or that it was --
22   A.   I thought it was over with.  I thought I
23 didn't do -- I thought I was just being part of a
24 lawsuit that happened to me.  I didn't know this

                                                    14

1  was -- I didn't know I was going to be down here
2  two and a half hours.
3    Q.   Well, actually, if you really want to
4  know, it could be up to seven hours.  That would
5  not be much fun for anyone.
6         Do you have a driver's license?
7    A.   Yes.
8    Q.   Do you have it with you today?
9    A.   Yes.
10   Q.   Could I take a look at it, please.
11        MR. CATANIA:  I've been handed an Illinois
12 driver's license issued November 13 of '07,
13 expires November 16 of 2011.
14 BY MR. CATANIA:
15   Q.   On the license it has John W. Holmes
16 listed.  What's the "W" stand for?
17   A.   Wesley.
18   Q.   It has an address of 6841 East End,
19 Chicago.  Is that your current address?
20   A.   That's -- well, my current address is
21 4747 King Drive.
22   Q.   When did you move to that current
23 address?
24   A.   About eight years ago.  Really I live

                                                    15

1  both places.  My sister owns that building there,
2  so I live in the basement there too.
3    Q.   You live in the basement at 6841 East
4  End?
5    A.   Right.  Right, both places.
6    Q.   Where is it that you receive your mail?
7    A.   4747.
8    Q.   And that's in Chicago?
9    A.   Right.
10   Q.   What's the apartment?
11   A.   1507.
12   Q.   Do you live at that apartment with
13 anybody else?
14   A.   Yeah, friend.
15   Q.   What's the friend's name?
16   A.   Mary Frazier.
17   Q.   How long have you lived with Mary
18 Frazier?
19   A.   Off and on maybe five years.
20   Q.   How old is Mary Frazier?
21   A.   52.
22   Q.   It also lists your birth date as being
23 ▉▉▉▉▉53; is that accurate?
24   A.   Correct.

                                                    16

4 (Pages 13 to 16)

1   Q.   Says you're six-one. Is that accurate?
2   A.   About six-two now.
3   Q.   Your weight is 210 pounds. Is that
4   accurate?
5   A.   No, 235 now.
6   Q.   Okay. Has your weight increased --
7   A.   Increased.
8   Q.   -- since this was issued?
9   A.   It increased.
10   Q.   Does your weight fluctuate at all?
11   A.   Yeah, it fluctuates.
12   Q.   What's the -- in the last, say, five
13   years, what's the minimum, least amount you've
14   weighed to your knowledge?
15   A.   Anywhere from 210 to 235.
16   Q.   So right now you're kind of at your
17   maximum weight?
18   A.   Yeah, maximum.
19   Q.   The license number on this card is
20   H▓▓▓▓▓▓26. I'm going to hand it back to
21   Mr. Holmes right now.
22   A.   Okay. Thank you.
23   Q.   Do you own any motor vehicles?
24   A.   No.

17

1   A.   No.
2   Q.   Any street names?
3   A.   No.
4   Q.   Have you ever been a member of a gang?
5   A.   No. They said I was but I wasn't. They
6   got two gangs. They got Black P. Stone Rangers
7   gang, Gangster Disciples. I mean that's -- that
8   was a blurb for in the penitentiary going in and
9   out of the penitentiary because see, who they see
10   you talking to, who they see you hanging with, and
11   then they'll see you belong to that part of the
12   gang. Then you go to another penitentiary and you
13   hanging with somebody else, so it's really -- no,
14   I don't belong to no gang.
15   Q.   Have you ever belonged to a gang?
16   A.   No.
17   Q.   Have you ever -- strike that.
18        Have you ever used any other birth dates
19   besides November 16 of 1953?
20   A.   Maybe November 16, 1952.
21   Q.   What's the highest level of education
22   you've received?
23   A.   13, 13th grade.
24   Q.   Did you ever get a GED?

19

1   Q.   Did you own a motor vehicle in 2006?
2   A.   Yeah.
3   Q.   What kind of vehicle?
4   A.   I can't remember.
5   Q.   Where was that vehicle registered?
6   A.   You mean -- in Illinois.
7   Q.   Yes.
8   A.   It was in Illinois.
9   Q.   What the address -- what was the address
10   it was registered to?
11   A.   I think it was registered to 40 -- I'm
12   trying to see. Probably had to be 6841. I'm not
13   sure. I'm not sure. It's one of them. I'm not
14   sure which -- what my credit report, how did I do
15   that. I can't remember. I think it was 6841.
16   I'm not really sure.
17   Q.   Okay. Is it one of the two addresses
18   that --
19   A.   Right. It's one of the two.
20   Q.   All right. Have you had any other
21   addresses aside from those two in the last ten
22   years?
23   A.   No.
24   Q.   Have you been known by any other names?

18

1   A.   Yes.
2   Q.   Where did you get the GED?
3   A.   In jail.
4   Q.   Cook County jail?
5   A.   No, Valleyview. Let me see, was it
6   Valleyview? Valleyview Boys School.
7   Q.   Where was that located?
8   A.   Kankakee. Valleyview. It was located in
9   Valley View, Illinois. I guess it's around
10   Kankakee.
11   Q.   Okay. And were you in custody at the
12   time you got the GED?
13   A.   Yes, youth commission.
14   Q.   Was it serving a sentence or pretrial?
15   A.   Sentence.
16   Q.   Okay. You said that you've been arrested
17   before. Have you been arrested anywhere else but
18   within the city of Chicago or the county of Cook?
19   A.   No.
20   Q.   Were you ever left behind a grade while
21   you were in school?
22   A.   What you mean?
23   Q.   Do you ever, like, have to repeat 8th
24   grade or something like that?

20

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois   (312) 263-0052**

1      A.   No, no, no.
2      Q.   Have you ever had any special education
3   classes?
4      A.   No.
5      Q.   Now, you said that you were not a member
6   of a street gang.  Have you ever told an officer
7   that you were a member of a street gang?
8      A.   No.
9      Q.   You say that you've not used any other
10   names before.  Have you been known by the name
11   John John before?
12      A.   No.
13      Q.   Have you ever been known by the name of
14   Marvin Grant?
15      A.   No.
16      Q.   Jerry Holmes?
17      A.   Yeah, Jerry Holmes.
18      Q.   Okay.  Who is Jerry Holmes?
19      A.   I don't know.  That's what they said.
20   You know, I told you -- you know, if I tell you my
21   name is John, you say Jerry, back then, you know,
22   yeah, you want to put Jerry down, I mean that's
23   how I was.  That's how I was back then.  I mean no
24   disrespect or nothing, but if I say my name is

21

1   John and you make a mistake and say Jerry, and you
2   start calling me Jerry, I say, yeah, that's my
3   name Jerry.
4      Q.   You ever use any other names besides that
5   one?
6      A.   No, just Jerry and John.
7      Q.   What about Wesley Holmes, you ever use
8   that one?
9      A.   That's my name, John Wesley Holmes.
10      Q.   You ever use Theodore Brown?
11      A.   No.
12      Q.   You ever spelled your name differently
13   than H-o-l-m-e-s?
14      A.   No.
15      Q.   Are your parents living?
16      A.   Yes.
17      Q.   What are their names?
18      A.   John Holmes and Thelma Holmes.
19      Q.   Where do they live?
20      A.   My father live on the west side on West
21   4500 West End and my mother live -- let me see.
22   41st and King Drive.
23      Q.   Not too far from where you're living now?
24      A.   Right.

22

1      Q.   And your current address is 4747 South
2   King Drive, Apartment 1507 --
3      A.   Right.
4      Q.   -- in Chicago?
5      A.   Uh-huh.
6      Q.   Are your parents currently married?
7      A.   They married.  They ain't never divorce
8   but they don't live together.
9      Q.   How long have they lived -- been
10   separated?
11      A.   Twenty years.
12      Q.   Have you ever spent any time at your
13   father, John Holmes', house on the west side?
14      A.   Not really.
15      Q.   Did you grow up in a household with both
16   parents living together?
17      A.   Yes.
18      Q.   Any siblings?
19      A.   Yes, four sisters.
20      Q.   Could you tell me their names and ages,
21   please.
22      A.   Sheila Holmes, I think she's 49.
23   Harriet Holmes, I think she's 50.  Selma Holmes,
24   she's 59, and Deborah Holmes, she's 55.

23

1      Q.   And how old are you today?
2      A.   57.
3      Q.   Have you ever lived with any of your
4   sisters other than when you were growing up as a
5   child perhaps?
6      A.   Well, that's what -- they the ones that
7   own the building at 6841 East End.  That's where
8   my -- I got the house there too.
9      Q.   Is that a single family home or is it an
10   apartment?
11      A.   Three building -- three story.
12      Q.   Three story.
13      A.   Well, four story.  The basement.
14   Basement.
15      Q.   Do any of your sisters have any criminal
16   arrest records?
17      A.   No.
18      Q.   I'm going to show you what's going to be
19   marked Exhibit 1 for your deposition.
20              (Holmes Deposition Exhibit
21              No. 1 was marked for
22              identification.)
23   BY MR. CATANIA:
24      Q.   Do you see that Exhibit 1 in front of you

24

1 there?
2     A.  Uh-huh, yes.
3     Q.  All right.  Can you page through it with
4 me and just count the number of pages there are.
5     A.  One, two, three, four.
6     Q.  And the fourth page is actually a page
7 that has your signature on it; right?
8     A.  Yes.
9     Q.  When did you sign that?
10     A.  I don't know.  I can't remember.
11     Q.  Okay.  Take a few moments, if you would,
12 and please read through the pages of this what's
13 called sworn declaration of John Holmes.
14     MR. MORRISSEY:  Can we go off the record.
15         (Discussion off the record.)
16     THE WITNESS:  Excuse me.  Can I talk to you?
17         (A break was taken.)
18     THE WITNESS:  Okay.  I'm ready.
19     MR. CATANIA:  We're back on the record.
20     THE WITNESS:  Okay.
21 BY MR. CATANIA:
22     Q.  Sir, you've had a chance to read the
23 whole declaration right now, haven't you?
24     MR. MORRISSEY:  I don't know if he has.

25

1     Q.  You could get up to five years in the
2 penitentiary, the federal penitentiary for a
3 violation of that which can be in the form of
4 writing.  I just want to tell you that now.
5         Now, are there changes you want to make
6 to that form today?
7     A.  Yes.
8     Q.  What do you want to change?
9     A.  OxyContin, the Gabapentin, the Eso --
10 this medicine right here, the first two I -- I
11 mean that's true for 2006.  These -- these five
12 here was in 2007.
13     Q.  So you're pointing to paragraph 6 and
14 you're saying that the first two, the Risperal, it
15 says, and the Depakote it says --
16     A.  Right.
17     Q.  -- those two you had in 2006?
18     A.  Right.  It relate to these -- it
19 relate -- the first part Risperdal and Depakote
20 relates to paragraph 5.
21     Q.  Okay.
22     A.  And the other ones starting Oxycodone,
23 that started in 2007.
24     Q.  Okay.

27

1     THE WITNESS:  I read it.  I mean it's.....
2 BY MR. CATANIA:
3     Q.  Okay.  It has been represented by your
4 lawyers in this case that this Exhibit No. 1 is
5 your sworn declaration; is that true?
6     A.  True.
7     Q.  Is it your intention to put your
8 signature and date on that declaration as it is
9 right now as a true declaration?
10     MR. MORRISSEY:  I'm going -- Mr. Holmes has
11 something to state in regards to Exhibit 1 after
12 having read the document.
13 BY MR. CATANIA:
14     Q.  Before you say anything, I just want to
15 tell you this, okay, a false declaration on the
16 form that this is written in which starts with the
17 words "the undersigned, under penalties of
18 perjury," that form which is a form created under
19 26 United States code 1746 can result in federal
20 perjury charges.  Are you aware of that?
21     A.  Uh-huh.
22     Q.  Do you understand what the penalty for
23 perjury is in federal court?
24     A.  Not really.

26

1     A.  Down.
2     Q.  What would you like to do to correct that
3 page right now?
4     A.  Just put 2007 here.
5     Q.  Okay.  So you want to say, for example,
6 if I put this on here --
7     A.  Oxycodone.
8     Q.  -- from Oxycodone -- from Oxycodone down
9 to aspirin?
10     A.  Right.
11     Q.  2007?
12     A.  Right.
13     Q.  And the other two refer to paragraph 5;
14 is that right?
15     A.  Right.
16     Q.  Any other changes?
17     A.  No, that's it.  That was it.  That's it.
18     Q.  Do you declare under penalty of perjury
19 under the laws of the United States of America
20 that the statements in this exhibit as changed by
21 you are true?
22     A.  Yes.
23     Q.  All right.  Would you please sign and
24 date the last page for me.

28

7 (Pages 25 to 28)

1    A.  Sign it again?
2    Q.  Yeah, the second to last page because the
3  last page I think is -- and date.
4    A.  And the date is May 5.
5    Q.  Yes, Cinco De Mayo.
6    A.  Okay.  Cinco De Mayo.
7    Q.  Thank you.
8        You might keep this in front of you for a
9  few more moments because I think we're going to
10  refer to it in a little bit.
11        In paragraph 1 of that sworn
12  declaration -- actually, not paragraph 1, it is
13  paragraph 7, paragraph 7 of that declaration it
14  says that your psychotropic medication has been
15  prescribed to you by Dr. Waters at Access Living
16  of Metro Chicago; is that right?
17    A.  Yes.
18    Q.  When did Dr. Waters prescribe medication
19  for you the first time?
20    A.  In 2006.
21    Q.  Okay.  So it would have been the Risperal
22  and the Depakote?
23    A.  Right.
24    Q.  Have you ever been determined to be a

                                              29

1  disabled American under the Social Security
2  Administration or Veterans Administration Act?
3    A.  Not under the veterans.  I'm not a
4  veteran.
5    Q.  Okay.  You have been declared to be a
6  disabled person?
7    A.  Yes.
8    Q.  When was that?
9    A.  Last year, April.
10    Q.  Have you ever been determined to be a
11  disabled person before last year April?
12    A.  Yeah, he -- I put the application in
13  2006 and they -- after they went through a few
14  denials, the judge and the doctors at the Social
15  Security board along with the doctors in the
16  medical reports, they, you know, claim it will be
17  disabled.
18    Q.  Was that a conditional determination of
19  disability or was it a permanent?
20    A.  It's permanent.
21    Q.  You don't have to prove anything in the
22  future, then --
23    A.  No.
24    Q.  -- is that what you're saying?

                                              30

1    So how many denials did you have before
2  it was finally determined?
3    A.  Two I think, two.
4    Q.  Can you tell me whether you were going to
5  Dr. Waters at Access Living of Metro Chicago that
6  location?
7    A.  Yes, I was going.
8    Q.  At the time you were going there you --
9  you just told me that you were not determined to
10  be a disabled person; right?
11    A.  No, I wasn't at that time.
12    Q.  Okay.  Access Living describes its
13  function as a change agent committed to fostering
14  an inclusive society that enables Chicagoans with
15  disabilities to live fully engaged and
16  self-directed lives.  Nationally recognized as a
17  leading force in the disability advocacy
18  community.  Access Living challenges stereotypes,
19  protects civil rights and champions social reform.
20    Are you familiar with that motto, that
21  claim?
22    A.  That's the satellite clinic of
23  Northwestern?
24    Q.  That's what it says, yes.  It says Access

                                              31

1  Living.
2    A.  They had me there.  I was -- the doctors,
3  you know, they set the appointment up for Access
4  Living that's because I was taking medication.
5  Maybe I just didn't understand what was
6  happening.  I guess when I went into the hospital
7  at Northwestern and then they recommended me there
8  I guess that I was disabled from taking.  That was
9  the first time I had been on really --
10    Q.  Okay.
11    A.  -- medication.
12    Q.  In paragraph I think it's 23, the last
13  page.
14    A.  Uh-huh.
15    Q.  Says that when I was released from jail
16  under CIMIS No. 2006-0084236, I had been in the
17  jail without my psychotropic medications for 23
18  days.  That week I was found lost and disoriented
19  by police outside a park on the north side of
20  Chicago.  Do you see that?
21    A.  Right.
22    Q.  The week that you were released is when
23  you say you were found lost and disoriented?
24    A.  Right.  I was wandering around the

                                              32

                                    8 (Pages 29 to 32)

1    hospital.
2        Q.  The hospital --
3        A.  I mean the north side, around that area.
4        Q.  Okay.  You -- that's not the first time
5    you've been on the north side, though; right?
6        A.  No.
7        Q.  Have you ever lived at Cabrini Green?
8        A.  I didn't really live there.  I just was
9    homeless around that area.
10       Q.  When were you homeless in that area?
11       A.  Back and forth.  Let me see.  First time
12   I was homeless around it was 1993 to about 1990 --
13   no, 1991 I guess to about 1993.  Second time I was
14   homeless was about 19 -- no, 2005, '6 -- 2005 and
15   '6.
16       Q.  Okay.  On -- in October of 2006 you were
17   arrested at 412 West Chicago Avenue; right?
18       A.  Right.
19       Q.  And that's the old Cabrini Green
20   41-Deuce; right?
21       A.  Right.
22       Q.  At that time you told the police that you
23   lived at 6841 South East End; is that right?
24       A.  Uh-huh.

33

1        Q.  You have to answer yes or no.
2        A.  Yes, sir.
3        Q.  Was it 6841 or 6941 South East End?
4        A.  68.
5        Q.  Do you have a job currently?
6        A.  No.
7        Q.  Did you have a job in 2006?
8        A.  Yes.
9        Q.  Was it a job for which you had applied
10   and were receiving a regular paycheck?
11       A.  Yes.
12       Q.  What kind of job was that?
13       A.  I was a night crew manager at Jewel Food
14   Store and I was a salesman for Arizona Tea.
15       Q.  As of that job were you required -- the
16   Arizona Tea job, were you required to drive a
17   motor vehicle?
18       A.  Uh-huh.
19       Q.  Is that yes?
20       A.  Yes.
21       Q.  And which Jewel did you work on the night
22   crew for?
23       A.  35th and King Drive and 68 -- I mean 67th
24   and West End.

34

1        Q.  Do you remember who your supervisor was
2    at the King Drive location?
3        A.  No.
4        Q.  How about the western location?
5        A.  Not really, no.  I can find out.
6        Q.  You've been arrested at other north side
7    locations as well, haven't you?
8        A.  Yes.  I don't remember where.
9        Q.  Well, were you arrested on October 24 of
10   2010 at 4722 South Indiana?
11       A.  That's on the south side.
12       Q.  I know.
13       A.  Yes.
14       Q.  Were you arrested on May 27 of 2010 at
15   851 North Hudson?
16       A.  Where?
17       Q.  851 North Hudson in Chicago.
18       A.  On what date?
19       Q.  May 27 of 2010.  Last year.
20       A.  I don't remember that one.
21       Q.  Okay.
22       A.  I might have.  851 Hudson?  That's on
23   Halsted.  I don't remember.  I don't remember that
24   one.

35

1        Q.  It's on the north side; right?
2        A.  It's on the north side but I just don't
3    remember that one.
4        Q.  It's in the area where Cabrini Green is
5    or was?
6        A.  Right.  That's on Halsted and Hudson.
7        Q.  Have you been arrested at 5 West Chicago
8    on November 30, '08?  Chicago and State.
9        A.  Yes, that was for drinking.  I remember
10   that.  Right, that was for drinking.
11       Q.  Have you been arrested at 412 West
12   Chicago on October 30 of '06?
13       A.  Right.  Yes, yes.  That was -- yes, I
14   remember that.
15       Q.  And were you arrested on August 25 of '06
16   at 22 West Chicago Avenue?
17       A.  Yes.
18       Q.  22 -- I'm sorry.  22 East Chicago.
19       A.  I know what you're talking about, around
20   the corner.
21       Q.  Yeah, okay.  And when you were arrested
22   there that was a construction site; right?
23       A.  That was a park.
24       Q.  22 East Chicago Avenue.

36

1   A.  That's a park.
2   Q.  Okay.  Were you arrested at 1541 North
3  Kingbury Court in Chicago?
4   A.  I don't think so.  I don't remember that.
5   Q.  Other than the South Indiana address that
6  I gave you earlier, those other addresses are all
7  on the north side; right?
8   A.  Right.
9   Q.  And all generally in the area where in
10  your affidavit you say that you were found lost
11  and oriented -- disoriented by police outside in a
12  park on the north side of Chicago?
13   A.  Right.
14   Q.  That's Chicago Avenue and Larrabee; is
15  that right?
16   A.  The park Chicago Avenue and Oak.
17   Q.  Okay.
18   A.  Around that area.
19   Q.  Did you ever live in that area?
20   A.  No, I mean I was --
21   MR. MORRISSEY:  Define the term live.
22  BY MR. CATANIA:
23   Q.  Reside.  So you didn't reside --
24   A.  I never lived on the north side.

37

1   Q.  Okay.  But you spent a lot of time on the
2  north side --
3   A.  That's while I was homeless.
4   Q.  You've identified in paragraph I think
5  it's the one you corrected, paragraph No. 6 that
6  you were taking Risperdal?
7   A.  Uh-huh.
8   Q.  Although it's written down as "Risperal";
9  right?
10   A.  Right.
11   Q.  And "Depacote"?
12   A.  Right.
13   Q.  And Risperal, R-i-s-p-e-r-d-a-l and
14  Depakote is D-e-p-a-k-o-t-e.
15   Did you write those words in this
16  affidavit yourself or did someone do that for you?
17   A.  No, they -- they took -- they took them
18  off of -- I read -- I think I read them off of the
19  sheet.
20   Q.  In preparation for preparing your sworn
21  declaration, did you review any documents?
22   A.  No, just my medication document.
23   Q.  The one that was shown to you by
24  Mr. Flaxman?

38

1   A.  No, the one that I had at home.
2   Q.  Okay.
3   A.  With the medicine, you know, with -- I
4  had a list of medicines I was taking.
5   Q.  Many people that take Risperdal and
6  Depakote report that those medications cause them
7  to be sleepy.  Did you feel sleepy taking those
8  medications?
9   A.  Yeah, sleepy drugs.
10   Q.  And similarly ones you were taking later
11  on I think you said -- you changed it to 2007,
12  Oxycodone, that also causes sleepiness, doesn't
13  it?
14   A.  Yes, the Gaba, all of it did to me except
15  the Simvastin (sic).
16   Q.  Did you take them also to help you sleep?
17   A.  Yeah, to sleep and be calm.
18   Q.  When you were doing jail time it was a
19  lot easier to do jail time when you were able to
20  sleep; right?
21   MR. MORRISSEY:  I object to that presumes
22  that his sleep was not uninterrupted while he was
23  incarcerated.
24  BY MR. CATANIA:

39

1   Q.  Can I have your answer?
2   A.  He objected.
3   MR. MORRISSEY:  I did.
4  BY MR. CATANIA:
5   Q.  You can still answer, sir.
6   A.  Oh, I can?
7   MR. MORRISSEY:  Yeah.
8   THE WITNESS:  There wasn't nothing wrong with
9  my sleep.  I was taking -- these were pain
10  medications.
11  BY MR. CATANIA:
12   Q.  I understand.
13   A.  It wasn't about me being sleepy.  These
14  is pain medication.
15   Q.  I understand their pain medication.
16   A.  I been in jail before, so it wasn't -- it
17  wasn't like I needed some medicine to go to sleep.
18   Q.  Well, is it easier to do jail time if
19  you --
20   A.  No, no, because it's not -- I don't care
21  how many medication you take, you're in jail.
22  It's just not a sleep thing.  Jail is a terrible
23  place.  Terrible.
24   Q.  Your -- your own criminal -- adult

40

1    criminal history starts in 1970, doesn't it?
2        A.   1970?  I thought it was '71.
3        Q.   Well, wasn't that your first adult
4    arrest?
5        A.   It was 1971.  My first, that was --
6        Q.   I'm talking about a time when you were
7    arrested, fingerprinted and released.  Does that
8    sound familiar in 1970?
9        A.   No, 1971.
10       Q.   Did you have any --
11       A.   Because I was 17.
12       Q.   Right.  Do you have any juvenile arrests?
13       A.   I got a lot of them.
14       Q.   You have a lot of them.  So considering
15   only the adult arrests for right now, since the
16   first adult arrest when you were 17, you've had 56
17   other Chicago adult arrests; right?
18       A.   I didn't know it was that many.
19       Q.   Can you give me an estimate of the total
20   amount of time that you've spent in police
21   custody, in a jail or in a prison since 1970?
22       A.   Probably about 20 years.  Off the back
23   maybe 22 years, 23.
24       Q.   How many of your sentences resulted in a

                                                41

1    penitentiary stay?
2        A.   See, 1971 to '75, I guess probably about
3    four, maybe five.
4        Q.   Okay.  You were convicted of armed
5    robbery in the past?
6        A.   That was in 1971.
7        Q.   Aggravated arson?
8        A.   That was in 1971.  No, that was in '76.
9        Q.   Burglary?
10       A.   Yeah, that was -- yeah.
11       Q.   Felony retail theft?
12       A.   Right, twice.  I think once or twice.
13       Q.   You spent a lot of time inside a
14   penitentiary?
15       A.   Yes, yes.
16       Q.   A judge once described to me that a
17   record of your type constitutes life in prison on
18   the installment plan.  Did you ever hear that?
19       A.   Yeah, they want -- they wanted to do that
20   but, you know, you know, I changed so they knew
21   that.  They knew that.  I mean, you know, a lot of
22   people -- I should be in jail now.  I mean, I
23   should be -- I should be in there with life, but
24   you know I look at it where so I mean a lot of

                                                42

1    people don't believe it but God got -- God has a
2    destiny for my life and prison is not it.  So I
3    mean I'm -- that's paper to me.  That paper's not
4    who I am.
5        Q.   Let me go into your background a little
6    bit more.  Do you or any of your blood relatives
7    have any of these conditions?
8        A.   No.  I mean -- I was going to say prison.
9        Q.   No.  You told me already that they don't
10   have arrests.
11       A.   Okay.
12       Q.   Do you or any of your blood relatives
13   have these conditions, serious mental disease?
14       A.   Any of my relatives?  Probably my son.
15       Q.   Your son?
16       A.   Probably because he's in jail now.
17       Q.   Where's he in jail?
18       A.   In Indiana.
19       Q.   What's his name?
20       A.   Johnny Holmes.
21       Q.   What is he in jail for?
22       A.   Burglary.
23       Q.   Do you have any other children?
24       A.   Daughter.  I can't find her because they

                                                43

1    stole her.
2        Q.   Okay.  Are you married?
3        A.   No.
4        Q.   Were you ever married?
5        A.   Yes.
6        Q.   Who were you married to?
7        A.   I was married to Fannie Holmes.  Fannie
8    MacDonald.  That's Johnny's mother.
9        Q.   When was that?
10       A.   2000 -- I don't know, 1990 -- 1975 or
11   1976.
12       Q.   How long did that marriage last?
13       A.   About three years.
14       Q.   Did it end in divorce?
15       A.   Yeah.
16       Q.   Is she still alive?
17       A.   Uh-huh.
18       Q.   Do you still see Fannie MacDonald?
19       A.   No.
20       Q.   Do you know where she lives?
21       A.   In Indiana somewhere.
22       Q.   And your daughter, you say was -- was
23   taken?
24       A.   Taken, you know, mother -- her mother

                                                44

1   said that -- I was going to court for child --
2   child -- you know, the child support. But some
3   type of way they ended up -- the mother ended up
4   adopting -- her -- she gave the baby to her mother
5   to adopt. So that stopped the court proceeding
6   for the child support. So I ended up not knowing
7   where the little girl was at or anything, so.
8       Q.   What's the girl's name?
9       A.   Celestine Walker.
10      Q.   Is that name that she got when she was
11  adopted?
12      A.   No, that's her name that they have on the
13  papers on the -- last time I went to court for
14  her.
15      Q.   And what's the mother's name?
16      A.   Sharon Walker.
17      Q.   Is her name on the birth certificate?
18      A.   Uh-huh.
19      Q.   Is that yes?
20      A.   Yes.
21      Q.   Do you or any of your blood relatives --
22  have you or any of your blood relatives been
23  treated for mental health?
24      A.   I have.

45

1       Q.   Anybody else?
2       A.   Not that I know of.
3       Q.   Have you or any of your blood relatives
4   had blood disorders or disease?
5       A.   Like -- like you mean like hypo?
6       Q.   Like sickle cell, things like that.
7       A.   No.
8       Q.   Have you or any of your blood relatives
9   ever suffered from dementia?
10      A.   What's that?
11      Q.   You would probably know if you heard the
12  term. I'm not going to describe it to you. But
13  if you -- have you ever heard them having that
14  problem, any of your relatives or even you?
15      A.   No.
16      Q.   How about diabetes?
17      A.   No.
18      Q.   No family history of diabetes?
19      A.   No. My -- no, I don't have no diabetes.
20      Q.   Anybody have difficulty swallowing.
21      A.   No.
22      Q.   Anybody suffer from heart disease in your
23  family in your history?
24      A.   I have.

46

1       Q.   You have. Okay. How about kidney
2   disease?
3       A.   No.
4       Q.   Any history of breast cancer?
5       A.   No.
6       Q.   Any history of irregular heartbeat?
7       A.   No.
8       Q.   Low blood pressure?
9       A.   I haven't. My mother.
10      Q.   Your mother had low blood pressure?
11      A.   That's like high and low blood pressure,
12  yes. Yeah, me and my mother. And my nephew got
13  it now, Terry.
14      Q.   And how is Terry related?
15      A.   That's my nephew.
16      Q.   By which of your sisters?
17      A.   Selma.
18      Q.   Is Selma married?
19      A.   No.
20      Q.   Any kidney disease?
21      A.   No.
22      Q.   Liver disease?
23      A.   No.
24      Q.   Parkinson's disease?

47

1       A.   No.
2       Q.   Seizures?
3       A.   No.
4       Q.   Anyone in your family or you ever have an
5   allergic reaction to Risperdal or any other
6   medicines?
7       A.   No.
8       Q.   Your declaration that you signed and
9   dated today says that you were -- you entered into
10  the jail August 27 of 2006 and were discharged
11  August 30 of 2006, also entered August -- October
12  31 of 2006, released November 23 of 2006; is that
13  correct?
14      A.   Uh-huh.
15      Q.   Is that yes?
16      A.   Yes. Yes.
17      Q.   So your visit in August and August --
18  those three days in August, that was pleasant
19  enough that you went back in October?
20      A.   No.
21      MR. MORRISSEY: I object to the form of the
22  question. It's argumentative.
23  BY MR. CATANIA:
24      Q.   Do you have an independent recollection

48

12 (Pages 45 to 48)

1   of the precise days that I just described, August
2   27, '06 to August 30, '06?
3       A.  Yes.
4       Q.  Do you have an independent precise memory
5   of the dates of October 31 of '06 and to November
6   23, '06?
7       A.  Yes.
8       MR. MORRISSEY:  I object to the word
9   "precise."
10  BY MR. CATANIA:
11      Q.  Do you have to refer to any documents in
12  order to help you remember what occurred between
13  those days?
14      A.  Probably police record.  You just -- you
15  told me already.
16      Q.  Do you have any papers or calendars or
17  diaries that cover the period of time between
18  August 27 of '06 and November 23 of '06?
19      A.  No.
20      Q.  You've stated in this affidavit in
21  paragraph 9 that if you don't get your pain
22  medication every day you have severe back pain?
23      A.  True, yes.
24      Q.  Were you taking any pain medication in

49

1   2006?
2       A.  Yes.
3       Q.  What medication were you taking?
4       A.  I probably was taking Depakote and
5   Risperdal, and I was taking the -- they were
6   giving me -- they wasn't giving me all this, but
7   they were giving me ibuprofen and -- 2006.
8   Probably Naprosyn or something.
9       Q.  Okay.  In 2006 you had back pain; is that
10  right?
11      A.  Yeah, I had back pain back then.
12      Q.  What caused the back pain.
13      A.  They found out that it was a degenerative
14  back disease.
15      Q.  Anybody else in your family history to
16  your knowledge that has a degenerative back
17  disease?
18      A.  Probably my mother the way she walk.  I'm
19  not sure.  My mother has real serious arthritis
20  problem.
21      Q.  When did you start having the back
22  problem of degenerative back disease?
23      A.  In 2006 when I was working.
24      Q.  Which doctor diagnosed that?

50

1       A.  I'm not sure.
2       Q.  At that time you had been working for the
3   Jewel company overnight; right?
4       A.  Uh-huh.
5       Q.  Is that right?
6       A.  Uh-huh.
7       Q.  You have to answer yes or no.
8       A.  Yes, sir.  Yes.  Yes.
9       Q.  And also working for Arizona Tea as a
10  salesman?
11      A.  Right.
12      Q.  And both of those jobs involved lifting
13  objects; right?
14      A.  Yes.
15      Q.  How did you leave those jobs?
16      A.  I left those jobs -- I left Arizona Tea
17  because I couldn't get there on time.  I left
18  Jewels because I couldn't get there on time from
19  using drugs, you know, I left.  I ended up
20  leaving.  I mean, I got fired because I wasn't
21  performing my duties.
22      Q.  So you were fired from both those jobs?
23      A.  Both jobs.
24      Q.  And that was partly because of doing

51

1   drugs; right?
2       A.  Drugs and not performing my duties.
3       Q.  What drugs?
4       A.  Cocaine, heroin and not staying on my --
5   not staying on my medication because I thought
6   that I could do it myself.  And I ended up -- I
7   was on my medication -- I was on my psych meds --
8   I was on my psych meds and then I figured I
9   wouldn't get in no trouble, so I stopped taking
10  it.  And then I started taking -- I mean I stopped
11  taking it, and I ended up going off again, you
12  know, doing stupid stuff.  I lost both jobs.  And
13  then they try to put me back on my medication.  I
14  will take it every now and then.  Every time I
15  felt like -- if I felt like it wasn't hurting
16  me -- I feel like I wasn't getting in no trouble I
17  will stop taking it.  Then I will start taking it
18  again when I felt -- whenever I start getting in
19  trouble but it was too late.
20      Q.  So one of the things that indicated to
21  you you need to start taking medication is when
22  you got in trouble; is that right?
23      A.  Well, I started using drugs, but the
24  medication was helping me stay off the drugs.

52

13 (Pages 49 to 52)

Ex 43 Holmes Dep 013

1    Q.   All right.
2    A.   No, it wasn't that.  It was helping me
3  stay off the drugs.
4    Q.   Has any physician determined the cause of
5  what you describe in paragraph two, bipolar
6  disorder?
7    A.   Uh-huh.  Yeah, I remember his name.
8  Dr. Seth Einstein.  He's in Stone Clinic.
9    Q.   When did he make the diagnosis?
10   A.   In '06 or maybe May.  I ended up coming
11  in there.  I was -- I was -- I was in the mental
12  institution.  I was locked up in there.
13   Q.   And that was sometime in '06?
14   A.   Right.  That was in May of '06.  May,
15  April, somewhere around there.
16   Q.   Where were you locked up?
17   A.   Stone Clinic.
18   Q.   Okay.  Were you there voluntarily?
19   A.   I'm not sure.  I can't remember.  That's
20  what I can't remember was I -- whether they put me
21  in there or in there -- I know I couldn't come
22  out.  I mean I couldn't let myself out.
23   Q.   You could or could not?
24   A.   I couldn't.

53

1    Q.   Could not.  Okay.  Did I get that right,
2  you were told you had to stay in?
3    A.   I had to stay.  Yeah, I had to stay in
4  there.
5    Q.   Was there a court order that said you had
6  to stay in?
7    A.   No, wasn't no court order.  But they
8  wouldn't let me out.  I couldn't sign myself out.
9    Q.   You were ultimately out of that
10  institution; right?  Do you remember when it was
11  you left that institution, Stone Clinic?
12   A.   No, it was a few days, a week.  Over a
13  week I guess.
14   Q.   When you got out of Stone Clinic, did you
15  hire a lawyer?
16   A.   Uh-uh.
17   Q.   Okay.
18   A.   No.
19   Q.   Did you feel like you were being held in
20  the Stone Clinic involuntarily?
21   A.   No.
22   Q.   You were there voluntarily?
23   A.   Yes.
24   MR. MORRISSEY:  Want to take a break?  Why

54

1  don't we take a break for two minutes.
2    (A break was taken.)
3  BY MR. CATANIA:
4    Q.   Take a look at paragraph six of your
5  affidavit.  Actually, had it open to the right
6  page.  Did I say six?  I mean nine.  Take a look
7  at nine.
8    In paragraph nine you say, If I do not
9  take my pain medication every day I have severe
10  back pain and I have difficulty walking.
11   At the time when you entered into 2006
12  into the jail both in August and October to
13  November, you did not have a prescription for the
14  pain medication that's listed here; is that right?
15   A.   Right.
16   Q.   And that would be -- you didn't have a
17  prescription for Oxycodone or Gabapentin; right?
18   A.   Yes.
19   Q.   And the next sentence says, "if I do not
20  take my magnesium medication every day my stomach
21  bloats."
22   When you entered into the jail in August
23  of '06 and in October of '06, you weren't taking
24  your magnesium at that time; right?

55

1    A.   True.
2    Q.   So in those two instances those
3  medications are not relevant to your affidavit
4  about '06 -- incarcerations in '06; right?
5    A.   No.
6    Q.   It says also "if I do not take my
7  cholesterol medication every day my cholesterol
8  level is higher."
9    Were you taking cholesterol medication in
10  2006?
11   A.   I believe I was.  I mean, you know, I'm
12  looking at this.  I'm looking at this and I said
13  2007.
14   Q.   Right.
15   A.   You know, I might have been on medication
16  but, see, I'm not really -- only reason why -- I
17  might have not been on medication, but I might
18  have been on medication.  But I mean, I'm not sure
19  in my head from back then, so I say, no, I wasn't
20  taking it.  I'm not sure.
21   Q.   Okay.
22   A.   I'm really not sure.
23   Q.   So I understand what you're saying is
24  before when you signed this in my presence, this

56

1   declaration in my presence with today's date on it
2   and you said that it was true that in 2007 you
3   were not taking Oxycodone, Gabapentin --
4       A.  Oh, I was taking it in 2007.
5       Q.  But you were not taking it in 2006?
6       A.  2006, right.
7       Q.  When you said that, though, you're saying
8   now after talking to your lawyer in the hallway
9   that that's not true?
10      MR. MORRISSEY:  Objection.
11      THE WITNESS:  That's not what I said.  That's
12  not what I said.  I'm saying that -- I'm still
13  saying that if the records come up, if the records
14  come up once I give them the name of the hospitals
15  and stuff that I was in, the records come up that
16  I was taking this medication then, then this is
17  what's happening.  What I'm saying is I don't
18  really remember.  I mean, I know I had back
19  problems in 2006 because of the job.  And so I
20  know that I was taking back medication back then
21  in 2006, but I don't remember which ones.
22  BY MR. CATANIA:
23      Q.  Okay.
24      A.  I don't know what they diagnosed it as or

                                                        57

1   what it was taking.
2       Q.  Fair enough.  You would rely on the
3   documents to help you to know --
4       A.  Right, because I don't remember.
5       Q.  I understand that.
6       In the next sentence in paragraph nine it
7   says, "If I do not take my psychotropic medication
8   every day I become depressed, paranoid, and
9   disoriented and have anxiety attacks."  Do you see
10  that?
11      A.  That's true.  That's very true.
12      Q.  What is psychotropic medication?
13      A.  That's the medication they -- that's like
14  the Depakote and the Risperdal.
15      Q.  Okay.  Who told you those are
16  psychotropic medications?
17      A.  The doctor.
18      Q.  What doctor?
19      A.  Dr. Waters and Dr. Einstein.  I read it
20  in books or seen it in computers.  I mean I seen
21  it on TV.
22      Q.  Your affidavit, in essence, that you
23  didn't get those two psychotropic medications in
24  2006.

                                                        58

1       A.  Sure didn't.
2       Q.  Okay.  Is there any doctor that would say
3   or determine that the cause of depression was not
4   having those medications?
5       MR. MORRISSEY:  I'm going to object.  He's
6   not a medical doctor.  He can testify in regards
7   to how he felt.
8   BY MR. CATANIA:
9       Q.  Sir, can you tell me despite the
10  objection if any physician, doctor determined the
11  cause of depression that you suffered when leaving
12  the jail in November of '06?
13      MR. MORRISSEY:  Do you understand the
14  question?
15      THE WITNESS:  No.
16  BY MR. CATANIA:
17      Q.  Okay.  Did you see a doctor who said, oh,
18  the reason why you're feeling depressed is because
19  for the last 23 days from October to November you
20  didn't have your Depakote?
21      A.  No, but I did see a doctor that said that
22  I was having these problems because I was stayed
23  off my medicine because I wasn't taking my
24  medicine.

                                                        59

1       Q.  When did you see that doctor?
2       A.  Right after I got out of jail.
3       Q.  And who was the doctor?  Who was that
4   doctor?
5       A.  I had to see Dr. Waters.
6       Q.  Dr. Waters said that you were having this
7   trouble because you were not taking medication?
8       A.  Right.  I was going through these changes
9   and dealing with the drugs and the whole thing
10  because I stopped taking my medicine.  I remember
11  that.
12      Q.  Okay.  When you say that he said that you
13  were --
14      A.  It's a she.
15      Q.  I'm sorry.  What's her first name?
16      A.  I don't know her first name.
17      Q.  When Dr. Waters said that the reason you
18  were having problems with taking illicit or
19  illegal drugs was because you were off your
20  medication, is that what you're saying?
21      A.  (Nonverbal response.)
22      Q.  Is that yes or no?
23      A.  Yes.
24      Q.  Did any physician doctor ever determine

                                                        60

1 the cause of paranoia to be not having your
2 medication for 23 days?
3    A. Well, like I said, that Dr. Einstein he's
4 the one who's -- he's the one who called it
5 bipolar when I came in there. And they the
6 ones -- oh, matter of fact, I took Carpo too.
7 Carpo. That's the one I forgot to tell you
8 about. That was the drug that kept me from
9 dealing with the drugs and the alcohol and stuff.
10 It's a drug called Carpo. Put that in there
11 because I remember that Carpo. He brought it back
12 to memory. It's called Carpo. And I was trying
13 to tell them I take that. They didn't give me
14 that medicine either. They didn't give me that
15 medicine. That's the medicine that would have
16 kept me stable from not taking drugs. I mean, if
17 you take it every day you don't take no drugs, you
18 won't drink no alcohol.
19    Q. That's what they told you?
20    A. That's what they told me.
21    Q. And despite that information that you got
22 from doctors, there were times when you stopped
23 taking drugs when you felt better; is that right?
24    A. Yeah, because I was taking my medicine.

61

1    Q. And there were times when you stopped
2 taking your medicine and then you started having
3 those symptoms again; right?
4    MR. MORRISSEY: Can we have a time context.
5    MR. CATANIA: I guess not. I'm talking to
6 the witness about this.
7    MR. MORRISSEY: Well, my objection is
8 foundation in regards to when you're asking the
9 question.
10 BY MR. CATANIA:
11    Q. Confining yourself to the period of time
12 you were just describing in your previous answer,
13 just that period of time, were there times when
14 you stopped taking your medication?
15    A. I really don't understand.
16    Q. Okay. Well, I'm not sure I understand
17 either. That's why I'm asking the questions. All
18 right.
19        Did any physician, that means doctor,
20 ever determine that the cause of paranoia that you
21 say you suffered after leaving the jail in
22 November of 2006 was caused by not having
23 psychotropic medication in the jail?
24    A. That's what they gave me. They -- well,

62

1 they knew if I didn't take my medicine -- if I
2 wasn't getting my medicine I would be crazy in the
3 head.
4    Q. I'm asking --
5    A. They knew that. They knew that. So when
6 I -- when they prescribed my medicine again, they
7 told me to get back on my medication because they
8 knew that I hadn't been on my medication and
9 they I was going through some more changes
10 like I was going through.
11    Q. All right.
12    A. Now, what you saying -- you're asking me
13 did any one of them tell me that directly?
14    Q. Yes. That's what I'm asking.
15    A. They didn't tell me that directly when
16 they told me get back on my medication. It would
17 have been hard for them to tell me that directly.
18    Q. Okay. Who is the "they" that you're
19 referring to right now?
20    A. The doctors, the psychiatrists. I had --
21 I don't know all of their names. That's a long
22 time ago.
23    Q. 2006?
24    A. That's a long time ago.

63

1    Q. Did any physician, and that means doctor,
2 ever determine the cause of your feeling
3 disoriented was related to not having medication
4 for 23 days?
5    A. They just -- again, they -- they said
6 that I had bipolar.
7    Q. You're talking about the doctor from the
8 Stone whatever it was called?
9    A. They said I had bipolar, Stone Clinic.
10    Q. Stone Clinic. Okay.
11    A. Stone Clinic, they said I had bipolar and
12 that's part of not taking your medication. I mean
13 when they -- you know, the bipolar, once they
14 prescribed the medicine to you for bipolar, even
15 as of today.
16    Q. Going back to the time when you just got
17 out of the jail in November of 2006, can you tell
18 me when you went to the doctor the first time
19 after you got out of jail in November 2006?
20    A. Probably a week after that, same -- week
21 after that, same day. I'm not really sure. It's
22 in the records. It's in the records.
23    Q. Again, you would rely on the records to
24 tell me?

64

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

1    A.   I would rely on the records because I'm
2  not remembering. I mean I'm -- you know, a lot of
3  stuff get blocked out.
4    Q.   Right. That doctor then is Dr. Waters;
5  is that right?
6    A.   Yes.
7    Q.   Did you see any psychiatrist other than
8  Dr. Waters?
9    A.   No.
10   Q.   When Dr. Waters saw you probably a week
11 after you got out of jail in November of 2006, did
12 that doctor run any tests?
13       MR. MORRISSEY: I'm going to object. He said
14 that he wasn't sure exactly when he saw
15 Dr. Waters, sometime after he got out of jail.
16       You can answer.
17       THE WITNESS: What did you just say?
18 BY MR. CATANIA:
19   Q.   Did you understand my question?
20   A.   No.
21   Q.   Did you understand his objection?
22   A.   Yes.
23   Q.   Okay.
24   A.   Because it seemed like -- it seemed like

65

1  I'm answering the same question. I don't
2  remember.
3    Q.   Okay.
4    A.   I mean, some things are blocked out, some
5  things I just don't remember. Everything else
6  that you're asking me, I'm answering.
7    Q.   Okay. I just want to know if when you
8  saw Dr. Waters after you got out of jail in
9  November of 2006, in your words probably a week
10 after, did Dr. Waters run any tests?
11       MR. MORRISSEY: I object. He didn't say it
12 was one week after.
13       You can answer the question.
14       THE WITNESS: They took blood tests.
15 BY MR. CATANIA:
16   Q.   Any other tests?
17   A.   No, just the blood tests.
18   Q.   Do you know what the blood test was for?
19   A.   See how much medicine I had in my system.
20   Q.   Did Dr. Waters tell you that was the
21 purpose of the blood test?
22   A.   Uh-huh.
23   Q.   And is that answer yes?
24   A.   Yes.

66

1    Q.   When you say in your affidavit paragraph
2  nine that if you don't take your medication you
3  become depressed, are you saying that you have a
4  feeling of sadness at the time when you don't take
5  medication?
6    A.   Yeah, sadness, want to hurt somebody,
7  want to hurt myself.
8    Q.   Did you have those feelings --
9        MR. MORRISSEY: I don't know if he's finished
10 with his statement.
11       THE WITNESS: Want to hurt myself, you know,
12 can't think, everything is rushed, you know, just
13 hurting, down, you be down, you feel bad, real
14 bad, you know, you feel weak, bad.
15 BY MR. CATANIA:
16   Q.   Have you ever attempted suicide?
17   A.   Yes.
18   Q.   When?
19   A.   In the jail.
20   Q.   Which jail?
21   A.   Cook County jail during the time --
22 during the time this year. This year. This year
23 here when they want to send me to the psych unit.
24 They wanted to send me to maximum security. They

67

1  wanted to send me to maximum security in division
2  ten, and I didn't want to go over there because,
3  you know, I feel like that I should have been in
4  minimum security. I took a sheet and wrapped it
5  around my head, but before I could jump off the
6  thing they came and snatched me. Then they said,
7  well, no, we're not going to put you over there.
8  We're going to leave you up here in the dorm.
9    Q.   So your mechanism of doing that was a
10 sheet; is that right?
11   A.   Right, a sheet.
12   Q.   Was that the only time you've ever
13 attempted suicide?
14   A.   No, a couple of other times I took a lot
15 of pills.
16   Q.   The medication we've been talking about?
17   A.   No, way before then, in Tinley Park. I
18 took a lot of pills, ended up in Tinley Park.
19   Q.   When was that?
20   A.   I'm not sure. I don't know. I can't
21 remember but I got -- it was in Tinley Park.
22   Q.   Were you in custody at the time?
23   A.   No. Yeah, I was in Matteson, Matteson,
24 another state hospital, Matteson. I guess

68

1 Matteson.
2   Q. You were in a state hospital?
3   A. Yeah, Matteson.
4   Q. Were you there against your will?
5   A. No, I was in there for one day.
6 Matteson.
7   Q. All right. Was that after you had taken
8 a lot of pills?
9   A. No, that was another time.
10   Q. Do you remember when in terms of years it
11 was ago that that happened?
12   A. No.
13   Q. In paragraph ten of your deposition or
14 your sworn declaration in front of you it says
15 that you were "arrested once for criminal trespass
16 and once for possession."
17     Are you talking about the two dates that
18 are listed earlier?
19   A. Yes.
20   Q. Okay. So on August 27 of '06, were you
21 arrested for criminal trespass?
22   A. That was for drugs I think and criminal
23 trespassing.
24   Q. Okay. Was it for both?

69

1   A. I think. I'm not sure.
2   Q. When you were taking your medication
3 before August 27 of 2006, where did you store your
4 medication?
5   A. In my backpack. I had a backpack. I was
6 homeless back then, so I had a backpack.
7   Q. When you were arrested, did you have a
8 backpack?
9   A. No, I hid it.
10   Q. You hid it; is that right?
11   A. Yes, I hid it with the other guys that
12 was homeless, and they would keep it for me. They
13 would always keep your backpacks. They wouldn't
14 mess with your stuff.
15   Q. When you say in paragraph ten "I never
16 had my prescription medication with me when I was
17 arrested," do you mean in all of the 57 adult
18 arrests?
19   MR. MORRISSEY: I'm going to object. I don't
20 think that's what that refers to in the document.
21   THE WITNESS: Not talking about at all. 57
22 arrests? Sometime I probably had it with me.
23 BY MR. CATANIA:
24   Q. Okay. Well, this paragraph --

70

1   A. My sisters and them brought it to me
2 once. I remember -- wait a minute. My sisters
3 and them brought my medicine to me once, couple
4 times.
5   Q. This paragraph says you never had your
6 prescription medication with you when you were
7 arrested.
8   A. This when I never had my medication with
9 me. Like I never had my medication with me that
10 time. That's what that mean.
11   Q. When you were arrested, that time being
12 August 27 of 2006, did you give the officers a
13 home address?
14   A. I'm not sure. I don't know. I probably
15 had my license in my pocket.
16   Q. When you were arrested on August -- was
17 actually August 25 of 2006; right? Is that right?
18   A. Uh-huh.
19   Q. Two days before you entered the jail; is
20 that correct?
21   A. Uh-huh.
22   Q. You have to answer yes or no.
23   A. Yes. Yes.
24   Q. Thank you.

71

1     The officer that arrested you, do you
2 remember his name?
3   A. No.
4   Q. Does the name Thomas Simon sound
5 familiar?
6   A. No, I don't know him.
7   Q. When you were arrested on August 25 of
8 2006, did you tell Officer Simon that you're a
9 Gangster Disciple?
10   A. No.
11   Q. When you reached the lockup on August 25,
12 2006, was that the 18th Police District?
13   A. Yes.
14   Q. When you reached the lockup you met with
15 the lockup officer named Michael Quattrocchi;
16 right? Q-u-a-t-t-r-o-c-c-h-i.
17   A. I don't remember. I don't remember.
18   Q. When you met with Michael Quattrocchi, he
19 asked you a series of questions that were on a
20 form in front of him; right?
21   A. Not that I remember.
22   Q. Do you ever remember being processed for
23 the arrest? Do you remember that?
24   A. No.

72

18 (Pages 69 to 72)

1    Q.   Are you saying you don't remember being
2  processed?
3    A.   I don't remember even being processed
4  then.
5    Q.   You don't remember being photographed?
6    A.   No.
7    Q.   Or having your fingerprints taken?
8    A.   I probably was medicated, heavily
9  medicated.
10   Q.   Do you mean medicated because you had
11 been taking heroin that day?
12   A.   Heroin, probably heroin, drinking, my
13 medicine and everything.
14   Q.   Have you ever been in the methadone
15 maintenance programs?
16   A.   No.
17   Q.   When you were processed on August 25 of
18 '06, and that means -- by that I mean you were
19 taken into custody, brought to the 18th Police
20 District and placed in a lockup area, are you
21 saying you don't remember --
22   A.   I don't remember.
23   Q.   Okay.  All right.  Two days after you
24 were arrested you ended up in a bond court; is

73

1  that right?
2    A.   Right.
3    Q.   And from the bond court after talking to
4  a judge you went to the jail; is that right?
5    A.   Right.
6    Q.   When you were in the bond court, did you
7  tell the judge that you didn't have your
8  medication?
9    A.   No, because we were in behind the
10 screening and you can't say nothing.
11   Q.   You didn't tell the judge that you were
12 taking medication?
13   A.   You can't say nothing.  The judge is
14 looking at your record, looking at the TV.
15   Q.   Did you tell the public defender's
16 investigator that you had not had your medication?
17   A.   They didn't ask me that.
18   MR. MORRISSEY:  Objection.
19 BY MR. CATANIA:
20   Q.   They didn't ask you that; is that right?
21   A.   Uh-uh, no.
22   Q.   When you went into the jail to be
23 processed you had to go through a series of
24 different stations; is that right?

74

1    A.   Yes.
2    Q.   Okay.  One of the stations was where they
3  determine your identify; is that right?
4    A.   Right.
5    Q.   They ask you questions about who you are?
6    A.   Yes.
7    Q.   They find out if you've ever been in the
8  jail before?
9    A.   Yes.
10   Q.   And you have been in the jail before,
11 then?
12   A.   Yes.
13   Q.   And I'm talking now about August 27 of
14 '06.
15   A.   Right.
16   Q.   In the processing did they take your
17 fingerprint?
18   A.   Yes.
19   Q.   Did they take your photograph?
20   A.   Yes.
21   Q.   Would you agree with me that the
22 photograph that they took of you at that time
23 would show whether or not you had any injuries on
24 your face?

75

1    A.   Yes.
2    Q.   Would you agree with me that the
3  photograph at the time would show whether or not
4  you had any expressions of discomfort on your
5  face?
6    A.   Yeah, I guess.  Yes.
7    Q.   Do you remember speaking with a
8  correctional medical technician at the time you
9  entered on October 27, 2006?
10   A.   Yes.
11   Q.   And you know what a correctional medical
12 technician is; right?
13   A.   Yes.
14   Q.   You've been through that many times
15 before, hadn't you?
16   A.   Yes.
17   Q.   And in fact, you know some of their
18 names, don't you?
19   A.   No.
20   Q.   Does the name James Myvet sound familiar?
21   A.   No.
22   MR. MORRISSEY:  Stop right now.  Do you have
23 any records from 2006 from Cermak Health Services
24 for Mr. Holmes?

76

19 (Pages 73 to 76)
Ex 43 Holmes Dep 019

1    MR. CATANIA:  I don't have any records in my
2  possession because as we stated in each one of
3  these depositions, they were subpoenaed with
4  notice to both sides.  You haven't received them.
5  I haven't received them.  What I handed you this
6  morning were the seven pages I believe or 11 pages
7  of records from later entries into the jail.
8    MR. MORRISSEY:  Your questioning seems to
9  indicate that Mr. Myvet was the one that spoke to
10  Mr. Holmes in August 2006.  I presume you might
11  have some record to reflect that.
12  BY MR. CATANIA:
13    Q.  In paragraph 11 of the affidavit in front
14  of you, you say that at intake into the jail both
15  times in 2006 you told the medical technician that
16  you had bipolar disorder, severe back pain, heart
17  and cholesterol problems.  "I told the medical
18  technician which prescription medication I was on
19  for these conditions."  Do you see that?
20    A.  That's true.  And you know what?  Since I
21  did put this in here, 11, you know what?  I did
22  have back pain and I was taking medication back
23  then, and I did have heart and cholesterol
24  problems back then, and I told them.  So you know

77

1  what?  In 2007 this is the medicine that they was
2  giving me, Oxycodone, Gabapentin, Sevastin,
3  aspirin and Esomeprazole.  Back then they was
4  giving me another kind of medication.  So you know
5  what?  I did tell them that.  So you know what?
6  I'm going to leave that in there as far as my back
7  pain and stuff and stuff because I know that's
8  what I was having back then.  And I know that's
9  what I told them, and I know that they didn't give
10  me my medication.
11    You know, we can go on with the
12  deposition, but I'm a still say the same thing.  I
13  don't know what's go on at this table.  I don't
14  know how long I'm going to be here.  But you know
15  what?  I don't know if this deposition can go on
16  another day, but like I say, all my records that I
17  have support this.  Period.  I mean, I don't have
18  to come in here and lie.  I don't have to do none
19  of that.  I mean, I don't know what -- what's
20  really go on here.  I'm telling you the truth
21  about what's going on here.  The records from the
22  county jail will reflect this.  So I mean,
23  whatever the county jail did, hey, that's on
24  them.  All of this is true, and all of my records

78

1  in there are support, all of my records at each
2  hospital that I did support it, and here I'm
3  getting a little bit upset because it's just the
4  same thing.  You asking me the same thing over and
5  over and over and over.  And you tell me I got to
6  be here for two and a half hours.
7    Q.  Okay.  Are you saying that the stack of
8  papers --
9    A.  I got some records over there and I got
10  some more records because the more and more that
11  you go over this here with me, the more and more
12  I'm remembering from the hospitals that I was in.
13  I'm remembering more and more about the
14  hospitals that I was in regarding this -- this --
15  this county jail thing.  I might have said before
16  I didn't remember it all because it was in the
17  back.  But I'm beginning to remember more and more
18  and more.  I remember St. Mary's hospital.  I
19  remember the hospital I just told you the Carpo,
20  that medicine that I was taking from the alcoholic
21  treatment they was giving me, medicine.  I'm
22  beginning to remember more and more and more.  All
23  of this is true.  It's true.  It's nothing that --
24  it's nothing -- it's no lies in here.  I mean, you

79

1  know, at first I said -- at first I said wait a
2  minute, at first I kind of corrected this.  I
3  did.  I corrected the 2007 because this is the
4  medicine that they gave me in 2007.  And this --
5  and this was because I called and I said wait a
6  minute, I was locked up in 2007, and I remember
7  asking for this medication and they didn't give
8  it to me.  That's why it got 2007 right here, you
9  know.  But I remember.  I'm sorry.  I'm sorry
10  about the disruption.  I'm sorry.
11    MR. MORRISSEY:  Do you want to take a break
12  for a second?
13    THE WITNESS:  Yeah.  I mean, no, I don't need
14  no take -- let's get it over.  I'm ready to get it
15  over with.
16    MR. MORRISSEY:  Okay.  All right.
17    THE WITNESS:  I'm ready to go.
18    MR. MORRISSEY:  Okay.  There's no question
19  pending right now.
20  BY MR. CATANIA:
21    Q.  When you entered into the jail on
22  October -- on August 27 of 2006, you told the
23  medical intake worker what your --
24    A.  I did.

80

1    Q.  -- drugs were?
2    A.  I did.
3    Q.  Both times in 2006 is when --
4    A.  I did.
5    MR. MORRISSEY:  Let him ask the questions.
6    BY MR. CATANIA:
7    Q.  And both times the medical technician
8    referred you to a physician assistant; is that
9    right?
10   A.  That's correct.
11   Q.  Both times the physician assistant, you
12   told him that you have bipolar disorder; right?
13   A.  Yes.
14   Q.  And that was based on what a doctor told
15   you years before; right?
16   A.  Right.
17   Q.  You told the physician assistant what
18   prescription medications you had for those
19   conditions; right?
20   A.  Yes.
21   Q.  You're saying that physician assistant
22   did not write prescriptions for your medications;
23   is that right?
24   A.  That's correct.

81

1    Q.  Both times?
2    A.  Both times.
3    Q.  After your entry into the jail both times
4    in 2006, were you housed in division two?
5    MR. MORRISSEY:  If you recall.
6    THE WITNESS:  I don't remember.
7    BY MR. CATANIA:
8    Q.  Was it a dormitory setting?
9    A.  I don't remember.
10   Q.  Have you ever received psychotherapy as a
11   result of your diagnosis?
12   A.  What's that, psychotherapy?
13   Q.  Where you've spoken with psychiatrists
14   and gone through batteries of tests with
15   psychologists to determine your condition.
16   A.  In disability.
17   Q.  For your disability?
18   A.  Right, that was it.  And -- and -- and
19   when I went to the medical -- I mean when I went
20   to Northwestern.
21   Q.  Are you currently taking Risperdal?
22   A.  I'm off and on.
23   Q.  Are you taking medication for mental
24   health problems right now?

82

1    A.  Off and on that I got at home already.  I
2    suppose to seen a medical -- I suppose to seen --
3    the doctors told me to go see a psychiatrist, but
4    I already had some medicine at home from before,
5    so started taking that again and I just haven't
6    seen the psychiatrist again yet.
7    Q.  When is the last time you had a dose of
8    the medication you have at home?
9    A.  Probably a few days ago.
10   Q.  How is that drug working for you?
11   A.  Good now.  I mean works better for me now
12   because I don't.....
13   Q.  Are you having any difficulty right now?
14   A.  No, because I took my medication.
15   Q.  Did you take it today or a few days ago?
16   A.  I took it today too.
17   Q.  Okay.  Do you feel tense right now?
18   A.  No, just feel rushed like, you know,
19   like -- like I'm being pounded on for some
20   reason.  That's how I feel, like I'm being pounded
21   on.
22   Q.  Where did you sleep last night?
23   A.  At home.
24   Q.  Was that the home at 4747?

83

1    A.  I slept there last night.  Night before
2    I -- yeah.  Yeah, I slept there.
3    Q.  Did you have any trouble sleeping last
4    night?
5    A.  No.
6    Q.  Are you having any trouble concentrating
7    right now?
8    A.  No.
9    Q.  Are you currently hearing any sounds or
10   voices?
11   A.  No.
12   Q.  Your medication that you're being
13   prescribed right now, who prescribed it?
14   A.  Dr. Lebec.
15   Q.  Where is Dr. Labet?
16   A.  At clinic on the south side, on 35th and
17   King Drive, 3423 King -- South King Drive.  It's a
18   public -- it's a public clinic.
19   Q.  When did you get that prescription most
20   recently?
21   A.  About a month ago.
22   Q.  And where did you have the prescription
23   filled?
24   A.  Provident Hospital.

84

21 (Pages 81 to 84)
Ex 43 Holmes Dep 021

1    Q.   What hospital?
2    A.   Provident.
3    Q.   Provident. Okay. And Provident of
4    course is a Cook County hospital?
5    A.   Cook County hospital.
6    Q.   Did you pay for your prescription?
7    A.   No.
8    Q.   Can you tell me how it is that you take
9    your medication?
10       MR. MORRISSEY: I'm going to object.
11   BY MR. CATANIA:
12   Q.   When you take it.
13       MR. MORRISSEY: I object to the form of the
14   question.
15       Can you understand it?
16       THE WITNESS: He want to know how many times
17   I take it?
18   BY MR. CATANIA:
19   Q.   Yeah. How do you take it?
20   A.   By mouth.
21   Q.   Okay. Do you take it twice a day, once a
22   day?
23   A.   It's different times. I take my heart
24   med -- I take my high blood pressure one time a

85

1    day. I take my cholesterol in the mornings. I
2    take my Gabapentin three times a day, take my
3    methocarbamol three times a day, the Risperdal and
4    the Depakote I take -- the Depakote I take once --
5    twice a day and Risperdal I take twice a day. And
6    when I see my psychiatrist she probably will
7    change the -- oh, yeah. I take -- I take a lot of
8    medicine, so I mean, so I take a lot of medicine.
9    Q.   Okay. That is a lot of medicines that
10   you take.
11   A.   Yes, I take a lot of med.
12   Q.   My question is, how do you take those
13   medications? Out of the bottle?
14   A.   Yeah, out of the bottle.
15   Q.   All right. Do you set up your medication
16   for a week?
17   A.   No, I got lined up.
18   Q.   Okay. They're all lined up in bottles?
19   A.   Yeah. And I just know which bottle to go
20   to, one, two, three, four, five, six, seven,
21   eight, nine, ten.
22   Q.   And those medications have different
23   times that you're supposed to take them; is that
24   right?

86

1    A.   Yeah.
2    Q.   Some more than once a day; right?
3    A.   I know which ones they are right now.
4    Q.   Do you keep a checklist about your
5    medications?
6    A.   Uh-uh, because I don't miss it.
7    Q.   And that means no; right?
8    A.   No.
9    Q.   Do you have a diary to help you keep?
10   A.   No.
11   Q.   Do you keep a calendar as to how to take
12   your medications?
13   A.   No.
14   Q.   Do you have a beeping alarm to help you
15   determine when to take your medications?
16   A.   No.
17   Q.   Have you ever experienced a situation
18   where you believe you've forgotten to take your
19   medication?
20   A.   Yes.
21   Q.   When you believe you've forgotten to take
22   a medication, what do you do?
23   A.   Go and take it because I feel it.
24   Q.   Go take medication.

87

1    A.   Right. Only one I really have problem
2    with is my high blood pressure medicine. That was
3    the one when I felt it. I knew I hadn't taken it
4    because of the way I felt.
5    Q.   For your bipolar issues, are there any
6    symptoms that indicate to you that you should be
7    taking medication?
8    A.   Yes.
9    Q.   What are those symptoms?
10   A.   My symptoms with bipolar I start getting
11   depressed. I start wanting to wander off. I
12   start wanting to get away from home. I start
13   collecting a lot of clutter, paper, a lot of paper
14   and then I know that I'm getting ready to go off.
15   I know that I'm getting ready to just lose it.
16   Q.   How many times in your life do you think
17   you've experienced the feeling that you need to
18   start taking your medication again?
19   A.   A lot. I'm not -- it -- I can't count
20   the time but a lot.
21   Q.   Which of course means that at times you
22   were not taking the medication; is that right?
23   A.   True. I thought I had it under control.
24   Q.   The person you're living with now, does

88

1   she help you in any way with remembering to take
2   your psychotropic medication?
3       A.   Well, I don't be there all the time. I
4   got medicines at both places. I don't be there
5   all the time. She don't ask. Well, I take it.
6       Q.   So you have no help from -- from her; is
7   that right?
8       A.   No.
9       Q.   Do your sisters or sister that you live
10  with help you?
11      A.   No.
12      Q.   Do you have a support network regarding
13  your -- your psychological illness?
14      A.   Yeah, I call -- I call different people.
15      Q.   Who do you call?
16      A.   AA and NA.
17      Q.   Okay.
18      A.   And I talk to them about my medicines and
19  about me, problems I'm having.
20      Q.   Were those AA and NA, that's alcoholics
21  anonymous and narcotics anonymous; right?
22  Those -- are those organizations ones that you
23  have voluntarily gone to in your life?
24      A.   Yes.

89

1       Q.   When was the last time you went?
2       A.   Probably about three days ago.
3       Q.   And who is your sponsor?
4       A.   Wayne. His name is Wayne.
5       Q.   Is he the sponsor for both organizations?
6       A.   He's my personal sponsor.
7       Q.   Do you know Wayne's last name?
8       A.   I can't give that. His name is Wayne. I
9   can't give his last name because I don't even know
10  it.
11      Q.   And where do you meet up with Wayne?
12      A.   At Mercy. Mercy we go to the other one
13  on 63rd and -- 62nd, 62nd and Lowe -- I mean not
14  Lowe, right off Woodlawn. Woodlawn, Woodlawn.
15  Dorchester. Dorchester. It's a church.
16      Q.   Okay. And those are the places where you
17  have the meetings; is that right?
18      A.   Right.
19      Q.   Do you ever meet up with Wayne at other
20  times.
21      A.   Coffee. Coffee.
22      Q.   Okay. Do you have Wayne's phone number?
23      A.   I can get it for you. I don't have it
24  with me.

90

1       Q.   Is that how you contact him?
2       A.   Uh-huh, by phone.
3       Q.   Is it a cell phone?
4       A.   Yeah, I guess it's cell phone. Rings
5   into his -- I only know the number he gave me.
6   But I know I can call that one number and I can
7   get his house too. I mean it goes back and forth.
8       Q.   Do you have that number with you?
9       A.   No.
10      Q.   Right now are you feel any stress?
11      A.   No, no, no, no.
12      Q.   Have you ever had an occasion when you've
13  run out of your prescription medication?
14      MR. MORRISSEY: I'm going to object. What
15  prescription medication you're referring to.
16  BY MR. CATANIA:
17      Q.   All of the ones that he's taking.
18      A.   Some of them.
19      Q.   When you run out of prescription
20  medication and you have to get a refill, have you
21  ever gone to the pharmacy?
22      A.   I had to go see the doctor.
23      Q.   You have to see a doctor?
24      A.   Right. And then she'll -- she'll write

91

1   me my -- but normally I mean I run out of -- I
2   mean I have one pill then I have to go see her.
3       Q.   Do you ever anticipate when you have a
4   few pills that it's time to go get refills?
5       A.   Yes.
6       Q.   Okay. But there are times when you end
7   up with one pill --
8       A.   One pill.
9       Q.   -- and then you go?
10      A.   Uh-huh.
11      Q.   So on those days when you end up with one
12  pill, are you able to get to the doctor the same
13  day?
14      A.   Yeah.
15      Q.   Where?
16      A.   On 35th Street.
17      Q.   Did you ever go to Stroger to get your
18  refill?
19      A.   Yeah, a long time ago when they send me
20  there.
21      Q.   When you were in jail or prison your
22  medication's brought to you; right?
23      A.   Right.
24      Q.   You ever get dose-by-dose medication from

92

1  a nurse while in prison?
2      A.  Dose by dose?
3      Q.  Yes.
4      MR. MORRISSEY:  I'm going to object.  Doesn't
5  appear he understands the question.
6      THE WITNESS:  I don't understand.
7  BY MR. CATANIA:
8      Q.  Okay.  Did you ever have a blister pack
9  brought to you?
10     A.  Right, I had a blister pack.
11     Q.  You understand that; right?
12     A.  Yeah, I know what a blister pack is.
13     Q.  A blister pack is multiple days of
14  medication; is that right?
15     A.  Uh-huh.
16     Q.  Is that yes?
17     A.  Yes.
18     Q.  Have you ever had medication issued to
19  you one dose at a time?
20     A.  Yeah.
21     Q.  And that's called dose by dose; right?
22     A.  Right, dose by dose.
23     Q.  Did you ever receive psychotropic
24  medications in a blister pack?

93

1      Q.  Did you have any unexpected symptoms when
2  you arrived at the jail on October -- on August
3  27, 2006?
4      A.  Not that I remember.
5      Q.  Have you ever heard the term
6  "asymptomatic" before?
7      A.  No.
8      Q.  Can you tell me what the paramedic or
9  correctional medical technician looked like that
10  you saw on August 27 of '06?
11     A.  No.
12     Q.  Can you tell me what the paramedic or
13  correctional medical technician looked like that
14  you saw on October 31, 2006?
15     A.  No.
16     Q.  Not even by gender --
17     A.  No, I can't remember.
18     Q.  -- race?
19         Did you tell the paramedic your current
20  symptoms?
21     A.  Yes.
22     Q.  Did you tell the paramedic about your
23  past illnesses?
24     A.  Yes.

95

1      A.  No.
2      Q.  Do you know why that is?
3      A.  Because you might OD.
4      Q.  Did you ever receive psychotropic
5  medications dose by dose?
6      A.  Yes.
7      Q.  When you were admitted to the jail
8  October 27 of 2006, were you conscious?
9      A.  Yes.
10     Q.  Would you consider yourself to be
11  semi-conscious?
12     A.  Conscious.
13     Q.  You had been in police custody for a
14  couple of days before then; right?
15     A.  Right.
16     Q.  Did you have your medication those two
17  days?
18     A.  No.
19     Q.  Were you injured in any way when you
20  arrived at the Cook County jail on August 27 of
21  2006?
22     A.  Not that I remember.
23     Q.  Were you mentally unstable at the time?
24     A.  Not that I remember.

94

1      Q.  Did you tell the paramedic about your
2  current illnesses?
3      A.  Yes.
4      Q.  Did the paramedic use a form conducting
5  your interview?
6      A.  Yes.
7      Q.  Did you answer the questions that were
8  asked of you?
9      A.  Yes.
10     Q.  Did the paramedic ask you about past
11  serious infectious diseases?
12     A.  Yes.
13     Q.  Did he ask you about allergies?
14     A.  Yes.
15     Q.  Did the paramedic ask you about any
16  recent symptoms such as coughing or weight loss?
17     A.  Yes.
18     Q.  Did he ask you about any recent
19  hospitalizations?
20     A.  Yes.
21     Q.  Did he ask you about both legal and
22  illegal drug use?
23     A.  Yes.
24     Q.  And you answered all those questions; is

96

24 (Pages 93 to 96)

1 that right?
2    A.  Sure did.
3    Q.  Did the paramedic ask you about suicide?
4    A.  Yes.
5    Q.  Did the paramedic ask you about mental
6 health?
7    A.  Yes.
8    Q.  Did the paramedic ask you about drug
9 abuse?
10    A.  Yes.
11    Q.  Alcohol abuse?
12    A.  Yes.
13    Q.  Paramedic ask you about alcohol or drug
14 abuse programs?
15    A.  Yes.
16    Q.  Did the --
17    A.  You mean drug abuse program, yeah.  Yes,
18 definitely.
19    Q.  Did the paramedic ask you about alcohol
20 withdrawal programs?
21    A.  No.
22    Q.  Symptoms?
23    A.  (Nonverbal response.)
24    Q.  Okay.  The paramedic was asking you those
                                                    97

1 questions while sitting directly across from you;
2 is that right?
3    A.  Yes.  This is the correctional paramedic;
4 right?
5    Q.  Yes.
6    A.  Yes.
7    Q.  Did the correctional paramedic ask you --
8 check your blood pressure?
9    A.  No.
10    Q.  Did he check your pulse?
11    A.  No.
12    Q.  Temperature?
13    A.  No.
14    Q.  Weight?
15    A.  No.
16    Q.  Did you get a chest x-ray?
17    A.  Yes.
18    Q.  Do you remember where your initial
19 housing assignment was?
20    A.  No.
21    Q.  Did you file any grievances?
22    A.  No.
23    Q.  Have you ever filed --
24    A.  I did file a grievance.  I filed a
                                                    98

1 grievance in 2006 about my medication.
2    Q.  When did you file that?
3    A.  In 2006 probably on the 10/31 admission.
4 Sure did.  Because I remember I put it -- I was
5 putting in request slip to get my medication.
6 They wouldn't give it to me.  So I got a group of
7 people together and I remember putting in the
8 grievance.
9    Q.  All right.  So you recall that you had a
10 group of people that got together about that?
11    A.  Right, because they weren't getting their
12 medication either.
13    Q.  And you had a group grievance filed?
14    A.  Right.
15    Q.  Was there any lawyer involved with
16 creating or instigating the group grievance?
17    A.  No.  No.
18    Q.  Was there any response to the group
19 grievance?
20    A.  No.
21    Q.  How many names were on the group
22 grievance?
23    A.  About -- let me see, about 20.
24    Q.  Do you keep contact with any of those 20
                                                    99

1 people?
2    A.  No.
3    Q.  Do you know their names?
4    A.  No.
5    Q.  Do you know that none of the other 20
6 people received a response?
7    A.  No, but they started calling us down to
8 the medical thing, you know, to medical thing.
9 They started -- well, I had left by then.
10    Q.  Okay.  So you had left before there
11 was --
12    A.  Yeah, really a response because some of
13 them was getting called down to the medical thing.
14    Q.  And you believe that to be in response to
15 the grievance?
16    A.  To the grievance, right, but I had
17 already left.
18    Q.  How did you know about that?
19    A.  I'm talking about when I was there, you
20 know, like some of the people that was on the
21 thing, they were called down.  I guess I was
22 getting called down but I was gone.
23    Q.  Where did you go to?
24    A.  Home.
                                                    100

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

1  Q. So were you discharged from the jail?
2  A. I was discharged.
3  Q. Was that as a result of your case being
4  terminated or did you post bond or what happened?
5  A. Terminated.
6  Q. How was it terminated?
7  A. No, probable cause.
8  Q. And that was the drug possession?
9  A. Right. No, probable cause.
10 Q. Recently October 24 of 2010 we already
11 talked about you being arrested at 4722 South
12 Indiana?
13 A. Oh, yeah.
14 Q. Officer Smith arrested you at that time?
15 A. Right.
16 Q. Okay. When you entered the lockup area
17 on that arrest, Officer John Nichols was
18 processing you into the lockup; right?
19 A. Right.
20 Q. And at that date and time he asked you a
21 series of questions on a computer screen; right?
22 Is that right?
23 A. Uh-huh.
24 Q. You have to answer yes or no.

101

1  Q. Okay. So when he recorded that you said
2  that you do not have any serious medical or mental
3  health problems, that was accurate at the time;
4  right? That's what you said?
5  A. I told him that. I told him I had mental
6  health problems.
7  Q. So when he recorded that you were not
8  receiving any treatment at that time, that was an
9  accurate response?
10 A. He knew I was receiving treatment. I
11 mean, I told him I was receiving treatment but he
12 asked me did I want -- how did I feel right then.
13 I told him I'm all right.
14 Q. Okay. So you told him you weren't
15 feeling any difficult --
16 A. I told him I wasn't going to kill myself.
17 Q. You did tell him that?
18 A. I told him I wasn't.
19 Q. Okay. Did he put you in a cell by
20 yourself?
21 A. Yeah, I was in a cell by myself.
22 Q. Did he take away all of the things that
23 might be inside of the cell before he put you in?
24 A. No, he took away my belt. I didn't have

103

1  A. Oh, yes. I'm sorry.
2  Q. And as he answered those questions -- as
3  you answered those questions he was marking that
4  screen; is that right?
5  A. Right.
6  Q. When Officer Nichols recorded that you
7  said that you do not take medication that was an
8  accurate response; right?
9  A. I said, no, I told him that -- I told him
10 that for a reason.
11 Q. Okay.
12 A. I told him that because if I did that,
13 then if I go to court, if I didn't -- if I go to
14 court -- if I'm taking medication they're going to
15 send me to the doctor. Once they send you to the
16 doctor, you might not get back to go to court, and
17 then you end up -- they'll tell you you're not
18 going to get called up on that bus, you won't be
19 able to go on that bus to go to court. You know,
20 you gonna have to wait to see what they're gonna
21 do. And that's why -- that's why I did that.
22 Q. So told Nichols that you don't take
23 medication so that you would not miss court?
24 A. Miss court.

102

1  no belt, I didn't have no shoe strings. Matter of
2  fact, I had this shirt on and the thing is out, my
3  strings.
4  Q. All right. So but you understand from
5  past experience that they always take your shoe
6  strings and your belt; right?
7  A. Yeah, they started.
8  Q. But it's been many, many years that they
9  were doing that; right?
10 A. Right.
11 Q. Do you know what that's for?
12 A. To keep you from hanging yourself.
13 Q. On May 27 of 2010 just a few months
14 before this one, you were arrested before by Jason
15 Carzanski; right?
16 A. I don't remember that name.
17 Q. For criminal trespass to vehicle?
18 A. That's -- oh, yeah, I remember that now.
19 It was a vehicle that said I had --
20 Q. You stole it.
21 A. No, that was my wife's vehicle. Before I
22 took my wife -- before I met her, you know, I mean
23 I met her, I took it, you know, I call her my
24 wife, but I had her car.

104

1    Q.   At 851 North Hudson is where you were
2   arrested; right?
3    A.   Right.
4    Q.   Again, that's on the north side of
5   Chicago?
6    A.   North side.  Because that's where I was
7   homeless at for all those years.
8    Q.   And that's pretty close to the Cabrini
9   Green area, isn't it?
10   A.   Right.  Ain't no Cabrini Greens no more.
11   Q.   Yeah, I understand that.  But it's the
12  area?
13   A.   It's the area.
14   Q.   And you see a lot of the same people
15  still hanging in the area?
16   A.   No, they're not there no more.
17   Q.   When you --
18   A.   Not there.
19   Q.   The car that you were in was one that you
20  had borrowed; right?
21   A.   Right, I had borrowed.
22   Q.   And then you forgot to return it?
23   A.   Yeah, I didn't want to return it.
24   Q.   And that's why you were charged with the

105

1   misdemeanor of trespass rather than --
2    A.   Right.
3    Q.   -- possession of a stolen motor vehicle?
4    A.   Right.
5    Q.   When you hit the lockup, Officer Warren
6   Marshall was there; is that right?
7    A.   Right.
8    MR. MORRISSEY:  If you know.
9    THE WITNESS:  What's his name?  I don't know
10  his name.
11  BY MR. CATANIA:
12   Q.   Did he ask you a bunch of questions on
13  that electronic form, the computer screen form?
14   MR. MORRISSEY:  If you recall.
15   THE WITNESS:  If they had used electronic
16  screen, I mean, I didn't see it.
17  BY MR. CATANIA:
18   Q.   Okay.  Well, he asked you questions about
19  your condition; right?
20   A.   Right.
21   Q.   And you answered the questions?
22   A.   Right.
23   Q.   So if he recorded that you said you do
24  have serious mental health problems that was

106

1   accurate; right?
2    A.   Yeah.
3    Q.   And if he said that you do take heroin
4   and medication for mental illness, that was
5   accurate; right?
6    A.   Yeah.
7    Q.   So when he recorded those things on the
8   form at the time that you gave the answers, he was
9   recording accurately what you said; right?
10   A.   I guess.  I didn't see what he was
11  recording.
12   Q.   Just about a year, year and a half before
13  that on January 28 of 2009 you were arrested by
14  Inez Benson; right?
15   A.   I guess, retail theft.
16   Q.   Right.  That was at the courthouse, 2727
17  East 111th Street; right?
18   A.   Right.
19   Q.   Inez Benson reported that you -- wrote in
20  her report that you were arrested there at that
21  time; right?
22   A.   I walk -- I came in.
23   Q.   And that was accurate when she reported
24  that in her report; right?

107

1    A.   Uh-huh.
2    Q.   Is that yes?
3    A.   Yes.
4    Q.   You went into the lockup area and saw
5   William Carter another officer at that time;
6   right?
7    A.   Yes.
8    Q.   And you were asked a series of questions
9   again from a form; right?
10   A.   I guess.  I don't remember form.
11   Q.   Well, do you remember seeing a computer
12  screen that he was at when he was asking the
13  questions?
14   A.   No.  I still don't remember that.  I
15  don't remember that.
16   Q.   Do you remember being fingerprinted then?
17   A.   I remember being fingerprinted and then I
18  remember taking a picture but that was it.
19   Q.   But the fingerprints were not ink prints;
20  right?
21   A.   No, it was a little machine right there.
22   Q.   On a glass?
23   A.   Right, uh-huh.
24   Q.   And that was read by a computer; right?

108

27 (Pages 105 to 108)

1    A. Right.
2        I wasn't asked no questions. I wasn't
3    asked no questions on a computer about my mental
4    health and stuff.
5        Q. All right. When you entered the area
6    they asked you some processing questions, though,
7    right, in order to process you on the felony
8    arrests?
9        A. Like my name and stuff?
10       Q. Yeah.
11       A. Yeah.
12       Q. Okay. What was the reason they told you
13   for your arrest?
14       A. Retail theft -- armed robbery.
15       Q. It was armed robbery; right?
16       A. Right, armed robbery. They said armed
17   robbery.
18       Q. And ultimately you were charged with
19   retail theft?
20       A. Because that's what it was. They knew
21   they couldn't hold me with no retail theft, they'd
22   let me go. So they used armed robbery from a
23   Walgreens.
24       Q. So when Officer Carter recorded that you

109

1    said you do not take medication, that was accurate
2    at the time? You said that?
3        A. No, not then because my sister and them
4    was supposed to be trying to bring me some
5    medication.
6        Q. So when Officer Carter recorded that you
7    said you do not have serious medical or mental
8    health problems, that was accurate when that was
9    recorded?
10       A. No.
11       Q. So Officer William Carter is someone that
12   you know; is that right?
13       A. No, I don't know any of them. I know I
14   was supposed to get my medicine there. My sister
15   was going to bring it to me.
16       Q. So Officer William Carter who didn't know
17   you had a reason to put down false information --
18       A. He might have.
19       MR. MORRISSEY: I object to the argumentative
20   nature. He said he doesn't know who Carter is.
21   BY MR. CATANIA:
22       Q. Is that right?
23       A. I don't know him.
24       Q. So you don't know Officer Carter?

110

1        A. No. And I don't know what they put down.
2        MR. MORRISSEY: There's no question pending.
3        THE WITNESS: Oh, okay.
4    BY MR. CATANIA:
5        Q. Can you tell me if you have ever had any
6    serious losses in your life or emotional traumas
7    in your life?
8        A. Yes.
9        Q. What were the worst emotional traumas in
10   your life?
11       A. I lost this girl I used to love real bad
12   because she passed.
13       Q. When was that?
14       A. I was locked up. Had to be 2005, 2003.
15   2005 I guess.
16       Q. You were locked up at the time?
17       A. Right.
18       Q. Have you ever experienced or witnessed
19   any of the following specific things, military
20   combat?
21       A. No.
22       Q. Rape?
23       A. No.
24       Q. Being captive or tortured?

111

1        A. No.
2        Q. Being shot or stabbed?
3        A. Stabbed, yeah.
4        Q. When did that happen?
5        A. I was a kid. Maybe I was -- I was a
6    kid. I don't even remember.
7        Q. Okay. Have you ever been mugged?
8        A. No.
9        Q. Badly beaten up?
10       A. No.
11       Q. Life threatened in any way?
12       A. No.
13       Q. Suffer a serious car crash?
14       A. No.
15       Q. Ever been in a CTA or train crash?
16       A. No.
17       Q. Ever experience a fire?
18       A. No.
19       Q. A flood?
20       A. No.
21       Q. Earthquake?
22       A. No.
23       Q. Other natural disaster?
24       A. No.

112

1  Q.  Have you ever been diagnosed with a
2  life-threatening illness?
3  A.  No.
4  Q.  Has any child of yours ever been
5  diagnosed with a life-threatening illness?
6  A.  No.
7  Q.  Has any close family member ever been
8  diagnosed with a life-threatening illness?
9  A.  No.
10 Q.  Have you ever witnessed someone being
11 killed or seriously injured?
12 A.  No.
13 Q.  Have you ever unexpectedly discovered a
14 dead body?
15 A.  No.
16 Q.  Have you ever experienced the death of a
17 close family member?
18 A.  No.
19 Q.  Have you ever had a significant business
20 loss?
21 A.  No.
22 Q.  Ever have a mortgage foreclosure?
23 A.  No.
24 Q.  Did you ever have a mortgage?

113

1  A.  I didn't know.
2  Q.  Okay.  Were you specifically told about
3  any expectations for this lawsuit?
4  A.  No.
5  Q.  What are your anticipations for the
6  lawsuit?
7  A.  Now?  Probably a lawsuit.  I know it's a
8  lawsuit.
9  Q.  What do you anticipate?
10 A.  I don't know nothing really, nothing.
11 Just --
12 Q.  Were you ever --
13 A.  -- helping somebody else, to keep people
14 from doing the same thing that was done to me.
15 That's all.
16 Q.  Okay.  So you're interested in seeing
17 that things are changed; right?
18 A.  Right, right.
19 Q.  But you were -- you were recently in
20 custody; right?
21 A.  Right.
22 Q.  Are things changed?
23 A.  A little bit.  As long as they keep -- as
24 long as they keep out the max I mean because a lot

115

1  A.  No.
2  Q.  Ever have any bankruptcy?
3  A.  No.
4  Q.  Have you ever learned that a close friend
5  or relative was raped?
6  A.  No.
7  Q.  Seriously physically attacked?
8  A.  No.
9  Q.  Injured in a motor vehicle crash?
10 A.  No.
11 Q.  Involved in any other serious injury or
12 in an accident?
13 A.  No.
14 Q.  How were you contacted regarding this
15 lawsuit?
16 A.  By them.
17 Q.  Did you contact the lawyers or did they
18 contact you?
19 A.  The lawyer, I got a letter through the
20 mail.
21 Q.  So they contacted you by mail?
22 A.  Yes.
23 Q.  When did you first learn that you could
24 get money in this lawsuit?

114

1  of people don't want to go to max.  I mean max you
2  locked up.  You know, they have people in a dorm
3  area, and when you first go in, if you tell them
4  you on -- if you tell them you take, you know,
5  psychotropic medication, then they going to
6  determine from your past record.  They say, okay,
7  you take this medicine here, then we're going to
8  send you over here to division ten.  And people
9  know the conditions over in division ten, so they
10 be like, no, that's all right, I don't want it.
11 They don't want it.  Then they turn around and put
12 you over into the dorm area.
13 Q.  Did that happen to you?
14 A.  Yeah, happened to me.
15 Q.  So you knew that if you came in and said
16 you wanted psychotropic medication that you would
17 be sent to division ten?
18 A.  I didn't know it at first until they told
19 me that.  But then when they sent me to
20 division -- to dorm two to the regular medicine --
21 I mean the regular dorm, then they was -- the next
22 day they said pack your stuff, you're going over
23 to division ten all the anxiety and stuff just
24 came about, so I tried to commit suicide because I

116

29 (Pages 113 to 116)

Ex 43 Holmes Dep 029

1  didn't want to go there.
2      Q.  Okay.  Division two is a dorm; right?
3      A.  Right.
4      Q.  Division ten is individual cells; right?
5      A.  Right.
6      Q.  So you knew that the conditions were
7  different from being in a dorm from being in a
8  cell?
9      A.  Right, yeah, uh-huh.
10     Q.  Much more preferable for you to be in a
11 dorm?
12     A.  Right.
13     Q.  So you would rather forgo medication
14 rather than -- and so that you could stay in dorm
15 setting?
16     A.  Yeah.
17     Q.  More comfortable there?
18     A.  Yeah.
19     Q.  Have you ever read up about symptoms of
20 bipolar disease?
21     A.  No.
22     Q.  When did you first hear the name bipolar?
23     A.  Back when the doctor in 2006 said that's
24 what I had.

117

1      Q.  And since then you haven't tried to
2  educate yourself on what that was?
3      A.  Not really.
4      Q.  And after you were told that you were
5  bipolar you had held down jobs; is that right?
6      A.  No.
7      Q.  You never had a job?
8      A.  I never had a job since.
9      Q.  Since you got diagnosed with bipolar?
10     A.  Right, I haven't had a job.
11     Q.  So when did you have that diagnosis of
12 bipolar disorder?
13     A.  2005.  No, 2006.
14     Q.  So you entered into the jail in this --
15 for this lawsuit at the same -- in the same year
16 where you had your first diagnosis --
17     A.  Right.
18     Q.  -- of bipolar?
19     A.  Uh-huh.
20     Q.  Okay.  Have you had any emotional
21 problems after getting out of the jail in November
22 of 2006?
23     A.  1ORRISSEY:  Object to the term "emotional
24 problems."  He's testified consistently during

118

1  this deposition in regards to various stages of
2  moods that he goes through.  So do you want him
3  to -- I don't understand the question.
4  BY MR. CATANIA:
5      Q.  Despite the fact that your lawyer doesn't
6  understand the question, do you understand the
7  question?
8      A.  Say it again.
9      Q.  Sure.  After being released November of
10 2006, did you suffer any emotional problems?
11     A.  Right.  I went through -- went through
12 the same thing, the depression, anxiety and all
13 that.  You know, same thing that's in here.
14     Q.  How soon after your release did that
15 occur?
16     A.  Well, that was going on all up in there.
17 That was going on in there.  It was going on until
18 I start taking my medication and it got back in my
19 system.
20     Q.  Okay.  So while you were still in jail in
21 October or November of 2006 you had suffered some
22 symptoms; right?
23     A.  Right.  Couldn't sleep, you know, walking
24 back and forth, you know, getting uptight, arguing

119

1  with people, the whole thing.
2      Q.  Did you ever get into a fight during that
3  period of time?
4      A.  Not that I recall.
5      Q.  Did you ever disobey an officer's order
6  during that period of time?
7      A.  Probably.  I used to get smart with them.
8      Q.  Did you ever have anyone take you out of
9  the living unit and bring you to be evaluated as a
10 result of being smart with an officer?
11     A.  No, I don't think so.  I don't remember.
12 I don't remember.
13     Q.  Did any doctor in Cermak see you during
14 that period of time?
15     A.  I'm not sure.  I can't remember.  I'm
16 quite sure they did.  I don't remember, though.
17     Q.  In jail do you think you have a lot of
18 privacy?
19     A.  No.
20     Q.  Do you think you have a right to go
21 wherever you want to go inside of a jail?
22     A.  No.
23     Q.  In fact, you have to be -- you're told
24 where to go inside the jail?

120

McCorkle Court Reporters, Inc.
Chicago, Illinois  (312) 263-0052

1    A.  Right.
2    Q.  It's the jailer's prerogative --
3    A.  Right.
4    Q.  -- to tell you where to go; right?
5    A.  Right.
6    Q.  So when he said that you're going to go
7  to division ten, you could be sent to division ten
8  despite what you want?
9    A.  Right.
10    Q.  As a result of the experience of not
11  having your psychotropic medication for 23 days in
12  October and November of 2006, did you have any bad
13  dreams or nightmares about that?
14    A.  Yes, just uptight.
15    Q.  You were just uptight?
16    A.  I can't remember.  I was just uptight,
17  you know, just.....
18    Q.  Did you have any trouble sleeping after
19  that?
20    A.  Yes.
21    Q.  While you were in the jail, did you have
22  any trouble sleeping?
23    A.  Yes.
24    Q.  In fact, doesn't the jail have kind of a

121

1  rhythm where you're awakened by the jailer early,
2  early in the morning for breakfast?
3    A.  Yeah, but if you ain't sleep -- but if
4  you been used to it, it don't matter.  You gonna
5  wake up.
6    Q.  Would you think that being awakened at
7  4:30 in the morning interrupts your normal sleep
8  patterns?
9    A.  Yes, I guess.
10    Q.  And that's pretty consistent in the jail
11  that people get up that early; right?
12    A.  Right.
13    Q.  Is it noisy in the jail?
14    A.  Very.
15    Q.  Did the noise ever keep you from sleeping
16  comfortably?
17    A.  No.
18    Q.  Have you ever suffered a serious head
19  injury?
20    A.  No, not really.
21    Q.  Aside from what's in paragraph 23 of your
22  affidavit about being found disoriented in a north
23  side park, have you ever experienced a period of
24  time where you've lost time?

122

1    A.  Oh, yeah.
2    Q.  Has that been as a result of taking
3  elicit or illegal drugs?
4    A.  And drinking.
5    Q.  And drinking.
6        Have you ever had the experience of
7  losing time when you're just not taking your
8  psychotropic medications?
9    A.  No.
10    Q.  Have you ever been found lost and
11  disoriented by police other than the instance that
12  you talked about here in your affidavit?
13    A.  None that I remember but I can't
14  remember.
15    Q.  In all of your 57 adult arrests, have you
16  ever told the officer that you were homeless?
17    A.  Yeah.  Yes.
18    Q.  When was the last time you told the
19  officer you were homeless?
20    A.  Back in probably 207 (sic).
21    Q.  When you came into the intake area you
22  say that you were talked to by a mental health
23  specialist; right?
24    A.  Uh-huh.

123

1    Q.  Was that both intakes in -- in 2006?
2    A.  Yeah.
3    Q.  At both intakes in 2006, did they ask you
4  questions that were on a preprinted form?
5    A.  Yes.
6    Q.  Did you answer the question about whether
7  you were homeless?
8    A.  Yes.
9    Q.  Do you remember what your answer was?
10    A.  I told them I was homeless.
11    Q.  Did you answer questions about whether
12  you had any recent hospitalization?
13    A.  Yes.
14    Q.  Do you remember your answer?
15    A.  I told them -- I told them the same thing
16  on here, I was hospitalized at Stone Clinic and at
17  Northwestern.
18    Q.  I'm going to show you what I'm going to
19  mark as Exhibit No. 2.
20        (Holmes Deposition Exhibit
21        No. 2 was marked for
22        identification.)
23  BY MR. CATANIA:
24    Q.  You had a chance to review these 16 pages

124

31 (Pages 121 to 124)

Ex 43 Holmes Dep 031

1  with your lawyer before?
2     A.  Can I go smoke a cigarette?
3     MR. MORRISSEY:  Sure.  Take a break.
4         (A break was taken.)
5     MR. CATANIA:  Can I have an answer to that
6  question before we break.
7     MR. MORRISSEY:  Sure.
8     THE WITNESS:  What's the question?
9  BY MR. CATANIA:
10     Q.  You had an opportunity to read the 16
11  pages with your lawyer before we started the
12  deposition; right?
13     A.  Yeah, we went over it.  Did we go over
14  this?  We gone over this.  This is when he was
15  telling us to come back in the room; right?
16     MR. MORRISSEY:  Right.
17     THE WITNESS:  Right.
18  BY MR. CATANIA:
19     Q.  Is that the same documents that you saw
20  me hand --
21     A.  This is what you handed to him down
22  stairs.  No, we were going over -- I don't
23  remember this.
24     Q.  And you're pointing to which page?  If

125

1  you look on the bottom right there's a page
2  number.
3     A.  We didn't go over this.
4     Q.  You're talking about page 14, 15?
5     A.  We didn't go over all this.
6     MR. CATANIA:  Okay.  Okay.  Well, let's take
7  a break.
8         (A break was taken.)
9     MR. CATANIA:  We're back on the record.  All
10  right.  We're back after our 10 minute 30-minute
11  break.
12  BY MR. CATANIA:
13     Q.  Sir, did you have a cigarette?
14     A.  I sure did.  Thank you.
15     Q.  How long have you been smoking?
16     A.  Oh, for about 30 years.
17     Q.  When you're in the jail you can't smoke;
18  right?
19     A.  Right.
20     Q.  That's pretty disturbing, isn't it?
21     A.  Yes.
22     Q.  Did you say before in this deposition
23  that you were diagnosed with having bipolar
24  disorder in 2006?

126

1     A.  Yes.
2     Q.  And that is true; right?
3     A.  That's true.
4     Q.  In front of you is Exhibit No. 2 for this
5  deposition.  Do you recognize that as the same 16
6  pages that your lawyer had in his possession
7  before this deposition?
8     A.  Yes.
9     Q.  On the first page of that deposition or
10  that exhibit it says that you entered into the
11  jail on October 4, 2009; is that right?
12     A.  Right.
13     Q.  Okay.  You signed that patient consent
14  section on the top of the page there; is that
15  right?
16     A.  Yes.
17     Q.  Okay.  And there was an emergency
18  response technician that did an interview
19  according to the signature at the bottom of the
20  page.  It says ERT; right?
21     A.  Right.
22     Q.  And that person interviewed you
23  face-to-face; right?
24     A.  Right.

127

1     Q.  Did you tell that person that you have
2  high blood pressure?
3     A.  Yes.
4     Q.  Did you tell that person that you don't
5  use alcohol?
6     A.  No.
7     Q.  Did you tell that person that you don't
8  use injection drugs?
9     A.  Yes.
10     Q.  Did you tell that person that you don't
11  use noninjection illicit drugs?
12     A.  Yes.
13     Q.  Do you tell that person that you do not
14  use tobacco?
15     A.  No.
16     Q.  If you turn to page 3 of the exhibit,
17  seems to indicate that you were in the -- in the
18  receiving area for Cook County jail on January 30
19  of 2009; is that right?
20     A.  Right.
21     Q.  What was the reason for being there at
22  that time?
23     A.  Because of the medication that I needed.
24     Q.  You went to jail for the medication?

128

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

1    A.  Well, I went -- I went to the medical
2    intake for -- '09.  Let me see.  What's this?
3    This 1/30/09?
4    Q.  Yeah.
5    A.  January.  This 11/30/09 or?
6    Q.  Well, it seems to say 1/30/09, January 30
7    of '09.
8    A.  This got to be 11/30.
9    Q.  In that little preprinted label that has
10   your name on that, it says book date, BKDT, colon
11   01 slash 30 slash 2009.
12   A.  Oh, this is the second time?  Because I'm
13   talking about I was looking up here and then over
14   here it says 10/4/09.
15   Q.  Right.  This is a different entry into
16   the jail.
17   A.  Oh, okay.  Okay.
18   Q.  Do you remember why you were brought to
19   jail that time?
20   A.  Oh, yeah, this was for armed robbery.
21   They said -- they said -- it was really retail
22   theft.
23   Q.  So that was the retail theft arrest that
24   we talked about earlier?

129

1    A.  Right.
2    Q.  And that arrest actually took place on
3    January 28 of '09; right?
4    A.  Right.
5    Q.  And this is -- the entry into the jail
6    happened two days later?
7    A.  Right.
8    Q.  Where were you between the 28th of
9    January and the 30th of January?
10   A.  In the investigation.
11   Q.  At the police station?
12   A.  Right.
13   Q.  That's your signature on the consent form
14   there?
15   A.  Yes.
16   Q.  Okay.  If you look at the medical history
17   box there where there are numbers 1 through 15 and
18   then 1 through 9 in that section, do you see that?
19   A.  Yes.
20   Q.  Did the correctional medical technician,
21   James Myvet, ask you those questions?
22   A.  Yes.
23   Q.  And did you answer that you have high
24   blood pressure?

130

1    A.  Yes.
2    Q.  And that you have mental illness?
3    A.  Yes.
4    Q.  And that you have other?
5    A.  Right.
6    Q.  And other is chronic back problems?
7    A.  Right.
8    Q.  Okay.  And he wrote down the things that
9    you said about those particular problems; right?
10   A.  Right.
11   Q.  He said you have hypertension for three
12   years?
13   A.  Right.
14   Q.  And bipolar disorder?
15   A.  Right.
16   Q.  And chronic back problems?
17   A.  Uh-huh.
18   Q.  Is that right?
19   A.  Yes.
20   Q.  Okay.  When he wrote those down, those
21   were actual -- your actual responses to him to
22   those questions; right?
23   A.  Yes.
24   Q.  And he was accurate when he wrote those

131

1    down; right?
2    A.  Yes.
3    Q.  You don't have any allergies; right?
4    A.  No allergies.
5    Q.  When he said no known allergies in that
6    box that says allergies, that was correct?
7    A.  Right.
8    Q.  And you do understand English; right?
9    A.  Yes.
10   Q.  So that was correct where he marked that
11   as well?
12   A.  Right.
13   Q.  He also sent you to the physician
14   assistant after that; right?
15   A.  Yes.
16   Q.  Okay.  In the box that says substance
17   abuse, it says under tobacco, yes, 25 years.  See
18   that?
19   A.  Yes.
20   Q.  And under alcohol it says yes; is that
21   right?
22   A.  Yes.
23   Q.  And under injection drug use it says no;
24   is that right?

132

33 (Pages 129 to 132)

Ex 43 Holmes Dep 033

1    A.   Right.
2    Q.   On the alcohol, how much were you -- did
3  you tell him you were drinking?
4    A.   About a fifth or half a pint a day.
5    Q.   Okay.  And that was over a course of
6  about ten years that you had that kind of a use?
7    A.   Yes.
8    Q.   Also on the elicit noninjection drug you
9  answered yes; is that right?
10   A.   Right.
11   Q.   And what drug did you tell them that you
12 were using?
13   A.   Elicit noninjection.  That illegal?
14   Q.   Yes.
15   A.   Oh, I might have meant no.  I don't know
16 what that means.
17   Q.   Well, does it say under that to the right
18 crack for 30 years?
19   A.   But I wasn't -- under other.
20   Q.   Well, it's under the word other, but it's
21 actually referring to the yes where it says --
22   A.   Oh, no, I don't -- no, that's -- that's
23 not true.
24   Q.   All right.  And below that in the comment

133

1  section, doesn't it say denies any current
2  distress?
3    A.   Right.
4    Q.   So at the time when he was asking you
5  questions you were not in distress?
6    A.   None that I remember.
7    Q.   All right.  And the time that's down
8  there is 5:30 p.m.?  See that.
9    A.   Uh-huh.
10   Q.   Is that yes?
11   A.   Yes.
12   Q.   All right.  Did he also check your blood
13 pressure?
14   A.   Yes.
15   Q.   And did he find that it was 114 over 66?
16   A.   Right.
17   Q.   And that's a normal blood pressure for
18 you?
19   A.   I guess.  I'm not sure.
20   Q.   Well, you said to him that you were
21 hypertensive; right?
22   A.   Right.  But I don't know what's normal
23 and what's not normal.
24   Q.   No one's ever educated on what's normal

134

1  for you?
2    A.   No.
3    Q.   Well, he referred you to the physician
4  assistant and that person spoke to you after James
5  Myvet; right?
6    A.   Right.
7    Q.   On the following page, page 5 of the
8  exhibit, the bottom right-hand corner it also has
9  that bar coded sticker that says John Holmes, book
10 date of 01/30/29 -- 2009?
11   A.   Right.
12   Q.   Okay.  So that refers to the date you
13 entered into January of '09 for the retail theft?
14   A.   Right.
15   Q.   You told the -- the mental health
16 specialist, Dena Williams, that your address was
17 4747 South King Drive; right?
18   A.   Correct.
19   Q.   And the answer to question No. 10 on that
20 form says, no, you're not now homeless; is that
21 right?
22   A.   Right.
23   Q.   When she asked you have you ever been
24 hospitalized for psychiatric treatment you

135

1  answered yes; is that right?
2    A.   Right.
3    Q.   And that was two times?
4    A.   Right, that's --
5    Q.   What two times?
6    A.   I was telling them at the time in '06,
7  and I was telling them about the time before, but
8  I didn't know what hospital it was at.
9    Q.   Okay.
10   A.   I knew it was Madden or Tinley Park.
11   Q.   Okay.  When was it that you went to
12 either Madden or Tinley Park?
13   A.   I'm not sure of the dates.
14   Q.   Okay.  Could it have been a long time
15 ago, say, 30 years ago?
16   A.   No, it wasn't that long, 30 year.  I
17 don't think it was 30 years.  I'm not sure.
18   Q.   Did you have any memory of that -- of
19 that experience at Tinley Park or Madden?
20   A.   No.
21   Q.   And when she asked you in paragraph No. 5
22 do you use drugs you answered yes; right?
23   A.   Right.
24   Q.   Just like you did with James Myvet?

136

34 (Pages 133 to 136)
Ex 43 Holmes Dep 034

1   A.   Right.
2   Q.   And you said that the drug was cocaine;
3   right?
4   A.   Right.
5   Q.   And she asked you how much per day, and
6   in terms of dollars how much did you tell her per
7   day?
8   A.   Right here it says 80.
9   Q.   Does that sound like it was an accurate
10  statement?
11  A.   Right.
12  Q.   So $80 a day is how much your cocaine
13  habit was then?
14  A.   Right.
15  Q.   And that was after the date that you say
16  you were not given medication in October of
17  2009 -- 2006 and --
18  A.   Say that again.
19  Q.   It was after the dates that you were in
20  our custody --
21  A.   Right.
22  Q.   -- in '06?
23  A.   Yeah.
24  Q.   If you look on page 6 there's a

137

1   prescription order.  Do you know what a
2   prescription order is?
3   A.   Yes.
4   Q.   It's a doctor's order; right?
5   A.   Right.
6   Q.   And the doctor at the time that you
7   entered the jail on January 30, '09 at 6:40 p.m.
8   ordered atenolol; right?
9   A.   Uh-huh, high blood pressure.
10  Q.   Neurotonin (sic) also.  What's that for?
11  A.   I don't know.
12  Q.   Okay.  And Motrin?
13  A.   That was for my back.
14  Q.   Okay.  And those were prescriptions
15  written by the doctor at the jail?
16  A.   Right.
17  Q.   And the doctor at the jail had made a
18  determination that you needed to have those
19  medications; right?
20  A.   Right, because I couldn't have the other
21  medication so they just gave me this.
22  Q.   The doctor wrote a doctor's order for you
23  to get Neurotonin, atenolol and Motrin?
24  A.   Uh-huh.

138

1   Q.   Is that right?
2   A.   Right.
3   Q.   Okay.  If you look to the next page which
4   is No. 7 of this exhibit, do you see that?  That's
5   it.  On the bottom there's a date and a time.  Do
6   you see that?
7   A.   Yes.
8   Q.   It says October 25 of 2010?
9   A.   Right.
10  Q.   So that was fairly recently; right?
11  A.   Right.
12  Q.   And is that 4:05 p.m.?
13  A.   Right.
14  Q.   And to the right of that it says John
15  Holmes, that's your name; right?
16  A.   Right.
17  Q.   And it has a book date of October 25 of
18  2010 on it; right?
19  A.   Right.
20  Q.   Do you remember going through a series of
21  questions that appear on this page, page 7 of the
22  exhibit?
23  A.   Yeah, this is Exhibit 7 right here;
24  right?

139

1   Q.   Yes.
2   A.   Uh-huh, yes.
3   Q.   At the top in handwriting it says
4   division ten, psych, slash PA; is that right?
5   A.   Right.
6   Q.   Do you know what division ten refers to?
7   A.   Maximum security.
8   Q.   Is that the division that you said before
9   you were supposed to go to?
10  A.   Right.
11  Q.   In the box -- the far left box where it
12  says have you ever had and then it's got a bunch
13  of different types of diseases, high blood
14  pressure is marked yes; right?
15  A.   Uh-huh.
16  Q.   Is that yes?
17  A.   Yes.  Yes.
18  Q.   And high cholesterol is also marked yes;
19  is that right?
20  A.   Yes.
21  Q.   And heart problems is marked yes; right?
22  A.   Yes.
23  Q.   In the middle box it says in the past
24  year have you had stomach ulcers and you answered

140

1    yes; is that right?
2        A.   Yes.
3        Q.   And on the right it says do you use cane,
4    crutches, walker and that's marked yes; right?
5        A.   Yes.
6        Q.   And cane is underlined?
7        A.   Yes.
8        Q.   You're not using a cane today, are you?
9        A.   No.
10       Q.   And on the bottom above where the
11   screener's signature it is, it says if on
12   medication, do you have a regular primary care
13   doctor, and there's a doctor's name there; right?
14       A.   Lebec.
15       Q.   And that's spelled on this form as
16   L-e-b-e-z; right?
17       A.   Right.  Supposed to be L-e-b-e-c.
18       Q.   Did you spell that for the person doing
19   the screen?
20       A.   Right, L-e-b-e-c.
21       Q.   And that's the same one that you talked
22   about earlier in this deposition --
23       A.   Right.
24       Q.   -- as your physician?

                                                    141

1        A.   Yes.
2        Q.   And if you turn to the next page, page 8,
3    there's a paragraph that's called M10 in the
4    largest box there.  It says have you ever been
5    hospitalized for mental health reasons or due to
6    your behavior.  And the box circled yes; is that
7    right?
8        A.   Yes.
9        Q.   And then it says if yes, how many times
10   in your life.  And there's a number five written
11   in there; is that right?
12       A.   Right.
13       Q.   And it says the most -- the date of the
14   most recent was July '08; is that right?
15       A.   Yes.
16       Q.   And before October 25 of 2010, you're
17   saying that you were hospitalized in July '08?
18       A.   If I can -- I might have been.  I just
19   don't remember.
20       Q.   On the next page, page 9 of this exhibit
21   it's called consent for health screening and
22   treatment.  Do you remember signing your name on
23   there?
24       A.   Yes, I guess.  I mean, I don't remember

                                                    142

1    but I guess I did.
2        Q.   And that's October 25 of 2010 that it was
3    signed; right?
4        A.   Yes.
5        Q.   The following page, page 10 of this
6    exhibit it says Cermak Health Services Department
7    of Health Services Mental Health Services
8    Admission/Evaluation Form; right?
9        A.   Uh-huh.
10       Q.   Do you remember going through this
11   screening?
12       A.   No.
13       Q.   This is the same date that's on there as
14   your date of intake and it says 4:15 p.m.; right?
15       A.   Yeah, I see it, 4:15.
16       Q.   Shortly after you talked to James Myvet
17   you were already seeing a mental health screener;
18   is that right?
19       A.   Right.
20       Q.   The top handwritten line which is fairly
21   easy to read, it says 56-year-old married African
22   American male referred for an evaluation due to
23   history of psych treatment.  Do you see that?
24       A.   Uh-huh.

                                                    143

1        Q.   Is that yes?
2        A.   Yes, I see it.
3        Q.   And you were 56 years old at the time;
4    right?
5        A.   Right.
6        Q.   And you're African American?
7        A.   Yes.
8        Q.   And you're male?
9        A.   Yes.
10       Q.   And you said before that you considered
11   the person that you live with to be someone you're
12   married to; right?
13       A.   Right.
14       Q.   So that was all true; right?
15       A.   True.
16       Q.   It's all information you provided; right?
17       A.   Right.
18       Q.   At the bottom where it says plan in the
19   preprinted portion, do you see that?  Above the
20   signature.
21       A.   Yeah.
22       Q.   Karen Wolf is the person who signed it;
23   right?
24       A.   Okay.

                                                    144

36 (Pages 141 to 144)
Ex 43 Holmes Dep 036

1    Q.   It says referred to RCDC psychiatrist for
2    further disposition; right?
3    A.   True.
4    Q.   So there's a psychiatrist in the RCDC
5    right now; is that right?
6    A.   Right.
7    Q.   On the next page which is page 11, if you
8    look to the box that says chief complaint, slash
9    HPI, do you see that?
10   A.   Yes.
11   Q.   There's a part that's handwritten by
12   somebody; is that right?
13   A.   True.
14   Q.   Did you see the psychiatrist in the
15   receiving area at the time of your intake in
16   October of -- of 2010?
17   A.   Yes.  Yes, if I can remember.  Yes.
18   Q.   And that psychiatrist is a medical
19   doctor; right?
20   A.   Right.
21   Q.   Under the box where it says HPI there's a
22   line written under HPI, it says the patient states
23   he hears voices telling him he needs to get out of
24   the house and get in trouble; is that right?

145

1    right?
2    A.   Okay.
3    Q.   And then the reason given was, and
4    this -- these are your words, hearing voices;
5    right?
6    A.   Right.
7    Q.   So back in 1975 did you go to Tinley Park
8    because you were hearing voices?
9    A.   Around that time, yes.
10   Q.   And then where it says most recent
11   hospitalization date it says 2008; right?
12   A.   Uh-huh.
13   Q.   Is that yes?
14   A.   Yes.
15   Q.   And then it asks where, and the answer's
16   written in, Northwestern; is that right?
17   A.   Right.
18   Q.   And the reason is because you were
19   walking around?
20   A.   Right.
21   Q.   On the next page all the way at the
22   bottom where it talks about mental status exam it
23   says attitude toward examiner was cooperative.
24   You were cooperative with the doctor; right?

147

1    A.   True.
2    Q.   Did you tell that to the doctor?
3    A.   Yes.
4    Q.   And then below that it says the patient
5    reports impulsive behavior.  Did you tell that to
6    the doctor?
7    A.   Yes.
8    Q.   Below that there's a line that's
9    preprinted, it says history of suicide attempts,
10   slash parasuicidal gestures.  Do you see that?
11   A.   Uh-huh.
12   Q.   And it says -- your answer to that was
13   no.
14   A.   I don't remember saying no, because I
15   mean I don't remember it.
16   Q.   Below that where it talks about prior
17   psychiatric hospitalizations it says yes, and then
18   there's first hospitalization and next to the box
19   it says age.  Do you see that?
20   A.   Yes.
21   Q.   And it's written in there 1975; right?
22   A.   Right.
23   Q.   And then the question is then asked
24   where.  And the answer is written in, Tinley Park;

146

1    A.   Yes.
2    Q.   And where it talks about grooming and
3    hygiene it says fair; right?
4    A.   Right.
5    Q.   It doesn't say poor; right?
6    A.   Right.
7    Q.   It doesn't have any comments after that;
8    right?
9    A.   Uh-uh.
10   Q.   All right.  And then it says orientation
11   and then it says next to that circled alert,
12   oriented times four.  Do you see that?
13   A.   Yes.
14   Q.   Do you know what the four are?
15   A.   No.
16   Q.   If you look to the right it says person,
17   place, time and situation.  Do you see that?
18   A.   Yes.
19   Q.   Do you think that maybe that oriented
20   times four refers to oriented towards person, you
21   know who you are; right?
22   A.   Uh-huh.
23   Q.   Did you know who you were at that time?
24   A.   Yes.

148

37 (Pages 145 to 148)

1    Q.   And you're oriented times the place, you
2  knew where you were?
3    A.   Yes.
4    Q.   And you're oriented times the time, you
5  knew what time it was?
6    A.   Yes.
7    Q.   And you knew at the time that you were in
8  a certain situation being asked questions by a
9  doctor; right?
10   A.   Yes.
11   Q.   It also says your cognition, your ability
12  to understand, was grossly intact.  Do you know
13  what that means?
14   A.   No.
15   Q.   If I told you that that means that you
16  are able to understand the person that's asking
17  you questions and you're able to think, that that
18  was an accurate description at that time?
19   A.   Yes.
20   Q.   That was after you had been in custody
21  for a few days?
22   A.   Few days.
23   Q.   Below where it says mood there's
24  parenthesis which -- I mean there's -- there's

149

1  quotes.  That usually means that someone's saying
2  those words that are being recorded; right?
3    A.   Right.
4    Q.   And it says anxiety and depression.  Did
5  you tell the doctor you felt anxious and
6  depressed?
7    A.   I believe what she wrote it down because
8  she was looking at me.
9    Q.   Okay.  On the following page where it
10  says assessment, slash plan in the middle of that
11  preprinted section, you see that?
12   A.   Yes.
13   Q.   Okay.  It says axis one.  Do you see what
14  it says there written?
15   A.   Yes.
16   Q.   It says R slash O, bipolar disorder;
17  right?
18   A.   Right.
19   Q.   Do you know what the R slash O means?
20   A.   No.
21   Q.   If I told you that the doctors use that
22  term to mean rule out, that that means that they
23  haven't made a diagnosis?
24   A.   No.  I don't remember.

150

1    Q.   Well, that's called a differential
2  diagnosis.  That means that more investigation has
3  to be done.  So at that time the doctor's
4  determination was he didn't know whether you had
5  bipolar disorder.
6    A.   Okay.
7    Q.   And that page is signed by a physician,
8  an M.D. at the bottom where it says 25 October
9  2010, it says doctor's signature; right?
10   A.   Uh-huh.
11   Q.   It also says in the assessment plan area
12  that your decision making is intact.  In other
13  words, you can make decisions for yourself; right?
14   A.   Right.
15   Q.   And that was at a time when you had
16  already been in the custody of police for several
17  days before that interview; right?
18   A.   Right.
19   Q.   Also on that page there are some circles
20  near the top.  There's a word "affect" followed by
21  some descriptions and then TP followed by some
22  descriptions and then TC followed by some
23  descriptions.  Do you see there's a circle around
24  one that says denies SI slash HI?

151

1    A.   Yes.
2    Q.   Do you know what that is?
3    A.   No.
4    Q.   If I tell you it's denies suicidal
5  ideation and homicidal ideation, does that mean
6  that you told the doctor that you weren't feeling
7  suicidal?
8    A.   Probably just stay from that room.
9  Probably just stay out of that room that they were
10  going to send me to.
11   Q.   Okay.  Did you tell the doctor that you
12  were not feeling homicidal at that time?
13   A.   Right, stay out of that room.  I didn't
14  want no handcuffs on.  I didn't want to be chained
15  to no bed.  I didn't want none of that.  That's
16  what they do.
17   Q.   Have you ever been in division ten,
18  housed there?
19   A.   No.  Just I would have went to division
20  ten if I would have told him I was suicidal, I
21  would have went to two north handcuffed with all
22  my clothes off and all of that into a little
23  rubber room.
24   Q.   Have you ever been there?

152

38 (Pages 149 to 152)

1    A.   Yes.
2    Q.   When was that?
3    A.   During the hospitalization before they
4    sent me to ten.
5    Q.   And that was in October of 2010?
6    A.   Yeah.  This was -- yeah, the last time.
7    Yeah, they sent me there because of the suicide
8    attempt.
9    Q.   Okay.  Are you saying now today under
10   oath that at the time you were in the custody of
11   the jail in October of 2010 that you told the
12   doctor that you didn't have any suicidal ideation
13   or homicidal ideation, you weren't thinking about
14   suicide or homicide?
15   A.   Did I tell the -- I told the doctor that.
16   Q.   Okay.  Did you also say that you were
17   having auditory hallucinations at the time?
18   A.   Yes, I told them that I had that.
19   Q.   And that the cause was, in quotes, the
20   devil?
21   A.   Right.
22   Q.   Are you saying that at that time that you
23   were sent to two north?
24   A.   Two north.

153

1    Q.   Okay.  If you look at the bottom where it
2    says disposition.
3    A.   Uh-huh.
4    Q.   There it says hold two north, hold two
5    west, transfer to south, transfer RTU division
6    three, GP active, GP inactive and other.  You see
7    that?
8    A.   Yes.
9    Q.   What's circled on that list?
10   A.   GP, general population active.
11   Q.   Is that where you actually sent at the
12   time?
13   A.   To division two.  They didn't have enough
14   room.
15   Q.   But you were not sent to two north?
16   A.   Not until after.  They sent me to two --
17   I mean to division two then they was going to
18   transfer because they have some room over in
19   division ten.  And then from division two they
20   sent me to two north.  I got out of two north,
21   they was going to send me to ten, then they said,
22   no, send him to -- two north said send him back to
23   where he came from to division two.
24   Q.   Okay.  Who said all of those things that

154

1    you just described?
2    A.   The psychiatrist.  I actually went to two
3    north.  There's something missing out of here.
4    Q.   When you went to two north, was that in
5    October of 2010?
6    A.   Sure was.
7    Q.   And at two north was that the first time
8    you had ever been --
9    A.   The first time I ever been there.
10   Q.   And that was as a result of a suicide
11   attempt?
12   A.   Right, going over to division ten.
13   Q.   Was your suicide attempt done with a
14   sheet as you described?
15   A.   That was the sheet.
16   Q.   When you were observed by correctional
17   officers with the sheet before you were able to
18   kill yourself, did they have to cut you down?
19   A.   Yeah, they grabbed my legs.
20   Q.   Did they use a cutting instrument to cut
21   the sheet?
22   A.   No, they got up on top of the table and
23   they untied the knots.  They put me in handcuffs.
24   Q.   And that occurred in the dormitory;

155

1    right?
2    A.   Right.
3    Q.   Who told you that you were leaving the
4    dormitory?
5    A.   They did.
6    Q.   Who did?
7    A.   The transfer order came in.  I'm not
8    sure.
9    Q.   Do you know if it was a correctional
10   officer that told you you were being transferred?
11   A.   Yes.  A correction officer told me.  They
12   told me just get my stuff together.
13   Q.   All right.  Do you remember the words
14   that the correctional officer used when they came
15   to tell you?
16   A.   Yes, pack your s-h-i-t up, you're
17   leaving.
18   Q.   Okay.  And that's -- that's -- to your
19   memory that's the words that he used?
20   A.   That's the words that he used.
21   Q.   Did he speak any other words besides
22   that?
23   A.   No.
24   Q.   Thank you.

156

1    Has any physician ever told you that you
2  take street drugs only because you don't take your
3  Risperdal and Depakote?
4    A.  Yes.
5    Q.  Which doctor told you that?
6    A.  Einstein.
7    Q.  And that's the one that first diagnosed
8  you?
9    A.  Right.
10   Q.  When's the last time you saw that doctor?
11   A.  A while, long time.  2006.
12   Q.  And back in 2006 were you using cocaine?
13   A.  Yes.
14   Q.  Were you using heroine?
15   A.  Yes, off and on.
16   Q.  Have you ever been in a treatment program
17 for heroin addiction?
18   A.  No.
19   Q.  Are you an addict?
20   A.  Yes.
21   Q.  You are an addict?  Did you ever tell
22 that to a judge, that you're an addict?
23   A.  Yes.
24   Q.  Have you ever been in a drug treatment
                                            157

1  program --
2    A.  Yes
3    Q.  -- ordered by a judge?
4    A.  Yes.
5    Q.  What judge ordered that?
6    A.  I'm not sure.  Back in 2000 -- no, 2003
7  to 2005.
8    Q.  You have two years of incarceration,
9  then?
10   A.  Right.
11   Q.  Was that --
12   A.  When I was in HRDI, division 14.  Then I
13 was released to task.
14   Q.  While you're in the HRDI and before you
15 were released to task, were you receiving
16 psychotropic medication?
17   A.  No.  Because you couldn't get in there
18 with taking psychotropic medicine.
19   Q.  And you knew that; right?
20   A.  Yeah.
21   Q.  Was it your choice to enter into the HRDI
22 and task program?
23   A.  Yes.
24   Q.  And that was a way to avoid a
                                            158

1  penitentiary sentence?
2    A.  Right.
3    Q.  Before you were sent to HRDI and task,
4  you were -- your rights were explained regarding
5  the criminal case you were there for?
6    A.  Uh-huh.
7    Q.  Is that right?
8    A.  Yes.
9    Q.  That was the -- was that the theft?  What
10 case was that?
11   A.  That was a burglary I think.
12   Q.  Okay.  And with burglary having the
13 background that you had, you would have had a
14 minimum of six years in a penitentiary?
15   A.  Right.
16   Q.  So this was a better option for you?
17   A.  Yes.
18   Q.  So you chose to avoid six years in the
19 penitentiary by going to HRDI and task?
20   A.  Right.
21   MR. MORRISSEY:  What was that, H?
22   THE WITNESS:  HRDI, human resource
23 development.
24   MR. MORRISSEY:  HR?
                                            159

1    THE WITNESS:  HRDI.
2    MR. MORRISSEY:  Human?
3    THE WITNESS:  Resource Development, Inc. I
4  believe.
5  BY MR. CATANIA:
6    Q.  Do you think that you are an impulsive
7  person as the doctor said --
8    A.  Yes.
9    Q.  -- in the diagnosis?
10   A.  Yes.  Yes.
11   Q.  Do you think that you also use your
12 circumstances to manipulate to get to where you
13 want to go?
14   A.  No.
15   Q.  And yet you chose to go to HRDI back in
16 2003?
17   A.  Yes.
18   Q.  And you voluntarily chose to do that by
19 saying I won't take my medication, my psychotropic
20 medication; right?
21   MR. MORRISSEY:  I'm going to object.  He
22 didn't say he was on psychotropic medication.
23   MR. CATANIA:  That's why I'm asking the
24 question.
                                            160

1    MR. MORRISSEY:  Well, the question presumes
2  that he was on psychotropic.
3    THE WITNESS:  Right.  Back in 2003 and '4 and
4  '5 I wasn't on there.  I wasn't on medication
5  then.
6  BY MR. CATANIA:
7    Q.  Okay.  Well, in order to get into the
8  task program you would have had to admit an
9  addiction; isn't that right?
10    A.  Right.
11    Q.  And your addiction that you admitted to
12  was heroin and cocaine; right?
13    A.  Right.
14    Q.  Before then, before you admitted that
15  addiction, you were using heroin and cocaine?
16    A.  Right.
17    Q.  You were not taking psychotropic
18  medication?
19    A.  Right.
20    Q.  So the psychotropic medication or being
21  off of psychotropic medication did not cause you
22  to use heroine and cocaine, did it?
23    A.  Because I wasn't diagnosed yet.
24    Q.  So it's only because you were diagnosed

161

1  Health Services Admission/Evaluation Form, bottom
2  right there are page numbers.  That's the page.
3    A.  Right here, that's the page number?
4    Q.  Yes.
5    A.  Okay.
6    Q.  And in the section that says current
7  treatments there's a list that includes two
8  psychotropic medications; right?
9    A.  Right.
10    Q.  And under Risperdal, 3 milligrams, in
11  quotes, which is quoting you, it says I don't take
12  it every day.
13    A.  True.
14    Q.  And that was true then?
15    A.  Yes.
16    Q.  When you don't take it every day, do you
17  use cocaine and heroin?
18    A.  No.
19    MR. CATANIA:  Thank you, sir.  I have no
20  further questions.  That's what you've been
21  waiting for.
22    THE WITNESS:  Thank you.
23    MR. CATANIA:  He might have some questions.
24    MR. MORRISSEY:  I have a few questions.

163

1  that you knew that?
2    A.  I knew that; right.  That if I took my
3  medicine I would -- I could -- that it would help
4  me stay off the drugs.
5    Q.  And do you follow a regimen of taking
6  drugs daily?
7    A.  Now?
8    Q.  Yes.
9    A.  No.
10    Q.  You don't.  You choose about when you
11  want to take them; right?
12    A.  I don't take them.
13    Q.  I'm talking about psychotropic
14  medication.
15    A.  Oh, yes.  I take my medicine.  I don't do
16  it all the time.  What I do is I still take it
17  until I see a psychiatrist, because it makes me --
18  I mean, I take it.  I take it every now and then
19  but at the same time I know I got to see a doctor
20  to -- you know, for her to prescribe me what I
21  really -- you know, prescription again.
22    Q.  Right.  If you look on page 10 of Exhibit
23  No. 2 that's in front of you, the bottom where
24  it's Cermak Health Services Department of Mental

162

1    EXAMINATION
2  BY MR. MORRISSEY:
3    Q.  Mr. Holmes, you stated that you -- you
4  were first -- strike that.
5    You stated that in 2006 you were treated
6  for psychiatric problems; right?
7    A.  Yes.
8    Q.  Do you recall being hospitalized in 2006
9  at Northwestern?
10    A.  Yes.
11    Q.  What -- what month was that in?
12    A.  May.
13    Q.  How long were you incarc -- how long were
14  you --
15    A.  For about a week.
16    Q.  Inpatient -- let me ask the question.
17    How long were you an inpatient at
18  Northwestern Hospital in May of 2006?
19    A.  For about a week, couple days.
20    Q.  In addition to Northwestern Hospital,
21  were you treated in 2006 for psychiatric problems?
22    A.  Yeah, but I don't know the dates.
23    Q.  Following your treatment who was treating
24  you at Northwestern Hospital at that time?

164

41 (Pages 161 to 164)

1     A. Dr. Einstein and Dr. Waters.
2     Q. Did they prescribe any psychotropic
3  medication?
4     A. Yes.
5     Q. What psychotropic medication did they?
6     A. Dr. Einstein, she -- he prescribed
7  Seroquel and Dr. -- he -- Dr. Einstein because he
8  prescribed Carpo and Seroquel. And Dr. Waters
9  prescribed -- prescribed Depakote and Risperdal.
10     Q. And how often would you take the
11  Risperdal.
12     A. Three times a day.
13     Q. That was in the summer of 2006?
14     A. Yes.
15     Q. And Depakote, how often would you take
16  it?
17     A. Three times a day.
18     Q. And would you do that all the time?
19     A. All the time.
20     Q. Now, you mentioned that you went into
21  the -- you were brought into the Cook County jail
22  in August of 2006, August 27, 2006?
23     A. Yes.
24     Q. And describe the receiving area of the

165

1  jail in August of 2006.
2     A. When you first come in you go down this
3  tunnel, and then they put you maybe about 50,
4  maybe 60, sometime a hundred to a cage. And then
5  they -- they call you out of the cage one at a
6  time and they take you around and you got to take
7  your fingerprints and they didn't have -- they
8  didn't have the scale things yet, the scanners.
9  So they take you around take your fingerprints,
10  they take your photo, then they put you back in
11  the cell.
12     Then they call you out with about all --
13  there's a booth like this here, everybody sitting
14  across from each other. And they asking you all
15  these questions. And they -- and they trying to
16  get to the next person. They writing the thing
17  off as you say, writing it off, then they put a
18  "P" on your arm. Then they tell you go stand over
19  there in the -- you know, the doctor they take the
20  x-ray. They put a "P" on your arm you got to see
21  a psychiatrist or psychic, whatever. You got to
22  see somebody with a "P."
23     Then they take your picture. Then they
24  put you back in the bull pen. Then you go wait

166

1  around in another bull pen. Then they call you
2  out. And then when you come out and you see the
3  medical doctor you tell them, you know, what your
4  problem is. They'll -- they'll either tell you to
5  go upstairs. They say we'll give you a
6  prescription or you'll see a medical doctor on
7  your deck.
8     And then when you see the psychiatrist,
9  the psychiatrist she going to tell you about if
10  you're saying that you -- that you need to take
11  medication that they putting you in -- that you
12  going to go in a rubber room with no clothes on
13  and all of that, you ain't going in no drug
14  program, that you're going to one specific place
15  and that's two north up there where you're around
16  a bunch of crazy -- you know, around a bunch of
17  people that's insane. You won't get no sleep
18  because they going to holler all night. And
19  that's what they tell you. That's how the
20  conditions is over there.
21     Q. Walk through that a little slower. In
22  August of 2006 you came in on the 27th; correct?
23     A. Correct.
24     Q. And at that time in August of 2006 what

167

1  psychiatric medication were you taking?
2     A. Depakote and Risperdal.
3     Q. And prior to being arrested on the 25th
4  or the 26th of August, had you been taking your
5  medications?
6     A. Yes.
7     Q. And when you came in, did you talk to a
8  medic?
9     A. Yes.
10     Q. And was that in a private setting?
11     A. No.
12     Q. Describe the setting again.
13     MR. CATANIA: Again? Objection.
14  BY MR. MORRISSEY:
15     Q. Was that at a desk?
16     A. It was at a desk like this. A long desk
17  like this here. I'm sitting across from him,
18  you're sitting across --
19     Q. Sitting across from the medic?
20     A. From the medic. You're sitting across
21  from that medic, you're sitting across from that
22  medic, and they all asking questions right then
23  and there with no privacy.
24     Q. Good. Now, do you recall the medic

168

42 (Pages 165 to 168)

1  asking you questions whether or not you were on --
2  whether or not you had history of mental illness?
3     A.  Yes.
4     Q.  And what did you tell?
5     A.  Yes.
6     Q.  And did you -- did the medic ask you if
7  you were on any medication?
8     A.  Yes.
9     Q.  And what did you tell the medic?
10    A.  Depakote, Risperdal and I think I told
11  him -- I might have told him some back
12  medication.  I can't remember which back
13  medication I was taking back then.
14    Q.  In addition to seeing the medic, did you
15  also have a screening for psychiatric help?
16    A.  Yes.
17    Q.  All right.  And was -- where was that
18  done?
19    A.  That was done in another little room, let
20  me see.  That was done at the same table, you go
21  down a little bit further.
22    Q.  And again, are there people on --
23    A.  Lot of people.
24    Q.  -- opposite sides?

169

1     A.  Yes.
2     Q.  So inmates on one side of the table
3  and --
4     A.  And people --
5     Q.  Workers on the other side?
6     A.  Other side.
7     Q.  And did you have a conversation with the
8  person that was asking you psychological
9  questions?
10    A.  Yes.
11    Q.  Did the person ask you whether you had
12  ever been hospitalized for psychiatric treatment?
13    A.  Yes.
14    Q.  And what did you tell that person?
15    A.  Yes.
16    Q.  And in fact, you had been treated just
17  recently?
18    A.  Recently with them.
19    Q.  And did you -- did they -- did the person
20  ask you if you were currently receiving outpatient
21  psychiatric treatment?
22    A.  Yes.
23    Q.  And what did you respond to that person?
24    A.  Yes.

170

1     Q.  Did you -- did the person ask you are you
2  taking -- now taking psychotropic medication?  And
3  what response did you give?
4     A.  Same thing, Depakote, the Risperdal.
5     Q.  Did that person tell you about what would
6  happen to you if you were -- strike that.
7        Did the person that was asking you
8  questions on this brief primary psychological
9  screening tool tell you whether or not you would
10  continue to receive your medication at the jail?
11    MR. CATANIA:  Objection.  Foundation.
12    THE WITNESS:  No.
13  BY MR. MORRISSEY:
14    Q.  Did the person advise you whether or
15  not -- what happened prior to getting your
16  psychotropic?
17    A.  Yes.
18    Q.  What did the person tell you?
19    A.  That I --
20    MR. CATANIA:  Objection.  Foundation.
21    THE WITNESS:  That I wasn't going into the
22  drug program, that I'll be housed in division two,
23  that my court date would be changed, that I
24  wouldn't have the same court date, and that I

171

1  would be -- everything would be delayed.  If
2  that's what I want, they'll gave it to me.  Have
3  to wait until I get upstairs and they'll get me
4  from up there.
5  BY MR. MORRISSEY:
6     Q.  What did you understand that person to
7  mean by that?
8     A.  That I -- that I will be, you know --
9  that I wouldn't get no privileges, that I would
10  end up staying in jail longer.
11    Q.  Now, you again went through the intake
12  process on October 31, 2006; correct?
13    A.  Right.
14    Q.  Were the same questions asked of you by a
15  medic that day?
16    A.  Yes, same questions.
17    Q.  And at that time did you advise the medic
18  that you were on medication?
19    A.  Yes.
20    Q.  Did you advise the person that you had a
21  history of mental illness?
22    A.  Yes.
23    Q.  What medications were you on in October
24  of 2006?

172

43 (Pages 169 to 172)
Ex 43 Holmes Dep 043

1    A.  Depakote and Risperdal and my back
2  medication, but I just don't remember to find out
3  what the back medications were.
4    Q.  Okay.  Did you also have a psychological
5  screening done?
6    A.  Yes.
7    Q.  Was it in the same type of environment
8  that you had went through in August of 2006?
9    A.  Yes.
10    MR. CATANIA:  Objection.  Form.
11    THE WITNESS:  Yes.
12  BY MR. MORRISSEY:
13    Q.  Did that person ask you questions about
14  whether you had previously been hospitalized?
15    A.  Yes.
16    Q.  And what did you tell that person?
17    A.  That I was on Risperdal, that I just come
18  out of Northwestern Hospital Stone Clinic and I
19  was on Depakote.
20    Q.  Did you indicate what type of
21  psychological problem you had in October of 2006?
22    A.  Yes.
23    MR. CATANIA:  Objection.  Form.
24    THE WITNESS:  Yes.

173

1  BY MR. MORRISSEY:
2    Q.  What did you tell the person?
3    A.  I told them I had bipolar, the
4  depression, anxiety, getting real uptight,
5  paranoid, told them all that.
6    Q.  Did you tell the person that you'd ever
7  attempted suicide?
8    A.  Yes.
9    Q.  Now, in October of 2006 were you put in
10  the general population?
11    A.  Yes.
12    Q.  Did the person tell you at that time in
13  October of 2006 what do you have to go through in
14  order to continue with psychotropic medications?
15    MR. CATANIA:  Objection.  Foundation.
16    THE WITNESS:  Yes.
17  BY MR. MORRISSEY:
18    Q.  What did the person tell you then?
19    A.  That I wouldn't -- I couldn't get in the
20  drug program, that I would have to go up to the
21  10th floor in the county building, I would have to
22  go through more psychological testing, that I
23  wouldn't go to court on time, that I'd be put over
24  in two north until my court date, a lot of stuff

174

1  just to discourage you from getting your medicine.
2    Q.  Did you receive -- you were incarcerated
3  from October 31, 2006 through November 23, '06;
4  correct?
5    A.  Yes.
6    Q.  And during that entire period of time,
7  did you receive any psychotropic medication?
8    A.  No, none.
9    Q.  How were you feeling emotionally during
10  that period of time?
11    MR. CATANIA:  Objection.  Form and
12  foundation.
13    THE WITNESS:  Uptight, you know, paranoid,
14  you know, just wanted to get out.  You know,
15  anxiety.  I was just rushing, everything was
16  rushed.  I was arguing.  You know, couldn't get
17  along, couldn't eat.  Just couldn't do nothing.
18  BY MR. MORRISSEY:
19    Q.  Did you convey those symptoms to any --
20    A.  Right.  I must have wrote about seven or
21  eight different request slips to the people.  I
22  was putting on there first request, second
23  request, third request, fourth request, fifth
24  request and nobody would still do nothing.  I mean

175

1  it was -- they wouldn't do nothing.
2    Q.  When you say you were making out request
3  slips --
4    A.  Sick call.
5    Q.  Okay.  And did they -- did they -- did
6  they provide you with your Risperdal during that
7  time?
8    A.  No, none.
9    Q.  Did they provide you with your Depakote?
10    A.  None.
11    Q.  Did you feel symptoms of depression?
12    A.  Yes.
13    Q.  What -- what symptoms of depression did
14  you experience?
15    MR. CATANIA:  Objection.  Foundation.
16    THE WITNESS:  Wanted to hurt myself, you
17  know, crying, talking to myself, you know,
18  withdrawn from people.
19  BY MR. MORRISSEY:
20    Q.  Did you receive any psychiatric --
21    A.  No.
22    Q.  -- further -- let me ask the question.
23    In October and November of 2006 while you
24  were incarcerated at the Cook County jail, did you

176

44 (Pages 173 to 176)

1    receive any psychiatric counseling to your
2    knowledge?
3        A.  No.
4        Q.  Or any further psychiatric evaluation?
5        A.  No.
6        Q.  I ask you to turn to page 3 of Group
7    Exhibit No. 2.  It's the medical intake form from
8    January 30, '09.
9        A.  I don't have it.
10       Q.  It's your signature up here on that
11   document?
12       A.  Right here.
13       Q.  Now, that was done at approximately
14   5:30 p.m. on January 30, '09; correct?
15       A.  Yes.
16       MR. CATANIA:  Objection.  Foundation.
17   BY MR. MORRISSEY:
18       Q.  And on top where the date is it says PA;
19   correct?
20       A.  Right.
21       Q.  There's a signature for PA.  I'm showing
22   you what has been marked as -- Bates stamp page
23   No. 5 of Group Exhibit 2.
24       A.  Yes.

177

1        Q.  -- the mental health specialist that?
2        A.  No.
3        Q.  Now, 27 minutes later on the same date,
4    January 30, 2007 -- 2009 I believe Mr. Catania
5    said it's Mr. Myvet who's the CMT that talked to
6    you at that time.  James Myvet.  And in fact,
7    Mr. Myvet asked you whether or not you had
8    suffered any mental illness, correct, No. 8?
9        A.  Correct.
10       Q.  And you said yes?
11       A.  Right.
12       Q.  And he made notes reflecting previous
13   history; correct?
14       A.  Yes.
15       Q.  Bipolar?
16       A.  Yes.
17       Q.  And did you tell Mr. Myvet that you
18   had -- you suffer from bipolar disorder?
19       A.  Yes.
20       Q.  And did he ask you whether you were
21   currently on any medications?
22       A.  Yes.
23       Q.  And what did you tell him?
24       A.  Risperdal and Depakote.

179

1        Q.  This is a brief primary psychological
2    screening; correct?
3        A.  Yes.
4        Q.  And that was done at what time?
5        A.  5:03.
6        Q.  So that was about 27 minutes before the
7    medic did his screening at 5:30?
8        A.  Right.
9        Q.  And on the form that the mental health
10   specialist filled out, No. 3 question is, are you
11   currently received outpatient psychiatric
12   treatment, and there's a mark there, yes?  Right?
13       A.  Yes, it says no.
14       Q.  And then on No. 4 can you read that?
15       A.  Are you now taking psychotropic
16   medication?  No.
17       Q.  And was that true or not?
18       A.  That's false.
19       Q.  Did you tell the mental health specialist
20   that you were not taking psychotropic?
21       A.  No, I didn't tell him that.
22       Q.  Number 6 is, have you ever attempted
23   suicide and it's marked no.  Did you tell the --
24       A.  No.

178

1        Q.  And Mr. Myvet properly wrote that down;
2    correct?
3        A.  Yes.
4        Q.  How do you account for the fact that 27
5    minutes prior to that when you were asked the same
6    type of questions by a mental health specialist
7    that that mental health specialist denied or
8    stated that you said that you are not taking
9    psychotropic medication?
10       MR. CATANIA:  Objection.  Form.
11       THE WITNESS:  Because he was telling me about
12   all those different places that I would be if
13   bipolar.  I mean I would be going into the two
14   north, that I wouldn't get into the drug program,
15   that I have a delayed court date and all that.
16   BY MR. MORRISSEY:
17       Q.  But you didn't tell them that you weren't
18   on psychotropic medication?
19       A.  No.
20       Q.  Now, you again were -- went through a
21   different process last fall, October -- I believe
22   it's October 25, 2010; correct?
23       A.  Uh-huh.
24       MR. CATANIA:  Objection.  Form.

180

45 (Pages 177 to 180)

BY MR. MORRISSEY:

1 Q. You came into the Cook County jail;
2 correct --
3 A. Right.
4 Q. -- October 25, 2010?
5 And at that time how did the taking of
6 your -- your physical -- your mental -- strike
7 that.
8 When you came in in October 25, 2010, did
9 they -- did anybody sit down with you and ask you
10 medical questions --
11 A. Yes.
12 Q. -- your medical history?
13 A. Yes.
14 Q. Where was that done at that time?
15 A. In a back room, in a little room, in
16 like -- not -- at the table, when they do it at
17 the table -- when they first come in they do it at
18 the table. After the table they send you into
19 like a little office like, inside of a doctor's
20 office.
21 Q. And was it at that time that they asked
22 you the detail questions that are on page 7 of
23 Group Exhibit No. 2?

181

1 processes differ?
2 MR. CATANIA: Objection. Form, calls for a
3 narrative.
4 THE WITNESS: Oh, one was more -- one was
5 more better because you was more -- you was -- you
6 was in a different setting. You wasn't around
7 people that was looking at you. I mean, you know,
8 you got to go to court with these same people. So
9 if people hearing that you talk about what it's
10 like -- like with me if I'm going around talking
11 about that I went through suicidal tendencies and
12 stuff, that mean I'm going to have problems when I
13 get to wherever I'm getting at because people will
14 be talking about, yeah, you suicidal, you know,
15 you take medicine and this, that and the other.
16 And then back -- it's more private. I
17 mean, you know, it's more private. You're more
18 relaxed. You be able to tell a person what's
19 wrong with you. You get your help. You know,
20 you're not -- I'm not going to tell nobody while
21 you sitting there looking at me and I know you.
22 And then after I get out of jail and I still know
23 you, you going to have it all over the street that
24 I'm a crazy, something wrong with me.

183

1 MR. CATANIA: Objection. Form and
2 foundation.
3 THE WITNESS: Yes.
4 BY MR. MORRISSEY:
5 Q. Was that done in a group setting with
6 hundreds of --
7 A. No.
8 Q. -- inmates present?
9 A. No.
10 Q. Was it done on a one-to-one basis?
11 A. One-to-one basis, yes.
12 Q. And included in questions about your
13 physical health on October 25, 2010, they also
14 asked you detailed questions about your mental
15 health history; correct?
16 A. Correct.
17 Q. And you gave appropriate responses to
18 those questions?
19 A. Yes.
20 MR. CATANIA: Objection. Form.
21 BY MR. MORRISSEY:
22 Q. As a person that's gone through the
23 medical and psychological intake in 2006 and also
24 just recently in October of 2010, how did the two

182

1 BY MR. MORRISSEY:
2 Q. Now, in October of 2010, did they have a
3 medical doctor or psychiatrist also talk to you
4 during the intake?
5 A. Right, you have real doctors.
6 MR. CATANIA: Objection. Foundation.
7 THE WITNESS: You have real doctors instead
8 of sheriffs.
9 MR. MORRISSEY: Take about a two-minute
10 break.
11 MR. CATANIA: No, we don't need a break.
12 MR. MORRISSEY: I do. I need a break.
13 (A break was taken.)
14 MR. MORRISSEY: We have no further questions.
15 MR. CATANIA: I have a couple of follow ups.
16 FURTHER EXAMINATION
17 BY MR. CATANIA:
18 Q. Back in 2006 in either of those two
19 entries into the jail in 2006, did you know any of
20 the people in the receiving room while you were
21 there?
22 A. No.
23 Q. When you went to court, where any of the
24 people that came in with you at the court -- into

184

46 (Pages 181 to 184)
Ex 43 Holmes Dep 046

1    the receiving room with you in court?
2        A. Oh, you mean -- you mean the security or
3    the guys, the inmates?
4        Q. Yes.
5        A. I knew a lot of the inmates.
6        Q. How do you know a lot of the inmates?
7        A. From being on the street with them and
8    them being -- coming in homeless and all that.
9        Q. Okay. Do those -- some of those people
10   also know about your medical history?
11       A. No, no.
12       Q. You didn't tell anybody that you've got
13   hypertension?
14       A. No, they don't know.
15       Q. You don't tell anybody that you drink
16   alcohol to excess?
17       A. They know I drink alcohol and stuff but
18   they don't --
19       Q. How would they find that out?
20       A. Because I was with them drinking.
21       Q. So that part of it was not a secret;
22   right?
23       A. Right.
24       Q. When you were in the receiving area and

185

1        Q. Yes.
2        MR. MORRISSEY: No, no, he's asking before.
3    BY MR. CATANIA:
4        Q. In '06.
5        MR. MORRISSEY: He's asking the old way.
6        THE WITNESS: The old way was like this. I
7    don't think it was like this.
8        MR. MORRISSEY: For the record, he's
9    indicating he's putting up a paper divider between
10   himself and Mr. Catania.
11       THE WITNESS: I don't think it was like
12   this. No, it wasn't like this. I was on a stool,
13   you was on a stool, and it was like this.
14       MR. MORRISSEY: The record he's indicating
15   that --
16       THE WITNESS: That it was like that. It was
17   divided --
18       MR. MORRISSEY: Small divider between --
19       MR. CATANIA: I'd like to make a record here
20   now because Mr. Morrissey spent a whole bunch of
21   years litigating the area where the Plexiglas is.
22       THE WITNESS: I just can't remember. I mean
23   I'm just telling what I can remember.
24   BY MR. CATANIA:

187

1    talking with a mental health specialist you were
2    sitting in a cubicle area divided by Plexiglas;
3    right?
4        A. No, right here. Right here. They can
5    hear you. They can hear you because you're right
6    there. Everybody hear each other.
7        Q. I'm asking you about when you were having
8    the mental health screening. Screening.
9        A. All of it was by Plexiglas but the
10   Plexiglas was no more than right here. It was
11   between the officer. The officer, it was --
12   this -- this man here, I -- I -- he's right here
13   next to me. The glass was between like this.
14       Q. We've both been down there.
15       A. Right. But it's like this.
16       Q. And we both know the layout. So does
17   your lawyer. Okay.
18       The Plexiglas in the area where you were
19   having your mental health screen where they were
20   just asking you the basic questions --
21       A. I don't remember.
22       Q. -- that are on this page which is page
23   5 --
24       A. Oh, you mean now?

186

1        Q. All right. I understand you're telling
2    me what you remember, but when you were having a
3    conversation with mental health specialist, the
4    two intakes in 2006, you had Plexiglas to your
5    left and to your right during that period of time;
6    right?
7        A. Uh-huh.
8        Q. And the questions you were asked are the
9    11 questions that are on this page here; is that
10   right?
11       A. Uh-huh.
12       Q. Is that right?
13       A. Yes.
14       Q. Is that yes? Okay.
15       And when you had those questions and
16   answers being given, there were a lot of other
17   people in other areas of the receiving room;
18   right?
19       A. Yeah. Normally is one right there in
20   back of you ready to take your seat. So he's
21   hearing everything I'm saying because he's right
22   back there.
23       Q. And who was that person that was behind
24   you during that time?

188

47 (Pages 185 to 188)
Ex 43 Holmes Dep 047

1    A.  Them inmates, inmates right behind me.
2    Q.  The person was behind you in August and
3  October of 2006, who were those people?
4    A.  Inmates.
5    Q.  Who?
6    A.  I don't remember.
7    Q.  Okay.  Have you seen them since?
8    A.  Not that I know of.
9    Q.  And how about the mental health
10  specialist, Dena Williams, have you seen her since
11  then?
12   A.  I don't know her.
13   Q.  To your knowledge, did Dena Williams tell
14  anybody anything about what you said during your
15  little interview?
16   A.  Not that I know of.
17   Q.  The brief primary psychological screening
18  tool which is this page here, page 5 of the
19  Exhibit No. 2, are you familiar with what that --
20  the purpose of that is?
21   MR. MORRISSEY:  Object.  He's not a mental
22  health person.
23  BY MR. CATANIA:
24   Q.  Are you familiar with what the purpose of

189

1  health questions you thought was an officer;
2  right?
3    A.  Right.  I thought they were same as the
4  ones that was in -- they do ask you -- officers do
5  ask you that.  They were officers.  Them were
6  officers technicians I think.
7    Q.  They were officers?
8    A.  I think those are officer technicians.
9  All of them wasn't medical doctors.
10   Q.  Okay.  Do you know for certain that they
11  were --
12   A.  I know for certain that those were
13  officer technicians because them the same officers
14  I would see on the deck.
15   Q.  You're talking about correctional
16  officers; right?
17   A.  Correctional officers, they was asking
18  you the questions.
19   Q.  So the correctional officers were asking
20  you the questions on this brief primary
21  psychological screening tool?
22   MR. MORRISSEY:  To the best of your
23  knowledge.
24   THE WITNESS:  To my knowledge.

191

1  it is?
2    A.  No.
3    Q.  After you entered into the jail in
4  October of 2010, you were also asked questions
5  about your mental health status; isn't that right?
6    A.  Yes.
7    Q.  And after the initial questions about
8  your mental health and physical health status,
9  then you were sent to another location where
10  somebody asked you in a more private room more
11  detailed questions; right?
12   A.  Right.
13   Q.  When you were in the jail in 2006, in
14  addition to mental health questions you were asked
15  medical questions; right?
16   A.  Right.
17   Q.  And that was done face-to-face with a
18  medic; isn't that right?
19   A.  Right.
20   Q.  When you said to Mr. Morrissey that there
21  were officers asking you these questions, what
22  were you referring to?
23   A.  I thought they were officers.
24   Q.  So the person that asked you the mental

190

1  BY MR. CATANIA:
2    Q.  If I tell you the name Dena Williams down
3  here is not a correctional officer, does that
4  change your opinion about who it was asking you?
5    A.  I don't know who Dena Williams is.
6    Q.  When you were on the living unit after
7  the October of '06 intake into the jail, you said
8  that people told you you would have to go into
9  inpatient in order to get medication; right?
10   A.  Right.
11   MR. MORRISSEY:  I object.  That's not what he
12  said.
13   THE WITNESS:  I said I have to go into the RT
14  unit I mean, you know, in two north.
15  BY MR. CATANIA:
16   Q.  Okay.  Did they tell you that from the
17  living unit as well?
18   A.  No.  They told me that from downstairs,
19  but I still tried to get my medicine on the living
20  unit.
21   Q.  In receiving they told you that you'd
22  have to be admitted to two north?
23   A.  Right.
24   Q.  And you knew what that meant; right?

192

48 (Pages 189 to 192)

1    A.  Right.

2    Q.  And your information was based on having

3  been to two north before October of 2006?

4    A.  No, no, I had never been there.

5    Q.  Was it based on hearsay?

6    A.  Right, from what they told me.

7    Q.  Was it based on anything prisoners were

8  telling you?

9    A.  No.  But when I got upstairs the prisoner

10  told me that wasn't true, that I should be able to

11  get my medicine and go ahead and put in for my

12  medicine.

13    Q.  And you did that, right, you said --

14    A.  Right.  I kept doing it over and over and

15  over.  Wouldn't nobody -- it was too late.  They

16  said you messed up.  You should have told them all

17  that downstairs.

18    Q.  Did you ask anybody in any of those

19  requests for psychiatric counsel?

20    A.  Sure did.

21    Q.  For counselling?

22    A.  For counselling.

23    Q.  Did you ask for medication in any of

24  those requests?

193

---

1  said he filed --

2    THE WITNESS:  Right.

3    MR. MORRISSEY:  -- seven requests.

4    THE WITNESS:  Request.  I think I filed the

5  sick call grievance.  I think it was in one of

6  them -- one of these court dates I told you

7  about.  I filed the -- a grievance, you know.

8  BY MR. CATANIA:

9    Q.  Do you have a copy of the grievance?

10    A.  No, that was in 2006.

11    Q.  So earlier when I asked you if you filed

12  any grievances in 2006 and you said no, was

13  that --

14    A.  I told you yes.  You wrote it down.  I

15  told you yes.  I told you that I had about 20

16  people sign -- remember I told you I had about 20

17  people sign it.

18    Q.  The group grievance?

19    A.  The group grievance.

20    Q.  Other than the group grievance --

21    A.  Oh, that was it.  No, I didn't sign no

22  other grievance.

23    Q.  No grievance about not getting

24  medication?

195

---

1    A.  Sure did.  And it's in there.  It's in

2  all those request form that I wrote.  You're going

3  to see.  When you get the papers back, you're

4  going to see request one, request two, you're

5  going to see all the way to six, seven.  You're

6  going to see them in my request form, on yellow

7  request form, sick call slips.

8    Q.  Do you have copies of those request

9  forms?

10    A.  No.

11    Q.  Does your lawyer have copies of those

12  request forms?

13    A.  I don't know.  No.  I guess you all have

14  them, sent to county jail.

15    Q.  Does your lawyer have those request

16  forms?

17    A.  No, I don't have them over there.

18    Q.  Does your lawyer have any -- any forms at

19  all from the Cook County jail from the sheriff's

20  department?

21    A.  No.

22    Q.  But you didn't file any grievances in

23  that period of time; right?

24    MR. MORRISSEY:  Object.  He filed -- he just

194

---

1    A.  No.

2    Q.  No grievance about not getting

3  psychiatric treatment?

4    A.  No.  No.

5    Q.  For you was psychiatric treatment the

6  same thing as getting medication?

7    A.  Yes, same thing.

8    Q.  So what you were after in the time which

9  you were in October of '06 was getting medication?

10    A.  Yeah, all my medication, yes.  My right

11  medication.

12    Q.  Did any of the people that were around

13  you in the 2006 -- either of the 2006 mental

14  health screens, did they ever come up to you and

15  tell you I heard what you said?

16    A.  No.

17    Q.  When you were in the living unit in 2006

18  and people said you can still get your medication,

19  under what circumstances did those conversations

20  take place?

21    A.  Because I was telling them what I told

22  them about downstairs when they told me that I

23  couldn't get to the drug program or that I was

24  going to go over there to that dorm and be locked

196

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

1   up, handcuffed, no clothes and stuff. They said,
2   no, that ain't true, man. You get your
3   medication. Just go ahead and fill them things
4   out, man. Keep on bugging them about it. They'll
5   get you your medications.
6       Q.   So your -- the reason why people asked
7   you about it is because you told them about your
8   need for mental health medication?
9       A.   I didn't tell them about the mental
10  health. I told them about the medical thing.
11  When they told me that I can get my medicine
12  anyway, then I went on and put down there on my --
13  on the doctor statement, put them in the sick call
14  thing about the mental health drugs.
15      Q.   So the source of the information that
16  they had was you; is that right?
17      A.   Right.
18      Q.   So nobody else told them about your
19  medical or mental health issues, just you?
20      A.   Just me.
21      Q.   Do you think this lawsuit has anything to
22  do with the Plexiglas cubicles?
23      MR. MORRISSEY: I object. That's beyond the
24  scope of -- of my cross.

197

1       MR. CATANIA: No, it's not. His answers
2   included that.
3   BY MR. CATANIA:
4       Q.   Do you think it has anything to do with
5   that?
6       A.   I don't know -- I don't even know what
7   you're saying about that. I honestly don't know
8   what you're really saying.
9       Q.   When you were answering --
10      A.   This is the first time I ever heard of
11  Plexiglas lawsuit.
12      Q.   My question is, what is your
13  understanding about Plexiglas in regards to this
14  litigation?
15      A.   I don't know.
16      MR. CATANIA: I have no further questions,
17  sir.
18      THE WITNESS: Thank you.
19      MR. CATANIA: At this point you have a right
20  to have a copy of the transcript provided to you
21  so that you can review it. That's called
22  signature. If you want that, there's a time
23  constraint on when you can do that. You have the
24  choice of whether or not you want to sign it or

198

1   want to waive signature and trust the court
2   reporter to have taken down things that you said.
3   It's your choice.
4       THE WITNESS: What do you think?
5       MR. CATANIA: It is your choice, sir.
6       MR. MORRISSEY: I think I would recommend you
7   waive it. It's fine. Otherwise you have to come
8   back.
9       THE WITNESS: I waive it. Waive it. I waive
10  it.
11      MR. CATANIA: It's waived.
12          (3:09 p.m. further deponent
13          saith not.)

199

1       I, MARTHA C. NEWTON, a notary public within
2   and for the County of Kane and State of Illinois,
3   do hereby certify that heretofore, to-wit, on the
4   5th day of May 2011, personally appeared before
5   me, at Richard J. Daley Center, Fifth Floor,
6   Chicago, Illinois, JOHN HOLMES, in a cause now
7   pending and undetermined in the United States
8   District Court, wherein MICHAEL PARISH, et al. are
9   the Plaintiffs, and SHERIFF OF COOK COUNTY and
10  COOK COUNTY are the Defendants.
11      I further certify that the said witness was
12  first duly sworn to testify the truth, the whole
13  truth and nothing but the truth in the cause
14  aforesaid; that the testimony then given by said
15  witness was reported stenographically by me in the
16  presence of the said witness, and afterwards
17  reduced to typewriting by Computer-Aided
18  Transcription, and the foregoing is a true and
19  correct transcript of the testimony so given by
20  said witness as aforesaid.
21      I further certify that the signature to the
22  foregoing deposition was waived by counsel for the
23  respective parties.
24      I further certify that the taking of this

200

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois   (312) 263-0052**

```
1    deposition was pursuant to Notice, and that there
2    were present at the deposition the attorneys
3    hereinbefore mentioned.
4        I further certify that I am not counsel for
5    nor in any way related to the parties to this
6    suit, nor am I in any way interested in the
7    outcome thereof.
8        I have hereunto set my hand this 16th day of
9    May 2011.
10
11
12
         NOTARY PUBLIC, KANE COUNTY, ILLINOIS
13
14
15
16
17
18
19
20
21
22
23
24
                                                 201
```

McCorkle Court Reporters, Inc.
Chicago, Illinois   (312) 263-0052

Ex 43 Holmes Dep 051