IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Micheal Parish, Curtis L. Oats, Leila Khoury, Sean Driscoll, Carla Lofton, Roy Cleaves, Lisa Brown, Dan Taylor, Dean Miller, Kevin Sanders, Stacey Clark, and Carlotte Watson, | ) ) ) ) ) | |
| | ) | No. 07 CV 4369 |
| *Plaintiffs,* | ) ) | *Judge John Z. Lee* |
| *-vs-* | ) ) | Judge Presiding |
| Sheriff of Cook County and Cook County, | ) ) | Courtroom 1225 |
| *Defendants.* | ) ) | |

**Exhibit 44**
**Deposition of John Hendrix**
**June 27, 2011**

**Exhibit 44, Hendrix Dep.**

**Page 1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL PARISH, CURTIS )
L. OATS, LEILA KHOURY, )
SEAN DRISCOLL, CARLA ) No. 07 CV 4369
LOFTON, ROY CLEAVES, )
LISA BROWN, DAN TAYLOR, )
DEAN MILLER, KEVIN )
SANDERS, STACEY CLARK, )
and CARLOTTE WATSON, )
        Plaintiffs, )
    vs. )
SHERIFF OF COOK COUNTY )
and COOK COUNTY, )
        Defendants. )

The deposition of JOHN HENDRIX, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Sandra Di Vito, a notary public within and for the County of Cook and State of Illinois, at 50 West Washington Street, Room 571, Illinois, on June 27, 2011, commencing at 10:40 a.m., and concluding at 1:37 p.m.

Reported By: Sandra Di Vito
License No.: 084-004642

**Page 2**

1 APPEARANCES:
2 THOMAS G. MORRISSEY, LTD.
3 BY: MR. THOMAS G. MORRISSEY,
4 10249 South Western Avenue
5 Chicago, Illinois 60643
6 (773) 233-7900
7     Representing the Plaintiffs;
8
9 ANITA ALVAREZ,
10 COOK COUNTY STATE'S ATTORNEY
11 BY: MR. FRANCIS J. CATANIA,
12 Richard J. Daley Center
13 50 West Washington Street, Room 302
14 Chicago, Illinois 60602
15 (312) 603-6572
16     Representing the Defendants.

**Page 3**

1            I N D E X
2 WITNESS            EXAMINATION
3 JOHN HENDRIX
4   DX By Mr. Francis Catania        7
5   CX By Mr. Thomas Morrissey       156
6   RDX By Mr. Francis Catania       159
7
8
9
10
11
12
13        E X H I B I T S
14 NUMBER            MARKED FOR ID
15 HENDRIX Deposition Exhibit
16   No. 1              12
17   Nos. 2-3            52
18   No. 4              77
19   Nos. 5-6           105
20
21
22
23
24

**Page 4**

1     (Whereupon, the witness was duly
2 sworn.)
3 MR. CATANIA: Sir, would you, please, state
4 your name, for the record.
5 THE WITNESS: John O. Hendrix.
6 MR. CATANIA: Is that, H-E-N-D-R-I-X?
7 THE WITNESS: Yes.
8 MR. CATANIA: This is the Federal deposition
9 of John Hendrix pursuant to notice and agreement
10 of the parties continued, from time to time.
11     Mr. Hendrix, my name is Frank Catania,
12 I represent the Defendants in this case.
13     Do you understand why you're here?
14 THE WITNESS: Yes.
15 MR. CATANIA: Have you ever been deposed?
16 THE WITNESS: What do you mean by that?
17 MR. CATANIA: Well, a situation where there's
18 a court reporter taking down your testimony
19 under oath is called a deposition, that's what
20 we're doing right now, has that ever happened
21 with you before?
22 THE WITNESS: Not that I can recall.
23 MR. CATANIA: But you've testified at court
24 before, right? Have you testified before?

1 (Pages 1 to 4)

1 THE WITNESS: Yes.
2 MR. CATANIA: Okay. All right. I'm going to
3 ask you a bunch of questions about, I suppose,
4 the dates that you entered into the jail and,
5 perhaps, some other things, you'll have to
6 answer them under oath. Mr. Morrissey may ask
7 you other questions, if he chooses. The court
8 reporter's taking everything down as we say it,
9 and this is, also, recording us, our words, at
10 this time.
11    Do you understand all of that?
12 THE WITNESS: Yes.
13 MR. CATANIA: Okay. At the end of the
14 deposition, the court reporter likely will type
15 up a transcript, that's the written copy of our
16 conversations today, do you understand that?
17 THE WITNESS: Yes.
18 MR. CATANIA: You'll be given an opportunity
19 to review that transcript and make some
20 corrections, do you understand that?
21 THE WITNESS: Yes.
22 MR. CATANIA: Okay. It's very important that
23 you understand the questions I'm asking and that
24 you give accurate answers, because we will

5

1 assume that if you answer a question, that you
2 did understand it, okay?
3 THE WITNESS: Okay.
4 MR. CATANIA: All right. You understand
5 you're under oath, right?
6 THE WITNESS: Yes.
7 MR. CATANIA: Do you understand what it means
8 to make statements under penalties of perjury?
9 THE WITNESS: Yes.
10 MR. CATANIA: Okay. Do you understand that
11 your answers here in this less formal setting
12 are just like in court where your answers are
13 under oath, do you understand that?
14 THE WITNESS: Yes.
15 MR. CATANIA: Okay. Are you prepared to
16 answer my questions today?
17 THE WITNESS: Yes.
18 MR. CATANIA: What did you do to get ready
19 for today's deposition?
20 THE WITNESS: I consulted with my attorney.
21 MR. CATANIA: Okay. All of your answers have
22 to be in words and out loud, you understand
23 that, right?
24 THE WITNESS: Yes.

6

1 MR. CATANIA: Okay. If you need to take a
2 break, at anytime, I would just ask that you let
3 me know that you want to take a break and we'll
4 accommodate, okay?
5 THE WITNESS: Yes.
6    JOHN HENDRIX,
7 having been first duly sworn, was examined and
8 testified as follows:
9    DIRECT EXAMINATION
10 BY MR. CATANIA:
11 Q. All right. Your full name, I believe
12 you said, is John O. Hendrix?
13 A. Yes.
14 Q. What does the "0" stand for?
15 A. Olis, O-L-I-S.
16 Q. O-L-I-S?
17 A. Yes.
18 Q. Okay. What's your date of birth?
19 A. ▆▆▆▆▆▆
20 Q. Have you ever gone by any other name?
21 A. No.
22 Q. Has any creditor or other person ever
23 identified you by a name spelled differently
24 than the way you spell it?

7

1 A. No.
2 Q. Okay. I've seen elsewhere that your
3 name was spelled with an I-C-K-S at the end
4 instead of an X, have you ever seen that?
5 A. No.
6 Q. Okay. Where do you currently live?
7 A. ▆▆▆▆▆▆th Loomis.
8 Q. Loomis?
9 A. Loomis, uh-hum.
10 Q. And that's in Chicago?
11 A. Yes.
12 Q. What's the ZIP code?
13 A. 60643.
14 Q. And how long have you lived at that
15 address?
16 A. Maybe about 10 years.
17 Q. Is that a house or an apartment?
18 A. House.
19 Q. Do you own the home?
20 A. No, I don't.
21 Q. Is it owned by any relative of yours?
22 A. My father-in-law.
23 Q. Okay. Does he live there at that
24 address with you?

8

2 (Pages 5 to 8)

1    A.   Yes.
2    Q.   Okay.  What's his name?
3    A.   Jimmy Hicks.
4    Q.   Anyone else live in the home with you?
5    A.   No.
6    Q.   Okay.  Now, is -- are you currently
7  married?
8    A.   Yes.
9    Q.   What is your wife's name?
10   A.   Patricia Hendrix.
11   Q.   Any children?
12   A.   Yes.
13   Q.   How many?
14   A.   Two.
15   Q.   What are their names and ages?
16   A.   Nigel Hendrix.
17   Q.   M-I-G-U-E-L?
18   A.   N-I-G-E-L, right.
19   Q.   N-I-G-E-L.
20   A.   Right.
21   Q.   How old?
22   A.   He's 9.
23   Q.   And your other child?
24   A.   Christian Hendrix.

9

1    Q.   And her age?
2    A.   His age.
3    Q.   His age.
4    A.   4.
5    Q.   Okay.  Do they live with you at the
6  address of 9558 --
7    A.   No.
8    Q.   -- South Loomis?
9    A.   Uhn-uhn.
10   Q.   Okay.  They live with their mother?
11   A.   Yes.
12   Q.   And where does she live?
13   A.   If I'm not mistaken, not for sure,
14  let's see, probably have to get you that.
15   Q.   Okay.  Is it in Chicago?
16   A.   Actually, yes, it's still in Illinois.
17   Q.   Okay.  In Illinois?
18   A.   Yes.
19   Q.   Okay.  Are you divorced?
20   A.   No.  We're separated right now.
21   Q.   Separated, okay.
22        Have you ever been divorced?
23   A.   No.
24   Q.   Okay.  Any other children by any other

10

1  women?
2    A.   Yes.
3    Q.   Names?
4    A.   Akisha Davis.
5    Q.   How old is she?
6    A.   37, about 30 -- 30-something.
7    Q.   Okay.  Any others?
8    A.   Sonya Renee Wilburn.
9    Q.   Sonya --
10   A.   Renee.
11   Q.   -- Renee?
12   A.   Uh-hum.
13   Q.   And the last name?
14   A.   Wilburn.
15   Q.   Wilburn?
16   A.   Uh-hum.
17   Q.   And how old is Sonya?
18   A.   Maybe about -- maybe about 30, about
19  30.
20   Q.   Okay.  Is that the Sonya that you have
21  tattooed on your arm?
22   A.   Yes.
23   Q.   Okay.
24   A.   Yes.

11

1      MR. CATANIA:  All right.  We were provided an
2   Affidavit in this case, a Sworn Declaration
3   which is another way of saying it, and we're
4   going to make that an exhibit for this.
5        (Whereupon, HENDRIX Deposition
6            Exhibit No. 1 was marked for
7            identification.)
8   BY MR. CATANIA:
9    Q.   I'm going to show you what's been
10  marked Hendrix No. 1, it appears to be four
11  pages, and I just want to know if you recognize
12  that and if it's in the same form as when you
13  saw it last.
14   A.   Yes.
15   Q.   Okay.  Is that your signature on the
16  last page?
17   A.   Yes, it is.
18   Q.   Did you sign it on September 6th of
19  2010, the date that's on there?
20   A.   Yes.
21   Q.   And that's your handwriting for the
22  date as well?
23   A.   Yes.
24   Q.   Okay.  Where were you when you signed

12

3 (Pages 9 to 12)

1    it?
2        A.   I was home.
3        Q.   Was there a notary public present when
4    you were at home?
5        A.   No.
6        Q.   Were you placed under oath when you
7    signed the Affidavit?
8        A.   Yes.
9        Q.   Who put you under oath?
10       A.   Actually -- actually, it was said that
11   anything I say is under oath in my letter that
12   told me that.
13       Q.   Okay.  So, you received a letter --
14       A.   Exactly.
15       Q.   -- with instructions?
16       A.   Exactly.
17       Q.   Okay.  Can you tell me when -- do you
18   know the name of this case, the one you're
19   testifying in, do you know the name of it?
20       A.   Medication litigation case.
21       Q.   Okay.  Is that what the lawyers call
22   it?
23       A.   Yes.
24       Q.   Okay.
                                                    13

1    moment.
2            (Whereupon, a short break was
3            taken.)
4    BY MR. CATANIA:
5        Q.   Now, you said just a moment ago that
6    you first heard about this case in 2007.  When
7    you heard about the case first, was it by a
8    piece of mail you received, or was it posted in
9    the jail, or how did you first hear about it?
10       A.   I got news through the mail.
11       Q.   Okay.  Are you talking about the page
12   you just showed me?
13       A.   Yes.
14       Q.   Mr. Morrissey just made a point that
15   it's May 15th, 2009, the date of the notice, is
16   that when you first heard about it?
17       MR. MORRISSEY:  I believe it's March.
18       MR. CATANIA:  Well, it says May --
19       MR. MORRISSEY:  No, take a look at the flip
20   side.
21   BY MR. CATANIA:
22       Q.   Okay.  March 16th is the date on the
23   top of the notice, is that when you first heard
24   about the case or did you hear about it from
                                                    15

1        A.   Yes.
2        Q.   All right.  The name of the case, for
3    your information, is Michael Parish, et al. vs.
4    The Sheriff of Cook County and Cook County --
5        A.   Okay.
6        Q.   -- okay?
7        A.   I recall it.
8        Q.   When is the first time that you ever
9    heard anything at all about this case?
10       A.   Actually, in 2007.
11       Q.   Okay.  Where were you when you first
12   heard about it?
13       A.   Actually, I received a letter in the
14   mail.
15       Q.   Did you keep that letter?
16       A.   Yes, I did.
17       Q.   Do you have it with you today?
18       A.   I don't think so.
19       MR. MORRISSEY:  Letter reflects -- he's
20   tendering the March 16th, 2009, a notice to
21   Class Members that opted out before him.
22       MR. CATANIA:  Sir, I would just like to take
23   a moment, if I could, to make a photocopy of the
24   letter, if you don't mind, just give me one
                                                    14

1    other means?
2        A.   No, that's the first time I heard of
3    it, 2007.
4        Q.   2007?
5        A.   When I actually heard of it.
6        Q.   All right.  And did you hear about it
7    based on something in the news?
8        A.   News?
9        A.   Yeah, I heard it a few times in the
10   news.
11       Q.   Okay.  All right.  When you received
12   the notice dated March 16th, 2009, and on the
13   back something called, "Opt Out Form," did you
14   opt out of the litigation?
15       A.   Uhn-uhn.
16       Q.   You didn't?
17       A.   No.
18       Q.   Okay.  And, like I said before, your
19   answers have to be in words, because the court
20   reporter can't take down shrugs, and uh-hum, and
21   uhn-uhn, because they come across the same way
22   on a transcript.
23       A.   Oh, okay, sorry.
24       Q.   That's all right.  I just want to make
                                                    16

                                    4 (Pages 13 to 16)

1    sure we both understand that point.
2        All right. Have you ever been
3    convicted of any crimes?
4        A.  Yes.
5        Q.  What crimes?
6        A.  Possession.
7        Q.  Possession of a controlled substance?
8        A.  Yes.
9        Q.  Okay.
10       A.  Yes.
11       Q.  When were you convicted of possession
12   of a controlled substance?
13       A.  Maybe been about maybe about 15 years
14   ago or something.
15       Q.  Okay.  Any other felonies that you've
16   been convicted of?
17       A.  No, uh-uhn.
18       Q.  How about possession of a stolen motor
19   vehicle?
20       A.  Stolen motor vehicle, don't recall no
21   stolen motor vehicle.
22       Q.  Okay.  That's going back a number of
23   years, like, more than 20.
24       A.  Oh.
                                                   17

1        Q.  All right.  What was the substance that
2    you were convicted of possessing?
3        A.  If I'm not mistaken, rock cocaine I
4    think it was, not for sure.
5        Q.  All right.  Do you take any medication
6    that's prescribed for you right now?
7        A.  I just take an inhaler, that's it.
8        Q.  You're talking about Albuterol?
9        A.  Yes.
10       Q.  Okay.  No other medications, right?
11       A.  Well, I was taking high blood pressure
12   pills.
13       Q.  Okay.
14       A.  High blood pressure.
15       Q.  Do you know what the name of that
16   medication was?
17       A.  Actually, I don't know what that -- I
18   got that from the County, they had -- they had
19   gave it to me.
20       Q.  Okay.  Did you take any medication
21   today before coming to this deposition?
22       A.  No, uh-uhn.
23       Q.  Did you use any illicit drugs today --
24       A.  No.
                                                   18

1        Q.  -- before coming?
2        A.  No.
3        Q.  Okay.  Did you use any alcohol --
4        A.  No.
5        Q.  -- within the last 24 hours?
6        A.  No.
7        Q.  Okay.  Is there any reason that you can
8    think of that you would be unable to give true,
9    correct, and complete answers to my questions
10   today?
11       A.  No.
12       Q.  When you were arrested -- your
13   Affidavit talks about, I believe, two arrests,
14   April of '07 entry into the jail, and August
15   of '09, that's in Paragraph 8 if you want to
16   look at that, but are there any other arrests
17   that you are complaining about other than those
18   two that are in your Sworn Declaration?
19       A.  No, not that I recall.
20       Q.  Okay.  The Sworn Declaration, you
21   understood when you signed it that it was being
22   signed under the penalties of perjury under the
23   Federal law, right?
24       A.  Right, exactly.
                                                   19

1        Q.  Okay.  And you know there are penalties
2    for lying under oath, right?
3        A.  Exactly.
4        Q.  All right.  Aside from the possession
5    of a controlled substance conviction, have you
6    been convicted of any other crimes?
7        A.  Actually, I just -- well, the 2009 that
8    I just got out of -- out on was when I was in
9    the County at this time right here.
10       Q.  Okay.
11       A.  They -- they upgraded it to a felony.
12       Q.  All right.
13       A.  Which it was two tickets, driving on
14   suspended and revoked.
15       Q.  All right.  Two tickets that were
16   upgraded to a felony, right?
17       A.  Yes.
18       Q.  Okay.
19       A.  As far as I know.  I'm on probation for
20   that right now.
21       Q.  Okay.  Who are you on probation, which
22   judge?
23       A.  Brown.
24       Q.  Okay.  Michael Brown?
                                                   20

5 (Pages 17 to 20)

1    A.   Michael Brown, exactly.
2    Q.   He's a good man.
3    A.   Uh-hum.
4    Q.   Do you have a driver's license?
5    A.   No.
6    Q.   Do you have a State ID?
7    A.   Yes.
8    Q.   Do you have it with you?
9    A.   Yes.
10   Q.   Can I take a look at it.  Show it to
11   your lawyer first.
12        I've been tossed Illinois State
13   Identification Card from Mr. Morrissey, it is
14   the old form, it has only one picture on it, but
15   it does look like the fellow sitting across from
16   me, although, I think in this one you have hair?
17   A.   Yeah, I had hair.
18   Q.   The Identification No. is
19   5364-7461-353H, as in Henry, issued February 1st
20   of 2006, expires 12/12 of 2011, the name on it
21   is John O. Hendrix, 9558 South Loomis, Chicago,
22   Illinois, 60643, it describes a date of birth as
23   12/12/61, a male, 5'8", 160 pounds, brown eyes,
24   an original Identification Card, and there's a

21

1    signature on it, it looks like it says
2    John Hendrix.
3         Did I accurately describe your card?
4    A.   Yes.
5    Q.   Okay.  You're not -- are you 5'8"?
6    A.   Yeah, about 5'8".
7    Q.   Okay.  And do you weigh 160?
8    A.   Actually, maybe a little bit more now.
9    Q.   Little more.
10        Now, you did have a driver's license,
11   at one time, right?
12   A.   No, I never had a driver's license.
13   Q.   Okay.  All right.  Did you have a
14   driving record created by the Secretary of State
15   as a result of driving a motor vehicle?
16   A.   Yes.
17   Q.   Okay.  When was that record first
18   created, to your knowledge?
19   A.   I don't recall.
20   Q.   All right.  Do you know why your
21   license is revoked?
22   A.   Not right now I don't.
23   Q.   Okay.  Did you plead guilty to the
24   charge that led to your recent conviction and

22

1    probation?
2    A.   No.
3    Q.   You went to trial on that?
4    A.   Yes.
5    Q.   Okay.  Did you testify in that case?
6    A.   Yes, I did.
7    Q.   So, you understand about testifying
8    under oath?
9    A.   Yes.
10   Q.   Judge Brown found you guilty of that
11   offense?
12   A.   Yes.
13   Q.   And that offense we're talking about is
14   driving while license revoked following a
15   previous conviction for driving revoked where
16   the basis of that revocation was either a
17   summary suspension for a DUI or a DUI
18   conviction; is that right?
19   A.   Right, exactly.
20   Q.   Okay.  So, you've had DUI --
21   A.   I had --
22   Q.   -- arrests before?
23   A.   Yes.  I had, I believe, one DUI.
24   Q.   Were you convicted of that DUI?

23

1    A.   Yes.
2    Q.   When was that?
3    A.   I don't recall that -- that year.
4    Q.   Okay.  You understood that having a DUI
5    conviction would result in a revocation of any
6    driving privileges you might have had, right?
7    A.   Yes.
8    Q.   Okay.  And that's what led to your
9    revocation record; is that right?
10   A.   Yes.
11   Q.   All right.  And you had been convicted
12   of driving after that revocation, also?
13   A.   Yes.
14   Q.   So, the felony is based on having had a
15   prior DUI conviction and revocation and a
16   driving while license revoked conviction after
17   that, right?
18   A.   As far as I know.
19   Q.   Okay.
20   A.   As far as I know.
21   Q.   All right.  Do you have a driver's
22   license or driving record in any other State?
23   A.   No.
24   Q.   Do you have any arrests and convictions

24

6 (Pages 21 to 24)

1   in any other State --
2       A.  No.
3       Q.  -- besides Illinois?
4       A.  No.
5       Q.  Have all of your arrests been in Cook
6   County?
7       A.  Yes.
8       Q.  How many times have you been to the
9   Cook County Jail?
10      A.  Maybe five, six times, something like
11  that.  Maybe about five, six times.
12      Q.  Over what period of time of years?
13      A.  I'd say from 2002 -- actually, I really
14  don't know.  I really don't know.  I really
15  don't know.
16      Q.  Okay.  How many times have you been to
17  the jail since August 3rd of 2005?
18      A.  I don't recall that either.
19      Q.  All right.  The Affidavit I said
20  describes two intakes into the jail that you're
21  complaining about, an '07 intake and an '09
22  intake, right?
23      A.  Uh-hum.
24      Q.  Is that a yes?

25

1       A.  Yes.
2       Q.  Okay.
3       A.  Yes.
4       Q.  Do you have any other intakes into the
5   jail that you're complaining about?
6       A.  Not that I know of.
7       Q.  All right.  Did you have one in 2010?
8       A.  2010?
9       Q.  Uh-hum.
10      A.  I don't recall that one.
11      Q.  All right.
12      A.  I don't recall that.
13      Q.  What's your Social Security number?
14      A.  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.
15      Q.  And that's accurately reflected in
16  Paragraph 1; is that right?
17      A.  That is correct.
18      Q.  Okay.  Have you ever used any other
19  dates of birth besides 12/12 of 1961?
20      A.  No.
21      Q.  What was the date that you entered into
22  the jail for -- strike that.
23          In Paragraph 8, it says that you were
24  processed in the Cook County Jail on April 27 of

26

1   2007, and assigned a CIMIS number, which is
2   2007-0030586, do you see that in Paragraph 8?
3       A.  Yes.
4       Q.  All right.  When were you arrested for
5   that entry into the jail?
6       A.  Excuse me?
7       Q.  When were you arrested before you
8   entered into the jail on April 27, 2007, was it
9   the same day, a previous day?
10      A.  I don't recall.
11      Q.  All right.  Did you spend any time in a
12  police lockup prior to April 27th of 2007, based
13  on that arrest?
14      A.  Don't recall that.
15      Q.  Okay.  Paragraph 8, also, alleges that
16  you were processed into the County Jail on
17  August 23rd of 2009, do you remember that
18  processing into the jail in 2009?
19      A.  Now, that process, I don't -- I don't
20  remember -- I remember I went there August 24th
21  of 2009.  August 23rd right here was when I got
22  arrested at the police station.
23      Q.  Okay.  On April 27th, 2007, the date
24  that is listed as your first entry, were you

27

1   serving a sentence, at that time, when you
2   entered the jail?
3       A.  Not that I can recall.
4       Q.  Okay.  When you were in the jail in
5   August of 2009, which is in Paragraph 8 of your
6   Sworn Declaration, August 23 of '09, were you in
7   the jail after being taken into custody from a
8   courtroom or were you in jail after an arrest by
9   the police?
10      A.  I went from the police station to the
11  County.
12      Q.  Okay.  Did you go to a courtroom or a
13  video bond hearing?
14      A.  I went to a hearing, I think it was a
15  bond hearing.
16      Q.  Do you remember where that was?
17      A.  That was in the -- that was in the
18  County -- that was in the County Building.
19      Q.  Okay.  At 26th and California?
20      A.  Yes.
21      Q.  Room 100, the bond room, or do you
22  know?
23      A.  I, actually, don't recall, but I
24  remember going to court.

28

7 (Pages 25 to 28)

1    Q.  All right.  Do you remember the judge
2  for the bond hearing?
3    A.  I don't recall whether it was a lady.
4  If I'm not mistaken, I think it was a lady.  I
5  don't recall.
6    Q.  Do you remember the charges?
7    A.  Driving on a suspended and revoked.
8    Q.  And any other charges, any other
9  tickets?
10   A.  None that I can recall.
11   Q.  Driving without insurance, perhaps?
12   A.  Yeah.  Yeah, driving without insurance.
13   Q.  And it was a couple of weeks after that
14  that you were indicted for driving while license
15  revoked as a felony, right?
16   A.  Yes.  They upgraded it.
17   Q.  Okay.  Was the time you spent in jail
18  in April of '07 the basis for the upgrade to the
19  felony, in other words, were you convicted of
20  driving while revoked in April of '07, and then
21  that was --
22   A.  I don't recall --
23   Q.  -- used in '09 --
24   A.  -- '07.  I don't recall '07.  I don't

29

1  recall '07.
2    Q.  Okay.  Do you remember who arrested you
3  on April 27 of 2007?
4    Answer has to be out loud.
5    A.  No, I don't.  No, I don't.
6    Q.  Thank you.
7    A.  Uhn-uhn.  Excuse me.
8    Q.  Were you taken from the floor in the
9  courtroom to serve time on April 27, 2007?
10   A.  Not that I recall.
11   Q.  All right.  On August 23 of 2009, or
12  August 22, 2009, whichever was the date of the
13  arrest, do you recall if you were with somebody
14  at the time you were arrested?
15   A.  No, I wasn't with nobody.
16   Q.  Okay.  Why is it that you were arrested
17  that time in August of '09?
18   A.  August of '09, I was -- I was visiting
19  my daughter on the west side, and a lady come
20  down the street, hit my wife car.  I come off
21  the porch, she backed up, said she was finna
22  call the police.  I went back on the porch until
23  the police came.
24   When the police came, they asked me for

30

1  my ID, I gave them my ID.  The lady told them I
2  was driving.  So, the officer -- they -- they
3  said that they don't know -- it don't sound like
4  her story sound right.  So, I end up -- so, they
5  said by me not having no license and whatnot,
6  they was finna lock me up.  So, I got locked up
7  that day.
8    Q.  All right.
9    A.  They asked me did I have keys to the
10  car -- to the car, I said, "No, I don't have the
11  keys to the car."
12   I was on the porch waiting on my
13  daughter to come home and I got -- I ended up
14  getting arrested because she said I was driving
15  the car.
16   Q.  Okay.  All right.  Before the accident
17  happened that involved your wife's car --
18   A.  Uh-hum.
19   Q.  -- you had gone to your daughter's
20  house from your South Loomis Avenue address; is
21  that --
22   A.  Right.  Exactly.
23   Q.  Okay.
24   A.  Right.

31

1    Q.  Was anyone with you when you went from
2  home to her house?
3    A.  No.  Just me.
4    Q.  Okay.  What was the weather like, at
5  the time?
6    A.  It was warm.
7    Q.  Okay.
8    A.  Warm.
9    Q.  Had you had any alcoholic beverage to
10  drink before that happened?
11   A.  No.
12   Q.  Were you under the influence of
13  anything at the time of that --
14   A.  No.
15   Q.  -- arrest?
16   A.  No.
17   Q.  Okay.  Can you tell me a little bit
18  about your education background, where did you
19  go to school and how far did you go?
20   A.  I went all the way to 12th grade.  I
21  went to McLaren High School, that was on 14th
22  and Roosevelt.
23   Q.  14th and?
24   A.  Roosevelt.

32

8 (Pages 29 to 32)

1    Q.   Roosevelt, okay.
2    A.   Long time ago.
3    Q.   And did you graduate?
4    A.   Yes.
5    Q.   What year?
6    A.   '80.
7    Q.   Okay.  Do you have any other education
8  beyond the 12th grade?
9    A.   No, uhn-uhn.
10   Q.   Did you grow up in a home with your --
11 both your parents?
12   A.   No.  Just my mom.
13   Q.   Okay.  Where was your father, at the
14 time?
15   A.   My father was staying in Texas.
16   Q.   Okay.  Is your father still alive?
17   A.   No, he's deceased.
18   Q.   When did he die?
19   A.   Maybe about three or four years ago.
20   Q.   Do you know what he died of?
21   A.   He had -- he had diabetes.
22   Q.   Was it a complication of the diabetes
23 that he died?
24   A.   Yes.
                                              33

1    Q.   Okay.  And your mother's still alive?
2    A.   Yes.
3    Q.   What's your father's name?
4    A.   John Edward Hendrix.
5    Q.   Okay.  And your mother's name?
6    A.   Gertrude Hawkins.
7    Q.   And she's still alive?
8    A.   Yes.
9    Q.   Where does she live?
10   A.   My mother stay -- actually, I don't
11 know her address, but she stay on Cicero and
12 Harlem, Harlem and Cicero.
13   Q.   Is that in Chicago?
14   A.   Yes.
15   Q.   Okay.  Because Cicero is at some points
16 a border, and Harlem is at some points a border.
17   A.   Right.  So, she's, like, Harlem and
18 Cicero, somewhere over there.
19   Q.   All right.  How old is your mother?
20   A.   About 69.
21   Q.   Does she have any health problems?
22   A.   Yes.
23   Q.   What kinds of health problems?
24   A.   My mother's a diabetic, she have high
                                              34

1  blood pressure.  That's as far as I know.
2    Q.   Okay.  Did either your father or your
3  mother have any problem with asthma?
4    A.   Not that I know about my father, but my
5  mom, it runs in my mom's family.
6    Q.   Mom's family?
7    A.   Yeah.
8    Q.   Okay.
9    A.   My dad, I don't know.
10   Q.   Any of your children have asthma?
11   A.   Not that I know of.
12   Q.   Was there a period of time that you
13 were inhaling illegal drugs?
14   A.   No.
15   Q.   Okay.  How did you -- did you use the
16 rock cocaine that you were in possession of?
17   A.   No.  No.  No.  No.
18   Q.   What is it that you do for a living?
19   A.   I work for a temporary agency right
20 now.
21   Q.   What's the name of the agency?
22   A.   Flexible Staffing.
23   Q.   Is that a Chicago company?
24   A.   Yes.
                                              35

1    Q.   How long have you done that?
2    A.   It's, like, off and on.  If they got
3  work, you go out, if not, no work at all.
4    Q.   I understand that.
5         When did you start working with
6  Flexible Staffing?
7    A.   I've been with Flexible Staffing ever
8  since 2005.
9    Q.   Okay.  And before that, were you
10 employed full time?
11   A.   Yes.
12   Q.   Where did you work full time before
13 that?
14   A.   I was working for Roman's Decorating
15 Products.
16   Q.   What did you do for them?
17   A.   Actually, did shipping and receiving.
18   Q.   All right.  As a shipping and receiving
19 clerk, did you call it that, at the time, a
20 clerk, or did you have some other title?
21   A.   It was actually shipping and receiving,
22 doc work, whatever you want to call it, yeah.
23   Q.   Okay.  Did you have to use the
24 forklift?
                                              36

9 (Pages 33 to 36)

1     A.   Actually, we used hand jacks.
2     Q.   Hand jacks?
3     A.   Yes.
4     Q.   Okay.   Could you tell me the name of
5 your immediate supervisor at Flexible Staffing?
6     A.   Virginia.
7     Q.   Do you remember the name of your
8 supervisor at Roman's Decorating Products?
9     A.   John Cashman.
10     Q.   That's a great name, if he's going to
11 pay you that is.
12      In your job, either one, Flexible
13 Staffing or the decorating products company, did
14 you have to do any physical work?
15     A.   Physical work?
16      Well, sometimes.
17     Q.   Okay. And by that, I mean, lifting --
18     A.   Lifting, yes.
19     Q.   -- moving --
20     A.   Yes.
21     Q.   Okay.   Does the Flexible Staffing
22 company limit your jobs, in any way, as a result
23 of your asthma?
24     A.   Yeah.
                   37

1     Q.   What do they limit you to?
2     A.   How long -- how long can I lift, stuff
3 like that.
4     Q.   Okay.   So, you have some restrictions
5 on lifting; is that right?
6     A.   Yeah, sometimes. Yeah, sometimes.
7     Q.   Are you still able to --
8     A.   Still --
9     Q.   -- do physical work?
10     A.   Right. I'm still able to do physical
11 work, right.
12     Q.   Okay.
13     A.   Because you get breaks and stuff,
14 so ...
15     Q.   All right.   Would you describe your
16 work as medium or heavy lifting?
17     A.   I would say, like, medium. Pretty more
18 like medium.
19     Q.   As a result of doing your work, did you
20 ever have an asthma attack that you required
21 hospitalization?
22     A.   No.
23     Q.   Okay.
24     A.   No.
                   38

1     Q.   Would you consider your current job as
2 a temporary to be a skilled or unskilled type of
3 job?
4     A.   I would say it was -- I would say it's
5 skillful.
6     Q.   Skillful?
7     A.   Yeah.
8     Q.   Okay.   You ever injure yourself on the
9 job?
10     A.   Injured?
11      Yes, I have.
12     Q.   Did you ever seek treatment as a result
13 of an injury on the job?
14     A.   Yes.
15     Q.   Okay.   When did you get injured?
16     A.   2008, if I'm not mistaken.
17     Q.   So, that would have been with the
18 temporary agency?
19     A.   Actually, I was working with them
20 permanent -- it was a permanent job, right.
21     Q.   Oh, okay.   And what type of injury was
22 it?
23     A.   Back injury.
24     Q.   Were you treated at a hospital or
                   39

1 doctor's office?
2     A.   Actually, the doctor's office.
3     Q.   Do you remember the name of the doctor?
4     A.   No.
5     Q.   What type of therapy or therapies did
6 you have?
7     A.   Like, bending, and back treatment, and
8 stuff like that.
9     Q.   Okay.   Do you mean that you were asked
10 to do certain exercises --
11     A.   Yes.
12     Q.   -- on your own?
13     A.   Yes.
14     Q.   Did you ever get assigned to do
15 physical therapy by a physical therapist?
16     A.   Yeah. I got that, yes.
17     Q.   Okay.
18     A.   Yes.
19     Q.   Any other treatments?
20     A.   Basically, that's it.
21     Q.   As a result of that injury, did you
22 file any kind of workers' comp claim or any
23 other type of action?
24     A.   Yes.
                   40

10 (Pages 37 to 40)

1    Q.  Did you receive workers' comp?
2    A.  Actually, I sued them.
3    Q.  Did you?
4    A.  Yes.
5    Q.  Did you receive a recovery?
6    A.  Not really.
7    Q.  Was there a settlement to the case?
8    A.  Yes, it was.
9    Q.  Okay.  Was it a settlement that paid
10 you money?
11    A.  Yes.
12    Q.  Do you remember when that was?
13    A.  I don't recall exactly when it was.
14    Q.  All right.  Have you ever filed a
15 lawsuit yourself?
16    A.  Yes.
17    Q.  When did you file a lawsuit?
18    A.  That's the one I filed right there.
19    Q.  Okay.  So, you're talking about the
20 workers' comp claim?
21    A.  Yes.
22    Q.  Any others besides that?
23    A.  Besides that, not that I recall.
24    Q.  All right.  When was it that you were

                    41

1    Q.  All right.  In your Affidavit, you
2 describe in Paragraph 3 as using Albuterol two
3 times per week as needed, that's what it says,
4 right?
5    A.  Right.
6    Q.  Okay.  So, if you don't need it, you
7 would use it less than two times a week?
8    A.  Basically.
9    Q.  Okay.
10    A.  Basically.
11    Q.  When you do use it, it's because you
12 have suffered some symptoms?
13    A.  Right.  Right.
14    Q.  Do you know what it is that brings on
15 the symptoms?
16    A.  Actually, it could be, like, if I'm
17 outside and I inhale, like, something to trigger
18 it --
19    Q.  Uh-hum.
20    A.  -- trigger my asthma.  Because it's
21 stuff that can trigger your asthma, such as
22 mold, different stuff.  Maybe running too much,
23 maybe climbing too many stairs, something like
24 that.

                    43

1 first diagnosed with having asthma?
2    A.  I was born with asthma.
3    Q.  Can you tell me when is the last time
4 you had an asthma attack for which you were
5 hospitalized?
6    A.  I've never been hospitalized.
7    Q.  How would you describe your current
8 physical condition?
9    A.  All right.
10    Q.  Okay.  You're not having any problems
11 right now with breathing, because I'm sitting
12 across the table from you; is that right?
13    A.  No, I'm not having no problem
14 breathing.  I got my asthma pump.
15    Q.  Now, you use the term, "asthma pump,"
16 and I was just wondering if a doctor's ever
17 described it as an asthma pump?
18    A.  Well, inhaler.
19    Q.  Inhaler?
20    A.  Excuse me, inhaler.
21    Q.  I've heard it described as an asthma
22 pump, because Mr. Morrissey brings me lots of
23 people from the jail that describe it that way.
24    A.  Oh.

                    42

1    Q.  Okay.  Do you run?
2    A.  No.  Sometimes.  Not all the time.
3 Sometimes.  Not all the time.  Sometimes.
4    Q.  Okay.
5    A.  Know when to shutdown --
6    Q.  Yeah.
7    A.  -- or when to stop running.
8    Q.  All right.  When you have been running
9 or climbing stairs and your symptoms are
10 triggered, what type of symptoms do you have?
11    A.  It's, like, I'm short of breath, I get
12 to wheezing, and that's how I know.
13    Q.  All right.  Has --
14    A.  I need to take my pump.
15    Q.  Has that ever happened to you when you
16 have not had your inhaler with you?
17    A.  No -- have it ever happened?
18    Q.  Yes.
19    A.  Sometimes it happened.  Sometimes it
20 happened when I don't have it, but I keep it on
21 me.
22    Q.  When you were arrested in April
23 of 2007, did you have your asthma inhaler with
24 you?

                    44

11 (Pages 41 to 44)

1    Q.  Did you receive workers' comp?
2    A.  Actually, I sued them.
3    Q.  Did you?
4    A.  Yes.
5    Q.  Did you receive a recovery?
6    A.  Not really.
7    Q.  Was there a settlement to the case?
8    A.  Yes, it was.
9    Q.  Okay.  Was it a settlement that paid
10 you money?
11   A.  Yes.
12   Q.  Do you remember when that was?
13   A.  I don't recall exactly when it was.
14   Q.  All right.  Have you ever filed a
15 lawsuit yourself?
16   A.  Yes.
17   Q.  When did you file a lawsuit?
18   A.  That's the one I filed right there.
19   Q.  Okay.  So, you're talking about the
20 workers' comp claim?
21   A.  Yes.
22   Q.  Any others besides that?
23   A.  Besides that, not that I recall.
24   Q.  All right.  When was it that you were

41

1    Q.  All right.  In your Affidavit, you
2 describe in Paragraph 3 as using Albuterol two
3 times per week as needed, that's what it says,
4 right?
5    A.  Right.
6    Q.  Okay.  So, if you don't need it, you
7 would use it less than two times a week?
8    A.  Basically.
9    Q.  Okay.
10   A.  Basically.
11   Q.  When you do use it, it's because you
12 have suffered some symptoms?
13   A.  Right.  Right.
14   Q.  Do you know what it is that brings on
15 the symptoms?
16   A.  Actually, it could be, like, if I'm
17 outside and I inhale, like, something to trigger
18 it --
19   Q.  Uh-hum.
20   A.  -- trigger my asthma.  Because it's
21 stuff that can trigger your asthma, such as
22 mold, different stuff.  Maybe running too much,
23 maybe climbing too many stairs, something like
24 that.

43

1 first diagnosed with having asthma?
2    A.  I was born with asthma.
3    Q.  Can you tell me when is the last time
4 you had an asthma attack for which you were
5 hospitalized?
6    A.  I've never been hospitalized.
7    Q.  How would you describe your current
8 physical condition?
9    A.  All right.
10   Q.  Okay.  You're not having any problems
11 right now with breathing, because I'm sitting
12 across the table from you; is that right?
13   A.  No, I'm not having no problem
14 breathing.  I got my asthma pump.
15   Q.  Now, you use the term, "asthma pump,"
16 and I was just wondering if a doctor's ever
17 described it as an asthma pump?
18   A.  Well, inhaler.
19   Q.  Inhaler?
20   A.  Excuse me, inhaler.
21   Q.  I've heard it described as an asthma
22 pump, because Mr. Morrissey brings me lots of
23 people from the jail that describe it that way.
24   A.  Oh.

42

1    Q.  Okay.  Do you run?
2    A.  No.  Sometimes.  Not all the time.
3 Sometimes.  Not all the time.  Sometimes.
4    Q.  Okay.
5    A.  Know when to shutdown --
6    Q.  Yeah.
7    A.  -- or when to stop running.
8    Q.  All right.  When you have been running
9 or climbing stairs and your symptoms are
10 triggered, what type of symptoms do you have?
11   A.  It's, like, I'm short of breath, I get
12 to wheezing, and that's how I know.
13   Q.  All right.  Has --
14   A.  I need to take my pump.
15   Q.  Has that ever happened to you when you
16 have not had your inhaler with you?
17   A.  No -- have it ever happened?
18   Q.  Yes.
19   A.  Sometimes it happened.  Sometimes it
20 happened when I don't have it, but I keep it on
21 me.
22   Q.  When you were arrested in April
23 of 2007, did you have your asthma inhaler with
24 you?

44

11 (Pages 41 to 44)

1    A.  It was in my car.
2    Q.  Okay.  Did you have it at the police
3 station?
4    A.  I had one at the police station --
5 well, it was in my car, but they said they were
6 going to go get it, but they never did go get
7 it.
8    Q.  Okay.  So, they did tow your car in
9 that -- in that situation?
10    A.  Yes.
11    Q.  Okay.  At the time the police were
12 informed by you that you had one in your car,
13 were you suffering any symptoms?
14    A.  He said -- he said, "Do you need your
15 asthma pump?"
16       I said, "Yeah, I need my asthma pump."
17       He said, "Well, I'll bring it back to
18 you."
19    Q.  Okay.  I understand that, but were you
20 suffering any symptoms at the time that you told
21 the police about --
22    A.  I couldn't hardly breath, right.
23    Q.  So, you were in police custody, right?
24    A.  Right.
                                                45

1    A.  Right.
2    Q.  -- and maybe we'll try to see if you
3 remember the other.
4       All right.  When you were arrested in
5 August of 2009, that was by Chicago Police, and
6 you were brought to Trumbull and 18th?
7    A.  Right.
8    Q.  Okay.  And you were saying that, at the
9 time of that arrest, you informed the police
10 that you had asthma?
11    A.  Yes.  I informed them I had asthma,
12 right.
13    Q.  All right.  Did you inform them about
14 any symptoms at the time of that -- that you
15 gave them information that you had asthma?
16    A.  No.  He just said, "You got an asthma
17 pump in your car?"
18       And I said, "Yes."
19       And he said, "I'll bring it back."
20       So, when they locked me up, he never
21 did bring it -- bring it back there to me.
22    Q.  Okay.  So, at the point where the
23 police said they would bring it to you --
24    A.  Right.
                                                47

1    Q.  At a Chicago Police Station?
2    A.  Yes.
3    Q.  Where?
4    A.  Trumbull, 18th and Trumbull.
5    Q.  I think I've been there.
6    MR. MORRISSEY:  Off the record for a second.
7       (Whereupon, a discussion was had
8        off the record.)
9 BY MR. CATANIA:
10    Q.  You were going to say something, I
11 think that --
12    A.  Yes.  Now, 2007, I don't know, you
13 probably getting it mixed up with 2009.
14    Q.  I don't.
15    A.  Well, 2009 was -- was when I got
16 arrested then --
17    Q.  Right.
18    A.  -- at the police on 18th and Trumbull.
19    Q.  Right.
20    A.  Now, 2007, I don't recall 2007 now.
21    Q.  All right.
22    A.  I don't recall 2007.
23    Q.  So, let's talk about 2009, since that's
24 the one you remember right now --
                                                46

1    Q.  -- you weren't actually in distress,
2 right?
3    A.  No.  I was waiting on them to bring it
4 back, right.
5    Q.  Okay.  Did they transport you to any
6 area hospital as a result of your disclosing
7 that you had asthma?
8    A.  No.
9    Q.  Do you remember what day of the week it
10 was that you were arrested?
11    MR. MORRISSEY:  If you recall.
12    MR. CATANIA:  That's why I asked.
13    THE WITNESS:  No, not that I can recall.
14 BY MR. CATANIA:
15    Q.  All right.  Was it a day that you had
16 been working?
17    A.  Not that I can recall that either.
18    Q.  Do you remember where you were
19 arrested?
20    MR. MORRISSEY:  Asked and answered.
21    THE WITNESS:  I was arrested on Trumbull.  I
22 was arrested on Trumbull.
23 BY MR. CATANIA:
24    Q.  Okay.  Do you remember what you were
                                                48

                                    12 (Pages 45 to 48)

1    doing that day?
2        A.   I was on the porch waiting for my
3    daughter.
4        Q.   All right.  Was your daughter at home,
5    at the time?
6        A.   No, she wasn't there yet.
7        Q.   All right.  Did she arrive before the
8    police took you away?
9        A.   Yes.
10       Q.   Okay.
11       A.   Yes.
12       Q.   And which daughter is this?
13       A.   Akisha Davis.
14       Q.   At this point, do you have any memory
15   of what time of day it was?
16       A.   It was -- it was at night.
17       Q.   In Paragraph 10 of the Sworn
18   Declaration in front of you, it says that at
19   intake, you told intake personnel that you were
20   asthmatic and needed an inhaler, what do you
21   mean by, "personnel"?
22       A.   In the County, one of the nurses.  When
23   you go in there and get examined, they ask you
24   do you have any medical condition, and I told
                                                49

1        Q.   Okay.  Who did you write to?
2        A.   I wrote to John Howard Association of
3    Illinois.
4        Q.   Okay.  Do you have that letter with you
5    today?
6        A.   Yes, I do.
7        Q.   The letter that you wrote?
8        A.   The letter that I wrote?
9        Q.   Yes.
10       A.   Actually, this is -- this is, actually,
11   my copy.
12       Q.   All right.  I've been handed a 14-inch
13   paper, handwritten, printed, which includes a
14   list of detainees and CIMIS numbers, looks like
15   25 or 26 names, CIMIS numbers, and, apparently,
16   signatures on it.
17            And I'm going to ask to make a copy of
18   this, if I could, because it does constitute
19   your statement, which we have requested in the
20   case.
21            All right.  I've had a chance to kind
22   of briefly read over this letter which is, "To
23   Whom It May Concern," and it appears that your
24   first complaint is that you've observed mice.
                                                51

1    them yes.
2        Q.   All right.  Aside from the person that
3    you described as a nurse, do you remember
4    anything else about that person?
5        A.   Well, the lady that asked me questions.
6        Q.   Okay.  Do you remember her name?
7        A.   No, I don't recall her name.
8        Q.   Did you review any documents before
9    now, before your testimony now to help you
10   remember the events?
11       A.   Not that I know of.  Not that I have
12   here.  I have this -- all I have is a document
13   that -- what I requested for my medication,
14   that's about it.
15       Q.   Okay.  Have you ever written anything
16   about your entry into the jail and how you felt,
17   at the time?
18       A.   No.
19       Q.   Okay.  Do you have a home computer?
20       A.   No, uhn-uhn.
21       Q.   Have you ever written any blogs about
22   it, about the story of your entry into the jail?
23       A.   Actually, I wrote what happened to me
24   while I was in there.
                                                50

1        MR. MORRISSEY:  Could we make a copy -- can
2    you make a copy for me, also.
3        MR. CATANIA:  I -- sorry, yes, we'll take a
4    brief moment to make a copy for Mr. Morrissey.
5        MR. MORRISSEY:  We could, perhaps -- if we're
6    going to talk about it, perhaps, mark it.
7        MR. CATANIA:  Yes.
8            (Whereupon, a discussion was had
9             off the record.)
10           (Whereupon, HENDRIX Deposition
11            Exhibit Nos. 2-3 were marked
12            for identification.)
13       MR. MORRISSEY:  Are we on the record?
14       MR. CATANIA:  Yes.
15       MR. MORRISSEY:  We had sent her a letter,
16   because there were multiple people noticed up
17   for today's date, and when we talked, I believe,
18   last week, we had agreed just Mr. Hendrix was
19   going today, but she didn't get alerted to that
20   fact, because she, apparently, wasn't returning
21   her phone calls, so that's why she came in today
22   at 11:00.
23       MR. CATANIA:  Okay.
24       MR. MORRISSEY:  And you want to proceed with
                                                52

13 (Pages 49 to 52)

Ex 44 Holmes Dep 014

1   her deposition?
2       MR. CATANIA: Yes.
3       MR. MORRISSEY: Okay.
4   BY MR. CATANIA:
5       Q. All right. Back to you, Mr. Hendrix.
6   All right. You've provided to me a handwritten
7   copy of what you say is a letter you sent to
8   John Howard Association of Illinois, you've,
9   also, handed my a copy of -- actually, original
10  letter that you have in your possession from
11  Charles A. Fasano, Director of Prisons and Jails
12  Program of John Howard Association, right?
13      A. Yes.
14      Q. Okay. The letter that you handed to me
15  is undated in terms of when it was written, the
16  letter from John Howard is September 25 of '09,
17  okay?
18          When did you send the letter to
19  John Howard Association?
20      A. I don't recall the date.
21      Q. All right. You have a little bit of
22  experience of being in jails and prisons, right?
23      A. Yes.
24      Q. Have you been to the penitentiary?
                                            53

1   letter?
2       A. A date of 9/29/09, since the date of
3   10/7/09, I signed a legal -- we had to write a
4   legal paper -- we had to do it on legal paper.
5       Q. All right. You're saying that you
6   wrote a letter --
7       A. A grievance.
8       Q. -- in September of '09, right?
9       A. Right.
10      Q. Okay. And was that as a result of
11  getting the letter from John Howard Association?
12      A. I think that was, like, have -- I don't
13  know was that -- that's, like, the beginning of
14  when I was requesting for my asthma pump, I
15  think he came right after -- after that --
16      Q. All right.
17      A. -- I think it was.
18      Q. Well, I'm going to --
19      A. If I'm not -- if I'm not mistaken. I,
20  actually -- excuse me. I requested -- I
21  requested pump 8/24/09, 9/18/09, 9/22/09,
22  9/29/09, 10/07/09, and 10/09/09.
23      Q. Okay. So, on six occasions from
24  August 24th of '09, you requested to have
                                            55

1       A. Yes.
2       Q. Okay. While you were in the
3   penitentiary, did you grieve any of the
4   conditions of confinement?
5       A. No.
6       Q. Did you understand the grievance
7   process when you were in the Illinois Department
8   of Corrections?
9       A. Some of it.
10      Q. Okay.
11      A. Not all of it.
12      Q. When you were in the Cook County Jail
13  in August of 2009, did you understand the
14  grievance process?
15      A. Some of it.
16      Q. All right. Did you know how to write a
17  grievance?
18      A. Actually, not really.
19      Q. Okay.
20      A. But I just wrote in my own words.
21      Q. Did you ever file a grievance for not
22  having your Albuterol?
23      A. Yes. I wrote a letter on legal paper.
24      Q. All right. When did you write the
                                            54

1   Albuterol; is that right?
2       A. Yes.
3       Q. Okay. Were any of those grievances?
4       A. Actually, they was -- I think it was
5   one that was a grievance, and the rest of them
6   was to request, which is this right here.
7       Q. All right. When did you --
8       A. Request to see the doctor.
9       Q. I understand.
10          When did you file a grievance in
11  this -- about this matter -- about -- about the
12  asthma and the Albuterol?
13      A. The grievance was -- I think it was
14  9 -- 9/29, I think it was.
15      Q. Do you have a copy of your grievance?
16      A. No, uhn-uhn. No, no, uhn-uhn.
17      Q. All right. I understand, also, that
18  you in your Affidavit say that you made numerous
19  requests -- let me read the words itself, in
20  Paragraph 13, "Instead, I was told to fill out a
21  Sick Call Request once I arrived at my assigned
22  division of the jail."
23          Is that what you're talking about, the
24  Sick Call Request, is that the same thing?
                                            56

14 (Pages 53 to 56)

1    A.  Right.  The request, right.
2    Q.  All right.  And what was your assigned
3  division at the jail?
4    A.  I don't recall that.  I don't recall
5  that.
6    Q.  Paragraph 14 says, "I filed a grievance
7  signed by myself and several other detainees in
8  my dorm who were asthmatic and did not receive
9  an inhaler."
10   A.  Right.  And those are the names.
11   Q.  Is this the form that you're talking
12  about, this --
13   A.  Yes.
14   Q.  -- okay, on long paper?
15   A.  Yes.
16   Q.  And marked Exhibit 2 for the
17  deposition.
18       Exhibit 3 is the response from
19  John Howard Association, which you handed me a
20  moment ago.
21   A.  Uh-hum.
22   Q.  In that one it says, "You should grieve
23  the asthma pump issue."
24       Is it as a result of your undated

                                              57

1  letter of response regarding conditions in
2  Division 2, is that what you're talking about?
3    A.  Actually, it was both.  Actually, it
4  was the asthma -- my asthma and the conditions
5  of the jail.
6    Q.  All right.  The conditions of the jail
7  meaning you had seen some evidence of mice?
8    A.  Yes, that's true.
9    Q.  Do you know when Division 2 was built?
10   A.  Division 2, no, I don't.  No, I don't
11  recall.
12   Q.  When was your own home that you live
13  in, when was that built?
14   A.  The home?
15   Q.  Yes.
16   A.  That I live in?
17   Q.  Yes.
18   A.  Oh, I don't know.  I don't know.
19   Q.  Is it an older home?
20   A.  Yeah, it's been there a long time.
21   Q.  More than 100 years?
22   A.  Yeah.  I think so, yeah.
23   Q.  Chicago has lots of old homes.
24   A.  Yeah.

                                              58

1    Q.  Especially, ones that -- some that
2  actually date before the Chicago Fire.
3    A.  Yeah.
4    Q.  All right.  When you say that you
5  filled out a grievance in Paragraph 14, I think
6  it is --
7    A.  Uh-hum.
8    Q.  -- what are you referring to?
9    A.  I had asked an officer there and he
10  said, "If you haven't received your asthma
11  pump," he said, "only thing I can tell you to
12  grievance it."
13       I asked for a grievance slip, they
14  didn't have them.  They said you had to take
15  legal paper and make your own grievance.
16   Q.  Okay.  So, that's what you did?
17   A.  That's what I did, I just wrote a
18  letter and that was it.
19   Q.  What did you do with it?
20   A.  I put it in the mailbox.
21   Q.  Which mailbox?
22   A.  In the County.
23   Q.  You mean you mailed it someplace or you
24  placed it in -- in a locked box --

                                              59

1    A.  In a grievance box.
2    Q.  Okay.
3    A.  A grievance locked box.
4    Q.  Okay.  And that was sometime after
5  September 25 of '09 that you did that?
6    A.  Something like that.  I don't recall
7  exactly.
8    Q.  Okay.  Were you released on October 10
9  of '09?
10   A.  Yes.
11   Q.  To electronic monitoring?
12   A.  Yes.
13   Q.  Had you ever received word from a
14  social worker that they had received your
15  grievance form?
16   A.  Nope.  No, I didn't.
17   Q.  And according to the letter --
18  according to what you just told me that this
19  grievance was presented to the Sheriff of Cook
20  County that included your complaint about not
21  getting asthma --
22   A.  Yes.
23   Q.  -- medication as well as other
24  detainees, right?

                                              60

1    A.  Right.
2    Q.  It was a group grievance?
3    A.  Actually, it was, I think, around about
4 maybe about six or seven people, but everybody
5 wanted to, I guess, put their own grievance in
6 or something.
7    Q.  All right.  Did six or seven people
8 join you in a group grievance about it?
9    A.  Yeah.
10    Q.  All right.  You were released to
11 electronic monitoring on 10/10 of '09?
12    A.  Yes.
13    Q.  And allowed to go back to a residence?
14    A.  Yes.
15    Q.  What residence?
16    A.  I went to, what, 8711 South 87th
17 Street, that was in Justice, Illinois.
18    Q.  Whose residence was that?
19    A.  That was my wife's residence.
20    Q.  They set you up with a location outside
21 of Cook County, Illinois?
22    A.  Yes.
23    Q.  Is there a home at the address where
24 you are currently residing -- I mean, a phone at

61

the home where you're currently residing?
2    A.  Where, now?
3    Q.  Yes.
4    A.  On 95th and Loomis?
5        Yes.
6    Q.  There's a home phone?
7    A.  Yes.
8    Q.  Not a cell phone, right?
9    A.  No.  Not a cell phone, no.
10    Q.  Do you have a cell phone?
11    A.  Yes.
12    Q.  At any time between August 23 of '09
13 and December 10 of '09, did you make any phone
14 calls to anybody about the Albuterol issue?
15    A.  No.
16    Q.  When you were released on October 10 of
17 '09, did you inform anybody else about the
18 Albuterol issue in the jail?
19    A.  Inside the jail?
20    Q.  After you -- after you were released on
21 electronic monitoring, did you notify anybody
22 else?
23    A.  No.  My lawyer.
24    Q.  And by, "lawyer," you're talking about

62

1 Mr. Morrissey?
2    A.  Well, yes.
3    Q.  Okay.  Did you talk about the Albuterol
4 issue with the judge in the courtroom?
5    A.  Not that I recall.
6    Q.  Did you talk about the Albuterol issue
7 with any of the officers that were assisting you
8 in getting on electronic monitoring?
9    A.  Yes.  Yes.
10    Q.  Who'd you talk to?
11    A.  I think it was a Sergeant, white shirt,
12 or something, I'd asked him about -- told him I
13 had not got my medication.
14    Q.  Was that inside the jail?
15    A.  That was inside the jail.
16    Q.  Okay.  Was that a Sergeant that was
17 assigned to Division 2?
18    A.  Yeah.  Well, he wasn't assigned, he
19 was, I guess, the working officer there for all
20 the other officers.  He happened to come around
21 and I happened to ask.
22    Q.  Do you remember where you had that
23 conversation?
24    A.  No, I don't recall.

63

1    Q.  Do you remember who was present, at the
2 time?
3    A.  Just -- just me and the officer.
4    Q.  Do you remember the name of the
5 Sergeant?
6    A.  No, uhn-uhn.  No, I don't.
7    Q.  Do you remember the exact words you
8 used, at the time?
9    A.  Yes.  I told him I need my inhaler.
10    Q.  Okay.  At the --
11    A.  I needed an inhaler.
12    Q.  At the time that you told the officer
13 that, was it verbally that you told him, in
14 words?
15    A.  Yeah.  With my mouth, right.  Spoke
16 with him.
17    Q.  What symptoms did you have, at that
18 time?
19    A.  At that time, I was telling him that --
20 he was saying wasn't nothing he could do about
21 it, at the time.  He said, "You going to have to
22 consult with the doctor."
23    Q.  All right.  What symptoms did you feel,
24 at the time?

64

16 (Pages 61 to 64)

Ex 44 Holmes Dep 017

1    A. I couldn't hardly breathe.
2    Q. Was it shortness of breath?
3    A. Yeah.
4    Q. Okay. And he told you to speak with
5 the doctor?
6    A. He said, "You have to -- ain't nothing
7 I can do about it. You have to consult with the
8 doctor, put in a request, something."
9    Q. You mentioned earlier that mold was a
10 problem for you with -- as a -- as a trigger for
11 asthma; is that right?
12    A. Sometimes, yes.
13    Q. Any other triggers that you can recall?
14    A. That's it.
15    Q. Was there mold in the jail?
16    A. Yeah.
17    Q. And how do you know that there was mold
18 in the jail?
19    A. Because I can see it.
20    Q. And when you say, "you could see it,"
21 did you see, like, the black spots on the wall?
22    A. The spots on the wall, greenish-like,
23 whatever.
24    Q. All right. But other than that, do you

65

1    A. Yes.
2    Q. A physical examine?
3    A. Well, you know, checked my back and
4 stuff, checked my breathing.
5       And she said, "Do you smoke?"
6       I said, "No, I don't smoke."
7    Q. You've been asked before about smoking,
8 haven't you?
9    A. Yes.
10    Q. And, in fact, you previously were a
11 smoker?
12    A. No, I don't smoke.
13    Q. I understand presently you don't, but
14 I'm talking about in the past, you did smoke?
15    A. 30 -- maybe 30-something years ago
16 maybe.
17    Q. Okay. Well, you've been treated by
18 other physicians aside from the jail, haven't
19 you?
20    A. Yes.
21    Q. Okay. And each one of those physicians
22 ask about your history of smoking, don't they?
23    A. Yes.
24    Q. All right. Did they ask you about any

67

1 have any other independent basis to believe that
2 was mold?
3    A. Looked like mold to me.
4    Q. Okay. Were you ever transported to an
5 emergency room as a result of an asthma attack
6 in --
7    A. No.
8    Q. -- while you were in jail?
9    A. No.
10    Q. Did you have a chance to talk with any
11 physician about your asthma while you were in
12 jail?
13    A. Yes.
14    Q. Do you remember who that was?
15    A. No, I don't recall her name. But I was
16 called down there on October 9th, the day before
17 I went home on house arrest, and the lady called
18 me in there, and checked me, and said that --
19 said right side clear -- that the right side
20 clear, left side lung something, I don't know.
21    Q. Okay. So, that particular physician or
22 medic that you spoke to --
23    A. Yes.
24    Q. -- did an examination?

66

1 of your living conditions when you were examined
2 by the physician in the jail?
3    A. My living conditions in jail, had they
4 asked me?
5    Q. Did they ask you, that particular
6 doctor on October 9th of '09?
7    A. No, no, uhn-uhn.
8    Q. Did you tell Judge Brown on October --
9 whenever you were in front of him in October
10 of '09, did you ever tell him about not getting
11 your Albuterol in jail?
12    A. Not that I recall.
13    Q. All right. You gave us a consent or
14 HIPAA waiver in order to obtain medical records
15 in the past --
16    A. Uh-hum.
17    Q. -- probably at the same time you signed
18 the Sworn Declaration, right?
19    A. Not that I recall.
20    Q. The one in front of you.
21       All right. Do you remember signing a
22 paper that said we could get your records?
23    A. Yes. Yes.
24    Q. Do you remember identifying your

68

17 (Pages 65 to 68)

1   doctors in that -- in that?
2       A.   Dr. Hajat or Dr. Kingra.
3       Q.   All right.  So, you did identify
4   doctors in your Sworn Declaration, right?
5       A.   Yes.  Yes.  Yes.
6       Q.   Did you tell Dr. Hajat in May of
7   2006 -- strike that.
8           March 18th of 2003, did you tell the
9   doctor, at that time, that you had a history of
10  asthma?
11      A.   Yes.  I told him I was asthmatic, yes.
12      Q.   And he, also, then prescribed you
13  medication as a result of asthma exacerbated by
14  bronchitis, right?
15      A.   Yes.  Yes.  Yes.
16      Q.   All right.  At the same time, he told
17  you that you needed to lose weight, right?
18      A.   Not that I recall.
19      Q.   Okay.  When is the last time you saw
20  Dr. Hajat?
21      A.   I don't recall.
22      Q.   Do you recall seeing him after your two
23  incarcerations that are discussed in your Sworn
24  Declaration?
                                              69

1       A.   Not that I recall.  Not that I recall.
2       Q.   All right.  But you did see another
3   doctor, Dr. Kingra; is that right?
4       A.   Yes.  I seen Dr. Kingra and Hajat.
5       Q.   Okay.  Do you remember when it was that
6   you saw Dr. Kingra last?
7       A.   No, I don't recall.
8       Q.   All right.  The doctor that you spoke
9   to in the jail on October 9th of 2009 said that
10  you had one right side lung that was clear, and
11  the other left side lung that was not?
12      A.   Something like that.
13      Q.   Okay.
14      A.   Something like that.
15      Q.   Was there any medication prescribed, at
16  that time?
17      A.   Yeah.  She gave me some -- some pills
18  for my asthma, and -- and I was waiting -- and I
19  was waiting for an asthma pump.
20      Q.   Okay.  Do you remember what pills she
21  gave you?
22      A.   I have to -- only thing I have is the
23  paper at home, that's all I have.
24      Q.   All right.
                                              70

1       A.   Matter of fact, I got the paper here.
2   Maybe you can get it off of here or something.
3   I don't know if these -- if this the paper that
4   she gave.  This is just my --
5       Q.   All right.  I've been shown, "Patient
6   Copy of Prescription Order," which says, "low
7   cholesterol diet," something called a ECASA,
8   E-C-A-S-A, which I think means Aspirin, A-S-A is
9   usually Aspirin, for 81-milligrams is what it
10  says.
11          Do you have any heart trouble?
12      A.   Not that I -- not that I know of.
13      Q.   Okay.  And I've been handed another
14  one, prescription -- "Patient Copy Prescription
15  Form," and it says, "Ventolin," and along with
16  something else on it, but I can't read the dates
17  on either one, this one may be June 4 of 2010,
18  this one looks like it says June 24 of 2010, but
19  they're both faint.
20          Were you housed in a different Division
21  in 2010?
22      A.   Well, in the process, I think they was,
23  like -- Receiving was, like, 5, and then they
24  kept moving you around and stuff until they got
                                              71

1   you settled into whatever, I don't -- I don't --
2       Q.   Well --
3       A.   -- that's all I know.
4       Q.   -- we've talked about dates in '07 and
5   '09, which are in your Sworn Declaration, both
6   of these prescription orders appear to have been
7   issued in 2010.
8           You were back in custody in 2010?
9       A.   Yeah.  I was took back into custody.
10      Q.   Okay.  And that was as a result of the
11  trial you had on your driving with a license
12  revoked?
13      A.   Right.  I think that's what this is.
14      Q.   All right.  So, you were remanded on a
15  sentence to the jail as a result of trying the
16  case, right?
17      A.   Right.  They took me back in custody,
18  yeah.
19      Q.   All right.
20      A.   Right.
21      Q.   Did they revoke your bond?
22      A.   Yes.  Yes, they did.
23      Q.   Do you remember what day that was?
24      A.   I don't recall what day that was.
                                              72

18 (Pages 69 to 72)

1     Q.   Was it June 4th of 2010?
2     A.   I don't recall when that was.
3     Q.   All right.
4     A.   I don't recall when it was.
5     Q.   You have a lot of papers there that
6 seem to be related to making requests for
7 Albuterol; is that right, in your file there?
8     A.   Yes.
9     Q.   All right. Do you have any copies of
10 requests that you gave for Albuterol while you
11 were in jail, the yellow form that you have
12 blanks of in there in that file?
13     A.   No, I don't -- no, uhn-uhn. No, I just
14 put it in and they never did send me anything
15 back. But that was what -- that was what I was
16 filling out right there.
17     Q.   Okay. I've just been handed a
18 "Detainee Health Request Form," the original
19 yellow form, which is blank in terms of no
20 handwriting on it, but it's in Spanish on one
21 side and English on the other side, and this is
22 used, apparently, for each medical, dental,
23 mental health problems, and this is what you
24 filled out?

73

1     A.   That's what I filled out to see the
2 doctor.
3     Q.   That top portion to see the doctor?
4     A.   Yeah, I think just the top portion
5 right there that I fill out to see the doctor.
6     Q.   All right. Do you remember what
7 particular problems you were describing in those
8 requests that you made on those six occasions?
9     A.   I was -- I was requesting my asthma
10 pump.
11     Q.   All right. At any time on August 24th
12 of '09, did you have any asthma attack?
13     A.   Well, if I was, I didn't -- I didn't
14 realize it.
15     Q.   Okay.
16     A.   I just kept asking for I needed an
17 asthma pump.
18     Q.   And on September 18th, 2009, did you
19 have any asthma attack?
20     A.   Not that I recall. Not that I recall.
21 I had used somebody pump in there -- I was using
22 somebody pump in there.
23     Q.   All right. On September 22 of '09, did
24 you have an asthma attack?

74

1     A.   I don't -- I don't recall.
2     Q.   On September 29 of '09, did you use an
3 asthma -- or did you have an asthma attack?
4     A.   I had one, but I used somebody pump,
5 though, is what I'm saying.
6     Q.   I understand. And it's difficult to
7 know what -- from your Affidavit what days
8 you're talking about since you gave me six
9 dates --
10     A.   Right.
11     Q.   -- I'm just asking if you have any
12 memory of -- of having an asthma attack on
13 September 22 of '09.
14     A.   No, I don't remember.
15     Q.   Do you have any memory of having an
16 asthma attack on September 29 of '09?
17     A.   I don't recall.
18     MR. MORRISSEY: Mr. Catania, the dates you're
19 referring to, are those the dates of his
20 grievance request or his healthcare requests; is
21 that right?
22     MR. CATANIA: The dates --
23     THE WITNESS: I was requesting my asthma
24 pump. I had used somebody asthma pump, but I

75

1 was requesting my asthma pump at the same time.
2 BY MR. CATANIA:
3     Q.   All right. On October 7 of 2009, did
4 you have an asthma attack?
5     A.   No.
6     Q.   On October 9 of '09, did you have an
7 asthma attack?
8     A.   No.
9     Q.   And that's the date that you saw a
10 physician?
11     A.   I seen the physician that day.
12     Q.   Okay. All right. I think what
13 Mr. Morrissey wants to direct your attention to
14 is Paragraph 15 where you say, "Within one week
15 of entering the jail in 2009, my chest became
16 very tight --
17     A.   Tight.
18     Q.   -- and I experienced a great deal of
19 discomfort in breathing."
20     A.   Breathing.
21     Q.   Within one week of entering the jail in
22 '09?
23     A.   Yeah. It had to be about a week, yes.
24     Q.   Okay. Do you remember what date you

76

19 (Pages 73 to 76)

Ex 44 Holmes Dep 020

1  entered?
2  A.  8/24.  I think it was 8/24.  8/24.
3  Q.  Are you describing --
4  A.  8/28.  8/28.
5  Q.  You're referring to an exhibit that
6  Mr. Morrissey has in front of him?
7  A.  Yes.
8  Q.  All right.  I would ask you to take a
9  look at that page, if you would, and tell me
10 what date.
11 A.  It's got 8/28 --
12 MR. MORRISSEY:  Mr. Catania, do you have any
13 of those medical request forms that you,
14 apparently, were reading off those various
15 dates?
16 MR. CATANIA:  No, I -- I took them from the
17 deponent.  He's the one who said those dates.
18 I'm going to ask that this exhibit be
19 marked as well.
20 (Whereupon, HENDRIX Deposition
21 Exhibit No. 4 was marked for
22 identification.)
23 BY MR. CATANIA:
24 Q.  Mr. Hendrix, I'm going to show you

77

1  barcode, this is all up at the top, do you see
2  that?
3  A.  Uh-hum.
4  Q.  Do you see the CCDOC number?
5  A.  Yes.
6  Q.  And that's, actually, four digits, it
7  says, "6217" --
8  A.  17.
9  Q.  -- right?
10 A.  Yes.
11 Q.  Do you remember what your DOC number
12 was when you entered into the jail in August
13 of '09?
14 A.  Give me a second.  I have it here
15 somewhere, I just have to find it.
16 2009?
17 Q.  Yes.
18 A.  0056217.
19 Q.  Okay.  On the document I just showed
20 you, J1 of Exhibit 4, the last four digits are
21 written in; is that right, 6217?
22 A.  17, yes.
23 Q.  And, also, the complete number's
24 written above -- below the barcode; is that

79

1  what's been marked for this exhibit as Exhibit
2  No. 4, previously marked by Mr. Morrissey as
3  Exhibit 1 -- Plaintiff's Exhibit 1 in a previous
4  deposition, do you recognize that page, Page 1,
5  which is called J1 of this, I think it's a
6  three-page exhibit?
7  A.  Yes.
8  Q.  All right.  Taking a look at Page J1 of
9  Exhibit 4, if you see in the bottom -- bottom
10 left --
11 A.  Yeah.
12 Q.  -- bottom right side, there's a --
13 A.  Oh, okay.
14 Q.  -- there's a number here, J1.
15 A.  J1, all right.
16 Q.  Is that the same page you were just
17 referring to -- if you need to take a cell phone
18 call, that's fine.
19 A.  No, I'll just cut it off.
20 Q.  Is that the same page you were just
21 shown by Mr. Morrissey?
22 A.  Yes.
23 Q.  Okay.  That page includes a date at the
24 top and it includes a DOC number that has a

78

1  right, 56217?
2  A.  Yes.
3  Q.  All right.
4  A.  Yes.
5  Q.  Below that, can you make out the book
6  date on the bottom of the barcode sticker?
7  A.  Right -- right here?
8  Q.  No, the -- yes, where your thumb is on
9  that -- the other side, yes.
10 A.  Yes.  Over here?
11 Q.  Yes.
12 A.  BK -- BKT --
13 Q.  BKDT, book date.
14 A.  Okay.  I can't read that.
15 Q.  All right.  Well, I'm going to tell you
16 that the book date according to the mechanical
17 record, the printout, which has the barcode, is
18 8/23 of '09.
19 Does that remind you as to when it was
20 that you had a conversation regarding your
21 asthma condition at intake, does that help you
22 remember it at all?  It doesn't have to --
23 A.  No, I --
24 Q.  -- I'm just asking if it does.

80

20 (Pages 77 to 80)

Ex 44 Holmes Dep 021

1     A.  -- don't recall.
2     Q.  All right.  Well, you were interviewed,
3  apparently -- by the way, the exhibit was used
4  in the Brittman deposition, that's the name of
5  the person that spoke -- you spoke to first, the
6  CMT Brittman spoke to you on August 23 of '09,
7  and did you sign that consent box up here at the
8  top, that's your signature?
9     A.  Yes.
10     Q.  All right.  She did markdown that you
11  said that you had asthma, that's Paragraph No. 4
12  under, "Medical History" --
13     A.  Yes.
14     Q.  -- do you see that?
15         And, then, to the right of where it
16  says, "Asthma/Emphysema: Yes," it says, "Patient
17  states asthma since childhood," that was true,
18  right?
19     A.  Yes.
20     Q.  Okay.  "Patient states last attack
21  30 years," do you see that?
22     A.  Yes, I see that.
23     Q.  All right.  To the right of that is a
24  box that says, "Form Reviewed," and in there it

81

1  experienced a great deal of discomfort
2  breathing," do you see that?
3     A.  Yes.
4     Q.  What did you do about it?
5     A.  I used this other guy pump.
6     Q.  Okay.  What else did you do?
7     A.  And I requested my pump, I requested
8  mines.
9     Q.  All right.  The other guy you've
10  described as Rodney Butler?
11     A.  Yes.
12     Q.  And who is that?
13     A.  He came in the same time I did.  He had
14  got his asthma -- he had got his asthma pump,
15  but I didn't get mines.  So, I confronted him
16  about my asthma problem.
17         So, the officer said, "Well, you didn't
18  get it, you ain't going to get it."  So, he
19  said, "You just have to request it when you --
20  when you get where you're going."
21     Q.  Okay.
22     A.  But we was being processed together, I
23  figured if he got his asthma pump, I couldn't --
24  I didn't get mines, but --

83

1  says, "EM," circled, do you understand what that
2  refers to?
3     A.  No.
4     Q.  Have you heard of electronic
5  monitoring?
6     A.  Oh, okay, yes.  Yes.
7     Q.  Were you taken by -- by security at
8  7:30 p.m. from receiving to be considered for
9  electronic monitoring?
10     A.  Yes.  Yes.
11     Q.  You didn't get the electronic
12  monitoring then, though, did you?
13     A.  No, I didn't get it then.
14     Q.  It was a couple of months later that
15  you got it, right?
16     A.  Yes.
17     Q.  Was that while -- while they were
18  trying to assess a place where you could do the
19  electronic monitoring that had a phone hookup?
20     A.  Yes.
21     Q.  All right.  In your Paragraph No. 15 of
22  the Declaration, Exhibit No. 1 in this case, it
23  says, "Within one week of entering the jail in
24  2009, my chest became very tight and I

82

1     Q.  Okay.  But Rodney Butler did not sign
2  the letter that you -- you sent to John Howard,
3  right?
4     A.  No.  No.  No.  No, he didn't.
5     Q.  That's because he actually got --
6     A.  He had got -- he had -- he had
7  gotten -- he had gotten out.  He had gotten out.
8     Q.  Do you know when he got out?
9     A.  No, I don't recall when he got out.
10  No, I don't recall.
11     Q.  When you were first examined by
12  Brittman, which is Page 1 --
13     A.  Uh-hum.
14     Q.  -- of J1 of that Exhibit 4 --
15     A.  Uh-hum.
16     Q.  -- when you were examined by her, did
17  she check your blood pressure, do you recall?
18     A.  Not that I recall.  Not that I recall.
19  I don't recall it.
20     Q.  She check your temperature?
21     A.  I don't know what -- was it her or -- I
22  don't -- I don't know.  I don't recall her.  I
23  just don't recall the person.
24     Q.  All right.  Did she ask you all the

84

21 (Pages 81 to 84)

1  questions that are on the first page there?
2  A.  Yeah, they asked me -- yeah, they asked
3  me questions.
4  Q.  All right.  About infectious disease
5  and things like that?
6  A.  Right.  Right.
7  Q.  Was there, also, somebody who asked you
8  questions about your mental status, at the time?
9  A.  Yes.
10  Q.  That was Kimberly Myers, wasn't it?
11  A.  I don't recall.
12  Q.  Was it a female?
13  A.  I don't recall the name.
14  Yes, I know it was a female.
15  Q.  Okay.
16  A.  I recall a female, but I don't recall
17  the name.
18  Q.  If you look at Page 3 of that Exhibit
19  No. 4, J3 --
20  A.  J3?
21  Q.  Yes.
22  A.  Okay.
23  Q.  It's that page.
24  A.  Okay.

85

1  that we're talking about the time being
2  August 23 of '09?
3  A.  Yes.
4  Q.  What was your job?
5  A.  Yes.  I worked for Sego Gallagher.
6  That was -- Sego Gallagher was a management
7  company that managed buildings for banks.
8  Q.  Okay.  Would you describe that as
9  working as a property manager?
10  A.  Yes.
11  Q.  What location did you work?
12  A.  Different locations, like, Michigan,
13  what, south side, north side, wherever they --
14  wherever the bank purchased buildings at, that's
15  where we were sent to, Maywood.
16  Q.  What were your job duties as a property
17  manager?
18  A.  Cutting the lawn, checking the
19  building, door locks, doing door locks, and
20  stuff like that, check the plumbing, and all
21  that stuff.
22  Q.  Were these bank-owned properties?
23  A.  Yes.
24  Q.  Foreclosures?

87

1  Q.  Your name appears at the top, right?
2  A.  Yes.
3  Q.  It's spelled wrong, isn't it?
4  A.  Yeah, it is.
5  Q.  But the DOC number is the same, it's
6  6217, do you see that --
7  A.  Yes.
8  Q.  -- at the top?
9  A.  Yes.
10  Q.  All right.  And the address is your
11  address, 9558 South Loomis?
12  A.  Yes.
13  Q.  And it says, "Charge: Traffic."
14  Did you give the information that it
15  was a traffic charge to -- to the person asking
16  you these questions?
17  A.  If I'm not mistaken, I think the person
18  did ask me what was I in here for.
19  Q.  Okay.  Did you provide that
20  information?
21  A.  Yes, I did.
22  Q.  All right.
23  A.  I think I did, yes.
24  Q.  Were you employed, at the time, and

86

1  A.  Yes.
2  Q.  Okay.  And, so, that was your job,
3  property manager, at the time?
4  A.  Yes.
5  Q.  All right.  So, what she wrote down on
6  the Page No. J3 --
7  A.  Uh-hum.
8  Q.  -- "Employed: Yes.  Occupation:
9  Property Manager" --
10  A.  Yes.
11  Q.  -- that information came from you?
12  A.  Yes.  Yes, it did.
13  Q.  Can you look at the other information
14  on the page, there's 11 questions, can you tell
15  me if all of those answers came from you?
16  A.  Yes, uh-hum.  Yes, that's true.
17  Q.  All right.  Including the one that
18  asks, "Are you a veteran," No. 11?
19  A.  Yes.
20  Q.  Okay.  You're not a veteran?
21  A.  No.
22  Q.  Okay.  Kimberly Myers signed this and
23  dated it August 23 of '09, at 4:20 p.m., do you
24  see that at the bottom of the page?

88

22 (Pages 85 to 88)

Ex 44 Holmes Dep 023

1    A.  Yes.
2    Q.  Is that about the time you remember
3  making -- having this conversation and giving
4  the answers?
5    A.  As far as I know.
6    Q.  Okay.
7    A.  That's what she got there.  I don't
8  know exactly what time it was, though.
9    Q.  Turn back to Page J2.
10    A.  Okay.
11    Q.  At the top you'll see that there's some
12  vital signs written down, there's amounts
13  written in the vital sign section, and it's,
14  also, signed by the same CMT Brittman, do you
15  see that?
16    A.  Yes.
17    Q.  All right.  It says, "Temperature: 98,"
18  and I can't tell if that's a 6 or what.
19        Does that sound like your temperature
20  was fine, normal at the time of entry?
21    A.  No, uhn-uhn.
22    Q.  How about blood pressure?
23    A.  No.
24    Q.  164 over 77, do you know if that's a

                                          89

1  normal blood pressure for you?
2    A.  I don't know.  I don't recall that.  I
3  don't know.  Because I know they said something
4  about my blood pressure was high.
5    Q.  Well, is that -- does that amount look
6  high to you, 164, for example, over 77?
7    A.  Yeah.
8    Q.  All right.
9    A.  Yes.
10    Q.  All right.  But you do agree that
11  sometime before the end of the night and before
12  you were transported to housing, that you were
13  taken by security to determine if you should go
14  on EM, electronic monitoring?
15    A.  Yes.
16    Q.  You couldn't do it that night, though,
17  right, you couldn't go to electronic monitoring
18  that night?
19    A.  Not that I know of.
20    Q.  Well, you went a month -- two months
21  later.
22    A.  Later, okay.
23    Q.  So, you were actually housed then in
24  Division 2; is that right?

                                          90

1    A.  I think that's what it was, Division 2.
2  Division 2, 4, something like that.
3    Q.  Well, according to Paragraph --
4    A.  I don't recall.
5    Q.  -- 14 of your Affidavit, it says that
6  you were complaining to nurses and guards in
7  Dorm 4 of Division 2 at the jail.
8    A.  Right, okay.
9    Q.  So, that's where you were housed after
10  that intake?
11    A.  Yes.
12    Q.  Okay.  Do you think that based on the
13  written evidence, which is Exhibit 4, that at
14  7:30, you were taken by security for electronic
15  monitoring review, that that's what Brittman
16  thought happened to you that day, that you were
17  placed on electronic monitoring?
18    MR. MORRISSEY:  I'm going to object.  I'm
19  going to object.  He's in no position to
20  speculate as far as what somebody else may or
21  may not have done.
22  BY MR. CATANIA:
23    Q.  I'm asking for your opinion, sir.
24    A.  I don't -- I don't know.

                                          91

1    Q.  Well, you do agree that you were talked
2  to by security for electronic monitoring during
3  the processing at the jail, that intake of
4  August 23 of '09?
5    A.  Not that I recall.  I can't recall.  I
6  can't recall.  Yes.
7    Q.  Do you remember what time you got to
8  your housing division?
9    A.  I don't recall, no.  No, I don't.
10    Q.  Is there any document you could look at
11  that would help you to remember?
12    A.  No.  Sure don't have it.
13    Q.  The documents that are in front of you
14  that you're paging through right now, would you
15  say that those documents have been kept by you
16  in order to help you to testify in this case?
17    MR. MORRISSEY:  Object.
18    THE WITNESS:  Just -- just notes.
19  BY MR. CATANIA:
20    Q.  I understand, but did you keep those
21  notes in order to help you testify in this case?
22    A.  Yes.  Yes, I did.
23    Q.  Okay.  You didn't keep them for any
24  other case that you filed anywhere else, right?

                                          92

23 (Pages 89 to 92)

1     A.   That is correct.
2     Q.   Okay. And when you prepared those, you
3 prepared those while you were in the jail,
4 right?
5     A.   Yes.
6     Q.   Did you ever inform any government
7 agency, other than the John Howard Association,
8 which is not a government agency, but I don't
9 want you to be confused, did you inform any
10 government agency about not getting Albuterol
11 while you were in jail?
12     MR. MORRISSEY: I'm going to object. Other
13 than what he's already presented here today and
14 the request.
15     He's already testified to it, but you
16 can go ahead.
17 BY MR. CATANIA:
18     Q.   You can answer. If you need me to
19 break it down for you, I will.
20     A.   Break it down to me.
21     Q.   All right. Did you tell the United
22 States Attorney's Office that you were not given
23 Albuterol while you were in jail?
24     A.   United States?

93

1     Q.   United States Attorney, U.S. Attorney?
2     A.   What you -- what you mean?
3     Q.   The Federal Prosecutor.
4     A.   An attorney?
5     Q.   The Federal Prosecutor's Office is what
6 I'm talking about, did you inform them that you
7 did not get Albuterol while in jail?
8     MR. MORRISSEY: Do you understand who the
9 Federal Prosecutor is?
10     THE WITNESS: No.
11     MR. MORRISSEY: Can you clarify it for him.
12     MR. CATANIA: Sure.
13 BY MR. CATANIA:
14     Q.   Do you understand what the Department
15 of Justice is?
16     A.   Yes.
17     Q.   You've heard of them?
18     A.   Yes.
19     Q.   Did you tell the Department of Justice
20 about your not getting Albuterol while you were
21 in jail?
22     A.   I've written -- I've written this
23 person here, John Howard.
24     Q.   John Howard.

94

1     A.   Yes.
2     Q.   Okay. Other than John Howard, anybody
3 else?
4     A.   That was in there?
5     Q.   Anybody else that you wrote to about
6 not getting --
7     A.   Besides -- besides him?
8     Q.   Yes.
9     A.   No. No. No.
10     Q.   All right. So, John Howard is the only
11 entity that you wrote to about your experience
12 of not getting Albuterol in the jail?
13     MR. MORRISSEY: Outside the Defendants, Cook
14 County, and the healthcare request we've already
15 talked about, is that the question?
16     MR. CATANIA: No, it's not the question.
17     THE WITNESS: Okay. John Howard is the one
18 that I wrote.
19 BY MR. CATANIA:
20     Q.   Okay. Did you --
21     A.   Anybody else that I wrote besides --
22 that I wrote, I didn't write nobody else.
23     Q.   Okay.
24     A.   John Howard was the one that I wrote.

95

1     Q.   Okay. Did you tell anybody else, and
2 by, "anybody," I mean, did you tell the
3 newspapers about your not getting Albuterol in
4 jail?
5     A.   No, I did not.
6     Q.   Did you tell any radio stations that
7 you did not get Albuterol in the jail?
8     A.   No, I did not.
9     Q.   Did you tell any lawyers other than
10 Class Counsel for the Parish Case about not
11 getting Albuterol in the jail?
12     A.   Well, I didn't talk to him, I talked to
13 somebody, I don't know who it was I talked to.
14     Q.   All right. Was it somebody associated
15 with the Defendants, in any way?
16     A.   I didn't talk to no lawyer, I talked to
17 maybe a secretary or something like that.
18     Q.   A paralegal?
19     A.   A paralegal.
20     Q.   At the office of the Class Attorney?
21     A.   Yes.
22     Q.   Mr. Morrissey's office?
23     A.   Yes.
24     Q.   Okay. All right. Was that as part of

96

24 (Pages 93 to 96)

1  becoming a member of the Class, in other words,
2  after you received the opt out and notice form?
3      A.  No, uh-uhn.  I had talked to him
4  way before -- I talked to him way -- when I got
5  out.
6      Q.  Okay.  When you got out of custody?
7      A.  I was seeking a lawyer through
8  John Howard, John Howard told me to discuss --
9  "You need to discuss that with a lawyer," so
10  that's when I got a lawyer then.
11      Q.  Did John Howard tell you who to discuss
12  it with?
13      A.  No.  He just -- he just said -- he just
14  said, "You need to discuss it with a lawyer or
15  somebody."
16      Q.  All right.
17      A.  That was it.
18      Q.  How many occasions did you borrow
19  Rodney Butler's asthma inhaler?
20      A.  I don't recall.
21      Q.  Have you spoken to Rodney Butler since
22  being released from the jail?
23      A.  No, I haven't.
24      Q.  Would you know how to get ahold of him
                                                        97

1  if you needed to?
2      MS. REPORTER:  Is that a yes or a no?
3      THE WITNESS:  No.  No.
4  BY MR. CATANIA:
5      Q.  Is there any documents or papers that
6  would help you to locate Mr. Butler if you
7  needed to?
8      A.  No.
9      Q.  All right.  You're saying in the Sworn
10  Declaration, Exhibit 1 in this case, the last
11  paragraph, that you asked the doctor if any
12  problems that you were having with your left
13  lung stem from being without the inhaler for
14  48 days, and that she did not respond.
15      Do you recall writing -- or signing a
16  paper that said that?
17      A.  Not that I recall.
18      Q.  Do you recall talking with the doctor
19  about that?
20      A.  I -- I recall talking to the doctor
21  about when the doctor said -- called me down to
22  examine me, the doctor said, "right lung clear,
23  left lung," something, I don't recall what it
24  was, and -- and said, "cough," and said, "sound
                                                        98

1  like a smoker's cough."
2      And I said, "I don't smoke."
3      Q.  All right.  But we did agree that, at
4  some time, you did smoke, right?
5      A.  Yeah.  Long time ago, right.
6      Q.  When you got released from the jail on
7  October 10 of 2009, were you suffering any
8  symptoms of asthma?
9      A.  After I got out?
10      Q.  No, on the day you got out, 10/10 of
11  '09.
12      A.  On the day I got out?
13      Q.  Yes.
14      A.  10/09, that's when I seen the doctor in
15  the County.
16      Q.  The County you saw on 10/9 --
17      A.  10/9, I mean, yes.
18      Q.  On 10/10, did you have any asthma
19  symptoms?
20      A.  I had -- I had my medication.  I had
21  the medication that they had -- they had gave me
22  from the County.
23      Q.  All right.  Did you have any symptoms
24  of asthma on 10/10 when you were released from
                                                        99

1  jail on --
2      A.  No.
3      Q.  -- electric monitoring?
4      A.  No.
5      Q.  And you went to your --
6      A.  My doctor.
7      Q.  When did you go to your doctor?
8      A.  I think I went to my doctor -- I'm not
9  sure when it was.
10      Q.  What doctor did you go to?
11      A.  I went to Dr. Kingra.
12      Q.  Okay.  Was it the day you got
13  released --
14      A.  No.
15      Q.  -- that you went to the doctor?
16      A.  No.  I don't -- no.
17      Q.  All right.  I believe that we spoke
18  about you being released on 10/10 of 2009; is
19  that right?
20      A.  Right.  You said 10/10, right.
21      Q.  From there, were you driven by the
22  Sheriff to the place where you were going to be
23  on electronic monitoring?
24      A.  Yes.  Yes.
                                                        100

25 (Pages 97 to 100)

1    Q.  All right.  And there was some time
2  taken in setting you up for electronic
3  monitoring, right, putting the bracelet on,
4  setting up your phone --
5    A.  Yes.
6    Q.  -- all of that?
7    A.  Yes.
8    Q.  Okay.  And instructions were given
9  about what to do?
10    A.  Yes.
11    Q.  At that time, did you have any special
12  requests of the monitoring program about where
13  you could go?
14    A.  Yes.
15    Q.  At the time you were hooked up, what
16  request did you make?
17    A.  I requested -- I had got a request from
18  the judge allowing me to go to work, which they
19  said I couldn't go to work because I had to be
20  at a single location.  I requested to go to
21  work, I requested to see my doctor, I had to go
22  see Dr. Kingra, and that's -- and the court --
23  and court.
24    Q.  Okay.

                                        101

1    Q.  Uh-hum.
2    A.  I told the job, that I work for a
3  management company, and that we manage buildings
4  for the bank, and the judge said he don't see
5  why it should be a problem.  But when I get back
6  home and called the County and tell them the
7  judge -- I got the order saying that the judge
8  said I can go to work, they was like, "Well, you
9  can't go unless you at a single location."
10    Q.  All right.
11    A.  So ...
12    Q.  All right.  Just for clarity, you were
13  calling the Cook County Sheriff's Electronic
14  Monitoring Program, right?
15    A.  Yes.
16    Q.  Okay.
17    A.  Yes.
18    Q.  I mean, "County," is many things, and
19  when people sometimes refer to, "County," they
20  mean the jail itself --
21    A.  Yeah, right.
22    Q.  -- sometimes they mean the government,
23  sometimes they mean the State's Attorney's
24  Office, though, I don't know why.

                                        103

1    A.  That was it.
2    Q.  When -- when you asked the judge about
3  going to work, did the judge said -- say that he
4  would write an order, but to understand that it
5  would be if eligible to go to work?
6    A.  Yes.  I -- I got that.  I had got that.
7    Q.  All right.  So, did you go to work,
8  were you able to work?
9    A.  Well, I called the County, they told me
10  I couldn't.
11    Q.  I understand.  The judge said that he
12  would order it --
13    A.  Right.
14    Q.  -- but it would be contingent on
15  whether you were eligible to be released to go
16  to work?
17    A.  A single location, I guess.
18    Q.  Okay.
19    A.  I guess I must have -- I couldn't go --
20  well, you know, I had to be at one single place,
21  I guess.
22    Q.  All right.
23    A.  But I explained it to the judge that
24  what my job was.

                                        102

1         When, to your memory, was the first
2  time after you were released on electronic
3  monitoring that you saw your doctor, Dr. Kingra?
4    MR. MORRISSEY:  If you recall.
5    THE WITNESS:  I don't recall.
6  BY MR. CATANIA:
7    Q.  Did you see Dr. Kingra at all
8  immediately before you were incarcerated in the
9  jail in August of 2009?
10    A.  I don't recall.
11    Q.  Did you receive any prescriptions from
12  Dr. Kingra in that -- the time that you went to
13  see the doctor --
14    A.  Yes.
15    Q.  -- after being released?
16    A.  Yes.
17    Q.  What prescription?
18    A.  Inhaler Albuterol.
19    Q.  All right.  In your Affidavit, you told
20  us that you filled your prescriptions at
21  Walgreens and CVS, right?
22    A.  That is correct.
23    Q.  All right.  And that's Paragraph 6 of
24  the Affidavit, "I obtained my medication from

                                        104

26 (Pages 101 to 104)

1  various CVS and Walgreens locations. I
2  currently obtain my medication from the
3  Walgreens located at 7945 West 95th Street, in
4  Hickory Hills, Illinois"; is that right?
5     A.  Yes, that's correct.
6     Q.  It says, "my medication," what are you
7  referring to?
8     A.  My inhaler.
9     Q.  Okay.
10    A.  My inhaler.
11    Q.  Albuterol?
12    A.  Albuterol.
13    Q.  Okay.  All right.  With your consent on
14 the HIPAA waiver, we subpoenaed the records from
15 CVS and from Walgreens.
16    A.  Uh-hum.
17          (Whereupon, HENDRIX Deposition
18          Exhibit Nos. 5-6 were marked
19          for identification.)
20 BY MR. CATANIA:
21    Q.  I'm going to show you what's been
22 marked Hendrix No. 5, which is a subpoena on CVS
23 Pharmacy, "I would just like to make a record
24 that we are asking for any and all records
                                              105

1  pertaining to prescriptions filled and drugs
2  prescribed for John Hendrix, spelled,
3  H-E-N-D-R-I-X --
4     A.  Right.
5     Q.  -- 9558 South Loomis, Chicago,
6  Illinois, date of birth of 12/12/78," does that
7  sound right?
8     A.  Huh?
9     Q.  It was on your -- it was on your HIPAA
10 waiver.
11    A.  '78?
12    Q.  That's what it says.  But it, also, has
13 your Social Security number on the subpoena.
14    A.  Okay.
15    Q.  So, if you could just verify with me,
16 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?
17    A.  Yes.
18    Q.  Okay.  So, your prescription was under
19 the Social Security number that I just recited.
20    A.  Oh, okay.
21    Q.  All right.  If you take a look at --
22 there's a perspective order in here as well, it
23 was part of the subpoena, but if you take a look
24 at the last page of Exhibit No. 5, you'll see
                                              106

1  that it says, "No records," and that's sworn to
2  by Stacey Toupin, Custodian of Records for CVS
3  Pharmacy, see that?
4     A.  On 78?
5     Q.  I'm sorry?
6     A.  On 78?
7     Q.  No, she signed this --
8     A.  Oh, okay.
9     Q.  -- saying that there --
10    A.  Okay.
11    Q.  -- were no records.
12    A.  Okay.
13    Q.  Do you agree with me that's what that
14 says?
15    A.  Okay.
16    Q.  And I'm going to show you what's been
17 marked Exhibit No. 6 for this deposition,
18 Hendrix No. 6, which, also, is a subpoena on
19 Walgreens Drug Company seeking any and all
20 records pertaining to prescriptions filled and
21 drugs prescribed for John Hendrix, that's you,
22 at your address, 9558 South Loomis, DOB of
23 12/12, and Social Security number of
24 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, do you see that?
                                              107

1     A.  Yes.
2     Q.  And on the last page, "Walgreens
3  certifies through," it looks like it says
4  JM Bosch, B-O-S-C-H -- Jill Bosch, I'm sorry,
5  "Jill Bosch," "A search of the requested date
6  range of past to present has been performed, and
7  understanding that such records could exist
8  under another spelling, name, or other
9  classification but with the information
10 furnished to our office, to the best of our
11 knowledge, no such records exist," and it's
12 notarized, do you see that?
13    A.  Okay.
14    Q.  All right.  In terms of your physician,
15 Dr. Kingra, we subpoenaed Dr. Kingra's records
16 as well, and those came to us in a Record Copy
17 Service statement, and this is Dr. Kingra with
18 an address in Evergreen Park, Illinois --
19    A.  Evergreen Park.
20    Q.  -- right?  2733 West 87th Street?
21    A.  Yes.
22    Q.  All right.  Dr. Kingra signed this
23 himself, it says, "Stawant Kingra," and there's
24 an SK, signed on September 28th of 2010, in
                                              108

27 (Pages 105 to 108)

1  which he said that these are the only records in
2  his possession or control for John Hendrix, do
3  you see that?
4      A.  Uh-hum.  Yes, I see that.
5      MR. MORRISSEY:  Are you going to mark those
6  or --
7      MR. CATANIA:  No.  They were marked already
8  C1, C2, C3, C4, C5, C6, C7, C8, C9, C10, C11,
9  C12, C13, and C14.  There's 14 pages in addition
10 to the instructions page that's signed by the
11 doctor, okay?
12 BY MR. CATANIA:
13     Q.   In this record, and you can look, if
14 you wish, on C2 and 3, it appears that your
15 first entry to see Dr. Kingra was in February
16 of '09, there's what's known as an H&P, a
17 history and a physical examination, and then the
18 very next dated entry after that is February 21
19 of 2010, that's on Page C9, which is several
20 months after your release in October of 2009,
21 right?
22     A.  Uh-hum.
23     Q.  All right.  If you look on C8, I
24 believe the doctor wrote --

109

1      A.  C8?
2      Q.   Yeah.  C8 of the one you have in your
3  left hand.
4      A.  Okay.
5      Q.   Yeah.  In the lower right-hand corner
6  you'll see the C numbers, on Page 8.
7      A.  Okay.
8      Q.  All right.  On C8, it looks like you
9  were there for a checkup; is that right?
10     A.  Yes.
11     Q.  And it says that your lungs were clear,
12 at that time, doesn't it?
13     A.  I can't see this.
14     Q.  Let me show you.  Here for a checkup
15 within the first line of March 18 of 2010,
16 "Checkup," it describes you as a 48-year old,
17 "Follow-up Examination," it says, "Primary
18 history: Asthma.  Smoker: No," you weren't
19 smoking.
20     A.  Right.
21     Q.  "Alcohol," it says, but it says,
22 "socially."
23     A.  Uh-hum.
24     Q.  And the exam shows -- what it says is,

110

1  "ENT: Clear," Ear, Nose, Throat: Clear, and it,
2  also, says -- there's actually nothing there
3  that says about stopping smoking or exercise; is
4  that right, they're not checked?
5      A.  I don't see it.
6      Q.  All right.  If you look on C7, which is
7  a date of April 20th of 2010, there was a
8  checkup, results from labs, apparently, labs
9  were taken the previous time, it says "HEENT,"
10 what this does say is that your -- your cardio
11 and pulmonary is clear, there's no problems with
12 your lungs, at that time, but they do want you
13 to stop drinking.
14     Do you agree with that, that that's
15 what the doctor told you, at the time?
16     A.  I don't recall.
17     Q.  Well, there's no -- there's no --
18 there's nothing here other than -- than an
19 examination, there's no follow-up except in the
20 one instance where the doctor says to stop
21 drinking.
22     On C6, that's May 20th of 2010, I
23 believe you told the doctor that you're doing
24 okay, and that's what it says near the top --

111

1      A.  Yeah.
2      Q.  -- that you're doing okay.
3      A.  I see it, right.
4      Q.  Yeah.
5      A.  I see it, right.
6      Q.  And, then, we'd, also, talked about
7  your first -- in this record, your first
8  examination, which was called a, "Medical
9  History and Physical Form," which is dated
10 February 7th of '09, C2 and C3, do you see that?
11     A.  Yes.
12     Q.  And it, also, says, "Alcohol use is
13 social, no drugs."
14     A.  Uh-hum.
15     Q.  "General appearance is good."  It,
16 also, has a diagnosis impression and conclusion,
17 and down here it says, "HTN," do you see that?
18     A.  I don't know what that is.
19     Q.  That's hypertension, high blood
20 pressure.
21     A.  Oh, okay.
22     Q.  At that time, apparently, there was
23 some consideration that there was hypertension
24 going on.

112

28 (Pages 109 to 112)

1    A.  I know --
2    Q.  Do you remember that --
3    A.  -- I know I got high blood pressure.
4    Q.  Okay.
5    A.  I know I got high blood pressure.
6    Q.  All right.  So, when -- when it
7  appeared on your record at the jail, which is in
8  front of you, that they thought that your blood
9  pressure might be high, that was true, wasn't
10  it, high blood pressure?
11    A.  High blood pressure.
12    Q.  All right.  Mr. Morrissey has a record,
13  also, in front of him from the Cermak Health
14  Services for your intake in August of '09, do
15  you recall having a chest x-ray done?
16    A.  Yes.  Yes.
17    Q.  Okay.  Did you ever have a chance to
18  review the lab report that Mr. Morrissey has on
19  Page J9?
20    A.  No.
21    Q.  Okay.  Would you like to look at that
22  lab report?
23    A.  Yes.
24    MR. MORRISSEY:  I don't have it.
                                                    113

1    MR. CATANIA:  J9, you didn't bring Page J9?
2    MR. MORRISSEY:  I don't seem to have J9.
3    MR. CATANIA:  Well, I have the same set you
4  have, so I will show J9 to your client.
5    MR. MORRISSEY:  All right.  Well, perhaps, we
6  have -- oh, wait, it's the last page here.  It
7  looks like C9 is what I have.
8    MR. CATANIA:  Cermak records, they're the
9  ones with the yellow tag -- I mean, the blue tag
10  on them.
11    MR. MORRISSEY:  Well, why don't you show it
12  to me first so I can --
13    MR. CATANIA:  It's the same record you have.
14    MR. MORRISSEY:  Well, you seem to know --
15    MR. CATANIA:  I can --
16    MR. MORRISSEY:  -- privy to my files.
17    MR. CATANIA:  I can see it sitting on the
18  table.
19  BY MR. CATANIA:
20    Q.  All right.  On J9, there's a record of
21  a chest x-ray read by a physician
22  Calvin Flowers, and it says, "view of chest,
23  lung fields cleared," do you see that?  I mean,
24  it's a chest x-ray, it's supposed to determine
                                                    114

1  whether or not you have tuberculosis, and you
2  don't see that.
3    A.  Okay.  Right here?
4    Q.  Yes.
5    A.  You talking about right up here?
6    Q.  Yes.
7    A.  I see that.
8    Q.  Okay.  So, when you entered the jail on
9  this date of exam, which is August 24 of '09, at
10  4:24 p.m., when they did a chest x-ray having
11  missed it on 8/23 while you were being evaluated
12  for electronic monitoring, "heart and aorta are
13  normal, lung fields clear," do you see that, "no
14  abnormalities"?
15    A.  Yes.
16    Q.  Okay.  Do you understand that this was
17  the first chance that -- for that intake in '09
18  that the physician had a chance to see your
19  chest x-ray, you understand that?
20    MR. MORRISSEY:  I'm going to object.  I don't
21  know whether or not this gentleman knows what
22  the procedure is for the office.
23  BY MR. CATANIA:
24    Q.  Okay.  They took a picture of your
                                                    115

1  chest in order to determine whether you have any
2  kind of pain or problem including tuberculosis,
3  and the read of that x-ray by the physician is
4  that it's clear, do you agree with that?
5    A.  No.
6    Q.  All right.  Well, did you have any
7  distress on the 24th of -- August of 2009 --
8    A.  I don't --
9    Q.  -- at 4:24 p.m.?
10    A.  I don't recall.
11    Q.  All right.  On Pages 4 through -- J4
12  through J6, it's an intake from, it looks like
13  it says, June 4 of 2010 for John Hendrix, with
14  your name spelled correctly, under the same
15  CIMIS number, do you see that, 56214, you see
16  that -- 56217, all right?
17    A.  Okay.  I see that.
18    Q.  That's the time that you were remanded
19  to the County when you were found guilty of
20  driving while license revoked; is that right?
21    A.  Not that I recall.  Not that I recall.
22    Q.  But you do recall being found guilty
23  and being remanded into custody when the judge
24  revoked your bond, right?
                                                    116

29 (Pages 113 to 116)

1    A.  Yes.
2    Q.  Okay.  Well, this intake which goes
3  from J4 through J6 includes information about
4  you, where you told the medic that did your --
5  this is -- I can't read the CMT's signature, it
6  looks like it might be a doctor, but the medic
7  was told by you that you have asthma, that was
8  correct, right?
9    A.  Yes.
10    Q.  And it's written in writing here next
11  to Paragraph 4 of that history, "asthma," do you
12  see that?
13    A.  Yes.
14    Q.  All right.  It, also, says up here in
15  the right-hand corner, "PA," do you understand
16  what that means?
17    A.  Physical --
18    Q.  Physician Assistant.
19        And on the next page, Physician
20  Assistant Jones saw you, according to this
21  record, because it's got your name on it along
22  with your CIMIS number of 56217, your date of
23  birth of 12/12/61, and the date of entry which
24  is August 23 of '09, so that refers to the same
                                                    117

1  entry you were on electronic monitoring --
2    A.  August 23?
3    Q.  August 23 of '09.
4    MR. MORRISSEY:  Well, this is from June
5  of '10 you're referring to.
6    MR. CATANIA:  Right.  But it's the same CIMIS
7  number, Mr. Morrissey.
8  BY MR. CATANIA:
9    Q.  All right.  On that it talks about an
10  examination done by -- by Physician Assistant
11  Jones, and on this section here under,
12  "Assessment, Plan, Referrals," hypertension and
13  asthma are written, do you see that, so you were
14  assessed having hypertension and asthma, do you
15  agree with me?
16    A.  I see it.
17    Q.  Okay.  And Ventolin, which is right
18  here, was given, do you see that?
19    A.  Yes, I see that.
20    Q.  Did you get Ventolin when you came into
21  the jail on August -- on June 20 -- June 4 of
22  2010, the day that you came in 2010?
23    A.  I don't recall that.
24    MR. MORRISSEY:  Well, you had some forms,
                                                    118

1  right?
2    THE WITNESS:  Huh?
3    MR. MORRISSEY:  You had those prescription --
4    THE WITNESS:  I had the -- I had the forms
5  here, right here.
6  BY MR. CATANIA:
7    Q.  You have a prescription form there, a
8  order form for June 4th of 2010, you showed it
9  to me earlier.
10    A.  Right here.
11    Q.  Yeah.
12    A.  6/24/10.
13    Q.  It would be the other one, 6/4.
14    A.  Okay.  I see the date on this one.
15    MR. MORRISSEY:  Looks like 6/4/10.
16  BY MR. CATANIA:
17    Q.  So, that's the date that you came into
18  the jail upon your bond being revoked when you
19  went to trial --
20    A.  Okay.
21    Q.  -- and you were found guilty, okay?
22    A.  Okay.
23    Q.  If you take a look at the same record,
24  which is here in your medical chart under
                                                    119

1  Page J6 --
2    A.  Uh-hum.
3    Q.  -- that looks the same, doesn't it, it
4  looks like the same record, a copy of which you
5  have?
6    A.  Looks like it.
7    Q.  Okay.  Physician Assistant Jones is the
8  one who signed this prescription order, and if
9  you see here, it talks about some medications,
10  but it, also, says, "Ventolin," and then,
11  "given," there's initials there where it says,
12  "given" all right?  That's the evidence that we
13  have that you got Ventolin when you came in in
14  June of 2010.
15        Do you have any memory of getting
16  Ventolin?
17        Do you know what Ventolin is?
18    A.  No.
19    Q.  Ventolin is an asthma pump medication.
20        Do you have any memory of getting that
21  in June of 2010?
22    A.  No.
23    Q.  Okay.  All right.  At the time when you
24  came into jail in June of 2010 -- actually, you
                                                    120

1    have a prescription form there, I think, for the
2    24th of June, don't you?
3        A.  24th?
4        Q.  Yeah, June 24th, prescription order
5    form.
6        A.  Yeah, 6/24.
7        Q.  Okay.  6/24 of 2010, do you recall
8    being examined by a physician in the clinic on
9    June 24 when you got that prescription order
10   form?
11       A.  Yes.
12       Q.  On Page J8 of the record, there's an
13   examination progress note for June 24 of 2010,
14   where it says, "Follow-up," and then it lists
15   information about your blood pressure, 146 over
16   86, and then next to the letter "S," which is
17   subjective, it says, "Follow-up history of
18   hypertension, on Amlodipine, 5-milligrams per
19   day," do you see that, were you receiving
20   Amlodipine --
21       A.  I think it --
22       Q.  -- medication?
23       A.  -- I think it was some pills or
24   something -- pills or something they gave me in

121

1    a cup of something.
2        Q.  Okay.  So, you were getting that
3    medication on June 24th, 2010, at that time, you
4    were getting some medication for hypertension,
5    right?
6        A.  Yes.
7        Q.  And your hypertension was well
8    controlled, at that point, wasn't it?
9        A.  Yes.
10       Q.  All right.  So, you're not saying they
11   weren't treating your hypertensive condition,
12   you're saying you didn't always get your
13   Albuterol, right?
14       A.  I didn't get -- I didn't get my
15   Albuterol.
16       Q.  Okay.
17       MR. MORRISSEY:  There's no complaint in
18   regards to June of 2010, that wasn't part of the
19   Declaration.
20       MR. CATANIA:  I understand that.
21       MR. MORRISSEY:  Okay.  So, there's no
22   contention that you didn't get your medication
23   in June of 2010, correct?
24       MR. CATANIA:  Are you telling him that?

122

1        MR. MORRISSEY:  No, I'm asking.  It's true,
2    right?
3        THE WITNESS:  Right.
4    BY MR. CATANIA:
5        Q.  All right.  And there are some
6    instructions on the bottom of this Page J8 where
7    it says, "RTC 4 weeks," do you know what that
8    refers to?
9        A.  No.
10       Q.  Return to clinic 4 weeks is what that
11   means.  So, they had planned to schedule you for
12   a future date in Sick Call.  And over here it
13   says, "Sick Call, 7/27/2010," do you see that?
14       A.  Yes.
15       Q.  Okay.  That was, approximately, 4 weeks
16   and a little bit more after your visit in June
17   of 2010 -- June 24, 2010, do you see that?
18       A.  Yes.
19       Q.  All right.  Do you recall going to Sick
20   Call on June 27 of 2010?
21       A.  No, I don't recall.
22       Q.  But, at that time, you were still doing
23   okay in terms of your hypertension, right?
24       A.  As far as I know.

123

1        Q.  And you were doing okay in terms of
2    your asthma, at that time, right?
3        A.  As far as I know.
4        Q.  Well, there's nothing here that says
5    you were in any distress, right, in June
6    of 2010?
7        A.  2010?
8        Q.  Right.
9        A.  I don't recall.
10       Q.  All right.  Would you say that your
11   experience in the jail was, in terms of intake
12   screening and the medication, was variable, that
13   things were not always what you expected?
14       MR. MORRISSEY:  Objection.  He's testified
15   to --
16   BY MR. CATANIA:
17       Q.  Do you understand the question, sir?
18       A.  No.
19       Q.  Okay.  He's objected, so I'll have
20   to -- I'll have to explain it, I guess, because
21   your attorney didn't understand it.
22       All right.  Would you say that on the
23   entry into the jail in June of 2010, that you
24   received some medication that you were treated

124

31 (Pages 121 to 124)

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois  (312) 263-0052**

Ex 44 Holmes Dep 032

1   with, right?
2     A. Some. Yes, some.
3     Q. And it was after an examination by a
4 physician or physician assistant that you
5 received the medication, right?
6     A. No, I didn't receive no medication
7 then.
8     Q. In June of 2010, when you were sent
9 there sentence -- or to be sentenced --
10     A. When I first -- when I first got sent
11 there. When I first got sent there.
12     MR. MORRISSEY: Do you understand --
13     MR. CATANIA: I'm talking about 2010 now,
14 presently.
15     MR. MORRISSEY: I think you're confusing.
16 Let me talk to you.
17        (Whereupon, a short break was
18        taken.)
19 BY MR. CATANIA:
20     Q. Did you understand my question before?
21     A. No, I didn't.
22     Q. Okay. I'm asking you to compare your
23 experience between the first time you entered
24 into the jail that's alleged in your Sworn
               125

1   2009, your intake into the jail, at that time,
2 with your intake into the jail after you were
3 convicted on that same case that you were
4 arrested for in August 23 of '09, comparing
5 those two intakes into the jail, would you say
6 that different things occurred on both of those
7 occasions?
8     MR. MORRISSEY: I'm going to object to the
9 vagueness of that question, "different things
10 occurred" --
11     MR. CATANIA: All right. I'll break it up
12 for you, I thought you might understand, I know
13 Mr. Morrissey doesn't.
14 BY MR. CATANIA:
15     Q. But if you say that when you entered in
16 the jail in August -- on August 23 of '09, and
17 you spoke with a medic, and you spoke with a
18 mental health specialist, and you gave them some
19 statements, do you remember that, about your
20 medical and physical -- or mental health
21 conditions?
22     A. Right. Right.
23     Q. Okay.
24     A. Right.
               127

1 Declaration, which is '07, June -- I'm sorry,
2 April 27 of '07, compare that with the third
3 time, I guess, based on this, in June of 2010.
4     A. I don't -- I don't recall it.
5     Q. Do you recall anything about the April
6 of -- April 27, '07 intake?
7     A. No, I don't recall.
8     Q. All right. Are you -- there -- is
9 there anything that you could look at that would
10 help remind you about April 27 of '07?
11     A. No.
12     Q. All right.
13     A. Not that I can recall.
14     Q. All right. We're talking more about
15 August 23 of '09, that was the date that -- that
16 you did most of the -- this discussion about,
17 okay, August 23 of '09 is when you entered into
18 the jail following an arrest; is that right?
19     A. Yes. An arrest, right.
20     Q. And that arrest was for driving while a
21 license revoked, you got tickets, and that was
22 upgraded to a felony?
23     A. Yes.
24     Q. All right. Comparing August 23 of
               126

1     Q. Then we talked about the fact that the
2 record says you were then considered by security
3 for Electronic Monitoring Program on August 23
4 of '09, do you remember -- remember that?
5     A. No, I don't -- I don't recall that.
6     Q. Do you remember being taken for EMP
7 during that initial intake in August of '09?
8     A. I remember home monitoring. I
9 remember -- I remember home monitoring.
10     Q. All right. The home monitoring didn't
11 happen on the same day that you entered into the
12 jail, but it was a couple months later?
13     A. Uh-hum, okay.
14     Q. So, you spent some time in jail?
15     A. Yes.
16     Q. And during that time is when you were
17 issuing requests for medical treatment, right?
18     A. Yes.
19     Q. Okay. On the last day before you
20 exited the jail, you grieved -- or sometime
21 immediately when you got electronic monitoring,
22 you grieved not getting medication, right, you
23 filed a grievance?
24     A. Yes. Right.
               128

**McCorkle Court Reporters, Inc.**
**Chicago, Illinois (312) 263-0052**

Ex 44 Holmes Dep 033

1    Q.   And that was the multiperson group
2  grievance about medication?
3    A.   Yes.
4    Q.   All right.  Did that group grievance,
5  did that result from anything that you saw in
6  terms of notices in the jail about this
7  litigation?
8    A.   What, did I get a letter or something?
9    Q.   No.  Did you see it posted in the jail?
10   A.   No.  No.  No.  No.
11   Q.   In the dayroom?
12   A.   No.  No.
13   Q.   Did you see it posted in Division 5 in
14 the basement in receiving?
15   A.   No.
16   Q.   Okay.  All right.  What I want you to
17 do is think about the time when you entered into
18 the jail in August of '09, compare that to June
19 of 2010, when you were convicted and you were
20 going to be sentenced on the same charge, and
21 that's June 4th of 2010, comparing those entries
22 into the jail, which was better, which was
23 worse, or were they the same?
24   A.   The same to me.

                                            129

1    Q.   Okay.
2    A.   The same.
3    Q.   All right.  You had an examination or
4  screening when you came in both times, right?
5    A.   Both time -- no.  No, I don't recall
6  when they took me back into custody --
7    Q.   Yes.
8    A.   -- when they took me -- took me from
9  the court back into custody.
10   Q.   Right.
11      Do you recall that?
12   A.   I don't recall that, no.
13   Q.   All right.  We looked at the exhibit --
14   A.   No, I don't recall that.
15   Q.   -- which is Cermak Health Services
16 Records beginning with J1, and we talked about
17 J4 through J6, which was the second time that
18 you entered into when they took you into custody
19 after you were convicted, going through the same
20 questions as on J1, which was the August 23
21 entry into the -- into the jail, right, those
22 are the same forms, right, same types of form?
23   MR. MORRISSEY:  Mr. Catania, there's no
24 question that in June of 2010 he got medication.

                                            130

1  So, if that's the question, then there's no --
2  there's no dispute about that, right,
3  Mr. Hendrix?
4    THE WITNESS:  No, there's not.
5    MR. CATANIA:  All right.  Is that a
6  question -- or is that an objection as to
7  relevance, Mr. Morrissey?
8    MR. MORRISSEY:  No, but, I mean, it's --
9  it's -- it's -- we've already established that
10 he has prescriptions indicating that he got
11 medication on June 4th, 2010.
12   MR. CATANIA:  Is that an objection as to
13 relevance?
14   MR. MORRISSEY:  It's an objection in regards
15 to the fact that we'll concede that he received
16 medication in June of 2010.
17   MR. CATANIA:  All right.  Thank you.
18   MR. MORRISSEY:  So, we -- we're not -- we're
19 not disputing that.
20   MR. CATANIA:  All right.  Thank you.
21 BY MR. CATANIA:
22   Q.   At the time when you entered the jail
23 in June -- on June 4th of 2010, you were in the
24 status of having been convicted but not yet

                                            131

1  sentenced, right?
2    A.   Right.
3    Q.   Okay.  When you entered into the jail
4  on June 4th of 2010, were you suffering any
5  symptoms of asthma?
6    A.   When I reentered?
7    Q.   Yes.
8    A.   No, not that I recall.
9    Q.   Okay.  So, when no symptoms are listed
10 on the form, which is J4, J5, about current
11 symptoms, that's accurate about you at the time
12 when you reentered the jail, right?
13   A.   Yes.
14   Q.   All right.  There are no symptoms
15 written down on J1, or J2, or J3 about asthma,
16 do you agree with me on that, there's no current
17 symptoms written down; is that correct?
18   A.   Yes.
19   Q.   Okay.  It does say, as pointed out by
20 Mr. Morrissey, that you disclosed then, also,
21 that you had history of asthma, right?
22   A.   Yes.
23   Q.   Okay.  So, both entries into the jail,
24 you disclosed that you had a history of asthma?

                                            132

33 (Pages 129 to 132)

Ex 44 Holmes Dep 034

1    A.   Yes.
2    Q.   All right.  Those things are the same,
3   that's what I was pointing to, all right, both
4   entries were the same up to this point, right?
5    A.   Right.
6    Q.   So, you didn't get worse as a result of
7   the first intake compared to the second intake,
8   right?
9    A.   Right.
10   Q.   All right.  And your hypertension was
11  under control both times?
12   A.   Yes.
13   Q.   All right.  Can you tell me if you have
14  ever suffered a significant loss in your life?
15   A.   Yes.
16   Q.   All right.  You've lost people close to
17  you?
18   A.   Yes.
19   Q.   To death?
20   A.   Yes.
21   Q.   Have died?
22   A.   Yes.
23   Q.   All right.  How did you feel when that
24  happened?

133

1    A.   Bad.
2    Q.   Okay.  Did you ever suffer a
3   significant financial loss in your life?
4    A.   Financial?
5    Q.   Yes.
6    A.   Yes.
7    Q.   All right.  How did that make you feel?
8    A.   It made me feel bad.
9    Q.   All right.  Have you ever filed
10  bankruptcy?
11   A.   No.
12   Q.   Okay.  Have you ever lost a job?
13   A.   Yes.
14   Q.   How did that make you feel?
15   A.   Mad.
16   Q.   Comparing those feelings, which was
17  worse, losing a family member or someone close
18  to you to death, or not having your Albuterol
19  for the period of time you described in your
20  testimony here?
21   A.   Which is the worse?
22   Q.   Yes.
23   A.   Between my family --
24   Q.   Uh-hum.

134

1    A.   -- and Albuterol?
2    Q.   Yes.
3    A.   I'd say my family.
4    Q.   Okay.  Have you ever been the victim of
5   a crime?
6    A.   No.
7    Q.   Okay.  Do you know anybody who has been
8   the victim of a traumatic physical crime, an
9   assault, a rape, a murder, an attempted murder,
10  things like that?
11   A.   Yes.
12   Q.   All right.  Has that ever happened in
13  your presence, where someone's been hurt in your
14  presence?
15   A.   Yes.
16   Q.   Okay.  When that has happened, how did
17  you feel?
18   A.   Real bad.
19   Q.   How would you compare that occurrence
20  with not having Albuterol for the days that you
21  didn't have it while you were in the jail?
22   A.   Bad.
23   Q.   Okay.  Which was worse?
24   A.   Person losing they life.

135

1    Q.   Okay.  What is it that you expect to
2   come to you in this lawsuit?
3    A.   I feel I should be compensated.
4    Q.   You should be compensated?
5    A.   Yes.
6    Q.   All right.  Do you have any idea of
7   what type of compensation you're expecting?
8    A.   I don't.
9    Q.   What would be compensated?
10   A.   Everything I went through.
11   Q.   All right.  And by that, you're talking
12  about not having your Albuterol, right?
13   A.   Yes.
14   Q.   All right.  When you didn't have your
15  Albuterol on at least several occasions as
16  described in your Sworn Declaration, somebody
17  else had it and you used theirs; is that right?
18   A.   Yes, I used somebody else's.
19   Q.   Okay.  Do you think that the Cermak
20  Health Services personnel made a mistake when
21  they failed to give you Albuterol during that
22  incarceration?
23   MR. MORRISSEY:  I'm going to object.  He has
24  no way of knowing why Cermak did what they did.

136

BY MR. CATANIA:
    Q.  Can you answer --
    MR. MORRISSEY:  You can answer.
BY MR. CATANIA:
    Q.  Can you answer the question?
    A.  No, I can't.
    Q.  Okay.  All right.  Do you have any
evidence that suggests that the personnel at the
jail at Cermak Health Services knew that you
needed Albuterol on the days that you made the
request that you described, those six days?
    A.  Not that I know.  Not that I know of.
    Q.  All right.  Other than telling them at
intake that you had a history of asthma and used
an asthma inhaler, other than that, is there any
other evidence that you have that suggests that
they knew on specific dates that you needed
Albuterol?
    A.  Well, I -- I requested it.
    Q.  I understand that.
    A.  I requested it.
    Q.  I understand you requested it.
        Do you know, do you have any evidence
of any type, that they, specifically, knew that

137

BY MR. CATANIA:
    Q.  Are you able to answer the question?
    A.  I can't answer that question.
    Q.  You can't answer it?
    A.  No, I can't.
    Q.  All right.  Is there any -- any
individual person that you know of that knew
that you did not have Albuterol while you were
in the jail?
    A.  They knew I didn't have it.
    Q.  Who didn't?
    A.  The County knew I didn't have it when I
requested it.
    Q.  What evidence do you have --
    A.  And when I came through -- when I came
through and said I was asthmatic.
    Q.  Okay.  What evidence do you have that a
particular person knew that you did not have
Albuterol while you were in the jail?
    A.  Oh, Rodney Butler knew I didn't have no
Albuterol and no inhaler.
    Q.  And that's the same Rodney Butler --
    A.  Yes.
    Q.  -- that you don't know how to reach

139

you did not have your Albuterol at the time when
you were --
    MR. MORRISSEY:  I'm going to object to you --
you used the word, "they."  I don't know who
you're referring to by, "they."  It's a global
term.
    MR. CATANIA:  All right.  Then I'm going to
object to the pleading, because it says, "they,"
for all aspects of the case.
BY MR. CATANIA:
    Q.  The two Defendants in the case, did the
County know that you, specifically, did not have
Albuterol?
    A.  Well, I told them when I came -- when I
came to process.
    Q.  You told them that you had a history of
asthma and were using Albuterol, right?
    A.  Yes.
    Q.  Okay.  What evidence do you have that
they, specifically, knew that you didn't have
Albuterol after you entered into the jail?
    MR. MORRISSEY:  Object.  This has been gone
through.  He's testified to his requests.
        You can answer again, if you want.

138

right now?
    A.  That I -- right.  I can't reach him,
right.
    Q.  Okay.  Is there any reason for you to
think that Rodney Butler will be located before
this case goes to trial?
    A.  I don't -- I don't know.
    Q.  Can you think of any reason why your
testimony at a future trial would be different
from your testimony here today?
    A.  No.
    Q.  Do you think it would be the same as
your testimony here today?
    A.  Yeah.
    Q.  Okay.  Are you able to obtain Albuterol
without a prescription?
    A.  Yes.  Yes.
    Q.  Okay.  Have you done that?
    A.  Yes, I have.
    Q.  Okay.  Has any doctor prescribed
Albuterol for you in the last month?
    A.  No, uhn-uhn.
    Q.  Okay.  Do you consider Albuterol to be
an over-the-counter medication as opposed to

140

35 (Pages 137 to 140)

1 one that you are --
2    A. You can -- you can get it
3 over-the-counter.
4    Q. Okay.
5    A. You can buy it over-the-counter.
6    Q. What -- what counter can you buy that
7 over?
8    A. Walgreens, CVS.
9    Q. All right. What is it that Albuterol
10 does in your body?
11    A. It opens -- it open up my lungs for me
12 to breath.
13    Q. All right. While you were in jail,
14 were you ever required to work?
15    A. Yes.
16    Q. Required to work?
17    A. Was I required to work?
18    Q. Yes.
19    A. Did they have me to work?
20    Q. No, did they require you to perform the
21 tasks?
22    A. I was working in the County.
23    Q. All right. What were you doing?
24    A. I was in the kitchen. I was on the
       141

1 you to a deck where it's more -- a lot of stuff
2 going on, like, fighting. So, you going to
3 choose to work, because you don't want to go
4 over there to the deck where it's rowdy.
5    Q. All right. Have you ever been to the
6 rowdy deck?
7    A. No.
8    Q. And it's based on hearsay that you know
9 something about it?
10    A. Well, I heard, I heard them talking
11 about it.
12    Q. All right. Who was talking about it?
13    A. Well, you know, inmates in there talk
14 about it.
15    Q. All right.
16    A. You don't want to get back and they
17 send you to a rowdy deck, you want to go on down
18 to the kitchen and work.
19    Q. So, again, you were on this working
20 deck because you wanted to be, right --
21    A. Yeah.
22    Q. -- as opposed to --
23    A. Yeah. Right. Exactly.
24    Q. So, you were not required to work
       143

1 worker's deck.
2    Q. And that was done with your consent,
3 right?
4    A. Uhn-uhn. They said you had to work
5 or -- or you get banked or something like that.
6    Q. Okay.
7    A. You'll be banked or something.
8    Q. Did you understand what that meant?
9    A. Go to the hole or something, move to
10 another tier or something, nonworking deck or
11 something like that.
12    Q. All right. When you -- you were on a
13 working deck, though, right?
14    A. Yes.
15    Q. You could have been transferred off of
16 a working deck if you wanted to be, right?
17    A. Yes.
18    Q. You could have been -- you could have
19 been transferred to a deck that did not do any
20 work at all?
21    A. Yeah. But you had a choice.
22    Q. Okay.
23    A. You either go to a working deck, you
24 either stay over there and work or they'll send
       142

1 except, in your mind, in order to stay where you
2 were?
3    A. In order to stay where I'm at, I had to
4 work.
5    Q. Okay. Was it -- was it work that ever
6 caused you to suffer any symptoms of asthma?
7    A. Not -- not that I know of.
8    Q. When you went to and from court during
9 your court appearances, do you remember how many
10 times you went to court on this particular case?
11    A. Maybe almost a whole year.
12    Q. Okay. Was it monthly or more than
13 monthly?
14    A. Monthly.
15    Q. Okay. On each of those --
16    A. Monthly.
17    Q. -- 12 appearances in Court, did you
18 ever make a record by saying something in open
19 court with the court reporter present that
20 suggested that you were not getting proper
21 medication in jail?
22    A. No.
23    Q. Were your family members present for
24 your bond hearing?
       144

36 (Pages 141 to 144)

1    A.   No.
2    Q.   Were any --
3    A.   Not that I can recall.  Not that I can
4  recall.
5    Q.   Were any of your family members present
6  for the status hearings during your criminal
7  case?
8    A.   My wife.
9    Q.   Do you remember when she was present?
10   A.   No, I don't recall.
11   Q.   Was it the day that you were going to
12 be approved for electronic monitoring?
13   A.   I don't recall that.
14   Q.   Okay.  How often did she come to court?
15   A.   I don't know.  Might have been a couple
16 of times.  I don't know.
17   Q.   And by, "a couple of times," do you
18 mean that she came twice?
19   A.   Something like that.
20   Q.   Do you intend on her testifying in this
21 case on your behalf, in any way?
22   A.   No.
23   Q.   You've appealed the case that you were
24 convicted of, right?
                                        145

1    A.   Yes.
2    Q.   What's the status of your appeal?
3    A.   They allowed a briefing -- they allowed
4  a briefing July 27th, 2009.
5    Q.   And who was prosecuting your appeal for
6  you?
7    A.   I don't -- I don't know her name.
8    Q.   Is it an Assistant Appellate Defender
9  with the Appellate Defender's Office?
10   A.   Yes.  Hawthorn, something like that.
11   Q.   Okay.
12   A.   I forgot her name.
13   Q.   Did you have a Public Defender for your
14 trial?
15   A.   Yes.
16   Q.   Okay.  Has any doctor ever told you
17 that as a result of not having Albuterol for the
18 time between April 27 of 2007, and June 8th of
19 2007, and the time between August 23 of '09,
20 October 10 of '09, that that caused additional
21 harm to you?
22   A.   No.
23   Q.   No doctor said that?
24   A.   Not that I recall.
                                        146

1    Q.   Okay.  Is there anything that you can
2  point to that would suggest otherwise, that
3  there is a doctor who has said that there is a
4  connection and you have additional harm as a
5  result of any delay that you suffered of getting
6  Albuterol?
7    A.   Not that I can tell you.
8    Q.   All right.  And presently today, you're
9  doing okay with your asthma, right?
10   A.   Yeah.  I got my asthma pump.
11   Q.   Yeah, it didn't get worse is my
12 point --
13   A.   Yes.
14   Q.   -- is that right?
15   A.   As far as I know.  I don't know.
16   Q.   All right.  The papers that you brought
17 with you today that are in your black folder in
18 front of you --
19   A.   Uh-hum.
20   Q.   -- are you planning on keeping those
21 papers the way they are intact, all of those
22 papers?
23   A.   Yes.
24   Q.   All right.  And you're going to keep
                                        147

1  them all the way up through the trial?
2    A.   Yes.
3    Q.   Are you going to add anything to that?
4    A.   No.
5    Q.   Do you keep any kind of a diary about
6  your life experiences?
7    A.   No.
8    Q.   Keep any calendar about your life
9  experiences?
10   A.   Well, I keep a calendar in the house,
11 like -- like, what I have to do for this day or
12 something like that.
13   Q.   And do you discard that calendar or do
14 you keep it at the end of the year, for example?
15   A.   Well, I keep it until the end of the
16 year.
17   Q.   And, then, you throw it away?
18   A.   And, then, after, yeah.
19   Q.   All right.  Do you keep any calendar
20 regarding your Albuterol?
21   A.   Albuterol?
22   Q.   Uh-hum.
23   A.   No.
24   Q.   Okay.
                                        148

37 (Pages 145 to 148)

1    A.  No.
2    Q.  You only take it when you have
3  symptoms, right?
4    A.  Right.
5    Q.  All right.
6    A.  Yes.
7    Q.  And, again, during those periods of
8  time that I talked about, April 27 of '07, and
9  June 8 of '07, during those times, you didn't --
10  you don't remember, at this point --
11    A.  Right.
12    Q.  -- any experience of having an asthma
13  attack during those periods, do you?
14    A.  No, I don't -- I don't recall.
15    Q.  All right.  Between August 23 of '09,
16  and October 10 of '09, you don't have any memory
17  of a specific experience of having an asthma
18  attack, do you?
19    MR. MORRISSEY:  Objection.  It's been
20  testified to.
21    THE WITNESS:  I'm not going to answer that.
22  BY MR. CATANIA:
23    Q.  I'm sorry?
24    A.  I'm not going to answer that.
                                                    149

1    Q.  You're not going to answer that?
2    A.  No.
3    Q.  Is that because of your attorney's
4  objection?
5    A.  I'm not answering because I'm trying to
6  see where you would -- 2007 and then 2009, it's,
7  like -- it's, like, a mixup or something.
8    Q.  But that's what's in your Affidavit,
9  that's why I'm using those dates.
10    All right.  Let me ask you this
11  question.  When you have an asthma attack, do
12  you believe that the asthma attack is
13  something -- is the symptoms that you described
14  of shortness of breath --
15    A.  Shortness of breath --
16    Q.  Okay.
17    A.  -- right, wheezing.
18    Q.  That's what you call an asthma
19  attack --
20    A.  Yes.
21    Q.  -- right?
22    A.  Yes.
23    Q.  All right.
24    A.  Yes.
                                                    150

1    Q.  And I think you told me earlier --
2    A.  Discomfort, right.
3    Q.  -- that you've never been hospitalized
4  for something like that, right?
5    A.  No.  No.
6    Q.  All right.
7    A.  No.  No.
8    Q.  Okay.  So, you can self treat those
9  symptoms that you consider to be an asthma
10  attack, right?
11    A.  Yes.  I can take my pump, right.
12    Q.  All right.  There were times during
13  the -- when you were in jail both in '07 and in
14  '09, in which you had symptoms but no asthma
15  pump, right?
16    A.  Yes.
17    Q.  All right.  And you survived those
18  experiences?
19    A.  Yes.
20    Q.  Without -- without an emergency?
21    A.  Without emergency, exactly.
22    Q.  All right.  And you found a way to
23  obtain, at least in the '09 period of time, to
24  obtain somebody else's --
                                                    151

1    A.  Asthma pump.
2    Q.  -- asthma medication?
3    A.  Yes.
4    Q.  Is there any employee of the County,
5  and I'm talking Cermak Health Services, that you
6  are going to say had specific information about
7  you having symptoms of asthma, not just telling
8  them you have a history of asthma, but any
9  County employee that you're going to say at
10  trial had some specific information about you
11  having symptoms of asthma?
12    A.  Am I going to have somebody there or
13  somebody at the County?
14    Q.  Somebody at the County working for
15  Cermak Health Services.
16    A.  Well, not that I -- not that I can
17  recall.  I just talked to one of the nurses,
18  that was it.
19    Q.  And that was to ask for Albuterol,
20  right?
21    A.  Well, actually, I've been asthmatic all
22  my life, but I'm saying, like, 2004 I was in
23  there, and 2004 I got my asthma pump --
24    Q.  Uh-hum.
                                                    152

38 (Pages 149 to 152)

Ex 44 Holmes Dep 039

1    A.  -- you know what I'm saying?  It's
2  records.  It's records there.
3    Q.  At the jail?
4    A.  Yeah.  Should be records in the jail.
5    Q.  Okay.
6    A.  I'm talking about when I come through
7  the County, I -- I get an asthma pump.
8    Q.  All right.  You had your asthma pump in
9  2004, right --
10    A.  Yes.
11    Q.  -- when you came through the jail?
12        And when you came through the jail in
13  2010, you had your asthma pump?
14    A.  No, uhn-uhn.
15    Q.  2010.
16    A.  2010.
17    Q.  June 2010.
18    A.  No.
19    Q.  That's the time period Mr. Morrissey
20  said he stipulates you're not complaining about.
21    A.  No, uhn-uhn.
22    Q.  You did not have it in 2010 when you
23  were -- when you were returned to jail after
24  being tried for driving while license revoked?

153

1    A.  I don't -- I don't recall.  I don't
2  recall.
3    Q.  All right.  You have prescription
4  forms, right?
5    A.  Yes.
6    Q.  All right.  And we pointed to the one
7  that it says you got Ventolin, right?
8    A.  Yes.
9    Q.  Which is an asthma medication in a pump
10  form?
11    A.  Yes.
12    Q.  So, did you get your pump in 2010 when
13  you were returned to the jail?
14    A.  I don't recall.  I don't recall.
15    Q.  Do you have any evidence that suggests
16  that from your experience in '09, August 23 of
17  '09, to October 10 of 2009, was anything other
18  than a mistake in you not getting an asthma
19  pump?
20    MR. MORRISSEY:  Objection.  He's testified
21  for the last four hours about this, now you're
22  trying to put words in his mouth.  He's
23  testified as far as his requests.
24  BY MR. CATANIA:

154

1    Q.  All right.  What your lawyer is trying
2  to do with that --
3    MR. MORRISSEY:  No --
4  BY MR. CATANIA:
5    Q.  -- speaking objection is inform you
6  about putting words in your mouth.  I'm not
7  trying to do that, all right?  What I'm asking
8  is if you have any evidence that suggests that
9  or establishes that not getting it in '09 was
10  anything other than a mistake as far as you?
11    A.  Can't answer that question.
12    Q.  Because you don't know?
13    A.  I don't recall.
14    Q.  All right.
15    A.  I don't recall.
16    Q.  All right.  Is there anything that you
17  can look at to help you remember?
18    A.  That's it.  That's all I have.  That's
19  it.
20    Q.  Everything that you've described --
21    A.  Yes.
22    Q.  -- correct?
23    A.  Yes.
24    Q.  Okay.

155

1    A.  Yes.
2    Q.  All right.  Earlier, I did take some
3  photocopies, which we made exhibits for this
4  case, of documents that are in your folder
5  there, I'm going to ask Mr. Morrissey, who has,
6  actually, the duty to do so, to reproduce to me
7  all of the documents that you have in your
8  folder, do you have any problem with that?
9    A.  No.
10    MR. CATANIA:  Okay.  We can do that today, if
11  you wish.
12    MR. MORRISSEY:  If you wish.
13    MR. CATANIA:  Okay.  Sir, thank you, very
14  much.  I have no further questions.
15  Mr. Morrissey might have some.
16    MR. MORRISSEY:  Let me talk to you.
17    THE WITNESS:  Okay.
18        (Whereupon, a discussion was had
19        off the record.)
20        CROSS-EXAMINATION
21  BY MR. MORRISSEY:
22    Q.  Mr. Hendrix, you came into the Cook
23  County Jail on August 23rd, '09, correct?
24    A.  Yes.

156

39 (Pages 153 to 156)

Ex 44 Holmes Dep 040

1    Q.   And when you came into the jail, you
2  told Ms. Brittman, the medic, that you have a
3  history of asthma, correct?
4    A.   Yes.
5    Q.   And you told her in addition that you
6  needed an asthma pump at times, correct?
7    A.   Yes.
8    Q.   About a week after that, you started
9  having asthma symptoms, correct?
10   A.   Yes.
11   MR. CATANIA:  Objection.  Form.
12 BY MR. MORRISSEY:
13   Q.   And did you fill out any health
14 requests?
15   A.   Yes, I requested.
16   Q.   How many health requests did you fill
17 out?
18   A.   About five.
19   Q.   And that is the process that they have
20 at the jail for -- for an inmate to get medical
21 attention, correct?
22   MR. CATANIA:  Objection.  Form.
23   THE WITNESS:  That's correct.
24
                                              157

1  BY MR. MORRISSEY:
2    Q.   And did they provide you with medical
3  attention in August of 2009?
4    A.   No.
5    Q.   In September of 2009, did they provide
6  you with medical attention after making those
7  written requests?
8    A.   Yes, after.
9    Q.   After -- after September of '09, right?
10   A.   Yes.
11   Q.   Okay.  Did you write a letter to the
12 John Howard Association?
13   A.   Yes, I did.
14   Q.   And why did you write a letter to the
15 John Howard Association?
16   A.   I wrote him for the condition of the
17 jail, and, plus, my asthma.
18   Q.   Okay.  Did you and a number of other --
19   A.   Inmates.
20   Q.   -- inmates --
21   A.   Sign.
22   Q.   -- sign a written grievance?
23   A.   Yes.
24   Q.   Is there anything else you could have
                                              158

1  done as an inmate to make the -- the people that
2  run the Cook County Jail aware of the fact that
3  you were asthmatic and you needed an asthma
4  pump, to your knowledge?
5    MR. CATANIA:  Objection.  Form.
6    THE WITNESS:  I requested.
7    MR. MORRISSEY:  Nothing further.
8    MR. CATANIA:  Just a few follow-up questions
9  based on that.
10           REDIRECT EXAMINATION
11 BY MR. CATANIA:
12   Q.   You were aware of the jail having a
13 grievance procedure in place, right?
14   A.   Yes.
15   Q.   Okay.  And you say that you filed a
16 group grievance with other people on your deck,
17 right?
18   A.   I filed a grievance, yes.
19   Q.   All right.  Do you agree with me that
20 when more than one person files a grievance,
21 that that's called a group grievance?
22   A.   No, I don't -- I didn't know that.
23   Q.   All right.  There are certain rules
24 that are -- you're required to go through in
                                              159

1  order to grieve things at the jail, aren't
2  there?
3    A.   Yes.
4    Q.   Okay.  And among those are to write
5  something in writing and submit it through the
6  channels that are available for grievances,
7  right?
8    A.   Yes.
9    Q.   And that's what you tried to do, right?
10   A.   Yes.
11   Q.   And you, actually, left the jail before
12 receiving a response even that it was received,
13 right?
14   A.   Actually, I put the grievance in way
15 before I even left the jail.
16   Q.   All right.  But you didn't receive a
17 response --
18   A.   I received no response.
19   Q.   -- even that it was received?
20   A.   No, I did not receive no response.
21   Q.   You didn't receive a copy of the
22 grievance?
23   A.   No, I did not.
24   Q.   All right.  And after you were gone,
                                              160

40 (Pages 157 to 160)

1   you weren't contacted by the social workers
2   about your grievance, were you?
3      A.  No, I wasn't.
4      Q.  So, there's been nothing to confirm
5   even to you that that grievance was received by
6   the grievance people, right?
7      A.  Right.  All I know is I wrote the
8   letter, put it in the grievance box, where it
9   went from there, I couldn't tell you.
10     Q.  Well, in the time since it was before
11  you exited the jail, did you make an inquiry of
12  the social worker about your grievance?
13     A.  I talked to the social worker about
14  certain grievances, like, request slips and
15  stuff like that.  They said, "Well, we'll
16  answer -- we'll answer it for you whenever we
17  get around to it."
18     Q.  Okay.  Who was the social worker you
19  asked?
20     A.  I don't even recall the social worker
21  name.
22     Q.  Was it in Division 2, Dorm 4,
23  Division 2?
24     A.  I don't know exactly who it was I
                                              161

1   talked to.  Somebody I talked to.
2      Q.  Okay.  How do you know that person was
3   a social worker?
4      A.  They -- they come through and say
5   social worker here, whoever the social worker --
6   might be a different person, don't be the same
7   person all the time.
8      Q.  Did you actually ask about your
9   grievance, your group grievance?
10     A.  Yeah.  They said that we don't have no
11  grievance, they said you have to fill out a
12  legal paper -- fill it out on a legal paper --
13     Q.  Right.
14     A.  -- and put it in the box --
15     Q.  Right, I understand.
16     A.  -- the grievance box.
17     Q.  I understand what you did in that
18  instance.  But after that, after putting it in
19  the box, did you inquire of any social worker,
20  "What happened to my grievance?"
21     A.  No.
22     Q.  When -- when did you submit it, to the
23  best of your memory?
24     A.  I don't remember when I submitted it.
                                              162

1      Q.  All right.  Other than the letter that
2   you sent to John Howard Association, which we've
3   made an exhibit in this case, do you have any
4   other information about other people that might
5   have signed that group grievance?
6      A.  Any other people?
7      Q.  Any -- anyone else.
8      A.  Not that I know of.
9      Q.  All right.  Did everybody that's on the
10  letter to John Howard, also, sign the grievance?
11     A.  Actually, signed this paper here that I
12  have.
13     Q.  Okay.
14     A.  That's the paper that he signed, the
15  one that I just presented today, that's the one
16  they signed.
17     Q.  All right.
18     A.  And I wrote the letter to John Howard,
19  and he wrote me back.
20     Q.  Charles Fasano did, is that whose
21  signature appears --
22     A.  Yeah.  Oh, okay.
23     Q.  -- signature stamp appears on that
24  page?
                                              163

1      A.  Yeah.  Oh, okay.  Okay.
2      Q.  All right.  You were aware that there
3   was a grievance procedure available to you in
4   the jail, right?
5      A.  Exactly.
6      Q.  And you were aware that part of the
7   grievance procedure was to obtain a confirmation
8   that you were -- your grievance had been
9   received, right?
10     A.  Right.
11     Q.  And you didn't receive that
12  confirmation?
13     A.  No, I did not.
14     Q.  In fact, you left before the time for
15  appeals was up, right?
16     A.  Not that I recall.
17     Q.  Are you still there?
18     A.  I don't know if I -- I don't know if I
19  left, because I was there for maybe a while -- I
20  was there for a while.  So, I don't know.  I
21  don't know.
22     Q.  Can you estimate how much time you were
23  there after submitting the grievance?
24     A.  No, I don't -- I don't recall.
                                              164

41 (Pages 161 to 164)

Ex 44 Holmes Dep 042

1    Q. Was it more than a month?
2    A. I don't know. I don't know.
3    Q. Other than your say so, do you have any
4 other evidence at your disposal to show that you
5 submitted a grievance about not getting
6 Albuterol?
7    A. No, not that I -- not that I know of.
8 Not that I know of.
9    Q. All right.
10    A. Because I normally -- normally, if I'm
11 in -- normally, in a situation like that, I use
12 a copy machine or something, but, unfortunately,
13 I didn't get a chance to use them.
14    Q. All right. Was it your plan to file a
15 lawsuit about the issues you raised in your
16 grievance?
17    A. No. My plan was because of my health.
18    Q. Okay. Was it -- did you know that in
19 order to file a lawsuit about the complaint
20 about not getting Albuterol, you would first
21 have to file the grievance process at the jail,
22 did you know that?
23    A. No, I didn't.
24    Q. Is your answer no?

165

1 have them or not.
2    MR. CATANIA: All right. Well, based on
3 that, and my experience with you, I'm going to
4 ask that before we leave today, would you mind
5 giving me copies of everything that's in your
6 folder today.
7    MR. MORRISSEY: I have to take a look at it,
8 and assuming that there's nothing privileged,
9 we'll provide you with copies.
10    MR. CATANIA: If there's anything privileged,
11 I will, certainly, return it to you --
12    MR. MORRISSEY: Well --
13    MR. CATANIA: -- immediately without copying
14 it, okay?
15    MR. MORRISSEY: Well, I'll take a look at it
16 with my client, and if there's documents that
17 are not privileged, we'll provide you with
18 copies -- or you can -- since we don't have a
19 Xerox machine, you can make copies.
20    MR. CATANIA: That will be fine. If you do
21 hold back any documents, you know how to do a
22 privileged log, right?
23    MR. MORRISSEY: Are you -- are you completed?
24    MR. CATANIA: Not quite.

167

1    A. No, I didn't know that.
2    Q. Okay. Did you know that group
3 grievances were not an acceptable format at the
4 jail?
5    MR. MORRISSEY: Object. I don't know that
6 there was any evidence that more than one inmate
7 can -- cannot file a grievance.
8    MR. CATANIA: Well, that's not quite the same
9 question.
10 BY MR. CATANIA:
11    Q. Did you know that a group grievance is
12 not an acceptable format for grievances at the
13 jail?
14    A. No, I didn't know that.
15    MR. CATANIA: Okay. Mr. Morrissey, you have
16 a couple of bound records in front of you, are
17 those yours?
18    MR. MORRISSEY: These would be mine, yes.
19    MR. CATANIA: Okay. Just asking because
20 there are times that you suggest that you didn't
21 receive record copies, which is exactly what I
22 use in this case.
23    MR. MORRISSEY: Well, I have some records.
24 When you refer to records, I don't know if I

166

1    MR. MORRISSEY: Okay.
2    MR. CATANIA: There's one more thing I need
3 to do.
4    Sir, at this stage, if Mr. Morrissey
5 has no further questions, you would have the
6 right, should this transcript be written, to
7 review that transcript and make corrections.
8    I would just ask, if you would agree,
9 that if you want to make corrections, that you
10 do it within the time that's allowed under the
11 rule, which is, generally, 30 days, and provide
12 reasons for the corrections you want to make; is
13 that okay?
14    THE WITNESS: Yes.
15    MR. CATANIA: All right. Thank you. Do you
16 want to reserve the right to review the
17 transcript if it's written or do you want to
18 waive that right?
19    THE WITNESS: Waive it.
20    MS. REPORTER: Does anyone need to order
21 this?
22    MR. CATANIA: Yes.
23    MR. MORRISSEY: I'll take a copy.
24    (FURTHER DEPONENT SAITH NAUGHT.)

168

42 (Pages 165 to 168)

```
 1      STATE OF ILLINOIS   )
 2                          ) SS:
 3      COUNTY OF C O O K   )
 4           I, Sandra Di Vito, a notary public within
 5      and for the County of Cook County and State of
 6      Illinois, do hereby certify that heretofore,
 7      to-wit, on June 27, 2011, personally appeared
 8      before me, at 50 West Washington Street, Room
 9      571, Chicago, Illinois, JOHN HENDRIX, in a cause
10      now pending and undetermined in the Circuit
11      Court of Cook County, Illinois, wherein MICHAEL
12      PARISH, CURTIS L. OATS, LEILA KHOURY, SEAN
13      DRISCOLL, CARLA LOFTON, ROY CLEAVES, LISA BROWN,
14      DAN TAYLOR, DEAN MILLER, KEVIN SANDERS, STACEY
15      CLARK, and CARLOTTE WATSON are the Plaintiffs,
16      and SHERIFF OF COOK COUNTY and COOK COUNTY are
17      the Defendants.
18           I further certify that the said
19      JOHN HENDRIX was first duly sworn to testify the
20      truth, the whole truth and nothing but the truth
21      in the cause aforesaid; that the testimony then
22      given by said witness was reported
23      stenographically by me in the presence of the
24      said witness, and afterwards reduced to
                                                    169
```

```
 1      typewriting by Computer-Aided Transcription, and
 2      the foregoing is a true and correct transcript
 3      of the testimony so given by said witness as
 4      aforesaid.
 5           I further certify that the signature to
 6      the foregoing deposition was waived by counsel
 7      for the respective parties.
 8           I further certify that the taking of this
 9      deposition was pursuant to notice and that there
10      were present at the deposition the attorneys
11      hereinbefore mentioned.
12           I further certify that I am not counsel
13      for nor in any way related to the parties to
14      this suit, nor am I in any way interested in the
15      outcome thereof.
16           IN TESTIMONY WHEREOF:  I have hereunto
17      set my hand and affixed my notarial seal this
18      14th day of July, 2011.
19
20
21
22      Sandra DiVito
23      NOTARY PUBLIC, COOK COUNTY, ILLINOIS
24      LIC. NO. 084-004642
                                                    170
```

