**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL PARISH, CURTIS L. OATS,** | ) | |
| **LEILA KHOURY, SEAN DRISCOLL,** | ) | |
| **CARLA LOFTON, ROY CLEAVES,** | ) | |
| **LISA BROWN, DAN TAYLOR,** | ) | |
| **DEAN MILLER, KEVIN SANDERS,** | ) | |
| **STACEY CLARK, and CARLOTTE** | ) | |
| **WILSON, on behalf of themselves and** | ) | |
| **all others similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **07 C 4369** |
| | ) | |
| **SHERIFF OF COOK COUNTY and** | ) | **Judge John Z. Lee** |
| **COOK COUNTY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

A certified class of pretrial detainees has brought this action pursuant to 42 U.S.C. § 1983

against the Sheriff of Cook County and Cook County. Plaintiffs allege that the Cook County Jail

(CCJ) has policies and practices of denying or delaying medication prescribed to detainees when

they enter CCJ. The class alleges that these policies and practices constitute deliberate

indifference to their serious medical needs in violation of their due process rights under the

Fourteenth Amendment. Defendants have moved to bar the testimony of four of Plaintiffs'

experts: Dr. Steven Whitman, Dr. Pablo Stewart, Dr. Julie Holland, and Dr. Lambert King. For

the reasons provided herein, the motions are denied.

**Legal Standard**

The admissibility of expert testimony is governed by Federal Rule of Evidence ("Rule")

702 and the Supreme Court's seminal decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

509 U.S. 579 (1993). *See United States v. Parra*, 402 F.3d 752, 758 (7th Cir. 2005) ("At this point, Rule 702 has superseded *Daubert*, but the standard of review that was established for *Daubert* challenges is still appropriate."). Rule 702 allows the admission of testimony by an expert—that is, someone with the requisite "knowledge, skill, experience, training, or education"—to help the trier of fact "understand the evidence or . . . determine a fact in issue." Fed. R. Evid. 702. An expert witness is permitted to testify when (1) the testimony is "based on sufficient facts or data," (2) the testimony is "the product of reliable principles and methods," and (3) the witness has "reliably applied the principles and methods to the facts of the case." *Id.* The proponent of an expert witness bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Under *Daubert*, the district court must act as the evidentiary gatekeeper, ensuring that Rule 702's requirements of reliability and relevance are satisfied before allowing the finder of fact to hear the testimony of a proffered expert. *See Daubert*, 509 U.S. at 589; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–49 (1999). District courts have broad discretion in determining the admissibility of expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). In considering whether to admit expert testimony, district courts employ a three-part framework that inquires whether: (1) the expert is qualified by knowledge, skill, experience, training, or education; (2) the reasoning or methodology underlying the expert's testimony is reliable; and (3) the expert's testimony will assist the trier of fact in understanding the evidence or determining a factual issue. *See Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893–94 (7th Cir. 2011).

With regard to the reliability of an expert's methodology, courts consider factors such as whether the methodology can and has been tested, whether it has been subject to peer review, whether it has a known or potential rate of error, and whether it is generally accepted among the relevant community. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Daubert*, 509 U.S. at 593–94). Under this framework, "shaky expert testimony may be admissible, assailable by its opponents through cross-examination," and criticisms of the testimony's quality speak not to admissibility but to the weight that the testimony should be accorded by the trier of fact. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010).

<u>**Analysis**</u>

**I.      Dr. Steven Whitman**

Plaintiffs rely on Dr. Steven Whitman to provide a quantitative analysis of CCJ's intake and prescription data. Dr. Whitman is a statistician, who analyzes health data. Whitman Report, ECF No. 188-1, at 2. He has a masters degree in biostatistics from the University of Pittsburgh and a PhD in biostatistics from Yale University. *Id.* at 13. He is currently the Director of the Sinai Urban Health Institute, a research institute that focuses on improving the health of urban communities using data analysis and community engagement. *Id.* at 2. He was formerly the Director of the Epidemiology Program at the Chicago Department of Public Health, as well as the Senior Epidemiologist at the Center for Urban Affairs at Northwestern University. *Id.* During his career as a biostatistician and epidemiologist, Dr. Whitman has been responsible for data collection and analysis in research studies about HIV, AIDS, breast and cervical cancer, asthma, diabetes, and epilepsy. *Id.* at 14–16. Dr. Whitman began his career in academia as a college math professor. *Id.* at 2.

## A. Qualifications

Defendants first contend that Dr. Whitman is unqualified to provide an expert opinion in this case because he is an epidemiologist who studies diseases, not correctional medicine. Quantitative analytical skills, however, may be applied to any data set, regardless of subject matter. For example, in *Obrycka v. City of Chicago*, No. 07 C 2372, 2011 WL 2600554, at *7 (N.D. Ill. June 29, 2011), another court in this district held that Dr. Whitman was qualified to provide quantitative analysis regarding the rate at which investigations into allegations of police misconduct were found meritorious in certain police districts, as well as a comparison of that rate to rates in other police districts. Although that case had nothing to do with health data, Dr. Whitman was found to be qualified to perform a mathematical analyses of the data. Likewise, the Court holds that Dr. Whitman's experience in providing quantitative analyses of data throughout his career provides a sufficient foundation to proffer his quantitative analysis in this case.

## B. Reliability

### 1. Reliability of the Methodology

Defendants also attack Dr. Whitman's methodology. Dr. Whitman provides data analysis of CCJ's intake and prescription records with regard to certain non-psychotropic[1] and psychotropic[2] medications. Whitman Report, at 2. Dr. Whitman determines the length of time between the date a prisoner was prescribed medication at his or her intake examination

---

[1]     Dr. Whitman analyzes the data with regard to eleven prescribed non-psychotropic medications: (1) albuterol; (2) amlodipine; (3) enalapril; (4) epilepsy medication; (5) glipizide; (6) HIV medication; (7) hydrochlorothiazide; (8) insulin; (9) lovastatin; (10) metformin; and (11) metoprolol. *Id.* at 30. Dr. Whitman separately analyzes delays in dispensing methadone from March 20, 2009, to May 3, 2010. *Id.* at 187, 190.

[2]     Dr. Whitman also analyzes six prescribed psychotropic medications: (1) chlorpromazine; (2) clonazepam; (3) fluoxetine and sertraline; (4) gabapentin; (5) lorazepam and diazepam; and (6) venlafaxine. *Id.* at 132.

("prescribed date") and the date that prescription was dispensed ("fill date"). *Id.* at 8–9. Dr. Whitman divides that data into five time periods: (1) October 1, 2006, to March 30, 2007; (2) October 1, 2007, to March 30, 2008; (3) October 1, 2008, to March 30, 2009; (4) October 1, 2009, to March 30, 2010; and (5) October 1, 2010, to March 30, 2011. *Id.* at 7. With regard to each medication analyzed, Dr. Whitman also determines whether there is a statistically significant difference between the prescription rates (*i.e.,* the rates at which a prescription was filled) during the first and last time periods and the likelihood that the difference could be the result of chance. *Id.* at 111 (albuterol), 112 (amlodipine), 114 (enalapril), 116 (epilepsy medication), 117–18 (glipizide), 123–26 (insulin), 127–28 (metformin), 129–31 (metoprolol), 175–77 (chlorpromazine), 178–79 (chlonazepam), 180–182 (fluoxetine and sertraline), 182–83 (gabapentin), 184–85 (lorazepam and diazepam), 186–87 (venlafaxine).

As an initial matter, Defendants move to bar Dr. Whitman because his analysis of compiled data was not available to them. Apparently, Plaintiffs had asked Defendants to contribute $6,800 to help defray the cost of Dr. Whitman's compilation of Defendants' raw data.[3] Plaintiffs later requested that Defendants contribute only $1,500. *See* Pl.'s Mem. Opp'n Mot. Bar Whitman, at 12 n.4, ECF No. 218. Plaintiffs wrote a letter to Defendants, stating that, based on Defendants' lack of response to the request for $1,500, Plaintiffs assumed that Defendants had abandoned their request for production of the compilation. *See* Pls.' Ex. 92, 5/7/12 Letter from K. Flaxman to F. Catania, ECF No. 221-14. Plaintiffs asked Defendants to let them know whether their assumption was mistaken. *See id.* Defendants have not pointed to any communication in which Defendants corrected Plaintiffs' assumption. Nor have Defendants

---

[3]     Although Defendants allude to the theory that Dr. Whitman's compilation became his proprietary document, Defendants have failed to provide any exhibit to support this theory. *See* Defs.' Mot. Bar. Whitman, at 6, ECF No. 188 (generally referencing a letter but failing to provide an exhibit number or the letter).

relied on any court filings seeking to compel production of the compilation. A party cannot sit on its rights and later seek to bar the opposing party's expert simply because the expert's compilation was offered at a cost. In other words, the time to speak up was then, not now. Given these unique facts, this is not a situation in which an expert's data has not been made available to the opposing party. Therefore, the Court declines to bar Dr. Whitman's testimony on this ground.

Next, Defendants contend that Dr. Whitman's method for tabulating the data is unclear. Putting aside the fact that Defendants' confusion as to the tabulated data might have been obviated if they had timely asserted their right to obtain it, Dr. Whitman's report adequately explains his methodology.

As Dr. Whitman explains it, he first merged the data files supplied by Defendants that include detainees' prescribed dates and fill dates. Whitman Report, at 2–4; *see* Whitman Dep. at 31, ECF No. 188-3. With regard to the tabulation of data for the eleven non-psychotropic drugs and the six psychotropic drugs, Dr. Whitman used a detainee's first name, last name, and birth date to match the records in each dataset. Whitman Report, at 6. Second, because Defendants' data files contained information from overlapping time periods, he eliminated any redundant data from those periods. *Id.* at 3–8. Third, Dr. Whitman eliminated data that resulted from data entry errors by using coding mechanisms to ensure that (1) the prescribed and fill dates occurred *after* the booking date, (2) the fill date occurred *before* a detainee's discharge date, and (3) the fill date occurred *after* the prescribed date. *Id*. at 6–8. Fourth, Dr. Whitman eliminated data regarding prescriptions unrelated to the intake process—such as refills or prescriptions written after CCJ conducted a second health assessment 14 days after intake—by considering only those fill dates that occurred within 14 days or less after a detainees' booking date. *Id*. Finally, at each step, Dr.

Whitman ensured that he accurately matched and omitted data by verifying three test subjects for each drug and each time period. *Id.* at 7–8. With regard to his methodology of extracting methadone dispensing records from the raw data files, Dr. Whitman matched records by using a detainee's Correctional Institution Management Information System number, which is unique to each inmate and each instance of admission to CCJ. *Id.* at 8. Dr. Whitman then tabulated the prescribed and fill dates from March 20, 2009, to May 3, 2010. *Id.* Dr. Whitman's thorough explanation as to how he tabulated the data spans eleven pages of his report, and the Court finds his explanation to be sufficiently clear.

Defendants also contend that Dr. Whitman has not explained why he selected particular time periods for analyzing the intake data. Defs.' Mot. Bar Whitman, at 3. Not so. For each year between 2006 and 2011, Dr. Whitman analyzed intake data from the same 195-day period from September 17 to March 30. Whitman Report, at 4. For prescription data, he analyzed the 181-day period from October 1 to March 30. *Id.* at 6. Dr. Whitman explains that his analysis is based on the assumption that any prescription written after a detainee has been housed at CCJ for over fourteen days is unrelated to the intake process at issue in this case. *Id.* Accordingly, he used coding mechanisms to eliminate any prescription record date that is more than 14 days past the intake date. *Id.* Dr. Whitman states that this is why the intake data period begins 14 days prior to the prescription record data for each year. *Id.* The selection of the range of months as a basis for comparison is a factual matter to be determined by a jury. To the extent that Defendants wish to ask Dr. Whitman why he selected the particular range of months from each year, they may do so on cross-examination.

Furthermore, Dr. Whitman concludes that there has been a statistically significant increase in the rate of dispensing certain prescription medications on the day of admission

between the 2006–07 and 2010–11 periods. Defendants argue that statistically significant changes may be observed with trivial outcomes. Criticisms of the testimony's quality, however, speak not to admissibility but to the weight that the testimony should be accorded by the trier of fact. *Metavante*, 619 F.3d at 762. To this end, Defendants are free to press Dr. Whitman with this line of questioning if and when he testifies.

### 2. Reliability of the Underlying Data

Next, Defendants attack Dr. Whitman's analysis as unreliable, claiming it is based on faulty data. "A district court enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Bryant v. City of Chi.*, 200 F.3d 1092, 1098 (7th Cir. 2000). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith*, 215 F.3d at 718.

In support of their argument that Dr. Whitman's analysis relies on faulty data, Defendants point to Dr. Whitman's statement that a "huge majority of the data that [was] received was often confusing or imperfect." Whitman Dep. at 32. What Dr. Whitman meant by this cherry-picked quotation becomes clear when it is put into context. Dr. Whitman stated that the data files provided by Defendants were confusing or imperfect because they often lacked inmate identification numbers. *Id.* at 32–35. But Dr. Whitman explained that he was ultimately able to utilize an inmate's first name, last name, and birth date to match the data from various data sets. *Id.* at 33–34. Dr. Whitman also explained that, because the different data sets supplied by Defendants pertained to overlapping time periods, he eliminated any data that was redundant. To

the extent that Defendants wish to challenge any of Dr. Whitman's assumptions to match or eliminate data, they may do so on cross-examination.

Furthermore, Defendants state that Dr. Whitman's reliance on CCJ's prescription records is erroneous because his comparison of prescribed dates and filled dates ignores that CCJ intake personnel are permitted to dispense medication from "par stock" during the intake evaluation without a written prescription.[4] But Dr. Whitman's stated assumption that all intake personnel are required to write a prescription for medication that subsequently is transmitted to the CCJ pharmacy finds support in the record. At least one of CCJ's physician assistants has stated that CCJ intake personnel are not allowed to prescribe psychotropic medications. *See* Stadnicki Dep. at 145–46, ECF No. 174-5. Thus, Defendants' argument regarding the use of par stock by intake personnel would not apply to Dr. Whitman's analyses of psychotropic medications. With regard to non-psychotropic medications, there is evidence that CCJ's intake personnel actually wrote prescriptions whenever medication was distributed from par stock, the CCJ's pharmacy received a copy of that prescription for entry into the recordkeeping system, and administration of such medication was noted in the detainee's records. *See* Trammel Dep. at 114–16, ECF No. 174-5; Stadnicki Dep. at 101–03, 105–08, 113; Martinez Dep. at 79–80, 87–88, ECF No. 174-6. Of course, on cross-examination, Defendants may challenge Dr. Whitman's assumption that, regardless of whether a medication is dispensed from par stock or the pharmacy, the prescription records reflect a medication's prescribed date and filled date. But Defendants have not established that Dr. Whitman's methodology is unreliable based upon the use of "par stock."

---

[4] Defendants do not explain which prescription medications that Dr. Whitman analyzed are affected by the "par stock" policy.

## C. Assisting the Trier of Fact

Defendants also argue that Dr. Whitman's opinion regarding a statistically significant increase in certain prescription rates is not relevant because it will not assist the trier of fact in determining the cause of the increase. "[I]n order for an expert's testimony to qualify as 'relevant' under Rule 702 it must assist the jury in determining any fact at issue in the case." *Smith*, 215 F.3d at 720. "No one piece of evidence has to prove every element of plaintiff's case; it need only make the existence of 'any fact that is of consequence' more or less probable." *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 425 (7th Cir. 2000) (quoting Fed. R. Evid. 401). Together with other testimony and evidence, Dr. Whitman's statistical analyses of the prescription rates may help the trier of fact determine whether the rate of dispensation of prescription medications during any of the five time periods supports a finding that Defendants were deliberate indifference to detainees' medical needs. In addition, Dr. Whitman's analysis—together with a Department of Justice report (DOJ Report) issued on July 11, 2008, Pls.' Ex 28, DOJ Report, ECF No. 174-9, outlining CCJ's systemic failings with regard to its intake screening process—is relevant to whether CCJ's intake process was constitutionally deficient at the time that the DOJ Report was issued, and whether and to what extent the prescription rates improved thereafter. This is sufficient to satisfy the relevant requirement.

Defendants also question the relevance of Dr. Whitman's methadone analysis, which studied whether CCJ abided by its policy of tapering a detainee's use of methadone over a period of 21 days. But Plaintiffs have abandoned this claim and now assert a more narrow claim, alleging that methadone is one of the non-psychotropic medications not provided within 24 hours after the detainee has notified the intake screener that he or she had been prescribed methadone. *See* Pls.' Mem. Resp. Defs.' Suppl. Br. Mot. Decertify, at 13, ECF No. 308. In this regard,

Defendants' argument is well-taken, but Dr. Whitman's analysis as to the number of methadone prescriptions filled on the day of intake, as well as every day up to the fourteenth day, is relevant and, together with the other evidence, will assist the trier of fact in determining whether there was a policy or practice of denying or delaying methadone dispensation. *See* Whitman Report, at 188, 191.

For these reasons, the Court denies Defendants' motion to bar Dr. Whitman's testimony.

## II.     Dr. Pablo Stewart

Plaintiffs offer Dr. Pablo Stewart to opine about CCJ's intake process as it relates to psychiatric care and methadone treatment. Dr. Stewart, a clinical professor of psychiatry at the University of California San Francisco School of Medicine, has over thirty years of experience in managing, monitoring, and reforming mental health systems in correctional settings, as well as consulting governments and agencies regarding the treatment of substance abuse. Pablo Report, at 2–4, ECF No. 187. He has served as a psychiatric director for a correctional facility in San Francisco. *Id.* at 4. Dr. Stewart also has served as a primary investigator for the DOJ with regard to a mental health correctional facility for juveniles in Michigan. *Id.* at 10. In addition, he has consulted both governmental and private agencies on a variety of psychiatric, forensic, substance abuse, and organizational issues and has testified as an expert in many cases involving the delivery of mental health care at correctional institutions. *Id.* at 5–10.

According to Dr. Stewart, CCJ's intake screening procedures are inadequate for several reasons: (1) intake personnel are authorized to discontinue prescriptions for psychotropic medications previously prescribed by physicians, even though the intake personnel are not qualified to do so; (2) detainees do not receive their psychotropic medications in a timely fashion; and (3) detainees suffer from the abrupt discontinuation of psychotropic medications, as

well as methadone.[5]  Stewart Report, at 20–25.  For their part, Defendants argue that these opinions should be barred, because Dr. Stewart fails to apply a valid methodology, has relied on false assumptions, and provides only a general opinion as to the risks caused by a delay in the delivery of medication that will be unhelpful to the jury.  Defs.' Mot. Bar Stewart, at 2–13, ECF No. 185.  None of these arguments are persuasive.

## A. Reliability of the Methodology

Defendants first contend that Dr. Stewart's methodology is invalid and unreliable because it is not as extensive as the methodology he previously employed when evaluating intake procedures at a mental health correctional facility for juveniles.  In the prior evaluation, Dr. Stewart:  (1) walked through the intake process from beginning to end while touring the facility to understand the process of identifying, evaluating, and treating those in need of mental health care; (2) reviewed the facility's policies and procedures; (3) determined whether employees were adhering to the policies and procedures; (4) interviewed members of the class of detainees; and (5) reviewed relevant records.  *Id.* at 4.

In this case, Dr. Stewart (1) inspected and spoke with personnel in the intake screening areas and the in-patient psychiatric units; (2) reviewed Dr. Avery Hart's deposition testimony regarding CCJ's psychotropic drug dispensation policies and practices; (3) reviewed Dr. Whitman's statistical analyses to determine the length of time between the date when psychotropic medication was prescribed and the date when it was dispensed;[6] (4) reviewed the

_____

[5]  For example, Dr. Stewart asserts that detainees who do not receive the full dose of methadone previously prescribed by their physicians experience gratuitous pain.  Stewart Report, at 2, ECF No. 187.

[6]  Defendants also argue that Dr. Stewart provides no valid opinion of his own and is merely is a mouthpiece for Dr. Whitman and the DOJ Report.  This argument misinterprets Dr. Stewart's expert report.  Dr. Stewart does not simply parrot Dr. Whitman and the DOJ Report, as Defendants claim.  Rather, Dr. Stewart offers his own opinion that, assuming Dr. Whitman's statistical analysis about delays in psychotropic medication dispensation and the findings in the DOJ Report are true, then detainees have

DOJ Report and the August 14, 2008, Court Monitoring Report issued in *Duran v. Sheahan*, which discussed the adequacy of CCJ's intake screening policies and practices; (5) interviewed four members of the class; and (6) reviewed their medical records. *See* Stewart Report, at 15; *id.*, App. 3, List of Exs. Referred to by Experts; Stewart Dep. Exs., ECF No. 324-1; *see also* Pls.' Ex 28, DOJ Report, ECF No. 174-9; *Duran v. Sheahan*, 07C2949, 8/14/08 Court Monitoring Report, ECF No. 1027.

Contrary to Defendants' contention, Dr. Stewart's present methodology is substantially similar to the one he employed in the prior occasion. In both cases, the methodology involved on-site inspection, knowledge of the applicable policies and practices, familiarity with certain class members and their medical records, and a review of how the policies and practices were being applied. Thus, to the extent that Defendants argue that Dr. Stewart's methodology in this case is unreliable because it differs from his prior methodology, their argument is unpersuasive.

Defendants also argue that Dr. Stewart's methodology is unreliable because he interviewed and reviewed the medical records of only four class members. Were this the sole sum of Dr. Stewart's work, the Court would be included to agree. But Dr. Stewart did more than that. As discussed above, among other things, he inspected the intake areas at CCJ, familiarized himself with CCJ's policies regarding intake procedures and dispensation of medication, and reviewed Dr. Whitman's statistical analysis for hundreds of detainees. Whether Dr. Stewart should have interviewed more than just four detainees goes to the weight of his testimony rather than its admissibility. *See SquirtCo v. Seven–Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980) ("In

---

not received in a timely fashion psychotropic medications to treat their serious health needs. Stewart Report, at 1–2. In this way, Dr. Stewart presents his own expert opinion as a medical doctor well-versed in the delivery of mental health care at correctional institutions. Accordingly, Defendants' motion to bar Dr. Stewart's expert testimony on this basis is denied.

evaluating survey evidence, technical deficiencies go to the weight to be accorded them, rather than to their admissibility.").

## B.     Reliability of the Underlying Assumptions

Next, Defendants challenge the reliability of nine factual assumptions underlying Dr. Stewart's opinion.  The reliability of such factual assumptions, however, is not to be weighed by the Court *in limine*, but rather is to be "tested by the adversarial process and determined by the jury." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013); *see also Wilbern v. Culver Franchising Sys., Inc.*, No. 13 C 3269, 2015 WL 5722825, at *11–12 (N.D. Ill. Sept. 29, 2015) (denying motion to strike damages expert and noting that "the validity of the expert's factual assumptions is not the focus under a pre-trial *Daubert* inquiry").  Because Dr. Stewart's assumptions go to the weight, rather than the admissibility, of his testimony, the Court denies Defendants' motion to bar his opinions on this ground.[7]

---

[7]     The Court notes that some of these purported assumptions are not assumptions at all.  For example, Defendants fail to point to, and the Court cannot find, any portion of Dr. Stewart's report that relies on an assumption that the receiving area operated 24-hours a day or that Dr. Puisis believed that the prior delivery system was inadequate.  *See* Defs.' Mot. Bar Stewart, at 5–6 (assumptions 1, 3, 4, and 6).  Nor could a magistrate's judge's description of Dr. Stewart's analysis in a different case possibly be an assumption on which Dr. Stewart bases his opinion in this case.  *See id.* at 6 (assumptions 7 and 8).

In addition, other assumptions have become moot.  Dr. Stewart's assumption about detainees' length of stay and the 21-day methadone tapering program has been mooted by Plaintiffs' narrowing of their methadone claim.  *See id.* (assumption 9).  Another assumption that initial mental health screenings were performed in a noisy, non-private setting has been mooted by the class definition.  *See id.* at 5 (assumption 2).  The certified class includes only those detainees who provided notice that they had been taking prescription medication for a serious health need.  Thus, if the setting prevented a detainee from providing such notice, that detainee would not be a member of the class.

This leaves one assumption that Defendants contend is false.  According to Defendants, Dr. Stewart assumes that, prior to October 2010, detainees would not see a psychiatrist right away upon intake.  *See id.* at 6 (assumption 5); see Stewart Report, at 23–24 (stating that, prior to November 2010, a detainee entering CCJ could not see a psychiatrist that day, but could be admitted into the infirmary for observation and see a psychiatrist the next day).  Defendants, however, do not point to any portion of the record that undermines this assumption.  *See* Defs.' Mot. Bar Stewart, at 6.  Nor do they even explain in general terms why this assumption is false.

## C.     Assisting the Trier of Fact

Defendants further argue that, to the extent that Dr. Stewart will testify that a delay in medications will result in more risk to the detainee, the opinion is too vague and obvious to assist the average juror.  Dr. Stewart outlines the uses of the following medications to treat certain medical conditions and the effects of abruptly discontinuing them, even for a brief period of time:  chlorpromazine (Thorazine); clonazepam (Klonopin); fluoxetine and sertraline (Prozac, Zoloft); gabapentin (Neurontin); lorazepam and diazepam (Ativan, Valium); venlafaxine (Effexor); and methadone.

An average juror, lacking a medical background or training, would be unfamiliar with the medical conditions at issue, the prescription medications used to treat them, and the effect of discontinuing the medications for a period of time.  *See Hudson v. United States*, 636 F. Supp. 2d 827, 831 (W.D. Wis. 2009) (stating that prescription of a drug for treatment of a medical condition "is not a matter of common knowledge or within the experience of laymen"), *aff'd*, 375 F. App'x 596 (7th Cir. 2010); *Cox v. Ann*, No. 12-CV-2678-DDC-GLR, 2015 WL 859064, at *18 (D. Kan. Feb. 27, 2015) ("A layperson does not possess the knowledge to determine whether the medication prescribed to plaintiff can create dependencies leading to serious withdrawal symptoms.").  Accordingly, Dr. Stewart's explanations will assist the trier of fact in understanding the effects of a delay in the administration of these medications to detainees, which is one of the central issues in this case.

## III.    Dr. Julie Holland

Defendants next move to bar the expert testimony of Dr. Julie Holland, a board-certified psychiatrist specializing in pharmacology—the study of the effects of drugs on one's mood, sensation, thinking, and behavior.  *See* Defs.' Mot. Bar. Holland, at 1, ECF No. 183. Dr. Holland

was an attending physician in the Comprehensive Psychiatric Emergency Program at Bellevue Hospital in New York City from 1996 to 2005. Holland Report, at 2, ECF No. 183-1. For the past eleven years, she has served as a Clinical Assistant Professor of Psychiatry at the New York University School of Medicine. *Id.* at 1. In addition, Dr. Holland currently has a private practice as a psychopharmacologist. *Id.*

Plaintiffs rely on Dr. Holland in four ways. First, Dr. Holland describes the uses for and potential effects of the sudden discontinuation of the following psychotropic drugs: chlorpromazine (Thorazine); clonazepam (Klonopin); fluoxetine and sertraline (Prozac, Zoloft); gabapentin (Neurontin); lorazepam and diazepam (Ativan, Valium); and venlafaxine (Effexor). *Id.* at 4–7. Second, Dr. Holland explains that a proper intake procedure should evaluate a detainee's psychological issues, by obtaining any current complaints, a history of symptoms, a history of any medications prescribed, and the detainee's current prescription medications. *Id.* at 7–11. Third, after reviewing Dr. Whitman's statistical analysis of the time period for delivering psychotropic drugs, Dr. Holland concludes that "[f]rom October 2006, to November 2010, detainees entering the Jail did not receive in a timely fashion prescription medication required by the detainee for serious psychiatric health needs." *Id.* at 1. Finally, Dr. Holland opines that the "failure of the Jail to provide in a timely fashion prescription medication required by the detainee for serious psychiatric health needs was likely to harm persons who had previously been prescribed medication for serious psychiatric problems." *Id.*

Defendants first question Dr. Holland's qualifications to offer these opinions, noting that Dr. Holland does not have any medical experience in a correctional setting and currently does not have physician privileges to admit patients to any hospital. This may be so, but as a psychiatrist specializing in pharmacology with extensive experience treating patients in a

psychiatric emergency room, Dr. Holland's work experience and education qualify her to attest to proper intake procedures for psychotropic drugs generally, as well as the uses of specific psychotropic medications and the dangers of abruptly discontinuing them.

Additionally, Defendants contend that Dr. Holland did not use any methodology in reaching her conclusions and, if she did, did not describe it in her report. This argument is also unpersuasive. Dr. Holland states that, based on her experience as a psychiatrist and her knowledge of pharmacology, she is knowledgeable of the risks of withdrawal symptoms and psychological changes caused by the abrupt discontinuation of various psychotropic medications. Furthermore, she is capable of assessing the dangers associated with abruptly restarting such medications at original doses after discontinuation. Her assessment of these risks and dangers presumes that Dr. Whitman's statistical analysis is correct. This explanation is sufficient to satisfy the requirement of Rule 702 and *Daubert*.[8]

Defendants also challenge the reliability of Dr. Holland's assumption that CCJ inmates, who had been prescribed medication prior to intake, had actually been taking that medication, such that a delay in dispensation would have a deleterious effect. But such a factual assumption can be "tested by the adversarial process and determined by the jury," *Manpower*, 732 F.3d at 808, and Defendants will be able to cross-examine Dr. Holland regarding this assumption if and when the opportunity arises.

Furthermore, Defendants argue that Dr. Holland's conclusions are not sufficiently tied to the litigation because her knowledge is not derived from the actual experience of any class member. It is true that Dr. Holland did not interview class members or review their medical

---

[8] Because Dr. Holland's opinions are limited to psychotropic medications and the risks of abruptly discontinuing and restarting them, Defendants' argument that she should have reviewed evidence regarding non-psychotropic medications and other topics outside the scope of her opinions provides no support for their motion.

records. However, she reviewed CCJ's intake policies, practices, and procedures, as well as statistical data showing periods of delay between the prescription and dispensation of psychotropic medications during the class period. Her review of these materials is sufficient to tie her opinions to this litigation.

Finally, Defendants argue that Dr. Holland's opinions will be of no assistance to the jury. The Court disagrees. Dr. Holland provides testimony based on specialized knowledge and expertise that is outside the province of the average juror. For these reasons, the Court denies Defendants' motion to bar the expert testimony of Dr. Holland.

## IV.    Dr. Lambert King

Dr. Lambert King is the Director of the Department of Medicine at Queens Hospital Center, a public hospital. King Report, at 1, ECF No. 209. He has substantial experience in the field of correctional medicine, including providing clinical health care at CCJ in Chicago, managing health care at Rikers Island in New York City, and acting as a court-appointed expert to evaluate medical services in the Maricopa County Jails in Arizona. *Id.* at 1–2.

Dr. King's opinions are limited to non-psychotropic medications. First, Dr. King asserts that, from October 1, 2006, to November 2010, a significant number of detainees entering the CCJ did not timely receive non-psychotropic medication prescribed for serious health needs. *Id.* at 5. Second, Dr. King concludes that the failure of the CCJ's medical services to provide timely prescription medication for serious medical conditions recklessly placed large numbers of detainees at risk for physical harm, morbidity, and mortality. *Id.* at 5–6. Dr. King also provides examples of such risks:  acute exacerbation of asthma, acute coronary syndrome, myocardial infarction, epileptic and withdrawal seizures with associated injuries, uncontrolled diabetes, diabetic ketoacidosis, hypertension, and stroke. *Id.*  Third, Dr. King states that, assuming the

dispensation delays described in Dr. Whitman's statistical analysis are true, during the base period of October 1, 2006, to March 30, 2007, there were systemic and unconscionable deficiencies in the quality of health care being provided to detainees who suffered from serious medical conditions, including hypertension, heart disease, diabetes, epilepsy, HIV infection, and asthma. *Id.* at 10. Lastly, Dr. King states that CCJ's methadone tapering policy that automatically reduces a detainee's methadone dosage caused gratuitous physical pain and psychological discomfort. *Id.* at 7.

Defendants do not challenge Dr. King's qualifications. Rather, they argue that he failed to apply a methodology he had employed in another case and that his opinions are not relevant or reliable. Defs.' Mot. Bar King, at 2–5, ECF No. 184.

As to the first argument, Defendants contend that Dr. King did not apply the methodology he had used when acting as the court-appointed evaluator of medical health care services in the Maricopa County Jails. There, he examined 72 to 89 randomly selected patient records. Defendants claim that he should have, but did not, conduct a similar analysis here. But, Dr. King did examine Dr. Whitman's data analysis in this case, and that data incorporated the prescription records for all detainees who used non-psychotropic medications for the months from October 1 to March 30 for a five-year period. Although Dr. King did not look at any particular detainee's medical chart, the tabulation of data provided him with the data necessary to support his opinions.

Defendants also attack Dr. King's assumption that each of the detainees, for whom CCJ personnel prescribed medication upon intake, suffered from a serious medical condition. But "a course of prescription medicine is evidence that . . . [a person] suffers from a serious medical condition requiring continuous treatment—that is, the medicine is designed to treat the

condition." *Jones v. C&D Techs., Inc.*, 684 F.3d 673, 678 (7th Cir. 2012); *McDonald v. Hardy*, 821 F.3d 882, 889 (7th Cir. 2016) ("An objectively serious medical condition is one that a physician has diagnosed as needing treatment . . . .") (internal quotation marks omitted); *see Calhoun v. Ramsey*, 408 F.3d 375, 379–80 (7th Cir. 2005) ("[I]f [a]. . . [j]ail had a policy that directed the sheriff's personnel to throw away all prescription medications brought in by detainees or prisoners without even reading the label and without making alternative provisions for the affected individuals, the County would be liable assuming that such a policy would, on its face, violate . . . the Due Process clause . . . ."); *see also Davis v. Carter*, 452 F.3d 686, 692 (7th Cir. 2006) (recognizing withdrawal symptoms caused by delays in prescribed methadone treatment is a "significant medical issue"). Because Whitman's data upon which Dr. King relies is based upon prescriptions of non-psychotropic medication issued by CCJ personnel at intake, Dr. King's reliance upon the data does not bar him from testifying under Rule 702 or *Daubert*.

Finally, Defendants argue that Dr. King's opinion would not assist the trier of fact in understanding the evidence. Although Defendants aver that Dr. King's opinion would be unhelpful because he has manipulated the relevant figures and statistics, they have not provided a single example to illustrate their point. Moreover, Plaintiffs note that they do not intend to rely on Dr. King for statistical analysis. Rather, they will rely on Dr. King only for opinions within his expertise regarding the consequences of discontinuing certain prescribed non-psychotropic medications.[9] Because such specialized knowledge is outside the purview of the average juror, the Court finds that Dr. King's opinions will help the jury understand the range of potential effects caused by delaying certain non-psychotropic medications.

---

[9] In addition, Defendants resurrect their argument that CCJ's prescription records do not account for medication dispensed from CCJ's "par stock." But, as noted above, this argument does not help Defendants.

## Conclusion

For the reasons set forth herein, the Court denies Defendants' motions to bar Plaintiffs' experts Dr. Whitman, Dr. Stewart, Dr. Holland, and Dr. King [183] [184] [185] [188].

**SO ORDERED**                     **ENTER:  4/17/18**

_____
**JOHN Z. LEE**
**U.S. District Judge**