**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL PARISH, CURTIS L. OATS,** | ) | |
| **LEILA KHOURY, SEAN DRISCOLL,** | ) | |
| **CARLA LOFTON, ROY CLEAVES,** | ) | |
| **LISA BROWN, DAN TAYLOR,** | ) | |
| **DEAN MILLER, KEVIN SANDERS,** | ) | |
| **STACEY CLARK and CARLOTTE** | ) | **07 C 4369** |
| **WILSON, on behalf of themselves and** | ) | |
| **all others similarly situated,** | ) | **Judge John Z. Lee** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **SHERIFF OF COOK COUNTY and** | ) | |
| **COOK COUNTY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

A certified class of pretrial detainees at the Cook County Jail ("CCJ") has sued the Sheriff

of Cook County, as well as Cook County itself, under 42 U.S.C. § 1983, claiming that Defendants'

intake practices at CCJ were deliberately indifferent to Plaintiffs' serious medical needs in

violation of their due process rights under the Fourteenth Amendment. Specifically, Plaintiffs

claim that intake screeners were allowed to prohibit detainees from receiving medication that had

been prescribed to them prior to their admission, without the benefit of an in-person evaluation by

a licensed medical professional. According to Plaintiffs, this practice delayed them from receiving

treatment for serious health needs. Second, Plaintiffs claim that, even on those occasions that an

intake screener did refer a detainee for a medical evaluation and medication was prescribed as a

result, CCJ did not dispense the medication in a timely manner. Third, Plaintiffs claim that CCJ

employed a twenty-one day methadone tapering program that caused unnecessary pain to detainees

who needed methadone treatment. Plaintiffs have moved for partial summary judgment [173], and Defendants have separately cross-moved for summary judgment [190] [193] as to these claims.[1] For the reasons provided herein, Defendants' motions are granted in part and denied in part, and Plaintiffs' motion is denied.

<u>**Factual Background**</u>[2]

## I.      The Parties

The Court previously certified, pursuant to Fed. R. Civ. P. 23(b)(3), a class of "all persons confined at the [CCJ] on and after August 3, 2005[,] who provided notice that he or she had been taking prescription medication for a serious health need and who was not provided with appropriate medication within 24 hours thereafter." *See Parish v. Sheriff of Cook Cty.*, No. 07 C 4369, 2008 WL 4812875, at *6 (N.D. Ill. Oct. 24, 2008); *see also Parish v. Sheriff of Cook Cty.*, No. 07 C 4369, 2016 WL 1270400, at *10 (N.D. Ill. Mar. 31, 2016) (denying motions to decertify).

CCJ is one of the largest single-site county pre-detention facilities in the United States. Pls.' LR 56.1(a)(3) Stmt. ¶ 5, ECF No. 174. And, at all times relevant to the class period, Cermak Health Services ("Cermak"), a public entity administered by the Cook County Health and Hospitals System Board, provided health services to CCJ detainees. Pls.' LR 56.1(a)(3) Stmt. ¶ 8.

Responsibility for CCJ is vested in the Sheriff, *see* 55 Ill. Comp. Stat. 5/3-6017, and he has sole supervision over CCJ's operations. *See DeGenova v. Sheriff of DuPage Cty.*, 209 F.3d 973, 976 (7th Cir. 2000) (citing *Moy v. Cty. of Cook*, 640 N.E.2d 926, 929 (Ill. 1994)). The Sheriff's expenses are funded by Cook County. 55 Ill. Comp. Stat. 5/5-1106.

---

[1]      Defendants request that the Court strike certain exhibits within their memorandum in opposition to Plaintiffs' motion for partial summary judgment. Defs.' Resp. Pls.' Mot Partial Summ. J. at 6, ECF No. 203. Because the Court has not relied on the exhibits that are the subject of the motion, the request is denied as moot.

[2]      The following facts are undisputed unless otherwise noted.

## II.  Intake Screening at CCJ

Between August 2005 and 2010, CCJ utilized the following intake procedures.[3]

### A.  Initial Medical Screening

During the relevant time period, CCJ admitted approximately 250 to 300 new detainees per day.  *See* Pls.' Ex. 11, Trammel Dep. at 64:12–10, ECF No. 174-5; Pls.' Ex. 21, Cook Cty. Appropriations 2007 Fiscal Year, at 2, ECF No. 174-7; Pls.' Ex. 22, Cook Cty. Appropriations 2008 Fiscal Year, at 2, ECF No. 174-8.  As part of the intake process, a detainee first met with a correctional medicine technician ("CMT"), who conducted a brief interview to determine what, if any, health issues the detainee had.  Pls.' LR 56.1(a)(3) Stmt. ¶ 18.  The CMT then filled out a form, known as a "bruise sheet," indicating whether the detainee reported suffering from any health conditions and whether the detainee was taking prescription medication.  *Id.*; *see* Trammel Dep. at 116:12–118:3.

CMTs are not licensed physicians, licensed physician assistants, or licensed nurse practitioners and, thus, cannot write prescriptions.  *See* Pls.' LR 56.1(a)(3) Stmt. ¶ 19; Pls.' Ex. 37, Hart Dep. III at 69:11–12, ECF No. 174-12.  A notation by a CMT on the bruise sheet that a particular detainee had a health condition or was taking prescription medication, in and of itself, did not trigger further evaluation of the detainee by a Physician Assistant ("PA").  Pls.' LR 56.1(a)(3) Stmt. ¶ 18; *see* Trammel Dep. at 35:20–36:17 (stating there is no CCJ policy or practice requiring a detainee who reported taking a medication to be evaluated by a PA or physician).

---

[3]     Although the parties agree that certain CCJ intake policies, practices, and customs existed through the fall of 2010, neither party has presented evidence as to when a particular practice ended.  *See, e.g.,* Pls.' LR 56.1(a)(3) Stmt. ¶ 18.  The parties agree that the following modifications were made: (1) emergency medical technicians, registered nurses, and a psychiatrist were hired to screen detainees at intake; (2) a detainee did not have to spend a night at the psychiatric ward in order to receive psychotropic medication at intake; and (3) typically, a detainee received his or her prescription medications before the detainee reached his or her housing unit.  *See* Pls.' LR 56.1(a)(3) Stmt. ¶ 38.  But there is no evidence as to when these modifications occurred.

Rather, a detainee received a medical evaluation only when the CMT wrote "PA" on the bruise sheet or when a CMT or a correctional officer physically accompanied a detainee to a PA's examination room. Pls.' LR 56.1(a)(3) Stmt. ¶ 18; *see* Trammel Dep. at 41:2-10, 45:1–11; Pl.'s Ex. 14, Martinez Dep. at 49:6:8, ECF No. 174-6.

Between 2005 and 2009, the intake area was staffed by three PAs, and four PAs thereafter. Pls.' LR 56.1(a)(3) Stmt. ¶ 19. The PAs began seeing new detainees referred by CMTs at approximately 5:00 p.m. each day. Martinez Dep. at 48:15–21. At least one PA stated that, on average, he spent five to seven minutes with each referred detainee. Pls.' Ex. 12, Stadnicki Dep. at 79:12–16, ECF No. 174-5. Other than the bruise sheet, PAs did not have access to a detainee's medical records during intake, even if the detainee previously had been incarcerated at CCJ. Trammel Dep. at 63:12–21. Whether the PAs called a detainee's physician to confirm that a detainee had been prescribed medication is a matter of dispute. *Compare* Trammel Dep. at 63:23–64:10 (stating he made an attempt), *with* Stadnicki Dep. at 54:16–56:9 (stating that the phone in the intake area was used only sporadically to call a detainee's family member or the Cermak ER).

PAs could prescribe and dispense certain non-psychotropic medications during the intake process. Pls.' LR 56.1(a)(3) Stmt. ¶ 20; Def. Cook Cty.'s LR 56.1(a)(3) Stmt. ¶ 62, ECF No. 195. Glen Trammel, a PA, testified that he was legally required to create a written prescription whenever he prescribed medication during intake or dispensed medication in the form of a seven-day-dose blister pack. Pls.' LR 56.1(a)(3) Stmt. ¶ 20; Martinez Dep. at 71:18–24; *see* Trammel Dep. at 115:9–17. Trammel also stated that, although he was unaware of any CCJ policy requiring him to do so, he would note on the bruise sheet that he had prescribed medication. Trammel Dep. at 116:12–118:3; *see* Martinez Dep. at 27:2–5; *see also* Defs.' Ex. 18, Marquez Dep. at 99:4–18, ECF No. 199-3.

On those occasions that a PA prescribed or dispensed medication during intake, a pharmacy technician would manually enter that information into CCJ's data system. Martinez Dep. at 84:13–85:9. If a medication was not available in the intake area, the PA was responsible for referring a detainee to the emergency room. *Id.* at 86:4–97:8. If a medication was prescribed and dispensed to a detainee on the day of admission in the emergency room, that information was entered into the computer system by a pharmacy technician. *Id.* at 87:13–17; *see* Pls.' Ex. 36, Blackwell Dep. ("Blackwell Dep.") at 61:17–21, ECF No. 174-12.

As of 2009, at the end of each day, a group comprised of three PAs reviewed the bruise sheets for detainees who had not been evaluated by a PA. Trammel Dep. at 39:11–19. If a PA noticed that a CMT had included a detainee's medical history or an abnormal vital sign on a bruise sheet, the PA might write on the bruise sheet that the detainee could require follow-up in the housing division where he or she was assigned. Stadnicki Dep. at 77:2–8. Once a detainee was transferred to a housing division, a detainee would need to fill out a health request form in order to receive another medical evaluation or wait for a health maintenance examination, which was performed annually. *Id.* at 78:18–23.

### B. Mental Health Screening

In addition to seeing a CMT, a new CCJ detainee also spoke with a mental health screener ("MHS"). Pls.' LR 56.1(a)(3) Stmt. ¶¶ 18, 22. An MHS was not required to be a licensed medical professional and could not write prescriptions. *Id.* ¶ 22. During the relevant time period, MHSs did not have access to the information provided by a detainee to a CMT or a detainee's medical records, even if the detainee previously had been incarcerated at CCJ. Pls.' Ex. 34, Stewart Report at 21, ECF No. 174-11.

If a detainee indicated to the MHS that he or she was taking psychotropic medication, an MHS typically asked the detainee to identify the name of the medication, the medication regimen,

and the date the medication was last taken. Pls.' LR 56.1(a)(3) Stmt. ¶ 22; Pls.' Ex. 15, Hart Dep.

I ("Hart Dep. I") at 27:4–9, 31: 11–19, ECF No. 174-6. If an MHS found that the information

obtained from the detainee was reasonably credible and indicated an active serious mental illness,

the detainee would receive a secondary evaluation by the MHS or a psychologist. Pls.' LR

56.1(a)(3) Stmt. ¶ 22; Stewart Report at 21. A detainee would not be referred for a secondary

evaluation just because he or she was taking psychotropic medication. Martinez Dep. at 53:16–

19.

When a detainee indicated during a secondary evaluation that he or she was regularly taking

medication for a mental health problem, the detainee was told that he or she would be required to

stay in Cermak's psychiatric unit, rather than with the general population, in order to receive a

prescription from the psychiatrist. Stewart Report at 21; Hart Dep. I at 48:2–6; 53:3–6; 53:14–

54:12. According to Dr. Avery Hart, the interim director of Cermak in 2008, if a condition did not

come up in the evaluations, the detainee needed to submit a health service request form in the

division in which he or she was housed. Hart Dep. I at 85:6-11.

### C. CCJ's Methadone Tapering Program

CCJ utilized a methadone tapering program for detainees who needed drug treatment. For

non-pregnant program participants, the program typically reduced the dosages of methadone given

to them over a twenty-one-day period, until they were eliminated altogether. Pls.' LR 56.1(a)(3)

Stmt. ¶ 75. Sean Driscoll, a detainee, was admitted to CCJ on January 26, 2009. Sander Aff. at

12. Because he was receiving methadone treatment in an outside clinic, he was referred to CCJ's

methadone program upon intake. *Id.* According to Driscoll, because of the tapering of the

methadone doses, he experienced aching in his knees, sweating, chills, vomiting, and

hallucinations. Pls.' Reply Ex. 47, Driscoll Dep. ("Driscoll Dep.) at 142, ECF No. 221-1.

## III. Delay in Dispensing Medication Prescribed at Intake

Plaintiffs also claim that CCJ unnecessarily delayed the dispensation of medication to detainees, who received prescriptions during intake; Defendants contest this assertion. In support their respective positions, the parties offer a number of experts.

### A. Dr. Steven Whitman

Plaintiff's expert Dr. Steven Whitman is a biostatistician and epidemiologist. He was asked to analyze the prescription drug and methadone data provided by CCJ, as well as CCJ's prescription records regarding certain non-psychotropic[4] and psychotropic[5] medications. Whitman Report at 3.

Using this data, Dr. Whitman measured, for each of the medications that he reviewed, the length of time that passed between, on the one hand, when a detainee was admitted to the CCJ ("intake date") and received a prescription for the medication ("prescribed date") and, on the other,

---

[4]     Dr. Whitman analyzed data regarding the following non-psychotropic medications: (1) albuterol; (2) amlodipine besylate; (3) enalapril; (4) HIV medication; (5) hydrochlorothiazide; (6) insulin; (7) lovastatin; (8) metformin; and (9) metoprolol. Pls.' Ex. 32, Whitman Report ("Whitman Report") at 30, ECF No. 174-9. Albuterol is prescribed to treat asthma and chronic obstructive pulmonary disease ("COPD"). Pls.' LR 56.1(a)(3) Stmt. ¶ 61. Amlodipine besylate is prescribed to treat high blood pressure and chest pain. *Id.* ¶ 62. Enalapril is prescribed to treat high blood pressure and heart failure. *Id.* ¶ 63. HIV medications are prescribed to treat patients with HIV infection. *Id.* ¶ 64. Hydrochlorothiazide is prescribed to treat high blood pressure and fluid retention caused by heart disease, among other conditions. *Id.* ¶ 65. Insulin is prescribed to treat diabetes mellitus. *Id.* ¶ 66. Lovastatin is prescribed to lower one's cholesterol. *Id.* ¶ 67. Metformin is prescribed to treat type 2 diabetes. *Id.* ¶ 68. Metoprolol is prescribed to treat high blood pressure and chest pain. *Id.* ¶ 69. Dr. Whitman separately analyzes delays in the dispensing of methadone from March 20, 2009, to May 3, 2010. *Id.* at 188–91.

[5]     Dr. Whitman also analyzed data regarding the following psychotropic medications: (1) chlorpromazine; (2) clonazepam; (3) fluoxetine and sertraline; (4) gabapentin; (5) lorazepam and diazepam; and (6) venlafaxine. Whitman Report at 132. Chlorpromazine is prescribed to treat symptoms of schizophrenia and other psychotic disorders. Pls.' LR 56.1(a)(3) Stmt. ¶ 52. Clonazepam is prescribed to control seizures and to relieve anxiety. *Id.* ¶ 53. Fluoxetine and sertraline are prescribed to treat depression. *Id.* ¶ 54. Gabapentin is prescribed to treat seizures, neuropathic pain, bipolar disorder, and anxiety. *Id.* ¶ 55. Lorazepam and diazepam are prescribed to control seizures; anxiety; panic attacks; irritable bowel syndrome; insomnia, nausea and vomiting from cancer treatment; as well as the agitation, hallucinations, and lowered seizure threshold caused by alcohol withdrawal. *Id.* ¶ 56. Venlafaxine is prescribed to treat depression. *Id.* ¶ 57.

when the medication was actually dispensed to the detainee ("fill date"). And he evaluated that data over time. Whitman Report at 8–9. Dr. Whitman also analyzed whether a statistically significant difference existed between the rates at which a prescription was filled (*i.e.,* the "prescription rates") over time.

To do this, Dr. Whitman divided the data into five time periods: (1) October 1, 2006, to March 30, 2007; (2) October 1, 2007, to March 30, 2008; (3) October 1, 2008, to March 30, 2009; (4) October 1, 2009, to March 30, 2010; and (5) October 1, 2010, to March 30, 2011. *Id.* at 7. Based upon his analysis, Dr. Whitman concluded that CCJ took longer to fill prescriptions for the medications at issue in 2006-07 than in 2010-11, and this difference was statistically significant and could not be attributed to mere chance. He also concluded that prescription rates were statistically higher during the 2010-11 period as compared to the 2006-07 period, and that the difference could not be due to mere chance. *See id.* at 110 (albuterol), 112 (amlodipine besylate), 113 (enalapril), 119 (HIV medications), 122 (hydrochlorothiazide), 123 (insulin), 126 (lovastatin), 127 (metformin), 129 (metoprolol), 175–77 (chlorpromazine), 177–79 (chlonazepam), 180–82 (fluoxetine and sertraline), 182–83 (gabapentin), 184–85 (lorazepam and diazepam), 186–87 (venlafaxine).

Dr. Whitman separately analyzed the time it took for CCJ to dispense methadone to newly admitted detainees between March 20, 2009, and May 3, 2010. *Id.* at 187, 190–91. He concluded that only 226 of 1,483 methadone prescriptions, or roughly 15%, were provided with methadone within four days of admittance. *Id.* at 191.

## B. Dr. Lambert King and Dr. Pablo Stewart

Plaintiffs also offer Dr. Lambert King and Dr. Pablo Stewart to testify as to the dispensation of non-psychotropic and psychotropic medication at CCJ. Both experts have experience managing, monitoring, and reforming health systems in correctional settings. Pls.' Ex. 33, King

Report at 2–3, ECF No. 174-10; Stewart Report at 2–4. To reach their conclusions, they relied on their own expertise, court-ordered compliance reports, Dr. Whitman's statistical analysis, and a report issued by the U.S. Department of Justice report (which will be discussed below). King Report at 5–6; Stewart Report at 15. In addition, Dr. Stewart interviewed four detainees—Teria Beasley, Andre White, John Holmes, and Jess Mason—and examined portions of their medical charts and deposition testimony. Stewart Report at 15; *see* Def. Cook Cty.'s LR 56.1(a)(3) Stmt. ¶ 56.

According to Dr. King, from October 2006 to November 2010, significant numbers of detainees who entered CCJ did not receive non-psychotropic prescription medication for serious medical conditions in a timely manner. King Report at 5. Furthermore, Dr. King determined that CCJ's failure to timely dispense these medicines recklessly placed large numbers of detainees at risk for physical harm, morbidity, and mortality. *Id.*

Dr. Stewart opined, based upon Dr. Whitman's analysis, that although CCJ's intake process may have improved over time, many newly admitted detainees had to wait approximately one week to receive non-psychotropic medications and as much as two to three days for psychotropic medication. Stewart Report at 15–16. As a result, Dr. Stewart concluded that CCJ's intake practices before October 2010 were likely to harm persons who had previously been prescribed medication for serious medical and mental health problems. *Id.* at 2–3.

Both Drs. King and Stewart also asserted that CCJ's 21-day methadone tapering policy caused gratuitous pain to all detainees who were subjected to the policy. King Report at 6; Stewart Report at 2. In addition, Dr. Stewart found that, of those detainees who eventually received methadone within fourteen days of being admitted to CCJ between 2009 and 2011, fifteen percent had to wait several days before receiving their first dose. Stewart Report at 30.

### C. Dr. Lynn Sander and Dr. Avery Hart

For their part, Defendants offer Dr. Lynn Sander and Dr. Avery Hart. Dr. Sander is an internist and an independent consultant in the field of correctional healthcare. *See* Cook Cty.'s Reply Ex. L.R., Sander Report at 1, ECF No. 245-7. In that role, she has monitored Delaware's mental healthcare system for compliance with reforms required by a remedial settlement agreement with the DOJ. *Id.* Here, Dr. Sander reviewed, among other things, the medical records, depositions, and declarations of thirty-three class representatives and other witnesses. *See generally id.*; Sander Aff. Dr. Sander also conducted a site visit to observe CCJ's intake area in October 2011. Defs.' Ex. 2, Sander Dep. at 67:15–17, ECF No. 195-2. Dr. Sander determined that the medical and mental health treatment that CCJ provided to the thirty-three detainees satisfied the requisite standard of care. Def. Cook Cty.'s LR 56.1(a)(3) Stmt. ¶¶ 12–44.

Dr. Avery Hart was employed by Cermak for 20 years and became its Chief Medical Officer in 2008. Hart Dep. I at 8:1–3. Based on his knowledge of the intake procedures and his work experience, Dr. Hart opined that CCJ's intake systems, policies, and procedures were adequate to meet the medical and mental health needs of detainees entering CCJ throughout the class period. Def. Cook Cty.'s LR 56.1(a)(3) Stmt. ¶ 47; Cook Cty.'s Ex. 12, Hart Dep. of 4/18/12 ("Hart Dep. 4/18/12"), at 14:21–20:16, ECF No. 195-2. With regard to the methadone tapering program, Dr. Hart concluded that, if a detainee's participation in a methadone program before admission is not verified, medication other than methadone may be prescribed to alleviate withdrawal symptoms. Defs.' LR 56.1(b)(3)(B) Stmt. ¶ 74, ECF No. 204.

## IV.     Department of Justice Report on CCJ's Intake Procedures

In 2007, the U.S. Department of Justice ("DOJ") formally investigated conditions at CCJ. The DOJ issued a report of its findings on July 11, 2008 ("DOJ Report").[6]  Pls.' LR 56.1(a)(3) Stmt. ¶¶ 33–35.  In it, the DOJ stated that the "medical care provided at CCJ falls below the constitutionally required standards of care" with respect to intake screening and medication administration.  *Id.* ¶ 34.  Pls.' Ex. 28, DOJ Report ("DOJ Report") at 42, ECF No. 174-9.

As for CCJ's medical screening process at intake, the DOJ found that it was "grossly inadequate."  DOJ Report at 45.

> Generally accepted correctional medical standards require that incoming inmates be screened by staff trained to identify and triage serious medical needs, including drug and alcohol withdrawal, communicable diseases, acute or chronic needs, mental illness, and potential suicide risks.  CCJ's intake screening fails to identify such needs and increases the risk of serious harm.

*Id.* at 44–45 (cited by Pls.' LR 56.1(a)(3) Stmt. ¶ 33); *see id.* at 43, 59–60 (cited by Pls.' LR 56.1(a)(3) Stmt. ¶¶ 34–35).

The DOJ also concluded that CCJ's mental health screening procedures at intake were "completely inadequate."

> The policy governing the CCJ mental health screening process is completely inadequate.  Insufficiently trained MHSs perform mental health initial intake screening at CCJ.  This screening is not accomplished under appropriate medical supervision.  The system allows technicians, who are not adequately or appropriately trained in detecting mental illness, to query inmates and detainees regarding their mental health history.

*Id.* at 60.  The DOJ found that no psychiatrists were assigned to supervise or support the intake area where the initial mental health screening took place.  *Id.* at 61.

---

[6]     The DOJ Report is admissible evidence under Fed. R. Evid. 803(8)(A)(iii), which provides an exclusion in civil cases to the hearsay rule for "factual findings from a legally authorized investigation."  *See* ECF No. 321 (citing *Daniel v. Cook Cty.*, 833 F.3d 728, 742 (7th Cir. 2016)).

In support of these conclusions, the DOJ compared the percentage of detainees who received medical evaluations by PAs or physicians at CCJ to the percentage of inmates nationwide who require such care. For instance, the DOJ determined that, nationwide, more than 30% of inmates have acute or chronic conditions that would necessitate a medical or mental health evaluation by a physician or PA on the first day of admission. At CCJ, however, only 15% of new detainees received a medical evaluation during a June 2007 visit, only 5% during a July 2007 on-site visit, and, on average, only 5% of detainees were identified as having psychiatric problems.[7] *Id.* at 43, 61 (cited by Pls.' LR 56.1(a)(3) Stmt. ¶ 33). The DOJ found that CCJ's "numbers depart[ed] significantly from what would be expected in CCJ's inmate population, which strongly suggested that CCJ's intake screening process is incomplete and inadequate." *Id.*

The DOJ investigation also found systemic problems with medication administration, noting that CCJ frequently failed to "provide critical medications to inmates without delay or lapses." *Id.* at 51. The investigation also revealed "delays ranging from days to weeks for inmates having their psychotropic medications started after their admission to CCJ." *Id.* at 64. The DOJ concluded that these "significant delays, errors, and lapses in medication administration . . . contributed to needless suffering and inmate hospitalizations." *Id.* at 51.

In addition, the DOJ determined that CCJ had failed to provide detainees with access to important information, such as its rules and regulations on how to access medical and mental health care and how to file a grievance. *Id.* at 83–84. This is contrary to the "[g]enerally accepted correctional practice requir[ing] that newly admitted inmates are given an opportunity to learn about the facility rules and regulations, services that are available, [and] policies and procedures

---

[7]     The DOJ Report noted that "the County's Director of Psychiatric Services acknowledged that the screening process was flawed and one would expect the percentage of inmates identified with psychiatric problems to be as much as ten percent." *Id.*

that affect the inmate . . . ." *Id.* at 42. Although intake personnel told DOJ investigators that detainees were offered a copy of the inmate handbook upon admission, the investigators saw only a small stack of handbooks behind a counter in the strip-search area of the receiving room, and did not see any of the hundreds of detainees actually carrying a handbook. *Id.* Moreover, CCJ maintained no record of whether a handbook was offered to a detainee or whether a detained accepted one. *Id.* The DOJ recommended that CCJ develop and implement policies and procedures to ensure that detainees have access to health care, can utilize an adequate grievance process, and are informed of CCJ's policies and procedures upon admission. *Id.* at 79, 83–84.

## Legal Standard

Summary judgment is proper when "there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, a court must "view the facts in the light most favorable to the nonmoving party." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2017 (2014). "Once the party moving for summary judgment uncovers a hole in the opponent's case, the nonmoving party that bears the ultimate burden at trial must show that there is evidence creating a genuine issue of material fact." *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). "Material facts are those which might affect the outcome of the suit." *Id.* at 598–99. "The judge must ask whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The existence of a mere scintilla of evidence supporting a plaintiff's position is insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Id.*

## Analysis

Section 1983 provides a private right of action against persons acting under color of state law who violate constitutional rights. 42 U.S.C. § 1983. The due process clause of the Fourteenth Amendment prohibits "deliberate indifference to the serious medical needs of pretrial detainees."

*Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir. 1991). "The protections for pre-trial detainees [under the Fourteenth Amendment] are at least as great as the Eighth Amendment protections available to a convicted prisoner, and we frequently consider the standards to be analogous." *Washington v. LaPorte Cty. Sheriff's Dep't*, 306 F.3d 515, 517 (7th Cir. 2002) (internal quotation marks and citation omitted).

As for Plaintiffs' claims against Cook County and Sheriff Dart in his official capacity, "[e]ver since the Supreme Court decided *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the availability of entity liability under section 1983 has been established." *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017), *cert. denied sub nom. Corr. Med. Servs., Inc. v. Glisson*, 138 S. Ct. 109 (2017). An entity "that has contracted to provide essential government services is subject to at least the same rules that apply to public entities." *Id.* at 378–79 (citing *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789–90 (7th Cir. 2014); *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)).

There are three ways to establish *Monell* liability under § 1983. *Glisson*, 849 F.3d at 379. First, a plaintiff may establish that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Los Angeles Cty. v. Humphries*, 562 U.S. 29, 35 (2010); *see Glisson*, 849 F.3d 378 ("[I]f institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible."). Second, a plaintiff may establish that the action was "pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690–91; *see League of Women Voters of Chi. v. City of Chi.*, 757 F.3d 722, 727 (7th Cir. 2014) (stating that municipal liability may also be based on "a common practice that is so widespread and well settled that it constitutes a custom or practice"). Third, a plaintiff may show that a constitutional violation "was

14

committed (that is, authorized or directed) at the policymaking level of government." *Vodak v. City of Chi.*, 639 F.3d 738, 747 (7th Cir. 2011).

## I.    Sheriff of Cook County

The Sheriff raises two primary arguments in support of his motion. *See* Sheriff's Mem. Law Supp. Summ. J. 1–5, ECF No. 191; Sheriff's LR 56.1(a)(3) ¶¶ 1–8, ECF No. 192. First, the Sheriff argues that summary judgment should be granted in his favor because he is entitled to rely on Cermak's medical staff to meet the medical needs of CCJ detainees. Put another way, the Sheriff contends that he should not be held responsible because the challenged intake policies were not his policies, but those of CCJ's medical provider, Cermak.

Under Illinois law, "the sheriff shall . . . be responsible for the hiring and training of all personnel necessary to operate and maintain the jail." *See* 730 Ill. Comp. Stat. 125/3; *Moy v. Cty. of Cook*, 640 N.E.2d 926, 929 (Ill. 1994); *see DeGenova v. Sheriff of DuPage Cty.*, 209 F.3d 973, 976 (7th Cir. 2000) ("Illinois sheriffs have final policymaking authority over jail operations."); *see* 730 Ill. Comp. Stat. 125/2. The Sheriff is correct that Cermak is the entity that provides medical care to detainees at CCJ. Pls.' LR 56.1 Stmt. ¶ 8; *see Davis v. Carter*, 452 F.3d 686, 687 n.1 (7th Cir. 2006). "But the constitutional duty under the Eighth and Fourteenth Amendments to provide adequate health care rests on the custodian"—here, the Sheriff. *See Daniel v. Cook Cty.*, 833 F.3d 728, 737 (7th Cir. 2016); 730 Ill. Comp. Stat. 125/2 ("The Sheriff of each county in this State shall be the warden of the jail of the county[.]"); *see also Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664–65 (7th Cir. 2012). The Sheriff's reliance on Cermak to provide medical care to detainees does not excuse him from liability under § 1983. *See King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) (stating that a defendant "cannot shield itself from § 1983 liability by contracting out its duty to provide medical services").

Furthermore, to the extent that the Sheriff relies completely upon Cermak's policies, customs, and practices in these matters, he has delegated his final decision-making authority to Cermak for the provision of medical services, thereby adopting them as his own. *See id.* at 1020 (the "company's policy becomes that of the County if the County delegates final decision-making authority to it").

Second, the Sheriff argues in a similar vein that no reasonable jury could find him liable because, according to Cermak's policies, the sole discretion as to medical care rests with the responsible physician, not him. *See* Sheriff's Mem. Supp. Summ. J. (citing Cermak Policy 01-08A-02 ("Matters of medical, mental health and dental judgment are the sole province of the responsible physician and the chief dentist.")). But this argument misunderstands the issues raised in this litigation. Plaintiffs' position is that Cermak's intake practices (as adopted by the Sheriff) unreasonably denied and delayed the dispensation of prescription medication necessary to treat the serious medical needs of the class members, without regard to the medical judgment of Cermak's physicians. Accordingly, the Sheriff's motion for summary judgment is denied.

## II.     Cook County

Turning to Cook County, Plaintiffs assert that the county also should be held liable for CCJ's allegedly unconstitutional intake policies and practices. As noted, however, the Sheriff has final policymaking authority over jail operations and the provision of medical services to detainees. *See* 55 Ill. Comp. Stat. 5/3-6017; 730 Ill. Comp. Stat. 125/2; *id.* 125/17. Furthermore, "the sheriff's statutory duties with respect to [CCJ] are independent of and unalterable by any governing body." *Moy*, 640 N.E.2d at 929 (finding that the Cook County Sheriff is an independently elected officer, that no employment relationship exists between Cook County and Sheriff, and that employees of the Jail are solely under Sheriff's control); *see DeGenova*, 209 F.3d at 976 (citing *Moy*, 640 N.E.2d at 929). Accordingly, to the extent Plaintiffs contend that Cook

County is directly liable for the allegedly unconstitutional intake policies, practices, and customs at CCJ, the Court grants summary judgment in favor of Cook County as a matter of law.

That said, Defendant Cook County is required by statute to fund the Sheriff's expenses, including any judgments entered against the Sheriff in his official capacity. 55 Ill. Comp. Stat. 5/5-1106; *Davis*, 452 F.3d at 687 n.1 ("Cook County is a unit of local government that finances the Cook County Jail."). Therefore, Cook County remains an indispensable party in this limited capacity. *Carver v. Sheriff of LaSalle Cty.,* 324 F.3d 947, 948 (7th Cir. 2003).

## III.     Deliberate Indifference Claim[8]

Plaintiffs and the Sheriff have filed cross motions for summary judgment as to Plaintiffs' claim that the Sheriff exhibited deliberate indifference to the serious medical needs of the class members. "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain . . . . [and includes] intentionally interfering with . . . treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (internal quotation marks omitted). To prevail on a deliberate indifference claim, Plaintiffs must establish that: (1) each of them had an objectively serious medical condition that posed a substantial risk; (2) the defendant knew of the risk; (3) the defendant failed to act in disregard of that risk; and (4) the defendant's indifference caused some injury. *See Estate of Clark v. Walker*, 865 F.3d 544, 551 (7th Cir. 2017); *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

### A.     Objectively Serious Medical Conditions That Pose a Substantial Risk

In support of their motion, Plaintiffs argue that they have established an objectively serious medical need. "An objectively serious medical need is 'one that has been diagnosed by a physician

---

[8]     In its briefs, the County raised various substantive arguments in support of its motion for summary judgment that go to Plaintiffs' claims against the Sheriff. The Court will address these arguments as though the Sheriff raised them on his own behalf.

as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Zentmyer v. Kendall Cty., Ill.*, 220 F.3d 805, 810 (7th Cir. 2000) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)).

"A medical condition need not be life-threatening to be serious . . . ." *Gayton*, 593 F.3d at 620. Instead, courts consider various factors, including: (1) whether the failure to treat the condition "could result in further significant injury," *Gutierrez*, 111 F.3d at 1373 (internal quotation marks omitted); (2) whether it was a condition "that a reasonable doctor or patient would find important and worthy of comment or treatment," *Hayes v. Snyder*, 546 F.3d 516, 523 (7th Cir. 2008); (3) whether the condition "significantly affect[ed] an individual's daily activities," *id.*; or (4) whether the condition involves "chronic and substantial pain," *id.*

In response, Defendants argue that Plaintiffs have failed to raise a triable issue of fact as to whether asthma, diabetes, high cholesterol, HIV infection, hypertension, opiate withdrawal, seizure disorder, anxiety disorder, bipolar disorder, depression, and schizophrenia are objectively serious health needs. But Plaintiffs have presented evidence that (1) the medical professionals at CCJ found these conditions worthy of treatment, (2) the conditions significantly affected the daily life activities of detainees, and (3) the failure to treat the particular condition could have resulted in further significant injury. *See* Pls.' Reply Ex. 78, Bailey Decl. ("Bailey Decl.") ¶¶ 5–6, 9, 13 (seizure disorder), ECF No. 221-10; Pls.' Reply Ex. 83, Beasley Decl. ¶¶ 2, 6, 15–16 (bipolar disorder), ECF No. 221-12; Pls.' Reply Ex. 66, Gerl Dep. at 110:2–18 (opiate withdrawal), ECF No. 221-5; Pl.'s Reply Ex. 81, Granderson Decl. ("Granderson Decl.") ¶¶ 4–6, 8, ECF No. 221-11 (hypertension, diabetes); King Report at 5 (high cholesterol); Pls.' Reply Ex. 69, Lee Decl. ("Lee Decl.") ¶¶ 2, 15–16 (depression/bipolar disorder/anxiety), ECF No. 221-6; Cook Cty. Reply Ex. 42, Stuckey Dep. at 103:9–15 (HIV), ECF No. 245-3; Pls.' Reply Ex. 77, White Decl. ("White Decl.") ¶¶ 2, 5, 8, 13 (schizophrenia), ECF No. 221-10; Pls.' Reply Ex. 75, Woodard Decl. ¶¶ 3–

4, 12 (asthma), ECF No. 221-9; Pls.' Reply Ex. 61, Raba Dep. ("Raba Dep.") at 22:19–21 (diabetes), ECF No. 221-2; *id.* at 84:20–85:4 (high cholesterol); Stewart Report at 26–27 (schizophrenia).  What is more, Plaintiffs have offered the opinions of Dr. King and Dr. Stewart that these conditions constitute objectively serious health needs.  *See* King Report at 5–6; Stewart Report at 26–30.

Furthermore, numerous courts have held that conditions such as asthma, diabetes, HIV infection, hypertension, opiate withdrawal, seizure disorder, bipolar disorder, depression, and schizophrenia present objectively serious health needs.  *See, e.g., Richmond v. Huq*, 885 F.3d 928, 942 (6th Cir. 2018) (bipolar disorder); *Pittman*, 746 F.3d at 775 (depression); *Jackson v. Pollion*, 733 F.3d 786, 789 (7th Cir. 2013) (hypertension); *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 678 (7th Cir. 2012) (schizophrenia); *Lee v. Young*, 533 F.3d 505, 510 (7th Cir. 2008) (asthma); *Davis*, 452 F.3d at 695–96 (methadone treatment for opiate withdrawal); *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000) (HIV); *Van Hoorelbeke v. Hawk*, 70 F.3d 117, 118 (7th Cir. 1995) (diabetes); *Brame v. Dart*, No. 09 C 3966, 2010 WL 5330741, at *7 (N.D. Ill. Dec. 20, 2010) (seizure disorder); *Lacy v. Shaw*, 357 F. App'x 607, 610 (5th Cir. 2009) (anxiety disorder).  *Cf. Shenk v. Cattaraugus Cty.*, 305 F. App'x 751, 754 (2d Cir. 2009) (stating in dicta that anxiety "appears to satisfy at least two of the . . . factors, anxiety being a condition that a doctor would find important, and which can affect one's daily activities.").

Accordingly, Plaintiffs have satisfied their burden of establishing a triable issue of fact as to whether asthma, diabetes, high cholesterol, HIV infection, hypertension, opiate withdrawal, seizure disorder, anxiety disorder, bipolar disorder, depression, and schizophrenia constitute objectively serious health needs.

## B. Whether the Sheriff Was Subjectively Aware of the Risk

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (citation omitted). "[I]f the risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it; but the inference cannot be conclusive, for we know that people are not always conscious of what reasonable people would be conscious of[.]" *Id.* (internal quotation marks omitted).

To prove knowledge, a plaintiff may adduce evidence that a substantial risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it." *Id.* at 842–43. And, of course, "a prison official may 'not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.'" *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (quoting *Farmer*, 511 U.S. at 843 n.8). Here, Plaintiffs contend that the Sheriff knew of the risk based upon a number of events, beginning in 1996.

First, Plaintiffs argue, the case *Donald v. Cook County Sheriff's Department*, 95 F.3d 548 (7th Cir. 1996), provided the Sheriff with notice of the substantial risks caused by CCJ's deficient intake procedures. In *Donald*, the plaintiff claimed that his heart medication had been confiscated by CCJ personnel at intake, and that, as a result, he suffered a heart attack two days later. *Id.* at 551. When the defendant moved to dismiss the *Monell* claim against CCJ, the plaintiff disavowed asserting any claim based on an official policy or procedure and stated that he was suing the

individual tortfeasors based on their own actions.  *Id.* at 553.  The district court dismissed the *Monell* cause of action because the plaintiff had not alleged a pattern or policy.  *See id.*; *Donald v. Cook Cty. Sheriff's*, No. 93 C 530, 1994 WL 23077, at *1 (N.D. Ill. Jan. 21, 1994), *rev'd*, 95 F.3d at 562.  The plaintiff moved for relief from judgment, listing the individual defendants, and the district court denied the motion, holding that, by the time the plaintiff had provided the names of the individuals, the claims against the defendants in their individual capacity were time-barred.  *Donald*, 95 F.3d at 553.

On appeal, the Seventh Circuit held that the district court had abused its discretion in denying the plaintiff's motion for relief from judgment without considering whether the amended complaint could have related back to original complaint or, alternatively, whether the statute of limitations could be subject to equitable tolling.  *Id.* at 562.  Stating that the plaintiff's "initial complaint clearly alleged facts sufficient to state an Eighth Amendment claim of cruel and unusual punishment against at least some individual officers," the Seventh Circuit held that the district court had failed "to provide ample opportunity for Donald to amend the complaint to render it legally viable."  *Id.* at 554.

Salient for our purposes, the plaintiff in *Donald* did not appeal the dismissal of his *Monell* claim, but, rather, appealed the denial of the motion seeking to amend the complaint to sue officers in their individual capacity.  Thus, the appellate court had no occasion to address the CCJ's official intake practices.  Accordingly, the Court concludes that a reasonable jury could not find that *Donald* put the Sheriff on notice that CCJ's intake practices created a substantial risk to the health of class members.

Additionally, Plaintiffs cite to a May 2001 Court Monitoring Report ("*Duran* Report") submitted by the John Howard Association in *Duran v. Sheahan*, 74 C 2949, which criticized various aspects of CCJ's receiving room, including the space and design of the psychiatric

assessments area, the lack of areas for observation and isolation of detainees with psychiatric or medical conditions, and the distance between the receiving room and the Cermak facility where acute health problems were diagnosed and treated. Pls.' LR 56.1(a)(3) Stmt. ¶ 13. Plaintiff also refer to a June 10, 2004, request by Dr. John Raba, who was the Chief Operating Officer of Cermak, for the construction of a new receiving facility and a new residential unit for chronically medically and mentally ill detainees. *Id.* ¶ 16. Lastly, Plaintiffs cite to a post 2005 letter from a Cermak PA to CCJ's Interim Medical Director and Chief Operating Officer describing the lack of privacy and hygiene in the intake area. Trammel Dep. at 51:4–16; *see* Stadnicki Dep. at 40:9–13; 41:13–21.

But all three of these instances involve perceived problems with the physical layout of CCJ's intake area. By contrast, the claims here deal with the actual medical screening and medication administration practices employed by CCJ at intake. Accordingly, the Court holds that no rational jury could find that these events provided the Sheriff with notice of a substantial risk of harm caused by CCJ's intake practices.

Additionally, Plaintiffs point to the DOJ Report and argue that its findings placed the Sheriff on notice of the substantial risks caused by CCJ's medication administration practices at intake. As noted, the DOJ concluded in its report that CCJ inadequately trained intake employees with regard to identifying and triaging serious medical needs, including drug and alcohol withdrawal, communicable diseases, acute or chronic needs, mental illness, and potential suicide risks. DOJ Report at 43.

In addition, the DOJ discussed several instances where CCJ fell below the constitutionally required standards of care.

> Nadia H. died in late 2006, one day after being booked into CCJ, likely of withdrawal syndrome. During intake, she reported a history of heroin addiction, yet staff failed to document her drug use and

history of addiction. Despite knowledge that Nadia had a history of addiction, staff disregarded her emergent condition and placed her in general population. The next day she was found dead in her cell.

*Id.* at 44.

In June 2007, Lyle P. was booked into CCJ. At intake, Lyle reported his HIV infection and his strong adherence to his medication regimen, but he did not receive his medication prescription. Nearly two weeks passed before he was finally seen by an infectious disease specialist. Because of the two week lapse in medication, the specialist chose to delay treatment, which further enhanced the risks for Lyle to develop potentially-fatal drug resistance.

*Id.* at 45.

In 2007, Stella R. had a prescription for Coumadin and a prescription for hypertension medication, yet CCJ staff failed to order her prescriptions. Stella went nearly 20 days without her prescriptions. It was only after we brought this medication error to CCJ's attention that Stella had her prescriptions ordered.

*Id.*

Seth P. was seen for a psychiatric consult during our July 2007 on-site visit. Seth had been admitted to CCJ three to four weeks prior to the consult and, after initial screening, had been placed in the general population. No records were available or requested at the time of the consult. The psychiatrist evaluated Seth and assessed him as exhibiting grandiose thinking and hyperactivity, prescribed medications, and ordered Seth to be admitted to CCJ's acute psychiatric unit for further evaluation. Immediately following the psychiatric consult, Seth was sent to an outside emergency room for evaluation for a possible fracture of his right hand. Upon his return to CCJ, the intake MHS, who was not aware of the recent psychiatric assessment due to the inadequate record keeping, determined independently that Seth was to be admitted to the general population. The result was that Seth received no further psychiatric evaluation and did not receive the prescribed antipsychotic medication ordered by the psychiatrist.

*Id.* at 61–62. A reasonable jury could conclude that the DOJ Report provided the Sheriff with notice that CCJ's medication dispensation practices at intake posed a pervasive and substantial risk to the serious medical conditions of detainees. *See id.* at 7, 9, 42.

For their part, Defendants do not argue that the DOJ Report failed to provide the Sheriff notice or that the Sheriff was subjectively unaware of the substantial risks outlined therein. Instead, Defendants object to the admissibility of the DOJ Report. But, because the DOJ Report is being offered to prove notice and not to establish the truth of the matter asserted therein, it does not fall within the rule against hearsay. Furthermore, as noted, to the extent it is hearsay, it is admissible under Rule 803(8)(A)(iii). *See Daniel*, 833 F.3d at 738.

Defendants also contend that an order entered in *United States v. Cook County*, 10 C 2946, reserved their right to contest the findings and conclusions in the DOJ Report. *See* Defs.' LR 56.1(b)(3)(B) Stmt. ¶ 33 (citing Pls.' Ex. 26, Agreed Order ("Agreed Order") ¶ 5 [sic], 10 C 2946). But whether Defendants preserved the right to contest the contents of the DOJ Report in separate litigation is immaterial to the issue of whether the DOJ Report provided the Sheriff with notice that CCJ's intake practices created a substantial health risk to detainees with serious health conditions.

Defendants are correct that the mere fact that the DOJ Report was sent to the Sheriff is not conclusive proof of his subjective knowledge that CCJ's intake practices posed a substantial risk of serious harm to detainees. But it is certainly sufficient to create a triable issue of fact as to the extent of his knowledge starting in July 11, 2008. On the other hand, to the extent that Plaintiffs' claims are based on events that took place prior to that date, they have failed to create a genuine issue of material fact regarding the extent of the Sheriff's knowledge of the risks at issue. Accordingly, Plaintiff's summary judgment motion is denied, and the Defendants' cross-motions are granted to the extent that Plaintiffs seek to impose liability upon the Sheriff for the period prior to July 11, 2008.

As for what this ruling means for the class, a "certified class has a legal status separate from and independent of the interest asserted by the named plaintiff." *Whitlock v. Johnson*, 153

F.3d 380, 384 (7th Cir. 1998); *see E. Texas Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395,

406 n.12 (1977) (stating that, after a class is certified, "the class members would not need to be

mooted or destroyed because subsequent events or the proof at trial had undermined the named

plaintiffs' individual claims."). Inasmuch as any of the named Plaintiffs cannot assert deliberative

indifference claims based on the above-identified medical conditions after July 11, 2008, their

claims are dismissed. As for the others, they may remain as named Plaintiffs, and Plaintiffs may

seek leave to designate other members of the class as named Plaintiffs to the extent necessary

under Rule 23.[9]

---

[9]     Defendants argue that three of the class representatives, Roy Cleaves, Carla Lofton, and Dan Taylor, cannot represent the class because they were in custody when this lawsuit was filed and had not exhausted their administrative remedies under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). *See* Cook Cty.'s Mem. Supp. Summ. J. at 2, 23, ECF No. 191 ("Several Class Representative are barred under the PLRA."). The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "Failure to exhaust is an affirmative defense for which the defendants carry the burden of proof." *Ramirez v. Young*, 906 F.3d 530, 533 (7th Cir. 2018). Because Cleaves' and Lofton's claims seem to be based solely on alleged constitutional violations that occurred prior to July 11, 2008, the Sheriff's arguments are moot.

As for Taylor, he became a named Plaintiff in this lawsuit on March 31, 2008. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 4, ECF No. 221. Defendants do not provide any evidence that Taylor was incarcerated in CCJ or a facility of the Illinois Department of Corrections ("IDOC") on March 31, 2008. The Sheriff believes that, because CCJ records show that Taylor was released from CCJ into IDOC custody on November 26, 2007, to serve a four-year sentence, Taylor was in IDOC custody on March 31, 2008. Cook Cty.'s Ex. 13, Kramer Decl. Exs., CIMIS Standard Inquiry dated 4/10/08, ECF No. 195-2. The Sheriff, however, has not provided evidence regarding the date on which Taylor was released from IDOC custody. Curiously, the Sheriff does not explain how, if Taylor was in IDOC custody serving a four-year sentence, he was arrested and admitted into CCJ on May 8, 2008, as indicated by Taylor's booking history records. *See* Defs.' Ex. 13, Kramer Decl. Exs., Cook Cty. Sheriff's Office Booking History Print Screen, at 29 (showing that Taylor entered CCJ on May 8, 2008, and again on August 5, 2008), ECF No. 198.

What is more, there is evidence in the record that CCJ's intake practices failed to provide detainees access to information about CCJ's grievance policy. *See* DOJ Report at 42, 83–84. A plaintiff is not obligated to exhaust administrative remedies that are unavailable. *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016). Remedies are unavailable when there are "omissions by prison personnel, particularly failing to inform the prisoner of the grievance process." *Hernandez v. Dart*, 814 F.3d 836, 842 (7th Cir. 2016). Moreover, it is unclear when CCJ adopted remedial measures to cure the deficiency. Accordingly, Plaintiffs have raised a genuine dispute as to whether administrative remedies were available to Taylor, and the Sheriff may seek an evidentiary hearing on this issue under *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008).

### C.    Whether the Sheriff Failed to Act in Disregard of the Risk

"Prison officials must provide inmates with medical care that is adequate in light of the severity of the condition and professional norms." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015). In a class action, deliberate indifference "can be demonstrated by proving there are such systemic and gross deficiencies in . . . procedures that the inmate population is effectively denied access to adequate medical care." *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (internal quotation marks omitted). In addition, "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff can sufficiently evidence deliberate indifference." *Kelley v. McGinnis*, 899 F.2d 612, 617 (7th Cir. 1990) (internal quotation marks omitted). Evidence that a plaintiff received "some medical care does not automatically defeat a claim of deliberate indifference if a fact finder could infer the treatment was so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate a medical condition." *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (internal quotation marks omitted). That said, "[n]ot every refusal of medical treatment will constitute deliberate indifference, but if the cost of treating a substantial medical need is low, an official's refusal to act is more likely to evidence deliberate indifference." *Carpenter v. Sullivan*, 695 F. App'x 147, 150 (7th Cir. 2017) (citing *Gil v. Reed*, 381 F.3d 649, 661–62 (7th Cir. 2004), and *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999)).

### 1.    Intake Screening Practices

CCJ's intake procedures during the class period required that a new detainee be evaluated in-person by a licensed medical professional before receiving prescription medication. Pls.' LR

56.1(a)(3) Stmt. ¶ 19.  And, to receive an in-person evaluation, the detainee first must receive a referral from the CMT or MHS, neither of whom is a licensed medical professional.  *See* Trammel Dep. at 41:2-10, 45:1–11; Martinez Dep. at 49:6:8. Plaintiffs cite to the experience of a number of class members to demonstrate that this procedure was grossly deficient.  For the reasons stated above, the relevant examples are those that took place after July 11, 2008.

Daniel Gerl and Nicholas Morris told a CMT that they were taking methadone for opiate withdrawal, but neither was referred to a PA for an in-person evaluation, and neither received a prescription for methadone while at CCJ.  *See* Gerl Dep. at 130–31; Sander Aff. at 34; Pls.' Reply Ex. 72, Morris Decl. ¶¶ 4–6, ECF No. 221-8.

Teria Beasley and Yvette Lee told an MHS at intake that they were taking medication for bipolar disorder.  Lee also stated that she was taking medication for depression.  But, again, neither were referred for further evaluation by a psychiatrist, and neither received any psychotropic medication.[10]  Beasley Decl. ¶¶ 10–12, 14; Lee Dec. ¶¶ 11–15; Sander Aff. at 40, 64.

Plaintiffs also rely on the DOJ's findings that CCJ's medical screening process was "grossly inadequate" and the mental health screening was "completely inadequate."  DOJ Report at 45, 60.  This report is admissible for the reasons already discussed.  Moreover, the report was

---

[10]     Beasley and Lee were told by an MHS that, in order to receive psychotropic medications, they would have to be admitted into CCJ's psychiatric ward.  *See* Beasley Decl. ¶ 10; Lee Decl. ¶ 12.  Because they were afraid of being housed in the psychiatric ward, they did not request a transfer.  *See* Beasley Decl. ¶ 12; Lee Decl. ¶ 13.

According to Dr. Stewart, because most detainees in need of psychotropic medication did not require the level of care provided by the psychiatric ward, which housed prisoners with extremely serious mental illnesses, the practice of requiring a detainee to be assigned to the psychiatric ward discouraged most detainees from requesting and receiving needed psychotropic medication.  Stewart Report at 24; *see* Pls.' Ex. 63, Parish Dep. at 150:13-17 ("Well, I had spent the night before up on 2N with people screaming and smearing feces on their walls and walking, yelling, and being restrained . . . [I recall] having to watch staff jump on people and it's traumatic being up there.").  The practice of requiring detainees to be housed in the psychiatric ward in order to be prescribed psychotropic medications has been eliminated (although the record is silent as to when).  *See* Pls.' LR 56.1(a)(3) Stmt. ¶ 38.

not "controverted" by the Agreed Order entered in *United States v. Cook County*, 10 C 2946, as Defendants claim. Defs.' LR 56.1(b)(3)(B) Stmt. ¶ 33 (citing Pls.' Ex. 26, Agreed Order ("Agreed Order") ¶ 5 [sic], 10 C 2946). Rather, the Agreed Order only preserved Defendants' rights to contest the findings in the report. Agreed Order ¶ 4 ("The [DOJ's] findings letter and the conclusions therein are contested by Defendants. Furthermore, by entering into this Agreed Order, Defendants to this action do not waive the right to contest the July 11, 2008 findings letter or any of the conclusions set for therein.").

The Sheriff also points to Dr. Hart's opinion that CCJ's intake system during the class period was adequate to meet the medical and mental health needs of detainees entering CCJ. *Id.* ¶ 47; *see* Hart Dep. 4/18/12, at 14:21–20:16. Defendants also rely on Dr. Sander's conclusion that the treatment of detainees during this time comported with the community standard of care. Def. Cook Cty.'s LR 56.1(a)(3) Stmt. ¶¶ 12–44; Sander Aff. at 34 (Gerl), 42, (Lee), 46 (Morris), 64 (Beasley).

In the end, both Plaintiffs and Defendants have presented evidence sufficient to create a genuine issue of material fact as to whether CCJ's screening practices delayed or denied necessary treatment of the serious health needs faced by new detainees at CCJ.

### 2.    Delayed Dispensation of Medication Prescribed at Intake

In addition, Plaintiffs have presented evidence that, even when a PA prescribed medication at intake, detainees experienced substantial delays in receiving it or did not receive it at all. The record includes the following examples that occurred after July 11, 2008.

At intake, a PA prescribed John Hendrix, Lance Woodard, and Terry Tharpe albuterol to treat their asthma, but none of them received an inhaler before they were released from CCJ. Pls.' Reply Ex. 86, Hendrix Decl. ("Hendrix Decl.") ¶¶ 10–11, ECF No. 221-13; Pls.' Reply Ex. 75, Woodard Decl. ("Woodard Decl.") ¶¶ 8–12, ECF No. 221-9; Pls.' Reply Ex. 73, Tharpe Decl.

("Tharpe Decl.") ¶¶ 10–12, 14, ECF No. 221-9; Sander Aff. at 47–48, 50–51, 69. Hendrix was incarcerated for six weeks, Woodard for four days, and Tharp for eight days. Hendrix Decl. ¶¶ 10–11; Woodard Decl. ¶ 8; Tharpe Decl. ¶¶ 10–12, 14; Sander Aff. at 47–48, 50–51, 69.

Veronica Stuckey and LaDon Pilcher received prescriptions for HIV medication at intake. But Stuckey did not receive the medication until twenty-one days later, and Pilcher did not receive it until three days later. Pls.' Reply Ex. 84, Stuckey Decl. ¶¶ 10–11, ECF No. 221-13; Pls.' Reply Ex. 74, Pilcher Decl. ¶¶ 7–8, ECF No. 221-9; Sander Aff. at 49, 64–65.

Jess Mason was prescribed hypertension medication, but there is no record that he received the medication before he was released twenty-three days later. Pls.' Reply Ex. 82, Mason Decl. ¶¶ 16–17, ECF No. 221-12; Sander Aff. at 59.

Rodney Bailey was prescribed seizure medication upon intake, but the medication was not dispensed. He suffered a seizure three days after he arrived at CCJ. Bailey Decl. ¶¶ 11–13; Sander Aff. at 54.

John Holmes was prescribed medication to treat depression at intake on October 25, 2010, but there is no indication that the medication was ever dispensed. *See* Sander Aff. 67.

In addition to these particular examples, Dr. Whitman analyzed the time it took for CCJ to dispense certain medications, once they were prescribed. In particular, he focused on non-psychotropic medications prescribed for asthma (albuterol), diabetes (insulin, glipizide, metformin), HIV infection (atazanavir, atazanavir sulfate, efavirenz, efavirenz-emtricitabine-t, lamivudine, lopinavir-ritonavir, ritonavir, tenofovir, tenofovir disporoxil fuma, zidovudine), and hypertension (amlodipine besylate, enalapril, metoprolol, hydrochlorothiazide). Whitman Report at 1–131. He also studied psychotropic medications necessary to treat anxiety and seizure disorder (clonazepam, lorazepam, and diazepam), bipolar disorder (gabapentin), depression (fluoxetine,

sertraline, venlafaxine) and schizophrenia (chlorpromazine). *Id.* at 132–87; Pls.' LR 56.1(a)(3) Stmt. ¶¶ 52–57, 61–69.[11]

Using this data, Dr. Whitman measured, for each medication, the length of time between the date a detainee with a chronic health need was admitted into CCJ ("intake date") and the date that a prescription was dispensed ("fill date") to treat the detainee's chronic health need. Whitman Report at 8–9. In doing so, Dr. Whitman divided the data into time periods: (1) October 1, 2008, to March 30, 2009 ("08–09"); (2) October 1, 2009, to March 30, 2010 ("09–10"); and (3) October 1, 2010, to March 30, 2011 ("10–11"). *Id.* at 7.

The following charts represent a summary of the results of Dr. Whitman's study. Under each column labeled with the particular time period, "08–09," "09–10," and "10–11," the chart includes the percentage of detainees during that particular time period, who received the denoted prescription medication within one day of being admitted into CCJ. The last column, labeled "# in 10–11 > week," represents the number of detainees during the 2010-11 time period, who had to wait a length of time greater than a week before receiving his or her medication.

---

[11]    Plaintiffs also rely on Dr. Whitman's conclusion that there was a statistically significant improvement in the time it took to dispense medication between the "06–07" period and the "10–11" period. *See, e.g., id.* at 110, 112–13, 119, 122–23, 126–27, 129, 175–77, 177–79, 180–82, 182–83, 184–85, 186–87. Plaintiffs suggest that a reasonable jury could infer from these data that the improvements were not a result of chance, but affirmative remedial actions taken by the Sheriff to address a known problem. Although the logic is less than compelling, it is sufficient to survive summary judgment.

**Non-psychotropic Medications**

| Condition | Medication | 08-09 | 09-10 | 10-11 | # in 10-11 > week |
|---|---|---|---|---|---|
| Asthma | albuterol | 73% | 83% | 93% | 54 detainees |
| Diabetes | insulin | 71% | 71% | 79% | 6 detainees |
| | glipizide | 65% | 78% | 74% | 11 detainees |
| | metformin | 72% | 66% | 76% | 18 detainees |
| High Cholesterol | lovastatin | 61% | 71% | 68% | 26 detainees |
| HIV | HIV meds | 66% | 78% | 74% | 24 detainees |
| Hypertension | amlodipine | 60% | 72% | 61% | 55 detainees |
| | enalapril | 63% | 73% | 74% | 66 detainees |
| | metoprolol | 49% | 61% | 59% | 14 detainees |
| | hydrochlorothiazide | 65% | 76% | 64% | 60 detainees |

**Psychotropic Medications**

| Condition | Medication | 08-09 | 09-10 | 10-11 | # in 10-11 > week |
|---|---|---|---|---|---|
| Seizure Disorder & Anxiety | clonazepam | 65% | 76% | 75% | 35 detainees |
| | lorazepam & diazepam | 63% | 43% | 72% | 22 detainees |
| | phenytoin, phenytoin sodium extended, carbamazepine | 65% | 76% | 75% | 14 detainees |
| Bipolar Disorder | gabapentin | 49% | 49% | 69% | 34 detainees |
| Depression | fluoxetine & sertraline | 19% | 19% | 32% | 130 detainees |
| | venlafaxine | 31% | 23% | 26% | 14 detainees |
| Schizophrenia | Chlorpromazine | 0% | 0% | 10% | 20 detainees |

Dr. Whitman's data indicate that considerable percentages of detainees had to wait more than a day to receive the medication that had been prescribed at intake. And, during the 2010–2011 time period, an appreciable number of detainees had to wait more than a week before they received their medication.

Furthermore, Dr. Whitman analyzed methadone prescribed for the treatment of opiate withdrawal. Whitman Report at 8, 188–91. Methadone dispensing records from March 20, 2009, to May 3, 2010, were matched to a detainee's inmate number to determine the length of time between a detainee's admission date and the date methadone was first dispensed. *Id.* at 8. As summarized in the following chart, Dr. Whitman's study demonstrated that a significant percentage of detainees who were designated into the methadone program had to wait more than

one day to receive the first dosage of methadone, including 25 detainees who had to wait more than a week.

**Methadone Dispensation for Opiate Withdrawal (March 3, 2009 to March 19, 2011)**

| Dispensed: | % of Detainees |
|---|---:|
| On day of admission | 0.13% |
| Within 1 day | 60.20% |
| Within 2 days | 24.31% |
| Within 3 days | 7.47% |
| Within 4 days | 2.83% |
| Within 5 days | 1.55% |
| Within 6 days | 0.81% |
| Within 7 days | 0.88% |

# of detainees in 2010-2011 that waited > week before methadone dispensed: 25

According to Dr. Stewart, a person suffering from drug addiction will experience extremely painful withdrawal symptoms after four days without methadone. Pls.' LR 56.1(a)(3) Stmt. ¶ 74. Effects include nausea, vomiting, muscle aches, increased heart rate, and sometimes an increased respiratory rate. *Id.* ¶ 76. Defendants, however, deny that detainees experiencing opiate withdrawal were left completely untreated for four days and assert that other drugs may have been prescribed to alleviate withdrawal symptoms. *See* Defs.' LR 56.1(b)(3)(B) Stmt. ¶ 74. But this is a factual issue to be left to the jury.

The Sheriff also attacks Dr. Whitman's entire analysis, arguing that the underlying data is flawed, because it only reflects only when the dispensation of a medication was recorded in the system, not when the medication was actually dispensed to the detainee. Defs.' Reply Ex. L.R., Sander Report at 25, ECF No. 245-7; *see also* Blackwell Dep. at 61:17–21. Indeed, according to Dr. Sander, when a PA dispensed medications at intake, there were times when the dispensing information was not entered into CCJ's computer system until several days later due to staffing

issues. Sander Report at 25.[12] But it is unclear from the record exactly which medications a PA could or could not dispense at intake. *See, e.g.,* Def. Cook Cty.'s LR 56.1(a)(3) Stmt. ¶ 60.[13] Furthermore, the Sheriff's argument would not apply to psychotropic drugs, which a PA could not dispense on his or her own. Pls.' LR 56.1(a)(3) Stmt. ¶ 20; Def. Cook Cty.'s LR 56.1(a)(3) Stmt. ¶ 9. In any event, such challenges are more appropriately raised in cross-examination at trial, rather than at the summary judgment stage.

Plaintiffs also rely on Dr. King and Dr. Stewart to corroborate the delay in disbursal of medication prescribed at intake. According to Dr. King, a significant number of detainees, who were admitted to CCJ between October 2006 and November 2010, did not receive non-psychotropic prescription medication in a timely manner. King Report at 5. Dr. King also concluded that, while circumstances had improved by the 2010–2011 time period, the records indicated that many detainees still did not receive medication for serious health needs until a week after intake. *Id.* at 6–7. From this, Dr. King opined that CCJ's failure to provide timely prescription medication for serious medical conditions recklessly placed large numbers of detainees at risk for physical harm, morbidity, and mortality. *Id.* at 6.

Dr. Stewart, in turn, concluded that the intake practices at CCJ pre-October 2010 were likely to harm persons, who had previously been prescribed psychotropic medication. Stewart Report at 2–3. Dr. Stewart continued that, although CCJ's intake screening process may have improved over time, a significant number of detainees still did not receive their prescription

---

[12]     The Sheriff has pressed the identical arguments in support of a motion to bar Dr. Whitman's expert opinion in its entirety, which the Court has denied.

[13]     At a minimum, at intake, a PA could prescribe and dispense albuterol inhalers for asthma, metformin and glipizide for diabetes, and carbamazepine for seizure disorders. Def. Cook Cty.'s LR 56.1(a)(3) Stmt. ¶ 61. But that is the full extent of the record.

medications until they have been at the jail for more than a week and did not receive psychotropic medication to treat depression until the second or third day after admission. *Id.* at 15–16.

And Plaintiffs again rely on the DOJ Report that found that CCJ frequently failed to "provide critical medications to inmates without delay or lapses." DOJ Report at 51. In fact, the DOJ concluded that there were "delays ranging from days to weeks for inmates having their psychotropic medications started after their admission to CCJ." *Id.* at 64. The DOJ also determined that these "significant delays, errors, and lapses in medication administration . . . contributed to needless suffering and inmate hospitalizations." *Id.* at 51.

In response, Defendants rely upon the opinions offered by Dr. Sander and Dr. Hart. Both expressed the opinion that the treatment of the detainees met the community standards of care, and that CCJ's intake systems, policies, and procedures were adequate to meet the medical and mental health needs of the detainees throughout the class period. Def. Cook Cty.'s LR 56.1(a)(3) Stmt. ¶¶ 12–44, 47; Hart Dep. of 4/18/12 at 14:21–20:16.

Such contradictory evidence create a genuine issue as to whether CCJ's intake practices significantly delayed the dispensation of medications that were prescribed to detainees during intake.

### 3. Methadone Tapering Policy

To support their claim that CCJ's methadone tapering policy was grossly deficient after July 11, 2008, Plaintiffs refer to the experience of Driscoll, who was admitted to CCJ on January 26, 2009, and placed in CCJ's twenty-one-day methadone tapering program. *See* Driscoll Dep. at 115, 124. Driscoll received his first dose of methadone within twenty-four hours of admission, and lower dosages until the dosage was eventually decreased to zero. Sander Aff. at 13. According to Driscoll, as a result, he experienced aching in his legs, sweating, chills, vomiting, and hallucinations. *Id.* at 142.

In addition to Dr. Whitman's statistical analysis, Plaintiffs rely on the opinions of Dr. King and Dr. Stewart, both of whom determined that CCJ's methadone tapering policy caused gratuitous pain to enrolled detainees. King Report at 7; Stewart Report at 2, 29–30. However, Defendant's expert, Dr. Sander, determined that Driscoll's treatment met the community standards of care. Sander Aff. at 13. This competing evidence again creates a genuine issue of fact for trial regarding the constitutionality of CCJ's methadone tapering policy.

### D. Whether the Delay in Treatment Caused Harm

"A delay in treatment may constitute deliberate indifference if it exacerbates an injury or prolongs the detainee's pain, depending on the 'seriousness of the condition and the ease of providing treatment.'" *Carpenter*, 695 F. App'x at 150–51 (quoting *Perez*, 792 F.3d at 778); *see Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1039–40 (7th Cir. 2012). "In cases where prison officials delayed rather than denied medical assistance to an inmate, courts have required the plaintiff to offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007); *see Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996). "That is, a plaintiff must offer medical evidence that tends to confirm or corroborate a claim that the delay was detrimental." *Williams*, 491 F.3d at 715.

"Clearly, expert testimony that the plaintiff suffered because of a delay in treatment would satisfy the requirement." *Id.* But expert testimony is not required. *See Gil*, 381 F.3d at 662 (holding that a detainee's stating he felt pain from an infection after the denial of a single dose of prescribed antibiotic, and felt better after it was administered, was sufficient to withstand summary judgment on the issue of causation); *see also Roe v. Elyea*, 631 F.3d 843, 865 (7th Cir. 2011) (affirming a jury verdict where a plaintiff lacked expert testimony as to causation); *Williams*, 491 F.3d at 715–16 (affirming the denial of judgment as a matter of law where "a reasonable jury could

have concluded from the medical records that the delay unnecessarily prolonged and exacerbated [the plaintiff's] pain and unnecessarily prolonged his high blood pressure"); *Egebergh v. Nicholson*, 272 F.3d 925, 928, 2001 WL 1491831 (7th Cir. 2001) (affirming denial of summary judgment on qualified immunity because a jury could infer that depriving an arrestee of one insulin shot exposed him to substantial danger).[14]

Furthermore, "[p]roximate cause is a question to be decided by a jury, and only in the rare instance that a plaintiff can proffer no evidence that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation." *Gayton*, 593 F.3d at 624–25; *see Ortiz v. City of Chi.*, 656 F.3d 523, 534–35 (7th Cir. 2011). "[I]f the plaintiff offers evidence that allows the jury to infer that a delay in treatment harmed an inmate, there is enough causation evidence to reach trial." *Gayton*, 593 F.3d at 624–25.

Cook County contends that Plaintiffs have failed to create a genuine issue regarding whether any delay resulting from CCJ's intake practices proximately caused harm to any particular detainee. Detainees, however, have either testified or declared under the penalty of perjury that the delay in receiving their prescribed medications did harm them. Pls.' Reply Exs. 41–86, Detainees' Deps. and Decls. For example, asthma sufferers describe the pain and discomfort of not being able to breathe without albuterol. Hendrix Decl. ¶¶ 7, 15; Woodard Decl. ¶¶ 7, 12 (required emergency treatment at CCJ due to lack of an inhaler). HIV sufferers indicate that they contracted mouth infections because they did not receive their HIV medications. Sander Aff. at 66 (stating that Stuckey was seen on sick call for mouth lesions six days after intake); Pilcher Decl.

---

[14]     Furthermore, "[d]amages are not an element of liability in a deliberate indifference claim." *Cotts v. Osafo*, 692 F.3d 564, 569 (7th Cir. 2012) (citing *Calhoun v. DeTella*, 319 F.3d 936, 941 (7th Cir. 2003) (approving an award of nominal damages for Eighth Amendment violations), and *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 265 (7th Cir. 1996) (holding that it is not harmless error to require a plaintiff to prove "actual injury" when it is not an element of the claim)).

¶ 14.    A detainee with hypertension describes experiencing elevated blood pressure without his medication.  *See, e.g.*, Mason Decl. ¶¶ 12, 20.  At least one detainee with a seizure disorder suffered a seizure and was brought to the emergency room three days after admission.  Bailey Decl. ¶¶ 11–13.  Those with bipolar disorder attest to being unable to sleep and feeling uncontrolled mood swings, dizziness, jitteriness, and panic attacks.  *See* Beasley Decl. ¶ 6; Lee Decl. ¶¶ 8, 16; Pls.' Reply Ex. 52, Cleaves Dep. at 106, ECF No. 221-1.  Those with depression felt suicidal, tired, and disoriented, and required psychiatric hospitalization shortly after being released from CCJ.  *See* Lee Decl. ¶¶ 16–17 (checked into psychiatric ward at hospital a week after release); Holmes Decl. ¶¶ 21, 24b (police found him lost and in park and hospitalized him for psychiatric issues within a week after release from CCJ).  One detainee with schizophrenia recounts how, until he received his medication, he became an insomniac and felt anxious, scared, jittery, and extremely paranoid to the point of fearing for his life.  Pls.' Reply Ex. 79, Mikel Decl. ¶¶ 14–15, ECF No. 221-11.  Methadone users describe experiencing hallucinations, vomiting, and pain when they did not receive methadone or received a tapered dose under the methadone policy.  Gerl Dep. at 110; Morris Decl. ¶ 18; Driscoll Dep. at 142.

Plaintiffs' experts corroborate these testimonials.  According to Dr. King, interruption in taking any of the non-psychotropic medications analyzed by Dr. Whitman, even for a few days, can pose a serious health risk for some patients.  Pls.' LR 56.1(a)(3) Stmt. ¶ 60.[15]  These include acute exacerbation of asthma, acute coronary syndrome, myocardial infarction, life-threatening infections, epileptic and withdrawal seizures with associated injuries, uncontrolled diabetes, diabetic ketoacidosis, hypertension, and stroke.  King Report at 5–6.  Dr. Holland confirmed the

---

[15]    Defendants challenge the proposition that an interruption of these medications for a few days poses a serious health risk.  However, Defendants' denial of this fact statement is unsupported by their citation to the record.  Defs.' LR 56.1(b)(3)(B) Stmt. ¶ 60 (citing a portion of Dr. Howard's deposition that was not included in Defendants' exhibits in response to Plaintiffs' motion for partial summary judgment).

types of adverse symptoms the detainees experienced when their psychotropic medications were discontinued. *See* Pls.' LR 56.1(a)(3) Stmt. ¶¶ 52–57; Pls.' Ex. 35, Holland Report, at 5–12, ECF No. 174-11. From this, a jury could reasonably conclude that CCJ's intake policies caused Plaintiffs harm.

## Conclusion

For the reasons set forth herein, Plaintiffs' motion for summary judgment is denied, and Cook County's and the Sheriff's cross-motions are granted in part and denied in part.

Cook County's motion is granted with regard to its direct liability, but is denied to the extent that Cook County is an indispensable party that must fund any judgment against the Sheriff. The Sheriff's motion is granted as to (1) claims asserting constitutional violations occurring prior to July 11, 2008; and (2) claims based on medical conditions other than asthma, diabetes, high cholesterol, HIV infection, hypertension, opiate withdrawal, seizure disorder, anxiety disorder, bipolar disorder, depression, and schizophrenia. In all other respects, the Sheriff's motion is denied.

To the extent that any named Plaintiff may base a surviving claim on alleged constitutional violations occurring on or after July 11, 2008, and to the extent that Plaintiffs wish to substitute class representatives, Plaintiffs shall file a motion for leave to file a third amended complaint within 28 days.

**SO ORDERED**                    **ENTER:  5/30/19**

_____

**JOHN Z. LEE**
**United States District Judge**